Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| ROBERT F. KENNEDY, JR., | Case No. 5:23-cv-03880-NC |
|---|---|
| Plaintiff, | [Assigned to the Hon. Nathanael Cousins] |
| vs. | |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | **DECLARATION OF SCOTT J. STREET** |
| Defendants. | |

///

///

///

///

///

///

1

## <u>DECLARATION OF SCOTT J. STREET</u>

I, Scott J. Street, declare as follows:

1.      I am an attorney duly licensed to practice before all courts in the state of California and before this Court. I am a partner with the law firm JW Howard/Attorneys, Ltd., counsel of record to Plaintiff Robert F. Kennedy, Jr., in this matter. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so.

2.      I am submitting this declaration in support of Mr. Kennedy's application for an order temporarily restraining Defendants Google LLC and YouTube, LLC, from enforcing their "medical misinformation" policies to remove videos of Mr. Kennedy's speech on matters of public concern from YouTube during the 2024 presidential campaign. Mr. Kennedy also applies to the Court for an order to show cause regarding the issuance of a preliminary injunction for the same relief pending a trial on the merits.

3.      Mr. Kennedy is seeking the Democratic Party's nomination for president, having declared his candidacy on April 19, 2023. Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. He accepted an invitation to speak about that and other issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March.

4.      Mr. Kennedy's NHIOP speech, which I attended, was viewed as a political speech and was attended by several prominent New Hampshire Democrats including the chairman of New Hampshire's Democratic Party. It lasted nearly two hours and centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, an issue he has fought about for years and which, in recent years, caused him to question the increasing numbers of vaccines American children must take.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

5.      Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. Google removed it. The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." A true and correct copy of a news article that reported on the matter on March 6, 2023, is attached as **Exhibit "A."**

6.      Mr. Kennedy complained about the action, particularly since his comments about vaccine safety only consumed a portion of the NHIOP speech (in other parts he spoke about his environmentalism and legal work fighting corporate polluters, among other things). Google refused to change its position. It said it "removed the [Kennedy speech] for violating our policies on COVID-19 vaccine misinformation …. While we do allow content with educational, documentary, scientific or artistic context, such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context." A true and correct copy of a news report from March 8, 2023, about this matter and which contains Google's statement is attached as **Exhibit "B."**

7.      A true and correct copy of YouTube's "Vaccine misinformation policy" is attached as **Exhibit "C."**

8.      A true and correct copy of YouTube's "COVID-19 medical misinformation policy" is attached as **Exhibit "D."**

9.      For ease of reference, I refer to the policies reflected in Exhibits C and D as the "medical misinformation policies."

10.      During the past few election cycles, YouTube has played an especially important role in the political process. Attached to this declaration as **Exhibit "E"** is a true and correct copy of an article written by YouTube's director of advertiser marketing, Kate Stanford, in March 2016 titled "How Political Ads and Video Content Influence Voter Opinion" which discussed that development.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

DECLARATION OF SCOTT J. STREET                                    CASE NO. 5:23-cv-03880-NC

11.     Mr. Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign. It has refused. That led to the filing of this case.

12.     A similar censorship case was filed in Louisiana by two state attorneys general, *Missouri et al. v. Biden et al.*, No. 3:22-cv-01213-TAD-KDM (the "State AG Censorship Case"). On July 4, Judge Terry Doughty issued a lengthy decision that enjoins federal government officials from coercing technology companies to censor the government's critics. The injunction does not bind the technology companies themselves, though, and thus does not prohibit Google from continuing to censor Mr. Kennedy based on the misinformation policies.

13.     The government appealed the decision in the State AG Censorship Case to the Fifth Circuit Court of Appeals. It will hear oral argument in the case this week.

14.     I have reviewed much of the evidence that was produced during the State AG Censorship Case, including documents that were produced and deposition testimony that was taken in that case. The evidence sheds light on the partnership that Google and Executive Branch officials developed to remove speech from people like Mr. Kennedy who disagree with Executive Branch officials about COVID-19, vaccines, and other matters of public concern.

15.     Attached to this declaration as **Exhibit "F"** is a true and correct copy of an email sent by White House official Rob Flaherty to Google executives, among other people, on April 22, 2021, which was produced in the State AG Censorship Case.

16.     Attached to this declaration as **Exhibit "G"** is a true and correct copy of sworn discovery responses provided by the Executive Branch officials in the State AG Censorship Case, which were signed by Max Lesko, Chief of Staff in the Office of the Surgeon General ("OSG") on December 16, 2022.

17.     Attached to this declaration as **Exhibit "H"** is a true and correct copy of

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

DECLARATION OF SCOTT J. STREET                          CASE NO. 5:23-cv-03880-NC

excerpts from the deposition of Eric Waldo, an OSG official, which was taken in the State AG Censorship Case.

18. Attached to this declaration as **Exhibit "I"** is a true and correct copy of the document that was marked as Exhibit 8 to Waldo's deposition transcript.

20. Attached to this declaration as **Exhibit "J"** is a true and correct copy of the document that was marked as Exhibit 31 to Waldo's deposition transcript.

22. Attached to this declaration as **Exhibit "K"** is a true and correct copy of the document that was marked as Exhibit 47 to Waldo's deposition transcript.

23. Attached to this declaration as **Exhibit "L"** is a true and correct copy of excerpts from the deposition of Carol Crawford, an official from the Centers for Disease Control, which was taken in the State AG Censorship Case.

24. Attached to this declaration as **Exhibit "M"** is a true and correct copy of the document that was marked as Exhibit 40 to Crawford's deposition transcript.

25. Attached to this declaration as **Exhibit "N"** is a true and correct copy of the document that was marked as Exhibit 43 to Crawford's deposition transcript.

26. Attached to this declaration as **Exhibit "O"** is a true and correct copy of excerpts from the deposition of Elvis Chan, an agent of Federal Bureau of Investigation, which was taken in the State AG Censorship Case.

27. Attached to this declaration as **Exhibit "P"** is a true and correct copy of an email exchange between Mr. Flaherty, the White House official, and Twitter executives about Mr. Kennedy that occurred between January 22 and 23, 2021.

28. To my knowledge, neither Google nor YouTube were subpoenaed in the State AG Censorship Case. None of their executives were deposed. No White House officials were deposed in the State AG Censorship Case either.

29. Although we have already obtained evidence that, in my opinion, is sufficient to satisfy the state action doctrine with respect to Google's enforcement of the medical misinformation policies, if given the chance we would seek additional

DECLARATION OF SCOTT J. STREET                                    CASE NO. 5:23-cv-03880-NC

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

discovery in this case and in connection with Mr. Kennedy's request for issuance of a preliminary injunction. The discovery would be targeted to Google and would include: (a) Communications between Google/YouTube executives and Executive Branch officials (especially White House, Surgeon General and CDC officials) about the new COVID-19 misinformation policies adopted by Google during the summer of 2021; (b) Communications between Google/YouTube executives and Executive Branch officials about alleged misinformation spread by Mr. Kennedy; (c) Communications between Google/ YouTube executives and Executive Branch officials about removing any videos of Mr. Kennedy from YouTube; and (d) Communications between Google/YouTube executives and Executive Branch officials about Mr. Kennedy's speech at the NHIOP and his interview with Jordan Peterson.

30.     We would also seek discovery about the creation of YouTube's original COVID-19 misinformation policy, which was first posted in May 2020. And we would seek information about the partnership between Google and the White House about suppressing speech about the COVID-19 vaccines specifically, including documents regarding an April 21, 2021, meeting between Google executives and White House officials that was described in Judge Doughty's decision in the State AG Censorship Case. I could not obtain a copy of those emails because they were filed under seal.

31.     I believe this discovery could be completed within the next month.

32.     Mr. Kennedy's presidential campaign has been gaining momentum, having raised millions of dollars, and generated impressive poll numbers, despite his being ignored by much of the mainstream media and disavowed by the Democratic National Committee and most Democratic members of Congress (who tried to censor his testimony at a Congressional hearing on censorship). The campaign is expected to heat up after Labor Day. That is why Mr. Kennedy is seeking preliminary injunctive relief now.

33.     Defendants' agent will be served with the summons and complaint this week. My office separately served the registered agent with the complaint last week. The case has also received significant attention in the press. Thus, I believe that Defendants are prepared to litigate the case and can do so on an expedited basis. Although Defendants have not yet appeared in the case, my office will personally serve Defendants' registered agent with copies of the application for a temporary restraining order and all supporting papers this week.

34.     I understand that the Court usually hears law and motion matters on Wednesdays. I will be traveling during the week of August 28. I will also be attending an oral argument in the Ninth Circuit Court of Appeals on September 14. I could appear for argument on Mr. Kennedy's application for preliminary relief on August 23, September 6, or September 13, or any other Wednesday during September.

Under penalty of perjury, under the laws of the United States of America, I declare that the foregoing is true and correct. Executed this 9th day of August 2023, at Pasadena, California.

Scott J. Street

DECLARATION OF SCOTT J. STREET                                    CASE NO. 5:23-cv-03880-NC

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# EXHIBIT A





NEWS

Politics
(https://nhjournal.com/category/politics/)

## RFK, Jr's NHIOP Speech Banned From YouTube

Posted to Politics (https://nhjournal.com/category/politics/) March 06, 2023 by Michael Graham (https://nhjournal.com/author/michaelgraham/)

Jason Cote has a simple mission at Manchester Public TV. "Proudly bringing MANCHESTER to your television: open government, free expression, education, arts, activities," as it says on the station's website (https://www.manchestertv.org/).

For Cote, the station's executive director, achieving that goal often involves broadcasting political speeches from the New Hampshire Institute of Politics. For example, MPTS shared New Hampshire Journal's GOP candidate debates with viewers last year.

But when the station tried to post its video of Robert F. Kennedy, Jr's NHIOP speech on its YouTube channel, something happened Cote had never experienced before.

"YouTube will not allow us to post the video because of controversial vaccination content," Cote told NHJournal.

"MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before.

"First time for everything, I guess," he added.

According to a message from YouTube sent to Cote, the media platform declared RFK, Jr's speech "medical misinformation" and would not allow it to be posted.

"YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization," the YouTube message read.

A spokesperson for YouTube responded to NHJournal's requests with assurances a statement would be forthcoming, but it failed to respond by late Monday night.

NHIOP Executive Director Neil Levesque was puzzled by YouTube's decision.

"This was a political and public policy speech that YouTube has censored."

RFK, Jr. is well known for advocating views often labeled "conspiracy theories," including his suggestion that childhood diseases like autism are linked to vaccines. He also spread the debunked conspiracy (https://clevelandmagazine.com/in-the-cle/politics/articles/robert-f-kennedy-jr-nut-job) that the 2004 presidential election was stolen from John Kerry.

His views on vaccines have gotten him banned from social media in the past. In 2021, he was blocked from Instagram





However unorthodox his views, RFK, Jr. was still welcomed by some of the biggest names in the New Hampshire Democratic Party, including state party chair Ray Buckley and Senate Minority Leader Donna Soucy (D-Manchester). If they could sit and hear what the possible 2024 presidential candidate had to say, why not voters across the state, Cote asked.

"We only try to help the Manchester citizens be the most educated about all views and opinions that we can."

More from New Hampshire Journal

**EXHIBIT B**



                                              ⊠ Sign up

# Bedford, NH                                              ✉ Subscribe

News Feed          Neighbor Posts          Local Businesses          Events

Politics & Government

# RFK Jr. Suing Over YouTube Ban Of NH IOP Speech

Kennedy spoke of his environmental causes and belief that the expanded regime of childhood vaccines was contributing to autism.

**New Hampshire Journal,** News Partner

Posted Wed, Mar 8, 2023 at 8:41 pm ET

💬 Reply

ADVERTISEMENT





An attorney for Robert F. Kennedy Jr. tells NHJournal the potential 2024 presidential candidate plans to sue YouTube over its decision to ban his recent speech at the prestigious New Hampshire Institute of Politics (NHIOP) from its video platform. (NH Journal)

## By Michael Graham, NH Journal

ADVERTISEMENT

ADVERTISEMENT

An attorney for Robert F. Kennedy Jr. tells NHJournal the potential 2024 presidential candidate plans to sue YouTube over its [decision to ban his recent speech](#) at the prestigious New Hampshire Institute of Politics (NHIOP) from its video platform.

"We will be filing suit," said John Howard, a legal adviser to Kennedy.

---

**Find out what's happening in Bedfordwith free, real-time updates from Patch.**

| Your email address | Subscribe |
|---|---|

---

Kennedy spoke at the NHIOP last Friday, recounting his efforts on behalf of environmental causes and his suspicions regarding the expanded regime of childhood vaccines he suggests are linked to increased cases of autism in children.

The Institute, based on the campus of St. Anselm College, is a must-stop destination for politicians considering a run for the White House. Asked by NHJournal if he had any plans to challenge President Joe Biden in the Democratic primary, Kennedy said ["I'm thinking about it."](#)

ADVERTISEMENT

ADVERTISEMENT

Manchester Public Television often broadcasts political speeches from the
NHIOP venue to its viewers, as well as posts them on the station's YouTube
channel. The possibility of a Kennedy challenge to President Joe Biden is
particularly newsworthy given the DNC's decision to strip New Hampshire of its
First in the Nation primary status.

But when MPTS executive director Jason Cote attempted to post RFK's remarks,
he received a message that the content was being blocked.

ADVERTISEMENT

"YouTube will not allow us to post the video because of controversial
vaccination content," Cote told NHJournal. "MPTS has recorded more than 100
wonderful NHIOP events, and I cannot recall this happening before.

"First time for everything, I guess," he added.

On Wednesday, a spokesperson for YouTube confirmed to NHJournal the speech
was banned from the platform.

"We removed the content for violating our policies on COVID-19 vaccine
misinformation. Our policies are enforced for everyone, regardless of the
speaker's political views," the spokesperson said in a statement. "While we do
allow content with educational, documentary, scientific or artistic context,

ADVERTISEMENT

such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context."

Kennedy's attorney said they are taking the matter to court.

"Justice Anthony Kennedy said the right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought," said Howard. "We should keep those principles in mind. YouTube may not be the government, but its actions have all the signs of government censorship. The people of New Hampshire—all Americans, really —deserve to hear from people who seek their vote."

Alphabet, the parent company of YouTube and Google, is already under scrutiny from Congress over its uneven — some say politically biased — application of content restrictions on its platforms. Alphabet CEO Sundar Pichai has been subpoenaed by the House Judiciary Committee to answer accusations regarding "the federal government's reported collusion with Big Tech to suppress free speech."

ADVERTISEMENT

While Kennedy is viewed as a longshot presidential candidate, he garnered praise from Granite State Democrats for intervening on behalf of the state's FITN primary. On the eve of the Democratic National Committee's vote to strip New Hampshire of its place at the front of the 2024 line, Kennedy published an open letter to the DNC urging it "not to interfere in New Hampshire's plan to hold the nation's first primary.

"My Uncle Jack spoke to voters in Dover on the eve of the 1960 New Hampshire primary. He said that 'We Democrats realize that the days when presidential candidates can be nominated in smoke-filled rooms, by political leaders and party bosses, have forever passed from the scene.' He said 'that no man has

ADVERTISEMENT

8/7/23, 12:20 PM

Case 5:23-cv-03880-NC Jr. suing over YouTube ban - NH IOP speech | Bedford, NH Patch Document 7b-1 Filed 08/09/23 Page 17 of 139

won a national election who was unwilling to test his candidacy with the people.'

"I echo those thoughts," Kennedy wrote.

Some of New Hampshire's top Democrats turned out for his NHIOP speech, including state party chairman Ray Buckley and state Senate minority leader Donna Soucy (D-Manchester).

