JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
JULIANA M. YEE (State Bar No. 304564)
Juliana.Yee@mto.com
CARSON SCOTT (State Bar No. 339868)
Carson.Scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

HELEN E. WHITE (*pro hac vice*)
Helen.White@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:    (202) 220-1100
Facsimile:    (202) 220-2300

Attorneys for Defendants
Google LLC and YouTube LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 3:23-cv-03880 |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| vs. | |
| GOOGLE LLC AND YOUTUBE, LLC, | Judge:   Hon. Trina Thompson |
| Defendants. | Date:    August 21, 2023 |
|  | Time:    10:00 a.m. |
|  | Crtrm.:  9 |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ..................................................................................................2

    A.   YouTube's Medical and Vaccine Misinformation Policies and their Application ......................................................................................................2

    B.   Google's Information Exchanges with the Government ...........................4

    C.   Kennedy's Lawsuit and Request for Emergency Relief ..........................7

III.  LEGAL STANDARD ........................................................................................8

IV.  ARGUMENT ......................................................................................................9

    A.   Kennedy Fails to Establish That He Is Likely to Succeed on the Merits ................9

        1.   Kennedy Does Not Allege *State* Action as Necessary Under Section 1983 ...............................................................................9

        2.   Kennedy Fails to Establish that Google, a Private Company, Engaged in Any "State Action" ..............................................9

            (a)   Ninth Circuit Precedent Sets a "Demanding" Standard for Transforming Private Conduct Into State Action .............................10

            (b)   Kennedy Cannot Meet This "Demanding" Standard Under Either the Nexus or Joint Action Tests ................................12

        3.   Kennedy's Contrary Arguments and Reliance on *Missouri v. Biden* Fail .............................................................................16

        4.   Kennedy Has Not Established Any State Action *with Respect to Him* ........18

    B.   Kennedy Fails to Establish Irreparable Harm Warranting a TRO ...........................19

    C.   The Balance of Equities Weighs Against a TRO and in Google's Favor, Including Because a TRO Would Violate Google's First Amendment Rights ........20

    D.   The Requested TRO Does Not Serve the Public Interest .........................................23

    E.   The Court Should Deny the Request for Expedited Discovery ..............................24

V.   CONCLUSION ..................................................................................................25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*Am. LegalNet, Inc. v. Davis*,
   673 F. Supp. 2d 1063 (C.D. Cal. 2009)............................................................24

5

6

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009)............................................................................8

7

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)..............................................................................10, 18

8

9

*Caribbean Marine Services Co., Inc. v. Baldridge*,
   844 F.2d 668 (9th Cir. 1988).............................................................................19

10

*Chiafalo v. Inslee*,
   224 F.Supp.3d 1140 (W.D. Wash. 2016).........................................................20

11

12

*Children's Health Defense v. Facebook, Inc.*,
   546 F. Supp. 909 (N.D. Cal. 2021).................................................................25

13

*Consul Grp. Re Dos Mil Veintiuno Sociedad De Responsabilidad Limitada v. Zinchenko*, No. LA CV19-01254, 2019 WL 2610963 (C.D. Cal. Apr. 15, 2019)...................25

14

15

*Consumer Opinion LLC v. Frankfort News Corp.*,
   No. 16-CV-05100-BLF, 2016 WL 6393520 (N.D. Cal. Oct. 28, 2016) ...................24

16

*CTIA – The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019)........................................................................19, 20

17

18

*Doe v. Harris*,
   772 F.3d 563 (9th Cir. 2014)........................................................................19, 20

19

*Doe v. San Diego Unified Sch. Dist.*,
   19 F.4th 1173, 1181 (9th Cir. 2021), reconsideration en banc denied, 22 F.4th
   1099 (9th Cir. 2022).......................................................................................23

20

21

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010)............................................................................8

22

23

*Fed. Agency of News LLC v. Facebook, Inc.*,
   395 F. Supp. 3d 1295 (N.D. Cal. 2019) .............................................................9

24

*Fed. Agency of News LLC v. Facebook, Inc.*,
   432 F. Supp. 3d 1107 (N.D. Cal. 2020) ........................................................ 12, passim

25

26

*Fid. Brokerage Servs. LLC v. York*,
   No. EDCV 19-1929-JGB, 2019 WL 5485122 (C.D. Cal. Oct. 24, 2019)..................25

27

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015)............................................................................8

28

*Global Horizons, Inc. v. U.S. Dep't of Labor*,
   510 F.3d 1054 (9th Cir. 2007)............................................................................................8

*Goldie's Bookstore, Inc. v. Superior Court*,
   739 F.2d 466 (9th Cir. 1984)..........................................................................................19

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
   742 F.3d 414 (9th Cir. 2014)..........................................................................................21

*Harbor Freight Tools USA Inc. v. Lumber Liquidators Holdings Inc.*,
   No. CV 12-10789 GAF, 2013 WL 12142995 (C.D. Cal. Jan. 10, 2013)..................25

*Hart v. Facebook Inc.*,
   No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ...................... 12, passim

*Hart v. Facebook Inc.*,
   No. 22-cv-737-CRB, 2023 WL 3362592 (N.D. Cal. May 9, 2023)............................2, 6, 12, 18

*IBiz, LLC v. City of Hayward*,
   962 F. Supp. 2d 1159 (N.D. Cal. 2013) .........................................................................21

*Kayvan v. Pompeo*,
   No. 5:19-CV-08071-EJD, 2020 WL 553940 (N.D. Cal. Feb. 4, 2020) ...............................24, 25

*Maffick LLC v. Facebook, Inc.*,
   No. 20-CV-05222-JD, 2020 WL 5257853 (N.D. Cal. Sept. 3, 2020)........................23

*Manhattan Comty. Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019) ...................................................................................................10

*Mathis v. Pacific Gas & Elec. Co.*,
   75 F.3d 498 (9th Cir. 1996)......................................................................................11, 17

*Maxim Integrated Prods., Inc. v. Quintana*,
   654 F. Supp. 2d 1024 (N.D. Cal. 2009) .........................................................................20

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974) ...................................................................................................1, 21

*NetChoice, L.L.C. v. Paxton*,
   49 F.4th 439 (5th Cir. 2022), cert. pet'n filed, No. 22-555 ...........................................21

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022), cert. pet'ns filed, Nos. 22-277, 22-393 ....................1, 21, 22

*O'Handley. Missouri v. Biden*,
   No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. July 4, 2023) ...............................2, 17

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022), aff'd sub nom. *O'Handley v. Weber*, 62
   F.4th 1145 (9th Cir. 2023)........................................................................................2, 21, 22

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023)................................................................................. 2, passim

*Oracle Am., Inc. v. Myriad Grp. AG*,
   No. C10-05064-SBA, 2011 WL 13154031 (N.D. Cal. Dec. 1., 2011) ....................................20

*Paxton. NetChoice, LLC v. Paxton*,
   142 S. Ct. 1715 (2022) ....................................................................................................................21

*Prager Univ. v. Google LLC*,
   951 F.3d 991 (9th Cir. 2020).................................................................................................1, 9, 10

*Sammartano v. First Jud. Dist. Ct.*,
   303 F.3d 959 (9th Cir. 2002), abrogated on other grounds *by Winter v. Nat. Res.*
   *Def. Council, Inc.*, 555 U.S. 7 (2008)..........................................................................................23

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
   208 F.R.D. 273 (N.D. Cal. 2002) ...................................................................................................24

*Stackla, Inc. v. Facebook Inc.*,
   No. 19-cv-05849-PJH, 2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ....................................23

*Turner Broadcasting Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ......................................................................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................................8

**FEDERAL STATUTES**

42 U.S.C. § 1983 .....................................................................................................................................9

**OTHER AUTHORITIES**

About Us, WHO, https://www.who.int/about .......................................................................................16

CNN, *Robert F. Kennedy Jr. explains why he is running for president*, YouTube
   (Apr. 29, 2023), https://www.youtube.com/watch?v=RRT8io6H0uo .........................................4

