# EXHIBIT A

TYLER BURSCH, LLP
Robert Tyler (STATE BAR NO. 179572)
rtyler@tylerbursch.com
Nada Higuera (STATE BAR NO. 299819)
nhiguera@tylerbursch.com
25026 Las Brisas Rd.
Murrieta, California 92562
Telephone: 951-600-2733
Facsimile: 951-600-4996

LIBERTY JUSTICE CENTER
Daniel Suhr, pro hac vice admitted
dsuhr@libertyjusticecenter.org
M.E. Buck Dougherty III, pro hac vice
admitted
bdougherty@libertyjusticecenter.org
James McQuaid, pro hac vice admitted
jmcquaid@libertyjusticecenter.org
440 N. Wells Street, Ste. 200
Chicago, Illinois 60654
Telephone: 312-637-2280
Facsimile: 312-263-7702
*Attorneys for Plaintiff Justin Hart*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JUSTIN HART,<br><br>       Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., Inc.; TWITTER, INC.; VIVEK MURTHY in his official capacity as U.S. Surgeon General; JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; ROB FLAHERTY, in his official capacity as Deputy Assistant to the President and White House Director of Digital Strategy; and CAROL Y. CRAWFORD, in her official capacity as Chief of Digital Media within the Centers for Disease Control and Prevention,<br><br>       Defendants. | **Case No. 3:22-cv-00737-CRB**<br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The [United States Supreme] Court has sought to protect the right to speak in this spatial context." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

2. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace — the 'vast democratic forums of the Internet' in general, *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 868 (1997), and social media in particular." *Packingham*, 137 S. Ct. at 1735.

3. The Internet is a "dynamic, multifaceted category of communication" that "includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue." *Reno*, 521 U. S. at 870.

4. Congress determined that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). And Congress further found that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(4).

5. It is the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

6. Here, the Defendants conspired to remove from the Internet—a public forum devoted to the marketplace of ideas—valid public health messages and social media posts by Plaintiff, Justin Hart, and others, because they disagreed with the viewpoint and message expressed in such posts on the Internet, which contradicted the federal government's COVID-19 public health message and views expressed.

7. The Federal Government Defendants (President Biden, Surgeon General Murthy, Flaherty, and Crawford) publicly criticized, exerted pressure, and threatened the Social Media Defendants (Meta Platforms, Inc. and Twitter, Inc.) and other social media platforms for allowing views opposed to the federal government's COVID-19 public health message to be posted on their platforms that access the Internet.

8. Such coercive, bullying, and intimidating threats and tactics by government officials designed to censor speech through private social media companies have been referred to as illegal jawboning.[1] "The term 'jawboning' was first used [during World War II] to describe official speech intended to control the behavior of businessmen and financial markets."[2]

9. The Ninth Circuit has long recognized the inherent problems associated with illegal jawboning techniques where government officials desired effect is censoring lawful free speech rights under the First Amendment. *See, e.g., Writers Guild of America, West, Inc. v. American Broadcasting Co., Inc.*, 609 F. 2d 355, 365 (9th Cir.1979) ("Regulation through 'raised eyebrow' techniques or through forceful jawboning is commonplace in the administrative context, and in some instances may fairly be characterized . . . as official action by the agency.") (footnotes omitted), *cert. denied*, 449 U.S. 824 (1980); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 52, 64 (1963) (holding government threats that amount to a censorship scheme violate free speech rights under the First Amendment.); *see also Backpage.com, LLC v. Dart*, 807 F. 3d 229, 231 (7th Cir. 2015) (Posner, J.) ("The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is

---

[1] *See* Will Duffield, *Jawboning against Speech*: *How Government Bullying Shapes the Rules of Social Media*, Policy Analysis no. 934, Cato Institute, Washington D.C. (Sep. 12, 2022), *available at* https://www.cato.org/policy-analysis/jawboning-against-speech.

[2] *Id* at p.2.

compliance with his demands.").

10. And in private communications, the Federal Government Defendants held regular "be-on-the-lookout" warning meetings with the Social Media Defendants and overtly instructed them on the specific types of so called COVID-19 "disinformation" or "misinformation" that should be excluded from their platforms and the Internet, regardless of whether such public posts violated the Social Media Defendants' terms, conditions, and policies on "disinformation" or "misinformation." The Social Media Defendants even adjusted their policies and algorithms on valid public health messages and acceptable viewpoints on the Internet to align with the Federal Government Defendants' pre-approved COVID-19 public health message and viewpoint.

11. The Social Media Defendants removing from the Internet COVID-19 related posts that opposed or contradicted the Federal Government Defendants' COVID-19 message—such as Hart's posts—violated the Social Media Defendants' terms, conditions, and policies on "disinformation" or "misinformation," because they acquiesced under duress to coercive pressure from the Federal Government Defendants.

12. Some of the Social Media Defendants further acquiesced under duress by giving the Federal Government Defendants millions of dollars in free advertising on their private platforms so the government's COVID-19 public health message would not be challenged on the Internet, despite the private Social Media Defendants substantially earning their revenue from third party advertising on their social media platforms.

13. The Federal Government Defendants knowingly received a benefit from the Social Media Defendants excluding from the Internet opposing views to the government's COVID-19 public health message such as Hart's public posts, because the government's views were unchallenged and without public scrutiny on the "vibrant and competitive free market that presently exists for the Internet" in violation of United States policy. 47 U.S.C. § 230(b)(2).

14. The Federal Government Defendants also knowingly received a financial benefit from some of the Social Media Defendants' financial gifts of millions of dollars in free

advertising to promote the government's COVID-19 public health message, because the Federal Government Defendants did not have to pay for a service—advertising its COVID-19 public health message on the Internet—that others who sought and paid for message advertising on the Internet, such as Hart, were required to pay to the Social Media Defendants.

15.  First, Hart brings this action to defend the freedom of speech under the First Amendment from viewpoint-based, discriminatory collusion between private social media companies and the federal government, because they jointly removed his COVID-19 social media posts from the Internet since Hart's posts contradicted the federal government's COVID-19 public health message and views.

16.  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Under the Free Speech Clause of the First Amendment, "discrimination against speech because of its message is presumed to be unconstitutional." *Id.*

17.  A conspiracy between private and governmental actors satisfies the joint action test when they have had a "meeting of the minds" to "violate constitutional rights." *Fonda v. Gray*, 707 F. 2d 435, 438 (9th Cir. 1983). When a government actor has "so far insinuated itself into a position of interdependence" with private actors it is recognized as a joint participant in the challenged constitutional deprivation. *See Gorenc v. Salt River Project Agr. Imp. & Power Dist.*, 869 F. 2d 503, 507 (9th Cir. 1989) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)). Such joint action between government and private parties transforms private actors into state actors. *See Pasadena Republican Club v. W. Justice Ctr.*, 985 F. 3d 1161, 1167 (9th Cir. 2021).

