Scott J. Street (SBN 258962)
**JW HOWARD/ATTORNEYS, LTD.**
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
**JW HOWARD/ATTORNEYS, LTD.**
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 5:23-cv-03880-NC |
| Plaintiff, | [Assigned to the Hon. Trina Thompson] |
| vs. | **REPLY BRIEF IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | |
| Defendants. | Date:    August 16, 2023<br>Time:    10:00 a.m.<br>Crtrm.:  9 |

///

///

///

///

///

1

JW HOWARD/ ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, California 92101

# TABLE OF CONTENTS

I.    INTRODUCTION ……………………………………………………..    7

II.   GOOGLE RELIED ON THE GOVERNMENT TO REMOVE

       KENNEDY'S SPEECH FROM YOUTUBE…………………….......     8

III.   GOOGLE DOES NOT HAVE TO ENDORSE RFK'S

       MESSAGE………………………………………………………..    13

IV.   THE BALANCE OF EQUITIES FAVORS THE SPEAKER...............    17

V.   LIMITED DISCOVERY IS ALSO WARRANTED…………………..    20

VI.   CONCLUSION…………………………………………………    21

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

REPLY BRIEF ISO APPLICATION FOR TRO                CASE NO. 5:23-cv-03880-NC

1

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Am. Mfrs. Mutual Ins. Co. v. Sullivan,*

    526 U.S. 40 (1999) …………………………………………….    12

*Atkinson v. Meta Platforms, Inc.,*

    No. 20-17489, 2021 WL 547022, (9th Cir. Nov. 22, 2021) …………    11

*Bell v. Keating,*

    697 F.3d 445 (7th Cir. 2012) ………………………………………    18

*Biden v. Knight First Amend. Inst.,*

    --U.S. --, 141 S. Ct. 1220 (2021)    ………………………………    15

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*

    531 U.S. 288 (2001) …………………………………………………    9

*Broderick v. Oklahoma,*

    413 U.S. 601 (1972) …………………………………………………    13

*Brown v. Hartlage,*

    456 U.S.  45 (1982) ………………………………………………..    19

*Bullfrog Films, Inc. v. Wick,*

    847 F.2d 502 (9th Cir. 1988) ………………………………………    14

*City and Cty. of San Francisco v. Trump,*

    897 F.3d 1225 (9th Cir. 2018) ……………………………………..    18

*Cohen v. California,*

    403 U.S. 15 (1971) …………………………………………………    12

*Cmty. House, Inc. v. Cit of Boise,*

    490 F.3d 1041 (9th Cir. 2007) …………………………………    17

*Cuviello v. City of Vallejo,*

    944 F.3d 816 (9th Cir. 2019) ………………………………………    18

*Denver Area Ed. Telecomms. Consortium, Inc.,*

518 U.S. 727 (1996) ……………………………………………….. 12

*Doe v. Google, LLC,*

No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ………… 10

*Doe v. Harris*

772 F.3d 563 (9th Cir. 2009) …………………………………… 17

*Dow Jones & Co. v. Kaye,*

90 F. Supp. 2d 1347 (S.D. Fla. 2000) ………………………… 18

*Evans v. Newton,*

382 U.S. 296 (1966) …………………………………………… 9

*Farris v. Seabrook,*

677 F.3d 858 (9th Cir. 2012) …………………………………… 17

*Fed. Election Comm'n v. Wisc. Right to Life, Inc.*

551 U.S. 449 (2007) …………………………………………… 19

*Griffin v. Bryant,*

30 F. Supp. 3d 1139 (D.N.M. 2014)……………………………… 18

*Heineke v. Santa Clara Univ.,*

965 F.3d 1009 (9th Cir. 2020) ………………………………… 12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*

515 U.S. 557 (1995) …………………………………………… 15, 16

*Klein v. City of San Clemente,*

584 F.3d 1196 (9th Cir. 2009) ………………………………… 17

*Lee v. Katz,*

276 F.3d 550 (9th Cir. 2002) …………………………………… 13

*Manhattan Cmty. Access Corp. v. Halleck,*

139 S. Ct. 1921 (2019) ………………………………………… 13

*McClure v. Watson,*

No. 22-0CV-00371-JPHDLP, 2020 WL 5994279,

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

(S.D. Ind. Oct. 9, 2020) ……………………………………………… 10

*Miami Herald Publishing Co. v. Tornillo,*                                   8, 15-

