UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, et al., <br><br> Defendants. | Case No. 23-cv-03880-TLT <br><br> **ORDER ON APPLICATION FOR TEMPORARY RESTRAINING ORDER** <br><br> Re: ECF No. 7 |

## I.  INTRODUCTION

Before the Court is an application for a temporary restraining order filed by plaintiff John F. Kennedy, Jr. seeking to enjoin defendants Google LLC and YouTube, LLC from using their medical misinformation policies to keep two specific videos of Kennedy off their platform. ECF No. 7. Plaintiff also seeks to enjoin defendants from using their medical misinformation policies to remove videos of Kennedy during his campaign for the 2024 presidential election. Counsel for the parties' appeared at a hearing on the application on August 21, 2023. ECF No. 29. Having considered the parties' briefs and oral arguments, the relevant legal authority, and for the reasons below, the Court **DENIES** Plaintiff's application for a temporary restraining order.

## II.  FACTUAL BACKGROUND

Plaintiff "John F. Kennedy, Jr. is seeking the democratic party's nomination for president." Complaint, para. 16. "He has filed the necessary paperwork with the Federal Election Commission and is taking steps to qualify for the ballot in early primary states, including New Hampshire." *Id*. "Kennedy announced his candidacy on April 19, 2023." Mot. p. 9, Street Decl. para. 3.

//

1   Defendant YouTube, LLC ("YouTube"), a subsidiary of defendant Google LLC
2   ("Google"), is a "video-sharing platform that allows users to upload content that can then be
3   viewed by visitors to its site." Opp'n. 2.  YouTube enforces its own terms and services and
4   content moderation policies.  Specifically, YouTube has policies regarding COVID-19 medical
5   misinformation and vaccine misinformation.  Opp'n., Blevin Decl. Exs. D, E.  Additionally,
6   YouTube allows users to control what content they see and provides users with a feature to flag
7   videos that violate YouTube's policies.
8   On March 3, 2023, Kennedy spoke at Saint Anselm College's New Hampshire Institute of
9   Politics.  Mot. 9-10; Street Decl. para. 4.  The speech centered around Kennedy's concerns about
10  the merger of corporate and state power as related to the number of vaccines children take.  *Id*.  He
11  also spoke about his environmental and legal work fighting corporate polluters.  *Id*.  On or about
12  the same day, Manchester Public Television posted a video of the speech and YouTube removed
13  it.  Street Decl. para. 5.
14  In addition to the video of Kennedy's speech at Saint Anslem College, Plaintiff alleges that
15  YouTube removed two other videos of him.  One video was titled "RFK on Joe Rogan – Pfizer
16  COVID Vaccine Trial." Mot., Amaryllis Kennedy Decl. Ex. A.  The video was posted on June
17  17, 2023 and was taken down the same day.  *Id*.  The second video features Kennedy in an
18  interview with Jordan Peterson.  Mot., Robert Kennedy Decl. para. 4.  Upon inquiry by the Court,
19  Plaintiff's counsel could not identify the dates of when Kennedy's interview with Jordan Peterson
20  took place, when the video was uploaded to YouTube, and when it was taken down.  Plaintiff did
21  not identify the topics discussed in the interview.  Plaintiff's counsel indicated that these two
22  videos were not posted by Plaintiff.
23  "The campaign is expected to heat up after Labor Day.  That is why Mr. Kennedy is
24  seeking preliminary injunctive relief now." Mot., p. 6, Street Decl. para. 32.
25  **III.   LEGAL STANDARD**
26  Injunctive relief is an "extraordinary and drastic remedy[.]" *Munaf v. Geren*, 553 U.S.
27  674, 689 (2008).  Such relief may be awarded only upon a clear showing by the plaintiff that he is
28  (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of an

2

injunction, (3) that the balance of equities tips in his favor, and (4) that the injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20-22 (2009); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

The purpose of preliminary injunctive relief is to maintain the status quo. *See*, *e.g.*, *King v. Saddleback Junior Coll. Dist.,* 425 F.2d 426, 427 (9th Cir. 1970). To grant preliminary injunctive relief, a court must find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). Assuming that this threshold has been met, " 'serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of [preliminary injunctive relief], so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In seeking out a preliminary injunction based on First Amendment grounds, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), *overruled on other grounds by Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019).

**IV.   DISCUSSION**

**A.   Plaintiff's First Amendment claim is unlikely to succeed on the merits because Google and YouTube are private entities and not state actors.**

Kennedy alleges that Google and YouTube (collectively "Google") violated his First Amendment rights when it removed two videos of him from YouTube based on its policies related to COVID-19 medical misinformation and vaccine misinformation. Mot., 13. Plaintiff further asserts that because YouTube's policies are exclusively guided by local health authorities, YouTube is a state actor for purposes of holding a private entity responsible for the deprivation of First Amendment rights. *Id.* Neither the case law nor the record suggests that Kennedy's First Amendment claim is likely to succeed on the merits.

