JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
JULIANA M. YEE (State Bar No. 304564)
Juliana.Yee@mto.com
CARSON SCOTT (State Bar No. 339868)
Carson.Scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

HELEN E. WHITE (*pro hac vice*)
Helen.White@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:     (202) 220-1100
Facsimile:     (202) 220-2300

Attorneys for Defendants
Google LLC and YouTube, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT F. KENNEDY, JR., <br><br> Plaintiff, <br><br> vs. <br><br> GOOGLE LLC AND YOUTUBE, LLC, <br><br> Defendants. | Case No. 3:23-cv-03880 <br><br> DEFENDANTS' MOTION TO DISMISS <br><br> Judge:     Hon. Trina Thompson <br> Date:      November 7, 2023 <br> Time:      2:00 p.m. <br> Crtrm.:    9 |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  BACKGROUND ........................................................................................................ 3

    A.  Google's Content Policies .................................................................................. 3

    B.  Google's Removal of Content that Violated Its Policies ................................... 4

    C.  Kennedy's Allegations About Federal Government Officials ............................ 4

    D.  Procedural History ............................................................................................. 6

III.  LEGAL STANDARD ................................................................................................ 7

IV.  ARGUMENT ............................................................................................................. 8

    A.  Kennedy Fails to State A Claim Under Section 1983 Because He Does Not Allege Any Conduct Taken Under Color of *State* Law ..................................... 8

    B.  Kennedy Fails to Allege that Google, a Private Company, Engaged in Any "State Action" .................................................................................................... 8

        1.  The Ninth Circuit and Courts Within It, Including This Court, Have Repeatedly Rejected the Claims Kennedy Asserts Here ............................. 8

        2.  Kennedy's Allegations Cannot Meet the "Demanding" Standards Under Either the Nexus or Joint Action Tests .......................................... 13

    C.  Kennedy Has Not Established Any State Action *with Respect to Him* ................ 19

    D.  Google's First Amendment Rights Bar Kennedy's Claims ............................... 19

V.  CONCLUSION ......................................................................................................... 22

-i-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................7, 8, 18

*Associates & Aldrich Co. v. Times Mirror Co.,*
    440 F.2d 133 (9th Cir. 1971) ...............................................................................22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .............................................................................................14

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) .......................................................................................10, 19

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
    531 U.S. 288 (2001) .............................................................................................10

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.,*
    827 F.2d 1291 (9th Cir. 1987)..............................................................................22

*Children's Health Def. v. Facebook, Inc.,*
    546 F. Supp. 3d 909 (N.D. Cal. 2021) ..................................................... 2, passim

*Clark Cnty. Sch. Dist. v. Breeden,*
    532 U.S. 268 (2001) .......................................................................................14, 19

*Daniels v. Alphabet, Inc.,*
    No. 20-CV-04687-VKD, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021).................2, 12, 13, 18

*Davison v. Facebook, Inc.,*
    370 F. Supp. 3d 621 (E.D. Va. 2019), aff'd, 774 F. App'x 162 (4th Cir. 2019)......................20

*Doe v. Google LLC,*
    No. 20-cv-07502-BLF, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021) ....................................16

*Fed. Agency of News LLC v. Facebook, Inc.,*
    395 F. Supp. 3d 1295 (N.D. Cal. 2019) .................................................................8

*Fed. Agency of News LLC v. Facebook, Inc.,*
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................................... 2, passim

*Flamingo Indus. (USA) Ltd. v. U.S. Postal Serv.,*
    302 F.3d 985 (9th Cir. 2002), rev'd on other grounds, 540 U.S. 736 (2004) ...........................8

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008)..............................................................................16

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014)..................................................................................21

*Hart v. Facebook Inc.*,
  No. 22-CV-00737-CRB, 2023 WL 3362592 (N.D. Cal. May 9, 2023) ...............................12, 13

*Hart v. Facebook Inc.*,
  No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ........................ 2, passim

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) .....................................................................................20, 22

*Informed Consent Action Network v. YouTube LLC*,
  582 F. Supp. 3d 712 (N.D. Cal. 2022) ...................................................... 1, passim

*Lee v. Katz*,
  276 F.3d 550 (9th Cir. 2002) ...............................................................................9

*Lewis v. U.S. Bank Nat'l Ass'n*,
  No. 16-CV-05490-JSW, 2017 WL 2903192 (N.D. Cal. Apr. 5, 2017), aff'd sub
  nom. *Lewis v. U.S. Bank Nat'l Ass'n as Tr. to Wachovia Bank, Nat'l Ass'n*, 740
  F. App'x 155 (9th Cir. 2018)..............................................................................1

*Lindberg v. Wells Fargo Bank, N.A.*,
  No. C 14-2544 PJH, 2015 WL 1137634 (N.D. Cal. Mar. 13, 2015) .........................1

*Lugar v. Edmondson Oil Co.*,
  457 U.S. 922 (1982) ..........................................................................................9

*Mac Isaac v. Twitter, Inc.*,
  557 F. Supp. 3d 1251 (S.D. Fla. 2021)................................................................20

*Manhattan Cmty. Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019) .......................................................................................8

*Mathis v. Pacific Gas & Elec. Co.*,
  75 F.3d 498 (9th Cir. 1996)...............................................................................18

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ...............................................................................3, 20, 21

*Missouri v. Biden*,
  No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. Jul. 4, 2023) .............................13

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022), cert. pet'n filed, No. 22-555 ...................................21

*NetChoice, LLC v. Att'y Gen., Fla.*,
  34 F.4th 1196 (11th Cir. 2022), cert. pet'ns filed, Nos. 22-277, 22-393 .........3, 20, 21

-iii-

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ........................................................3, 20, 21

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023)............................................................. 1, passim

*Parks Sch. of Bus., Inc. v. Symington*,
   51 F.3d 1480 (9th Cir. 1995) .........................................................................10

*Paxton. NetChoice, LLC v. Paxton*,
   142 S. Ct. 1715 (2022) ..................................................................................21

*Prager Univ. v. Google LLC*,
   951 F.3d 991 (9th Cir. 2020)............................................................. 2, passim

*Villegas v. Gilroy Garlic Festival Ass'n*,
   541 F.3d 950 (9th Cir. 2008) .........................................................................10

*Volokh v. James*,
   No. 22-CV-10195 (ALC), 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023) ................................20

*W. Marine Prods., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   572 F. Supp. 3d 841 (N.D. Cal. 2021) ...........................................................7, 8

**FEDERAL STATUTES**

28 U.S.C. § 2201 ..............................................................................................6

42 U.S.C. § 1983 .......................................................................................2, 6, 8

47 U.S.C. § 230 ...............................................................................6, 16, 17, 18

**FEDERAL RULES**

Federal Rule of Civil Procedure 12(b)(6) .........................................................1, 7

