Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge Presiding

```
ROBERT F. KENNEDY, JR.,        )
                               )
          Plaintiff,           )
                               )
  VS.                          )       NO. C 23-03880 TLT
                               )
GOOGLE LLC, a Delaware         )
corporation, and YOUTUBE, LLC,)
a Delaware corporation,        )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Monday, August 21, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                JW HOWARD/ATTORNEYS
                201 South Lake Avenue, Suite 303
                Pasadena, California  91101
        **BY:   SCOTT J. STREET**
                **ATTORNEY AT LAW**

For Defendant:
                MUNGER, TOLLES & OLSON LLP
                560 Mission Street - 27th Floor
                San Francisco, California  94105
        **BY:   JONATHAN H. BLAVIN**
                **JULIANA MARIKO YEE**
                **ATTORNEYS AT LAW**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

<u>**Monday - August 21, 2023**</u>                               <u>**9:56 a.m.**</u>

**P R O C E E D I N G S**

---oOo---

**THE CLERK:**  Now calling Case Number 23-cv-03880,

Kennedy, Jr. versus Google, LLC, et al.

Counsel, will you please come forward to the podium and

state your appearances, beginning with the plaintiff.

**ATTORNEY STREET:**  Good morning, Your Honor.  Scott

Street for the plaintiff, Mr. Kennedy.

**THE COURT:**  Good morning.

**ATTORNEY BLAVIN:**  Good morning, Your Honor.  Jonathan

Blavin for defendants Google and YouTube.

**ATTORNEY YEE:**  Good morning, Your Honor.  Juliana Yee

on behalf of Google and YouTube.

**THE COURT:**  Good morning.  And pleasure to meet you

all.  And I'm glad that there were safe travels coming from

Burbank as well as the streets of San Francisco.  So pleasure

to see everyone.

All right.  This matter is before the Court for an

application of a temporary restraining order.  Plaintiff has

filed an application for a prospective temporary restraining

order to enjoin Google and YouTube from using its

misinformation policies during the 2024 presidential campaign.

Counsel, if you'll please approach, I'm going to have some

general rules.  Those of you who are going to be presenting to

the Court should approach the podium so that you can be heard
by the Court as well as our court reporter.  Thank you.

For those who may be unfamiliar with this Court, I will
generally give a recitation of what I believe the facts to be
and allow you to provide correction during your presentation.

I will also have a list of questions and some I will
intermittently pose to you.  Please understand if I'm asking
these questions, these are questions that are relevant to my
ultimate decision.

I've read all of the briefing as well as the cases that
you've recited in your briefing, and I'm very clear in terms of
the standard of a temporary restraining order.

So, counsel, I'll note that the Court will have as one of
its first questions is why is this an emergency given the lapse
of time?  So please take that into consideration.

Now, on January 23rd, 2021, Twitter, not YouTube, removed
a tweet from Mr. Kennedy's Twitter account.  The takedown was
precipitated by an e-mail sent before from Clarke Humphrey of
the White House office flagging the tweet and asked if we can
get moving on the process for having it removed.  This is based
on the motion and declaration filed by Mr. Street.

This is a fact that I believe supports documentation of
*Missouri v. Biden*, but I want to note that Mr. Kennedy had
filed a motion to intervene and I believe that motion was
denied on January 10th, 2023, by the District Court Western

1  Division of Louisiana, Monroe Division.

2      Now the facts that are relevant to this case are as

3  follows and those of which the Court is asked to consider.

4  Mr. Kennedy announced his candidacy on April 19th, 2023.  He

5  spoke earlier, a month prior, at Saint Amselm College in

6  New Hampshire Institute of Politics on March -- in March of

7  2023.  I do -- I would like to know the actual date.

8      The speech centered around Mr. Kennedy's concern about the

9  merger of corporate and state power as it related to vaccines

10  that children are asked to take.

11      He spoke about the environmental and legal work fighting

12  corporate polluters.  And this is based on the motion pages 9

13  through 10, and counsel, Mr. Street's declaration paragraph 4.

14      Manchester Public Television posted a video of the speech,

15  and YouTube removed it.  This is according to the declaration

16  filed by Mr. Street.

17      Once again, Mr. Kennedy announced his candidacy a month

18  later on April 19th, 2023.  And he's seeking the Democratic

19  Party's nomination for President.  He has filed the necessary

20  paperwork within the Federal Election Commission and is taking

21  steps to qualify for the ballot in early primary states

22  including New Hampshire.

23      Now then YouTube removed a video of an interview with

24  podcast host Jordan Peterson and comedian Joe Rogan after he

25  announced his candidacy.  On June 17th, YouTube removed the

video titled "RFK on Joe Rogan, Pfizer COVID Vaccine Trial,"
and this is based upon the declaration in Exhibit A, Amaryllis
Kennedy.

Kennedy does not identify what video interview with Jordan
Peterson was taken down, the topics of the interview, what date
it was posted, or what date it was taken down.

On the 4th of July, 2023, the decision in *Missouri v.*
*Biden* was filed.  The appeal was filed on July 6th, 2023.
Defendant's motion to stay during appeal was denied on
July 10th.  Oral arguments for the appeal were held on
August 10th, 2023.

Plaintiff filed his complaint on August 8th, 2023, and his
TRO application on August 9th, 2023.

Now then, counsel, I invite you to share any additional
facts that you believe are relevant to the Court in making this
final decision and whether to grant a TRO.

There are standards of which the Court would like to know
which do you feel are the appropriate standards to apply,
keeping in mind that *Missouri v. Biden* at best is persuasive.
*O'Handley v. Weber* found at 62 F.4th 1143, decided in 2023 by
our Ninth Circuit, is the case that the Court will follow.  And
the Court would like to know which of the tests in that case
you feel is appropriate.

What date in March of 2023 did Mr. Kennedy give his
speech?  What date did Manchester Public Television post

1    Mr. Kennedy's speech?  On what date was Mr. Kennedy's speech

2    taken down by YouTube?  How many other videos of Mr. Kennedy

3    have been taken down by YouTube, if any?  And please precisely

4    indicate the date and the content.

5         Twitter, who is not a party to this case, allegedly

6    removed a video of Mr. Kennedy on January 23rd, '21.  Was this

7    video also posted to YouTube, and did YouTube remove it?

8         Now, I do have other questions.  And we'd like to start

9    with under which test for determining a state actor does

10   plaintiff suggest in controlling this case and why in terms of

11   the decision that I will be making today?

12        So, counsel, I have a number of other questions, but those

13   are kind of the broad stroke.  Please correct me on any facts

14   that I may have stated in error.  Speak as slowly as possible

15   for our court reporter.  And, please, I ask that neither party

16   speak over one another so we have a clear record.

17        **ATTORNEY STREET:**  Okay.  Thank you, Your Honor.  And

18   thank you for obviously putting a lot of time into this.

19        I know it was done on short notice, and thank you for

20   indulging my efforts to get here in person so -- which

21   fortunately were successful.

22        **THE COURT:**  You're welcome.  And as you can tell from

23   your binder behind you, every page has been read.

24        **ATTORNEY STREET:**  I appreciate that, by you and by me.

25   Thank you, Your Honor.

1      There were a lot of questions that the Court posed.  So
2  I'm going to start with the question that Your Honor -- the
3  last question that you asked, which is which test applies here.

4      And I want to emphasize that under -- that both the Ninth
5  Circuit and the Supreme Court have said that the tests are
6  really guides to use in determining whether private action --
7  otherwise private action is, quote, fairly attributable to the
8  state.  That's the standard that the Supreme Court laid out in
9  the *Brentwood* -- in the *Brentwood* case in 2002.  And the Ninth
10  Circuit has mentioned that several times including in *O'Handley*
11  and in the *Rawson v. Recovery* case that we cited in our brief.

12      Of the tests that are used, I think here the joint action
13  and the nexus tests are the most on point because of the
14  significant parent coordination between Google, YouTube, and
15  the government in developing particularly the vaccine
16  misinformation policy, which is the one that has been cited
17  when removing my speech -- my client's speech from YouTube.

