Scott J. Street (SBN 258962)
**JW HOWARD/ATTORNEYS, LTD.**
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
**JW HOWARD/ATTORNEYS, LTD.**
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 3:23-cv-03880 |
| Plaintiff, | [Assigned to the Hon. Trina Thompson] |
| vs. | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | |
| Defendants. | [Filed concurrently with Declarations of Robert F. Kennedy, Jr., Amaryllis Kennedy and Scott J. Street; [Proposed] Order and Preliminary Injunction lodged concurrently] |
| | Date:    November 7, 2023 |
| | Time:    2:00 p.m. |
| | Crtrm:  9 |

///

///

///

**TABLE OF CONTENTS**

Pages

I.   **INTRODUCTION**…………………………………………………………9

II.  **FACTS**……………………………………………………………………..11

III. **LEGAL STANDARD**……………………………………………..………16

IV. **ARGUMENT**………………………………………..…………….…………17

    A. The State Action Doctrine Applies When the
    Government Tells Google What Information
    to Censor, Especially Under These Circumstances………………..….…17

    B. Kennedy Has Alleged a Colorable First Amendment Claim………....26

    C. Even Temporary First Amendment
    Violations Cause Irreparable Harm…………………………………..30

    D. The Balance of Harms Strongly
    Supports Granting the
    Motion………………………………………………………….......31

    E. The Court Should Grant Limited Discovery
    Regarding the Communications Between
    Google and Executive Branch
    Officials……………………………………………………..…........32

V. **CONCLUSION**…………………………………………………....……33

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

**TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*A.C.L.U. of Nev. v. City of Las Vegas,*
  466 F.3d 784 (9th Cir. 2006)…………………………………………..…………27

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011)……………………………………………..……..…17

*Am. LegalNet, Inc. v. Davis,*
673 F. Supp. 2d 1063 (C.D. Cal. 2009)……………………………….…..….…32

*Am. Mfrs. Mutual Ins. Co. v. Sullivan,*
  526 U.S. 40 (1999)…………………………………………………….…...23

*Atkinson v. Meta Platforms, Inc.,*
  No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)…………...…..…22

*Berger v. City of Seattle,*
  569 F.3d 1029 (9th Cir. 2009)……………………………………….…..……...29

*Beshear v. Butt,*
  863 F. Supp. 913 (E.D. Ark. 1994)……………………………………………28

*Biden v. Knight First Amend. Inst.,*
  -- U.S. --, 141 S. Ct. 1220 (2021)……………………………….…….…...31
  .

*Blum v. Yaretsky,*
  457 U.S. 991(1982)………………………………………………...…..…18

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
  531 U.S. 288 (2001)…………………………………………………...…..…18

*Broderick v. Oklahoma,*
  413 U.S. 601 (1972)………………………………………………….…...29

*Brown v. Hartlage*
  456 U.S. 45 (1982)……………………………………………...….………...30

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*Buckley v. Valeo*,
　　424 U.S. 1, 52-53 (1976)……………………………………………..….27

*Bullfrog Films, Inc. v. Wick*,
　　847 F.2d 502 (9th Cir. 1988)…………………………………….…...29

*Butler v. Ala. Judicial Inquiry Comm'n*,
　　111 F. Supp. 2d 1224 (M.D. Ala. 2000)……………………………….28

*Carlin Communications, Inc. v. Mountain States Telephone*
*& Telegraph Company*,
　　827 F.2d 1291 (9th Cir.1987)…………………………………….…...26

*Cohen v. Calif.*,
　　403 U.S. 15 (1971))………………………………………….....…..24

*Denver Area Ed. Telecomms. Consortium, Inc.*,
　　518 U.S. 727 (1996)……………………………………………….....…..24

*Doe v. Google, LLC*,
　　No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022)………….....22

*Doe v. Harris*,
　　772 F.3d 563 (9th Cir. 2014)…………………………………….…...31

*Elrod v. Burns*,
　　427 U.S. 347 (1976)…………………………………………….........30

*Farris v. Seabrook*,
　　677 F.3d 858 (9th Cir. 2012)…………………………….………......…30

*Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*,
　　192 F. Supp. 3d 1120 (E.D. Cal. 2016)………………………….........30

*Flores v. Bennett*,
　　635 F. Supp. 3d 1020 (2022)…………………………………………...32

*Grayned v. City of Rockford*,
　　408 U.S. 104 (1972)…………………………………………….…...29

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MOTION FOR PI AND MEMO. OF POINTS & AUTHORITIES　　　　CASE NO. 5:23-cv-03880

*Heineke v. Santa Clara Univ.*,
    965 F.3d 1009 (9th Cir. 2020)……………………...…………..…..23

*Howerton v. Gabica*,
    708 F.2d 380 (9th Cir. 1983)……………………………….…...18

*Index Newspapers, LLC v. City of Portland*,
    474 F. Supp. 3d 1113 (D. Or. 2020)…………………….………..…..17

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974)…………………………………………….…..25

*Kirtley v. Rainey*,
    326 F.3d 1088 (9th Cir. 2003)…………………………………..……18

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) …………………………………..…...30
    .
*Lee v. Katz*,
    276 F.3d 550 (9th Cir. 2001)…………………………………......9, 18, 24

*Lugar v. Edmondson Oil Company*,
    457 U.S. 922 (1982)……………………………………..……..25

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)…………………………………..………..27

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019)…………………………………………..…..18

*Mathis v. Pacific Gas & Electric Company*,
    891 F.2d 1429 (9th Cir. 1989)………………………………….…………25
    ..
*Mills v. Alabama*,
    384 U.S. 214 (1966)………………………………….……...…27

*Missouri v. Biden*,
    -- F. Supp. 3d --, 2023 WL 4335270 (W.D. La. July 4 2023)…………….....20

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972)………………………………………………..25

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*New York Times Company v. Sullivan*,
　　376 U.S. 254 (1964)………………………………………….……...28

