JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
JULIANA M. YEE (State Bar No. 304564)
Juliana.Yee@mto.com
CARSON SCOTT (State Bar No. 339868)
Carson.Scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

HELEN E. WHITE (*pro hac vice*)
Helen.White@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:    (202) 220-1100
Facsimile:    (202) 220-2300

Attorneys for Defendants
Google LLC and YouTube, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT F. KENNEDY, JR.,<br><br>Plaintiff,<br><br>vs.<br><br>GOOGLE LLC AND YOUTUBE, LLC,<br><br>Defendants. | Case No. 3:23-cv-03880-TLT<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:    Hon. Trina Thompson<br>Date:    November 7, 2023<br>Time:    2:00 pm<br>Crtrm.:    9 |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION.................................................................................................1

II.    FACTUAL BACKGROUND ..............................................................................2

       A.     Google and Its Medical and Vaccine Misinformation Policies...................2

       B.     Google's Ongoing Efforts to Combat COVID-19 Misinformation ...........4

       C.     Google Removes Videos of Kennedy Pursuant to Its Longstanding Policies ...........5

III.   PROCEDURAL HISTORY ................................................................................6

IV.    LEGAL STANDARD ........................................................................................7

V.     ARGUMENT .....................................................................................................8

       A.     Kennedy Cannot Show a Likelihood of Success on the Merits of His First Amendment Claim Because Google Is a Private Company—Not a State Actor .........................................................................................................8

              1.     Kennedy Cannot Satisfy the First Prong of the State Action Test .............11

              2.     Kennedy Cannot Satisfy the Nexus Test.....................................11

              3.     Kennedy Cannot Satisfy the Joint Action Test ...........................15

              4.     Kennedy Fails to Identify Any State Action *with Respect to the Videos at Issue Here* ...............................................................17

              5.     Kennedy's Other Arguments to the Contrary Are Unavailing...................17

                     (a)     No Ninth Circuit Precedent Supports Kennedy's Position .............17

                     (b)     Missouri v. Biden Is Irreconcilable with Binding Precedent and Readily Distinguishable...............................................18

       B.     Kennedy Ignores His State Law Claim, Which Is Similarly Unlikely to Succeed on the Merits ...............................................................20

       C.     Kennedy Fails to Establish Irreparable Harm ........................................20

       D.     The Balance of Equities Favors Google.................................................21

       E.     Kennedy Fails to Address the Public Interest, Let Alone Show It Favors An Injunction ...............................................................23

       F.     This Court Should Deny Kennedy's Renewed Request for Discovery ..................24

VI.    CONCLUSION ................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*All. for the Wild Rockies* v. *Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................................................. 8

*Am. LegalNet, Inc. v. Davis*,
673 F. Supp. 2d 1063 (C.D. Cal. 2009) .............................................................................. 24

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) .............................................................................................. 7

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ............................................................................................ 23

*Blum v. Yaretsky*,
457 U.S. 991 (1982) ........................................................................................................... 17

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
827 F.2d 1291 (9th Cir. 1987) ...................................................................................... 18, 22

*Changizi v. Dep't of Health & Hum. Servs.*,
No. 22-3573, 2023 WL 5965931 (6th Cir. Sept. 14, 2023) ................................................ 20

*Children's Health Def. v. Facebook, Inc.*,
546 F. Supp. 3d 909 (N.D. Cal. 2021) ...................................................................... 11, *passim*

*Clark Cnty. Sch. Dist. v. Breeden*,
532 U.S. 268 (2001) ........................................................................................................... 17

*Consumer Opinion LLC v. Frankfort News Corp.*,
No. 16-cv-05100-BLF, 2016 WL 6393520 (N.D. Cal. Oct. 28, 2016) ............................... 24

*CTIA – The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ....................................................................................... 20, 21

*Daniels v. Alphabet, Inc.*,
No. 20-cv-04687-VKD, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ........................... 1, 10

*Divino Grp. LLC v. Google LLC*,
No. 19-cv-04749-VKD, 2022 WL 4625076 (N.D. Cal. Sept. 30, 2022) ............................. 20

*Doe v. Google LLC*,
No. 20-cv-07502-BLF, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021) ............................... 14

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) .................................................................................. 21

*Doe v. San Diego Unified Sch. Dist.*,
    19 F.4th 1173 (9th Cir. 2021) ................................................................................ 24

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) .................................................... 1, 17, 24

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) ..................................................................................... 23

*Galindo v. BSI Fin. Servs., Inc.*,
    No. 17-CV-0021-LHK, 2017 WL 3007081 (N.D. Cal. July 14, 2017) .................. 20

*Glob. Horizons, Inc. v. U.S. Dep't of Labor*,
    510 F.3d 1054 (9th Cir. 2007) ................................................................................. 8

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) .................................................................................. 12

*Hart v. Facebook, Inc.*,
    No. 22-CV-00737-CRB, 2023 WL 3362592 (N.D. Cal. May 9, 2023) ............... 10, 11, 19, 25

*Hart v. Facebook Inc.*,
    No. 22-CV-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ...................... 1, *passim*

*Informed Consent Action Network v. YouTube LLC*,
    582 F. Supp. 3d 712 (N.D. Cal. 2022)  ....................................................... 1, 10, 14, 17

*Kayvan v. Pompeo*,
    No. 5:19-cv-08071-EJD, 2020 WL 553940 (N.D. Cal. Feb. 4, 2020) .................. 24

*Kennedy v. Warren*,
    66 F.4th 1199 (9th Cir. 2023) .......................................................................... 14, 15

*Lee v. Katz*,
    276 F.3d 550 (9th Cir. 2002) .................................................................................. 18

*Lindberg v. Wells Fargo Bank, N.A.*,
    No. C 14-2544 PJH, 2015 WL 1137634 (N.D. Cal. Mar. 13, 2015) ...................... 2

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ..................................................................................... 8, 18

*Mathis v. Pac. Gas & Electric Co.*,
    891 F.2d 1429 (9th Cir. 1989) ................................................................................ 18

*Miami Herald Publ'g. Co. v. Tornillo*,
    418 U.S. 241 (1974) ............................................................................................... 21

*Missouri v. Biden*,
   No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023), *aff'd in part,*
   *rev'd in part*, No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) ..................... 6, *passim*

*Missouri v. Biden*,
   No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) ..................................................... 19

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022), *cert. granted sub nom. Moody v. NetChoice,*
   *LLC*, No. 22-277 (U.S. Sept. 29, 2023) ....................................................................... 21, 22, 23

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62
   F.4th 1145 (9th Cir. 2023) ............................................................................................... 21, 22

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ............................................................................................ 1, *passim*

*Prager Univ. v. Google LLC*,
   951 F.3d 991 (9th Cir. 2020) .............................................................................................. 8, 9, 18

*Rawson v. Recovery Innovations, Inc.*,
   975 F.3d 742 (9th Cir. 2020) ..................................................................................................... 18

*Semitool, Inc v. Tokyo Electron Am., Inc.*,
   208 F.R.D 273 (N.D. Cal. 2002) ............................................................................................... 24

*Sutton v. Providence St. Joseph Med. Ctr.*,
   192 F.3d 826 (9th Cir. 1999) ..................................................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................................................. 7, 8, 20, 23

**STATE CASES**

*Prager Univ. v. Google LLC*,
   85 Cal. App. 5th 1022 (2022) .................................................................................................... 20

**STATUTES**

47 U.S.C. § 230 ..................................................................................................................... 5, *passim*

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     INTRODUCTION**

3
4
5
6
7
8
9
10
11
12
13

In his latest bid to dictate the content moderation policies of a private entity, Plaintiff Robert F. Kennedy, Jr. seeks the remarkable relief of preliminarily enjoining Google from exercising its discretion to remove videos conveying dangerous COVID-19 and vaccine misinformation from its video-sharing platform, YouTube.  But this Court already has answered the dispositive question: Kennedy is "unlikely to succeed on the merits" because he has offered "no evidence" of state action and has not made "a colorable claim that [his] First Amendment rights have been infringed[] by way of a state actor."  Order on Application for Temporary Restraining Order, Dkt. 32, at 7–8 ("TRO Order").  Because Kennedy relies almost entirely on evidence already before this Court when it denied his TRO application—his handful of new documents do not identify a single new communication between Google and the government—this Court's order denying the TRO forecloses Kennedy's request for preliminary injunctive relief.