Best-selling author Marianne Williamson has announced her candidacy in the 2024 Democratic presidential primary. She is scheduled to make campaign appearances across the Granite State between March 8 –13.

ADVERTISEMENT

Polls consistently show a majority of Granite State Democrats would prefer to back someone other than Biden as their party's nominee. And while no prominent local Democrats have endorsed Kennedy or Williamson, some have expressed dissatisfaction with Biden.

Asked if he wants Biden to run again, former N.H. Speaker of the House Steve Shurtleff (D-Penacook) told the AP, "In my heart of hearts, no. I think a lot of people just don't want to say it."

---

*This story was originally published by the NH Journal, an online news publication dedicated to providing fair, unbiased reporting on, and analysis of, political news of interest to New Hampshire. For more stories from the NH Journal, visit NHJournal.com.*

♡ Thank    💬 Reply    ↝ Share                                    ⚑

---

### More from Bedford

ADVERTISEMENT

Community Corner | 3h

🍹 **Fecal Bacteria Alert: NH Beaches + Hike The New Hollow Fairy Trail**

Arts & Entertainment | 1d

**Events: Bedford Garden Club's Mum Sale; Corn Hole; Zero Waste Store**

Community Corner | 14h

🍹 **Kayla Stoll 18 Under 18 Award + Senator Ricciardi Budget Wins**

ADVERTISEMENT

## Latest News Nearby

1. 📍 Concord, NH News
   **Fatal Car Crash; Teen Dies In Boating Accident; More: PM Patch NH**

2. 📍 Bedford, NH News
   🍹 **Fecal Bacteria Alert: NH Beaches + Hike The New Hollow Fairy Trail**

3. 📍 Across America, US News
   **Help Patch Recognize Outstanding Community Leaders Across The Country**

4. 📍 Concord, NH News
   **New York Teen Dies In Crescent Lake Boating Crash: NH State Police**

ADVERTISEMENT

Find out what's happening in your
community on the Patch app

**Corporate Info**

About Patch

Careers

**Partnerships**

Advertise on Patch

**Support**

FAQs

Contact Patch

Community Guidelines

Posting Instructions

    

Terms of Use    Privacy Policy

© 2023 Patch Media. All Rights Reserved.

Do Not Sell My Personal Information

ADVERTISEMENT

**EXHIBIT C**

# Vaccine misinformation policy



YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO). This is limited to content that contradicts local health authorities' or the WHO's guidance on vaccine safety, efficacy, and ingredients.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes harmful misinformation about currently approved and administered vaccines on any of the following:

- **Vaccine safety:** content alleging that vaccines cause chronic side effects, outside of rare side effects that are recognized by health authorities

- **Efficacy of vaccines:** content claiming that vaccines do not reduce transmission or contraction of disease

- **Ingredients in vaccines:** content misrepresenting the substances contained in vaccines

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to [external links](#) in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Claims that vaccines cause chronic side effects such as:
  - Cancer
  - Diabetes
  - Other chronic side effects
- Claims that vaccines do not reduce risk of contracting illness
- Claims that vaccines contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal byproducts
- Claims that vaccines contain substances or devices meant to track or identify those who've received them
- Claims that vaccines alter a person's genetic makeup
- Claims that the MMR vaccine causes autism
- Claims that vaccines are part of a depopulation agenda

- Claims that the flu vaccine causes chronic side effects such as infertility
- Claims that the HPV vaccine causes chronic side effects such as paralysis

## Educational, scientific, artistic, or testimonial content

YouTube may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

YouTube also believes people should be able to share their own experiences, including personal experiences with vaccinations. This means we may make exceptions for content in which creators describe firsthand experiences from themselves or their family. At the same time, we recognize there is a difference between sharing personal experiences and promoting misinformation about vaccines. To address this balance, we will still remove content or channels if they include other policy violations or demonstrate a pattern of promoting vaccine misinformation.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

## Additional resources

More information on vaccines, including their safety and efficacy, can be found below.

**Health Authority Vaccine Information:**

- Centers for Disease Control and Prevention (CDC)    (US)
- European Vaccination Information Portal    (EU)
- National Health Service    (UK)
- World Health Organization vaccine safety    (Global)
- World Health Organization vaccine preventable diseases    (Global)

**Additional Vaccine Information:**

- American Academy of Pediatrics    (US)
- GAVI, the Vaccine Alliance    (Global)
- UNICEF    (Global)

Need more help?
Try these next steps:

**Post to the help community**
Get answers from community members

**EXHIBIT D**

# COVID-19 medical misinformation policy

The safety of our creators, viewers, and partners is our highest priority. We look to each of you to help us protect this unique and vibrant community. It's important you understand our Community Guidelines, and the role they play in our shared responsibility to keep YouTube safe. **Take the time to carefully read the policy below**. You can also check out this page for a full list of our guidelines.

YouTube doesn't allow content about COVID-19 that poses a serious risk of egregious harm.

YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19. This is limited to content that contradicts WHO or local health authorities' guidance on:

- Treatment
- Prevention
- Diagnosis
- Transmission
- The existence of COVID-19

**Note**: YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus. There may be a delay between new LHA/WHO guidance and policy updates given the frequency with which this guidance changes, and our policies may not cover all LHA/WHO guidance related to COVID-19.

Our COVID-19 policies were first published on May 20, 2020.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes any of the following:

**Treatment misinformation**:

- Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment such as consulting a doctor or going to the hospital
- Content that claims that there's a guaranteed cure for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19
- Claims that Hydroxychloroquine is an effective treatment for COVID-19
- Categorical claims that Ivermectin is an effective treatment for COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Other content that discourages people from consulting a medical professional or seeking medical advice

**Prevention misinformation**: Content that promotes prevention methods that contradict local health authorities or WHO.

- Claims that there is a guaranteed prevention method for COVID-19
  - Claims that any medication or vaccination is a guaranteed prevention method for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the prevention of COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO

- Claims that an approved COVID-19 vaccine will cause death, infertility, miscarriage, autism, or contraction of other infectious diseases
- Claims that an approved COVID-19 vaccine will contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal products
- Claims that an approved COVID-19 vaccine will contain substances or devices meant to track or identify those who've received it
- Claims that COVID-19 vaccines will make people who receive them magnetic
- Claims that an approved COVID-19 vaccine will alter a person's genetic makeup
- Claims that COVID-19 vaccines do not reduce risk of serious illness or death
- Claims that any vaccine causes contraction of COVID-19
- Claims that a specific population will be required (by any entity except for a government) to take part in vaccine trials or receive the vaccine first
- Content that promotes the use of unapproved or homemade COVID-19 vaccines
- Instructions to counterfeit vaccine certificates, or offers of sale for such documents

**Diagnostic misinformation**: Content that promotes diagnostic information that contradicts local health authorities or WHO.

- Claims that approved COVID-19 tests are dangerous or cause negative physical health effects
- Claims that approved COVID-19 tests cannot diagnose COVID-19

**Transmission misinformation**: Content that promotes transmission information that contradicts local health authorities or WHO.

- Content that claims that COVID-19 is not caused by a viral infection
- Content that claims COVID-19 is not contagious
- Content that claims that COVID-19 cannot spread in certain climates or geographies
- Content that claims that any group or individual has immunity to the virus or cannot transmit the virus

**Content that denies the existence of COVID-19:**

- Denial that COVID-19 exists
- Claims that people have not died or gotten sick from COVID-19
- Claims that the death rate of COVID-19 is equal to or less than that of the common cold or seasonal flu
- Claims that COVID-19 is equal to or less transmissible than the common cold or seasonal flu
- Claims that the symptoms of COVID-19 are never severe

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Denial that COVID-19 exists
- Claims that people have not died from COVID-19
- Claims that any vaccine is a guaranteed prevention method for COVID-19
- Claims that a specific treatment or medicine is a guaranteed cure for COVID-19
- Claims that hydroxychloroquine saves people from COVID-19
- Promotion of MMS (Miracle Mineral Solution) for the treatment of COVID-19

- Claims that certain people have immunity to COVID-19 due to their race or nationality
- Encouraging taking home remedies instead of getting medical treatment when sick
- Discouraging people from consulting a medical professional if they're sick
- Content that claims that holding your breath can be used as a diagnostic test for COVID-19
- Videos alleging that if you avoid Asian food, you won't get the coronavirus
- Videos alleging that setting off fireworks can clean the air of the virus and will prevent the spread of the virus
- Claims that COVID-19 is caused by radiation from 5G networks
- Videos alleging that the COVID-19 test is the cause of the virus
- Claims that countries with hot climates will not experience the spread of the virus
- Claims that COVID-19 vaccines kill people who receive them
- Claims that COVID-19 vaccines are a means of population reduction
- Videos claiming that COVID-19 vaccines contain fetal tissue
- Claims that the flu vaccine causes contraction of COVID-19
- Claims that the flu is more contagious than COVID-19
- Claims that COVID-19 vaccines cause contraction of other infectious diseases or makes people more vulnerable to contraction of other infectious diseases
- Claims that COVID-19 vaccines contain a microchip or tracking device
- Claims that achieving herd immunity through natural infection is safer than vaccinating the population
- Claims that COVID-19 never causes serious symptoms or hospitalization
- Claims that the death rate from the seasonal flu is higher than the death rate of COVID-19
- Claims that people are immune to the virus based on their race
- Claims that children cannot or do not contract COVID-19
- Claims that there have not been cases or deaths in countries where cases or deaths have been confirmed by local health authorities or the WHO

## Educational, documentary, scientific or artistic content

We may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

6/20/23, 11:01 AM
Case 5:23-cv-03880-NC   Document 7-1   Filed 08/09/23   Page 28 of 139
COVID medical misinformation policy - YouTube Help

## Need more help?

Try these next steps:

**Post to the help community**
Get answers from community members

**EXHIBIT E**



# How Political Ads and Video Content Influence Voter Opinion

**Written by**
Kate Stanford

**Published**
March 2016

**Topics**
Video, Government & Education, Advertising

There are so many major moments that lead up to Election Day: debates, caucuses, primaries. But the moments that matter most won't make major headlines. They'll happen quietly and quickly in micro-moments, when undecided voters become decided voters, often by going online.



V oter decisions used to be made in living rooms, in front of
televisions. Today, they're increasingly made in micro-moments,
on mobile devices. Election micro-moments happen when voters
turn to a device to learn about a candidate, event, or issue.

Today's voters want a quick way to catch up on the latest elections buzz
and they've found it in online video. Since April 2015, people have watched
more than 110 million hours of candidate- and issues-related content
on YouTube. That's 100X the amount of time it would take to watch all
content ever aired on CNN, C-Span, MSNBC, and Fox News combined.[1]
Whether voters are looking for a debate sound bite, instructions on how to
vote, or Stephen Colbert's latest burn, they turn to YouTube.

## Since April 2015, people have watched more than 110 million hours of candidate- and issues-related content on YouTube. That's 100X the amount of time it would take to watch all content ever aired on CNN, C-Span, MSNBC, and Fox News combined.

In fact, searches for election-related content on YouTube have grown
by nearly 4X since presidential candidates started making their
announcements last April.[2] And voters of all ages—not just young
people—turn to YouTube in their I-want-to-know moments. While 59% of
people who turn to online video to learn more about the candidates are
under the age of 35, one in four are over the age of 45.[3]

So, how can candidates win these micro-moments to win in November?
As the season heats up, here are three ways all candidates—whether
they're running for a local seat, Congress, or the presidency—can meet
voters in their micro-moments:

## 1. Be there: What online video trends reveal about voter micro-moments

Being there for voters in critical micro-moments means knowing what they're looking for. To get a map of voter wants and needs when it comes to video, we use Google Trends and filter by YouTube.

Here's a look at the trending topics since the presidential candidates launched their campaigns in April 2015 and how much search volume has grown on those topics.

Source: Google data, U.S., YouTube search interest in top issues, April 2015–February 2016.

### Top Video Search Trends for Political Issues

| Political Issue | Increase in searches since April 2015 |
| --- | --- |
| Refugees | +224% |
| Immigration | +51% |
| Gun Control | +27% |
| Economy | +22% |
| Health Care | +10% |

As you look at what voters want, ask yourself: Do I have the video content to answer their queries? Are my videos showing up for voters experiencing micro-moments on YouTube?

In Nevada, Hillary Clinton's campaign answered "yes" to both of those questions. First, her campaign created a moving video ad about the second issue on the list above: immigration. Then, the campaign used standard targeting features to try to reach voters who might be interested in the issue:



Thanks to the TrueView "skip" button, campaigns can get immediate feedback: Did viewers skip the ad, or choose to watch it? Based on that feedback, campaigns are able to adjust TrueView ads midflight. As The Wall Street Journal noted recently from the perspective of the Ted Cruz campaign, TrueView ads "offer the closest parallel to the power to persuade voters offered by classic TV ads, but allow for much better targeting."

## 2. Be useful and quick: How candidates' video content helps when micro-moments happen

Timing is everything when it comes to micro-moments. Voters don't just want the right content—they want it right now. While micro-moments can happen at any time, we see spikes in interest around key decision-making moments. Take the Iowa caucuses, for example, when voters went to YouTube to get informed: Watch Time Trends for Videos Related to the Iowa Caucuses



Watch Time Trends for Videos
Related to the Iowa Caucuses

● Video Watch Time

Source: Google data, U.S., classification as a
candidate-related "Iowa caucuses" video was
based on public data such as headlines, tags, etc.,
and may not account for every such video available
on YouTube, January 15–February 7, 2016.

The chart above shows watch time before, during, and after the Iowa caucuses. The first major spike was driven by people coming to YouTube to catch up on video of recent debates and town halls. The second was driven by people watching Donald Trump's caucus speech. Both are micro-moments experienced by voters en masse.

But it's not just political events, like debates and caucuses, that are shaping election watch time trends. Timely, cultural conversations spark voter micro-moments, too. For example, the week after same-sex marriage was legalized, watch time for related videos grew by 23X compared to the average of the three weeks prior: Watch Time Trends for Videos Related to Same-Sex Marriage



Watch Time Trends for Videos
Related to Same-Sex Marriage

**Same-sex marriage legalized**
Jun. 26

● Video Watch Time

Source: Google data, U.S., classification as a
candidate and issues-related "same-sex
marriage" video was based on public data
such as headlines, tags, etc., and may not
account for every such video available on
YouTube, June 2015–July 2015.

6/16/15                    7/1/15                    7/11/15

Some candidates are getting out in front of these micro-moments with
event- or issue-related content, combined with more targeted ads. In
an effort to get out the vote, Donald Trump's "Find Your Iowa Caucus
Location" video and Bernie Sanders' "How to Caucus in Iowa" explained to
Iowans how to register and caucus:





The Trump and Sanders campaigns knew voters would head to YouTube to ask "how to caucus" ahead of Iowa, and they were ready with two simple videos that offered step-by-step instructions. Talk about a decision-making moment: These videos could have meant the difference between showing up for your candidate on caucus day or staying home.

### 3. Be Influential: Who influences voter opinion in micro-moments

We've talked about understanding what voters are looking for in election micro-moments and when those moments occur most. But who carries the most sway in these moments? More than half of daily YouTube users ages 18–49 say their personal opinions (including politics) have been influenced by YouTube creators.[4]

Savvy politicians have taken advantage of YouTube creators' influence, taking interviews with them or partnering on videos to share in the dialogue. Six YouTube creators interviewed President Obama after his last two State of the Union addresses. And this election season, politicians are acting more like creators themselves. For example, Marco Rubio published several videos that are more in the style of creator Casey Neistat's "Ask Me Anything" videos than typical campaign TV ads:



  Creators are, ultimately, master listeners. The most influential creators on YouTube listen for audience questions and create content that answers them. The most influential politicians on YouTube do, too.