NTD, *LIVE: Democratic Presidential Candidate Robert F. Kennedy Jr. Delivers
   Foreign Policy Speech*, YouTube (June 20, 2023),
   https://www.youtube.com/watch?v=iZUZZTtZw_s ....................................................................4

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.     INTRODUCTION**

3      In this action, Plaintiff Robert F. Kennedy, Jr. advances the remarkable claim that the First

4 Amendment requires Google—a private entity with its own First Amendment rights—to

5 disseminate his wrong and dangerous medical falsehoods to the entire world on its video-sharing

6 platform, YouTube.  Even worse, he demands a temporary restraining order ("TRO") that requires

7 Google to start doing so now.  But Kennedy's extraordinary request flies in the face of controlling

8 law, in two fundamental and independently dispositive ways.  First, Google is not the government,

9 and the "First Amendment prohibits the government—not a private party—from abridging

10 speech."  *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020).  Second, Kennedy's

11 arguments rest on a profound misunderstanding of bedrock First Amendment law.  Google has an

12 unassailable First Amendment right to exercise its own discretion to decide what speech it will

13 serve on YouTube.  *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *NetChoice, LLC*

14 *v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022) (The First Amendment guarantees the right

15 to "remove or deprioritize a user or post" based on a platform's independent "judgment . . . about

16 the sorts of content and viewpoints that are valuable and appropriate for dissemination on its site."),

17 *cert. pet'ns filed*, Nos. 22-277, 22-393.  Far from requiring Google to disseminate misinformation,

18 the First Amendment protects Google's judgment that it will not help spread dangerous anti-vaxx

19 propaganda.

20      In an effort to evade this binding authority, Kennedy advances the wholly unsupported

21 assertion that the federal government has either strong-armed or secretly interjected itself into

22 Google's content-moderation decisions and therefore transformed Google's removal of his speech

23 into unconstitutional "state action."  The documents on which Kennedy relies establish nothing

24 more than that Google made an independent decision two years ago to address COVID- and

25 vaccine-related misinformation and that Google met with federal government officials to share

26 information relevant to their respective efforts to fight the COVID pandemic, which has killed over

27 a million Americans.  The Ninth Circuit has recently rejected nearly identical arguments that such

28 mutual information sharing transforms private parties' content moderation decisions into state

action.  *O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023).  And Judge Breyer, applying *O'Handley,* rejected nearly identical arguments, based on many of the same documents that Kennedy cites here.  *Hart v. Facebook Inc.*, No. 22-cv-737-CRB, 2023 WL 3362592, at *3 (N.D. Cal. May 9, 2023) ("*Hart II*").  Ignoring that precedent, Kennedy instead stakes his entire argument on *Missouri v. Biden*, a recent district court opinion from the Western District of Louisiana—a court notably not bound by *O'Handley*.  *Missouri v. Biden*, No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. July 4, 2023).  Notably, Kennedy offers no evidence at all that government officials and Google ever discussed his content specifically and thus that any purported restriction of *his* speech was caused by any state action.  His claims thus have no chance of success on the merits.

The equities also overwhelmingly favor rejection of Kennedy's extraordinary request.  To begin with, he waited nearly five months to bring suit, fatally undermining any claim for emergency relief.  Even more to the point, the injunction Kennedy seeks would deprive *Google* of its First Amendment rights, causing *it* irreparable harm.  *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–88 (N.D. Cal. 2022) ("[An online platform] has important First Amendment rights that would be jeopardized by a Court order telling [it] what content-moderation policies to adopt and how to enforce those policies. The Court will issue no such order.").  And in restricting Google's ability to moderate objectionable content in the manner it sees fit on YouTube, such an injunction would undermine the trust and expectations users have in the platform.

By the same token, the public interest weighs heavily in Google's favor:  Vaccine misinformation poses significant public health risks.  Substantial numbers of people may rely on such misinformation, putting themselves and other members of their community at risk.

The requested TRO should be denied.

## II.   BACKGROUND

### A.   YouTube's Medical and Vaccine Misinformation Policies and their Application

Defendant YouTube, LLC ("YouTube")—a subsidiary of Defendant Google LLC ("Google")—is a popular video-sharing platform that allows users to upload content that can then be viewed by visitors to its site.  As "one of the most visited websites in the world," Compl. ¶ 11,

1   YouTube has policies that govern how people can use the service, including restrictions on the

2   types of content that they can post.  Declaration of Jonathan H. Blavin ("Blavin Decl."), Ex. C

3   (Community Guidelines).  These policies are designed and regularly updated to make YouTube a

4   safer and more enjoyable place for users and creators.  *Id.*  These policies also create an

5   expectation for YouTube users about what content is—and is not—available on the platform.

6       Among these policies are two that concern medical misinformation.  As of June 2023,

7   YouTube's COVID-19 Medical Misinformation Policy prohibited "content about COVID-19 that

8   poses a serious risk of egregious harm" and "content that spreads medical misinformation that

9   contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical

10   information about COVID-19."[1]  Street Decl., Ex. D.  YouTube's Vaccine Misinformation Policy

11   similarly did not "allow content that poses a serious risk of egregious harm by spreading medical

12   misinformation"—content that contradicts local health authorities' or the WHO's guidance on

13   vaccine safety, efficacy, and ingredients—"about currently administered vaccines that are

14   approved and confirmed to be safe and effective by local health authorities and by the World

15   Health Organization (WHO)."  *Id.*, Ex. C.

16       Earlier this year, Google removed two YouTube videos of Kennedy that violated its

17   policies on medical misinformation, which are the focus of the TRO.[2]  In March 2023, Google

18   removed a video of Kennedy speaking at Saint Anselm College's New Hampshire Institute of

19   Politics (NHIOP), in which he "recount[ed] his suspicions regarding the expanded regime of

20   childhood vaccines he suggests are linked to increased cases of autism in children."  *Id.*, Ex. B

21   (Patch Article).  And in June 2023, Google removed a video in which Kennedy discussed the

---

[1] Google recently adopted a revised, materially similar medical misinformation policy.  Blavin Decl., Ex. E.  Under that new policy, Google will continue to remove "content [from YouTube] that promotes information that contradicts health authority guidance on the prevention or transmission of specific health conditions, or on the safety, efficacy or ingredients of currently approved and administered vaccines."  *Id.*  As with its prior misinformation policies, Google retains discretion and ultimate decision-making authority over when to remove this material.  *Id.* (explaining that Google "may make exceptions" to this policy under certain circumstances).

[2] Plaintiff references Google's removal of another video involving Jordan Peterson, but fails to identify specifically the video or provide any documentation suggesting that it was removed for violating YouTube's medical misinformation policies, as opposed to some other reason.  TRO Br. at 10 (citing R. Kennedy Decl. ¶ 4).

"Pfizer COVID Vaccine Trial" with podcast host Joe Rogan that included "claims about COVID-19 vaccinations that contradict[ed] expert consensus."  A. Kennedy Decl., Ex. A (Takedown Notice).  In each instance, Google "reviewed [the] content carefully, and . . . confirmed that it violate[d] [Google's] . . . policy."  *Id.*  Google continues to allow other speeches and appearances by Kennedy to remain on YouTube.[3]

These takedowns were unremarkable.  Google's "policies are enforced for everyone, regardless of the speaker's political views."  Street Decl., Ex. B (Patch Article).  "If content breaks [Google's] rules, [it] remove[s] it."  A. Kennedy Decl., Ex. A (Takedown Notice).

**B.    Google's Information Exchanges with the Government**

Kennedy contends that somehow "the decisions to censor [him] on these matters of public concern were not made by [Google], acting of its own accord, but as part of the partnership between [Google] and federal government officials."  Compl. ¶ 26.  Examination of the declarations and accompanying exhibits attached to the TRO, summarized below, reveals nothing of the sort.  At most, the documents Kennedy cites demonstrate that Google met with government officials to inform them of its independent and existing efforts to remove misinformation on YouTube; there is no evidence of coercion.