18.  When the federal government admits to conspiring with social media companies to censor messages on the Internet with which it disagrees, as it has in this case, both the government and the private companies are guilty of unconstitutional viewpoint discrimination: "Joint action exists where the government . . . encourages . . .

unconstitutional conduct through its involvement with a private party . . . ." *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013) (cleaned up). Joint action further occurs when there is "substantial cooperation" between the private and state actors, or their actions were "inextricably intertwined." *Brunette v. Humane Society of Ventura Cnty.*, 294 F. 3d 1205, 1211 (9th Cir. 2002).

19.  This Court should declare the actions of Defendants Meta Platforms, Inc., f/k/a Facebook, Inc., Twitter, Inc., President Biden, Surgeon General Murthy, Flaherty, and Crawford unconstitutional and permanently enjoin them from monitoring, flagging, censoring, and deleting social media posts on the Internet based on the viewpoints the posts espouse that contradict the federal government's pre-approved viewpoint. The Court should further enjoin the Social Media Defendants from adjusting their policies on misinformation to align with the Federal Government Defendants' misinformation policies.

20.  Second, Defendants Meta Platforms, Inc., f/k/a Facebook, Inc., and Twitter, Inc. are liable under the doctrine of promissory estoppel for promising Hart the use of their social media platforms to access the Internet so he could further his business interests and then rescinding this promise after he relied on them to his detriment.

21. Third, Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., is liable to Hart for intentional interference with a contract for knowingly denying him the ability to fulfill his contractual duty to administer the Facebook account of Donorbureau, LLC.

22. Fourth, Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., is liable to Hart for negligent interference with a prospective economic advantage for knowingly disrupting the contractual relationship between Donorbureau, LLC and him by preventing him from administering the Facebook account of Donorbureau.

23.  For these reasons, Hart brings this lawsuit and seeks declaratory, injunctive, and monetary relief for the constitutional deprivation, injuries, and injustices he has suffered at the hands of the Defendants.

# PARTIES

24.  Plaintiff, Justin Hart, is a natural person domiciled in San Diego County, California.

25.  Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., ("Facebook") is a publicly traded corporation incorporated in Delaware with a principal place of business at 1601 Willow Road, Menlo Park, California in San Mateo County.

26.  Defendant Twitter, Inc. ("Twitter") is a publicly traded corporation incorporated in Delaware with a principal place of business at 1355 Market Street, Suite 900, San Francisco, California in the City and County of San Francisco.

27.  Defendant Vivek Murthy is sued in his official capacity as the Surgeon General of the United States. In that role, he directs the office of the Surgeon General, a part of the Department of Health and Human Services ("HHS") agency within the Executive Branch of the federal government.

28.  Defendant Joseph R. Biden, Jr. is sued in his official capacity as the President of the United States. In that role, he directs the Executive Branch of the federal government, including the Office of Management and Budget ("OMB"), White House staff, and HHS.

29. Defendant Rob Flaherty is sued in his official capacity as the Deputy Assistant to the President of the United States and Director of Digital Strategy at the White House.

30. Defendant Carol Y. Crawford is sued in her official capacity as Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention ("CDC"). The CDC is an agency within HHS and the Executive Branch of the federal government.

# JURISDICTION AND VENUE

31. This case raises federal claims under the First Amendment of the United States Constitution; therefore, the Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

32. This Court has jurisdiction to issue injunctive relief to protect constitutional rights. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

33. The Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. § 2201 and to order further necessary or proper relief based on a declaratory judgment or decree pursuant to 28 U.S.C. § 2202.

34. The Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

35. The Court has personal jurisdiction over Defendants Murthy, Biden, Flaherty, and Crawford because they are officers of, or oversee agencies of, the United States.

36. The Court has personal jurisdiction over Defendants Facebook and Twitter because they maintain their principal places of business in California.

37. Venue is appropriate in this district because Facebook and Twitter maintain their principal places of business here and a substantial part of the events giving rising to the claims occurred in this district.

## FACTUAL ALLEGATIONS

***Facebook offered the government $15 million dollars in free COVID-19 advertising***

38. On February 21, 2021, Payton Iheme, a Facebook employee in charge of U.S. Public Policy at the social media platform, sent an email to Carol Crawford, an employee of the CDC. The CDC is a public health agency within HHS and its employees work with Surgeon General Murthy on public health issues such as COVID-19. A true and correct copy of this email string between Facebook's Iheme and the CDC's Crawford is attached as ***Exhibit 1***.

39. In the email, Facebook employee Iheme offered CDC and the federal government a $15 million-dollar in-kind donation to allow the government to advertise for free its COVID-19 public health message on Facebook's private platform and the Internet. *Id*.

40. CDC employee Crawford responded to Facebook's offer on the same day, stating, "Thank you for this amazing offer. We'll work with our policy staff on next steps." *Id*.

***The government placed a condition on the $15 million gift and Facebook accepted***

41. On April 5, 2021, Dia Taylor, CDC's Acting Chief Operating Officer, sent an email to Facebook's Iheme and copied Crawford and other CDC employees. The email contained an attached letter, and true copies of the email and letter are attached hereto as ***Exhibit 2***.

42. In the letter from the CDC to Facebook, the federal government placed a "Publicity and Endorsements" conditional clause on Facebook's $15 million gift of free COVID-19 advertising. This clause required Facebook to not use the name of HHS, CDC, or any related federal agencies regarding the federal government's COVID-19 public health messages to be posted on Facebook and the Internet. *Id.*

43. The "Publicity and Endorsements" clause further required Facebook to "clear all publicity materials for this gift with HHS and CDC to ensure compliance with this paragraph." *Id.*

44. Facebook acknowledged there was a meeting of the minds by accepting the federal government's "Publicity and Endorsements" conditional clause, evidenced by Iheme's signature to the letter. Iheme then emailed a copy of the signed acceptance letter to the CDC on April 8, 2022. *Id.*

***The government held "Be-on-the-lookout" meetings with social media companies***

45. Beginning in May of 2021, the CDC scheduled regular "be-on-the-lookout" or BOLO meetings with social media platforms, including Facebook and Twitter, and provided detailed and specific instructions on what the government deemed to be COVID-19 disinformation or misinformation and what information the private social media companies should or should not allow on their platforms and on the Internet.

46. On May 6, 2021, the CDC sent an email to Facebook with examples of what COVID-19 messages were inappropriate for the public on private social media platforms and the Internet. Attached as ***Exhibit 3*** is a true and correct copy of this email.

47. On May 14, 2021, the CDC's Crawford sent an email inviting social media companies including Facebook and Twitter to participate in a BOLO meeting and included a slide presentation related to COVID-19 "Misinformation." Attached as ***Exhibit 4*** is a true and correct copy of this email along with the COVID-19 slide presentation.

48. On May 28, 2021, the CDC sent an email invitation for a second BOLO meeting with social media platforms including Facebook and Twitter, on COVID-19

"Misinformation." Attached as ***Exhibit 5*** is a true and correct copy of this email along with the COVID-19 slide presentation.