    418 U.S. 241 (1974) ……………………………………………… 16

*Missouri v. Biden,*

    --F.Supp.3d --, 2023 WL 4335270 (W.D. La. July 4, 2023) ………… 10

*NetChoice, LLC v. Paxton*

    49 F.4th 439 (5th Cir. 2022) ……………………………………… 14

*O'Handley v. Weber,*

    62 F.4th 1145 (9th Cir. 2023) …………………………………… *passim*

*Pac. Gas & Elec. Co. v. Public Util. Comm'n of Cal.*

    475 U.S. 1 (1986) ……………………………………………… 15-16

*Packingham v. North Carolina,*

    --U.S. --, 137 S. Ct. 1730 (2017) ……………………………… 15

*Rawson v. Recovery Innovations, Inc.,*

    975 F. 3d 742 (9th Cir. 2020) …………………………………… 9, 11

*Roberts v. AT&T Mobility, LLC,*

    871 F.3d 833 (9th Cir. 2017) …………………………………… 12

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc.,*

    547 U.S. 47 (2006) ……………………………………………… 16

*Rutenberg v. Twitter, Inc.,*

    No. 21-160743, 2022 WL 1568360 (9th Cir. May 18, 2022) ………… 10

*Sec'y of State v. Joseph H. Munson Co.,*

    467 U.S.  947 (1984) …………………………………………... 17

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*

    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ……………………… 14

*Thornhill v. Alabama,*

    310 U.S. 88 (1940) …………………………………………….. 19

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

REPLY BRIEF ISO APPLICATION FOR TRO                                   CASE NO. 5:23-cv-03880-NC

*Thornton v. Kroger Co.,*

No. CIV 20-1040 JB/JFR, 2022 WL 488932

(D.N.M. Feb. 17, 2022) ………………………………………………… 10

*Turner Broad. Sys., Inc. v. F.C.C.,*

512 U.S. 622 (1994) ……………………………………………….. 12

*Warth v. Seldin,*

422 U.S. 490 (1975) ……………………………………………….. 17

**Statutes and Legislative Materials**

H.R. REP. No. 104-458 (1996) ……………………………………….. 14

47 U.S.C § 230  …...…………………………………………………... 14

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

6

Plaintiff Robert F. Kennedy, Jr., respectfully submits the following reply brief in support of his application for a temporary restraining order.

## I.   <u>INTRODUCTION</u>

This application seeks limited relief. It does not ask the Court to force Google to do anything. It does not seek a mandatory injunction. It asks the Court to order Google not to use its medical misinformation policies—policies that Google developed in response to government demands and which rely entirely on government sources—to remove videos of Mr. Kennedy's political speech from YouTube during his presidential campaign.

That prohibitory relief falls well within the Court's discretion. It will protect the political process by ensuring that Americans have the unfettered chance to hear from a presidential candidate on matters of public concern.

Google cannot seriously dispute that. It once championed free speech. It made billions of dollars by turning YouTube into the digital public square, a place where, until recently, people could freely communicate about the issues of the day.

Thus, rather than discussing the First Amendment principles—all of which favor Mr. Kennedy—Google relies on the conventional wisdom that the First Amendment does not apply to private parties. The Ninth Circuit rejected that conventional wisdom long ago. So did the Supreme Court. Both have held that the state action doctrine is a flexible one that focuses on deciding whether seemingly private action is "fairly attributable" to the government.