//

"[T]he Free Speech Clause of the First Amendment prohibits the government—not a private party—from abridging speech." *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020). Under the state action doctrine, though, the conduct of a private entity may be attributed to that of the government for constitutional purposes. *Id*. at 997-998. In determining whether conduct allegedly causing deprivation of a constitutional right may be attributable to the state, the Court considers a two-step framework. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The Court first asks whether the alleged constitutional violation was caused by the "exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the state is responsible."[1] *Id*. If the answer is yes, the Court then considers whether "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Id*. There are four different tests used to determine the answer: (1) the public function test, (2) the state compulsion test, (3) the nexus test, and (4) the joint action test. *Id*. at 939. Out of the four tests used for determining whether a private entity is a state actor, Plaintiff's counsel asserted at oral argument that the nexus test and joint action test apply to his case.

### 1. **Nexus Test**

There are two different versions of the nexus test. The first version asks whether there is "pervasive entwinement of public institution and public officials in the [private entity's] composition and workings." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). Under this test, the court considers whether the private entity relies on public funding, is comprised of mostly government institutions, and those officials dominate the decision making of the entity. *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008). None of these factual considerations are present in this case.

The second version of the nexus test asks whether public officials have "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). "One

---

[1] Plaintiff's claim does not satisfy the first prong of the test but, since the Ninth Circuit does not apply the *Lugar* framework rigidly, the Court addresses the remainder of the framework to cover every aspect. *See Mathis v. Pacific Gas & Electric Co.*, 75 F.3d 498, 503 n.3 (9th Cir. 1996).

4

circumstance in which this version of the test will be satisfied is when government officials threaten adverse action to coerce a private party into performing a particular act." *O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023).

### 2. Joint Action Test

Under the joint action test, a plaintiff must prove "the existence of a conspiracy" or "that the private party was a willful participant in joint action with the State or its agents." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012). "[J]oint action exists when the state has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." *Id.* "This test is intentionally demanding and requires a high degree of cooperation between private parties and state officials to rise to the level of state action." *O'Handley*, 62 F.4th at 1159-1160.

### 3. Plaintiff has not shown that Google or YouTube is a state actor under either the Nexus or Joint Action Tests.

Plaintiff's application for a temporary restraining order, vis-à-vis his legal arguments and evidence, relies heavily on *Missouri v. Biden*—a case that is merely persuasive authority in this district.[2] *See* 2023 WL 4335270 (W.D. La. Jul. 4, 2023), *appeal filed* Jul. 6, 2023, *argued* Aug. 10, 2023. Rather—as Kennedy's counsel conceded at oral argument—this Court is bound by *O'Handley v. Weber* as the controlling authority for determining whether a social media platform has been rendered a state actor.

In *O'Handley v. Weber*, the Ninth Circuit held that Twitter's content-moderation decisions did not constitute state action under either the *Lugar* framework or the nexus or the joint action tests under the second step. 62 F.4th at 1160. Rogan O'Handley, a public commentator, claimed that Twitter[3] and California's Office of Election Cybersecurity ("OEC") had worked in concert to censor his speech by limiting user access to his tweets and later suspending his account. *Id.* at

---

[2] Kennedy filed a motion to intervene in *Missouri v. Biden*. *See* 2023 WL 4389008 (W.D. La. Nov. 17, 2022). The motion was denied on January 10, 2023. *Id.* Plaintiff filed a separate action against President Joe Biden and others government officials in the Western District of Louisiana. *See Kennedy, et al. v. Biden, et al.*, 3:23-cv-381 (W.D. La. Mar. 24, 2023).
[3] Twitter was renamed as "X" in or about April 2023. What was once referred to as a "tweet" is now called a "post."

5

1153. Through its partner support portal, Twitter granted a limited number of government agencies and civil society groups access to an expedited review process. *Id*. at 1153-1154. "After an approved partner flagged a tweet through the Portal, Twitter's content moderators reviewed the post and decided whether remedial action was warranted." *Id*. at 1154. The OEC touted that it had flagged for Facebook and Twitter nearly "300 erroneous or misleading social media posts" and that "98 percent of those posts were promptly removed". *Id*.