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on November 7, 2023, at 2:00 p.m. or as soon thereafter as the matter may be heard, in Courtroom 9 of the U.S. District Court for the Northern District of California, this Motion to Dismiss will be heard.  Defendants Google LLC ("Google") and YouTube, LLC ("YouTube") move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants request that the Court dismiss all of Plaintiff Robert F. Kennedy Jr.'s claims with prejudice.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

In this action, Plaintiff Robert F. Kennedy, Jr. ("Kennedy") seeks to hold Google—a private entity—liable *as a state actor* under the First Amendment for exercising its discretion to remove videos conveying COVID-19 and vaccine misinformation from its video-sharing platform, YouTube.  Kennedy's claim stumbles out of the gate, however.  As the Court already recognized, "[Kennedy's] First Amendment claim is unlikely to succeed on the merits."  Order on Application for Temporary Restraining Order, Dkt. No. 32, at 3 ("TRO Order").  An unbroken string of federal decisions from the Ninth Circuit and courts in this District have dismissed complaints similar to Kennedy's for failure to state a plausible claim premised on the state action doctrine.  *See O'Handley v. Weber*, 62 F.4th 1145, 1156 (9th Cir. 2023) (Twitter is not a state actor); *Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 722 (N.D. Cal. 2022) (Google is not a state actor); *Daniels v. Alphabet, Inc.*, No. 20-CV-04687-VKD, 2021 WL 1222166, at *13 (N.D.

---

[1] If the Court dismisses the complaint, it need not consider any preliminary injunction motion.  This is because a "preliminary injunction motion can be premised only on claims that are capable of surviving a motion to dismiss."  *Lindberg v. Wells Fargo Bank, N.A.*, No. C 14-2544 PJH, 2015 WL 1137634, at *3 (N.D. Cal. Mar. 13, 2015).  Once a court determines that a plaintiff's claims should be dismissed, it should deny as moot any pending motion for a preliminary injunction.  *See id.* at *6 (denying as moot pending motion for preliminary injunction where motion to dismiss was granted, as "plaintiff ha[d] no remaining viable claims"); *Lewis v. U.S. Bank Nat'l Ass'n*, No. 16-CV-05490-JSW, 2017 WL 2903192, at *10 (N.D. Cal. Apr. 5, 2017), *aff'd sub nom. Lewis v. U.S. Bank Nat'l Ass'n as Tr. to Wachovia Bank, Nat'l Ass'n*, 740 F. App'x 155 (9th Cir. 2018) (same).

1    Cal. Mar. 31, 2021) (same); *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507, at

2    *8 (N.D. Cal. May 5, 2022) (Facebook is not a state actor); *Fed. Agency of News LLC v. Facebook,*

3    *Inc.*, 432 F. Supp. 3d 1107, 1124–25 (N.D. Cal. 2020) (same); *Children's Health Def. v. Facebook,*

4    *Inc.*, 546 F. Supp. 3d 909, 930 (N.D. Cal. 2021) (same).  This Court should follow suit.

5         Google is not the government, and the "First Amendment prohibits the government—not a

6    private party—from abridging speech."  *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir.

7    2020).  The complaint advances a vague and implausible theory that the federal government

8    secretly inserted itself into Google's content moderation decisions, thereby transforming Google's

9    removal of certain videos featuring Kennedy into unconstitutional "state action."  But as the Court

10   held in denying Kennedy's application for a TRO, Kennedy did not "mak[e] a colorable claim that

11   [his] First Amendment rights have been infringed[] by way of a state actor."  TRO Order at 8.  The

12   complaint's allegations, which are even more ill-defined and conclusory than the record submitted

13   with the TRO, fare no better and fail to state a viable First Amendment claim.

14        As an initial matter, Kennedy's claim brought under 42 U.S.C. § 1983 is facially deficient

15   because he alleges no government action taken under color of *state* law.  His complaint describes

16   conduct by federal agencies and employees; it contains no allegations regarding state entities, state

17   actors, or state law.  Such claims are not cognizable under Section 1983.

18        More fundamentally, the complaint fails to allege any facts that could form the basis of a

19   state action claim.  The complaint is long on insinuation and innuendo and remarkably short on

20   concrete factual assertions.  For example, Kennedy alleges that the federal government interacted

21   *with a different* Internet platform more than two years ago regarding his posts on that other

22   platform, yet his complaint is devoid of allegations identifying any specific interactions between

23   *Google* and the federal government, much less any interactions between Google and the

24   government that concerned posts about *Kennedy*.  And even if Kennedy had pleaded specific facts

25   showing government interaction with Google about his YouTube videos, the Ninth Circuit has held

26   that mutual information sharing and cooperation between private parties and the government does

27   not transform private parties' content moderation decisions into state action.  *O'Handley v. Weber*,

28   62 F.4th 1145, 1157 (9th Cir. 2023).

-2-

Finally, Kennedy's claims are independently barred because the relief he seeks would violate *Google*'s First Amendment rights by "telling [it] what content-moderation policies to adopt and how to enforce those policies." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–88 (N.D. Cal. 2022); *see Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022), *cert. pet'ns filed*, Nos. 22-277, 22-393. Far from dictating what content Google must permit on YouTube, the First Amendment protects Google's independent judgment that it will not help spread dangerous medical and vaccine misinformation. *See* TRO Order at 10 ("[I]t would not serve the public interest to let medical misinformation proliferate on YouTube.").

The complaint should be dismissed with prejudice.

## II.    BACKGROUND

### A.    Google's Content Policies

Google's subsidiary, YouTube, is a video-sharing platform that is "one of the most visited websites in the world." Compl. ¶ 11. Google has adopted policies that govern how people can use the platform, including restrictions on the types of content that they can post. As of June 2023, YouTube's COVID-19 Medical Misinformation Policy prohibited "content about COVID-19 that poses a serious risk of egregious harm" and "medical misinformation that contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19." *Id.* Ex. A. And YouTube's Vaccine Misinformation Policy prohibited "content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO)." *Id.* Ex. B. It similarly defines misinformation as content that "contradicts local health authorities' or the WHO's guidance on vaccine safety, efficacy, and ingredients."[2] *Id.*

---

[2]  As noted in Google's opposition to Kennedy's motion for a TRO, Google recently adopted a revised, materially similar medical misinformation policy. *See* Dkt. 26-6, TRO Opp., Blavin Decl. Ex. E. Under that new policy, Google has discretion to continue to remove "content [from YouTube] that promotes information that contradicts health authority guidance on the prevention or transmission of specific health conditions, or on the safety, efficacy or ingredients of currently approved and administered vaccines." *Id.*

1    These policies reflect Google's "belie[fs]" about what "people should be able to share" on

2    YouTube.  Compl. Ex. B.  As the policies attached to the complaint describe, Google

3    communicated to users that its COVID-19 Medical Misinformation Policy is "important" to "our

4    shared responsibility to keep YouTube safe" and emphasized that "[t]he safety of our creators,