18      That policy was drafted and the evidence that was
19  developed in *Missouri v. Biden* case showed that that policy was
20  developed by Google in 2020 -- I believe 2021 in response to
21  the government's demands for it.

22      **THE COURT:**  If I could interrupt, and I apologize
23  because I want to make sure our record is clear.  You indicated
24  that the joint action test along with the nexus test which has
25  two separate tests under nexus, under the nexus test.

1    **ATTORNEY STREET:**  Yes.

2    **THE COURT:**  And please identify which one.

3    With regards to the user agreement, and you misspoke and

4    said your speech as opposed to Mr. Kennedy's speech.  Did

5    Mr. Kennedy sign the user agreement when he became a consumer

6    on the free YouTube platform?  Did he sign the user agreement

7    or agreed to it electronically?

8    **ATTORNEY STREET:**  Well, as a -- as a user, yes, he

9    signed it.  But the issue in this case, Your Honor, is not

10   YouTube taking down videos posted by Mr. Kennedy, but

11   YouTube -- YouTube taking down videos of Mr. Kennedy's speech

12   posted by third parties, including Manchester Public

13   Television, including the individual whose name was redacted

14   but we included the e-mail with our filing.

15   And so what that has done is, irrespective of

16   Mr. Kennedy's post to YouTube themselves, Google's actions have

17   created this chill effect where they have said essentially to

18   third parties, including independent media, if you post videos

19   of this man, this political candidate talking about these

20   issues, your video is liable to be removed and you could be

21   punished, given a strike, for violating our policy.

22   And so that's -- and I want to pull back for a second,

23   Your Honor, to emphasize that what we're here for today is not

24   just to protect my client, Mr. Kennedy's, rights but to protect

25   the political process itself.

1    **THE COURT:**  I understand.  But you've now mentioned

2    third parties, and does Mr. Kennedy have standing to represent

3    those unknown third parties?

4    **ATTORNEY STREET:**  Yes.  In this context, Your Honor,

5    in the political process, the Supreme Court's made very clear

6    that where First Amendment rights are concerned and what the

7    plaintiff is alleging is a chilling effect on speech, a

8    plaintiff like Mr. Kennedy, who has clearly a concrete interest

9    in this relief, has standing to pursue such relief.

10    We cited those cases in our brief, and I think they're

11    especially appropriate in this context of the presidential

12    campaign.

13    **THE COURT:**  I don't know if you answered my earlier

14    question with regards to the joint action and nexus test.  I

15    indicated that there are two versions of the nexus test.  And

16    do you plan to address both or just one?

17    **ATTORNEY STREET:**  I do plan to address both,

18    Your Honor.  I just want to make sure that I have them -- I

19    have them both so I don't -- I don't discuss them in a

20    contrary -- contrary fashion.

21    So that the nexus test, the first one is the pervasive

22    entwinement between public officials and the government, which

23    I think is shown here by the evidence that's been developed in

24    the *Missouri v. Biden* case, the interaction between Google and

25    government officials in drafting the policy that it's been

1    using to remove my client's speech.

2        But the other one I think is even more appropriate, which

3    is the government encouragement that's discussed in the

4    *O'Handley* case at page 1158.  And this really gets into -- and

5    I think that second aspect of the nexus test overlaps with the

6    joint action test.  You can see that in *O'Handley*.  It

7    discusses the facts -- factors under each interchangeably.

8        And this is where, in *O'Handley*, the Ninth Circuit was

9    very, very clear, Your Honor, that a constitutional problem

10   would arise if Twitter had agreed to serve as an arm of the

11   government thereby fulfilling the state's censorship goals.

12       Now that wasn't satisfied in *O'Handley*, Your Honor,

13   because the only allegation in *O'Handley* was that a government

14   agency was flagging tweets that the government believed

15   violated a preexisting policy developed by Twitter to try to

16   protect the sanctity of its platform in the civic process.

17       Here you don't have information -- you don't have flagging

18   the one-way channel of communication that the Ninth Circuit

19   discussed in *O'Handley*.  Here you have actually evidence that

20   Google developed this policy in response to government demands

21   for it in apparent collaboration with government officials in

22   writing it -- in writing it, at least that's what the evidence

23   from the *Missouri v. Biden* case suggests.

24       And the policy itself is based entirely on what the

25   government says.  The policy says you cannot disagree with what

1   the government says about these issues.

2        And so that's why I think this case goes far beyond what

3   the Ninth Circuit was dealing with in *O'Handley* and satisfies

4   really both the nexus and the joint action test.

5        And more importantly, Your Honor, really shows that this

6   policy that Google developed, it's not its own policy.  It may

7   not have been compelled by the government to adopt it, but it's

8   a policy that looks entirely to the government to decide which

9   information to remove.  And I think under the Supreme --

10            **THE COURT:**  So you agree that they were not compelled,

11  that Google was not compelled by the government.  Do you agree

12  with that?

13            **ATTORNEY STREET:**  Well, I haven't seen evidence yet to

14  say that they were compelled.  I know that that was shown in

15  the *Missouri v. Biden* case.

16            **THE COURT:**  And again, *Missouri v. Biden* is persuasive

17  authority, not controlling, and *O'Handley* is the case that we

18  are concerned about.

19            **ATTORNEY STREET:**  That is true, Your Honor, and I will

20  note, though, that the *Missouri v. Biden* case had an

21  evidentiary record that did not exist in the *O'Handley* case or

22  any of the other what I'll call censorship cases that were

23  litigated in this court.

24        In fact, I think it's interesting that the allegations

25  that were deemed implausible in *O'Handley* and similar cases,

1  the court developed -- the parties developed actually an

2  evidentiary record in the *Missouri v. Biden* case which showed

3  exactly what the Ninth Circuit said was implausible in these

4  prior technology companies.

5      And I think that's very important because that's -- it was

6  the record in that case that convinced the judge,

7  Judge Doughty, and I think what convinced the Fifth Circuit

8  that there was coercion.

9      We may develop that here, I don't know yet, and I don't

10 want to argue coercion without having a good faith basis to do

11 that.  I think on the record we've established already, though,

12 Your Honor, we have satisfied the joint action and nexus tests.

13 We have shown that Google's policy is fairly attributable to

14 the government.  And we have shown that in the political

15 process where the Supreme Court has always said more speech is

16 better than less speech, that we have satisfied the burden.

17     And that brings me back to the first question that the

18 Court asked about what is the emergency here?  Now --

19     **THE COURT:**  No, my first question was actually -- I'm

20 going to go back to my questions because I need these answered.

21     What date in March of 2023 did Mr. Kennedy give his

22 speech?

23     **ATTORNEY STREET:**  So the date -- I should know this

24 since I was there.  If I remember correctly the date, it was

25 March 3rd of 2023.

1      **THE COURT:**  All right.  And on what date did

2  Manchester Public Television post his speech?

3      **ATTORNEY STREET:**  The same day.

4      **THE COURT:**  The same day.

5  And on what date was the video taken down?

6      **ATTORNEY STREET:**  As I recall, the same date or one

7  day later.  Not simultaneously but within a day or two.

8      **THE COURT:**  How many other videos by Mr. Kennedy have

9  been taken down by YouTube, if you know?

10      **ATTORNEY STREET:**  I know of at least half a dozen.

11      **THE COURT:**  And can you identify that half dozen?

12      **ATTORNEY STREET:**  Three of them were identified in

13  our -- in our moving papers.  There was an interview with

14  Jordan Peterson that was posted and removed.  There was -- and

15  it was reported on publicly.  There was a podcast that

16  Mr. Kennedy did with Joe Rogan that was taken down.

17  And then I have since -- which is referred to in our

18  moving papers -- and then I have since heard, received numerous

19  e-mails, communications from other people who said -- who told

20  me they have had similar content removed --

21      **THE COURT:**  Well, no.