*NetChoice, LLC v. Paxton*,
　　49 F.4th 439 (5th Cir. 2022)……………………………..…………..26

*O'Handley v. Weber*,
　　62 F.4th 1145 (9th Cir. 2023)…………………………..……….…….Passim

*Pacific Gas & Electric Company v. Public Utilities
Commission of California*,
　　475 U.S. 1 (1986)("PG&E")…………………………………...…..9

*Packingham v. North Carolina*,
　　-- U.S. --, 137 S. Ct. 1730 (2017)……………………………….......31

*Rawson v. Recovery Innovations, Inc.*,
　　975 F.3d 742 (9th Cir. 2020)……………………….……………..19, 22

*Recycle for Change v. City of Oakland*,
　　856 F.3d 666 (9th Cir. 2017)…………………………..…….…....27

*Reed v. Town of Gilbert, Ariz.*,
　　576 U.S. 155 (2015)…………………………………………….…….27
.
*Roberts v. AT&T Mobility, LLC*,
　　871 F.3d 833 (9th Cir. 2017…………………………………….…….23

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
　　515 U.S. 819 (1995)……………………………………………...18

*Rutenberg v. Twitter, Inc.*,
　　No. 21-160743, 2022 WL 1568360 (9th Cir. May 18, 2022)……………..22

*State v. Biden*,
　　-- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam)……..…16

*Sutton v. Providence St. Joseph Medical Center*
　　192 F.3d 826 (9th Cir. 1999)………………………..……..24, 25, 26

*Thalheimer v. City of San Diego*,
    645 F.3d 1109, 1116 (9th Cir. 2011)……………………………..…..……17

*Turner v. U.S. Agency for Global Media*,
    502 F. Supp. 3d 333, 385 (D.D.C. 2020)……………………………….....29

*U.S. WeChat Users Alliance v. Trump*
    488 F. Supp. 3d 912, 916 (2020)……………….………………………...17

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir.2013)………………………………………...……30

*Villegas v. Gilroy Garlic Festival*,
    541 F.3d 950 (9th Cir. 2008)………………………………………………19
…

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005)…………………………………………....30

*Winter v. Natural Resources Defense Council, Inc.*
    555 U.S. 7 (2008)……………………………………………..……..16, 17


**Statutes**

47 U.S.C. § 230…………………………..…………………………………32

**Other**

Alexander M. Bickel, *The Morality of Consent* 62 (2d ed. 1975)……………..……28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MOTION FOR PI AND MEMO. OF POINTS & AUTHORITIES          CASE NO. 5:23-cv-03880

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

**PLEASE TAKE NOTICE** that, on November 7, 2023, at 2:00 p.m. in the above-referenced Court, Plaintiff Robert F. Kennedy, Jr., will and hereby does move for an order preliminarily enjoining Defendants Google LLC and YouTube, LLC, from using their "medical misinformation" policy to remove videos of Mr. Kennedy's speech on matters of public concern from YouTube during the 2024 presidential campaign.

This motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure. There is good cause to grant the relief. The First Amendment prohibits the government from censoring Mr. Kennedy based on the content of his speech. The First Amendment, buttressed by the state action doctrine, also prohibits the government from using a third party like Google to censor Mr. Kennedy on matters that it disagrees with and does not want Americans to hear. That is what happened here and what warrants this extraordinary relief.

DATED:  September 25, 2023          JW HOWARD/ATTORNEYS, LTD.


By:  */s Scott J. Street*
     John W. Howard
     Scott J. Street
     Andrew G. Nagurney
     Attorneys for Plaintiff
     ROBERT F. KENNEDY, JR.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This case challenges the conventional wisdom that private parties cannot violate the First Amendment. They can, especially when, as here, they engage in viewpoint discrimination during the political process to prevent people from hearing voices the incumbent government does not want them to hear.

The Ninth Circuit has applied the state action doctrine liberally for more than forty years. It has emphasized that the analysis does not involve rigid criteria but focuses on determining whether seemingly private action is fairly attributable to the state. Many of those cases involved the deprivation of liberty or property rights. A few, including *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2001), found state action when a private party violated an individual's free speech rights. *Lee* recognized, as Justice Thurgood Marshall did in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), that First Amendment rights are entitled to special protection, even when they are invoked against a private party that engages in viewpoint discrimination in a privately owned space.

Such spaces include YouTube. The internet is the modern public square. It is the place where millions of Americans get their news and discuss the issues of the day, especially during the political process. It is akin to the parks, sidewalks, squares, and billboards that the Supreme Court has always recognized as public fora for speech, even when those places are owned or controlled by a private party. And YouTube is not an ordinary website. It is the second largest search engine on the Internet.

The Ninth Circuit seemed to recognize that in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), when it said that a constitutional problem would arise if a giant tech company like Twitter or Google agreed to censor speech that government officials do not want people to hear.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MOTION FOR PI AND MEMO. OF POINTS & AUTHORITIES                    CASE NO. 5:23-cv-03880

The Ninth Circuit did not find such evidence in *O'Handley* but it surely exists here. In fact, even at this early stage of litigation, the evidence (most of which was revealed during discovery in a similar case) is compelling. It shows that Google developed its medical misinformation policies in response to the federal government's demands for them. It shows that Google consulted with government officials when drafting the policies. And, most importantly, it shows that the speech that is subject to removal from YouTube is only speech that public health officials—*i.e.*, the government—deem false, misleading, or dangerous. Speech that many people would call false, misleading, or dangerous—for example, that there are more than two genders or that abortion has physical and psychological risks—is not subject to removal from YouTube because the current public health administration supports those messages.

Americans may agree with Mr. Kennedy's views. They may disagree with them. They may vote for Kennedy or reject him at the ballot box. Whatever the case, our Constitution requires that voters have an unfettered chance to hear Mr. Kennedy speak. That is the only way they can make an educated decision when exercising their right to vote.