14
15
16
17
18
19
20
21
22

Kennedy thus continues to fall well short of establishing that "this is one of the *exceptional cases* in which a private entity will be treated as a state actor for constitutional purposes." *O'Handley v. Weber*, 62 F.4th 1145, 1155–56 (9th Cir. 2023) (emphasis added).  Indeed, the Ninth Circuit in *O'Handley* and an unbroken string of federal decisions from this District have dismissed a half dozen complaints just like Kennedy's for failure to plausibly plead state action.[1]  This case is no different.  What's more—Kennedy *agrees*.  Before the Ninth Circuit, Kennedy acknowledged that bringing this motion for a preliminary injunction would be "futile," given this Court's prior ruling that "*O'Handley* is controlling here and that it precludes relief in a case like this."  Declaration of Jonathan H. Blavin ("Blavin Decl.") Ex. A at 29–30 (Emergency Mot. for Injunct. Pending Appeal).

23

24
25
26
27
28

---

[1] *See O'Handley*, 62 F.4th at 1156 (Twitter is not a state actor); *Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 722 (N.D. Cal. 2022) (Google is not a state actor); *Daniels v. Alphabet, Inc.*, No. 20-cv-04687-VKD, 2021 WL 1222166, at *13 (N.D. Cal. Mar. 31, 2021) (same); *Hart v. Facebook Inc.*, No. 22-CV-00737-CRB, 2022 WL 1427507, at *8 (N.D. Cal. May 5, 2022) ("*Hart I*") (Facebook is not a state actor); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1124–25 (N.D. Cal. 2020) ("*FAN*") (same); *Children's Health Def. v. Facebook, Inc.*, 546 F. Supp. 3d 909, 930 (N.D. Cal. 2021) (same).

1    Kennedy's request for extraordinary relief fares no better on the equitable factors.

2 Kennedy's requested remedy—an order enjoining Google from enforcing its own content

3 moderation policy—would trample on Google's First Amendment rights and erode its users' trust

4 in YouTube by forcing it to carry content that it believes to be harmful.  Kennedy, meanwhile, faces

5 no irreparable harm: he remains free to speak in any forum and on any platform that elects to host

6 his content—and many do (including YouTube as to other videos).  And, as this Court held, an

7 injunction would be contrary to the public interest in promoting public health.  TRO Order at 10.

8    Nor should Kennedy be granted a license to go on a fishing expedition in the form of

9 vague and opened-ended discovery, which this Court already rejected in denying his TRO, on his

10 facially deficient claims.  TRO Order at 11.

11    The Court should deny the motion for a preliminary injunction.[2]

12 **II.    FACTUAL BACKGROUND**

13    **A.    Google and Its Medical and Vaccine Misinformation Policies**

14    Google's subsidiary, YouTube, is a popular video-sharing platform.  *See* Declaration of

15 Scott J. Street, Dkt. 49-1, Ex. E-1 ("Street Decl.").  YouTube has policies that govern how people

16 can use the service, including restrictions on the types of content that they can post.  *See*

17 Declaration of Alexandra Veitch ("Veitch Decl.") ¶¶ 4–5.  These policies are designed and

18 regularly updated to make YouTube a safer place for users and creators.  *Id.* ¶¶ 4–5, 9.

19    Under YouTube's current medical misinformation policy, Google may remove "content

20 [from YouTube] that . . . contradicts local health authorities' (LHAs) or the World Health

21 Organization's (WHO) guidance about specific health conditions and substances."  Street Decl.

22 Ex. D.  This includes content about COVID-19 and about "the safety, efficacy or ingredients of

23

24 _____

[2] In the alternative, this Court should grant Google's pending motion to dismiss Kennedy's First

25 Amended Complaint with prejudice and deny this motion as moot.  If the Court dismisses the
complaint, it need not consider any preliminary injunction motion.  This is because a "preliminary

26 injunction motion can be premised only on claims that are capable of surviving a motion to

27 dismiss."  *Lindberg v. Wells Fargo Bank, N.A.*, No. C 14-2544 PJH, 2015 WL 1137634, at *3, 6
(N.D. Cal. Mar. 13, 2015) (denying as moot pending motion for preliminary injunction where

28 motion to dismiss granted).

currently approved and administered vaccines," including the COVID-19 vaccine.  *Id.*  Google

retains discretion and ultimate decision-making authority over when to remove material.  *Id.*  The

misinformation policies in place at the time Kennedy filed this action were materially similar,

although they were split into a COVID-19 medical misinformation policy, *id.* Ex. C-2, and a more

general vaccine misinformation policy, *id.* Ex. C-1.

Google's efforts to limit the spread of medical misinformation on YouTube pre-date the

Biden Administration and even the COVID-19 pandemic.  Google's Community Guidelines have

prohibited the spread of medical misinformation since July 2019.  Veitch Decl. ¶ 7; *id.* Exs. B, C.

And Google first developed a COVID-19 medical misinformation policy in May 2020, long

before any of the alleged interactions between Google and Biden Administration officials—

indeed, before President Biden was elected.  *See id.* ¶ 8.  That policy—like the medical

misinformation policy in force today—prohibited content that "contradicts WHO or local health

authorities' guidance" on COVID-19.  *Id.* Ex. D (May 2020 policy).  Google updated its guidance

concerning COVID-19 medical misinformation frequently, including at least six times in 2020.

*Id.* ¶ 9.  In October 2020, for instance, Google updated its guidance to expressly prohibit "[c]laims

about COVID-19 vaccinations that contradict expert consensus from local health authorities or

WHO."  *Id.* ¶ 10; *id.* Ex. E (October 2020 policy).  In December 2020, Google added a number of

examples of vaccine misinformation claims that could be removed pursuant to the policy.  *See id.*

¶ 11; *id.* Ex. F (December 2020 policy) (prohibiting, for example, "[c]laims that an approved

COVID-19 vaccine will cause death").

Google actively enforced these policies.  By October 2020, years before the alleged

communications between the Biden Administration and Google (indeed, before President Biden had

even been elected), Google had already removed more than 200,000 videos from YouTube "related

to dangerous or misleading Covid-19 information."  Blavin Decl. Ex. B (quoting YouTube

spokesperson); *see id.* Ex. C (August 2021 YouTube blog post) ("[S]ince February of 2020 [Google

has] removed over 1M videos related to dangerous coronavirus information [from YouTube].").

In September 2021, Google announced that it had again updated its guidance concerning

medical misinformation on YouTube, this time by introducing separate guidance to cover

-3-

misinformation on "currently administered vaccines that are approved and confirmed to be safe and effective."  Street Decl. Ex. J.  Google noted that this update built on its existing policies, which had, since October 2020, prohibited misinformation about the COVID-19 vaccine.  *Id.*; *see* Veitch Decl. Ex. E (October 2020 policy).  Like its predecessor policies, this "vaccine misinformation policy" permitted Google to remove content that "contradicts local health authorities' or the WHO's guidance."  Veitch Decl. Ex. G (September 2021 Policy).

### B.   Google's Ongoing Efforts to Combat COVID-19 Misinformation

Kennedy attaches to the preliminary injunction motion several documents showing that, in 2021—many months *after* Google began actively enforcing its COVID-19 misinformation policies, and years *before* Kennedy's content was removed from YouTube—employees of Google met with representatives of the Executive Office of the President, the Centers for Disease Control and Prevention ("CDC"), and the Office of the Surgeon General ("OSG") to discuss the proliferation of misinformation concerning COVID-19.  Street Decl. Exs. F–M.  As Kennedy's exhibits reveal, these meetings primarily involved the exchange of information regarding Google's ongoing efforts to combat medical misinformation on YouTube.

For example, in April 2021, White House official Rob Flaherty emailed Google to request that it share information regarding its ongoing efforts to combat misinformation.  Street Decl. Ex. F.  He asked about the "top trends that [Google was] seeing in terms of misinformation" and the effectiveness of various "interventions" Google already had implemented.  *Id.*  Flaherty made clear that the government was not recommending—let alone requesting or requiring—that Google remove any content: "We certainly recognize that removing content that is unfavorable to the cause of increasing vaccine adoption is not a realistic—or even good—solution."  *Id.*  Other meetings similarly involved the exchange of information regarding COVID-19 misinformation.  *Id.* Ex. G.