At a time when politicians and pundits are asking, "Do Political TV Ads Still Work?," YouTube trends show that online video is now table stakes for political campaigns. In our connected world, video works hardest when it answers a need or want that voters experience in election micro-moments.

These micro-moments might occur before, during, or after a debate or in reaction to a cultural event. They might happen when voters need a question answered fast, like "how to caucus in Iowa." Politicians can have extra influence in micro-moments by working alongside creators or taking a page out of their playbooks, as Marco Rubio did.

Micro-moments are shaping the electorate in 2016. I, for one, can't wait to find out which candidate won the most micro-moments—who met the most voters in their decision-making moments on YouTube. We'll find out on November 8.

*Dive into the data to learn more about voter micro-moments with The Presidential Elections on YouTube - Trends Report 2016.*

## Sources

1 Google data, U.S., classification as election "candidates" and "issues" was based on public data such as headlines and tags, and may not account for every such video available on YouTube. Content broadcast by CNN, C-SPAN, Fox News, and MSNBC was estimated by adding the number of days since their first broadcast. April 2015–February 2016.

2 Google data, U.S., YouTube search interest related to election candidates and issues, April 2015–February 2016.

3 Google/Ipsos Connect, Google Elections Omnibus, U.S. adults 18+, n=2,022, January 2016.

4 Google/Ipsos Connect, "The YouTube Generation" study", U.S., 18–49 year-olds, n=1,125, November 2015

**EXHIBIT F**

| From: | Flaherty, Rob EOP/WHO ████████████████████████████ |
|---|---|
| Sent: | 4/22/2021 12:05:16 AM |
| To: | ████████████@google.com]; ████████@google.com]; ████████@google.com]; ████████@google.com; ████████@google.com; ████████@google.com; ████████@google.com] |
| CC: | Slavitt, Andrew M. EOP/WHO ████████@who.eop.gov]; Humphrey, Clarke EOP/WHO ████████@who.eop.gov]; Fitzpatrick, Kelsey V. EOP/WHO ████████@who.eop.gov] |
| Subject: | Following Up on Today's Conversation |

All – Thanks again for the conversation today.

We'll look out for the top trends that you've seen in terms of misinformation around the vaccine.

To recap: As we move away from a supply problem toward a demand problem, we remain concerned that Youtube is "funneling" people into hesitance and intensifying people's hesitancy. We certainly recognize that removing content that is unfavorable to the cause of increasing vaccine adoption is not a realistic – or even good – solution. But we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. This is a concern that is shared at the highest (and I mean highest) levels of the WH, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out.

Just before we were meeting, this article from Buzzfeed popped, highlighting the Youtube misinformation that is spreading through the Vietnamese community. I think this brings up a question that I had in our first meeting about your capabilities around misinformation in non-english-speaking communities. Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages – how your enforcement has differed in languages and what your road map to improvement is.

A couple of other things it would be good to have from you all:

• As mentioned up top, the top trends that you're seeing in terms of misinformation/hesitance inducing content (Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing)

• A deeper dive on reduction and its effectiveness. It's helpful that you mentioned that watch time is your key metric. I believe you said you reduced watch time by 70% on "borderline" content, which is impressive. Obviously, the term "borderline" is moveable, but taking it for what it is: How does that track with vaccine-related content specifically (removing the "UFO stuff"). What has the comparative reduction in watch time on "borderline" vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?

• I appreciated your unequivocal response that you are not recommending anti-vaccine content and you are lifting authoritative information in both search and recommendations to all audiences. Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a "strike" still being recommended and shown in prominent search positions?

• I feel like I am not coming away with a very clear picture of how you're measuring the effectiveness of uplifting authoritative information. I obviously buy the theory – but how did you arrive on info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? What are you doing mechanically to boost the authoritative information? When you have relevant influencers speak to experts, I imagine (hope?) it's not just putting the content out there and that you're recommending it to people for whom it would be most relevant. How does that work?

• What are the general vectors by which people see the "borderline" content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?

We are excited to continuing partnering with you on this work as we have via ████████████ but we want to make sure that the work extends to the broader problem. Needless to say, in a couple of weeks when we're having trouble

getting people to get vaccinated, we'll be in the barrel together here. We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly?

Looking forward to more conversation.

-Rob

**Rob Flaherty**
Director of Digital Strategy
The White House
Cell: ▮▮▮▮▮▮▮▮

**EXHIBIT G**

*CONFIDENTIAL*

**OSG**. Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, OSG responds that the following meetings took place with the Social-Media Platforms relating to Misinformation:

- On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Slavitt from the White House met remotely with Nick Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg. Misinformation may have been discussed.

- On July 12, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG met remotely with Lauren Culberton and Todd Boyle from Twitter. Kyla Fullenwider from U.S. Digital Response was invited and may have also attended. The meeting provided notice of the upcoming OSG Advisory and a high-level view of what issues OSG would be prioritizing in the Advisory.

- On July 14, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG met remotely with Kevin Kane from YouTube, Jan Antonaros from Google, and Ariel Altman from YouTube. The meeting provided notice of the upcoming OSG Advisory and a high-level view of what issues OSG would be prioritizing in the Advisory.

- On July 16, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG and Kyla Fullenwider from U.S. Digital Response met remotely with Payton Iheme and Justine Isola from Facebook. Kate Thornton and Brian Rice from Facebook were invited and may have also attended. The meeting discussed the newly issued OSG Advisory.

- On July 23, 2021, from 1:30 pm to 2:00 pm ET, Dr. Vivek Murthy and Eric Waldo from OSG, and D.J. Patil (who OSG understands to be a then part-time consultant

*CONFIDENTIAL*

CONFIDENTIAL

supporting the Office of Science Technology and Policy) met remotely with Nick Clegg and (very likely) Brian Rice from Facebook. The meeting discussed a recent e-mail from Mr. Clegg to Dr. Murthy concerning recent public comments by the Administration about Facebook.

- On July 30, 2021, from 2:00 pm to 2:30 pm ET, Eric Waldo from OSG met with Kevin Kane from YouTube, Lauren Kelly from Google, and Jan Antonaros from Google. The topics discussed included YouTube/Google following up on the announcement of the OSG Advisory to share more of the work it was doing around health mis- and disinformation.

- As indicated by MOLA_DEFSPROD_00007276, on August 10, 2021, there was a call between Eric Waldo from OSG, Robert Flaherty from EOP, and personnel from Facebook that discussed, as stated in the document, "an operation [Facebook] uncovered that is related to vaccine misinformation."

- As indicated by MOLA_DEFSPROD_00007455, on or about September 14, 2021, there was a call between Eric Waldo from OSG and Kevin Kane and Jan Antonaros from Google/YouTube. As stated in the document, the purpose was "a brief meeting to discuss a new policy we are working on as well as provide an update on our overall efforts to combat harmful COVID-19 misinformation on the platform."

- As indicated by MOLA_DEFSPROD_00007398, on November 22, 2021, from 4:00 to 4:30 pm ET, there was a virtual meeting attended by Tericka Lambert, other ASPA personnel, personnel from Fors Marsh Group (a contractor for ASPA), personnel from OSG, and Google/YouTube personnel. This meeting briefly touched on misinformation among other topics.

CONFIDENTIAL

*CONFIDENTIAL*

The above list reflects OSG's identification to date, based on reasonably diligent efforts, of meetings that took place with the Social-Media Platforms relating to Misinformation and the included participants. OSG is not aware of specific additional meetings with the Social-Media Platforms relating to Misinformation, but it is possible that the above list is not exhaustive.

**NIAID.** Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, NIAID responds that no meetings took place with the Social-Media Platforms relating to Misinformation. NIAID has identified two possible meetings to discuss the potential participation by the NIAID director in U.S. Government efforts to publicize health information and provide COVID-19 and vaccine education via social media, which are not responsive to the Interrogatory, but are identified in the documents being produced in response to Plaintiffs' First Requests For Production to Defendants:

- Facebook approached NIAID in March 2020 to discuss public service announcements and ads, Facebook's CV19 hub, and an interview between Dr. Fauci and Mark Zuckerberg; NIAID scheduled the interview between Dr. Fauci and Mr. Zuckerberg (which aired on Facebook Live)

- NIAID was invited to, but did not attend, a meeting scheduled for March 4, 2021, to discuss possible Facebook Live interviews with celebrities/influencers related to COVID-19 vaccines

Further, in accordance with the Court's September 6, 2022 Order, subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, including consultation with Dr. Fauci and review of Dr. Fauci and NIAID staff e-mail records, NIAID responds on behalf of Dr. Fauci in his role as Director of NIAID as follows: NIAID has not identified any communications, written or

*CONFIDENTIAL*

### VERIFICATION

I, Max Lesko, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the interrogatory response of the Office of the Surgeon General to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories dated July 18, 2022, Common Interrogatories Numbers 1-5 and Additional Interrogatories Numbers 1-3, contained in the Responses of the Office of the Surgeon General, is true and correct, to the best of my knowledge.

Dated: December ___16___, 2022

*Max Lesko*

_____

Max Lesko

Chief of Staff

Office of the Surgeon General

# EXHIBIT H

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF LOUISIANA
 2                    MONROE DIVISION

 3

 4   THE STATE OF MISSOURI, et al.,

 5        Plaintiffs,

 6   vs.                         Case No.
                                 3:22-cv-01213-TAD-KDM
 7   JOSEPH R. BIDEN, JR., et al.,

 8        Defendants.

 9

10

11

12

13

14      VIDEORECORDED VIDEOCONFERENCED DEPOSITION
                    OF ERIC WALDO
15                 DECEMBER 22, 2022

16

17

18

19

20

21

22

23

24

25
```

```
 1    And all of them had -- you know, had an opportunity
 2    to improve how they were handling this issue.  And
 3    our job was to raise this as an issue so folks
 4    could know about it and hopefully take steps to --
 5    to ameliorate the situation.
 6           Q.    Yeah.  And that -- those taking steps
 7    to ameliorate would include social media platforms,
 8    correct?
 9           A.    Correct.  But I would again
10    highlight, you know, when you think about our --
11    the advisory but also the work we were doing, the
12    -- the community toolkit, we recognize that we did
13    call for an all-society approach, and we recognize
14    that there are multiple ways to stop or lessen the
15    spread or damage of misinformation, including
16    individuals and others.  You know, it's -- it's not
17    just -- it wasn't just a technology company issue
18    or a social media issue.
19           Q.    Are you aware who devised that phrase
20    all-of-society approach to describe the advisory --
21    or the advisory --
22           A.    I'm not --
23           Q.    -- recommendations?
24           A.    I'm not aware.
25           Q.    Scrolling down in Exhibit 3, the next
```

1    bullet point talks about meeting on July 30th, 2021

2    between yourself and representatives of

3    Google/YouTube, correct?

4         A.    That is correct.

5         Q.    And the interrogatory responses

6    supplied as topics discussed included in

7    YouTube/Google, following up on the announcement of

8    the OSG advisory to share and work the work it was

9    doing around health mis- and disinformation,

10   correct?

11        A.    That's correct.

12        Q.    What do you remember being said about

13   that in this phone call or Zoom call?

14        A.    It was a Zoom call.  I think it was

15   really just the YouTube and Google teams saying,

16   hey, we agree that this is a really important

17   issue, and here's all the things that -- that we

18   are working on about it.  So it was -- it was them

19   informing us of the steps they are currently

20   taking.

21        Q.    And I believe you said part of the

22   follow-up call with Facebook was to ask them to,

23   you know, give a report on any steps they would be

24   taking in response to the health advisory, correct?

25        A.    Correct.

ERIC WALDO  12/22/2022

1      Q.    And is that what's going on here with

2  -- with YouTube as well, to ask them, okay, we've

3  issued a health advisory.  What are you guys doing

4  about it?

5      A.    I think they -- they asked for the

6  call.  So this was a little different.  They asked

7  for the call on their own to share with us what

8  they were doing.  I think they -- from a government

9  affairs perspective, public affairs people were

10  trying to say, hey, look, you know, we agree with

11  you, and we want to let you know all the things

12  we're doing.

13      Q.    Did the report --

14      A.    And, again, I think --

15      Q.    Go ahead.

16      A.    And I would think, right, we had

17  first had that first call to let them know the

18  report was coming out.  The report came out.  They

19  looked at it, and then they said, hey, we've looked

20  at it.  Let us tell you, you know, what we're

21  doing.

22      Q.    And in the first call you had

23  mentioned, I think, that you advised them that

24  there would be some potential recommendations for

25  them, right?

ERIC WALDO  12/22/2022

Page 120

```
 1        A.    That there were recommendations for
 2   -- I think they -- certainly within the advisory
 3   there are recommendations for what social media
 4   companies can do.
 5        Q.    And then in the follow-up call, they
 6   came back to you and said, okay, we've read the
 7   advisory and here are steps that we are taking or
 8   plan to take in response to the issues raised in
 9   the advisory?
10        A.    I don't recall specifically, but that
11   was -- the general tone was let us tell you what
12   we're doing about this issue.  I didn't -- I didn't
13   get the impression that it was new things.  I got
14   the impression that it was work that they were
15   already doing.
16        Q.    What did they report to you?
17        A.    I don't really remember, but I think
18   it was generally saying, hey, we have a -- you
19   know, we have a team that does -- that works on
20   this issue.  Like we're -- you know, it's important
21   to us.  Like we're thinking about how we're
22   addressing it.
23              Just it was, I think, more of a
24   process call of saying, you know, we want you to
25   know this is on our agenda.
```

```
 1          Q.      So did they, for example, report that
 2     they had adopted new policies to address
 3     misinformation on YouTube?
 4          A.      I don't recall.
 5          Q.      Or did they give indication they were
 6     taking more steps to kind of remove more harmful
 7     information on YouTube?
 8          A.      I don't recall if there was a new.  I
 9     recall them telling us what they were currently
10     doing to address that.  So I -- and some of these
11     calls I experienced as them -- you know, they read
12     the advisory and said, yeah, we are doing that.
13     Thanks.  You may not know all the things we're
14     doing, so let us share with you what we're doing.
15          Q.      And you don't -- you don't remember
16     whether they, you know, advised you of kind of new
17     policies, like, hey, you raised an issue for us,
18     and -- and here's are some things we're going to do
19     to respond to it?
20          A.      I don't recall.  I think I would
21     remember because if it was the something new, I
22     feel like we would have shared it or probably done
23     something like put it in a fact sheet to say, look,
24     because of this report, these many new things are
25     happening.
```

ERIC WALDO  12/22/2022

1      Q.     Did you do that for any of them?  Did
2  you issue any fact sheets saying, you know, here
3  are some positive developments that came out of the
4  health advisory?
5      A.     I don't remember.  I don't think so.
6  The only time that could have happened would have
7  been when we did the -- that -- what I keep calling
8  the community toolkit, but I don't recall -- I do
9  remember Twitter tweeted something in support of
10  Dr. Murthy's advisory.
11           So when we launched on whatever, the
12  15th or 16th, the Twitter policy handle I think
13  either retweeted or quote tweeted and said
14  something like, we agree.  This does call -- we do
15  need an all-society approach, and here's what we're
16  doing.  So that's my one recollection.
17      Q.     And we talked earlier about how there
18  was a particular focus on Facebook on July 15th and
19  16th, and you mentioned that, I think, Jennifer
20  Psaki mentioned Facebook specifically in the press
21  conference and President Biden said "They're
22  killing people," the next day.
23           Do you know why the White House
24  thought a particular focus on Facebook was
25  appropriate?