Kennedy points to documents showing that years before his specific videos were removed from YouTube, during the midst of the COVID-19 pandemic in 2021, employees of Google met with representatives of the Office of the Surgeon General, Street Decl., Ex. G (OSG Discovery Responses at 32), the Executive Office of the President, *id.*, Ex. F (Flaherty Email), and the Centers for Disease Control and Prevention, *id.*, Ex. L (Crawford Dep. at 179), to discuss the proliferation of misinformation concerning COVID-19.[4]  These meetings primarily involved the exchange of information regarding Google's efforts to combat medical misinformation on

---

[3] *E.g.*, CNN, *Robert F. Kennedy Jr. explains why he is running for president*, YouTube (Apr. 29, 2023), https://www.youtube.com/watch?v=RRT8io6H0uo; NTD, *LIVE: Democratic Presidential Candidate Robert F. Kennedy Jr. Delivers Foreign Policy Speech*, YouTube (June 20, 2023), https://www.youtube.com/watch?v=iZUZZTtZw_s.

[4] Other major platforms also met with the government to discuss medical misinformation during the COVID-19 pandemic.  *See* Street Decl., Ex. M (noting meetings with Meta, Twitter, and Pinterest).

-4-

1    YouTube, and largely consisted of Google employees "informing [the government] of the steps

2    they [were] *currently taking*" independently to fight misinformation.  Street Decl., Ex. H (Waldo

3    Dep. at 118:19-20) (emphasis added).

4            Beginning in July 2021, the Office of the Surgeon General held a series of meetings with

5    Google to discuss the company's ongoing efforts to combat misinformation.  Eric Waldo, OSG's

6    Director of Engagement, noted at the outset his impression that Google had already been "working

7    hard and thinking deeply about this issue."  *Id.*, Ex. I (Waldo Email).  In the first meeting, OSG

8    informed Google that the Surgeon General intended to issue an Advisory on Health

9    Misinformation.  *Id.*, Ex. G (OSG Discovery Responses at 32).  Following issuance of the

10   Advisory, which included recommendations for online platforms on how to combat misinformation,

11   *id.*, Ex. H (Waldo Dep. at 119-20), it was Google (not government officials) that proactively

12   requested a follow-up discussion.  *Id.* (Waldo Dep. at 119).  At the ensuing July 30 meeting, Google

13   representatives expressed "agree[ment] that [COVID misinformation] is a really important issue"

14   and conveyed "all the things that . . . [Google was] working on about it."  *Id.* (Waldo Dep. at

15   118:16-18).  Google did not, however, suggest that it was doing "new things" in response to the

16   Advisory.  *Id.* (Waldo Dep. at 120:13).  Instead, it informed the government of "work that they

17   were *already doing*" with respect to COVID misinformation.  *Id.* (Waldo Dep. at 120:14-15)

18   (emphasis added).  A September 14 meeting featured another "update of . . . [Google] telling the

19   Surgeon General's office what they were doing to fight misinformation."  *Id.* (Waldo Dep. at

20   129:20-23).  The final meeting in that series, on November 22, lasted only thirty minutes and

21   "briefly touched on misinformation among other topics."  *Id.*, Ex. G (OSG Discovery Responses at

22   33).

23           Google's interactions with other federal government actors were similarly centered on

24   exchanging information about its independent and existing efforts to combat misinformation.  In an

25   apparent reference to an April 21, 2021 meeting highlighted in the TRO application, *see* TRO Br. at

26   15, White House official Rob Flaherty stated in an email to Google that his focus in meeting with

27   Google was on obtaining additional information regarding its ongoing efforts to combat

28   misinformation.  He asked for the "top trends that [Google was] seeing in terms of misinformation,"

-5-

1    and further inquired as to what "interventions" have been effective in reducing the impact of

2    misinformation.  Street Decl., Ex. F (Flaherty Email).  Although Flaherty suggested that he wanted

3    to "be sure that [Google] . . . [was] working toward making the problem better," he made clear that

4    the government was not recommending—let alone requesting or requiring—that Google remove

5    any content: "We certainly recognize that removing content that is unfavorable to the cause of

6    increasing vaccine adoption is not a realistic—or even good—solution."  *Id.*  Ultimately, Flaherty's

7    primary ask was simply to be kept apprised of Google's efforts: he requested that Google "continue

8    a good-faith dialogue about what is going on under the hood."  *Id.*  Google representatives—along

9    with representatives of other online platforms—during this time also attended BOLO ("be on the

10   lookout") COVID-19 misinformation meetings with the CDC.[5]  *Id.*, Ex. L (Crawford Dep. at 242-

11   45).  However, "the CDC 'did not discuss the development of [content-moderation] policies, or the

12   enforcement of [those] policies' with the [online platforms]."  Indeed, when asked whether "anyone

13   at CDC" either "craft[ed] the content policy" of "any social media company" or even "g[ave] input

14   on what such a policy should look like," CDC official Carol Crawford responded "No."  Blavin

15   Decl., Ex. B (Crawford Dep. at 103:20-104:10).  Crawford also responded "No" when asked

16   whether she or "anyone at the CDC help[ed] any . . . social media company on how they should

17   apply their policies . . . toward a particular post."  *Id.* (Crawford Dep. at 105:1-6); *see Hart II*, 2023

18   WL 3362592, at *3 ("[T]he CDC 'did not discuss the development of [content-moderation]

19   policies, or the enforcement of [those] policies' with the [platforms].").[6]

20          When Google first adopted a COVID-19 vaccine misinformation policy that included

21   criteria for removing offending content in September 2021, it shared this information with the

22   government in a similarly proactive fashion as it had other updates regarding its efforts to combat

23   misinformation.  Via what "appear[ed] to be an unsolicited email" from Google, *id.*, Street Decl.,

24   _____

25   [5] As of November 2022, representatives of the CDC continued to meet bi-weekly with Google,
     though those meetings were "mostly about things other than misinformation."  Street Decl., Ex. L

26   (Crawford Dep. at 181:22-23).  Google has also occasionally sought assistance from the CDC in
     determining whether certain COVID-related medical claims were true.  *Id.*, Ex. N (Gruner Email).

27   [6] Plaintiff misleadingly omitted excerpts of the Crawford Deposition that make clear that the CDC
     had no involvement in the creation or enforcement of any online platform's content policies.

28   Blavin Decl. ¶ 3 & Ex. B.

Ex. H (Waldo Dep. at 297:9-10), a Google representative informed Waldo that Google would "be introducing a new policy that prohibits content that includes harmful misinformation about . . . vaccines." *Id.*, Ex. J (Kane Email).  The email offered links to Google's "help center," where the government could learn more about Google's policy.  *Id.*

Kennedy does not identify a single document or communication between the federal government and Google from any point in time concerning his content, let alone the application of such policies to, or the removal of, his content.

### C.   Kennedy's Lawsuit and Request for Emergency Relief

Following Google's removal of his NHIOP speech in March 2023, Kennedy, through counsel, took to the press to threaten Google with legal action.  *Id.*, Ex. B (Patch Article).  His counsel asserted, without evidence, that "[Google's] actions"—removing Kennedy's posts pursuant to its clearly stated policies—"have all the signs of government censorship."  *Id.*  The next month, Kennedy declared his candidacy for President of the United States.  *Id.* ¶ 3.  According to Kennedy, Facebook and Twitter "stopped censoring [him] after [he] declared [his] presidential candidacy," R. Kennedy Decl. ¶ 4, taking a notably different approach from Google despite Facebook and Twitter having also met with federal government officials to discuss their COVID-related misinformation efforts, Street Decl., Ex. G (OSG Discovery Responses at 32–33).  Kennedy laments that "Google's actions have deterred [his supporters] from posting other content related to [him]," yet recognizes that "some wear [Google's removal of their videos] as a badge of honor."  R. Kennedy Decl. ¶ 5.