49. On June 18, 2021, the CDC sent another email invitation for a third BOLO meeting with social media platforms including Facebook and Twitter, on COVID-19 "Misinformation." Attached as ***Exhibit 6*** is a true and correct copy of this email along with the COVID-19 slide presentation.

50. These BOLO meetings held in May and June, between the federal government and private social media platforms, including Facebook and Twitter, followed a trend that began in December of 2020, with the CDC's Crawford initially emailing Facebook about COVID-19 "Misinformation." Attached as ***Exhibit 7*** is a true and correct copy of this December 2020 email, along with a COVID-19 slide presentation.

### *Deplatforming Justin Hart and removing his posts from the Internet*

51. In early July of 2021, in preparation for the upcoming school year, the CDC updated its guidelines and recommended that young children should continue to wear masks at school but vaccinated older students and teachers did not need to wear masks.[3]

52. Following Facebook's $15 million-dollar gift to the federal government, regular government BOLO instructional meetings with Facebook and Twitter, and the CDC's updated masking guidelines for children, on or around July 13, 2021, Hart posted to his personal Facebook page and on the Internet a graphic entitled, "Masking Children is Impractical and Not Backed by Research or Real World Data."

---

[3] https://www.chalkbeat.org/2021/7/9/22570068/new-cdc-guidance-schools-masks (last visited Oct. 10, 2022)

53. Below is a photo of the graphic in Hart's post:

54. The graphic Hart posted is science-based, contains footnotes to scientific evidence supporting its claims, and is a valid public health message.

55. Facebook flagged the above post on or around July 13, 2021, with the following notice:

> **You can't post or comment for 3 days.**
>
> This is because you previously posted something that didn't follow our Community Standards.
>
> This post goes against our standards on misinformation that could cause physical harm, so only you can see it.
>
> **Learn more about updates to our standards.**

56. On or around July 18, 2021, Hart posted to his personal Twitter page and on the Internet a tweet that read:

> So the CDC just reported that 70% of those who came down with
> #COvId19 symptoms had been wearing a mask. We know that
> masks don't protect you... but at some point you have to wonder
> if they are PART of the problem.

57. Although Hart's post stated a valid public health message, Twitter locked Hart's account on or around July 18, 2021, after his post, with the following notice sent to his email:

> **Hi Justin Hart,**
>
> **Your Account, @justin_hart has been locked for violating the Twitter Rules.**
>
> Specifically for: Violating the policy on spreading misleading and potentially harmful information related to COVID-19.

### President Biden, the White House, and Surgeon General Murthy

58. Within days of these two removals of Hart's posts from the Internet, Defendant Biden's administration revealed publicly that it was directing social media companies to remove posts that bucked their party line on COVID-19.

59. On July 15, 2021, at a White House Press Conference, Defendant Surgeon General Murthy stated, "We're asking [our technology companies] to consistently take action against misinformation super-spreaders on their platforms."[4]

60. The White House revealed that a team of government employees was actively researching and tracking social media posts with which it disagreed and relaying those posts to social media companies with instructions to take them down from the Internet.

61. Former White House Press Secretary Jen Psaki admitted, "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation."[5]

62. Psaki also revealed that the White House effort to suppress free speech on the

---

[4] Vivek H. Murthy, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

[5] Jen Psaki, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

Internet that contradicted the government's COVID-19 public health message reaches all the way to the level of senior staff for Defendant Biden's administration.

63. Psaki gave a glimpse of how the scheme works: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team . . . ."[6]

64. Emails confirm Psaki's public comments. For example, in February and March of 2021, Facebook conducted a survey, shared its survey data with the CDC, and held meetings with government employees to discuss COVID-19 vaccine hesitancy on Facebook's platform and the Internet. Attached as ***Exhibit 8*** are true and correct copies of emails regarding this communication between Facebook and the CDC.

65. Psaki further revealed in public comments that the far-reaching government effort targeted multiple posts on multiple social media sites and the Internet exclaiming, "You shouldn't be banned from one platform and not others."[7]

66. Against United States policy as set forth by Congress "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation" 47 U.S.C. § 230(b)(2), Defendants Biden and Murthy directed four key changes for social media platforms and the Internet.

67. First, Biden and Murthy directed that private companies "measure and publicly share the impact of misinformation on their platform."[8]

68. Second, Biden and Murthy directed social media companies to "create a robust enforcement strategy that bridges their properties and provides transparency about the rules."[9]

---

[6] *Id.*

[7] Jen Psaki, White House Press Briefing (July 16, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/ (last visited Aug. 18, 2021).

[8] Psaki, *supra* n. 3.

[9] *Id.*

69. Third, Biden and Murthy stressed that "it's important to take faster action against harmful posts" because "information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts[.]"[10]

70. Fourth, Biden and Murthy directed Facebook to "promote quality information in their feed algorithm."[11] No definition was provided by Biden and Murthy publicly as to the government's definition of "quality information."

71. At the direction of Biden, Murthy created and published a 22-page Advisory with instructions on how social media companies should remove posts with which Murthy and Biden disagree.[12]

72. Biden further threatened social media companies who do not comply with his directives by publicly shaming and humiliating them, stating, "They're killing people."[13]

73. Emails between Facebook and the government confirm that Facebook had used its proprietary tool "CrowdTangle" to monitor and report on social media posts that contradicted the federal government's COVID-19 message and shared such information with the government. Attached as ***Exhibit 9*** are true and correct copies of emails regarding this communication between Facebook and the CDC regarding CrowdTangle reports.

74. At the direction of the Federal Government Defendants Biden and Murthy, Facebook used CrowdTangle, along with social media algorithms designed to cast a wide net, to remove posts from the Internet that contradicted the government line on COVID-19,

---

[10] *Id.*

[11] *Id.*

[12] Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (2021), *available at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf (last visited Aug. 18, 2021).

[13] Lauren Egan, *"They're killing people": Biden blames Facebook, other social media for allowing Covid misinformation*, NBC News (July 16, 2021, 4:10 PM), *available at* https://www.nbcnews.com/politics/white-house/they-re-killing-people-biden-blames-facebook-other-social-media-n1274232 (last visited Aug. 18, 2021).

regardless of whether such posts violated Facebook's terms of service.

75. For example, in April of 2021, the CDC's Crawford and Facebook's Iheme communicated via email that the Wyoming Public Health Department notified the federal government that Facebook's and other platforms' algorithms, intended to screen out COVID-19 "misinformation," were also screening out "valid" public health messaging, including social media posts on the Internet by the Wyoming Public Health Department. Attached as *Exhibit 10* is a true and correct copy of this email communication.

76. Like the Wyoming Public Health Department's valid public health message that was wrongfully removed from the Internet because of social media platforms' adjusted algorithms, Hart's public Facebook and Twitter posts in July of 2021 were valid public health messages wrongfully removed from the Internet by algorithms designed jointly by the Federal Government Defendants and the Social Media Defendants.