The medical misinformation policies qualify. They rely entirely on the government to decide what information to remove from YouTube. By their terms, the rules change only when the government changes its position. And, according to evidence obtained in other litigation, Google developed at least one of the policies (the vaccine policy that it usually cites when censoring Kennedy) in response to government demands for it. It also consulted with government officials while writing

JW HOWARD/ ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, California 92101

the policy and it shared the government's desire to censor information that the government does not want people to hear. That shows the cooperation and meeting of the minds that triggers the state action doctrine.

Of course, Google construes that evidence in a much different light. It compares its use of the misinformation policies to the information sharing that the Ninth Circuit said was insufficient in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). It compares its censoring of a presidential candidate's speech to cases that other judges in this district rejected at the pleading stage. The evidentiary record here goes much further. It shows precisely the type of public-private censorship campaign that *O'Handley* warned about.

There is also no merit to Google's argument that *it* will be harmed if the Court prohibits it from using government-sponsored policies to censor one of the government's most prominent critics. Google is not a publisher. It takes no responsibility for the content people publish on YouTube. In fact, it cannot be held liable for that content. That legal protection is the foundation of its business. That distinguishes this case from the *Miami Herald* line of cases, in which the Supreme Court held that the government could not force private parties engaged in expressive activities to host speech that they disagreed with.

The application should be granted.

## II.    <u>GOOGLE RELIED ON THE GOVERNMENT TO REMOVE KENNEDY'S SPEECH FROM YOUTUBE</u>

As expected, Google's primary argument is that Mr. Kennedy cannot show a likelihood of success on the merits in this case because the First Amendment does not apply to private parties. It is wrong.

The state action doctrine is not as narrow as Google contends. The Supreme Court has said that "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior

may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotations omitted). Courts have adopted various tests to help guide this analysis but it "is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* As is often the case, "examples may be the best teachers," *id.*, at 296, and they favor Mr. Kennedy.

For example, Google contends that it decided to remove Kennedy's speech for its own reasons, independent of the government's desire to censor him. But the Ninth Circuit rejected a similar argument in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020). Indeed, like Google, the private medical professionals in *Rawson* argued that the plaintiff had to prove that the government overrode their professional decisions to prove state action. The court rejected the argument, concluding that while "[a] finding that individual state actors or other state requirements literally overrode a nominally private defendant's independent judgment might very well provide relevant information … it is a mistake to focus too narrowly on this question." *Id.* at 751.

YouTube's medical misinformation policies rely *entirely* on the government to decide what information gets removed from YouTube. Street Decl., Exhs. C, D.[1] They prohibit speech that "contradicts" government statements and which the government deems dangerous. *Id.* The policies change not when Google changes its mind about the prohibited subjects but when the *government* changes its mind about the subjects. *Id.* That is critical. "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton*, 382 U.S. 296, 299 (1966). It is hard to imagine a clearer case of entwinement between private and governmental policies than this one, where the private policy incorporates the government's policy verbatim and where the private policy changes only in response to the government's changes. *See Rawson*, 975 F.3d at 754-55 (discussing

---

[1] Defined terms have the meaning given to them in the application.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1   importance of government imprimatur as factor in this analysis).[2]

2   Google also makes much of the fact that it shared the government's censorship

3   goals. Unlike Facebook, the government did not have to coerce Google into censoring

4   people like Mr. Kennedy. Even if true, that undermines Google's argument. Courts

5   have drawn "a sharp distinction between attempts to convince and attempts to coerce."

6   *O'Handley*, 62 F.4th at 1158. By contrast, state action can be shown when "the public

7   and private actors shared a common, unconstitutional goal …." *Thornton v. Kroger*

8   *Co.*, No. CIV 20-1040 JB/JFR, 2022 WL 488932, at *61 (D.N.M. Feb. 17, 2022).