The Ninth Circuit held that Twitter exercised its own independent, judgment in adopting its content moderation policies and enforcing them. *Id*. at 1158. Additionally, the court held that the "private and state actors were generally aligned in their missions to limit the spread of misleading election information" and that "[s]uch alignment does not transform private conduct into state action." *Id*. 1156–57.

Similarly, here, under either test, Plaintiff has not shown that the government so "insinuated itself into a position of interdependence" with Google or that it "exercised coercive power or has provided such significant encouragement" to Google that give rise to state action. Since Plaintiff's counsel, at oral argument, conceded that the evidence provided in support of his application does not show that the government coerced Google, the Court limits its inquiry to whether there is evidence suggesting that the government insinuated itself into a position of interdependence or provided significant encouragement. Regardless of which test is used, the analysis is "necessarily fact-bound …." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982).

Per its COVID-19 medical misinformation policy and vaccine misinformation policies, community guidelines and terms of service, Google took down three videos of Kennedy: (1) a video of Kennedy giving a speech at Saint Anslem College regarding the number of vaccines American children take that was uploaded to YouTube by Manchester Public Television on March 3, 2023, (2) a video of an interview titled "RFK on Joe Rogan – Pfizer COVID Vaccine Trial" that was uploaded and taken down on June 17, 2023, and (3) a video of an interview with Kennedy and Jordan Peterson that has not been identified by date or content.

//

//

In support of its state action theory, Plaintiff produces evidence from *Missouri v. Biden* including emails between government officials and Google[4] personnel. *See* Street Decl., Exs. F, I, J, K, M, N, P. These communications between government officials and Google concern requests for information to YouTube about trends related to vaccine misinformation and YouTube seeking information related to science backed responses to two medical misinformation claims. In one email concerning vaccination hesitation, a White House official stated that "[t]his is a concern that is shared at the highest (and I mean highest) levels of the WH…" However, this is insufficient to deem YouTube's decisions to be deemed that of the State, yet alone part of a conspiracy to censor speech.

There is no evidence before the Court that any of the identified government officials, who are not parties to this case, demanded that Google adopt a COVID-19 medical misinformation or vaccine misinformation policy. Moreover, there is no evidence before the Court that government officials communicated with Google regarding Kennedy at all. Rather, the evidence reflects that the nature of the communications between officials from the White House, Office of the Surgeon General, and Center for Disease Control and Prevent and Google is one of "consultation and information sharing". As in *O'Handley*, Google and YouTube removed Plaintiff's videos based on its content moderation and COVID-19 medical misinformation policy as permitted under the terms of service Plaintiff agreed to when he signed up for a YouTube account. Plaintiff does not produce evidence establishing that Google removed his videos YouTube was pursuant to a state-created right.

Plaintiff implies that the Court should apply the joint action test as used in *Rawson v. Recovery Innovations, Inc.*, which the court in *O'Handley* declined to extend. Mot. 14. In *Rawson v. Recovery Innovations, Inc.*, the Ninth Circuit held that that joint action was shown when medical professionals who leased property connected to a state psychiatric hospital involuntarily confined the plaintiff after his arrest, in part based on the prosecutor's "heav[y] involve[ment] in the decision-making process." 975 F.3d 742, 754 (9th Cir. 2020). The Ninth

---

[4] Google and YouTube executives were not deposed in *Missouri v. Biden*. Street Decl. para. 28.

7

1  Circuit declined to extend the *Rawson* joint action test in *O'Handley* on grounds that and
2  O'Handley's complaint do not give rise to a plausible inference of a similar degree of
3  entwinement between Twitter's actions and those of state officials. There is less evidence of
4  entwinement in the present case then there was in *O'Handley.*

5  Since Plaintiff does not meet his initial burden of making a colorable claim that its First
6  Amendment rights have been infringed, by way of a state actor, he is unlikely to succeed on the
7  merits.

**B.  Plaintiff has not shown that he has been irreparably harmed by Google or YouTube because he does not demonstrate urgency or that his speech will be censored on other social media platforms.**

11  Defendants assert that Plaintiff is not entitled to a temporary restraining order because he
12  waited five months from the first video takedown before seeking relief and Plaintiff's content is
13  still available online through other channels of communications. Opp'n. 19-20. The Court agrees.
14  "A plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed
15  to irreparable harm." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.
16  1988). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably
17  constitutes irreparable injury." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). Nevertheless,
18  "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a
19  preliminary injunction." *Id*.