5    viewers, and partners is our highest priority."  *Id.* Ex. A.  Likewise, the Vaccine Misinformation

6    Policy describes what content Google allows or doesn't allow on YouTube, as well as the

7    circumstances under which Google may "make exceptions, . . . provided the content does not aim

8    to promote misinformation that violates our policies."  *Id.* Ex. B.  Both policies describe the

9    actions Google can take in the event a user posts content that violates these policies, including

10   removing the content, providing a warning to the user, issuing a "strike" against the user's

11   channel, and terminating the user's channel for repeated violations of YouTube's Community

12   Guidelines or Terms of Service.  *Id.* Exs. A, B.

13          **B.      Google's Removal of Content that Violated Its Policies**

14   The complaint alleges that Google removed three videos involving Kennedy pursuant to its

15   COVID-19 Medical Misinformation and Vaccine Misinformation Policies.  In March 2023,

16   Manchester Public Television posted to YouTube a video of a speech delivered by Kennedy at

17   Saint Anselm College's New Hampshire Institute of Politics.  Compl. ¶ 20.  In the speech,

18   Kennedy discussed "his views about vaccines [and] COVID-19," *id.* ¶ 22, and "question[ed] the

19   increasing numbers of vaccines American children must take," *id.* ¶ 17.  Google removed the

20   video for violating its medical misinformation policies.  *Id.* ¶ 21.  According to the complaint,

21   Google removed two more videos of Kennedy pursuant to its medical misinformation policies that

22   were posted after he declared his candidacy for President of the United States on April 19, 2023:

23   interviews with Joe Rogan and Jordan Peterson.  *Id.* ¶ 23.[3]

24          **C.      Kennedy's Allegations About Federal Government Officials**

25   The complaint asserts in a broad and conclusory fashion that "[t]he decisions to censor Mr.

26   Kennedy . . . were . . . made . . . as part of the partnership between YouTube and federal

27

28   [3] The complaint does not describe the contents of these videos or specify the dates on which the videos were posted or removed.

-4-

government officials, including the Biden White House," Compl. ¶ 26, and that the "White House and other government officials repeatedly worked with . . . YouTube[] to censor Mr. Kennedy during 2021 and 2022," *id*. ¶ 27.  In support of these sweeping allegations, the complaint marshals only a handful of alleged facts:

First, Kennedy points to a January 2021 email discussion between two White House officials, Clarke Humphrey and Robert Flaherty, and a representative from *Twitter*, a company that is not a defendant in this case.  Compl. ¶ 26.  In the email, which Kennedy attached to his complaint, Humphrey wrote to Twitter:

> Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP:
>
> >https://twitter.come/RobertKennedyJr/status/1352748139665645569<
>
> And then if we can keep an eye out for tweets that fall in this same ~genre that would be great.

*Id.* Ex. C.

Second, Kennedy alleges that in July 2021, the White House press secretary "call[ed] on the tech platforms to ban Mr. Kennedy completely," and further alleges "on information and belief" that "YouTube was working behind the scenes with CISA (the Cybersecurity and Infrastructure Security Agency) and other government officials to do just that."  Compl. ¶ 27.  Kennedy does not allege that he was ever banned from YouTube or any other platform.

Third, Kennedy attaches to his complaint an April 16, 2021 email from Rob Flaherty to *Twitter*, not Google, scheduling a "Twitter Vaccine Misinfo Briefing," at which "White House Staff will be briefed by Twitter on vaccine misinfo."  Compl. Ex. D; *id.* ¶ 37.  Kennedy alleges that, "on information and belief," the "partnership" purportedly substantiated by this meeting "has increased since Kennedy challenged [President Biden] politically."  *Id.* ¶ 37.  He puts forward no facts to substantiate this conclusory allegation.

Fourth, Kennedy cites to YouTube's medical misinformation policies as of June 2023, noting that they disallow medical misinformation that "contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19," and limit prohibited information to "content that contradicts WHO or local health authorities' guidance on"

topics like treatment, prevention, diagnosis, transmission, and the existence of COVID-19. Compl. Ex. A; *id.* ¶ 35.

Finally, Kennedy alludes briefly to the immunity offered to online platforms for claims arising from third-party content under Section 230 of the Communications Decency Act, 47 U.S.C. § 230, alleging in conclusory fashion that the government "ensured that YouTube [would] cooperate" with its alleged "censorship goals" by "threatening to take away . . . [YouTube's] "immunity under section 230 of the Communications Decency Act."  Compl. ¶¶ 38–39.  Kennedy identifies no specific statement made by a government official concerning Section 230 in any context, much less a statement by a government official threatening to revoke Section 230 in the context of Google's adoption of its medical and vaccine misinformation policies or Google's enforcement of those policies as to Kennedy.

All told, the complaint fails to allege a single specific interaction between any government official and Google with respect to COVID or vaccine misinformation, let alone anything specific to Kennedy on YouTube, whether about health misinformation or otherwise.[4]

**D.      Procedural History**

Several months after declaring his candidacy for President in April 2023, Kennedy filed this complaint asserting a claim for injunctive relief under 42 U.S.C. § 1983 and a claim for declaratory judgment under 28 U.S.C. § 2201.  Kennedy seeks a permanent injunction to "restore any videos of Mr. Kennedy's political speech that it has removed during the 2024 presidential campaign," as well as an order declaring that Google's medical misinformation policies are unconstitutional under the First Amendment, and enjoining Google from enforcing them in the future.  Compl. Prayer for Relief ¶¶ 1–3.

Shortly after initiating this action, Kennedy filed an application for a temporary restraining order, seeking to bar Google from "using either the 'Vaccine misinformation policy' or the 'COVID-19 medical misinformation policy' to remove videos of [Plaintiff's] speech from

---

[4] Kennedy also alleges that "by allowing the public to post videos [on YouTube], YouTube turned youtube.com into a public forum of some sort" and therefore "cannot exclude people from the platform based on their viewpoint" or "decide which speech people hear."  Compl. ¶ 29; *see id.* ¶ 41.

YouTube . . . pending a trial on the merits."  Proposed Temporary Restraining Order, Dkt. No. 7-4, at 1 ("Proposed TRO").

Following briefing and a hearing, this Court issued an order denying the TRO application and Kennedy's request for expedited discovery.  TRO Order at 11.  The Court, applying the Ninth Circuit's controlling decision in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), held that Kennedy failed to "mak[e] a colorable claim that [his] First Amendment rights have been infringed[] by way of a state actor."  *Id.* at 8.  In so holding, the Court had before it both the complaint—including its allegations and the documents attached to it—and the additional documents Kennedy attached to his TRO application,[5] before concluding that "[t]here is no evidence . . . that any of the identified government officials . . . demanded that Google adopt a COVID-19 medical misinformation or vaccine misinformation policy" and that "there is no evidence . . . that government officials communicated with Google regarding Kennedy at all."  *Id.* at 7.  The Court also determined that Kennedy has suffered no irreparable harm as a result of Google's exercise of its content moderation policies.  *Id.* at 8.  The Court further recognized that Kennedy's requested TRO ran contrary to the "strong public interest in protecting the community from an international public health crisis."  *Id.* at 10.