22      (Simultaneous colloquy.)

23      **THE COURT:**  -- I want to know the actual.  So far I

24  know of two.  And one was with comedian Joe Rogan.  And the

25  date of that of which it was removed was what?

1    **ATTORNEY STREET:**  I don't have the date offhand,

2    Your Honor.  I can look for that.

3        **THE COURT:**  All right.

4        **ATTORNEY STREET:**  I believe it was in early July.

5        **THE COURT:**  And then with regards to podcast host

6    Jordan Peterson, what day was this one taken down?

7        **ATTORNEY STREET:**  Let me --

8        **THE COURT:**  What was the date of the interview and

9    what day was it taken down?  The date of the interview with

10   comedian Joe Rogan, and what date was that taken down?

11       **ATTORNEY STREET:**  That is not something I don't have

12   at the top of my head, Your Honor.  So I have to look through

13   my files to see if I have that.

14       **THE COURT:**  All right.  And then going back to my

15   earlier question, because it's in your declaration, Twitter was

16   not a party to this case, allegedly removed a video of

17   Mr. Kennedy on January 23rd, 2021.  Was this video also posted

18   to YouTube, and did YouTube remove it?

19       **ATTORNEY STREET:**  That question I don't have an answer

20   to, Your Honor, but I would be happy to look and find out.

21       **THE COURT:**  And then is the video of Mr. Kennedy at

22   the college in New Hampshire still available to view online

23   outside of YouTube?

24       **ATTORNEY STREET:**  I have not looked so I do not know

25   the answer to that.  I know it is not available through

1   Manchester Public Television.

2   **THE COURT:**  All right.  Then that brings us to the

3   topic that you want to address now, which is what grounds do

4   you allege which makes this an urgent request?  And was there

5   any correlation between this request and its urgency driven by

6   in any way the appeal taken in *Missouri v. Biden*?

7   **ATTORNEY STREET:**  Well, the urgency, Your Honor, is

8   twofold.  First off, the Ninth Circuit and Supreme Court have

9   always -- always recognized that First Amendment harms are

10  different than other harms.  And so as a general matter, they

11  have applied these doctrines flexibly, recognizing that ongoing

12  harms are actionable and that any chilling of speech is

13  irreparable and --

14  **THE COURT:**  But we waited from March to August.  So

15  I'm just trying to understand.

16  **ATTORNEY STREET:**  Sure.  Sure.  And I understand.  I'm

17  going to tell you as a practical matter what -- what the reason

18  for the delay, if there was a delay, was Mr. Kennedy believed

19  strongly that during his political campaign, the technology

20  companies would stop censoring him, recognizing the settled --

21  settled principles that more speech, not enforced silence,

22  rules in the political process.

23  Twitter and Facebook, in fact, changed the way they deal

24  with him and have stopped censoring him during his presidential

25  campaign.  Google has not, despite repeated requests.

1     We believed after -- and going back to the *Missouri v.*

2    *Biden* case, Your Honor noted that Mr. Kennedy moved to

3    intervene in that case.  That motion was denied, but he

4    subsequently filed a lawsuit against the federal officials who

5    were also named in that case.  And he filed that case in

6    Louisiana this spring.

7     And the judge, Judge Doughty in Louisiana, enforced --

8    issued an order essentially saying that the same injunction

9    that was issued in the State Attorney General case would apply

10    to protect Mr. Kennedy, given the overlapping issues.

11     So --

12     **THE COURT:**  Okay.  Well, I'm just trying to get some

13    clarity for areas that were a little foggy for me.  And I have

14    no ego invested in this so I want to make sure I get this right

15    and I'm clear.

16     The speech was early March of 2023.  Mr. Kennedy announced

17    his candidacy in April.  But the urgency, as you're describing

18    it, and the delay and his treatment by others have some nexus

19    to this case, and I'm just trying to allow you to tease that

20    out.

21     And then I may turn to Google after we get through a

22    couple of other questions that I have and give you an

23    opportunity to see if you can locate the dates I asked about

24    earlier.  But go ahead.

25     **ATTORNEY STREET:**  Sure.  Well, the truth is,

1    Your Honor, I don't know why Google removes some of my client's

2    speeches and not others.

3        **THE COURT:**  Well, I'm just looking at the timeline and

4    the urgency question.

5        **ATTORNEY STREET:**  I understand.  I understand.

6        So but that plays into my answer because it is my client

7    and his campaign have repeatedly reached out to Google to

8    prevent this from happening.

9        It doesn't -- he doesn't get censored completely, but

10   certain high-profile speeches and interviews do get censored.

11       And so we realized really in late July or early August

12   that Google was not changing its policies.  And in fact in the

13   last three days, Google has actually amended its misinformation

14   policies.  It really blended the vaccine misinformation and the

15   medical misinformation policies to prohibit all kinds of speech

16   on medical matters, including vaccines, abortion, cancer

17   screenings, and the like.

18       So it's become clear to us in the last month that Google

19   is, unlike Facebook and Twitter which have pulled back from the

20   censorship of people on their platforms, Google was actually

21   doing more censoring.  And that will likely continue during

22   Mr. Kennedy's presidential campaign.

23       And the damage that would be done to the political

24   process, if that's allowed to continue, would be irreparable.

25       **THE COURT:**  All right.  Let me ask three very precise

1   questions.  Then I'm going to turn to counsel on behalf of

2   Google to see if some of these dates and information or

3   questions I've asked can be resolved.

4       What authority does plaintiff have for the proposition

5   that defendants may not rely on local health authorities

6   informing their own medical misinformation policy?

7       Second question, and, again, going back to my earlier one:

8   Under which tests for determining a state actor does plaintiff

9   suggest is controlling and why?

10      And what irreparable harm will plaintiff suffer if the TRO

11  is not granted since we're talking about a video that was

12  uploaded prior to his announcement of his candidacy and then

13  one with a podcast host and the other with a comedian?

14      Please respond.

15          **ATTORNEY STREET:**  Well, with respect to the first

16  question, Your Honor, there is no evidence on this record that

17  Google has anybody making independent decisions about how to

18  apply its misin-- at least its medical misinformation policies.

19  The policies themselves depend entirely on government sources.

20      And so I guess in a hypothetical world, could they do

21  that?  Sure.  But in this situation, the record we have before

22  us, we have no record of independent decision-making.  Instead

23  we have a policy that was drafted in response to government

24  demands for it and collaboration with government -- government

25  sources, and a policy that looks on its face entirely to the

1    government to decide what is -- what is false, what is

2    misleading, what is damaging.  And that is exactly what I think

3    the state action doctrine was designed to prevent.

4         And I actually want to go -- I want to mention a case that

5    we cited in our reply brief, Your Honor, called *Brown v.*

6    *Hartlage* which 41 years ago dealt with a similar situation.

7    The government of Kentucky addressing alleged false

8    information -- false and misleading information by a political

9    candidate in an election.  And the Supreme Court said it's not

10   up to the government to decide what is true and what is false,

11   what is misleading in a political campaign.

12        Obviously this situation is different because there's a

13   private party involved, but you have a private party relying

14   entirely on government sources.  And so what that means is that

15   triggers constitutional scrutiny.  And that's what's

16   significant here.

17        Now to the Court's -- to the Court's other two questions.

18   I think -- again I think that in this case, at least on the

19   record we have right now, the joint action and nexus tests are

20   the most appropriate, but I would also say that we need to

21   remember that in Supreme Court's view stated in the *Brentwood*

22   case, what we're always looking for is whether seemingly

23   private action is, quote, fairly attributable to the

24   government.

25        And so regardless of whether we're using one test or

1    another applying aspects of different tests, I think that has

2    been -- that has been satisfied here.