Using government policies to remove Mr. Kennedy's political speech from YouTube violates that principle. And, unless the Court acts, Google will continue to engage in this unconstitutional action during the 2024 campaign. Its counsel already admitted that. The danger to political discourse cannot be overstated.  Therefore, the Court should issue an order preliminary enjoining Google from using its medical misinformation policy—which was recently amended—to remove any videos of Mr. Kennedy's speech.

///

///

///

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MOTION FOR PI AND MEMO. OF POINTS & AUTHORITIES                    CASE NO. 5:23-cv-03880

## II.  **FACTS**

Mr. Kennedy is a lawyer, a son of former Attorney General Robert F. Kennedy and a nephew of former President John F. Kennedy. He is seeking the Democratic Party's nomination for president, having declared his candidacy on April 19, 2023. Declaration of Scott J. Street, dated September 25, 2023 ("Street Decl."), ¶ 3.

Kennedy has long been a thorn in the side of public health officials and their political enablers. His criticism increased after Joe Biden took office in 2021. Declaration of Robert F. Kennedy, Jr., dated September 21, 2023 ("RFK Decl."), ¶¶ 3, 9-10. The White House responded in kind. First it instructed Twitter executives to censor Mr. Kennedy's speech. Street Decl., Exh. P. Then it turned to Google.

In April 2021, a White House staffer named Rob Flaherty reached out to Google executives, telling them that "we" (that is, President Biden and his White House staff) "remain concerned that YouTube is 'funneling' people into hesitance and intensifying people's hesitancy [to take the COVID-19 shots]." Street Decl., Exh. F. Flaherty said that concern was "shared at the highest (and I mean highest) levels of the White House." *Id.* Flaherty told the Google executives that there was "more work to be done here." *Id.* He asked them to explain "what your road map to empowerment is." *Id.* And he said the White House was "excited to continuing [*sic.*] partnering with you on this work … but we want to make sure that the work extends to the broader problem. Needless to say, in a couple of weeks when we're having trouble getting people to get vaccinated, we're going to be in the barrel together." *Id.*

As of April 22, 2021, Google did not have a vaccine misinformation policy for YouTube. There is no evidence that it had any intention of developing one, either. Rather, Google began developing the vaccine misinformation policy—the policy it used to censor Kennedy—in response to the White House's demands for it. Street Decl., Exhs. F-T.

Google seems to have embraced its role. Between May 2021 and September

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

2021, Google executives met numerous times with government officials from the Centers for Disease Control and the Office of the Surgeon General to discuss the executive branch's demand for more vaccine-related censorship. *Id.*

But the executive branch was getting impatient. After all, President Biden had campaigned on a promise to eliminate COVID-19. By July 2021, a new variant was spreading. The president needed somebody to blame. Thus, on July 16, 2021, President Biden said: "Look, the only pandemic we have is among the unvaccinated." Street Decl., Exh. Q. Soon government officials were referring to COVID-19 as a "pandemic of the unvaccinated." In the same speech, Biden said technology companies like Google were "killing people" by not removing vaccine-critical speech from their platforms. *Id.* Around the same time, the Surgeon General issued an advisory calling on tech companies to aggressively remove criticism of the government's pro-vaccine message from their platforms. *Id.*, Exh. R.

When making these comments, the president targeted not just the tech companies but a group of commentators—called the "disinformation dozen"—that an activist group has targeted for censorship. Street Decl., Exh. S. Biden explained: "Facebook isn't killing people – these 12 people are out there giving misinformation. Anyone listening to it is getting hurt by it. It's killing people. It's bad information." *Id.* Kennedy is part of that group. RFK Decl., ¶ 6. Indeed, Mr. Kennedy is one of the most prominent members of that group and the only one who is a political threat to Biden.

These comments, delivered by the Commander in Chief, revealed a plan to punish tech companies like Google if they did not go along with the Biden Administration's censorship goals. They were corroborated by other threatening statements made by executive branch officials about the tech companies' responsibility to censor dissenting public health viewpoints, and the consequences if they did not do so—namely that the White House would push to eliminate the companies' section 230 immunity and bring more enforcement actions against them.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Indeed, within days of President Biden's July 16 "misinformation" speech, CNN reported that "[t]he White House is reviewing whether social media platforms should be held legally accountable for publishing misinformation via Section 230, a law that protects companies' ability to moderate content …." Street Decl., Exh. T.

The tech companies, especially Google, got the message. Google executives met with officials from the Surgeon General's office at least twice around the time of President Biden's misinformation speech. Street Decl., Exh. G. They also met on September 14, 2021, to discuss "a new policy that [Google was] working on as well as [to] provide an update on our overall efforts to combat harmful COVID-19 misinformation on [YouTube]." *Id.* at 33. That "new policy" was the vaccine misinformation policy that Google has used to censor Mr. Kennedy's speech about public health matters, and which it announced on or around September 29, 2021. Street Decl., Exh. J.

Google was inconsistent in applying its vaccine misinformation policy on YouTube during 2021 and 2022, although the threat of censorship (and the related strike that could get offenders suspended or banned from YouTube) caused Mr. Kennedy to often self-censor his comments. RFK Decl., ¶ 6. The censorship project ratcheted up during 2023, though, as Kennedy prepared to challenge Mr. Biden for the Democratic Party's presidential nomination.

Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. Street Decl., ¶ 3. He accepted an invitation to speak about that and other issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March. *Id.* His speech, which was viewed as a political speech and attended by several prominent New Hampshire Democrats, including the chairman of New Hampshire's Democratic Party, lasted nearly two hours. *Id.*, ¶¶ 3-4. It centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, a

danger he has fought for years and which, in recent years, caused him to question the increasing number of vaccines American children are required to take. *Id.*, ¶ 4.

Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. *Id.*, ¶ 5. Google removed it. *Id.* The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." *Id.*, Exh. A.