Google, along with other online platforms, also met with the CDC around this time to discuss misinformation.  CDC official Carol Crawford testified that there were only two such meetings, each of which lasted about twenty minutes.  Blavin Decl. Ex. D (Crawford Dep. at 198:21-24, 266:11-12).  She further testified that no one at CDC "craft[ed] the content policy" of "any . . . social media company" or even "g[ave] input on what such a policy should look like," *id.*

-4-

1   (Crawford Dep. at 103:20-104:10), let alone "help[ed] any . . . social media company on how they

2   should apply their policies . . . toward a particular post," *id.* (Crawford Dep. at 105:1-6).

3       Kennedy also points to an equally benign series of events that took place in July 2021.  That

4   month, the United States Surgeon General issued an "Advisory" on COVID-19 misinformation,

5   which called on "all Americans" to "help slow the spread of health misinformation."  Street Decl.

6   Ex. R.  At the same time, Google and government officials continued their exchange of information

7   about Google's pre-existing efforts to combat misinformation on YouTube.  *See id.* Ex. G (meeting

8   with Google and OSG for "YouTube/Google . . . to share more of the work it *was doing* around

9   health mis- and disinformation." (emphasis added)); *id.* Ex. I (OSG representative acknowledging

10  that Google had been "working hard and thinking deeply about [the COVID-19 misinformation]

11  issue").  Indeed, OSG Official Eric Waldo, who attended those meetings, testified that Google had

12  not undertaken any "new things" in response to the Surgeon General's Advisory, but had instead

13  simply continued on with "work that they were *already doing*" on misinformation.  *Id.* Ex. H

14  (Waldo Depo. at 120:13-15 (emphasis added)).

15      Kennedy also points to a White House spokesperson stating that the Administration was

16  "reviewing" potential changes to the immunity conferred on platforms by Section 230 of the

17  Communications Decency Act, *id.* Ex. T, and to President Biden's comments indicating that

18  misinformation on Facebook was "killing people," *id.* Ex. S.  In conjunction with these comments,

19  President Biden clarified that he was not "trying to hold [platforms] accountable," with his press

20  secretary adding that it was "up to Congress to determine how . . . to proceed."  *Id.*  Kennedy

21  points to no evidence linking any of these statements to the Administration's communications with

22  Google regarding efforts to combat misinformation.

23      **C.    Google Removes Videos of Kennedy Pursuant to Its Longstanding Policies**

24      Nearly two years later, Google removed a number of videos of Kennedy from YouTube,

25  including a video of Kennedy speaking at Saint Anselm College's New Hampshire Institute of

26  Politics ("NHIOP"), posted by Manchester Public Television in March 2023, Street Decl. ¶ 5; and

27  videos of his interviews with Jordan Peterson, Joe Rogan, and a former New York Post reporter,

28  posted by unidentified users, in June 2023, Declaration of Amaryllis Kennedy, Dkt. 49-3, ¶ 4 ("A.

Kennedy Decl.").  The NHIOP video was removed for violating YouTube's policies on "Covid-19 vaccine misinformation."  Street Decl. Ex. B (Patch article quoting YouTube spokesperson).  The Rogan video was removed pursuant to Google's "medical misinformation policy," because it included "claims about COVID-19 vaccinations that contradict expert consensus."  A. Kennedy Decl. Ex. A.  In the interview with Joe Rogan, Kennedy repeated claims that "if you take the [COVID-19] vaccine, you're 21% more likely to die [over the next six months]" and that a vaccine "caused the autism epidemic."  Blavin Decl. ¶ 14.  Kennedy does not identify reasons the other videos were removed.

### III.    PROCEDURAL HISTORY

Five months after his NHIOP speech was removed from YouTube, and three-and-a-half months after declaring his candidacy for President, Kennedy filed an initial complaint alleging that Google had violated his First Amendment rights and seeking an injunction to "restore any videos of Mr. Kennedy's political speech that it has removed during the 2024 presidential campaign," as well as a declaration that Google's medical misinformation policies are unconstitutional.  Dkt. 1 at 13.  One week after that, Kennedy filed an application for a temporary restraining order seeking to bar Google from using its medical misinformation policies "to remove videos of Mr. Kennedy's speech from YouTube . . . pending a trial on the merits."  Dkt. 7-4 at 2.

Following briefing and a hearing, this Court issued a thorough order denying the TRO application and Kennedy's request for expedited discovery.  TRO Order at 11.  The Court, applying the Ninth Circuit's "controlling authority" in *O'Handley*, held that Kennedy failed to "mak[e] a colorable claim that [his] First Amendment rights have been infringed[] by way of a state actor."  *Id.* at 8.  In so holding, the Court acknowledged the evidence before it (and attached to Kennedy's preliminary injunction motion), including emails between government officials and Google personnel, from the *Missouri v. Biden* case, No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023), *aff'd in part, rev'd in part*, No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023).  *Id.* at 7.  The Court agreed that these communications "concern requests for information to YouTube about trends related to vaccine misinformation and YouTube seeking information . . . ."  *Id.*  Noting that Kennedy had conceded the evidence provided in support of his

application "does not show that the government coerced Google," this Court concluded that "[t]here is no evidence . . . that any of the identified government officials . . . demanded that Google adopt a COVID-19 medical misinformation or vaccine misinformation policy" and that "there is no evidence . . . that government officials communicated with Google regarding Kennedy at all." *Id.* at 6–7; *see also* Blavin Decl. Ex. E (TRO Hr'g Tr. 50:18-51:2). This Court also denied Kennedy's request for expedited discovery. TRO Order at 11.

Following this Court's TRO Order, Google filed a motion to dismiss the initial complaint. Dkt. 37. Rather than oppose the motion, Kennedy filed an amended complaint. *See* First Amended Complaint, Dkt. 42 ("FAC"). The First Amended Complaint asserts (1) a claim for "Declaratory/Injunctive Relief under First Amendment/State Action Doctrine"; and (2) a claim for "Declaratory Relief under Article I, sec. 2 of the Cal. Constitution/*Pruneyard*." *Id.*

In the meantime, Kennedy sought review of the TRO denial in the Ninth Circuit. *See* Notice of Appeal, Dkt. 33. He then filed an "emergency" motion for temporary injunctive relief pending appeal in that court. *See* Blavin Decl. Ex. A. After briefing, the Ninth Circuit dismissed Kennedy's appeal, mooting his "emergency" motion. *See* Order as to Notice of Appeal, Dkt. 47.

Kennedy now seeks temporary injunctive relief for a third time. He also renews his request for expedited discovery, seeking, by mid-December, "document requests and written interrogatories" from three multi-month periods without specifying the specific topics of these discovery requests. Street Decl. ¶ 33.

## IV.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain this relief, a plaintiff must establish: (1) the plaintiff "is likely to succeed on the merits"; (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). Where a "party has not shown any chance of success on the merits, no further determination of irreparable harm or balancing of hardships is necessary." *Glob.*

1  *Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007).[3]

2  **V.      ARGUMENT**

3        **A.      Kennedy Cannot Show a Likelihood of Success on the Merits of His First
                   Amendment Claim Because Google Is a Private Company—Not a State Actor**

4        This Court's order denying Kennedy's application for a TRO because he is "unlikely to

5  succeed on the merits"—on a virtually identical record—is dispositive of this motion.  TRO Order

6  at 7.  In denying the TRO application, this Court correctly held that Kennedy had not made a

7  "colorable claim that [his] First Amendment rights have been infringed, *by way of a state*

8  *actor.*"  *Id.* at 8 (emphasis added).  None of the handful of new documents Kennedy offers in

9  support of this motion supplies any evidence of further communications between Google and the

10  Biden Administration about misinformation, let alone evidence of communications about

11  Kenney's content at issue here.  Accordingly, Kennedy's motion once again fails at the first

12  hurdle—he cannot establish that he is likely to succeed on the merits.