```
 1   of -- something they discovered.  I think it ended
 2   up being like a foreign entity was doing work on
 3   Facebook, spreading -- I don't know if it -- what
 4   type of misinformation, but they were letting us
 5   know that they discovered it.
 6        Q.     Do you know why they thought to brief
 7   you guys on that?
 8        A.     I do not --
 9               MS. CHUZI:  Objection.  Calls for
10   speculation.
11               THE WITNESS:  I don't know why.
12        Q.     (BY MR. SAUER)  Scrolling down
13   another bullet point, there's a reference to a
14   September 14th meeting between yourself and Kevin
15   Kane and Jan Antonaros at Google/YouTube, correct?
16        A.     That is what the document says,
17   correct.
18        Q.     Yeah.  And do you recall that meeting
19   or phone call?
20        A.     Not really.  That's actually a few
21   days before my first child was born, so I don't --
22   I -- I vaguely remember this.
23        Q.     You had other matters on your mind at
24   that time?
25        A.     I -- I did.
```

1          Q.     It -- it -- it -- it says the purpose

2     was a brief meeting to discuss a new policy we are

3     working on as well as provide and update on our

4     overall efforts to combat harmful COVID-19

5     misinformation on the platform, right?

6          A.     That's what it says, yes.

7          Q.     So this would have been, I take it, a

8     kind of second update by them to you following the

9     health advisory of stuff they're doing to combat

10    harmful COVID-19 misinformation through YouTube,

11    correct?

12         A.     That's correct.

13         Q.     So first, they provided that update,

14    I think, on the July 30th meeting that we talked

15    about above, correct?

16         A.     Yes.

17         Q.     And then they --

18         A.     Correct.

19         Q.     Sorry.  And they followed up again on

20    September 14th of another update of, you know, kind

21    of telling the Surgeon General's office what they

22    were doing to fight misinformation?

23         A.     That's correct.

24         Q.     Do you know what it was -- it says

25    they gave some kind of update on overall efforts to

1   combat harmful COVID-19 misinformation on the

2   platform.  Do you know what those efforts were?

3           A.    I don't recall.

4           Q.    Do you remember anything specific

5   about what YouTube and Google were doing in this

6   time frame to kind of remove or -- or reduce the

7   spread of misinformation?

8           A.    I don't recall.

9           Q.    It also says that they were -- the

10  meeting was to discuss a new policy we were working

11  on.  Do you remember that?

12          A.    I do not.

13          Q.    Do you know what new -- was that a

14  new policy that related to misinformation?

15          A.    I'm not sure.

16          Q.    Or a new policy related to something

17  unrelated?

18          A.    I don't recall.

19          Q.    You remember YouTube and Google

20  raising anything that was unrelated to the health

21  advisory about this information and these two

22  calls?

23          A.    I don't recall.

24          Q.    So you don't know whether other

25  topics came up or if they were just focused on

ERIC WALDO  12/22/2022

Page 131

1    health misinformation following the advisory?

2         A.    I'm not certain.  I don't recall.

3         Q.    Do you remember anything specific

4    that was said in this call on September 14th?

5         A.    I do not.

6         Q.    Did you say anything?

7         A.    I mean, I would have, in general,

8    been -- tried to greet them, asked them how they

9    were doing, and certainly asked them, you know, be

10   -- expressed some sort of feeling of, you know,

11   interest in what they wanted to share.

12        Q.    Okay.  But do you remember saying

13   anything in response to what they did share about a

14   new policy and update on overall efforts to combat

15   harmful misinformation?

16        A.    I do not.

17        Q.    Going down a little further, last

18   bullet point here refers to a meeting on

19   November 22nd, 2021.  It mentions that personnel

20   from OSG were involved in this meeting.  Do you

21   remember -- were you involved in this meeting?  Do

22   you know?

23        A.    I don't think so.  I do not believe

24   so.  If I was on it -- if I was in the meeting, I

25   would have identified it.

ERIC WALDO  12/22/2022

Page 296

```
 1    focused, given your personal situation at the time,

 2    but do you know whether there was a briefing on

 3    this?

 4         A.    I do not.

 5         Q.    Do you know whether Facebook talked

 6    to, you know, Courtney, Rob Flaherty, DJ Patil

 7    about this in your absence?

 8         A.    I do not.

 9         Q.    Exhibit 31.  Do you remember this

10    e-mail from the Google/YouTube team in

11    September 29th?

12         A.    So I would have been on paternity

13    leave during this time.

14         Q.    Okay.  And in this e-mail, they

15    report back to you and Nancy S. Negron about --

16         A.    Negron.

17         Q.    Yeah, who's she?

18         A.    Nancy Negron was my deputy director

19    of engagement.

20         Q.    And they report back about having a

21    COVID-19 vaccine misinfo policy that allows them to

22    remove a limited list of verified false claims

23    about COVID vaccines, right?

24         A.    Yes, that's what the e-mail says.

25         Q.    And they also report back to you guys
```

```
 1    that they're introducing a new policy that
 2    prohibits content that includes harmful
 3    misinformation about the safety, efficacy, and
 4    ingredients for the vaccines, right?
 5         A.    Yes, that's what the e-mail says.
 6         Q.    Is this an unsolicited e-mail or are
 7    they responding to some kind of communication or
 8    request from you guys, do you know?
 9         A.    I'm not positive, but it would appear
10    to be an unsolicited e-mail.
11         Q.    I know that you had said earlier that
12    you reached out to Facebook, Twitter, and YouTube
13    in the aftermath of the health advisory that --
14    to -- to see what steps they were taking.  Is that
15    response to that request for information?
16         A.    Could be.  I'm not certain, to be
17    honest with you.  But based on both my departure --
18    and I think I had had an out-of-office at this
19    moment, which may have led them to add Nancy.
20    Nancy was also just coming on, and I don't think
21    her HHS e-mail had been set up yet, but I'm not --
22    I'm not positive.
23         Q.    Let's look at Exhibit 32.  Can you
24    see this one on screen share?
25         A.    Yes, I see this note.
```

ERIC WALDO  12/22/2022

Page 336

```
 1                    THE VIDEOGRAPHER:  The time is 3:41
 2   p.m. Central Standard Time.  We are back on the
 3   record.
 4          Q.    (BY MR. SAUER)  Mr. Waldo, you're
 5   aware that on March 3rd the Surgeon General's
 6   office issued a Request For Information about
 7   social media misinformation.  You recall that?
 8          A.    Yes.
 9          Q.    Yeah.  And here on the screens share,
10   I'm showing you Exhibit 42 that I previously
11   e-mailed your counsel.  (Technical difficulty) this
12   the RFI --
13          A.    That's correct.
14          Q.    -- on here, right?  Yeah.  Called
15   Impact of Health Misinformation on the Digital
16   Information Environment in the United States
17   Through the COVID-19 Pandemic Request for
18   Information, right?
19          A.    That's correct.
20          Q.    And were you involved in formulating
21   this RFI at all?
22          A.    I was involved in meetings where the
23   -- where there was a discussion about whether or
24   not to do this RFI or for the overall strategy
25   around -- around this data by -- with -- with the
```

1    team, yes.

2         Q.    Overall strategy.  What overall

3    strategy was there with -- regarding this RFI?

4         A.    I'm sorry, I didn't say strategy

5    about this RFI.  Strategy whether or not there was

6    going to be additional data requests to make and

7    how to make them.

8         Q.    Oh.  You mean additional data

9    requests.  What do you mean by that?

10        A.    I mean -- I shouldn't say additional.

11   I think there was a question of whether or not we

12   were going to -- going to make questions, you know,

13   ask for -- given that the -- given the

14   conversations with Facebook and others, was there

15   something more constructive we could do around

16   helping researchers have a better understanding of

17   what's happening in this community.  And so

18   ultimately, the RFI was -- was determined as the

19   path forward.

20        Q.    Okay.  So were there other paths

21   forward (technical difficulty) Surgeon General's

22   office --

23              (A discussion was held off the

24   record.)

25        Q.    (BY MR. SAUER)  Were there other

1 **paths forward about COVID-19 misinformation that**
2 **the Surgeon General's office did or was this the**
3 **only one at this time?**
4         MS. CHUZI:  Objection.  To the extent
5 that question calls for information covered by the
6 deliberative process privilege, I will instruct the
7 witness not to answer.
8         THE WITNESS:  On the advice of
9 counsel, I will not answer the question.
10     Q.   (BY MR. SAUER)  **I'm not asking about**
11 **deliberations.  I'm asking if there were actions**
12 **taken.  Did the Surgeon General's office do**
13 **anything other than RFI to address issues of COVID**
14 **misinformation in this time frame?**
15     A.    Not to my knowledge.
16     Q.    **Scrolling down, were you involved in**
17 **formulating, you know, kind of what kind of**
18 **information to ask for here in the RFI?**
19     A.    No.
20     Q.    **Who was involved in formulating kind**
21 **of the specific types of information to ask for?**
22     A.    I think Kyla was the primary driver
23 on the RFI from a content expert perspective.
24     Q.    **That's Kyla Fullenwider?**
25     A.    That's correct.

```
 1          Q.     Do you know if she had input from

 2   Renee DiResta or other academics in formulating the

 3   RFI?

 4          A.     I do not.

 5          Q.     Do you know -- do you know who she --

 6   who she would have worked with in formulating it?

 7          A.     I do not.

 8          Q.     Do you know if anyone besides Kyla

 9   had any input into what information to ask for?

10          A.     I know that Kyla was running these

11   ideas by Max Lesko from an -- more of a process,

12   getting Dr. Murthy's input perspective.  More or

13   less of a content expertise perspective.  But I

14   think she certainly ran this by Max.

15          Q.     And that was to get Dr. Murthy's

16   approval on the approach taken?

17          A.     I believe so, yes.

18          Q.     Do you know if Dr. Murthy provided

19   input on the content of the RFI, asked for this

20   information, that kind of thing?

21          A.     I'm not certain.

22          Q.     Anyone else you know of besides

23   Dr. Murthy, Max Lesko, and Kyla Fullenwider

24   involved in the formulation of the RFI?

25          A.     Not to my knowledge.
```

```
 1        Q.    What is Kyla's role in the Surgeon
 2  General's office in this time frame?  I remember
 3  she's in US Digital Response.  Is she a -- an
 4  employee of the Surgeon General's office by now or
 5  what's her formal role?
 6        A.    I'm not certain how -- what was the
 7  mechanism for how she was employed out of HHS, but
 8  I know she was doing work on behalf of the Surgeon
 9  General.
10        Q.    The RFI here on the -- I think it's
11  on the second page of the document -- asks for
12  information about technology platforms, correct?
13        A.    What page are you on, sir?
14        Q.    Second page of the document, here
15  down in the bottom right, column number 2,
16  Information about Technology Platforms.
17        A.    Yes.  That's correct.
18        Q.    And it asks number 3:  Information
19  about how widespread COVID-19 misinformation is on
20  individual technology platforms including general
21  search engines, content sharing platforms, social
22  media platforms, e-commerce platforms, crowdsourced
23  platforms, and instant messaging systems, correct?
24        A.    That's correct.
25        Q.    Were there discussions -- general
```

```
 1   search engines, that's like Google, right?
 2        A.   I assume so.
 3        Q.   What's a content sharing platform?
 4   Is that like Reddit?
 5        A.   I'm not certain.  I don't -- I'm not
 6   sure what the technical definition is there, but
 7   it --
 8        Q.   Do you know what kind of platform --
 9        A.   Because that seems -- that seems
10   different than social media.
11        Q.   Yeah, what kind of platforms are they
12   referring to there, do you know?
13        A.   I do not.
14        Q.   It goes on to say social media
15   platforms, then e-commerce platforms.  What are
16   those?
17        A.   I presume places where you -- where
18   e-commerce occurs so...
19        Q.   eBay, Amazon, places like that?
20        A.   I think -- I definitely would think
21   Amazon, yeah.
22        Q.   What -- were there discussions that
23   you're aware of about COVID misinformation being
24   shared on e-commerce platforms?
25        A.   I recall at some point in the rollout
```

```
1    Kyla sharing with me just from a factual
2    perspective that on sites like Amazon it was
3    possible to also spread health mis- and
4    disinformation based on promotion of, you know,
5    certain -- I think the algorithm could promote if
6    you like this, buy this, and maybe promoting
7    conspiracy theories.
8         Q.    So conspiracy theories about COVID or
9    other conspiracy theories?
10        A.    I think it was about COVID but I
11   don't truly recall.
12        Q.    Okay.  What are crowdsourced
13   platforms?
14        A.    I'm not sure what the technical
15   definition is of a crowdsourced platform.
16        Q.    Do you know what platforms are being
17   referred to there in that -- in that phrase?
18        A.    As I said just now, I don't know what
19   crowdsourced platforms means in the context of this
20   document.
21        Q.    So one of the things that's asked for
22   here is aggregate data and analysis on the
23   prevalence of COVID-19 misinformation on individual
24   platforms including exactly how many users saw or
25   may have been exposed to instances of COVID-19
```

 1   misinformation, right?

 2        A.    Yes, that's what the RFI says on that

 3   paragraph.

 4        Q.    Is that the kind of data that you

 5   guys have been asking Facebook for in the meetings

 6   in 2021 where you talked about data transparency?

 7        A.    It appears to be a version of that,

 8   yes.

 9        Q.    Scrolling down here at number 5, it

10   says information about the sources of COVID-19

11   misinformation.  Do you see that?

12        A.    I do see that.

13        Q.    And it asks for information about the

14   major sources of COVID-19 misinformation associated

15   with exposure, correct?

16        A.    That is what 5 sub bullet A says,

17   correct.

18        Q.    What does "associated with exposure"

19   mean there?

20        A.    It says -- I'm not sure technically.

21   It says information about COVID -- resources about

22   COVID-19 misinformation.  Information about the

23   major sources of COVID-19 misinformation associated

24   with exposure.  I don't -- let's see, does it have

25   the definition in there further down?

ERIC WALDO  12/22/2022

Page 344

```
 1          Q.     I don't recall.  I guess up here it
 2   says --
 3          A.     Sorry.  I was trying to look.  Yes.
 4          Q.     Seeing content in news feeds and
 5   exposure.
 6          A.     Yeah, okay.  So it seems to be saying
 7   that information associated with seeing the content
 8   in news feeds and search results are
 9   algorithmically nominated content.
10          Q.     It goes on under little I there to
11   say:  By source, we mean both specific public
12   actors that are providing misinformation as well as
13   components of specific platforms that are driving
14   exposure to misinformation, correct?
15          A.     Yes, that's what the document says.
16          Q.     So the RFI is actually seeking
17   information about specific speakers or posters on
18   social media platforms that spread misinformation,
19   right?
20          A.     I'm not sure, because earlier, you
21   highlighted that it talks about aggregate data and
22   I'm pretty sure the document also talks about
23   anonymity.
24          Q.     So you think that specific public
25   actors does not refer to specific people who spread
```

1    -- provide misinformation?

2         A.    It may, but I'm pretty sure in this

3    document there's some sort of caveat about having

4    to submit anonymized data.

5         Q.    Okay.  That would be an indicator of

6    people who are reviewing it, right, the people

7    exposed to the misinformation, right?

8         A.    I'm sorry.  Say again, sir.

9         Q.    Doesn't the anonymized data refer to

10   the users who are exposed, not the public actors

11   who are providing this information?

12        A.    I'm not sure.  If you can bring up

13   that portion of the document, I'm happy to take a

14   look.  But I'm pretty sure in general when the

15   federal government does requests for information

16   like this, there are various stipulations that have

17   to be made to -- for -- to ensure that there's

18   anonymized data.

19        Q.    Let me ask you this.  I believe there

20   was a plan expressed by the Surgeon General's

21   office to render any comments received in response

22   of this information public, right, to publicly post

23   them?

24        A.    Are you asking -- can you repeat the

25   question?  It sounded like a statement.

ERIC WALDO  12/22/2022

```
 1          Q.    Did the -- did the Surgeon General's

 2   office announce that it would publicly post all the

 3   comments received in response to this RFI?