Three-and-a-half months after declaring his candidacy, and five months after the removal of the NHIOP speech, Kennedy filed this complaint alleging that Google had violated his First Amendment rights and seeking an injunction to "restore any videos of Mr. Kennedy's political speech that it has removed during the 2024 presidential campaign," as well as a declaration that Google's medical misinformation policies are unconstitutional.  Compl. at 13.  One week after that, Kennedy filed this application for a temporary restraining order, which seeks to bar Google from "using either the 'Vaccine misinformation policy' or the 'COVID-19 medical misinformation policy' to remove videos of [Plaintiff's] speech from YouTube . . . pending a trial on the merits."  Proposed TRO, Dkt. No. 7-4, at 1.

III.    **LEGAL STANDARD**

A temporary restraining order is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); s*ee Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (discussing that plaintiffs "face a difficult task in proving that they are entitled to this 'extraordinary remedy'"). To obtain this relief, a plaintiff must establish: (1) the plaintiff "is likely to succeed on the merits"; (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angele*s, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  Where a "party has not shown any chance of success on the merits, no further determination of irreparable harm or balancing of hardships is necessary." *Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007).

In addition, where, as here, a party seeks a mandatory injunction, the burden is "doubly demanding," as the party "must establish that the law and facts clearly favor her position, not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). An injunction is mandatory where it "orders a responsible party to take action," and "goes well beyond simply maintaining the status quo" pending litigation. *Id*. (quotations omitted).  Here, Kennedy's requested relief would effectively require Google to *restore* videos of him it already has removed. *E.g.*, Compl. at 12–13 (seeking injunctive relief to "*restore any videos* of [Plaintiff's] political speech that it has removed during the 2024 presidential campaign" (emphasis added)); TRO Br. at 10–11 (noting that Google has "removed" videos); Street Decl., ¶ 5 & Ex. A (same); A. Kennedy Decl., Ex. A (noting that Google "won't be putting your content back up on YouTube").   The requested injunction thus "require[s] Google to take affirmative action" and is mandatory in nature. *Garcia*, 786 F.3d at 740 (injunction mandatory where it required Google to "remove (and to keep removing)" videos from YouTube).  Such injunctions are "'particularly disfavored'" and "should not issue in 'doubtful cases.'" *Id*. (citations omitted).

As set forth below, under either the traditional or heightened mandatory injunction standard, Kennedy has failed to meet the necessary elements for a TRO.

IV.   **ARGUMENT**

   A.   **Kennedy Fails to Establish That He Is Likely to Succeed on the Merits**

   Kennedy's claim for injunctive relief under 42 U.S.C. § 1983 fails for two independent reasons.  First, Section 1983 applies only to acts taken "under color of" *state* law and Kennedy has not demonstrated the involvement of any state or local official.  That alone dooms his claim and precludes success on this motion.  Second, the Constitution only protects against *government* encroachment on free speech and Google is indisputably a private entity.  Kennedy has failed to articulate any theory under which Google's general policies surrounding medical misinformation could constitute state action and therefore warrant judicial scrutiny, let alone that any such state action led to the removal of his speech.  Kennedy therefore is unlikely to succeed on the merits of any constitutional claim against Defendants.

   1.   **Kennedy Does Not Allege *State* Action as Necessary Under Section 1983**

   Kennedy brings his lone claim for injunctive relief under 42 U.S.C. § 1983, but cannot demonstrate an essential element of that claim: some action taken "under color of any statute, ordinance, regulation, custom, or usage, of any *State or Territory or the District of Columbia*." 42 U.S.C. § 1983 (emphasis added).  He makes no allegation and offers no evidence that anyone at Google had any contact with any *state* official—only members of the federal government.  He therefore cannot show a likelihood of success on his Section 1983 claim.  *See*, *e.g.*, *Fed. Agency of News LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1304 (N.D. Cal. 2019) (dismissing Section 1983 claim where "Plaintiffs' complaint does not allege that any party was acting under color of *state* law." (emphasis in original)).

   2.   **Kennedy Fails to Establish that Google, a Private Company, Engaged in Any "State Action"**

   Kennedy's motion fails for a separate, more fundamental reason:  He has failed to show a likelihood of success of proving that Google engaged in state action of any kind.  Kennedy asserts that Google violated his First Amendment rights, but "the First Amendment prohibits the government—not a private party—from abridging speech." *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020).  The Ninth Circuit has expressly held that YouTube is not a "public

-9-

forum for speech" and is not bound by the First Amendment's constraints when it decides what speech to permit and what speech not to permit on its platform. *Id.* at 996–97. Thus, while "YouTube may be a paradigmatic public square on the Internet," "it is 'not transformed' into a state actor solely by 'provid[ing] a forum for speech.'" *Id.* (quoting *Manhattan Comty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930, 1934 (2019)).

(a)     Ninth Circuit Precedent Sets a "Demanding" Standard for Transforming Private Conduct Into State Action

Kennedy is unlikely to prevail in proving that this case falls within any of the "exceptional cases" in which a private party may nevertheless be deemed a "state actor" subject to constitutional requirements. *O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023). In the Ninth Circuit, a private party may only be deemed a state actor if it satisfies one of four tests: "(1) the public function test, (2) the state compulsion test, (3) the nexus test, [or] (4) the joint action test." *Id*. Though Kennedy does not situate his argument in any of these particular tests, his arguments appear to be directed at showing some form of "nexus" or "joint action" between the government and Defendants.[7] Under the nexus test, courts "ask[] whether government officials have 'exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). A state exercises impermissible coercive power when "government officials threaten adverse action to coerce a private party into performing a particular act." *Id.* And, under this test, "significant encouragement" is not mere plaudits for doing the right thing, but instead applies only where "the State's use of positive incentives . . . overwhelm[s] the private party and essentially compel[s] the party to act in a certain way." *Id.* at 1158. Under the joint action test, courts will only find joint action "when the state has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity" or when the state "significantly involves itself in the private parties'

---

[7] Kennedy does not show that, when it removed videos of Kennedy, Google "exercise[d] a state-created right"—a showing which is generally necessary to state a constitutional claim against a party. *O'Handley*, 62 F.4th at 1156. Because Kennedy has neither made any argument that he satisfies that requirement, nor has he argued that that requirement does not apply here, he has forfeited any argument on this score and is, in all events, unlikely to succeed on the merits.

1   actions and decisionmaking in a complex and deeply intertwined process." *Id.* at 1159 (internal

2   quotations and citations omitted).  Kennedy cannot meet either of these "demanding" tests. *Id.*

3       Ninth Circuit precedent forecloses Kennedy's claim.  In *O'Handley*, the Ninth Circuit held

4   that Twitter was not a state actor under either the nexus or joint action tests despite allegations of a

5   far closer partnership with the California Secretary of State's office than Kennedy asserts here. *Id.*

6   at 1157.  Specifically, the plaintiff there alleged that Twitter created a special platform through

7   which a "limited number of government agencies and civil society groups," including the

8   California Secretary of State's office, could flag posts for "expedited review" for content

9   moderation. *Id.* at 1154.  According to the complaint, California then created a special division

10  within the Secretary of State's office "[t]o monitor and counteract false or misleading information

11  regarding the electoral process that is published online," including by "working closely with social

12  media companies." *Id.*  This office allegedly "worked in partnership with social media platforms

13  to develop more efficient reporting procedures for potential misinformation." *Id.*  And lastly, the

14  office flagged over 300 "erroneous or misleading social media posts," "98 percent" of which

15  "were promptly removed for violating the respective social media companies community

16  standards"—including the plaintiff's. *Id.*

17      The Ninth Circuit held that these allegations satisfied neither the nexus nor joint action test.

18  Applying the nexus test, the court held that a government request to remove a post was neither

19  coercive nor "significantly encouraging" because there was no evidence "that Twitter would suffer

20  adverse consequences if it refused the request (or receive benefits if it complied)." *Id.* at 1158–59.

21  Thus, any post-removal decisions were merely "the result of [Twitter's] own independent judgment

22  in enforcing its . . . Policy." *Id.*  The court similarly held that this flunked the joint action test

23  because the allegations amounted merely to "consultation and information sharing" that does not

24  "rise to the level of joint action." *Id*. at 1160 (quoting *Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d

25  498, 504 (9th Cir. 1996)).  Though government officials provided important information about

26  potentially impermissible posts, at the end of the day, "in every case," "company employees

27  decided how to utilize this information based on their own reading of the flagged posts and their

28  own understanding of the Twitter Rules." *Id.*  Because the government had neither "interjected

-11-

itself into the company's internal decisions" nor "played any role in drafting Twitter's" policy, *id.*, Twitter retained control over its content moderation decisions and was not a state actor.