77. Defendants Biden and Murthy directed Defendants Facebook and Twitter to design specific algorithms to identify and remove social media posts from the Internet that contradicted the federal government's COVID-19 public health message and viewpoint. The Social Media Defendants substantially cooperated with the Federal Government Defendants' request by designing algorithms that would target viewpoint messages and posts that contradicted the federal government's COVID-19 public health viewpoint, resulting in Hart's social media posts being removed from the Internet.

78. On July 23, 2021, ten days after Facebook removed Hart's valid public health message from Facebook's platform and the Internet, Facebook employee Nick Clegg emailed Defendant Surgeon General Murthy. In the email, Clegg advised Murthy that Facebook had recently taken steps "to adjust policies on what we are removing for misinformation." Attached as *Exhibit 11* is a true and correct copy of this email communication.

79. Clegg's tone in his email to Surgeon General Murthy was defensive, and he stated, "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id*.

80. Clegg continued with his defensive and submissive posture in his email to Defendant Murthy, and he said, "We will reach out directly to DJ to schedule the deeper dive on how to best measure Covid related content and how to proceed with the question around data." *Id.*

81. On information and belief, "DJ" is not employed by Facebook, does not have authority and control over Facebook's misinformation policies and terms of service, and "DJ" operates under the authority and control of Murthy, the Executive Branch, and the federal government.

82. Clegg further stated to Murthy, "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress." *Id*. Clegg also noted to Surgeon General Murthy, "You have identified 4 specific recommendations for improvement, and we want to make sure to keep you informed of our work on each." *Id.*

83. On information and belief, these "4 specific recommendations for improvement" Clegg referred to in his email to Surgeon General Murthy are the same 4 Executive Branch policy recommendations Psaki stated in her July 16, 2021, press briefing. *See supra*, Psaki transcript, n.5.

84. The following month, on August 20, 2021, Clegg sent Murthy a lengthy email because Surgeon General Murthy requested an update. Attached as ***Exhibit 12*** is a true and correct copy of this email communication.

85. In that email, Clegg stated to Defendant Murthy, "You asked for an update on existing and new steps Facebook is taking." Clegg noted to date that Facebook had removed over 20 million pieces of content for COVID-related misinformation. *Id.*

86. Clegg further stated to Murthy, "In light of our conversation we have been reviewing our efforts to combat COVID-19 and are eager to continue working toward our shared goal of helping more people get vaccinated and limiting the spread of harmful misinformation." *Id.*

### *Facebook*

87. Defendant Facebook is one of the most popular social media sites in the world. It

boasts "more than 2.8 billion monthly users worldwide," who use it for both business and pleasure.[14] Almost 70% of Americans use Facebook in some capacity.[15] Of these users, 70% visit Facebook daily.[16]

88. Facebook's services involve creating a sort of personal website for its users who can post pictures of themselves and others, create posts on their wall where they can "debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 137 S. Ct. at 1735. These posts are published on the Internet and can also include links to news articles and videos. Other users can post comments on a user's posts and thereby have a dialogue with one another. Users may also send each other direct messages through Facebook's Messenger feature.

89. Given this tremendous opportunity to network and speak with other people throughout the United States and even the world on the Internet, users frequently use Facebook to promote their business. "There are over 60 million active business [p]ages" on Facebook.[17] Millions of businesses pay to be active advertisers.[18]

90. Facebook's hosting of advertisements is very lucrative for it. In 2018, it generated a total of $55.8 billion in revenue, 99% of which came from ads on Facebook and other platforms that it owns, such as Instagram.[19]

91. On December 31, 2021, the same fiscal year when Facebook made its $15 million

---

[14] John Gramlich, *10 facts about Americans and Facebook*, Pew Research Center (June 1, 2021), *available at* https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/) (last visited Aug. 18, 2021).

[15] *Id.*

[16] *Id.*

[17] Kit Smith, *53 Incredible Facebook Statistics and Facts*, Brandwatch (June 1, 2019), *available at* https://www.brandwatch.com/blog/facebook-statistics/ (last visited Aug. 18, 2021).

[18] *Id.*

[19] Erin Black, *How Facebook makes money by targeting ads directly to you*, CNBC (Apr. 2, 2019), *available at* https://www.cnbc.com/2019/04/02/how-facebook-instagram-whatsapp-and-messenger-make-money.html?__source=facebook%7Cmain&fbclid=IwAR05sCPLjY61T3UOfYNvQQZwOiMY64mJsnMQ0Lu4UNYqXkaXa1FUPpn1Huo (last visited Aug. 18, 2021).

free advertising donation to the Federal Government Defendants, Facebook filed its Form 10K Annual Report with the Securities and Exchange Commission ("SEC").[20]

92. In its 2021 filed Annual Report with the SEC, Facebook noted: "Substantially all of our revenue is currently generated from third parties advertising on Facebook and Instagram."[21]

93. Facebook's terms of service invite businesses to use its services to "connect with [other people], build communities, and grow businesses."[22] Facebook describes its services as "[e]mpower[ing] you to express yourself and communicate about what matters to you."[23]

94. The terms of service require users to follow Facebook's "Community Standards."[24] Those standards state that Facebook is "a service for more than two billion people to freely express themselves across countries and cultures and in dozens of languages."[25] They go on to state, "To ensure that everyone's voice is valued, we take great care to craft policies that are inclusive of different views and beliefs, in particular those of people and communities that might otherwise be overlooked or marginalized."[26]

95. The limits on this pro-free-speech stance include abstract categories such as "Violence and Criminal Behavior," "Safety" (which includes "Suicide and Self-Injury," "Child Sexual Exploitation, Abuse, and Nudity," "Sexual Exploitation of Adults," "Bullying and Harassment," "Human Exploitation," and "Privacy Violations and Image Privacy Rights"), "Objectionable Content" (which includes "Hate Speech," "Violent and Graphic Content," "Adult Nudity and Sexual Activity," and "Sexual Solicitation"), "Integrity and

---

[20] https://www.sec.gov/Archives/edgar/data/1326801/000132680122000018/fb-20211231.htm (last visited Oct. 10, 2022).

[21] *Id.* at p. 15.

[22] Terms of Service, Facebook, *available at https://www.facebook.com/terms.php* (last revised Oct. 22, 2020) (last visited July 19, 2021).

[23] *Id.*

[24] *Id.*

[25] Community Standards, Facebook, *available at* https://www.facebook.com/communitystandards/ (last visited July 19, 2021).

[26] *Id.*

Authenticity," (which includes "Account Integrity and Authentic Identity," "Spam,"
"Cybersecurity," "Inauthentic Behavior," "False News," "Manipulated Media," and
"Memorialization"), and "Respecting Intellectual Property." For the "False News" sub-
category, Facebook states that "we do not remove false news from Facebook but we
significantly reduce its distribution by showing it lower in News Feed."[27]

96. At no point in the terms of service or Community Standards does Facebook prohibit
valid public health messages and viewpoints that oppose making children wear masks,
such as Hart's posts.