9   That is the case here, as government officials "aligned themselves with and partnered

10   with" third parties like Google "to avoid Government involvement with free speech"

11   that would clearly violate the First Amendment. *Missouri v. Biden*, -- F. Supp. 3d --,

12   2023 WL 4335270, at *52 (W.D. La. July 4, 2023). The fact that Google relished its

13   role makes its actions more, not less, suspect.

14   Indeed, this is precisely the case the Ninth Circuit warned about in *O'Handley*.

15   That case arrived at a precarious time. Courts in this district had dismissed several

16   state action cases against technology companies, usually by deeming their allegations

17   of joint action implausible. In each case, the Ninth Circuit affirmed the dismissal in a

18   short order. *See Doe v. Google, LLC*, No. 21-16934, 2022 WL 17077497, at *1-3 (9th

19   Cir. Nov. 18, 2022) (affirming dismissal because plaintiffs "failed to show any link

20   between the alleged actions by the Speaker and the House and YouTube's decision to

21   remove [their] channels"); *Rutenberg v. Twitter, Inc.*, No. 21-160743, 2022 WL

22   1568360, at *1 (9th Cir. May 18, 2022) (noting plaintiff's "acknowledge[ment] that

23

24   [2] Google contends that Kennedy has not alleged the state action necessary to plead a
     section 1983 claim, but Google's misinformation policies rely on multiple government
25   sources, including "local health authorities" which constitute state action. Street Decl.,
     Exhs. C, D. And, of course, "federal courts may grant injunctive relief against federal
26   officers who are violating federal law." *McClure v. Watson*, No. 22-0CV-00371-
     JPHDLP, 2020 WL 5994279, at *1 (S.D. Ind. Oct. 9, 2020). The state action doctrine
27   makes that rule applicable to Google.

28                                                    10

Twitter exercised its own 'discretion and authority' in moderating President Trump's account, and that Twitter acted as President Trump's 'opponent' in doing so); *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *1 (9th Cir. Nov. 22, 2021) (declining to infer that state officials "'dominate[d]' Meta Platforms' decision making"). Unlike the plaintiffs in the previous cases, Mr. O'Handley had evidence that Twitter suspended his account at least once after a California government agency called the Office of Elections Cybersecurity (OEC) notified Twitter of his post. O'Handley alleged that this government notification process constituted state action. 62 F.4th at 1153-55.

The Ninth Circuit struggled with these allegations, issuing a lengthy, published opinion after rejecting the previous cases in short, unsigned dispositions. It dispatched O'Handley's argument by stating that "[t]he OEC offered Twitter no incentive for taking down the post it flagged." *Id.* at 1158. It said the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.* Of course, in saying that, the court improperly drew inferences in Twitter's favor. The panel seemed to recognize that, qualifying its analysis by noting that "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government," but it concluded that "we do not see the high degree of entwinement needed for state action in this case." *Id.* at 1158 n.2 (citing *Rawson*).

That high degree of entwinement exists here.  Moreover, *O'Handley* said "[a] constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *Id.* at 1159. That is exactly what Google did here. And that cooperation, plus the shared goals, distinguish this case from others decided in this district.

This does not mean that Google had to cloak itself in the power of the state, nor

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

that Mr. Kennedy must identify a specific threat made by a government official that got Google to do its bidding, although he has obtained evidence of White House officials directing tech companies to censor him. Street Decl., Exh. P. True, merely accepting public funds and complying with generally applicable laws will not suffice. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020). And laws that simply give legal protection to private actions (like arbitration agreements) do not automatically transform private action into state action. *Roberts v. AT&T Mobility, LLC*, 871 F.3d 833, 844-45 (9th Cir. 2017). For good reason, as the Supreme Court has said it "will not tolerate the imposition of constitutional restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (cleaned up) (quotations omitted).

But if the state action doctrine means anything, it must be applied when a private party like Google does the government's bidding at the government's behest and to promote the government's preferred message.