20  Here, Kennedy is asserting redress for the political process. He claims that YouTube's
21  removal of the Saint Anslem video creates a chilling effect and hurdles to his campaign. By doing
22  so, Plaintiff suggests that the Court ignore its precedent on the state actor doctrine to determine if
23  Google may even be held liable for alleged constitutional infringement. Instead, it appears that
24  Plaintiff asks the Court to head straight into a First Amendment analysis. Kennedy does not cite
25  authority for the proposition that he may seek redress for the "political process." Abstract claims
26  which lack particularity do not give rise to an actionable claim in federal district court. Fed. R.
27  Civ. Proc. 8.
28  //

1    Kennedy, by words and conduct, has shown no urgency to resolve this issue either. As

2    provided in his brief, the only urgency is that "[t]he campaign is expected to heat up after Labor

3    Day. That is why Mr. Kennedy is seeking preliminary injunctive relief now." Mot., p. 6.

4    Furthermore, Kennedy has expressed that he is still able to post content on Facebook and X that

5    runs afoul of Google's policy. There are numerous other ways that Plaintiff may share video

6    content concerning his viewpoints on vaccinations and COVID-19.

     **C.    The balance of equities tips in favor of Kennedy.**

7    A plaintiff seeking a preliminary injunction must establish that the balance of equities tips

8    in his favor. *Winter,* 129 S.Ct. at 374. "A court balancing the equities will look to the possible

9    harm that could befall the various parties." *Maxim Integrated Prod., Inc. v. Quintana*, 654 F.

10   Supp. 2d 1024, 1036 (N.D. Cal. 2009).

11   Plaintiff asserts that YouTube's enforcement of its COVID-19 medical misinformation and

12   vaccine misinformation policies may jeopardize his political campaign. Plaintiff does not

13   distinguish how he will be jeopardized if the videos of him that run afoul of Google's policies are

14   still able to be posted and viewed on Facebook, X, or the numerous other ways to share and

15   publicize video content and messaging. While Plaintiff argues that Google's policies create a

16   chilling effect on speech, in the same breath, he claims that some people are proud to have their

17   videos taken down by Google and wear it "like a badge of honor." Robert Kennedy Decl. para. 5.

18   Defendants assert that social media platforms have their own First Amendment rights as

19   publishers. Opp'n., p. 21 citing *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974);

20   *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). Moreover, Defendants have "a strong interest

21   in the application of its own content moderation polices in maintaining users' trust and

22   expectations" on its privately hosted platform. Opp'n. 23.

23   Since the equities of the parties are somewhat balanced, the scale to tips in favor of the

24   speaker, Kennedy. *Fed. Election Comm'n v. Wisc. Right to Life, Inc*., 551 U.S. 449, 474 (2007).

25   //

26   //

27   //

9

### D. A temporary restraining order would not serve the public interest in preventing widespread death and illness.

Even if Plaintiff could establish that a Google was a state actor attributing its conduct to that of the governments, the rights guaranteed under the First Amendment are not unencumbered by any restrictions:

> [I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–572 (1942).

"The Ninth Circuit has consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). However, there is also a strong public interest in protecting the community from an international public health crisis such as the COVID-19 pandemic. *See*, *e.g.*, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). On March 13, 2020, then President Donald Trump declared a national emergency concerning the COVID-19 outbreak. Proclamation No. 9994, 85 Fed. Reg. 15337, 2020 WL 1272563. By February 2021, the COVID-19 pandemic had killed over 432,000 Americans.[5] To date, COVID-19 was the underlying or contributing cause of the deaths of 1,140,829 Americans.[6] The coronavirus still poses a health risk to certain individuals, and it would not serve the public interest to let medical misinformation proliferate on YouTube.

### V. CONCLUSION

Plaintiff has not shown circumstances warranting the extraordinary remedy of a temporary restraining order. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20-22 (2009). The Court finds

---

[5] The Atlantic, The COVID Tracking Project (last visited Aug. 22, 2023) https://covidtracking.com/data/national/deaths
[6] Centers for Disease Control and

that the First Amendment claim is unlikely to succeed on the merits because Google and YouTube are not state actors. Second, Plaintiff was not, and will not, be irreparably harmed if a temporary restraining order does not issue because he does not demonstrate urgency or that he will not be able to share his videos through other sites and methods. Third, the balance of equities is somewhat even so it tips in favor of Plaintiff. Fourth, a temporary restraining order does not serve the public interest of preventing the spread of illness and medical misinformation.

Plaintiff's application for a temporary restraining order is **DENIED**. Additionally, Plaintiff's request for urgent discovery is **DENIED**.

This resolves docket no. 7.

The parties' next court appearance is on November 7, 2023, at 2:00 p.m., in-person, for the hearing on Plaintiff's motion for preliminary injunction and defendants' motion to dismiss.

**IT IS SO ORDERED.**

Dated: August 23, 2023

TRINA L. THOMPSON
United States District Judge

11