### III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *W. Marine Prods., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 572 F. Supp. 3d 841, 847 (N.D. Cal. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In evaluating the complaint, "the court must accept as true all 'well pleaded factual allegations' and determine whether the allegations 'plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Though courts "must also construe the alleged facts in the light most favorable to the plaintiff," they are

---

[5] Kennedy's complaint attaches four exhibits.  Kennedy's TRO application, meanwhile, included seventeen exhibits and three declarations.  This Court nonetheless concluded that Kennedy's TRO application marshaled insufficient evidence to make out even a "colorable claim" of state action.  TRO Order at 8.

"'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

## IV.   ARGUMENT

### A.   Kennedy Fails to State A Claim Under Section 1983 Because He Does Not Allege Any Conduct Taken Under Color of *State* Law

Kennedy brings his lone claim for injunctive relief under 42 U.S.C. § 1983, but fails to plead an essential element of that claim: some action taken "under color of any statute, ordinance, regulation, custom, or usage, of any *State or Territory or the District of Columbia*." 42 U.S.C. § 1983 (emphasis added). He makes no allegation that anyone at Google had any contact with any *state* official—the complaint only refers to members of the federal government. Because "[section] 1983 does not allow for a suit based upon actions taken under color of federal law," he therefore cannot show a likelihood of success on his Section 1983 claim. *Flamingo Indus. (USA) Ltd. v. U.S. Postal Serv.*, 302 F.3d 985, 997 (9th Cir. 2002), *rev'd on other grounds*, 540 U.S. 736 (2004); *see also, e.g., Fed. Agency of News LLC v. Facebook, Inc.*, 395 F. Supp. 3d 1295, 1304 (N.D. Cal. 2019) (dismissing Section 1983 claim where "Plaintiffs' complaint does not allege that any party was acting under color of *state* law." (emphasis in original)).

### B.   Kennedy Fails to Allege that Google, a Private Company, Engaged in Any "State Action"

#### 1.   The Ninth Circuit and Courts Within It, Including This Court, Have Repeatedly Rejected the Claims Kennedy Asserts Here

Binding Ninth Circuit authority establishes that Kennedy's allegations fail to state a claim that Google engaged in state action as a matter of law. In *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020), the Ninth Circuit expressly held that YouTube is not a "public forum for speech" and is not bound by the First Amendment's constraints when it decides what content to permit or not permit on its platform. *Id.* at 996–97. Thus, while "YouTube may be a paradigmatic public square on the Internet," "it is 'not transformed' into a state actor solely by 'provid[ing] a forum for speech.'" *Id.* (quoting *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930, 1934 (2019)).

-8-

Kennedy's allegations do not fall within any of the "exceptional cases" in which a private party may nevertheless be deemed a "state actor" subject to constitutional requirements. *O'Handley v. Weber*, 62 F.4th 1145, 1157 (9th Cir. 2023).  To allege state action by a private party, a plaintiff must show (1) that "the alleged constitutional violation was caused by the 'exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,'" *id.* at 1156 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)); and (2) that "the party charged with the deprivation [is] a person who may fairly be said to be a state actor," *id.* (quoting *Lugar*, 457 U.S. at 937). Kennedy's allegations cannot satisfy either requirement.

As in *O'Handley*, "[Kennedy's] claims falter at the first step."  *Id.*  Kennedy makes no allegation that could plausibly be construed to suggest that Google removed Kennedy's videos pursuant to a right conferred on it by the federal government.  Google's vaccine and medical misinformation policies, and Google's ability to remove content that violates those policies, derive from its "Community Guidelines" and "Terms of Service."  Compl. Exs. A, B; *see also* TRO Order at 6 ("Google and YouTube removed Plaintiff's videos based on its content moderation and COVID-19 medical misinformation policy as permitted under the terms of service Plaintiff agreed to when he signed up for a YouTube account."); *O'Handley*, 62 F.4th at 1156 ("Twitter's right to take those actions when enforcing its content-moderation policy was derived from its user agreement with O'Handley, not from any right conferred by the State.").

Even if Kennedy had alleged the exercise of a state-created right, he has nonetheless failed to plausibly allege that Google is a state actor.  In the Ninth Circuit, a private party may only be deemed a state actor if it satisfies one of four tests: "(1) the public function test, (2) the state compulsion test, (3) the nexus test, [or] (4) the joint action test."  *O'Handley*, 62 F.4th at 1156. Kennedy acknowledged that only the "nexus" or "joint action" test is at issue, TRO Order at 4; Kennedy does not and cannot make any allegations directed at the public function or state compulsion tests.  *See Prager*, 951 F.3d at 997 (holding that YouTube does not provide a public function because "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment

-9-

1   constraints"); *Lee v. Katz*, 276 F.3d 550, 554–55 (9th Cir. 2002) (a private party satisfies the

2   "public function" test when it is "endowed by the State with powers or functions" that are "both

3   traditionally and exclusively governmental"); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480,

4   1486 (9th Cir. 1995) ("[T]he state compulsion test considers whether some state regulation or

5   policy compelled the offensive action.").

6        The nexus test comes in two varieties.  Under one formulation of the nexus test, courts ask

7   whether there is "pervasive entwinement of public institution and public officials in [the private

8   entity's] composition and workings." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,

9   531 U.S. 288, 298 (2001).  As the Court already recognized, "[n]one of [the relevant] factual

10  considerations are present in this case." TRO Order at 4.  Kennedy has not alleged that Google

11  "relies on public funding," that it "is comprised of mostly government institutions," or that

12  government officials "dominate the decision making of the entity." *Id.* (citing *Villegas v. Gilroy*

13  *Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008)).

14       Under a second version of the nexus test, courts "ask[] whether government officials have

15  'exercised coercive power or [have] provided such significant encouragement, either overt or

16  covert, that the choice must in law be deemed to be that of the State.'" *O'Handley*, 62 F.4th at 1157

17  (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  Such encouragement is not mere plaudits

18  for doing the right thing, but instead applies only where "the State's use of positive incentives . . .

19  overwhelm[s] the private party and essentially compel[s] the party to act in a certain way." *Id.* at

20  1158.  Kennedy conceded that there is no such evidence of coercion.  TRO Order at 6.

21       Under the joint action test, courts will find joint action only "when the state has so far

22  insinuated itself into a position of interdependence with [the private party] that it must be

23  recognized as a joint participant in the challenged activity" or when the state "significantly

24  involves itself in the private parties' actions and decisionmaking in a complex and deeply

25  intertwined process." *O'Handley*, 62 F.4th at 1159 (internal quotations and citations omitted).