3         And the danger to the political process, not just to my

4    client's presidential campaign, but the danger to the political

5    process of allowing Google to even selectively remove speech on

6    matters of public concern during a presidential campaign is

7    significant and would grossly affect the campaign itself.

8         **THE COURT:** All right.  Does YouTube, as a private

9    company offering both free and paid services, have a right to

10   decide what's published or not published on their website?  Do

11   they have that right?

12        **ATTORNEY STREET:** Well, if they were a publisher,

13   Your Honor, they would have that right, but they're not a

14   publisher.  And we went through this several pages in our -- in

15   our reply brief talking about the differences between

16   technology companies, Internet companies of today, and

17   publishers like the *New York Times* or private parties that are,

18   you know, putting in a newsletter, in the *PG&E* case, in their

19   billing statements.

20        And in fact, there's -- and the most fundamental reason

21   that Google/YouTube is not a publisher is, unlike publishers,

22   they take no responsibility for the content that's posted on

23   their platform.  And as a matter of law, they cannot be held

24   liable for that.

25        So that's an important -- that's an important distinction,

1    Your Honor, and one that distinguishes this case from the *Miami*

2    *Herald* case, *PG&E* case, and the *Hurley* cases that we discussed

3    in our brief.

4            **THE COURT:**  And, again, Mr. Kennedy did agree to

5    YouTube's terms and services when creating his account.  And

6    this issue from your perspective is going beyond his particular

7    account?

8            **ATTORNEY STREET:**  This does go beyond his particular

9    account.  And I would also say, Your Honor, that an agreement

10   cannot be used to circumvent the Constitution.

11       I think that would need to look at -- address each

12   question in the appropriate constitutional framework, and here

13   that weighs strongly in his favor.

14           **THE COURT:**  And so he agreed to the user agreement

15   which included misinformation language and other third parties

16   that they were all on notice and they could either accept or

17   decline that service.  Would that be fair?

18           **ATTORNEY STREET:**  I don't know if it's fair or not,

19   but what I know is that it can't be -- whether you agree to

20   boilerplate terms of service in a user agreement or not, I

21   don't think that even a private party can use those policies to

22   violate individuals' constitutional rights and to create a

23   chilling effect on speech in the political process.

24           **THE COURT:**  Thank you.

25       All right.  Counsel, the same questions are posed to you.

1    I will probably have a couple of additional questions with

2    regards to YouTube's user policy.  And if you can recite the

3    relevant portions.  And could YouTube be found liable by

4    private parties for not addressing information, therefore is

5    there any coercive nature that can be imposed by anyone?

6        If you know how many people died of COVID-19 by the end of

7    January 2021, and whether there's any dispute about the number

8    of citizens that were impacted by COVID-19.

9        And how does YouTube make decisions on what videos

10   violates its misinformation policies?

11       How are YouTube's misinformation policies enforced?

12       And if Mr. Kennedy plans on posting videos that violates

13   the terms and services or policies, how would that be addressed

14   in the future given the lifeline of COVID-19 as it stands now?

15       And if you need me to repeat any of the previous questions

16   posed to counsel, let me know and I'll go back and recite those

17   questions as well with regards to how many videos of

18   Mr. Kennedy were taken down and if you happen to know the

19   chronology of events.

20       **ATTORNEY BLAVIN:**  Thank you, Your Honor.

21       I'll start with Your Honor's questions relating to the

22   videos taken down and the timing with respect to them.

23       I think the record is unclear precisely when the video of

24   the Saint Amselm speech was taken down.  I don't have any

25   reason to dispute that it was within a short period of time of

1  the speech given on March 3rd, but there's nothing in the

2  record in this case at least in terms of the declarations that

3  have been submitted which identify the specific date.

4      **THE COURT:**  But it's definitely before he announced

5  his campaign?

6      **ATTORNEY BLAVIN:**  Yes, I know that's for sure.  I

7  think it was attempted to be reposted I believe on March 6th.

8  It was at that point not permitted.  So it was certainly within

9  a very close time frame of when it was posted to the site.

10     As to the Seth Rogan -- I'm sorry, the video with the

11  comedian Mr. Rogan, not Seth Rogan, not somebody else, and

12  Mr. Kennedy, I believe the record demonstrates that -- and this

13  is attached as an exhibit I believe to the A Kennedy

14  declaration, the takedown communications with Mr. Kennedy, I

15  believe it's identified as June 17th, 2023, in an e-mail from

16  YouTube to the recipients:  We've reviewed your content.  We

17  think it violates our medical misinformation policies and it's

18  been removed.

19     So I think we have a June 17th date for that.

20     With respect to the Peterson video, as Your Honor noted,

21  they don't identify the specific video at issue.  So I just

22  don't think it's clear from the record what that video was or

23  when it was removed.

24     **THE COURT:**  Thank you.

25     **ATTORNEY BLAVIN:**  Unless Your Honor has any more

questions about those specific issues, I'm happy to go to

Your Honor's questions relating to the applicable test and how

it applies here in the Ninth Circuit decision in *O'Handley*.

      **THE COURT:**  All right.  And with regards to the

comedian Joe Rogan's video, you believe that that may be a

family member of the Kennedy family, or at least the same last

name, sharing the same last name as Mr. Kennedy?

           **ATTORNEY BLAVIN:**  Are you referencing, Your Honor --

      **THE COURT:**  The June 17th, 2023.

      **ATTORNEY BLAVIN:**  Oh, yes, I believe that was sent

to -- it's redacted, I believe the "To" line, but from my

understanding of the declaration it was sent to Mr. Kennedy's

relative.

      **THE COURT:**  Thank you.

  And then if you'll proceed under which test for

determining a state actor, do you believe, is controlling and

why?

         **ATTORNEY BLAVIN:**  So the Ninth Circuit's decision in

*O'Handley*, as Your Honor correctly identified, is controlling

here.

  Plaintiffs, in their motion papers, didn't identify

specifically which test would apply.  As we indicated in our

opposition, we think if there's going to be any test which

would apply, it would be either the nexus test or the joint

action test.

1    Plaintiff's counsel today said that they are in fact in

2  agreement on that, that those would be the two applicable

3  tests.  And those tests are very demanding as the Ninth Circuit

4  made absolutely clear in *O'Handley*.

5    With respect to the nexus test, just to flesh it out,

6  Your Honor, the Ninth Circuit said, as Your Honor indicated,

7  there's two subparts to that test which could apply, the first

8  one being the State cannot, quote, threaten adverse action to

9  coerce a private party into performing a particular act.

10    And just to pause on that for a second, because I think

11  counsel conceded today that there's absolutely no evidence at

12  all that the federal government coerced Google in this instance

13  to either adopt a medical misinformation policy, much less to

14  apply that policy specifically to Mr. Kennedy's content.

15    In fact, there's absolutely nothing in the record

16  regarding any communications or even knowledge of the federal

17  government with respect to Mr. Kennedy's particular posts that

18  are at issue in this case or a request to take them down.

19    And that's very different from *O'Handley* where you had the

20  plaintiff's specific content, a request from the government to

21  remove that content, and the Ninth Circuit nonetheless said

22  that that did not constitute a state action under the nexus

23  test.

24    The second element of the nexus test is whether the state

25  uses positive incentives such that they, quote, overwhelm the

1    private party and essentially compel the party to act in a

2    certain way.

3        And just to pause on that, Your Honor, I don't think

4    there's anything in the record indicating any positive

5    incentives from the state to Google, much less one that would

6    essentially compel Google to act in a particular way.

7        With respect to the joint action test, the Ninth Circuit

8    said that the party -- the government, that is, has to so far

9    insinuate itself into a position of interdependence with the

10   private party that it must be recognized as a joint participant

11   in the challenged activity or significantly involve itself in

12   the private party's actions and decision-making in a complex

13   and deeply intertwined process.

14       And, again, in the Ninth Circuit decision in *O'Handley*,

15   based on the allegations of the complaint, the court found that

16   neither of those tests were satisfied.