Mr. Kennedy complained about the action, particularly since his comments about vaccine safety only consumed a portion of the NHIOP speech (in other parts he spoke about his environmentalism and legal work fighting corporate polluters, among other things). *Id.,* ¶ 6. Google refused to change its position. *Id.*, Exh. B. Google has since removed other videos of Kennedy since he announced his candidacy, including interviews he did with Jordan Peterson, Joe Rogan and former NY Post reporter Al Guart. RFK Decl., ¶ 4; Declaration of Amaryllis Kennedy, dated September 22, 2023 ("A. Kennedy Decl."), ¶¶ 4-5, Exh. A. Again, although Google cited its vaccine misinformation policy to justify these decisions, it removed the entire video.

Mr. Kennedy complained to Google about these matters. RFK Decl., ¶ 7; A. Kennedy Decl., ¶ 10.  But unlike Facebook and Twitter, Google continued to use its misinformation policies (primarily the vaccine policy) to remove Kennedy's political speech from YouTube. RFK Decl., ¶ 4. It will continue to do so throughout the 2024 campaign.

Indeed, after this case was filed, Google merged its COVID-19 and vaccine misinformation policies into a single "medical misinformation" policy. Street Decl., ¶¶ 7-9, Exh. D. The new policy is extraordinary. It added a host of topics that are subject to removal from YouTube, including:

•        "Content that recommends the use of specific methods for the treatment of cancer when those have not been approved by local health authorities or the World

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Health Organization as safe or effective ….”

•      “Content that promotes use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19.”

•      “Claims that alternative treatments are safer or more effective than approved treatments for cancer.”

•      “Content that promotes diet and exercise instead of seeking approved treatment for cancer.”

•      “Discouraging people from consulting a medical professional or seeking medical advice if they're sick with COVID-19.”

•      “Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment for COVID-19 such as consulting a doctor or going to the hospital.”

•      “Content that contradicts local health authorities' or the World Health Organization's guidance on the safety of chemical and surgical abortion.”

•      “Promotion of alternative abortion methods in place of chemical or surgical methods deemed safe by health authorities.”

*Id.* These are just a few examples—the new policy spans multiple pages—and Google says it “isn't a complete list.” *Id.*

Like the earlier policies, the new policy looks entirely to government sources to determine what information gets removed from YouTube. It prohibits people from saying anything “that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances.” *Id.* And it gets changed only “in response to changes to guidance from health authorities or WHO.” *Id.*

Google's use of its medical misinformation policy to censor videos of his speech on YouTube is just one of the many obstacles that Mr. Kennedy has had to deal with during the campaign. But it has a huge impact because YouTube has

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

become an important platform for political campaigns, especially when it comes to raw content like candidate interviews and speeches. RFK Decl., ¶¶ 5-7; A. Kennedy Decl., ¶¶ 4-8. YouTube is an especially important platform for Mr. Kennedy, who many mainstream media outlets have simply refused to cover. RFK Decl., ¶ 5; A. Kennedy Decl., ¶ 8.

Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign. RFK Decl., ¶ 7. It refused. Kennedy has also had to self-censor his message, omitting topics that he would otherwise talk about because of the danger that his speech will be removed from YouTube and that he will be blocked from communicating with people there. RFK Decl., ¶¶ 5-7; A. Kennedy Decl., ¶ 6.

That led to the filing of this case. Others like it are being litigated in other courts, most notably in the Fifth Circuit Court of Appeals. *State v. Biden*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam). *Biden* was the first case to order discovery into the public/private campaign to remove alleged "misinformation" from technology platforms like Google/YouTube. It is now pending review in the United States Supreme Court.

### III.   LEGAL STANDARD

Ordinarily, to obtain a preliminary injunction, the moving party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). But in "the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government [or, here, a third party accused of engaging in state action] to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

2011).

There is also a lower standard that the Ninth Circuit has used to grant temporary relief when the moving party raises "serious questions going to the merits" and shows that "the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). Courts in this circuit often use the "serious questions" test instead of the *Winter* test when the case involves First Amendment rights. *See, e.g., Index Newspapers, LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1125 (D. Or. 2020) (applying serious questions test, instead of *Winter*, to grant TRO in First Amendment case brought by media); *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 916 (2020) (applying serious questions test to grant injunction in First Amendment case brought by people using WeChat app).

Given the important interests this motion affects, and the political nature of his speech, Mr. Kennedy urges the Court to apply the "serious questions" test here. Regardless, he satisfies either test.

## IV.  ARGUMENT

The Court should grant the motion because Google violates the First Amendment when it removes video of Mr. Kennedy based on a "misinformation" policy that relies entirely on government sources to decide what speech to censor and because the public and private interests at stake weigh heavily in favor of allowing robust debate on these matters of public concern.

### A. The State Action Doctrine Applies When the Government Tells Google What Information to Censor, Especially Under These Circumstances.

There is no doubt that the medical misinformation policy at issue in this case would violate the First Amendment if the government issued it. After all, it makes distinctions about which speech is allowed on YouTube based on the speech's content. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of*

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, Google's primary argument is that, unlike the government, it can decide which speech to allow, or not allow, on YouTube based on its content. It is wrong.

A "private entity is not ordinarily constrained by the First Amendment …." *Manhattan Cmty. Access Corp. v. Halleck*, -- U.S. --, 139 S. Ct. 1921, 1930 (2019). But it may be sued for violating a person's constitutional rights under certain circumstances. This Court recognizes "at least four different criteria, or tests, used to identify [such] state action: (1) public function; (2) joint action; (3) government compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (cleaned up). But it has also emphasized that "there is no specific formula for defining state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (quotations omitted). Moreover, the tests discussed above are guideposts and "the criteria lack rigid simplicity." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). The goal is to decide whether "seemingly private behavior may be fairly treated as that of the State itself." *Id.* (quotations omitted).