13         Kennedy agrees, as he must, that Google is a private entity not "ordinarily constrained by

14  the First Amendment."  Plaintiff's Motion for Preliminary Injunction ("Mot.") at 18 (quoting

15  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019)).  Because "the First

16  Amendment prohibits the government—not a private party—from abridging speech," *Prager*

17  *Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020), Kennedy's claims survive only if they

18  fall within any of the "exceptional cases" in which a private party may be deemed a "state actor"

19  bound by the Constitution, *O'Handley*, 62 F.4th at 1155–56.  Under *O'Handley*, the court first

20  asks whether the alleged constitutional violation was caused by the "exercise of some right or

21  privilege created by the State or by a rule of conduct imposed by the State or by a person for

22  whom the state is responsible."  *Id.* at 1156.  Even if the first prong is satisfied, a private party

23

24  _____

25  [3] Kennedy asks that this Court apply the alternative standard from *Alliance for the Wild Rockies* v.
   *Cottrell*, which requires him to show "'serious questions going to the merits' and a hardship
26  balance that tips sharply" in his favor.  632 F.3d 1127, 1132 (9th Cir. 2011).  Kennedy cannot
   satisfy the *Cottrell* standard either.  This Court, in holding that Kennedy supplied "no evidence"
27  bearing on state action and was therefore "*unlikely* to succeed on the merits," left little doubt that
   there were no serious questions going to the merits.  TRO Order at 7 (emphasis added).  Without
28  any new evidence of consequence, that remains equally true at the preliminary injunction stage.

may be deemed a state actor only if one of four "demanding" tests is satisfied:  "(1) the public

function test, (2) the state compulsion test, (3) the nexus test, [or] (4) the joint action test."  *Id.* at

1157.  Kennedy seeks only to hold Google liable under the nexus or joint action tests.[4]  Blavin

Decl. Ex. E (TRO Hr'g Tr. 12:12).  Under the nexus test, courts may treat a private party as a state

actor only when "government officials threaten adverse action to coerce a private party into

performing a particular act" or offer such "significant encouragement" that "the State's use of

positive incentives . . . overwhelm[s] the private party and essentially compel[s] the party to act in

a certain way."  *O'Handley*, 62 F.4th at 1157–58.  Under the joint action test, courts find joint

action only "when the state has so far insinuated itself into a position of interdependence with [the

private party] that it must be recognized as a joint participant in the challenged activity" or when

the state "significantly involves itself in the private parties' actions and decisionmaking in a

complex and deeply intertwined process."  *Id.* at 1159 (internal quotations and citations omitted).

In *O'Handley*, the Ninth Circuit held that a partnership between Twitter and the California

Secretary of State's office did not transform Twitter's content moderation decisions into state

action.  The plaintiff there alleged that Twitter created a special platform that allowed a special

division within the Secretary of State's office, which "worked in partnership with social media

platforms to develop more efficient reporting procedures for potential misinformation," to flag

posts for "expedited review" for content moderation.  *Id.* at 1154.  The division flagged over 300

"erroneous or misleading social media posts," "98 percent" of which "were promptly removed for

violating the respective social media companies community standards"—including the

plaintiff's.  *Id.*  Despite this extensive government involvement, the Ninth Circuit held that these

allegations satisfied neither the nexus test nor the joint action test.

Applying the nexus test, *O'Handley* held that a government request to remove a post was

neither coercive nor "significantly encouraging" because there was no evidence "that Twitter

would suffer adverse consequences if it refused the request (or receive benefits if it

---

[4] To the extent Kennedy also gestures at the public function test in his motion, *see* Mot. at 24,
application of that test to YouTube is expressly foreclosed by *Prager*.  *See* 951 F.3d at 997
("YouTube does not perform a public function."); *infra* Part V.A.5.*(a)*.

1   complied).” *Id.* at 1158–59.  Thus, Twitter's removal decisions were merely “the result of

2   [Twitter's] own independent judgment in enforcing its . . . Policy.” *Id.*  The Ninth Circuit further

3   held that the allegations amounted merely to “consultation and information sharing,” which did

4   not “rise to the level of joint action.” *Id.* at 1160 (quoting *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d

5   498, 504 (9th Cir. 1996)).  Although the government officials provided information about

6   potentially impermissible posts, at the end of the day, “the company's employees decided how to

7   utilize this information based on their own reading of the flagged posts and their own

8   understanding of the Twitter Rules.” *Id.*  As the government neither “interjected itself into the

9   company's internal decisions” nor “played any role in drafting Twitter's” policy, *id.*, Twitter

10  retained control over its content moderation decisions and was not a state actor.

11      Both before and after *O'Handley*, judges in this District have faced—and uniformly

12  rejected—cases on all fours with this one: state action claims against Google and YouTube based

13  on the removal of content under their medical and vaccine misinformation policies.  In *Informed*

14  *Consent Action Network v. YouTube LLC*, Judge Tigar dismissed allegations that YouTube

15  behaved as a state actor when it removed plaintiff's videos containing COVID- and vaccine-

16  related misinformation and ultimately terminated its account.  582 F. Supp. 3d 712, 720 (N.D. Cal.

17  2022) (“*ICAN*”).  Judge Demarchi rejected similar allegations in *Daniels v. Alphabet Inc.*,

18  concluding that “Mr. Daniels does not plead any facts that support his argument that the federal

19  government ‘coerced’ or ‘significantly encouraged’ defendants to remove his . . . videos from

20  YouTube's platform.”  2021 WL 1222166, at *6.

21      Courts in this District have reached the same conclusion with respect to other platforms'

22  applications of their COVID-19 and vaccine misinformation policies.  In *Hart v. Facebook*, Judge

23  Breyer dismissed similar First Amendment claims against Facebook and Twitter, holding that

24  Biden Administration officials' suggestions regarding those companies' misinformation policies

25  were insufficient to transform them into state actors when they suspended the plaintiff's accounts.

26  *Hart I*, 2022 WL 1427507, at *7; *Hart v. Facebook, Inc.*, No. 22-CV-00737-CRB, 2023 WL

27  3362592, at *3 (N.D. Cal. May 9, 2023) (“*Hart II*”).  Judge Breyer considered—and rejected—

28  much of the same evidence, including from *Missouri v. Biden*, that Kennedy offers here.  *Hart I*,

2022 WL 1427507, at *2–3, *7; *Hart II*, 2023 WL 3362592, at *2; *see also Children's Health Def.*, 546 F. Supp. 3d at 930 (similar).

### 1.    Kennedy Cannot Satisfy the First Prong of the State Action Test

Kennedy cannot satisfy the first prong of the state action inquiry, as this Court previously held.  TRO Order at 4 n.1.  Google did not exercise a "state-created right" when it removed posts of Kennedy; the FAC itself alleges that YouTube's medical misinformation policies were developed by Google.  FAC ¶¶ 20, 42; *see O'Handley*, 62 F.4th at 1156.  Nor did Google enforce a state-imposed rule.  As Kennedy's declarant acknowledges, Google acted under the terms of its own rules in removing Kennedy's content for "violating our policies on COVID-19 vaccine misinformation . . . ."  Street Decl. ¶ 6; *see O'Handley*, 62 F.3d at 1156–57.  Because Kennedy's motion fails to claim otherwise, he forfeits any argument on this first prong.

### 2.    Kennedy Cannot Satisfy the Nexus Test

As this Court held at the TRO stage, Kennedy offers even less evidence of state action than in *O'Handley*, leaving him unlikely to prevail on the merits under the nexus test.  TRO Order at 5–8.  In support of his motion, Kennedy leans heavily on the following communications between federal government officials and Google—all of which were before this Court at the TRO stage:[5] (1) a series of meetings in the summer and fall of 2021 between the Surgeon General's office and Google, Street Decl. Ex. G (OSG Discovery Responses) (disclosing meetings); *id.* Ex. H (Waldo Dep. at 117–21) (describing meetings); *id.* Ex. R (Surgeon General's Advisory); (2) an April 22, 2021, email from White House official Rob Flaherty to Google employees summarizing a meeting the day prior and asking Google for additional information about the spread of vaccine misinformation on YouTube and its policies to combat it, *id.* Ex. F (Flaherty Email); and (3) communications related to two short meetings between the CDC and online platforms in 2021 at which vaccine misinformation was discussed, *id.* Exs. L, M.  Kennedy, however, has already *conceded* that this evidence is insufficient to establish coercion, and the Court accepted that

---

[5] The Surgeon General's Advisory, Street Decl. Ex. R, itself is newly a part of the record, but it is discussed at length in the deposition transcript of Eric Waldo, pertinent excerpts of which were already before this Court at the TRO stage.  *See id.* Ex. H (Waldo Dep. at 118:5-122:16).