 4          A.    I don't know.

 5          Q.    Was there a -- do you recall a policy

 6   of that?

 7          A.    I don't know.  In my other life

 8   working in government for, like, noticing common

 9   rule making, which I'm sure you know from your law

10   school days, there was requirements about public --

11   making public comments, but I'm not sure if that

12   refers to RFIs as well.

13          Q.    Let me ask this.  Do you know whether

14   the comments received in response to this RFI have

15   ever been published?

16          A.    I'm -- I'm not aware of whether they

17   have or not.

18          Q.    And we submitted a FOIA request for

19   them months ago and haven't received any yet.  Are

20   you aware of that?

21          A.    I am not.

22          Q.    So you don't know whether the Surgeon

23   General's office ever made these -- the comments it

24   received public?

25                MS. CHUZI:  Objection.  Asked and
```

```
 1          Q.    And here, for example in Exhibit 45,
 2   there's an e-mail from Max Lesko to Nick Clegg and
 3   Brian Rice and someone else at Facebook with a
 4   letter from the U.S. Surgeon General attached,
 5   correct?
 6          A.    Yes, that's an e-mail from Max Lesko
 7   to Nick Clegg, Brian Rice, and Nathaniel Gleicher.
 8          Q.    And it indicates that he's attached a
 9   letter from Surgeon General Murthy to Mark
10   Zuckerberg, right?
11          A.    That's correct.
12          Q.    And he says -- also says:  Let me
13   know if I can be helpful with respect to the
14   request for information which has been sent to the
15   Federal Register and expect to receive submissions
16   in the coming days.  Correct?
17          A.    Yes, that's what Max has written to
18   -- to those individuals.
19          Q.    And so the Surgeon General's office
20   e-mailed a link to the RFI to Facebook and also
21   attached a letter directly from Surgeon General
22   Murthy to Mark Zuckerberg, right?
23          A.    That is what the e-mail says, yes.
24          Q.    And then Exhibit 46.  And this is --
25   is this actually the letter from Surgeon General
```

**ERIC WALDO  12/22/2022**

Page 350

```
 1    Murthy to Mark Zuckerberg dated March 3rd, 2022
 2    that Max Lesko e-mailed?
 3         A.    It would appear so.
 4         Q.    Yeah, let me put it on the screen
 5    share.  And the purpose of this letter is to
 6    encourage Facebook to participate in the RFI,
 7    right?
 8         A.    It's -- it says:  I am writing today
 9    to request that your company contribute to the RFI.
10         Q.    So he's encouraging Facebook to
11    contribute to the RFI, right?
12         A.    He's definitely asking him to do so,
13    yes.
14         Q.    And he says:  Given that a large
15    proportion of health misinformation is spread
16    through technology platforms, my Advisory includes
17    a call for technology companies to join this
18    broader effort to create a safer, healthier
19    information environment, right?
20         A.    Yes, that's what -- that's an
21    accurate reading of that portion of the letter.
22         Q.    And he requests responses from
23    companies about the extent and spread of COVID-19
24    misinformation on your platforms, policies to
25    address COVID-19 misinformation, and their
```

1    effectiveness, sources of COVID-19 misinformation

2    and so forth, right?

3         A.    That's an accurate reading of that

4    portion of the letter.

5         Q.    **Were you involved in drafting the**

6    **letter?  I think you probably were still on**

7    **paternity leave at this time, right?**

8         A.    Yeah.  As I mentioned, this letter is

9    dated March 3rd and I was still on paternity leave.

10   So I was not involved in the drafting of this

11   letter.

12        Q.    **Did Max Lesko send similar letters to**

13   **other social media platforms?**

14        A.    I think so.

15        Q.    **Yeah.  I mean, I don't want to put**

16   **six more exhibits in front of you, but would you**

17   **agree that he sent a very similar, basically**

18   **identically phrased letter to Google, LinkedIn,**

19   **Twitter, YouTube, and Microsoft all on that same**

20   **day, March 3rd, 2022?**

21        A.    I don't know if he did, but if you --

22   I don't have any reason to disbelieve that he did,

23   so.  That, I believe was the plan.

24        Q.    **Let's just very briefly, I'm going to**

25   **e-mail those to your counsel and I'll pull them up**

ERIC WALDO  12/22/2022

1   real quick.

2              And you said you're aware that that

3   was the plan, right?

4        A.   I think I became aware after I got

5   back that that happened.  I wasn't part of the

6   planning process.

7        Q.   Here on the screen share, I'm showing

8   you Exhibit 47.  Similar letter to Sundar Pichai of

9   Google from Surgeon General Murthy about the RFI

10  dated March 3rd, correct?

11       A.   Yes, that's the date of the letter.

12             Sir, if you're -- okay.  Sorry.

13       Q.   Exhibit 48, yeah, -- similar

14  letter --

15       A.   Thank you.

16       Q.   -- to the CEO of LinkedIn about the

17  RFI encouraging them to participate, correct?

18       A.   It's a letter asking -- informing

19  them and requesting that they participate in the

20  RFI.

21       Q.   In fact, these letters kind of all

22  have exactly the same text, right?  Is that your

23  understanding?

24       A.   You're moving the letters up and down

25  very quickly but I don't have any reason to believe

1    they're not virtually the same.

2        Q.    Exhibit 49, similar letter to

3    Twitter, right, and Parag Agrawal, who was then the

4    CEO of Twitter?

5        A.    Yes, it appears to be the same

6    functional letter.  I'm not having much of an

7    opportunity to review it.  But I don't have any

8    reason to believe it's not the same overall text

9    requesting that they participate in the RFI.

10       Q.    Exhibit 50, same letter to Microsoft

11   -- I'm sorry, YouTube, I apologize.  Same letter to

12   YouTube, correct?

13       A.    You're okay.  Yes, sir, I'm only

14   looking at part of the letter that you're sharing

15   and I can't actually review all of it in the way

16   that we're doing it right now.  But it appears to

17   be the same form of a letter asking for a request

18   -- requesting that -- informing them about the RFI

19   and requesting that they participate.

20       Q.    And then finally, Exhibit 51, similar

21   letter to Microsoft, correct?

22       A.    That looks like it's to the Microsoft

23   corporation.  Right now, I'm only being exposed to

24   the first couple of lines.  But it looks -- the

25   first -- overall, it seems to be the same letter

**ERIC WALDO  12/22/2022**

Page 354

```
 1    requesting that they participate in the RFI.
 2          Q.    Did all of those companies that got
 3    the letter, did they all participate, do you know?
 4          A.    I don't know.
 5          Q.    Do you know if Facebook submitted
 6    anything?
 7          A.    I think so.  But I'm not positive.
 8          Q.    How about Google?
 9          A.    I don't know.
10          Q.    How about Twitter?
11          A.    I don't know.
12          Q.    How about Microsoft?
13          A.    I don't know.
14          Q.    Shortly after the RFI was issued, the
15    Surgeon General gave an interview to GQ Magazine,
16    right?  Does that ring a bell?
17          A.    It does not.
18          Q.    So you weren't -- let me -- let me
19    show Exhibit 52 on the screen share.  Does this
20    dazzling picture of Surgeon General Murthy jog your
21    memory?
22          A.    It does not.
23          Q.    So you don't recall him giving an
24    interview to GQ Magazine on March 11th of 2022?
25          A.    I do not.
```

ERIC WALDO  12/22/2022

```
 1                    NOTARIAL CERTIFICATE

 2

 3        I, Tammie A. Heet, Registered Professional

 4   Reporter, certified Shorthand Reporter for the

 5   State of Illinois, and Certified Court Reporter for

 6   the state of Missouri and a duly commissioned

 7   Notary Public within and for the States of Missouri

 8   and Illinois, do hereby certify that the witness

 9   whose testimony appears in the foregoing deposition

10   was duly sworn by me; that the testimony of said

11   witness was taken by me to the best of my ability

12   and thereafter reduced to printing under my

13   direction; that I am neither counsel for, related

14   to, nor employed by any of the parties to the

15   action in which this deposition was taken, and

16   further that I am not a relative or employee of any

17   attorney or counsel employed by the parties

18   thereto, nor financially or otherwise interested in

19   the outcome of the action.

20

21

22                  _____
                    Tammie A. Heet, RPR, CSR, CCR
23

24

25
```

# EXHIBIT I

CONFIDENTIAL

| | |
|---|---|
| **From**: | Kevin Kane ███████████████ |
| **Sent**: | 7/9/2021 12:36:47 PM |
| **To**: | Waldo, Eric (HHS/OASH) ████████████ |
| **CC**: | ███████████ Kyla Fullenwider ██████████ |
| **Subject**: | Re: Connecting with Dr. Murthy's office |

Thank you! Look forward to speaking with you then.
Best,
Kevin

On Fri, Jul 9, 2021 at 10:28 AM Waldo, Eric (HHS/OASH) ███████████ wrote:
Sorry about that! Moving too fast. Will update.

**From:** Kevin Kane ███████████
**Sent:** Friday, July 9, 2021 9:28 AM
**To:** Waldo, Eric (HHS/OASH) ███████████
**Cc:** ███████ Kyla Fullenwider ██████████
**Subject:** Re: Connecting with Dr. Murthy's office

Thanks Eric -

The invite you sent was for 3:30-4:15, and unfortunately some of my colleagues won't be able to make it then. Any chance we could meet 3:00-3:30 (ET) on the 14th?

Thanks again, and hope you have a good weekend!

Kevin

On Thu, Jul 8, 2021 at 5:30 PM Waldo, Eric (HHS/OASH) ████████████ wrote:
Great. Just send you a zoom!

**From:** Kevin Kane ██████████
**Sent:** Thursday, July 8, 2021 8:35 AM
**To:** Waldo, Eric (HHS/OASH) ██████████
**Cc:** ███████ Kyla Fullenwider ██████████
**Subject:** Re: Connecting with Dr. Murthy's office

Good Morning Eric -

How about we shoot for 3:00-3:30pm (ET) on Wednesday, July 14?

Thanks,

Kevin

On Wed, Jul 7, 2021 at 5:11 PM Waldo, Eric (HHS/OASH) ░░░░░░░░░░░░░ wrote:

Hi Kevin,

Thanks so much for your note. Would love to have more of your colleagues join.

I'm traveling with Dr. Murthy for part of next week so it's a bit tight. Here are some options:
Wednesday, July 14: 2:45pm-4:15pm ET; 5pm-6pm ET
Thursday, July 15: 4:15pm-5pm ET

If none of those work, I have some time on Friday, July 16 and we can always discuss the following week.

Thanks so much!
Eric

**From:** Kevin Kane ░░░░░░░░░░░░
**Sent:** Wednesday, July 7, 2021 4:51 PM
**To:** Waldo, Eric (HHS/OASH) ░░░░░░░░░░░
**Cc:** ░░░░░░░░░░░░░░ Kyla Fullenwider ░░░░░░░░░░░░░░░░░░
**Subject:** Re: Connecting with Dr. Murthy's office

Hi Eric -

It's great to e-meet you as well. If possible, I wanted to include a few of my colleagues for this conversation and see if you had any availability next Wednesday or Thursday to meet. Would you happen to have any time open either of those days? If not, I'm more than happy to find another day that would work for you.

Thank you for reaching out and look forward to speaking with you soon!

Best Regards,

Kevin

On Tue, Jul 6, 2021 at 9:49 AM Waldo, Eric (HHS/OASH) ██████████████ wrote:

Hi Alexandra and Kevin,

I hope this finds you well. I'm Dr. Murthy's Director of Engagement and I wanted to reach out.

As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond. I know you and your teams are working hard and thinking deeply about this issue. We'd love to chat over zoom to connect and discuss what's on the horizon for our teams.

Is there a good time this week to connect? Happy to work with whomever on your team to coordinate calendars.

Thanks so much!

Eric

Eric W. Waldo [He/Him]
Director of Engagement
Office of the U.S. Surgeon General, Dr. Vivek Murthy
U.S. Department of Health & Human Services

--

Kevin Kane | Government Affairs & Public Policy Manager,
YouTube | ██████████████ | ██████████

--



--

--

MOLA_DEFSPROD_00007442

**EXHIBIT J**

| From: | Kevin Kane [____@google.com] |
|---|---|
| Sent: | 9/29/2021 12:56:30 PM |
| To: | Waldo, Eric (HHS/OASH) [____@hhs.gov]; ____@gmail.com |
| CC: | Jan Antonaros [____@google.com] |
| Subject: | YouTube Vaccine Policy Announcement |

Good Afternoon -

I'm writing to share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation.

Today we have a COVID-19 Vaccine misinfo policy which allows us to remove a limited list of verified false claims about COVID-19 vaccines.

We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO).

You can learn more about the announcement we made here and a detailed overview of our policy in our help center here.

Please let me know if you have any questions.

Best Regards,
Kevin

--



Kevin Kane || Government Affairs & Public Policy Manager,
YouTube || ____@google.com ||

**EXHIBIT K**



**OFFICE OF THE SURGEON GENERAL**
March 3, 2022

Sundar Pichai
Chief Executive Officer
Google, Inc.



Dear Mr. Pichai,

I hope this letter finds you well.

As you know, the proliferation of health misinformation during the pandemic has been both extensive and dangerous. Over the last year I've spoken with health care and public health workers across the country about how health misinformation is harming their ability to care for patients, contributing to burnout, and posing a growing threat to the nation's health. It is clear that we must do everything we can to address this threat. We also owe a debt of action to the doctors, nurses, and public health professionals who have sacrificed so much for us throughout this pandemic.

To this end, my office issued a Surgeon General's Advisory on Health Misinformation in July 2021, calling for action across all sectors of society to address the spread of health misinformation. Given that a large proportion of health misinformation is spread through technology platforms, my Advisory includes a call for technology companies to join this broader effort to create a healthier, safer information environment.

My office is launching an initiative to deepen our understanding of the spread of COVID-19 misinformation, the role the information environment played in societal response to the pandemic, and its implications for future public health emergencies. We are issuing a public *Request for Information (RFI)* to gather and share data and research on health misinformation during the COVID-19 pandemic, including the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency. We will share what we learn through the RFI directly with the public at surgeongeneral.gov/RFI.

I am writing today to request that your company contribute to the RFI. To date, our collective understanding of the nature of misinformation that is spreading online is incomplete which in turn hinders our nation's ability to implement a robust, effective response. Specifically, I am requesting responses from companies about the extent and spread of COVID-19 misinformation on their technology platforms, policies to address COVID-19 misinformation and their effectiveness, sources of COVID-19 misinformation, and information about the sale of unproven COVID-19 products or services.

MOLA_DEFSPROD_00007477

I hope that all of us – researchers, companies, members of the health care community, civic leaders, families, and concerned Americans alike – can work together to protect people's right to make decisions about health based on accurate information. I remain confident that through our collective efforts, we can address the harms of health misinformation and safeguard the health of the nation.

Thank you for your cooperation and partnership on this critical public health matter.

Sincerely,

Vivek Murthy, MD, MBA
Surgeon General of the United States

MOLA_DEFSPROD_00007478

**EXHIBIT L**

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF LOUISIANA
2                        MONROE DIVISION

3    STATE OF MISSOURI ex
     rel. ERIC S. SCHMITT,
4    Attorney General,
     et al.,
5                                   No. 3:22-cv-01213-TAD-KDM
          Plaintiffs,
6
     vs.
7
     JOSEPH R. BIDEN, JR.,
8    in his official capacity

9    as President of the United

10   States, et al.,

11        Defendants.

12

13       THE VIDEOTAPED DEPOSITION OF CAROL CRAWFORD

14                   November 15, 2022

15                9:24 a.m. to 5:33 p.m.

16

                 Office of General Counsel
17      Centers for Disease Control and Prevention
                   1600 Clifton Road NE
18                  Atlanta, Georgia

19
     Reporter:
20         Maureen S. Kreimer, CCR-B-1379, CRR

21

22

23

24

25

1    I interpreted the "check in first."

2        Q.  And by this time were you already having

3    regular meetings with Google like we've seen with

4    Facebook?

5        A.  Yeah.  This was in 2021.  So we had been

6    meeting pretty regularly with Google by this time.

7            MR. VECCHIONE:  Okay.  You can put that

8    aside.

9            (Plaintiffs' Exhibit 29 marked.)

10   BY MR. VECCHIONE:

11       Q.  Let's try Exhibit 29.  Same thing, read me

12   the subject line, the date, and then take a look at

13   it.

14       A.  Okay.  Okay.  Subject line's:  Followup on

15   misinformation, or misinfo conversation.  It's

16   4/5/2021.

17           THE WITNESS:  Can I see this?

18           MS. SNOW:  Yes.

19       A.  Okay.

20   BY MR. VECCHIONE:

21       Q.  All right.  So can you go to the very end,

22   I guess, the very last page, read what you said on

23   March 29 at 9:52.

24       A.  "Are you all open to using our regular 4pm

25   meetings to go over things with Census, or what is

1  preferred?  I wasn't clear how interested you all

2  were on this effort or who the players are on your

3  end."

4       Q.  So what were the regular 4:00 p.m.

5  meetings you refer to?

6       A.  I think -- because I still have a

7  4:00 p.m. meeting every other Monday with Google.  I

8  think that these were the same every-other-week

9  check-in meetings.  Sometimes we wouldn't have them.

10  Sometimes we would have them and discuss things.

11       Q.  Did you have similar regular meetings with

12  the other platforms we've been discussing, Face- --

13  Meta and Twitter?

14       A.  We -- you asked some of this earlier.

15       Q.  I did.

16       A.  The same answer.  So we had regular

17  meetings with Google, and we had regular meetings

18  with Meta.  Most -- you know, the frequency changed.

19  So, you know, I don't meet as often.  I mean, Google

20  we meet every other week.  Right now with Meta it's

21  more ad hoc.

22       Q.  Okay.

23       A.  We had had a regular meeting with

24  Pinterest for a short period of time, and we had my

25  memory was just more ad hoc meetings on occasion

CAROL CRAWFORD  11/15/2022

Page 181

1   with Twitter.

2        **Q.  So on the regular meetings with either**

3   **Google or Facebook?**

4        A.  Mm-hmm (affirmative).

5        **Q.  Well, let me ask the question this way.**

6   **From the CDC end, were the same people usually**

7   **attending those meetings with each social media?**

8        A.  It could vary.  I mean, I was always -- I

9   mean, with Google, it was typically me and Fred

10  Smith, who's our technical lead, because often the

11  Google questions would be more about technical

12  implementations that we might have to work on.  We

13  were usually always on it.  Sometimes I would --

14  depending on the subject, I would bring in other

15  people.

16        With Meta, I was pretty much always on

17  there.  Jay typically listened in.  And then I would

18  bring people in depending on the subject.

19        **Q.  All right.  And what were the -- were the**

20  **topics typically misinformation, or technical**

21  **subjects?**

22        A.  They -- by and large, they were mostly

23  about things other than misinformation; though

24  misinformation was discussed in the meetings.  But

25  they were originated about getting our credible

CAROL CRAWFORD  11/15/2022