Multiple district court decisions from this district—from before and after *O'Handley*—also have rejected strikingly similar claims by plaintiffs alleging First Amendment violations by online platforms.  In *Hart v. Facebook*, Judge Breyer considered some of the same documents at issue here and dismissed similar First Amendment claims against Facebook and Twitter, holding that Biden Administration officials' policy suggestions regarding those companies' COVID and vaccine-related misinformation policies and a related Surgeon General advisory were insufficient to make those companies state actors when they suspended the plaintiff's accounts.  *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507, at *7 (N.D. Cal. May 5, 2022) ("*Hart I*"); *Hart*, 2023 WL 3362592, at *3 ("*Hart II*").  In *Federal Agency of News LLC v. Facebook, Inc.*, Judge Koh—then serving as a district court judge—similarly held that Facebook was not a state actor despite allegations that it was in a "'partnership' with the government and law enforcement agencies" that assisted Facebook in detecting and removing posts from Russian operations designed to interfere with the 2018 election.  *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1124–25 (N.D. Cal. 2020) ("*FAN*").

> (b)    Kennedy Cannot Meet This "Demanding" Standard Under Either the Nexus or Joint Action Tests.

Kennedy does not meet the high bar for either nexus or joint action under *O'Handley*.  He contends that the following communications between the federal government officials and Google transformed Google into a state actor: (1) a series of meetings in the summer and fall of 2021 between the Surgeon General's office and Google both before and after the Surgeon General issued a health advisory regarding vaccine misinformation on social media, Street Decl., Ex. G (OSG Discovery Responses) (disclosing meetings); Street Decl., Ex. H (Waldo Dep. at 117–21) (describing meetings); (2) an April 22, 2021 email from Rob Flaherty to Google employees summarizing a meeting the day prior and asking Google for additional information about the spread of vaccine misinformation on YouTube and its policies to combat it, Street Decl., Ex. F (Flaherty Email); and (3) meetings between the CDC and major online platforms in 2021 at which

vaccine misinformation was sometimes discussed and related communications, Street Decl., Exs. L–N.[8]  TRO Br. at 15–16.  Kennedy offers no evidence of any communications within the past year and no evidence of any communication between government officials and Google regarding any of his specific content—let alone the content that forms the basis of his lawsuit.

*Nexus Test.*  None of the communications Kennedy relies on, whether taken individually or as a whole, transforms Google's private content moderation decisions into state action under *O'Handley*'s nexus test, i.e., involve "government officials threaten[ing] adverse action to coerce" Google "into performing a particular act," or significant encouragement such that "the State's use of positive incentives . . . overwhelm[ed]" Google "and essentially compel[led] [it] to act in a certain way."  62 F.4th at 1157–58.

To start, Kennedy's documents describing the Surgeon General's Office's July 2021 communications with Google undermine, rather than advance, his claim of state action under the nexus test.  In deposition testimony, Surgeon General's Office official Eric Waldo repeatedly explained that Google was *independently* seeking to limit vaccine-related misinformation on its platform without any prompting by the government.  *See* Street Decl., Ex. H (Waldo Dep. at 119–21).  During these meetings—some of which Google initiated—Google shared with the government what work it was "already doing" rather than any "new things" that it was doing in response to the Surgeon General's health advisory.  *Id.* (Waldo Dep. at 120:13-15); *see also id.* (Waldo Dep. at 121:8-12) ("I recall them telling us what they were currently doing to address that.  So I – and some of these calls I experienced as them – you know, they read the advisory and said, yeah, we are doing that."); *id.* (Waldo Dep. at 120:12-15) ("I didn't get the impression that it was new things [that Google was doing].  I got the impression that it was work they were already doing.").  In addition, Waldo's emails to Google demonstrate that the Office understood Google already to be

---

[8] Kennedy also includes deposition testimony regarding communications between law enforcement and Google concerning election-related misinformation and election interference.  *See* Street Decl., Ex. O (Chan Dep.).  Plaintiff does not contend that any such content of his was removed nor does that testimony mention medical misinformation.  And, in any event, the communications described in that testimony do not contain any indicia of coercion, significant encouragement, or joint action—with respect to vaccine misinformation or otherwise.

1    "working hard and thinking deeply" about "stop[ping] the spread of health information" when

2    asking to meet and "discuss what's on the horizon."  Street Decl., Ex. I (Waldo Email).

3            Flaherty's April 2021 meeting with, and email to, Google, likewise do not come close to

4    satisfying the nexus test.  *Id.*, Ex. F.  Though Flaherty makes clear that the White House is

5    "concerned" about vaccine misinformation, the email itself merely asks questions about Google's

6    approach to the problem and for information about trends on YouTube.  *Id.*  Flaherty never directs

7    Google to take particular action or threatens any adverse consequences if it does not address the

8    issue.  *Id.*  To the contrary, Flaherty acknowledges that "removing content that is unfavorable to

9    the cause of increasing vaccine adoption is not a realistic—or even good—solution."  *Id.*  This

10   email therefore offers no evidence of any coercion by the White House for Google to remove more

11   vaccine misinformation.

12           Kennedy's documents regarding the CDC's communication with Google are similarly

13   devoid of any evidence of coercion.  He attaches a May 10, 2021 email from CDC official Carol

14   Crawford to Google inviting Google to "COVID [Be On the Lookout] meetings on

15   misinformation" with all of the major online platforms.  Street Decl., Ex. M (Crawford Email).

16   Crawford's deposition testimony reveals that only two such meetings ever took place, Blavin

17   Decl., Ex. B (Crawford Dep. at 198:21-24) and that each meeting lasted "maybe . . . 20 minutes."

18   *Id.* (Crawford Dep. at 266:11-12).  Other meetings Crawford held with Google were "by and large

19   . . . about things other than misinformation."  Street Decl., Ex. L (Crawford Dep. at 181:22-23).

20   Her deposition testimony contains no evidence of coercion, nor does Kennedy offer any

21   explanation of how or why these meetings might transform Google into a state actor.  Indeed,

22   Crawford's testimony, relevant portions of which Kennedy misleadingly omitted from his

23   excerpts, makes clear that no one at CDC "craft[ed] the content policy" of "any social media

24   company" or even "g[ave] input on what such a policy should look like," Blavin Decl., Ex. B

25   (Crawford Dep. at 103:20-104:10), let alone "help[ed] any . . . social media company on how they

26   should apply their policies . . . toward a particular post."  *Id.* (Crawford Dep. at 105:1-6).

27           None of these communications between the government and Google—viewed

28   independently or as a whole—establish the sort of coercion or significant encouragement to

-14-

1    transform Google into a state actor under the nexus test.  That conclusion is further underscored by

2    the fact that other online platforms have not apparently suffered any governmental consequences

3    for allowing Kennedy to share vaccine-related misinformation since he announced his presidential

4    campaign.  TRO Br. at 11.  Thus, all these communications demonstrate is "general align[ment]"

5    between Google and the government in their "missions to limit the spread of misleading" vaccine

6    information.  *O'Handley*, 62 F.4th at 1156.  Mere information sharing in service of those

7    independently-adopted, shared missions does not convert Google into a state actor.  *Id.* at 1160.

8        **Joint Action Test.**  Turning to joint action, Kennedy's documents likewise do not show

9    that the "state has so far insinuated itself into a position of interdependence with [Google]" or

10   "significantly involve[d] itself in [Google's] actions and decisionmaking in a complex and deeply

11   intertwined process" such that Google should be deemed a state actor.  *O'Handley*, 62 F.4th at

12   1159.  Rather, the documents demonstrate precisely the same sort of "consultation and sharing"

13   arrangement that the Ninth Circuit and other courts repeatedly have held do not amount to joint

14   action.  *Hart*, 2022 WL 1427507, at *7 ("One party supplying information to another party does

15   not amount to joint action."); *Fed. Agency of News*, 432 F. Supp. 3d at 1124 ("supplying

16   information to the state alone [does not amount] to conspiracy or joint action").