97. Further, at no point in the terms of service or Community Standards does Facebook
mention that it would adjust its policies at or about the same time Hart posted on
Facebook in July of 2021, and substantially cooperate with, and follow, Defendants Biden
and Murthy's "4 specific recommendations for improvement" Clegg referred to in his email
to Surgeon General Murthy that Psaki mentioned in her July 16, 2021, press briefing.

98. Facebook voluntarily commits itself to be governed by an Oversight Board, which is
an independent non-Article III quasi-judicial board that interprets Facebook's content
policies by reviewing content moderation decisions.

99. For example, in March of 2021, shortly before Facebook removed Hart's valid public
health message, the Oversight Board "upheld Facebook's decision to leave up a post by a
state-level medical council in Brazil which claimed that lockdowns are ineffective and had
been condemned by the World Health Organization (WHO)."[28]

100. Hart is an executive consultant with over 25 years' experience creating data-driven
solutions for Fortune 500 companies and presidential campaigns alike. He is the Chief
Data Analyst and founder of RationalGround.com, which helps companies, public policy
officials, and parents gauge the impact of COVID-19 across the country.

101. He has used Facebook's services since 2007. He has roughly 1,700 Facebook users
who follow his account, and roughly 3,000 Facebook friends.

---

[27] *Id.*

[28] https://www.oversightboard.com/decision/FB-B6NGYREK/ (last visited October 20, 2022).

102. He uses his Facebook account as a feeder for his other social media accounts, as a networking tool for his consulting business, and as a promotion for his online website, RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

103. Given Hart's use of Facebook for his business, he has purchased advertising on Facebook to promote his consulting business. Over the years, Hart has spent thousands of dollars on Facebook advertisements and has never been gifted free advertisement from Facebook as it gifted the Federal Government Defendants.

104. Hart has also purchased advertising for his consulting clients over the years, spending tens of thousands of dollars.

105. On his website RationalGround.com Hart offers some of his articles exclusively to subscribers. His subscriptions generate thousands of dollars per month.

106. On April 23, 2021, Facebook restricted Hart's ability to post or comment for 24 hours because it claimed the following three posts violated its Community Standards:

    a.    On or around April 14, 2021, Hart created a post on Facebook stating, "If you ever want to know where your BLM donation is going – the co-founder 'trained Marxist' Patrisee Cullars – just bought this amazing home in LA" and it included a link to a picture of the house.

    b.    That same day, a second post of his was removed from Facebook.

    c.    On April 23, 2021, he created a post stating: "This is the truth: Covid is almost gone in America. Hospitals are literally empty. Every willing senior has already been vaccinated. In a few weeks every willing adult can be…

107. Losing the ability to connect with people on the Internet through his Facebook account has harmed Hart's online business and work to help educate and provide information to others. He is also suffering injury because he serves as the administrator of at least one of his client's Facebook pages. While Hart's personal account is suspended, he cannot service this account.

108. Facebook's policies and standards for censorship on its platform and the Internet are constantly shifting and adjusting in accordance with Defendants Biden and Murthy's

direction on COVID-19 "misinformation" and the federal government's pre-approved public health message and views allowed on the Internet.

109. For example, since early 2020, there has been widespread debate over whether COVID-19 was made by humans in a lab in Wuhan, China, and escaped from the lab or whether it started naturally through animal-to-human transmission.

110. Despite this public health debate, in February 2020, Facebook announced it would remove posts that suggested the virus was man-made, stating that the theory had been debunked by public health officials.[29]

111. But in May 2021, after Defendant Biden acknowledged the possibility of the theory, Facebook adjusted and reversed its policy to align with Biden's view and announced that it would no longer remove posts expressing that viewpoint.[30] Therefore, Facebook is stifling the free debate of scientific theories and valide public health messages on the Internet such as Hart's by taking its directions from the Federal Government Defendants.

### Twitter

112. Defendant Twitter is also a popular social media site; more than one in five adult Americans use the platform.[31] Of these users, 46% visit Twitter daily.[32]

113. Twitter's services involve creating a personal profile from which its users can "tweet"—meaning post messages, photos, and weblinks to their feed for other users to see. Users can "like", repost, or reply to other users' tweets.

---

[29] Peter Suciu, *Social Media About Face: Facebook Won't Remove Claims Covid Was Man-Made*, Forbes (May 28, 2021, 3:39 PM), *available at* https://www.forbes.com/sites/petersuciu/2021/05/28/social-media-about-face-facebook-wont-remove-claims-covid-was-man-made/?sh=d21e05c6aa1a (last visited Aug. 18, 2021).
[30] Donie O'Sullivan & Jordan Valinsky, *Facebook will no longer remove claims that Covid-19 was man-made*, CNN Business (May 27, 2021, 12:16 PM), *available at* https://www.cnn.com/2021/05/27/tech/facebook-covid-19-origin-claims-removal/index.html (last visited Aug.18, 2021).
[31] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Research Center (Apr. 7, 2021), *available at* https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021/ (last visited July 19, 2021).
[32] *Id.*

114. Twitter allows users to have a dialogue on a variety of issues, including topics of national importance. 42% of U.S. adults on Twitter say they use the site to discuss politics.[33] Twitter is known for being "one of the social media sites with the most news-focused users."[34] 71% of adult Twitter users in the U.S. use the site to get news.[35]

115. "The Twitter Rules" proclaim that "Twitter's purpose is to serve the public conversation."[36]

116. The limitations on that "public conversation" include tweets that threaten or glorify violence or terrorism, sexually exploit children, abuse or harass other people, promote self-harm or suicide, show excessively gory media or adult content within live videos or profile photos, or serve any unlawful purpose.[37]

117. At no point in the terms of service or Twitter Rules does Twitter prohibit valid public health messages and viewpoints that oppose wearing masks. Nor do the terms of service or Twitter Rules state that Twitter would have regular BOLO meetings with the Federal Government Defendants to get instruction and direction on COVID-19 "misinformation."

118. Hart has used Twitter's services since 2007.

119. He uses his Twitter account as a feeder for his other social media accounts, as a networking tool for his consulting business, and to promote his website RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

---

[33] Adam Hughes & Stefan Wojcik, *10 facts about Americans and Twitter*, Pew Research Center (Aug. 2, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/ (last visited July 19, 2021).

[34] *Id.*

[35] *Id.*

[36] The Twitter Rules, Twitter, *available at* https://help.twitter.com/en/rules-and-policies/twitter-rules (last visited Aug. 19, 2021).

[37] *Id.*

120. Hart has purchased ads on Twitter to promote his consulting business. Over the years, he has spent thousands of dollars on Twitter ads. Hart planned to increase his use of Twitter advertising, but Twitter has denied him the ability to do so.