That is especially important when the case involves political speech. "In the realm of speech and expression, the First Amendment envisions the citizen shaping the government, not the reverse; it removes 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity.'" *Denver Area Ed. Telecomms. Consortium, Inc.*, 518 U.S. 727, 782-83 (1996) (O'Connor, J., concurring in part and dissenting in part) (quoting *Cohen v. Cal.*, 403 U.S. 15, 24 (1971)). The Supreme Court has repeatedly emphasized that "each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

12

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1   The Supreme Court did not deviate from these principles in *Manhattan*

2   *Community Access Corporation v. Halleck*, 139 S. Ct. 1921 (2019). In *Halleck*, the

3   plaintiffs argued that a private entity "exercises a traditional, exclusive public function

4   when it operates the public access [television] channels on Time Warner's cable

5   system in Manhattan." *Id.* at 1928. The majority disagreed and reversed the Second

6   Circuit's decision, but four justices dissented in an opinion that echoed the state action

7   doctrine's liberal roots, and which noted that "[t]he right to convey expressive content

8   using someone else's physical infrastructure is not new." *Id.* at 1938 (Sotomayor,

9   Ginsburg, Breyer and Kagan, JJ., dissenting).

10   That principle may explain *Lee v. Katz*, 276 F.3d 550, 557 (9th Cir. 2002), a

11   unique case in which the Ninth Circuit "conclude[d] that, in regulating speech within"

12   a public space, "the OAC [a private entity] performs an exclusively and traditionally

13   public function within a public forum." *Lee* reflects a fundamental principle: freedom

14   of speech is different than the interests the plaintiffs asserted in other state action

15   cases. It is the foundation of American democracy. And when giant corporations work

16   with the government to silence speech that the government does not want people to

17   hear—in a forum otherwise open to all viewpoints—they violate that right.

18   **III.   GOOGLE DOES NOT HAVE TO ENDORSE RFK'S MESSAGE**

19   Google's other arguments also lack merit. Mr. Kennedy does not have to show

20   that government officials specifically targeted him to prevent Google from using its

21   government sponsored misinformation policies to censor his speech, as their "very

22   existence may cause others not before the court to refrain from constitutionally

23   protected speech or expression." *Broderick v. Oklahoma*, 413 U.S. 601, 612 (1972).

24   Google's failure to censor all of Kennedy's speech also undermines its argument, as

25   the company's arbitrary enforcement of the misinformation policies creates a chilling

26   effect on speech that the Supreme Court has applied the First Amendment's vagueness

27   doctrine strictly to avoid. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir.

28

REPLY BRIEF ISO APPLICATION FOR TRO                    CASE NO. 5:23-cv-03880-NC

1988).

Moreover, Mr. Kennedy has presented evidence of at least one occasion in which White House officials directed a technology company to censor him. Street Decl., Exh. P. He has also been targeted by government officials as a member of the "disinformation dozen," the group that government officials have targeted most aggressively for dissenting from government orthodoxy about medical issues. Thus, Mr. Kennedy has the necessary personal interest to bring this action.

Google cannot seriously argue otherwise. Thus, it spends much of its brief arguing that *it* will be harmed if the Court grants the requested injunction. That argument suffers from several flaws.

*First*, Google is not a publisher. Under section 230 of the Communications Decency Act, it cannot be held liable for the content its users publish. 47 U.S.C. § 230(c)(1). In fact, Congress enacted section 230 in response to a decision, *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), that deemed an internet platform, over its objection, to be akin to a newspaper because its content removal process "constitute[d] editorial control" over the platform. *See* H.R. REP. No. 104-458, at 194 (1996) ("One of the specific purposes of [section 230] is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers….").

Google cannot have it both ways, claiming that it cannot be held liable for content posted on YouTube because it is not a publisher while asserting the rights that genuine publishers do have.