26       Controlling precedent bars Kennedy's claim under either test.  Specifically, in *O'Handley*,

27  the Ninth Circuit held that Twitter was not a state actor under either the nexus or joint action tests

28  despite allegations of more "entwinement" than "in the present case." TRO Order at 8.  There, the

-10-

plaintiff alleged that Twitter created a special platform through which a "limited number of government agencies and civil society groups," including the California Secretary of State's office, could flag posts for "expedited review" for content moderation.  *O'Handley*, 62 F.4th at 1154. According to the complaint, California created a special division within the Secretary of State's office "[t]o monitor and counteract false or misleading information regarding the electoral process that is published online," including by "working closely with social media companies."  *Id.*  This office allegedly "worked in partnership with social media platforms to develop more efficient reporting procedures for potential misinformation."  *Id.*  Most importantly, the office flagged over 300 "erroneous or misleading social media posts," "98 percent" of which "were promptly removed"—including the plaintiff's—for violating the social media companies' standards.  *Id.*

Yet the Ninth Circuit held these allegations satisfied neither the nexus nor joint action test. Applying the nexus test, the court determined that government requests to remove posts were neither coercive nor "significantly encouraging" because there was no allegation "that Twitter would suffer adverse consequences if it refused the request[s] (or receive benefits if it complied)." *O'Handley*, 62 F.4th at 1158–59.  Thus, any post-removal decisions were merely "the result of [Twitter's] own independent judgment in enforcing its . . . Policy." *Id.*  The court similarly held that this failed the joint action test because the allegations amounted merely to "consultation and information sharing" that does not "rise to the level of joint action."  *Id*. at 1160.  Though government officials provided information about potentially impermissible posts, including the plaintiff's, "in every case," the "company's employees decided how to utilize this information based on their own reading of the flagged posts and their own understanding of the Twitter Rules." *Id.*  Because the government had neither "interjected itself into the company's internal decisions" nor "played any role in drafting Twitter's" policy, *id.*, Twitter retained control over its content moderation decisions and was not a state actor.

Multiple decisions from this District—from before and after *O'Handley*— likewise have dismissed strikingly similar claims alleging First Amendment violations by online platforms. Indeed, two such cases dealt with Google's application of the *exact medical and vaccine misinformation policies at issue here* to remove content from its YouTube platform.  In *Informed*

-11-

*Consent Action Network v. YouTube LLC*, Judge Tigar dismissed allegations that Google behaved as a state actor when it removed plaintiff's videos containing COVID and vaccine-related misinformation and ultimately terminated its account, rejecting the same sorts of vague, sweeping assertions at issue here: "ICAN asks the Court to infer that the statements by government and corporate officials were part of a larger collaboration which led Defendants to remove ICAN from their platforms.  These allegations are not plausible."  582 F. Supp. 3d 712, 720 (N.D. Cal. 2022) ("*ICAN*").  Judge Demarchi rejected similar allegations in *Daniels v. Alphabet Inc.*, concluding that "Mr. Daniels does not plead any facts that support his argument that the federal government 'coerced' or 'significantly encouraged' defendants to remove his . . . videos from YouTube's platform."  No. 20-CV-04687-VKD, 2021 WL 1222166, at *6 (N.D. Cal. Mar. 31, 2021).

Cases involving other platforms reached similar outcomes.  In *Hart v. Facebook*, Judge Breyer dismissed similar First Amendment claims against Facebook and Twitter, holding that Biden Administration officials' policy suggestions regarding those companies' COVID and vaccine-related misinformation policies and a related Surgeon General advisory were insufficient to make those companies state actors when they suspended the plaintiff's accounts.  *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507, at *7 (N.D. Cal. May 5, 2022) ("*Hart I*"); *Hart*, 2023 WL 3362592, at *3 ("*Hart II*").  Judge Breyer considered—and rejected—many of the same general allegations made by Kennedy's complaint.  *Hart I*, 2022 WL 1427507, at *2–3, *7; *Hart II*, 2023 WL 3362592, at *2.  In *Children's Health Defense v. Facebook*, Judge Illston similarly held that Facebook could not be treated as a state actor with respect to its efforts to curb COVID misinformation on its platform, explaining that "simply alleging that Facebook and the CDC are 'working together' or 'partnering' to curb the spread of 'vaccine misinformation' does not allege that the [content moderation decisions] challenged in this lawsuit were made pursuant to a CDC policy."  546 F. Supp. 3d 909, 930 (N.D. Cal. 2021).  And in *Federal Agency of News LLC v. Facebook, Inc.*, Judge Koh—then serving as a district court judge—held that Facebook was not a state actor despite allegations that it was in a "'partnership' with the government and law enforcement agencies" that assisted Facebook in detecting and removing posts from Russian

operations designed to interfere with the 2018 election.  *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1124–25 (N.D. Cal. 2020) ("*FAN*").

Notably, in *O'Handley* and in all five of the aforementioned district court cases, these claims were disposed of at the pleadings stage.[6]  *See O'Handley*, 62 F.4th at 1160; *ICAN*, 582 F. Supp. 3d, at 724; *Daniels*, 2021 WL 1222166, at *13; *Hart I*, 2022 WL 1427507, at *11; *FAN*, 432 F. Supp. 3d at 1127; *Children's Health Def.*, 546 F. Supp. 3d at 914–15.  The Court should do the same here.

### 2.    Kennedy's Allegations Cannot Meet the "Demanding" Standards Under Either the Nexus or Joint Action Tests

Kennedy's complaint fails to allege any nexus or joint action for a fundamental reason: Kennedy makes no specific allegations of *any* communications between *Google* and any federal government officials—let alone any in the past two years or any that are specific to him.  Nor do the alleged communications between the federal government officials and Google or other conduct by Google transform Google into a state actor.  As the Court already determined, "under either test, Plaintiff has not shown that the government so 'insinuated itself into a position of interdependence' with Google or that it 'exercised coercive power or has provided such significant encouragement' to Google that give rise to state action." TRO Order at 6.

***Nexus Test.***  None of the communications Kennedy relies on, whether taken individually or as a whole, transforms Google's private content moderation decisions into state action under *O'Handley*'s nexus test, i.e., involves "government officials threaten[ing] adverse action to coerce" Google "into performing a particular act," or significant encouragement such that "the State's use of positive incentives . . . overwhelm[ed]" Google "and essentially compel[led] [it] to act in a certain way."  62 F.4th at 1157–58.  Kennedy has conceded that the federal government did not coerce

---

[6] In his application for a TRO, Kennedy relied heavily on the Western District of Louisiana decision in *Missouri v. Biden*, No. 3:22-cv-01213, 2023 WL 4335270 (W.D. La. Jul. 4, 2023), but as the Court explained in denying that application, that case is "merely persuasive authority" and Kennedy's claims were foreclosed by binding circuit precedent, including *O'Handley*.  TRO Order at 5.  In *Hart*, Judge Breyer considered evidence about Facebook and Twitter obtained from discovery in *Missouri v. Biden*, and concluded that it was insufficient to support an allegation of state action against the two platforms under *O'Handley*.  *Hart II*, 2023 WL 3362592, at *3.