17       And just to quickly summarize what those allegations were,

18   because I think they demonstrate, if anything, substantially

19   more government involvement than what we have in this case.

20   There Twitter allegedly established an expedited review process

21   for posts that were specifically flagged by state officials.

22   It removed 98 percent of the 300 posts that were flagged by the

23   state, including one specifically involving the plaintiff's

24   content.  And third, Twitter allegedly worked -- or the

25   government worked in partnership with social media companies to

1   develop more efficient reporting procedures for potential

2   misinformation.

3       Nonetheless the Ninth Circuit held that Twitter exercised

4   its own independent judgment in adopting its policies and

5   enforcing them, and the mere fact that you have information

6   sharing in cooperation between the government and the private

7   party does not establish state action.

8       And the Ninth Circuit specifically noted, because I know

9   plaintiffs have indicated this during today's argument,

10  plaintiff's counsel and also in their reply brief, that, well,

11  if there's a shared mission or objective between the private

12  party and the government, that could somehow satisfy the joint

13  action test.

14      Actually the Ninth Circuit specifically rejected that in

15  *O'Handley*.  The Ninth Circuit said that, quote, private and

16  state actors were generally aligned in a mission to limit the

17  spread of misleading election information...does not transform

18  private conduct into state action.

19      Moreover, Your Honor, courts in this district, both before

20  and after *O'Handley*, have rejected near identical claims.

21      And I want to direct Your Honor's attention to the *Hart v.*

22  *Facebook* decisions from Judge Breyer which plaintiff's counsel

23  did not address during today's argument or in their reply

24  brief.

25      There, similar to here, there was a motion to dismiss

1   which was granted by Judge Breyer.  Then the plaintiffs took

2   all of the discovery they could find from the *Missouri v. Biden*

3   proceeding and filed a motion for leave to amend their

4   complaint, and said, look, we have enough now based upon this

5   discovery to state a claim and to establish state action under

6   either of *O'Handley*'s test.

7         And Judge Breyer considered all of that evidence,

8   including Carol Crawford's CDC deposition testimony, which has

9   been submitted to Your Honor.  We provided the entire

10  transcript including e-mails from Mr. Flaherty of the

11  White House to Facebook and Twitter.  And if anything, and

12  Your Honor can see this in the declaration I submitted, those

13  communications were even more aggressive from the state than

14  anything that we have here.

15        And nonetheless Judge Breyer said under *O'Handley*, even

16  taking all of this evidence into account from the *Missouri v.*

17  *Biden* proceeding, that it does not satisfy the *O'Handley* test.

18  And I think that's exactly right, Your Honor, and I think that

19  analysis squarely applies here.

20        Other decisions such as the *Federal Agency of News* case we

21  cite from Judge Koh involving Facebook, she held that the mere

22  fact that there was allegedly a partnership between government

23  and law enforcement agencies and Facebook to deal with Russian

24  misinformation on the platform did not satisfy either of these

25  state actions.

1    So there's a host of authority on this which plaintiff's

2    counsel has not addressed.

3    And I'll pause there to see if Your Honor has any

4    questions on the test.  But I would like to go through the

5    specific evidence that plaintiff's counsel has put forward

6    because they make assertions regarding that evidence, but the

7    actual evidence itself does not bear out what they're saying.

8    **THE COURT:**  All right.  That would be helpful since

9    the plaintiff is indicating they will suffer irreparable harm

10   if this TRO is not granted and it will have a chilling effect

11   on speech.

12   **ATTORNEY BLAVIN:**  Yes, Your Honor.

13   So if you look at the actual documents and materials that

14   plaintiff's counsel has put forward to establish state action

15   here, they formed the three buckets:  One, 2021 meetings with

16   the Surgeon General's office.  Second, an April 22nd, 2021,

17   e-mail from Rob Flaherty of the White House to Google.  And

18   three, meetings between the CDC and major online platforms in

19   2021, at which vaccine misinformation was occasionally

20   addressed.

21   Now if you actually look at the record here, two things

22   are absolutely clear.  First, none of these communications

23   offer any evidence of coercion which I think plaintiff has

24   conceded now, nor do they establish any sort of overwhelming

25   positive incentives to establish the nexus test.

1    But, two, with respect to the joint action test, what

2  these documents show and testimony shows is that Google was

3  already and independently crafting and developing its own

4  policies at the time it was talking with the government.

5  There's no evidence at all to state that Google somehow only

6  did this as a result of its discussions with the government.

7    So, for example, if you look at the communications with

8  the office of the Surgeon General, Eric Waldo testified in his

9  deposition that the government perceived Google to have

10 independently decided to limit vaccine-related misinformation

11 without any prompting by the government.

12    He describes his meetings with Google as saying what

13 Google was already doing to address these issues, and that's at

14 pages 119 through 121 of his deposition, which is attached as

15 Street Declaration Exhibit H, and he says the same thing at

16 page 129.

17    With respect to the White House communications, the

18 communications from Rob Flaherty, this is again the April 22nd,

19 2021 e-mail, Flaherty, in that e-mail, never directs Google to

20 take any particular action with respect to a medical

21 misinformation policy, whether with a carrot or a stick.  Just

22 the opposite, Flaherty acknowledges, and this is quoting from

23 his e-mail, that, quote, removing content that is unfavorable

24 to the cause of increasing vaccine adoption is not a realistic

25 or even a good solution.

1    So basically he's saying we're not saying to do this,

2    we're not even recommending to do that, it may not be the right

3    thing.  And that's exactly what he's accusing Google of doing

4    in this case.

5    With respect to the communications as to the CDC, we

6    provided Your Honor with a complete copy of Carol Crawford's

7    deposition testimony, and again this is the testimony that

8    Judge Breyer also considered in the *Hart v. Facebook* case.

9    And in that deposition testimony, which Mr. Kennedy only

10    provides excerpts for, we provided Your Honor with the entire

11    transcript, at pages -- page 105 of the deposition to 106, she

12    states in that deposition that no one at the CDC had crafted

13    the content policy of any social media company or even gave

14    input on what such a policy should look like.

15    So I think, Your Honor, collectively when you look at all

16    of this evidence, it doesn't even establish, you know, what

17    plaintiff's counsel has stated here today that somehow Google

18    just adopted this policy in response to the communications with

19    the government.

20    If anything, it shows that Google was independently

21    exercising its own judgment that these were important policies

22    to adopt, the government shared that objective, and that's

23    exactly what the Ninth Circuit in *O'Handley* rejected as

24    sufficient to satisfy the joint action test.

25    Now, if I could respond to an additional argument which

plaintiff's counsel made today regarding the fact that, well, the fact that Google and YouTube made reference government policies, you know, with respect to vaccine -- you know, information, with respect to COVID-19, et cetera, that that somehow would convert Google into a state actor.

And of course relying on the expertise of particular agencies and individuals if they're in the government or outside the government would not be sufficient to satisfy either of *O'Handley*'s joint -- either of *O'Handley*'s state action tests.

And I think in *O'Handley* itself, again, you had the government that was specifically flagging for Twitter a post that it thought constituted election misinformation.  And Twitter was relying upon that expertise in terms of looking at those posts itself and making its own independent judgment.  So that can't be enough.

But beyond that, if you actually look at Exhibit D to the Street declaration, and this is I believe the vaccine misinformation policy, it specifically says that Google looks to WHO and -- the World Health Organization, WHO, and local health agencies in terms of identifying, you know, proper information related to these policies.

So it's not even the federal government that Google was looking to, and that's a big disconnect in that argument.  It's looking to other regulatory agencies.

1    And then finally, Your Honor, on this point, you know,

2    even if, you know, there was allegedly some sort of government

3    pressure, which I think plaintiff's has counsel conceded there

4    wasn't even, the fact is he doesn't identify -- the plaintiff

5    doesn't identify any particular state action as to his content.