*Brentwood* represented a sea change in the Supreme Court's state action jurisprudence. It stopped the narrowing of the doctrine that had developed since the 1980s and moved the doctrine back to the functional and factual analysis that Justice Brennan had urged in cases like *Blum v. Yaretsky*, 457 U.S. 991, 1013 (1982) (Brennan and Marshall, JJ., dissenting). The Ninth Circuit did the same thing. For example, in *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002), the court reversed a district court's decision that found no state action in a case brought by preachers against a private party (the "OAC") who leased land (the "Commons") from the City of Portland. The OAC had occasionally excluded the preachers from preaching on the land, a plaza near Portland's basketball arena. The City played no role in excluding the preachers from the property: the OAC, a private entity, made that decision for its

own reasons. *Id.* at 552-53. But the court "conclude[d] that, in regulating speech within the Commons, the OAC performs an exclusively and traditionally public function within a public forum." *Id.* at 557. That satisfied the state action doctrine.

Similarly, in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 754 (9th Cir. 2020), the Ninth Circuit reversed a grant of summary judgment for the defendant, a private entity that operated a private hospital, which the plaintiff sued after he was involuntarily committed at the hospital. 975. Other examples abound. Indeed, until recently, the Ninth Circuit's most liberal judges repeatedly called for courts to apply the state action doctrine broadly, emphasizing that the Supreme Court has always taken "a flexible approach" in such cases by, among other things, "applying a variety of tests to the facts of each case." *Villegas v. Gilroy Garlic Festival*, 541 F.3d 950, 960 (9th Cir. 2008) (en banc) (Thomas, Wardlaw, Fisher, Paez and Gould, JJ., dissenting) (cleaned up).

Google's actions in removing Kennedy's speeches and interviews from YouTube satisfy several aspects of the state action tests and show that, at root, it is the government, not Google, that is responsible for removing Kennedy's speech from YouTube. After all, the misinformation policy that Google has used to remove Kennedy's speech from YouTube relies *entirely* on the government to decide what speech is false, misleading, or dangerous. Street Decl., Exhs. C-D. The policy changes only when the government sources change their guidance about certain issues. *Id.* In fact, according to the misinformation policy, if public health authorities said that birds can talk but can't fly, a person would be prohibited from posting a video that says otherwise on YouTube—at least, that is, until the public health authorities decide otherwise.

Moreover, evidence developed in *Biden* shows that Google developed the medical misinformation policy in response to the federal government's demand for it and that Google consulted with government officials, including White House officials,

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1   when writing it. Street Decl., Exhs. F-T. That partnership intensified after the
2   president accused the tech platforms of killing people by not censoring the content the
3   executive branch wanted removed, while simultaneously suggesting that tech
4   companies should lose their section 230 immunity if they did not cooperate. *Id.*

5        This environment was coercive but the fact that Google communicated and
6   cooperated with executive branch officials to develop the vaccine misinformation
7   policy strengthens the state action analysis. Many of the previous social media related
8   state action cases were based on comments made by Democratic Party legislators.
9   Unlike legislators, executive branch officials have direct regulatory authority over
10  companies like Google. That is why the record developed in *Biden* led Judge Doughty
11  to describe the pressure that executive branch officials put on technology companies
12  to censor dissenting viewpoints as "unrelenting pressure" which "had the intended
13  result of suppressing millions of protected free speech postings by American citizens."
14  *Missouri v. Biden*, -- F. Supp. 3d --, 2023 WL 4335270, at *44 (W.D. La. July 4
15  2023).

16       Judge Doughty discussed that record at length. *Id.* at *9-28. He had no problem
17  finding it to constitute state action, and to violate the First Amendment. Indeed, Judge
18  Doughty concluded that federal government officials "aligned themselves with and
19  partnered with" third parties like Google "to avoid Government involvement with free
20  speech" that would clearly violate the First Amendment. *Id.* at *52.

21       The Fifth Circuit largely affirmed Judge Doughty's decision, most notably with
22  respect to officials from the White House and Surgeon General's office. It focused on
23  "coercion and significant encouragement—two distinct means of satisfying the close
24  nexus test." *Biden*, 2023 WL 5821788, at *13. As to the latter, it found "that the clear
25  throughline for encouragement in our caselaw is that there must be some exercise of
26  active (not passive), meaningful (impactful enough to render them responsible)
27  control on the part of the government over the private party's challenged decision." *Id.*

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

28

at *14 (original emphasis). That can be demonstrated either by "entanglement in a party's independent decision-making" or by "direct involvement in carrying out the decision itself …." *Id.*

The court concluded that the executive branch officials' actions satisfied both the coercion and significant encouragement tests. *Id.* at *19-24. As to encouragement, it noted that "the officials entangled themselves in the platforms' decision-making processes, namely their moderation policies." *Id.* at *23. They "had consistent and consequential interaction with the platforms and constantly monitored their moderation activities." *Id.* They did so not informally or indirectly but by "repeatedly communicat[ing] their concerns, thoughts, and desires to the platforms." *Id.* Critically, the court noted that "[t]he platforms responded with cooperation—they invited the officials to meetings, roundups, and policy discussions. And, more importantly, they complied with the officials' requests, including making changes to their policies." *Id.*

These were not isolated actions. The court summarized its analysis as follows:

> Consequently, it is apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions. By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards. Instead, they were encouraged by the officials' imposed standards.

*Id.* at *24 (cleaned up).

The same reasoning applies here. *O'Handley* should not change this analysis, not in light of recent developments. That case arrived at a precarious time. Courts in this district had dismissed several state action cases against technology companies, usually by deeming their allegations of joint action implausible. In each case, the

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Ninth Circuit affirmed the dismissal in a short order. *See Doe v. Google, LLC*, No. 21-16934, 2022 WL 17077497, at *1-3 (9th Cir. Nov. 18, 2022) (affirming dismissal because plaintiffs "failed to show any link between the alleged actions by the Speaker and the House and YouTube's decision to remove [their] channels"); *Rutenberg v. Twitter, Inc.*, No. 21-160743, 2022 WL 1568360, at *1 (9th Cir. May 18, 2022) (noting plaintiff's "acknowledge[ment] that Twitter exercised its own 'discretion and authority' in moderating President Trump's account, and that Twitter acted as President Trump's 'opponent' in doing so); *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *1 (9th Cir. Nov. 22, 2021) (declining to infer that state officials "'dominate[d]' Meta Platforms' decision making"). Unlike the plaintiffs in the previous cases, Mr. O'Handley had evidence that Twitter suspended his account at least once after a California government agency called the Office of Elections Cybersecurity (OEC) notified Twitter of his post. O'Handley alleged that this government notification process constituted state action. 62 F.4th at 1153-55.