1  position, in part, for purposes of its TRO ruling.  TRO Order at 6.  Kennedy should not be

2  permitted to take an inconsistent position on this motion.  *See Hamilton v. State Farm Fire & Cas.*

3  *Co.*, 270 F.3d 778, 782–83 (9th Cir. 2001) (judicial estoppel applies to "cases where the court

4  relied on, or 'accepted,' the party's previous inconsistent position").  Even if the Court considers

5  the coercion component of the test, Kennedy cannot meet it.

6        As an initial matter, Kennedy's purported evidence of coercion or significant

7  encouragement by the Biden Administration cannot overcome the basic fact that Google was

8  removing COVID-19 misinformation long before President Biden had even been elected.  Even

9  before the pandemic, Google's Community Guidelines prohibited medical misinformation.  Veitch

10  Decl. ¶ 7.  Google first adopted a policy specifically aimed at COVID-19 misinformation on

11  YouTube in May 2020, *id.* ¶ 8, and updated its guidance to expressly prohibit misinformation

12  about the COVID-19 vaccine in October 2020, *id.* ¶ 10.  Google actively enforced these policies.

13  Indeed, by October 2020, it had already removed more than 200,000 videos from YouTube

14  "related to dangerous or misleading Covid-19 information."  Blavin Decl. Ex. B.  Google's pre-

15  existing prohibition on COVID misinformation makes clear that no government coercion or

16  encouragement was necessary for Google to remove such content.

17        Furthermore, a close review of the record confirms this Court's prior determination that

18  there is nothing to set this case apart from the litany of similar cases dismissed before it.  *First*,

19  Flaherty's April 2021 meeting with, and email to, Google do not demonstrate the requisite

20  coercion or substantial encouragement to satisfy the nexus test.  Street Decl. Ex. F.  To be sure,

21  Flaherty makes clear that the White House is "concerned" about COVID misinformation.  *Id.*  But

22  the email itself merely asks questions about Google's approach to the problem and for information

23  about trends on YouTube.  *Id.*  Far from directing or pressuring Google to take particular action,

24  Flaherty acknowledges that "removing content that is unfavorable to the cause of increasing

25  vaccine adoption is not a realistic—or even good—solution."  *Id.  Second*, Kennedy's documents

26  concerning the Surgeon General's Office's July 2021 communications with Google confirm that

27  Google was *independently* seeking to limit COVID-related misinformation on its platform without

28  any prompting by the government.  *Id.* Ex. H (Waldo Dep. at 119–21).  During these meetings—

-12-

1  some of which Google initiated—Google shared with the government what work it was "*already*

2  *doing*" rather than any "new things" that it was doing in response to the Surgeon General's

3  Advisory.  *Id.* (Waldo Dep. at 120:13-15 (emphasis added)).  *Third*, the documents regarding the

4  CDC's communications with Google *undercut* any notion of a nexus.  CDC official Carol

5  Crawford testified that no one at CDC "craft[ed] the content policy" of "any . . . social media

6  company" or even "g[ave] input on what such a policy should look like," Blavin Decl. Ex. D

7  (Crawford Dep. at 103:20-104:10), let alone "help[ed] any . . . company on how they should apply

8  their policies . . . toward a particular post," *id.* (Crawford Dep. at 105:1-6).

9         As the Court correctly found, this "evidence reflects that the nature of the communications

10  between [government] officials . . . and Google is one of 'consultation and information

11  sharing.'"  TRO Order at 7.  Under *O'Handley*, such information sharing in service of

12  independently-adopted, shared missions does not convert Google into a state actor.  62 F.4th at 1160.

13         Despite this Court's clear ruling that Kennedy's evidence at the TRO stage was insufficient,

14  Kennedy has returned to this Court virtually empty handed—the only new documents of any

15  relevance are three news articles that relay public statements made by the President and White

16  House officials in July 2021.  *See* Street Decl. Exs. Q, S, T.  Kennedy describes them as revealing

17  "a plan to punish tech companies like Google if they did not go along with the Biden

18  Administration's censorship goals," including by threatening to revoke immunity under Section

19  230.  Mot. at 12.

20         This is a gross mischaracterization of the content and import of these articles.  Kennedy

21  points to President Biden's remarks about misinformation "killing people," but those were

22  squarely directed at *Facebook*.  *See* Street Decl. Ex. S.  None of the articles mentions Google or

23  YouTube.  Further, the comments reflected in these articles do not articulate any sort of "plan" to

24  "punish" platforms.  While Kennedy points to a comment from a White House spokesperson that

25  the Administration was "reviewing" Section 230 immunity, *id.* Ex. T, President Biden specifically

26  noted he was "*not* trying to hold [platforms] accountable," *id.* Ex. S (emphasis added), with his

27  press secretary adding that it was "up to Congress to determine how . . . to proceed," *id.*

28         And at any rate, judges in this District have rejected nearly identical factual assertions as

insufficient to support a state action claim.  In *Hart*, the plaintiff pointed to the exact series of remarks that Kennedy relies on here, alleging that President Biden had "threatened social media companies who do not comply with his directives by publicly shaming and humiliating them, stating 'They're killing people,'" which "in light of 'public battles over the future of Section 230' . . . amount[ed] to a 'threat.'"  *Hart I*, 2022 WL 1427507, at *8.  Judge Breyer rejected these "conclusory allegations," holding that they do not "come remotely close to coercion," as "[a] President's one-time statement about an industry does not convert into state action all later decisions by actors in that industry that are vaguely in line with the President's preferences."  *Id.*  Similarly, in *ICAN*, the plaintiff alleged YouTube implemented misinformation policies in response to government threats, including statements by then-presidential candidate Biden and various members of Congress that they would eliminate Section 230 immunity or increase regulation if companies did not intensify their efforts to combat misinformation.  582 F. Supp. 3d at 716–17.  Judge Tigar rejected these allegations as a "post hoc fallacy" that failed to establish a causal relationship between any government coercion and Defendants' conduct.  *Id.* at 723-24.  Other courts have reached the same conclusion.  *See, e.g.*, *Doe v. Google LLC*, No. 20-cv-07502-BLF, 2021 WL 4864418, at *3 (N.D. Cal. Oct. 19, 2021) (holding the "threats of penalties Plaintiffs point to," including "the repeal of CDA Section 230 protections," "are insufficient to convert private conduct into state action").

In addition, *Kennedy* specifically has seen his own similar attempts to cast legitimate government communication as "coercion" rejected by the courts.  In *Children's Health Defense*, Judge Illston dismissed claims of coercion brought by a Kennedy-led organization, holding that statements by members of Congress about "the possibility of legislation to remove Section 230 immunity are too general to support a claim of governmental coercion."  546 F. Supp. 3d at 944; *see id.* at 916 ("Robert F. Kennedy, Jr. founded and leads CHD.").  And in *Kennedy v. Warren*, the Ninth Circuit affirmed the denial of Kennedy's request for a preliminary injunction to require that Senator Warren retract a letter she sent to Amazon requesting that it "'perform an immediate review of [its] algorithms and . . . provide both a public report on the extent to which [they] are directing consumers to . . . COVID-19 misinformation and a plan to modify these algorithms so

1   that they no longer do so.'"  66 F.4th 1199, 1205 (9th Cir. 2023).  The court held that the letter

2   "falls safely on the persuasion side" of the "constitutional line" separating lawful persuasion from

3   unlawful coercion, emphasizing that it contained no threat of adverse consequences.  *Id.* at 1204,

4   1211–12.  So too here.