```
 1    or what the format, or Microsoft Teams, or in
 2    person, or?
 3          A.  It was always on either teams or they had
 4    BlueJeans that we used occasionally.
 5          Q.  Okay.  What's BlueJeans?
 6          A.  It's something like a Teams or a Zoom.
 7          Q.  Okay.  And, once again, do you know if
 8    there is any notes or record kept of the meeting?
 9          A.  I did not take any notes at the meeting
10    that I recall.  I mean, same answer I have been
11    giving.  If there were any, it was minor and they
12    would have been in Word or email.
13          Q.  Okay.
14              MR. VECCHIONE:  40.
15              MR. GILLIGAN:  I remember when everybody
16    just used Skype when it was simpler times.
17              (Plaintiffs' Exhibit 40 marked.)
18    BY MR. VECCHIONE:
19          Q.  Exhibit 40.  Once again the date and the
20    subject line, and then read it to yourself.
21          A.  Subject line:  COVID BOLO meetings on
22    misinformation, sent on May 10, 2021.
23              Okay.
24          Q.  All right.  Let's go back to the back page
25    of this that's Bates number 682.
```

CAROL CRAWFORD  11/15/2022

Page 242

```
 1        A.  Okay.
 2        Q.  Now, this is -- I think we've said this
 3   date.  It's May 10th of 2021?
 4        A.  Yes.
 5        Q.  And you send to Facebook the COVID BOLO
 6   misinformation meeting request; right?
 7        A.  Yes.
 8        Q.  And could you please read that for me?
 9        A.  (As read)  We would like to establish
10   COVID BOLO meetings on misinformation and invite all
11   platforms to join the meetings.  We are aiming for
12   the first one on Friday at noon.  I know you were
13   considering a possible process on your end, but we
14   wanted to start here just as an interim first step.
15   Are there direct POCs on your end I should include
16   on the invite?  I'm happy to chat if better, thanks.
17        Q.  All right.  Now, so this is the first BOLO
18   meeting.  Does that comport with your recollection?
19        A.  This is a note that I'm about to send an
20   appointment for the first BOLO meeting and asking
21   them who to include.
22        Q.  All right.  And we've already said POCs --
23        A.  Yes.
24        Q.  -- are the point of contacts; right?
25        A.  Mm-hmm (affirmative).
```

CAROL CRAWFORD  11/15/2022

```
 1          Q.  And you said:  "I know you are considering
 2   possible process on your end."
 3               What did you mean by that?
 4          A.  As I mentioned, that I was engaging with
 5   the platform saying what format would be best for us
 6   to talk about this.  And I think there were
 7   references in the exhibit a couple of times where
 8   they said they were thinking internally about what
 9   would be best.  So I think I was just referencing
10   that I knew that they were considering it as well.
11          Q.  Do you know what the topics -- did you
12   know what the topics for the BOLO were when you sent
13   this out?
14          A.  I don't know if I did or not.
15          Q.  All right.  Let's go to the next page back
16   where we have -- I believe this is from Jan
17   Antonaros to you, but he includes your email to him;
18   right?
19          A.  This -- the bottom part --
20          Q.  Mm-hmm (affirmative).
21          A.  -- is where I sent a similar note to
22   Google, which is Jan.
23          Q.  Okay.
24          A.  And I was telling her that we would like
25   to invite the digital platforms to attend the BOLO.
```

CAROL CRAWFORD  11/15/2022

Page 244

1    I think it was me sending the appointment or a

2    heads-up that it was coming.  I can't -- it looks

3    like maybe I -- this is an actual appointment.

4         Q.  Okay.

5         A.  But I tried to send each of them a

6    personal note that we were doing it.

7         Q.  And in this one you actually spelled out

8    be on the lookout; right?

9         A.  I did.

10        Q.  And was that because you hadn't discussed

11   it with them before, or did you have some concern

12   they wouldn't know what it was?

13        A.  I don't know why I didn't do it that time.

14        Q.  All right.  And there is Kevin Kane here

15   with the email address ███████@Google.com.  Who is

16   that?

17        A.  I don't remember Kevin, but this indicates

18   that he was from YouTube.

19        Q.  Okay.  And do you recall having

20   discussions with YouTube?

21        A.  YouTube would occasionally -- people from

22   YouTube would occasionally be on our regular

23   meetings, depending on what we talked about.  And

24   because YouTube has the most content, like, hosting,

25   they -- they were at the -- they were a part of the

 1   BOLO meetings, I believe, that Kevin attended

 2   probably, or someone from YouTube did.

 3          Q.   And you responded:  "Great.  I was going

 4   to ask about Kevin."

 5          A.   Yeah.  Maybe I remembered who Kevin was at

 6   the time.

 7          Q.   Okay.  And then finally the front page.

 8          A.   That's a repeat of -- oh, no, that's not.

 9   I apologize.  I'm looking at the wrong one.

10          Q.   And here you're sending this to the Google

11   folks?

12          A.   Yes.

13          Q.   Why don't you read it for the record?

14          A.   "We would like to establish COVID BOLO

15   meetings on misinformation and invite all platforms

16   to join the meetings.  We were aiming for the first

17   one on Friday at noon.  We heard through the

18   grapevine that Kevin Cain at YouTube would want to

19   join.  Are there other POCs on your end I should

20   include on the invite?"

21          Q.   All right.  You said YouTube.  Who's

22   YouTube related to, is it Google or Facebook?

23          A.   YouTube is a Google property.

24          Q.   Okay.

25          A.   Or platform.

CAROL CRAWFORD  11/15/2022

Page 246

1          Q.  And is it your recollection that you did

2     have a meeting on Friday?

3          A.  I think we did, but I don't have the exact

4     date.  But I believe we had -- that's when we had

5     the first BOLO meeting.

6          Q.  All right.  And do you have any list of

7     who actually showed up and was an attendee?

8          A.  No.

9          Q.  All right.  And, once again, it would be

10    on your calendar as far as if it happened?

11         A.  Now, to clarify I don't remember keeping a

12    list of who attended.  Maybe Census might have

13    because this is something they were arranging.  But

14    I don't recall it being sent to me.  It could have

15    been, but I don't believe so.

16         Q.  So they were helping you arrange this

17    because they'd done it before, this particular

18    meeting?

19         A.  Yes.  I mean, I mentioned that they

20    drafted the slides.

21         Q.  Right.

22         A.  And, you know, Chris participated in the

23    meeting.

24         Q.  Okay.  Chris.  Remind me his last name?

25         A.  Lewinsky, Lewitzke.

CAROL CRAWFORD  11/15/2022

Page 254

```
 1    had one.
 2             Q.  So the email states that --
 3                 You can put that aside.
 4                 (Plaintiffs' Exhibit 43 marked.)
 5    BY MR. VECCHIONE:
 6             Q.  Let's go to -- yeah, let's go to the last,
 7    43.
 8                 Once again for Exhibit 43 please state the
 9    subject matter line, and then the -- and who it --
10    what the date of it is?
11             A.  Subject:  Claims review.  6/29/2022.
12                 I have read it.
13             Q.  Okay.  So can you read the -- well, who is
14    Rachel Gruner?
15             A.  She is my new point of contact at Google.
16    She replaced Jan Antonaros.
17             Q.  And who's Lindsay Steele?
18             A.  Lindsay Steele replaced Stanley.
19             Q.  Onyimba?
20             A.  "O".
21             Q.  Okay.  And they're both -- their emails
22    are here in the to line; right?
23             A.  Yes.
24             Q.  All right.  And if you could read the
25    after Hi, Carol, Hi, Fred from Rachel, what does she
```

1    say here?

2         A.  "The YouTube policy team is requesting

3    evidence-based input on the claims below.  In the

4    past, the CDC has reviewed COVID information claims

5    and commented true or false plus any additional

6    context needed."

7         Q.  And then what are the claims?

8         A.  (As read)  Claim:  High dosage of

9    progesterone is a safe method of reversing chemical

10   abortion, in parentheses, mifepristone and

11   misoprostol.

12            Sorry.

13            (As read)  Claim:  High doses of

14   progesterone is an effective method of reversing

15   chemical abortion, in parentheses, mifepristone and

16   misoprostol.

17        Q.  All right.

18        A.  "Please let me know if you have questions

19   or concerns."

20        Q.  And then what -- how do you respond?

21        A.  "I'll check on this, but I think I'll

22   probably end up needing to refer you to another

23   agency.  I'll get back to you."

24        Q.  So this -- this -- is it your

25   understanding this didn't have anything to do with

CAROL CRAWFORD  11/15/2022

```
 1    COVID-19 or vaccines?

 2         A.  It definitely didn't have anything to do

 3    with COVID-19 or vaccines.

 4         Q.  Do you know why it was sent to you?

 5         A.  Well, as COVID's -- our focus is not

 6    solely on COVID.  We're focusing on other topics.  I

 7    think Rachel thought that we might be able to help

 8    with this topic as well.

 9         Q.  Okay.  Do you know who you sent it, what

10    agency you sent it to, if any?

11         A.  I -- I didn't know.  I called one of our

12    centers and asked if this was something that CDC

13    dealt with.  I didn't think that we did, and they

14    confirmed that we do not.  And I don't think they

15    had a suggestion on where to refer this to, but I

16    can't recall for sure.

17              MR. VECCHIONE:  All right.  I would like

18    to take a brief break and have the court reporter

19    put my last exhibit together and give you copies

20    and then --

21              MR. GILLIGAN:  There is a 44, too?

22              MR. VECCHIONE:  -- confer, confer with

23    counsel, and I think we'll be finishing up.

24              (Comments off the record.)

25              THE VIDEOGRAPHER:  Off the record at 5:07.
```

```
 1                  C E R T I F I C A T E

 2       STATE OF GEORGIA:

 3       DEKALB COUNTY:

 4                  I, Maureen S. Kreimer, a Certified Court

 5       Reporter for the State of Georgia, before whom the

 6       foregoing deposition was taken, do hereby certify:

 7                  That CAROL CRAWFORD, the witness whose

 8       deposition is hereinbefore set forth in pages 1 to 269,

 9       was duly sworn by me and that such deposition is a true

10       record of the testimony given by the witness.

11                  I further certify that I am not related to

12       any of the parties to this action by blood or marriage,

13       and that I am in no way interested in the outcome of this

14       matter.

15                  IN WITNESS HEREOF, I have hereunto set my

16       hand this 18th day of November, 2022.