17       Here, the government is even less involved in content moderation than in *O'Handley*.

18   Kennedy offers no evidence within the past two years that the government flagged any particular

19   videos of his—let alone established an entire government office to systematically do so.  And while

20   Google and the administration shared information about vaccine misinformation and strategies to

21   address it, the record Kennedy cites makes clear that Google independently developed and applied

22   *its own* policies in taking down Kennedy's content.  Google repeatedly explained to him that it was

23   removing his content "for violating [its] policies on COVID-19 vaccine misinformation."  TRO Br.

24   at 10 (quoting A. Kennedy Decl., Ex. A ¶ 6); *id.* (citing A. Kennedy Decl., Ex. A ¶¶ 4-5).  And

25   Kennedy's own description of his speech in those videos indicates that the videos do, in fact, violate

26   those policies.  *Compare* Street Decl., Ex. B (Patch Article) (describing Plaintiff's speech as

27   claiming that childhood vaccines cause autism) *with* Street Decl., Ex. C (Vaccine Misinformation

28   Policy) (explaining that YouTube's medical misinformation policy prohibits claims that "vaccines

-15-

cause chronic side effects," or that "the MMR vaccine causes autism").  Thus, all Kennedy has

shown is that, as in every case, Google employees interpreted the contents of the videos, considered

in their own judgment whether they violated YouTube's voluntarily and independently adopted

medical misinformation policies, and removed the content.  Just as *O'Handley* found that "Twitter

never took its hands off the wheel," neither did Google.  62 F.4th at 1160.

   To be sure, YouTube's Vaccine and COVID-19 Medical Misinformation Policies prohibit

posting misinformation that "contradicts" official medical information from external authorities,

such as the World Health Organization and "local health authorities."  But Google's decision to refer

to health guidelines developed by experts does not deprive Google of the ultimate control over the

content on its site or transform its content moderation policy into an enforcement arm of those

authorities.[9]  *O'Handley*, 62 F.4th at 1160.  Google may always unilaterally change its policies and

even under the applicable policies must make independent judgments about whether the content

"contradicts" those guidelines or "poses a serious risk of egregious harm."  Street Decl., Ex. C

(Vaccine Misinformation Policy).  And Google's reliance on the World Health Organization as a

source of official information undermines Kennedy's claim that the policies were designed to ban

speech with which the *federal government* disagrees.  TRO Br. at 15.  After all, the WHO is not a

part of or controlled by the federal government.  *See* About Us, WHO, https://www.who.int/about.

At the end of the day, the record shows that Google, not the government, decides what may be

posted on YouTube and has done so free of any coercion or inducement by the government.

Kennedy therefore is unlikely to succeed in showing any state action.

   **3.**  **Kennedy's Contrary Arguments and Reliance on *Missouri v. Biden* Fail**

   Kennedy's efforts to avoid *O'Handley* and other governing precedent fail.

   First, he sidesteps the dispositive precedents from this Circuit by largely ignoring them.

He first dismisses the extensive cooperative partnership at issue in *O'Handley* as merely a "one-

---

[9] To the extent that Google has, in the past, asked the CDC to provide guidance on whether a
medical claim made in a video is true or not, that similarly does not evince either coercion or joint
action.  Street Decl., Ex. N (Gruner Email).  Google may seek expert guidance on medical science
from whatever source it wants—including experts employed by the government—provided it does
not "cede control" over the ultimate content moderation decision.  *O'Handley*, 64 F.4th at 1154.

-16-

way information sharing agreement." TRO Br. at 15. That is a gross mischaracterization of *O'Handley*'s facts. *See supra* Part IV.A.2.a. To the extent Kennedy means to suggest that anything more than a "one-way information sharing agreement" amounts to joint action, he is wrong about that, too. Other Ninth Circuit precedent has held arrangements that went beyond one-way information sharing to still not amount to joint action. In *Mathis*, for example, the Ninth Circuit held that PG&E had not engaged in "joint action" with a government narcotics task force when it suspended an employee "after conducting an undercover investigation in collaboration with" the task force. *O'Handley* at 1160 (describing *Mathis*, 75 F.3d at 504). These precedents clearly illustrate that Kennedy falls far short of establishing any sort of joint action.

And as for the decisions of Judges Breyer and Koh in *Hart* and *FAN*, Kennedy never mentions them at all. He instead relies extensively on a recent decision out of the Western District of Louisiana that held that government officials coerced and acted jointly with online platforms to limit the spread of misinformation on their platforms.[10] TRO Br. at 15–16 (citing *Missouri v. Biden*, No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. July 4, 2023)). But *Missouri v. Biden*, a case involving government entity defendants, is unpersuasive here. That court is of course not bound by *O'Handley*. Nor did that court persuasively explain how or why the facts there amounted to state action under *O'Handley*'s high bar. In addition, the *Missouri* court's analysis focused primarily on the government's relationship to *other* companies—not Google. And, finally, the *Missouri* court made no mention of conversations between government officials and Google *about Mr. Kennedy*. *See infra* Part IV.A.4 (plaintiff must show state action *with respect to him*). Thus, that opinion should have no persuasive value to this Court as it applies *O'Handley*–even though the *Missouri* court considered some of the same documents that Plaintiff presents here.[11] Judge Breyer, who by contrast was bound by *O'Handley*, considered evidence from *Missouri v. Biden*, including

---

[10] Kennedy omits the fact that the Fifth Circuit promptly stayed the injunction in *Missouri*.

[11] In addition, though Kennedy submitted some of the documents that the *Missouri* court relied on, he omitted much of the evidence that the *Missouri* court found most probative because that evidence either involved communications with online platforms other than Google or subjects other than medical misinformation or both. *See*, *e.g.*, *Missouri*, 2023 WL 4335270, at *46 (discussing emails between White House and Facebook and Twitter and statements by White House officials directed at those two platforms, but not YouTube).

the Crawford deposition and communications between Flaherty and other government officials, and Facebook representatives, which could be read as more aggressive than any of the communications involving Google. *Hart II*, 2023 WL 3362592, at *2–4; Blavin Decl. ¶ 2. Judge Breyer nonetheless denied a motion to amend the complaint in *Hart*, holding that the *Missouri v. Biden* evidence could not demonstrate that Facebook had taken any state action. *Hart II*, 2023 WL 3362592, at *2–4 (the "deposition of CDC's Director of Digital Media Carol Crawford and emails involving . . . Flaherty, then-White House Senior Advisor Andy Slavitt and Facebook," "obtained as part of the discovery in *Missouri v. Biden*," do "not establish joint action or government coercion" under *O'Handley*). As Judge Breyer explained, "[t]hat government officials asked Facebook and Twitter to generally be on the lookout for COVID-related misinformation and contacted the platforms about the prevalence of misinformation do not show that the government exercised dominant control over the social media companies' action in temporarily restricting Hart's accounts." *Id.* The Court should reach the same conclusion here.

### 4.   Kennedy Has Not Established Any State Action *with Respect to Him*

Kennedy's TRO fails for the independent reason that he has not demonstrated a likelihood of success in establishing any state action *with respect to him*. Even if he could show generalized pressure by the government encouraging Google to regulate vaccine misinformation, the government must have compelled "the *specific conduct* of which the plaintiff complains" in order for that conduct to be treated as state action. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis added); *accord Hart I*, 2022 WL 1427507, at *7–8; *FAN*, 432 F. Supp. 3d at 1126. Kennedy does not identify any emails, deposition testimony, or any other materials stating that the government ordered or coerced Google to remove his specific content. In fact, Kennedy offers no evidence to suggest that government officials were even aware of the content that he alleges was improperly removed. And any cited communications and meetings between government officials and Google generally regarding COVID and vaccine-related misinformation took place *two years* before Kennedy's content was removed. All Kennedy can show is that more than two years ago, a White House official sent a single email about him to Twitter, *an entirely different company*. Street Decl., Ex. P.