121. Losing the ability to communicate with people through his Twitter account has harmed his online business.

### *Missouri v. Biden*

122. There is a similar pending case to this case, *State of Missouri v. Biden,* Case No. 3:22-cv-01213-TAD-KDM, in the United States District Court for the Western District of Louisiana, Monroe Division.

123. On October 21, 2022, that court issued a 28-page Memorandum Order Regarding Witness Depositions ("Order"). A copy of the Order is attached as ***Exhibit 13.***

124. In the Order, District Judge Terry A. Doughty explained that plaintiffs' claims involve allegations of collusion between the federal government and private social media companies to suppress disfavored views and content on social media platforms by labeling such content "dis-information," "mis-information," and "mal-information."

125. The court further determined that expedited discovery and depositions were appropriate for 10 witnesses. Three of the witnesses to be deposed as set forth in the Order are either parties in this case or play a prominent role in the allegations of this case.

126. The three individuals and witnesses relevant to this case with Judge Doughty's analysis as to why they should submit to depositions and expedited discovery in *State of Missouri v. Biden* are as follows:

- **Jennifer Psaki – Former White House Press Secretary**

127. The *Missouri* court noted that Psaki had made a series of public statements at press conferences in her former role as Press Secretary.

128. Judge Doughty found that Psaki had publicly spoken of pressuring social media companies to censor disfavored views related to COVID-19 misinformation.

129. In ordering her to submit to a deposition, the Court found that "Psaki has made a number of statements that are relevant to the Government's involvement in a number of

social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19."

- **Dr. Vivek Murthy – Surgeon General**

130. The court found that Dr. Murthy, a named defendant in this case, had publicly criticized "tech companies" by asserting that they are responsible for COVID-19 deaths due to their failure to censor "misinformation."

131. And that Murthy also engaged in communications with high-level Facebook executives about the "demand" for greater censorship of COVID-19 "misinformation."

132. Judge Doughty determined that Murthy's actions went beyond the scope of his rank as Surgeon General. In ordering his deposition, the court found that "Dr. Murthy made public statements about how the [social] media companies' failure to censor its users resulted in COVID-19 deaths."

- **Carol Y. Crawford – CDC's Chief of the Digital Media Branch**

133. The court addressed Crawford's organization of the BOLO meetings referenced above, which were essentially meetings that attempted to "quell the spread of misinformation" related to COVID-19.

134. In ordering her deposition, the court found that "Crawford organized meetings and engaged in a number of communications with social-media officials, and the contents of those meetings and communications are highly important for the issues presented by this case."

135. On November 15, 2022, Crawford submitted to a video deposition. A copy of the Crawford deposition transcript is attached as ***Exhibit 14***.

136. In her deposition, Crawford testified that the federal government had insinuated itself into a position of interdependence with the Social Media Defendants by holding regular BOLO meetings to assist them with implementing their misinformation policies on their private platforms and the Internet.

137. For example, Crawford explained this interdependence between the federal government and Social Media Defendants in her deposition as follows:

1  Q; What's BOLO?

2  A: Be on the lookout.

3  Q. Why were you concerned about this?

4  A. Similar to all the other BOLOs, we still thought it was good to point out if we had facts
5  around something that was widely circulating as a cause of misinformation to the
   platforms to assist them in whatever they were going to do with their policy or not do. And
   this was one that was kind of growing, and we had a lot of facts about it, and the team was
6  concerned about this, this misunderstanding.

7  Crawford Depo., *Exhibit 14*, p. 153-54, Lines 20-26.

8      138. In addition to the three individuals above named in the Order in *Missouri v. Biden*,

9  emails were produced in discovery in that case from federal government employee Rob

10  Flaherty to anonoymous Facebook officials. Attached hereto as ***Exhibit 15*** are the

11  Flaherty emails in and around March of 2021.

12      139. The Flaherty emails were not produced by the federal government to Hart in this

13  case pursuant to his FOIA claim.

14      140. The Flaherty emails' subject line is, "You are hiding the ball." The Flaherty emails

15  may be summarized as Flaherty dressing down and admonishing a Facebook official for the

16  private social media company's lack of transparency to the federal government regarding

17  vaccine hesitancy and borderline content misinformation allowed to be posted on

18  Facebook's platform.

19      141. For example, on March 15, 2021, Flaherty writes to this Facebook official and says,

20  "I will also be the first to acknowledge that borderline content offers no easy solutions. But

21  we want to know that you are trying, we want to know how we can help, and we want to

22  know that you are not playing a shell game with us when we ask you what is going on."

23      142. And the anonoymous Facebook official responds on behalf of the private social

24  media company by groveling and asking Flaherty to hold Facebook "accountable."

25      143. For example, on March 15, 2021, the anonymous Facebook official responds to

26  Flaherty and says, "We obviously have work to do to gain your trust. You mention that you

27  are not trying to play "gotcha" with us – I appreciate the approach you are taking to

28  continued discussions. We are also working to get you useful information that's on the

level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."

### The Federal Defendants Engaged in Illegal Jawboning

144. It was not essential for him to perform his duties and make decisions as President of the United States for Biden to direct the Social Media Defendants to employ his 4 recommendations for improvement; design algorithms to target opposing views of the government's COVID-19 message on the Internet; declare publicly they were "killing people;" and to adjust their misinformation policies related to COVID-19.

145. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

146. It was not essential for him to perform his duties and make decisions as Surgeon General for Murthy to engage in communications with high-level Facebook executives and demand greater censorship of COVID-19 "misinformation;" direct the Social Media Defendants to employ the 4 recommendations for improvement; design algorithms to target opposing views of the government's COVID-19 message on the Internet; and to adjust their misinformation policies related to COVID-19.

147. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

148. It was not essential for her to perform her duties and make decisions on behalf of the CDC for Crawford to conduct regular BOLO meetings with the Social Media Defendants to assist them with their misinformation policies related to COVID-19; and to negotiate with Facebook for the federal government to receive a $15 million advertising credit to promote its COVID-19 message on Facebook's platform that accesses the Internet.

149. Rather, the desired effect of her actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

150. It was not essential for him to perform his duties and make decisions on behalf of the White House for Flaherty to admonish an anonymous Facebook official and demand greater transparency from Facebook and to hold it accountable for COVID-19 "borderline content information" as he defined it that in his view was being posted to Facebook's private platform and on the Internet.

151. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate Facebook so it would censor its users' speech that was in opposition to the federal government's message on COVID-19.

### Elon Musk's public release of the Twitter Files

152. After purchasing and taking control of Twitter in late Fall of 2022 and firing most of its upper level management and many employees, Elon Musk released a number of internal Twitter documents to various journalists. Referred to as the "Twitter Files," they were then released to the public and were summarized into 15 Parts.[38]

153. In Part 10 of the summary of the Twitter Files, it was revealed that the United States government pressured Twitter and other social media platforms to elevate certain content and suppress other content about COVID-19.