*Second*, Google does not engage in expressive activity when it allows people to post videos on YouTube. "Unlike newspapers," internet platforms like YouTube "exercise virtually no editorial control or judgment." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 460 (5th Cir. 2022). They use "algorithms to screen out certain obscene and spam-related content. And then virtually everything else is just posted to the Platform

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

with zero editorial control or judgment." *Id.* That is why the Supreme Court has called the internet the "modern public square." *Packingham v. North Carolina*, -- U.S. --, 137 S. Ct. 1730, 1737 (2017); *see also Biden v. Knight First Amend. Inst.*, -- U.S. --, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring) (noting that internet platforms like YouTube "hold themselves out as organizations that focus on distributing the speech of the broader public").

That distinguishes this case from *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241 (1974). *Miami Herald* involved a newspaper's challenge to a law that required the paper to give free space to political candidates its editorial board criticized. The Supreme Court declared the law unconstitutional. In doing so, it noted that "[a] newspaper is more than a passive receptacle or conduit for news, comment and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." *Id.* at 258. The First Amendment protects that process.

Similarly, in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), the Supreme Court decided that the California government could not force PG&E, a private company, to give an opponent space in a newsletter that PG&E included in its billing statements. The Court emphasized that "because access is awarded only to those who disagree with appellant's views and who are hostile to appellant's interests, appellant must contend with the fact that whenever it speaks out on a given issue, it may be forced … to help disseminate hostile views." *Id.* at 14. The Court had no problem finding that regulation to violate the First Amendment. *Id.* And in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995), the Supreme Court held that a state law could not require a parade to include a group whose message the parade organizer did not want to promote.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Google describes these cases as enshrining a broad constitutional right to exclude disfavored messages. Not so. They were compelled speech cases and "[t]he compelled speech violation in each … resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006) ("*FAIR*"). For example, in *Hurley*, the law that dictated including a particular group in the parade "alter[ed] the expressive content of the parade." *Id.* (cleaned up). In *Miami Herald*, the "right-of-reply statute infringed the newspaper editors' freedom of speech by altering the message the paper wished to express" about a particular candidate. *Id.* at 64. And the regulation in *PG&E* "interfered with the utility's ability to communicate its own message in its newsletter." *Id.*

Moreover, in each of these cases, the Supreme Court emphasized that the challenged action would chill speech. *See Miami Herald*, 418 U.S. at 257 (noting that, due to penalties imposed by statute, "editors might well conclude that the safe course is to avoid controversy"); *PG&E*, 475 U.S. at 14 (same). No such concern exists here. To the contrary, it is Google's actions, not the requested injunction, that will chill speech—and not just any speech, but speech by a presidential candidate on matters of public concern during one of the most important elections in American history.

Justice Marshall drew an important distinction between the limited nature of the forum involved in *PG&E* (billing statements) and the way the company used it. He explained that if PG&E were "to use its billing envelopes as a sort of community billboard, regularly carrying the messages of third parties, its desire to exclude a particular speaker would be deserving of lesser solicitude." 475 U.S. at 23 (Marshall, J., concurring). That is exactly what Google did with YouTube and why its desire to remove Mr. Kennedy's political speech after the fact does not deserve the protection the Supreme Court showed in the *Miami Herald* line of cases.

## IV.    THE BALANCE OF EQUITIES FAVORS THE SPEAKER

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1    In that vein, the balance of equities weighs strongly in favor of granting the

2  application. That is not just based on the threat to Mr. Kennedy's campaign from

3  Google's government induced censorship, which is substantial, but on the damage that

4  will be done to the political process if the Court allows such action to continue.

5    "The Ninth Circuit has consistently recognized the significant public interest in

6  upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir.

7  2014). This harm "is particularly irreparable where, as here, a plaintiff seeks to engage

8  in political speech, as timing is of the essence in politics and a delay of even a day or

9  two may be intolerable." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir.