Google into adopting any specific policies.  TRO Order at 6.  Thus, the only question remaining for the nexus test is whether the government engaged in "significant encouragement."

*First*, the January 2021 email that Kennedy attaches to his complaint does not advance his claim of state action.  To start, it was sent from Clarke Humphrey, a White House official, to *Twitter*; it does not involve Google *at all*.  *See* Compl. Ex. C.  The fact that the government was communicating with Twitter does not make plausible any claim that *Google* was a state actor, as the government may have had different approaches with different online platforms.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007) (dismissing a complaint with allegations that were "consistent with" both unlawful and lawful conduct).  But even if the email had been sent to Google, it would not transform Google's removal of videos featuring Plaintiff two years later into state action against him.  The email merely "flag[ged]" one of Kennedy's tweets and asked Twitter to "keep an eye out" for similar tweets.  Compl. Ex. C.  But *O'Handley* made clear that government officials may flag problematic content on Internet platforms without transforming any subsequent removals into state action—under either the nexus or joint action tests.  62 F.4th at 1157–58.  And, under *O'Handley*, that is so even if the online platform and the government work together to create streamlined procedures for the government to flag content for removal.  *Id.*  Certainly, a one-off communication about particular pieces of content—like this email—falls even further from any state action line.

*Second*, Kennedy's allegation that the White House Press Secretary publicly called on online platforms to ban him does not satisfy the nexus test for the same reasons.  A standalone request to ban a particular user or remove a particular post—whether done publicly or privately—is not itself coercive or an offer of overwhelming positive incentives such that it transforms the online platform into a state actor if it then bans or removes particular content or users.  *O'Handley*, 62 F.4th at 1157–58.  And, the fact that Google did *not* ban Kennedy as a consequence of that public statement at any point, nor remove any content featuring him until nearly *two years* later, precludes any inference that these statements had any coercive effect.  *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all.").

1    *Third*, the April 2021 email from Rob Flaherty is similarly addressed *only to Twitter*, so it

2  also cannot make plausible any claim that *Google* was a state actor.  *See* Compl. Ex. D.  It too, if

3  sent to Google, would not demonstrate any nexus.  The email is an invitation for a meeting at which

4  "White House Staff will be briefed by Twitter on vaccine misinfo" and, in particular, trends seen on

5  Twitter's platform, the effects of Twitter's recent policy changes, any further policy changes, and

6  possibilities for "partner[ing]" with the White House and its COVID experts.  *Id.*  This email (and

7  the meeting it suggests took place) is, at most, an information exchange; nothing about it suggests

8  of any sort of pressure from government officials, let alone the kind of coercion or

9  "overwhelm[ing]" "positive incentives" necessary to satisfy the nexus text and to transform Google

10  into a state actor.  *O'Handley*, 62 F.4th at 1157–58.

11    *Fourth*, Kennedy alleges a "close nexus between YouTube and the federal government"

12  because YouTube's relevant Vaccine and COVID-19 Medical Misinformation Policies prohibited

13  posting misinformation that "contradicts" official medical information from external authorities,

14  such as the World Health Organization and "local health authorities."  Compl. ¶ 35; *see id.* Exs. A,

15  B (YouTube's relevant policies).  But Google's decision to refer to health guidelines developed by

16  experts does not deprive Google of the ultimate control over the content on its site or transform its

17  content moderation policy into an enforcement arm of those authorities, as courts repeatedly have

18  held.  *O'Handley*, 62 F.4th at 1160; *see Children's Health Def.*, 546 F. Supp. 3d at 930 (allegations

19  that Facebook "may have relied on CDC information about vaccines to determine what information

20  is 'misinformation'" were "not enough" to plausibly plead state action).

21    Google under its applicable policies makes independent judgments about whether the

22  content "contradicts" those guidelines or "poses a serious risk of egregious harm" (and it always

23  may decide how to enforce or change those policies).  Compl. Ex. B (Vaccine Misinformation

24  Policy); *see ICAN*, 582 F. Supp. 3d at 721 ("[E]ven if Defendants had looked exclusively to a single

25  government authority, their activities nonetheless involved 'the independent professional

26  judgments' which defeat the 'requisite nexus to the government' to establish joint action.").  And

27  Google's reliance on the World Health Organization, which is not a part of or controlled by the

28

1   federal government,[7] as a source of official information undermines Kennedy's claim that the

2   policies were designed to ban speech with which the *federal government* disagrees.  *See ICAN*, 582

3   F. Supp. 3d at 721 n.4 ("Facebook's decision to look to the WHO [in its medical misinformation

4   policies] further suggests that the federal government has not created a 'rule of decision.'"); *accord*

5   *Children's Health Def.*, 546 F. Supp. at 927–28.  At the end of the day, the record shows that

6   Google, not the government, decides what may be posted on YouTube and has done so free of any

7   coercion or inducement by the government.  Whether taken together or individually, the four

8   allegations of specific acts by either Google or government officials plainly flunk the nexus test.

9           Finally, Kennedy alleges that "the federal government" "threaten[ed] to take away" section

10  230 of the Communications Decency Act.  Compl. ¶ 39.[8]  Kennedy, however, fails to identify any

11  specific statement made by a government official concerning Section 230, let alone a threat by a

12  government official to revoke Section 230 in the context of YouTube's medical and vaccine

13  misinformation policies or Google's removal of content involving Kennedy.  These allegations—

14  unadorned with the who, what, when, or where necessary to make them well-pleaded and

15  plausible—are precisely the kind of "conclusory, unwarranted" allegation that the Court need not

16  accept nor draw any inference from.  *ICAN*, 582 F. Supp. 3d at 718 (quoting *In re Gilead Scis. Sec.*

17  *Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).  In *ICAN*, Judge Tigar rejected nearly identical

18  allegations, explaining that "the argument that the threats to Section 230 provide a nexus that

19  transform Defendants into government actors, like the rest of ICAN's government compulsion

20  argument, lacks factual support and relies on unsupported inferences."  582 F. Supp. 3d at 724.

21  Other courts have held the same.  *See Children's Health Def.*, 546 F. Supp. 3d at 944 ("allegations

22  about … the possibility of legislation to remove Section 230 immunity are too general to support a

23

24  ─────────────────
    [7] The WHO is an agency of the United Nations, an intergovernmental organization.  About Us,

25  WHO, https://www.who.int/about.

26  [8] Kennedy has already conceded that these alleged threats cannot constitute coercion sufficient to
    transform Google into a state actor.  TRO Order at 6.  And in any event, Kennedy's allegation that

27  several other online platforms, who also benefit from Section 230, have recently *stopped* removing
    posts featuring his vaccine misinformation suggests that any discussions surrounding changes to

28  Section 230 have not coerced online platforms into changing their content moderation policies
    regarding Kennedy.

-16-

1   claim of governmental coercion, as there are no allegations that any public official pressured

2   Facebook to take any specific actions regarding CHD's page"); *Doe v. Google LLC*, No. 20-cv-

3   07502-BLF, 2021 WL 4864418, at *3 (N.D. Cal. Oct. 19, 2021) (rejecting theory of state action

4   coercion against Google based on threatened "repeal of CDA Section 230 protections").