6    And the Supreme Court in the *Blum v. Yaretsky* case made

7    clear that the government must compel, quote, the specific

8    conduct of which the plaintiff complains.

9    And both in the *Hart* decision from Judge Breyer, his first

10   decision, and in the *Federal Agency of News* case from

11   Judge Koh, they both independently dismiss the claims at issue

12   because even though there may have been generalized discussions

13   relating to Russian misinformation, or in *Hart*, again, medical

14   misinformation between the government and the private party,

15   there was nothing to show that there was a specific

16   communication or pressure relating to any particular piece of

17   content of the plaintiff.

18   And I think as Your Honor correctly identified here, all

19   that they have with respect to Mr. Kennedy's own content is an

20   e-mail that a White House official sent more than two years ago

21   to a different company, Twitter.

22   And even if there was that type of evidence here, under

23   *O'Handley* it makes clear that even if the government tells you,

24   hey, we think this information should be removed, and then the

25   company exercises its own independent judgment and decides to

1     remove that, that cannot satisfy the state action doctrine.

2          And then finally on these legal issues, Your Honor, we've

3     heard frequently today that Mr. Kennedy is a political

4     candidate during the 2024 presidential election and that that

5     somehow should change the analysis.  But it doesn't.  The fact

6     that you're running for office doesn't excuse you from

7     satisfying the demanding requirements of the state action

8     doctrine.  And there's nothing, there's no authority at all

9     that somehow a looser standard were to apply when you have a

10    political candidate at issue.

11         **THE COURT:**  And just for clarity and closure, please

12    address the plaintiff's position on standing.  And then also

13    the, just for clarity, because I know you've woven it into your

14    argument, how YouTube's misinformation policies are enforced

15    and how does YouTube make decisions on what videos violate its

16    medical misinformation policies?

17         **ATTORNEY BLAVIN:**  Yes, Your Honor.  I'm sorry.  Could

18    you repeat that first question again?  I just want to make sure

19    I have that right.

20         **THE COURT:**  The first one was standing.

21         **ATTORNEY BLAVIN:**  Yes.

22         **THE COURT:**  Address plaintiff's argument on standing.

23    And then the next is how are YouTube's misinformation policies

24    enforced and how does YouTube make decisions on what videos

25    violates its medical information policies.

1    On standing, we're looking at causation and

2    redressability.

3        **ATTORNEY BLAVIN:**  Yes.  So with respect to the

4    standing arguments, I think -- and these were, I think,

5    interjected a little bit in the reply brief.  There were

6    various cases citing with respect to, you know, you can have

7    standing if there's a general chilling effect, et cetera,

8    et cetera.

9        All of those cases, Your Honor, address the particular

10    issue of where the government is taking direct action on the

11    plaintiff.  And I think the briefs were speaking a little bit

12    past each other because Google has not made a standing argument

13    here with respect to this content.  So there's no state action

14    to begin with.  So there's nothing to analyze under the First

15    Amendment in terms of whether or not there's standing.

16        In the *Brown* case, which plaintiff's counsel referenced,

17    again that involved a state actor taking action with respect to

18    a particular political candidate's content, not a private

19    party.

20        So the mere fact that Mr. Kennedy feels that he's

21    suffering a chilling effect on future content or that other

22    third parties may feel that they don't want to upload his

23    content, none of that is relevant for purposes of First

24    Amendment standing because there's no state action to begin

25    with.  And that really ends the inquiry.  There's not a

question of standing.  There's just a question of state action.
And without a state action, there's no potential violation of
Mr. Kennedy's First Amendment rights.

With respect to the application and development of
YouTube's own policies and their applications to Mr. Kennedy, I
want to pause here because I think Your Honor raised this
question in the context of your discussion with plaintiff's
counsel on Google's own rights here.  And I think that's
important to emphasize.

Google has its own First Amendment rights in terms of
deciding what content is appropriate to appear on its platform
or not.  So plaintiff's counsel actually have it backwards.  If
the Court were to issue an injunction here, that wouldn't
preserve plaintiff's rights.  It would actually violate
Google's First Amendment rights.  And that's exactly what
Judge Breyer held in the District Court in the *O'Handley*
decision.

He made clear that:

An online platform, quote, has important First
Amendment rights that would be jeopardized by a court
order telling it what content moderation policies to adopt
and how to enforce those policies.  The Court will issue
no such order.

And Judge Breyer's decision, as he noted, was consistent
with Supreme Court and Ninth Circuit precedent.  The Supreme

1  Court going back to the *Miami Herald v. Tornillo* case made

2  absolutely clear.  And again this case, just to be clear, it

3  involved political candidates.  The issue was whether or not

4  the government could force a newspaper to carry the content of

5  a political candidate to respond.  And the Supreme Court said

6  no, the treatment of public issues and public officials,

7  whether fair or unfair, constitute the exercise of editorial

8  control and judgment which is protected by the First Amendment.

9      The Eleventh Circuit, in the *NetChoice* case, this was

10  versus the Attorney General of Florida, similarly held that

11  online platforms have this First Amendment right.  The Eleventh

12  Circuit specifically said, quote, when a platform selectively

13  removes what it perceives to be incendiary political rhetoric,

14  pornographic content, or public health misinformation, it

15  conveys a message and thereby engages in speech within the

16  meaning of the First Amendment.

17      And the statute there also dealt with political candidate

18  speech.  The Florida statute limited the ability of platforms

19  to remove content of political candidates.  The Eleventh

20  Circuit confirmed the District Court's decision that that would

21  violate the platform's First Amendment rights.

22      So if anything, the injunction here that's being proposed

23  would violate Google's First Amendment rights, not plaintiff's

24  First Amendment rights, which demonstrates that the irreparable

25  harm would be suffered by Google and the balance of equities

1    sharply tip in Google's favor.

2         With respect to the policies themselves and their

3    enforcement, I think the record is clear here that the policies

4    were developed independently by Google, just looking at the

5    communications with the government, and Google exercised its

6    own independent judgment of what those policies would be, as we

7    went over the evidence before.

8         And as to the application of those policies, it's not in

9    the record, Your Honor, specifically how those policies are

10   applied, but I think if you look at the communications such as

11   Exhibit D to the A. Kennedy declaration, it says, "Our team has

12   reviewed your content, and unfortunately we think it violates

13   our medical misinformation policy."

14        So there's a team at Google that uses their own

15   independent judgment in reviewing content and determining

16   whether it violates the policies and to remove that content if

17   it does.

18        And, again, that's Google's First Amendment right to do

19   that, as Judge Breyer held, as the Eleventh Circuit held, and

20   several other decisions have held as well, referenced in our

21   papers.

22        I can address Your Honor's additional questions, and I

23   apologize if I miss anything.  So please interject at any point

24   in time.

25        I think you asked with respect to the harm that COVID had

1    been causing during the pandemic, you know, how many people may

2    have died back in 2021 as a result of COVID when these policies

3    were being adopted and how many people, you know, have died at

4    this point.

5         I know at least the latter, I think it's very well

6    publicly settled though I'm not sure if it's in the docket,

7    although we did noted this in our brief.  At this point over a

8    million people have died in the United States from COVID-19

9    back in 2021.

10        I don't have the specific figures, Your Honor, and I'm

11   happy to supplement the record if that would be helpful.  But I

12   think we knew that, you know, at that point close to half a

13   million back in 2021 may have passed away from COVID.

14        And again this isn't in the record, and I'm just relying

15   upon my colleague, Ms. Yee, looking for some of this

16   information from public sources.  We're happy to supplement.

17        But I think what this will demonstrate is that this was a

18   serious public health emergency.  I think it remains a serious

19   public health issue.  There's discussion all the time of new

20   variants coming up or even happening in San Francisco right

21   now, a mini-surge of COVID.  So these are incredibly important

22   issues that remain important public health issues.