The Ninth Circuit struggled with these allegations, issuing a lengthy, published opinion after rejecting the previous cases in short, unsigned dispositions. It dispatched O'Handley's argument by stating that "[t]he OEC offered Twitter no incentive for taking down the post it flagged." *Id.* at 1158. It said the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.* Of course, in saying that, the court improperly drew inferences in Twitter's favor. The panel seemed to recognize that, qualifying its analysis by noting that "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government," but it concluded that "we do not see the high degree of entwinement needed for state action in this case." *Id.* at 1158 n.2 (citing *Rawson*).

That high degree of entwinement exists here. Moreover, *O'Handley* said "[a]

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *Id.* at 1159. That is exactly what Google is doing to public health critics like Kennedy. It is removing speech that public health authorities and the president deem false, misleading, or dangerous, and it seems to be increasing those efforts during the 2024 campaign. That cooperation, combined with the shared goals that Google and the government have, distinguishes this case from *O'Handley*.

This does not mean that Google had to cloak itself in the power of the state, nor that Mr. Kennedy must identify a specific threat made by a government official that got Google to do its bidding, although he has obtained evidence of White House officials directing tech companies to censor him. Street Decl., Exh. P. True, merely accepting public funds and complying with generally applicable laws will not suffice. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020). And laws that simply give legal protection to private actions (like arbitration agreements) do not automatically transform private action into state action. *Roberts v. AT&T Mobility, LLC*, 871 F.3d 833, 844-45 (9th Cir. 2017). For good reason, as the Supreme Court has said it "will not tolerate the imposition of constitutional restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (cleaned up) (quotations omitted).

But if the state action doctrine means anything, it must be applied faithfully when a private party like Google does the government's bidding at the government's behest and to promote the government's preferred message.

That is especially important when the case involves political speech. "In the realm of speech and expression, the First Amendment envisions the citizen shaping the government, not the reverse; it removes 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity.'" *Denver Area Ed. Telecomms. Consortium, Inc.*, 518 U.S. 727, 782-83 (1996) (O'Connor, J., concurring in part and dissenting in part) (quoting *Cohen v. Calif.*, 403 U.S. 15, 24 (1971)).

That principle may explain *Lee v. Katz*, a unique case in which this Court "conclude[d] that, in regulating speech within" a public space, "the OAC [a private entity] performs an exclusively and traditionally public function within a public forum." 276 F.3d at 557. If Google were correct, the plaintiffs should have lost that case. After all, like Google, the OAC was a private entity regulating speech that occurred on private property. *Lee* reflects a fundamental principle: freedom of speech is different than the interests the plaintiffs asserted in other state action cases. It is the foundation of American democracy. And when giant corporations work with the government to silence speech that the government does not want people to hear—in a forum otherwise open to all viewpoints—they assume the role of the censor and violate that right.

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999), did not hold otherwise. There a prospective employee (Sutton) could not get a job from a private hospital because he refused to give the hospital his social security number. He sued, alleging that the hospital's refusal to hire him violated his constitutional and statutory rights. Essentially, Sutton argued that "because the federal government compels every employer to obtain employees' social security numbers, every employer is liable under [federal law] for violating the rights of employees (or applicants) who object on religious grounds to the social-security number requirement." *Id.* at 836. The court rejected that argument, finding that "in a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant. Indeed, without some other nexus between the private entity and the

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

government, we would expect that the private defendant is not responsible for the government's compulsion." *Id.* at 838.

     *Sutton* gave some examples. It noted that, in *Lugar v. Edmondson Oil Company*, 457 U.S. 922 (1982), the Supreme Court "held that the private defendants who had initiated the attachment process could be liable as state actors for 'participating in that deprivation'" because the act of inducing the "state officials to take advantage of state-created attachment procedures' made the private defendants 'willful participant[s] in joint activity with the State or its agents.'" *Id.* at 839 (quoting *Lugar*, 457 U.S. at 941-42). *Sutton* also explained that, in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972), the "private defendant was deemed to be acting in concert with the state when it sought the state's help to enforce the defendant's own racially discriminatory bylaws. Once again, the 'something more' required for a finding of governmental action on the part of a private defendant was satisfied when the plaintiff alleged that the private defendant and the state were jointly pursuing an unconstitutional end." *Sutton*, 192 F.3d at 840; *see also Biden*, 2023 WL 5821788, at *19 (concluding that "relationship between the officials and the platforms went beyond" mere advocacy and constituted "'something more'" needed satisfy state action doctrine).

     As in *Biden*, that "something more" also exists here. Furthermore, *Sutton* distinguished *Mathis v. Pacific Gas & Electric Company*, 891 F.2d 1429 (9th Cir. 1989), a case in which the Ninth Circuit found the plaintiff's state action allegations to be sufficient at the pleading stage because the defendant sued for collaborating with the government there was a public utility. "'It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be state 'acts' than will the acts of an entity lacking these characteristics." *Id.* at 843 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350-51 (1974)). *Sutton* distinguished another coercion/encouragement case,

JW HOWARD/ ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, California 92101

1  *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Company*,

2  827 F.2d 1291 (9th Cir.1987), on the same ground. It also emphasized that, in *Carlin*,

3  "the government directed a specific entity to take a specific (allegedly

4  unconstitutional) action against a specific person." *Sutton*, 192 F.3d at 843.