5              **3.     Kennedy Cannot Satisfy the Joint Action Test**

6              This Court similarly has rejected Kennedy's efforts to convert Google into a state actor

7   under the joint action test.  *See* TRO Order at 8.  The Court reached that conclusion based on its

8   finding that Kennedy had put forward even "less evidence of entwinement" than "in

9   *O'Handley*."  *Id.*  The state had neither "insinuated itself into a position of interdependence with

10  [Google]" nor so "significantly involve[d] itself in [Google's] actions and decisionmaking in a

11  complex and deeply intertwined process" such that Google should be deemed a state actor.  TRO

12  Order at 8 (rejecting joint action argument under *O'Handley*).

13             Kennedy's claim that Google's April 2021 communication with White House official Rob

14  Flaherty somehow kicked off a public-private partnership that culminated in the development of

15  Google's vaccine misinformation guidelines in September 2021, Mot. at 11, falls apart upon a

16  cursory glance at the chronology of relevant events.  YouTube's pre-April 2021 medical

17  misinformation policy framework already prohibited content contradicting expert guidance on the

18  *COVID-19* vaccine; the September 2021 guidelines merely expanded the policy to a broader set of

19  vaccines.  *See* Veitch Decl. ¶¶  12–13; *id.* Exs. G–H.  And by Kennedy's own telling, the Biden

20  Administration's alleged pressure was focused on misinformation about the COVID-19 vaccine—

21  which was addressed by YouTube's 2020 guidelines—rather than misinformation about any

22  vaccines covered by its expanded 2021 guidelines.[6]  *See, e.g.*, Mot. at 11, 12.  By April 2021,

23

24  [6]  COVID-19 vaccine misinformation was also the primary reason cited for his videos' removal.
    *See* Street Decl. Ex. B ("[Google] removed the [NHIOP video] for violating our policies on
25  COVID-19 vaccine misinformation"); A. Kennedy Decl. Ex. A (Rogan video removed because
    "YouTube doesn't allow claims about COVID-19 vaccinations that contradict expert consensus").
26  Indeed, Kennedy's statement in the Joe Rogan interview that "if you take the [COVID-19]
    vaccine, you're 21% more likely to die of all causes [over the next six months]," Blavin Decl. ¶
27  14, would appear to directly violate Google's December 2020 policy, which prohibited "[c]laims
    that an approved COVID-19 vaccine will cause death."  Veitch Decl. ¶ 11.
28

1  when the government pressure allegedly began, Google had *already* been actively enforcing a

2  policy that prohibited sharing COVID-19 medical misinformation on YouTube *for nearly a year*,

3  and that policy had specifically named misinformation surrounding the COVID-19 *vaccines* for

4  more than five months.  *See* Veitch Decl. ¶¶ 8–10.  Flaherty and the rest of the Biden

5  Administration were not yet in office when Google began removing content about COVID-19

6  vaccines that contradicted expert consensus.  As in *Hart*, Kennedy cannot explain how Google

7  "took joint action with governmental actors from the future."  *Hart I*, 2022 WL 1427507, at *6.

8      But the Court need not rely on the timeline alone; the evidence confirms that Google

9  independently developed and applied its misinformation policies.  Testimony from the very

10  government actors alleged to have been a part of this supposed "public/private campaign," Mot. at

11  16, underscores that Google developed its own policies.  *See* Street Decl. Ex. H (Waldo Dep. at

12  119–21) (Google was independently taking steps to combat misinformation); Blavin Decl. Ex. D

13  (Crawford Dep. at 103:20-104:10) (CDC did not "craft[] the content policy" of platforms).  And

14  the record confirms that Google applied its own policy when it removed Kennedy's posts.  A.

15  Kennedy Decl. Ex. A (Takedown notice citing "medical misinformation policy").

16      Kennedy's further argument that the joint action test is met here because "the

17  misinformation policy that Google has used to remove Kennedy's speech from YouTube relies

18  *entirely* on the government to decide what speech is false, misleading, or dangerous,"  Mot. at 19,

19  is wrong on the facts and on the law.  As an initial matter, Google's decision to refer to health

20  guidelines developed by experts does not deprive Google of the ultimate control over the content

21  on its site or transform its content moderation policy into an enforcement arm of those

22  authorities.  *O'Handley*, 62 F.4th at 1160.  Google may always unilaterally change its policies and,

23  even under the applicable policies, must make independent judgments about whether the content

24  "contradicts" those guidelines or "poses a serious risk of egregious harm."  Street Decl. Ex. C-1

25  (Vaccine Misinformation Policy).  If anything, "[b]y adopting a public health framework to guide

26  decisions about content moderation, Defendants by definition maintained 'independent

27  professional judgment' to make decisions about the content on their platforms."  *ICAN*, 582 F.

28  Supp. 3d at 721–22.  Moreover, Google's policies reference only the WHO by name and therefore

-16-

do not rely "entirely" on the federal government.  Indeed, a platform's "decision to look to the WHO further suggests that the federal government has not created a 'rule of decision.'"  *Id.* at 721 n.4; *accord Children's Health Def.*, 546 F. Supp. 3d at 927–28.  After all, the WHO is not a part of or controlled by the federal government.  *See* About Us, WHO, https://www.who.int/about (last visited Oct. 8, 2023).

### 4.   Kennedy Fails to Identify Any State Action *with Respect to the Videos at Issue Here*

Kennedy's motion fails for the additional, and independent, reason that he offers no evidence tying any claimed state action to the videos at issue here.  Such an omission is fatal because the government must have compelled "the specific conduct of which the plaintiff complains" in order for that conduct to be treated as state action.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *accord Hart I*, 2022 WL 1427507, at *7 ("Hart makes no allegation that the Federal Defendants ever knew about his July 13 Facebook post, his July 18 tweet, or even his existence" and thus "they could not have had a 'meeting of the minds' as to the disciplinary action those companies took."); *FAN*, 432 F. Supp. 3d at 1126 (similar).  Kennedy does not allege that any government official ever communicated with anyone at Google about him or about the videos that were removed.  Instead, all he offers is a two-year-old email to a *different company* about a *different* post.  *See* Street Decl. Ex. P.  These actions are simply too attenuated from Google and the removal of Kennedy's videos in particular to sustain his claim of state action.  *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all.").

### 5.   Kennedy's Other Arguments to the Contrary Are Unavailing

#### (a)   *No Ninth Circuit Precedent Supports Kennedy's Position*

Confronted by directly controlling precedent in *O'Handley*, and without new evidence to distinguish it, Kennedy cites an array of pre-*O'Handley* decisions.  None supports his position.  To start, Kennedy briefly invokes *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020).  But this Court rightly explained that *O'Handley* considered and "declined to extend" *Rawson* to much more analogous facts to this case, limiting *Rawson*'s relevance here.  TRO Order

at 7–8; *O'Handley*, 62 F.4th at 1158 n.2.  In finding state action by the private facility at which Rawson was institutionalized, the Court relied on the unique context of the plaintiff's involuntary commitment and the fact that, in such cases, the plaintiff is subject to the conduct of the private party as a consequence of state law.  975 F.3d at 753, 755.  Kennedy makes no comparable allegation that he is subject to Google's conduct by force of law.

Kennedy next attempts to analogize to *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002), but such an analogy is foreclosed by binding precedent.  Kennedy invokes *Lee* to argue that Google is a state actor because it is performing a "traditional public function" by hosting speech on YouTube.  Mot. at 24.  But in *Prager*, the Ninth Circuit expressly held that while "YouTube may be a paradigmatic public square on the Internet," "it is 'not transformed' into a state actor solely by 'provid[ing] a forum for speech,'" 951 F.3d at 997 (quoting *Halleck*, 139 S. Ct. at 1930, 1934), distinguishing *Lee* by explaining that "[t]he relevant function performed by YouTube—hosting speech on a private platform—is hardly 'an activity that only governmental entities have traditionally performed,'" *id.* at 998 (quoting *Halleck*, 139 S. Ct. at 1930).

Kennedy also turns to *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999), which is similarly of little help to him, as the Ninth Circuit there *declined* to attribute governmental action to a private defendant.  *Id.* at 838.  Kennedy cites two cases distinguished by *Sutton*, but neither is on point.  *See* Mot. 25–26 (citing *Mathis v. Pac. Gas & Electric Co.*, 891 F.2d 1429 (9th Cir. 1989); *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987)).  The alleged state action in *Mathis* was compelled under the threat of a specific proposed federal regulation and carried out by a heavily regulated public utility, *see* 891 F.2d at 1433–34, and the alleged state action in *Carlin* was compelled by a direct threat of criminal prosecution, *see* 827 F.2d at 1295.  Kennedy has no remotely comparable evidence.