17

18

19

20

21       _____

22       MAUREEN S. KREIMER, CCR-B-1379

23       Notary Public in and for the

24       State of Georgia.  My Commission

25       Expires August 14, 2024.
```

**EXHIBIT M**

CONFIDENTIAL

PLAINTIFF'S
EXHIBIT

40

From:        Crawford, Carol Y. (CDC/OD/OADC)

Sent:        5/10/2021 12:42:50 PM
To:          Stanley Onyimba          @google.com]; Jan Antonaros          @google.com]
Subject:     COVID BOLO meetings on misinformation

We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings.  We are aiming for our first one on Friday at noon.   We have heard through the grapevine that Kevin Cain at YouTube would want to join.  Are there other POCs on your end I should include on the invite?

MOLA_DEFSPROD_00002683

CONFIDENTIAL

| From: | Crawford, Carol Y. (CDC/OD/OADC) |
|---|---|
| Sent: | 5/11/2021 3:55:11 PM |
| To: | Jan Antonaros ▊@google.com]; Kevin Kane ▊@google.com] |
| Subject: | RE: COVID 19 BOLO Meeting |

Great – I was going to ask about Kevin at 4. ☺

From: Jan Antonaros ▊@google.com>
Sent: Tuesday, May 11, 2021 3:51 PM
To: Crawford, Carol Y. (CDC/OD/OADC) ▊@cdc.gov>; Kevin Kane ▊@google.com>
Subject: Re: COVID 19 BOLO Meeting

Hi Carol, Could you please add +Kevin Kane from our YouTube team to the call below? Thank you!

Jan Fowler Antonaros
Google Government Affairs and Public Policy
25 Mass Ave NW, 9th FL
Washington, DC 20001
▊@google.com
Android Mobile ▊

On Tue, May 11, 2021 at 3:25 PM Crawford, Carol Y. (CDC/OD/OADC) ▊@cdc.gov> wrote:

We would like to invite digital platforms to attend a short "Be On The Lookout" meeting on COVID. Let us know if you have questions and feel free to forward this message to anyone in your organization that should attend.

Thank you.

Carol Crawford
Chief, Digital Media Branch
Division of Public Affairs
OADC
▊@cdc.gov
▊

Join ZoomGov Meeting

▊

Dial by your location

| From: | Crawford, Carol Y. (CDC/OD/OADC) |
|---|---|
| Sent: | 5/10/2021 12:44:41 PM |
| To: | Payton Iheme @fb.com]; Genelle Adrier @fb.com] |
| Subject: | COVID BOLO Misinformation meetings |

We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings.  We are aiming for our first one on Friday at noon.  I know you were considering possible process on your end, but we wanted start here just as interim first step.  Are there direct POCs on your end I should include on the invite?  Happy to chat if better.

THANKS!

**EXHIBIT N**

CONFIDENTIAL

PLAINTIFF'S
EXHIBIT

43

| | |
|---|---|
| **From:** | Crawford, Carol Y. (CDC/OD/OADC) ▮ ▮P |
| **Sent:** | 6/29/2022 6:01:54 PM |
| **To:** | Rachel Gruner ▮ @google.com]; Smith, Fred (CDC/OD/OADC) ▮ @cdc.gov]; Lindsay Steele ▮ @google.com] |
| **Subject:** | RE: Claims review |

I'll check on this but I think I'll probably end up needing to refer you to another agency. I'll get back to you.

**From:** Rachel Gruner ▮ @google.com>
**Sent:** Wednesday, June 29, 2022 4:38 PM
**To:** Crawford, Carol Y. (CDC/OD/OADC) ▮ @cdc.gov>; Smith, Fred (CDC/OD/OADC ▮ @cdc.gov>; Lindsay Steele ▮ @google.com>
**Subject:** Claims review

Hi Carol and Fred,

The YouTube Policy team is requesting evidence-based input on the claims below. In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed.

**CLAIM:** High doses of progesterone is a **safe** method of reversing chemical abortion (mifepristone & misoprostol)
**CLAIM:** High doses of progesterone is an **effective** method of reversing chemical abortion (mifepristone & misoprostol)

Please let me know if you have any questions or concerns.

Thanks, Rachel

--

x  The linked...

Rachel Gruner, MPH
Health Outreach Lead, Google
▮ @google.com

**EXHIBIT O**

**ELVIS CHAN  11/29/2022**

```
 1        IN THE UNITED STATES DISTRICT COURT

 2      FOR THE WESTERN DISTRICT OF LOUISIANA

 3               MONROE DIVISION

 4               ---o0o---

 5

 6
    STATE OF MISSOURI, et al.,        )
 7                                    )
                      Plaintiff,      )
 8                                    )
         vs.                          )   Case No.
 9                                    )   3:22-cv-01213
    JOSEPH R. BIDEN, JUNIOR, et       )   -TAD-KDM
10  al.,                              )
                                      )
11                    Defendants.     )
                                      )
12

13

14

15               ---o0o---

16       TUESDAY, NOVEMBER 29, 2022

17   ZOOM VIDEOTAPED DEPOSITION OF ELVIS CHAN

18               ---o0o---

19

20

21

22

23

24  REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

25
```

1    But I understand that Mr. Sur is defending the

2    deposition, not Mr. Berger.  So if you've got an

3    issue, I don't mind if you guys want to talk about

4    it, but I don't want to have multiple -- multiple

5    attorneys objecting and instructions being started.

6    Can we proceed on that basis from now on?

7         MR. SUR:  We intend to do so.  There my be

8    some exceptional circumstances that warrant a

9    different approach, but that's how we expect to

10   proceed.

11        MR. SAUER:  I am fine to hear that.  You

12   know, if things come up that raise an issue, you

13   know, we can -- we can raise them.  But, yeah,

14   anyway, all right.  I mean, to be clear, you know,

15   any law enforcement privilege is held by the

16   government, not by Mr. Chan's personal capacity,

17   and Mr. Sur is the one who is there to represent

18   the government today.

19     **Q.   So -- but anyway, okay.  Mr. Chan, or**

20   **Agent Chan, who do you recall on the social media**

21   **platform side participating in these -- in these**

22   **working group meetings that you have been**

23   **testifying about from 2020 and 2022?**

24        A.   The companies that I remember attending

25   the meetings are Facebook; Microsoft; Google;

```
 1    Twitter; Yahoo!, which may have been known as
 2    Verizon Media at the time; Wikimedia Foundation and
 3    Reddit.
 4         Q.   Do you remember any others at this time?
 5         A.   I think I listed seven.  I -- those were,
 6    like, the regular participants that I can remember.
 7         Q.   How about on the U.S. government side,
 8    what agencies were represented at these meetings?
 9         A.   At these meetings, CISA is the host and
10    facilitator for the meeting.  They also invite
11    another component of Department of Homeland
12    Security called Intelligence and Analysis, I&A, so
13    DHS I&A I know attends.  The Office of the Director
14    of National Intelligence, ODNI, attends.  And then
15    from the FBI there is typically a representative
16    from the FBI's Foreign Influence Task Force, which
17    you will hear me abbreviate as FITF regularly.  And
18    then I attend from FBI San Francisco when I am
19    available.
20         Q.   And why are you included in particular?
21         A.   The reason that I attend these meetings is
22    because the way the FBI works is FBI field offices
23    are responsible for maintaining the day-to-day
24    relationships with the companies that are
25    headquartered in their area of responsibility,
```

1    which I may occasionally abbreviate to AOR.  And

2    all of the companies that have been listed, with

3    the exception of Microsoft, are all headquartered

4    in FBI San Francisco's territory.

5        **Q.   Now, where is Microsoft headquartered?**

6        A.   They are headquartered in Redmond,

7    Washington.

8        **Q.   And then on the CISA side in particular,**

9    **what individuals participate in these meetings?**

10       A.   Typically there are senior-level -- what I

11   believe are senior-level officials.  The two that I

12   specifically remember are Matt Masterson and Brian

13   Scully.

14       **Q.   Is that Matt Masterson, did you say?**

15       A.   Yeah.  Yeah, Matthew Masterson and Brian

16   Scully are the two regular attendees.  And they are

17   usually -- one or both of them -- one -- either one

18   of them is usually emceeing the meeting.

19       **Q.   So Brian Scully, do you know him**

20   **personally?**

21       A.   I know him just through work.

22       **Q.   Okay.  In what connection at work?**

23       A.   And I only know -- I only know

24   Mr. Masterson through work as well.

25       **Q.   When you say you know him through work,**

```
 1    did you work together on anything other than these
 2    meetings?
 3         A.    So we have met -- I want to say I have met
 4    in person with each of those individuals, twice in
 5    person; but they are primarily through either the
 6    preparatory calls for these meetings that they are
 7    hosting or the meetings themselves.
 8         Q.    So you work with CISA in preparatory calls
 9    for these industry working group meetings?
10         A.    Yes.
11         Q.    And in that connection, you've met Brian
12    Scully and Matt Masterson, correct?
13         A.    Yes.
14         Q.    And Brian Scully is involved in kind of
15    leading or emceeing these meetings; is that right?
16              MR. SUR:  Objection; vague.
17         Q.    BY MR. SAUER:  Or is he the -- is he the
18    leader of the meeting when it convenes?
19         A.    For the 2020 election cycle, Mr. Masterson
20    was the primarily -- he was primarily the
21    facilitator.  Ahead of the 2022 midterm elections,
22    Mr. Scully has been the primary facilitator.
23         Q.    Was that because Mr. Masterson left CISA
24    in the -- in the intervening time?
25         A.    Yes.
```

```
 1        Q.    Do you know where he works now?

 2        A.    Yes.  I believe he works at Microsoft now.

 3        Q.    Do you -- do you interact with him now as

 4    a representative of a -- of a tech company?

 5              MR. SUR:  Objection; vague.

 6              THE WITNESS:  I have only interacted with

 7    him on two occasions.  One was when he showed up at

 8    one of the more recent industry meetings ahead of

 9    the 2022 midterm elections.  That is when I

10    discovered that he went to Microsoft.  And then I

11    asked him to send me his new contact information

12    during the call, and then he sent me an email and

13    provided me with his new contact information.

14        Q.    BY MR. SAUER:  You work with CISA on these

15    industry working group meetings to help prepare

16    them, what's the nature of your involvement in

17    preparing for these meetings?  Do you kind of set

18    the agenda or -- you know, what's your involvement?

19              MR. SUR:  Objection; vague and compound

20    and implicates the deliberative process privilege.

21              MR. SAUER:  Let me rephrase the question.

22        Q.    Are you involved in preparing for these

23    meetings?

24        A.    No.  I participate in the preparation

25    meetings, but I do not provide any agenda items.
```

```
1        Q.   Do you remember anyone else at CISA
2    besides Mr. Scully and Mr. Masterson who
3    participates in these meetings?
4        A.   I don't recollect any other people's names
5    at this time.
6        Q.   Were there others who participated in --
7    but you just don't remember who they were?
8        A.   Yes, that is correct.
9        Q.   Okay.  Let me -- do you still have Exhibit
10   1 on the screen in front of you, your thesis?
11       A.   Yes.
12       Q.   Okay.  Let me ask -- let's turn back to
13   that for a little while.  And if we could, I am
14   going to scroll ahead to your abstract on Page v.
15   Can you see that clearly, Roman numeral v.
16            MR. SUR:  Roman numeral v.  Okay.
17            THE WITNESS:  Yes, I see it now.
18       Q.   BY MR. SAUER:  And can you see it also on
19   the screen share as well as on the iPad?  I want to
20   make sure you can see the document in both places
21   as we go forward today.
22       A.   I can see the bottom half of one
23   paragraph, and then -- wait, now -- now I see --
24   yeah, I see the bottom paragraph of the --
25       Q.   Actually, can I -- can I direct your
```

```
1    attention this sentence here in your abstract that
2    I am highlighting?  I guess, actually, for context,
3    if you see above -- actually, just focus on that
4    sentence.  "This" -- you say, "This thesis finds
5    that the Russians shifted their tactics from 2016
6    to 2020," right?
7        A.   Correct.
8        Q.   And then you say, "Still, the U.S.
9    government and social media companies effectively
10   impeded their influence campaigns primarily through
11   information sharing and account takedowns,
12   respectively," correct?
13       A.   Correct.
14       Q.   What do you mean by "information sharing"
15   here?
16       A.   So "information sharing" is meant --
17   there -- as I mentioned previously, there are two
18   types of information that the U.S. government,
19   specifically the FBI, shares with the social media
20   companies.  The first type of information, the
21   strategic information, which discusses the tools,
22   tactics or processes, shortened to be TPPs, used by
23   the Russians.
24            The second type of information shared by
25   the U.S. government is tactical information.  And
```

 1    when I mean tactical information, I specifically

 2    mean indicators or selectors.  And both of those

 3    are a term of art within the cybersecurity

 4    industry.  And indicators or selectors include IP

 5    addresses, email accounts, social media accounts,

 6    well, website domain names, and, like, file hash

 7    values.

 8        **Q.    Sorry.  Say the last thing.  What kind of**

 9    **hash values?**

10        A.    File, like electronic file hash values.

11        **Q.    Okay.  And so, yeah, I take it the**

12    **strategic information is kind of high-level advice**

13    **to the social media platforms about, you know, the**

14    **kinds of -- kinds of campaigns the Russians might**

15    **be conducting; is that fair to say?**

16             MR. SUR:  Objection; lacks foundation.

17             THE WITNESS:  I would not -- I would not

18    characterize the information we share as advice.

19        **Q.    BY MR. SAUER:  Okay.  Then in that case it**

20    **is sort of -- is it high-level general information**

21    **about what FBI understands the Russians are**

22    **engaging in when it comes to social media influence**

23    **campaigns?**

24             MR. SUR:  Objection; lacks foundation.

25             THE WITNESS:  Yes.

```
 1        Q.   BY MR. SAUER:  And then -- go ahead.
 2   Sorry.  Go ahead.
 3        A.   I can provide an example if that would be
 4   illustrative.
 5        Q.   That would be super helpful.  Please do.
 6        A.   I had the 2020 elections, through our
 7   investigation of the Internet Research Agency, we
 8   discovered that they were trying to set up a base,
 9   as it were, or set up offices in western Africa.
10   We shared this type of strategic information with
11   the social media companies.  They were able to use
12   whatever detection methods they have to discover
13   that there were Russian troll farms being set up
14   specifically in Ghana and Nigeria.
15        Q.   Okay.  And so you mentioned earlier that
16   tactical -- that would be strategic information?
17        A.   That would be strategic.  To summarize, an
18   example would be we believe the Russian troll
19   farms, specifically the Internet Research Agency,
20   is trying to make inroads in western Africa.
21        Q.   Got you.  And then tactical information
22   would be much more specific.  Here are specific --
23   I think you said IP addresses, websites, social
24   media accounts, that are actually -- the FBI has
25   concluded are being operated by the Russians.  Is
```

```
 1    that what tactical information is?
 2        A.    That is correct.
 3        Q.    So there is -- and so is there information
 4    sharing from the FBI to social media platforms
 5    providing that kind of specific tactical-level
 6    information?
 7        A.    Yes, there is.
 8        Q.    And I think your -- that then the timeline
 9    in your thesis goes on specifically with
10    "information sharing and account takedowns."  Does
11    "account takedowns" refer to the social media
12    platforms kind of taking down those social media
13    accounts where the FBI identifies them as being
14    operated by Russian actors?
15            MR. SUR:  Objection; lacks foundation.
16            THE WITNESS:  So the FBI shares
17    information with the social media companies, no
18    strings attached, so that the social media
19    companies can protect their platforms as they deem
20    appropriate.  And from what I have observed and
21    what they have told me when we have provided them
22    with high confidence of Russian selectors, that
23    they have been able to discover fake Russian
24    accounts and take them down.
25        Q.    BY MR. SAUER:  So you don't control what
```

1    they do, correct?

2        A.   I do not control what they do.

3        Q.   But you provide them with information that

4    they don't have about the source of certain -- you

5    called them selectors or social media accounts,

6    correct?

7        A.   Correct.

8        Q.   And when you provide them with that

9    information, they take it and they pull down those

10   accounts, at least sometimes, fair to say?

11            MR. SUR:  Objection; lacks foundation.

12            THE WITNESS:  If I can clarify, what they

13   do is they take the information that we share, they

14   validate it through their own means.  And then if

15   they determine that these are accounts being

16   operated by Russian state-sponsored actors, then

17   they have taken them down.

18       Q.   BY MR. SAUER:  Oh, okay.  And then -- and

19   that's, I -- I take it, part of the point of your

20   sharing the information with them, right?  So that

21   they can assess and evaluate and then ultimately,

22   if they agree with your conclusion, take them down,

23   correct?

24       A.   Correct.

25       Q.   In other words, the purpose of the

1    **information sharing on the FBI's side is to have**

2    **the inauthentic Russian accounts taken down so that**

3    **they are not influencing political discourse in the**

4    **United States, correct?**

5            MR. SUR:  Objection; lacks foundation,

6    calls for speculation.

7            THE WITNESS:  I would characterize it as

8    the FBI provides information to these companies so

9    that they can protect their platforms as they deem

10   appropriate, and they can take whatever actions

11   they deem appropriate without any suggestion or

12   interference from the FBI.

13      **Q.   BY MR. SAUER:  But my question's a little**

14   **different, which is what -- my question is:  Part**

15   **of the purpose from the FBI's perspective is to**

16   **give them the tools to assess and potentially take**

17   **down accounts that the FBI has deemed to be**

18   **inauthentic, correct?**

19           MR. SUR:  Objection; lacks foundation,

20   calls for speculation.

21      **Q.   BY MR. SAUER:  You may answer.**

22      A.   So I would say -- inauthentic -- so my

23   focus is on Russian state-sponsored, -controlled

24   accounts.  And so whether the companies take them

25   down or not, it's their own choice.

1      Q.    Right, but is it your purpose in giving

2   them the information that the FBI believes or has

3   concluded that they are Russian-operated accounts,

4   is it your purpose to equip them to take them down

5   if they end up agreeing with your assessment?

6            MR. SUR:  Objection; lacks foundation,

7   calls for speculation.

8            THE WITNESS:  My purpose is to share the

9   information with them so that they can protect

10  their platforms as they deem appropriate.

11     Q.    BY MR. SAUER:  And one way to protect

12  their platforms is to take down these accounts,

13  correct?

14     A.    That is correct.

15     Q.    And, in fact, that's what you say here in

16  this sentence, right?  You say that, "the U.S.

17  government and social media companies effectively

18  impeded their influence campaigns...through

19  information sharing and account takedowns," right?

20     A.    I said that.  You can see -- I put

21  "respectively" because it was the U.S. government,

22  specifically the FBI, sharing information; and it

23  was the social media companies doing the account

24  takedowns.

25     Q.    Right.  And the joint result of that was