Courts consistently have rejected similar efforts to establish state action under the nexus or joint action test that, like here, fail to establish the government's knowledge of the specific content at issue, much less communications with the private platform regarding such content. *See Hart I*, 2022 WL 1427507, at *7–8 ("Hart makes no allegation that the Federal Defendants ever knew about his July 13 Facebook post, his July 18 tweet, or even his existence.  Because the Federal Defendants did not know about Hart's post or tweet, they could not have had a 'meeting of the minds' as to the disciplinary action those companies took."); *FAN*, 432 F. Supp. 3d at 1126 (allegations of Facebook's cooperation with government "do not mention FAN at all" and "are unconnected with Facebook's April 3, 2018 decision to delete FAN's Facebook page and block FAN content and restrict access to FAN's account, and as a result, these new allegations do not establish joint action between Facebook and the government").  Kennedy's claims fail here for the same reason.

### B. Kennedy Fails to Establish Irreparable Harm Warranting a TRO

"As a prerequisite to [] injunctive relief, a plaintiff must demonstrate immediate threatened injury." *Caribbean Marine Services Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). "[T]he mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019).  A "colorable First Amendment claim" may constitute irreparable injury, *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014), but not if "the constitutional claim is too tenuous." *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984).

Kennedy dedicates only a single paragraph of the brief to the issue of irreparable harm, dispatching with this element by reiterating that he has suffered a First Amendment violation.  TRO Br. at 22.  His declaration similarly asserts, without detail, that Google's actions have "created a chilling effect surrounding [his] campaign" and "created hurdles for [his] campaign." R. Kennedy Decl. ¶¶ 5, 6.  At the same time, he acknowledges that his removed content remains available on Facebook, Twitter, and through other channels of communications.  *Id*. ¶ 4.

Kennedy's irreparable harm argument fails for the same reasons his claim is unlikely to succeed on the merits—Google is a private company that is not engaged in state action when it applies its own terms of service to remove COVID and vaccine misinformation from its platform.

-19-

1    Absent a colorable First Amendment claim, Kennedy fails to demonstrate irreparable harm.  *See*

2    *CTIA*, 928 F.3d at 851; *Chiafalo v. Inslee*, 224 F.Supp.3d 1140 (W.D. Wash. 2016) (holding that

3    presidential electors for the State of Washington seeking preliminary injunction against

4    enforcement of the state's Presidential Electors Statute failed to show a colorable First Amendment

5    violation to establish irreparable harm).

6         Even assuming *arguendo* a likelihood of success on the merits, Kennedy's arguments and

7    documents undermine any suggestion that he has suffered irreparable harm.  *See Doe v. Harris*,

8    772 F.3d 563, 582 (9th Cir. 2014) ("Even where a plaintiff has demonstrated a likelihood of

9    success on the merits of First Amendment claim, he 'must also demonstrate that he is likely to

10   suffer irreparable injury in the absence of a [TRO], and that the balance of equities and the public

11   interest tip in his favor.'"); *CTIA*, 928 F.3d at 853.  Despite the removal of a video of Kennedy

12   giving a speech at the NHIOP, *see* Street Decl., Ex. A, back in March 2023, and declaring his

13   candidacy for President in mid-April, TRO Br. at 10, he delayed until *August*—five months

14   later—to file suit and bring this TRO application.  This delay greatly undercuts any claim of

15   exigency in his TRO application.  And he certainly identifies nothing pressing within the next few

16   days (or weeks) warranting an emergency TRO at this time.  *See Oracle Am., Inc. v. Myriad Grp.*

17   *AG*, No. C10-05064-SBA, 2011 WL 13154031, at *1 (N.D. Cal. Dec. 1, 2011) (finding no

18   exigency to justify imposition of TRO in view of three months' delay in filing TRO and noting

19   that TROs are "generally reserved for emergency situations in which a party may suffer immediate

20   irreparable harm" and "[n]o such emergency is evident in this action").

21   **C.    The Balance of Equities Weighs Against a TRO and in Google's Favor,**
            **Including Because a TRO Would Violate Google's First Amendment Rights**

22        The balance of equities also tip against granting the requested TRO.  "A plaintiff seeking a

23   preliminary injunction must establish that the balance of equities tips in his favor."  *Maxim*

24   *Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1036 (N.D. Cal. 2009).  To balance the

25   equities, the Court "will look to the possible harm that could befall the various parties."  *Id.*  Here,

26   the balance of equities decidedly tips in Google's favor, not Plaintiff's.

27        At the outset, the proposed TRO would violate *Google's* First Amendment rights, not

28

preserve Kennedy's rights.  *E.g.*, *IBiz, LLC v. City of Hayward*, 962 F. Supp. 2d 1159, 1170 (N.D. Cal. 2013) (noting "loss of . . . constitutional rights" as factor in balancing equities).  As demonstrated, Kennedy would suffer no deprivation of his constitutional rights because he has not established any state action.  By contrast, Google's First Amendment rights would be violated by a court order restricting the application of its own content moderation policies in determining what material is appropriate or not appropriate on YouTube.

"Freedom to publish is guaranteed by the Constitution," *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 252 (1974), as is the right to "exercis[e] editorial discretion over" what to publish, *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994).  The "choice of material to" publish "and the decisions made" as to the "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" and are protected by the First Amendment.  *Tornillo*, 418 U.S. at 257–58.  As courts have held, these principles apply to the exercise of discretion by online platforms in determining what content to host and serve.  *See NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1216 (11th Cir. 2022) ("A social-media platform that 'exercises editorial discretion in the selection and presentation of' the content that it disseminates to its users 'engages in speech activity.'" (citations omitted)), *cert. pet'ns filed*, Nos. 22-277, 22-393; *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–88 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) (collecting authorities; "Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment.").[12]  Thus, "[w]hen a platform selectively removes what it perceives to be incendiary political rhetoric, pornographic content, or public-health misinformation, it conveys a message and thereby engages in 'speech' within the meaning of the First Amendment." *NetChoice*, 34 F.4th at 1210.

---

[12] The Fifth Circuit in *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022), *cert. pet'n filed*, No. 22-555, reached a contrary conclusion, disagreeing with the Eleventh Circuit.  In *O'Handley*, Judge Breyer approvingly cited several decisions recognizing platforms' First Amendment rights, and characterized these cases as consistent with Ninth Circuit and Supreme Court precedent.  579 F. Supp. 3d at 1186-878 (citing, *e.g.*, *Tornillo*, 418 U.S. at 257–58; *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 424-25 (9th Cir. 2014)).  In addition, the Supreme Court reinstated the injunction prohibiting enforcement of the statute at issue in *Paxton*.  *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022).

-21-

Here, the proposed TRO would enjoin Google "from using either the 'Vaccine misinformation policy' or the 'COVID-19 medical misinformation policy' to remove videos of Mr. Kennedy's speech from YouTube."  Proposed TRO, Dkt. No. 7-4, at 1.  It therefore would directly restrict Google's speech, i.e., its ability to apply its own content moderation policies to material that it finds objectionable on its platform, and would thus infringe upon its First Amendment rights.  As Judge Breyer held in *O'Handley*, an online platform "has important First Amendment rights that would be jeopardized by a Court order telling [it] what content-moderation policies to adopt and how to enforce those policies. The Court will issue no such order."  579 F. Supp. 3d at 1188.  The Court should reach the same conclusion here.

In addition, Google has a strong interest in the application of its own content moderation policies in maintaining users' trust and expectations in its platform.  As YouTube's relevant medical misinformation policy—which prohibited "content about COVID-19 that poses a serious risk of egregious harm"—stated, the "safety of our creators, viewers, and partners is our highest priority" and "[w]e look to each of you to help us protect this unique and vibrant community."  Street Decl., Ex. D; *see also id.*, Ex. C ("YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO)."); Blavin Decl., Ex. D (YouTube Misinformation Policies).  Forcing YouTube to host content that it believes violates these policies would directly undermine its users' trust in Google and the application of its policies to its own platform.  *Cf. NetChoice*, 34 F.4th at 1214 n.14 (noting "platforms' intent to communicate messages through their content-moderation decisions—including that certain material is harmful or unwelcome on their sites" and citing Google testimony that its approach "is to remove content that violates [its] policies (developed with outside experts to prevent real-world harms), reduce the spread of harmful misinformation . . . and raise authoritative and trusted content"); Blavin Decl., Ex. C (Community Guidelines).