154. The Twitter Files revealed three serious problems with Twitter's process related to moderating COVID-19 "misinformation:"[39]

  o First, much of the content moderation was conducted by bots, trained on machine learning and AI—impressive in their engineering, yet still too crude for such nuanced work.
  o Second, contractors, in places like the Philippines, also moderated content. They were given decision trees to aid in the process, but tasking non experts to adjudicate tweets on complex topics like myocarditis and mask efficacy data was destined for a significant error rate.
  o Third, most importantly, the buck stopped with higher level employees at Twitter who chose the inputs for the bots and decision trees, and

---

[38] *See The Twitter Files Parts 1-15: A Comprehensive Summary, Analysis, and Discussion of Ramifications for American Institutions (updated 1.19.23) – Stopping Socialism*, available at https://stoppingsocialism.com/2023/01/the-twitter-files-comprehensive-summary-analysis-and-discussion-of-ramifications-for-american-institutions/

[39] *See id* at Part 10.

subjectively decided escalated cases and suspensions. As it is with all people and institutions, there was individual and collective bias. With Covid, this bias bent heavily toward establishment dogmas.

155. And the Twitter Files revealed that on September 3, 2021, former FDA commissioner and Pfizer board member Dr. Scott Gottlieb, contacted Todd O'Boyle, a top lobbyist in Twitter's Washington office and the White House's Twitter point of contact. Gottlieb complained to O'Boyle about a tweet from Justin Hart, known to be a "lockdown and Covid vaccine skeptic with more than 100,000 Twitter followers."[40]

## COUNT I – Free Speech

**Murthy, Biden, Crawford, Flaherty, Facebook, and Twitter violated the Free Speech clause of the First Amendment when they acted jointly to remove Hart's social media posts from the Internet and block him from using his accounts.**

156. The allegations in the preceding paragraphs are incorporated herein by reference.

157. "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger*, 515 U.S. at 819.

158. Murthy, Biden, Crawford, and Flaherty knowingly engaged in viewpoint discrimination when they directed Facebook and Twitter to remove from the Internet social media posts and valid public health messages like those of Hart's that contained a viewpoint on COVID-19 that did not fit with their own political public health narrative.

159. Murthy, Biden, Crawford, and Flaherty further knowingly engaged in viewpoint discrimination against Hart when they and Executive Branch officials (1) directed Facebook and Twitter representatives to employ the federal government's "4 specific recommendations for improvement;" (2) held BOLO meetings with Facebook and Twitter representatives to target opposing public health messages on the Internet; (3) directed the Social Media Defendants to design algorithms to specifically target valid public health messages on the Internet opposing the government's COVID-19 views resulting in 20

---

[40] *See id*. at Part 13.

million pieces of content being removed from platforms and the Internet, including Hart's valid public health messages; (4) directed Facebook to adjust its policies regarding COVID-19 "misinformation" on the Internet at or about the time of Hart's valid public health message; and (5) negotiated and received a $15 million advertising credit from Facebook to advertise the government's unchallenged COVID-19 public health message on the Internet shortly before Hart's valid public messages were removed.

160.  Murthy, Biden, Crawford, and Flaherty's unconstitutional viewpoint discrimination acts that deprived Hart of his First Amendment rights were further contrary to the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

161. Private companies engage in state action when they jointly work with government officials to deprive individuals of their constitutional rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

162. "The Supreme Court has articulated four tests for determining whether a non-governmental person's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Ohno*, 723 F.3d at 995.

163. "Joint action exists where the government affirms, authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a private party." *Id.* at 996.

164. The Ninth Circuit finds joint action when "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (cleaned up). "This requirement can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Id.*

165. And threats from government officials that amount to a censorship scheme violate the First Amendment. *See Bantam Books,* 372 U.S. at 64; *Writers Guild of America*, 609 F. 2d at 365.

166. "Particularly relevant here is the maxim that if the state knowingly accepts the benefits derived from unconstitutional behavior, then the conduct can be treated as state action." *Tsao,* 698 F.3d at 1140.

167. Facebook and Twitter engaged in state action when they removed valid public health messages and posts like Hart's from their platforms and the Internet at the request of Murthy, Biden, Crawford, and Flaherty based on the viewpoint of those posts on COVID-19 that differed from the public health message of the federal government.

168. Facebook and Twitter worked in concert, substantially cooperated with, and/or conspired with Murthy, Biden, Crawford, and Flaherty to deprive Hart of his First Amendment right to free speech to post valid public health messages on the Internet.

169. Murthy, Biden, Crawford, and Flaherty affirmed, authorized, encouraged, and/or facilitated Facebook and Twitter's unconstitutional conduct of censorship of Hart's posts and valid public health messages on the Internet.

170. Facebook and Twitter either were willful participants when they removed Hart's posts from the Internet based on his viewpoint at the direction of Murthy, Biden, Crawford, and Flaherty or were subject to government compulsion, either of which makes the removal of the posts state action and transforms Facebook and Twitter into state actors.

171. Murthy, Biden, Crawford, and Flaherty knowingly accepted the benefits of censored speech derived from the unconstitutional behavior of Facebook and Twitter in removing posts from the Internet based on a valid COVID-19 public health viewpoint with which Murthy, Biden, Crawford, and Flaherty disagreed.

172. Further, Murthy, Biden, Crawford, Flaherty, and Executive Branch officials knowingly accepted the benefits of $15 million in advertising credit from Facebook to promote the federal government's unchallenged public health COVID-19 viewpoint and

message on the Internet, a public forum Congress intended to be a marketplace of ideas free from government regulation.

173. Although Hart remains active on Facebook and Twitter in an attempt to rebuild his brand and continue to post valid public health messages, Facebook and Twitter now require that Hart and other users in the future express a government-approved viewpoint to use their platforms that reach the Internet and that are subject to the COVID-19 public health policies and control of the federal government, and such posts that reach the Internet are no longer subject to the Social Media Defendants' policies.

174. Further, Facebook adjusts and deviates from its voluntary submission to its independent Oversight Board on COVID-19 public health misinformation and instead follows the direction of Murthy, Biden, Crawford, and Flaherty's recommendations.

175. Hart is entitled to declaratory and injunctive relief against Murthy, Biden, Crawford, and Flaherty for violating his right to free speech on the Internet under the First Amendment and to stop them from directing Facebook and Twitter to utilize the federal government's policies on what constitutes COVID-19 "misinformation" on their platforms and Internet.

176. Hart is entitled to declaratory and injunctive relief as well as compensatory and nominal damages from Facebook and Twitter for violating his right to free speech on the Internet under the First Amendment and to stop them from adjusting their algorithms and policies to align with the federal government's COVID-19 "misinformation" policies.