10  2009); *see also Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (upholding

11  preliminary injunction against state's limitations on contributions to political

12  committees in state or county recall campaigns for this reason). This principle is so

13  well settled that the Ninth Circuit has said a finding that the case raises "serious First

14  Amendment questions *compels* a finding that ... the balance of hardships tips sharply

15  in [the plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th

16  Cir. 2007) (emphasis added) (cleaned up).

17    Instead of acknowledging that principle, Google accuses Mr. Kennedy of

18  lacking the individualized interest necessary to bring this case. That argument lacks

19  merit. A "plaintiff generally must assert his own legal rights and interests, and cannot

20  rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*,

21  422 U.S. 490, 499 (1975). Courts relax this rule in the First Amendment context,

22  though, because "when there is a danger of chilling free speech, ... society's interest"

23  in promoting speech outweighs the prudential standing considerations. *Sec'y of State*

24  *v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). In this context, a person "must

25  substantiate a concrete and particularized chilling effect on his protected speech or

26  expressive conduct to pursue prospective relief." *Bell v. Keating*, 697 F.3d 445, 454

27  (7th Cir. 2012). "He does so where, for example, he challenges an exercise of

28

government power that is regulatory, proscriptive, or compulsory in nature, and he was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id.* (quotations omitted).

Mr. Kennedy satisfies that standard. Google's medical misinformation policies apply to everybody, including him. Mr. Kennedy explained the consequences that Google's actions, and the chilling effect they create, have on him and his campaign. RFK Decl., ¶¶ 5-6; A. Kennedy Decl., ¶¶ 5-8. Nothing more needs to be shown. *See, e.g., Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1175-77 (D.N.M. 2014) (concluding that plaintiff had standing to challenge rule because it "most likely affected his speech," and because of lax standing requirements for such cases). And, as required, Mr. Kennedy is not seeking to enjoin all applications of Google's medical misinformation policies but an injunction that is narrowly tailored to protect the political speech associated with his campaign. *City and Cty. of San Fran. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

There is also no merit to Google's argument that Mr. Kennedy waited too long to seek this relief. Courts have repeatedly rejected such arguments when the injunctive relief would prevent a violation of First Amendment rights, reasoning that "[t]his rationale of denial due to delay is not applicable in the context of an alleged First Amendment violation where each passing day may constitute a separate and cognizable infringement on the First Amendment." *Dow Jones & Co. v. Kaye*, 90 F. Supp. 2d 1347, 1362 (S.D. Fla. 2000) (cleaned up); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (discussing this principle and noting that "courts are loath to withhold relief solely on that ground" (cleaned up)). In any event, Mr. Kennedy provided a compelling reason for his decision to file this case—and to seek injunctive relief—now because, unlike Facebook and Twitter, Google has continued to censor his speech on matters of public concern during his political campaign and despite his repeated requests that they stop. A. Kennedy Decl., ¶ 8.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1    Nor is there any merit to Google's argument that the harm it would suffer from

2  being unable to censor Mr. Kennedy will outweigh the harm to Mr. Kennedy and the

3  political process from the censorship. "Where the First Amendment is implicated, the

4  tie goes to the speaker, not the censor." *Fed. Election Comm'n v. Wisc. Right To Life,*

5  *Inc.*, 551 U.S. 449, 474 (2007). That is why, despite spilling much ink in its

6  opposition, Google did not say anything about the merits of Kennedy's First

7  Amendment claim. It can't justify the censorship. Nor should it. "Freedom of

8  discussion, if it would fulfill its historic function in this nation, must embrace all

9  issues about which information is needed or appropriate to enable the members of

10  society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S.

11  88, 102 (1940). That is why the Supreme Court has repeatedly rejected government

12  efforts to control the information voters receive during the political process. *See, e.g.,*

13  *Brown v. Hartlage*, 456 U.S. 45, 61-62 (1982) (finding that application of state statute

14  to invalidate election results based on candidate's promise to serve at impermissible

15  reduced salary violated First Amendment).