5   Accordingly, this bare assertion offers no support for Kennedy's claims.

6          ***Joint Action.***  Kennedy also fails to plausibly allege that the "state has so far insinuated

7   itself into a position of interdependence with [Google]" or "significantly involve[d] itself in

8   [Google's] actions and decisionmaking in a 'complex and deeply intertwined process'" such that

9   Google should be deemed a state actor.  *O'Handley*, 62 F.4th at 1159.  Rather, he alleges precisely

10  the same sort of "consultation and information sharing" arrangement that the Ninth Circuit and

11  other courts have held do not amount to joint action.  *Id.* at 1145; *see Hart I*, 2022 WL 1427507, at

12  *7 ("One party supplying information to another party does not amount to joint action."); *FAN*, 432

13  F. Supp. 3d at 1124 ("supplying information to the state alone does not amount to conspiracy or

14  joint action").

15          Here, the government is even less involved in content moderation than in *O'Handley*.  *See*

16  TRO Order at 8 (noting "less evidence of entwinement in the present case" than "in *O'Handley*").

17  Again, the January 2021 and April 2021 emails were sent to *other platforms* and so cannot possibly

18  make plausible Kennedy's claim that the government was "deeply intertwined" with *Google*'s

19  "process."  Even assuming similar communications were sent to Google (and there are no

20  allegations they were), these communications do not—together or individually—amount to joint

21  action.  The January 2021 email and the July 2021 press conference were merely isolated incidents

22  of government officials flagging certain content and users—conduct that the Ninth Circuit clearly

23  held not to amount to joint action in *O'Handley*.  62 F.4th at 1160.  Likewise, the April 2021 email

24  and related meeting were plainly limited to information sharing, which *O'Handley* similarly held

25  did not amount to joint action.  *Id.*

26          And lastly, Google's decision to rely on medical information from the World Health

27  Organization and local health authorities (which notably are *not* the federal government) in helping

28  Google decide what content to remove does not transform YouTube's policies into a federal

1  government-imposed censorship regime.  *See* Compl. Exs. A, B.  It instead merely demonstrates

2  that Google sought to base its content moderation decisions on medical information from those

3  outside experts, while retaining complete control over its content moderation decisions.  *See id.* Ex.

4  A (explaining that YouTube "may allow content that violates the misinformation policies on this

5  page" in certain circumstances).  Because Kennedy's allegations show that Google remained

6  entirely in control of the development and application of its content moderation policies, his

7  complaint clearly does not satisfy the joint action test.  *O'Handley*, 62 F.4th at 1160.

8      Kennedy also makes a series of vague and conclusory allegations about "coordination and

9  collaboration" between Google and the federal government.  Compl. ¶ 20; *see also, e.g., id.* ¶ 36

10 ("YouTube decided to partner with the federal government to censor dissenting voices about

11 COVID-19.").  But, like Kennedy's Section 230 allegation, these allegations amount to nothing

12 more than pleading a "naked assertion" of the legal standard, *Iqbal*, 556 U.S. at 678, and should be

13 rejected as similar allegations have been on at least five occasions in this district.  *See ICAN*, 582 F.

14 Supp. 3d at 724; *Daniels*, 2021 WL 1222166, at *13; *Hart I*, 2022 WL 1427507, at *11; *FAN*, 432

15 F. Supp. 3d at 1124; *Children's Health Def.*, 546 F. Supp. 3d at 944.  In any event, *O'Handley* held

16 "consultation and information sharing" does not "rise to the level of joint action."  62 F.4th  at 1160

17 (quoting *Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 504 (9th Cir. 1996)); *see also FAN*, 432 F.

18 Supp. 3d at 1124–25 (finding no state action despite allegations of a "'partnership' with the

19 government and law enforcement agencies" that assisted Facebook in detecting and removing posts

20 from Russian operations designed to interfere with the 2018 election).

21      Kennedy's *own allegations* further undermine his joint action argument.  Specifically,

22 Kennedy alleges that Google justified its decision to remove the NHIOP video "for violating

23 [YouTube's] policies on COVID-19 vaccine misinformation."  Compl. ¶ 21.  And Kennedy alleges

24 that Google removed two other videos of Kennedy—on Joe Rogan and Jordan Peterson's

25 podcasts—and "cited [YouTube's] medical misinformation policies to justify these decisions."  *Id.*

26 ¶ 23.  Thus, by Kennedy's own account, in every case, Google employees—not the government—

27 reviewed the contents of the videos, assessed in their own judgment whether they violated

28 YouTube's voluntarily and independently adopted medical misinformation policies, and decided to

remove the content.  Just as *O'Handley* found that "Twitter never took its hands off the wheel," neither did Google.  62 F.4th at 1160.

### C.  Kennedy Has Not Established Any State Action *with Respect to Him*

Kennedy's complaint fails for the independent reason that he has not alleged any state action *with respect to videos of him on YouTube*.  Such an omission is fatal because the government must have compelled "the *specific conduct* of which the plaintiff complains" in order for that conduct to be treated as state action.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis added); *accord Hart I*, 2022 WL 1427507, at *7–8 ("Hart makes no allegation that the Federal Defendants ever knew about his July 13 Facebook post, his July 18 tweet, or even his existence.  Because the Federal Defendants did not know about Hart's post or tweet, they could not have had a 'meeting of the minds' as to the disciplinary action those companies took."); *FAN*, 432 F. Supp. 3d at 1126 (allegations of Facebook's cooperation with government "do not mention FAN at all" and "are unconnected with Facebook's April 3, 2018 decision to delete FAN's Facebook page and block FAN content and restrict access to FAN's account, and as a result, these new allegations do not establish joint action between Facebook and the government").

Kennedy does not allege that any government official ever communicated with anyone at Google about the videos that were removed.  Nor does he make any allegation that any time in the last two years, any government official ever communicated with *anyone* about him.  Instead, all Kennedy offers is a two-year-old email *to a different company* about a *different post* and an equally stale public statement from the White House press secretary that he should be banned from online platforms in general.  These actions are simply too attenuated from Google and from removal of Kennedy's videos in particular to sustain his claim of state action with respect to the removal of recent and future content.  *Cf. Breeden*, 532 U.S. at 274 ("Action taken (as here) 20 months later suggests, by itself, no causality at all.").