23        And if you look at, you know, the question of would an

24   injunction be in the public interest, I think the answer is

25   absolutely not.  Besides the fact that such an injunction would

violate Google's First Amendment rights so it would causes

irreparable harm to Google, and if the First Amendment

demonstrates what's in the public interest, an injunction would

do exactly the opposite.  But forcing Google to carry medical

vaccine misinformation on YouTube is absolutely against the

public interest.

As the Surgeon General letter that is attached to the

Street declaration, Exhibit K, states, "The proliferation of

health misinformation during the pandemic has been both

extensive and dangerous and poses a growing threat to the

nation's health."

The Ninth Circuit in the *Doe v. San Diego Unified School

District* case, which we cited in our papers with respect to the

public interest, that involved the question of an injunction to

enjoin the San Diego School District's vaccine mandate.  And

what the Ninth Circuit said is the public interest weighs

strongly in favor of denying the injunction.

And the court noted that the record indicates that

vaccines are safe and effective at preventing the spread of

COVID-19 and that a mandate is therefore likely to promote the

health and safety of school students and staff as well as the

broader community.

So if anything, the Surgeon General itself has recognized

forcing Google to carry this type of medical misinformation,

vaccine-related misinformation would be directly contrary to

1    the public interest in this matter.

2         **THE COURT:**  All right.  Thank you.

3        Now then, plaintiff, based on the fact that the defendants

4    indicate that they did not rely on local health authorities

5    informing their medical information policy but were guided by

6    the expertise of those in the community, regulatory agencies,

7    and local health authorities, your response?

8         **ATTORNEY STREET:**  Well, that's still -- those are

9    still government actors, Your Honor.  And I think that it's

10   what's helpful from the record, that entry record that was

11   developed in the *Missouri v. Biden* case is that the evidence of

12   communications between these technology companies like Google,

13   Facebook, and Twitter, and government authorities while writing

14   these policies shows that there is something more than --

15   there's something more than Google having, say, a team of

16   doctors who are writing a policy.

17        **THE COURT:**  Do you have information to support that

18   assertion?

19        **ATTORNEY STREET:**  I'm sorry?

20        **THE COURT:**  Do you have information to support that

21   assertion that it's beyond their independent evaluation?

22        **ATTORNEY STREET:**  Well, there's no evidence in the

23   record that there's been an independent evaluation.  And I

24   think -- and this is my point as to the evidence that was

25   developed in *Missouri v. Biden*.

1    In the previous cases that Google's counsel cited that
2    were decided in this district, those cases were dismissed
3    because the judges in those cases decided that, well, it's
4    implausible to believe that Google or Facebook or Twitter are
5    working with the government or communicating with the
6    government and writing these policies.

7    And the relevance of the record, the evidence that was
8    gathered in *Missouri v. Biden* case is that in fact that is what
9    was happening.

10   Now this case may -- you know, we're still at an early
11   stage, and so I don't think that is the only issue that matters
12   here.  In fact, I think what's far more important in this case,
13   Your Honor, is the content of the policies, the misinformation
14   policies themselves.  They prohibit speech that contradict
15   government sources.  They change -- by their terms, they change
16   not when Google changes its mind, but when the government
17   changes its mind about these subjects.

18   And I'm glad that my colleague mentioned, you know, the
19   interest in -- Google's interest in promoting public -- you
20   know, what it calls public health, which is fine.  But
21   promoting public health, that's something that the government
22   does, and that's an inherently governmental action.

23   And if you're a publisher, say, you're the *New York Times*
24   or whoever else, and you want to write articles, write
25   editorials as a publisher that also promote public health, that

1  say, you know, the government is right, we think this is

2  important, we think people like Kennedy are quacks and aren't

3  to be listened to, aren't to be trusted, that's fine.  But a

4  publisher takes responsibility for what it publishes.  Under

5  the law, it has an obligation to do that.

6      Google does not.  Google disclaims responsibility for

7  anything.  It is not -- it is not a publisher.  And so I think

8  as to the balance of harms, there is no harm to Google in

9  issuing this injunction.  Which I would note, Your Honor, we've

10  actually narrowed substantially to only apply to speech from my

11  client, Mr. Kennedy, on issues related to his presidential

12  campaign.

13      And that's important because what's happening here is when

14  Google takes down a speech or a video content of Mr. Kennedy

15  speaking, it's not just removing what it claims to be or what

16  the government claims to be misinformation about medical

17  information, it's also removing political speech.  That's the

18  importance of that speech in New Hampshire that was taken down

19  back in March.

20      I was at that speech.  At least half of it had nothing to

21  do with medical information whatsoever.  It was Mr. Kennedy,

22  you know, talking about his environmental record, his

23  childhood.

24      So that's -- that's the issue here.  When you're removing

25  political speech, there is a chilling effect, and that does

1   damage the political process.

2        THE COURT:  So that brings me to a question.  Are you

3   indicating that the only objectionable portion was any

4   reference to the vaccines, that he didn't say anything else in

5   any of these speeches that may violate other policies, just the

6   medical policy standing alone, just the medical policy?

7        ATTORNEY STREET:  That is the only policy that

8   YouTube -- and if you look at the exhibit to my declaration

9   that attached a news article with YouTube's explanation, that's

10  the policy that they --

11       THE COURT:  No.  My question to you is, is it your

12  position there's nothing else in those speeches that could be

13  found as objectionable or violating any service agreement?

14       ATTORNEY STREET:  Well, correct, because I don't

15  think -- I don't think the discussion of Mr. Kennedy's

16  environmental record, like say with the Hudson River CAPERs,

17  is -- I wouldn't even claim -- I don't think they would even

18  claim that that's -- that that's misinformation.

19       THE COURT:  Well, the March one is not as relevant as

20  the April -- anything post-April since that is kind of the

21  linchpin of where you begin in your arguments.  And so I'm just

22  trying to have some clarity about what encompasses this TRO and

23  what does not.

24       ATTORNEY STREET:  Well, I'd say what encompasses this

25  TRO, Your Honor, is that -- and I think we spelled this out in

1  the order -- it's just that we're asking for the Court to order

2  Google to not remove speech of Mr. Kennedy's on matters of

3  public concern during his campaign.

4      Now if he ceases to be a presidential candidate, then

5  maybe that's a different situation.  But I think that given --

6  given the importance of my client's criticism of the government

7  on certain issues, including public health policy, it's

8  impossible to carve one out.  It's impossible to say, well, you

9  know, this certain information violates our policies, we'll

10  take this down.

11      And I think that's actually why we've seen, Your Honor,

12  that Google is not removing all of the content that's posted

13  regarding Mr. Kennedy.  It just happens to be certain -- you

14  know, certain -- certain content.

15      But that doesn't -- that doesn't change the analysis

16  because it still creates the chilling effect.  And some of the

17  videos they have taken down again have been some of the most

18  widely viewed videos, including the New Hampshire speech, the

19  Rogan interview, and the Peterson interview.  Which I checked

20  my notes and I don't -- I don't have the date.  I know that it

21  was in either June or July, but I apologize, I don't have the

22  specific date.

23          **THE COURT:**  All right.  Thank you.

24      Anything further?

25          **ATTORNEY BLAVIN:**  Yeah, Your Honor.  If you wouldn't

mind, I'll briefly go through just a last set of points here.

First with respect to the issue of whether only a portion of the speech was removed and other parts of the speech may not have been offending Google's policies, it's not Google's obligation to edit the video.  If the video violates its medical misinformation policies, its vaccine-related misinformation policies, it can remove that video.

Now if plaintiffs want to or anyone else wants to edit the video to take out the part of the video that's violating its policies, of course they are free to do so.

And, again, as Your Honor recognized, Mr. Kennedy, as he acknowledges, has his videos up on Twitter, or X as it's now called, has his videos up on Facebook.  There's several other videos of him up on YouTube.  He just acknowledge, yeah, if the videos don't violate those policies, generally they stayed up. So that's just a fact that I wanted to make sure that was clear in the record.