5  So here. We have already obtained evidence that the White House directed

6  Twitter to censor Mr. Kennedy. Street Decl., Exh. P. Discovery (including the

7  discovery requested below) will likely reveal similar directions from executive branch

8  officials to Google.

9  That evidence is significant. Although Google may not have a legal monopoly

10  on online video sharing, the Fifth Circuit found that it, like Facebook and Twitter, has

11  an "effective monopoly over its particular niche of online discourse." *NetChoice, LLC*

12  *v. Paxton*, 49 F.4th 439, 476 (5th Cir. 2022). Indeed, YouTube's influence is only

13  growing. "As of 2023, the platform boasts 2.68 billion active users, as well as 80

14  million YouTube Premium subscribers. It's also established itself as the second-

15  largest search engine in the world, next to its parent Google." Street Decl., Exh. E-2.

16  According to *Forbes*, more than half of internet users visit YouTube at least once per

17  month. Those "staggering numbers aren't just statistics, either. They highlight the

18  expansive influence and potential of social media platforms." *Id.* And they continue to

19  grow.

20  Historically, this has been the type of situation in which the courts paid closer

21  attention to the inherent nexus between the government and the private entity. Those

22  factors, combined with the self-described public/private partnership and Google's

23  reliance on government policies to censor speech, weigh in favor of finding state

24  action here.

25  **B. Kennedy Has Alleged a Colorable First Amendment Claim.**

26  Mr. Kennedy is also likely to prevail on his claim that the act of removing his

27  speech from YouTube because of its content violates the First Amendment.

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Under the First Amendment, the government "has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quotations omitted). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (quotations omitted). A law is content based if it "draws distinctions based on the message a speaker conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017). Such restrictions are "presumptively invalid" and can be upheld only if they represent "the least restrictive means of furthering a compelling government interest." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006).

Viewpoint discrimination that occurs in the political process is especially noxious. The First Amendment "affords the broadest protection" possible to political speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). "Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Buckley v. Valeo*, 424 U.S. 1, 52-53 (1976) (per curiam).

It does not matter that some people may find the affected speech to be dangerous, misleading, or even false (although the comments that Mr. Kennedy makes that usually get censored are true statements or opinions that the government says are misleading or lack "context"). "The social interest that the First Amendment vindicates is … the interest in the successful operation of the political process, so that

the country may be better able to adopt the course of action that conforms to the wishes of the greatest number, whether or not it is wise or is founded in truth." Alexander M. Bickel, *The Morality of Consent* 62 (2d ed. 1975) (hereafter "Bickel"). Echoing that principle, "the Supreme Court has relied on the strong presumption that First Amendment protections have little to do with the caliber and quality of the speech involved, but … with the broad protection of the speech itself in order to encourage a robust exchange of ideas in political campaigns for elected office." *Butler v. Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1238 (M.D. Ala. 2000).

Thus, in *Butler*, a court invalidated a judicial canon that prohibited candidates from disseminating "true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person." *Id.* at 1233. The court noted the "difficulties [that] arise in ascertaining when the dissemination of 'true information' should be deemed 'deceiving or misleading'" including the fact that "[w]hat is 'deceiving or misleading' to one reasonable person may not necessarily be 'deceiving or misleading' to another reasonable person." *Id.* at 1237. Similarly, in *Beshear v. Butt*, 863 F. Supp. 913, 916-17 (E.D. Ark. 1994), a court found that a judicial canon that prohibited candidates from "announcing views on disputed legal or political issues" was "substantially overbroad and vague" and thus violated the First Amendment. (Cleaned up.)

And, of course, in *New York Times Company v. Sullivan*, 376 U.S. 254, 271 (1964), the Supreme Court held that the First Amendment guarantees the right to lie, saying: "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." That is true especially in the political process and "even though the utterance contains 'half-truths' and 'misinformation.'" *Id.* at 273.

MOTION FOR PI AND MEMO. OF POINTS & AUTHORITIES                    CASE NO. 5:23-cv-03880

The government-guided censorship of Mr. Kennedy on YouTube violates these settled principles. It is content-based discrimination of speech that does not satisfy strict scrutiny. *See Berger v. City of Seattle,* 569 F.3d 1029, 1050-52 (9th Cir. 2009) (explaining why strict scrutiny governs this analysis). The medical misinformation policy is unconstitutionally vague because it does not "give a person of ordinary intelligence a reasonable opportunity to know what is prohibited" and because they encourage "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Indeed, although Google often removes high-profile videos of Mr. Kennedy from YouTube, such as the Rogan and Peterson interviews, it does not remove them all. That arbitrary enforcement undermines the misinformation policy's supposed necessity and creates a chilling effect that the Supreme Court has applied the vagueness doctrine strictly to avoid. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988).

The misinformation policy also violates the overbreadth doctrine, as its "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broderick v. Oklahoma*, 413 U.S. 601, 612 (1972). This interest is particularly acute here as Google does not just use its misinformation policy to remove government dissent from YouTube: it reserves the right to sanction the people who post the speech. Street Decl., Exhs. C, D. Its counsel said during the oral argument below that Google will continue doing that, even if it results in the censorship of Kennedy's political speech—including speech that has nothing to do with public health—and that "if plaintiffs want to or anyone else wants to edit the video to take out the part of the video that's violating its policies, of course they are free to do so." ECF 39 at 46:8-10. That is precisely the type of self-censorship that the First Amendment prohibits. *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020).

Thus, Mr. Kennedy has raised a colorable claim that Google's medical

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

misinformation policy violates the First Amendment via the state action doctrine. At minimum, there are serious questions about the constitutionality of Google's actions in this censorship partnership which, given the political context, justify preliminary injunctive relief.

**C. Even Temporary First Amendment Violations Cause Irreparable Harm.**

Mr. Kennedy will suffer irreparable harm if the Court does not order Google to stop using its misinformation policy to censor Kennedy's speech during his political campaign. Nor could there be. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, this Court has held that irreparable injury is often presumed when the plaintiff alleges a "colorable First Amendment claim …." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).