       *(b)*     Missouri v. Biden *Is Irreconcilable with Binding Precedent and Readily Distinguishable*

Without support in the Ninth Circuit, Kennedy turns to the Fifth Circuit's decision in *Missouri v. Biden*, No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023), but that is also misplaced.  To start, this Court already considered the impact of *Missouri* in its TRO Order,

-18-

correctly concluding that it was of no moment in light of the governing on-point circuit precedent. *See* TRO Order at 5.  The Fifth Circuit's partial affirmance does not change matters.  If anything, it confirms that this Court should decline to follow *Missouri* because it was decided under a materially different standard than the Ninth Circuit's controlling decision in *O'Handley*.  *Compare O'Handley*, 62 F.4th at 1156–57 (nexus test requires a threat of "adverse action," such as a "threat[] to prosecute" or "equivalent threats"), *with Missouri*, 2023 WL 6425697, at *18 ("tone" and reasonable perception of a "threat worth heeding" are sufficient for coercion).  Indeed, Judge Breyer recently considered much of the same evidence from *Missouri*, including the deposition testimony of CDC official Carol Crawford, and various emails from White House officials to Facebook—which could be read as more aggressive than any of the communications involving Google—and held that under *O'Handley* such evidence did "not establish joint action or government coercion."  *Hart II*, 2023 WL 3362592, at *2–4; Blavin Decl. ¶ 8.  And the U.S. Solicitor General characterized the standards adopted by the Ninth and Fifth Circuits as "irreconcilable" in a recent application to the Supreme Court to stay the injunction issued in *Missouri*.  *See* Blavin Decl. Ex. G at 16 (Stay Application).

In addition, *Missouri* has little to say about Google's actions specifically, much less as to any content containing Kennedy's speech.  Because the defendants were government officials, rather than any private platform, the Fifth Circuit elected to treat evidence involving various platforms interchangeably, obfuscating which platforms exchanged which communications with the government.  *See, e.g.*, *Missouri*, 2023 WL 6425697, at *23–24 (discussing communications exchanged with "the platforms").  And the opinion does not once mention Kennedy or his content. The Sixth Circuit recently distinguished *Missouri* on these grounds, noting that it discussed "these issues . . . on a more comprehensive scale, not based on actions with respect to discrete individual plaintiffs," and that the plaintiffs in its case "fail to adduce facts demonstrating that the decisions Twitter made when it enforced its own COVID-19 policy [as to them] did not result from its 'broad and legitimate discretion as an independent company.'"  *Changizi v. Dep't of Health & Hum. Servs.*, No. 22-3573, 2023 WL 5965931, at *3, 4 n.8 (6th Cir. Sept. 14, 2023).

### B.      Kennedy Ignores His State Law Claim, Which Is Similarly Unlikely to Succeed on the Merits

Kennedy has forfeited any argument for an injunction premised on his claim under the California Constitution.  A plaintiff seeking a preliminary injunction bears the burden of establishing a likelihood of success.  *See Winter*, 555 U.S. at 20.  Kennedy has made no attempt to meet his burden as to his California Constitution claim, failing to even mention it.  Accordingly, this Court should not consider its likelihood of success.  *See Galindo v. BSI Fin. Servs., Inc.*, No. 17-CV-0021-LHK, 2017 WL 3007081, at *6, 8 (N.D. Cal. July 14, 2017) (considering the likelihood of success of "only claims that Plaintiffs brief in their TRO motion" and declining to address other claims).  Regardless, Kennedy cannot show a likelihood of success with respect to this claim because it seeks to hold Google liable for its content moderation decisions and is thus barred by Section 230 of the Communications Decency Act, and because *Pruneyard*-style claims do not apply in the Internet context.  *See Prager Univ. v. Google LLC*, 85 Cal. App. 5th 1022, 1033 (2022) (free speech claim under California Constitution against Google based on content removal from YouTube barred by Section 230); *Divino Grp. LLC v. Google LLC*, No. 19-cv-04749-VKD, 2022 WL 4625076, *7 (N.D. Cal. Sept. 30, 2022) (declining to extend *Pruneyard*-style claims against Google to Internet context); Defs.' Mot. to Dismiss, Dkt. 50, at 22–23.

### C.      Kennedy Fails to Establish Irreparable Harm

This Court already has determined that Kennedy will suffer no irreparable harm if Google is able to enforce its content moderation policies during the pendency of this case.  TRO Order at 8–9.  Kennedy's motion does not even purport to offer new evidence of harm—if anything, the further delay contemplated by his motion confirms that he is suffering no irreparable harm.

As an initial matter, Kennedy's irreparable harm argument fails for the same reason his claim is unlikely to succeed on the merits—Google is a private company, not a state actor.  "[T]he mere assertion of First Amendment rights does not automatically require a finding of irreparable injury."  *CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019).  Absent a "colorable First Amendment claim," *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014), Kennedy fails to demonstrate irreparable harm.  *See CTIA*, 928 F.3d at 851.

Even assuming arguendo a likelihood of success on the merits, Kennedy's repeated delays in prosecuting this case and the availability of his content on other platforms undermine any suggestion that he will suffer irreparable harm. As this Court found, Kennedy "has shown no urgency," TRO Order at 9, undercutting his claims of exigency. Kennedy waited until August—five months after the removal of a video of one of his speeches, *see* Street Decl. Ex. A—to file suit. And he has now offered to delay the hearing on this motion by three-and-a-half months, to mid-January 2024, Mot. at 33. Further, as this Court has noted, Kennedy "is still able to post content on Facebook and X that runs afoul of Google's policy" while this case remains pending. TRO Order at 9.

### D. The Balance of Equities Favors Google

Google would suffer significant harm from a court order mandating that it carry certain speech against its will as the preliminary injunction Kennedy seeks would violate *Google's* First Amendment rights and erode its users' trust in its platform.

The "choice of material to" publish "and the decisions made" as to the "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" and are protected by the First Amendment. *Miami Herald Publ'g. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). This fundamental First Amendment principle has been extended to online platforms' decisions about what content to host, serve, and remove because "[w]hen a platform selectively removes what it perceives to be . . . public-health misinformation, it conveys a message and thereby engages in 'speech' within the meaning of the First Amendment." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1210 (11th Cir. 2022), *cert. granted sub nom. Moody v. NetChoice, LLC*, No. 22-277 (U.S. Sept. 29, 2023); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–88 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).

Google possesses a strong First Amendment interest in enforcing its policies, as this Court previously recognized. TRO Order at 9. Google's misinformation policies are a reflection of Google's "belie[fs]" about what "people should be able to share" on YouTube, Street Decl. Ex. C-1, and Google removes videos only after "careful[]" review and assessment against its policies, A. Kennedy Decl. Ex. A. (Takedown Notice). As Judge Breyer held in *O'Handley*, "Twitter has

-21-

1    important First Amendment rights that would be jeopardized by a Court order telling Twitter what

2    content-moderation policies to adopt and how to enforce those policies.  The Court will issue no

3    such order." *O'Handley*, 579 F. Supp. 3d at 1188.  The same is true here.

4            In addition, as this Court has recognized, Google has "a strong interest in the application of

5    its own content moderation policies in maintaining users' trust and expectations on its privately

6    hosted platform."  TRO Order at 9 (internal quotation marks omitted).  Google has communicated

7    to the public that its policies are designed to "priorit[ize]" the "safety of [its] creators, viewers, and

8    partners."  Street Decl. Ex. C-2.  Forcing Google to host content that it believes violates its policies

9    would therefore directly undermine its users' trust in Google and the application of its policies to

10   its own platform.  *Cf. NetChoice*, 34 F.4th at 1214 n.14 (noting "platforms' intent to communicate

11   messages through their content moderation decisions—including that certain material is harmful or

12   unwelcome on their sites"); Blavin Decl. Ex. H (Community Guidelines).

13           The harm that Google would suffer is exacerbated by the excessive reach of Kennedy's

14   requested injunction, which would bar any enforcement against him pursuant to Google's *current*

15   medical misinformation policy, regardless of whether such enforcement decision is the product of

16   state action.  *See* Proposed Order, Dkt. 49-4.  The grant of such an injunction would be contrary to

17   binding precedent.  In *Carlin Communications*, the Ninth Circuit held that the defendant phone

18   company had engaged in state action in removing the plaintiff's messages from its service, yet

19   refused to enjoin the defendant from excluding such messages in the future.  827 F.2d at 1296–97.