```
 1   effectively impeding Russian influence campaigns,
 2   correct?
 3        A.   Correct.
 4        Q.   And -- and that's FITF's goal, right?  To
 5   effectively impede Russian influence campaigns,
 6   right?
 7             MR. SUR:  Objection; lacks foundation,
 8   calls for speculation.
 9             THE WITNESS:  Yeah, FITF -- my
10   understanding of FITF's goal is to counter malign
11   foreign-influence campaigns.
12        Q.   BY MR. SAUER:  Does that include
13   effectively impeding their influence campaigns, as
14   you say in your thesis?
15        A.   Yes.
16        Q.   Does that include doing so through account
17   takedowns by information sharing with social media
18   platforms?
19             MR. SUR:  Objection; lacks foundation,
20   mischaracterizes the testimony.
21             THE WITNESS:  Yeah, I believe you're
22   mischaracterizing.  So like I said before, the FBI
23   shares information with no strings attached and no
24   expectations to -- for the companies.  And the
25   companies, they can protect their own platforms.
```

```
 1              MR. SAUER:  I am going to jump ahead to
 2     page little Roman xvii.
 3              You can see there, Indraneel, it's going
 4     to be on Page 19 of the PDF.  See that?
 5              MR. SUR:  Yep.  Yeah, we're on it.
 6        Q.   BY MR. SAUER:  Okay.  I believe this is a
 7     kind of summary section of your thesis.  You talk
 8     about in this paragraph here that begins with, "The
 9     U.S. government's response," that I have
10     highlighted; do you see that?
11        A.   Yes.
12        Q.   And you say, "The U.S. government's
13     response to the Russian influence campaign appeared
14     more robust before the 2020 elections than in the
15     2016 or 2018 elections," correct?
16        A.   Correct.
17        Q.   And then in the next sentence, you say,
18     "The most important actions taken by the U.S.
19     government may have been the information sharing
20     with the social media companies to expose Russia's
21     different operations and shut down its accounts,"
22     correct?
23        A.   Correct.
24        Q.   So the information sharing was done, "To
25     expose Russia's different operations and shut down
```

```
1    its accounts," right?
2        A.   Correct.
3        Q.   And then "its" refers to Russia, right?
4    So (as read) "to expose Russia's different
5    operations and shut down Russia's accounts,"
6    correct?
7        A.   Correct.
8        Q.   I am going to jump ahead a few pages to
9    Page xxii.
10           MR. SAUER:  And, Indraneel, if you're
11   following on your iPad, that's going to be Page 24
12   of the PDF.
13       Q.   There's a reference here in the
14   acknowledgments where you refer to, "My colleagues
15   back at headquarters who were in the trenches with
16   me as we worked to protect the 2020 elections."
17   See that?
18       A.   Yes.
19       Q.   Okay.  What are you talking about there
20   where it says (as read), "in the trenches with you
21   as you worked to protect the 2020 elections"?
22       A.   I'm referring to my colleagues
23   specifically at the Foreign Influence Task Force
24   who participated in the meetings with me, who
25   provided briefings to the companies and who
```

1   coordinated the information sharing.

2        **Q.    And so you said you had meetings with the**

3   **companies.  What meetings did you have?**

4        A.   We had -- let me be more clear.  I hosted

5   meetings, bilateral meetings between each of the

6   companies I mentioned and the Foreign Influence

7   Task Force.

8             And we would also bring in field offices

9   that had investigations related to malign foreign

10  influence by state-sponsored actors.  We would also

11  bring in field offices that had cyber

12  investigations.  And when I mean cyber

13  investigations, I mean state-sponsored actors that

14  the FBI was investigating that we believe were

15  capable of hack-and-dump campaigns that we observed

16  in the 2016 election.

17       **Q.    Okay.  Let me unpack that a bit.**

18            **First of all, you said there were meetings**

19  **with social media companies, between you and social**

20  **media companies during the 2020 election cycle,**

21  **correct?  Is that what we're talking about?**

22       A.   Yes, that is correct.

23       **Q.    Now, did those meetings also continue in**

24  **the 2022 election cycle?**

25       A.   Yes.  They occur at roughly a quarterly

```
 1   cadence.
 2        Q.   And then do they -- does the cadence
 3   increase as elections get close?
 4        A.   Yes, they do.  And --
 5        Q.   Now, does that become monthly as the
 6   election nears and then weekly very close to the
 7   elections?
 8        A.   Ahead of the 2020 elections, that is
 9   correct.  Ahead of the 2022 elections, we moved it
10   from quarterly to monthly, and then we just had one
11   meeting a week ahead of the midterm elections.
12        Q.   I'm sorry.  You said you had one weekly
13   meeting ahead of the midterm elections?
14        A.   Right.  We had one meeting a week before
15   the midterm elections.
16        Q.   Oh, and how long was the -- how long was
17   that period of weekly meetings?  Was that, like,
18   the month before or the three months before?
19        A.   No.  Just the week before the election
20   itself.
21        Q.   Oh, okay.  There was one weekly meeting,
22   right, the week before the election?
23        A.   Yeah.  There was -- yeah.  So there was a
24   monthly meeting in October; and then we had another
25   meeting out of -- you know, out of cadence the week
```

```
 1   before the election, so the end of October.
 2        Q.    And then are these meetings going back to
 3   quarterly now that the election has passed?
 4        A.    That is correct.
 5        Q.    And so you're -- you'll have quarterly
 6   meetings with the social media companies going
 7   forward until the 2024 election cycle gets closer?
 8        A.    That is what I anticipate.
 9        Q.    And then as that election gets closer,
10   then you'll move to monthly and eventually weekly a
11   couple years from now, or in the fall of 2024; is
12   that fair to say?
13             MR. SUR:  Objection; calls for
14   speculation.
15             THE WITNESS:  That is what I anticipate.
16        Q.    BY MR. SAUER:  Let me ask you this:  What
17   social media companies are involved in these
18   meetings?
19             MR. SUR:  Objection; vague.
20             THE WITNESS:  Currently or in 2020?
21        Q.    BY MR. SAUER:  Well, let's start with
22   2020.  I'd like to know both.  Let's start with
23   2020, please.
24        A.    So for the 2020 elections, we regularly
25   met with Facebook, Google, Twitter, Yahoo!, Reddit
```

1    they take it very seriously.  And I would say that
2    to the best of their ability, they are very careful
3    before doing account takedowns.
4        **Q.  BY MR. SAUER:  I think that ties back into**
5    **something you said earlier, which was in 2016 they**
6    **really didn't do any account takedowns, fair to**
7    **say?**
8        A.    That is correct.
9        **Q.    And it -- and I take it they may have had**
10   **a -- I -- we may be speculating here, if you know.**
11   **Do you know if that was because they have a**
12   **financial incentive to leave those accounts up**
13   **because it increases their ad revenues?**
14            MR. SUR:  Objection; calls for
15   speculation.
16            THE WITNESS:  I wouldn't even begin to
17   speculate.  I don't know why.
18       **Q.  BY MR. SAUER:  Let me ask you this:  Why**
19   **did things change, in your view?  I take it in 2018**
20   **and 2020 there were many more account takedowns,**
21   **right?**
22       A.    So there are two parts to your question.
23   Why do I think they did it?  I can provide you with
24   my personal opinion.
25       **Q.    Okay.**

```
 1      A.   My -- I believe pressure from Congress,
 2  specifically HPSCI and SSCI, may have had a part of
 3  it.
 4           And then also because I believe that they
 5  felt that this may have damaged their brands, but
 6  that is my personal opinion.
 7      Q.   Okay.  Well, let me ask you this:  When
 8  you say "pressure from Congress" and you mentioned
 9  HPSCI and SSCI, what are HPSCI and SSCI?  Are
10  those -- are those committees?
11      A.   I'm sorry.  HPSCI is the -- the House
12  Permanent Select Committee on Intelligence.  And
13  SSCI is the Senate Select Committee on
14  Intelligence.
15      Q.   Starting with the House Permanent Select
16  Committee on Intelligence, what kind of pressure
17  did they put on the social media platforms to, you
18  know, engage more aggressively in account
19  takedowns?
20      A.   They compelled -- I don't know if they
21  compelled.  They requested the CEOs for the
22  companies that I mentioned, the -- to testify in
23  front of their committee.
24      Q.   And so they kind of brought in Mark
25  Zuckerberg and Jack Dorsey and Sundar Pichai and
```

```
 1   had them testify in front of Congress?

 2        A.    That is correct.

 3        Q.    And that happened -- that happened once or

 4   it happened multiple times?

 5        A.    To my knowledge, that happened more than

 6   once.

 7        Q.    And you believe that that -- that that

 8   kind of scrutiny and public pressure from Congress,

 9   in your view, motivated them to be more aggressive

10   in the account takedowns?

11             MR. SUR:  Objection; lacks foundation,

12   calls for speculation.

13             THE WITNESS:  That is just my personal

14   opinion.

15        Q.    BY MR. SAUER:  Yeah.  What is the basis

16   for your opinion?  Has anyone at a social media

17   platform ever made a comment to you that would

18   reflect that -- that view?

19        A.    I would say yes.  And the types of

20   comments that I have received are that staffers

21   from both of those committees have visited with

22   those companies.  And while they would not reveal

23   the types of discussions that they had with these

24   House and Senate staffers, they would indicate that

25   they had to prepare very thoroughly for these types
```

1  of meetings and that it was -- they indicated that

2  it felt like a lot of pressure.

3      Q.  "They" is representatives of social media

4  platforms?

5      A.  Yeah.  The social media companies that

6  were visited.

7      Q.  What -- what social media companies were

8  visited by these HPSCI and SSCI staffers?

9      A.  To my knowledge, it was the three

10 companies that I've mentioned, which include

11 Facebook, Google and Twitter.

12     Q.  And Facebook, Google and -- Facebook,

13 Google and Twitter employees all told you that they

14 experienced these visits from congressional

15 staffers as exercising a lot of pressure on them?

16     A.  That was how I interpreted their comments.

17     Q.  And then you infer from that that their

18 changes in takedown policies resulted from that

19 kind of pressure from Congress?

20     A.  That is my personal opinion.

21         If I can add, I think some of -- some of

22 what was discussed -- I'm interpreting what -- some

23 of what was discussed.  But what the -- the

24 staffers would come and talk to us either before or

25 after they met with those three companies.  And so

1   what was discussed with us was legislation that

2   they were thinking about doing, and them asking for

3   our opinion.

4        Q.   Uh-huh.  When you say "legislation that

5   they were thinking about doing," what do you mean?

6        A.   Legislation that either HPSCI or SSCI was

7   thinking about doing.

8        Q.   So HPSCI and SSCI, these committees on

9   intelligence, their staffers would be communicating

10   to the social media platforms Facebook, Twitter and

11   Google or YouTube that they intended to try and

12   pass legislation?

13        A.   So I inferred that because that is what

14   they discussed with me personally.

15        Q.   That is what they, the social media

16   platforms, discussed with you, correct?

17        A.   No, no.  That is what HPSCI and SSCI

18   discussed with me when they were coming to these

19   meetings.

20        Q.   Oh, did you -- were you in on these

21   meetings?  Like, were you included in the meetings

22   with the congressional staffers?

23        A.   So I and FBI San Francisco personnel would

24   meet with the congressional staffers, typically

25   before they met or after they met with the social

**ELVIS CHAN  11/29/2022**

Page 310

```
 1                 DEPOSITION OFFICER'S CERTIFICATE
 2    STATE OF CALIFORNIA    )
 3                           ) ss.
 4    COUNTY OF SAN FRANCISCO)
 5
 6            I, Balinda Dunlap, hereby certify:
 7            I am a duly qualified Certified Shorthand
 8    Reporter in the State of California, holder of
 9    Certificate Number CSR 10710 issued by the Certified Court
10    Reporters' Board of California and which is in full
11    force and effect.  (Fed. R. Civ. P. 28(a)(1)).
12            I am authorized to administer oaths or
13    affirmations pursuant to California Code of Civil
14    Procedure, Section 2093(b) and prior to being examined,
15    the witness was first duly sworn by me.  (Fed. R. Civ.
16    P. 28(a)(a)).
17            I am not a relative or employee or attorney or
18    counsel of any of the parties, nor am I a relative or
19    employee of such attorney or counsel, nor am I
20    financially interested in this action.  (Fed. R. Civ. P.
21    28).
22            I am the deposition officer that
23    stenographically recorded the testimony in the foregoing
24    deposition and the foregoing transcript is a true record
25                           / / /
```

**ELVIS CHAN  11/29/2022**

Page 311

```
 1    of the testimony given by the witness.  (Fed. R. Civ. P.

 2    30(f)(1)).

 3            Before completion of the deposition, review of

 4    the transcript [  ] was [  ] was not requested.  If

 5    requested, any changes made by the deponent (and

 6    provided to the reporter) during the period allowed, are

 7    appended hereto.  (Fed. R. Civ. P. 30(e)).

 8

 9    Dated:

10

11                           _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT P**

| | |
|---|---|
| **From:** | @twitter.com] |
| **Sent:** | 1/23/2021 1:08:36 AM |
| **To:** | Humphrey, Clarke EOP/WHO @who.eop.gov] |
| **CC:** | @twitter.com]; Flaherty, Robert EOP/WHO @who.eop.gov] |
| **Subject:** | [EXTERNAL]  Re: Flagging Hank Aaron misinfo |

Thanks. We recently escalated this.

On Fri, Jan 22, 2021 at 8:05 PM Humphrey, Clarke EOP/WHO @who.eop.gov> wrote:
Hey folks —

Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP:

>https://twitter.com/RobertKennedyJr/status/1352748139665645569<

And then if we can keep an eye out for tweets that fall in this same ~genre that would be great.

Thanks!
Clarke

--

Twitter, Inc. | Public Policy
@TwitterGov & @Policy