By contrast, the only purported harm Kennedy claims that is not based on the alleged (and specious) violation of his constitutional rights is that "the censorship of him on YouTube hurts his

political campaign." TRO Br. at 22. Yet he admits that his speeches and interviews are being broadcast via other channels, including Facebook and Twitter. R. Kennedy Decl. ¶ 4. And Kennedy's supporting papers state that even without having his videos on YouTube, his "presidential campaign has been gaining momentum, having raised millions of dollars, and generated impressive poll numbers." Street Decl. ¶ 32; *see* R. Kennedy Decl. ¶ 5 (stating having a video removed from YouTube is a "badge of honor."). And, of course, YouTube continues to host videos featuring Kennedy that do not violate its policies. *See supra* Part II.A.

### D. The Requested TRO Does Not Serve the Public Interest

The public interest also weighs heavily against the issuance of a TRO.

First, as shown, such an injunction would violate Google's First Amendment rights, and there is a "significant public interest in upholding First Amendment principles." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Moreover, forcing Google to carry medical and vaccine misinformation on YouTube is against the public interest. As the Office of the Surgeon General materials attached to the TRO papers state, "the proliferation of health misinformation during the pandemic has been both extensive and dangerous" and "pos[es] a growing threat to the nation's health." Street Decl., Ex. K; *see also, e.g.*, *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1181 (9th Cir. 2021), *reconsideration en banc denied*, 22 F.4th 1099 (9th Cir. 2022) (the "public interest weighs strongly in favor of denying" injunction to enjoin school district vaccine mandate as "record indicates that vaccines are safe and effective at preventing the spread of COVID-19," and "mandate is therefore likely to promote the health and safety of [school] students and staff, as well as the broader community"). Forcing Google to host and serve medical and vaccine misinformation on YouTube would be contrary to these important public health goals and the public interest. *E.g., Maffick LLC v. Facebook, Inc.*, No. 20-CV-05222-JD, 2020 WL 5257853, at *4 (N.D. Cal. Sept. 3, 2020) (denying TRO that would have forced removal of state-controlled media notice given "the public interest served by Facebook's notices to 'help its users better understand the sources of news content they see on Facebook'" in combating Russian disinformation on platform); *Stackla, Inc. v. Facebook*

-23-

1  *Inc.*, No. 19-cv-05849-PJH, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) (denying injunction

2  where "the public has a strong interest in the integrity of Facebook's platforms" from abuse).

3       **E.      The Court Should Deny the Request for Expedited Discovery**

4       Kennedy seeks expedited discovery before any preliminary injunction proceedings

5  "regarding the state action issues."  TRO Br. at 23.  Such requested discovery would include four

6  broad categories of "subjects" regarding communications between Google and various "Executive

7  Branch Officials," including but not limited to the White House, Surgeon General, and CDC

8  officials, concerning (1) Google's vaccine misinformation policy, (2) "alleged misinformation

9  spread by Mr. Kennedy," (3) the removal of "any videos of Mr. Kennedy from YouTube," and (4)

10 "Mr. Kennedy's speech at the NHIOP and any other political speeches or interviews he has done

11 during 2023."  *Id*.  Kennedy has not met his burden of establishing the requisite "good cause" for

12 such expedited discovery and the Court should deny that request.  *Semitool, Inc. v. Tokyo Electron*

13 *Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).

14      "[E]xpedited discovery is not automatically granted merely because a party seeks a

15 preliminary injunction."  *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009);

16 *see also Kayvan v. Pompeo*, No. 5:19-CV-08071-EJD, 2020 WL 553940, at *1–2 (N.D. Cal. Feb. 4,

17 2020) ("although there is a preliminary injunction motion pending, this factor alone does not justify

18 expedited discovery").  And no such discovery is warranted here.  To start, Kennedy's claims for

19 relief are facially deficient, and he likewise has not come close to demonstrating the necessary

20 elements for a TRO, including the likelihood of success and irreparable harm.  *See supra* Part IV.A-

21 C; *cf. Consumer Opinion LLC v. Frankfort News Corp.*, No. 16-CV-05100-BLF, 2016 WL

22 6393520, at *1 (N.D. Cal. Oct. 28, 2016) (expedited discovery not appropriate to uncover identity

23 of defendants where "it is clear . . . the complaint would be dismissed on other grounds").  This is

24 notwithstanding the fact that Kennedy already has obtained, and attached to this TRO application,

25 substantial discovery from the *Missouri v. Biden* proceedings, including communications between

26 government officials and Google employees, deposition transcripts of government officials, and

27 government discovery responses.  *See* Street Decl., Exs. F–P.  As set forth above, those materials do

28 not establish state action, and there is no reason to believe that a fishing expedition to obtain

additional discovery from Google will yield a different result.[13]   In the absence of such threshold

showings, courts routinely deny expedited discovery.  *E.g.*, *Consul Grp. Re Dos Mil Veintiuno*

*Sociedad De Responsabilidad Limitada v. Zinchenko*, No. LA CV19-01254 JAK (Ex), 2019 WL

2610963, at *2 (C.D. Cal. Apr. 15, 2019) (Plaintiff did not show "sufficient justification for

expedited discovery" given "absence of a sufficient showing as to likelihood of success and

irreparable harm"); *Fid. Brokerage Servs. LLC v. York*, No. EDCV 19-1929-JGB (SPx), 2019 WL

5485122, at *1 (C.D. Cal. Oct. 24, 2019) (Plaintiff "fails to show good cause for expedited

discovery" as the TRO is "not warranted, due to the lack of evidence of irreparable harm").

     Expedited discovery also is improper for other reasons.  While Kennedy purports to

describe the requested discovery as "limited," it is in fact expansive, seeking discovery (which

Kennedy in no way limits, and would presumably encompass document production, written

discovery, and depositions), including, though not limited to, four broad "subjects."  Such

expedited, expansive discovery should be denied at this early stage.  *See, e.g.*, *Kayvan*, 2020 WL

553940, at *2 (denying expedited discovery pending preliminary injunction, and noting that

"although the breadth of the discovery may appear narrow, it presents a significant burden to

Defendants.").  In addition, because Kennedy seeks a mandatory injunction to alter the status quo,

this further renders any expedited discovery improper.  Plaintiffs cannot generally seek "expedited

discovery to gain evidence" where they are asking the court to do more than "preserve the status

quo,'" as that "'is not the purpose of a preliminary injunction, nor of the limited discovery that the

courts traditionally permit a plaintiff to have to secure it.'"  *Harbor Freight Tools USA Inc. v.*

*Lumber Liquidators Holdings Inc*., No. CV 12-10789 GAF (JEMx), 2013 WL 12142995, at *4

(C.D. Cal. Jan. 10, 2013) (citation omitted)).

## V.   CONCLUSION

     For these reasons, the Court should deny the TRO.

---

[13] Indeed, courts including in *O'Handley*, *Hart*, *FAN*, and others, consistently have dismissed similar claims asserting "state action" on the pleadings without permitting any discovery.  *See* *O'Handley*, 62 F.4th at 1153; *Hart*, 2022 WL 1427507, at *1; *FAN*, 432 F. Supp. 3d at 1112; *Children's Health Defense v. Facebook, Inc.*, 546 F. Supp. 909, 914-15 (N.D. Cal. 2021).

-25-

1   DATED:  August 16, 2023                    MUNGER, TOLLES & OLSON LLP

2

3

4                                              By:   /s/ Jonathan H. Blavin

5                                              JONATHAN H. BLAVIN
                                               Attorneys for Defendants
6                                              Google LLC and YouTube, LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28