### COUNT II - Promissory Estoppel

**Facebook and Twitter committed promissory estoppel by not fulfilling their promise to Hart to use their social media platforms to reach an audience on the Internet in furtherance of his business.**

177. The allegations in the preceding paragraphs are incorporated herein by reference.

178. Facebook and Twitter made "a clear and unambiguous promise" to Hart that he could use their services to communicate and network with other Facebook and Twitter

users on the Internet. *Bushell v. JPMorgan Chase Bank, N.A.*, 163 Cal. Rptr. 3d 539, 550 (Cal. Ct. App. 2013).

179.  In making this promise, Facebook and Twitter did not include a provision that they would censor speech on the Internet opposing masks at the direction of the federal government.

180.  Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's and Twitter's promise when he started using their services to speak with and network with other Facebook and Twitter users on the Internet to promote his business. *Bushell*, 163 Cal. Rptr. 3d at 550.

181. Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's promise when he invested substantial sums of money to advertise on Facebook and Twitter and their platforms that reach an audience on the Internet. *Id.*

182.  Facebook's and Twitter's removal from the Internet and flagging of Hart's posts and suspension of his account for engaging in speech caused his reliance on their promises to be to the detriment of his business, finances, and reputation.

183. As the result of this detrimental reliance, Hart suffered monetary and non-monetary damages.

184. Hart is entitled to monetary relief from Facebook and Twitter for committing the tort of promissory estoppel.

### COUNT III - Intentional Interference with a Contract

**Facebook committed intentional interference with a contract by interfering with Hart's contract with Donorbureau, LLC.**

185. The allegations in the preceding paragraphs are incorporated herein by reference.

186. To establish a claim of intentional interference with a contractual relationship, the claimant must show (1) a valid contract between claimant and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual

relationship; and (5) resulting damage. *Davis v. Nadrich*, 94 Cal. Rptr. 3d 414, 421 (Cal. Ct. App. 2009).

187.  California law does not require that the defendant act with the specific intent to interfere. *See id.* at 422; *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513 (1998). The tort is applicable if the defendant knows that the interference is substantially certain or certain to happen as a result of defendant's actions. *Nadrich*, 94 Cal. Rptr. 3d at 422.

188.  Hart maintains a valid employment contract with Donorbureau, LLC ("Donorbureau"), a Virginia-based limited liability company.

189.  As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

190. Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

191. Facebook intentionally suspended Hart's use of his personal Facebook account and removed his posts from the Internet, and Facebook knew and intended that such action would prevent Hart from doing his work as an Administrator on the Donorbureau account.

192. Therefore, Facebook intentionally interfered with Hart's contract with Donorbureau.

193. Not being able to service Donorbureau's Facebook page placed Hart in breach of his contract with Donorbureau.

194. Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

195. Hart is entitled to monetary relief from Facebook for intentionally interfering with his contract with Donorbureau.

**COUNT IV - Negligent Interference with a Prospective Economic Advantage**

**Facebook committed negligent interference with a prospective economic advantage by interfering with Hart's contract with Donorbureau, LLC.**

196. The allegations in the preceding paragraphs are incorporated herein by reference.

197. To establish a claim of negligent interference with a prospective economic advantage, a claimant must show (1) the existence of a valid contractual relationship between the plaintiff and a third party containing the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge, actual or construed, of the relationship; (3) the defendant's knowledge, actual or construed, that the relationship would be disrupted if the defendant failed to act with reasonable care; (4) the defendant's failure to act with reasonable care; (5) actual disruption of the relationship; and (6) resulting economic harm. *Nelson v. Tucker Ellis, LLP*, 262 Cal. Rptr. 3d 250, 264 n.5 (Cal. App. Ct. 2020).

198. Hart maintains a valid employment contract with Donorbureau, LLC, a Virginia-based limited liability company.

199. As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

200. Hart has a probability of future economic benefit by fulfilling the terms of his employment contract with Donorbureau.

201. Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

202. When Facebook suspended Hart's use of his personal Facebook account and removed his posts from the Internet, it knew or should have known that Hart's work as an Administrator on the Donorbureau account and his relationship with Donorbureau would be disrupted as a result of its negligent actions.

203. In not providing Hart any avenue to access the Donorbureau account, Facebook failed to act with reasonable care.

204. Facebook's act of suspension caused an actual disruption in the relationship between Hart and Donorbureau because he could not post content to the site or on the Internet or make other changes in his work to increase Donorbureau's revenue.

205. Therefore, Facebook negligently interfered with Hart's prospective economic advantage from his contractual relationship with Donorbureau.

206. Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

207. Hart is entitled to monetary relief from Facebook for negligently interfering with the prospective economic advantage resulting from his contract with Donorbureau.

## PRAYER FOR RELIEF

Plaintiff Justin Hart respectfully requests that this Court enter judgment in his favor on every claim set forth above and award him the following relief:

A. Declare that the actions of Murthy, Biden, Crawford, Flaherty, Facebook, and Twitter constitute a violation of the Free Speech Clause of the First Amendment by denying Hart the ability to speak on the Internet through the private social media platforms of Facebook and Twitter;

B. Enjoin Murthy, Biden, Crawford, and Flaherty from directing in the future social media companies such as the Social Media Defendants to censor information and speech on platforms and the Internet with which Murthy, Biden, Crawford, and Flaherty disagree;

C. Enjoin Facebook and Twitter from removing in the future Hart's posts from the Internet or suspending his posts at the direction of Murthy, Biden, Crawford, and Flaherty or based on the federal government's "misinformation" policies;

D. Enjoin Murthy, Biden, Crawford, and Flaherty from directing social media companies such as the Social Media Defendants from censoring speech in the future;

E. Award Hart compensatory damages in the amount of his past, present, and future lost income resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

F. Award Hart compensatory damages in the amount of a return of the money he spent on Facebook and Twitter advertisements because of Facebook's and Twitter's actions of

promissory estoppel and Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

G. Award Hart compensatory damages in an amount to fully compensate him for the time he spent building a following on the Internet through Facebook and Twitter that has now been wasted by Facebook's and Twitter's actions of promissory estoppel and Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

H. Award Hart compensatory damages in the amount of the harm to his reputation on the Internet resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage; and

I.   Award any further relief to which Hart may be entitled, including reasonable attorneys' fees and costs.

Dated: February 15, 2023          Respectfully submitted,

s/ Daniel Suhr
Daniel Suhr, pro hac vice admitted
dsuhr@libertyjusticecenter.org
M.E. Buck Dougherty III, pro hac vice admitted
bdougherty@libertyjusticecenter.org
James McQuaid, pro hac vice admitted
jmcquaid@libertyjusticecenter.org
LIBERTY JUSTICE CENTER
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Telephone: 312-637-2280
Facsimile: 312-263-7702

Robert Tyler (STATE BAR NO. 179572)
rtyler@tylerbursch.com
Nada Higuera (STATE BAR NO. 299819)
nhiguera@tylerbursch.com
TYLER BURSCH, LLP
25026 Las Brisas Road
Murrieta, California 92562

Telephone: 951-600-2733
Facsimile: 951-600-4996

*Attorneys for Plaintiff Justin Hart*