16    *Brown* is instructive. Like YouTube's government-based misinformation

17  policies, the Kentucky statute imposed a penalty on a candidate for distributing

18  alleged misinformation. That did not save it. "Although the state interest in protecting

19  the political process from distortions caused by untrue and inaccurate speech is

20  somewhat different from the state interest in protecting individuals from defamatory

21  falsehoods, the principles underlying the First Amendment remain paramount." *Id.* at

22  61. In fact, a "candidate's factual blunder is unlikely to escape the notice of, and

23  correction by, the erring candidate's political opponent." *Id.* Thus, in the political

24  process, "[t]he preferred First Amendment remedy of more speech, not enforced

25  silence, [ ] has special force." *Id.* (cleaned up).

26    This case is no different. The fact that it involves a private party punishing

27  people for disagreeing with the government only makes it more important. The

28

Supreme Court was right: the internet *is* the modern public square. It is where political debate occurs, where people get their news, where they decide how to vote. That will only increase in the future. Allowing the companies that control the biggest parts of that square to silence the incumbent government's critics, based solely on the incumbent government's views, would set a dangerous precedent.

Finally, the fact that Americans can find *some* videos of Mr. Kennedy speaking about matters of public concern on YouTube only undermines Google's argument. It shows that Google does not really care about Kennedy's message, which has appeared on YouTube for years. RFK Decl., ¶ 3. It removes speech because the government wants it removed. It may not do a perfect job of that, but that just shows the arbitrariness of Google's actions, another factor that supports granting the application.

## V.     LIMITED DISCOVERY IS ALSO WARRANTED

Regardless of how the Court rules on the application for emergency relief, it should set a hearing on Mr. Kennedy's request for a preliminary injunction and allow him to conduct limited discovery in connection with that hearing.

There are several reasons to do that. *First*, this case is already proceeding on an expedited schedule, with the Rule 16 conference set for November 2. *Second*, the allegations in Mr. Kennedy's case, construed liberally in his favor, state a plausible claim to relief. Thus, unlike the other cases decided in this district, there will likely be discovery and a decision on the merits based on a full record. *Third*, the important First Amendment issues involved in this case justify having as complete a record as possible before the Court decides whether to grant a preliminary injunction.

This request is not frivolous. The parties built a large evidentiary record in the State AG Censorship Case that the Fifth Circuit Court of Appeals heard argument in last week. That record shows repeated interactions between Google and government officials, including White House officials, about the new medical misinformation policies, including evidence that Google/YouTube executives were talking to the

government about the policies while writing them. Street Decl., Exhs. F-O. Although the government officials who were deposed in the State AG Censorship Case did not recall the details of those meetings, the Google executives might. They did not testify in the State AG case and, to our knowledge, the plaintiffs in that case did not gather much evidence about Google because they were more focused on Facebook, the government's most reluctant partner in the censorship campaign. Street Decl., ¶¶ 28.

Furthermore, the parties in the State AG Censorship Case did not gather any evidence of the censorship partnership between the government and Google during the presidential campaign. Thus, nobody has explored the depths to which government officials—including White House officials—are pressuring Google to censor Mr. Kennedy during his presidential campaign. Although the Court can grant the temporary relief requested in this application without answering that question, it should be subject to discovery, especially since White House officials have pressured other technology companies to censor Kennedy. *Id.*, Exh. P.

## VI.   CONCLUSION

Mr. Kennedy respectfully requests that the Court grant the application.


DATED:  August 18, 2023            JW HOWARD/ATTORNEYS, LTD.




                                        By:  */s Scott J. Street*
                                             John W. Howard
                                             Scott J. Street
                                             Andrew G. Nagurney
                                             Attorneys for Plaintiff
                                             ROBERT F. KENNEDY, JR.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

## **CERTIFICATE OF SERVICE**

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On August 18, 2023, I caused said document to be filed and served via the Court's Electronic Service upon the parties listed on the Court's service list for this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on August 18, 2023 at San Diego, California.

*/s/ Dayna Dang* _____
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com

REPLY BRIEF ISO APPLICATION FOR TRO                                      CASE NO. 5:23-cv-03880-NC