### D.  Google's First Amendment Rights Bar Kennedy's Claims

The complaint should also be dismissed for the separate reason that Kennedy's requested relief is precluded by *Google's* First Amendment rights.  *E.g.*, *O'Handley*, 579 F. Supp. 3d at 1187–88 (dismissing similar claims on pleadings because "Twitter has important First

1  Amendment rights that would be jeopardized by a Court order telling Twitter what content-

2  moderation policies to adopt and how to enforce those policies").

3      The "choice of material to" publish "and the decisions made" as to the "treatment of public

4  issues and public officials—whether fair or unfair—constitute the exercise of editorial control and

5  judgment" and are protected by the First Amendment. *Tornillo*, 418 U.S. at 257–58.  Like this

6  case, *Tornillo* involved political speech.  Pat Tornillo, a candidate for the U.S. House of

7  Representatives, sued the Miami Herald newspaper under Florida's "right of reply" statute for

8  refusing to publish his responses to editorials critical of his candidacy. *Id.* at 243–44.  The

9  Supreme Court refused to require the Herald to carry Tornillo's speech, however, holding that

10 "any such compulsion to publish that which reason tells them should not be published is

11 unconstitutional." *Id.* at 256 (internal quotation marks omitted).

12     The fact that Google's discretion in this case involves which content to host and serve on

13 YouTube—rather than in a traditional newspaper—does not change the analysis.  The Supreme

14 Court has held that this "rule's benefit" is not "restricted to the press." *Hurley v. Irish-Am. Gay,*

15 *Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) (holding that a parade organizer's

16 decisions regarding which floats to include constituted protected First Amendment expression).

17     Indeed, in *O'Handley v. Padilla*, Judge Breyer recently held that *Tornillo* specifically

18 applies to the exercise of discretion by online platforms in determining what content to host and

19 serve, and held that near-identical claims against Facebook and Twitter relating to their removal of

20 medical misinformation were barred as a matter of law by the First Amendment.  579 F. Supp. 3d

21 1163, 1186–88 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir.

22 2023).  Other courts have agreed.  *See NetChoice*, 34 F.4th at 1216 ("A social-media platform that

23 'exercises editorial discretion in the selection and presentation of' the content that it disseminates

24 to its users 'engages in speech activity.'" (citations omitted)); *Mac Isaac v. Twitter, Inc.*, 557 F.

25 Supp. 3d 1251, 1261 (S.D. Fla. 2021) ("The instant suit arose from Defendant's protected First

26 Amendment activity—i.e., preventing the dissemination of the NY Post Article on its platform for

27 violation of its content moderation policies."); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621,

28 629 (E.D. Va. 2019) ("Facebook has, as a private entity, the right to regulate the content of its

-20-

platforms as it sees fit."), *aff'd*, 774 F. App'x 162 (4th Cir. 2019); *Volokh v. James*, No. 22-CV-10195 (ALC), 2023 WL 1991435, at *6 (S.D.N.Y. Feb. 14, 2023) ("It is well-established that a private entity has an ability to make 'choices about whether, to what extent, and in what manner it will disseminate speech.'"; holding that statute regulating content on online platforms violated First Amendment (quoting *NetChoice*, 34 F.4th at 1210)).[9]  "When a platform selectively removes what it perceives to be incendiary political rhetoric, pornographic content, or public-health misinformation, it conveys a message and thereby engages in 'speech' within the meaning of the First Amendment."  *NetChoice*, 34 F.4th at 1210.

Accordingly, Kennedy's claims for relief—which seek a court order enjoining application of Google's content moderation policies—would violate and are barred by the First Amendment. Google's decision to remove videos from YouTube that include vaccine and medical misinformation is an act of expression.  Indeed, Google's policies are a direct reflection of its "belie[fs]" about what "people should be able to share" on its platform.  Compl. Ex. B (Vaccine Misinformation Policy); *cf. O'Handley*, 579 F. Supp. 3d at 1188–89 ("[Twitter] expressed its 'view that O'Handley's particular tweets were not appropriate for sharing on its platform' by suspending O'Handley's account.").  They also reflect Google's "priorit[ies]"—in this case, "[t]he safety of [its] creators, viewers, and partners."  Compl. Ex. A (COVID-19 Medical Misinformation Policy).  As this Court has recognized, Google has "a strong interest in the application of its own content moderation policies in maintaining users' trust and expectations on its privately hosted platform."  TRO Order at 9 (internal quotation marks omitted).  Were this Court to nonetheless override Google's expressive decision and force it to serve all of Kennedy's

---

[9] The Fifth Circuit in *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022), *cert. pet'n filed*, No. 22-555, reached a contrary conclusion, disagreeing with the Eleventh Circuit.  In *O'Handley*, Judge Breyer approvingly cited several decisions recognizing platforms' First Amendment rights, and characterized these cases as consistent with Ninth Circuit and Supreme Court precedent.  579 F. Supp. 3d at 1186–87 (*e.g.*, *Tornillo*, 418 U.S. at 257–58; *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 424–25 (9th Cir. 2014)).  In addition, the Supreme Court reinstated the injunction prohibiting enforcement of the statute at issue in *Paxton*.  *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022).

content, the result would be an infringement of Google's rights.[10]  That the effect of protecting Google's expressive freedoms in this way is that Kennedy is forced to find other venues for his speech is of no moment; this is a feature—not a bug—of the Court's First Amendment jurisprudence.  *See Hurley*, 515 U.S at 574 ("[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.").[11]  And, indeed, as this Court noted in denying the TRO, Kennedy admits that "he is still able to post content on Facebook and X that runs afoul of Google's policy."  TRO Order at 9.  Kennedy, therefore, remains free to speak his message; but any order requiring Google to host all of his YouTube videos would deprive it of its First Amendment rights entirely.

Accordingly, the First Amendment separately bars Kennedy's claims.

## V.        CONCLUSION

For these reasons, the Court should dismiss the complaint with prejudice.


DATED:  August 30, 2023                    MUNGER, TOLLES & OLSON LLP

By:   */s/ Jonathan H. Blavin*
_____
JONATHAN H. BLAVIN
Attorneys for Defendants
Google LLC and YouTube, LLC

---

[10] In addition, this Court has recognized that forcing Google to serve medical misinformation to its users would be contrary to the public interest.  TRO Order at 10.

[11] Further, Google's First Amendment rights preclude an injunction in favor of Kennedy irrespective of whether this court determines that Google's removal of Kennedy's content constituted state action.  In adjudicating a newspaper's refusal to print an advertisement exactly as submitted, the Ninth Circuit explained that "[e]ven if state action were present . . . there is still the freedom to exercise subjective editorial discretion."  *Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 135 (9th Cir. 1971).  And in *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987), the court vacated an injunction barring the phone company from forbidding certain messages, reasoning that "[i]t does not follow . . . that [the phone company] may never thereafter decide independently to exclude [the] messages . . . . It only follows that the *state* may never *induce* [the phone company] to do so."  *Id.* at 1296–97 (emphasis in original).

-22-