With respect to the reliance on government experts, I mean it can't be the fact that you rely on a government agency for their expertise would automatically convert you into a state actor when you're exercising your own independent judgment in adopting a policy and enforcing it.  And plaintiff cites no authority to support that.

And more so, as noted before, the specific government agencies that are referenced in the policies are not even the

federal government.  It's WHO and local health authorities.  So there's a disconnect there.

With regards to plaintiff's counsel's argument that, well, none of these other courts that have dismissed these cases, again on the pleadings without any discovery whatsoever, considered *Missouri v. Biden*.

Well, as I noted, Your Honor, that's just wrong. Judge Breyer considered substantial evidence from *Missouri v. Biden* including a significant amount of evidence that's in front of your court and held that there was no state action whatsoever.

And then briefly, Your Honor, with respect to, you know, the alleged harm Mr. Kennedy would suffer from these handful of videos being removed, Google also has, besides its First Amendment rights, as we noted in our papers, Google has a strong interest in its own content moderation policies maintaining users' trusts and expectations in the platforms.

We've submitted to Your Honor several of those policies, and they emphasized that the safety of our creators, viewers, and partners is our highest priority.

So an injunction that would force Google to carry this content would not only violate the First Amendment, but it would harm its own efforts to make sure that it has a safe platform in which potentially dangerous medical and vaccine misinformation does not exist on it.

1    And then briefly, Your Honor, just on the issue of, you

2    know, plaintiffs have suggested that, you know, there could be

3    more out there that they just don't have.

4    Again, Your Honor, all of these cases have been dismissed

5    on the pleadings, including the *O'Handley* case which had

6    significant evidence in it, the *Hart* case, *Federal Agency of*

7    *News* case.

8    Courts do not allow discovery to determine if you have a

9    claim.  And plaintiff here has already had access to

10   substantial discovery from the *Missouri v. Biden* case,

11   including communications between government officials and

12   Google employees, deposition transcripts, government discovery

13   responses.  All that would happen with enabling any discovery

14   where there's absolutely no basis to issue a TRO would be a

15   fishing expedition from Google to see if the plaintiff has a

16   claim.

17   And Google's motion to dismiss is due on August 30th.  We

18   plan to file that motion on or before that date.  And we think

19   Your Honor should rule on that motion which we think is clear

20   based upon the record submitted here and the allegations of the

21   complaint that the complaint here is facially deficient, does

22   not come close to stating a claim.  We believe the Court should

23   dismiss that complaint on its face without permitting any

24   potential discovery from Google in the interim.

25        **THE COURT:**  Anything further?

1          **ATTORNEY STREET:**  The only thing I would add,

2     Your Honor, is that the Supreme Court and the Ninth Circuit,

3     indeed all federal courts in this country, have a very proud

4     history of protecting dissenting viewpoints, protecting

5     government dissent, especially in the political process, and

6     that's what this case comes down to.

7          Now, obviously we're dealing with it in a modern context

8     of you have huge companies that control what the Supreme Court

9     has called the, you know, modern public square, and that's a

10    new development.

11         But I would urge the Court to read the court's -- Supreme

12    Court's state action cases very, very closely.  And I'd also

13    ask the Court to think about the Ninth Circuit's reasoning in

14    the *O'Handley* case.  And in the context of the Supreme Court's

15    admonition, what we're really looking at is whether seemingly

16    private behavior is fairly attributable to the state.

17         And I think that the Ninth Circuit -- if the Ninth Circuit

18    had believed these cases never had merit, can't possibly be

19    brought, they would have said so.  It actually said to the

20    contrary, that there is a situation we can envision in which

21    private action could be deemed state action, and I think this

22    is that case.

23         And I think that the importance of protecting the

24    political process while minimizing any harm to Google who is

25    not a publisher, cannot be held liable for what my client says

1    on YouTube, weighs in favor of granting the relief.

2            **THE COURT:**  All right.  Thank you.

3        And I'm glad that you brought the Court back to *O'Handley*,

4    and I'm going to recite for the record the items that I'm going

5    to take under submission and based on what I've heard whether

6    the evidence and arguments fall short of state action.

7        And then taking a look at the guidelines in *O'Handley*,

8    whether a private entity's conduct amounts to state action,

9    namely, was the alleged constitutional violation caused by an

10   exercise of some right or privilege created by the state or by

11   a rule of conduct imposed by the state or by a person for whom

12   the state is responsible.

13       When I look at nexus test one, whether there is pervasive

14   entwinement of public institutions and public officials in the

15   private actor's composition and workings, that's the first

16   question that I would be looking at when I analyze this issue

17   in reflection based upon all of the arguments of counsel.

18       Number two seems to have been conceded with regards to the

19   nexus test, whether government officials have exercised

20   coercive power or provided such significant encouragement,

21   either overt or covert, that the choice must in law be deemed

22   to be that of the state; whether the government officials

23   threaten adverse action to coerce the private party into

24   performing a particular act or encouraged by using positive

25   incentives that overwhelm the private party and essentially

1   compel them to act.  Counsel has conceded that that does not

2   apply.

3        The joint action test, a plaintiff can show joint action

4   either by proving the existence of a conspiracy or by showing

5   that the private party was a willful participant in joint

6   action with the state or its agents.

7        Counsel is arguing that relying upon WHO and local

8   authorities and regulatory agencies and any public health

9   officials, that that somehow entwines and becomes a joint

10  action.

11       With regards to the remaining issues, the Court finds that

12  there's nothing to show that there's any coercion or

13  retaliation, and the evidence falls short of dates and nexus to

14  the actions that were taken by Google.

15       So I'm going to be focused on two questions in reflection.

16  It does not appear that, based upon what I've heard thus far,

17  would warrant discovery at this stage.

18       We do have a further case management conference scheduled

19  for September 12th, 2024.  And I can give you anticipated dates

20  that you may be assigned based on my calendar so that you can

21  begin your planning.  And when you have your joint conference

22  with regards to your case management conference, you can at

23  least determine whether these dates are suitable to your

24  calendar.

25       The first available trial date is March 17th, 2025.  So I

1   want you to know that.  Final pretrial conference would thereby

2   take place on February 13th, 2025.  And joint pretrial

3   statements would be due January 30th, 2025.

4       Now then we are going to reserve the date of November 7,

5   2023, at 2:00 p.m., that's an in-person hearing for motion for

6   preliminary injunction and motion to dismiss.

7       I believe the briefing schedule has already been uploaded

8   for you.  We will provide you with additional dates such as

9   close of discovery.  Fact discovery would be August 30th, 2024.

10  Expert disclosure September 30th, 2024.  Rebuttal expert

11  disclosure October 21st, 2024.  And close of expert discovery

12  November 11th, '24.  Last day to file dispositive motions would

13  be December 10th, '24.

14      This is a tentative schedule.  And the Court will place

15  the tentative schedule on ECF so that you can review it.  It

16  will be a standalone document that will indicate tentative

17  trial schedule.

18      Of course, these dates will fall off if the Court denies

19  the motion for preliminary injunction and/or the TRO.  And also

20  if the Court grants the motion to dismiss, any later dates that

21  come after November 7th would fall off the Court's calendar.

22      All right.  So we will post the tentative schedule so that

23  when you meet and confer, you will have the dates that are

24  convenient to the Court's calendar.

25      Thank you both for being so amazingly prepared and making

1    it through some inclement weather.  And it was a pleasure

2    meeting each of you.  Thank you.

3             **ATTORNEY STREET:**  Thank you, Your Honor.

4             **ATTORNEY BLAVIN:**  Thank you, Your Honor.

5             **THE COURT:**  This matter is concluded.

6                  (Proceedings adjourned at 11:13 a.m.)

7                         ---oOo---

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, August 24, 2023

8

9

10

11    _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25