It makes no difference that Kennedy has other ways of communicating with voters. The Ninth Circuit "has repeatedly found irreparable harm to plaintiffs even where a speech restriction left them free to speak in other ways." *Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1128 (E.D. Cal. 2016) (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009), and *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827-28 (9th Cir.2013)).

The harm that accompanies the denial of First Amendment rights "is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and a delay of even a day or two may be intolerable." *Klein*, 584 F.3d at 1208 (cleaned up); *see also Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (upholding preliminary injunction against political contributions limits for this reason). That may be why the Supreme Court has repeatedly rejected government efforts to control the information voters receive during the political process. *See, e.g., Brown v. Hartlage*, 456 U.S. 45, 61-62 (1982) (finding that application of state statute to invalidate election results based on candidate's

promise to serve at impermissible reduced salary violated First Amendment).

*Brown* is instructive. Like YouTube's government-based misinformation policy, the Kentucky statute involved in that case imposed a penalty on a candidate for distributing alleged misinformation. That did not save it. "Although the state interest in protecting the political process from distortions caused by untrue and inaccurate speech is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount." *Id.* at 61. In fact, a "candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent." *Id.* Thus, in the political process, "[t]he preferred First Amendment remedy of more speech, not enforced silence, [ ] has special force." *Id.* (cleaned up).

This case is no different. The fact that it involves a private party punishing people for disagreeing with the government only makes it more important. The Supreme Court was right: the internet *is* the "modern public square." *Packingham v. North Carolina*, -- U.S. --, 137 S. Ct. 1730, 1737 (2017); *see also Biden v. Knight First Amend. Inst.*, -- U.S. --, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring) (noting that internet platforms like YouTube "hold themselves out as organizations that focus on distributing the speech of the broader public"). It is where political debate occurs, where people get their news, where they decide how to vote. That will only increase in the future. Allowing the companies that control the biggest parts of that square to silence the incumbent government's critics, based solely on the incumbent government's views, would set a dangerous precedent.

**D. The Balance of Harms Strongly Supports Granting the Motion.**

Finally, the balance of equities tips sharply in Mr. Kennedy's favor, as does the public interest. "The Ninth Circuit has consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). Moreover, Kennedy has shown that the censorship of him on

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1   YouTube hurts his political campaign and results in self-censorship. RFK Decl., ¶¶ 5-
2   10; A. Kennedy Decl., ¶¶ 6-9.  By contrast, Google cannot be held liable for content
3   posted on YouTube. 47 U.S.C. § 230(c)(1). Thus, it will not suffer any harm if the
4   Court enjoins it from enforcing the medical misinformation policy against Mr.
5   Kennedy during his political campaign.

6         The only possible harm that Google could cite is the federal government's
7   interest in encouraging Americans to do what it recommends about medical matters
8   but "[t]he Supreme Court has established that the government may not proscribe
9   speech merely because it offends someone or because it contains an unpopular
10  viewpoint." *Flores*, 635 F. Supp. 3d at 1038.

11        **E. The Court Should Grant Limited Discovery Regarding the**
12        **Communications Between Google and Executive Branch Officials.**

13        If the Court has any doubts about the propriety of the requested injunction, it
14  should give Mr. Kennedy the chance to conduct limited discovery regarding the state
15  action issues discussed above. *See Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063,
16  1067 (C.D. Cal. 2009) (explaining when courts find "good cause" to grant discovery
17  in connection with motion for preliminary injunction).

18        Discovery is especially appropriate here because Google has tried to minimize
19  its interactions with executive branch officials. It argues that the evidence the
20  plaintiffs obtained in *Biden* does not show the degree of coercion or encouragement
21  between government officials and Google/YouTube that may have existed between
22  the government and other tech platforms like Facebook and Twitter. In fact, the
23  evidence developed in *Biden* shows the same pattern of behavior. Street Decl., ¶ 32.
24  There may be less evidence of it because the *Biden* plaintiffs focused on Facebook and
25  Twitter and because, to our knowledge, no Google/YouTube executives were deposed
26  or required to produce documents in that case. *Id.* They would be required to
27  participate in discovery in this case, though, and that discovery could provide

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

compelling evidence of public/private coordination that, even under *O'Handley*, violates the First Amendment via the state action doctrine.

Moreover, discovery is needed to test two of Google's central arguments: (1) that it is making an independent decision (and applying independent standards) when it removes videos of Kennedy's speech from YouTube; and (2) that it is only removing speech that is false.

This discovery can be done quickly. It would start with targeted document requests and written interrogatories. Mr. Kennedy is not asking to depose anybody, yet, although the documents might show that to be necessary. Street Decl., ¶ 33. The Court could continue the preliminary injunction hearing to January 16, 2024, the date set for a future motion hearing. *Id.* That would provide the parties with the time needed to do this limited discovery and provide the Court with a thorough record on which to decide these important constitutional issues.

## V.   **CONCLUSION**

For the foregoing reasons, Mr. Kennedy respectfully requests that the Court grant the motion and enjoin Google from using its medical misinformation policy to remove videos of Kennedy's speech from YouTube during the 2024 campaign.

DATED:  September 25, 2023          JW HOWARD/ATTORNEYS, LTD.

By:  */s Scott J. Street*
        John W. Howard
        Scott J. Street
        Andrew G. Nagurney
        Attorneys for Plaintiff
        ROBERT F. KENNEDY, JR.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

MOTION FOR PI AND MEMO. OF POINTS & AUTHORITIES          CASE NO. 5:23-cv-03880

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On September 25, 2023, I caused the **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** to be filed and served via the Court's Electronic Service upon the parties listed on the Court's service list for this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on September 25, 2023 at San Diego, California.

*/s/ Dayna Dang*
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com

MOTION FOR PI AND MEMO. OF POINTS & AUTHORITIES                    CASE NO. 5:23-cv-03880