20   The court reasoned that "[i]t does not follow [from the initial state action determination] . . . that

21   [the defendant] may never thereafter decide independently to exclude [the] messages . . . . It only

22   follows that the state may never *induce* [Defendant] to do so."  *Id.*  "The question is whether state

23   action also inhered in [a defendant's] decision to [later] adopt a policy" allowing it to remove such

24   content going forward.  *Id.* at 1297.  And as Kennedy recognizes, Mot. at 14, Google's *current*

25   medical misinformation guidance—updated after all of the alleged actions that encompass

26   Kennedy's state action claim—would govern any future removal decisions.  *See* Veitch Decl. ¶ 15.

27   In order to justify an injunction of *all* enforcement actions taken pursuant to it, Kennedy would

28   need to show that *that* policy is the product of state action.  He has not even attempted to do so.

1    Kennedy's suggestion that Google would not suffer harm from a preliminary injunction

2  because it "cannot be held liable for content posted on YouTube" under Section 230 of the

3  Communications Decency Act, Mot. at 32, is misdirected.  Google is harmed by being forced to

4  carry content on its platform that violates its policies, irrespective of whether such content leads to

5  legal liability.  Moreover, the purpose of Section 230 is to advance protections for online

6  platforms' decisions relating to content curation and editorial discretion—not to straight-jacket

7  platforms into hosting content against their will.  *See Force v. Facebook, Inc.*, 934 F.3d 53, 68 (2d

8  Cir. 2019); *NetChoice*, 34 F.4th at 1210; *see also Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir.

9  2003) (Congress enacted Section 230 "to further First Amendment . . . interests on the Internet.").

10    By contrast, the only purported harm Kennedy claims that is not based on the alleged

11  violation of his constitutional rights is the harm to his political campaign and self-censorship.

12  Mot. at 31–32.  But as the district court found, "[t]here are numerous other ways that [Kennedy]

13  may share video content concerning his viewpoints," TRO Order at 8–9, including Facebook and

14  X, Mot. at 32.  And, of course, YouTube continues to host a substantial number of other videos

15  featuring Kennedy.[7]  For all these reasons, the balance of equities tips in Google's favor.

16    **E.    Kennedy Fails to Address the Public Interest, Let Alone Show It Favors An
       Injunction**

17

18    Kennedy's motion entirely fails to address the public interest, an "importan[t]" factor on

19  which he bears the burden.  *Winter*, 555 U.S. at 19, 26.  He therefore offers no basis for departing

20  from this Court's previous ruling that "there is a strong public interest in protecting the community

21  from an international public health crisis such as the COVID-19 pandemic" and that "it would not

22  serve the public interest to let medical misinformation proliferate on YouTube."  TRO Order at 10.

23  Forcing Google to host and serve medical and vaccine misinformation on YouTube would be

24  contrary to important public health goals and the public interest, as this Court correctly ruled.  *Id.*;

25  *cf. Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1181 (9th Cir. 2021).

26  _____

27  [7] *E.g.*, Team Kennedy, *The Polls Say I Can Win*, YouTube (Sept. 16, 2023),
   https://www.youtube.com/watch?v=zKUB-QfVN1g; CNBC Television, *Watch CNBC's Full

28  Interview with Democratic Presidential Nominee Robert F. Kennedy Jr.*, YouTube (Aug. 30,
   2023), https://www.youtube.com/watch?v=Knqdv5j9XG4.

**F.     This Court Should Deny Kennedy's Renewed Request for Discovery**

This Court already denied Kennedy's request for expedited discovery on this preliminary injunction motion when it denied his TRO and set a November 7, 2023 hearing date on this motion. TRO Order at 11.  Kennedy's latest request for discovery—and request to push back the hearing date by several months to accommodate such discovery—is merely his attempt to take a second bite at the apple.  Nothing has changed during the intervening month to warrant a different result.

"[E]xpedited discovery is not automatically granted merely because a party seeks a preliminary injunction." *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009); *see also Kayvan v. Pompeo*, No. 5:19-cv-08071-EJD, 2020 WL 553940, at *1–2 (N.D. Cal. Feb. 4, 2020) (same).  Kennedy still fails to meet his burden of establishing "good cause" for such discovery.  *Semitool, Inc v. Tokyo Electron Am., Inc.*, 208 F.R.D 273, 276 (N.D. Cal. 2002).

To start, Kennedy fails to state a plausible claim for relief for the reasons set forth in Google's motion to dismiss, Dkt. 50, and he likewise has not come close to demonstrating the necessary elements for a preliminary injunction.  Kennedy should not be permitted to circumvent pleading requirements and get to discovery merely by pairing conclusory allegations with vague and speculative assertions about what discovery might uncover.  *Cf. Consumer Opinion LLC v. Frankfort News Corp.*, No. 16-cv-05100-BLF, 2016 WL 6393520, at *1 (N.D. Cal. Oct. 28, 2016) (expedited discovery not appropriate to uncover identity of defendants where "it is clear . . . the complaint would be dismissed on other grounds").

In addition, Kennedy's request improperly seeks to shift the burden on his preliminary injunction motion.  Google is an indisputably private company.  The burden of proof is on *Kennedy* to show a likelihood of success on the merits of his claim that Google engaged in state action; it is not Google's burden to refute that claim.  None of Kennedy's allegations or exhibits comes close to satisfying that burden.  *See supra* Part V.A–B.  Courts regularly and consistently dismiss similar claims asserting "state action" on the pleadings without permitting any discovery. *See, e.g.*, *O'Handley*, 62 F.4th at 1153; *Hart I*, 2022 WL 1427507, at *1; *FAN*, 432 F. Supp. 3d at 1112; *Children's Health Def.*, 546 F. Supp. 3d at 914–15.

1      Moreover, the significant amount of materials Kennedy obtained in *Missouri* illustrates

2  why discovery in this case is unnecessary.  Kennedy's counsel states that he has "reviewed much

3  of the evidence that was produced in *Missouri v. Biden*," and attaches several such

4  communications between government officials and Google and other documents produced in that

5  case.  Street Decl. ¶¶ 14–27.  Still, Kennedy speculates that the *Missouri* plaintiffs "focused on

6  Facebook and Twitter," and so further discovery here focused on Google and YouTube could

7  provide "compelling evidence" of coordination.  Mot. at 32–33.[8]  Kennedy, however, provides no

8  reason to believe the extensive discovery produced in *Missouri* would not include all relevant

9  communications between the government and Google.  To the contrary, the district court in

10  *Missouri* authorized the plaintiffs to serve discovery requests on the government defendants and

11  online platforms, *including YouTube and Google*, seeking communications regarding

12  "disinformation, misinformation, malinformation, and/or any censorship or suppression of speech

13  on social media."  Blavin Decl. Ex. I (July 12, 2022 Order); *id.* Ex. J (Joint Discovery Responses

14  identifying "YouTube" as a subpoenaed platform).  Plaintiffs identified government officials that

15  had contacted the platforms, and the DOJ represented that it produced responsive emails that those

16  officials had exchanged with any Google employees.  *Id.* Ex. K (Defendants' Objections to

17  Requests For Production).  Kennedy's wishful thinking that of the many documents produced

18  about Google in *Missouri* there might be yet additional documents beyond the innocuous

19  communications attached to his motion does not justify such a fishing expedition.[9]

20  **VI.    CONCLUSION**

21      For these reasons, the Court should deny the motion and request for expedited discovery.

---

[8] The discovery obtained in *Missouri* is insufficient under *O'Handley* to establish state action *even as to Facebook and Twitter*, as Judge Breyer concluded in *Hart II*.  2023 WL 3362592, at *3.

[9] Kennedy's request for discovery to test Google's argument that it is "only removing speech that is false" is based on a wholly incorrect premise.  Google does not contend that it removes only speech that is "false"; rather, as a review of its policies confirms, it may remove content that "contradicts local health authorities'. . . or the World Health Organization's . . . guidance about specific health conditions and substances."  Street Decl. Ex. D.

1    DATED:  October 9, 2023                    MUNGER, TOLLES & OLSON LLP

2                                                By    */s/ Jonathan H. Blavin*

3                                                     ─────────────────────────

4                                                     JONATHAN H. BLAVIN
                                                     Attorneys for Defendants
5                                                     Google LLC and YouTube, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28