JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
JULIANA M. YEE (State Bar No. 304564)
Juliana.Yee@mto.com
CARSON SCOTT (State Bar No. 339868)
Carson.Scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

HELEN E. WHITE (*pro hac vice*)
Helen.White@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:    (202) 220-1100
Facsimile:    (202) 220-2300

Attorneys for Defendants Google LLC and
YouTube, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT F. KENNEDY, JR.,<br><br>Plaintiff,<br><br>vs.<br><br>GOOGLE LLC AND YOUTUBE, LLC,<br><br>Defendants. | Case No. 3:23-cv-03880-TLT<br><br>**DECLARATION OF JONATHAN H. BLAVIN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## <u>DECLARATION OF JONATHAN H. BLAVIN</u>

I, Jonathan H. Blavin, declare as follows:

1.      I am an attorney at the law firm of Munger, Tolles & Olson LLP, counsel for Defendants Google LLC and YouTube, LLC (collectively, "Google" or "Defendants") in the above-captioned matter.  I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.  I submit this declaration in support of Defendants' opposition to Plaintiff's motion for a preliminary injunction.

2.      Exhibits D, F, and H, described in detail below, were previously submitted to this Court as Exhibits, B, A, and C, respectively, to the Declaration of Jonathan H. Blavin, which was attached to Google's opposition to Kennedy's application for a temporary restraining order.

3.      Attached as Exhibit A is a true and correct copy of Kennedy's emergency motion for temporary injunctive relief filed in the Ninth Circuit Court of Appeals, in which Kennedy acknowledged that bringing this motion for a preliminary injunction would be "futile," given this Court's prior ruling that "*O'Handley* is controlling here and that it precludes relief in a case like this."  Appellant's Emergency Motion for Injunction Pending Appeal, at 29–30,  *Kennedy v. Google LLC*, No. 23-16141 (9th Cir. Sept. 11, 2023).

4.      Attached as Exhibit B is a true and correct copy of an article from The Guardian titled *YouTube bans misinformation about Covid vaccinations*, dated October 14, 2020.  The article quotes a "YouTube Spokesperson" as saying "To date, we have removed over 200K videos related to dangerous or misleading Covid-19 information since early February."  It is available at: https://www.theguardian.com/technology/2020/oct/14/youtube-bans-misinformation-about-covid-vaccinations.  The copy of this article was printed at my direction.

5.      Attached as Exhibit C is a true and correct copy of a page on the YouTube Official Blog titled *Perspective: Tackling Misinformation on YouTube*, dated August 25, 2021, and authored by YouTube SVP Neal Mohan.  It states that "since February of 2020 we've removed

-1-

over 1M videos related to dangerous coronavirus information." It is available at:

https://blog.youtube/inside-youtube/tackling-misinfo/. The copy of this page was printed at my direction.

6.      Attached as Exhibit D is a true and correct copy of the full transcript dated November 15, 2022 of the deposition of Carol Crawford, Division Director for the CDC's Office of Associate Director for Communication, filed in *Missouri v. Biden*. *See* Transcript of Deposition of Carol Crawford, *Missouri v. Biden*, No. 3:22-cv-01213-TAD (W.D. La. Mar. 3, 2023), ECF 205-1. Plaintiff here submitted excerpts from this transcript as Exhibit L to the Street Declaration. However, Plaintiff omitted several relevant portions of the transcript, including sections in which Ms. Crawford testified that the CDC played no role in the creation or application of content policies for any online platforms. When asked whether she or "anyone at CDC" either "craft[ed] the content policy" of "any social media company" or even "g[ave] input on what such a policy should look like," Ms. Crawford responded "No." Ex. D (Crawford Deposition) at 103:20-104:10. Ms. Crawford also responded "No" when asked whether she or "anyone at the CDC help[ed] any . . . social media company on how they should apply their policies . . . toward a particular post." *Id.* at 105:1-6. Relevant portions of Exhibit D are highlighted.

7.      Attached as Exhibit E is a true and correct copy of the official transcript from the August 21, 2023, hearing on Kennedy's application for a temporary restraining order.

8.      Attached as Exhibit F is a true and correct copy of the proposed First Amended Complaint filed on February 15, 2023, in *Hart v. Facebook, Inc.* in support of the plaintiff's Motion to Amend Complaint in that case. *See* Proposed First Amended Complaint, *Hart v. Facebook*, No. 3:22-cv-00737-CRB (N.D. Cal. Feb. 15, 2023), ECF 112-1. The proposed First Amended Complaint summarizes the materials that the plaintiff in that case sought to introduce, obtained from the proceedings in *Missouri v. Biden*, No. 3:22-cv-01213, 2023 WL 4335270 (W.D.

La. July 4, 2023), to demonstrate that Facebook's and Twitter's removal of certain content constituted state action, including:

- (1) an email "from federal government employee Rob Flaherty to . . . Facebook officials," with the subject line "You are hiding the ball," which "may be summarized as Flaherty dressing down and admonishing a Facebook official for the private social media company's lack of transparency to the federal government regarding vaccine hesitancy and borderline content misinformation allowed to be posted on Facebook's platform," Ex. F (Proposed First Amended Complaint), ¶¶ 138–40 at 25:9-18, and a response in which the Facebook employee "grovel[s] and ask[s] Flaherty to hold Facebook 'accountable,'" *id.* ¶ 142 at 25:24;

- (2) evidence that Facebook assured the U.S. Surgeon General that "[w]e hear your call for us to do more and . . . we're committed to working toward our shared goal of helping America get on top of this pandemic," *id.* ¶ 79 at 15:26-28, and "noted to Surgeon General Murthy, 'You have identified 4 specific recommendations for improvement, and we want to make sure to keep you informed of our work on each,'" *id.* ¶ 82 at 16:11-12;

- (3) evidence that "the CDC sent an email to Facebook with examples of what COVID-19 messages were inappropriate for the public on private social media platforms and the Internet," *id.* ¶ 46 at 9:19-21;

- (4) evidence that "Facebook had used its proprietary tool 'CrowdTangle' to monitor and report on social media posts that contradicted the federal government's COVID-19 message and shared such information with the government", *id.* ¶ 73 at 14:13-16;

- (5) evidence that "Facebook . . . offered CDC and the federal government a $15 million-dollar in-kind donation to allow the government to advertise for free its COVID-19 public health message on Facebook's private platform," *id.* ¶ 39 at 8:20-22.

Relevant portions of Exhibit F are highlighted.

9.      Attached as Exhibit G is a true and correct copy of the application for a stay filed by the government official parties in *Murthy v. Missouri*. *See* Application for a Stay of the Injunction Issued by the United States District Court for the Western District of Louisiana, *Murthy v. Missouri*, No. 23A243 (Sept. 14, 2023).

10.     Attached as Exhibit H is a true and correct copy of a page from YouTube's website titled *YouTube's Community Guidelines*. This page informs users: "When you use YouTube, you join a community of people from all over the world. The guidelines below help keep YouTube fun and enjoyable for everyone." It also explains that "The YouTube Community is one that's built on trust," and that "certain types of misinformation"—including COVID-19 medical misinformation and vaccine misinformation—"can cause real-world harm." It is available at: https://support.google.com/youtube/answer/9288567?hl=en. The copy of this page was printed at my direction.

11.     Attached as Exhibit I is a true and correct copy of an order in *Missouri v. Biden* authorizing the plaintiffs to serve discovery requests on government official parties and on online platforms. Order, *Missouri v. Biden*, No. 3:22-cv-01213-TAD (W.D. La. July 12, 2022), ECF 34.

12.     Attached as Exhibit J is a true and correct copy of the parties' joint statement on discovery disputes in *Missouri v. Biden*. Joint Statement on Discovery Disputes, *Missouri v. Biden*, No. 3:22-cv-01213-TAD (W.D. La. Aug. 31, 2022), ECF 71. In the statement, plaintiffs

identify "YouTube" as among the five online platforms on which they served third-party subpoenas.

13.     Attached as Exhibit K is a true and correct copy of discovery objections filed by defendants in *Missouri v. Biden*, in which defendants represent that plaintiffs had already identified government officials that had contacted online platforms regarding misinformation, and agree to produce emails those identified officials had exchanged with the employees of Google and other online platforms.  Objections to Requests For Production, *Missouri v. Biden*, No. 3:22-cv-01213-TAD (W.D. La. Aug. 31, 2022), ECF 71-13.

14.     The declaration submitted by Amaryllis Kennedy in support of Kennedy's motion states that Google removed a video of Kennedy's podcast interview with Joe Rogan around June 17, 2023.  Declaration of Amaryllis Kennedy in Support of Motion for Preliminary Injunction ¶ 4. The complete podcast interview is available at: https://open.spotify.com/episode/3DQfcTY4viyXsIXQ89NXvg.  Kennedy makes various claims regarding vaccines in the video, including that a vaccine "caused the autism epidemic," (56:20-57:30), and that "if you take the [COVID-19] vaccine, you're 21% more likely to die [over the next six months]," (2:14:33-38).

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on October 9, 2023 at San Francisco, California.

*/s/ Jonathan H. Blavin*
JONATHAN H. BLAVIN

# EXHIBIT A

No. 23-16141

_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

_____

Robert F. Kennedy, Jr.,

*Plaintiff-Appellant*,

vs.

Google LLC, and YouTube, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-03880
Hon. Trina Thompson

_____

**APPELLANT'S EMERGENCY MOTION UNDER CIRCUIT RULE 27-3**
**FOR INJUNCTION PENDING APPEAL**

_____

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

*Attorneys for Robert F. Kennedy, Jr.*

## CIRCUIT RULE 27-3 CERTIFICATE

Pursuant to Circuit Rule 27-3, Appellant Robert F. Kennedy, Jr., provides

the following information:

**(i)     The names, telephone numbers, e-mail addresses and office**

**addresses of the attorneys for all of the parties.**

| Attorneys | Parties |
|---|---|
| Jonathan H. Blavin<br>Juliana Lee<br>Carson Scott<br>MUNGER TOLLES & OLSON LLP<br>560 Mission Street<br>Twenty-Seventh Floor<br>San Francisco, California 94105-2907<br>Telephone: (415) 512-4000<br>Facsimile: (415) 512-4077<br><br>HELEN E. WHITE (*pro hac vice*)<br>Helen.White@mto.com<br>MUNGER, TOLLES & OLSON LLP<br>601 Massachusetts Avenue NW, Suite 500 E<br>Washington, DC 20001<br>Telephone: (202) 220-1100<br>Facsimile: (202) 220-2300 | Defendants Google LLC and YouTube, LLC |

**(ii)     The facts showing the existence and nature of the emergency.**

Mr. Kennedy is seeking the Democratic Party's nomination for president. He

filed the underlying case to declare YouTube's medical misinformation policies

i

(which have since been amended and merged into a single policy) unconstitutional under the First Amendment and state action doctrine. He sought a temporary restraining order to prevent Google from using the policy to remove videos of his speech, whether posted by him or by third parties, during his presidential campaign. Although written by a private party, the medical misinformation policy relies entirely on government sources to determine which information gets removed from YouTube. Essentially, Google does not allow people to disagree with public health authorities (*i.e.*, the government) about certain subjects, including COVID-19 and abortion. Indeed, Google said the multipage list of prohibited topics "isn't a complete list" thus raising the possibility that other speech the government does not want people to hear—such as speech regarding transgender policies—will also be censored.

The chilling effect from this unprecedented public/private censorship campaign is great. It is especially problematic for Mr. Kennedy's presidential campaign, which relies heavily on social media—including content posted by third parties—to get Kennedy's message out. And, without judicial intervention, it will continue. Indeed, Google seems to believe that it has a civic obligation to remove Kennedy's speech about public health policy from YouTube.

This censorship campaign cannot continue, not in one of the most important elections in American history. "The loss of First Amendment freedoms, for even

ii

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, this Court has held that irreparable injury is often presumed when the plaintiff alleges a "colorable First Amendment claim …." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005). Those principles justify emergency relief here.

Moreover, the District Court set this case for trial on March 17, 2025. Dist. Ct. ECF 30. The 2024 election will be done by then. And while the District Court may simply dismiss the case before that, as Google is urging it to do, that order will not be issued until late this year or early next year, right as the primaries get underway. Thus, emergency relief is needed to protect Mr. Kennedy's fundamental right to freely communicate with the American people as he tries to win their votes.

**(iii)   Why the motion could not have been filed earlier.**

Mr. Kennedy has diligently pursued relief. He filed this case on August 2, 2023. Dist. Ct. ECF 1. He did so after spending several months trying to convince Google to stop censoring his speech on YouTube during his presidential campaign, as Facebook and Twitter pledged to do. He applied for a temporary restraining order in the District Court on August 9, 2023. Dist. Ct. ECF 7. The District Court heard arguments on the requested TRO on August 21, 2023, and denied the application on August 23, 2023. Dist. Ct. ECF 29, 32. Although Judge Thompson

iii

set a hearing on Kennedy's motion for a preliminary injunction for November 7, 2023, with further briefing to be done between September 25 and October 16, Dist. Ct. ECF 30, she denied Kennedy's request for limited discovery and made clear that she believes this Court's decision in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), is controlling and effectively precludes Kennedy from prevailing. Thus, this Court will have to decide the matter at some point. It will be far more efficient to do so now, with the primaries still several months away and with argument in a similar case (*Trump v. Twitter*, No. 22-15961) set for October 4, 2023. Furthermore, the Fifth Circuit Court of Appeals issued a decision last Friday that resolved similar issues in favor of the plaintiffs, although neither Google nor any of the other large technology companies accused of state-sponsored censorship are defendants in that case. *Missouri et al. v. Biden et al.*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam).

**(iv)   Notice and service of motion to counsel for other parties and Clerk's Office.**

Mr. Kennedy's counsel contacted Google's counsel by email at 2:20 pm on September 8, 2023, and informed them that Kennedy would seek an emergency injunction pending appeal. Google's counsel opposes the request for an emergency injunction but agrees with Kennedy's suggestion that Judge Thompson's denial of

the TRO was tantamount to the denial of a preliminary injunction and thus that the Court has jurisdiction over this appeal.

Mr. Kennedy's counsel also contacted the Ninth Circuit Motions Unit by phone on the afternoon of September 8 and left a voicemail (with a subsequent email) advising the unit of the nature of the emergency and that Kennedy intended to file an emergency motion for injunction pending appeal by Monday, September 11.

**(v)  Whether the relief sought in the motion was sought in the district court.**

Pursuant to Rule 8(a)(2)(A)(i), it would be impracticable for Mr. Kennedy to first seek an injunction pending appeal in the District Court as it just denied Kennedy's application for a TRO based on its belief that Google cannot be held liable under the state action doctrine, even when it relies on government sources to censor dissenting viewpoints that the government does not want Americans to hear.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and based upon my personal knowledge. Executed at Pasadena, California.

Respectfully submitted,

Date:  September 11, 2023

JW HOWARD/ATTORNEYS, LTD.


_____/s/ Scott J Street_____
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

# DISCLOSURE STATEMENT

Rule 26.1 of the Federal Rules of Appellate Procedure does not require the filing of a Disclosure Statement here.

Date:  September 11, 2023

JW HOWARD/ATTORNEYS, LTD.


_____*/s/ Scott J. Street*_____
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 27-3 CERTIFICATE ................................................................ i

TABLE OF AUTHORITIES ........................................................................... x

INTRODUCTION ......................................................................................16

FACTS AND PROCEDURAL BACKGROUND ...........................................19

STANDARD FOR INTERIM RELIEF.........................................................28

ARGUMENT .............................................................................................30

    A.    YouTube's Medical Misinformation Policy—Which Was Developed in Response to Government Demands for It and Which Relies Entirely on the Government to Decide Which Information to Censor—Likely Violates the First Amendment. ...................................................................................30

    B.    Mr. Kennedy Will Be Irreparably Harmed If the Court Allows Google to Continue Using its Misinformation Policy to Remove His Political Speech from YouTube. .......................................45

    C.    Google Is Not a Publisher, So It Will Not Suffer from Being Ordered Not to Remove Video of Kennedy's Political Speech. ...................................................................................48

    D.    The Public Interest in Having Open Dialogue During the Political Process Strongly Favors Granting Injunctive Relief..51

    E.    The Court Should Set an Expedited Briefing Schedule and Schedule Argument at the Same Time as the Trump/Wolf Appeal…………………………………………………………….54

CONCLUSION ..........................................................................................56

STATEMENT OF RELATED CASES……………………………………..…..57

CERTIFICATE OF COMPLIANCE…………………………………………..58

CERTIFICATE OF SERVICE…………………………………………………59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,

632 F.3d 1127 (9th Cir. 2011)……………………………………………...28

*Am. Mfrs. Mutual Ins. Co. v. Sullivan*,

526 U.S. 40 (1999) …………………………………………………....40

*Ashcroft v. Free Speech Coal.*,

535 U.S. 234, 253 (2002)…………………………………………………..18

*Atkinson v. Meta Platforms, Inc.*,

No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)……………..…38

*Biden v. Knight First Amend. Inst.*,

-- U.S. --, 141 S. Ct. 1220 (2021)…………………………………………48

*Blum v. Yaretsky*,

457 U.S. 991 (1982) …………………………………………….…………32

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,

531 U.S. 288, 295 (2001)………………………………………….…27

*Brown v. Hartlage*,

456 U.S. 45 (1982)…………………………………………………47

*Buckley v. Valeo*,

424 U.S. 1 (1976)……………………………………………..…46

*Caribbean Marine Servs. Co. v. Baldrige*,

844 F.2d 668 (9th Cir. 1988)………………………………………..…52

*Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*,

827 F.2d 1291 (9th Cir.1987)……………………………………..…43

*Citizens United v. F.E.C.*,

558 U.S. 310 (2010)……………………………………………….54

*Cohen v. Calif.*,

403 U.S. 15 (1971) ……………………………………..…….…41

*Cuviello v. City of Vallejo*,

944 F.3d 816 (9th Cir. 2019)…………………………………….…53

*Daunt v. Benson*,

956 F.3d 396 (6th Cir. 2020)……………………………………………46

*Denver Area Ed. Telecomms. Consortium, Inc.*,

518 U.S. 727 (1996) ……………………………………………40-41

*Doe v. Google, LLC*,

No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022)…………...…38

*Doe v. Harris*,

772 F.3d 563 (9th Cir. 2014)…………………………………….…………51

*Dow Jones & Co. v. Kaye*,

90 F. Supp. 2d 1347 (S.D. Fla. 2000)………………………………………53

*Elrod v. Burns*,

427 U.S. 347 (1976)………………………………………….…….45

*Farris v. Seabrook*,

677 F.3d 858 (9th Cir. 2012)………………………………….……47

*Fashion Valley Mall, LLC v. NLRB*,

42 Cal.4th 850 (2007)…………………………………………………41

*Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*,

192 F. Supp. 3d 1120 (E.D. Cal. 2016)………………………….……45

xi

*Gallagher v. Neil Young Freedom Concert*,

    49 F.3d 1442 (10th Cir. 1995) ……………………………………………….33

*Graham v. Teledyne-Continental Motors*,

    805 F.2d 1386 (9th Cir. 1987)…………………………………………………..29

*Griffin v. Bryant*,

    30 F. Supp. 3d 1139 (D.N.M. 2014)……………………………….……….46

*Heineke v. Santa Clara Univ.*,

    965 F.3d 1009 (9th Cir. 2020) …………………………………….……..23

*Howerton v. Gabica*,

    708 F.2d 380 (9th Cir. 1983) …………………………………………………16

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,

    515 U.S. 557 (1995)………………………………………………………...33

*Index Newspapers LLC v. City of Portland*,

    474 F. Supp. 3d 1113 (D. Or. 2020) ………………………………………14

*Jackson v. Metropolitan Edison Co.*,

    419 U.S. 345 (1974)……………………………………….…………………43

*Kirtley v. Rainey*,

    326 F.3d 1088 (9th Cir. 2003)………………………………………...31

*Klein v. City of San Clemente*,

    584 F.3d 1196 (9th Cir. 2009)………………………………….….……45

*Lee v. Katz*,

    276 F.3d 550 (9th Cir. 2001)……………………………….......16, 32, 41

*Lopez v. Heckler*,

    713 F.2d 1432 (9th Cir. 1983) .……………………………………………28

*Lugar v. Edmondson Oil Company*,

    457 U.S. 922 (1982)……………………………………………...……42

*Manhattan Cmty. Access Corp. v. Halleck*,

    -- U.S. --, 139 S. Ct. 1921 (2019).……………………………….………31

*Mathis v. Pacific Gas & Electric Company*,

    891 F.2d 1429 (9th Cir. 1989)……………………………………….....…43

*Missouri v. Biden*,

    -- F. Supp. 3d --, 2023 WL 4335270 (W.D. La. July 4, 2023)…………27, 35

*Missouri v. Biden*,

    --F.4th--, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam)..24, 27, 36, 43

*Moose Lodge No. 107 v. Irvis*,

    407 U.S. 163 (1972)…………………………………………………..42

*NetChoice, L.L.C. v. Paxton*,

    49 F.4th 439 (5th Cir. 2022)…………………………………………..50

*O'Handley v. Weber*,

    62 F.4th 1145 (9th Cir. 2023)………………….....…16, 17, 27, 30, 34, 37-39

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,

    475 U.S. 1 (1986) ("*PG&E*")………………………………………16, 43, 48

*Packingham v. North Carolina*,

    -- U.S. --, 137 S. Ct. 1730 (2017)…………………………………..48

*PG&E, Miami Herald Publishing Company v. Tornillo*,

    418 U.S. 241 (1974)…………………………………………....…49

*Puerto Rico Ass'n of Mayors v. Velez-Martinez*,

480 F. Supp. 3d 377 (D.P.R. 2020)………………………………….…..46

*Rawson v. Recovery Innovations, Inc.*,

    975 F. 3d 742 (9th Cir. 2020)…………………………………………27, 32, 39

*Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*,

    869 F.2d 1306 (9th Cir. 1989) …………………………………………29, 32

*Roberts v. AT&T Mobility, LLC*,

    871 F.3d 833 (9th Cir. 2017) ……………………………………………40

*Robins v. Pruneyard Shopping Center*,

    23 Cal.3d 899 (1979) …………………………………………………41

*Rosenberger v. Rector & Visitors of Univ. of Va.*,

    515 U.S. 819 (1995)……………………………………………………31, 46

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,

    547 U.S. 47 (2006)……………………………………………………49

*Rutenberg v. Twitter, Inc.*,

    No. 21-160743, 2022 WL 1568360 (9th Cir. May 18, 2022)……………...38

*Sec'y of State v. Joseph H. Munson Co.*,

    467 U.S. 947 (1984)…………………………………………………..51

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,

    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)………………………….50

*Sutton v. Providence St. Joseph Medical Center*,

    192 F.3d 826 (9th Cir. 1999)………………………………………...41-44

*Thornhill v. Alabama*,

    310 U.S. 88 (1940)……………………………………………………53

*Trump v. Twitter*, Inc.,

No. 22-15961………………………………………………….……55

*Tunick v. Safir*,

209 F.3d 67 (2d Cir.2000)……………………………………………….51

*Turner Broad. Sys., Inc. v. F.C.C.*,

512 U.S. 622 (1994)……………………………………………………..19

*United States v. Kincaide*,

379 F.3d 813 (9th Cir. 2004)…………………………………………….54

*U.S. WeChat Users Alliance v. Trump*,

488 F. Supp. 3d 912 (N.D. Cal. 2020) ……………………………………29

*Valle Del Sol Inc. v. Whiting*,

709 F.3d 808 (9th Cir.2013)……………………………………….……46

*Villegas v. Gilroy Garlic Festival*,

541 F.3d 950 (9th Cir. 2008) ……………………………………………33

*Warsoldier v. Woodford*,

418 F.3d 989 (9th Cir. 2005)…………………………………….………45

*Winter v. Natural Resources Defense Council, Inc.*,

555 U.S. 7 (2008)………………………………………………………29

## Other

California Constitution, Article I, section 2………………………………41

House Report: Telecommunications Act of 1996
H.R. REP. No. 104-458 (1996)…………………………………………..50

# INTRODUCTION

This case challenges the conventional wisdom that private parties cannot violate the First Amendment. They can, especially when, as here, they engage in viewpoint discrimination during the political process to prevent people from hearing dissenting voices.

During the past forty years, as urged by Justices Brennan and Marshall, this Court has applied the state action doctrine liberally. It has emphasized that the analysis does not involve rigid criteria but focuses on determining whether seemingly private action is "fairly attributable" to the state. Many of those cases involved the deprivation of liberty or property rights. A few, including *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2001), found state action when a private party violated an individual's free speech rights. *Lee* recognized, as Justice Thurgood Marshall did in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), that First Amendment rights are entitled to special protection, even when they are invoked against a private party that engages in viewpoint discrimination in a privately owned space.

Although it did not discuss *Lee*, the Court pulled back from that rationale in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), when it found no constitutional problem with Twitter removing posts that government officials flagged for violating Twitter's civic integrity policy. That was a mistake. The

internet is the modern public square. It is the place where millions of Americans get their news and discuss the issues of the day, especially during the political process. It is akin to the parks, sidewalks, squares, and billboards that the Supreme Court has always recognized as public fora for speech, even when those places are owned or controlled by a private party. And YouTube is not an ordinary website. It is the second largest search engine on the Internet, behind only its parent Google.

The Court seemed to recognize that in *O'Handley*. It noted that Twitter created the civic integrity policy itself, based on concerns that people had manipulated its product to mislead voters during the 2016 election. It emphasized the one-way nature of the communication. And it said, correctly, that a constitutional problem would arise if Twitter had effectively agreed to serve as an arm of the government in censoring speech that the government did not want people to hear.

The Court did not find such evidence in *O'Handley* but it surely exists here. In fact, even at this early stage of litigation, the evidence (most of which was revealed during discovery in a similar case) is compelling. It shows that Google developed its medical misinformation policies in response to the federal government's demands for them. It shows that Google consulted with government officials when drafting the policies. And, most importantly, it shows that the speech that is subject to removal from YouTube is only speech that public health

17

officials—*i.e.*, the government—deem false, misleading, or dangerous. Speech that many people would call false, misleading, or dangerous—for example, that there are more than two genders or that abortion has physical and psychological risks—is not subject to removal from YouTube because the current public health administration supports those messages.

The district court seemed swayed by the fact that the speech Google seeks to block from YouTube involves public health. Google's counsel also invoked public health at the argument on Mr. Kennedy's application for a TRO, suggesting that Google has a civic obligation to prevent people from hearing messages that might harm them, especially during a pandemic. That only strengthens Kennedy's argument. Promoting *public* health is a *public* function. It is subject to constitutional scrutiny. Thus, it is reasonable to apply constitutional scrutiny when a private party like Google plays the middleman in that public function—particularly when, as here, it does so willingly, in partnership with the government and to get around First Amendment constraints that would indisputably apply to the government.

This is not a trivial matter. "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). That is especially true in the political process. The Supreme Court has repeatedly

18

emphasized that "each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Google's medical misinformation policy threatens that ideal. And it will not just hurt Mr. Kennedy's campaign. Judge Terry Doughty noted that social media companies have targeted "conservative" speech, more than "liberal" speech, for censorship under the Biden Administration. That seems likely to continue, as Google's updated medical misinformation policy prohibits speech from conservative viewpoints about medical care and abortion.

The First Amendment does not sanction such blatant viewpoint discrimination. It is time for this Court to apply the state action doctrine faithfully and to uphold the First Amendment principles upon which American democracy rests.

## FACTS AND PROCEDURAL BACKGROUND

Mr. Kennedy is a lawyer, a son of former Attorney General Robert F. Kennedy and a nephew of former President John F. Kennedy. Mr. Kennedy is seeking the Democratic Party's nomination for president. Declaration of Robert F. Kennedy, Jr., dated September 7, 2023 ("RFK Decl."), ¶¶ 1-2.

Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. Declaration of Scott J. Street, dated September 8, 2023 ("Street Decl."), ¶ 3. He accepted an invitation to speak about that and other political issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March. *Id.*, ¶ 4. His speech, which was attended by several prominent New Hampshire Democrats and viewed as a soft presidential launch, lasted nearly two hours. *Id.* It centered on Mr. Kennedy's concerns about the merger of corporate and state power, a danger he has fought for years, and which has recently caused him to question the increasing number of vaccines American children are required to take. *Id.*

Mr. Kennedy does not oppose the use of vaccines. Instead, his central concern has been the cozy relationship between the pharmaceutical companies that produce the vaccines and the government agencies that approve them. *Id.* In fact, government agencies receive much of their funding from the companies they regulate, a conflict of interest that reminds Mr. Kennedy of the situation he encountered decades ago when he was working with environmentalists to take on large polluters like Monsanto. *Id.* Mr. Kennedy received accolades, including from many Democrats, for that work. *Id.* These concerns about the corrupt merger of corporate and state power—whether in environmental policy, healthcare policy, or

foreign policy—are a central part of his presidential campaign. *Id.* It is a message that resonates with millions of Americans, especially given the evidence of corruption that has emerged from the Biden White House. *Id.*

Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. Street Decl., ¶ 5. Google removed it. *Id.* The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." *Id.*, Exh. A.

Mr. Kennedy complained about the action, particularly since his comments about vaccine policy only consumed a portion of the NHIOP speech and since criticism of the government's public health policymaking is such an important part of Kennedy's campaign. *Id.*, ¶ 6. Indeed, Kennedy became a vocal critic of the government's COVID-19 policies not just because of his advocacy for enhanced vaccine safety—recall that the COVID shots did not exist at the beginning of the pandemic—but because he saw how the federal government and large corporations used the pandemic to enrich themselves while hurting others. RFK Decl., ¶ 10. Thus, for Kennedy's campaign, COVID-19 has been a contemporary example of the corrupt merger of corporate and state power, something he has spent decades advocating against. *Id.*

Despite Mr. Kennedy's pleas, Google refused to change its position. It said it "removed the [Kennedy speech in New Hampshire] for violating our policies on COVID-19 vaccine misinformation …. While we do allow content with educational, documentary, scientific or artistic context, such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context." Street Decl., Exh. B.

Google has removed other videos of Kennedy during his presidential campaign, including interviews he did with Jordan Peterson and Joe Rogan, which were removed in June and July, respectively. RFK Decl., ¶ 4; Declaration of Amaryllis Kennedy, dated September 11, 2023 ("A. Kennedy Decl."), ¶¶ 4-5, Exh. A.) Again, although Google cited its vaccine misinformation policy to justify these decisions, it removed the entire video, which included Kennedy speaking about other matters of public concern that are central to his presidential campaign. It often does this. RFK Decl., ¶¶ 3-5; A. Kennedy Decl., ¶¶ 4-8. And while Google has not removed every video of Kennedy speaking about these matters from YouTube, it has removed several high-profile videos, including the Peterson and Rogan videos, creating a chilling effect around Mr. Kennedy's campaign, which, like many insurgent campaigns, depends on third parties to circulate Kennedy's message. *Id.* That is especially true now, since the Democratic Party has refused to

22

hold primary debates or do anything to allow anybody to mount a challenge to President Biden.

YouTube is not some bit player in the campaign. Users consumed roughly 110 million hours of election-related content on YouTube during the early stages of the 2016 campaign. Street Decl., Exh. E-1. Kate Stanford, the director of YouTube's advertiser marketing at the time, made much of that, saying: "Voter decisions used to be made in living rooms, in front of televisions. Today, they're increasingly made in micro-moments, on mobile devices [and while watching YouTube]." *Id.* The data on the 2020 campaign will likely show even greater use of YouTube by voters. Thus, YouTube has become an important platform for political campaigns, especially when it comes to raw content like candidate interviews and speeches. RFK Decl., ¶ 5; A. Kennedy Decl., ¶¶ 6-8. YouTube is an especially important platform for Mr. Kennedy, who many mainstream media outlets have refused to cover or censored to remove comments critical of the current government. RFK Decl., ¶ 10.

Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign, but it refused. RFK Decl., ¶ 7; A. Kennedy Decl., ¶ 10; Street Decl., ¶ 11. That led to the filing of this case. It was filed on the heels of a similar case led by two state attorneys general, *Missouri et al. v. Biden et al.*, No. 3:22-cv-01213-TAD-KDM. On July 4, Judge Terry

23

Doughty issued an opinion that enjoins federal government officials from coercing technology companies to censor the government's critics. Street Decl., ¶ 12. The injunction does not bind the technology companies themselves, though, and thus does not prohibit Google from continuing to use its misinformation policies to censor Mr. Kennedy during his presidential campaign. *Id.*

The government appealed that decision to the Fifth Circuit Court of Appeals, which stayed the injunction pending appeal. *Id.*, ¶ 13. The Fifth Circuit issued an opinion last week that largely affirmed Judge Doughty's order. *State of Missouri et al. v. Biden et al.*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023)(per curiam).

Shortly after the Fifth Circuit's argument, Mr. Kennedy filed an application for a temporary restraining order in the District Court. Dist. Ct. ECF 7. The application was eventually heard by District Judge Trina Thompson, who held oral argument regarding the TRO request on August 21, 2023. At the argument, Google's attorneys made clear that Google has no intention of rescinding its medical misinformation policies and that Google believes it has an obligation to remove alleged medical "misinformation" from YouTube. Street Decl., ¶ 31. Indeed, before the argument, Google amended its medical misinformation policy by merging the COVID-19 and vaccine misinformation policies. *Id.*, Exh. D.

Google also added a host of other subjects that are subject to removal from YouTube, including:

- "Content that recommends the use of specific methods for the treatment of cancer when those have not been approved by local health authorities or the World Health Organization as safe or effective …."

- "Content that promotes use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19."

- "Claims that alternative treatments are safer or more effective than approved treatments for cancer."

- "Content that promotes diet and exercise instead of seeking approved treatment for cancer."

- "Discouraging people from consulting a medical professional or seeking medical advice if they're sick with COVID-19."

- "Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment for COVID-19 such as consulting a doctor or going to the hospital."

- "Content that contradicts local health authorities' or the World Health Organization's guidance on the safety of chemical and surgical abortion."

- "Promotion of alternative abortion methods in place of chemical or surgical methods deemed safe by health authorities."

*Id.* These are just a few examples—fully expanded, the new medical misinformation policy spans multiple pages—and Google notes that it "isn't a complete list." *Id.* Presumably, anything that public health authorities say is false, misleading, or dangerous may be removed from YouTube. In addition, the person who posted the prohibited content could be issued a strike—YouTube's form of punishment—with multiple strikes leading to additional punishment, up to and including termination of the user's account. *Id.*

Like the earlier policies, the amended medical misinformation policy looks entirely to government sources to decide what information gets removed. It prohibits people from saying anything "that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances." *Id.* And it gets changed only "in response to changes to guidance from health authorities or WHO." *Id.*

On August 23, Judge Thompson issued an order denying Mr. Kennedy's application for a TRO. Dist. Ct. ECF 32. Judge Thompson believed that the balance of equities favored Kennedy over Google. *Id.* at 9. She also believed that the public interest favors more speech, not less. *Id.* at 10. But she denied the application because she did not believe that Google can be held liable under the

26

state action doctrine for using its government-dependent misinformation policies to remove videos of Mr. Kennedy's political speech from YouTube. *Id.* at 5-8. Judge Thompson gave no weight to Judge Doughty's decision in *Missouri v. Biden*, which, while focusing on the government's efforts to coerce Facebook and Twitter into censoring its critics, also described how Google embraced the Biden Administration's censorship efforts in 2022, developing is vaccine misinformation policy in response to them and in collaboration with government officials. *See Missouri v. Biden*, -- F. Supp. 3d --, 2023 WL 4335270 (W.D. La. July 4, 2023), *aff'd*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam). Instead, Judge Thompson held that she was bound by this Court's decision in *O'Handley v. Weber*, 62 F.4th 1125 (9th Cir. 2023), which she construed to set a high bar for state action cases and to preclude relief here. Dist. Ct. ECF 32, at 7-8.

Judge Thompson gave short shrift to *Rawson v. Recovery Innovations, Inc.*, 975 F. 3d 742 (9th Cir. 2020), where this Court held that the state action analysis is a flexible concept that does not require the use of specific tests, or even specific facts, but focuses on determining, as required under Supreme Court caselaw, whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotations omitted). Judge Thompson ignored *Brentwood Academy*, the Supreme

27

Court's most recent state action case, and described *O'Handley* as having "declined to extend *Rawson* …." Dist. Ct. ECF 32 at 8.

Judge Thompson found that the public interest supported denying Kennedy's application because of Google's asserted interest in "preventing widespread illness and death." *Id.* at 10. According to the court: "The coronavirus still poses a health risk to certain individuals, and it would not serve the public interest to let medical misinformation proliferate on YouTube." *Id.* Judge Thompson did not address Mr. Kennedy's argument that the speech Google has censored during his campaign is not "misinformation" (Google did not produce evidence that anything Kennedy said was false) but political speech about matters of public concern that are highly relevant in the presidential campaign.

On August 31, 2023, Google filed a motion to dismiss Mr. Kennedy's complaint. Dist. Ct. ECF 37. It is set for a hearing on November 7, 2023, the same time as the hearing on Kennedy's motion for a preliminary injunction. Dist. Ct. ECF 30.

## STANDARD FOR INTERIM RELIEF

To obtain an injunction pending appeal, Mr. Kennedy must demonstrate either (1) "a probability of success on the merits and the possibility of irreparable injury," or (2) "that serious legal questions are raised and that the balance of hardships tips sharply in [their] favor." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th

Cir. 1983); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-

35 (9th Cir. 2011) (discussing latter test, which this Court has found to survive

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)). Courts in

this circuit often use the "serious questions" test instead of *Winter* when the case

involves First Amendment rights. *See, e.g., Index Newspapers LLC v. City of

Portland*, 474 F. Supp. 3d 1113, 1125 (D. Or. 2020) (applying serious questions

test, instead of *Winter*'s likelihood of success test, to grant TRO in First

Amendment case brought by media); *U.S. WeChat Users Alliance v. Trump*, 488 F.

Supp. 3d 912, 916 (N.D. Cal. 2020) (applying serious questions test to grant

injunction in First Amendment case brought by people using WeChat app).

        Although ordinarily not appealable, a district court's denial of an application

for a TRO may be appealed immediately when further motion practice in the

district court would be futile and, absent an injunction, the controversy would

become moot. *See Graham v. Teledyne-Continental Motors*, 805 F.2d 1386, 1388

(9th Cir. 1987) (holding that denial of TRO was de facto denial of permanent

injunction). That is the case here, as this case would not be tried until 2025, after

the 2024 election. Dist. Ct. ECF 30. Moreover, an order denying an application for

a TRO is appealable when "denial of all relief was implied in the trial judge's

denial of a temporary restraining order." *Miller v. Lehman*, 736 F.2d 1268, 1269

(9th Cir. 1984) (per curiam); *see also Religious Tech. Ctr., Church of Scientology*

*Int'l, Inc. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989) (concluding that court had jurisdiction over appeal where "the circumstances render the denial [of TRO] tantamount to the denial of a preliminary injunction" (cleaned up)). Judge Thompson made clear in her ruling on the TRO that she believes *O'Handley* is controlling here and that it precludes relief in a case like this. Dist. Ct. ECF 32, at 6-8; *see also* Street Decl., ¶ 32. Thus, the Court has jurisdiction over this appeal.

Finally, there is a substantial likelihood that this and other cases that have arisen out of the public/private censorship regime, including *O'Handley*, *Missouri v. Biden* and two lawsuits brought by technology industry groups against anti-censorship laws enacted by Florida and Texas (the "*NetChoice* cases"), could be heard by the Supreme Court during its next term. That possibility weighs in favor of expedited appellate review.

## ARGUMENT

The Court should grant the injunction pending appeal because it is necessary to prevent irreparable harm to Mr. Kennedy and to prevent Google from manipulating the political process by removing criticism of the government that the Biden Administration does not want people to hear.

## A. YouTube's Medical Misinformation Policy—Which Was Developed in Response to Government Demands for It and Which Relies Entirely on the Government to Decide Which Information to Censor—Likely Violates the First Amendment.

There is no doubt that the medical misinformation policy at issue in this case would violate the First Amendment if the government issued it. After all, it makes distinctions about which speech is allowed on YouTube based on the speech's content. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, Google's primary argument is that, unlike the government, *it* can decide which speech to allow, or not allow, on YouTube based on its content. It is wrong.

A "private entity is not ordinarily constrained by the First Amendment …." *Manhattan Cmty. Access Corp. v. Halleck*, -- U.S. --, 139 S. Ct. 1921, 1930 (2019). But it may be sued for violating a person's constitutional rights under certain circumstances. This Court recognizes "at least four different criteria, or tests, used to identify [such] state action: (1) public function; (2) joint action; (3) government compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (cleaned up). But it has also emphasized that "there is no specific formula for defining state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (quotations omitted). Moreover, the tests discussed above are guideposts and "the criteria lack rigid simplicity." *Brentwood Academy*, 531 U.S.

31

at 295. The goal is to decide whether "seemingly private behavior may be fairly treated as that of the State itself." *Id.* (quotations omitted).

*Brentwood* represented a sea change in the Supreme Court's state action jurisprudence. It stopped the narrowing of the doctrine that had developed since the 1980s and moved the doctrine back to the functional and factual analysis that Justice Brennan had urged in cases like *Blum v. Yaretsky*, 457 U.S. 991, 1013 (1982) (Brennan and Marshall, JJ., dissenting). This Court did the same thing. For example, in *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002), the court reversed a district court's decision that found no state action in a case brought by preachers against a private party (the "OAC") who leased land (the "Commons") from the City of Portland. The OAC had occasionally excluded the preachers from preaching on the land, a plaza near Portland's basketball arena. The City played no role in excluding the preachers from the property: the OAC, a private entity, made that decision for its own reasons. *Id.* at 552-53. But the court "conclude[d] that, in regulating speech within the Commons, the OAC performs an exclusively and traditionally public function within a public forum." *Id.* at 557. That satisfied the state action doctrine.

Similarly, in *Rawson*, this Court reversed a grant of summary judgment for the defendant, a private entity that operated a private hospital, which the plaintiff sued after he was involuntarily committed at the hospital. The Court emphasized that, "[a]t bottom, the inquiry is always whether the defendant has exercised power

possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." 975 F.3d at 748 (quotations omitted). And it concluded that the private health care workers could potentially be held liable as state actors because a "county prosecutor played an outsized role in the duration of [the plaintiff's] detention" at the private facility. *Id.* at 754.

Other examples abound. Indeed, until 2021, on the rare occasion that this Court applied the state action doctrine narrowly, it did so over the objection of its most liberal judges. For example, in *Villegas v. Gilroy Garlic Festival*, 541 F.3d 950 (9th Cir. 2008) (en banc), the court, sitting en banc, affirmed the district court's grant of summary judgment for the private association that operates the Gilroy Garlic Festival, and which was sued for excluding the plaintiff (the member of a group called the Top Hatters). Five judges dissented. They explained that, when "deciding whether conduct of private parties amounts to government action, we engage in a highly factual inquiry." *Id.* at 958 (Thomas, Wardlaw, Fisher, Paez and Gould, JJ., dissenting). They criticized the majority's focus on just one of the state action tests—not the one (joint action) that mattered—and they said that "in limiting its analysis to whether organizing a garlic festival is an exclusive governmental function, the majority ignores both the ultimate state action inquiry and the Supreme Court's traditional means of answering that question: 'taking a flexible approach … and applying a variety of tests to the facts of each case.'" *Id.*

at 960 (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (cleaned up).

Google's actions in removing Kennedy's speeches and interviews from YouTube satisfy several aspects of the state action tests and show that, at root, it is the government, not Google, that is responsible for removing Kennedy's speech from YouTube. After all, the misinformation policy that Google has used to remove Kennedy's speech from YouTube relies *entirely* on the government to decide what speech is false, misleading, or dangerous. Street Decl., Exhs. C-D. The policy changes only when the government sources change their guidance about certain issues. *Id.* In fact, according to the misinformation policy, if public health authorities said that birds can talk but can't fly, a person would be prohibited from posting a video that says otherwise on YouTube—at least, that is, until the public health authorities decide otherwise.

Moreover, Mr. Kennedy has obtained evidence that Google worked with public health and other government officials to develop its medical misinformation policy. Street Decl., Exhs. F-P. They did so not as part of a one-way information sharing agreement like the one involved in *O'Handley*, but through a deeply intertwined partnership in which the government told Google what information it thinks is false, misleading, and dangerous and Google crafted a policy that censors that information.

34

The fact that Google communicated and worked with executive branch officials to develop its misinformation policy strengthens the state action analysis. Many of the previous social media related state action cases were based on comments made by Democratic Party legislators. Unlike legislators, executive branch officials have direct regulatory authority over companies like Google. That is why the record developed in *Missouri v. Biden* led Judge Doughty to describe the pressure that executive branch officials put on technology companies to censor dissenting viewpoints as "unrelenting pressure" which "had the intended result of suppressing millions of protected free speech postings by American citizens." *Missouri v. Biden*, -- F. Supp. 3d --, 2023 WL 4335270, at *44 (W.D. La. July 4 2023).

Judge Doughty discussed that record at length. For example, with respect to Google/YouTube, Judge Doughty described several acts of coordination that raised constitutional problems, including meetings between Google/YouTube and officials from the White House, Surgeon General's office and Centers for Disease Control about the information that the government wanted to see removed. *Id.* at *9-15. Judge Doughty also described how the CDC and Census Bureau have regular meetings with Google/YouTube about removing alleged medical misinformation which "continue[ ] to the present day." *Id.* at *22, 27-28.

Judge Doughty had no problem finding these actions to constitute state action, and to violate the First Amendment, because at least some of the government officials "either exercised or provided significant encouragement, which resulted in the possible suppression of Plaintiffs' speech." *Id.* at *42; *see also id.* at *48 (emphasizing that both White House officials and tech executives referred to themselves as "'partners' and 'on the same team' in their efforts to censor disinformation, such as their efforts to censor 'vaccine' hesitancy"). Indeed, Judge Doughty concluded that federal government officials "aligned themselves with and partnered with" third parties like Google "to avoid Government involvement with free speech" that would clearly violate the First Amendment. *Id.* at *52.

The Fifth Circuit largely affirmed Judge Doughty's decision, most notably with respect to officials from the White House and Surgeon General's office. It focused on "coercion and significant encouragement—two distinct means of satisfying the close nexus test." *Missouri*, 2023 WL 5821788, at *13. As to the latter, it found "that the clear throughline for encouragement in our caselaw is that there must be some exercise of *active* (not passive), *meaningful* (impactful enough to render them responsible) *control* on the part of the government over the private party's challenged decision." *Id.* at *14 (original emphasis). That can be

36

demonstrated either by "entanglement in a party's independent decision-making" or by "direct involvement in carrying out the decision itself …." *Id.*

The court concluded that the executive branch officials' actions satisfied both the coercion and significant encouragement tests. *See id.* at *19-24. As to encouragement, it noted that "the officials entangled themselves in the platforms' decision-making processes, namely their moderation policies." *Id.* at *23. They "had consistent and consequential interaction with the platforms and constantly monitored their moderation activities." *Id.* They did so not informally or indirectly but by "repeatedly communicat[ing] their concerns, thoughts, and desires to the platforms." *Id.* Critically, the court noted that "[t]he platforms responded with cooperation—they invited the officials to meetings, roundups, and policy discussions. And, more importantly, they complied with the officials' requests, including making changes to their policies." *Id.*[1]

These were not isolated actions. The court summarized its analysis as follows:

> Consequently, it is apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions. By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not

---

[1] The Fifth Circuit referred to the large technology companies that participated in this state-sponsored censorship project collectively as "the platforms" but they included Google/YouTube, Facebook/Instagram and Twitter.

      made in accordance with independent judgments guided by independent standards. Instead, they were encouraged by the officials' imposed standards.

*Id.* at *24 (cleaned up).

      Judge Thompson barely acknowledged Judge Doughty's decision, which the Fifth Circuit vindicated with its equally historic opinion. Instead, she concluded that *O'Handley* precludes relief in a case like this. That misreads *O'Handley*. That case arrived at a precarious time. Courts in this district had dismissed several state action cases against technology companies, usually by deeming their allegations of joint action implausible. In each case, this Court affirmed the dismissal in a short order. *See Doe v. Google, LLC*, No. 21-16934, 2022 WL 17077497, at *1-3 (9th Cir. Nov. 18, 2022) (affirming dismissal because plaintiffs "failed to show any link between the alleged actions by the Speaker and the House and YouTube's decision to remove [their] channels"); *Rutenberg v. Twitter, Inc.*, No. 21-160743, 2022 WL 1568360, at *1 (9th Cir. May 18, 2022) (noting plaintiff's "acknowledge[ment] that Twitter exercised its own 'discretion and authority' in moderating President Trump's account, and that Twitter acted as President Trump's 'opponent' in doing so); *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *1 (9th Cir. Nov. 22, 2021) (declining to infer that state officials "'dominate[d]' Meta Platforms' decision making"). Unlike the plaintiffs in the previous cases, Mr. O'Handley had evidence that Twitter suspended his account at least once after a

California government agency called the Office of Elections Cybersecurity (OEC) notified Twitter of his post. O'Handley alleged that this government notification process constituted state action. 62 F.4th at 1153-55.

This Court struggled with these allegations, issuing a lengthy, published opinion after rejecting the previous cases in short, unsigned dispositions. It dispatched O'Handley's argument by stating that "[t]he OEC offered Twitter no incentive for taking down the post it flagged." *Id.* at 1158. It said the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.* Of course, in saying that, the court improperly drew inferences in Twitter's favor. The panel seemed to recognize that, qualifying its analysis by noting that "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government," but it concluded that "we do not see the high degree of entwinement needed for state action in this case." *Id.* at 1158 n.2 (citing *Rawson*).

That high degree of entwinement exists here. Moreover, *O'Handley* said "[a] constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *Id.* at 1159. That is exactly what Google is doing to public health critics like Kennedy. It is removing

39

speech that public health authorities (the government) deem false, misleading, or dangerous, and it seems to be doing so voluntarily, as part of its civic duty to combat alleged misinformation. That cooperation, combined with the shared goals, distinguishes this case from *O'Handley*.

This does not mean that Google had to cloak itself in the power of the state, nor that Mr. Kennedy must identify a specific threat made by a government official that got Google to do its bidding, although he has obtained evidence of White House officials directing tech companies to censor him. Street Decl., Exh. P. True, merely accepting public funds and complying with generally applicable laws will not suffice. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020). And laws that simply give legal protection to private actions (like arbitration agreements) do not automatically transform private action into state action. *Roberts v. AT&T Mobility, LLC*, 871 F.3d 833, 844-45 (9th Cir. 2017). For good reason, as the Supreme Court has said it "will not tolerate the imposition of constitutional restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (cleaned up) (quotations omitted).

But if the state action doctrine means anything, it must be applied faithfully when a private party like Google does the government's bidding at the government's behest and to promote the government's preferred message.

40

That is especially important when the case involves political speech. "In the realm of speech and expression, the First Amendment envisions the citizen shaping the government, not the reverse; it removes 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity.'" *Denver Area Ed. Telecomms. Consortium, Inc.*, 518 U.S. 727, 782-83 (1996) (O'Connor, J., concurring in part and dissenting in part) (quoting *Cohen v. Calif.*, 403 U.S. 15, 24 (1971)).

That principle may explain *Lee v. Katz*, a unique case in which this Court "conclude[d] that, in regulating speech within" a public space, "the OAC [a private entity] performs an exclusively and traditionally public function within a public forum." 276 F.3d at 557. If Judge Thompson were correct, the plaintiffs should have lost that case. After all, like Google, the OAC was a private entity regulating speech that occurred on private property. *Lee* reflects a fundamental principle, one this Court has long championed: freedom of speech is different than the interests the plaintiffs asserted in other state action cases. It is the foundation of American democracy. And when giant corporations work with the government to silence

speech that the government does not want people to hear—in a forum otherwise open to all viewpoints—they assume the role of the censor and violate that right.[2]

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999), did not hold otherwise. There a prospective employee (Sutton) could not get a job from a private hospital because he refused to give the hospital his social security number. He sued, alleging that the hospital's refusal to hire him violated his constitutional and statutory rights. Essentially, Sutton argued that "because the federal government compels every employer to obtain employees' social security numbers, every employer is liable under [federal law] for violating the rights of employees (or applicants) who object on religious grounds to the social-security number requirement." *Id.* at 836. The court rejected that argument, finding that "in a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant. Indeed, without some other nexus between the private entity and the government, we would expect that the private defendant is not responsible for the government's compulsion." *Id.* at 838.

---

[2] Article I, section 2 of the California Constitution protects expressive activities conducted in privately-owned shopping centers. *Fashion Valley Mall, LLC v. NLRB*, 42 Cal.4th 850, 869-70 (2007) (citing *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899 (1979)). That principle should extend to large digital spaces like YouTube. Indeed, there is an even greater reason to extend the *Pruneyard* principle to YouTube since, unlike the shopping centers in *Pruneyard* and *Fashion Valley*, YouTube's entire purpose is to host and disseminate speech.

*Sutton* gave some examples. It noted that, in *Lugar v. Edmondson Oil Company*, 457 U.S. 922 (1982), the Supreme Court "held that the private defendants who had initiated the attachment process could be liable as state actors for 'participating in that deprivation'" because the act of inducing the "state officials to take advantage of state-created attachment procedures' made the private defendants 'willful participant[s] in joint activity with the State or its agents.'" *Id.* at 839 (quoting *Lugar*, 457 U.S. at 941-42). *Sutton* also explained that, in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972), the "private defendant was deemed to be acting in concert with the state when it sought the state's help to enforce the defendant's own racially discriminatory bylaws. Once again, the 'something more' required for a finding of governmental action on the part of a private defendant was satisfied when the plaintiff alleged that the private defendant and the state were jointly pursuing an unconstitutional end." *Sutton*, 192 F.3d at 840; *see also Missouri*, 2023 WL 5821788, at *19 (concluding that "relationship between the officials and the platforms went beyond" mere advocacy and constituted "'something more'" needed satisfy state action doctrine).

As in *Missouri v. Biden*, that "something more" also exists here. Furthermore, *Sutton* distinguished *Mathis v. Pacific Gas & Electric Company*, 891 F.2d 1429 (9th Cir. 1989), a case in which this Court found the plaintiff's state action allegations to be sufficient at the pleading stage because the defendant sued

43

for collaborating with the government there was a public utility. "'It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be state 'acts' than will the acts of an entity lacking these characteristics." *Id.* at 843 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350-51 (1974)). *Sutton* distinguished another coercion case, *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Company*, 827 F.2d 1291 (9th Cir.1987), on the same ground. It also emphasized that, in *Carlin*, "the government directed a specific entity to take a specific (allegedly unconstitutional) action against a specific person." *Sutton*, 192 F.3d at 843.

So here. We have already obtained evidence that the White House directed Twitter to censor Mr. Kennedy. Street Decl., Exh. P. Discovery will likely reveal similar directions from executive branch officials to Google. Indeed, the White House and other executive branch officials have repeatedly denounced Mr. Kennedy as a member of the "disinformation dozen" and specifically called for technology companies to censor him. RFK Decl., ¶ 16.

That evidence is significant. Although Google may not have a legal monopoly on online video sharing, the Fifth Circuit found that it, like Facebook and Twitter, has an "effective monopoly over its particular niche of online discourse." *NetChoice*, 49 F.4th at 476. Indeed, YouTube's influence is only

44

growing. "As of 2023, the platform boasts 2.68 billion active users, as well as 80 million YouTube Premium subscribers. It's also established itself as the second-largest search engine in the world, next to its parent Google." Street Decl., Exh. E-2. According to *Forbes*, more than half of internet users visit YouTube at least once per month. Those "staggering numbers aren't just statistics, either. They highlight the expansive influence and potential of social media platforms." *Id.* And they continue to grow, with the technology companies using federal law to immunize themselves from liability for the content they host.

Historically, this has been the type of situation in which the courts paid closer attention to the inherent nexus between the government and the private entity. Those factors, combined with the self-described public/private partnership and Google's reliance on government policies to censor speech, weigh in favor of finding state action here.

### B. Mr. Kennedy Will Be Irreparably Harmed If the Court Allows Google to Continue Using its Misinformation Policy to Remove His Political Speech from YouTube.

There is no dispute that Mr. Kennedy will suffer irreparable harm if the Court does not order Google to stop using its misinformation policy to censor Kennedy's speech during his political campaign. Nor could there be. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed,

this Court has held that irreparable injury is often presumed when the plaintiff alleges a "colorable First Amendment claim …." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).

Judge Thompson held otherwise because she believed that Kennedy has other ways of communicating with voters. She erred. This Court "has repeatedly found irreparable harm to plaintiffs even where a speech restriction left them free to speak in other ways." *Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1128 (E.D. Cal. 2016) (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009), and *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827-28 (9th Cir.2013)). Moreover, contrary to Google's arguments below, a plaintiff does not need to show that he, and he alone, is being censored, as "the Supreme Court has acknowledged that a party may claim viewpoint discrimination even when it is not the only one targeted for censorship." *Daunt v. Benson*, 956 F.3d 396, 419–20 (6th Cir. 2020) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831-32 (1995)); *see also Griffin v. Bryant,* 30 F. Supp. 3d 1139, 1175-77 (D.N.M. 2014) (concluding that plaintiff had standing to challenge rule because it "most likely affected his speech," and because of lax standing requirements for such cases).

That would not matter anyway. "The First Amendment protects political association as well as political expression." *Puerto Rico Ass'n of Mayors v. Velez-*

*Martinez*, 480 F. Supp. 3d 377, 378 (D.P.R. 2020) (citing *Buckley v. Valeo*, 424 U.S. 1, 15 (1976)). The chilling effect created by YouTube's medical misinformation policy disrupts Kennedy's political organization and thus interferes with his and other people's right to political association.  RFK Decl., ¶ 5; A. Kennedy Decl., ¶¶ 6-8.

Judge Thompson also erred in discounting the political nature of Mr. Kennedy's speech. The harm that accompanies the denial of First Amendment rights "is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and a delay of even a day or two may be intolerable." *Klein*, 584 F.3d at 1208 (cleaned up); *see also Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (upholding preliminary injunction against state's limitations on contributions to political committees in state or county recall campaigns for this reason). That may be why the Supreme Court has repeatedly rejected government efforts to control the information voters receive during the political process. *See, e.g., Brown v. Hartlage*, 456 U.S. 45, 61-62 (1982) (finding that application of state statute to invalidate election results based on candidate's promise to serve at impermissible reduced salary violated First Amendment).

*Brown* is instructive. Like YouTube's government-based misinformation policy, the Kentucky statute involved in that case imposed a penalty on a candidate

for distributing alleged misinformation. That did not save it. "Although the state interest in protecting the political process from distortions caused by untrue and inaccurate speech is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount." *Id.* at 61. In fact, a "candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent." *Id.* Thus, in the political process, "[t]he preferred First Amendment remedy of more speech, not enforced silence, [ ] has special force." *Id.* (cleaned up).

This case is no different. The fact that it involves a private party punishing people for disagreeing with the government only makes it more important. The Supreme Court was right: the internet *is* the "modern public square." *Packingham v. North Carolina*, -- U.S. --, 137 S. Ct. 1730, 1737 (2017); *see also Biden v. Knight First Amend. Inst.*, -- U.S. --, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring) (noting that internet platforms like YouTube "hold themselves out as organizations that focus on distributing the speech of the broader public"). It is where political debate occurs, where people get their news, where they decide how to vote. That will only increase in the future. Allowing the companies that control the biggest parts of that square to silence the incumbent government's critics,

48

based solely on the incumbent government's views, would set a dangerous precedent.

## C. Google Is Not a Publisher, So It Will Not Suffer from Being Ordered Not to Remove Video of Kennedy's Political Speech.

We are not the only ones who think so. Justice Marshall, a champion of the state action doctrine, drew an important distinction between the limited nature of the private speech forum involved in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), and the way the company used it.

In that case, the Supreme Court decided that the California government could not force PG&E, a private company, to give an opponent space in a newsletter that PG&E included in its billing statements. The Court emphasized that "because access is awarded only to those who disagree with appellant's views and who are hostile to appellant's interests, appellant must contend with the fact that whenever it speaks out on a given issue, it may be forced … to help disseminate hostile views." *Id.* at 14. The Court had no problem finding that regulation to violate the First Amendment. *Id.* But Justice Marshall explained that if PG&E were "to use its billing envelopes as a sort of community billboard, regularly carrying the messages of third parties, its desire to exclude a particular speaker would be deserving of lesser solicitude." *Id.* at 23 (Marshall, J., concurring).

49

That is exactly what Google did with YouTube and why its desire to remove Mr. Kennedy's political speech after the fact does not deserve the protection the Supreme Court showed in *PG&E*, *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241 (1974), or *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), the cases that Google cited below to justify its actions. Moreover, those cases were compelled speech cases and "[t]he compelled speech violation in each … resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006) ("*FAIR*"). But Google is *not* a publisher. Under section 230 of the Communications Decency Act, it cannot be held liable for the content its users publish. 47 U.S.C. § 230(c)(1). In fact, Congress enacted section 230 in response to a decision, *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), that deemed an internet platform, over its objection, to be akin to a newspaper because its content removal process "constitute[d] editorial control" over the platform. *See* H.R. REP. No. 104-458, at 194 (1996) ("One of the specific purposes of [section 230] is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers….").

Moreover, Google does not engage in expressive activity when it allows people to post videos on YouTube. "Unlike newspapers," internet platforms like YouTube "exercise virtually no editorial control or judgment." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 460 (5th Cir. 2022). They use "algorithms to screen out certain obscene and spam-related content. And then virtually everything else is just posted to the Platform with zero editorial control or judgment." *Id.* That further distinguishes this situation from *Tornillo* and its progeny.

As Google admitted below, there are many videos of Kennedy speaking on YouTube about public health matters that the government disagrees with, and which therefore could be removed at any time, especially under Google's new medical misinformation policy. Judge Thompson viewed that fact as weighing against Mr. Kennedy. In fact, it tilts the scales sharply in Kennedy's favor because it shows that Google acts arbitrarily when it removes videos (often the most popular ones) of Kennedy's political speech. Furthermore, Google does not have to censor Kennedy completely to violate his rights. In the current political environment, Mr. Kennedy needs *every* avenue open to him. After all, the president won't debate him, and the DNC won't even acknowledge his candidacy. RFK Decl., ¶ 5. Any video could go viral. Every video matters. Thus, the chilling effect from Google's actions hurts Kennedy's campaign. *Id.,* ¶¶ 5-6.

### D.     The Public Interest in Having Open Dialogue During the Political Process Strongly Favors Granting Injunctive Relief.

That gives Mr. Kennedy the personal interest needed to pursue this relief. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984) (noting that "when there is a danger of chilling free speech, ... society's interest" in promoting speech outweighs prudential standing considerations that might otherwise require greater degree of harm to sue). And it tilts the public interest in favor of granting an in junction pending appeal.

That should not be surprising. "The Ninth Circuit has consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *cf. Tunick v. Safir*, 209 F.3d 67, 95 (2d Cir.2000) (Sack, J., concurring) (explaining that courts should not "mak[e] unnecessary distinctions ... between speech that we find to be urgent and that which we think can bide its time"). Judge Thompson recognized that but held that the public interest favored denying the requested TRO because Kennedy's speech, which she described as "misinformation," might lead to more COVID illnesses and deaths. ECF 32, at 10.

She erred. The record contains no evidence that anything Mr. Kennedy said was false. In fact, the government has increasingly targeted Kennedy's speech not because it is false (and thus "misinformation" or "disinformation") but because the government believes it is misleading or potentially harmful (and thus something

called "malinformation"). RFK Decl., ¶ 8. Even if that was a meaningful distinction—it still constitutes viewpoint discrimination—the record did not contain any evidence that Kennedy's speech, especially his political speech about public health policymaking, would cause any harm to anybody. *Id.* Thompson's concerns about the public health consequences of Kennedy's speech were, at best, speculative. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Speculative harm to the public should not be used to deny relief in an important First Amendment case where, under established law, the balance of equities otherwise favors the plaintiff and justifies relief.

Judge Thompson also erred in denying the TRO based on Mr. Kennedy's purported delay in seeking relief. Courts have rejected such arguments when the injunctive relief would prevent a violation of First Amendment rights, reasoning that "[t]his rationale of denial due to delay is not applicable in the context of an alleged First Amendment violation where each passing day may constitute a separate and cognizable infringement on the First Amendment." *Dow Jones & Co. v. Kaye*, 90 F. Supp. 2d 1347, 1362 (S.D. Fla. 2000) (cleaned up); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (discussing this principle and noting that "courts are loath to withhold relief solely on that ground" (cleaned up)).

Moreover, Mr. Kennedy has provided a compelling reason for his decision to seek injunctive relief now because, unlike Facebook and Twitter, Google has continued to censor his speech on matters of public concern during his political campaign and despite his repeated requests that they stop. RFK Decl., ¶¶ 7-10; A. Kennedy Decl., ¶¶ 8-10.

That is especially true now, in what will be one of the most important elections in American history. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940). It does not matter that Mr. Kennedy's political speech often references COVID-19, an illness that Judge Thompson believes "still poses a health risk to certain individuals …." Dist. Ct. ECF 31, at 10. "'They that can give up essential liberty to obtain a little safety deserve neither liberty nor safety.'" *United States v. Kincaide*, 379 F.3d 813, 842 (9th Cir. 2004) (en banc) (Reinhardt, Pregerson, Kozinski and Wardlaw, JJ., dissenting) (quoting B. Franklin, Historical Review of Pennsylvania (1759)). COVID-19 will always pose a health risk to Americans, just as the flu does more than a century after it first struck. The risk of illness could always be used to chill public health debate. That cannot be proper.

E.     The Court Should Set an Expedited Briefing Schedule and
       Schedule Argument at the Same Time as the Trump/Wolf Appeal.

Time is of the essence. "There are short timeframes in which speech can
have influence." *Citizens United v. F.E.C.*, 558 U.S. 310, 334 (2010). That is
especially true in the political process. "The decision to speak is made in the heat
of political campaigns, when speakers react to messages conveyed by others. A
speaker's ability to engage in political speech that could have a chance of
persuading voters is stifled if the speaker must first commence a protracted
lawsuit." *Id.*

So here. Some people would like to forget the COVID-19 pandemic. They
want to treat it as a historical anomaly, a once-in-a-century event that won't be
repeated. Others, like Mr. Kennedy, feel otherwise. They saw government and
corporations manipulate the pandemic to increase their power and enrich
themselves while destroying small businesses and trampling civil liberties. RFK
Decl., ¶ 10. They saw the government's COVID-19 response, which included
shutting down the global economy and then spending trillions of dollars to try to
turn it back on at the right time, as the biggest public policy blunder in history. *Id.*
They saw billions of dollars in taxpayer money wasted on ineffective, and
potentially unsafe, vaccines. *Id.* They saw children's lives set back by the
unprecedented and unnecessary forced closure of schools. *Id.*

Public health officials supported all those failed policies. How can America recover from the COVID pandemic, and deal with future public health events, without questioning the public health orthodoxy?

Moreover, Google's amended medical misinformation policy shows that the company does not view COVID-19 as an isolated emergency that briefly required the censorship of dissent. It prohibits the discussion of many topics that, while involving individual health, are also matters of public and political concern, including abortion. Street Decl., Exh. D. No doubt Google's medical misinformation policy will also soon prohibit people from posting videos that say there are only two genders (if it does not already do that, since the list of prohibited viewpoints is not exhaustive). *Id.*

Thus, the Court must act now. A case involving similar issues, *Trump v. Twitter, Inc.*, No. 22-15961, in which Mr. Kennedy's counsel represents one of the appellants (Dr. Naomi Wolf), is pending and will be argued in Pasadena on October 4, 2023. *Id.*, ¶ 33. This case could be set for argument at the same time. That will ensure that these important issues get the prompt attention they deserve—both in this Court and above.

# CONCLUSION

For the foregoing reasons, the Court should grant the motion or set an expedited briefing and argument schedule so this important matter can be decided as soon as possible.

Respectfully submitted,

Date: September 11, 2023

JW HOWARD/ATTORNEYS, LTD.

_____/s/ Scott J. Street_____
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

## 9th Cir. Case Number(s) 23-16141

The undersigned attorney or self-represented party states the following:

[  ] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ x ]   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Trump v. Twitter, Inc.*, No. 22-15961 (described above, raises similar First Amendment and state action issues against a technology company)

**Signature:** /s/ Scott J. Street        **Date September 11, 2023**

58

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16141

I am the attorney or self-represented party.

**This brief contains 9,491 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Scott J. Street **Date September 11, 2023**
*(use "s/[typed name]" to sign electronically filed documents)*

# CERTIFICATE OF SERVICE

**_Robert F. Kennedy, Jr. v. Google, LLC, et al._**

**U.S. Court of Appeals for the Ninth Circuit, Case No.
23-16141**

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On September 11, 2023, I caused **APPELLANT'S EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR INJUNCTION PENDING APPEAL** to be filed and served via the Court's Electronic Service upon the parties listed on the Court's service list for this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 11, 2023 at San Diego, California.

_/s/ Dayna Dang_
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com

# EXHIBIT B

YouTube bans misinformation about Covid vaccinations | YouTube | The Guardian

**YouTube**

🕐 This article is more than **2 years old**

# YouTube bans misinformation about Covid vaccinations

**Any claims about Covid vaccinations that contradict the WHO will be removed, says YouTube**

**Coronavirus – latest updates**

**See all our coronavirus coverage**



📷 YouTube's new policy comes a day after Facebook expanded its own policy on vaccination content. Photograph: Toby Melville/Reuters

**Alex Hern**

🐦 **@alexhern**

Wed 14 Oct 2020 12.40 EDT

YouTube has banned misinformation about Covid vaccinations, just days after Facebook took similar action on its own platform.

The company says that the fact that such a vaccine might be imminent makes it the right time to take action, and expand its pre-existing policies against Covid-19 medical misinformation.

"A Covid-19 vaccine may be imminent, therefore we're ensuring we have the right policies in place to be able to remove misinformation related to a Covid-19 vaccine from the platform," a YouTube spokesperson said. "Any content that includes claims about Covid-19 vaccinations that contradict expert consensus from local health authorities or the World Health Organization (WHO) will be removed from YouTube."

Examples of now-banned claims include false allegations that the vaccine would kill people or cause infertility, or claiming that the vaccine would in some way implant microchips in recipients.

"To date, we have removed over 200K videos related to dangerous or misleading Covid-19 information since early February," the spokesperson continued.

The company has faced considerable criticism over its misinformation policies in the past, which have been typified by "infoboxes" it places under videos on controversial topics. The boxes, which simply link to a Wikipedia page on the controversy in question, have been mocked by users as doing little to solve the basic problem of misinformation.

Andy Pattison, manager of digital solutions at the World Health Organization, said that the WHO meets weekly with the policy team at YouTube to discuss content trends and potentially problematic videos. Pattison said the WHO was encouraged by YouTube's announcement on coronavirus vaccine misinformation.

YouTube said it would be announcing more steps in the coming weeks to emphasise authoritative information about Covid-19 vaccines on the site.

YouTube's new policy comes a day after Facebook expanded its own policy on vaccination content to ban adverts which advocate against vaccines. That policy has been criticised for leaving a loophole which continues to allow anti-vaccination ads provided they have a political message. For instance, an advert which advocated against the government providing a Covid-19 vaccine would be allowed, Facebook said, even if it may do so by questioning the efficacy or safety of vaccines.

## More on this story



**MrBeast sues company behind his fast food chain over 'inedible' burgers**

🕐 2 Aug 2023



**YouTube found to push content about guns to children watching games videos**

🕐 17 May 2023



**YouTube's NFL deal turns up the heat in battle for sports rights**

🕐 23 Dec 2022

**Most viewed**

# EXHIBIT C

INSIDE YOUTUBE

# Perspective: Tackling Misinformation on YouTube

BY **NEAL MOHAN,** *SVP, YOUTUBE*

AUG 25, 2021  –  4 MINUTE READ

  

It's not just what we take down, but how we treat all the content we leave up that gives us the best path forward.

Misinformation has moved from the marginal to the mainstream. No longer contained to the sealed-off worlds of Holocaust deniers or 9-11 truthers, it now stretches into every facet of society, sometimes tearing through communities with blistering speed. Seemingly no topic is immune. All too frequently, we've seen misinformation spin up in the midst of breaking news. Following tragic events like violent attacks, theories emerge by the second on everything from a shooter's identity to motive. In these moments, what happens in the world also happens on YouTube. We reflect the world around us, but know we can also help shape it. And that's why we've made stopping the spread of misinformation one of our deepest commitments.

" **Speedy removals will always be important but we know they're not nearly enough. Instead, it's how we**

# content we're leaving up on YouTube that gives us the best path forward."

The solution might not be what you're thinking—that we just need to get better at removing more content, more quickly, from our site. We've had that focus since the beginning of YouTube through our Community Guidelines. Today, we remove nearly 10 million videos a quarter, the majority of which don't even reach 10 views. Speedy removals will always be important but we know they're not nearly enough. Instead, it's how we also treat all the content we're leaving up on YouTube that gives us the best path forward.

The most important thing we can do is increase the good and decrease the bad. That's why at YouTube we're ratcheting up information from trusted sources and reducing the spread of videos with harmful misinformation. When people now search for news or information, they get results optimized for quality, not for how sensational the content might be. Here's why we've made this core to our approach:

First, if we only focus on what we remove, we're missing the massive amount of content that people actually see. Bad content represents only a tiny percentage of the billions of videos on YouTube (about .16-.18% of total views turn out to be content that violates our policies). And our policies center on the removal of any videos that can directly lead to egregious real world harm. For example, since February of 2020 we've removed over 1M videos related to dangerous coronavirus information, like false cures or claims of a hoax. In the midst of a global pandemic, everyone should be armed with absolutely the best information available to keep themselves and their families safe.

track the science as it develops. In most other cases, misinformation is less clear-cut. By nature, it evolves constantly and often lacks a primary source to tell us exactly who's right. Like in the aftermath of an attack, conflicting information can come from all different directions. Crowdsourced tips have even identified the wrong culprit or victims, to devastating effect. In the absence of certainty, should tech companies decide when and where to set boundaries in the murky territory of misinformation? My strong conviction is no.

## " **In the absence of certainty, should tech companies decide when and where to set boundaries in the murky territory of misinformation? My strong conviction is no.**"

We saw this play out in the days that followed the 2020 U.S. Presidential election. Without an official election certification to immediately point to, we allowed voices from across the spectrum to remain up. But our systems delivered the most trustworthy content to viewers. That first week, the most watched channels and videos for election coverage came from reliable news outlets. Once states certified their election results in early December, we began removing content with false claims that widespread fraud changed the outcome of any past U.S. presidential election. We've since taken down thousands of videos for violating our elections-related policies, with over 77% removed before hitting 100 views.

a message that controversial ideas are unacceptable. We're seeing disturbing new momentum around governments ordering the takedown of content for political purposes. And I personally believe we're better off as a society when we can have an open debate. One person's misinfo is often another person's deeply held belief, including perspectives that are provocative, potentially offensive, or even in some cases, include information that may not pass a fact checker's scrutiny. Yet, our support of an open platform means an even greater accountability to connect people with quality information. And we will continue investing in and innovating across all our products to strike a sensible balance between freedom of speech and freedom of reach.

I sometimes get asked whether we leave up hot-button content because we benefit financially. Not only have we found that this type of content doesn't perform well on YouTube—especially compared to popular content like music and comedy—it also erodes trust with viewers and advertisers. We've committed significant time and money to address this, and as we've done so, our company, and therefore our creator economy has benefitted. In short, responsibility is good for business.

Some will likely disagree with our approach and ask us to take down or leave up even more content, but I'm buoyed by the progress of these early investments. Our teams continue to work around the clock to improve our systems and we'll keep building on the foundational work that helps us combat misinformation. I'll detail more on that soon, but I hope these perspectives shed light on how we're thinking about the broader misinformation challenge at YouTube.

## Related Topics

Explore the latest company news, creator and artist profiles, culture and trends analyses, and behind-the-scenes insights on the YouTube Official Blog.

**Our Channels**

**Twitter**

**Connect**

About YouTube

YouTube Products

For Business

For Creators

Our Commitments

Policy & Safety        Copyright        Brand Guidelines        Privacy        Terms

Help      English

# EXHIBIT D

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF LOUISIANA
 2                     MONROE DIVISION

 3     STATE OF MISSOURI ex
       rel. ERIC S. SCHMITT,
 4     Attorney General,
       et al.,
 5                              No. 3:22-cv-01213-TAD-KDM
           Plaintiffs,
 6
       vs.
 7
       JOSEPH R. BIDEN, JR.,
 8     in his official capacity

 9     as President of the United

10     States, et al.,

11         Defendants.

12

13       THE VIDEOTAPED DEPOSITION OF CAROL CRAWFORD

14                  November 15, 2022

15               9:24 a.m. to 5:33 p.m.

16

17                Office of General Counsel
            Centers for Disease Control and Prevention
18                   1600 Clifton Road NE
                       Atlanta, Georgia

19

       Reporter:
20           Maureen S. Kreimer, CCR-B-1379, CRR

21

22

23

24

25
```

```
 1                  INDEX TO EXAMINATIONS

 2     Examination                                    PAGE

 3     CAROL CRAWFORD

 4     Cross-Examination by Mr. Vecchione                9

 5               DESCRIPTION OF EXHIBITS
       Plaintiffs'
 6       EXHIBIT            DESCRIPTION             PAGE

 7     Exhibit 1    Deposition Notice for Carol       21
                    Crawford
 8
       Exhibit 2    Emails ending 2/7/20 Subject FB   22
 9                  Coordination
                    MOLA_DEFSPROD_00004442-4445
10
       Exhibit 3    Emails ending 3/5/20 Facebook's   33
11                  COVID-19 Response Efforts
                    MOLA_DEFSPROD_0004060-4061
12
       Exhibit 4    Emails ending 3/31/20 CDC brief on 38
13                  ways to reach high-risk and
                    frequent travelers
14                  MOLA_DEFSPROD_00003872 and
                    MOLA_DEFSPROD00015014-15017
15
       Exhibit 5    Emails ending 3/30/20 CDC brief on 43
16                  ways to reach high-risk and
                    frequent travelers
17                  MOLA_DEFSPROD_00015018--19
       Exhibit 6    Emails ending 1/26/21 CrowdTangle 49
18                  COVID-19 reports for WHO
                    MOLA_DEFSPRDO_00002595-96
19     Exhibit 7    Emails ending 5/26/21 CrowdTangle 60

20                  COVID-19 reports

21                  MOLA_DEFSPROD_00002591-94

22     Exhibit 8    Emails ending 3/31/21 re: This    67

23                  week's meeting

24                  MOLA-DEFSPROD-00003031-33

25     (CONTINUED NEXT PAGE)
```

**CAROL CRAWFORD  11/15/2022**

 1   Exhibit 9    Emails ending 5/6/21 Misinfo on two       85
              issues MOLA_DEFSPROD_00002686-2688
 2
     Exhibit 10   emails ending 5/10/21 CV19 misinfo        91
 3            reporting channel
              MOLA_DEFSPROD002684-2685
 4
     Exhibit 11   Emails ending 5/20/21 Agenda item        102
 5            for CDC call this week
              MOLA-DEFSPROD_00002659-2660
 6
     Exhibit 12   Lancet April 2021 article.  Bell's       112
 7            palsy and SARS-CoV-2 vaccines
     Exhibit 13   Lancet September 2021 article            112
 8            Bell's palsy and SARS-CoV-2
              vaccines - an unfolding story
 9   Exhibit 14   Document titled Infection fatality       113
              rate of COVID-19 in
10            community-dwelling populations with
              emphasis on the elderly:  An
11            overview
     Exhibit 15   Emails ending 6/2/21 RE It was this      118
12            list sorry!
              MOLA-DEFSPROD_00002538-2541
13   Exhibit 16   Emails ending 6/3/21 RE It was this      126
              list, sorry!
14            MOLA-DEFSPROD_00002532-33
     Exhibit 17   Emails 7/26/21 FB Misinformation         138
15            Claims_Help Debunking
              MOLA_DEFSPROD_00002478
16   Exhibit 18   Emails ending 7/20/21 CrowdTangle        141

17            COVID-19 reports

18            MOLA-DEFSPROD_00002487-2489

19   Exhibit 19   emails ending 8/18/21 CrowdTangle        145

20            COVID-19 reports

21            MOLA-DEFSPROD-00002438-440

22   Exhibit 20   Emails ending 8/19/21 VAERS talking      150

23            points 8.15_AH_PM_CLEAN COPY.docx

24            MOLA-DEFSPROD_00002434-435

25   (CONTINUED NEXT PAGE)

```
 1    Exhibit 21    9/1/21 Email BOLO: CDC lab alert &    152
               misinformation
 2             MOLA-DEFSPROD_00002249
      Exhibit 22    Emails ending 11/2/21 New Claims &    155
 3             Policy updates following EAU
               authorization for 5-11 year olds
 4             MOLA-DEFSPROD_000011778-779

 5    Exhibit 23    Emails ending 11/8/21 New Claims &    163
               Policy updates following EAU
 6             authorization for 5-11 year olds
               MOLA_DEFSPROD_00001774-775
 7    Exhibit 24    Bloomberg article Frequent Boosters   164
               Spur Warning on Immune Response
 8
      Exhibit 26    Emails ending 2/3/22 Vaccine          166
 9             Misinformation Questions for CDC
               MOLA_DEFSPROD_00001683-1686
10
      Exhibit 27    Emails ending 2/4/22 Have 5 minutes   171
11             to chat?  MOLA_DEFSPROD_00001677
      Exhibit 28    Emails ending 3/23/21 COVID misinfo   173
12             project MOLA_DEFSPROD_00003130-31

13    Exhibit 29    Emails ending 4/5/21 Followup on      179
               mis-info conversation
14             MOLA_DEFSPROD_00003024-25

15    Exhibit 30    Emails ending 4/12/21 Followup on     187
               mis-info conversation
16             MOLA_DEFSPROD_00002936

17    Exhibit 31    Emails ending 12/21/21 Omicron page   188
               MOLA_DEFSPROD_00001719-21
18    Exhibit 32    Emails ending 4/9/21 Request for      196
               problem accounts
19             MOLA_DEFSPROD_00002971
20    Exhibit 33    Emails ending 4/14/21 Request for     200
21             problem accounts
22             MOLA_DEFSPROD_00002807
23
24    (CONTINUED NEXT PAGE)
25
```

**CAROL CRAWFORD  11/15/2022**

```
 1    Exhibit 34   Emails ending 6/30/21 COVID        205
                   Misinformation
 2                 MOLA_DEFSPROD_00002496-500
      Exhibit 35   9/3/21 Email BOLO:  CDC lab alert & 219
 3                 misinformation
                   MOLA-DEFSPROD_00002200
 4    Exhibit 36   Emails ending 4/15/21 Call or VC -  221
                   Facebook weekly sync with CDC
 5                 MOLA_DEFSPROD_00002806
      Exhibit 37   Emails ending 4/29/21 CDC Guides    226
 6                 and this week's meeting
                   MOLA_DEFSPROD_00002694-95
 7    Exhibit 38   Emails ending 4/30/21 WY issue      237
                   MOLA_DEFSPROD_00002690-91
 8
      Exhibit 39   Emails ending 5/6/21 Join with New  239
 9                 Info E call or VC
                   MOLA_DEFSPROD_00002689
10
      Exhibit 40   5/10/21 Email COVID BOLO meetings   241
11                 on misinformation
                   MOLA_DEFSPROD_00002683-2682
12
      Exhibit 41   Emails ending 6/10/21 CDC COVID_19  247
13                 BOLO Meeting
                   MOLA_DEFSPROD_00002521-22
14
      Exhibit 42   Emails ending 10/28/21 Booster      249
15                 Shots MOLA_DEFSPROD_00001827-29
      Exhibit 43   6/29/22 email Claims review         254
16                 MOLA_DEFSPROD_00001556

17    Exhibit 44   Emails ending 3/10/21 Themes that   257

18                 have been removed for misinform

19                 MOLA_DEFSPROD_00003159-161

20

21    (REPORTER'S NOTE:  Original Plaintiffs' Exhibits 1

22    through 24 and 26 through 44 have been attached to

23    the original deposition transcript.)

24

25
```

```
 1    APPEARANCES OF COUNSEL:
      On behalf of the Plaintiff State of Missouri:
 2         D. JOHN SAUER, ESQ.
           Missouri Attorney General's Office
 3         Supreme Court Building
           221 W. High Street
 4         P.O. Box 899
           Jefferson City, Missouri 65101
 5         John.sauer@ago.mo.gov
           (877) 696-6775
 6    On behalf of the Plaintiffs Dr. Jayanta Bhattacharya,
      Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill
 7    Hines:

 8         JOHN J. VECCHIONE, ESQ.

 9         New Civil Liberties Alliance

10         1225 19th Street N.W.

11         Suite 450

12         Washington, DC  20036

13         John.vecchione@ncla.legal

14         (202) 869-5210

15    On behalf of Centers for Disease Control and

16    Prevention:

17          JAMES GILLIGAN, ESQ.

18          KYLA SNOW, ESQ.

19          U.S. Department of Justice

20          1100 L Street N.W.

21          Washington, DC 29530

22          202-353-3098

23          James.gilligan@usdoj.gov

24          Kyla.snow@usdoj.gov

25     (Continued next page)
```

**CAROL CRAWFORD  11/15/2022**

```
 1    On behalf of U.S. Department of Health & Human
      Services:
 2         ANANT KUMAR, ESQ.
           U.S. Department of Health & Human Services
 3         200 Independence Avenue S.W.
           Washington, DC 20201
 4         Anant.kumar@hhs.gov

 5    Also Present:
                Kenya S. Ford, Esq.
 6              Sudevi N. Ghosh, Esq.
                Centers for Disease Control & Prevention
 7
                Melissa Thombley, Esq (via Zoom)
 8              U.S. Department of Health and Human

 9              Services

10

11              Joseph Foster, Esq.  (via Zoom)

12              Centers for Disease Control & Prevention

13

14    Legal videographer:  Jason Silling, Lexitas Legal

15

16                        - - -

17

18

19      (Pursuant to Article 10(B) of the Rules and

20    Regulations of the Georgia Board of Court Reporting,

21    disclosure was presented to all counsel present at

22    the proceeding and a written copy is attached

23    hereto.)

24

25
```

**CAROL CRAWFORD  11/15/2022**

```
 1              THE VIDEOGRAPHER: We are on the record.
 2    Today's date is November 15, 2022.  The time is
 3    9:24.  This is the video-recorded deposition of
 4    Carol Crawford in the matter of the State of
 5    Missouri versus Joseph R. Biden in the U.S. District
 6    Court for the Western District of Louisiana.
 7              This deposition is being held at the CDC.
 8    The reporter's name is Maureen Kreimer.  My name is
 9    Jason Silling.  I am the legal videographer.  We are
10    with Lexitas Legal.  Would the attorneys present
11    please introduce themselves and the parties they
12    represent.
13              MR. VECCHIONE:  I am John Vecchione.  I
14    represent the individual plaintiffs Jay
15    Bhattacharya, Aaron Kheriaty, and Jill Hines and
16    Martin Kulldorff.
17              MS. SNOW: My name is Kyla Snow.  I'm with
18    the Department of Justice representing the
19    defendants in this case.  And defendants reserve
20    their right to review, read, review and sign the
21    transcript.
22              MR. GILLIGAN:  James Gilligan, also with
23    the Department of Justice representing the
24    defendants.
25              MR. KUMAR:  Anant Kumar with the Office of
```

**CAROL CRAWFORD  11/15/2022**

```
 1   General Counsel in HHS, and I also represent the
 2   defendant.  I represent the HHS defendants.
 3           THE VIDEOGRAPHER:  Would the court
 4   reporter please swear in the witness.
 5                   CAROL CRAWFORD,
 6   having been first duly sworn, was examined and
 7   testified as follows:
 8           REPORTER:  You can begin, Counsel.
 9           THE VIDEOGRAPHER:  You may proceed.
10                   EXAMINATION
11   BY MR. VECCHIONE:
12       Q.  Good morning, Ms. Crawford.  Have you ever
13   been deposed before?
14       A.  No, I have not.
15       Q.  All right.  So I'm going to lay out some
16   ground rules.  We have to -- the court reporter and
17   everything else can only pick up verbal cues.  In
18   normal conversation, we nod our heads like you're
19   doing now and all that, but for the record we have
20   to say things out loud.  And that also, to keep a
21   clear record, we have to try not to talk over each
22   other.  And that's really something the lawyers, we
23   say to the lawyers, because they're the ones who
24   interrupt, not the witness.  But keep that in mind.
25           If you don't -- I will be asking
```

CAROL CRAWFORD  11/15/2022

Page 10

1    questions.  If you don't understand the question,

2    you can ask me to rephrase, or say you don't

3    understand.  Don't answer a question that you think

4    you don't understand.  If during the course of this,

5    your counsel -- which of you is defending this one?

6    You're going to defend it?

7            MS. SNOW:  Yes.

8    BY MR. VECCHIOINE:

9        Q.  So your counsel will make objections.

10   Wait for the objections to fade, and then answer the

11   question unless I rephrase or something like that,

12   unless she instructs you not to answer.

13           Let's see.  So do you agree with all that?

14   Do you understand the process?

15       A.  I understand.  Could you speak up a

16   little, though?  It's hard for me to hear you.

17       Q.  I can.  You know what, I didn't turn on

18   this.  I was dealing with the other mic that I have

19   on my tie.

20       A.  Thank you.

21       Q.  But in any event, so.

22           All right.  Are you taking any

23   medications, or do you have any condition that would

24   impact your ability to testify truthfully today?

25       A.  No.

```
 1            Q.  All right.  For the record please state
 2    your name.
 3            A.  Carol Young Crawford.
 4            Q.  And what's your current employment?
 5            A.  I work for the CDC.
 6            Q.  What's your title?
 7            A.  I am the division director for the
 8    division of Digital Media within the CDC Office of
 9    the Associate Director for Communication, which we
10    call OADC.
11            Q.  Give me the term again.  Office of?
12            A.  The Associate Director for Communication.
13            Q.  And what are your duties in that role?
14            A.  Our division provides leadership for CDC's
15    web presence.  We provide leadership for CDC's
16    social media presence.  We have -- we lead the
17    development operations of CDC's 800-number, which is
18    our Contact Center.  We also provide graphics and
19    visual design services for the Agency.
20            Q.  And what do you do?
21            A.  I'm the director of that work.  I
22    determine strategy, objectives, oversee work.
23            Q.  Do you have any -- well, why don't we
24    start.  Go back a little bit.
25                Could you briefly outline your education
```

1    **and employment history up until now?**

2         A.  Yes.  I started work at CDC when I was 18.

3    So I have been here 34 years.  I went to school -- I

4    have a bachelor's in business and a master's in

5    public administration, and I have been working at

6    CDC within digital communications, web, social

7    media, for really as long as those things existed at

8    CDC.

9         **Q.  And where are your degrees from?**

10        A.  University of -- the University of Georgia

11   for the master's, Georgia State for the bachelor.

12        **Q.  Okay.  So have you always been at CDC here**

13   **in Atlanta?**

14        A.  Yes.

15        **Q.  Did you have any back- -- do you have any**

16   **background in medicine, sciences, or epidemiology?**

17        A.  No.

18        **Q.  And is there anything else about the role**

19   **of the division of Public Affairs' place within CDC**

20   **that you haven't told me?  Is there anything --**

21        A.  Can you repeat?

22        **Q.  Yeah.  You have told me a little bit about**

23   **what the division of Public Affairs does, I believe,**

24   **or was that only what OADC does?**

25        A.  I was referring to the division of Digital

 1   Media.

 2        Q.  Okay.

 3        A.  Which was created in April of 2022.  Or

 4   maybe March 2022.  Sorry.

 5        Q.  On or about, as we say.

 6        A.  Yes.

 7        Q.  Now -- well, let's go back to that, the

 8   division.  The division of Public Affairs, you're

 9   within that at the CDC?

10        A.  There is no division of Public Affairs in

11   OADC any longer.

12        Q.  What happened there?

13        A.  The reorganization of OADC occurred in

14   March or April of 2022, and there's -- that division

15   does not exist anymore.

16        Q.  Prior to this changeover what did that

17   division do?

18        A.  The division had three branches.  The

19   division -- I mean, the branch of Digital Media,

20   where I was, the branch for News Media, and a branch

21   for Employee Communications.

22        Q.  And then what did the reorganization do

23   with each of those three?  Where did they go?

24        A.  The -- well, Digital Media became the

25   division of Digital Media, and parts from other

 1    divisions came to join the work that we were already

 2    doing such as the Contact Center, and the Graphics,

 3    and that was new to my organization.  The News Media

 4    group is now a branch in the division of News Media,

 5    I believe.  I'm sorry.

 6         **Q.  That's your understanding?**

 7         A.  Yes.  And then they have a Broadcast group

 8    with them.  And the Employee Communication group is

 9    now an office in the OD of the OADC.  That was the

10    other component of the Public Affairs group that you

11    asked about.

12         **Q.  Okay.  So the Digital Media branch now --**

13    **so I understand.  I'm not sure I got all that.  Who**

14    **did that before?  Was that only in the Digital Media**

15    **section of the three you've told me, or was there**

16    **overlap?**

17         A.  Well, there is no Digital Media branch

18    now.

19         **Q.  Okay.**

20         A.  There is now a division of Digital Media.

21         **Q.  Okay.**

22         A.  You may have to reask the second part of

23    your question.

24         **Q.  Okay.  Now it's the division of Digital**

25    **Media.  Who had that -- what was the name of the**

1   organization that had that role before April of

2   March of 2022?

3        A.   I was the branch chief of the Digital

4   Media Branch within the Division of Public Affairs,

5   and most of the roles that our division currently

6   performs, web and social media, were in that branch.

7        Q.   Thank you.  Did anyone else have overlap

8   before?

9        A.   No.

10       Q.   All right.  So what is the current duty of

11   the Division of Digital Media?

12       A.   The current?

13       Q.   Duties?

14       A.   Of the division of Digital Media?  We

15   provide leadership for CDC's website.  We provide

16   leadership for CDC's social media efforts.  We

17   provide graphic support for the entire agency, and

18   we manage the 800-number, the Contact Center.

19       Q.   Okay.  And what's -- what is leadership;

20   when you use that word, what do you mean?

21       A.   We, for web, for example, we convene a web

22   council with people across CDC to manage the

23   governance of the website.  We manage the web

24   content management system.  We draft policies and

25   guidelines around it.

```
 1            Q.   In your current role since April or March
 2     of 2022 --
 3            A.   Mm-hmm (affirmative).
 4            Q.   --  have you had any contact with major
 5     technology companies such as Twitter, Facebook,
 6     LinkedIn, Microsoft or Google?
 7            A.   Yes.
 8            Q.   In your previous role before the
 9     reorganization, did you have such contacts?
10            A.   Yes.
11            Q.   Generally what type of contacts are those
12     when you started them?
13            A.   We started regular contact with the groups
14     at the beginning of the COVID outbreak to exchange
15     information about COVID, and most of the contact
16     since then has been around COVID or other
17     high-priority things, but mostly COVID.
18            Q.   Okay.  Let's get some timeline down.  Is
19     the beginning of COVID, would you think, February or
20     March of 2019?
21            A.   2020.
22            Q.   2020.  Excuse me.
23            A.   Yes.
24            Q.   Okay.  For our purposes.  All right.
25            A.   Mm-hmm (affirmative).
```

1          Q.  So before that, social media had been

2   around for a while, I mean, but did -- you didn't

3   have contact with them before COVID?

4          A.  I had periodic occasional contact with the

5   platforms, depending on maybe they would reach out

6   to CDC for something, or we would be trying to reach

7   out to them for assistance with something.  I didn't

8   have regular meetings.  They were -- they were very

9   occasional.

10         Q.  All right.  COVID hits, let's say, early

11  spring of 2020.

12         A.  Mm-hmm (affirmative).

13         Q.  How did you instigate contact with these

14  systems?  Generally, I'm speaking.  I know there may

15  be some differences, but generally how did you

16  initially instigate contacts with them?

17         A.  I don't recall who initiated contact.

18         Q.  Does that mean you don't know who within

19  CDC, or does that mean you don't know if they called

20  you?

21         A.  I don't recall if they called us first, or

22  we called them first.  It could have differed also

23  depending on the platform.

24         Q.  From media company to media company?

25         A.  There was a lot going on at that time, so.

**CAROL CRAWFORD  11/15/2022**

1        Q.   Do you have a present recollection of when

2   you first spoke to any media platform about COVID,

3   or email, when I say -- had communications with?

4        A.   I believe, my recollection is, is that we

5   started talking to some of them in February and

6   March of 2020.

7        Q.   And what was the nature of the

8   discussions?

9        A.   My memory of our first interactions were

10  around getting out CDC-credible information.  For

11  instance, I know Facebook was looking at making it

12  easier to find COVID information from the CDC and

13  WHO on a platform, and they wanted to use our public

14  domain content and they were similar in

15  conversations with platforms.

16       Q.   Got it.  And did you take the initiative

17  in these meetings, or did someone direct you to go

18  do these meetings, or contacts?

19       A.   I would say I took initiative on the

20  meetings.  But there were a lot of people asking

21  staff, or other staff, are we -- were we in contact

22  with the groups, and do we have any arrangements.

23       Q.   In your current role who do you report to?

24       A.   In my current role I report to the

25  director of OADC, which is Kevin Griffis.

```
 1          Q.  And who did you report to prior to the
 2   reorganization?  That a good word.
 3          A.  Yes.
 4          Q.  Can I call it a "reorg"?
 5          A.  Yes, you can.
 6          Q.  Prior to the reoorg, who did you report
 7   to?
 8          A.  I reported to the division director for
 9   the division of Public Affairs, who was Michelle
10   Bonds.
11          Q.  All right.  So during the beginning of the
12   pandemic your direct report would be Michelle Barnes
13   [sic]?
14          A.  I was her direct report.
15          Q.  Yes, that's what I meant.
16          A.  Yes.
17          Q.  You would directly report to her?
18          A.  Mm-hmm (affirmative).
19          Q.  All right.  So do you recall her talking
20   to you about what to do with the social media
21   companies early on?
22          A.  I don't believe we discussed it.
23          Q.  And why don't you believe that?
24          A.  It was an extremely busy time, and it was
25   within the scope of work I would normally handle.
```

```
 1          Q.  All right.  Let's look at the early spring
 2     of 2020.  What were the types of contacts you had
 3     with the social media companies?  And I'm going to
 4     go through some, and you tell me if you had them.
 5              Electronic email, or other communications
 6     that are electronic?
 7          A.  Yes.
 8          Q.  Telephonic?
 9          A.  Yes.
10          Q.  And in person?
11          A.  No.
12          Q.  Okay.  Who did -- if they're telephonic,
13     who were you speaking to?  I have a hard time
14     getting any of these people on the phone.  How did
15     you get -- who did you telephonically speak to at
16     any of these social media companies?
17          A.  I had points of contact at several of
18     them, and we would have meetings when we needed to
19     talk.  So we arranged calls.
20          Q.  Do you recall any particular points of
21     contact?
22          A.  Yes.
23          Q.  Who are they?
24          A.  At Facebook my primary point of contact
25     was Payton Iheme.  I-H-E-M-E.  At Google my two
```

```
 1   points of contact were Jan Antonaros, and -- forgive
 2   me.  I'm blanking on this.
 3        Q.  We'll be looking at emails.  If you see
 4   the name, will you --
 5        A.  Yes, mm-hmm.
 6        Q.  Who else?
 7        A.  A contact we had at Twitter was Todd
 8   O'Brien [sic], though I spoke to him very rarely.
 9   We had other contacts at Twitter, but I don't know
10   their names too.  I don't recall the names of other
11   platforms.  I didn't talk to them as regularly.
12             (Plaintiffs' Exhibit 1 marked.)
13   BY MR. VECCHIONE:
14        Q.  Okay.  Can you take a look at Exhibit 1.
15   If counsel would hand it to her, please.
16             And have you seen this document before?
17        A.  Yes, I think I did.
18        Q.  So this is the Notice of Video Deposition
19   to be here today; right?
20        A.  Yes.
21        Q.  You're here pursuant to this notice?
22        A.  Yes.
23        Q.  All right.  And I'll just make one
24   correction.  We're not at Building 21.  We're in
25   Building 19?
```

Case 3:22-cv-01213-TKW-MLT Document 205-13 Filed 03/04/23 Page 102 of 349 PageID #:
10966

```
 1        A.   That's correct.

 2        Q.   All right.  Thank you.  You can put that

 3   aside.

 4             MR. VECCHIONE:  I'm going to hand to

 5   counsel a packet of Exhibit 2, if I might.  And if

 6   you could give -- and if you could give the witness

 7   an original, and there are two for your purposes.

 8             (Plaintiffs' Exhibit 2 marked.)

 9   BY MR. VECCHIONE:

10        Q.   I'll give you a moment to read through it.

11   Do you recognize this?

12        A.   Yes.

13        Q.   All right.  What is it?

14        A.   An email chain with Facebook around COVID.

15        Q.   Yeah.  Early February 2020?

16        A.   Yes.

17        Q.   Let's get -- just so we can get onto the

18   same page, the way this email chain works is the

19   oldest part is in the back; right?  And then it

20   reads up.

21        A.   Yes.

22        Q.   And let's go to the back.  In the first

23   part of the chain, as far as I can see, it says from

24   Carol Y. Crawford?

25        A.   Yes.
```

**CAROL CRAWFORD  11/15/2022**

```
 1            Q.   All right.   And there is a -- there is an
 2   email there.   Well, could you read that for me, your
 3   email?
 4            A.   "Payton, just looping you in on
 5   something."
 6            Q.   Oh.   No, no, no.   I mean, I want to get
 7   the email down.   I think it's C -- because of
 8   your -- I think it's ▓▓▓▓@CDC.gov?
 9            A.   Mm-hmm (affirmative).
10            Q.   Am I correct about that?
11            A.   That's mine, yes.
12            Q.   Okay.   And is that the only email,
13   government email, you used over this whole period,
14   or is there a different one?
15            A.   There is a -- it's the same email box, but
16   there is also ▓▓▓▓▓@CDC.gov.   It's like an alias
17   for ▓▓▓@CDC.gov.   It's the same box.
18            Q.   They all go to the same place?
19            A.   Yes.
20            Q.   It's just how the computer reads it, or?
21            A.   It's just an easier email address for
22   someone to give people --
23            Q.   Quicker to write?
24            A.   -- than ▓▓▓.
25            Q.   Do you have any other government --
```

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 225 of 349 PageID #: 10968

```
 1          A.  No.
 2          Q.  And how about have you contacted any of
 3    the social media companies with a personal email?
 4          A.  Never.
 5          Q.  Okay.  So and then this is -- I believe
 6    this is a fellow we identified earlier; right?
 7    Who's Payton Iheme?
 8          A.  Yes.
 9          Q.  And if I see ██████@fb.com, that's your
10    understanding that's Payton Iheme --
11          A.  Yes.
12          Q.  -- that's his email?  And then it says cc
13    ████████, and then there is an ██████ Facebook [sic]
14    ██@CDC.gov".  Who is that?
15          A.  Jay Dempsey worked -- works now and within
16    my branch as the social media lead, and he reported
17    to me.
18          Q.  Okay.  And his ████ has nothing to do with
19    Facebook as in Payton's email; right --
20          A.  No.
21          Q.  -- it's just a coincidence?
22          A.  It's his user ID, yes.
23          Q.  All right.  Thank you.  And what was his
24    role?
25          A.  He was the social media lead within my
```

1  branch.

2      **Q.   Okay.   And what do you state here in this**

3  **email to Payton?**

4      A.   (As read) Just looping you in on something

5  Jay and I had awareness of.   Are you in the loop

6  with this.

7      **Q.   All right.   And what is this?   What have**

8  **you attached here?**

9      A.   I don't remember this part of the chain at

10  all, but it appears to be a note from Facebook to

11  someone at the State Department outlining some

12  Facebook work on COVID.

13      **Q.   And let's get some terms down here.   The**

14  **reason you believe that, is that just from your**

15  **memory, or is that because it's Shelley Thakral --**

16  **it's from them to a person in the State Department?**

17      A.   I don't know any of the names on the

18  email.

19      **Q.   Okay.**

20      A.   I read this.   This is the first thing I

21  read when you handed --

22      **Q.   Yeah.**

23      A.   -- me the document.

24      **Q.   Got it.**

25      A.   I started at the back.

Case 3:22-cv-03233-TKW-MLT Document 20523-13 Filed 03/04/23 Page 206 of 348 PageID #:
10970

```
 1          Q.  So I'm just trying to be clear.  You don't
 2   have a present recollection of what this is --
 3          A.  No.
 4          Q.  -- what you just told me you got because
 5   that's what it says; right?
 6          A.  No.  I don't remember that part of the
 7   chain, no.  No.
 8          Q.  And were you asking Mr. Iheme whether he
 9   knew about this, or was he responsible for it?
10   Which what does it mean "in the loop about it"?
11          A.  As a note, Payton is female.
12          Q.  Okay.
13          A.  I mean, I'm reading what I wrote:  Just
14   looping you on something Jay and I had awareness on.
15   Are you in the loop with this?
16              That's all I know.  It's what I typed.
17          Q.  You don't have any other understanding
18   than that?
19          A.  No.
20          Q.  All right.  Let's move to the next part of
21   the chain.
22              (REPORTER'S NOTE:  Mr. Sauer enters
23          deposition.)
24   BY MR. VECCHIONE:
25          Q.  I see it's from Payton, from Ms. Iheme, to
```

```
 1    you and cc'ing Dempsey; right?

 2         A.   Yes.

 3         Q.   And he's responding to your request about

 4    the loop.   What does he say there?

 5         A.   At 3:35 for Payton is what you're asking

 6    me?

 7         Q.   Yes, I am.   Thank you.

 8         A.   Okay.   (As read) Let me know if you're --

 9    you would like to speak to our teams working on

10    these items.

11              Do you want me to read the whole email?

12         Q.   Yes, please.

13         A.   Okay.   (As read)  Our teams at Facebook

14    have been working to identify how we can support

15    efforts to provide users with accurate and timely

16    information about coronavirus.  We would like to get

17    CDC's feedback on a few key initiatives that we are

18    considering launching in the coming days, weeks.  I

19    have outlined the specifics below, and would greatly

20    appreciate your thoughts on the tactics and proposed

21    design/content.  We would be happy to jump on a

22    quick call today or tomorrow if that would be easier

23    as well."

24         Q.   All right.   That's great.   That's -- okay.

25    And then he has a bunch of proposals, like three
```

Case 3:22-cv-02333-WHO-MLT Document 205-13 Filed 03/04/23 Page 208 of 348 PageID #:
10972

```
 1    proposals; correct?

 2        A.  Yes.

 3        Q.  All right.  And you respond to him the

 4    next day?

 5        A.  Yes.

 6        Q.  All right.  And you say "sorry for the

 7    delay."

 8            Were you in the habit of responding to him

 9    faster than less than 24 hours on these matters at

10    that point in time?

11        A.  Payton is female.

12        Q.  Yeah, I heard.  Thank you.

13        A.  It's okay.

14        Q.  You know what Payton I'm thinking of?

15        A.  No.

16        Q.  The football player.

17        A.  Oh, sorry.

18            I don't know.  At this time I believe we

19    were working a lot of hours, and a few hours seemed

20    like a long time.  I don't think I -- I don't think

21    Payton and I had known each other via email very

22    long at this point, so I can't speculate on how

23    quick I normally email her.

24        Q.  Okay.  And you say in here in item one:

25    As well, if can rotate messages, there might be
```

```
 1   times we might want to address widespread myths like
 2   mask use or new issues.
 3           At this time what was the myth of mask
 4   use?
 5       A.  My general memory of mask use was that
 6   there was confusion about whether people should wear
 7   masks or not.
 8       Q.  And what was CDC's view at that time?
 9       A.  I really can't speak to our
10   recommendations.  I probably don't have the specific
11   recall of the timelines.
12       Q.  Okay.  And then your next sentence:  "This
13   could and should replace flu shot messaging."
14           And was that messaging that the platforms
15   were already doing about flu prior to COVID?
16       A.  This was one of the occasional
17   interactions that I recall having with Facebook.
18   They had -- I believe -- I believe they approached
19   CDC about flu messaging that prior flu season, and
20   we had had a few phone calls with them and our flu
21   division.  And my recollection is that we provided
22   them with some public domain content for them to
23   highlight.
24       Q.  Okay.  And then the next one is you're
25   still trying to get this phone call together.  And
```

```
 1    eventually you get a phone call together; right?

 2         A.   It looks like it from this chain, yes.

 3         Q.   Okay.  Can you tell us who was on that

 4    call besides Payton and you?

 5         A.   I don't recall the specific calls from

 6    that time period.

 7         Q.   Okay.  And do you know what was said on

 8    the call at all, what you discussed?

 9         A.   On that specific call, I do not.

10         Q.   Do you have any notes, calendars, or other

11    records what was said on the call?

12         A.   I don't believe -- I mean, the calendar

13    appointment's probably in my Outlook.  I don't

14    recall us taking notes, much notes, from any of the

15    meetings.  Occasional followup items.  But I don't

16    know if we took any for this.  If we did, it would

17    have been in my email, or my record, the electronic

18    records.

19              MR. VECCHIONE:  All right.  Mr. Sauer has

20    joined us.  Can we take a five-minute break while I

21    put things in order?  And I will give you the next

22    exhibit.

23              MS. SNOW:  Okay.

24              THE VIDEOGRAPHER:  We are off record at

25    9:57.
```

**CAROL CRAWFORD  11/15/2022**

```
 1              (Recess 9:57 a.m.  - 10:09 a.m.)

 2              THE VIDEOGRAPHER:  We are back on the

 3     record at 10:09.

 4              MS. SNOW:  If I could just --

 5              MR. VECCHIONE:  Go ahead.

 6              MS. SNOW:  Defendants just wanted to note

 7     that at the request of plaintiffs' counsel we've

 8     forwarded a Zoom link with a call-in number for

 9     counsel, for plaintiffs' counsel, who could not be

10     here at the deposition to listen in.  And with the

11     agreement of the parties, the Zoom link will not be

12     shared with others beyond the three plaintiffs'

13     counsel who are listening in and the Zoom, the

14     deposition will not be recorded using the phone, the

15     call-in number.

16              MR. VECCHIONE:  Remotely by them.  Just by

17     him.  (Indicating videographer.)

18              MS. SNOW:  Yes, yes.  Exactly, yes.  Thank

19     you.  And then we also just wanted to -- the witness

20     wanted to clarify a point during the last round of

21     questioning.

22     BY MR. VECCHIONE:

23         Q.  Go right ahead.

24         A.  In reviewing this email, it refreshed my

25     memory about roles.
```

**CAROL CRAWFORD  11/15/2022**

1      Q.  Are you looking at Exhibit 3 or 2, for my

2   purposes?

3      A.  2.

4      Q.  Thank you.

5      A.  I recalled that during the time of these

6   emails, I was actually serving as the acting

7   director for the division of Public Affairs.  I

8   served in that role for, I think, five or six

9   months.

10      Q.  Was that an add-on to your other duties,

11   or instead of, or like was it -- how did that come

12   about?

13      A.  Michelle Bonds had gone on a detail

14   somewhere else.  I don't recall where.  Sorry.  But

15   I was still really -- especially when COVID hit, I

16   really started also focusing on digital in-depth.

17   So that's why I was still involved.  I mean, digital

18   was still part of the division of Public Affairs, so

19   it was still part of my portfolio, but I had the

20   expertise on it, so.

21      Q.  All right.  Thank you for that.  And

22   during the day if there is any -- you have further

23   recollection as further documents get put in front

24   of you, feel free to interrupt me and tell me that.

25      A.  Okay.

Page 33

```
 1              MR. VECCHIONE:  Does the witness have
 2    Exhibit 3 in front of her?
 3              MS. SNOW:  There you go.
 4              (Plaintiffs' Exhibit 3 marked.)
 5              MR. VECCHIONE:  This is a short one.  Take
 6    a second to take a look at it.
 7    BY MR. VECCHIONE:
 8         Q.  Do you recognize this document?
 9         A.  No.
10         Q.  Can you tell me what the subject line is
11    of the first email on the chain?
12         A.  Facebook COVID-19 Response Efforts.
13         Q.  All right.  And it's from Ms. Iheme that
14    we've spoken about before to you; correct?
15         A.  Yes.
16         Q.  And it says:  "Apologies for the late
17    note," she says to you.  I want to ensure you -- "I
18    want to ensure you are aware that Mark just shared
19    our ongoing work to support government."
20              Who's Mark?
21         A.  I don't know for sure, but I'm assuming
22    this was Mark Zuckerberg.
23         Q.  And she says to you:  "Our goal is to help
24    organizations to get their safety message out to the
25    public, remove misinformation, and support overall
```

 1   community efforts in areas where we can be of help;"

 2   right?

 3        A.  Yes.

 4        Q.  Now, the next thing I see is above that it

 5   says on "March 5, 2020, at 8:55 a.m. Crawford, Carol

 6   Y...wrote," is that an email, is that a reply email

 7   from you to her?

 8        A.  Yes.

 9        Q.  You say there:  "We want to do a very

10   controlled Q&A and would like to know our best

11   options."

12             What are you referring to there, what's

13   going on?

14        A.  I believe this is in reference to a

15   Facebook Live event that we were trying to plan, and

16   it was going to be -- we expected it to be pretty

17   big, and we were asking for help in setting it up in

18   the best practices.

19        Q.  Was that from a technological standpoint,

20   like, how it was going to work, or did you need

21   their input on information?

22        A.  My memory is that it was mostly about how

23   it would work.  We had not done many big Facebook

24   Lives before then, and we were worried about having,

25   like, thousands of Q&A that we couldn't possibly

1    answer.

2        Q.  All right.  And the next thing you say

3    there is:  "Our lead POC" -- is that point of

4    contact, when I see POC?

5        A.  Yes.

6        Q.  Is Kat Turner at ███ -- I'll say ███?

7        A.  █.

8        Q.  █@CDC.gov.  So who is that?

9        A.  Kat was a social media coordinator in one

10   of our centers that was willing to help manage this

11   effort.

12       Q.  In the original email from Payton Iheme

13   what was your understanding of why she was sending

14   you this information?

15       A.  I don't recall the specific email, or --

16   there looks like there is a link -- or what it said,

17   or what it was about.  But they would often forward

18   posts from their corporations for awareness for us.

19   So I assume that was probably what this was about.

20       Q.  Okay.  And then your final email on the

21   chain you send your -- that's your phone number at

22   work, I take it?

23       A.  It's actually my personal cell that I use

24   as a what CDC calls "bring your own device."

25       Q.  Got it.

```
 1        A.  Yes, but it was the cell phone.

 2        Q.  It's your cell number you use?

 3        A.  Yes.

 4        Q.  Did you message through that cell to any

 5   of the social media companies?

 6        A.  The only time I recall using my cell phone

 7   to message anyone was like we're late for the

 8   meeting, or the contact number didn't work or

 9   something like that.  We didn't have any kind of

10   conversations on texting.

11        Q.  Do you recall whether you spoke to Payton

12   Iheme at this time?

13        A.  No.

14        Q.  Now, this is -- from my understanding is

15   this call that you're referring at the top, your

16   last part, is that to arrange the Facebook meeting,

17   or is that the Facebook meeting, the Q&A?

18             MS. SNOW:  Objection.  Vague.

19   BY MR. VECCHIONE:

20        Q.  Okay.  So let me tell you -- the reason

21   it's vague is because I don't understand something.

22             Here's what I'm trying to understand from

23   information.  Originally Ms. Iheme writes to you

24   about this information.  And then you say you want a

25   controlled Q&A; right?  On Facebook.  And then
```

1     somehow you're going to -- you're going to arrange

2     that with them and Kat Turner.

3           And then you say I'll -- here's my number,

4     and Kat knows it, I have an appointment.

5           Did you have a conversation is what I'm

6     getting about besides the Facebook Q&A?

7         A.  I don't know.  But we talked pretty

8     regularly around this time, so I imagine we probably

9     did talk.  But I don't know that for sure.

10        Q.  All right.  What was your understanding of

11     Ms. Iheme's statement that the -- Facebook was going

12     to help organizations remove misinformation?

13        A.  I don't recall a recollection of

14     discussing misinformation with Payton around this

15     time, so I can't speculate.

16        Q.  You don't have a present recollection of

17     what that meant?

18        A.  No.

19        Q.  All right.  And once again for this call

20     that you had, and maybe Kat Turner was on it, maybe

21     she wasn't, do you have any record of that call, or

22     what might have been said?

23        A.  It doesn't look like this had an

24     appointment associated with it, so I don't think

25     there's an appointment, and I don't know -- I don't

 1    remember the call, so I don't recall if there were

 2    notes.  But I know in general very little notes were

 3    kept.

 4        **Q.  Now, you said you don't recall many**

 5    **conversations about removing misinformation at that**

 6    **time.  When do you recall such conversations?**

 7        A.  I remember it becoming occasionally

 8    discussed in the fall of 2020 perhaps.

 9        **Q.  Okay.  And what do you recall being**

10    **discussed at that time?**

11        A.  I can recall us generally saying things to

12    the effect of -- I don't remember any specifics, but

13    misinformation is really growing, or, you know, what

14    do you think we could be doing to address it?  That

15    kind of conversation.

16        **Q.  All right.**

17        A.  Very general.

18            (Plaintiffs' Exhibit 4 marked.)

19    BY MR. VECCHIONE:

20        **Q.  Fair enough.  Let's move on to Exhibit 4.**

21        A.  Okay.

22        **Q.  All right.  And I'll give you a moment to**

23    **take a look at that.**

24            **All right.  Have you had a chance to**

25    **review?**

Case 3:22-cv-01213-MTD-HLD Document 205-13 Filed 03/04/23 Page 119 of 910 PageID #:
10983

```
 1          A.   Yes.

 2          Q.   Do you recall this email?

 3          A.   No.

 4          Q.   All right.  Well, let's talk about it and

 5     who these people are because I think we have some

 6     new folks.

 7               So what's the subject line of the first,

 8     the email there at the top?

 9          A.   CDC brief on ways to reach high-risk and

10     frequent travelers.

11          Q.   All right.  And what is the CDC brief?

12     What does that refer to?

13          A.   I don't -- I don't recall what the brief

14     was.

15          Q.   Okay.  But as -- my question is a little

16     broader than that.  We're lawyers.

17          A.   Mm-hmm (affirmative).

18          Q.   We write briefs all the time; right?  They

19     are actually physical pieces of a paper that we put

20     forth our arguments for.  Sometimes people use that

21     term as bullet points, or sometimes their positions,

22     even just orally stated.

23               What I'm trying to get at is what does

24     "brief" mean in this context?

25          A.   To me, a brief probably was a one- or
```

```
 1    two-page summary of something that we, or they, were

 2    trying to do.

 3         Q.  Now, this email exchange I think occurred

 4    sometime at the end of March 31st; is that correct?

 5         A.  Yes.

 6         Q.  All right.  And it was between you and

 7    Kevin Hatcher, and his email is          @fb.com?

 8         A.  That's what the email says.

 9         Q.  All right.  Who is Kevin Hatcher?

10         A.  Oh.  That says -- I don't have a clear

11    recollection.  There was a lot going on during this

12    time beyond any of this work.  But I think that

13    Kevin Hatcher might have been some type of

14    instructional designer with Facebook that I --

15    looking at the units and the Unit 1 and Unit 2,

16    there was an effort to put together like learning

17    modules that communities could use.  I think that

18    that might have been what this was about, and that

19    that was Kevin's role.

20         Q.  All right.

21         A.  I cannot be sure, though.

22         Q.  All right.  But from your understanding of

23    what this says --

24         A.  Mm-hmm (affirmative).

25         Q.  -- and how it worked, that is your best
```

1    understanding right now; whether it's right or wrong

2    that's what you understand?

3         A.  Yes, I remember that activity, and this

4    seems to match that activity.

5         Q.  All right.  Then at the top you say:

6    "Kevin, I realized others made comments on the pdfs

7    after I sent you the previous one.  So, this

8    answered your Q."

9              Is that question?

10        A.  Yes.

11        Q.  -- "on breathing.  I hate to ask but can

12   your team check the other comments here?  I

13   apologize."

14             What are the other comments?

15        A.  I don't know what the other comments were.

16   But it appears to me that we sent to a group of

17   people the drafts, and CDC folks commented and I

18   forwarded it back.

19        Q.  All right.

20        A.  But I don't remember the comments.

21        Q.  All right.  Can you go to the end page of

22   this document?

23        A.  Mm-hmm (affirmative).

24        Q.  It says:  "Recommend breaking this

25   sentence up as it's linking stress to severe illness

**CAROL CRAWFORD  11/15/2022**

Page 42

```
 1   in a way I we don't.  If ARTF doesn't suggest an
 2   edit, we can."
 3            Do you know who ARTF is?
 4        A.  I don't.  But I believe it's probably a
 5   CDC task force.  TF would be task force.  I don't
 6   know what AR is.
 7        Q.  Got it.  Do you know what Mr. Hatcher was
 8   referring to where it says:  "Emergency warning
 9   signs include difficulty breathing"?  Do you know
10   what that was referring to?
11        A.  I only know what I'm reading here.
12        Q.  Right.
13        A.  The unit that he was developing must have
14   had this wording, and he was asking for
15   clarification on what the wording should be.
16        Q.  All right.  And do you have an
17   understanding, or do you know, why Mr. Hatcher was
18   asking whether Facebook should add extreme before
19   emergency warning signs?
20        A.  I have no recollection of it.
21        Q.  Okay.  Do you know why Mr. Hatcher asked
22   whether he should replace:  Older people are at high
23   risk from severe illness from COVID to people over
24   65?  Do you know if there was any messaging from CDC
25   at that time?
```

```
 1        A.  I do not know.
 2        Q.  All right.  Do you know now sitting here
 3   whether there is any preference by digital media at
 4   CDC's digital output right now, for either of those
 5   terms?
 6        A.  I do not know because our office does not
 7   write the content.
 8        Q.  Okay.  You can put that aside.
 9        A.  Okay.
10            (Plaintiffs' Exhibit 5 marked.)
11   BY MR. VECCHIONE:
12        Q.  Take a minute, take a look at that.
13        A.  Okay.
14        Q.  You've got it?
15        A.  Mm-hmm (affirmative).
16        Q.  So I think we don't have any new players;
17   right?  These are all the same people we talked
18   about before, you and Ms. Iheme and Mr. Hatcher.
19            Can you tell me what the subject of this
20   email string was?
21        A.  CDC brief on ways to reach high-risk and
22   frequent travelers.
23        Q.  Okay.  And I think this is March 30th?
24        A.  2020, yes.
25        Q.  And so I guess it's before the one I
```

 1    showed you that was March 31st, Exhibit 4?

 2         A.   I don't have that exhibit, but I assume

 3    that's correct.

 4         Q.   Okay.  We can compare it.

 5              Can you go to the very beginning of the

 6    string on this?

 7         A.   Mm-hmm (affirmative).

 8         Q.   There is a blacked out "from," and then it

 9    says:  "When:  3:30-4:30, Subject:  CDC brief on

10    ways to reach high-risk and frequent travelers."

11              Do you see that?

12         A.   Yes.

13         Q.   What is that?

14         A.   It looks like an appointment for a phone

15    call.

16         Q.   Okay.

17         A.   But I'm not -- it's not fully there.

18         Q.   Yeah.  Would Facebook be sending that to

19    you, or is that just at the bottom of his email?  Do

20    you have any understanding of how it works?

21         A.   They have a different email system than we

22    have, but it looks similar to someone forwarding on

23    an appointment and using the chain as an email,

24    though I don't know that for sure.

25         Q.   Got it.  And this starts at a March 27th

1    email from him to him -- or from her to herself and

2    you; correct?

3        A.  Yes.

4        Q.  And then there is a Margaret E. Silver.

5    Who is that?

6        A.  She was with our Travelers Health group.

7    I believe that's where she was.

8        Q.  And what was the Travelers Health group?

9        A.  We have a unit at CDC that focuses on

10   traveler's health.  There is a website on traveler's

11   health.

12       Q.  And who's Caroline Seman?

13       A.  I believe she was also with Travelers

14   Health.

15       Q.  All right.  And then I see Dempsey.  Is

16   that the same Dempsey we saw before?

17       A.  Yes, yes.

18       Q.  Does that -- and then ██?

19       A.  That's still Jay Dempsey.

20       Q.  Still Dempsey, it's just split; right?

21       A.  Mm-hmm (affirmative).

22       Q.  So Ms. Iheme says to you:  "Hi, Carol and

23   team.  As relayed on the call, we're happy to target

24   additional populations such as youth as the content

25   becomes available.  Just let us know.  For the first

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 126 of 910 PageID #:
10990

```
 1    wave, we'd like to move forward with launching this
 2    next week," I think it's "ideally April 3rd to the
 3    groups for which you already produced content (older
 4    adults, HIV plus, asthma and pregnant women)."
 5              Do you know whether that's for travelers,
 6    or just general populations?
 7         A.   That was for general populations.
 8         Q.   All right.  And how do you know that?
 9         A.   I have some recollection of this project.
10         Q.   Okay.
11         A.   It was like units of information on COVID
12    that Facebook communities could attach to their
13    groups.  And I'm not 100 percent sure about this,
14    but I think we asked about travel, and then they
15    mentioned the idea of this project and said if you
16    have content for -- that would help other groups, we
17    could do similar things.
18         Q.   Okay.  And then he then asks how you want
19    this to read on the Facebook's sites, whether
20    sourced from CDC, or authored by CDC?
21         A.   Yes, I see that.
22         Q.   Do you know what the answer was to that?
23         A.   I don't recall which one we picked, but
24    I'm pretty sure it was one of the sources.
25         Q.   Okay.  Let's go up to the next, the March
```

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 127 of 910 PageID #: 10991

1    27th, 3:01 p.m.

2         A.  Okay.

3         Q.  **There is some more people here, I just**

4    **want to -- I don't know that we've seen.  Well, we**

5    **have seen her.  Okay.  Never mind.  You described**

6    **it.**

7              **And then at the very top, March 30, he**

8    **says they are going to have their content**

9    **strategists make the changes you'd agreed to that**

10   **day.**

11        A.  That's what I'm reading as well.

12        Q.  **Okay.  Now, why was the CDC editing this**

13   **content?**

14             MS. SNOW:  Objection.  Mischaracterizes

15   testimony and the document.

16   BY MR. VECCHIONE:

17        Q.  **Okay.  You can answer.**

18        A.  I don't have the attachments or the

19   documents, so I don't know what we were editing or

20   not editing.  But we had content on the website, but

21   the format of the units was slightly different.  So

22   we had to take the content from our website and have

23   it fit in the units.

24        Q.  **Okay.**

25        A.  And they requested CDC's review of that.

```
 1          Q.  All right.  Do you know why in the part
 2   where he says:  "If we don't launch next week we'll
 3   be pulled onto other COVID-19 projects, hence the
 4   urgency," do you know why he's asking you about when
 5   they should launch?
 6          A.  I don't think he was asking me about when
 7   we should launch.  I think he's letting us know if
 8   we don't launch they may not get to it.
 9          Q.  All right.  And do you know if those, if
10   he's referring to other COVID projects he has with
11   CDC, or just generally?
12          A.  I don't know for sure.
13          Q.  You can put that aside.
14          A.  Okay.
15          Q.  Just one more question about that.  Is he
16   creating a Facebook page for CDC, or just for
17   Facebook, do you know?
18          A.  My recollection of what this project was,
19   it was like units that would exist in Facebook that
20   like if you're in a group on travel that the group
21   administrator could provide a link to these units if
22   people wanted additional COVID information.  They
23   are not up any longer and my memory is vague on
24   them.
25              MR. VECCHIONE:  Got it.  Thank you.
```

Case 3:22-cv-01213-TAD-KDM Document 205-3 Filed 03/04/23 Page 130 of 348 PageID #: 10993

```
 1                (Plaintiffs' Exhibit 6 marked.)
 2   BY MR. VECCHIONE:
 3        Q.  Take a moment to look at this.  This is
 4   Exhibit 6.  The mark may look like a 4, but I assure
 5   you it's Exhibit 6.
 6             All right.  Do you recognize this
 7   document?
 8        A.  No.
 9        Q.  But do you know what it is?
10        A.  Yes.
11        Q.  What is it?
12        A.  It's a discussion about access to or for
13   Facebook giving us CrowdTangle COVID reports.
14        Q.  All right.  And let's talk about this a
15   little bit.  We're more forward in time; right?
16   This is sometime in January 2021?
17        A.  Correct.
18        Q.  And I think both dates say January 26,
19   2021.  Would you agree with me there?
20        A.  Yes.  Well no, the first one is
21   January 25th.
22        Q.  All right.  See, that's why we have
23   witnesses.
24             All right.  The first thing is what's
25   CrowdTangle?
```

```
 1          A.   I have not used CrowdTangle personally,
 2     but I've seen it demonstrated.  But it is to my --
 3     my description of it is it's a social media
 4     listening tool for Meta properties.
 5          Q.   What are Meta properties?
 6          A.   Like Instagram and Facebook.
 7          Q.   Okay.  So by Meta properties you mean
 8     properties of the company Meta, not on some other
 9     level of?
10          A.   No.
11          Q.   Okay.
12          A.   Their platforms.
13          Q.   Got it.  Thank you.
14               Let's look at that January 25th email,
15     because I think we have some new people here.
16               There is Payton Iheme, and you.  It's from
17     her to you.  And you cc Lauren Balog Wright at
18     Facebook.  Do you know who that is?
19          A.   I think that Lauren, just from reading
20     this, she was the person that was the CrowdTangle
21     expert and was going to provide the reports.
22          Q.   Okay.  And Priya Gangolly?
23          A.   Priya Gangolly I interpreted to be like an
24     assistant to Payton.
25          Q.   And Kelly Perron?
```

 1          A.  And from this email I believe Kelly was

 2     also going to provide the CrowdTangle reports.

 3          Q.  And it says:  Subject CrowdTangle COVID-19

 4     reports for WHO.

 5              Not to channel Abbott and Costello, but

 6     who is that?

 7          A.  World Health Organization.

 8          Q.  And why were they asking you about

 9     information to WHO?

10          A.  Well, I do have -- after reading this I do

11     recall the conversation a bit.  But what they are

12     saying in this email is we provide this report to

13     WHO, and we can provide it to you as well.

14          Q.  Okay.  What do you remember of the

15     conversation?

16          A.  Just that they -- I believe they mentioned

17     on a call that they could possibly do this, and this

18     is a followup email.  And they shared the reports

19     and occasionally they would ask me on the call if

20     these reports were helpful.

21          Q.  And let's see what he says here, what she

22     says here.  "Hi, Carol, I am following up on our

23     conversation several weeks ago about providing more

24     detailed reporting from our CrowdTangle team.  I

25     wanted to share our first CrowdTangle COVID content

1   report with you courtesy of Lauren and Kelly on this
2   cc.  They are providing these to WHO, thought it
3   helpful for CDC's teams as well."  And then she says
4   what the time period of it is, and that these are
5   going to be biweekly.
6           What kind of information was in the
7   CrowdTangle?  What did it provide you?
8       A.  Well, I don't have a clear recollection of
9   the reports because I sent the reports to other
10  teams.  But typically social media listening reports
11  show themes and -- of discussion on social media
12  channels.
13      Q.  Okay.  And so if you look down further
14  I'll just ask you again some words that I think I
15  know what they mean, but we might as well put on the
16  record.
17          (As read) Lauren, can you -- can do that
18  "distro."
19          That's distribution?
20      A.  Yes.
21      Q.  And "the full report is attached but some
22  highlights the CrowdTangle team would like to call
23  to your attention are:  Top engaged COVID and
24  vaccine-related content overall across Pages and
25  Groups."  And it says "largely a mix of educational

1   posts, reports of successful vaccinations," and it

2   goes on.  And then "news/commentary on COVID and

3   vaccination rollout."

4           So does this -- is this like an algorithm

5   that shows you where -- what people are talking

6   about?

7       A.  I wouldn't characterize it as an

8   algorithm.  But it's a search of content on social

9   media, and a summary of the higher volume

10  conversations.  It's helpful for communicators to

11  know what is being discussed because it helps

12  improve our communication materials.

13      Q.  All right.  And then he says:  "However,

14  posts falling into the following themes, all of

15  which have potential risks, also garnered high

16  engagement."  And then he has reports of healthcare

17  workers refusing the vaccine; right?

18      A.  Yes.

19      Q.  And he says there was an article in Forbes

20  about it?

21      A.  Yes.

22      Q.  Posts about alleged vaccine-related

23  deaths?

24      A.  Yes, I see that, too.

25      Q.  And:  "News and reports of severe vaccine

```
 1    side effects included both first- and secondhand
 2    reports in Groups, with users sharing photos and
 3    video."
 4            Do you see that?
 5        A.  Yes.
 6        Q.  Why are these of concern to the CDC, if at
 7    all?
 8            MS. SNOW:  Objection.  Mischaracterizes
 9    testimony, and the document.
10    BY MR. VECCHIONE:
11        Q.  You can answer.
12        A.  Well, this doesn't say that they were a
13    concern to CDC.  They are providing a report of the
14    most talked about topics on social media during this
15    time period.  But in general, as I mentioned before,
16    it does help for people to -- for communicators to
17    know what conversations occurs on social media
18    because it helps us identify gaps in knowledge, or
19    confusion, or things that we're not communicating
20    effectively that we need to adjust.
21        Q.  All right.  Again, pardon me -- but
22    secondhand reports and groups, groups are like the
23    travelers information groups; if I'm on Facebook I
24    can belong to various groups, and I get information
25    on that feed?
```

```
 1        A.  Can you clarify what you're referring to
 2   with groups?
 3        Q.  He says number 3 -- number -- well, in 1,
 4   2 and 3 he uses the words "groups."  In 1 he says:
 5   Worker-centric groups, groups especially
 6   anti-vaccination groups.  And then in 3 he has
 7   secondhand reports in groups.  So I'm just asking
 8   for the record --
 9        A.  Yeah.
10        Q.  -- that if I am on Facebook I can belong
11   to various groups and get information that that
12   group gets?
13        A.  I cannot -- I can't say for sure that this
14   report was about the Facebook groups, but it seems
15   likely that that's what that is reference to and you
16   are describing them correctly.
17        Q.  Thank you.  And then he tells -- you tell
18   in the next -- in January 26th you write to
19   Ms. Iheme and you say -- you say:  "It looks
20   wonderful and much appreciated," and then send, send
21   them to you.  It says:  "One group we'll be adding
22   is the Census group who hopefully will soon start
23   their project."
24            "Also, the wide group of those looking at
25   misinfo will want this."
```

Case 3:22-cv-01213-MLTD Document 2052-13 Filed 03/04/23 Page 556 of 348 PageID #: 11000

```
 1                First, what's the Census group within CDC?
 2    Or is that not within CDC?  What is that, Census
 3    group?
 4         A.  This is the Census Bureau.
 5         Q.  Okay.  And they would be on this CDC list?
 6         A.  It appears I was suggesting that, yes.
 7         Q.  Okay.  And then who's the wide group of
 8    those looking at -- well, first let's go back.
 9    Misinfo is misinformation?
10         A.  Yes.
11         Q.  Who's the wide group of those looking at
12    misinformation?
13         A.  I don't know specifically what I was
14    referring to there.
15         Q.  Do you know generally?
16         A.  I suspect that it was probably people
17    working on communication materials or developing
18    reports about gaps and areas of confusion.
19         Q.  Okay.  Do you have notes or other records
20    of the phone call he refers -- she refers to:  "I'm
21    following up on our conversation several weeks ago"?
22         A.  I doubt I have notes.
23         Q.  Okay.
24         A.  If I did, they would have been electronic.
25         Q.  Do you know who took part in the
```

**CAROL CRAWFORD  11/15/2022**

1    conversation?

2        A.  I don't know.  But typically I was on the

3    call, sometimes Jay was as well, Jay Dempsey.  But I

4    don't recall the specific meeting.

5        **Q.  Did you instruct Ms. Iheme or anyone else**

6    **at Facebook to do anything with the biweekly reports**

7    **other than send them to you?**

8          MS. SNOW:  Objection.  Mischaracterizes

9    testimony.

10   BY MR. VECCHIONE:

11       **Q.  You did ask Ms. Iheme to send you the**

12    **biweekly reports, didn't you?**

13       A.  She offered to send me the biweekly

14   reports, and I agreed that would be good.

15       **Q.  Did you instruct her to do anything else**

16   **regarding the biweekly reports?**

17       A.  Not that I recall.

18       **Q.  Do you know who decided the reports would**

19   **be developed biweekly?**

20       A.  I don't recall.  But this email seems to

21   suggest that they were already doing biweekly ones.

22       **Q.  For the -- for your purposes, what was the**

23   **purpose of the reports, receiving them?**

24       A.  They would help us understand what was

25   being discussed on social media about COVID, which

```
 1   helps us look for gaps in information, confusion
 2   about facts, things that we might need to adjust our
 3   communication materials for.
 4        Q.  Had you prior to this email discussed with
 5   Ms. Iheme such items as reports of healthcare
 6   workers refusing the vaccine, posts about alleged
 7   vaccine-related deaths, and news and reports of
 8   severe vaccine side effects?  Did you ever report to
 9   her that those would be of interest to the CDC?
10        A.  I don't recall reporting or discussing
11   these with them specifically.  I do recall generally
12   discussing misinformation with Facebook around this
13   time and --
14        Q.  And those could have been included within
15   that discussion?
16        A.  Possibly.
17        Q.  Why did you add Census to the distribution
18   of this?
19        A.  They were going to start working with the
20   CDC regarding misinformation.
21        Q.  So what did -- what did the wide group of
22   those looking at misinformation do with the reports?
23        A.  I don't know what they did with the
24   reports.  However, I do know two things that were
25   likely done with the reports.  We had -- we have
```

1    part of our Joint Information Center in the

2    Emergency Response a research team that compiles all

3    the themes of discussion on news and social media.

4    And I know that they received these reports, and

5    they use a lot of sources to develop a summary for

6    the response for all the reasons I just described

7    about why this is helpful.

8            I believe at this time it was also part of

9    a publicly-available vaccine confidence report that

10   also looked across themes, what was being discussed,

11   and where areas of confusion were so that they could

12   update vaccine communication and other issues.

13   Those are posted on CDC's website.

14       **Q.  Did you do anything with the reports**

15   **besides forward them on to Census and to this wide**

16   **group?**

17       A.  Anything with the CrowdTangle reports, I

18   didn't personally do anything else with the

19   CrowdTangle reports.

20       **Q.  Do you know if anyone else did anything**

21   **besides what you've described with the CrowdTangle**

22   **reports?**

23       A.  I would assume that it was used by people

24   to look in background of conversations similar to

25   what I have described.

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 140 of 348 PageID #: 11004

```
 1              MR. VECCHIONE:  All right.  You can put
 2     that aside.
 3              (Plaintiffs' Exhibit 7 marked.)
 4     BY MR. VECCHIONE:
 5         Q.  All right.  So what is the subject line of
 6     this email chain?
 7         A.  "Crowd Tangle COVID-19 Reports."
 8         Q.  All right.  Let's take a look at the
 9     February 21, 2021, 8:39.  Who is this from and who's
10     the recipient?
11         A.  Kelly Perron at Facebook, and I'm the
12     recipient.
13         Q.  All right.  And we've discussed her
14     before.  She was going to be one of the contacts
15     with CrowdTangle; right?
16         A.  Yes.
17         Q.  And what is the summary that Perron
18     reports?
19         A.  She attached the report, which is not
20     here, but and then summarized the high points.
21         Q.  Okay.  And why is she reporting this to
22     you?  Is this part of the biweekly report that you
23     agreed to earlier?
24         A.  Yes.
25         Q.  And this would be a summary of a report
```

 1    that's probably attached, but it's not here?

 2         A.  Correct.

 3         Q.  All right.  And what did you do with this

 4    information?

 5         A.  We created a mail group, and this was

 6    forwarded on by -- I either forwarded it, or over

 7    time I had an assistant that started forwarding

 8    them.

 9         Q.  All right.  So the same groups within the

10    CDC and the Census we talked about before?

11         A.  At some point I recall adding Census to

12    the distro.  I am sure by May or March there were

13    several time periods they were probably included.

14    The distribution list likely changed a bit because

15    people deployed into the response and out of the

16    response, but, yes.

17         Q.  Okay.  Can you take a look at the emails

18    dated Tuesday, February 16 and 17th, 2021 at

19    9:00 p.m.?

20         A.  Yes.

21         Q.  So who is that from, and who is that to?

22         A.  That's Kelly Perron at Facebook to me.

23         Q.  And what is she summarizing here?  What is

24    the summary that she reports?

25         A.  It's the -- it looks like the next

Case 3:22-cv-01213-MJT-LTD   Document 205-13   Filed 03/04/23   Page 142 of 349   PageID #: 11006

1  biweekly report.  And it looks attached, but it's

2  not in the exhibit.  And she summarized it in the

3  body of the email.

4      Q.  All right.  And she's highlighted, some

5  things are highlighted, right, in dark black?

6      A.  Some things are bolded.

7      Q.  Bolded.  That's right.  Reports of deaths

8  post-vaccination?

9      A.  Yes, that's in bold.

10     Q.  Double masking?

11     A.  Yes, that's bold.

12     Q.  And personal reports of vaccination?

13     A.  Yes, that's bold.

14     Q.  Why did she report this to you, those

15  highlights?

16     A.  There again, they are using CrowdTangle to

17  do a summary of the themes that are being discussed

18  on Facebook and Instagram channels, and this is a

19  summary of that.

20     Q.  Okay.  And what did you do with this

21  information?

22     A.  As mentioned, we had a distribution list

23  that this was forwarded to.

24     Q.  You just sent it on?

25     A.  Mm-hmm (affirmative).

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 143 of 910 PageID #: 11007

1          Q.  Can you look at the email dated Monday
2     March 1st?  And who is this to?
3          A.  Kelly at Facebook to me.
4          Q.  All right.  And she added someone.  She
5     says she added Chelsey Lepage at Facebook.  Who is
6     that?
7          A.  I think that she may have been --
8          Q.  I'm cheating a little.  I went above what
9     I told you to look at.
10         A.  Yes.  I'm sorry.  I see that now.  But I
11    believe Chelsey was another assistant to Payton, I
12    think.
13         Q.  Okay.  And then on the one I did direct
14    your attention to, March 1st at 5:47, again she says
15    Hi -- Kelly Perron says:  Hi, Carol.  And she
16    attached the latest CrowdTangle insights report for
17    February 10th to 24, and she says it's attached.
18         A.  Mm-hmm.
19         Q.  And then she does a summary.  And there
20    again there are certain points she's bolded:
21    COVID-19 and mental health, vaccine refusal, testing
22    positive post-vaccination.
23              Do you know whether those were bolded
24    because those were of particular concern to the CDC?
25         A.  No.  That's the format of all the reports.

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 144 of 343 PageID #:
11008

```
 1          Q.  Okay.  So bolding them was -- your
 2   testimony is bolding them is not because they were
 3   of particular interest to the CDC, that's just how
 4   she did it?
 5          A.  I really couldn't say what her thinking
 6   was when she bolded them.
 7          Q.  Okay.  When you received it did you have
 8   any understanding about the bolded portions?
 9          A.  No.
10          Q.  Were the bolded portions things that you
11   had particularly spoken with Facebook before in your
12   telephone conversations?
13          A.  I don't believe so.
14          Q.  All right.
15          A.  Well, can I clarify that a little bit?
16          Q.  Yes, please.
17          A.  I'm sure -- I don't remember discussing
18   these in terms of the CrowdTangle report or the
19   things in bold.  I am sure that general discussions
20   that there was a lot of information on vaccines,
21   which is one of the bolded words, for example.  I am
22   sure that did occur.
23          Q.  Thank you.  On March 15 Kelly sends you at
24   6:19 p.m.
25          A.  Yes.
```

Case 3:22-cv-01213-MLTD Document 205-13 Filed 03/30/23 Page 145 of 349 PageID #: 11009

1     Q.  Sort of goes over, she keeps Chelsey

2     Lepage in there, and then she -- this time she

3     summarizes slightly different items:

4     Post-vaccination guidelines and protocols, vaccine

5     ingredients and vaccine side effects.

6          A.  I see that.

7          Q.  And your testimony is the same as to why

8     they are bolded as before, as far as you know?

9          A.  Correct.

10         Q.  And you did the same thing with them as

11    you did before that you've testified?

12         A.  I believe so, yes.

13         Q.  Let's see.  And then at the bottom of that

14    March 15, she says:  This week we also are including

15    a one off content insights report we did looking at

16    Spanish language content relative to the U.S. we

17    thought might be interesting for you.

18              She asks you not to share it externally.

19              Do you recall any other times you got

20    Spanish language-specific material?

21         A.  No.  But I didn't recall this time either

22    until I read it.

23         Q.  Okay.  And then I'll just -- to finish up,

24    March -- May 25th.  Now, there doesn't seem to be

25    something for April.  Do you know why there would be

Case 3:22-cv-01213-MLT Document 2052-13 Filed 03/04/23 Page 146 of 348 PageID #: 11010

1    a break in the two-week reporting?

2         A.  No.  I don't recall unless she just sent

3    it separate from the chain.

4         Q.  And then here she's bolded vaccination in

5    children, healthcare workers and masks and

6    vaccination; right?

7         A.  I see that, too.

8         Q.  And do you recall whether you spoke to her

9    about those things, or that was just her choice to

10   highlight those?

11        A.  We did not discuss with them the issues we

12   wanted in the CrowdTangle report.

13        Q.  All right.  And then you say "thanks" in

14   response to this on 5:26.  But we've got a new

15   person here.  Tyler Woods.  Who is that?

16        A.  I think, but I'm not positive, that he

17   took over the reports later, so perhaps he was

18   starting to come in on their team.

19        Q.  Okay.  We've been going about an hour.  I

20   always give the witness a chance to break if she

21   wants.

22        A.  I'm okay.

23        Q.  Okay.

24        A.  Thank you for checking.

25             MR. GILLIGAN:  Can I ask one question,

Case 3:22-cv-03233-VC-TLD Document 205-13 Filed 08/04/23 Page 147 of 349 PageID #: 11011

```
 1   John?

 2           MR. VECCHIONE:  Yeah.

 3           MR. GILLIGAN:  What is the number of your

 4   last exhibit?

 5           MR. VECCHIONE:  42.

 6           MR. GILLIGAN:  Thank you.

 7           And I actually -- that was -- I do have

 8   one that's unmarked that I may use.

 9           MR. GILLIGAN:  Okay.  Just to add a little

10   suspense.  Thank you.

11           MR. VECCHIONE:  Mm-hmm (affirmative).

12           (Plaintiffs' Exhibit 8 marked.)

13   BY MR. VECCHIONE:

14        Q.  All right.  Do you recognize Exhibit 8?

15        A.  I haven't finished reading it.

16        Q.  Okay.  Go ahead.

17        A.  Sorry.  Okay.  Sorry.

18        Q.  It's all right.

19        A.  Can you repeat the question?

20        Q.  Can you identify this document?

21        A.  I recognize the first page chain of

22   emails, but not the previous chain.

23        Q.  So you don't -- tell me where -- the first

24   page at the back?

25        A.  Oh, I'm sorry.  No, the first page of the
```

**CAROL CRAWFORD  11/15/2022**

Page 68

```
 1   packet.
 2         Q.  Got it.
 3         A.  I remembered this email more -- I don't
 4   have a recollection of this previous back and forth.
 5         Q.  Got it.  Well, what's the subject line?
 6         A.  "This week's meeting."
 7         Q.  Okay.  And by this time were you meeting
 8   with them every week?
 9         A.  We were -- we were meeting weekly during
10   parts, so I imagine we were.
11         Q.  All right.  And can you read the email
12   from Ms. Iheme to you about the meeting on
13   March 30th, 2021, 2:42 p.m.?
14         A.  Yes.  "Hi, Carol, hope all is well as it
15   can be.  At least spring is making an appearance.  I
16   wanted to surface any misinfo questions your team
17   may have for the team that I had briefing last time.
18   They are available to attend again, but also want to
19   make sure that we are answering any of your team's
20   questions."
21         Q.  All right.  What's the briefing she refers
22   to?
23         A.  I don't recall the briefing specifically,
24   but I do recall her bringing in people from their
25   Trust and Safety or Misinformation teams -- I'm not
```

Case 3:22-cv-01213-TKW-ZCB   Document 205-3   Filed 03/04/23   Page 149 of 348PageID #: 11013

```
 1   sure what they called the team -- to talk to us

 2   about misinformation at some weekly meetings.  I

 3   think that's probably what this is in reference to.

 4       Q.  Why is she offering to surface misinfo

 5   questions and to answer your team's questions?

 6       A.  Because I think -- I can't say for sure

 7   what she was thinking.

 8       Q.  What's your understanding?

 9       A.  But I think it was because we -- we had

10   asked questions about what they were seeing in terms

11   of misinformation and inquired about any activities

12   they were undertaking.  And I believe this was an

13   offer to sort of get back to us on any of those

14   questions.

15       Q.  All right.  That you had?

16       A.  Yes.

17       Q.  Given her.  Thank you.

18       A.  Yes.

19       Q.  Let's clean up the record a little.  That

20   you had -- the questions that you had proposed to

21   her?

22       A.  I think it was questions asked within the

23   meeting, but.

24       Q.  Got it.

25       A.  I'm not 100 percent sure because I don't
```

1  know the timing of that meeting, but I believe

2  that's what this is in reference to.

3         **Q.  And can you read your response at**

4  **3:08 p.m.?**

5         A.  "Hope all is well, too.  I plan to join

6  and listen to the 3:30 meeting, FYI.  I added this

7  part in yellow to our chain on turn.io so you

8  probably missed it.  Did you have thoughts on how we

9  can regularly meet with Census?  I will also check

10  back with others to see if they have other Qs that

11  went unanswered and get back to you."

12         Do you want me to keep reading?

13         **Q.  No, you can stop.**

14         A.  Okay.

15         **Q.  But what is "turn.io"?**

16         A.  This was another project that we were

17  working on with WhatsApp.

18         **Q.  And what was that project?**

19         A.  I believe this was using WhatsApp to -- so

20  people could use it, they could look up ZIP codes to

21  find vaccines.

22         **Q.  Okay.**

23         A.  And maybe, I'm speculating, there was also

24  a Spanish offering for vaccine information on

25  WhatsApp.  It was one of those.

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 151 of 910 PageID #: 11015

```
 1          Q.  Got it.  Why is Census involved in your
 2    coordination with Facebook at this time?
 3          A.  We had entered an IAA with Census to help
 4    advise on misinformation.
 5          Q.  And an IAA is?
 6          A.  Interagency agreement.
 7          Q.  All right.  Did the CDC ever use any
 8    software programs developed by Census that enabled
 9    the CDC to track the viewpoints of U.S. citizens?
10          A.  No.
11          Q.  Did the CDC ever gain access to or in any
12    way receive information about the viewpoint of U.S.
13    citizens on COVID masking or vaccination from
14    Census?
15          A.  We likely did because they provided
16    reports on misinformation that they were seeing to
17    us.
18          Q.  Did the CDC ever share data on the
19    viewpoints of U.S. citizens with the Census?
20          A.  I don't recall if we did.
21          Q.  You did share the CrowdTangle with them?
22          A.  Yes.  Can you reask the question?
23          Q.  I will.  Did the CDC ever share the data
24    on the viewpoint of -- the viewpoints of U.S.
25    citizens that CDC was seeing with the Census?
```

Case 3:22-cv-01213-TKW-MDJ Document 205-3 Filed 03/04/23 Page 152 of 348 PageID #:
11016

```
 1        A.  You refer to it as data.  I don't recall

 2   sharing data.  I do recall sharing social media

 3   listening reports such as this, or the publicly

 4   available vaccine confidence reports that talk about

 5   what people are talking about, and probably the

 6   JIC's research, you know.  They had a standing

 7   summary of what was being discussed.  I suspect I

 8   shared that, too, with Census.

 9        Q.  The JIC?  What kind of research, the?

10        A.  I mentioned the JIC research team that

11   looked at what the conversations were on news,

12   social media and did summaries of that for everyone

13   in the response.

14        Q.  All right.  And did information come back

15   from the Census to CDC about what they were finding?

16        A.  My recollection is that the Census did

17   provide us with the key themes they were seeing

18   around misinformation during the times that they

19   were looking at it.

20        Q.  Who was at the meeting that Ms. Iheme

21   references and that you refer to in the next email?

22        A.  The next email, which email?

23        Q.  So above it.  It says -- oh, hang on.

24   I'll tell you in a second.

25             "Yes, I did see and will know in a few
```

1   hours."

2           Hang on for a second.

3           So I took it to mean that this March 30th,

4   3:16 email that she says:  "Hi, Carol, Yes, I did

5   see and will know in a few hours, I'm told if we

6   plan to present for Census Thursday or if it needs

7   more work."

8           And then you say that "I didn't ask Census

9   if they had questions."

10          Do you know if there was a meeting with

11  Census on or about that time?

12      A.  I don't --

13      Q.  Okay.

14      A.  -- remember enough detail to answer the

15  question.  Sorry.

16      Q.  So in this March 30th, 2021 at 7:38.

17      A.  Yes.

18      Q.  There you say:  "I didn't ask Census if

19  they had questions, but I know they were hoping to

20  go over the deck they had."

21          And is that the one you sent them or

22  Facebook sent them, or did they create that

23  themselves?

24      A.  I don't know for sure.  I'm interpreting

25  from this email that the Census created it, but I do

```
 1    not know.
 2         Q.  All right.  "And discuss how to engage on
 3    a more regular basis."
 4              Do you know if they ever decided to engage
 5    on a more regular basis?
 6         A.  With -- about their activity, or about
 7    CDC?
 8         Q.  Yeah, with Facebook.
 9         A.  I don't know what Census did directly with
10    Facebook.
11         Q.  And then I'll ask you to take a look at
12    the 3:16 again.  She says:  It would be great to
13    have questions that may not have been answered from
14    your team on misinformation.  She says "misinfo",
15    but I'm using the full word.
16              And is she looking -- is it your
17    understanding she's looking for those answers from
18    Census that you didn't have, CDC?
19         A.  Let me reread this chain.
20         Q.  Go ahead.
21         A.  Sorry.  Can you repeat the question?
22         Q.  I will withdraw the question for a moment.
23         A.  Okay.
24         Q.  Just take a look at March 30th, 7:46 as
25    well.  She writes to you, Carol:  "Hi, Carol.  Yes,
```

CAROL CRAWFORD  11/15/2022

Page 75

 1    I think it's good to have questions from Census to

 2    make sure we have the right person.  I can ask Liz

 3    to join again so she can be asked questions/provide

 4    more information about influencers and I have noted

 5    your question about removals and will tee that up as

 6    well."

 7              What was your question about removals?

 8        A.  I -- reading in this email?

 9        Q.  Yeah.

10        A.  I'm saying -- the email before this I'm

11    saying the team is still interested in more info

12    about how you analyze the data on removals.  And my

13    general recollection where this question came from

14    was that we -- the -- that I think there was

15    wondering if they delete the info will we know those

16    myths or information so we could update

17    communication activity.  So if they were deleting

18    content would we know what the themes were.

19        Q.  And did you ask them to remove any

20    content?

21        A.  No.  This was -- this was when -- this was

22    a meeting where we were just asking what -- how that

23    worked and would there be data, would we be able to

24    see in CrowdTangle or other reports like what kind

25    of themes were removed so we would still have the

CAROL CRAWFORD  11/15/2022

```
 1    full picture of areas of confusion.

 2         Q.  All right.  And if you look at your March

 3    31st, 2:07 p.m., and you say what "Census mentioned

 4    they'd like to discuss."  "It looks like the post

 5    from last week's deck about infertility and side

 6    effects have all been removed.  Were those

 7    re-evaluated by the moderation team or taken down

 8    for another reason?"

 9              What are you saying there?

10         A.  It looks to me like I cut and pasted this

11    from something that Census had said, and I don't

12    have good recollection of what this was on

13    March 31st.

14         Q.  Then you've also cut and pasted:  "One of

15    the main themes we're seeing and from the

16    CrowdTangle report is local news coverage of deaths

17    after receiving the vaccine.  What's the approach

18    for adding labels to those stories?"

19              Why would you or Census want them to add

20    labels to those stories?

21              MS. SNOW:  Objection.  Calls for

22    speculation and mischaracterizes the testimony -- or

23    the document.

24    BY MR. VECCHIONE:

25         Q.  You can answer.
```

**CAROL CRAWFORD  11/15/2022**

1      A.  I don't think we were asking them to add

2  labels, from what I'm reading here.  We were asking

3  them what their approach for labels were.

4      **Q.  Then they have asked:  "Can we add the**

5  **Census team to CrowdTangle?"**

6          **Hadn't it already been added to**

7  **CrowdTangle by this time?  Haven't we established**

8  **that?**

9      A.  There were two different offerings for

10  CrowdTangle.  They had allowed us to directly log

11  into CrowdTangle and run our own reports or

12  searches.  I believe that started back in, you know,

13  March or April 2020.  Then they sent the reports.

14  So this appears to be to log in to CrowdTangle.

15      **Q.  Then what did you mean by your team is**

16  **going to consider how you might want to engage with**

17  **CDC Census team routinely and get back to us?**

18      A.  I don't know specifically this day this

19  email what I meant.  But I do know that we generally

20  discussed, you know, how we should talk about

21  misinformation because they had already been working

22  with Census, on their own Census misinformation, and

23  I wanted to know what was best for them for engaging

24  on any topics that we might want to discuss.

25      **Q.  All right.  Do you know what Facebook was**

**CAROL CRAWFORD 11/15/2022**

Page 78

```
 1    told previously about engaging with CDC and Census
 2    on this?
 3            MS. SNOW:  Objection.  Vague, calls for
 4    speculation.
 5    BY MR. VECCHIONE:
 6        Q.  You can answer.
 7        A.  Can you rephrase the question?
 8        Q.  Yeah.  They were already engaging, it
 9    seems to me, with CDC and Census at this time.  Do
10    you know if there was anything additional from what
11    we've discussed about such engagement that's causing
12    them to ask this question?
13        A.  Causing them to ask what question?
14        Q.  About closer engagement with the Census,
15    and you asking to have -- "can we add the Census
16    team to CrowdTangle?"  Do you know what --
17            MS. SNOW:  Objection.  Mischaracterizes
18    the document.
19    BY MR. VECCHIONE:
20        Q.  It's okay.  You can answer if you
21    understand.  I'm trying to understand.  It seems
22    that Facebook has been talking to CDC and Census
23    throughout for a while now.  And yet here is a
24    request that they want a different CrowdTangle, as
25    you've explained.
```

**CAROL CRAWFORD  11/15/2022**

Page 79

```
 1              MS. SNOW:  Objection.  It assumes facts
 2    not in evidence.
 3    BY MR. VECCHIONE:
 4         Q.  You can still answer.  I'm trying to
 5    understand what is happening in this series of
 6    emails, since they have already been sending you the
 7    CrowdTangle information.  You've explained that
 8    there was a different CrowdTangle information that
 9    Census might want; right?  That is --
10         A.  I think it was the log-in to the
11    CrowdTangle.
12         Q.  Okay.  Well, I'll give you an example.  So
13    Ms. Iheme asks:  Yes, I think it's good -- this is
14    at 7:46 on March 30th, said:  "I think good to have
15    question from Census so we make sure we have the
16    right person."
17              So my question is, is that the right
18    person to answer those questions to the Census from
19    Facebook?  What's your understanding?
20         A.  I don't know this chain of emails
21    specifically, but I believe it was likely in
22    reference to just me mentioning to Payton that we
23    were partnering with the Census to learn more.  We
24    had been discussing things, and we were going to
25    have some collective questions that we would like to
```

 1   discuss at a future meeting.

 2        Q.  Okay.  What's the amplification side at

 3   March 30th at 7:38?  You are going to ask Liz about

 4   what is being done on the amplification side.  What

 5   does that mean?

 6        A.  I don't know why I was asking that.

 7        Q.  And why did you want to get a better

 8   understanding of how Facebook was working with

 9   influencers?

10        A.  I don't remember the meeting before that,

11   so I'm not sure what that is in reference to.

12        Q.  And it says the team's interested in more

13   info on how you analyze the data on removals.

14             Why are you asking about how Facebook

15   operates on removals?

16             MS. SNOW:  Objection.  Asked and answered.

17        A.  I did answer it previously.

18   BY MR. VECCHIONE:

19        Q.  I don't believe I have directed you to

20   that exact portion of this, and I would ask the

21   witness to answer unless she's being instructed not

22   to.

23             MS. SNOW:  No, you may answer.

24        A.  Okay.  What I think this was about was I

25   believe the teams that were looking at, like, our

Case 3:22-cv-01213-TAD-KDM Document 205-13 Filed 03/04/23 Page 161 of 910 PageID #: 11025

1    research reports, or our vaccine confidence report
2    were wondering if the data was removed if it would
3    show up in the report, so would they be missing gaps
4    or information because the posts were removed.
5    That's what I believe that this question is about.
6    BY MR. VECCHIONE:
7        **Q.  All right.  CDC wasn't concerned that they**
8    **weren't removing materials fast enough?**
9        A.  That's not what I believe was being
10    discussed here.  This was about the data that we
11    could get so we had a full picture on confusion so
12    that we could adjust communication materials, or
13    ways that we were communicating.  That's what I
14    believe that that's in reference to.
15            And you know what, I have a clarification.
16        **Q.  Go right ahead.**
17        A.  You asked me what the amplification
18    side --
19        **Q.  Yes.**
20        A.  -- and the influencers.  Now that I'm
21    remembering this, I think that it it was likely
22    about how to promote how to get a vaccine, or where
23    to get a vaccine and I think that was all part of
24    that conversation.
25        **Q.  All right.  Let's go to the March 31st,**

**CAROL CRAWFORD  11/15/2022**

```
 1    2021 at 2:07, the one you've told me you've cut and
 2    pasted from Census, at least those bullet points.
 3         A.  You mean March 31st?
 4         Q.  March 31st at 2:07.
 5         A.  Yes.
 6         Q.  It says:  "Were those reevaluated by the
 7    moderation team or taken down for another reason?"
 8              Do you know if that refers to a moderation
 9    team at CDC or Facebook?
10         A.  It must have been Facebook because we
11    don't have a moderation team at CDC.
12              I'd also like to clarify that I think I
13    probably cut and pasted it.  I don't know for sure
14    that I did.
15         Q.  That's fine.  Got it.  I follow you.
16              Why do you -- do you know why you wanted
17    to know what the approach for adding labels to the
18    stories about deaths after receiving the vaccine
19    was?
20              MS. SNOW:  Objection.  Asked and answered.
21         A.  I don't remember this specific set of
22    conversation, or why we were asking about that any
23    longer.
24    BY MR. VECCHIONE:
25         Q.  Okay.  Do you know -- so you're discussing
```

CAROL CRAWFORD  11/15/2022

Page 83

1    **talking to Census at some point.  Do you know**

2    **whether that conversation ever happened, a**

3    **conversation with -- regarding this string of emails**

4    **with Census, CDC and at Facebook?**

5    A.  I don't know that we were discussing the

6    string of emails, but there were meetings where

7    Census, myself and Facebook were on calls.

8    **Q.  Okay.  And do you recall what you**

9    **discussed?**

10    A.  My memory is we had general conversations

11    about what were opportunities to address

12    misinformation.  And things like in this chain I

13    believe were probably discussed, but I don't have

14    specific memory of it.

15    **Q.  Do you know who your contact was at**

16    **Census, like who was the main person at Census on**

17    **this aspect of the CrowdTangle and dealing with**

18    **Facebook?**

19    A.  There were a couple of people from Census

20    that we were talking with.  I only remember two of

21    the names.  One was Christopher Lewitzke, who I

22    believe was a contractor for them.  And then Jen

23    Shopkorn, I think I'm saying it correctly.  I

24    believe she was their director for digital.

25    **Q.  Thank you.**

**CAROL CRAWFORD  11/15/2022**

```
 1        A.   But there were a couple of others that
 2   typically participated.
 3        Q.   And then March 31st at 2:18 Ms.  Iheme
 4   writes you:  "Hi, Carol we are working on a proposal
 5   how set up sharing partnership on the misinformation
 6   items, what would it look like, so we can discuss
 7   Thursday.  Lots of team members out the last two
 8   weeks due to all the holidays, but that is the plan
 9   so we can discuss on the Thursday call."
10             Do you know whether that meeting, the
11   Thursday meeting, to set up sharing partnerships on
12   misinformation occurred?
13        A.   I don't remember if this specific meeting
14   occurred.
15        Q.   Would you have a calendar that would tell
16   you?
17        A.   Yes.
18             MR. VECCHIONE:  I would ask counsel to
19   produce that calendar of the date of that meeting.
20             MR. GILLIGAN:  We'll take your request
21   under advisement.
22             MR. VECCHIONE:  Thank you.
23   BY MR. VECCHIONE:
24        Q.   And once again would you have notes or
25   recordings of that conversation?
```

```
 1          A.   We never recorded the calls.  If I had --
 2     I didn't take many notes, but if there was anything
 3     it would be in Word or email.
 4               MR. VECCHIONE:  You can put 8 aside,
 5     Exhibit 8 aside.
 6               (Plaintiffs' Exhibit 9 marked.)
 7     BY MR. VECCHIONE:
 8          Q.   In this, if you'll just an initial look at
 9     it you can tell me.  I just ask you to -- I'd like
10     you to identify it and tell me the date of the
11     email.
12          A.   The subject is Misinfo on two issues.  And
13     the date of the email is May 6, 2021.
14          Q.   All right.  You can continue to read it.
15          A.   Read the email?
16          Q.   Yeah.
17          A.   "Payton, Genelle" --
18          Q.   No, no.  I mean, to yourself.
19          A.   Oh.
20          Q.   Just scan through it.
21          A.   Sorry.  Thank you.
22          Q.   I want you to be a little familiar with
23     it.
24               MR. GILLIGAN:  Good clarification.
25          A.   Okay.
```

**CAROL CRAWFORD  11/15/2022**

```
 1   BY MR. VECCHIONE:
 2        Q.  All right.  So can you tell us why you
 3   were flagging misinformation about the vaccines for
 4   Facebook?
 5             MS. SNOW:  Objection.  Mischaracterizes
 6   the document.
 7   BY MR. VECCHIONE:
 8        Q.  Well, let's take a look at it for a
 9   moment.  It's from you; right?
10        A.  Yes.
11        Q.  And then it's to Ms. Iheme under a new
12   name Gennelle Adrien.  Do you know her and what her
13   role was?
14        A.  I think she was one of Payton's
15   assistants.
16        Q.  All right.  And then you're cc'ing Sam
17   Huxley at ████████@Reingold.com.  Do you know who that
18   is?
19        A.  Yeah, now that I see the name.  Sam was a
20   contractor for Census that was often on our phone
21   calls with Christopher and Jen.
22        Q.  And that's Christopher Lewitzke; right?
23        A.  Yes.
24        Q.  And then Jennifer Shopkorn, I apologize if
25   you told me who that was, but who was that?
```

Case 3:22-cv-01213-TAD-KDM Document 205-3 Filed 03/04/23 Page 167 of 910 PageID #:
11031

```
 1          A.  She's with Census, and I believe she's the
 2   director for their digital team.
 3          Q.  And Lynn Sokler?
 4          A.  Lynn Sokler is a counterpart of mine in
 5   OADC who was working on this partnership with Census
 6   along with myself.
 7          Q.  All right.  And then it says:
 8   "Payton/Genelle.  As mentioned, here are two issues
 9   we are seeing a great deal of misinfo on that we
10   wanted to flag for you all -- vaccine shedding and
11   microchips"; right?  You wrote that?
12          A.  Yes.
13          Q.  Can you tell us why you were flagging
14   misinformation about the vaccines for Facebook?
15          A.  Because we had had conversations with
16   Facebook about ways that we could address
17   misinformation, and my recollection is that one
18   suggestion that was -- that came up in that
19   conversation was to let them know if we were seeing
20   major themes that CDC had scientific information on,
21   or had web content that would address.
22              I believe that is why I was sending these,
23   because these were two large areas of
24   misinformation.
25          Q.  What did you mean by the term "flag" or
```

1    flagging?

2        A.  Pointing out.

3        Q.  **What was the expectation of what Facebook**

4    **would do when something was flagged?**

5        A.  I don't recall having a specific

6    recollection of what I thought that they would do.

7            I do know that the platforms have a

8    variety of ways to address misinformation.  They

9    might tag it as something that people should look

10   more into.  I think that they have the -- I think,

11   but I do not know, that they have the ability to

12   control how often some of these things show up in

13   peoples' feeds.  And I do know that removing them is

14   an option that they could consider.

15           So I didn't know exactly what they might

16   do with it, but I felt like it was worth pointing

17   out what we knew, that we had seen these myths and

18   that we were going to have information up soon.

19       Q.  **All right.  And what was the consequence**

20   **to Facebook if they didn't do anything with your**

21   **flagging of these items?**

22       A.  Nothing.

23       Q.  **All right.  What were you hoping to**

24   **accomplish by flagging these items for Facebook?**

25       A.  I mean, our goal always is to be sure that

**CAROL CRAWFORD  11/15/2022**

```
 1   people have credible health information so that they
 2   can make the correct health decisions for
 3   themselves.  There were a lot of things circulating
 4   that were not accurate information about COVID.  And
 5   so we were trying to point out and make the credible
 6   information more available to users.
 7       Q.  How did you decide on these particular
 8   posts?
 9       A.  I don't remember specifically this
10   conversation, or what made us decide.  But I do know
11   generally that these were two very high-volume
12   misconceptions online at the time about vaccines.
13       Q.  All right.  Do you recall whether you had
14   any criteria in determining which posts to flag?
15       A.  I don't recall that we had any criteria on
16   what we pointed out to Facebook other than it had to
17   be something that was in CDC's lane that we had
18   information for, you know, to offer about it, and
19   something that had been -- you know, was high
20   volume, that was worth pointing out to this entity.
21       Q.  Did you or anyone at CDC have concerns
22   about the government working with Facebook and
23   telling them what should be flagged or not?
24           MS. SNOW:  Objection.  Mischaracterizes
25   testimony, calls for speculation.
```

**CAROL CRAWFORD  11/15/2022**

```
 1    BY MR. VECCHIONE:
 2          Q.  You can answer.
 3          A.  Can you rephrase the question again, or
 4    say it again?
 5          Q.  Yeah.  Did you or anyone at CDC have any
 6    concerns about CDC or the government flagging
 7    materials for Facebook when you knew they took some
 8    things down?
 9          A.  I can't speculate what others at CDC might
10    have thought about it.  Personally, because I didn't
11    believe we were asking them to remove content
12    specifically, I did think getting credible
13    information out was important.
14          Q.  Where did this information about
15    microchips and the shedding, what kind of
16    information did the Census team have on those posts
17    at that time?
18          A.  My recollection is that we were pointing
19    out to Facebook that there were these themes going
20    around pretty heavily, and these probably came from
21    the social listening tools, you know, that can
22    consolidate examples.  And we provided some examples
23    of what we meant.
24          Q.  Okay.  You can put that aside.
25          A.  Thank you.
```

```
 1              (Plaintiffs' Exhibit 10 marked.)
 2   BY MR. VECCHIONE:
 3        Q.  And, again, I'll give you a chance to read
 4   it, but if you could just identify the document and
 5   the subject line?
 6              MR. GILLIGAN:  The document being
 7   Exhibit 10?
 8              MR. VECCHIONE:  Exhibit 10.
 9        A.  It says:  Subject CV19 misinfo reporting
10   channel.  May 10, 2021.
11   BY MR. VECCHIONE:
12        Q.  All right.  What is -- I presume CV19 is
13   COVID-19?
14        A.  Yes.
15        Q.  "Misinfo" is misinformation?
16        A.  Yes.
17        Q.  All right.  What is the COVID-19
18   misinformation channel?
19        A.  Well, I don't think I -- just rereading
20   this email, I don't think I understood this at
21   first, what she was referring to.  I think I thought
22   that this was CrowdTangle, just by reading the
23   chain, but I now know what it was was Facebook
24   apparently has a portal or reporting channel where
25   you can report misinformation or threats or things
```

**CAROL CRAWFORD  11/15/2022**

```
 1    from a specific log-in that I believe they only

 2    provide to like federal agencies.

 3         Q.  All right.  And who used it at the CDC?

 4         A.  To my recollection, the only person that

 5    ever logged in at CDC was Brook Aspinall.

 6         Q.  Who was that?

 7         A.  She was part of our social media team.

 8         Q.  For what?

 9         A.  For COVID.

10         Q.  For what did she log on?

11         A.  Oh.  Why did she log on?

12         Q.  Yeah.

13         A.  My memory is that we log on one time to

14    see what it was -- what the system was and

15    understand what we could do in it.  And she logged

16    on one time, and I think reported two or three -- I

17    don't remember what they were -- two or three posts

18    or threats or one or the other.

19         Q.  All right.  Would you have a record of

20    what she put on there?

21         A.  I believe so.  But I only really remember

22    this from pulling documents at some point related to

23    this litigation earlier in the process.  I recall

24    there was an email that listed it, but I don't

25    remember what they said.  But I believe that there
```

CAROL CRAWFORD  11/15/2022

```
 1   is a record of it because I recall seeing it during
 2   that process.
 3        Q.  All right.
 4            MR. VECCHIONE:  I would request that as
 5   well, Counsel.  But I'll put it in writing.
 6   BY MR. VECCHIONE:
 7        Q.  Well, I'll just ask this question.  I
 8   usually ask this question earlier, but I might as
 9   well.  In preparation for your deposition today, did
10   you review any documents?
11        A.  No.  Well, we -- the only one I reviewed
12   happened to be one of the ones you had during our
13   practice.
14        Q.  Good.  All right.  That's fine.  Do you
15   know which one it was?
16            MS. SNOW:  Objection.
17        A.  Oh, sorry.
18            MS. SNOW:  To the extent this calls for --
19            MR. GILLIGAN:  Does call for.
20            MS. SNOW:  The question calls for
21   information that's covered by the attorney-client
22   privilege.  So I direct the witness not to answer.
23            MR. VECCHIONE:  No, it doesn't.  What
24   she's reviewed I'm allowed to know.  That's --
25            MR. GILLIGAN:  Not if it didn't refresh
```

```
 1   her recollection.

 2           MS. SNOW:  Yeah.

 3           MR. VECCHIONE:  Doesn't matter.  She

 4   reviewed it.  I'm allowed to know it.

 5           MR. GILLIGAN:  No, you're not.

 6           MS. SNOW:  Not if it did not refresh her

 7   recollection about the facts.

 8           MR. VECCHIONE:  She's been shown the

 9   document today.  I'm allowed to know which one she

10   reviewed if she's been shown it today.

11           MS. SNOW:  You're asking about documents

12   that --

13           MR. VECCHIONE:  That she saw today.

14           MS. SNOW:  -- she reviewed in

15   preparation --

16           MR. VECCHIONE:  Yeah.

17           MS. SNOW:  -- for the deposition?

18           MR. VECCHIONE:  Yes.

19           MS. SNOW:  Yes, that is covered by

20   attorney-client.

21           MR. VECCHIONE:  She said she's been shown

22   it today.  There is no attorney-client privilege for

23   that.

24           MR. GILLIGAN:  I don't know that -- I

25   don't know that she said that she was shown it
```

```
 1    today.
 2    BY MR. VECCHIONE:
 3        Q.  I'll ask.  Were you shown it today?
 4        A.  One of them, yes.
 5            MR. GILLIGAN:  It's still --
 6            MR. VECCHIONE:  It's an improper
 7    objection, but it's not that important, so I'm going
 8    to let it go for now.
 9            MR. GILLIGAN:  All right.  Well, if you
10    care to raise the issue again later, we'll be happy
11    to discuss it later.
12    BY MR. VECCHIONE:
13        Q.  All right.  So who's responsible for
14    creating this channel, this COVID-19 channel?
15        A.  Well, I have a small recollection of this
16    channel, and I never looked at it myself to my
17    memory.  But it's, to my understanding, you log onto
18    Facebook as an administrator, and it's something
19    that they make available to you as a federal agency.
20        Q.  Okay.  So Facebook made it?
21        A.  Yeah.  It's like a place you can go and
22    report something.  I -- "channel" does feel like an
23    odd description of it to me.
24        Q.  Okay.  How do you know that it was made
25    available to, like, law enforcement?  Do you know
```

**CAROL CRAWFORD  11/15/2022**

```
 1    that from this document, or do you know that from
 2    your own memory?
 3                  MS. SNOW:  Objection.  Facts not in
 4    evidence.
 5                  MR. VECCHIONE:  She testified to it a
 6    minute ago.
 7                  MS. SNOW:  Okay.  Sorry.  My apologies.  I
 8    missed that.  Sorry.
 9    BY MR. VECCHIONE:
10        Q.  So how do you know that?  Like, why is
11    that your understanding?
12        A.  I guess I can't say I know that.  I have a
13    vague recollection of it being described to me as
14    something that other, like, official groups could
15    use to report, that it wasn't something that was
16    generally available.  But I might be wrong.
17        Q.  Okay.
18        A.  I don't know for sure.
19        Q.  That's fine.  Now, at the end of this
20    email there is a list of other email lists; right?
21    She says:  Thank you, Genelle.  And then she lists
22    some government people and some Census people and
23    CDC people and Reingold again.
24        A.  I see it.
25        Q.  So those -- and she asks you to confirm if
```

```
 1    the below emails are correct for onboarding to the
 2    reporting channel; right?
 3         A.  Yes.
 4         Q.  All right.  Are any of those people the
 5    Ms. Aspinall I think you told me before?
 6         A.  Those emails are so difficult, I don't
 7    know.  Perhaps it's ███ or ███ or ███, but I don't
 8    know peoples' user IDs, so I can't answer.
 9              I would also like to clarify that when I
10    was reviewing this based on this chain, I thought
11    this was about CrowdTangle access.
12         Q.  Okay.  At that time?
13         A.  At this -- yes, so.
14         Q.  You don't believe that now, but that's
15    what you thought when you received it?
16         A.  Yes.  I can see in this chain that that's
17    what I thought was happening with this.
18         Q.  All right.  Do you know how this list of
19    employees, whether you recognize them or not, do you
20    know how the people for access were selected,
21    like --
22              (REPORTER'S NOTE:  Loud audio noise heard
23              over loud speakers in room.)
24              (Comments off the record.)
25              MR. VECCHIONE:  Let's go off record.
```

**CAROL CRAWFORD  11/15/2022**

```
 1                THE VIDEOGRAPHER:  Off record at 11:51.

 2                (Comments off the record.)

 3                THE VIDEOGRAPHER:  Back on record at

 4     11:53.

 5     BY MR. VECCHIONE:

 6         Q.  All right.  So the question is, the

 7     question on the floor, before we were so rudely

 8     interrupted, was how was this list of employees or

 9     contractors selected?

10         A.  I don't know.  Maybe from a meeting

11     invite.  Maybe people that were on a meeting, but I

12     don't know.

13         Q.  Do you know whether there was any training

14     involved in using this COVID-19 misinformation

15     channel?

16         A.  I don't remember any training.  The email

17     looks like perhaps there was.

18         Q.  Do you know whether CDC employees or

19     contractors asked to flag or report certain kinds of

20     information to Facebook?

21         A.  Yes.  On occasion there were people saying

22     "we saw this."  Usually they were around threats

23     that they wanted us to report, which you can do as

24     an administrator for Facebook now.

25                In terms of this, I only remember the one
```

```
 1   occasion that I mentioned a minute ago.

 2        Q.  Was Facebook asked to flag certain types

 3   of material to report to CDC or to Census?

 4        MS. SNOW:  Objection.  Vague.

 5   BY MR. VECCHIONE:

 6        Q.  I mean, I have asked whether or not CDC

 7   asked to flag things to Facebook, and you've

 8   answered that question.  Did Facebook ask CDC to

 9   flag things to them?

10        A.  Well, the way I have been using "flag" in

11   these emails is to point out.

12        Q.  Right.

13        A.  I don't recall asking them to point

14   anything out to us, but I can maybe recall us saying

15   something are you seeing this too, are y'all

16   considering this too?

17        Q.  Do you know whether or not we have any

18   documents that were given to CDC staff or

19   contractors regarding the training on this COVID-19

20   channel?

21        A.  I don't recall.

22        Q.  Okay.  Did the meeting -- I think it was

23   from May 18th.  Let me look at the document for a

24   second.

25        Okay.  You had a meeting that she -- that
```

 1    Genelle Adrienne refers to on May 7, 2021, 11:27

 2    a.m.  "Hi, Carol following up from our meeting

 3    yesterday it looks like Monday May 17th at 12 will

 4    work for onboarding meeting."

 5              Do you know whether that onboarding

 6    meeting ever occurred for this channel?

 7         A.  I don't have any recollection of the

 8    onboarding meeting.

 9         Q.  And once again would you have a calendar

10    mark for that onboarding meeting, if it occurred?

11         A.  If I was invited I would.

12              MR. VECCHIONE:  And once again, I'll put

13    that in a letter to you, Counsel.

14              MS. SNOW:  We'll note that document

15    discovery has closed, but we'll take it under

16    advisement.

17              MR. VECCHIONE:  I got you.

18    BY MR. VECCHIONE:

19         Q.  And you can put Exhibit 10 aside.

20              Oh, you know, might need it for this, but

21    I don't know if you do.

22              The Reingold contractors.  Why did CDC

23    need contractors?  What were they doing?  Did they

24    have concern -- let me withdraw the question.

25              Why did CDC have the contractors, the

**CAROL CRAWFORD  11/15/2022**

```
 1     Reingold contractors, involved in this?
 2              MS. SNOW:  Objection.  Mischaracterizes
 3     testimony.
 4     BY MR. VECCHIONE:
 5          Q.  Was it Census?
 6              MS. SNOW:  Objection.  Vague.
 7     BY MR. VECCHIONE:
 8          Q.  Why were the Reingold contractors involved
 9     in all this?
10          A.  They were contractors working with Census.
11          Q.  Okay.  Did you know why they were
12     contractors and not Census directly?
13          A.  No.
14          Q.  Do you know if their duties involve
15     content moderation?
16          A.  I don't.
17          Q.  Do you know whether their duties involve
18     flagging or reporting on certain kinds of opinions
19     expressed by U.S. citizens?
20              MS. SNOW:  Objection.  Vague, calls for
21     speculation.
22     BY MR. VECCHIONE:
23          Q.  You can answer.
24          A.  I really don't know.  I wouldn't know what
25     they had them do.
```

**CAROL CRAWFORD  11/15/2022**

```
 1              MR. VECCHIONE:  All right.  That's it for
 2    10.  I could go on to 11, and or we could break here
 3    and fix the sound.  You go -- you could have lunch.
 4    Decide what the witness --
 5              MR. GILLIGAN:  It's up to the witness to
 6    break.
 7              THE WITNESS:  Let's break.  Let's break.
 8              MR. VECCHIONE:  There you go.
 9              THE VIDEOGRAPHER:  Off record at 11:59.
10              (Lunch recess 11:59 a.m. - 12:51 p.m.)
11              THE VIDEOGRAPHER:  Back on record at
12    12:51.
13              MS. SNOW:  And, defense counsel, just like
14    to note that we've reestablished the Zoom connection
15    and shared a call-in phone number again, which is
16    being forwarded to plaintiffs' counsel pursuant to
17    the previous agreement that it not be shared, the
18    Zoom link not be shared beyond plaintiffs' counsel
19    or the Zoom, or the call recorded using the Zoom
20    call-in number.
21              MR. VECCHIONE:  That's fine.
22              (Plaintiffs' Exhibit 11 marked.)
23    BY MR. VECCHIONE:
24         Q.  All right.  Ms. Crawford, I have handed
25    you -- once again can you identify Exhibit 11 and
```

1    **then tell me what the subject matter of the -- what**

2    **the subject line is, and then you can continue to**

3    **read it.**

4          A.  Agenda item for CDC call this week.

5    May 20th, '21.

6          Okay.

7          **Q.  Can you tell me who Liz Lagone is?**

8          A.  My understanding is that Liz is on their

9    Trust and Safety team, or the Misinformation team,

10   which I don't know what the official name of it is.

11         **Q.  Meaning Facebook's?**

12         A.  Yes, Facebook's.  Sorry.

13         **Q.  And in these emails Ms. Lagone identified**

14   **the, quote, "Content Policies" of Facebook as**

15   **guiding which posts get removed; right?**

16         A.  It says "we may reduce, remove or inform."

17         **Q.  And I think she describes these policies**

18   **as evolving?**

19         A.  Yes, I see that.

20         **Q.  Okay.  Did you or anyone at the CDC**

21   **participate in the crafting of the content policy of**

22   **Facebook?**

23         A.  No.

24         **Q.  Did you or anyone at CDC contribute to the**

25   **terms of service or community standards of Facebook?**

```
 1          A.  No.
 2          Q.  Any other policy at Facebook that they
 3   contributed to?
 4          A.  No.
 5          Q.  Did you do so at any other social media
 6   company?
 7          A.  No.
 8          Q.  Did you or anyone at CDC ever give input
 9   on what such a policy should look like?
10          A.  No.
11          Q.  Did you, or --
12          A.  I should clarify.
13          Q.  Go ahead.
14          A.  I'm speaking from my -- no one in my group
15   or my office.  I can't imagine anyone else did.
16          Q.  To your knowledge?
17          A.  Yes, yes.
18          Q.  You're only testifying to your knowledge.
19   I understand that.
20          A.  Yes.
21          Q.  Thank you.
22              Did you or anyone at the CDC either advise
23   or help Facebook on how to enforce or apply their
24   policies to any particular social media post?
25          A.  Not that I recall.
```

CAROL CRAWFORD  11/15/2022

Page 105

 1        Q.  Same question for other social media.  Did
 2   you ever -- did you or anyone at CDC help any other
 3   social media company on how they should apply their
 4   policies to -- toward a particular post?
 5        A.  No.  We didn't -- I have never seen their
 6   policies.
 7        Q.  Did you or anyone at CDC ever discuss with
 8   Ms. Lagone any manner relating to any enforcement of
 9   the policies that she's discussing here?
10        MS. SNOW:  Objection.  Vague.
11   BY MR. VECCHIONE:
12        Q.  Well, she's discussing these policies
13   here.  Did you ever discuss with her their
14   development and enforcement?
15        A.  No.  We did not discuss the development of
16   their policies, or the enforcement of their
17   policies.  What we did provide was scientific
18   information that I did assume that they might use to
19   do those things.
20        Q.  Okay.  I'd like you to take a look at one
21   of -- she -- Payton Iheme lays out a number of items
22   that I think she says at May 19th, 4:19:  To help
23   with scoping on your end for Thursday, here's some
24   of the COVID content items that Liz will be flagging
25   for you the CDC team.

```
 1            And here she seems to be flagging items
 2   for you at CDC.  And then she goes through them.
 3   And what did you do when they flagged some of these
 4   to you?  What -- why was she flagging those to you,
 5   and then what did you do in response?
 6            MS. SNOW:  Objection.  Compound.
 7   BY MR. VECCHIONE:
 8       Q.  You can answer.
 9       A.  So why were they flagging this to us?
10   First part.  They were wanting our feedback on
11   whether these things were true or false statements
12   that they were seeing.  Did the CDC have science
13   around this, did we have content on our website.
14            Can you refresh me on the second part of
15   the question?
16       Q.  And what did you do in response to the
17   flagging?
18       A.  Typically what we would do is try to
19   let -- if we knew, if we had something or we had
20   science on these items, we would point to it or
21   provide them an answer.  If we didn't, we wouldn't
22   provide it.
23            My recollection, this might have been one
24   of the first times they asked in this type of
25   format.  And I think we talked about that on the
```

**CAROL CRAWFORD  11/15/2022**

```
 1  call, like, who knew -- some of these people, I
 2  thought, could help answer whether -- what we had on
 3  these topics.
 4      Q.  All right.  And you had -- and let's,
 5  since you just pointed out, we'll just say --
 6      A.  Mm-hmm (affirmative).
 7      Q.  -- your response was:  Thanks for the
 8  additional info.  And then you say you're going to
 9  have these folks joining.
10          And you've got the Census team members
11  joining this.  Cynthia Jorgensen, director of Comms
12  for NCIRD.  What's that?
13      A.  National Center for Immunization and
14  Respiratory Diseases at CDC.
15      Q.  "And our joint information center
16  co-lead."  So is she that as well?  She's the joint
17  information center co-lead, or is that a different
18  person?
19      A.  She was serving both roles.  She -- we
20  deployed to the response, and she was -- at this
21  point in time was deployed as the co-lead for the
22  joint information center, but her regular job is the
23  ADCS.  So she had a lot of knowledge regarding this
24  topic.
25      Q.  And then you've got Rosie
```

```
 1    Bretthauer-Mueller and Demi Haynes.  And they are
 2    co-leads for consumer vaccine content development.
 3              Is that content development on your
 4    website at CDC?
 5         A.  Yes.
 6         Q.  Okay.  And they say:  "I'm not going to
 7    have SME join."
 8              Is that subject matter experts?
 9         A.  Yes.
10         Q.  What are those?
11         A.  That would have been like an actual
12    scientist that studied these issues, or knew what
13    the science was on it.  When I -- I believe when I
14    scanned this I thought we probably had readily
15    answered -- we probably had a lot of this already
16    addressed on the website, and the content folks
17    would be able to point that out.  We didn't have to
18    have the expert on the call.
19         Q.  I have -- if you look at 11.
20         A.  Mm-hmm (affirmative).
21         Q.  "Is the claim 'COVID-19 manmade' false,
22    unproven, unsupported by evidence, or true?"
23              Do you know whether or not CDC ever
24    responded to that inquiry?
25         A.  I don't know for sure, but I doubt we
```

 1    would have.

 2         **Q.  And why do you think that?**

 3         A.  I don't recall us having any information

 4    on this posted on our website.  I know it came up a

 5    lot, but I don't remember us having it like an FAQ

 6    on it.

 7         **Q.  All right.**

 8         A.  But I'm not an expert on all the content

 9    we had on the web.  I don't develop the content.

10         **Q.  I understand.**

11         A.  Okay.

12         **Q.  I'm just -- I appreciate the information**

13    **and why you thought it.**

14              **I have a -- so this -- Census is now in.**

15    **Is this after the IAA you mentioned to me yesterday?**

16    **Earlier today.  It's not yesterday yet.  Before**

17    **lunch?**

18         A.  Yes.

19         **Q.  Okay.  So what is the -- what's your**

20    **understanding of what an interagency memo is, or an**

21    **interagency agreement is?**

22         A.  I'm definitely not an expert on IAAs.  But

23    it's an agreement between two agencies to conduct

24    some kind of work between them.  Sometimes you're

25    given fundings to do it.  Usually you are.  I

```
 1   don't -- I wasn't -- I didn't create the IAA, so I
 2   don't have a lot of details on what was in it.
 3        Q.  Have you seen it?
 4        A.  I do believe I saw it.
 5        Q.  Is it related just to COVID, or is it
 6   broader than that?
 7           MS. SNOW:  Objection.  Assumes facts not
 8   in evidence.
 9   BY MR. VECCHIONE:
10        Q.  Okay.  Is it related to COVID?
11        A.  I cannot say for sure what was stated in
12   the IAA, but we were only engaging on COVID
13   misinformation.  But we were learning about how they
14   operated a general misinformation team along the way
15   to --
16        Q.  How Census did?
17        A.  How Census did it, yes.
18        Q.  And did you -- was part of the IAA --
19   well, I'll ask it in two parts first.  Was part
20   of -- was the purpose of the IAA so that CDC could
21   learn what they did and perhaps replicate it?
22        A.  Was that the purpose of the IAA?  No, I
23   wouldn't say it.  I think that we were learning from
24   it to determine if we needed to do it.  I really
25   don't recall the wording in the IAA.
```

CAROL CRAWFORD  11/15/2022

1      Q.  Okay.  What was your understanding of what

2  the AII was about?

3      A.  To let us partner with the Census to learn

4  how they handled misinformation and help us with the

5  COVID misinformation.  We were shorthanded.  They

6  seemed to have more knowledge than we did.

7      Q.  All right.  And do you know if the IAA is

8  still in place?

9      A.  Well, we haven't been working with Census

10 in quite some time.  I don't know the actual date on

11 the end of the IAA, though.

12     Q.  All right.  If you look at item eight of

13 the items flagged:  "COVID-19 vaccine cause bell's

14 palsy."  Do you see that?

15     A.  Yes.

16     Q.  Do you know whether you gave any input on

17 that question?

18     A.  I don't recall.

19     Q.  And how about item number nine:  "COVID-19

20 has 99.96% survival rate"?

21     A.  I don't remember what we said about that

22 one.

23     Q.  All right.

24        MR. VECCHIONE:  I will hand over these all

25 at once because I'm going to ask the same question

**CAROL CRAWFORD 11/15/2022**

Page 112

```
 1   about them.
 2              MR. GILLIGAN:  31?
 3              MR. VECCHIONE:  12.  No, no, no, 12
 4   through 14, how about that?
 5              (Plaintiffs' Exhibit 12 and Exhibit 13
 6              marked.)
 7   BY MR. VECCHIONE:
 8       Q.  And you don't have to read through these.
 9   You can just look at them all at once.  I'll let
10   counsel look at them for a second, and then I'll ask
11   the question.
12              Now, I'll just represent to you what these
13   are, unless you can tell me you've seen them before.
14       A.  I haven't seen them before.
15       Q.  All right.  So Exhibit 12 is a scientific
16   paper on the relationship between Bell's palsy and
17   SARS CoV-2, as is 13.
18              Do you know whether or not in relationship
19   to Exhibit 11 and Bell's palsy, that whether or not
20   any of these scientific articles or others on Bell's
21   palsy were flagged by CDC to Facebook?
22              MS. SNOW:  Objection.  Calls for
23   speculation.  Lack of foundation.
24   BY MR. VECCHIONE:
25       Q.  You can answer, if you know.
```

**CAROL CRAWFORD  11/15/2022**

Page 113

```
 1          A.  I wouldn't know.  I mean, I didn't flag
 2   them.
 3              (Plaintiffs' Exhibit 14 marked.)
 4   BY MR. VECCHIONE:
 5          Q.  Okay.  And then on 14, Plaintiffs'
 6   Exhibit 14, have you seen this before?
 7          A.  No.
 8          Q.  And this is another scientific paper on
 9   the percentage survival rate of COVID patients.
10              Do you know whether this was flagged by
11   CDC to Facebook or other social media?
12          A.  We didn't flag this, or specific things.
13   We provided CDC content.
14          Q.  All right.  And that means things that
15   either CDC had on its website, or it knew
16   internally?
17          A.  I think primarily it was things that were
18   on CDC's site, but I can't say that for sure.  I did
19   not, not -- none of the communicators answered the
20   questions directly.
21          Q.  Okay.
22          A.  Unless we had it on our website.
23          Q.  So what you do is would you refer them to
24   subject matter experts?
25          A.  Those questions would -- if they were on
```

CAROL CRAWFORD  11/15/2022

Page 114

```
 1   an email, they would go, you know, we would -- I
 2   didn't.
 3        Q.  Right.
 4        A.  People in the response would ask the SMEs
 5   about them.  That's my understanding of what
 6   happened when they were circulated.
 7        Q.  So I'm trying to get the trail of how they
 8   get -- how Facebook or the other social media get
 9   information.  You're the contact point oftentimes.
10   They send you things like this?
11        A.  Mm-hmm (affirmative).
12        Q.  Then somebody -- and we've already
13   determined, you're not -- you don't do science,
14   you're a communicator, right?  And a tech person?
15   So where do you send this material to get those
16   answers if it's not on the website?  Because you've
17   told me if it's on the website we just send it over
18   to them.
19        A.  I didn't even always check to see if it
20   was on the website myself or in my office.  I would
21   let the communicator that was assigned to whatever
22   the area was.  For instance, Rosie on the Exhibit 11
23   was working with this area, and she would have the
24   contacts with the experts.
25        Q.  Okay.
```

```
 1        A.  I don't know what they -- how they got the
 2   answers back in every instance.
 3        Q.  Because you weren't always the person to
 4   send the answer back?
 5        A.  I sent the answers back, but I didn't
 6   collect them.  Usually they required multiple
 7   experts.
 8        Q.  Okay.  All right.  And in Exhibit 11
 9   again -- you can put 12 to 14 aside.  Do you know if
10   Cynthia Jorgensen and Rosie Bretthauer-Mueller and
11   Demi Haynes joined the meeting, as indicated?
12             MS. SNOW:  Objection.  Vague.
13             MR. VECCHIONE:  They're the people she's
14   going to bring in for the meeting.
15        A.  I think they probably did.  I don't know
16   if all three of them did.
17   BY MR. VECCHIONE:
18        Q.  And what is -- do you know what the role
19   is of a co-lead for consumer vaccine content
20   development is?
21        A.  She would help write all the materials on
22   vaccines that were on the website, or in a fact
23   sheet.
24        Q.  And do you recall this meeting taking
25   place?
```

 1      A.  I don't recall the specific meeting.  I do
 2 recall meetings such as -- like this.  I mean, maybe
 3 it's this one I have in my mind.  I don't know for
 4 sure.
 5      **Q.  Well, if it's -- what was discussed at the**
 6 **meeting, to the best of your recollection?**
 7      A.  Sometimes in these meetings they would ask
 8 do we know if this is true or false, which is what
 9 they were doing.  And then if we knew, the
10 communicators knew the answer, we would provide it.
11 If not, I would say, we would say, I'll have to get
12 back to you later, we'll talk to our SMEs.
13           And then that's why I was referring to not
14 going to have an SME going, but we can go back to
15 the group after the meeting if needed was the gist.
16      **Q.  Do you have notes or other records of what**
17 **was said on the call?**
18      A.  I didn't take notes.  I don't believe
19 notes were taken.
20      **Q.  But once again, on a calendar you might**
21 **have that calendared?**
22      A.  I would have -- the appointment would be
23 there, but it wouldn't necessarily say if Cynthia
24 joined or not.  She would have been invited.
25      **Q.  All right.  And we discussed earlier today**

1    your conversations with at least Facebook, but some

2    social media on misinformation.  And you said it was

3    on -- I think you said it was on a general level,

4    you couldn't remember anything specific.

5           After looking at these documents, has

6    anything changed in your response?  Do you remember

7    any specific misinformation you discussed with the

8    social media organizations around here, around 2021?

9        A.   I mean, I remember seeing this list before

10   now that you've showed it, but I don't remember what

11   we sent back, or what we said on the phone

12   specifically about each of these items.

13       Q.   And did you -- did CDC -- when I say "you"

14   here I mean you or anyone you know at CDC.

15       A.   Mm-hmm (affirmative).

16       Q.   Ever monitor whether Facebook or other

17   social media company took down material that you

18   have indicated was false?

19       A.   I do think that Census was at least

20   periodically checking on things that they had

21   flagged, or they had seen come up.

22       Q.   Okay.  Thank you.  And why do you believe

23   that?

24       A.   Because I have vague recollections of them

25   mentioning it or asking it in the meetings, and I

```
 1  believe that was in one of these exhibits.
 2       Q.  Got it.  That you reviewed during this
 3  deposition, or before?
 4       A.  In this one.
 5       Q.  Okay.  You can put Exhibit 11 aside.
 6       A.  Okay.
 7            (Plaintiffs' Exhibit 15 marked.)
 8  BY MR. VECCHIONE:
 9       Q.  And let's go to Exhibit 15.
10            MR. GILLIGAN:  Just a moment, Counsel,
11  before you ask your next question.
12            (REPORTER'S NOTE:  Mr. Gilligan conferring
13       with witness.)
14            MR. VECCHIONE:  The witness has conferred
15  with counsel.
16  BY MR. VECCHIONE:
17       Q.  And, again, I'd just ask you to identify
18  it by the subject of the re:  line and the date, and
19  then continue reviewing it.
20            MR. GILLIGAN:  Referring to Exhibit 15?
21  BY MR. VECCHIONE:
22       Q.  Referring to Exhibit 15.
23       A.  "It was this list, sorry.  Agenda item for
24  CDC call this week."  It was June 2nd, 2021.
25       Q.  Now, please take a look.
```

**CAROL CRAWFORD  11/15/2022**

```
 1         A.   Okay.

 2         Q.   All right.  Now, I think the end of this

 3   email is pretty much the same as the one that was

 4   Exhibit 14; right?

 5         A.   It is.

 6         Q.   So let's just start with the email that's

 7   from Liz Lagone to you on May 24 at 1:57 p.m., and

 8   she ccs Carrie Adams at Facebook, it looks like,

 9   from the email.  Who's Carrie Adams?

10         A.   She was part of Liz -- of Payton's team,

11   now Carrie is my main point of contact at Facebook,

12   Payton has since left.

13         Q.   And can you tell me -- so she says on this

14   email:  "Thanks so much again for you and team's

15   help in debunking a few COVID-19 and vaccine

16   misinformation claims for us.  As a followup to our

17   meeting, please see the list of claims below with

18   notes from our conversation last Thursday morning."

19              So if this is Monday May 24th, is it fair

20   to say that the meeting was Thursday May 20th, if

21   that's the Thursday of the previous week?

22         A.   It appears that way to me too.

23         Q.   Okay.  So do you recall who met at that

24   meeting, and where it was?

25         A.   Well, as we were discussing on the other
```

**CAROL CRAWFORD  11/15/2022**

1   exhibit, it was a phone conference, and I think that

2   Cynthia and Rosie and Demi may have attended.  I

3   can't say for sure all three of them attended, but I

4   know that they were at least two of them were

5   probably on the line.

6       **Q.  All right.  And she's listed a number of**

7   **those items that we saw before that they had**

8   **questions about.  And the first one that she lists,**

9   **although it's not in the same order, she sent it to**

10  **you earlier; right?**

11      A.  It does appear in a different order, yes.

12      **Q.  But, she says:  "Is the claim, quote,**

13  **'COVID-19 is manmade' false, unproven, unsupported**

14  **by evidence or true?"  And the answer's:**

15  **Inclusive [sic] -- inconclusive; right?**

16          **And then she also goes on to say:  It's**

17  **probably from animals jumping to humans.**

18          **And my question here is she says:  The CDC**

19  **director in her testimony yesterday said being**

20  **manmade was technically possible because we did not**

21  **know the origin still.**

22          **And was that the CDC dir- --  I think I**

23  **saw Walensky in this email beforehand.  Is that your**

24  **understanding of who that is?**

25      A.  In May that would be Walensky.

```
 1          Q.  Okay.  Now, why is Liz Lagone sending this
 2    email to you about -- why is she sending this email
 3    to you to confirm the conclusions below about the
 4    COVID vaccine?
 5          MS. SNOW:  Objection.  Calls for
 6    speculation.
 7    BY MR. VECCHIONE:
 8          Q.  You can answer.
 9          A.  I don't know why Liz specifically sent it
10    for sure.  But I -- because I just mentioned -- when
11    we were talking about the other exhibit -- that we
12    were communicators and not experts, there were
13    probably -- I'm sure we were saying we're pretty
14    sure this is correct.  We might have to go back and
15    check on stuff.  And I think she was trying to give
16    us something to go and follow up.
17          And I can see I said let's -- I'd like to
18    note that we have no scientific experts on the call
19    so these are our thoughts, but we'll definitely
20    check on this on our end.
21          Q.  Okay.  So you didn't -- but you didn't
22    respond that she had misheard anything on the
23    conversation; right?  You just said you needed to
24    check with scientists; right?
25          A.  Correct.  That's what I said in the email.
```

```
 1          Q.  Okay.  And then I will just to -- later on
 2     the COVID-19 vaccine causes various things, these
 3     things had been proposed:  Alzheimer's, Prion's,
 4     cytokine storm.  And you respond inconclusive.  We
 5     don't know right now; right?  You just didn't have
 6     anything at hand?
 7          A.  That appears to be what we said on the
 8     call, and that Liz, in theory, wrote down what we
 9     said correctly.
10          Q.  Right.
11          A.  That's not clear from this chain.
12          Q.  And then --
13          A.  But how I'm interpreting it.
14          Q.  And then once again the survival rate,
15     they say it's inconclusive but it's a hard number to
16     prove, and -- correct, that's what she says?
17          A.  "Not able to debunk now, inconclusive.
18     Scientists would be hesitant to attach a correct
19     number to the survival rates," so.
20          Q.  Okay.  Yes.  And then it says "Note, this
21     claim is tied to the VAERS issue."
22              What's VAERS?
23          A.  VAERS is a Vaccine Adverse Events
24     Reporting system.
25          Q.  And is it your understanding that doctors
```

 1   **around the country report adverse events for**
 2   **patients as a matter of course?**
 3           MS. SNOW:  Objection.  Calls for
 4   speculation.
 5       A.  I'm not an expert on the system.
 6   BY MR. VECCHIONE:
 7       **Q.  But the system, who puts the information**
 8   **there, do you know?**
 9       A.  I actually believe anyone is able to
10   report an adverse event.  It doesn't have to only be
11   physicians.  It can be any of us that wanted to.
12       **Q.  Okay.**
13       A.  I believe.
14       **Q.  Right.  And so it could be someone who**
15   **doesn't know whether it's connected to the vaccine,**
16   **or someone else?**
17       A.  I think any kind of -- any kind of thing
18   can be reported.
19       **Q.  Okay.  In this email do you know who the**
20   **science experts, the subject matter experts you**
21   **mention in your email, do you know who they were, or**
22   **who you checked with?**
23       A.  No.  Because people deployed in and out of
24   the response, and I was not usually the person
25   asking the SMEs directly.  It was the communicators

1    assigned to the topic group such as Rosie who was

2    the communicator for vaccines.  She was talking to

3    the SMEs.

4         Q.  All right.  And then would she talk --

5    could she talk directly to Facebook or the other

6    social media after that?

7         A.  Almost always she'd send back to me, and I

8    would consolidate responses and send them back.

9    Sometimes if I was out, Rosie would respond directly

10   with a copy to me or something.  I don't know that

11   that happened ever, but it might have.

12        Q.  All right.  Now, on May 24 at 1:57 she

13   does thank you for your and your team's help in

14   debunking a few COVID-19 and vaccine misinformation

15   claims; correct?

16        A.  Where do you see the thank you?

17        Q.  On May 24th, 2021 at 1:57.  The Bates

18   stamp at the bottom ends in 539.

19        A.  Sorry.  I'm on the wrong --

20        Q.  Yeah.

21        A.  Yeah, she does say that.  But then I note

22   that we haven't had scientific experts review this

23   yet right after she sent that to clarify.

24        Q.  All right.  But you were going to check

25   with them so that it could be debunked; correct?

```
 1        A.  Correct.  If it was supposed to be
 2   debunked.
 3        Q.  If it --
 4        A.  Yes.
 5        Q.  Yes, if it was.  I thought -- I'm not
 6   seeing it now.  One second.
 7            Ah, here it is on the very first page of
 8   Exhibit 15.  Liz Lagone refers to a Sam.  "Also I
 9   meant to ask in my email earlier but I recall it was
10   either you or Sam mentioning that you could share a
11   transcript."  Who's Sam?
12        A.  I assume that was Sam with the Census
13   team.
14        Q.  Got it.  And have we talked about him
15   before?  Is he --
16        A.  We mentioned that he was one of the Census
17   folks.  I didn't remember his name until the
18   exhibits, but yes.
19        Q.  And do you know if the transcript of
20   Dr. Walensky was just her testimony to Congress, or
21   something else?
22        A.  In re-reading this, my recollection is is
23   that they asked about this, and several of us said I
24   think we heard her address this in the press event,
25   or maybe it was the testimony.  I'm not sure.  I
```

1    guess it was the testimony because I was looking for

2    the transcript, and we mentioned it.  And we were

3    looking for it because that was the only thing that

4    we knew of that might exist to help them with their

5    question.

6           MR. VECCHIONE:  All right.  You can put

7    that aside.

8           (Plaintiffs' Exhibit 16 marked.)

9    BY MR. VECCHIONE:

10     Q.  **And once again if you could just tell me**

11   **the subject line and the date, and then --**

12          MS. SNOW:  And this is Exhibit 16?

13    BY MR. VECCHIONE:

14     Q.  **Exhibit 16.**

15     A.  "It was this list, sorry.  Agenda item for

16   the CDC call this week."  June 3rd.

17     Q.  **Okay.  Now, let's go to the back again.**

18  **And Liz Lagone writes to you on June 1st, 2021,**

19  **8:49 p.m.:  "Hi, Carol, I hope you're well and had a**

20  **restful long weekend.  I want to follow up on my**

21  **below email and see if you needed any further**

22  **information or context about COVID-19 vaccine claims**

23  **below.  We'd love CDC's help in debunking."**

24        **And the next one from June 2nd, 2021 at**

25  **6:58, that's from you; right?**

```
 1          A.   Yes.
 2          Q.   And that's to Liz Lagone; right?
 3          A.   Yes.
 4          Q.   And what -- could you read what you say to
 5    her?
 6          A.   "Notes below on some.  I hope this helps.
 7    I will let you know when we have cleared points."
 8          Q.   And then stop there.
 9          A.   Okay.
10          Q.   Then "COVID-19 vaccines causing
11    magnetism."  And, surprisingly, "debunked."
12               Then you'll say "will have cleared TP
13    soon."  What's TP?
14          A.   Talking point.
15          Q.   How does a talking point get cleared?
16    Well, I'll withdraw that.  What is a talking point?
17          A.   Usually it's a bullet or a paragraph on
18    whatever the subject is that one could refer to.
19          Q.   And how does it get cleared?  What's the
20    process?
21          A.   I mean, I'm not sure why I was looking for
22    TP instead of web content.  I don't know if that was
23    just a mistype or not, but -- or maybe -- maybe it
24    was going to be a talking point.  But usually any
25    content that's going outside of the agency goes
```

```
 1   through a very specific clearance process.  There
 2   was a clearance process for COVID.  I wasn't -- I
 3   rarely cleared things myself, but there -- many
 4   people have to sign off on content before it leaves
 5   the Agency.
 6        Q.  Got it.  And I'll just notice -- I'll just
 7   point out that the bottom about the COVID-19
 8   vaccines causing erectile dysfunction, again, you
 9   say "will have a cleared TP soon"; right?
10        A.  Yeah.  I believe thinking more about why I
11   said TP, we often provide media with talking points
12   when they ask questions.  And that was -- we were
13   also looking at things that we were providing to
14   media in addition to web content because that was
15   similar, there were similar questions coming.  So
16   perhaps that's why this says TP instead of web
17   content.
18        Q.  All right.
19        A.  I can't say for 100 percent sure, but I
20   think that might be likely.
21        Q.  And you use web content in other -- in
22   other of these points.  So my question there is with
23   respect to items 3, 4 and 6, which, I think if you
24   look at it, that's what they are.
25        A.  Mm-hmm (affirmative).
```

1     Q.  What does it mean that, quote, "web
2  content to debunk is in clearance"?
3     A.  Well, I think what we were referring to is
4  posting a more specific kind of FAQ or myth.  We had
5  a myths page where we would more directly address
6  the myth.  You know, sometimes answers to things
7  were buried in guidance or scientific papers, and we
8  were trying to make it easier for people to
9  understand the myths.  So I think this is in
10  reference to adding a myth or an FAQ to the site.
11     Q.  All right.  And then you said -- well, my
12  next question:  So what does CDC do to debunk the
13  claims that -- I'll make it more specific here.
14  What did CDC do to debunk each of these claims?
15  What process does it go through to debunk them?
16     A.  I can't -- I can't answer what the --
17  because that's a scientific process that I'm not
18  part of.
19     Q.  Okay.  So they give these questions to
20  you, and you send it out to a scientist or a subject
21  matter expert, let's call them.
22     A.  Mm-hmm (affirmative).
23     Q.  I take it -- I take it from the responses
24  there is a number of different CDC answers.  One is
25  inconclusive.  You say that a number of times.  They

 1  didn't have the information at that time, is that
 2  fair?
 3       A.  That's my assumption of what was meant by
 4  that.
 5       Q.  Okay.  And sometimes they'd say
 6  inconclusive, but give here's what we know now?
 7       A.  Mm-hmm (affirmative).
 8       Q.  And then in other times it's just
 9  debunked.
10           What did you get from the subject matter
11  experts when they send that back?  Did they just
12  send back "debunked," or do they have some reference
13  or explanatory note?
14       A.  On -- I think it varied.  For this one I'm
15  not sure.  I don't remember if I saw all the
16  explanations, or if they were discussed in meetings
17  with the experts.  I've seen some that seemed to
18  have a little more description when I have asked it,
19  but -- or well, maybe when I was asking the SME they
20  might have given me, but I was really the one
21  discussing it directly with the SME.
22       Q.  Now you've also described already some
23  things they'd already done and put on your website?
24       A.  Yes.
25       Q.  All right.  So do you know if CDC

```
 1   conducted any experiment or processes to debunk any

 2   of these items?

 3        A.  I wouldn't know.

 4        Q.  Do you know whether they did surveys of

 5   the medical literature of the vaccines?

 6             MS. SNOW:  Objection.  Vague.

 7   BY MR. VECCHIONE:

 8        Q.  In order to debunk claims do you know

 9   whether they checked medical literature, or what

10   they reviewed?

11        A.  I wasn't part of the scientific process,

12   so I wouldn't even want to speculate.

13        Q.  So I think if you look at Exhibit 15.

14        A.  Yes.

15        Q.  Do you have it?  If you go to the

16   second-to-last page it's where they start.  And

17   Payton Iheme sends you this list of a number of

18   claims.  And the date of that is May 19th; right?

19        A.  Yes.

20        Q.  And then if you look at 16 by June 3rd at

21   2021, 2:57 you write about the last ones that you

22   hadn't told her about:  "Yes, they are debunked and

23   we will also have content on it soon"; correct?

24        A.  I see that, yes.

25        Q.  All right.  So that is about two weeks'
```

 1    time to debunk these claims that?

 2         A.   That seems like the dates, yes.

 3         Q.   **So given that short time frame, would you**

 4    **agree with me that CDC didn't do any experiment to**

 5    **debunk these proposals?**

 6              MS. SNOW:  Objection.  Mischaracterizes

 7    the documents and the testimony.

 8         A.   I feel like it took us two weeks to

 9    respond back to Facebook.  I don't think it was fair

10    to characterize it as the time it took CDC to

11    potentially collect science on this.

12    BY MR. VECCHIONE:

13         Q.   **Thank you.  Do you know who -- when you**

14    **give your initial proposals to Facebook, when --**

15    **like the discussions we saw earlier where you said**

16    **those were our discussions but we have to check with**

17    **the subject matter experts, who in that**

18    **conversation, when you're meeting with them, who**

19    **makes those proposals?  Is that you, or is that one**

20    **of the co-chairs we mentioned?**

21              MS. SNOW:  Objection.  Vague.

22         A.   What do you mean by proposals?

23    BY MR. VECCHIONE:

24         Q.   **Well, they put together these matters to**

25    **be debunked; right?  And we saw -- and you can put**

 1    **15 next to 16.  And if you look at 15, as we**

 2    **discussed earlier, Liz Lagone sends you:  This is**

 3    **the conversation we had.  It's kind of --**

 4              MR. GILLIGAN:  Which page?

 5              MR. VECCHIONE:  Page -- on page 15 [sic],

 6    second page.

 7              MR. GILLIGAN:  Thank you.

 8              MR. VECCHIONE:  Exhibit 15.

 9    BY MR. VECCHIONE:

10         **Q.  So she says, and we've discussed this**

11    **before:  "Please confirm the conclusions I have**

12    **noted below based on our discussion."**

13              **So you had a discussion and she got these**

14    **impressions.  But who gave her these impressions?**

15    **In other words, who was the person in the room who**

16    **could say, nah, I don't think that's right, but**

17    **we'll get back to you with the subject matter**

18    **expert?**

19         A.  I don't remember this call specifically in

20    any kind of detail, but I do believe it was one of

21    the first times they had sent us a list, and I think

22    that Cynthia and Rosie or Demi, who had a lot more

23    knowledge of the content, piped in mostly on what

24    they thought was available.

25         **Q.  Okay.**

```
 1           A.  But I believe we characterized it during
 2     the call that we would need the expert, and I
 3     followed up that way at the end.
 4           Q.  In the subsequent emails?
 5           A.  Yes.
 6           Q.  And then -- so then finally there is at
 7     the end:  "Yes, these are debunked" --
 8           A.  Mm-hmm (affirmative).
 9           Q.  -- and you'll "have content on it soon."
10           And that content, is that talking points,
11     or is that web content when you use that term?
12           A.  When I use what term?
13           Q.  Content.
14           A.  Web content, it could have been a FAQ on
15     the web, it could have been a myth, it could have
16     been a fact sheet on the web.  Anything on the
17     web --
18           Q.  All right.
19           A.  -- that was for consumers.
20           Q.  But you considered that debunked by the
21     CDC by June 3rd, 2021?
22           MS. SNOW:  Objection.  Vague.
23     BY MR. VECCHIONE:
24           Q.  Well, she says:  "Yes, they are debunked
25     and we will also have content on it soon" in
```

 1   **Plaintiffs' Exhibit 16, June 3rd, 2021.**

 2        A.  We reported to Facebook that they were

 3   debunked at this time.

 4        MR. VECCHIONE:  Thank you.  Exhibit 17.

 5   You know what, take this one, too, because it will

 6   be real quick, I hope.

 7   BY MR. VECCHIONE:

 8        **Q.  So I'll -- one more question on 16.  On**

 9   **that June 3rd date where you said these are**

10   **debunked, who makes the final calls that they are**

11   **debunked before you send it Facebook?**

12        A.  The communicators or the SME that I'm

13   working with would decide if it was okay to send it

14   back to Facebook.  The communicator would get that

15   from the SME that they were working with.

16        For instance, my team posts the web, but I

17   don't know how every piece is exactly cleared, but

18   yet when they send it to us to post it there were

19   trusted people that send it to me, and we assume

20   that it's cleared and we post it.

21        It's very similar.  Rosie was also in

22   charge of clearing other things, and so she would

23   assure to me that she had discussed it with the SMEs

24   of authority.

25        **Q.  Okay.  And do you know of any, the names**

1    of any of these SMEs?

2         A.  No, not off the top of my head.  I mean,

3    people were in and out of the response, and I don't

4    recall.

5         **Q.  All right.  I'll ask you to take a look at**

6    **Plaintiffs' Exhibit 16 again.**

7         A.  Okay.

8         **Q.  Can you read item seven, and the answer on**

9    **-- it's Bates stamped 533.  It's on the second page.**

10        A.  Of which exhibit?

11        **Q.  Exhibit 16.**

12        A.  Of 533.

13        **Q.  The bottom at the number is called a Bates**

14   **stamp.**

15        A.  Oh, sorry.

16        **Q.  That page, if you go up -- yeah, not**

17   **everybody knows that and I have to say that --**

18             MR. GILLIGAN:  Nobody actually uses a

19   Bates stamp any more either.

20             MR. VECCHIONE:  What do they do?

21             MR. GILLIGAN:  They're all electronically

22   applied.

23             MR. VECCHIONE:  I gotcha.  I remember.

24   BY MR. VECCHIONE:

25        **Q.  In any event, could you read item 7 from**

```
 1    the email that you sent?

 2         A.   "People who are receiving COVID-19

 3    vaccines are subject to medical experiments."

 4         Q.   And then the answer at 7(a)?

 5         A.   "Debunked.  CDC notes this likely stems

 6    from the vaccines only having EUA now and equating

 7    lack of full authorization as being involuntary part

 8    of a medical experiment."

 9         Q.   And WhatsApp EUA?

10         A.   Emergency use authorization.

11         Q.   All right.  And that's when the FTC -- FDA

12    has given an emergency use authorization for certain

13    medicines?

14         A.   This is not my area of expertise, but yes,

15    I believe that's --

16         Q.   That's your understanding?

17         A.   Yes.

18         Q.   So were you aware at this time that

19    vaccine mandates had been employed by governments,

20    employers and colleges as a condition of maintaining

21    employment or enrollment?

22              MS. SNOW:  Objection.  Assumes facts not

23    in evidence.

24    BY MR. VECCHIONE:

25         Q.   Have you ever heard of such a thing?
```

1          A.  Yes.  I don't know --

2          Q.  **Does getting a vaccine as a requirement of**

3  **maintaining employment or enrollment affect**

4  **voluntariness?**

5          MS. SNOW:  Objection.  Calls for

6  speculation, assumes facts not in evidence,

7  argumentative.

8          A.  This is really not my area of expertise of

9  any account.  I don't have anything really to

10 provide on that.

11 BY MR. VECCHIONE:

12         Q.  **Did you instruct Facebook to do anything**

13 **with debunked claims?**

14         A.  No.

15         Q.  **Did you have an understanding of what they**

16 **were going to do with any claims that the CDC said**

17 **were debunked?**

18         A.  I knew that they had options, but I think

19 we also discussed on a previous exhibit, which is to

20 inform people, to maybe reduce it in the algorithm,

21 or to remove it.  I -- they probably had other

22 options, but I knew of at least those.

23         (Plaintiffs' Exhibit 17 presented.)

24         Q.  **Thank you.  Exhibit 17.  And, again, just**

25 **tell me the subject line and the date.**

Case 3:22-cv-01213-TAD-KDM Document 20-1 Filed 03/06/23 Page 340 of 348 PageID #: 11083

```
 1        A.  "FB misinformation claims help debunking,"
 2   misspelled.  The date is 7/26/2021.
 3        Q.  So on July 26, 2021 it's Liz Langone to
 4   you again; right?
 5        A.  Yes.
 6        Q.  And she says:  "Our Misinformation Policy
 7   Team," meaning Facebook's do you believe?
 8        A.  Yes.
 9        Q.  "Has identified some claims that we were
10   hoping your team could help us understand if they
11   are false and can lead to harm"; right?
12        A.  Yes.
13        Q.  And she has spike proteins in COVID-19
14   vaccines, Guillain-Barre syndrome -- which I will
15   use GBS from now on as well -- is possible side
16   effect, and heart inflammation as a possible side
17   effect of all COVID-19 vaccines.
18            Those were the questions that she sent
19   you; right?
20        A.  Yes.
21        Q.  Do you know why she's asking you, or do
22   you have an understanding?  I'll withdraw it.
23            Do you have an understanding of why she's
24   asking you at CDC whether the claims are true or
25   false?
```

```
 1        A.  Because CDC would have credible health
 2   information about the claims or scientific
 3   information that would benefit their policy making
 4   is the way I understood it.
 5        Q.  Okay.  And she then asks you she was
 6   "wondering if your team was aware of any global
 7   source of truth/database for vaccine adverse effects
 8   including possibly vaccine-related deaths."
 9            Do you see that?
10        A.  Yes.
11        Q.  Did there ever come a time when WHO or
12   some foreign medical health agency differed with the
13   CDC on any of these vaccine topics that you recall?
14        A.  That's not my area of expertise, and I
15   don't recall any specifics.
16        Q.  Do you know whether on these three
17   requests that you did another response on debunking,
18   inconclusive, or not known like you did in the
19   previous one, exhibits we looked at?
20        A.  I don't remember what I specifically
21   answered with this.
22        Q.  Okay.
23        A.  I know generally what I -- how I handled
24   them, but not what I did with this.
25        Q.  Okay.  And generally how you handled them
```

```
 1    we've already discussed?

 2         A.   Yes.

 3         Q.   And you have nothing different to add on

 4    this particular request?

 5         A.   No.

 6              (Plaintiffs' Exhibit 18 presented.)

 7         Q.   Okay.  You can go to Exhibit 18.  And once

 8    again could you please give me the subject line and

 9    the date of Exhibit 18?

10         A.   Yes.  CrowdTangle COVID-19 reports.

11    7/20/21.

12         Q.   Okay.  And please take a look at it.

13         A.   I've scanned this one.

14         Q.   Who's -- at the top, at the very end, I

15    guess I should say the end, the very top?

16         A.   Mm-hmm (affirmative).

17         Q.   It's Carol Crawford to Tyler Woods.  Who

18    is that?

19         A.   Tyler Woods was a name on another exhibit.

20    I mentioned at that time I'm pretty sure that Tyler

21    Woods took over the reporting from Kelly Perron, and

22    that appears to be the case here.  There is a

23    transfer on the first page saying -- from Kelly

24    saying Tyler is going to be sending the reports in

25    the future.
```

```
 1          Q.  Okay.  And once again these are the
 2    CrowdTangle reports that I think we discussed at one
 3    point you were receiving biweekly?
 4          A.  Yes.
 5          Q.  And were you doing anything different with
 6    this information at this time than you've described
 7    to me earlier?
 8          A.  Not that I recall.
 9          Q.  Okay.  And at this time, June 9th, 2021,
10    are they reporting this to you for the same reasons
11    as you've described previously when we first
12    mentioned CrowdTangle?
13          A.  That's my recollection of it.
14          Q.  On the very last page, which is the
15    beginning of it, June 8th, 2021, 8:13 p.m.,
16    "vaccination lawsuits" --
17          A.  I see it.
18          Q.  -- highlighted.  Do you know what they are
19    referring to there?
20          A.  Sounds like the lawsuits around the
21    mandates that you mentioned previously.
22          Q.  Okay.  Like the OSHA mandate or CMS
23    mandates?
24              MS. SNOW:  Objection.  Assumes facts not
25    in evidence.  Calls for speculation.
```

CAROL CRAWFORD 11/15/2022

Page 143

1          A.  I really am speculating.

2    BY MR. VECCHIONE:

3          **Q.  You're not sure?**

4          A.  I don't know.  This is not really an area

5    of my expertise.  This is simply a report of

6    conversations that are occurring on social media.

7          **Q.  All right.  When you received it, did you**

8    **have an understanding of what the vaccine lawsuits**

9    **they were referring to were?**

10         A.  I had a recollection of that from watching

11   the news in my personal life.

12         **Q.  Okay.  On that same page "Deciding to Get**

13   **Vaccinated" she's highlighted.**

14              **Why does the CDC need to be updated on the**

15   **statements of public physicians?**

16              MS. SNOW:  Objection.  Mischaracterizes

17   testimony and the document.

18   BY MR. VECCHIONE:

19         **Q.  Why were you updated on those statements?**

20         A.  Again, these are reports that characterize

21   the overall conversation of social media.  They are

22   not -- I don't believe these were picked out

23   specifically for CDC.  I think these are a report of

24   the trends of conversation on social media.

25         **Q.  And I'd like you to turn to the next page**

```
 1   where Tyler Woods takes over and he sends a June
 2   22nd, 4:43 p.m. summary to you.
 3        A.  Okay.
 4        Q.  At the end of it it says:  "Let us know if
 5   you have any questions or specific keywords/topics
 6   you'd like us to explore in the next report.  As
 7   always, please do not share."
 8             Did there come a time that you shared
 9   keywords or topics with Facebook that you wanted
10   them to check in?
11        A.  I don't recall doing it.
12        Q.  All right.  Turn to the first page of
13   Exhibit 18.  Once again, this is Tyler Woods to you?
14        A.  Yes.  Sorry.
15        Q.  Thank you.  The very, very mistake on my
16   instructions at the beginning.  You're to be
17   commended, because it usually happens a lot more
18   until now.
19             So the last, the last item that's
20   highlighted:  Door-to-door vaccines.  Do you know
21   whether he's referring to any public statements made
22   on this topic by any plaintiff in this case,
23   including Governor Mike Parson?
24        A.  I wouldn't know.
25             MR. VECCHIONE:  You can put that aside.
```

```
 1              (Plaintiffs' Exhibit 19 marked.)
 2   BY MR. VECCHIONE:
 3        Q.  And once again please identify it to me by
 4   subject matter and date of Exhibit 19, and then
 5   please read it to yourself.
 6        A.  CrowdTangle COVID-19 reports, 8/18/21.  I
 7   didn't hear your last part of to yourself, what.
 8        Q.  Just read it to yourself.  In other words,
 9   you get to review the document but you don't have to
10   read it out loud?
11        A.  I'm sorry about that.  Okay.
12        Q.  I'm not caught up to you.
13        Okay.  So as we've discussed, this, once
14   again, is one of the CrowdTangle reports but that
15   Tyler Woods is now sending; correct?
16        A.  Yes.
17        Q.  Let's go back to the August 3rd exchange
18   on this.  So on August 3rd Tyler Woods writes to you
19   at 6:16 p.m.?
20        A.  Yes.
21        Q.  And once again the purpose of this you've
22   already testified to; it hasn't changed, why you're
23   getting these?
24        A.  Correct.
25        Q.  All right.  So did the CDC at this time
```

 1  have proof that, quote, "the recent uptick in
 2  hospitalizations and deaths is being driven by
 3  unvaccinated individuals"?
 4       A.  I'm not an expert in that area and I
 5  wouldn't be able to answer that question.
 6       Q.  All right.  Do you know whether subsequent
 7  evidence the CDC had supported that view?
 8       A.  I'm not an expert in this area, and I
 9  don't feel comfortable.  I don't know.
10       Q.  The email exchange that Tyler would send
11  you on July 20th, 2021, the Bates stamp number at
12  the bottom is 2440 of this document.
13       A.  I see it.
14       Q.  You there?  So, once again, when he sends
15  you material from CrowdTangle concerning allowing
16  people to return to religious services, that's
17  because it's appearing on CrowdTangle and not
18  because you asked for it?
19       A.  Correct.
20       Q.  And let's go to the first page here, but
21  I'll ask you to take a look at the August 17th
22  exchange.  Once again, Tyler Woods sending you the
23  CrowdTangle reports?
24       A.  Yes.
25       Q.  Now, by August 17th, 2021 are you still

```
 1    using CrowdTangle for the same purposes you
 2    discussed earlier?
 3         A.  Yes.  But this isn't about us using
 4    CrowdTangle.  This is about them sending us
 5    CrowdTangle reports.
 6         Q.  Okay.
 7         A.  But either way it's all the same purpose.
 8    I just wanted to clarify that.
 9         Q.  Okay.  Because by now you may be using
10    CrowdTangle in a different way.  You might be
11    getting the summaries and going in directly?
12         A.  Well, we had access to go in directly to
13    CrowdTangle and run in reports I think from early
14    2020.
15         Q.  Okay.
16         A.  And I mentioned that our research team, I
17    think, searched in it and looked in it to create
18    their reports, and I believe other teams did too.  I
19    did not personally.  These are reports that were
20    sent to us.  So that's different than the way you
21    stated it.
22         Q.  I see.
23         A.  I did not use these reports in any
24    different way than I have been saying in previous.
25         Q.  But just to clarify.
```

```
 1        A.  Yes.
 2        Q.  So these are reports from Facebook to you?
 3        A.  Yes.
 4        Q.  As we've discussed?
 5        A.  Yes.
 6        Q.  I might ask you if something's changed,
 7   but you've already testified to that.  But within
 8   CDC you had access to CrowdTangle, and created your
 9   own reports?
10        A.  That we could -- I don't know that we
11   created reports.  I know that we did searches in
12   CrowdTangle, the same way we do searches in other
13   social media and listening tools that we have to
14   create, to understand what's being discussed in the
15   environment, to update our communication material,
16   as I was explaining this morning.
17        Q.  Okay.  So on this particular one that
18   we're discussing, once again Facebook has sent you
19   their CrowdTangle summary.  And I-- the COVID 19
20   mandates at the bottom there that's highlighted.  It
21   says:  "On the other hand, many conservative
22   politicians are calling for an end to government
23   mandated restrictions and vaccinations."
24             And my question is do you know whether or
25   not there was any CrowdTangle information about
```

```
 1    either Attorney General Schmitt or Attorney General
 2    Landry in these CrowdTangle briefings?
 3         A.  I'm not -- I wouldn't even say I flipped
 4    open this -- every report.  I don't know.  I
 5    couldn't remember any of the details.
 6              They did often put pictures of the posts,
 7    of a post as examples.
 8         Q.  Oh, okay.
 9         A.  But I don't know.
10         Q.  That they're finding?  Sort of like that
11    that attachment we saw earlier where they were
12    asking you about the wording?  Like, in other words,
13    it wouldn't look like this.  It would be some
14    something they had taken off Facebook?
15         A.  Yeah.  But that was -- those samples I
16    feel like you're referencing are different.  This
17    would just be like they are saying a lot of people
18    are talking about COVID-19 mandates; they might put
19    a few example posts someone put in the slide deck to
20    show what they were talking about.
21         Q.  Got it.  Thank you.
22              MR. VECCHIONE:  Exhibit 20.
23              THE WITNESS:  After Exhibit 20, could we
24    take a short break?
25              MR. VECCHIONE:  Let's take one now.
```

**CAROL CRAWFORD  11/15/2022**

```
 1              THE WITNESS:  Could we take one now?

 2              THE VIDEOGRAPHER:  Off record at 2:06.

 3              (Recess 2:06 p.m. - 2:19 p.m.)

 4              THE VIDEOGRAPHER:  We are back on the

 5      record at 2:19.

 6              (Plaintiffs' Exhibit 20 marked.)

 7      BY MR. VECCHIONE:

 8         Q.  Okay.  Ms. Crawford, have you had a chance

 9      to look at Plaintiffs' Exhibit 20?

10         A.  I did.

11         Q.  All right.  And could you tell me the

12      subject line and who's it from, who's it to and what

13      the date is?

14         A.  Yes.  The subject is VAERS policy

15      consultation on 8/19, 2021.  The first email is from

16      me to Carrie Adams at Facebook.

17         Q.  All right.  What's your understanding of

18      why the CDC was asking to meet with the VAERS

19      experts for consultation about misinformation?

20         A.  I don't recall a lot of the details, but

21      VAERS, the topic of VAERS was an area that was

22      widely discussed on social media, and there was a

23      lot of areas of confusion about what VAERS data was.

24      There was myths about VAERS data, and there was

25      misinformation about VAERS data.  So it was always
```

```
 1    one of the things that rose to the top in terms of
 2    volume of discussion of people were very confused
 3    about VAERS.
 4            Q.  And do you know whether this meeting ever
 5    took place?
 6            A.  I don't remember if the one we were
 7    discussing at this time took place and the Singapore
 8    team attended for sure.  But we did have a session
 9    with the VAERS experts with Facebook.
10            Q.  Okay.
11            A.  Probably as a result of this, I feel like
12    it might have dragged out a little bit after this
13    for a few weeks.
14            Q.  And do you know what was discussed at that
15    meeting?  First, did you attend it?
16            A.  I did attend it.
17            Q.  And do you recall what was discussed at
18    that meeting?
19            A.  We had one of the experts for VAERS,
20    and -- maybe it was two experts for VAERS and a
21    couple of their communication experts on the line
22    with Facebook's team.  I believe it was like their
23    misinformation and policy type team like that Liz
24    was part of, but I don't know who -- I don't
25    remember specifically who was on there.  And we
```

**CAROL CRAWFORD  11/15/2022**

1  offered the SME just to answer their questions about

2  what VAERS was and what it wasn't.

3          And my recollection is they asked a lot of

4  questions like, you know, what does -- what does --

5  who can report something on VAERS and things like

6  that during the session.

7      **Q.  Okay.  Do you know who the subject matter**

8  **experts on VAERS were at CDC?**

9      A.  Goodness.  I'm just totally blanking on

10  their names.  I'm sorry.

11      **Q.  If you recall during the course of this**

12  **deposition, please let me know.**

13      A.  Okay.

14          MR. VECCHIONE:  We can move on to the next

15  document.

16          (Plaintiffs' Exhibit 21 marked.)

17      A.  Thank you.

18  BY MR. VECCHIONE:

19      **Q.  And once again if you could just read the**

20  **subject line, and then who -- what the date was and**

21  **then read it to yourself.**

22          MS. SNOW:  Is this for Exhibit 21?

23          MR. VECCHIONE:  21.

24      A.  Subject BOLO, CDC lab alert and

25  misinformation.  September 1st.  It's from me to

```
 1   Carrie Adams at Facebook.

 2            I have read it.

 3   BY MR. VECCHIONE:

 4       Q.  Okay.  So do you recall this email?

 5       A.  I do now that I'm seeing it, yes.

 6       Q.  What are you telling Adams in this email?

 7       A.  I can't see the attachment.  But there was

 8   a misinterpretation of a lab alert that we issued,

 9   and so I think we put together a deck -- a power

10   point or a two-page just saying what the facts were

11   about this lab alert.

12       Q.  Okay.  What is a lab alert?

13       A.  I don't know if this was a HAN alert or if

14   was some other kind of alert they sent straight to

15   laboratory.  So I don't remember the details.

16       Q.  What is a HAN alert?

17       A.  A health advisory alert.  We send it --

18   no, Network.  Health Advisory Network alert.  Sorry.

19       Q.  And you have:  "Carrie - BOLO."

20           What's BOLO?

21       A.  Be on the lookout.

22       Q.  Why were you concerned about this?

23       A.  Similar to all the other BOLOs, we still

24   thought it was good to point out if we had facts

25   around something that was widely circulating as a
```

```
 1   cause of misinformation to the platforms to assist
 2   them in whatever they were going to do with their
 3   policy or not do.  And this was one that was kind of
 4   growing, and we had a lot of facts about it, and the
 5   team was concerned about this, this
 6   misunderstanding.
 7        Q.  Do you recall whether Facebook did
 8   anything upon receiving this information from you?
 9        A.  I don't recall.
10        Q.  How did you know that it was a small but
11   growing area of misinformation?
12        A.  I vaguely recall that we ran some
13   Meltwater reports, and that people -- that
14   conversation regarding this topic -- Meltwater is
15   sort of like CrowdTangle but for all the
16   platforms -- and that the conversation around this
17   was growing.
18        Q.  Got it.  Now, tell me about Meltwater.
19   Does it aggregate all the platforms and you search
20   across them?
21        A.  Yes.  And social media listening tools are
22   used by every social media team, I believe.  I mean,
23   it's widely common practice, and, yes, it will
24   search.  The CrowdTangle can see more on the Meta
25   properties.  So it's nicer if you're just looking at
```

**CAROL CRAWFORD  11/15/2022**

**Page 155**

```
 1   Meta properties.  Meltwater gives you social media
 2   at large.  The Meta platforms, to clarify.
 3         Q.  Do you know what the nature of the
 4   misinterpretation was?  I know we don't have the
 5   attachment, but do you know?
 6         A.  I don't recall any longer.
 7             (Plaintiffs' Exhibit 22 marked.)
 8   BY MR. VECCHIONE:
 9         Q.  Go to Exhibit 22.  So what -- before we
10   look at that exhibit --
11         A.  Mm-hmm (affirmative).
12         Q.  -- when you said "be on the lookout," what
13   did you expect them to do once they were on the
14   lookout for Facebook?
15         A.  The same thing I have been describing.  I
16   knew that they had various options.  They could have
17   just used it to inform people.  They could have
18   considered it in their algorithm, I believe.  I did
19   understand that potentially removing posts was
20   something that they might do.
21         Q.  So if you could, just please identify
22   Exhibit 22 to me the same way by its re: line --
23         A.  Okay.
24         Q.  -- and its date and then read it to
25   yourself.
```

```
 1          A.   November 2nd, 2021.  Subject New Claims
 2    and Policy Updates Following EUA Authorization for 5
 3    to 11-year-olds.
 4               It's from me to a group, but I think
 5    primarily it was to Facebook.  Also -- never mind.
 6    I thought I missed part of the subject.  Sorry.
 7    Okay.
 8          Q.   All right.  So this is the first one
 9    that -- she actually signs off with Meta this time;
10    right?  So I guess whatever he did took place --
11          A.   I see that.
12          Q.   -- changed over by then.
13               All right.  The -- can you read the first
14    two paragraphs she writes to you on November 2nd,
15    1:22 p.m. into the record?
16          A.   Yes.  "Kristen, thanks so much for
17    confirming the ability for the claims in question
18    last week having the risk of causing vaccine
19    refusals.  And thank you all so much for your input
20    over the last week on our many questions about
21    vaccine misinformation relative to the EUA."
22          Q.   And second paragraph?
23          A.   (As read)  I wanted to share that as a
24    result of our work together, when the FDA give
25    emergency use authorization to the Pfizer vaccine
```

**CAROL CRAWFORD  11/15/2022**

1    for children last week, we immediately updated our

2    policies globally to remove false claims about the

3    COVID-19 vaccine for children, e.g., the COVID

4    vaccine is not safe for kids, we also launched a new

5    feature on Instagram where accounts that repeatedly

6    post content that violates our polices on COVID-19

7    or vaccine misinformation may now lose the ability

8    to be tagged or mentioned or may see pop-ups asking

9    if they'd like to delete certain posts that violate

10   our policies.

11        **Q.  And then she goes on to say:  Now we've**

12   **identified new claims; right?  And then she lists**

13   **them?**

14        A.  Yes.

15        **Q.  And she asks you could you tell her**

16   **whether the claim is false, and if believed this**

17   **claim could contribute to vaccine refusals; right?**

18        A.  Yes.

19        **Q.  All right.  And this is similar to the**

20   **other lists she had sent you earlier that we looked**

21   **at to be debunked or not?**

22        A.  This is similar.  This time, though,

23   they -- I think -- I don't know if this is the first

24   time, but this added the whole "could this

25   contribute to vaccine refusals" element that I don't

```
 1   think we had on the last one.

 2        Q.  Okay.  What was your understanding of why

 3   she was reporting to you Meta's policies on

 4   childhood vaccines?

 5           MS. SNOW:  Objection.  Mischaracterizes

 6   the document.

 7   BY MR. VECCHIONE:

 8        Q.  You can answer.

 9        A.  Would you reask the question?

10        Q.  Yeah.  What was your understanding of why

11   she was telling you what Meta's policy was on

12   pediatric vaccines?

13        A.  Well, I don't know what -- why she was

14   doing it specifically because I can't speculate on

15   that, but I received it as a thank you for assisting

16   with the claims or the facts about this that we

17   could provide.

18        Q.  And then why did you think she was asking

19   you to tell her which claims were true and which

20   were false on that further list?

21           MS. SNOW:  Objection.

22        A.  Sorry?

23           MS. SNOW:  Mischaracterizes the document.

24   BY MR. VECCHIONE:

25        Q.  Okay.  You can answer.
```

**CAROL CRAWFORD  11/15/2022**

```
 1        A.  Ask the question again.
 2        Q.  Yeah.  What was your understanding of what
 3   Langone was asking -- why she was asking you to tell
 4   her which of these claims were true and which were
 5   false, and, as you said, which would lead to vaccine
 6   hesitancy?
 7        A.  It was still my interpretation that she
 8   was asking to inform their policies.  They were
 9   looking for CDC, who would have the scientific
10   facts, to provide them with scientific facts.
11        Q.  And didn't this email give you a pretty
12   good idea that when CDC said something was false
13   that Meta was going to take it down?
14             MS. SNOW:  Objection.  Calls for
15   speculation.
16   BY MR. VECCHIONE:
17        Q.  You can answer.
18        A.  I did not have a recollection of this
19   email, and -- when I think about the work we did,
20   but it definitely says here that they updated the
21   policy globally to remove additional false claims.
22        Q.  All right.  Upon getting your information;
23   correct?
24        A.  It doesn't say upon getting our
25   information.  It just says that when the FDA gave
```

1    the emergency use authorization we immediately

2    updated our policies.  It doesn't say upon getting

3    our information.

4         Q.  She goes on to say:  I wanted to share

5    that as a result of our work together; right?

6         A.  Yes.  But I assume this was -- I mean, I

7    don't -- I'm reading it now.  I don't have memory of

8    this email.  I'm interpreting it more of like the

9    ongoing work for us to provide the facts to them.

10   It could have been something specific, but I don't

11   remember something specific regarding the -- this.

12        Q.  Do you know whether -- and then you say --

13   hang on.  I'll get back to it.

14             You then respond to her on 11/2.  I think

15   it's 2:54:26.  It's down to the second.  "Got it,

16   Liz.  I'm going to work on this one with some other

17   vaccine staff and take this one off of Kristen."

18             So who are the other vaccine staff?

19        A.  Kristen Nordlund is a press officer for

20   the National Center -- or at the time was a press

21   officer for the National Center for Immunization,

22   Respiratory Diseases where the vaccine work was, and

23   she was very involved in the COVID response.

24             And I don't see it in this chain, and I

25   cannot be sure, but what I think happened was that

 1   Kristen helped on some questions regarding this in a
 2   previous set of emails or maybe a conversation.
 3        Q.  All right.  And then you say: "I hope we
 4   can do it by Monday."
 5            So it's going to take a little less than a
 6   week.  But you're going to hope to get back to her
 7   by then.  This is a Tuesday.
 8        A.  Yes.  I see that, yes.
 9        Q.  But then you say: "Thank you so much for
10   the feedback on what you've been able to do.  This
11   is very good to know."  Right?
12        A.  I do say that, yes.
13        Q.  So you're approving of her taking down the
14   COVID vaccine is not safe for kids off the Meta
15   platforms; right?
16            MS. SNOW:  Objection.  Mischaracterizes
17   document and testimony.
18   BY MR. VECCHIONE:
19        Q.  You can answer.
20        A.  I did not mean it generally.  I never felt
21   that my role, or CDC's role, was to determine what
22   to do with the scientific information that we
23   provided.  But I'm happy that providing the
24   scientific information led to less spread of
25   misinformation.  In this email I think what's what I

**CAROL CRAWFORD  11/15/2022**

```
 1   was reflecting.

 2        Q.  So you were pleased that people who

 3   believed that the COVID vaccine was not safe for

 4   kids were taken off the platforms of Meta?

 5            MS. SNOW:  Objection.  Mischaracterizes

 6   testimony.

 7        A.  I don't think that's what she's saying in

 8   here.

 9   BY MR. VECCHIONE:

10        Q.  (As read)  We immediately updated our

11   policies globally to remove additional false claims

12   about COVID vaccine for children, e.g. the COVID

13   vaccine is not safe for kids.

14            That doesn't tell you that she's removing

15   those people from the platform?

16            MS. SNOW:  Objection.  Mischaracterizes

17   document.

18        A.  No.

19   BY MR. VECCHIONE:

20        Q.  What is she doing then?

21        A.  I understand that she's removing claims

22   that have -- that are not scientifically accurate.

23        Q.  Okay.  Well, let me put it another way.

24   People who post that statement will have that

25   statement removed from Meta; correct?
```

```
 1            MS. SNOW:  Objection.  It calls for
 2    speculation, mischaracterizes the document.
 3    BY MR. VECCHIONE:
 4        Q.  That was your understanding of this email;
 5    right?
 6        A.  I think we'd have to just look at what's
 7    written here.
 8        Q.  And it is in English; right?
 9            MS. SNOW:  Objection.
10            MR. GILLIGAN:  Argumentative.
11        A.  I don't think you're characterizing it
12    correctly.  Sorry.
13            (Plaintiffs' Exhibit 23 marked.)
14    BY MR. VECCHIONE:
15        Q.  Move on to Exhibit 23.  And once again I'd
16    like you to just read the subject line and the date,
17    and then read the rest to yourself.
18        A.  New claims and policy updates following
19    EAU authorization for 5 to 11-year olds.
20            This is on November 8th, 2021 from me to
21    Liz and some others at CDC.
22            Okay.
23        Q.  All right.  So once again in Exhibit 23
24    she's asking you a number of questions, particularly
25    number one was COVID-19 vaccines weaken the immune
```

1    system.  And then the same question she's asked

2    before:  "Is this false?  Could this lead to vaccine

3    refusals?"  Right?

4         A.  Yes.

5         Q.  And you've -- and you've responded,

6    "false"; right?  "COVID vaccination will help people

7    from getting COVID-19.  Adults and children may have

8    some side effects from vaccine which is normal signs

9    that their body is building protection.  These side

10   effects may affect their ability to do daily

11   activities but they should go away in a few days.

12   Some people have no side effects, and allergic

13   reactions are rare.  Learn how mRNA vaccines work."

14   Right?  That's your response to her?

15        A.  That I received from the content teams,

16   yes.

17             (Plaintiffs' Exhibit 24 marked.)

18   BY MR. VECCHIONE:

19        Q.  Okay.  I'm going to give you Exhibit 24.

20   I'll just represent to you this is a report about

21   European's Medicines Agency.

22             Do you know whether or not CDC looked to

23   other worldwide agencies' view of the vaccines in

24   order to inform Facebook on what was true and false?

25        A.  That's completely out of my expertise or

Case 3:22-cv-01213-TAD-KDM Document 206-3 Filed 03/06/23 Page 245 of 345 PageID #: 11109

```
 1    knowledge.

 2         Q.  Have you seen this document before?

 3         A.  No.

 4         Q.  And you don't know whether it was used to

 5    formulate any response you gave to Ms. Lagone?

 6         A.  No.

 7             MS. SNOW:  Objection.  Asked and answered.

 8    BY MR. VECCHIONE:

 9         Q.  That's fine.  You said no.

10         A.  (Nods head.)

11         Q.  And then let's look at -- I think I tossed

12    my document aside.  Yeah.

13             I'll direct you to item number six that

14    you responded to Lagone about breast milk from

15    vaccinated parents, harmful to babies and children.

16             MR. GILLIGAN:  What document you referring

17    to again, John?

18             MR. VECCHIONE:  It's number 23.  It's

19    number six of the Lagone proposals.

20             MR. GILLIGAN:  Thank you.

21             MR. VECCHIONE:  You know what, I'm going

22    to let that -- we're going to move on.

23             MR. GILLIGAN:  Okay.  No objection.

24    BY MR. VECCHIONE:

25         Q.  All right.  We're going to Exhibit 26.
```

**CAROL CRAWFORD  11/15/2022**

Page 166

```
 1    We're going to skip Exhibit 25.

 2              (Plaintiffs' Exhibit 26 marked.)

 3    BY MR. VECCHIONE:

 4        Q.  And once again I ask you to tell me what

 5    the subject line is, and the date, and then read it

 6    to yourself of Exhibit 26.

 7        A.  Vaccine misinformation questions for CDC.

 8    February 3rd, 2022.

 9            I have read it.  I didn't read all the

10    questions.

11        Q.  I got.  I'll direct you too.  So this is a

12    long email, so let's go by it in pieces.

13        A.  Mm-hmm (affirmative).

14        Q.  If you see Liz Lagone writes to you on

15    February 3rd, 2022 4:36; right?

16        A.  Yes.

17        Q.  The very front page.  She says:  Hi,

18    Carol.  And could you please read her paragraph

19    there?

20        A.  (As read) I hope your team are well and

21    staying healthy.  Thank you so much for the

22    information you provided on claims we asked about

23    last month.  Since we last spoke, I wanted to share

24    updates we made as a result of our work together.  I

25    also wanted to ask for your assessment of a few
```

 1    things, including three additional claims we've

 2    become aware of from our regular monitoring; how FDA

 3    EUA authorization for children under five might

 4    impact our policies; and three, CDC's insights

 5    regarding deaths from vaccines.  As always, please

 6    do let me know if it's easier to set up a time to

 7    talk.  Otherwise could we get input before

 8    February 9.

 9         Q.  Okay.  Time to talk through any of these

10    live; right?

11         A.  Excuse me?

12         Q.  I think you just --

13         A.  Oh, did I miss a sentence?

14         Q.  I think you just skipped.

15         A.  Sorry.  "Set up a time to talk through any

16    of these live."  I apologize.

17         Q.  So what was your understanding of what she

18    meant by as a result of our work together?

19         A.  I believe the result of the work together

20    is us providing the scientific information for the

21    questions that they were asking us periodically like

22    these in this email.

23         Q.  All right.  And if you'd look -- I'd ask

24    you to go to the back of the document, the very

25    back.  And the first at three, she says:  "COVID-19

1    vaccines have caused thousands/millions of deaths."

2              And she says:  (As read) Under our current

3    policy, we remove posts that claim that COVID-19

4    vaccines kill people or lead to death.  We removed

5    these posts on the grounds that the claim is false

6    and that it's harmful because people believe it, it

7    might make them less likely to get vaccinated;

8    right?

9         A.  Yes.

10        Q.  And then she notes that:  In fact,

11   vaccines -- some people might have an adverse

12   reaction that leads to death; right?

13             MS. SNOW:  Objection.  Mischaracterizes

14   the document.

15        A.  I also can't --

16   BY MR. VECCHIONE:

17        Q.  Okay.

18        A.  I'm not a scientist.

19        Q.  I understand that.  But she's telling you

20   her understanding.  Putting millions and thousands

21   of deaths aside, we have this -- she's bringing to

22   you a problem now.

23        A.  Okay.  If you'd -- I lost where you're

24   reading from.

25        Q.  Okay.  So on the last page she says:  We

1    understand that in general COVID-19 vaccines do not

2    cause death.  However, we are aware that some deaths

3    have been linked to COVID-19 vaccination such as

4    detailed in this correspondence in The Lancet...

5    reporting death rates from TTS following AstraZeneca

6    vaccination in a number of countries.

7             And then she's saying we're going to

8    reconsider our policies, and she's asking you for

9    your advice; correct?

10        A.   She's asking us for scientific

11   information.

12        Q.   I'll ask you to go to the second page of

13   this document, which is Bates stamped 1684 at the

14   bottom.  And in the middle of the page under number

15   2 of the Claims about COVID vaccines for children

16   under five years of age.

17             And she says:  We understand the FDA is

18   considering giving emergency use authorization for

19   COVID-19 vaccine for children under five in coming

20   weeks.  We are considering how our existing policy

21   on COVID-19 vaccines (see below) should apply to

22   claims about children 6 months to 4 years once the

23   vaccine is approved for use.  Can you please assess

24   for each claim whether it is false for children in

25   this age range and if believed, likely to contribute

 1   to vaccine hesitancy or refusal?

 2          And then:  Please let us know if it's

 3   easiest to set up a time to meet and discuss each

 4   one.

 5          And then she tells you what their policies

 6   are; correct?

 7       A.  No.  I don't -- I haven't interpreted any

 8   of this as being the policies.  These are the

 9   claims.

10       Q.  Okay.

11       A.  These are the things or -- they're saying

12   are these true or false or unknown.

13       Q.  Well, at the first one we read, though,

14   they -- she did tell you under our current policy,

15   remove posts that claim COVID-19 vaccines kill

16   people or lead to death; right?

17       A.  But the policy is not the same as the

18   claims.  The claims are the -- what she's asking us

19   about, which is I know that they're using our

20   scientific information to determine their policy,

21   but they're asking us about the science.

22       Q.  Okay.  And your response was:  "PS - the

23   update is very helpful.  Thank you for including

24   that."  Right?

25       A.  Yes.

CAROL CRAWFORD 11/15/2022

```
1          Q.   But and in this you don't respond on
2     whether anything's debunked or not?
3          A.   Yes.  I don't remember if we did or not.
4          Q.   And what did you find helpful about this?
5          A.   I think what I think is helpful for us is
6     to have her ask us specifically what she needs input
7     on.  So it's been helpful when she started just
8     sending us the things she's wanting us to do.
9               I also think it is helpful to know that
10    they're actually using the responses that we have in
11    some form or fashion because it takes time to put
12    them together.
13         Q.   Thank you.  You can put that aside.
14         A.   Okay.
15              (Plaintiffs' Exhibit 27 marked.)
16    BY MR. VECCHIONE:
17         Q.   And just again tell me the subject matter,
18    the date, and then read it to yourself.
19         A.   Okay.
20              MS. SNOW:  What exhibit is it?
21              MR. VECCHIONE:  Exhibit 27.
22         A.   Have five minutes to chat.  E: Vaccine
23    Misinformation questions for CDC February 4th, 2022.
24              Okay.
25              (Reporter clarifying exhibit number.)
```

Case 3:22-cv-01213-TAD-KDM Document 206-3 Filed 03/06/23 Page 252 of 345 PageID #: 11116

 1   BY MR. VECCHIONE:

 2       Q.  All right.  And I think this is the same,

 3   at least part of the email is the same, as the last

 4   one we looked at; right?

 5       A.  I agree.

 6       Q.  But there is a different chain on top of

 7   hers saying she -- the part where she says she hopes

 8   you and your team are well and staying healthy.

 9       A.  Can I see 26?

10       Q.  When you say on February 3rd at 5:21:

11   I'll talk to the vaccine program and see what I can

12   do -- or what we can do.  Excuse me.  You say:  I

13   will talk to the vaccine program and see what we can

14   do; right?

15       A.  Yes.

16       Q.  Is that to have a meeting on these

17   questions that she'd presented?

18       A.  Well, I mean, I guess it could have been a

19   meeting, but I was -- I was meeting -- I'll see if

20   they could -- it was a lot of claims she gave in

21   this email.

22       Q.  Right.

23       A.  And I was thinking I don't know that we're

24   going to be able to address all of these.  So I

25   think I was thinking I would talk to them and see if

 1  would even be willing to look at this many of them
 2  because she's asking for input on them within a
 3  couple of days.
 4      **Q.  And it would be difficult to give input on**
 5  **all those questions that quickly?**
 6      A.  I thought so.
 7      **Q.  And do you know if this phone call**
 8  **occurred that you say at the very top of it in**
 9  **Exhibit 27?**
10      A.  I don't know for sure.  I think that she
11  called, and I just said, look, I don't think that
12  we're going to be able to -- I was going out of
13  town.  I do remember that much.  I think I -- I
14  think she may have called, or I had emailed her
15  separately when we didn't catch up, and said I don't
16  think we're going to have it this quickly, it
17  probably will be when I return.
18          MR. VECCHIONE:  Aren't you glad you came?
19          MR. KUMAR:  Make myself useful, yeah.
20          (Plaintiffs' Exhibit 28 marked.)
21  BY MR. VECCHIONE:
22      **Q.  And once again I'd ask you to read, for**
23  **Exhibit 28 read the subject line and the date and**
24  **read it to yourself.**
25      A.  Okay.  COVID Misinfo Project.  3/23/2021.

1          Okay.

2          **Q.  Okay.  We have a new cast of characters.**

3  **I'd like you to take a look at the bottom here, the**

4  **March 18, 2021 portion of the email chain.**

5          A.  Yes.

6          **Q.  And that's from you to Stanley Onyimba at**

7  **a Google -- it's** ████ ████████ **@google.com and Jan**

8  **Antonaros at --** ████████████ **@google.com.**

9          **Do you recognize those names?**

10         A.  Yes.  And Stanley was the name I couldn't

11  remember when you asked me who my POCs were at

12  Google.

13         **Q.  Okay.  Stanley.**

14         **So you wrote to them on March 18 -- well,**

15  **read that out loud to me what you wrote to them:**

16  **"Stanley/Jan"?**

17         A.  (As read)  As I believe we discussed

18  previously, CDC is now working with Census to

19  leverage some of their infrastructure to help

20  identify and address COVID vaccine misinfo.  As I

21  understand it from the Census team, when they were

22  doing this for the Census project last year, they

23  met regularly with a Google/YouTube Trust team.  Is

24  it possible for us to start regular meetings on this

25  topic or maybe use our existing time?  Let us know

 1  if you want to discuss in more depth.

 2      **Q.  All right.  So what did you mean by CDC is**

 3  **now working with Census to leverage some of their**

 4  **infrastructure to help identify and address COVID**

 5  **vaccine misinfo?**

 6      A.  That was the work of the IAA with Census

 7  to help consult and work with us on the COVID

 8  misinformation information.  I just -- put COVID

 9  information one time.  That's what I'm referring to

10  here.  This is more specific.  This is when I refer

11  to infrastructure, I was referring to the fact that

12  Christopher ran those reports and looked for

13  misinformation on these areas for us.

14      **Q.  All right.  And you refer to the Census**

15  **project last year in which they met -- meet**

16  **regularly with Google YouTube Trust team.**

17          **Was that a different project?**

18      A.  That was their -- I believe this was the

19  2020 Census.

20      **Q.  And that's what you think you're referring**

21  **to there?**

22      A.  Yes.

23      **Q.  Do you know whether or not the Census**

24  **engaged in content moderation with Google?**

25      A.  I don't know.

**CAROL CRAWFORD  11/15/2022**

```
 1              MS. SNOW:  Objection.  Vague.
 2   BY MR. VECCHIONE:
 3         Q.  So and here I am not using censorship --
 4   anyways, still drawing objections.
 5              All right.  Let's take a look at
 6   March 23rd, 2021.  Jan Antonaros to you, and cc's
 7   Stanley Onyimba.  Can you read that response out
 8   loud?
 9         A.  Yes.  But before I do, I want to go back
10   to the clarification that she objected.  When you
11   asked me did Census do content moderation, I assumed
12   you meant for the Census project, and I answered for
13   that.
14         Q.  Okay.  How about for --
15         A.  I wondered if there was more vagueness
16   to --
17         Q.  And how about for the COVID-19 vaccine
18   project?
19         A.  Not to my knowledge either.
20         Q.  Okay.
21         A.  But I thought you were referring to their
22   project.
23         Q.  All right.  So please read Mr. Antonaros'
24   response to you.
25         A.  Hey, Carol -- or "Hi, Carol, Thank you for
```

1  your patience as we identified the right colleagues

2  from Google to pull into this effort.  Would it be

3  possible to schedule a call for later this week to

4  learn more about how the CDC and Census envision

5  working together on this important topic."

6      **Q.  What was your understanding of what**

7  **Antonaros meant by the right colleague from Google**

8  **to pull into this effort?**

9      A.  I believe she was going to ask people on

10  their trust team, or whatever their name for their,

11  that kind of team is.

12      **Q.  Okay.  Did you -- do you know now or did**

13  **you know then who these people were and what their**

14  **titles were, or are?**

15      A.  No.  I mean, I might have known then.

16  They may have participated in the meeting.

17      **Q.  But you can't remember now?**

18      A.  But I don't know their names now.

19      **Q.  And what's your response to him?**

20      A.  "Sounds good to check in first -- would

21  Friday around 3:30 work?"

22      **Q.  All right.  And do you know whether or not**

23  **you had that call with him?**

24      A.  I don't remember.

25      **Q.  All right.  So you don't recall who was on**

CAROL CRAWFORD  11/15/2022

```
 1   the call besides you, if it took place?

 2           MS. SNOW:  Objection.  Mischaracterizes

 3   testimony.

 4        A.  I --

 5           MS. SNOW:  Sorry.

 6           (Inaudible crosstalk.)

 7           MR. VECCHIONE:  I'll rephrase.

 8   BY MR. VECCHIONE:

 9        Q.  You don't recall whether the call happened

10   and who was on it?

11        A.  Correct.

12        Q.  All right.  And do you know whether you'd

13   have a calendar with that call on it, by any chance?

14        A.  If we had a call, we typically had a

15   calendar appointment.

16        Q.  Okay.  All right.  And what was -- you say

17   "sounds good to check in first."

18           What did you want to check in with him

19   for?  What were you -- what did you want to talk

20   about first?

21        A.  I mean, I'm doing this from reading the

22   email.  I think she's saying let's check in before

23   our regular meeting.

24        Q.  Okay.

25        A.  I think that's what -- I mean, that's how
```

1    I interpreted the "check in first."

2         Q.  And by this time were you already having

3    regular meetings with Google like we've seen with

4    Facebook?

5         A.  Yeah.  This was in 2021.  So we had been

6    meeting pretty regularly with Google by this time.

7              MR. VECCHIONE:  Okay.  You can put that

8    aside.

9              (Plaintiffs' Exhibit 29 marked.)

10   BY MR. VECCHIONE:

11        Q.  Let's try Exhibit 29.  Same thing, read me

12   the subject line, the date, and then take a look at

13   it.

14        A.  Okay.  Okay.  Subject line's:  Followup on

15   misinformation, or misinfo conversation.  It's

16   4/5/2021.

17              THE WITNESS:  Can I see this?

18              MS. SNOW:  Yes.

19        A.  Okay.

20   BY MR. VECCHIONE:

21        Q.  All right.  So can you go to the very end,

22   I guess, the very last page, read what you said on

23   March 29 at 9:52.

24        A.  "Are you all open to using our regular 4pm

25   meetings to go over things with Census, or what is

1   preferred?  I wasn't clear how interested you all

2   were on this effort or who the players are on your

3   end."

4       **Q.  So what were the regular 4:00 p.m.**

5   **meetings you refer to?**

6       A.  I think -- because I still have a

7   4:00 p.m. meeting every other Monday with Google.  I

8   think that these were the same every-other-week

9   check-in meetings.  Sometimes we wouldn't have them.

10  Sometimes we would have them and discuss things.

11      **Q.  Did you have similar regular meetings with**

12  **the other platforms we've been discussing, Face- --**

13  **Meta and Twitter?**

14      A.  We -- you asked some of this earlier.

15      **Q.  I did.**

16      A.  The same answer.  So we had regular

17  meetings with Google, and we had regular meetings

18  with Meta.  Most -- you know, the frequency changed.

19  So, you know, I don't meet as often.  I mean, Google

20  we meet every other week.  Right now with Meta it's

21  more ad hoc.

22      **Q.  Okay.**

23      A.  We had had a regular meeting with

24  Pinterest for a short period of time, and we had my

25  memory was just more ad hoc meetings on occasion

Case 3:22-cv-01213-TAD-KDM Document 236-3 Filed 03/06/23 Page 262 of 348 PageID #: 11125

1   with Twitter.

2        **Q.  So on the regular meetings with either**

3   **Google or Facebook?**

4        A.  Mm-hmm (affirmative).

5        **Q.  Well, let me ask the question this way.**

6   **From the CDC end, were the same people usually**

7   **attending those meetings with each social media?**

8        A.  It could vary.  I mean, I was always -- I

9   mean, with Google, it was typically me and Fred

10  Smith, who's our technical lead, because often the

11  Google questions would be more about technical

12  implementations that we might have to work on.  We

13  were usually always on it.  Sometimes I would --

14  depending on the subject, I would bring in other

15  people.

16        With Meta, I was pretty much always on

17  there.  Jay typically listened in.  And then I would

18  bring people in depending on the subject.

19        **Q.  All right.  And what were the -- were the**

20  **topics typically misinformation, or technical**

21  **subjects?**

22        A.  They -- by and large, they were mostly

23  about things other than misinformation; though

24  misinformation was discussed in the meetings.  But

25  they were originated about getting our credible

**CAROL CRAWFORD  11/15/2022**

Page 182

```
 1    information out to our audiences and some of the
 2    examples I gave this morning.
 3         Q.  Okay.  And what did you mean by with we're
 4    going to check with -- "to go over things with
 5    Census, or what is preferred"?  What does that mean?
 6         A.  I don't -- I don't have direct memory of
 7    it.  I'm only assuming that -- what I recall doing
 8    is asking through this chain is like is it okay if
 9    we bring Census in?  Do you like -- what format is
10    best to talk about misinformation?
11              Maybe we didn't resolve it on this call
12    from the previous exhibit.  I can't say for sure
13    what I meant by it.
14         Q.  Okay.  And then could you read Onyimba's
15    response to you on that, following that on
16    March 29th?
17         A.  (As read)  We would like to follow up on
18    our discussion with your colleague, Cynthia, on
19    vaccine information a few months ago.  Specifically,
20    we plan to share a new list of common vaccine
21    misinformation claims and would love it if Cynthia
22    or other vaccine experts can join.  We can also save
23    a few minutes for me, you and Jan to discuss
24    potential next steps regarding Census, but will not
25    need the broader team for that discussion.
```

```
 1          Q.  So who's Cynthia?

 2          A.  Cynthia Jorgensen, which was on a previous

 3    exhibit.  She was the -- I mean, at the time of the

 4    other exhibits, she was the co-lead and the

 5    associate director for communication.  I don't know

 6    what role she was -- she was definitely the ACS

 7    during this.  I don't know if he was in their JIC

 8    during this period of time.

 9          Q.  Do you know what vaccine information she

10    provided to Google?

11          A.  I don't recall specifically.  But they --

12    so they were trying to be sure that they had the

13    right information when someone Googled something.

14    When you Google COVID, for instance, there are these

15    little tabs that come up.  They'll say, like,

16    symptoms, treatment, vaccines.  And that content,

17    some of the things came from the CDC website.  So

18    from time to time they wanted to update information

19    like that, and would ask us to have an expert on

20    that could talk about it.

21          Q.  Got it.

22          A.  I don't remember this question, but I'm

23    sure that's what it's in reference to.

24          Q.  All right.  Do you know what Google did

25    with the list of common vaccine misinformation
```

Case 3:22-cv-01213- TAD-KDM Document 20561-3 Filed 03/06/23 Page 245 of 345 PageID #: 11128

1   claims?

2       A.  I don't remember the list of claims, or

3   what the format was or what they asked us about it.

4   Maybe if you have future exhibits I'll remember, but

5   I don't recall from this.

6       **Q.  All right.  And then he says and -- "can**

7   **save a few minutes for you, me and Jan to discuss**

8   **potential next steps regarding the Census but will**

9   **not need the broader team for the discussion."**

10      **Is that your understanding that it's a**

11  **discussion about Census, or with Census, like are**

12  **they there?**

13      A.  I don't know for sure what this was in

14  reference to.  But it -- I think that it is in

15  reference to discussing how to engage on an ongoing

16  basis about misinformation and the Census suggestion

17  that we have regular meetings with them just on that

18  topic.

19      **Q.  I got it.  And you respond that you're**

20  **going to get those subject matter experts on the**

21  **next call?**

22      A.  Yes.

23      **Q.  I think I might as well add, and Census**

24  **won't be there, but you'll discuss how to engage**

25  **with them.  Is that the meaning of that, that they**

**CAROL CRAWFORD  11/15/2022**

1    are not going to be at the next meeting but we'll

2    talk about them?

3         A.   That's my assumption.

4         Q.   Okay.

5         A.   I don't know if it's because they weren't

6    available, or if there was some reason we didn't

7    invite them.

8         Q.   Do you recall what your discussion with

9    Census was about Google at that time?

10        A.   I don't recall, but I still believe this

11   is just about how to engage more regularly about

12   misinformation, or whatever -- whatever Census had

13   done with Google and YouTube, should we have a

14   similar structure with CDC.  I believe that is what

15   is not resolved in these chains.

16        Q.   All right.  And then Mr. Onyimba asked you

17   another question on Friday April 2nd, 2021.

18        A.   Mm-hmm (affirmative).

19        Q.   He says:  "Thanks again for your time this

20   week.  Attached are some of the claims we discussed

21   for your reference," and they are not attached so we

22   can't see those.  But it says:  "On a separate but

23   related note would you happen to know if the CDC has

24   statistics on hospitalization or death for people in

25   the 40-49 age category who do not have underlying

```
 1    health conditions or co-morbidities?"
 2              You see that?
 3         A.  Yes.
 4         Q.  Do you know why he was asking you that?
 5         A.  No, I don't know why he was asking me
 6    that.
 7         Q.  And you responded on April 5th that you
 8    couldn't respond over the weekend, but then you -- I
 9    think you sent him this chart?
10         A.  Yes.
11         Q.  What is that chart?
12         A.  I thought that this chart would answer his
13    question.  It's the -- it was from the CDC's data
14    tracker.  It's a chart on hospitalizations.
15         Q.  But it's a chart of people with asthma;
16    right?
17         A.  That's -- the link worked -- you could --
18    that's a drop-down where you can pick anything you
19    want I think I'd screenshot so he'd know what was
20    going to be on the link.
21         Q.  So you could pick without asthma if you
22    wanted?
23         A.  Yeah.  I think I just was showing him what
24    it was.
25         Q.  Okay.
```

```
 1        A.  But the link was more interactive.
 2        Q.  Okay.  And so if he went there, if you go
 3   to this website, theoretically he can take out
 4   asthma and put in whatever age range he wants?
 5        A.  Mm-hmm (affirmative).  And you could pick
 6   a different major category or an age.
 7             MR. VECCHIONE:  Thank you.  Put that
 8   aside.
 9             (Plaintiffs' Exhibit 30 marked.)
10   BY MR. VECCHIONE:
11        Q.  Plaintiffs' Exhibit 30.  Again, could you
12   just tell us the subject matter and the date and
13   then read it to yourself.
14        A.  Subject:  Follow up on mis-info
15   conversation.  4/12/21.  4 -- yeah, 2021.  Sorry.
16             Okay.
17        Q.  So would you agree with me that this is
18   also, if you look at Plaintiffs' Exhibit 29, that
19   bottom link you had sent is the same link, and then
20   there is just a new chain on the top of this?
21        A.  Yes.
22        Q.  And then you ask him:  "Can you give me an
23   idea what topics we'll be covering?  But yes, I'll
24   ask them to attend."
25             I guess we ought to read.  Could you
```

**CAROL CRAWFORD  11/15/2022**

1    please read to me what question he asked you?

2         A.   "For tomorrow's call would it be possible

3    to include Cynthia or other COVID-19 treatment SMEs

4    to follow up on some additional questions?"

5         Q.   And then you say:  "Can you give me an

6    idea of what topics we'll be covering?  But, yes,

7    I'll ask them to attend"?

8         A.   Yes.

9         Q.   Was this a BOLO meeting or a regular

10   meeting?  Like, was this for something that had just

11   occurred that you wanted to alert them to, or was

12   this a regular meeting?

13        A.   I don't believe this was a BOLO meeting

14   because I don't think we had started BOLO meetings

15   in April.  I think we started those in May.  I don't

16   know for sure, but I don't feel like that's what

17   this was.

18             I -- without that attachment, I don't

19   remember what it was, but it wasn't uncommon for

20   them to have just general questions about things and

21   ask us to bring people to a meeting to help go over

22   it.  Maybe they were trying to display something in

23   the search or whatever.  I just -- I don't remember

24   this context.

25             (Plaintiffs' Exhibit 31 marked.)

**CAROL CRAWFORD  11/15/2022**

```
 1    BY MR. VECCHIONE:

 2         Q.  All right.  Go to Exhibit 31.

 3         A.  Thank you.

 4         Q.  Once again for Exhibit 31 could you tell

 5    me the date and the subject matter line, and then

 6    read it to yourself.

 7         A.  Subject:  Omicron page.  Sent December 21,

 8    2021.

 9              Okay.

10         Q.  All right.  We can go to the back again,

11    the last page.  And you have an email exchange you

12    sent on December 21, 2021 at 10:38?

13         A.  Yes.

14         Q.  Who did you send it to?

15         A.  That's -- I -- probably to Jan and

16    Stanley.

17         Q.  Okay.  And why are you sending information

18    about Omicron-specific pages to them?

19         A.  Very similar to how I described how we've

20    been working with them.  This was a really big thing

21    at the time, and they are trying to also be sure

22    that people can find things in the search results,

23    and they were -- they were highlighting CDC content

24    and what they -- I call it the knowledge panel,

25    those little tabs on Google.
```

1          So, if something big like this was

2    happening I would let them know if we had new key

3    pages that they were likely getting a high number of

4    searches on.  And I'm pretty sure everyone was

5    searching for Omicron around December of 2021.  So

6    that is why I sent it to them so they would have

7    awareness of this brand new piece of content, and

8    because I was seeing this -- I know.  I have a

9    point.

10          **Q.  Right.**

11          A.  This is a screenshot of what I call the

12   knowledge panel with the tabs, and it wasn't coming

13   up with the newer piece of content.  So I wanted to

14   alert them to it.

15          **Q.  Okay.  So what you've cut and pasted I**

16   **think in there, says, like, coronavirus virus**

17   **disease, and then there is overview statistic**

18   **symptoms?**

19          A.  Yes.

20          **Q.  And then below it has the information on**

21   **variants.**

22          A.  Mm-hmm (affirmative).

23          **Q.  All right.  So let me understand this,**

24   **because I'm not quite sure I'm getting it.**

25          **You say: "I see our main Variant page."**

CAROL CRAWFORD  11/15/2022

Page 191

```
 1     That means CDC's variant page; right?
 2          A.  Yes.
 3          Q.  "Is coming up at the top of the
 4     Omicron/variant panel."
 5              What -- was that Google search?
 6          A.  Yes.
 7          Q.  Or what are you referring to then?
 8          A.  So this -- when you search Google, you
 9     would get -- this is a screenshot --
10          Q.  Got it.
11          A.  -- of the Google results.
12          Q.  Okay.
13          A.  This is not our site.  This is their site.
14     They have these little things that say overview
15     symptom -- I mean, statistic symptoms.  Some of
16     these were populated by CDC's content.  There was
17     one here that's cut off that said variants.
18          Q.  Got it.
19          A.  That was going to just the general
20     variants page.  But I know people were looking --
21     because we'd saw all the search terms, they were
22     looking for Omicron specifically, and I wanted to
23     make them aware that they may want to swap the links
24     out.
25          Q.  Okay.  And so you said:  "So I want to be
```

 1  **sure you were aware that this Omicron specific page**

 2  **is maturing and I expect further updates."**

 3  **What does that mean, the Omicron-specific**

 4  **page is maturing?  The one at CDC?**

 5  A.  Yes.  This was our page, like -- you know,

 6  this is pretty early in the Omicron, I believe, I

 7  don't have the timetable in it, but -- so we're

 8  always updating our web pages as situations changes.

 9  So I don't think this -- at the time I sent it I had

10  just tons of concrete information, but it -- we were

11  going to add to it, and I thought it was a better

12  place to send people that were searching for

13  Omicron.

14  **Q.  And what did you want them to do with it?**

15  A.  Well, they have always been clear that the

16  search results are not something that they mess

17  with, but this part, the knowledge panel, is

18  something that they manually assembled and worked

19  with us on.  So I thought they might want to switch

20  this.  (Indicating.)

21  **Q.  Got it.  And then he responds -- at least**

22  **it looks like Jan Antonaros responds to you; right?**

23  A.  Jan does, yes.

24  **Q.  "Thanks for heads up.  Our health team,**

25  **including our Chief Health Officer, is tracking U.S.**

CAROL CRAWFORD  11/15/2022

```
 1   federal announcements today closely.  Stanley and I
 2   will take this back to our team."
 3            Do you know who the chief health officer
 4   was?
 5        A.  I think -- I think it may be Karen
 6   DeSalvo.
 7        Q.  Okay.
 8        A.  But on their end.  That's their chief
 9   health officer.  I think that's her title.
10        Q.  And when he says tracking U.S. federal
11   announcements today closely, does he mean on Google?
12   What does he mean by that, in your understanding?
13            MS. SNOW:  Objection.  Calls for
14   speculation.
15   BY MR. VECCHIONE:
16        Q.  What did you understand that term?
17        A.  I don't remember.  I'm guessing there was
18   some announcements then, but I don't recall.
19        Q.  Had Google been instructed by the CDC to
20   update following the CDC guidance?
21        A.  To update what?
22        Q.  To update their search engine, or for
23   their panels to follow the CDC guidance?
24            MS. SNOW:  Objection.  Compound.
25   BY MR. VECCHIONE:
```

1          Q.  You could answer if you understand.

2          A.  We did not instruct Google to update their

3     search engines, or their panels.  But I did suggest

4     that -- and he said about CDC guidance.  This was --

5     this wasn't about -- this was a consumer page about

6     what people would need to know about Omicron.  I --

7     it was more of just correcting what I thought was a

8     better link in the panels that we had provided input

9     on before.

10          Google is already -- has always made it

11    clear that the search engine is sacred.  There is

12    nothing we can say to have them fix their search

13    engine, or change their search engine to something

14    else.

15          Q.  All right.  But how about the panel

16    itself?  What -- I guess what I'm trying to

17    understand is what -- you send them this panel --

18    because apparently it's going to the wrong place on

19    the CDC -- if you put in certain search terms, it's

20    going to the wrong place on the CDC website?

21          A.  So I think what's hard to understand about

22    this is this is not a typical way that Google

23    presents things.  You will have to ask Google how

24    they considered when they added it.  But my

25    perception is that because of the substantial demand

```
 1   of searches for COVID, they added this that I call a
 2   knowledge panel.  I think they may have another word
 3   for it.  So that there is this layer before the
 4   search results come up, and it looks like this
 5   screenshot.
 6       Q.  What you're pointing --
 7       A.  But normally when you search, you don't
 8   get that on other topics.  I think they do have it
 9   for a few other topics, but I rarely run into it
10   when I do searches.
11       Q.  Okay.  And then on December 21st I think
12   Stanley Onyimba writes to you?
13       A.  Yes.
14       Q.  And he again said he explains how it's
15   working and what they are going to do; right?
16       A.  Yes.
17       Q.  And then he says again: "As Jan mentioned,
18   we are tracking announcements closely and will
19   continue to update our products to reflect the
20   latest guidance."
21           What did you understand that to mean?
22       A.  I think he is saying -- I -- gosh, I don't
23   remember what was happening the week of December 21.
24   There seems to be a reference to announcements that
25   I just, at this moment I'm not sure.  So I think I'm
```

```
 1   missing some context to what he's saying.
 2         Q.  And at the top?
 3         A.  Mm-hmm (affirmative).
 4         Q.  Then you say:  "Glad you all are
 5   tracking."  You sign off.
 6         A.  That would mean I'm glad you're watching
 7   what's happening, but I don't -- unfortunately, I
 8   can't remember what was happening that week that
 9   they're referencing.  But when they say reflect the
10   latest guidance, what I believe he's referring to is
11   what I said before is that we helped populate some
12   of these tabs.
13         Q.  You can put that aside.
14         A.  Okay.
15             (Plaintiffs' Exhibit 32 marked.)
16   BY MR. VECCHIONE:
17         Q.  Exhibit 32.  And once again I'll ask you
18   for Exhibit 32 to read the subject line and the
19   date, and then read it to yourself.
20         A.  Subject:  Request for problem accounts.
21   Sent April 9, 2021.
22             Okay.
23         Q.  All right.  This is from you to Todd
24   O'Boyle at the top.  And then it's from Todd O'Boyle
25   to you at the bottom, right, on April 8th, 2021?
```

```
 1        A.  Yes.

 2        Q.  Can you read what he writes to you, and

 3   then your response?

 4        A.  "Hi, Carol, I'm looking forward to setting

 5   up regular chats; my team has asked for examples of

 6   problematic content so we can examine trends.  All

 7   examples of misinformation are helpful, but in

 8   particular, if you have examples of fraud such as

 9   fraudulent COVID cures, fraudulent vaccine cards,

10   et cetera, that will be very helpful."

11             And I said:  "Yes, we will get back to you

12   early this week."

13        Q.  "Thanks for checking in"; right?

14             So did you -- had you talked to Todd

15   O'Boyle before this exchange?

16        A.  I don't recall.  But I think this is

17   around the time that Census was helping us, and I

18   believe I asked Todd, similar to I asked the other

19   ones, like:  Is there a good way that we should

20   start engaging on misinformation?  And this is

21   probably a followup to either that email or phone

22   call.

23        Q.  And so first, who's Todd O'Boyle?  And he

24   says at Twitter.com, so I assume he's at Twitter?

25        A.  Yes, Todd's at Twitter.  And I know he was
```

1  a point of contact that I received for the topic of

2  misinformation.  I don't know what his title was

3  specifically.

4      Q.  Okay.  Have you ever met him in person?

5      A.  No.  And as a clarification, I think I

6  called him Todd O'Brien when you asked me earlier

7  who the POCs were.  Until I see this, I didn't

8  remember his name correctly.

9      Q.  So O'Boyle, different, yes.

10     A.  Yes.

11     Q.  That's fine.  At this time did you set up

12  regular meetings with Twitter?

13     A.  My memory is is that we never got regular

14  meetings with Twitter set up.  I mean, around this

15  time.  I know they participated in the BOLO

16  meetings, but I don't recall any kind of regular

17  schedule with them.  I don't remember many occasions

18  we actually got on a phone call and discussed

19  anything during COVID.  There was a couple, but not

20  many.

21     Q.  How many BOLO meetings did you have with

22  the social media companies from the beginning of

23  COVID to, say, now?

24     A.  I think that we only had two.  And then I

25  think that I sent one time a -- in lieu of a meeting

**CAROL CRAWFORD  11/15/2022**

```
 1    a PowerPoint.  And I didn't recall it but we sent
 2    another PowerPoint regarding that lab issue that was
 3    in a previous exhibit.
 4         Q.  Do you know who directed Mr. O'Boyle to
 5    send misinformation on Twitter to you?
 6            MS. SNOW:  Objection.  Mischaracterizes
 7    testimony.
 8         A.  Say again.
 9    BY MR. VECCHIONE:
10         Q.  Excuse me.  Do you know who directed him
11    to ask you for examples of misinformation?
12         A.  No.
13         Q.  And do you know whether you sent him any?
14         A.  No.
15         Q.  Okay.
16         A.  Could --
17         Q.  Yeah, go ahead.
18         A.  Can I get you to clarify?  What do you
19    mean by directed him to?
20         Q.  I just wanted to -- I'll put it this way.
21    Todd O'Boyle was your point of contact with Twitter?
22         A.  Yes.
23         Q.  Was -- did you know of anyone over him
24    telling him to do things?
25         A.  That's how I interpreted it.  No.
```

 1          Q.  He says that examples of misinformation
 2     are helpful, particularly fraud.  Do you know what
 3     he was doing that it would be helpful to him to get
 4     this information?
 5          A.  I don't remember the exact context of this
 6     email, but I believe, as I mentioned before, this
 7     was probably part of me saying how could we work
 8     together on misinformation.
 9               And it sounds like he's kind of wondering
10     what we're seeing that we want to bring up, and he's
11     asking for some examples.  This is how I'm reading
12     it now.  And it sounds familiar based on what we,
13     you know, my memory of this time.
14               MR. VECCHIONE:  You can put that aside.
15               (Plaintiffs' Exhibit 33 marked.)
16     BY MR. VECCHIONE:
17          Q.  Exhibit 33.  And once again please read
18     the subject matter and the date, and then read it to
19     yourself for Exhibit 33.
20          A.  Twitter CDC examples.  4-13-21 xlsx is the
21     extension.  4/14/2021.
22          Q.  Can you read his request to you, and then
23     your response?
24          A.  This is the same email from before.  "I'm
25     looking forward to setting up regular chats.  My

1    team has asked for examples of problematic content
2    so we can examine trends.  All examples of
3    misinformation are helpful, but in particular, if
4    you have examples of fraud such as fraudulent COVID
5    cures, fraudulent vaccine cards, et cetera, that
6    would be very helpful."
7         **Q.  And then this time you respond, though?**
8         A.  Yes.  I didn't recall if we sent them, but
9    we did.
10        **Q.  And what do you say?**
11        A.  "The Census team put together this
12   spreadsheet with four examples.  Is this what you
13   had in mind?"
14        **Q.  And then you have examples:  Vaccines**
15   **aren't FDA approved.  Fraudulent cures.  VAERS data**
16   **taken out of context and infertility; right?**
17        A.  Yes.
18        **Q.  What did you mean by the subject word --**
19   **what was your understanding of the subject "request**
20   **for problem accounts"?**
21        A.  I don't know --
22        **Q.  Okay.**
23        A.  -- why the subject read that.  But what he
24   asked for in the email is for examples of
25   misinformation.

```
 1           Q.  Okay.  And when you met with him, did you
 2     have a spreadsheet like this?
 3           A.  I don't -- we, we sent him a spreadsheet.
 4     I don't remember meeting with Todd --
 5           Q.  Okay.
 6           A.  -- besides the BOLO meetings.  We might
 7     have, but I don't recall.
 8           Q.  And if -- and if you look at this email --
 9           A.  Mm-hmm (affirmative).
10           Q.  -- it has attachments?
11           A.  Yes.
12           Q.  And it's Twitter CDC examples.  So you've
13     attached the spreadsheet to this?
14           A.  Right.
15           Q.  Okay.
16           A.  I thought you were asking about when we
17     met with him --
18           Q.  No --
19           A.  -- did we have spreadsheets.
20           Q.  -- that's -- I was asking that.
21           A.  Okay.
22           Q.  Do you know who in the Census put this
23     spreadsheet together?
24           A.  I don't know for sure, but likely it was
25     Christopher.
```

```
 1          Q.  Christopher, remind me.

 2          A.  Lewitzke.

 3          Q.  Lewitzke, yes.  I got it.

 4          A.  Something close to that name.

 5          Q.  We discussed him earlier.  He appears on

 6     those emails?

 7          A.  Yes.

 8          Q.  Not a new guy?

 9          A.  No.  I feel like we're saying his name

10     wrong, though.

11          Q.  I think that's correct.  Lewitzke.

12              (Comment off the record.)

13     BY MR. VECCHIONE:

14          Q.  Do you know whether that Census team had

15     any medical professionals on it?

16          A.  No.

17          Q.  And what was the definition of fraudulent

18     cures?

19          A.  I don't remember what that was.

20          Q.  And what is the category:  Vaccines aren't

21     FDA approved?  Is that a claim, or is that a

22     statement about vaccines that you're making?  What

23     is that?

24          A.  I'm interpreting this whole list as things

25     that they saw that were being stated as
```

```
 1   misinformation, that there were claims that vaccines
 2   aren't FDA approved.
 3        Q.  All right.  And as far as VAERS data taken
 4   out of context, is your understanding that that's
 5   the same problem we discussed earlier with VAERS
 6   reports?
 7        A.  Yes.
 8        Q.  All right.  It's not something different?
 9        A.  Yes.
10        Q.  Let me rephrase.  No, it's not something
11   different?
12        A.  I believe this VAERS data taken out of
13   context is the same kind of thing we were discussing
14   earlier.
15        Q.  Thank you.  And what do you believe
16   "infertility" is?
17        A.  I'm assuming this was people claiming that
18   getting the vaccines led to infertility.
19        Q.  Okay.  And why did you give this chart and
20   this information to Mr. O'Boyle?
21        A.  He asked for examples.  And I believe he
22   was asking for these examples in this email because
23   he was wondering what we would -- what would come up
24   in BOLO meetings, or what we would be discussing.  I
25   think he wanted some sense of what we would be
```

```
 1   bringing to point out.  That's my memory of it.
 2        Q.  You can put that aside.
 3             MS. SNOW:  Can we take like a five-minute
 4   break?
 5             MR. VECCHIONE:  Sure, sure.  We have --
 6   we're -- I was cooking with gas, though, so, you
 7   know --
 8             (Comments off the record.)
 9             THE VIDEOGRAPHER:  Off the record at 3:37.
10             (Recess 3:37 p.m. - 3:51 p.m.)
11             THE VIDEOGRAPHER:  Back on record at 3:51.
12   BY MR. VECCHIONE:
13        Q.  And I will again direct the witness to
14   read the subject line and the date, and then read
15   this one.  And this one is a little more hefty.  You
16   may want to take a look through it.
17             MS. SNOW:  What exhibit?
18             MR. VECCHIONE:  Exhibit 34.
19             (Plaintiffs' Exhibit 34 marked.)
20        A.  Subject line is COVID Misinformation.
21   Sent 6/30/2021.
22             MS. SNOW:  Mine is stapled out of order, I
23   just realized.  I want to make sure, it might just
24   be mine, if you want to clarify.
25             MR. VECCHIONE:  Let's do the Bates stamps.
```

**CAROL CRAWFORD 11/15/2022**

```
 1    The bottom right I have it ends 496, 497, 498, 499
 2    and 500.
 3            MS. SNOW:  I think I have all those.  They
 4    are just out of order.  I just want to make sure no
 5    one else's was.
 6            MR. VECCHIONE:  No, I appreciate that.
 7            MS. SNOW:  Yeah.
 8            MR. GILLIGAN:  Is Carol's right?
 9            MS. SNOW:  Yeah.
10        A.  Mine was correct.
11    BY MR. VECCHIONE:
12        Q.  Tell me when you're ready.
13        A.  I'm ready.
14        Q.  All right.  Can you identify Exhibit 34
15    for me?
16        A.  The subject line is COVID misinformation.
17    6/30/2021.
18        Q.  Do you recognize this document?
19        A.  This, yes, feels familiar to me.
20        Q.  And what is it?
21        A.  It's a discussion about accessing
22    Twitter's partner support portal where you can flag
23    information to be reviewed by Twitter.
24        Q.  Let's take a look.  As usual, these chains
25    start at the back.
```

```
 1          A.  Mm-hmm (affirmative).
 2          Q.  I think the first one in this chain is
 3    May 10, 2021 at 1:50 p.m. and is that from you to
 4    Todd O'Boyle?
 5          A.  Yes.
 6          Q.  And I think that we've seen this list of
 7    items before to other -- to other social media
 8    outlets about --
 9          A.  Yes.
10          Q.  And it's concerned -- it's mainly
11    concerned about shedding?
12          A.  And microchips.
13          Q.  And microchips.  And you attach sort of a
14    chart.  Could you tell us what that chart is?
15          A.  Just a table of example posts regarding
16    this, those two issues, vaccine shedding and
17    microchips.  It's not really a chart.  It's just
18    formatted in a table.
19          Q.  Okay.  Could you read what you say to him
20    right above the table?
21          A.  (As read)  We wanted to point out two
22    issues that we are seeing a great deal of misinfo
23    about, vaccine shedding and microchips.  These
24    are -- the below are just some example posts.  We do
25    plan to post something shortly to address vaccine
```

1    shedding, and I can send that link too.  Our Census

2    team copied here has much more info on it if needed.

3    **Q.  Okay.  And so you have copied the Census**

4    **team that we've discussed earlier.**

5    A.  Yes.

6    **Q.  And then you say -- could you read what**

7    **you say next?**

8    A.  (As read) We're -- also we're standing up

9    a BOLO COVID misinformation meeting and inviting all

10    tech platforms.  We are shooting for 12 p.m. on

11    Friday for our first meeting.  I'll include you on

12    the invite but if you'd like to propose an alternate

13    approach or would like me to include others, just

14    let me know.

15    **Q.  All right.  Tell us.  We discussed a**

16    **little bit the BOLO meetings that you had with the**

17    **tech companies.  And this BOLO COVID meeting, is**

18    **this the first one?  Where does it stand amongst**

19    **those you've discussed?**

20    A.  I -- without having the date --

21    **Q.  Right.**

22    A.  -- in front of me, I think this is in

23    reference to the very first meeting.

24    **Q.  Okay.  And BOLO, we said, is be on the**

25    **lookout.  And this was -- you were sending this to**

CAROL CRAWFORD  11/15/2022

```
 1    Mr. O'Boyle so that he would be on the lookout for

 2    these things appearing on Twitter?

 3         A.  Yes.

 4         Q.  Did you have a prior conversation with him

 5    about this before you sent it, do you know?

 6         A.  I don't think I had a prior conversation

 7    about vaccine shedding and microchips, and these are

 8    examples of that.  I mean, we saw on the other one

 9    we had sort of general conversations about how we

10    could -- how we should have meetings or not have

11    meetings.  And I probably asked about the BOLO, like

12    is the BOLO format, since it was used previously, a

13    good format.

14         Q.  Okay.  And what is that format?  So it's

15    just -- we've seen the previous one, you said to him

16    I'll include you on the invite, but if you'd like to

17    propose an alternative approach, or would like me to

18    include others, just let me know.

19              Did you have some view of whether Twitter

20    wanted to meet alone, or separately?  Is that what

21    that means?

22         A.  No.  But I had a view that I couldn't tell

23    if the platforms wanted to do the BOLO meetings the

24    way Census had done them for their own work, so I

25    was checking.
```

```
 1          Q.  Had you been at any -- invited to any of
 2    the Census BOLOs?
 3          A.  No.  I don't think they were doing BOLOs
 4    by the time that we were meeting.
 5          Q.  So they had done that for the Census?
 6          A.  That's my understanding.
 7          Q.  And it had been in relation to the 2020
 8    Census?
 9          A.  That's my understanding.
10          Q.  All right.  Did you talk to anyone at
11    Census about how they ran BOLO meetings?
12          A.  Yes.
13          Q.  Okay.  In order to create your own?
14          A.  Yes.
15          Q.  And what did they tell you?
16          A.  Well, they explained how they did it.  In
17    fact, they drafted the slide deck.  We talked about
18    this earlier.  They drafted it and showed me how
19    they thought that we should do it, and that it was
20    just we would give examples, we would give the
21    science, and then they --  people could follow up
22    separately.  I mean, I believe we changed some of
23    the format of the PowerPoint, what we did for CDC of
24    course, but they -- you know, they kind of told us
25    how they had done it in the past.
```

```
 1          Q.  Okay.  Let's go to his response to you.
 2              He says to you -- and here we see
 3     Mr. Lewitzke's name spelled correctly; right?
 4          A.  Yes.
 5          Q.  Okay.  So Todd O'Boyle writes to you on
 6     May 10, 2021 on Exhibit 34.  "Hi, Carol.  Thanks for
 7     sharing this."
 8              And you took that to mean your chart,
 9     right, or table, you called it?
10          A.  Yes.
11          Q.  "Agree these are important trends to note.
12     A quick scan shows that at least some of these have
13     been previously reviewed and actioned.  I will now
14     ask the team to review the others."
15              What did you take that to mean?
16          A.  I don't know how Todd meant it
17     specifically, but I interpreted it as Twitter made
18     decisions about the areas of misinformation based on
19     whatever policy they had.
20          Q.  And he says:  "Carol, remind me:  Did you
21     have a chance to enroll in our partner support
22     portal?  In the future that's the best way to get a
23     spreadsheet like this reviewed."
24              So you mentioned that Partner Support
25     Portal.  What is that?
```

1        A.  My understanding of it, and I don't

2   believe I ever successfully got into it, but it's

3   similar to what I described for Meta.  It's an

4   offering where you log in and you can report

5   misinformation or threats or problematic posted

6   content in this portal, and it puts it in a system

7   for review.

8        **Q.  Did you know what happened at Twitter to**

9   **reports that were deemed actionable?**

10       A.  I assume similar to Meta that they

11   probably had multiple options.  I am sure some were

12   removed.  I am sure some may have had -- were

13   flagged.  I see flags all the time on the Twitter

14   posts.  I am sure some were just maybe -- I don't

15   know what they do, but maybe they weren't

16   distributed as much on peoples' feeds.

17       **Q.  Where do you see Twitter?  Do you have a**

18   **Twitter?**

19       A.  Yeah.  I mean, my responsibility is social

20   media for CDC, so I do look at Twitter, and we have

21   Twitter accounts at CDC.

22       **Q.  And CDC -- well, I'll just go back for one**

23   **second.  You -- prior -- on May 10 you were**

24   **discussing a Friday meeting that you'd invited**

25   **Mr. O'Boyle to.  And do you know whether that**

Case 3:22-cv-01213-TAD-KDM Document 205-3 Filed 03/06/23 Page 293 of 345 PageID #: 11157

1   meeting occurred?

2       A.  I mean, I think we set up the first BOLO

3   meeting in May.  And this was May 10th, and the

4   Friday was there so I suspect it did occur.

5       Q.  Okay.  And you said you didn't use the

6   portal.  Did anyone else at CDC use the portal?

7       A.  No, I don't -- I don't recall anyone else

8   trying to get access besides myself.

9       Q.  Had you talked to him about the partner

10  support portal beforehand, before this email chain?

11      A.  I don't remember.  I'm inferring from this

12  chain that perhaps not.

13      Q.  All right.  Had you talked to Census about

14  the portal?

15      A.  I don't recall if we discussed the Twitter

16  portal per se.  But I did know from discussions with

17  them that one technique I think that they used was

18  using portals to -- for their work to report

19  information.  I don't remember if we discussed

20  Twitter or not.

21      Q.  Okay.

22      A.  Or if it was all about Meta.

23      Q.  But it was your understanding that Census

24  did use such devices when offered?

25      A.  That, or they told me it was an option for

Case 3:22-cv-01213-TAD-MIL Document 205-3 Filed 03/06/23 Page 245 of 346 PageID #:
11158

```
 1    us.  I'm worried I'm mischaracterizing their work
 2    with very little actual memory on it.
 3           Q.  Okay.  And you respond to him:  "Todd, I
 4    don't think we have info on how to enroll, but we'd
 5    be happy to get on it if you'd send some info";
 6    right?
 7           A.  Yes.
 8           Q.  And he responds that -- on May 10th at
 9    8:51, he says he's happy to enroll you, and it
10    allows you a special, expedited reporting flow in
11    the Twitter Help Center.  That's the purpose of it.
12           A.  Yes, I see that.
13           Q.  What's the Twitter Help Center?
14           A.  The portal is part of their help center
15    somehow.  I mean, I'm not an expert, but I -- it's
16    seeming -- I think the screenshot might even show
17    how it's part of it.
18               No, it doesn't.  But I believe it's like a
19    link on the help center page.
20           Q.  And he says it worked very well with
21    Census colleagues last year; right?
22           A.  Well, there we go.
23           Q.  Yeah.
24           A.  That's why he came up with that.
25           Q.  Okay.  And did you give him a Twitter
```

 1    **account to enroll?**

 2        A.   I asked him -- I can see that I asked him

 3    does it have to be our official CDC account, or is

 4    it supposed to be personal.  And I gave him my

 5    personal one.

 6        **Q.   Okay.  And what was your problem with**

 7    **using -- did you have a technical problem with using**

 8    **it?  What happened?**

 9        A.   It was not a priority for me, for one.  I

10    wasn't thinking that we would probably want to use

11    this portal on a regular basis.  I thought that let

12    me just myself, instead of asking my staff to get

13    involved, I want to see what the portal is myself

14    because I wasn't able to look at the Meta portal

15    myself because you had to be administrator.

16            So I wanted to look at it and see what it

17    it looked like, but I -- it wasn't a priority.  So

18    every now and then I would try to get on it, and I

19    don't remember ever solving the problem.  All I know

20    is I think when I clicked it nothing happened, or I

21    didn't get drop-downs.  That's -- and I felt like

22    maybe I wasn't in the right place.

23        **Q.   Okay.**

24        A.   But I am --

25        **Q.   Okay.**

**CAROL CRAWFORD  11/15/2022**

```
 1         A.   -- unclear of what exactly was wrong.
 2    Sorry.
 3         Q.   I got it.  But here's -- so then I see
 4    May 24th, 2021, 2:28 email from Christopher Lewitzke
 5    that I think Todd forwards it to you.  Is that how
 6    that works?  How does that page -- could you tell me
 7    what's happening on this page?
 8         A.   The way the reply works from the email
 9    it's unclear if I was copied or not, so I can't say.
10    But I definitely was copied on Todd's response to
11    Christopher.  I'm not sure if Christopher copied me
12    on his email to Todd, which is what I think you're
13    asking me.
14         Q.   Okay.  But on May 24th at least it looks
15    like Lewitzke sent a note to Todd?
16         A.   Mm-hmm (affirmative).  And then 30 minutes
17    later Todd hit reply with everyone on it.
18         Q.   Okay.  And Carol says I had -- (as read)
19    Carol and I had a sidebar, and I requested her
20    account be enrolled.  Your email reminds me that the
21    process should have been completed by now.  I'll
22    check with the team to make sure it's properly
23    enrolled.
24              And that's your recollection that's how it
25    occurred?
```

 1      A.  That's my recollection.  I don't recall
 2  the sidebar, but I do know that I wanted it to be
 3  CDC people in these portals versus Census.  I felt
 4  like that was more appropriate.
 5      **Q.  And remind me, who's Christopher Lewitzke?**
 6      A.  He's a -- he's a Census contractor.
 7      **Q.  Okay.  With this Reingold outfit we talked**
 8  **about?**
 9      A.  Mm-hmm.
10      **Q.  He says:  We want to have at least some**
11  **CDC accounts whitelisted.  What does whitelisted**
12  **mean?**
13      A.  Let me read this.  I'm not sure.
14      **Q.  You've never heard that term before?**
15      A.  I have heard of whitelisted.  I don't
16  understand it in this context.
17      **Q.  What was your understanding of whitelisted**
18  **meaning?**
19      A.  Like my under -- my general understanding
20  of whitelisting is you can have kind of a list of
21  things that maybe -- of servers that are allowed or
22  not allowed is an example of a list of whitelist.
23      **Q.  Okay.  And then do you know which Census**
24  **accounts had access to this portal?**
25      A.  My memory was that none.  And I think this

 1   email supports my memory, and that Todd responding

 2   that I'm going to be the account that's enrolled.

 3        **Q.   Oh.**

 4        A.   For CDC.

 5        **Q.   For CDC.**

 6        A.   For CDC at least.

 7        **Q.   But do you know which Census accounts?**

 8        A.   Oh, no.

 9        **Q.   Okay.**

10        A.   I wouldn't have any knowledge of what they

11   did.

12        **Q.   Okay.  And then let's read up to May 27th,**

13   **2021, 2:30.  And you say haven't seen anything come**

14   **through.  And then Todd says:  You should now be**

15   **up -- should be fully -- and period.  You should be**

16   **fully period, he says.**

17        **Then he says:  "When you visit the Twitter**

18   **help center logged in with your account you should**

19   **see additional reporting options."**

20        **Do you know what he meant by that?**

21        A.   Yes.  This portal, like I think when

22   anyone goes to the health center -- help center, I

23   think there is, like, you can flag threats and

24   things, I believe.  I think he was saying I would

25   have had something more.  But I never could locate

 1    that.

 2        Q.   Okay.  And you tell him:  "Hi, Todd.  I

 3    have been trying to enter info but I realize I have

 4    been unclear on where to enter them.  I went to

 5    /forms and there is a drop down on things to submit,

 6    but none of them seem relevant to misinformation.

 7    Am I in the right place?"

 8            So is that the problem you had?

 9        A.   I -- based on this email I think it was

10    one of the problems.  I don't -- I think at the

11    beginning I didn't get the links, I couldn't find it

12    on the help center.  There's probably additional

13    chains, I suspect, regarding this.

14        Q.   Okay.  But you don't recall what they

15    were?

16        A.   No.

17            MR. VECCHIONE:  All right.  Put that

18    aside.

19            (Plaintiffs' Exhibit 35 marked.)

20    BY MR. VECCHIONE:

21        Q.   35.  And once again for Exhibit 35 tell me

22    what the subject line is and what's the date at the

23    top.

24        A.   The subject line:  BOLO CDC lab alert

25    misinformation.  Sent September 2nd, 2021.

```
 1          Q.  And I think we've seen this alert before
 2    for another social media recipient, am I correct
 3    about that?
 4          A.  You're correct.
 5          Q.  All right.  Is this anything different
 6    than when you testified last time about this BOLO?
 7          A.  The only difference is this email is going
 8    to Twitter.
 9          Q.  Okay.  And what was your intent in telling
10    Twitter through O'Boyle to be on the lookout for
11    misinformation about PCR testing?
12          A.  I mean, I, again, I think CDC's role is to
13    provide the facts around issues.  We saw this
14    confusion about this alert brewing and more posts
15    were going up with confusion, and we thought it
16    would be a good idea to provide the platforms with
17    the facts before it became something bigger.
18          Q.  And what did you believe he'd do with the
19    information?
20          A.  I believed that they would consider it in
21    their -- I knew their policy teams or their trust
22    teams or misinfo teams, whatever they -- whatever
23    they called their teams, would evaluate it.
24          Q.  And perhaps remove it?
25          A.  I knew that removal was one of the options
```

**CAROL CRAWFORD  11/15/2022**

 1   that they had, yes.

 2              MR. VECCHIONE:  You can put that aside.

 3              (Plaintiffs' Exhibit 36 marked.)

 4   BY MR. VECCHIONE:

 5       **Q.  Exhibit 36.  And once again, if you could,**

 6   **for Exhibit 36 tell me the date and the subject**

 7   **line, and then read it to yourself.**

 8       A.  Subject:  Call or VC-Facebook weekly sync

 9   with CDC (CDC to invite other agencies as needed.)

10   And this was sent on April 15, 2021.

11       **Q.  And then please read it to yourself.**

12       A.  Okay.

13       **Q.  All right.  Do you know who created the**

14   **meeting agenda there?**

15       A.  I think Payton probably inserted these

16   agenda items because it was her appointment.

17       **Q.  And what was on that agenda?**

18       A.  New attendees intro, CDC needs/questions,

19   FB product updates/feedback requests. (COVID-HUB).

20   And then COVID-19 projects, and several are listed

21   CMU/FB data survey.  Update -- data survey update.

22   Excuse me.  Misinfo collab status.  Others.

23       **Q.  Let's go through this.  What's COVID-HUB?**

24       A.  I believe the COVID-HUB is what they

25   called when I mentioned you're on Facebook and you

1  could search for COVID, they actually provided

2  in-app content on COVID that they pulled from WHO,

3  CDC and other sources and I believe they call that

4  internally the COVID-HUB.

5      **Q.  All right.  And I think we have some new**

6  **names here in the middle.  Let's see if we see most**

7  **of them.  Kang-Xing Jin.  Do you know who that was?**

8      A.  Looks like a Facebook employee, but I

9  don't recall.

10      **Q.  And I think we've discussed Raena Saddler,**

11  **but I've forgotten.  Do you recall?**

12      A.  I mean, she's with Facebook, or he is with

13  Facebook, but I don't know who they are.

14      **Q.  All right.  And then she cc'd a number of**

15  **people.  Do you recognize any of those names besides**

16  **Liz Lagone?**

17      A.  Yes, Airton, the first name.

18      **Q.  Yeah.**

19      A.  He was definitely with Facebook, and he

20  seemed to be an expert on like Facebook ads how to

21  run Facebook ads.

22          Julia Eisman is someone we talked to

23  regularly.  I think she's in, like, their public

24  relations type office.  She occasionally would be on

25  the calls with Payton.  Kate Thornton, I don't

 1   recall.  Carrie Adams, I mentioned is the new point

 2   of contact I have now.  And Ursula Phoenix Weir was

 3   -- is someone at CDC.  I assume that for this

 4   meeting she was probably deployed in a -- something

 5   that was related to what I thought was going to be

 6   discussed here.

 7          **Q.  And what was her title?**

 8          A.  Ursula's?

 9          **Q.  Yeah.**

10          A.  I'm not sure.  When people deploy into

11   something -- Ursula probably had several roles

12   during COVID, as many of us did.  I just don't -- I

13   can't tell why I invited her to this meeting from

14   looking at this.

15          **Q.  Where was she normally?**

16          A.  I believe -- I believe.  I believe she's

17   in the National Center for Birth Defects.

18          **Q.  Now, the subject says "Call or VC," I**

19   **assume that's voice chat?**

20          A.  Yes.

21          **Q.  "Facebook weekly sync."  That's**

22   **synchronization with CDC?**

23          A.  That's how I interpret sync, yes.

24          **Q.  CDC to invite other agendas as -- agencies**

25   **as-needed.  Okay.**

1          **What did you understand CDC needs**

2   **questions to be about in this agenda?**

3          A.   I think that that was often just listed.

4   I mean, it would just be if we had a question that

5   we needed, we wanted to ask Facebook about, or if we

6   had something that we -- was upcoming that we wanted

7   their assistance with or something.  I know, like,

8   for instance, Airton's on this because sometimes

9   we'd have technical questions about how to run an ad

10  or the live chat, that kind of -- that we talked

11  about earlier, how to make it work.

12         **Q.   All right.  And then the COVID-19**

13  **projects, she seems to have split them up.  Were**

14  **they split up this way within CDC or within**

15  **Facebook, to your knowledge?**

16         A.   No.  I think it's just a list of things

17  that were just put together in one area.  But I

18  don't recall.

19         **Q.   What's your understanding of CMU/FB?**

20         A.   I think this was -- oh, gosh.  I think

21  this was about some surveying that Facebook was

22  doing regarding COVID maybe, and they wanted to just

23  let us know they were doing it.  But I'm very fuzzy

24  on that, on the details of it.

25         **Q.   All right.  And is data and survey**

1    separate?

2        A.  I think that's all one update.  CMU at

3    slash FB data survey update.  That's how I believe

4    this to be.

5        Q.  All right.  And misinformation.  "Misinfo"

6    is misinformation?

7        A.  "Collab status" is one thing.

8        Q.  Oh, that's one thing?

9        A.  Yeah.

10       Q.  Okay.  And "collab" is collaboration?

11       A.  Yes.

12       Q.  And then others, I take it, is everything

13   else?

14       A.  Yes.

15       Q.  So when this meeting took place do you

16   know if there is any notes or recordings of it?

17       A.  We didn't record them.  I don't -- like

18   I've been saying, I rarely took notes.  If something

19   was jotted down, it would have been in an email or a

20   Word doc.

21       Q.  Do you recall if all these agenda items

22   were discussed on this call?

23       A.  No.

24       Q.  What do you remember about that meeting?

25       A.  I don't remember the specific meeting at

Case 3:22-cv-01213-TAD-KDM Document 206-3 Filed 03/06/23 Page 306 of 910 PageID #: 11170

```
 1   all.
 2              MR. VECCHIONE:  Okay.  You can put that
 3   aside.
 4              (Plaintiffs' Exhibit 37 marked.)
 5   BY MR. VECCHIONE:
 6       Q.  37.  And once again for Plaintiffs'
 7   Exhibit 37 please read the date and the subject line
 8   of, and then read it to yourself, please.
 9       A.  Subject line:  CDC "guides," in quotes,
10   and this week's meeting.  And that was sent on
11   4/29/2021.
12              Okay.
13       Q.  All right.  And can you identify what this
14   is?
15       A.  This is an email chain about -- that's
16   called "CDC 'Guides' and this week's meeting."
17       Q.  Okay.  And at this time -- I think we've
18   talked about biweekly meetings.  At this time could
19   you have been having weekly meetings with Facebook?
20       A.  We might have.  There definitely were
21   times that we were talking weekly.
22       Q.  All right.  Let's do it -- let's go to the
23   back, the last page.
24              She writes to you:  "Hi, Carol, we want to
25   flag a couple of items for you this week," right?
```

```
 1    And she says:  "Instagram Guides Promotion
 2    Opportunity.  Our Instagram team is looking to run
 3    promotion to amplify vaccine-related Instagram
 4    Guides.  We saw that CDC has a great one on its
 5    feed."  And then she provides a link; is that right?
 6    Am I correct?  Did I read that correctly?
 7         A.  Yes.
 8         Q.  What is an Instagram Guides?  I --
 9         A.  I honestly don't remember.  I noticed I
10    added our social lead to pipe in more of the guides.
11    I think it might have been like a reel, like the
12    little video snippets you can see on Instagram.  But
13    I honestly cannot remember what they were at the
14    time.
15         Q.  Okay.
16         A.  I don't know that Instagram guides still
17    exist.
18         Q.  Let's talk about it just for a moment,
19    though, because we talked about various types of
20    social media.  Instagram is usually like a photo and
21    then some words under it?
22         A.  That is one type of Instagram post, and
23    then there is more like a video version of it.
24         Q.  Okay.  And how long -- does the video run
25    a long time like YouTube, or is it short?
```

1          A.  No, it's short.

2          Q.  **And then she says:  "The team is planning**

3   **to launch an in-feed promotion of the Guides on**

4   **Monday."**

5               **What's an in-feed promotion?**

6          A.  If I'm not sure what they meant by in-feed

7   promotion.  But what I'm -- as reading this at this

8   moment, I believe they were -- it would, you know,

9   it would get highlighted more often in a user's

10  feed.  They would -- the content would be promoted

11  more to the users in their scrolling.

12         Q.  **Okay.  And then it says that this launch**

13  **in-feed promotion would run for three weeks, and the**

14  **anticipated reach is 60 to 80 percent of the people**

15  **in the U.S. on Instagram.**

16              **So that's 60 to 80 percent of the people**

17  **that -- the United States people on that platform,**

18  **is that your understanding?**

19         A.  Yes.

20         Q.  **And then she says:  (As read)  "We wanted**

21  **to know if the Guide above is up-to-date, or if**

22  **you'd be willing to update it (if needed) and if it**

23  **is something" you can include in the -- "we can**

24  **include in the promotion.  Happy to discuss further**

25  **if this is something you may be interested in, or if**

```
 1    you have any questions."

 2              Did I read that correctly?

 3        A.  Yes.

 4        Q.  Who decides whether the guide is up to

 5    date or not?

 6        A.  That would be us because it's our post.

 7        Q.  Okay.

 8        A.  Like if the guide is like a story -- I

 9    called it a reel earlier, but a story is better for

10    Instagram.  It's something that CDC has posted, so

11    it's our content to update.

12        Q.  Got it.

13        A.  And I'll add, to clarify, I can see on the

14    url it says "/CDC gov."  So it's definitely

15    something we have posted, and if I'm incorrect about

16    the format of it I still can tell it's something

17    we've posted.

18        Q.  Okay.  Then also "FYI", which I think is

19    for your information, "we are hoping for an update

20    on our COVID-19 misinfo reporting, but that is not

21    ready for this week."

22              What did you -- did I read that correctly?

23        A.  You read it correctly.

24        Q.  And what did you take that to mean?

25        A.  I am not sure, but I'm -- it might have
```

 1   been about those CrowdTangle reports and sending

 2   them to us.

 3        **Q.  Can you read your response at 2:32 on the**

 4   **same day, the 28th?**

 5        A.  Read the whole response?

 6        **Q.  Yeah.**

 7        A.  Okay.  (As read) plus Jay to weigh in on

 8   that guide.  I think he'll have the latest info.  I

 9   think it would be great to get that kind of

10   promotion on it.  Thanks for offering.  I still hope

11   to get you some health equity info, but agree we can

12   pull that meeting down tomorrow.  Are you being

13   asked by the White House to do anything on

14   vaccine.gov or vaccinefinder?  If so, can you share

15   any plans in a nutshell via email?

16        **Q.  All right.  So, first, what's health**

17   **equity info?**

18        A.  I can't recall the context of why we were

19   discussing it, or what prompted me to write that.

20   But CDC had posted, I believe around this time,

21   information on health equity.  I'm thinking that we

22   either -- they wanted it, or we wanted to mention it

23   to them, but I don't recall which.

24        **Q.  And you asked about the White House.  You**

25   **asked her whether the White House is asking her to**

1    do anything on vaccine.gov or vaccinefinder.  What's

2    "vaccinefinder"?

3         A.  Vaccines.gov originally was called

4    vaccinefinder.gov.  But we renamed it vaccine.gov or

5    vaccines.gov when the vac- -- COVID vaccines came

6    out.  But a lot of us still think of it as the

7    "vaccinefinder site" because when you go to that

8    site, in effect, the main thing it does is you can

9    put in your ZIP code and find out where COVID

10   vaccines are offered.  So it helps you find the

11   vaccine.

12        Q.  Why did you suspect the White House was

13   asking her or Facebook to do something about that

14   site?

15        MS. SNOW:  Objection, calls for

16   speculation.

17   BY MR. VECCHIONE:

18        Q.  And you wrote down:  "Are you being asked

19   by the White House?"  You asked her that.  Why did

20   you do that?

21        A.  I --

22        MR. GILLIGAN:  You asked her why she

23   suspected something.

24   BY MR. VECCHIONE:

25        Q.  Why did you -- why did you ask whether the

CAROL CRAWFORD  11/15/2022

Page 232

 1   **White House had asked her to do anything?**

 2       A.  I don't remember specifically.  But it was

 3   not uncommon because there was multiple major

 4   agencies such as the White House working on things.

 5   And so Payton had meetings with lots of federal

 6   agencies, and we were -- the vaccine.gov site was

 7   something CDC, HHS and the White House were

 8   collaboratively working on.

 9           So it might have been me just trying to

10   understand if we were about to promote vaccines.gov

11   on -- maybe it was in the guides; maybe I was just

12   trying to see if she knew something related to what

13   we were doing.  We did overlap from time to time and

14   ask Payton similar things.

15       **Q.  So you knew that Facebook could also have**

16   **been being contacted by other agencies besides CDC?**

17       A.  Yes.  They -- she -- I'm fairly confident

18   that she was speaking to several federal agencies

19   during the COVID response.

20       **Q.  Including HHS?**

21       A.  I believe so, yes.

22       **Q.  And including the White House?**

23       A.  I think.  I believe so, yes.  I don't -- I

24   didn't ask her her meeting schedule, but she often

25   would be up to date.

1          Q.  Did she ever mention to you who her
2    contact was at the White House?
3          A.  No.
4          Q.  Do you know that of your own knowledge
5    from some other source?
6          A.  No.
7          Q.  Were you ever on a call with any of the
8    agencies in the White House?
9          A.  Yes.  Sometimes what I remember was that
10   when vaccines.gov was coming out, that was involving
11   multiple agencies including people at the White
12   House and the U.S. Design System team and HHS and
13   CDC, and I do believe there might have been some
14   joint calls to discuss some of the promotion of
15   vaccine.gov.
16         Q.  All right.  And U.S. Design are the people
17   who design the websites for the government?
18         A.  Yes.  I think in my mind when I say White
19   House, they are the people in the White House that
20   I'm talking about because that's my counterparts in
21   the White House are digital people.  I should have
22   clarified.  I should have clarified that earlier.
23         Q.  All right.  And do you know of anyone, any
24   names?
25         A.  There was several of them that were

```
 1  involved with vaccines.gov.

 2         Q.  Okay.  Do you recall any names?

 3         A.  I really don't.

 4         Q.  All right.  Did anyone from the White

 5  House, any office in the White House, direct you to

 6  engage with social media companies independent of

 7  your supervisor at the CDC?

 8         A.  No.

 9         Q.  All right.  Let's take a look at the next

10  one.  Payton to you on April 29 at 6:23.  Can you

11  read her response to you?

12         A.  (As read)  Thank you, Carol.  Regarding

13  vaccines.gov -- or vaccine.gov -- we haven't had any

14  specific requests from the White House on this.

15  We've been working at the state level on our vaccine

16  finders tools and promotions.  I also want to

17  followup on our COVID-19 misinfo reporting.  Our

18  team is looking to schedule a training with CDC and

19  Census colleagues who will be reporting content

20  through the tool.  It will cover Community

21  Standards, COVID-19 misinformation and harm policies

22  and a walkthrough of the reporting tool.

23         Q.  Let's stop there.

24         A.  Okay.

25         Q.  Did that training occur with CDC?
```

```
 1        A.  To my recollection, that training never

 2   occurred.  But I might not have been a part of it,

 3   and that's why I don't recall it.

 4        Q.  Do you recall whether or not Census was

 5   involved in such a training?

 6        A.  No, because I'm not sure that we had the

 7   training, so I don't know who would have attended

 8   it.

 9        Q.  Okay.  And then could you continue reading

10   where you have the asterisks?

11        A.  "Could you share back some times that may

12   work to schedule?  We'll probably need 1.5 hours to

13   cover.  If needed, we can break the training up if a

14   longer block is hard to schedule."

15        Q.  All right.  And then you'll respond that

16   you'll check with Census; right?

17        A.  Yes.

18        Q.  But do you know whether or not you checked

19   with Census?

20        A.  No.

21        Q.  Do you recall anything more than what

22   you've told me about this training?

23        A.  I recall that when this -- well, can I ask

24   my -- can I ask counsel a question first?

25            MR. GILLIGAN:  Yes, you may.
```

```
 1                (Witness conferring with counsel.)

 2                MR. VECCHIONE:  Let the record reflect

 3     that the witness has consulted with counsel.

 4     BY MR. VECCHIONE:

 5          Q.  Can you answer my question?

 6          A.  Oh.  Yes.  When we went through discovery,

 7     I was pulling documents for discovery, and I was

 8     asked if we had used the portal by I believe the CDC

 9     lawyer that I have been working with, and I could

10     not recall.

11                So I went through a lot of emails at that

12     time, and I concluded that my memory was correct

13     that we really did not use the portal more than the

14     one time that I mentioned earlier, and that's why I

15     don't believe the training occurred.  I don't have

16     any memory of going through the training, or setting

17     up the training.  But it's pos- -- I mean, I have a

18     lot of emails, but that was what I thought after I

19     did discovery.

20     BY MR. VECCHIONE:

21          Q.  Right.  And that's what you think now

22     sitting here?

23          A.  Yes.

24          Q.  All right.  Thank you.  You can put that

25     aside.
```

```
 1          A.  Okay.

 2              (Plaintiffs' Exhibit 38 marked.)

 3     BY MR. VECCHIONE:

 4          Q.  And, again, for Exhibit 38 just tell me

 5     the date and the subject line, and then read it to

 6     yourself.

 7          A.  I'm sorry.  The subject, Wyoming issue.

 8     April 30th, 2021.  Okay.

 9          Q.  So let's start from the back again.

10              On April 23rd you write to Payton Iheme

11     again.  Can you write what you say to her?

12          A.  (As read)  The Wyoming Department of

13     Health mentioned to one of our groups that the

14     algorithms that Facebook and other social media are

15     apparently using to screen out postings by sources

16     of vaccine misinformation are also apparently

17     screening out valid public health messaging,

18     including Wyoming Health communications.  They were

19     looking for advice about how to work with social

20     media networks to ensure that verifiable information

21     sources are not blocked.  Do you have someone that

22     she could talk to -- sorry.  Do you have someone

23     that could perhaps talk to the state about this?

24          Q.  And then before you get a response you say

25     on top:  "Anything you all can do to help on this?"
```

 1   I guess -- you say that five days later, is that why

 2   you sent it again?

 3        A.  They hadn't responded.

 4        Q.  Okay.  Who decided what a verifiable

 5   information source was at this time?

 6        A.  I don't know.

 7        Q.  Now, on April 28th at 6:37 you get an

 8   email back from Adrien Genelle, I think or Genelle

 9   Adrien.  Excuse me.

10        A.  Yes.

11        Q.  And she says that her colleague can solve

12   this problem?

13        MS. SNOW:  Objection, mischaracterizes

14   document.

15   BY MR. VECCHIONE:

16        Q.  Did she direct you to another person to

17   take care of the problem?

18        A.  She looped in another colleague to provide

19   additional guidance, or to connect directly with the

20   state health department that asked.

21        Q.  Okay.  And then you say, you tell her that

22   you don't have an email chain to loop anyone in

23   because it was received via meeting.  Do you know

24   what meeting it was received in?

25        A.  Yes.  Well, no, I don't know exactly which

```
 1   meeting it was in, but it was just relayed to me

 2   during one of the COVID internal meetings that, hey,

 3   we got a call from Wyoming, do we know anyone to

 4   connect them with.

 5        Q.  And you connected to Holly Scheer?  Is

 6   that what you're doing there?

 7        A.  Yes.

 8        Q.  And do you know anything more about Eva

 9   Guidarini than what she states here about her?  Did

10   you ever deal with her?

11        A.  No.

12             MR. VECCHIONE:  You can put that aside.

13             Exhibit 39.  I believe they are all

14   one-pagers, and they are all stapled together, so

15   give me one moment.

16             (Plaintiffs' Exhibit 39 marked.)

17   BY MR. VECCHIONE:

18        Q.  Once again, could you just read the -- 39,

19   could you read the subject line and the date?

20        A.  Join with new info E:  Call or VC-Facebook

21   weekly sync with CDC (CDC to invite other agencies

22   as needed).  May 6, 2021.

23        Q.  Okay.  Tell me when you're ready.

24        A.  Oh, I'm ready.  I'm sorry.

25        Q.  And I think we've seen this meeting
```

```
 1   before, but I just want to make sure it's not a
 2   separate one.  Was -- this was just with Facebook;
 3   right?
 4        A.  This was.
 5        Q.  Okay.  And the -- and we've already
 6   discussed the items that were -- that were on the
 7   agenda; right?
 8        A.  We did.  But I'm just now noticing that
 9   the items in the agenda might be a cut-and-paste
10   from the same thing and maybe weren't updated
11   regularly.
12        Q.  I see.  That's my question.  All right.
13   So do you have any memory of this particular
14   meeting?
15        A.  I don't.
16        Q.  And you don't recall what was said one way
17   or another?
18        A.  Don't recall, excuse me?
19        Q.  Okay.
20        A.  I didn't catch -- I'm sorry.  I didn't
21   catch what you asked me.
22        Q.  Oh, oh.  Do you recall anything that was
23   said at that meeting?
24        A.  On May 6?  No.
25        Q.  And do you know if the format was in Zoom,
```

```
 1    or what the format, or Microsoft Teams, or in

 2    person, or?

 3         A.  It was always on either teams or they had

 4    BlueJeans that we used occasionally.

 5         Q.  Okay.  What's BlueJeans?

 6         A.  It's something like a Teams or a Zoom.

 7         Q.  Okay.  And, once again, do you know if

 8    there is any notes or record kept of the meeting?

 9         A.  I did not take any notes at the meeting

10    that I recall.  I mean, same answer I have been

11    giving.  If there were any, it was minor and they

12    would have been in Word or email.

13         Q.  Okay.

14              MR. VECCHIONE:  40.

15              MR. GILLIGAN:  I remember when everybody

16    just used Skype when it was simpler times.

17              (Plaintiffs' Exhibit 40 marked.)

18    BY MR. VECCHIONE:

19         Q.  Exhibit 40.  Once again the date and the

20    subject line, and then read it to yourself.

21         A.  Subject line:  COVID BOLO meetings on

22    misinformation, sent on May 10, 2021.

23              Okay.

24         Q.  All right.  Let's go back to the back page

25    of this that's Bates number 682.
```

```
 1          A.  Okay.

 2          Q.  Now, this is -- I think we've said this

 3   date.  It's May 10th of 2021?

 4          A.  Yes.

 5          Q.  And you send to Facebook the COVID BOLO

 6   misinformation meeting request; right?

 7          A.  Yes.

 8          Q.  And could you please read that for me?

 9          A.  (As read)  We would like to establish

10   COVID BOLO meetings on misinformation and invite all

11   platforms to join the meetings.  We are aiming for

12   the first one on Friday at noon.  I know you were

13   considering a possible process on your end, but we

14   wanted to start here just as an interim first step.

15   Are there direct POCs on your end I should include

16   on the invite?  I'm happy to chat if better, thanks.

17          Q.  All right.  Now, so this is the first BOLO

18   meeting.  Does that comport with your recollection?

19          A.  This is a note that I'm about to send an

20   appointment for the first BOLO meeting and asking

21   them who to include.

22          Q.  All right.  And we've already said POCs --

23          A.  Yes.

24          Q.  -- are the point of contacts; right?

25          A.  Mm-hmm (affirmative).
```

```
 1          Q.  And you said:  "I know you are considering
 2    possible process on your end."
 3              What did you mean by that?
 4          A.  As I mentioned, that I was engaging with
 5    the platform saying what format would be best for us
 6    to talk about this.  And I think there were
 7    references in the exhibit a couple of times where
 8    they said they were thinking internally about what
 9    would be best.  So I think I was just referencing
10    that I knew that they were considering it as well.
11          Q.  Do you know what the topics -- did you
12    know what the topics for the BOLO were when you sent
13    this out?
14          A.  I don't know if I did or not.
15          Q.  All right.  Let's go to the next page back
16    where we have -- I believe this is from Jan
17    Antonaros to you, but he includes your email to him;
18    right?
19          A.  This -- the bottom part --
20          Q.  Mm-hmm (affirmative).
21          A.  -- is where I sent a similar note to
22    Google, which is Jan.
23          Q.  Okay.
24          A.  And I was telling her that we would like
25    to invite the digital platforms to attend the BOLO.
```

```
 1    I think it was me sending the appointment or a
 2    heads-up that it was coming.  I can't -- it looks
 3    like maybe I -- this is an actual appointment.
 4         Q.  Okay.
 5         A.  But I tried to send each of them a
 6    personal note that we were doing it.
 7         Q.  And in this one you actually spelled out
 8    be on the lookout; right?
 9         A.  I did.
10         Q.  And was that because you hadn't discussed
11    it with them before, or did you have some concern
12    they wouldn't know what it was?
13         A.  I don't know why I didn't do it that time.
14         Q.  All right.  And there is Kevin Kane here
15    with the email address ▮▮▮▮▮▮@Google.com.  Who is
16    that?
17         A.  I don't remember Kevin, but this indicates
18    that he was from YouTube.
19         Q.  Okay.  And do you recall having
20    discussions with YouTube?
21         A.  YouTube would occasionally -- people from
22    YouTube would occasionally be on our regular
23    meetings, depending on what we talked about.  And
24    because YouTube has the most content, like, hosting,
25    they -- they were at the -- they were a part of the
```

```
 1    BOLO meetings, I believe, that Kevin attended
 2    probably, or someone from YouTube did.
 3          Q.  And you responded:  "Great.  I was going
 4    to ask about Kevin."
 5          A.  Yeah.  Maybe I remembered who Kevin was at
 6    the time.
 7          Q.  Okay.  And then finally the front page.
 8          A.  That's a repeat of -- oh, no, that's not.
 9    I apologize.  I'm looking at the wrong one.
10          Q.  And here you're sending this to the Google
11    folks?
12          A.  Yes.
13          Q.  Why don't you read it for the record?
14          A.  "We would like to establish COVID BOLO
15    meetings on misinformation and invite all platforms
16    to join the meetings.  We were aiming for the first
17    one on Friday at noon.  We heard through the
18    grapevine that Kevin Cain at YouTube would want to
19    join.  Are there other POCs on your end I should
20    include on the invite?"
21          Q.  All right.  You said YouTube.  Who's
22    YouTube related to, is it Google or Facebook?
23          A.  YouTube is a Google property.
24          Q.  Okay.
25          A.  Or platform.
```

```
 1          Q.  And is it your recollection that you did
 2     have a meeting on Friday?
 3          A.  I think we did, but I don't have the exact
 4     date.  But I believe we had -- that's when we had
 5     the first BOLO meeting.
 6          Q.  All right.  And do you have any list of
 7     who actually showed up and was an attendee?
 8          A.  No.
 9          Q.  All right.  And, once again, it would be
10     on your calendar as far as if it happened?
11          A.  Now, to clarify I don't remember keeping a
12     list of who attended.  Maybe Census might have
13     because this is something they were arranging.  But
14     I don't recall it being sent to me.  It could have
15     been, but I don't believe so.
16          Q.  So they were helping you arrange this
17     because they'd done it before, this particular
18     meeting?
19          A.  Yes.  I mean, I mentioned that they
20     drafted the slides.
21          Q.  Right.
22          A.  And, you know, Chris participated in the
23     meeting.
24          Q.  Okay.  Chris.  Remind me his last name?
25          A.  Lewinsky, Lewitzke.
```

```
 1          Q.  Lewitzke.  I'm glad he's not here because
 2     we've done terrible things to his name, and I
 3     apologize for that.  My name is Vecchione.  I have
 4     no excuses for this.
 5               All right.  I think you can put that
 6     aside.
 7               (Plaintiffs' Exhibit 41 marked.)
 8     BY MR. VECCHIONE:
 9          Q.  Let's go to Exhibit 41.  And once again
10     please tell me the headline, subject line, and the
11     date, and then read it to yourself.
12          A.  Subject, CDC COVID-19 BOLO meeting.
13     6/10/2021.
14          Q.  Okay.  So let's go back -- well, the first
15     item on here, it says "On Wednesday June 9, 2021 at
16     4:23 PM Crawford, Carol wrote."
17               Can you read that to -- into the record?
18          A.  Yes.
19               "We would like to invite digital platforms
20     to attend our third short 'Be On The Lookout'
21     meeting on COVID.  Let us know if you have questions
22     and feel free to forward this message to anyone in
23     your organization that should attend."
24          Q.  And did you send these out separately to
25     all the -- withdrawn.
```

```
 1                   You sent this particular one to Todd
 2     O'Boyle at Twitter; right?
 3          A.   The formatting of the email is odd.  But I
 4     don't believe I did that.  I believe I had one
 5     appointment and I blind copied everyone, so the
 6     emails -- I think that's just because he replied, it
 7     looks like it's just him.
 8          Q.   Okay.  But you think when you sent these
 9     out you sent them out to all the social media places
10     at once?
11          A.   I do.  And I think when we were looking at
12     the other exhibit I wondered the same thing, but I
13     think that was the situation.
14          Q.   All right.  That explains it for me.
15                   And did you -- do you know if this meeting
16     in June, I think it would be, ever took place?
17          A.   I don't believe it did.  And this is a
18     morning question.  I'm starting to think maybe
19     Juneteenth was a new holiday we weren't expecting
20     that conflicted with the third BOLO meeting and
21     maybe that is why we didn't end up having it and we
22     sent the materials out via email.
23          Q.   All right.  And who tasked you with
24     sending out the BOLO messages?  Why were you doing
25     it?
```

```
 1        A.  Because I was the main person that was the
 2   CDC point of contact to talk to Facebook, Twitter
 3   and the platforms since our job was to lead digital
 4   media.
 5             MR. VECCHIONE:  Okay.  You can put that
 6   aside.
 7             (Plaintiffs' Exhibit 42 marked.)
 8   BY MR. VECCHIONE:
 9        Q.  Exhibit 42.
10             MR. VECCHIONE:  And I feel that someone
11   has added 43 in here, so I do apologize.  That's a
12   late addition.
13             MR. GILLIGAN:  I thought it was Carnac
14   time.
15             MR. VECCHIONE:  No.
16   BY MR. VECCHIONE:
17        Q.  So, once again, please just name the date
18   and the subject matter, and then take a look at it.
19        A.  Yeah.  Subject:  Booster shots, regarding
20   booster shots.  It was sent on 10/28/2021.
21             Okay.
22        Q.  All right.  Do you recognize this
23   document?
24        A.  Not specifically.
25        Q.  Can you describe what it is?
```

CAROL CRAWFORD  11/15/2022

Page 250

```
 1        A.  It's a conversation about some booster
 2   guidance updates that are occurring and some
 3   requests from Google to review some of the changes
 4   that they were considering on the search result
 5   pages.
 6        Q.  All right.  And the date is -- I think it
 7   starts, if you look at the last page, on
 8   September 30th, 2021.
 9        A.  Yes.
10        Q.  And that's from Stanley Onyimba to Fred
11   Smith.
12            Who is Fred Smith?  He's new.
13        A.  He's a direct -- he reports to me.  He was
14   the technical person I mentioned who usually
15   attended the Google meetings with me.  I was out of
16   town this date, so I wasn't on the email.
17        Q.  All right.  And he -- well, I think he
18   sends you the email?
19        A.  Yeah.
20        Q.  Just you're cc'd?
21        A.  Maybe.  I don't believe I was in town,
22   though --
23        Q.  Okay.
24        A.  -- when this was occurring.  I don't see
25   myself cc'd on Stanley's email to Fred.
```

Case 3:22-cv-01213-TAD-KDM Document 206-3 Filed 03/06/23 Page 332 of 910 PageID #:
11195

```
 1          Q.  All right.  Why is -- do you have any
 2    knowledge why is Stanley Onyimba sending this to
 3    Fred?  What is the purpose of this?
 4          MS. SNOW:  Objection.  Calls for
 5    speculation.
 6          A.  Are you going to re-ask the question?
 7    BY MR. VECCHIONE:
 8          Q.  No.
 9          A.  I mean --
10          Q.  What's your understanding of why he's
11    sending this --
12          A.  Yes.
13          Q.  -- to CDC?
14          A.  Well, I don't -- because the screenshots
15    are not available that are attached or put in here,
16    I can't directly explain this, but sometimes on
17    those Google panels that I mentioned they would
18    highlight specific things like, they would -- they
19    would, you know, before the search results came up,
20    they would highlight a link.  And I think that they
21    were considering -- considering taking some words
22    that they saw on vaccines.gov and add it to that
23    panel, and they wanted to be sure it was right and
24    they were asking us.
25          Q.  All right.  And then Fred responds that it
```

CAROL CRAWFORD 11/15/2022

Page 252

```
 1    looks okay to him, but he's not the -- he's not an
 2    expert on this?
 3         A.  Correct.
 4         Q.  All right.  And so -- and then Mr. Smith
 5    writes -- now, after that -- after that, you know, I
 6    don't know, I'm going to go check with some people,
 7    Mr. Smith writes back:  "Hi, Stanley, I heard back
 8    from some folks.  No heartburn over the messages
 9    proposed.  Cheers, Fred."
10         Do you see that?
11         A.  Yes.
12         Q.  Did I read that correctly?
13         A.  Yes.
14         Q.  Do you know who "some folks" are?  Who did
15    he check with?
16         A.  I don't know who he checked with.
17         Q.  Okay.  And then the next -- I'm having a
18    hard time -- I can read the message.  Do you know
19    when that was sent, the next message up?
20         A.  The one from Jan and Megan?
21         Q.  Yeah.
22         A.  It looks like October 28, 2021.
23         Q.  So you go all the way up to the next -- on
24    page 1, and then you read down?
25         A.  That's what it appears, mm-hmm.
```

```
 1          Q.  All right.  Why don't you take -- so can
 2     you -- you came back, apparently, and emailed
 3     Antonio [sic] -- Jan and Stanley and the folks at
 4     Google on October 28th at 5:11; right?
 5          A.  Yes.
 6          Q.  Okay.  And you said:  "This looks good,
 7     thanks for checking," in the middle there?
 8          A.  Mm-hmm (affirmative).
 9          Q.  The next part?
10          A.  (As read)  Yes.  We can discuss the
11     pediatric vaccines early next week but let me give
12     you some general info:  ACIP is likely to vote on
13     this on November 2nd.  CDC is likely to start
14     posting final information on November 3rd...if that
15     helps to know.  There will be many updates so the
16     changes might span over a few days.  We are also
17     looking ahead and misinformation and hope to have a
18     BOLO type meeting later that week with the platforms
19     that are interested.
20          Q.  And who's ACIP?
21          A.  The Advisory Council for Immunization
22     Practices, I believe, I think that's right.
23          Q.  And do you know whether you had a BOLO
24     meeting for this?
25          A.  I don't -- I don't believe that we ever
```

```
 1   had one.
 2          Q.  So the email states that --
 3              You can put that aside.
 4              (Plaintiffs' Exhibit 43 marked.)
 5   BY MR. VECCHIONE:
 6          Q.  Let's go to -- yeah, let's go to the last,
 7   43.
 8              Once again for Exhibit 43 please state the
 9   subject matter line, and then the -- and who it --
10   what the date of it is?
11          A.  Subject:  Claims review.  6/29/2022.
12              I have read it.
13          Q.  Okay.  So can you read the -- well, who is
14   Rachel Gruner?
15          A.  She is my new point of contact at Google.
16   She replaced Jan Antonaros.
17          Q.  And who's Lindsay Steele?
18          A.  Lindsay Steele replaced Stanley.
19          Q.  Onyimba?
20          A.  "O".
21          Q.  Okay.  And they're both -- their emails
22   are here in the to line; right?
23          A.  Yes.
24          Q.  All right.  And if you could read the
25   after Hi, Carol, Hi, Fred from Rachel, what does she
```

1    say here?

2        A.   "The YouTube policy team is requesting

3    evidence-based input on the claims below.  In the

4    past, the CDC has reviewed COVID information claims

5    and commented true or false plus any additional

6    context needed."

7        Q.   And then what are the claims?

8        A.   (As read)  Claim:  High dosage of

9    progesterone is a safe method of reversing chemical

10   abortion, in parentheses, mifepristone and

11   misoprostol.

12            Sorry.

13            (As read)  Claim:  High doses of

14   progesterone is an effective method of reversing

15   chemical abortion, in parentheses, mifepristone and

16   misoprostol.

17       Q.   All right.

18       A.   "Please let me know if you have questions

19   or concerns."

20       Q.   And then what -- how do you respond?

21       A.   "I'll check on this, but I think I'll

22   probably end up needing to refer you to another

23   agency.  I'll get back to you."

24       Q.   So this -- this -- is it your

25   understanding this didn't have anything to do with

1   **COVID-19 or vaccines?**

2       A.  It definitely didn't have anything to do

3   with COVID-19 or vaccines.

4       **Q.  Do you know why it was sent to you?**

5       A.  Well, as COVID's -- our focus is not

6   solely on COVID.  We're focusing on other topics.  I

7   think Rachel thought that we might be able to help

8   with this topic as well.

9       **Q.  Okay.  Do you know who you sent it, what**

10  **agency you sent it to, if any?**

11      A.  I -- I didn't know.  I called one of our

12  centers and asked if this was something that CDC

13  dealt with.  I didn't think that we did, and they

14  confirmed that we do not.  And I don't think they

15  had a suggestion on where to refer this to, but I

16  can't recall for sure.

17          MR. VECCHIONE:  All right.  I would like

18  to take a brief break and have the court reporter

19  put my last exhibit together and give you copies

20  and then --

21          MR. GILLIGAN:  There is a 44, too?

22          MR. VECCHIONE:  -- confer, confer with

23  counsel, and I think we'll be finishing up.

24          (Comments off the record.)

25          THE VIDEOGRAPHER:  Off the record at 5:07.

**CAROL CRAWFORD  11/15/2022**

```
 1                    (Recess 5:07 p.m. - 5:19 p.m.)

 2                    THE VIDEOGRAPHER:  Back on the record at

 3          5:19.

 4                    (Plaintiffs' Exhibit 44 marked.)

 5          BY MR. VECCHIONE:

 6               Q.  All right.  Ms. Crawford, this is going to

 7          be Exhibit 44.  And it will have -- once again, read

 8          the subject line and then tell me what the date was.

 9               A.  Subject:  "Themes that have been removed

10          from misinform."  I am sure that was typo.

11          3/10/2021.

12                    Okay.

13               Q.  All right.  Let's go to the back end of

14          the exhibit.  And the first email chain is from

15          March 10th, 2021 from you to Payton Iheme; is that

16          correct?

17               A.  Yes.

18               Q.  And it says:  "Themes that have been

19          removed for misinfo."  And I think we've established

20          that's misinformation; correct?

21               A.  Yes.

22               Q.  And you say to her:  "We mentioned this on

23          a call last week and you said you'd be sending

24          something as other had asked -- is that available

25          yet by chance?"
```

```
 1              What were you telling her?  What did you
 2   mean?
 3         A.  This is what I was referencing on a
 4   previous exhibit that one of our teams that was
 5   doing those vaccine confidence reports and those
 6   research reports, they were wondering if we -- if
 7   they had info on the -- on the types of posts that
 8   were removed and the themes because they were
 9   worried that we could only see the live posts and so
10   we wouldn't know if there was also confusion about
11   other areas that had been removed.
12         Q.  And she --
13         A.  I feel pretty confident that that is what
14   this is about.
15         Q.  And she responds to you.  "Are you looking
16   for types of COVID-19 misinfo we remove"; right?
17         A.  Yes.
18         Q.  "I think it may be worth a separate
19   meeting to have some of our leads discuss the
20   approach/what they are seeing and doing.  Would that
21   work?"  That's what you said?
22         A.  Yes.
23         Q.  And what are her leads; what was your
24   understanding?
25         A.  Just like I would bring people that were
```

**CAROL CRAWFORD  11/15/2022**

Page 259

```
 1   in charge of different areas, sometimes she would
 2   bring people that had more expertise.  Payton and I
 3   did not know everything in our respective
 4   organizations, so I assume it was a lead for
 5   something, someone in this area.
 6        Q.  All right.  And then you respond to her on
 7   March 10th at 9:24; correct?
 8        A.  Yes.
 9        Q.  "Yes."  And you say "you mentioned
10   that" -- is that White House?
11        A.  Yes.
12        Q.  "And HHS"?
13        A.  Yes.
14        Q.  "Had asked so you'd get it to us"; right?
15        A.  Yes.
16        Q.  "I think it is wanted as part of
17   analysis -- so are you thinking there is no
18   report/file to send?"
19           Is that your question to her?
20        A.  Yes.
21        Q.  All right.  And what you say there is when
22   White House and HHS ask Facebook for this
23   information, they assumed that Facebook would
24   provide it to them; correct?
25              MS. SNOW:  Objection.  Calls for
```

Case 3:22-cv-01213-TAD-KDM Document 206-3 Filed 03/06/23 Page 260 of 345 PageID #: 11204

```
 1    speculation.

 2    BY MR. VECCHIONE:

 3         Q.   You can answer.

 4         A.   Well, I think it was poorly worded by

 5    myself and kind of typo maybe.  But what this was

 6    was I recall we asked on the meeting if they had

 7    this data, like, because we wanted it.  And I think

 8    she said, Oh, we did something like this for the

 9    White House or HHS.

10              This is my memory of it.

11         Q.   Okay.  This is one of your weekly

12    meetings, or a BOLO?

13         A.   I think it was at a weekly meeting.

14         Q.   All right.  And then the next thing she

15    says back to you is:  (As read)  It wasn't a report,

16    but rather a discussion.  We were setting up a

17    meeting with White House and HHS to discuss more

18    likely later this week or early next week.  Perhaps

19    the CDC rep could participate or HHS share out?

20              Is that what she says?

21         A.   Yes.

22         Q.   What does HHS share out mean?  That they'd

23    give it to you?

24         A.   Yes.  Oh.

25              MS. SNOW:  You're good.  You're good.
```

**CAROL CRAWFORD  11/15/2022**

```
 1   BY MR. VECCHIONE:
 2        Q.  So let's clean up the record a little.
 3   What is an HHS share out?  Does that mean they give
 4   you whatever they are provided?
 5        A.  Yes.
 6        Q.  All right.  So it was your understanding
 7   that Facebook was having the same kind of meetings
 8   you were having with them with White House and HHS?
 9        A.  I don't know that in relation to this
10   email.  I was assuming that.  But I do think that
11   they did have meetings with the agencies.
12        Q.  And could you read what you respond to her
13   on May 10th at 9:30 a.m.?
14        A.  "Oh, I assumed it was a report.  Who at
15   HHS is in the meeting?"
16        Q.  And what did she respond to you at 9:32?
17        A.  (As read)  Josh Peck would be the HHS rep
18   once a meeting is confirmed based on that I see him
19   at a previous discussions or meetings with the White
20   House.
21        Q.  Do you know who he is?
22        A.  Yes.
23        Q.  Who is he?
24        A.  I don't know his specific title, but he, I
25   believe, during this time was running the HHS COVID
```

```
 1    communication marketing campaign.
 2         Q.  All right.  And did you interface with him
 3    in any of your work?
 4         A.  Yes.
 5         Q.  Would he be at these, any of your weekly
 6    meetings?
 7         A.  No.
 8         Q.  All right.  Would he be at your BOLO
 9    meeting?
10         A.  No.
11         Q.  All right.  Next at 9:36 she adds
12    something.  What does she say?
13         A.  (As read)  And of course we are using
14    CrowdTangle as well to visualize the current trends
15    as well.  Lauren has been working on that and can
16    give a refresher if needed.  I know she has been
17    sending reports as well.
18         Q.  And who's Lauren?
19         A.  Lauren is the one who's been -- sent those
20    biweekly CrowdTangle reports during this time frame.
21         Q.  Okay.  And then you respond to her at
22    9:43:56 seconds.  What do you say?
23         A.  (As read)  They want to see what you guys
24    proactively have removed that might not be in those
25    reports.  My guess is a short meeting with Lis
```

**CAROL CRAWFORD  11/15/2022**

1  Wilhelm on the vaccine confidence team is what is

2  needed if Facebook is willing to do it.  Doesn't

3  seem to me like that would be -- like it should be

4  part of the White House HHS meeting.

5      Q.  Who's Lis Wilhelm?

6      A.  She is the group that was creating those

7  vaccine confidence reports that was wondering if

8  they had all the data reflected in them, and what

9  the people were worried about, or confused about.

10  And she was thinking that if the data -- if we knew

11  the kinds of things that were removed, it might give

12  a fuller picture for those reports.

13      Q.  Okay.  And then you discuss a time for

14  another meeting, and I think it ends at -- this

15  chain ends at 3:10, 9:54 a.m.:  Let's plan on next

16  Thursday then.

17          Do you know whether you ever had that

18  meeting?

19      A.  I think we did.

20      Q.  And do you know what was discussed there?

21      A.  I think that the vaccine confidence team

22  came, and I don't -- and we discussed what they

23  might have that would give them that fuller picture.

24      Q.  You can put that aside.  I have got a few

25  followup questions.

```
 1        A.  Okay.

 2        Q.  At any of your -- in flagging any material

 3   for any of the social media issues, themes, facts,

 4   whatever you flag, can you say whether or not you

 5   flagged any information from the Great Barrington

 6   Declaration?

 7        A.  I don't know what that is.

 8        Q.  Okay.  How about Jay Bhattacharya?

 9   Anything from him?

10        A.  I don't know who that is.

11        Q.  Marty Kulldorff.  Anything from him?

12        A.  I don't know who that is.

13        Q.  Aaron Kheriaty.  Anything from him?

14        A.  I don't know who that is.

15        Q.  Jim Hoft, or Gateway Pundit?

16        A.  I don't know who that is.

17        Q.  All right.  And Jill Hines?

18        A.  I don't know who she is.

19        Q.  All right.  And I think I have asked you

20   before, but bear with me.  Have you flagged anything

21   from Governor Michael Parson?

22        A.  I -- well, I may or may not have known the

23   name of the governor.  But I don't recall any

24   specific who posted anything we flagged.  That might

25   be a better way to answer these questions.
```

CAROL CRAWFORD  11/15/2022

```
 1          Q.  Okay.  And that's --
 2          A.  I don't remember anybody associated with
 3     the example posts that we sent.
 4          Q.  Okay.  And that would include -- I'm doing
 5     this for the record, you understand.  I understand
 6     your answer.
 7          A.  Yes.
 8          Q.  That would include Eric Schmitt, Jeff
 9     Landry and John Bel Edwards?
10          A.  Yes.
11          Q.  Thank you.  And now, finally, on the BOLO
12     meetings, who ran the BOLO meetings?
13          A.  I ran the BOLO meetings.
14          Q.  In what manner?  How did you do it?
15          A.  I opened up the meeting, introduced
16     myself, gave context for why we were doing the BOLO
17     meeting in brief.  And then I believe that
18     Christopher went through the slide decks, and I
19     occasionally piped in on them.
20          Q.  Lewitzke?
21          A.  Yes.
22          Q.  And so he -- these slide decks, would they
23     be like the table you showed me or that we looked at
24     with examples of the shedding and the microchips in
25     the bloodstream?
```

**CAROL CRAWFORD  11/15/2022**

Page 266

```
 1          A.  They were similar to the table, but they
 2     were more like this is a theme, and then there'd be
 3     maybe a little info about what the theme was and
 4     then maybe a couple of example posts.  And then
 5     there would be a slide maybe with CDC links or
 6     information related to that theme.
 7          Q.  All right.
 8          A.  So it was more than just a table.  It had
 9     more context to it.
10          Q.  How long did the meetings go?
11          A.  They were short.  I mean, maybe they were
12     20 minutes.
13          Q.  And what did you and Mr. -- well, first,
14     what did you hope to accomplish by those meetings?
15          A.  The same thing that I've been referencing.
16     I mean, our goal is to be sure that credible
17     information about COVID was out there.  A lot of
18     people seek information on platforms.  We thought
19     that by giving the platform scientific information
20     it might help in our goals to being sure that
21     credible information could be found.
22          Q.  And uncredible information would not be
23     found; correct?
24               MS. SNOW:  Objection, mischaracterizes
25     testimony.
```

```
 1   BY MR. VECCHIONE:
 2        Q.  You can answer.
 3        A.  I did want the credible information to be
 4   found in advance of the uncredible information.
 5        Q.  You at least wanted upgraded over --
 6        A.  Yes.
 7        Q.  -- uncredible information?
 8        A.  Yes.
 9        Q.  Do you recall anything anyone at any of
10   the social media platforms asked at any of these
11   BOLO meetings?
12        A.  They weren't able to ask questions during
13   the BOLO meetings.
14        Q.  Why was that?  Tell me how it ran.
15        A.  I think we talked about that this morning.
16   They are muted because the thought was they're
17   competitors, and they could ask questions
18   individually later.
19        Q.  Got it.  One second.
20            (Mr. Vecchione conferring with Mr. Sauer.)
21   BY MR. VECCHIONE:
22        Q.  Did they ask any questions individually
23   later that you recall?
24        A.  No, I don't think that they did.
25            MR. VECCHIONE:  All right.  I have no
```

```
 1   further questions at this time.
 2           MS. SNOW:  Okay.  Nothing further.  No
 3   questions for defense.
 4           MR. VECCHIONE:  And you already said
 5   you'll read, right, at the beginning?
 6           MS. SNOW:  I said that at the beginning,
 7   so I didn't want to forget at the end.
 8           MR. VECCHIONE:  All right.
 9           THE VIDEOGRAPHER:  Okay.  I've got to ask
10   on the record, what about video copies for
11   everybody?  Anybody?
12           MR. SAUER:  We want video as soon as it's
13   available.
14           THE VIDEOGRAPHER:  So you want synced,
15   non-synced?
16           MR. SAUER:  I think synced syncs the video
17   to the transcript?
18           THE VIDEOGRAPHER:  Yes, I believe so.
19           MR. VECCHIONE:  And we -- I think what
20   we've been doing, we're going to do is give the
21   originals to her to put the record together, the
22   transcript together, the original exhibits.
23           MR. GILLIGAN:  The original exhibits, yes.
24           MR. SAUER:  So there should be -- that
25   stack of exhibits should go to the court reporter in
```

**CAROL CRAWFORD  11/15/2022**

```
 1   front of the witness.

 2            THE VIDEOGRAPHER:  Do you want a copy also

 3   for your group?

 4            MR. SAUER:  No, just one.  We're both

 5   plaintiffs.

 6            MR. VECCHIONE:  And there is no Exhibit.

 7   25 that's the one we skipped.  So don't be thinking

 8   it's lost.

 9            MS. SNOW:  But, yeah, we would like a copy

10   of the video as well.

11            THE VIDEOGRAPHER:  Okay.  A synced copy?

12            MS. SNOW:  Yes.

13            THE VIDEOGRAPHER:  So how about you, sir?

14            MR. GILLIGAN:  She's with us.

15            THE VIDEOGRAPHER:  So just one for each.

16            MS. SNOW:  Yeah.

17            THE VIDEOGRAPHER:  Got you.  Thank you.

18   And we are off the record at 5:33.

19            (Concluded at 5:33 p.m.)

20            (Signature reserved.)

21

22

23

24

25
```

CAROL CRAWFORD  11/15/2022

**Page 270**

```
 1                    C E R T I F I C A T E

 2    STATE OF GEORGIA:

 3    DEKALB COUNTY:

 4                I, Maureen S. Kreimer, a Certified Court

 5    Reporter for the State of Georgia, before whom the

 6    foregoing deposition was taken, do hereby certify:

 7                That CAROL CRAWFORD, the witness whose

 8    deposition is hereinbefore set forth in pages 1 to 269,

 9    was duly sworn by me and that such deposition is a true

10    record of the testimony given by the witness.

11                I further certify that I am not related to

12    any of the parties to this action by blood or marriage,

13    and that I am in no way interested in the outcome of this

14    matter.

15                IN WITNESS HEREOF, I have hereunto set my

16    hand this 18th day of November, 2022.

17

18

19

20

21    _____

22    MAUREEN S. KREIMER, CCR-B-1379

23    Notary Public in and for the

24    State of Georgia.  My Commission

25    Expires August 14, 2024.
```

```
 1                          LEXITAS LEGAL

 2

 3   November 17, 2022

 4
     KYLA SNOW, ESQ.
 5   U.S. Department of Justice
     1100 L Street N.W.
 6   Washington, DC 29530

 7   IN RE: STATE OF MISSOURI ex rel. ERIC S. SCHMITT,
             Attorney General, et al. v. JOSEPH R.
 8           BIDEN, JR., in his official capacity as
             President of the United States, et al.
 9
     Dear Ms. Snow:
10
     Please find enclosed your copies of the deposition of
11   CAROL CRAWFORD taken on November 15, 2022 in the
     above-referenced case. Also enclosed is the original
12   signature page and errata sheets.

13   Please have the witness read your copy of the
     transcript, indicate any changes and/or corrections
14   desired on the errata sheets, and sign the signature
     page before a notary public.
15

16   Please return the errata sheets and notarized

17   signature page within 30 days to our office at 711 N

18   11th Street, St. Louis, MO 63101 for filing.

19

20   Sincerely,

21

22

23   Lexitas Legal

24

25   Enclosures
```

**CAROL CRAWFORD  11/15/2022**

```
 1                    ERRATA SHEET
    Witness Name: CAROL CRAWFORD
 2  Case Name: STATE OF MISSOURI ex rel. ERIC S. SCHMITT,
              Attorney General, et al. v. JOSEPH R.
 3            BIDEN, JR., in his official capacity as
              President of the United States, et al.
 4  Date Taken: NOVEMBER 15, 2022

 5  Page #_____   Line #_____

 6  Should read:  _____

 7  Reason for change: _____

 8

 9  Page #_____   Line #_____

10  Should read:  _____

11  Reason for change: _____

12

13  Page #_____   Line #_____

14  Should read:  _____

15  Reason for change: _____

16

17  Page #_____   Line #_____

18  Should read:  _____

19  Reason for change: _____

20

21  Page #_____   Line #_____

22  Should read:  _____

23  Reason for change: _____

24

25  Witness Signature:  _____
```

```
 1   STATE OF _____)

 2

 3   COUNTY OF _____)

 4

 5   I, CAROL CRAWFORD, do hereby certify:

 6         That I have read the foregoing deposition;

 7         That I have made such changes in form

 8   and/or substance to the within deposition as might

 9   be necessary to render the same true and correct;

10         That having made such changes thereon, I

11   hereby subscribe my name to the deposition.

12         I declare under penalty of perjury that the

13   foregoing is true and correct.

14         Executed this _____ day of _____,

15   20___, at _____.

16

17

18

19                       _____

20                       CAROL CRAWFORD

21

22                       _____

23                       NOTARY PUBLIC

24   My Commission Expires:

25
```

**CAROL CRAWFORD 11/15/2022**

**A**

**a.m** 1:15
31:1,1
34:5 100:2
102:10
261:13
263:15
**Aaron** 6:6
8:15
264:13
**Abbott** 51:5
**ability**
10:24
88:11
156:17
157:7
164:10
**able** 75:23
108:17
122:17
123:9
146:5
161:10
172:24
173:12
215:14
256:7
267:12
**abortion**
255:10,15
**above-re...**
271:11
**access** 49:12
71:11
97:11,20
147:12
148:8
213:8
217:24
**accessing**
206:21
**accomplish**
88:24
266:14
**account**
138:9
215:1,3
216:20
218:2,18

**accounts**
4:18,21
157:5
196:20
201:20
212:21
217:11,24
218:7
**accurate**
27:15 89:4
162:22
**ACIP** 253:12
253:20
**ACS** 183:6
**acting** 32:6
**action**
270:12
**actionable**
212:9
**actioned**
211:13
**activities**
69:11
164:11
**activity**
41:3,4
74:6 75:17
**actual**
108:11
111:10
214:2
244:3
**ad** 180:21,25
224:9
**Adams** 119:8
119:9
150:16
153:1,6
223:1
**ADCS** 107:23
**add** 42:18
58:17 67:9
76:19 77:1
77:4 78:15
141:3
184:23
192:11
229:13
251:22

**add-on** 32:10
**added** 63:4,5
70:6 77:6
157:24
194:24
195:1
227:10
249:11
**adding** 55:21
61:11
76:18
82:17
129:10
**addition**
128:14
249:12
**additional**
45:24
48:22
78:10
107:8
159:21
162:11
167:1
188:4
218:19
219:12
238:19
255:5
**address**
23:21 29:1
38:14
83:11
87:16,21
88:8
125:24
129:5
172:24
174:20
175:4
207:25
244:15
**addressed**
108:16
**adds** 262:11
**adjust** 54:20
58:2 81:12
**administ...**
12:5

**administ...**
48:21
95:18
98:24
215:15
**Adrien** 86:12
238:8,9
**Adrienne**
100:1
**ads** 222:20
222:21
**adults** 46:4
164:7
**advance**
267:4
**adverse**
122:23
123:1,10
140:7
168:11
**advice** 169:9
237:19
**advise** 71:4
104:22
**advisement**
84:21
100:16
**advisory**
153:17,18
253:21
**Affairs**
12:23 13:8
13:10
14:10 15:4
19:9 32:7
32:18
**Affairs'**
12:19
**affect** 138:3
164:10
**affirmative**
16:3,25
17:12
19:18 23:9
39:17
40:24
41:23
43:15 44:7
45:21

62:25
67:11
107:6
108:20
114:11
117:15
128:25
129:22
130:7
134:8
141:16
155:11
166:13
181:4
185:18
187:5
190:22
196:3
202:9
207:1
216:16
242:25
243:20
253:8
**age** 169:16
169:25
185:25
187:4,6
**agencies**
92:2
109:23
221:9
223:24
232:4,6,16
232:18
233:8,11
239:21
261:11
**agencies'**
164:23
**agency** 11:19
15:17
95:19
127:25
128:5
140:12
164:21
255:23
256:10

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| **agenda** 3:4 | 271:7,8 | **Anant** 7:2 | **answer's** | 247:3 |
| 103:4 | 272:2,3 | 8:25 | 120:14 | 249:11 |
| 118:23 | **alert** 4:1 | **Anant.ku...** | **answered** | **apparently** |
| 126:15 | 5:2 152:24 | 7:4 | 41:8 74:13 | 91:24 |
| 221:14,16 | 153:8,11 | **and/or** | 80:16 | 194:18 |
| 221:17 | 153:12,13 | 271:13 | 82:20 99:8 | 237:15,16 |
| 224:2 | 153:14,16 | 273:8 | 108:15 | 253:2 |
| 225:21 | 153:17,18 | **animals** | 113:19 | **appear** |
| 240:7,9 | 188:11 | 120:17 | 140:21 | 120:11 |
| **agendas** | 190:14 | **announce...** | 165:7 | **appearance** |
| 223:24 | 219:24 | 193:1,11 | 176:12 | 68:15 |
| **aggregate** | 220:1,14 | 193:18 | **answering** | **APPEARANCES** |
| 154:19 | **algorithm** | 195:18,24 | 68:19 | 6:1 |
| **ago** 51:23 | 53:4,8 | **answer** 10:3 | **answers** | **appearing** |
| 56:21 96:6 | 138:20 | 10:10,12 | 74:17 | 146:17 |
| 99:1 | 155:18 | 35:1 46:22 | 114:16 | 209:2 |
| 182:19 | **algorithms** | 47:17 | 115:2,5 | **appears** |
| **agree** 10:13 | 237:14 | 54:11 69:5 | 129:6,24 | 25:10 |
| 49:19 | **alias** 23:16 | 73:14 | **anti-vac...** | 41:16 56:6 |
| 132:4 | **alleged** | 76:25 78:6 | 55:6 | 77:14 |
| 172:5 | 53:22 58:6 | 78:20 79:4 | **anticipated** | 119:22 |
| 187:17 | **allergic** | 79:18 | 228:14 | 122:7 |
| 211:11 | 164:12 | 80:17,21 | **Antonaros** | 141:22 |
| 230:11 | **Alliance** 6:9 | 80:23 90:2 | 21:1 174:8 | 203:5 |
| **agreed** 47:9 | **allowed** | 93:22 97:8 | 176:6 | 252:25 |
| 57:14 | 77:10 | 101:23 | 177:7 | **applied** |
| 60:23 | 93:24 94:4 | 106:8,21 | 192:22 | 136:22 |
| **agreement** | 94:9 | 107:2 | 243:17 | **apply** 104:23 |
| 31:11 71:6 | 217:21,22 | 112:25 | 254:16 | 105:3 |
| 102:17 | **allowing** | 115:4 | **Antonaros'** | 169:21 |
| 109:21,23 | 146:15 | 116:10 | 176:23 | **appointment** |
| **Ah** 125:7 | **allows** | 121:8 | **Antonio** | 37:4,24,25 |
| **ahead** 31:5 | 214:10 | 129:16 | 253:3 | 44:14,23 |
| 31:23 | **alternate** | 136:8 | **anybody** | 116:22 |
| 67:16 | 208:12 | 137:4 | 265:2 | 178:15 |
| 74:20 | **alternative** | 146:5 | 268:11 | 221:16 |
| 81:16 | 209:17 | 152:1 | **anymore** | 242:20 |
| 104:13 | **Alzheimer's** | 158:8,25 | 13:15 | 244:1,3 |
| 199:17 | 122:3 | 159:17 | **anything's** | 248:5 |
| 253:17 | **amplific...** | 161:19 | 171:2 | **appointm...** |
| **AII** 111:2 | 80:2,4 | 180:16 | **anyways** | 30:13 |
| **aiming** | 81:17 | 186:12 | 176:4 | **appreciate** |
| 242:11 | **amplify** | 194:1 | **apologies** | 27:20 |
| 245:16 | 227:3 | 236:5 | 33:16 96:7 | 109:12 |
| **Airton** | **analysis** | 241:10 | **apologize** | 206:6 |
| 222:17 | 259:17 | 260:3 | 41:13 | **appreciated** |
| **Airton's** | **analyze** | 264:25 | 86:24 | 55:20 |
| 224:8 | 75:12 | 265:6 | 167:16 | **approach** |
| **al** 1:4,10 | 80:13 | 267:2 | 245:9 | 76:17 77:3 |

**CAROL CRAWFORD  11/15/2022**

82:17
208:13
209:17
approach...
258:20
approached
29:18
appropriate
217:4
approved
169:23
201:15
203:21
204:2
approving
161:13
April 3:6
13:3,14
15:1 16:1
46:2 65:25
77:13
185:17
186:7
188:15
196:21,25
221:10
234:10
237:8,10
238:7
AR 42:6
area 114:22
114:23
137:14
138:8
140:14
143:4
146:4,8
150:21
154:11
224:17
259:5
areas 34:1
56:18
59:11 76:1
87:23
150:23
175:13
211:18
258:11

259:1
argument...
138:7
163:10
arguments
39:20
arrange
36:16 37:1
246:16
arranged
20:19
arrangem...
18:22
arranging
246:13
ARTF 42:1,3
article 3:6
3:7 4:7
7:19 53:19
articles
112:20
as-needed
223:25
aside 22:3
43:8 48:13
60:2 85:4
85:5 90:24
100:19
115:9
118:5
126:7
144:25
165:12
168:21
171:13
179:8
187:8
196:13
200:14
205:2
219:18
221:2
226:3
236:25
239:12
247:6
249:6
254:3
263:24

asked 14:11
42:21
46:14
69:10,22
75:3 77:4
80:16
81:17
82:20
98:19 99:2
99:6,7
106:24
125:23
130:18
146:18
152:3
164:1
165:7
166:22
174:11
176:11
180:14
184:3
185:16
188:1
197:5,18
197:18
198:6
201:1,24
204:21
209:11
215:2,2
230:13,24
230:25
231:18,19
231:22
232:1
236:8
238:20
240:21
256:12
257:24
259:14
260:6
264:19
267:10
asking 9:25
18:20 26:8
27:5 34:17
42:14,18

48:4,6
51:8 55:7
75:22 77:1
77:2 78:15
80:6,14
82:22
90:11
94:11
99:13
117:25
123:25
130:19
139:21,24
149:12
150:18
157:8
158:18
159:3,3,8
163:24
167:21
169:8,10
170:18,21
173:2
182:8
186:4,5
200:11
202:16,20
204:22
215:12
216:13
230:25
231:13
242:20
251:24
asks 46:18
65:18
79:13
96:25
140:5
157:15
aspect 83:17
Aspinall
92:5 97:5
assembled
192:18
assess
169:23
assessment
166:25

assigned
114:21
124:1
assist 154:1
assistance
17:7 224:7
assistant
50:24 61:7
63:11
assistants
86:15
assisting
158:15
associate
11:9,12
183:5
associated
37:24
265:2
assume 35:19
44:2 59:23
105:18
125:12
135:19
160:6
197:24
212:10
223:3,19
259:4
assumed
176:11
259:23
261:14
assumes 79:1
110:7
137:22
138:6
142:24
assuming
33:21
182:7
204:17
261:10
assumption
130:3
185:3
assure 49:4
135:23
asterisks

**CAROL CRAWFORD  11/15/2022**

235:10
asthma 46:4
186:15,21
187:4
AstraZeneca
169:5
Atlanta 1:18
12:13
attach 46:12
122:18
207:13
attached
5:22 7:22
25:8 52:21
60:19 61:1
62:1 63:16
63:17
185:20,21
202:13
251:15
attachment
149:11
153:7
155:5
188:18
attachments
47:18
202:10
attend 68:18
151:15,16
187:24
188:7
243:25
247:20,23
attended
120:2,3
151:8
235:7
245:1
246:12
250:15
attendee
246:7
attendees
221:18
attending
181:7
attention
52:23

63:14
Attorney 1:4
6:2 149:1
149:1
271:7
272:2
attorney...
93:21
94:20,22
attorneys
8:10
audiences
182:1
audio 97:22
August
145:17,18
146:21,25
270:25
authored
46:20
authority
135:24
authoriz...
4:3,6
137:7,10
137:12
156:2,25
160:1
163:19
167:3
169:18
available
45:25
68:18 72:4
89:6 95:19
95:25
96:16
133:24
185:6
251:15
257:24
268:13
Avenue 7:3
aware 33:18
137:18
140:6
167:2
169:2
191:23

192:1
awareness
25:5 26:14
35:18
190:7

_____

B

babies
165:15
bachelor
12:11
bachelor's
12:4
back 11:24
13:7 22:19
22:22
25:25 31:2
41:18 56:8
67:24 68:4
69:13
70:10,11
72:14
77:12,17
98:3
102:11
115:2,4,5
116:12,14
117:11
121:14
124:7,8
126:17
130:11,12
132:9
133:17
135:14
145:17
150:4
160:13
161:6
167:24,25
176:9
189:10
193:2
197:11
205:11
206:25
212:22
226:23
235:11

237:9
238:8
241:24,24
243:15
247:14
252:7,7
253:2
255:23
257:2,13
260:15
back- 12:15
background
12:16
59:24
Balog 50:17
Barnes 19:12
Barrington
264:5
based 97:10
133:12
200:12
211:18
219:9
261:18
basis 74:3,5
184:16
215:11
Bates 124:17
136:9,13
136:19
146:11
169:13
205:25
241:25
bear 264:20
becoming
38:7
beginning
16:14,19
19:11 44:5
142:15
144:16
198:22
219:11
268:5,6
behalf 6:1,6
6:15 7:1
Bel 265:9
believe

12:23 14:5
18:4 19:22
19:23 24:5
25:14
28:18
29:18,18
30:12
34:14 42:4
45:7,13
51:1,16
59:8 63:11
64:13
65:12
69:12 70:1
70:19
77:12
79:21
80:19,25
81:5,9,14
83:13,22
83:24 87:1
87:22
90:11 92:1
92:21,25
97:14
108:13
110:4
116:18
117:22
118:1
123:9,13
128:10
133:20
134:1
137:15
139:7
143:22
147:18
151:22
154:22
155:18
167:19
168:6
174:17
175:18
177:9
185:10,14
188:13
192:6

**CAROL CRAWFORD  11/15/2022**

| | | | |
|---|---|---|---|
| 196:10 | 211:22 | **bloodstream** | 267:11,13 | **brewing** |
| 197:18 | 243:5,9 | 265:25 | **BOLOs** 153:23 | 220:14 |
| 200:6 | **better** 80:7 | **Bloomberg** | 210:2,3 | **brief** 2:12 |
| 204:12,15 | 192:11 | 4:7 | **Bonds** 19:10 | 2:15 39:9 |
| 204:21 | 194:8 | **BlueJeans** | 32:13 | 39:11,13 |
| 210:22 | 229:9 | 241:4,5 | **booster** 5:14 | 39:24,25 |
| 212:2 | 242:16 | **Board** 7:20 | 249:19,20 | 43:21 44:9 |
| 214:18 | 264:25 | **body** 62:3 | 250:1 | 256:18 |
| 218:24 | **beyond** 31:12 | 164:9 | **Boosters** 4:7 | 265:17 |
| 220:18 | 40:12 | **bold** 62:9,11 | **bottom** 44:19 | **briefing** |
| 221:24 | 102:18 | 62:13 | 65:13 | 68:17,21 |
| 222:3 | **Bhattach...** | 64:19 | 124:18 | 68:23 |
| 223:16,16 | 6:6 8:15 | **bolded** 62:6 | 128:7 | **briefings** |
| 223:16 | 264:8 | 62:7 63:20 | 136:13 | 149:2 |
| 225:3 | **Biden** 1:7 | 63:23 64:6 | 146:12 | **briefly** |
| 228:8 | 8:5 271:8 | 64:8,10,21 | 148:20 | 11:25 |
| 230:20 | 272:3 | 65:8 66:4 | 169:14 | **briefs** 39:18 |
| 232:21,23 | **big** 34:17,23 | **bolding** 64:1 | 174:3 | **bring** 35:24 |
| 233:13 | 189:20 | 64:2 | 187:19 | 115:14 |
| 236:8,15 | 190:1 | **BOLO** 4:1 5:2 | 196:25 | 181:14,18 |
| 239:13 | **bigger** | 5:10,13 | 206:1 | 182:9 |
| 243:16 | 220:17 | 152:24 | 243:19 | 188:21 |
| 245:1 | **Birth** 223:17 | 153:19,20 | **box** 6:4 | 200:10 |
| 246:4,15 | **bit** 11:24 | 188:9,13 | 23:15,17 | 258:25 |
| 248:4,4,17 | 12:22 | 188:14 | **branch** 13:19 | 259:2 |
| 250:21 | 49:15 | 198:15,21 | 13:20,20 | **bringing** |
| 253:22,25 | 51:11 | 202:6 | 14:4,12,17 | 68:24 |
| 261:25 | 61:14 | 204:24 | 15:3,4,6 | 168:21 |
| 265:17 | 64:15 | 208:9,16 | 24:16 25:1 | 205:1 |
| 268:18 | 151:12 | 208:17,24 | **branches** | **Broadcast** |
| **believed** | 208:16 | 209:11,12 | 13:18 | 14:7 |
| 157:16 | **biweekly** | 209:23 | **brand** 190:7 | **broader** |
| 162:3 | 52:5 57:6 | 210:11 | **break** 30:20 | 39:16 |
| 169:25 | 57:12,13 | 213:2 | 66:1,20 | 110:6 |
| 220:20 | 57:16,19 | 219:24 | 102:2,6,7 | 182:25 |
| **bell's** 3:6,8 | 57:21 | 220:6 | 102:7 | 184:9 |
| 111:13 | 60:22 62:1 | 241:21 | 149:24 | **Brook** 92:5 |
| 112:16,19 | 142:3 | 242:5,10 | 205:4 | **building** 6:3 |
| 112:20 | 226:18 | 242:17,20 | 235:13 | 21:24,25 |
| **belong** 54:24 | 262:20 | 243:12,25 | 256:18 | 164:9 |
| 55:10 | **black** 62:5 | 245:1,14 | **breaking** | **bullet** 39:21 |
| **benefit** | **blacked** 44:8 | 246:5 | 41:24 | 82:2 |
| 140:3 | **blanking** | 247:12 | **breast** | 127:17 |
| **best** 34:10 | 21:2 152:9 | 248:20,24 | 165:14 | **bunch** 27:25 |
| 34:18 | **blind** 248:5 | 253:18,23 | **breathing** | **Bureau** 56:4 |
| 40:25 | **block** 235:14 | 260:12 | 41:11 42:9 | **buried** 129:7 |
| 77:23 | **blocked** | 262:8 | **Bretthau...** | **business** |
| 116:6 | 237:21 | 265:11,12 | 108:1 | 12:4 |
| 182:10 | **blood** 270:12 | 265:13,16 | 115:10 | **busy** 19:24 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| **C** | 190:11 | 233:14 | 141:22 | 42:24 |
| **C** 23:7 270:1 | 195:1 | 251:4 | 144:22 | 43:21 44:9 |
| 270:1 | 197:22 | 259:25 | 271:11 | 45:9 46:20 |
| **Cain** 245:18 | 198:18 | **campaign** | 272:2 | 46:20 |
| **calendar** | 221:8 | 262:1 | **cast** 174:2 | 47:12 |
| 30:12 | 222:3 | **capacity** 1:8 | **catch** 173:15 | 48:11,16 |
| 84:15,19 | 223:18 | 271:8 | 240:20,21 | 54:6,13 |
| 100:9 | 225:22 | 272:3 | **category** | 56:1,2,5 |
| 116:20 | 233:7 | **cards** 197:9 | 185:25 | 58:9,20 |
| 178:13,15 | 239:3,20 | 201:5 | 187:6 | 61:10 |
| 246:10 | 257:23 | **care** 95:10 | 203:20 | 63:24 64:3 |
| **calendared** | **call-in** 31:8 | 238:17 | **caught** | 71:7,9,11 |
| 116:21 | 31:15 | **Carnac** | 145:12 | 71:18,23 |
| **calendars** | 102:15,20 | 249:13 | **cause** 111:13 | 71:25 |
| 30:10 | **called** 17:19 | **Carol** 1:13 | 154:1 | 72:15 74:7 |
| **call** 3:5 5:4 | 17:21,22 | 2:3,7 8:4 | 169:2 | 74:18 |
| 5:9 11:10 | 69:1 | 9:5 11:3 | **caused** 168:1 | 77:17 78:1 |
| 19:4 27:22 | 136:13 | 22:24 34:5 | **causes** 122:2 | 78:9,22 |
| 29:25 30:1 | 173:11,14 | 45:22 | **causing** | 81:7 82:9 |
| 30:4,8,9 | 198:6 | 51:22 | 78:11,13 | 82:11 83:4 |
| 30:11 | 211:9 | 63:15 | 127:10 | 87:20 |
| 36:15 | 220:23 | 68:14 73:4 | 128:8 | 89:21 90:5 |
| 37:19,21 | 221:25 | 74:25,25 | 156:18 | 90:6,9 |
| 38:1 44:15 | 226:16 | 84:4 100:2 | **cc** 24:12 | 92:3,5 |
| 45:23 | 229:9 | 126:19 | 50:17 52:2 | 96:23 |
| 51:17,19 | 231:3 | 141:17 | **cc'd** 222:14 | 98:18 99:3 |
| 52:22 | 256:11 | 166:18 | 250:20,25 | 99:6,8,18 |
| 56:20 57:3 | **calling** | 176:25,25 | **cc'ing** 27:1 | 100:22,25 |
| 84:9 93:19 | 148:22 | 197:4 | 86:16 | 103:4,20 |
| 102:19 | **calls** 20:19 | 211:6,20 | **cc's** 176:6 | 103:24 |
| 103:4 | 29:20 30:5 | 216:18,19 | **CCR-B-1379** | 104:8,22 |
| 107:1 | 35:24 | 226:24 | 1:20 | 105:2,7,25 |
| 108:18 | 76:21 78:3 | 234:12 | 270:22 | 106:2,12 |
| 116:17 | 83:7 85:1 | 247:16 | **ccrawfor...** | 107:14 |
| 118:24 | 86:21 | 254:25 | 23:16 | 108:4,23 |
| 121:18 | 89:25 | 270:7 | **ccs** 119:8 | 110:20 |
| 122:8 | 93:18,20 | 271:11 | **CDC** 2:12,15 | 112:21 |
| 126:16 | 101:20 | 272:1 | 3:5 4:1,9 | 113:11,13 |
| 129:21 | 112:22 | 273:5,20 | 5:2,4,5,12 | 113:15 |
| 133:19 | 121:5 | **Carol's** | 8:7 11:5,8 | 117:13,14 |
| 134:2 | 123:3 | 206:8 | 12:2,6,8 | 118:24 |
| 173:7 | 135:10 | **Caroline** | 12:12,19 | 120:18,22 |
| 177:3,23 | 138:5 | 45:12 | 13:9 15:22 | 126:16 |
| 178:1,9,13 | 142:25 | **Carrie** 119:8 | 17:6,19 | 129:12,14 |
| 178:14 | 159:14 | 119:9,11 | 18:12 | 129:24 |
| 182:11 | 163:1 | 150:16 | 29:19 | 130:25 |
| 184:21 | 193:13 | 153:1,19 | 35:24 39:9 | 132:4,10 |
| 188:2 | 222:25 | 223:1 | 39:11 | 134:21 |
| 189:24 | 231:15 | **case** 8:19 | 41:17 42:5 | 137:5 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 138:16 | 236:8 | 79:23 82:2 | 214:11,13 | 257:14 |
| 139:24 | 239:21,21 | 83:1,4,7 | 214:14,19 | 263:15 |
| 140:1,13 | 247:12 | 83:16,16 | 218:18,22 | **chains** |
| 143:14,23 | 249:2 | 83:19 | 218:22 | 185:15 |
| 145:25 | 251:13 | 86:20 87:1 | 219:12 | 206:24 |
| 146:7 | 253:13 | 87:5 90:16 | 223:17 | 219:13 |
| 148:8 | 255:4 | 96:22 99:3 | **centers** 1:17 | **chance** 38:24 |
| 150:18 | 256:12 | 101:5,10 | 6:15 7:6 | 66:20 91:3 |
| 152:8,24 | 260:19 | 101:12 | 7:12 35:10 | 150:8 |
| 159:9,12 | 266:5 | 107:10 | 256:12 | 178:13 |
| 163:21 | **CDC's** 11:14 | 109:14 | **certain** | 211:21 |
| 164:22 | 11:15,17 | 110:16,17 | 63:20 | 257:25 |
| 166:7 | 15:15,16 | 111:3,9 | 98:19 99:2 | **change** |
| 171:23 | 27:17 29:8 | 117:19 | 101:18 | 194:13 |
| 174:18 | 43:4 47:25 | 125:12,16 | 137:12 | 272:7,11 |
| 175:2 | 52:3 59:13 | 174:18,21 | 157:9 | 272:15,19 |
| 177:4 | 89:17 | 174:22 | 194:19 | 272:23 |
| 181:6 | 113:18 | 175:3,6,14 | **Certified** | **changed** |
| 183:17 | 126:23 | 175:19,23 | 270:4 | 61:14 |
| 185:14,23 | 161:21 | 176:11,12 | **certify** | 117:6 |
| 189:23 | 167:4 | 177:4 | 270:6,11 | 145:22 |
| 192:4 | 186:13 | 179:25 | 273:5 | 148:6 |
| 193:19,20 | 191:1,16 | 182:5,9,24 | **cetera** | 156:12 |
| 193:23 | 220:12 | 184:8,11 | 197:10 | 180:18 |
| 194:4,19 | **CDC-cred...** | 184:11,16 | 201:5 | 210:22 |
| 194:20 | 18:10 | 184:23 | **chain** 22:14 | **changeover** |
| 200:20 | **cell** 35:23 | 185:9,12 | 22:18,23 | 13:16 |
| 202:12 | 36:1,2,4,6 | 197:17 | 25:9 26:7 | **changes** 47:9 |
| 210:23 | **censorship** | 201:11 | 26:21 30:2 | 192:8 |
| 212:20,21 | 176:3 | 202:22 | 33:11 | 250:3 |
| 212:22 | **Census** 55:22 | 203:14 | 35:21 | 253:16 |
| 213:6 | 56:1,2,4 | 208:1,3 | 44:23 60:6 | 271:13 |
| 215:3 | 58:17 | 209:24 | 66:3 67:21 | 273:7,10 |
| 217:3,11 | 59:15 | 210:2,5,8 | 67:22 70:7 | **channel** 3:3 |
| 218:4,5,6 | 61:10,11 | 210:11 | 74:19 | 51:5 91:10 |
| 219:24 | 70:9 71:1 | 213:13,23 | 79:20 | 91:18,24 |
| 221:9,9,18 | 71:3,8,14 | 214:21 | 83:12 | 95:14,14 |
| 222:3 | 71:19,25 | 217:3,6,23 | 91:23 | 95:16,22 |
| 223:3,22 | 72:8,15,16 | 218:7 | 97:10,16 | 97:2 98:15 |
| 223:24 | 73:6,8,11 | 234:19 | 122:11 | 99:20 |
| 224:1,14 | 73:18,25 | 235:4,16 | 160:24 | 100:6 |
| 226:9,16 | 74:9,18 | 235:19 | 172:6 | **channels** |
| 227:4 | 75:1 76:3 | 246:12 | 174:4 | 52:12 |
| 229:10,14 | 76:11,19 | **center** 11:18 | 182:8 | 62:18 |
| 230:20 | 77:5,17,22 | 14:2 15:18 | 187:20 | **characte...** |
| 232:7,16 | 77:22 78:1 | 59:1 | 207:2 | 53:7 |
| 233:13 | 78:9,14,15 | 107:13,15 | 213:10,12 | 132:10 |
| 234:7,18 | 78:22 79:9 | 107:17,22 | 226:15 | 143:20 |
| 234:25 | 79:15,18 | 160:20,21 | 238:22 | **characte...** |

**CAROL CRAWFORD  11/15/2022**

134:1
characte...
163:11
characters
174:2
charge
135:22
259:1
chart 186:9
186:11,12
186:14,15
204:19
207:14,14
207:17
211:8
chat 4:11
171:22
223:19
224:10
242:16
chats 197:5
200:25
cheating
63:8
check 41:12
70:9
114:19
121:15,20
121:24
124:24
132:16
144:10
177:20
178:17,18
178:22
179:1
182:4
216:22
235:16
252:6,15
255:21
check-in
180:9
checked
123:22
131:9
235:18
252:16
checking

66:24
117:20
197:13
209:25
253:7
Cheers 252:9
Chelsey 63:5
63:11 65:1
chemical
255:9,15
chief 15:3
192:25
193:3,8
childhood
158:4
children
66:5 157:1
157:3
162:12
164:7
165:15
167:3
169:15,19
169:22,24
choice 66:9
Chris 246:22
246:24
Christopher
83:21
86:21,22
175:12
202:25
203:1
216:4,11
216:11
217:5
265:18
circulated
114:6
circulating
89:3
153:25
citizens
71:9,13,19
71:25
101:19
City 6:4
Civil 6:9
■■■■ 23:24

■■■ @CDC...
23:8,17
claim 108:21
120:12
122:21
157:16,17
168:3,5
169:24
170:15
203:21
255:8,13
claiming
204:17
claims 4:2,5
5:15
119:16,17
124:15
126:22
129:13,14
131:8,18
132:1
138:13,16
139:1,9,24
140:2
156:1,17
157:2,12
158:16,19
159:4,21
162:11,21
163:18
166:22
167:1
169:15,22
170:9,18
170:18
172:20
182:21
184:1,2
185:20
204:1
254:11
255:3,4,7
Claims_Help
3:15
clarific...
42:15
81:15
85:24
176:10

198:5
clarified
233:22,22
clarify
31:20 55:1
64:15
82:12 97:9
104:12
124:23
147:8,25
155:2
199:18
205:24
229:13
246:11
clarifying
171:25
clean 69:19
261:2
clear 9:21
26:1 40:10
52:8
122:11
180:1
192:15
194:11
clearance
128:1,2
129:2
cleared
127:7,12
127:15,19
128:3,9
135:17,20
clearing
135:22
clicked
215:20
Clifton 1:17
close 203:4
closed
100:15
closely
193:1,11
195:18
closer 78:14
CMS 142:22
CMU 225:2
CMU/FB

221:21
224:19
co-chairs
132:20
co-lead
107:16,17
107:21
115:19
183:4
co-leads
108:2
co-morbi...
186:1
code 231:9
codes 70:20
coincidence
24:21
collab
221:22
225:7,10
225:10
collabor...
232:8
colleague
177:7
182:18
238:11,18
colleagues
177:1
214:21
234:19
collect
115:6
132:11
collective
79:25
colleges
137:20
come 32:11
66:18
72:14
117:21
140:11
144:8
183:15
195:4
204:23
218:13

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 146:9 | 124:2 | concern 54:6 | confirm | 243:1,10 |
| coming 27:18 | 135:14 | 54:13 | 96:25 | 250:4 |
| 128:15 | communic... | 63:24 | 121:3 | 251:21,21 |
| 169:19 | 53:10 | 100:24 | 133:11 | consolidate |
| 190:12 | 54:16 | 244:11 | confirmed | 90:22 |
| 191:3 | 113:19 | concerned | 256:14 | 124:8 |
| 233:10 | 116:10 | 81:7 | 261:18 | consult |
| 244:2 | 121:12 | 153:22 | confirming | 175:7 |
| commended | 123:25 | 154:5 | 156:17 | consulta... |
| 144:17 | 135:12 | 207:10,11 | conflicted | 150:15,19 |
| Comment | communities | concerning | 248:20 | consulted |
| 203:12 | 40:17 | 146:15 | confused | 236:3 |
| commented | 46:12 | concerns | 151:2 | consumer |
| 41:17 | community | 89:21 90:6 | 263:9 | 108:2 |
| 255:5 | 34:1 | 255:19 | confusion | 115:19 |
| comments | 103:25 | concluded | 29:6 54:19 | 194:5 |
| 41:6,12,14 | 234:20 | 236:12 | 56:18 58:1 | consumers |
| 41:15,20 | communit... | 269:19 | 59:11 76:1 | 134:19 |
| 97:24 98:2 | 3:10 | conclusions | 81:11 | contact |
| 205:8 | companies | 121:3 | 150:23 | 11:18 14:2 |
| 256:24 | 16:5 19:21 | 133:11 | 220:14,15 | 15:18 16:4 |
| Commission | 20:3,16 | concrete | 258:10 | 16:13,15 |
| 270:24 | 24:3 36:5 | 192:10 | Congress | 17:3,4,13 |
| 273:24 | 198:22 | condition | 125:20 | 17:17 |
| common | 208:17 | 10:23 | connect | 18:21 |
| 154:23 | 234:6 | 137:20 | 238:19 | 20:17,21 |
| 182:20 | company | conditions | 239:4 | 20:24 21:1 |
| 183:25 | 17:24,24 | 186:1 | connected | 21:7 35:4 |
| Comms 107:11 | 50:8 104:6 | conduct | 123:15 | 36:8 83:15 |
| communic... | 105:3 | 109:23 | 239:5 | 114:9 |
| 54:19 | 117:17 | conducted | connection | 119:11 |
| 81:13 | compare 44:4 | 131:1 | 102:14 | 198:1 |
| communic... | competitors | confer | consequence | 199:21 |
| 11:9,12 | 267:17 | 256:22,22 | 88:19 | 223:2 |
| 14:8 53:12 | compiles | conference | conserva... | 233:2 |
| 56:17 58:3 | 59:2 | 120:1 | 148:21 | 249:2 |
| 59:12 | completed | conferred | consider | 254:15 |
| 75:17 | 216:21 | 118:14 | 77:16 | contacted |
| 81:12 | completely | conferring | 88:14 | 24:2 |
| 148:15 | 164:25 | 118:12 | 220:20 | 232:16 |
| 151:21 | component | 236:1 | considered | contacts |
| 183:5 | 14:10 | 267:20 | 134:20 | 16:9,11 |
| 262:1 | comport | confidence | 155:18 | 17:16 |
| communic... | 242:18 | 59:9 72:4 | 194:24 | 18:18 20:2 |
| 12:6 13:21 | Compound | 81:1 258:5 | considering | 21:9 60:14 |
| 18:3 20:5 | 106:6 | 263:1,7,21 | 27:18 | 114:24 |
| 237:18 | 193:24 | confident | 99:16 | 242:24 |
| communic... | computer | 232:17 | 169:18,20 | content |
| 114:14,21 | 23:20 | 258:13 | 242:13 | 15:24 |

**CAROL CRAWFORD  11/15/2022**

18:14
29:22 43:7
45:24 46:3
46:16 47:8
47:13,20
47:22
51:25
52:24 53:8
65:15,16
75:18,20
87:21
90:11
101:15
103:14,21
105:24
106:13
108:2,3,16
109:8,9
113:13
115:19
127:22,25
128:4,14
128:17,21
129:2
131:23
133:23
134:9,10
134:11,13
134:14,25
157:6
164:15
175:24
176:11
183:16
189:23
190:7,13
191:16
197:6
201:1
212:6
222:2
228:10
229:11
234:19
244:24
**context**
39:24
126:22
188:24

196:1
200:5
201:16
204:4,13
217:16
230:18
255:6
265:16
266:9
**continue**
85:14
103:2
118:19
195:19
235:9
**Continued**
2:25 3:25
4:24 6:25
**contractor**
83:22
86:20
217:6
**contractors**
98:9,19
99:19
100:22,23
100:25
101:1,8,10
101:12
**contribute**
103:24
157:17,25
169:25
**contributed**
104:3
**control** 1:17
6:15 7:6
7:12 88:12
**controlled**
34:10
36:25
**convene**
15:21
**conversa...**
4:13,15
9:18 37:5
38:15
51:11,15
51:23

56:21 57:1
81:24
82:22 83:2
83:3 84:25
87:19
89:10
119:18
121:23
132:18
133:3
143:21,24
154:14,16
161:2
179:15
187:15
209:4,6
250:1
**conversa...**
18:15
36:10 38:5
38:6 53:10
54:17
59:24
64:12
72:11
83:10
87:15
117:1
143:6
209:9
**cooking**
205:6
**coordina...**
2:9 71:2
**coordinator**
35:9
**copied** 208:2
208:3
216:9,10
216:11
248:5
**copies**
256:19
268:10
271:10
**copy** 7:22
124:10
269:2,9,11
271:13

**COPY.docx**
3:23
**coronavirus**
27:16
190:16
**corporat...**
35:18
**correct** 22:1
23:10 28:1
33:14 40:4
44:3 45:2
49:17 61:2
65:9 89:2
97:1
121:14,25
122:16,18
124:15,25
125:1
131:23
145:15,24
146:19
159:23
162:25
169:9
170:6
178:11
203:11
206:10
220:2,4
227:6
236:12
252:3
257:16,20
259:7,24
266:23
273:9,13
**correcting**
194:7
**correction**
21:24
**corrections**
271:13
**correctly**
55:16
83:23
122:9
163:12
198:8
211:3

227:6
229:2,22
229:23
252:12
**correspo...**
169:4
**Costello**
51:5
**council**
15:22
253:21
**counsel** 1:16
6:1 7:21
9:1,8 10:5
10:9 21:15
22:5 31:7
31:9,9,13
84:18 93:5
100:13
102:13,16
102:18
112:10
118:10,15
235:24
236:1,3
256:23
**counterpart**
87:4
**counterp...**
233:20
**countries**
169:6
**country**
123:1
**COUNTY** 270:3
273:3
**couple** 83:19
84:1
151:21
173:3
198:19
226:25
243:7
266:4
**course** 10:4
123:2
152:11
210:24
262:13

**court** 1:1
 6:3  7:20
 8:6  9:3,16
 256:18
 268:25
 270:4
**courtesy**
 52:1
**CoV-2** 112:17
**cover** 234:20
 235:13
**coverage**
 76:16
**covered**
 93:21
 94:19
**covering**
 187:23
 188:6
**COVID** 4:11
 5:1,10
 16:14,15
 16:16,17
 16:19  17:3
 17:10  18:2
 18:12
 22:14
 25:12
 29:15
 32:15
 42:23
 46:11
 48:10,22
 49:13
 51:25
 52:23  53:2
 57:25
 71:13  89:4
 92:9
 105:24
 110:5,10
 110:12
 111:5
 113:9
 121:4
 128:2
 148:19
 157:3
 160:23

161:14
162:3,12
162:12
164:6
169:15
173:25
174:20
175:4,7,8
183:14
195:1
197:9
198:19,23
201:4
205:20
206:16
208:9,17
222:1,2
223:12
224:22
231:5,9
232:19
239:2
241:21
242:5,10
245:14
247:21
255:4
256:6
261:25
266:17
**COVID's**
 256:5
**COVID-19**
 2:11,18,20
 3:9,17,20
 33:12  48:3
 51:3  60:7
 63:21
 91:13,17
 95:14
 98:14
 99:19
 108:21
 111:13,19
 119:15
 120:13
 122:2
 124:14
 126:22

127:10
128:7
137:2
139:13,17
141:10
145:6
149:18
157:3,6
163:25
164:7
167:25
168:3
169:1,3,19
169:21
170:15
176:17
188:3
221:20
224:12
229:20
234:17,21
247:12
256:1,3
258:16
**COVID-HUB**
 221:19,23
 221:24
 222:4
**COVID_19**
 5:12
**crafting**
 103:21
**Crawford**
 1:13  2:3,7
 8:4  9:5,12
 11:3  22:24
 34:5
 102:24
 141:17
 150:8
 247:16
 257:6
 270:7
 271:11
 272:1
 273:5,20
**create** 73:22
 110:1
 147:17

148:14
210:13
**created** 13:3
 61:5  73:25
 148:8,11
 221:13
**creating**
 48:16
 95:14
 263:6
**credible**
 89:1,5
 90:12
 140:1
 181:25
 266:16,21
 267:3
**criteria**
 89:14,15
**Cross-Ex...**
 2:4
**crosstalk**
 178:6
**Crowd** 60:7
**CrowdTangle**
 2:17,19
 3:16,19
 49:13,25
 50:1,20
 51:2,3,24
 51:25  52:7
 52:22
 59:17,19
 59:21
 60:15
 62:16
 63:16
 64:18
 66:12
 71:21
 75:24
 76:16  77:5
 77:7,10,11
 77:14
 78:16,24
 79:7,8,11
 83:17
 91:22
 97:11

141:10
142:2,12
145:6,14
146:15,17
146:23
147:1,4,5
147:10,13
148:8,12
148:19,25
149:2
154:15,24
230:1
262:14,20
**CRR** 1:20
**cues** 9:17
**cures** 197:9
 201:5,15
 203:18
**current** 11:4
 15:10,12
 16:1  18:23
 18:24
 168:2
 170:14
 262:14
**currently**
 15:5
**cut** 76:10,14
 82:1,13
 190:15
 191:17
**cut-and-...**
 240:9
**CV19** 3:2
 91:9,12
**Cynthia**
 107:11
 115:10
 116:23
 120:2
 133:22
 182:18,21
 183:1,2
 188:3
**cytokine**
 122:4

_____
 D
_____
**D** 6:2

**CAROL CRAWFORD 11/15/2022**

daily 164:10
dark 62:5
data 71:18
  71:23 72:1
  72:2 75:12
  75:23
  80:13 81:2
  81:10
  150:23,24
  150:25
  186:13
  201:15
  204:3,12
  221:21,21
  224:25
  225:3
  260:7
  263:8,10
date 8:2
  84:19
  85:10,13
  111:10
  118:18
  126:11
  131:18
  135:9
  138:25
  139:2
  141:9
  145:4
  150:13
  152:20
  155:24
  163:16
  166:5
  171:18
  173:23
  179:12
  187:12
  189:5
  196:19
  200:18
  205:14
  208:20
  219:22
  221:6
  226:7
  229:5
  232:25

237:5
239:19
241:19
242:3
246:4
247:11
249:17
250:6,16
254:10
257:8
272:4
dated 61:18
  63:1
dates 49:18
  132:2
day 28:4
  32:22
  47:10
  77:18
  230:4
  270:16
  273:14
days 27:18
  164:11
  173:3
  238:1
  253:16
  271:17
DC 6:12,21
  7:3 271:6
deal 87:9
  207:22
  239:10
dealing
  10:18
  83:17
dealt 256:13
Dear 271:9
death 168:4
  168:12
  169:2,5
  170:16
  185:24
deaths 53:23
  58:7 62:7
  76:16
  82:18
  140:8
  146:2

167:5
168:1,21
169:2
debunk
  122:17
  129:2,12
  129:14,15
  131:1,8
  132:1,5
debunked
  124:25
  125:2
  127:11
  130:9,12
  131:22
  132:25
  134:7,20
  134:24
  135:3,10
  135:11
  137:5
  138:13,17
  157:21
  171:2
debunking
  3:15
  119:15
  124:14
  126:23
  139:1
  140:17
December
  189:7,12
  190:5
  195:11,23
decide 89:7
  89:10
  102:4
  135:13
decided
  57:18 74:4
  238:4
decides
  229:4
Deciding
  143:12
decisions
  89:2
  211:18

deck 73:20
  76:5
  149:19
  153:9
  210:17
decks 265:18
  265:22
Declaration
  264:6
declare
  273:12
deemed 212:9
Defects
  223:17
defend 10:6
defendant
  9:2
defendants
  1:11 8:19
  8:19,24
  9:2 31:6
defending
  10:5
defense
  102:13
  268:3
definitely
  109:22
  121:19
  159:20
  183:6
  216:10
  222:19
  226:20
  229:14
  256:2
definition
  203:17
degrees 12:9
DEKALB 270:3
delay 28:7
delete 75:15
  157:9
deleting
  75:17
demand
  194:25
Demi 108:1
  115:11

120:2
133:22
demonstr...
  50:2
Dempsey
  24:15 27:1
  45:15,16
  45:19,20
  57:3
department
  6:19 7:1,2
  7:8 8:18
  8:23 25:11
  25:16
  237:12
  238:20
  271:5
depending
  17:5,23
  181:14,18
  244:23
deploy
  223:10
deployed
  61:15
  107:20,21
  123:23
  223:4
deposed 9:13
deposition
  1:13 2:7
  5:23 8:3,7
  21:18
  26:23
  31:10,14
  93:9 94:17
  118:3
  152:12
  270:6,8,9
  271:10
  273:6,8,11
depth 175:1
DeSalvo
  193:6
describe
  249:25
described
  47:5 59:6
  59:21,25

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 96:13 | 42:13 | 15:11,14 | 100:15 | 203:5 |
| 130:22 | 56:17 | 32:16,17 | 236:6,7,19 | 204:5 |
| 142:6,11 | **development** | 43:3,4 | **discuss** | 208:4,15 |
| 189:19 | 11:17 | 83:24 87:2 | 66:11 74:2 | 208:19 |
| 212:3 | 105:14,15 | 233:21 | 76:4 77:24 | 213:15,19 |
| **describes** | 108:2,3 | 243:25 | 80:1 84:6 | 222:10 |
| 103:17 | 115:20 | 247:19 | 84:9 95:11 | 223:6 |
| **describing** | **device** 35:24 | 249:3 | 105:7,13 | 225:22 |
| 55:16 | **devices** | **dir-** 120:22 | 105:15 | 240:6 |
| 155:15 | 213:24 | **direct** 18:17 | 170:3 | 244:10 |
| **description** | **differed** | 19:12,14 | 175:1 | 263:20,22 |
| 2:5,6 50:3 | 17:22 | 63:13 | 180:10 | **discussing** |
| 95:23 | 140:12 | 93:22 | 182:23 | 37:14 |
| 130:18 | **difference** | 165:13 | 184:7,24 | 58:10,12 |
| **design** 11:19 | 220:7 | 166:11 | 228:24 | 64:17 |
| 233:12,16 | **differences** | 182:6 | 233:14 | 79:24 |
| 233:17 | 17:15 | 205:13 | 253:10 | 82:25 83:5 |
| **design/c...** | **different** | 234:5 | 258:19 | 105:9,12 |
| 27:21 | 23:14 | 238:16 | 260:17 | 119:25 |
| **designer** | 44:21 | 242:15 | 263:13 | 130:21 |
| 40:14 | 47:21 65:3 | 250:13 | **discussed** | 148:18 |
| **desired** | 77:9 78:24 | **directed** | 19:22 30:8 | 151:7 |
| 271:14 | 79:8 | 80:19 | 38:8,10 | 180:12 |
| **detail** 32:13 | 107:17 | 199:4,10 | 53:11 | 184:15 |
| 73:14 | 120:11 | 199:19 | 57:25 58:4 | 204:13,24 |
| 133:20 | 129:24 | **directly** | 59:10 | 212:24 |
| **detailed** | 141:3 | 19:17 74:9 | 60:13 | 230:19 |
| 51:24 | 142:5 | 77:10 | 62:17 72:7 | **discussion** |
| 169:4 | 147:10,20 | 101:12 | 77:20 | 49:12 |
| **details** | 147:24 | 113:20 | 78:11 | 52:11 |
| 110:2 | 149:16 | 123:25 | 81:10 83:9 | 58:15 59:3 |
| 149:5 | 172:6 | 124:5,9 | 83:13 | 133:12,13 |
| 150:20 | 175:17 | 129:5 | 116:5,25 | 151:2 |
| 153:15 | 187:6 | 130:21 | 117:7 | 182:18,25 |
| 224:24 | 198:9 | 147:11,12 | 130:16 | 184:9,11 |
| **determine** | 204:8,11 | 238:19 | 133:2,10 | 185:8 |
| 11:22 | 220:5 | 251:16 | 135:23 | 206:21 |
| 110:24 | 259:1 | **director** | 138:19 | 260:16 |
| 161:21 | **difficult** | 11:7,9,12 | 141:1 | **discussions** |
| 170:20 | 97:6 173:4 | 11:21 | 142:2 | 18:8 64:19 |
| **determined** | **difficulty** | 18:25 19:8 | 145:13 | 132:15,16 |
| 114:13 | 42:9 | 32:7 83:24 | 147:2 | 213:16 |
| **determining** | **digital** 11:8 | 87:2 | 148:4,14 | 244:20 |
| 89:14 | 12:6,25 | 107:11 | 150:22 | 261:19 |
| **develop** 59:5 | 13:19,24 | 120:19 | 151:14,17 | **disease** 1:17 |
| 109:9 | 13:25 | 183:5 | 174:17 | 6:15 7:6 |
| **developed** | 14:12,14 | **disclosure** | 181:24 | 7:12 |
| 57:19 71:8 | 14:17,20 | 7:21 | 185:20 | 190:17 |
| **developing** | 14:24 15:3 | **discovery** | 198:18 | **Diseases** |

| | | | | |
|---|---|---|---|---|
| 107:14 | 161:17 | **doses** 255:13 | 147:2 | 76:6 140:7 |
| 160:22 | 162:17 | **Double** 62:10 | 149:11 | 164:8,10 |
| **display** | 163:2 | **doubt** 56:22 | 157:20 | 164:12 |
| 188:22 | 165:2,12 | 108:25 | 180:14 | **effort** 35:11 |
| **distributed** | 165:16 | **Dr** 6:6,6,6 | 198:6 | 40:16 |
| 212:16 | 167:24 | 125:20 | 203:5 | 177:2,8 |
| **distribu...** | 168:14 | **draft** 15:24 | 204:5,14 | 180:2 |
| 52:19 | 169:13 | **drafted** | 208:4 | **efforts** 2:11 |
| 58:17 | 206:18 | 210:17,18 | 210:18 | 15:16 |
| 61:14 | 238:14 | 246:20 | 224:11 | 27:15 |
| 62:22 | 249:23 | **drafts** 41:17 | 229:9 | 33:12 34:1 |
| **District** 1:1 | **documents** | **dragged** | 233:22 | **eight** 111:12 |
| 1:1 8:5,6 | 32:23 | 151:12 | 236:14 | **Eisman** |
| **distro** 52:18 | 47:19 | **drawing** | **early** 17:10 | 222:22 |
| 61:12 | 92:22 | 176:4 | 19:21 20:1 | **either** 43:4 |
| **division** 1:2 | 93:10 | **driven** 146:2 | 22:15 | 61:6 65:21 |
| 11:7,8,14 | 94:11 | **drop** 219:5 | 147:13 | 104:22 |
| 12:19,23 | 99:18 | **drop-down** | 192:6 | 113:15 |
| 12:25 13:8 | 117:5 | 186:18 | 197:12 | 125:10 |
| 13:8,10,14 | 132:7 | **drop-downs** | 253:11 | 136:19 |
| 13:17,18 | 236:7 | 215:21 | 260:18 | 147:7 |
| 13:19,25 | **doing** 9:19 | **due** 84:8 | **easier** 18:12 | 149:1 |
| 14:4,20,24 | 14:2 29:15 | **duly** 9:6 | 23:21 | 176:19 |
| 15:4,5,11 | 38:14 | 270:9 | 27:22 | 181:2 |
| 15:14 19:8 | 57:21 | **duties** 11:13 | 129:8 | 197:21 |
| 19:9 29:21 | 100:23 | 15:13 | 167:6 | 230:22 |
| 32:7,18 | 116:9 | 32:10 | **easiest** | 241:3 |
| **divisions** | 142:5 | 101:14,17 | 170:3 | **elderly** 3:10 |
| 14:1 | 144:11 | **duty** 15:10 | **EAU** 4:3,5 | **electronic** |
| **doc** 225:20 | 158:14 | **dysfunction** | 163:19 | 20:5,6 |
| **doctors** | 162:20 | 128:8 | **edit** 42:2 | 30:17 |
| 122:25 | 174:22 | | **editing** | 56:24 |
| **document** 3:9 | 178:21 | ——————— | 47:12,19 | **electron...** |
| 21:16 | 182:7 | **E** | 47:20 | 136:21 |
| 25:23 33:8 | 200:3 | **E** 5:9 45:4 | **education** | **element** |
| 41:22 | 210:3 | 171:22 | 11:25 | 157:25 |
| 47:15 49:7 | 224:22,23 | 239:20 | **educational** | **else's** 206:5 |
| 54:9 67:20 | 232:13 | 270:1,1 | 52:25 | **email** 4:1 |
| 76:23 | 239:6 | **e.g** 157:3 | **Edwards** | 5:2,10,15 |
| 78:18 86:6 | 244:6 | 162:12 | 265:9 | 18:3 20:5 |
| 91:4,6 | 248:24 | **earlier** 24:6 | **effect** 38:12 | 22:14,18 |
| 94:9 96:1 | 258:5,20 | 60:23 | 139:16,17 | 23:2,3,7 |
| 99:23 | 265:4,16 | 92:23 93:8 | 231:8 | 23:12,13 |
| 100:14 | 268:20 | 109:16 | **effective** | 23:15,21 |
| 143:17 | **domain** 18:14 | 116:25 | 255:14 | 24:3,12,19 |
| 145:9 | 29:22 | 120:10 | **effectively** | 25:3,18 |
| 146:12 | **Door-to-...** | 125:9 | 54:20 | 27:11 |
| 152:15 | 144:20 | 132:15 | **effects** 54:1 | 28:21,23 |
| 158:6,23 | **dosage** 255:8 | 133:2 | 58:8 65:5 | 30:17 |
| | | 142:7 | | |

**CAROL CRAWFORD 11/15/2022**

33:11 34:6
34:6 35:12
35:15,20
39:2,8
40:3,7,8
43:20
44:19,21
44:23 45:1
50:14 51:1
51:12,18
57:20 58:4
60:6 62:3
63:1 68:3
68:11
72:21,22
72:22 73:4
73:25 75:8
75:10
77:19 85:3
85:11,13
85:15
91:20
92:24
96:20,20
98:16
114:1
119:3,6,9
119:14
120:23
121:2,2,25
123:19,21
125:9
126:21
137:1
146:10
150:15
153:4,6
159:11,19
160:8
161:25
163:4
166:12
167:22
172:3,21
174:4
178:22
189:11
197:21
200:6,24

201:24
202:8
204:22
213:10
216:4,8,12
216:20
218:1
219:9
220:7
225:19
226:15
230:15
238:8,22
241:12
243:17
244:15
248:3,22
250:16,18
250:25
254:2
257:14
261:10
**emailed**
173:14
253:2
**emails** 2:8
2:10,12,15
2:17,19,22
3:1,2,4,11
3:13,14,16
3:19,22
4:2,5,8,10
4:11,13,15
4:17,18,20
5:1,4,5,7
5:8,12,14
5:17 21:3
32:6 61:17
67:22 79:6
79:20 83:3
83:6 97:1
97:6 99:11
103:13
134:4
161:2
203:6
236:11,18
248:6
254:21

**emergency**
42:8,15
59:2
137:10,12
156:25
160:1
169:18
**emphasis**
3:10
**employed**
137:19
**employee**
13:21 14:8
222:8
**employees**
97:19 98:8
98:18
**employers**
137:20
**employment**
11:4 12:1
137:21
138:3
**enabled** 71:8
**enclosed**
271:10,11
**Enclosures**
271:25
**ends** 124:18
206:1
263:14,15
**enforce**
104:23
**enforcement**
95:25
105:8,14
105:16
**engage** 74:2
74:4 77:16
184:15,24
185:11
234:6
**engaged**
52:23
175:24
**engagement**
53:16
78:11,14
**engaging**

77:23 78:1
78:8
110:12
197:20
243:4
**engine**
193:22
194:11,13
194:13
**engines**
194:3
**English**
163:8
**enroll**
211:21
214:4,9
215:1
**enrolled**
216:20,23
218:2
**enrollment**
137:21
138:3
**ensure** 33:17
33:18
237:20
**enter** 219:3
219:4
**entered** 71:3
**enters** 26:22
**entire** 15:17
**entity** 89:20
**environment**
148:15
**envision**
177:4
**epidemio...**
12:16
**equating**
137:6
**equity**
230:11,17
230:21
**erectile**
128:8
**Eric** 1:3
265:8
271:7
272:2

**errata**
271:12,14
271:16
272:1
**especially**
32:15 55:5
**Esq** 6:2,8,17
6:18 7:2,5
7:6,7,11
271:4
**establish**
242:9
245:14
**established**
77:7
257:19
**et** 1:4,10
197:10
201:5
271:7,8
272:2,3
**EUA** 137:6,9
156:2,21
167:3
**European's**
164:21
**Eva** 239:8
**evaluate**
220:23
**event** 10:21
34:15
123:10
125:24
136:25
**events**
122:23
123:1
**eventually**
30:1
**every-ot...**
180:8
**everybody**
136:17
241:15
268:11
**evidence**
79:2 96:4
108:22
110:8

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 120:14 | 204:21,22 | 100:19 | 199:3 | **experiment** |
| 137:23 | 209:8 | 102:22,25 | 200:15,17 | 131:1 |
| 138:6 | 210:20 | 112:5,5,15 | 200:19 | 132:4 |
| 142:25 | 265:24 | 112:19 | 205:17,18 | 137:8 |
| 146:7 | **exchange** | 113:3,6 | 205:19 | **experiments** |
| **evidence...** | 16:14 40:3 | 114:22 | 206:14 | 137:3 |
| 255:3 | 145:17 | 115:8 | 211:6 | **expert** 50:21 |
| **evolving** | 146:10,22 | 118:5,7,9 | 219:19,21 | 108:18 |
| 103:18 | 189:11 | 118:20,22 | 221:3,5,6 | 109:8,22 |
| **ex** 1:3 271:7 | 197:15 | 119:4 | 226:4,7 | 123:5 |
| 272:2 | **excuse** 16:22 | 120:1 | 237:2,4 | 129:21 |
| **exact** 80:20 | 167:11 | 121:11 | 239:13,16 | 133:18 |
| 200:5 | 172:12 | 125:8 | 241:17,19 | 134:2 |
| 246:3 | 199:10 | 126:8,12 | 243:7 | 146:4,8 |
| **exactly** | 221:22 | 126:14 | 247:7,9 | 183:19 |
| 31:18 | 238:9 | 131:13 | 248:12 | 214:15 |
| 88:15 | 240:18 | 133:8 | 249:7,9 | 222:20 |
| 135:17 | **excuses** | 135:1,4 | 254:4,8 | 252:2 |
| 216:1 | 247:4 | 136:6,10 | 256:19 | **expertise** |
| 238:25 | **Executed** | 136:11 | 257:4,7,14 | 32:20 |
| **Examination** | 273:14 | 138:19,23 | 258:4 | 137:14 |
| 2:2 9:10 | **exhibit** 2:6 | 138:24 | 269:6 | 138:8 |
| **EXAMINAT...** | 2:7,8,10 | 141:6,7,9 | **exhibits** 2:5 | 140:14 |
| 2:1 | 2:12,15,17 | 141:19 | 5:21 118:1 | 143:5 |
| **examine** | 2:19,22 | 144:13 | 125:18 | 164:25 |
| 197:6 | 3:1,2,4,6 | 145:1,4 | 140:19 | 259:2 |
| 201:2 | 3:7,9,11 | 149:22,23 | 183:4 | **experts** |
| **examined** 9:6 | 3:13,14,16 | 150:6,9 | 184:4 | 108:8 |
| **example** | 3:19,22 | 152:16,22 | 268:22,23 | 113:24 |
| 15:21 | 4:1,2,5,7 | 155:7,9,10 | 268:25 | 114:24 |
| 64:21 | 4:8,10,11 | 155:22 | **exist** 13:15 | 115:7 |
| 79:12 | 4:13,15,17 | 163:13,15 | 48:19 | 121:12,18 |
| 149:19 | 4:18,20 | 163:23 | 126:4 | 123:20,20 |
| 207:15,24 | 5:1,2,4,5 | 164:17,19 | 227:17 | 124:22 |
| 217:22 | 5:7,8,10 | 165:25 | **existed** 12:7 | 130:11,17 |
| 265:3 | 5:12,14,15 | 166:1,2,6 | **existing** | 132:17 |
| 266:4 | 5:17 21:12 | 171:15,20 | 169:20 | 150:19 |
| **examples** | 21:14 22:5 | 171:21,25 | 174:25 | 151:9,19 |
| 90:22,22 | 22:8 30:22 | 173:9,20 | **expect** | 151:20,21 |
| 149:7 | 32:1 33:2 | 173:23 | 155:13 | 152:8 |
| 182:2 | 33:4 38:18 | 179:9,11 | 192:2 | 182:22 |
| 197:5,7,8 | 38:20 | 182:12 | **expectation** | 184:20 |
| 199:11 | 43:10 44:1 | 183:3 | 88:3 | **Expires** |
| 200:1,11 | 44:2 49:1 | 187:9,11 | **expected** | 270:25 |
| 200:20 | 49:4,5 | 187:18 | 34:16 | 273:24 |
| 201:1,2,4 | 60:3 62:2 | 188:25 | **expecting** | **explain** |
| 201:12,14 | 67:4,12,14 | 189:2,4 | 248:19 | 251:16 |
| 201:24 | 85:5,6 | 196:15,17 | **expedited** | **explained** |
| 202:12 | 91:1,7,8 | 196:18 | 214:10 | 78:25 79:7 |

| | | | | |
|---|---|---|---|---|
| 210:16 | 55:10,14 | 222:8,12 | 53:14 | 61:18 |
| **explaining** | 57:6 58:12 | 222:13,19 | **false** 106:11 | 63:17 |
| 148:16 | 60:11 | 222:20,21 | 108:21 | 166:8,15 |
| **explains** | 61:22 | 223:21 | 116:8 | 167:8 |
| 195:14 | 62:18 63:3 | 224:5,15 | 117:18 | 171:23 |
| 248:14 | 63:5 64:11 | 224:21 | 120:13 | 172:10 |
| **explanat...** | 71:2 73:22 | 226:19 | 139:11,25 | **federal** 92:2 |
| 130:16 | 74:8,10 | 231:13 | 157:2,16 | 95:19 |
| **explanatory** | 77:25 | 232:15 | 158:20 | 193:1,10 |
| 130:13 | 78:22 | 237:14 | 159:5,12 | 232:5,18 |
| **explore** | 79:19 80:8 | 240:2 | 159:21 | **feed** 54:25 |
| 144:6 | 80:14 82:9 | 242:5 | 162:11 | 227:5 |
| **expressed** | 82:10 83:4 | 245:22 | 164:2,6,24 | 228:10 |
| 101:19 | 83:7,18 | 249:2 | 168:5 | **feedback** |
| **extension** | 86:4 87:14 | 259:22,23 | 169:24 | 27:17 |
| 200:21 | 87:16 88:3 | 261:7 | 170:12 | 106:10 |
| **extent** 93:18 | 88:20,24 | 263:2 | 255:5 | 161:10 |
| **externally** | 89:16,22 | **Facebook's** | **familiar** | **feeds** 88:13 |
| 65:18 | 90:7,19 | 2:10 46:19 | 85:22 | 212:16 |
| **extreme** | 91:23 | 103:11,12 | 200:12 | **feel** 32:24 |
| 42:18 | 95:18,20 | 139:7 | 206:19 | 95:22 |
| **extremely** | 98:20,24 | 151:22 | **FAQ** 109:5 | 132:8 |
| 19:24 | 99:2,7,8 | **fact** 115:22 | 129:4,10 | 146:9 |
| | 103:14,22 | 134:16 | 134:14 | 149:16 |
| **F** | 103:25 | 168:10 | **far** 22:23 | 151:11 |
| **F** 270:1 | 104:2,23 | 175:11 | 65:8 204:3 | 188:16 |
| **Face-** 180:12 | 112:21 | 210:17 | 246:10 | 203:9 |
| **Facebook** 5:4 | 113:11 | **facts** 58:2 | **fashion** | 247:22 |
| 16:5 18:11 | 114:8 | 79:1 94:7 | 171:11 | 249:10 |
| 20:24 | 117:1,16 | 96:3 110:7 | **fast** 81:8 | 258:13 |
| 22:14 | 119:8,11 | 137:22 | **faster** 28:9 | **feels** 206:19 |
| 24:13,19 | 124:5 | 138:6 | **fatality** 3:9 | **fellow** 24:6 |
| 25:10,12 | 132:9,14 | 142:24 | **FB** 2:8 3:14 | **felt** 88:16 |
| 27:13 | 135:2,11 | 153:10,24 | 139:1 | 161:20 |
| 29:17 | 135:14 | 154:4 | 221:19 | 215:21 |
| 33:12 | 138:12 | 158:16 | 225:3 | 217:3 |
| 34:15,23 | 144:9 | 159:10,10 | **FDA** 137:11 | **female** 26:11 |
| 36:16,17 | 148:2,18 | 160:9 | 156:24 | 28:11 |
| 36:25 37:6 | 149:14 | 220:13,17 | 159:25 | **filing** |
| 37:11 | 150:16 | 264:3 | 167:2 | 271:18 |
| 40:14 | 151:9 | **fade** 10:10 | 169:17 | **final** 35:20 |
| 42:18 | 153:1 | **fair** 38:20 | 201:15 | 135:10 |
| 44:18 | 154:7 | 119:19 | 203:21 | 253:14 |
| 46:12 | 155:14 | 130:2 | 204:2 | **finally** |
| 48:16,17 | 156:5 | 132:9 | **feature** | 134:6 |
| 48:19 | 164:24 | **fairly** | 157:5 | 245:7 |
| 49:13 50:6 | 179:4 | 232:17 | **February** | 265:11 |
| 50:18 | 181:3 | **fall** 38:8 | 16:19 18:5 | **find** 18:12 |
| 54:23 | 221:25 | **falling** | 22:15 60:9 | 70:21 |

**CAROL CRAWFORD  11/15/2022**

171:4
189:22
219:11
231:9,10
271:10
**finders**
234:16
**finding**
72:15
149:10
**fine** 82:15
93:14
96:19
102:21
165:9
198:11
**finish** 65:23
**finished**
67:15
**finishing**
256:23
**first** 9:6
17:21,22
18:2,9
22:22
25:20
33:11 39:7
45:25
49:20,24
51:25 56:1
56:8 67:21
67:23,25
91:21
106:10,24
110:19
120:8
125:7
133:21
141:23
142:11
144:12
146:20
150:15
151:15
156:8,13
157:23
167:25
170:13
177:20

178:17,20
179:1
197:23
207:2
208:11,18
208:23
213:2
222:17
230:16
235:24
242:12,14
242:17,20
245:16
246:5
247:14
257:14
266:13
**first-** 54:1
**fit** 47:23
**five** 32:8
167:3
169:16,19
171:22
238:1
**five-minute**
30:20
205:3
**fix** 102:3
**flag** 87:10
87:25
89:14
98:19 99:2
99:7,9,10
113:1,12
206:22
218:23
226:25
264:4
**flagged** 88:4
89:23
106:3
111:13
112:21
113:10
117:21
212:13
264:5,20
264:24

**flagging**
86:3 87:13
88:1,21,24
90:6
101:18
105:24
106:1,4,9
106:17
264:2
**flags** 212:13
**flipped**
149:3
**floor** 98:7
**flow** 214:10
**flu** 29:13,15
29:19,19
29:20
**focus** 256:5
**focuses** 45:9
**focusing**
32:16
256:6
**folks** 39:6
41:17
107:9
108:16
125:17
245:11
252:8,14
253:3
**follow** 82:15
121:16
126:20
182:17
187:14
188:4
193:23
210:21
**followed**
134:3
**following**
4:3,5
51:22
53:14
56:21
100:2
156:2
163:18
169:5

182:15
193:20
**follows** 9:7
**followup**
4:13,15
30:15
51:18
119:16
179:14
197:21
234:17
263:25
**football**
28:16
**Forbes** 53:19
**force** 42:5,5
**Ford** 7:5
**foregoing**
270:6
273:6,13
**foreign**
140:12
**forget** 268:7
**forgive** 21:1
**forgotten**
222:11
**form** 171:11
273:7
**format** 47:21
63:25
106:25
182:9
184:3
209:12,13
209:14
210:23
229:16
240:25
241:1
243:5
**formatted**
207:18
**formatting**
248:3
**forms** 219:5
**formulate**
165:5
**forth** 39:20
68:4 270:8

**forward**
35:17 46:1
49:15
59:15
197:4
200:25
247:22
**forwarded**
31:8 41:18
61:6,6
62:23
102:16
**forwarding**
44:22 61:7
**forwards**
216:5
**Foster** 7:11
**found** 266:21
266:23
267:4
**foundation**
112:23
**four** 201:12
**frame** 132:3
262:20
**fraud** 197:8
200:2
201:4
**fraudulent**
197:9,9
201:4,5,15
203:17
**Fred** 181:9
250:10,12
250:25
251:3,25
252:9
254:25
**free** 32:24
247:22
**frequency**
180:18
**frequent**
2:13,16
4:7 39:10
43:22
44:10
**Friday**
177:21

**CAROL CRAWFORD 11/15/2022**

185:17
208:11
212:24
213:4
242:12
245:17
246:2
**front** 32:23
33:2
166:17
208:22
245:7
269:1
**FTC** 137:11
**full** 52:21
74:15 76:1
81:11
137:7
**fuller**
263:12,23
**fully** 44:17
218:15,16
**fundings**
109:25
**further**
32:22,23
52:13
126:21
158:20
192:2
228:24
268:1,2
270:11
**future** 80:1
141:25
184:4
211:22
**fuzzy** 224:23
**FYI** 70:6
229:18

——————
G
——————
**gain** 71:11
**Gangolly**
50:22,23
**gaps** 54:18
56:18 58:1
81:3
**garnered**

53:15
**gas** 205:6
**Gateway**
264:15
**GBS** 139:15
**Genelle**
85:17
96:21
100:1
238:8,8
**general** 1:4
1:16 9:1
29:5 38:2
38:17 46:6
46:7 54:15
64:19
75:13
83:10
110:14
117:3
149:1,1
169:1
188:20
191:19
209:9
217:19
253:12
271:7
272:2
**General's**
6:2
**generally**
16:11
17:14,15
38:11
48:11
56:15
58:11
77:19
89:11
96:16
140:23,25
161:20
**Gennelle**
86:12
**Georgia** 1:18
7:20 12:10
12:11
270:2,5,24

**getting**
18:10
20:14 37:6
90:12
138:2
145:23
147:11
159:22,24
160:2
164:7
181:25
190:3,24
204:18
**Ghosh** 7:6
**Gilligan**
6:17 8:22
8:22 66:25
67:3,6,9
84:20
85:24 91:6
93:19,25
94:5,24
95:5,9
102:5
112:2
118:10,12
118:20
133:4,7
136:18,21
163:10
165:16,20
165:23
206:8
231:22
235:25
241:15
249:13
256:21
268:23
269:14
**gist** 116:15
**give** 11:11
22:6,6,10
23:22
30:21
38:22
66:20
79:12 91:3
104:8

121:15
129:19
130:6
132:14
141:8
156:24
159:11
164:19
173:4
187:22
188:5
204:19
210:20,20
214:25
239:15
253:11
256:19
260:23
261:3
262:16
263:11,23
268:20
**given** 69:17
99:18
109:25
130:20
132:3
137:12
270:10
**gives** 155:1
**giving** 49:13
169:18
241:11
266:19
**glad** 173:18
196:4,6
247:1
**global** 140:6
**globally**
157:2
159:21
162:11
**go** 11:24
13:7,23
18:17 20:4
22:22
23:18 31:5
31:23 33:3
41:21 44:5

46:25 56:8
67:16
73:20
74:20
81:16,25
95:8,21
97:25
102:2,3,8
104:13
114:1
116:14
118:9
121:14,16
126:17
129:15
131:15
136:16
141:7
145:17
146:20
147:12
155:9
164:11
166:12
167:24
169:12
176:9
179:21,25
182:4
187:2
188:21
189:2,10
199:17
211:1
212:22
214:22
221:23
226:22
231:7
241:24
243:15
247:9,14
252:6,23
254:6,6
257:13
266:10
268:25
**goal** 33:23
88:25

| | | | | |
|---|---|---|---|---|
| 266:16 | 185:1 | 194:22,23 | **grounds** | **guidance** |
| **goals** 266:20 | 186:20 | 243:22 | 168:5 | 129:7 |
| **goes** 53:2 | 191:19 | 245:10,22 | **group** 14:4,7 | 193:20,23 |
| 65:1 106:2 | 192:11 | 245:23 | 14:8,10 | 194:4 |
| 120:16 | 194:18,20 | 250:3,15 | 41:16 45:6 | 195:20 |
| 127:25 | 195:15 | 251:17 | 45:8 48:20 | 196:10 |
| 157:11 | 218:2 | 253:4 | 48:20 | 238:19 |
| 160:4 | 220:7,15 | 254:15 | 55:12,21 | 250:2 |
| 218:22 | 223:5 | **Google/Y...** | 55:22,24 | **Guidarini** |
| **going** 9:15 | 236:16 | 174:23 | 56:1,3,7 | 239:9 |
| 10:6 17:25 | 245:3 | **Googled** | 56:11 | **guide** 228:21 |
| 20:3 22:4 | 251:6 | 183:13 | 58:21 | 229:4,8 |
| 34:13,16 | 252:6 | **gosh** 195:22 | 59:16 61:5 | 230:8 |
| 34:20 37:1 | 257:6 | 224:20 | 104:14 | **guidelines** |
| 37:1,11 | 268:20 | **gotcha** | 116:15 | 15:25 65:4 |
| 40:11 47:8 | **good** 9:12 | 136:23 | 124:1 | **guides** 5:5 |
| 50:21 51:2 | 19:2 57:14 | **gov** 229:14 | 156:4 | 226:9 |
| 52:5 58:19 | 75:1 76:12 | **governance** | 263:6 | 227:1,4,8 |
| 60:14 | 79:13,14 | 15:23 | 269:3 | 227:10,16 |
| 66:19 | 85:24 | **government** | **groups** 16:13 | 228:3 |
| 77:16 | 93:14 | 23:13,25 | 18:22 46:3 | 232:11 |
| 79:24 80:3 | 153:24 | 33:19 | 46:13,16 | **Guides'** |
| 88:18 | 159:12 | 89:22 90:6 | 52:25 54:2 | 226:16 |
| 90:19 95:7 | 161:11 | 96:22 | 54:22,22 | **guiding** |
| 107:8 | 177:20 | 148:22 | 54:23,24 | 103:15 |
| 108:6 | 178:17 | 233:17 | 55:2,4,5,5 | **Guillain...** |
| 111:25 | 197:19 | **governments** | 55:6,7,11 | 139:14 |
| 115:14 | 209:13 | 137:19 | 55:14 61:9 | **guy** 203:8 |
| 116:14,14 | 220:16 | **governor** | 96:14 | **guys** 262:23 |
| 124:24 | 253:6 | 144:23 | 237:13 | |
| 127:24,25 | 260:25,25 | 264:21,23 | **growing** | |
| 138:16 | **Goodness** | **grapevine** | 38:13 | **H** |
| 141:24 | 152:9 | 245:18 | 154:4,11 | **habit** 28:8 |
| 147:11 | **Google** 16:6 | **graphic** | 154:17 | **HAN** 153:13 |
| 154:2 | 20:25 | 15:17 | **Gruner** | 153:16 |
| 159:13 | 174:7,12 | **graphics** | 254:14 | **hand** 21:15 |
| 160:16 | 175:16,24 | 11:18 14:2 | **guess** 43:25 | 22:4 |
| 161:5,6 | 177:2,7 | **great** 27:24 | 96:12 | 111:24 |
| 164:19 | 179:3,6 | 74:12 87:9 | 126:1 | 122:6 |
| 165:21,22 | 180:7,17 | 207:22 | 141:15 | 148:21 |
| 165:25 | 180:19 | 227:4 | 156:10 | 270:16 |
| 166:1 | 181:3,9,11 | 230:9 | 172:18 | **handed** 25:21 |
| 169:7 | 183:10,14 | 245:3 | 179:22 | 102:24 |
| 172:24 | 183:24 | 264:5 | 187:25 | **handle** 19:25 |
| 173:12,12 | 185:9,13 | **greatly** | 194:16 | **handled** |
| 173:16 | 189:25 | 27:19 | 238:1 | 111:4 |
| 177:9 | 191:5,8,11 | **Griffis** | 262:25 | 140:23,25 |
| 182:4 | 193:11,19 | 18:25 | **guessing** | **hang** 72:23 |
| 184:20 | 194:2,10 | **ground** 9:16 | 193:17 | 73:2 |
| | | | | 160:13 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| happen | 247:10 | 54:16 | 159:6 | 251:18,20 |
| 185:23 | heads 9:18 | 57:24 71:3 | 170:1 | highlighted |
| happened | 192:24 | 104:23 | hesitant | 62:4,5 |
| 13:12 83:2 | heads-up | 105:2,22 | 122:18 | 142:18 |
| 93:12 | 244:2 | 107:2 | hey 176:25 | 143:13 |
| 114:6 | health 7:1,2 | 111:4 | 239:2 | 144:20 |
| 124:11 | 7:8 45:6,8 | 115:21 | HHS 9:1,2 | 148:20 |
| 160:25 | 45:10,11 | 119:15 | 232:7,20 | 228:9 |
| 178:9 | 45:14 51:7 | 124:13 | 233:12 | highligh... |
| 212:8 | 63:21 89:1 | 126:4,23 | 259:12,22 | 189:23 |
| 215:8,20 | 89:2 140:1 | 139:1,10 | 260:9,17 | highlights |
| 246:10 | 140:12 | 164:6 | 260:19,22 | 52:22 |
| happening | 153:17,18 | 174:19 | 261:3,8,15 | 62:15 |
| 79:5 97:17 | 186:1 | 175:4,7 | 261:17,25 | Hines 6:7 |
| 190:2 | 192:24,25 | 188:21 | 263:4 | 8:15 |
| 195:23 | 193:3,9 | 214:11,13 | Hi 45:22 | 264:17 |
| 196:7,8 | 218:22 | 214:14,19 | 51:22 | history 12:1 |
| 216:7 | 230:11,16 | 218:18,22 | 63:15,15 | hit 32:15 |
| happens | 230:21 | 219:12 | 68:14 73:4 | 216:17 |
| 144:17 | 237:13,17 | 237:25 | 74:25 84:4 | hits 17:10 |
| happy 27:21 | 237:18 | 256:7 | 100:2 | HIV 46:4 |
| 45:23 | 238:20 | 266:20 | 126:19 | hoc 180:21 |
| 95:10 | healthcare | helped 161:1 | 166:17 | 180:25 |
| 161:23 | 53:16 58:5 | 196:11 | 176:25 | Hoft 264:15 |
| 214:5,9 | 66:5 | helpful | 197:4 | holiday |
| 228:24 | healthy | 51:20 52:3 | 211:6 | 248:19 |
| 242:16 | 166:21 | 53:10 59:7 | 219:2 | holidays |
| hard 10:16 | 172:8 | 170:23 | 226:24 | 84:8 |
| 20:13 | hear 10:16 | 171:4,5,7 | 252:7 | Holly 239:5 |
| 122:15 | 145:7 | 171:9 | 254:25,25 | honestly |
| 194:21 | heard 28:12 | 197:7,10 | high 6:3 | 227:9,13 |
| 235:14 | 97:22 | 200:2,3 | 42:22 | hope 68:14 |
| 252:18 | 125:24 | 201:3,6 | 53:15 | 70:5 |
| harm 139:11 | 137:25 | helping | 60:20 | 126:19 |
| 234:21 | 217:14,15 | 197:17 | 89:19 | 127:6 |
| harmful | 245:17 | 246:16 | 190:3 | 135:6 |
| 165:15 | 252:7 | helps 53:11 | 255:8,13 | 161:3,6 |
| 168:6 | heart 139:16 | 54:18 58:1 | high-pri... | 166:20 |
| Hatcher 40:7 | heartburn | 127:6 | 16:17 | 230:10 |
| 40:9,13 | 252:8 | 231:10 | high-risk | 253:17 |
| 42:7,17,21 | heavily | 253:15 | 2:13,16 | 266:14 |
| 43:18 | 90:20 | hereinbe... | 39:9 43:21 | hopefully |
| hate 41:11 | hefty 205:15 | 270:8 | 44:10 | 55:22 |
| Haynes 108:1 | held 8:7 | HEREOF | high-volume | hopes 172:7 |
| 115:11 | help 33:23 | 270:15 | 89:11 | hoping 73:19 |
| he'll 230:8 | 34:1,17 | hereto 7:23 | higher 53:9 | 88:23 |
| head 136:2 | 35:10 | hereunto | highlight | 139:10 |
| 165:10 | 37:12 | 270:15 | 29:23 | 229:19 |
| headline | 46:16 | hesitancy | 66:10 | hospital... |

**CAROL CRAWFORD  11/15/2022**

185:24
hospital...
 146:2
 186:14
hosting
 244:24
hour 66:19
hours 28:9
 28:19,19
 73:1,5
 235:12
House 230:13
 230:24,25
 231:12,19
 232:1,4,7
 232:22
 233:2,8,12
 233:19,19
 233:21
 234:5,5,14
 259:10,22
 260:9,17
 261:8,20
 263:4
Human 7:1,2
 7:8
humans
 120:17
Huxley 86:17
 @R...
 86:17

____I____
I-- 148:19
I-H-E-M-E
 20:25
IAA 71:3,5
 109:15
 110:1,12
 110:18,20
 110:22,25
 111:7,11
 175:6
IAAs 109:22
ID 24:22
idea 46:15
 159:12
 187:23
 188:6

220:16
ideally 46:2
identified
 24:6
 103:13
 139:9
 157:12
 177:1
identify
 27:14
 54:18
 67:20
 85:10 91:4
 102:25
 118:17
 145:3
 155:21
 174:20
 175:4
 206:14
 226:13
IDs 97:8
IFB 24:18
Iheme 20:25
 24:7,10
 26:8,25
 33:13
 35:12
 36:12,23
 43:18
 45:22
 50:16
 55:19 57:5
 57:11 58:5
 68:12
 72:20
 79:13 84:3
 86:11
 105:21
 131:17
 237:10
 257:15
Iheme's
 37:11
illness
 41:25
 42:23
imagine 37:8
 68:10

104:15
immediately
 157:1
 160:1
 162:10
immune 4:7
 163:25
Immuniza...
 107:13
 160:21
 253:21
impact 10:24
 167:4
implemen...
 181:12
important
 90:13 95:7
 177:5
 211:11
impressions
 133:14,14
improper
 95:6
improve
 53:12
in-app 222:2
in-depth
 32:16
in-feed
 228:3,5,6
 228:13
Inaudible
 178:6
include 42:9
 188:3
 208:11,13
 209:16,18
 228:23,24
 242:15,21
 245:20
 265:4,8
included
 54:1 58:14
 61:13
includes
 243:17
including
 65:14
 140:8

144:23
 167:1
 170:23
 192:25
 232:20,22
 233:11
 237:18
Inclusive
 120:15
inconclu...
 120:15
 122:4,15
 122:17
 129:25
 130:6
 140:18
incorrect
 229:15
Independ...
 7:3
independent
 234:6
INDEX 2:1
indicate
 271:13
indicated
 115:11
 117:18
indicates
 244:17
Indicating
 31:17
 192:20
individual
 8:14
individu...
 267:18,22
individuals
 146:3
Infection
 3:9
inferring
 213:11
infertility
 76:5
 201:16
 204:16,18
inflamma...
 139:16

influencers
 75:4 80:9
 81:20
info 5:9
 75:11,15
 80:13
 107:8
 208:2
 214:4,5
 219:3
 230:8,11
 230:17
 239:20
 253:12
 258:7
 266:3
inform
 103:16
 138:20
 155:17
 159:8
 164:24
information
 16:15
 18:10,12
 27:16
 34:21
 35:14
 36:23,24
 46:11
 48:22 51:9
 52:6 54:23
 54:24
 55:11 58:1
 59:1 61:4
 62:21
 64:20
 70:24
 71:12
 72:14 75:4
 75:16 79:7
 79:8 81:4
 87:20
 88:18 89:1
 89:4,6,18
 90:13,14
 90:16
 93:21
 98:20

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 107:15,17 | initially | instructed | 73:24 | 199:2 |
| 107:22 | 17:16 | 80:21 | 122:13 | 237:7 |
| 109:3,12 | initiated | 193:19 | 160:8 | issued 153:8 |
| 114:9 | 17:17 | instruct... | 203:24 | issues 3:1 |
| 123:7 | initiative | 40:14 | interrupt | 29:2 59:12 |
| 126:22 | 18:16,19 | instruct... | 9:24 32:24 | 66:11 |
| 130:1 | initiatives | 144:16 | interrupted | 85:12 87:8 |
| 140:2,3 | 27:17 | instructs | 98:8 | 108:12 |
| 142:6 | input 34:21 | 10:12 | intro 221:18 | 207:16,22 |
| 148:25 | 104:8 | intent 220:9 | introduce | 220:13 |
| 154:8 | 111:16 | interact... | 8:11 | 264:3 |
| 159:22,25 | 156:19 | 18:9 29:17 | introduced | item 3:4 |
| 160:3 | 167:7 | interactive | 265:15 | 28:24 |
| 161:22,24 | 171:6 | 187:1 | invite 98:11 | 103:4 |
| 166:22 | 173:2,4 | interagency | 185:7 | 111:12,19 |
| 167:20 | 194:8 | 71:6 | 208:12 | 118:23 |
| 169:11 | 255:3 | 109:20,21 | 209:16 | 126:15 |
| 170:20 | inquired | interest | 221:9 | 136:8,25 |
| 175:8,9 | 69:11 | 58:9 64:3 | 223:24 | 144:19 |
| 182:1,19 | inquiry | interested | 239:21 | 165:13 |
| 183:9,13 | 108:24 | 75:11 | 242:10,16 | 247:15 |
| 183:18 | inserted | 80:12 | 243:25 | items 27:10 |
| 189:17 | 221:15 | 180:1 | 245:15,20 | 30:15 58:5 |
| 190:20 | insights | 228:25 | 247:19 | 65:3 84:6 |
| 192:10 | 63:16 | 253:19 | invited | 88:21,24 |
| 200:4 | 65:15 | 270:13 | 100:11 | 105:21,24 |
| 204:20 | 167:4 | interesting | 116:24 | 106:1,20 |
| 206:23 | Instagram | 65:17 | 210:1 | 111:13 |
| 213:19 | 50:6 62:18 | interface | 212:24 | 117:12 |
| 220:19 | 157:5 | 262:2 | 223:13 | 120:7 |
| 229:19 | 227:1,2,3 | interim | inviting | 128:23 |
| 230:21 | 227:8,12 | 242:14 | 208:9 | 131:2 |
| 237:20 | 227:16,20 | internal | involuntary | 207:7 |
| 238:5 | 227:22 | 239:2 | 137:7 | 221:16 |
| 253:14 | 228:15 | internally | involve | 225:21 |
| 255:4 | 229:10 | 113:16 | 101:14,17 | 226:25 |
| 259:23 | instance | 222:4 | involved | 240:6,9 |
| 264:5 | 18:11 | 243:8 | 32:17 71:1 | |
| 266:6,17 | 114:22 | interpret | 98:14 | **J** |
| 266:18,19 | 115:2 | 223:23 | 101:1,8 | J 6:8 |
| 266:21,22 | 135:16 | interpre... | 160:23 | James 6:17 |
| 267:3,4,7 | 183:14 | 159:7 | 215:13 | 8:22 |
| infrastr... | 224:8 | interpreted | 234:1 | James.gi... |
| 174:19 | instigate | 50:23 | 235:5 | 6:23 |
| 175:4,11 | 17:13,16 | 170:7 | involving | Jan 21:1 |
| ingredients | instruct | 179:1 | 233:10 | 174:7 |
| 65:5 | 57:5,15 | 199:25 | issue 5:7 | 176:6 |
| initial 85:8 | 138:12 | 211:17 | 95:10 | 182:23 |
| 132:14 | 194:2 | interpre... | 122:21 | 184:7 |

**CAROL CRAWFORD  11/15/2022**

189:15
192:22,23
195:17
243:16,22
252:20
253:3
254:16
█████ ...
174:8
**January**
49:16,18
49:21
50:14
55:18
**Jason** 7:14
8:9
**Jay** 8:14
24:15 25:5
26:14
45:19 57:3
57:3
181:17
230:7
264:8
**Jayanta** 6:6
**Jeff** 265:8
**Jefferson**
6:4
**Jen** 83:22
86:21
**Jennifer**
86:24
█████ 45:18
█████
24:13
**JIC** 72:9,10
183:7
**JIC's** 72:6
**Jill** 6:6
8:15
264:17
**Jim** 264:15
**Jin** 222:7
**job** 107:22
249:3
**John** 6:2,8
8:13 67:1
165:17
265:9

John.sau...
6:5
**John.vec...**
6:13
**join** 5:8
14:1 70:5
75:3 108:7
182:22
239:20
242:11
245:16,19
**joined** 30:20
115:11
116:24
**joining**
107:9,11
**joint** 59:1
107:15,16
107:22
233:14
**Jorgensen**
107:11
115:10
183:2
**Joseph** 1:7
7:11 8:5
271:7
272:2
**Josh** 261:17
**jotted**
225:19
**JR** 1:7 271:8
272:3
**Julia** 222:22
**July** 139:3
146:11
**jump** 27:21
**jumping**
120:17
**June** 118:24
126:16,18
126:24
131:20
134:21
135:1,9
142:9,15
144:1
247:15
248:16

**Juneteenth**
248:19
**Justice** 6:19
8:18,23
271:5

_____

K

█████ @...
244:15
**Kane** 244:14
**Kang-Xing**
222:7
**Karen** 193:5
**Kat** 35:6,9
37:2,4,20
**Kate** 222:25
**keep** 9:20,24
70:12
**keeping**
246:11
**keeps** 65:1
**Kelly** 50:25
51:1 52:1
60:11
61:22 63:3
63:15
64:23
141:21,23
**Kenya** 7:5
**kept** 38:3
241:8
**Kevin** 18:25
40:7,9,13
41:6
244:14,17
245:1,4,5
245:18
**Kevin's**
40:19
**key** 27:17
72:17
190:2
**keywords**
144:9
**keywords...**
144:5
**khatcher...**
40:7
**Kheriaty** 6:6

8:15
264:13
**kids** 157:4
161:14
162:4,13
**kill** 168:4
170:15
**kind** 36:9
38:15 52:6
72:9 75:24
90:15
109:24
123:17,17
129:4
133:3,20
153:14
154:3
177:11
198:16
200:9
204:13
210:24
217:20
224:10
230:9
260:5
261:7
**kinds** 98:19
101:18
263:11
**knew** 26:9
88:17 90:7
106:19
107:1
108:12
113:15
116:9,10
126:4
138:18,22
155:16
220:21,25
232:12,15
243:10
263:10
**know** 10:17
17:14,18
17:19
18:11 21:9
25:17

26:16 27:8
28:14,18
30:7,16
33:21
34:10 37:7
37:9,25
38:2,13
41:15 42:3
42:6,7,9
42:11,17
42:21,24
43:1,2,6
44:24
45:25 46:5
46:8,22
47:4,19
48:1,4,7,9
48:12,17
49:9 50:18
52:15
53:11
54:17
56:13,15
56:25 57:2
57:18
58:23,24
59:4,20
63:23 65:8
65:25 70:1
72:6,25
73:5,10,19
73:24 74:1
74:4,9
75:15,18
77:12,18
77:19,20
77:23,25
78:10,16
79:20 80:6
81:15 82:8
82:13,16
82:17,25
83:1,5,15
84:10
86:12,17
87:19 88:7
88:11,13
88:15
89:10,18

**CAROL CRAWFORD  11/15/2022**

89:19
90:21
91:23
93:15,24
94:4,9,24
94:25
95:24,25
96:1,10,12
96:18 97:7
97:8,18,20
98:10,12
98:13,18
99:17
100:5,20
100:21
101:11,14
101:17,24
101:24
103:10
108:23,25
109:4
111:7,10
111:16
112:18,25
113:1,10
114:1
115:1,9,15
115:18
116:3,8
117:14
120:4,21
121:9
122:5
123:8,15
123:19,21
124:10
125:19
127:7,22
129:6
130:6,25
131:3,4,8
132:13
135:5,17
135:25
138:1
139:21
140:16,23
142:18
143:4

144:4,20
144:24
146:6,9
148:10,11
148:24
149:4,9
151:4,14
151:24
152:4,7,12
153:13
154:10
155:3,4,5
157:23
158:13
160:12
161:11
164:22
165:4,21
167:6
170:2,19
171:9
172:23
173:7,10
174:25
175:23,25
177:12,13
177:18,22
178:12
180:18,19
183:5,7,9
183:24
184:13
185:5,23
186:4,5,19
188:16
190:2,8
191:20
192:5
193:3
194:6
197:25
198:2,15
199:4,10
199:13,23
200:2,13
201:21
202:22,24
203:14
205:7

208:14
209:5,18
210:24
211:16
212:8,15
212:25
213:16
215:19
217:2,23
218:7,20
221:13
222:7,13
224:7,23
225:16
227:16
228:8,21
233:4,23
235:7,18
238:6,23
238:25
239:3,8
240:25
241:7
242:12
243:1,11
243:12,14
244:12,13
246:22
247:21
248:15
251:19
252:5,6,14
252:16,18
253:15,23
255:18
256:4,9,11
258:10
259:3
261:9,21
261:24
262:16
263:17,20
264:7,10
264:12,14
264:16,18
**knowledge**
54:18
104:16,18
107:23

111:6
133:23
165:1
176:19
189:24
190:12
192:17
195:2
218:10
224:15
233:4
251:2
**known** 28:21
140:18
177:15
264:22
**knows** 37:4
136:17
**Kreimer** 1:20
8:8 270:4
270:22
**Kristen**
156:16
160:17,19
161:1
**Kulldorff**
6:6 8:16
264:11
**Kumar** 7:2
8:25,25
173:19
**Kyla** 6:18
8:17 271:4
**Kyla.sno...**
6:24
■ 97:7
_____
**L**
**L** 6:20 271:5
**lab** 4:1 5:2
152:24
153:8,11
153:12
199:2
219:24
**labels** 76:18
76:20 77:2
77:3 82:17
**laboratory**

153:15
**lack** 112:23
137:7
**Lagone** 103:7
103:13
105:8
119:7
121:1
125:8
126:18
127:2
133:2
165:5,14
165:19
166:14
222:16
**Lancet** 3:6,7
169:4
**Landry** 149:2
265:9
**lane** 89:17
**Langone**
139:3
159:3
**language**
65:16
**language...**
65:20
**large** 87:23
155:2
181:22
**largely**
52:25
**late** 33:16
36:7
249:12
**latest** 63:16
195:20
196:10
230:8
**launch** 48:2
48:5,7,8
228:3,12
**launched**
157:4
**launching**
27:18 46:1
**Lauren** 50:17
50:19 52:1

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 52:17 | **let's** 10:13 | **letting** 48:7 | 206:16 | 183:25 |
| 262:15,18 | 13:7 16:18 | **level** 50:9 | 219:22,24 | 184:2 |
| 262:19 | 17:10 20:1 | 117:3 | 221:7 | 203:24 |
| **law** 95:25 | 22:17,22 | 234:15 | 226:7,9 | 207:6 |
| **lawsuits** | 25:13 | **leverage** | 237:5 | 217:20,22 |
| 142:16,20 | 26:20 | 174:19 | 239:19 | 224:16 |
| 143:8 | 38:20 39:4 | 175:3 | 241:20,21 | 246:6,12 |
| **lawyer** 236:9 | 46:25 | **Lewinsky** | 247:10 | **listed** 92:24 |
| **lawyers** 9:22 | 49:14 | 246:25 | 254:9,22 | 120:6 |
| 9:23 39:16 | 50:14 | **Lewitzke** | 257:8 | 221:20 |
| **lay** 9:15 | 51:21 56:8 | 83:21 | 272:5,9,13 | 224:3 |
| **layer** 195:3 | 60:8 65:13 | 86:22 | 272:17,21 | **listen** 31:10 |
| **lays** 105:21 | 69:19 | 203:2,3,11 | **line's** | 70:6 |
| **lead** 11:16 | 81:25 86:8 | 216:4,15 | 179:14 | **listened** |
| 24:16,25 | 97:25 | 217:5 | **link** 31:8,11 | 181:17 |
| 35:3 | 102:7,7 | 246:25 | 35:16 | **listening** |
| 139:11 | 107:4 | 247:1 | 48:21 | 31:13 50:4 |
| 159:5 | 118:9 | 265:20 | 102:18 | 52:10 72:3 |
| 164:2 | 119:6 | **Lewitzke's** | 186:17,20 | 90:21 |
| 168:4 | 121:17 | 211:3 | 187:1,19 | 148:13 |
| 170:16 | 126:17 | **Lexitas** 7:14 | 187:19 | 154:21 |
| 181:10 | 129:21 | 8:10 271:1 | 194:8 | **lists** 96:20 |
| 227:10 | 145:17 | 271:23 | 208:1 | 96:21 |
| 249:3 | 146:20 | **Liberties** | 214:19 | 120:8 |
| 259:4 | 149:25 | 6:9 | 227:5 | 157:12,20 |
| **leadership** | 165:11 | **lieu** 198:25 | 251:20 | **literature** |
| 11:14,15 | 166:12 | **life** 143:11 | **linked** 169:3 | 131:5,9 |
| 15:15,16 | 176:5 | **Lindsay** | **LinkedIn** | **litigation** |
| 15:19 | 178:22 | 254:17,18 | 16:6 | 92:23 |
| **leads** 168:12 | 179:11 | **line** 33:10 | **linking** | **little** 10:16 |
| 258:19,23 | 205:25 | 39:7 60:5 | 41:25 | 11:24 |
| **learn** 79:23 | 206:24 | 68:5 91:5 | **links** 191:23 | 12:22 38:2 |
| 110:21 | 211:1 | 103:2 | 219:11 | 39:15 |
| 111:3 | 218:12 | 118:18 | 266:5 | 49:15 63:8 |
| 164:13 | 221:23 | 120:5 | **Lis** 262:25 | 64:15 67:9 |
| 177:4 | 222:6 | 126:11 | 263:5 | 69:19 |
| **learning** | 226:22,22 | 138:25 | **list** 3:12,13 | 85:22 |
| 40:16 | 227:18 | 141:8 | 56:5 61:14 | 130:18 |
| 110:13,23 | 234:9,23 | 150:12 | 62:22 | 151:12 |
| **leaves** 128:4 | 237:9 | 151:21 | 96:20 | 161:5 |
| **led** 161:24 | 241:24 | 152:20 | 97:18 98:8 | 183:15 |
| 204:18 | 243:15 | 155:22 | 117:9 | 189:25 |
| **left** 119:12 | 247:9,14 | 163:16 | 118:23 | 191:14 |
| **legal** 7:14 | 254:6,6 | 166:5 | 119:17 | 205:15 |
| 7:14 8:9 | 257:13 | 173:23 | 126:15 | 208:16 |
| 8:10 271:1 | 261:2 | 179:12 | 131:17 | 214:2 |
| 271:23 | 263:15 | 189:5 | 133:21 | 227:12 |
| **Lepage** 63:5 | **letter** | 196:18 | 158:20 | 261:2 |
| 65:2 | 100:13 | 205:14,20 | 182:20 | 266:3 |

**CAROL CRAWFORD  11/15/2022**

live 34:15
167:10,16
224:10
258:9
Lives 34:24
Liz 75:2
80:3 103:7
103:8
105:24
119:7,10
121:1,9
122:8
125:8
126:18
127:2
133:2
139:3
151:23
160:16
163:21
166:14
222:16
local 76:16
locate
218:25
log 77:10,14
92:10,11
92:13
95:17
212:4
log-in 79:10
92:1
logged 92:5
92:15
218:18
long 12:7
28:20,22
126:20
166:12
227:24,25
266:10
longer 13:11
48:23
82:23
155:6
235:14
look 20:1
21:14 33:6
37:23

38:23
43:12 49:3
49:4 50:14
52:13 58:1
59:24 60:8
61:17 63:1
63:9 70:20
74:11,24
76:2 84:6
85:8 86:8
88:9 99:23
104:9
105:20
108:19
111:12
112:9,10
118:25
128:24
131:13,20
133:1
136:5
141:12
146:21
149:13
150:9
155:10
163:6
165:11
167:23
173:1,11
174:3
176:5
179:12
187:18
202:8
205:16
206:24
212:20
215:14,16
234:9
249:18
250:7
looked 59:10
72:11
95:16
140:19
147:17
157:20
164:22

172:4
175:12
215:17
265:23
looking
18:11 21:3
32:1 40:15
55:24 56:8
56:11
58:22
65:15
72:19
74:16,17
80:25
117:5
126:1,3
127:21
128:13
154:25
159:9
191:20,22
197:4
200:25
223:14
227:2
234:18
237:19
245:9
248:11
253:17
258:15
lookout
153:21
155:12,14
208:25
209:1
220:10
244:8
Lookout'
247:20
looks 30:2
35:16
44:14,22
55:19
61:25 62:1
76:4,10
98:17
100:3
119:8

192:22
195:4
216:14
222:8
244:2
248:7
252:1,22
253:6
loop 25:5
26:10,15
27:4
238:22
looped
238:18
looping 23:4
25:4 26:14
lose 157:7
lost 168:23
269:8
lot 17:25
18:20
28:19
40:11 59:5
64:20 89:3
107:23
108:15
109:5
110:2
133:22
144:17
149:17
150:20,23
152:3
154:4
172:20
231:6
236:11,18
266:17
lots 84:7
232:5
loud 9:20
97:22,23
145:10
174:15
176:8
Louis 271:18
Louisiana
1:1 8:6
love 126:23

182:21
lunch 102:3
102:10
109:17
Lynn 87:3,4

―――――――

**M**

magnetism
127:11
mail 61:5
main 76:15
83:16
119:11
190:25
231:8
249:1
maintaining
137:20
138:3
major 16:4
87:20
187:6
232:3
making 18:11
68:15
140:3
203:22
manage 15:18
15:22,23
35:10
management
15:24
mandate
142:22
mandated
148:23
mandates
137:19
142:21,23
148:20
149:18
manmade
120:20
manmade'
108:21
120:13
manner 105:8
265:14
manually

**CAROL CRAWFORD 11/15/2022**

192:18
**March** 13:4
13:14 15:2
16:1,20
18:6 34:5
40:4 43:23
44:1,25
46:25 47:7
61:12 63:2
63:14
64:23
65:14,24
68:13 73:3
73:16
74:24 76:2
76:13
77:13
79:14 80:3
81:25 82:3
82:4 84:3
174:4,14
176:6
179:23
182:16
257:15
259:7
**Margaret**
45:4
**mark** 33:18
33:20,22
49:4
100:10
**marked** 21:12
22:8 33:4
38:18
43:10 49:1
60:3 67:12
85:6 91:1
102:22
112:6
113:3
118:7
126:8
145:1
150:6
152:16
155:7
163:13
164:17

166:2
171:15
173:20
179:9
187:9
188:25
196:15
200:15
205:19
219:19
221:3
226:4
237:2
239:16
241:17
247:7
249:7
254:4
257:4
**marketing**
262:1
**marriage**
270:12
**Martin** 6:6
8:16
**Marty** 264:11
**mask** 29:2,3
29:5
**masking**
62:10
71:13
**masks** 29:7
66:5
**master's**
12:4,11
**match** 41:4
**material**
65:20 99:3
114:15
117:17
146:15
148:15
264:2
**materials**
53:12
56:17 58:3
81:8,12
90:7
115:21

248:22
**matter** 8:4
94:3 103:1
108:8
113:24
123:2,20
129:21
130:10
132:17
133:17
145:4
152:7
171:17
184:20
187:12
189:5
200:18
249:18
254:9
270:14
**matters** 28:9
132:24
**maturing**
192:2,4
**Maureen** 1:20
8:8 270:4
270:22
**mean** 13:19
15:20 17:2
17:18,19
23:6 26:10
26:13
30:12
32:17
39:24 50:7
52:15 73:3
77:15 80:5
82:3 85:18
87:25
88:25 99:6
113:1
116:2
117:9,14
127:21
129:1
132:22
136:2
154:22
160:6

161:20
172:18
175:2
177:15
178:21,25
180:19
181:8,9
182:3,5
183:3
191:15
192:3
193:11,12
195:21
196:6
198:14
199:19
201:18
209:8
210:22
211:8,15
212:19
213:2
214:15
217:12
220:12
222:12
224:4
229:24
236:17
241:10
243:3
246:19
251:9
258:2
260:22
261:3
266:11,16
**meaning**
103:11
139:7
184:25
217:18
**means** 113:14
191:1
209:21
**meant** 19:15
37:17
77:19
90:23

125:9
130:3
167:18
176:12
177:7
182:13
211:16
218:20
228:6
**media** 11:8
11:16 12:7
13:1,19,20
13:24,25
14:3,4,12
14:14,17
14:20,25
15:4,6,11
15:14,16
17:1,24,24
18:2 19:20
20:3,16
24:3,16,25
35:9 36:5
43:3 50:3
52:10,11
53:9 54:14
54:17
57:25 59:3
72:2,12
92:7 104:5
104:24
105:1,3
113:11
114:8
117:2,8,17
124:6
128:11,14
143:6,21
143:24
148:13
150:22
154:21,22
155:1
181:7
198:22
207:7
212:20
220:2
227:20

**CAROL CRAWFORD 11/15/2022**

234:6
237:14,20
248:9
249:4
264:3
267:10
**medical**
131:5,9
137:3,8
140:12
203:15
**medications**
10:23
**medicine**
12:16
**medicines**
137:13
164:21
**meet** 70:9
150:18
170:3
175:15
180:19,20
209:20
**meeting** 2:23
5:6,13
36:8,16,17
57:4 68:6
68:7,9,12
69:23 70:1
70:6 72:20
73:10
75:22 80:1
80:10
84:10,11
84:13,19
98:10,11
99:22,25
100:2,4,6
100:8,10
115:11,14
115:24
116:1,6,15
119:17,20
119:24
132:18
151:4,15
151:18
172:16,19

172:19
177:16
178:23
179:6
180:7,23
185:1
188:9,10
188:12,13
188:21
198:25
202:4
208:9,11
208:17,23
210:4
212:24
213:1,3
221:14
223:4,13
225:15,24
225:25
226:10,16
230:12
232:24
238:23,24
239:1,25
240:14,23
241:8,9
242:6,18
242:20
246:2,5,18
246:23
247:12,21
248:15,20
253:18,24
258:19
260:6,13
260:17
261:15,18
262:9,25
263:4,14
263:18
265:15,17
**meetings**
5:10  17:8
18:17,18
18:20
20:18
30:15  69:2
83:6  116:2

116:7
117:25
130:16
174:24
179:3,25
180:5,9,11
180:17,17
180:25
181:2,7,24
184:17
188:14
198:12,14
198:16,21
202:6
204:24
208:16
209:10,11
209:23
210:11
226:18,19
232:5
239:2
241:21
242:10,11
244:23
245:1,15
245:16
250:15
260:12
261:7,11
261:19
262:6
265:12,12
265:13
266:10,14
267:11,13
**Megan** 252:20
**Melissa** 7:7
**Meltwater**
154:13,14
154:18
155:1
**members** 84:7
107:10
**memo** 109:20
**memory** 18:9
25:15  29:5
31:25
34:22

48:23
83:10,14
92:13
95:17  96:2
160:7
180:25
182:6
198:13
200:13
205:1
214:2
217:25
218:1
236:12,16
240:13
260:10
**mental** 63:21
**mention**
123:21
230:22
233:1
**mentioned**
46:15
51:16
54:15
62:22
72:10  76:3
87:8  99:1
109:15
121:10
125:16
126:2
132:20
141:20
142:12,21
147:16
157:8
195:17
200:6
211:24
221:25
223:1
236:14
237:13
243:4
246:19
250:14
251:17
257:22

259:9
**mentioning**
79:22
117:25
125:10
**mess** 192:16
**message**
33:24  36:4
36:7
247:22
252:18,19
**messages**
28:25
248:24
252:8
**messaging**
29:13,14
29:19
42:24
237:17
**met** 119:23
174:23
175:15
198:4
202:1,17
**Meta** 50:4,5
50:7,8
154:24
155:1,2
156:9
159:13
161:14
162:4,25
180:13,18
180:20
181:16
212:3,10
213:22
215:14
**Meta's** 158:3
158:11
**method** 255:9
255:14
**mic** 10:18
**Michael**
264:21
**Michelle**
19:9,12
32:13

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| microchips | 161:16 | 74:14 | 241:22 | 166:13 |
| 87:11 | 162:5,16 | 77:21,22 | 242:6,10 | 181:4 |
| 90:15 | 163:2 | 83:12 84:5 | 245:15 | 185:18 |
| 207:12,13 | 168:13 | 84:12 86:3 | 253:17 | 187:5 |
| 207:17,23 | 178:2 | 87:14,17 | 257:20 | 190:22 |
| 209:7 | 199:6 | 87:24 88:8 | misinter... | 196:3 |
| 265:24 | 238:13 | 91:15,18 | 153:8 | 202:9 |
| Microsoft | 266:24 | 91:25 | 155:4 | 207:1 |
| 16:6 241:1 | mischara... | 98:14 | misoprostol | 216:16 |
| middle | 214:1 | 103:9 | 255:11,16 | 217:9 |
| 169:14 | misconce... | 110:13,14 | missed 70:8 | 242:25 |
| 222:6 | 89:12 | 111:4,5 | 96:8 156:6 | 243:20 |
| 253:7 | misheard | 117:2,7 | missing 81:3 | 252:25 |
| mifepris... | 121:22 | 119:16 | 196:1 | 253:8 |
| 255:10,15 | misinfo 3:1 | 124:14 | Missouri 1:3 | MO 271:18 |
| Mike 144:23 | 3:2 4:11 | 139:1,6 | 6:1,2,4 | moderation |
| milk 165:14 | 55:25 56:9 | 150:19,25 | 8:5 271:7 | 76:7 82:7 |
| millions | 68:16 69:4 | 151:23 | 272:2 | 82:8,11 |
| 168:20 | 74:14 | 152:25 | misspelled | 101:15 |
| mind 9:24 | 85:12 87:9 | 154:1,11 | 139:2 | 175:24 |
| 47:5 116:3 | 91:9,15 | 156:21 | mistake | 176:11 |
| 156:5 | 173:25 | 157:7 | 144:15 | modules |
| 201:13 | 174:20 | 161:25 | mistype | 40:17 |
| 233:18 | 175:5 | 166:7 | 127:23 | MOLA-DEF... |
| mine 23:11 | 179:15 | 171:23 | misunder... | 3:21 |
| 87:4 | 207:22 | 175:8,13 | 154:6 | MOLA-DEF... |
| 205:22,24 | 220:22 | 179:15 | mix 52:25 | 2:24 |
| 206:10 | 221:22 | 181:20,23 | mm-hmm 16:3 | MOLA-DEF... |
| minor 241:11 | 225:5 | 181:24 | 16:25 | 4:4 |
| minute 43:12 | 229:20 | 182:10,21 | 17:12 | MOLA-DEF... |
| 96:6 99:1 | 234:17 | 183:25 | 19:18 21:5 | 5:3 |
| minutes 4:10 | 257:19 | 184:16 | 23:9 39:17 | MOLA-DEF... |
| 171:22 | 258:16 | 185:12 | 40:24 | 4:2 |
| 182:23 | misinform | 197:7,20 | 41:23 | MOLA-DEF... |
| 184:7 | 5:18 | 198:2 | 43:15 44:7 | 3:24 |
| 216:16 | 257:10 | 199:5,11 | 45:21 | MOLA-DEF... |
| 266:12 | misinfor... | 200:1,8 | 62:25 | 3:18 |
| mis-info | 3:14 4:1,9 | 201:3,25 | 63:18 | MOLA-DEF... |
| 4:13,15 | 5:1,3,11 | 204:1 | 67:11 | 3:14 |
| 187:14 | 33:25 | 205:20 | 107:6 | MOLA-DEF... |
| mischara... | 37:12,14 | 206:16 | 108:20 | 3:12 |
| 47:14 54:8 | 38:5,13 | 208:9 | 114:11 | MOLA-DEF... |
| 57:8 76:22 | 56:9,12 | 211:18 | 117:15 | 3:5 |
| 78:17 86:5 | 58:12,20 | 212:5 | 128:25 | MOLA_DEF... |
| 89:24 | 58:22 | 219:6,25 | 129:22 | 2:18 |
| 101:2 | 68:25 69:2 | 220:11 | 130:7 | MOLA_DEF... |
| 132:6 | 69:11 71:4 | 225:5,6 | 134:8 | 5:16 |
| 143:16 | 71:16 | 234:21 | 141:16 | MOLA_DEF... |
| 158:5,23 | 72:18 | 237:16 | 155:11 | 4:11 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| MOLA_DEF... 4:9 | 2:14 | 88:17 | necessary 273:9 | 39:6 43:16 |
| MOLA_DEF... 4:17 | MOLA_DEF... 3:3 | 129:5,9 | need 34:20 | 50:15 |
| MOLA_DEF... 4:6 | moment 22:10 | 150:24 | 54:20 58:2 | 66:14 |
| MOLA_DEF... 5:15 | 38:22 49:3 | | 100:20,23 | 86:11 |
| MOLA_DEF... 3:15 | 74:22 86:9 | **N** | 134:2 | 156:1 |
| MOLA_DEF... 5:2 | 118:10 | N 7:6 271:17 | 143:14 | 157:4,12 |
| MOLA_DEF... 5:13 | 195:25 | N.W 6:10,20 | 182:25 | 163:18 |
| MOLA_DEF... 2:21 | 227:18 | 271:5 | 184:9 | 174:2 |
| MOLA_DEF... 5:11 | 228:8 | nah 133:16 | 194:6 | 182:20 |
| MOLA_DEF... 3:1 | 239:15 | name 8:8,8 | 235:12 | 187:20 |
| MOLA_DEF... 5:9 | Monday 63:1 | 8:17 11:2 | needed 20:18 | 190:2,7 |
| MOLA_DEF... 5:7 | 100:3 | 14:25 21:4 | 110:24 | 203:8 |
| MOLA_DEF... 5:6 | 119:19 | 86:12,19 | 116:15 | 221:18 |
| MOLA_DEF... 5:5 | 161:4 | 103:10 | 121:23 | 222:5 |
| MOLA_DEF... 4:22 | 180:7 | 125:17 | 126:21 | 223:1 |
| MOLA_DEF... 4:16 | 228:4 | 141:19 | 208:2 | 239:20 |
| MOLA_DEF... 4:19 | monitor | 174:10 | 221:9 | 248:19 |
| MOLA_DEF... 4:14 | 117:16 | 177:10 | 224:5 | 250:12 |
| MOLA_DEF... 4:12 | monitoring | 198:8 | 228:22 | 254:15 |
| MOLA_DEF... 5:19 | 167:2 | 203:4,9 | 235:13 | newer 190:13 |
| MOLA_DEF... 2:14 | MONROE 1:2 | 211:3 | 239:22 | news 13:20 |
| MOLA_DEF... 2:9 | month 166:23 | 222:17 | 255:6 | 14:3,4 |
| MOLA_DEF... 2:17 | months 32:9 | 246:24 | 262:16 | 53:25 58:7 |
| MOLA_DEF... 2:11 | 169:22 | 247:2,3 | 263:2 | 59:3 72:11 |
| MOLA_DEF... | 182:19 | 249:17 | needing | 76:16 |
| | morning 9:12 | 264:23 | 255:22 | 143:11 |
| | 119:18 | 272:1,2 | needs 73:6 | news/com... |
| | 148:16 | 273:11 | 171:6 | 53:2 |
| | 182:2 | names 21:10 | 224:1 | nicer 154:25 |
| | 248:18 | 21:10 | needs/qu... | nine 111:19 |
| | 267:15 | 25:17 | 221:18 | nod 9:18 |
| | move 26:20 | 83:21 | Network | Nods 165:10 |
| | 38:20 46:1 | 135:25 | 153:18,18 | noise 97:22 |
| | 152:14 | 152:10 | networks | non-synced |
| | 163:15 | 174:9 | 237:20 | 268:15 |
| | 165:22 | 177:18 | never 24:4 | noon 242:12 |
| | mRNA 164:13 | 222:6,15 | 47:5 85:1 | 245:17 |
| | multiple | 233:24 | 95:16 | Nordlund |
| | 115:6 | 234:2 | 105:5 | 160:19 |
| | 212:11 | National | 156:5 | normal 9:18 |
| | 232:3 | 107:13 | 161:20 | 164:8 |
| | 233:11 | 160:20,21 | 198:13 | normally |
| | muted 267:16 | 223:17 | 217:14 | 19:25 |
| | myth 29:3 | nature 18:7 | 218:25 | 28:23 |
| | 129:4,6,10 | 155:3 | 235:1 | 195:7 |
| | 134:15 | NCIRD 107:12 | new 4:2,5 | 223:15 |
| | myths 29:1 | NE 1:17 | 5:8 6:9 | notarized |
| | 75:16 | necessarily | 14:3 29:2 | 271:16 |
| | | 116:23 | | notary |

270:23
271:14
273:23
note 5:21
25:10
26:11,22
31:6 33:17
97:22
100:14
102:14
118:12
121:18
122:20
124:21
130:13
185:23
211:11
216:15
242:19
243:21
244:6
noted 75:4
133:12
notes 30:10
30:14,14
38:2,2
56:19,22
84:24 85:2
116:16,18
116:19
119:18
127:6
137:5
168:10
225:16,18
241:8,9
notice 2:7
21:18,21
128:6
noticed
227:9
noticing
240:8
November
1:14 8:2
156:1,14
163:20
253:13,14
270:16

271:3,11
272:4
number 31:8
31:15
35:21 36:2
36:8 37:3
55:3,3
67:3
102:15,20
105:21
111:19
120:6
122:15,19
129:24,25
131:17
136:13
146:11
163:24,25
165:13,18
165:19
169:6,14
171:25
190:3
222:14
241:25
nutshell
230:15
■ 97:7

— O —

O 254:20
O'Boyle
196:24,24
197:15,23
198:9
199:4,21
204:20
207:4
209:1
211:5
212:25
220:10
248:2
O'Brien 21:8
198:6
OADC 11:10
12:24
13:11,13
14:9 18:25

87:5
objected
176:10
objection
36:18
47:14 54:8
57:8 76:21
78:3,17
79:1 80:16
82:20 86:5
89:24
93:16 95:7
96:3 99:4
101:2,6,20
105:10
106:6
110:7
112:22
115:12
121:5
123:3
131:6
132:6,21
134:22
137:22
138:5
142:24
143:16
158:5,21
159:14
161:16
162:5,16
163:1,9
165:7,23
168:13
176:1
178:2
193:13,24
199:6
231:15
238:13
251:4
259:25
266:24
objections
10:9,10
176:4
objectives
11:22

occasion
98:21 99:1
180:25
occasional
17:4,9
29:16
30:15
occasion...
38:7 51:19
222:24
241:4
244:21,22
265:19
occasions
198:17
occur 64:22
213:4
234:25
occurred
13:13 40:3
84:12,14
100:6,10
173:8
188:11
213:1
216:25
235:2
236:15
occurring
143:6
250:2,24
occurs 54:17
October
252:22
253:4
OD 14:9
odd 95:23
248:3
offer 69:13
89:18
offered
57:13
152:1
213:24
231:10
offering
69:4 70:24
212:4
230:10

offerings
77:9
office 1:16
6:2 8:25
11:8,11
14:9 43:6
104:15
114:20
222:24
234:5
271:17
officer
160:19,21
192:25
193:3,9
official 1:8
96:14
103:10
215:3
271:8
272:3
oftentimes
114:9
oh 23:6
28:17
40:10
67:25
72:23
85:19
92:11
93:17
100:20
136:15
149:8
167:13
218:3,8
224:20
225:8
236:6
239:24
240:22,22
245:8
260:8,24
261:14
okay 12:12
13:2 14:12
14:19,21
14:24
15:19

**CAROL CRAWFORD  11/15/2022**

20:12
21:14
23:12 24:5
24:18 25:2
25:19
26:12 27:8
27:13,24
28:13,24
29:12,24
30:3,7,23
32:12
35:20
36:20 38:9
38:21
39:15
42:21 43:8
43:9,13,23
44:4,16
46:10,18
46:25 47:2
47:5,12,17
47:24
48:14 50:7
50:11,22
51:14
52:13 56:5
56:7,19,23
60:21
61:17
62:20
63:13 64:1
64:7 65:23
66:19,22
66:23 67:9
67:16,17
68:7 70:14
70:22
73:13
74:23
78:20
79:12 80:2
80:24
82:25 83:8
85:25
90:24
95:20,24
96:7,17
97:12
99:22,25

101:11
103:6,20
105:20
108:6
109:11,19
110:10
111:1
113:5,21
114:25
115:8
117:22
118:5,6
119:1,23
121:1,21
122:1,20
123:12,19
126:17
127:9
129:19
130:5
133:25
135:13,25
136:7
140:5,22
140:25
141:7,12
142:1,9,22
143:12
144:3
145:11,13
147:6,9,15
148:17
149:8
150:8
151:10
152:7,13
153:4,12
155:23
156:7
158:2,25
162:23
163:22
164:19
165:23
167:9
168:17,23
168:25
170:10,22
171:14,19

171:24
173:25
174:1,2,13
176:14,20
177:12
178:16,24
179:7,14
179:14,19
180:22
182:3,8,14
185:4
186:25
187:2,16
189:9,17
190:15
191:12,25
193:7
195:11
196:14,22
198:4
199:15
201:22
202:1,5,15
202:21
204:19
207:19
208:3,24
209:14
210:13
211:1,5
213:5,21
214:3,25
215:6,23
215:25
216:14,18
217:7,23
218:9,12
219:2,14
220:9
221:12
223:25
225:10
226:2,12
226:17
227:15,24
228:12
229:7,18
230:7
234:2,24

235:9
237:1,8
238:4,21
239:23
240:5,19
241:5,7,13
241:23
242:1
243:23
244:4,19
245:7,24
246:24
247:14
248:8
249:5,21
250:23
252:1,17
253:6
254:13,21
256:9
257:12
260:11
262:21
263:13
264:1,8
265:1,4
268:2,9
269:11
**older** 42:22
46:3
**oldest** 22:19
**olds** 4:3,6
163:19
**Omicron** 4:17
189:7
190:5
191:22
192:1,6,13
194:6
**Omicron-...**
189:18
192:3
**Omicron/...**
191:4
**onboarding**
97:1 100:4
100:5,8,10
**once** 37:19
84:24

100:9,12
102:25
111:25
112:9
116:20
122:14
126:10
141:7
142:1
144:13
145:3,13
145:21
146:14,22
148:18
152:19
155:13
163:15,23
166:4
169:22
173:22
189:4
196:17
200:17
219:21
221:5
226:6
239:18
241:7,19
246:9
247:9
248:10
249:17
254:8
257:7
261:18
**one-** 39:25
**one-pagers**
239:14
**ones** 9:23
57:21
93:12
131:21
197:19
**ongoing**
33:19
160:9
184:15
**online** 89:12
**Onyimba**

| | | **P** | 192:1,4,5 | 255:10,15 |
|---|---|---|---|---|
| 174:6 | 117:8 | | 194:5 | **parents** |
| 176:7 | 259:4 | **p.m** 1:15 | 214:19 | 165:15 |
| 185:16 | **origin** | 47:1 61:19 | 216:6,7 | **Parson** |
| 195:12 | 120:21 | 64:24 | 226:23 | 144:21 |
| 250:10 | **original** | 68:13 70:4 | 241:24 | 264:21 |
| 251:2 | 5:21,23 | 76:3 | 243:15 | **part** 14:22 |
| 254:19 | 22:7 35:12 | 102:10 | 245:7 | 22:19,23 |
| **Onyimba's** | 268:22,23 | 119:7 | 250:7 | 25:9 26:6 |
| 182:14 | 271:11 | 126:19 | 252:24 | 26:20 |
| **open** 149:4 | **originally** | 142:15 | 271:12,14 | 32:18,19 |
| 179:24 | 36:23 | 144:2 | 271:17 | 36:16 48:1 |
| **opened** | 231:3 | 145:19 | 272:5,9,13 | 56:25 59:1 |
| 265:15 | **originals** | 150:3,3 | 272:17,21 | 59:8 60:22 |
| **operated** | 268:21 | 156:15 | **pages** 52:24 | 70:7 81:23 |
| 110:14 | **originated** | 180:4,7 | 189:18 | 92:7 |
| **operates** | 181:25 | 205:10,10 | 190:3 | 106:10,14 |
| 80:15 | **OSHA** 142:22 | 207:3 | 192:8 | 110:18,19 |
| **operations** | **ought** 187:25 | 208:10 | 250:5 | 119:10 |
| 11:17 | **outbreak** | 257:1,1 | 270:8 | 129:18 |
| **opinions** | 16:14 | 269:19 | **palsy** 3:7,8 | 131:11 |
| 101:18 | **outcome** | **P.O** 6:4 | 111:14 | 137:7 |
| **opportun...** | 270:13 | **packet** 22:5 | 112:16,19 | 145:7 |
| 83:11 | **outfit** 217:7 | 68:1 | 112:21 | 151:24 |
| **Opportunity** | **outlets** | **page** 2:2,6 | **pandemic** | 156:6 |
| 227:2 | 207:8 | 2:25 3:25 | 19:12 | 172:3,7 |
| **option** 88:14 | **outline** | 4:17,24 | **panel** 189:24 | 192:17 |
| 213:25 | 11:25 | 6:25 22:18 | 190:12 | 200:7 |
| **options** | **outlined** | 41:21 | 191:4 | 214:14,17 |
| 34:11 | 27:19 | 48:16 | 192:17 | 235:2 |
| 138:18,22 | **outlining** | 67:21,24 | 194:15,17 | 243:19 |
| 155:16 | 25:11 | 67:25 | 195:2 | 244:25 |
| 212:11 | **Outlook** | 125:7 | 251:23 | 253:9 |
| 218:19 | 30:13 | 129:5 | **panels** | 259:16 |
| 220:25 | **output** 43:4 | 131:16 | 193:23 | 263:4 |
| **orally** 39:22 | **outside** | 133:4,5,5 | 194:3,8 | **participate** |
| **order** 30:21 | 127:25 | 133:6 | 251:17 | 103:21 |
| 120:9,11 | **overall** | 136:9,16 | **paper** 39:19 | 260:19 |
| 131:8 | 33:25 | 141:23 | 112:16 | **particip...** |
| 164:24 | 52:24 | 142:14 | 113:8 | 84:2 |
| 205:22 | 143:21 | 143:12,25 | **papers** 129:7 | 177:16 |
| 206:4 | **overlap** | 144:12 | **paragraph** | 198:15 |
| 210:13 | 14:16 15:7 | 146:20 | 127:17 | 246:22 |
| **organiza...** | 232:13 | 166:17 | 156:22 | **particular** |
| 14:3 15:1 | **oversee** | 168:25 | 166:18 | 20:20 |
| 51:7 | 11:22 | 169:12,14 | **paragraphs** | 63:24 64:3 |
| 247:23 | **overview** | 179:22 | 156:14 | 89:7 |
| **organiza...** | 3:11 | 189:7,11 | **pardon** 54:21 | 104:24 |
| 33:24 | 190:17 | 190:25 | **parentheses** | 105:4 |
| 37:12 | 191:14 | 191:1,20 | | |

**CAROL CRAWFORD  11/15/2022**

141:4
148:17
197:8
201:3
240:13
246:17
248:1
particul...
64:11
163:24
200:2
parties 8:11
31:11
270:12
partner
111:3
206:22
211:21,24
213:9
partnering
79:23
partnership
84:5 87:5
partners...
84:11
parts 13:25
68:10
110:19
pasted 76:10
76:14 82:2
82:13
190:15
patience
177:1
patients
113:9
123:2
Payton 20:25
23:4 24:7
24:10 25:3
26:11,25
27:5 28:11
28:14,21
30:4 35:12
36:11
37:14
50:16,24
63:11
79:22

85:17
105:21
119:12
131:17
221:15
222:25
232:5,14
234:10
237:10
257:15
259:2
Payton's
24:19
86:14
119:10
Payton/G...
87:8
@f...
24:9
PCR 220:11
pdfs 41:6
Peck 261:17
pediatric
158:12
253:11
penalty
273:12
people 15:22
18:20
20:14
23:22 29:6
39:5,20
41:17
42:22,23
43:17 47:3
48:22
50:15 53:5
54:16
56:16
59:23
61:15
68:24
70:20 72:5
83:19 88:9
89:1 96:22
96:22,23
97:4,20
98:11,21
107:1

114:4
115:13
123:23
128:4
129:8
135:19
136:3
137:2
138:20
146:16
149:17
151:2
154:13
155:17
162:2,15
162:24
164:6,12
168:4,6,11
170:16
177:9,13
181:6,15
181:18
185:24
186:15
188:21
189:22
191:20
192:12
194:6
204:17
210:21
217:3
222:15
223:10
228:14,16
228:17
233:11,16
233:19,21
244:21
252:6
258:25
259:2
263:9
266:18
peoples'
88:13 97:8
percent
46:13

69:25
128:19
228:14,16
percentage
113:9
perception
194:25
performs
15:6
period 23:13
30:6 52:4
54:15
180:24
183:8
218:15,16
periodic
17:4
periodic...
117:20
167:21
periods
61:13
perjury
273:12
Perron 50:25
60:11,17
61:22
63:15
141:21
person 20:10
25:16
50:20
66:15 75:2
79:16,18
83:16 92:4
107:18
114:14
115:3
123:24
133:15
198:4
238:16
241:2
249:1
250:14
personal
24:3 35:23
62:12
143:11

215:4,5
244:6
personally
50:1 59:18
90:10
147:19
Pfizer
156:25
Phoenix
223:2
phone 20:14
29:20,25
30:1 31:14
35:21 36:1
36:6 44:14
56:20
86:20
102:15
117:11
120:1
173:7
197:21
198:18
photo 227:20
photos 54:2
physical
39:19
physicians
123:11
143:15
pick 9:17
186:18,21
187:5
picked 46:23
143:22
picture 76:1
81:11
263:12,23
pictures
149:6
piece 135:17
190:7,13
pieces 39:19
166:12
Pinterest
180:24
pipe 227:10
piped 133:23
265:19

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| **place** 12:19 | 187:18 | 247:19 | **point** 20:24 | 105:17 |
| 23:18 | 188:25 | 249:3 | 28:10,22 | 157:2,10 |
| 95:21 | 196:15 | 253:18 | 31:20 35:3 | 158:3 |
| 111:8 | 200:15 | 266:18 | 61:11 83:1 | 159:8 |
| 115:25 | 205:19 | 267:10 | 89:5 92:22 | 160:2 |
| 151:5,7 | 219:19 | **player** 28:16 | 99:11,13 | 162:11 |
| 156:10 | 221:3 | **players** | 106:20 | 167:4 |
| 178:1 | 226:4,6 | 43:16 | 107:21 | 169:8 |
| 192:12 | 237:2 | 180:2 | 108:17 | 170:5,8 |
| 194:18,20 | 239:16 | **please** 8:11 | 114:9 | 234:21 |
| 215:22 | 241:17 | 9:4 11:1 | 119:11 | **policy** 4:3,5 |
| 219:7 | 247:7 | 21:15 | 127:14,15 | 103:21 |
| 225:15 | 249:7 | 27:12 | 127:16,24 | 104:2,9 |
| 248:16 | 254:4 | 64:16 | 128:7 | 139:6 |
| **places** 248:9 | 257:4 | 118:25 | 142:3 | 140:3 |
| **plaintiff** | **plan** 34:15 | 119:17 | 153:10,24 | 150:14 |
| 6:1 144:22 | 70:5 73:6 | 133:11 | 190:9 | 151:23 |
| **plaintiffs** | 84:8 | 141:8,12 | 198:1 | 154:3 |
| 1:5 6:6 | 182:20 | 144:7 | 199:21 | 156:2 |
| 8:14 269:5 | 207:25 | 145:3,5 | 205:1 | 158:11 |
| **plaintiffs'** | 263:15 | 152:12 | 207:21 | 159:21 |
| 2:5 5:21 | **planning** | 155:21 | 223:1 | 163:18 |
| 21:12 22:8 | 228:2 | 166:18 | 242:24 | 168:3 |
| 31:7,9,12 | **plans** 230:15 | 167:5 | 249:2 | 169:20 |
| 33:4 38:18 | **platform** | 169:23 | 254:15 | 170:14,17 |
| 43:10 49:1 | 17:23 18:2 | 170:2 | **pointed** | 170:20 |
| 60:3 67:12 | 18:13 | 176:23 | 89:16 | 211:19 |
| 85:6 91:1 | 162:15 | 188:1 | 107:5 | 220:21 |
| 102:16,18 | 228:17 | 200:17 | **pointing** | 255:2 |
| 102:22 | 243:5 | 221:11 | 88:2,16 | **politicians** |
| 112:5 | 245:25 | 226:7,8 | 89:20 | 148:22 |
| 113:3,5 | 266:19 | 242:8 | 90:18 | **poorly** 260:4 |
| 118:7 | **platforms** | 247:10 | 195:6 | **pop-ups** |
| 126:8 | 17:5 18:15 | 249:17 | **points** 3:23 | 157:8 |
| 135:1 | 21:11 | 254:8 | 20:17,20 | **populate** |
| 136:6 | 29:14 | 255:18 | 21:1 39:21 | 196:11 |
| 138:23 | 50:12 88:7 | 271:10,13 | 60:20 | **populated** |
| 141:6 | 154:1,16 | 271:16 | 63:20 82:2 | 191:16 |
| 145:1 | 154:19 | **pleased** | 127:7 | **populations** |
| 150:6,9 | 155:2 | 162:2 | 128:11,22 | 3:10 45:24 |
| 152:16 | 161:15 | **plus** 46:4 | 134:10 | 46:6,7 |
| 155:7 | 162:4 | 230:7 | **polices** | **portal** 91:24 |
| 163:13 | 180:12 | 255:5 | 157:6 | 206:22 |
| 164:17 | 208:10 | **PM** 247:16 | **policies** | 211:22,25 |
| 166:2 | 209:23 | **POC** 35:3,4 | 15:24 | 212:6 |
| 171:15 | 220:16 | **POCs** 174:11 | 103:14,17 | 213:6,6,10 |
| 173:20 | 242:11 | 198:7 | 104:24 | 213:14,16 |
| 179:9 | 243:25 | 242:15,22 | 105:4,6,9 | 214:14 |
| 187:9,11 | 245:15 | 245:19 | 105:12,16 | 215:11,13 |

**CAROL CRAWFORD 11/15/2022**

215:14
217:24
218:21
236:8,13
**portals**
213:18
217:3
**portfolio**
32:19
**portion**
80:20
174:4
**portions**
64:8,10
**pos-** 236:17
**positions**
39:21
**positive**
63:22
66:16
**possible**
120:20
139:15,16
174:24
177:3
188:2
242:13
243:2
**possibly**
34:25
51:17
58:16
140:8
**post** 76:4
104:24
105:4
135:18,20
149:7
157:6
162:24
207:25
227:22
229:6
**post-vac...**
62:8 63:22
65:4
**posted** 59:13
109:4
212:5

229:10,15
229:17
230:20
264:24
**posting**
129:4
253:14
**postings**
237:15
**posts** 35:18
53:1,14,22
58:6 81:4
89:8,14
90:16
92:17
103:15
135:16
149:6,19
155:19
157:9
168:3,5
170:15
207:15,24
212:14
220:14
258:7,9
265:3
266:4
**potential**
53:15
182:24
184:8
**potentially**
132:11
155:19
**power** 153:9
**PowerPoint**
199:1,2
210:23
**practice**
93:13
154:23
**practices**
34:18
253:22
**preference**
43:3
**preferred**
180:1

182:5
**pregnant**
46:4
**preparation**
93:9 94:15
**presence**
11:15,16
**present** 7:5
7:21 8:10
18:1 26:2
37:16 73:6
**presented**
7:21
138:23
141:6
172:17
**presents**
194:23
**President**
1:9 271:8
272:3
**press** 125:24
160:19,20
**presume**
91:12
**pretty** 34:16
37:7 46:24
90:20
119:3
121:13
141:20
159:11
179:6
181:16
190:4
192:6
258:13
**Prevention**
1:17 6:16
7:6,12
**previous**
16:8 41:7
67:22 68:4
102:17
119:21
138:19
140:19
147:24
161:2

182:12
183:2
199:3
209:15
258:4
261:19
**previously**
78:1 80:17
142:11,21
174:18
209:12
211:13
**primarily**
113:17
156:5
**primary**
20:24
**Prion's**
122:3
**prior** 13:16
19:1,6
29:15,19
58:4 209:4
209:6
212:23
**priority**
215:9,17
**privilege**
93:22
94:22
**Priya** 50:22
50:23
**proactively**
262:24
**probably**
29:10
30:13
35:19 37:8
39:25 42:4
56:16 61:1
61:13 69:3
70:8 72:5
82:13
83:13
90:20
108:14,15
115:15
120:5,17
121:13

138:21
151:11
173:17
189:15
197:21
200:7
209:11
212:11
215:10
219:12
221:15
223:4,11
235:12
245:2
255:22
**problem** 4:18
4:21
168:22
196:20
201:20
204:5
215:6,7,19
219:8
238:12,17
**problematic**
197:6
201:1
212:5
**problems**
219:10
**proceed** 9:9
**proceeding**
7:22
**process**
10:14
92:23 93:2
127:20
128:1,2
129:15,17
131:11
216:21
242:13
243:2
**processes**
131:1
**produce**
84:19
**produced**
46:3

**CAROL CRAWFORD  11/15/2022**

product
  221:19
products
  195:19
professi...
  203:15
progeste...
  255:9,14
program
  172:11,13
programs
  71:8
project 4:12
  46:9,15
  48:18
  55:23
  70:16,18
  173:25
  174:22
  175:15,17
  176:12,18
  176:22
projects
  48:3,10
  221:20
  224:13
promote
  81:22
  232:10
promoted
  228:10
promotion
  227:1,3
  228:3,5,7
  228:13,24
  230:10
  233:14
promotions
  234:16
prompted
  230:19
proof 146:1
properly
  216:22
properties
  50:4,5,7,8
  154:25
  155:1
property

245:23
proposal
  84:4
proposals
  27:25 28:1
  132:5,14
  132:19,22
  165:19
propose
  208:12
  209:17
proposed
  27:20
  69:20
  122:3
  252:9
protection
  164:9
proteins
  139:13
protocols
  65:4
prove 122:16
provide
  11:15,18
  15:15,15
  15:17
  27:15
  48:21
  50:21 51:2
  51:12,13
  52:7 72:17
  92:2
  105:17
  106:21,22
  116:10
  128:11
  138:10
  158:17
  159:10
  160:9
  220:13,16
  238:18
  259:24
provided
  29:21
  71:15
  90:22
  113:13

161:23
166:22
183:10
194:8
222:1
261:4
provides
  11:14
  227:5
providing
  51:23 52:2
  54:13
  128:13
  161:23
  167:20
PS 170:22
public 12:5
  12:19,23
  13:8,10
  14:10 15:4
  18:13 19:9
  29:22 32:7
  32:18
  33:25
  143:15
  144:21
  222:23
  237:17
  270:23
  271:14
  273:23
publicly
  72:3
publicly...
  59:9
pull 177:2,8
  230:12
pulled 48:3
  222:2
pulling
  92:22
  236:7
Pundit
  264:15
purpose
  57:23
  110:20,22
  145:21
  147:7

214:11
251:3
purposes
  16:24 22:7
  32:2 57:22
  147:1
pursuant
  7:19 21:21
  102:16
put 22:2
  30:21
  32:23
  39:19
  40:16 43:8
  48:13
  52:15 60:1
  85:4 90:24
  92:20 93:5
  100:12,19
  115:9
  118:5
  126:6
  130:23
  132:24,25
  144:25
  149:6,18
  149:19
  153:9
  162:23
  171:11,13
  175:8
  179:7
  187:4,7
  194:19
  196:13
  199:20
  200:14
  201:11
  202:22
  205:2
  219:17
  221:2
  224:17
  226:2
  231:9
  236:24
  239:12
  247:5
  249:5

251:15
254:3
256:19
263:24
268:21
puts 123:7
  212:6
Putting
  168:20

———— Q ————

Q&A 34:10,25
  36:17,25
  37:6
Qs 70:10
question
  10:1,3,11
  14:23
  39:15 41:9
  48:15
  66:25
  67:19
  71:22
  73:15
  74:21,22
  75:5,7,13
  78:7,12,13
  79:15,17
  81:5 90:3
  93:7,8,20
  98:6,7
  99:8
  100:24
  105:1
  106:15
  111:17,25
  112:11
  118:11
  120:18
  126:5
  128:22
  129:12
  135:8
  146:5
  148:24
  156:17
  158:9
  159:1
  164:1

181:5
183:22
185:17
186:13
188:1
224:4
235:24
236:5
240:12
248:18
251:6
259:19
**questioning**
31:21
**questions**
4:9 10:1
68:16,20
69:5,5,10
69:14,20
69:22 73:9
73:19
74:13 75:1
79:18,25
113:20,25
120:8
128:12,15
129:19
139:18
144:5
152:1,4
156:20
161:1
163:24
166:7,10
167:21
171:23
172:17
173:5
181:11
188:4,20
224:2,9
229:1
247:21
255:18
263:25
264:25
267:12,17
267:22
268:1,3

**question...**
75:3
**quick** 27:22
28:23
135:6
211:12
**Quicker**
23:23
**quickly**
173:5,16
**quite** 111:10
190:24
**quote** 103:14
120:12
129:1
146:1
**quotes** 226:9

_____

**R**
**R** 1:7 8:5
270:1
271:7
272:2
**Rachel**
254:14,25
256:7
**Raena** 222:10
**raise** 95:10
**ran** 154:12
175:12
210:11
265:12,13
267:14
**range** 169:25
187:4
**rare** 164:13
**rarely** 21:8
128:3
195:9
225:18
**rate** 3:9
111:20
113:9
122:14
**rates** 122:19
169:5
**re-ask** 251:6
**re-evalu...**
76:7

**re-reading**
125:22
**reach** 2:13
2:16 17:5
17:6 39:9
43:21
44:10
228:14
**reaction**
168:12
**reactions**
164:13
**read** 8:20
22:10 23:2
25:4,20,21
27:8,11,13
46:19
52:17
65:22
68:11 70:3
85:14,15
91:3 103:3
112:8
127:4
136:8,25
145:5,8,10
152:19,21
153:2
155:24
156:13,23
162:10
163:16,17
166:5,9,9
166:18,20
168:2
170:13
171:18
173:22,23
173:24
174:15,17
176:7,23
179:11,22
182:14,17
187:13,25
188:1
189:6
196:18,19
197:2
200:17,18

200:22
201:23
205:14,14
207:19,21
208:6,8
216:18
217:13
218:12
221:7,11
226:7,8
227:6
228:20
229:2,22
229:23
230:3,5,7
234:11,12
237:5,12
239:18,19
241:20
242:8,9
245:13
247:11,17
252:12,18
252:24
253:10
254:12,13
254:24
255:8,13
257:7
260:15
261:12,17
262:13,23
268:5
271:13
272:6,10
272:14,18
272:22
273:6
**readily**
108:14
**reading**
26:13
42:11
47:11
50:19
51:10
67:15
70:12 75:8
77:2 91:22

160:7
168:24
178:21
200:11
228:7
235:9
**reads** 22:20
23:20
**ready** 206:12
206:13
229:21
239:23,24
**real** 135:6
**realize**
219:3
**realized**
41:6
205:23
**really** 9:22
12:7 29:9
32:15,16
38:13 64:5
92:21
101:24
110:24
130:20
138:8,9
143:1,4
189:20
207:17
234:3
236:13
**reask** 14:22
71:22
158:9
**reason** 25:14
36:20 76:8
82:7 185:6
272:7,11
272:15,19
272:23
**reasons** 59:6
142:10
**recall** 17:17
17:21
19:19
20:20
21:10
29:11,17

**CAROL CRAWFORD  11/15/2022**

30:5,14
32:14
35:15 36:6
36:11
37:13 38:1
38:4,6,9
38:11 39:2
39:13
46:23
51:11 57:4
57:17,20
58:10,11
61:11
65:19,21
66:2,8
68:23,24
71:20 72:1
72:2 83:8
88:5 89:13
89:15
92:23 93:1
99:13,14
99:21
104:25
109:3
110:25
111:18
115:24
116:1,2
119:23
125:9
136:4
140:13,15
142:8
144:11
150:20
151:17
152:11
153:4
154:7,9,12
155:6
177:25
178:9
182:7
183:11
184:5
185:8,10
193:18
197:16

198:16
199:1
201:8
202:7
213:7,15
217:1
219:14
222:9,11
223:1
224:18
225:21
230:18,23
234:2
235:3,4,21
235:23
236:10
240:16,18
240:22
241:10
244:19
246:14
256:16
260:6
264:23
267:9,23
**recalled**
32:5
**receive**
71:12
**received**
59:4 64:7
97:15
143:7
158:15
164:15
198:1
238:23,24
**receiving**
57:23
76:17
82:18
137:2
142:3
154:8
**recess** 31:1
102:10
150:3
205:10
257:1

**recipient**
60:10,12
220:2
**recognize**
22:11 33:8
49:6 67:14
67:21
97:19
174:9
206:18
222:15
249:22
**recollec...**
18:1,4
26:2 29:21
32:23
37:13,16
40:11
42:20 46:9
48:18 52:8
68:4 72:16
75:13
76:12
87:17 88:6
90:18 92:4
94:1,7
95:15
96:13
100:7
106:23
116:6
125:22
142:13
143:10
152:3
159:18
216:24
217:1
235:1
242:18
246:1
**recollec...**
117:24
**Recommend**
41:24
**recommen...**
29:10
**reconsider**
169:8

**record** 8:1
9:19,21
11:1 30:17
30:24 31:3
37:21
52:16 55:8
69:19
92:19 93:1
97:24,25
98:1,2,3
102:9,11
150:2,5
156:15
203:12
205:8,9,11
225:17
236:2
241:8
245:13
247:17
256:24,25
257:2
261:2
265:5
268:10,21
269:18
270:10
**recorded**
31:14 85:1
102:19
**recordings**
84:25
225:16
**records**
30:11,18
56:19
116:16
**reduce**
103:16
138:20
**reel** 227:11
229:9
**reestabl...**
102:14
**reevaluated**
82:6
**refer** 39:12
72:1,21
113:23

127:18
175:10,14
180:5
255:22
256:15
**reference**
34:14
55:15 69:3
70:2 79:22
80:11
81:14
129:10
130:12
183:23
184:14,15
185:21
195:24
208:23
**references**
72:21
243:7
**referencing**
149:16
196:9
243:9
258:3
266:15
**referring**
12:25
34:12
36:15 42:8
42:10
48:10 55:1
56:14
91:21
116:13
118:20,22
129:3
142:19
143:9
144:21
165:16
175:9,11
175:20
176:21
191:7
196:10
**refers** 56:20
56:20

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 68:21 82:8 | 174:24 | 222:24 | 196:8 | 162:25 |
| 100:1 | 178:23 | **relation...** | 198:8,17 | 168:4 |
| 125:8 | 179:3,24 | 112:16,18 | 200:5 | 212:12 |
| **reflect** | 180:4,11 | **relative** | 202:4 | 257:9,19 |
| 195:19 | 180:16,17 | 65:16 | 203:19 | 258:8,11 |
| 196:9 | 180:23 | 156:21 | 213:11,19 | 262:24 |
| 236:2 | 181:2 | **relayed** | 215:19 | 263:11 |
| **reflected** | 184:17 | 45:23 | 225:24,25 | **removing** |
| 263:8 | 188:9,12 | 239:1 | 227:9,13 | 38:5 81:8 |
| **reflecting** | 197:5 | **relevant** | 232:2 | 88:13 |
| 162:1 | 198:12,13 | 219:6 | 233:9 | 155:19 |
| **refresh** | 198:16 | **religious** | 241:15 | 162:14,21 |
| 93:25 94:6 | 200:25 | 146:16 | 244:17 | **renamed** |
| 106:14 | 215:11 | **remember** | 246:11 | 231:4 |
| **refreshed** | 244:22 | 25:9 26:6 | 265:2 | **render** 273:9 |
| 31:24 | **regularly** | 38:1,7,12 | **remembered** | **reoorg** 19:6 |
| **refresher** | 21:11 37:8 | 41:3,20 | 68:3 245:5 | **reorg** 19:4 |
| 262:16 | 70:9 | 51:14 | **remembering** | **reorgani...** |
| **refusal** | 174:23 | 64:17 | 81:21 | 13:13,22 |
| 63:21 | 175:16 | 73:14 | **remind** 203:1 | 16:9 19:2 |
| 170:1 | 179:6 | 80:10 | 211:20 | **rep** 260:19 |
| **refusals** | 185:11 | 82:21 | 217:5 | 261:17 |
| 156:19 | 222:23 | 83:20 | 246:24 | **repeat** 12:21 |
| 157:17,25 | 240:11 | 84:13 89:9 | **reminds** | 67:19 |
| 164:3 | **Regulations** | 92:17,21 | 216:20 | 74:21 |
| **refusing** | 7:20 | 92:25 | **Remotely** | 245:8 |
| 53:17 58:6 | **Reingold** | 98:16,25 | 31:16 | **repeatedly** |
| **regarding** | 96:23 | 109:5 | **removal** | 157:5 |
| 57:16 | 100:22 | 111:21 | 220:25 | **rephrase** |
| 58:20 83:3 | 101:1,8 | 117:4,6,9 | **removals** | 10:2,11 |
| 99:19 | 217:7 | 117:10 | 75:5,7,12 | 78:7 90:3 |
| 107:23 | **rel** 1:3 | 125:17 | 80:13,15 | 178:7 |
| 154:14 | 271:7 | 130:15 | **remove** 33:25 | 204:10 |
| 160:11 | 272:2 | 133:19 | 37:12 | **replace** |
| 161:1 | **related** | 136:23 | 75:19 | 29:13 |
| 167:5 | 92:22 | 140:20 | 90:11 | 42:22 |
| 182:24 | 110:5,10 | 149:5 | 103:16 | **replaced** |
| 184:8 | 185:23 | 151:6,25 | 138:21 | 254:16,18 |
| 199:2 | 223:5 | 153:15 | 157:2 | **replicate** |
| 207:15 | 232:12 | 160:11 | 159:21 | 110:21 |
| 219:13 | 245:22 | 171:3 | 162:11 | **replied** |
| 224:22 | 266:6 | 173:13 | 168:3 | 248:6 |
| 234:12 | 270:11 | 174:11 | 170:15 | **reply** 34:6 |
| 249:19 | **relating** | 177:17,24 | 220:24 | 216:8,17 |
| **regular** | 105:8 | 183:22 | 258:16 | **report** 18:23 |
| 16:13 17:8 | **relation** | 184:2,4 | **removed** 5:18 | 18:24 19:1 |
| 74:3,5 | 210:7 | 188:19,23 | 75:25 76:6 | 19:6,12,14 |
| 107:22 | 261:9 | 193:17 | 81:2,4 | 19:17 |
| 167:2 | **relations** | 195:23 | 103:15 | 51:12 52:1 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 52:21 | 60:21 66:1 | 175:12 | **reserved** | 66:14 70:3 |
| 54:13 | 91:9,24 | 204:6 | 269:20 | 72:13 |
| 55:14 58:8 | 97:2 | 212:9 | **resolve** | 106:5,16 |
| 59:9 60:19 | 101:18 | 230:1 | 182:11 | 107:7,20 |
| 60:22,25 | 122:24 | 250:13 | **resolved** | 114:4 |
| 62:1,14 | 141:21 | 258:5,6 | 185:15 | 117:6 |
| 63:16 | 142:10 | 262:17,20 | **respect** | 123:24 |
| 64:18 | 158:3 | 262:25 | 128:23 | 136:3 |
| 65:15 | 169:5 | 263:7,12 | **respective** | 140:17 |
| 66:12 | 214:10 | **represent** | 259:3 | 160:23 |
| 76:16 81:1 | 218:19 | 8:12,14 | **Respiratory** | 164:14 |
| 81:3 91:25 | 229:20 | 9:1,2 | 107:14 | 165:5 |
| 95:22 | 234:17,19 | 112:12 | 160:22 | 170:22 |
| 96:15 | 234:22 | 164:20 | **respond** 28:3 | 176:7,24 |
| 98:19,23 | **reports** 2:18 | **represen...** | 121:22 | 177:19 |
| 99:3 123:1 | 2:20 3:17 | 8:18,23 | 122:4 | 182:15 |
| 123:10 | 3:20 49:13 | **request** 4:18 | 124:9 | 197:3 |
| 143:5,23 | 50:21 51:2 | 4:20 27:3 | 132:9 | 200:23 |
| 144:6 | 51:4,18,20 | 31:7 78:24 | 160:14 | 211:1 |
| 149:4 | 52:9,9,10 | 84:20 93:4 | 171:1 | 216:10 |
| 152:5 | 53:1,16,25 | 141:4 | 184:19 | 230:3,5 |
| 164:20 | 54:2,22 | 196:20 | 186:8 | 232:19 |
| 212:4 | 55:7 56:18 | 200:22 | 201:7 | 234:11 |
| 213:18 | 57:6,12,14 | 201:19 | 214:3 | 237:24 |
| 260:15 | 57:16,18 | 242:6 | 235:15 | **responses** |
| 261:14 | 57:23 58:5 | **requested** | 255:20 | 124:8 |
| **report/file** | 58:7,22,24 | 47:25 | 259:6 | 129:23 |
| 259:18 | 58:25 59:4 | 216:19 | 261:12,16 | 171:10 |
| **reported** | 59:14,17 | **requesting** | 262:21 | **responsi...** |
| 19:8 24:16 | 59:19,22 | 255:2 | **responded** | 212:19 |
| 92:16 | 60:7,18 | **requests** | 108:24 | **responsible** |
| 123:18 | 61:24 62:7 | 140:17 | 164:5 | 26:9 95:13 |
| 135:2 | 62:12 | 221:19 | 165:14 | **rest** 163:17 |
| **reporter** | 63:25 | 234:14 | 186:7 | **restful** |
| 1:19 9:4,8 | 66:17 | 250:3 | 238:3 | 126:20 |
| 9:16 | 71:16 72:3 | **required** | 245:3 | **restrict...** |
| 171:25 | 72:4 75:24 | 115:6 | **responding** | 148:23 |
| 256:18 | 77:11,13 | **requirement** | 27:3 28:8 | **result** |
| 268:25 | 81:1 | 138:2 | 218:1 | 151:11 |
| 270:5 | 141:10,24 | **reread** 74:19 | **responds** | 156:24 |
| **reporter's** | 142:2 | **rereading** | 192:21,22 | 160:5 |
| 5:21 8:8 | 143:20 | 91:19 | 214:8 | 166:24 |
| 26:22 | 145:6,14 | **research** | 251:25 | 167:18,19 |
| 97:22 | 146:23 | 59:2 72:6 | 258:15 | 250:4 |
| 118:12 | 147:5,13 | 72:9,10 | **response** | **results** |
| **reporting** | 147:18,19 | 81:1 | 2:11 4:7 | 189:22 |
| 3:3 7:20 | 147:23 | 147:16 | 33:12 59:2 | 191:11 |
| 51:24 | 148:2,9,11 | 258:6 | 59:6 61:15 | 192:16 |
| 58:10 | 154:13 | **reserve** 8:19 | 61:16 | 195:4 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 251:19 | 35:2 36:25 | 111:23 | 175:2,14 | 243:15,18 |
| **return** | 37:10,19 | 112:15 | 176:5,23 | 244:8,14 |
| 146:16 | 38:16,22 | 113:14 | 177:1,7,22 | 245:21 |
| 173:17 | 38:24 39:4 | 114:3,14 | 177:25 | 246:6,9,21 |
| 271:16 | 39:11,18 | 115:8 | 178:12,16 | 247:5 |
| **reversing** | 40:6,9,20 | 116:25 | 179:21 | 248:2,14 |
| 255:9,14 | 40:22 41:1 | 119:2,4 | 180:20 | 248:23 |
| **review** 5:15 | 41:1,5,19 | 120:6,10 | 181:19 | 249:22 |
| 8:20,20 | 41:21 | 120:15 | 183:13,24 | 250:6,17 |
| 38:25 | 42:12,16 | 121:23,24 | 184:6 | 251:1,23 |
| 47:25 | 43:2,4,17 | 122:5,5,10 | 185:16 | 251:25 |
| 93:10 | 45:15,20 | 123:14 | 186:16 | 252:4 |
| 124:22 | 46:8 48:1 | 124:4,12 | 189:2,10 | 253:1,4,22 |
| 145:9 | 48:9 49:6 | 124:23,24 | 190:10,23 | 254:22,24 |
| 211:14 | 49:14,15 | 126:6,25 | 191:1 | 255:17 |
| 212:7 | 49:22,24 | 127:2 | 192:22 | 256:17 |
| 250:3 | 53:13,17 | 128:9,18 | 194:15 | 257:6,13 |
| 254:11 | 54:21 60:1 | 129:11 | 195:15 | 258:16 |
| **reviewed** | 60:5,8,13 | 130:25 | 196:23,25 | 259:6,14 |
| 93:11,24 | 60:15 61:3 | 131:18,25 | 197:13 | 259:21 |
| 94:4,10,14 | 61:9 62:4 | 132:25 | 201:16 | 260:14 |
| 118:2 | 62:5,7 | 133:16 | 202:14 | 261:6 |
| 131:10 | 63:4 64:14 | 134:18 | 204:3,8 | 262:2,8,11 |
| 206:23 | 66:6,13 | 136:5 | 206:1,8,14 | 264:17,19 |
| 211:13,23 | 67:14,18 | 137:11 | 207:20 | 266:7 |
| 255:4 | 68:11,21 | 139:4,11 | 208:15,21 | 267:25 |
| **reviewing** | 69:15 71:7 | 139:19 | 210:10 | 268:5,8 |
| 31:24 | 72:14 74:2 | 143:7 | 211:3,9 | **risk** 42:23 |
| 97:10 | 75:2 76:2 | 144:12 | 213:13 | 156:18 |
| 118:19 | 77:25 79:9 | 145:25 | 214:6,21 | **risks** 53:15 |
| **right** 8:20 | 79:16,17 | 146:6 | 215:22 | **Road** 1:17 |
| 9:15 10:22 | 81:7,16,25 | 150:11,17 | 219:7,17 | **role** 11:13 |
| 11:1 15:10 | 85:14 86:2 | 156:8,10 | 220:5 | 12:18 15:1 |
| 16:24 | 86:9,16,22 | 156:13 | 221:13 | 16:1,8 |
| 17:10 | 87:7,11 | 157:12,17 | 222:5,14 | 18:23,24 |
| 19:11,19 | 88:19,23 | 157:19 | 224:12,25 | 24:24 32:8 |
| 20:1 21:19 | 89:13 | 159:22 | 225:5 | 40:19 |
| 21:23 22:2 | 91:12,17 | 160:5 | 226:13,22 | 86:13 |
| 22:13,19 | 92:3,19 | 161:3,11 | 226:25 | 115:18 |
| 23:1 24:6 | 93:3,14 | 161:15 | 227:5 | 161:21,21 |
| 24:19,23 | 95:9,13 | 163:5,8,23 | 230:16 | 183:6 |
| 25:7 26:5 | 96:20 97:2 | 164:3,6,14 | 233:16,23 | 220:12 |
| 26:20 27:1 | 97:4,18 | 165:25 | 234:4,9 | **roles** 15:5 |
| 27:24 28:3 | 98:6 99:12 | 166:15 | 235:15,16 | 31:25 |
| 28:6 30:1 | 102:1,24 | 167:10,23 | 236:21,24 | 107:19 |
| 30:19 | 103:15 | 168:8,12 | 240:3,7,12 | 223:11 |
| 31:23 | 107:4 | 170:16,24 | 241:24 | **rollout** 53:3 |
| 32:21 | 109:7 | 172:2,4,14 | 242:6,17 | **room** 97:23 |
| 33:13 34:2 | 111:7,12 | 172:22 | 242:22,24 | 133:15 |

| | | | | |
|---|---|---|---|---|
| **rose** 151:1 | **SARS-CoV-2** | 24:12  26:5 | 223:18 | 167:20 |
| **Rosie** 107:25 | 3:7,8 | 33:16,17 | 227:1 | 169:10 |
| 114:22 | **Sauer** 6:2 | 33:23  34:5 | 228:2,12 | 170:20 |
| 115:10 | 26:22 | 40:8,10,23 | 228:20 | 266:19 |
| 120:2 | 30:19 | 41:24  42:8 | 229:14 | **scientif...** |
| 124:1,9 | 267:20 | 44:9  45:22 | 238:11 | 162:22 |
| 133:22 | 268:12,16 | 47:8  48:2 | 247:15 | **scientist** |
| 135:21 | 268:24 | 51:3,21,22 | 257:18 | 108:12 |
| **rotate** 28:25 | 269:4 | 52:3,25 | 260:15,20 | 129:20 |
| **round** 31:20 | **save** 182:22 | 53:13,19 | **scan** 85:20 | 168:18 |
| **routinely** | 184:7 | 55:3,4,21 | 211:12 | **scientists** |
| 77:17 | **saw** 45:16 | 63:5,14,15 | **scanned** | 121:24 |
| **rudely** 98:7 | 94:13 | 63:17 | 108:14 | 122:18 |
| **rules** 7:19 | 98:22 | 65:14 | 141:13 | **scope** 19:25 |
| 9:16 | 110:4 | 72:23  73:4 | **schedule** | **scoping** |
| **run** 77:11 | 120:7,23 | 74:12,14 | 177:3 | 105:23 |
| 147:13 | 130:15 | 80:12  82:6 | 198:17 | **screen** |
| 195:9 | 132:15,25 | 87:7  91:9 | 232:24 | 237:15 |
| 222:21 | 149:11 | 96:21 | 234:18 | **screening** |
| 224:9 | 191:21 | 103:16 | 235:12,14 | 237:17 |
| 227:2,24 | 203:25 | 105:22 | **Scheer** 239:5 | **screenshot** |
| 228:13 | 209:8 | 119:13 | **Schmitt** 1:3 | 186:19 |
| **running** | 220:13 | 120:12,18 | 149:1 | 190:11 |
| 261:25 | 227:4 | 122:16,20 | 265:8 | 191:9 |
| | 251:22 | 128:16 | 271:7 | 195:5 |
| **S** | **saying** 38:11 | 133:10 | 272:2 | 214:16 |
| **S** 1:3,20  7:5 | 51:12 | 134:24 | **school** 12:3 | **screenshots** |
| 270:4,22 | 75:10,11 | 139:6 | **science** | 251:14 |
| 271:7 | 76:9  83:23 | 144:4 | 106:12,20 | **scrolling** |
| 272:2 | 98:21 | 148:21 | 108:13 | 228:11 |
| **s--** 174:7 | 99:14 | 159:20,25 | 114:13 | **se** 213:16 |
| **S.W** 7:3 | 121:13 | 166:17 | 123:20 | **search** 53:8 |
| **sacred** | 141:23,24 | 167:25 | 132:11 | 154:19,24 |
| 194:11 | 147:24 | 168:2,25 | 170:21 | 188:23 |
| **Saddler** | 149:17 | 169:17 | 210:21 | 189:22 |
| 222:10 | 153:10 | 172:7 | **sciences** | 191:5,8,21 |
| **safe** 157:4 | 162:7 | 184:6 | 12:16 | 192:16 |
| 161:14 | 169:7 | 185:19,22 | **scientific** | 193:22 |
| 162:3,13 | 170:11 | 190:16 | 87:20 | 194:3,11 |
| 255:9 | 172:7 | 193:10 | 105:17 | 194:12,13 |
| **safety** 33:24 | 178:22 | 195:17 | 112:15,20 | 194:19 |
| 68:25 | 195:22 | 197:24 | 113:8 | 195:4,7 |
| 103:9 | 196:1 | 200:1 | 121:18 | 222:1 |
| **Sam** 86:16,19 | 200:7 | 211:2,20 | 124:22 | 250:4 |
| 125:8,10 | 203:9 | 214:9,20 | 129:7,17 | 251:19 |
| 125:11,12 | 218:24 | 216:18 | 131:11 | **searched** |
| **samples** | 225:18 | 217:10 | 140:2 | 147:17 |
| 149:15 | 243:5 | 218:14,16 | 159:9,10 | **searches** |
| **SARS** 112:17 | **says** 22:23 | 218:17 | 161:22,24 | 77:12 |

**CAROL CRAWFORD 11/15/2022**

148:11,12
190:4
195:1,10
searching
190:5
192:12
season 29:19
second 14:22
33:6 72:24
73:2 99:24
106:14
112:10
125:6
133:6
136:9
156:22
160:15
169:12
212:23
267:19
second-t...
131:16
secondhand
54:1,22
55:7
seconds
262:22
section
14:15
see 10:13
21:3 22:23
24:9 26:25
34:4 35:4
44:11
45:15
46:21
49:22
51:21
53:24 54:4
63:10 65:6
65:13 66:7
70:10
72:25 73:5
75:24
86:19
92:14
96:24
97:16
103:19

111:14
114:19
119:17
121:17
124:16
126:21
131:24
140:9
142:17
146:13
147:22
153:7
154:24
156:11
157:8
160:24
161:8
166:14
169:21
172:9,11
172:13,19
172:25
179:17
185:22
186:2
190:25
198:7
211:2
212:13,17
214:12
215:2,13
215:16
216:3
218:19
222:6,6
227:12
229:13
232:12
240:12
250:24
252:10
258:9
261:18
262:23
seeing 69:10
71:16,25
72:17
76:15 87:9
87:19 93:1

99:15
106:12
117:9
125:6
153:5
190:8
200:10
207:22
258:20
seek 266:18
seen 21:16
47:4,5
50:2 88:17
105:5
110:3
112:13,14
113:6
117:21
130:17
165:2
179:3
207:6
209:15
218:13
220:1
239:25
selected
97:20 98:9
Seman 45:12
send 35:21
55:20,20
57:7,11,13
114:10,15
114:17
115:4
124:7,8
129:20
130:11,12
135:11,13
135:18,19
146:10
153:17
189:14
192:12
194:17
199:5
208:1
214:5
242:5,19

244:5
247:24
259:18
sending
35:13
44:18 79:6
87:22
121:1,2
141:24
145:15
146:22
147:4
171:8
189:17
208:25
230:1
244:1
245:10
248:24
251:2,11
257:23
262:17
sends 64:23
131:17
133:2
144:1
146:14
250:18
sense 204:25
sent 41:7,16
52:9 62:24
66:2 73:21
73:22
77:13
115:5
117:11
120:9
121:9
124:23
133:21
137:1
139:18
147:20
148:18
153:14
157:20
186:9
187:19
189:7,12

190:6
192:9
196:21
198:25
199:1,13
201:8
202:3
205:21
209:5
216:15
219:25
221:10
226:10
238:2
241:22
243:12,21
246:14
248:1,8,9
248:22
249:20
252:19
256:4,9,10
262:19
265:3
sentence
29:12
41:25
167:13
separate
66:3
185:22
225:1
240:2
258:18
separately
173:15
209:20
210:22
247:24
September
3:7 152:25
219:25
250:8
series 79:5
served 32:8
servers
217:21
service
103:25

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| **services** 7:1 | 84:5,11 | 265:23 | 189:19 | **SMEs** 114:4 |
| 7:2, 9 | 211:7 | **showing** | 197:18 | 116:12 |
| 11:19 | **she'd** 124:7 | 186:23 | 212:3,10 | 123:25 |
| 146:16 | 172:17 | **shown** 94:8 | 232:14 | 124:3 |
| **serving** 32:6 | **shedding** | 94:10,21 | 243:21 | 135:23 |
| 107:19 | 87:10 | 94:25 95:3 | 266:1 | 136:1 |
| **session** | 90:15 | **shows** 53:5 | **simpler** | 188:3 |
| 151:8 | 207:11,16 | 211:12 | 241:16 | **Smith** 181:10 |
| 152:6 | 207:23 | **sic** 19:13 | **simply** 143:5 | 250:11,12 |
| **set** 82:21 | 208:1 | 21:8 24:13 | **Sincerely** | 252:4,7 |
| 84:5,11 | 209:7 | 120:15 | 271:20 | **snippets** |
| 161:2 | 265:24 | 133:5 | **Singapore** | 227:12 |
| 167:6,15 | **sheet** 115:23 | 253:3 | 151:7 | **Snow** 6:18 |
| 170:3 | 134:16 | **side** 54:1 | **sir** 269:13 | 8:17,17 |
| 198:11,14 | 272:1 | 58:8 65:5 | **site** 113:18 | 10:7 30:23 |
| 213:2 | **sheets** | 76:5 80:2 | 129:10 | 31:4,6,18 |
| 270:8,15 | 271:12,14 | 80:4 81:18 | 191:13,13 | 33:3 36:18 |
| **setting** | 271:16 | 139:15,16 | 231:7,8,14 | 47:14 54:8 |
| 34:17 | **Shelley** | 164:8,9,12 | 232:6 | 57:8 76:21 |
| 197:4 | 25:15 | **sidebar** | **sites** 46:19 | 78:3,17 |
| 200:25 | **shooting** | 216:19 | **sitting** 43:2 | 79:1 80:16 |
| 236:16 | 208:10 | 217:2 | 236:22 | 80:23 |
| 260:16 | **Shopkorn** | **sign** 8:20 | **situation** | 82:20 86:5 |
| **seven** 136:8 | 83:23 | 128:4 | 248:13 | 89:24 |
| **severe** 41:25 | 86:24 | 196:5 | **situations** | 93:16,18 |
| 42:23 | **short** 33:5 | 271:14 | 192:8 | 93:20 94:2 |
| 53:25 58:8 | 132:3 | **signature** | **six** 32:8 | 94:6,11,14 |
| **share** 51:25 | 149:24 | 269:20 | 165:13,19 | 94:17,19 |
| 65:18 | 180:24 | 271:12,14 | **skip** 166:1 | 96:3,7 |
| 71:18,21 | 227:25 | 271:17 | **skipped** | 99:4 |
| 71:23 | 228:1 | 272:25 | 167:14 | 100:14 |
| 125:10 | 247:20 | **signs** 42:9 | 269:7 | 101:2,6,20 |
| 144:7 | 262:25 | 42:19 | **Skype** 241:16 | 102:13 |
| 156:23 | 266:11 | 156:9 | **slash** 225:3 | 105:10 |
| 160:4 | **shorthanded** | 164:8 | **slide** 149:19 | 106:6 |
| 166:23 | 111:5 | **Silling** 7:14 | 210:17 | 110:7 |
| 182:20 | **shortly** | 8:9 | 265:18,22 | 112:22 |
| 230:14 | 207:25 | **Silver** 45:4 | 266:5 | 115:12 |
| 235:11 | **shot** 29:13 | **similar** | **slides** | 121:5 |
| 260:19,22 | **shots** 5:15 | 18:14 | 246:20 | 123:3 |
| 261:3 | 249:19,20 | 44:22 | **slightly** | 126:12 |
| **shared** 31:12 | **show** 52:11 | 46:17 | 47:21 65:3 | 131:6 |
| 33:18 | 81:3 88:12 | 59:24 | **small** 95:15 | 132:6,21 |
| 51:18 72:8 | 149:20 | 128:15,15 | 154:10 | 134:22 |
| 102:15,17 | 214:16 | 135:21 | **SME** 108:7 | 137:22 |
| 102:18 | **showed** 44:1 | 153:23 | 116:14 | 138:5 |
| 144:8 | 117:10 | 157:19,22 | 130:19,21 | 142:24 |
| **sharing** 54:2 | 210:18 | 180:11 | 135:12,15 | 143:16 |
| 72:2, 2 | 246:7 | 185:14 | 152:1 | 152:22 |

**CAROL CRAWFORD  11/15/2022**

158:5,21
158:23
159:14
161:16
162:5,16
163:1,9
165:7
168:13
171:20
176:1
178:2,5
179:18
193:13,24
199:6
205:3,17
205:22
206:3,7,9
231:15
238:13
251:4
259:25
260:25
266:24
268:2,6
269:9,12
269:16
271:4,9
**social** 11:16
12:6 15:6
15:16 17:1
19:20 20:3
20:16 24:3
24:16,25
35:9 36:5
50:3 52:10
52:11 53:8
54:14,17
57:25 59:3
72:2,12
90:21 92:7
104:5,24
105:1,3
113:11
114:8
117:2,8,17
124:6
143:6,21
143:24
148:13

150:22
154:21,22
155:1
181:7
198:22
207:7
212:19
220:2
227:10,20
234:6
237:14,19
248:9
264:3
267:10
**software**
71:8
**Sokler** 87:3
87:4
**solely** 256:6
**solve** 238:11
**solving**
215:19
**somebody**
114:12
**something's**
148:6
█████████ ...
174:7
**soon** 55:22
88:18
127:13
128:9
131:23
134:9,25
268:12
**sorry** 3:12
3:13 13:4
14:5 28:6
28:17
32:14
63:10
67:17,17
67:25
73:15
74:21
85:21
93:17 96:7
96:8
103:12

118:23
124:19
126:15
136:15
144:14
145:11
152:10
153:18
156:6
158:22
163:12
167:15
178:5
187:15
216:2
237:7,22
239:24
240:20
255:12
**sort** 65:1
69:13
149:10
154:15
207:13
209:9
**sound** 102:3
**sounds**
142:20
177:20
178:17
200:9,12
**source** 140:7
233:5
238:5
**sourced**
46:20
**sources**
46:24 59:5
222:3
237:15,21
**span** 253:16
**Spanish**
65:16,20
70:24
**speak** 10:15
20:15 27:9
29:9
**speakers**
97:23

**speaking**
17:14
20:13
104:14
232:18
**special**
214:10
**specific**
29:10 30:5
30:9 35:15
57:4 82:21
83:14
84:13 88:5
92:1
113:12
116:1
117:4,7
128:1
129:4,13
144:5
160:10,11
175:10
192:1
225:25
234:14
251:18
261:24
264:24
**specific...**
56:13
58:11
68:23
77:18
79:21 89:9
90:12
117:12
121:9
133:19
140:20
143:23
151:25
158:14
171:6
182:19
183:11
191:22
198:3
211:17
232:2

249:24
**specifics**
27:19
38:12
140:15
**speculate**
28:22
37:15 90:9
131:12
158:14
**speculating**
70:23
143:1
**speculation**
76:22 78:4
89:25
101:21
112:23
121:6
123:4
138:6
142:25
159:15
163:2
193:14
231:16
251:5
260:1
**spelled**
211:3
244:7
**spike** 139:13
**split** 45:20
224:13,14
**spoke** 18:2
21:8 36:11
66:8
166:23
**spoken** 33:14
64:11
**spread**
161:24
**spreadsheet**
201:12
202:2,3,13
202:23
211:23
**spreadsh...**
202:19

**CAROL CRAWFORD  11/15/2022**

spring 17:11
 20:1 68:15
Spur 4:7
St 271:18
stack 268:25
staff 18:21
 18:21
 99:18
 160:17,18
 215:12
stamp 124:18
 136:14,19
 146:11
stamped
 136:9
 169:13
stamps
 205:25
stand 208:18
standards
 103:25
 234:21
standing
 72:6 208:8
standpoint
 34:19
Stanley
 174:6,10
 174:13
 176:7
 189:16
 193:1
 195:12
 250:10
 251:2
 252:7
 253:3
 254:18
Stanley's
 250:25
Stanley/Jan
 174:16
stapled
 205:22
 239:14
start 11:24
 55:22
 58:19
 119:6

131:16
174:24
197:20
206:25
237:9
242:14
253:13
started 12:2
 16:12,13
 18:5 25:25
 32:16 61:7
 77:12
 171:7
 188:14,15
starting
 66:18
 248:18
starts 44:25
 250:7
state 1:3
 6:1 8:4
 11:1 12:11
 25:2,11,16
 234:15
 237:23
 238:20
 254:8
 270:2,5,24
 271:7
 272:2
 273:1
stated 39:22
 110:11
 147:21
 203:25
statement
 37:11
 162:24,25
 203:22
statements
 106:11
 143:15,19
 144:21
states 1:1
 1:10
 228:17
 239:9
 254:2
 271:8

272:3
statistic
 190:17
 191:15
statistics
 185:24
status
 221:22
 225:7
staying
 166:21
 172:8
Steele
 254:17,18
stems 137:5
step 242:14
steps 182:24
 184:8
stop 70:13
 127:8
 234:23
stories
 76:18,20
 82:18
storm 122:4
story 3:8
 229:8,9
straight
 153:14
strategists
 47:9
strategy
 11:22
Street 6:3
 6:10,20
 271:5,18
stress 41:25
string 43:20
 44:6 83:3
 83:6
structure
 185:14
studied
 108:12
stuff 121:15
subject 2:8
 33:10 39:7
 43:19 44:9
 51:3 60:5

68:5 85:12
91:5,9
103:1,2
108:8
113:24
118:18
123:20
126:11
127:18
129:20
130:10
132:17
133:17
137:3
138:25
141:8
145:4
150:12,14
152:7,20
152:24
156:1,6
163:16
166:5
171:17
173:23
179:12,14
181:14,18
184:20
187:12,14
189:5,7
196:18,20
200:18
201:18,19
201:23
205:14,20
206:16
219:22,24
221:6,8
223:18
226:7,9
237:5,7
239:19
241:20,21
247:10,12
249:18,19
254:9,11
257:8,9
subjects
 181:21

submit 219:5
subscribe
 273:11
subsequent
 134:4
 146:6
substance
 273:8
substantial
 194:25
successful
 53:1
successf...
 212:2
Sudevi 7:6
suggest 42:1
 57:21
 194:3
suggesting
 56:6
suggestion
 87:18
 184:16
 256:15
Suite 6:11
summaries
 72:12
 147:11
summarized
 60:20 62:2
summarizes
 65:3
summarizing
 61:23
summary 40:1
 53:9 59:5
 60:17,25
 61:24
 62:17,19
 63:19 72:7
 144:2
 148:19
supervisor
 234:7
support
 15:17
 27:14
 33:19,25
 206:22

**CAROL CRAWFORD  11/15/2022**

211:21,24
213:10
**supported**
146:7
**supports**
218:1
**supposed**
125:1
215:4
**Supreme** 6:3
**sure** 14:13
33:21 37:9
40:21
44:24
46:13,24
48:12
55:13
61:12
64:17,19
64:22
68:19 69:1
69:6,25
73:24 75:2
79:15
80:11
82:13
88:25
96:18
108:25
110:11
113:18
116:4
120:3
121:10,13
121:14
125:25
127:21
128:19
130:15
141:20
143:3
151:8
160:25
173:10
182:12
183:12,23
184:13
188:16
189:21

190:4,24
192:1
195:25
202:24
205:5,5,23
206:4
212:11,12
212:14
216:11,22
217:13
223:10
228:6
229:25
235:6
240:1
251:23
256:16
257:10
266:16,20
**surface**
68:16 69:4
**surprisi...**
127:11
**survey**
221:21,21
224:25
225:3
**surveying**
224:21
**surveys**
131:4
**survival**
111:20
113:9
122:14,19
**suspect**
56:16 72:7
213:4
219:13
231:12
**suspected**
231:23
**suspense**
67:10
**swap** 191:23
**swear** 9:4
**switch**
192:19
**sworn** 9:6

270:9
**symptom**
191:15
**symptoms**
183:16
190:18
191:15
**sync** 5:4
221:8
223:21,23
239:21
**synced**
268:14,16
269:11
**synchron...**
223:22
**syncs** 268:16
**syndrome**
139:14
**system** 15:24
44:21
92:14
122:24
123:5,7
164:1
212:6
233:12
**systems**
17:14

———————
**T**
———————
**T** 270:1,1
**table** 207:15
207:18,20
211:9
265:23
266:1,8
**tabs** 183:15
189:25
190:12
196:12
**tactics**
27:20
**tag** 88:9
**tagged** 157:8
**take** 18:16
21:14
30:20 33:5
33:6 35:22

38:23
43:12,12
47:22 49:3
60:8 61:17
74:11,24
84:20 85:2
86:8
100:15
105:20
116:18
118:25
129:23,23
135:5
136:5
141:12
146:21
149:24,25
150:1
159:13
160:17
161:5
174:3
176:5
179:12
187:3
193:2
205:3,16
206:24
211:15
225:12
229:24
234:9
238:17
241:9
249:18
253:1
256:18
**taken** 76:7
82:7
116:19
149:14
162:4
201:16
204:3,12
270:6
271:11
272:4
**takes** 144:1
171:11

**talk** 9:21
20:19
21:11 37:9
39:4 49:14
69:1 72:4
77:20
116:12
124:4,5
167:7,9,15
172:11,13
172:25
178:19
182:10
183:20
185:2
210:10
227:18
237:22,23
243:6
249:2
**talked** 37:7
43:17
54:14
61:10
106:25
125:14
197:14
210:17
213:9,13
217:7
222:22
224:10
226:18
227:19
244:23
267:15
**talking** 3:22
18:5 19:19
53:5 72:5
78:22 83:1
83:20
121:11
124:2
127:14,15
127:16,24
128:11
134:10
149:18,20
226:21

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 233:20 | 228:2 | 67:23 | 39:21 | 25:15 |
| **Tangle** 60:7 | 233:12 | 72:24 | 87:25 | **thank** 10:20 |
| **target** 45:23 | 234:18 | 84:15 85:9 | 134:11,12 | 15:7 22:2 |
| **task** 42:5,5 | 255:2 | 85:10 86:2 | 193:16 | 24:23 27:7 |
| **tasked** | 263:1,21 | 87:13 | 217:14 | 28:12 |
| 248:23 | **team's** 68:19 | 103:1,7 | **terms** 25:13 | 31:18 32:4 |
| **team** 41:12 | 69:5 80:12 | 112:13 | 43:5 64:18 | 32:21 |
| 45:23 | 119:14 | 119:13 | 69:10 | 48:25 |
| 51:24 | 124:13 | 126:10 | 98:25 | 50:13 |
| 52:22 59:2 | **teams** 27:9 | 138:25 | 103:25 | 55:17 |
| 66:18 | 27:13 52:3 | 150:11 | 151:1 | 64:23 |
| 68:16,17 | 52:10 | 154:18 | 191:21 | 66:24 67:6 |
| 69:1 72:10 | 68:25 | 157:15 | 194:19 | 67:10 |
| 74:14 | 80:25 | 158:19 | **terrible** | 69:17 |
| 75:11 76:7 | 147:18 | 159:3 | 247:2 | 83:25 |
| 77:5,15,17 | 164:15 | 162:14 | **testified** | 84:22 |
| 78:16 82:7 | 220:21,22 | 166:4 | 9:7 65:11 | 85:21 |
| 82:9,11 | 220:22,23 | 170:14 | 96:5 | 90:25 |
| 84:7 87:2 | 241:1,3,6 | 171:17 | 145:22 | 96:21 |
| 90:16 92:7 | 258:4 | 187:12 | 148:7 | 104:21 |
| 103:9,9 | **tech** 114:14 | 189:4 | 220:6 | 117:22 |
| 105:25 | 208:10,17 | 206:12 | **testify** | 124:13,16 |
| 107:10 | **technical** | 207:14 | 10:24 | 132:13 |
| 110:14 | 181:10,11 | 208:15 | **testifying** | 133:7 |
| 119:10 | 181:20 | 209:22 | 104:18 | 135:4 |
| 125:13 | 215:7 | 210:15 | **testimony** | 138:24 |
| 135:16 | 224:9 | 216:6 | 47:15 54:9 | 144:15 |
| 139:7,10 | 250:14 | 219:2,21 | 57:9 64:2 | 149:21 |
| 140:6 | **technically** | 221:6 | 65:7 76:22 | 152:17 |
| 147:16 | 120:20 | 223:13 | 89:25 | 156:19 |
| 151:8,22 | **technique** | 229:16 | 101:3 | 158:15 |
| 151:23 | 213:17 | 237:4 | 120:19 | 161:9 |
| 154:5,22 | **technolo...** | 238:21 | 125:20,25 | 165:20 |
| 166:20 | 34:19 | 239:23 | 126:1 | 166:21 |
| 172:8 | **technology** | 247:10 | 132:7 | 170:23 |
| 174:21,23 | 16:5 | 257:8 | 143:17 | 171:13 |
| 175:16 | **tee** 75:5 | 267:14 | 161:17 | 176:25 |
| 177:10,11 | **telephone** | **telling** | 162:6 | 187:7 |
| 182:25 | 64:12 | 89:23 | 178:3 | 189:3 |
| 184:9 | **telephonic** | 153:6 | 199:7 | 204:15 |
| 192:24 | 20:8,12 | 158:11 | 266:25 | 234:12 |
| 193:2 | **telephon...** | 168:19 | 270:10 | 236:24 |
| 197:5 | 20:15 | 199:24 | **testing** | 265:11 |
| 201:1,11 | **tell** 20:4 | 220:9 | 63:21 | 269:17 |
| 203:14 | 30:3 32:24 | 243:24 | 220:11 | **thanks** 66:13 |
| 208:2,4 | 33:10 | 258:1 | **texting** | 107:7 |
| 211:14 | 36:20 | **tells** 55:17 | 36:10 | 119:14 |
| 216:22 | 43:19 | 170:5 | **TF** 42:5 | 156:16 |
| 227:2 | 55:17 | **term** 11:11 | **Thakral** | 185:19 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 192:24 | 12:7 16:17 | **think** 10:3 | 133:16,21 | 218:21,23 |
| 197:13 | 30:21 | 16:19 | 138:18 | 218:24 |
| 211:6 | 38:11 | 21:17 23:7 | 142:2 | 219:9,10 |
| 230:10 | 46:17 | 23:8 28:20 | 143:23 | 220:1,12 |
| 242:16 | 54:19 58:2 | 28:20 32:8 | 147:13,17 | 221:15 |
| 253:7 | 58:24 62:5 | 37:24 | 153:9 | 222:5,10 |
| **theme** 266:2 | 62:6 64:10 | 38:14 39:5 | 156:4 | 222:23 |
| 266:3,6 | 64:19 66:9 | 40:3,12,17 | 157:23 | 224:3,16 |
| **themes** 5:17 | 79:24 | 43:16,23 | 158:1,18 | 224:20,20 |
| 52:11 | 83:12 | 46:2,14 | 159:19 | 225:2 |
| 53:14 59:3 | 88:12 89:3 | 48:6,7 | 160:14,25 | 226:17 |
| 59:10 | 90:8 91:25 | 49:18 | 161:25 | 227:11 |
| 62:17 | 99:7,9 | 50:15,19 | 162:7 | 229:18 |
| 72:17 | 105:19 | 52:14 63:7 | 163:6,11 | 230:8,9 |
| 75:18,25 | 106:11 | 63:12 | 165:11 | 231:6 |
| 76:15 | 113:12,14 | 66:16 69:3 | 167:12,14 | 232:23 |
| 87:20 | 113:17 | 69:6,9,22 | 171:5,5,9 | 233:18 |
| 90:19 | 114:10 | 75:1,14 | 172:2,25 | 236:21 |
| 257:9,18 | 117:20 | 77:1 79:10 | 173:10,11 | 238:8 |
| 258:8 | 122:2,3 | 79:13,14 | 173:13,14 | 239:25 |
| 264:3 | 128:3,13 | 80:24 | 173:16 | 242:2 |
| **theoreti...** | 129:6 | 81:21,23 | 175:20 | 243:6,9 |
| 187:3 | 130:23 | 82:12 | 178:22,25 | 244:1 |
| **theory** 122:8 | 135:22 | 83:23 | 180:6,8 | 246:3 |
| **thereon** | 151:1 | 86:14 | 184:14,23 | 247:5 |
| 273:10 | 152:5 | 88:10,10 | 186:9,19 | 248:6,8,11 |
| **they'd** 76:4 | 167:1 | 90:12 | 186:23 | 248:13,16 |
| 130:5,23 | 170:11 | 91:19,20 | 188:14,15 | 248:18 |
| 157:9 | 171:8 | 91:21 | 190:16 | 250:6,17 |
| 246:17 | 179:25 | 92:16 97:5 | 192:9 | 251:20 |
| 260:22 | 180:10 | 99:22 | 193:5,5,9 | 253:22 |
| **thing** 25:20 | 181:23 | 103:17 | 194:21 | 255:21 |
| 34:4 35:2 | 182:4 | 105:22 | 195:2,8,11 | 256:7,13 |
| 49:24 | 183:17 | 106:25 | 195:22,25 | 256:14,23 |
| 65:10 | 188:20 | 109:2 | 197:16 | 257:19 |
| 123:17 | 189:22 | 110:23 | 198:5,24 | 258:18 |
| 126:3 | 191:14 | 113:17 | 198:25 | 259:16 |
| 137:25 | 194:23 | 115:15 | 203:11 | 260:4,7,13 |
| 155:15 | 199:24 | 117:3,19 | 204:25 | 261:10 |
| 179:11 | 203:24 | 119:2 | 206:3 | 263:14,19 |
| 189:20 | 209:2 | 120:1,22 | 207:2,6 | 263:21 |
| 204:13 | 217:21 | 121:15 | 208:22 | 264:19 |
| 225:7,8 | 218:24 | 123:17 | 209:6 | 267:15,24 |
| 231:8 | 219:5 | 125:24 | 210:3 | 268:16,19 |
| 240:10 | 224:16 | 128:20,23 | 213:2,17 | **thinking** |
| 248:12 | 232:4,14 | 129:3,9 | 214:4,16 | 28:14 64:5 |
| 260:14 | 247:2 | 130:14 | 215:20 | 69:7 |
| 266:15 | 251:18 | 131:13 | 216:5,12 | 128:10 |
| **things** 9:20 | 263:11 | 132:9 | 217:25 | 172:23,25 |

**CAROL CRAWFORD  11/15/2022**

215:10
230:21
243:8
259:17
263:10
269:7
**third** 247:20
248:20
**Thombley** 7:7
**Thornton**
222:25
**thought** 52:2
65:17 88:6
90:10
91:21
97:10,15
97:17
107:2
108:14
109:13
125:5
133:24
153:24
156:6
173:6
176:21
186:12
192:11,19
194:7
202:16
210:19
215:11
220:15
223:5
236:18
249:13
256:7
266:18
267:16
**thoughts**
27:20 70:8
121:19
**thousands**
34:25
168:20
**thousand...**
168:1
**threats**
91:25

92:18
98:22
212:5
218:23
**three** 13:18
13:23
14:15
27:25
31:12
92:16,17
115:16
120:3
140:16
167:1,4,25
228:13
**Thursday**
73:6 84:7
84:9,11
105:23
119:18,20
119:21
263:16
**tie** 10:19
**tied** 122:21
**time** 8:2
17:25
19:24
20:13
28:10,18
28:20 29:3
29:8 30:6
32:5 36:6
36:12 37:8
37:15 38:6
38:10
39:18
40:12
42:25
49:15 52:4
54:15
58:13 59:8
61:7,13
65:2,21
68:7,17
71:2 73:11
77:7 78:9
89:12
90:17
92:13,16

97:12
107:21
111:10
130:1
132:1,3,10
135:3
137:18
140:11
141:20
142:6,9
144:8
145:25
151:7
156:9
157:22,24
160:20
167:6,9,15
170:3
171:11
174:25
175:9
179:2,6
180:24
183:3,8,18
183:18
185:9,19
189:21
192:9
197:17
198:11,15
198:25
200:13
201:7
210:4
212:13
220:6
226:17,18
227:14,25
230:20
232:13,13
236:12,14
238:5
244:13
245:6
249:14
252:18
261:25
262:20
263:13

268:1
**timeline**
16:18
**timelines**
29:11
**timely** 27:15
**times** 29:1
65:19
72:18
106:24
129:25
130:8
133:21
226:21
235:11
241:16
243:7
**timetable**
192:7
**timing** 70:1
**title** 11:6
193:9
198:2
223:7
261:24
**titled** 3:9
**titles**
177:14
**today** 10:24
21:19
27:22 93:9
94:9,10,13
94:22 95:1
95:3
109:16
116:25
193:1,11
**Today's** 8:2
**Todd** 21:7
196:23,24
197:14,18
197:23
198:6
199:21
202:4
207:4
211:5,16
214:3
216:5,12

216:15,17
218:1,14
219:2
248:1
**Todd's**
197:25
216:10
**told** 12:20
12:22
14:15 26:4
63:9 73:5
78:1 82:1
86:25 97:5
114:17
131:22
210:24
213:25
235:22
**tomorrow**
27:22
230:12
**tomorrow's**
188:2
**tons** 192:10
**tool** 50:4
234:20,22
**tools** 90:21
148:13
154:21
234:16
**top** 36:15
39:8 41:5
47:7 52:23
136:2
141:14,15
151:1
172:6
173:8
187:20
191:3
196:2,24
219:23
237:25
**topic** 107:24
124:1
144:22
150:21
154:14
174:25

**CAROL CRAWFORD  11/15/2022**

177:5
184:18
198:1
256:8
topics 54:14
77:24
107:3
140:13
144:9
181:20
187:23
188:6
195:8,9
243:11,12
256:6
tossed
165:11
totally
152:9
town 173:13
250:16,21
TP 127:12,13
127:22
128:9,11
128:16
track 71:9
tracker
186:14
tracking
192:25
193:10
195:18
196:5
trail 114:7
training
98:13,16
99:19
234:18,25
235:1,5,7
235:13,22
236:15,16
236:17
transcript
5:23 8:21
125:11,19
126:2
268:17,22
271:13
transfer

141:23
travel 46:14
48:20
traveler's
45:10,10
travelers
2:13,16
39:10
43:22
44:10 45:6
45:8,13
46:5 54:23
treatment
183:16
188:3
trends
143:24
197:6
201:2
211:11
262:14
tried 244:5
true 106:11
108:22
116:8
120:14
139:24
158:19
159:4
164:24
170:12
255:5
270:9
273:9,13
trust 68:25
103:9
174:23
175:16
177:10
220:21
trusted
135:19
truth/da...
140:7
truthfully
10:24
try 9:21
106:18
179:11

215:18
trying 17:6
26:1 29:25
34:15
36:22
39:23 40:2
78:21 79:4
89:5 114:7
121:15
129:8
183:12
188:22
189:21
194:16
213:8
219:3
232:9,12
TTS 169:5
Tuesday
61:18
161:7
turn 10:17
143:25
144:12
turn.io 70:7
70:15
Turner 35:6
37:2,20
Twitter 16:5
21:7,9
180:13
181:1
197:24,25
198:12,14
199:5,21
200:20
202:12
206:23
209:2,19
211:17
212:8,13
212:17,18
212:20,21
213:15,20
214:11,13
214:25
218:17
220:8,10
248:2

249:2
Twitter's
206:22
Twitter.com
197:24
two 3:1
20:25 22:7
58:24 77:9
83:20 84:7
85:12 87:8
87:23
89:11
92:16,17
109:23
110:19
120:4
131:25
132:8
151:20
156:14
198:24
207:16,21
two-page
40:1
153:10
two-week
66:1
Tyler 66:15
141:17,19
141:20,24
144:1,13
145:15,18
146:10,22
type 16:11
40:13
106:24
151:23
222:24
227:22
253:18
typed 26:16
types 20:2
99:2
227:19
258:7,16
typical
194:22
typically
52:10 57:2

84:2
106:18
178:14
181:9,17
181:20
typo 257:10
260:5

————————

**U**

U.S 6:19 7:1
7:2,8 8:5
65:16 71:9
71:12,19
71:24
101:19
192:25
193:10
228:15
233:12,16
271:5
unanswered
70:11
unclear
216:1,9
219:4
uncommon
188:19
232:3
uncredible
266:22
267:4,7
underlying
185:25
understand
10:1,3,4
10:14,15
14:13
36:21,22
41:2 57:24
78:21,21
79:5 92:15
104:19
109:10
129:9
139:10
148:14
155:19
162:21
168:19

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 169:1,17 | 224:19 | 193:20,21 | 156:25 | 58:6,8 |
| 174:21 | 228:18 | 193:22 | 160:1 | 59:9,12 |
| 190:23 | 251:10 | 194:2 | 169:18,23 | 63:21 65:4 |
| 193:16 | 255:25 | 195:19 | 174:25 | 65:5 70:24 |
| 194:1,17 | 258:24 | 221:21,21 | 213:5,6,24 | 72:4 76:17 |
| 194:21 | 261:6 | 225:2,3 | 215:10 | 81:1,22,23 |
| 195:21 | **understood** | 228:22 | 236:13 | 82:18 |
| 217:16 | 91:20 | 229:11,19 | **useful** | 87:10 |
| 224:1 | 140:4 | **updated** | 173:19 | 108:2 |
| 232:10 | **undertaking** | 143:14,19 | **user** 24:22 | 111:13 |
| 265:5,5 | 69:12 | 157:1 | 97:8 | 115:19 |
| **understa...** | **unfolding** | 159:20 | **user's** 228:9 | 119:15 |
| 14:6 24:10 | 3:8 | 160:2 | **users** 27:15 | 121:4 |
| 26:17 | **unfortun...** | 162:10 | 54:2 89:6 | 122:2,23 |
| 35:13 | 196:7 | 240:10 | 228:11 | 123:15 |
| 36:14 | **unit** 40:15 | **updates** 4:3 | **uses** 55:4 | 124:14 |
| 37:10 | 40:15 | 4:5 156:2 | 136:18 | 126:22 |
| 40:22 41:1 | 42:13 45:9 | 163:18 | **usual** 206:24 | 137:19 |
| 42:17 | **United** 1:1,9 | 166:24 | **usually** 93:8 | 138:2 |
| 44:20 64:8 | 228:17 | 192:2 | 98:22 | 140:7,13 |
| 69:8 74:17 | 271:8 | 250:2 | 109:25 | 143:8 |
| 79:19 80:8 | 272:3 | 253:15 | 115:6 | 156:18,21 |
| 95:17 | **units** 40:15 | **updates/...** | 123:24 | 156:25 |
| 96:11 | 46:11 | 221:19 | 127:17,24 | 157:3,4,7 |
| 103:8 | 47:21,23 | **updating** | 144:17 | 157:17,25 |
| 109:20 | 48:19,21 | 192:8 | 181:6,13 | 159:5 |
| 111:1 | **University** | **upgraded** | 227:20 | 160:17,18 |
| 114:5 | 12:10,10 | 267:5 | 250:14 | 160:22 |
| 120:24 | **unknown** | **uptick** 146:1 | ——————— | 161:14 |
| 122:25 | 170:12 | **urgency** 48:4 | **V** | 162:3,12 |
| 137:16 | **unmarked** | **url** 229:14 | **v** 271:7 | 162:13 |
| 138:15 | 67:8 | **Ursula** 223:2 | 272:2 | 164:2,8 |
| 139:22,23 | **unproven** | 223:11 | **vac-** 231:5 | 166:7 |
| 143:8 | 108:22 | **Ursula's** | **vaccinated** | 169:19,23 |
| 150:17 | 120:13 | 223:8 | 143:13 | 170:1 |
| 158:2,10 | **unsupported** | **use** 15:20 | 165:15 | 171:22 |
| 159:2 | 108:22 | 18:13 29:2 | 168:7 | 172:11,13 |
| 163:4 | 120:13 | 29:4,5 | **vaccination** | 174:20 |
| 167:17 | **unvaccin...** | 35:23 36:2 | 53:3 62:12 | 175:5 |
| 168:20 | 146:3 | 39:20 | 66:4,6 | 176:17 |
| 177:6 | **up-to-date** | 40:17 59:5 | 71:13 | 182:19,20 |
| 184:10 | 228:21 | 67:8 70:20 | 142:16 | 182:22 |
| 193:12 | **upcoming** | 71:7 96:15 | 164:6 | 183:9,25 |
| 201:19 | 224:6 | 105:18 | 169:3,6 | 197:9 |
| 204:4 | **update** 59:12 | 128:21 | **vaccinat...** | 201:5 |
| 210:6,9 | 75:16 | 134:11,12 | 53:1 | 207:16,23 |
| 212:1 | 148:15 | 137:10,12 | 148:23 | 207:25 |
| 213:23 | 170:23 | 139:15 | **vaccine** 4:8 | 209:7 |
| 217:17,19 | 183:18 | 147:23 | 53:17,25 | 231:11 |

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| 234:15 | 231:3,5 | **vary** 181:8 | 106:7 | 196:16 |
| 237:16 | 232:10 | **VC** 5:4,9 | 110:9 | 199:9 |
| 258:5 | 233:10 | 223:18 | 111:24 | 200:14,16 |
| 263:1,7,21 | 234:1,13 | **VC-Facebook** | 112:3,7,24 | 203:13 |
| **vaccine-...** | 251:22 | 221:8 | 113:4 | 205:5,12 |
| 52:24 | **VAERS** 3:22 | 239:20 | 115:13,17 | 205:18,25 |
| 53:22 58:7 | 122:21,22 | **VECCHIOINE** | 118:8,14 | 206:6,11 |
| 140:8 | 122:23 | 10:8 | 118:16,21 | 219:17,20 |
| 227:3 | 150:14,18 | **Vecchione** | 121:7 | 221:2,4 |
| **vaccine.gov** | 150:21,21 | 2:4 6:8 | 123:6 | 226:2,5 |
| 230:14 | 150:23,24 | 8:13,13 | 126:6,9,13 | 231:17,24 |
| 231:1,4 | 150:25 | 9:11 21:13 | 131:7 | 236:2,4,20 |
| 232:6 | 151:3,9,19 | 22:4,9 | 132:12,23 | 237:3 |
| 233:15 | 151:20 | 26:24 | 133:5,8,9 | 238:15 |
| 234:13 | 152:2,5,8 | 30:19 31:5 | 134:23 | 239:12,17 |
| **vaccinef...** | 201:15 | 31:16,22 | 135:4,7 | 241:14,18 |
| 230:14 | 204:3,5,12 | 33:1,5,7 | 136:20,23 | 247:3,8 |
| 231:1,2,7 | **vague** 36:18 | 36:19 | 136:24 | 249:5,8,10 |
| **vaccinef...** | 36:21 | 38:19 | 137:24 | 249:15,16 |
| 231:4 | 48:23 78:3 | 43:11 | 138:11 | 251:7 |
| **vaccines** 3:7 | 96:13 99:4 | 47:16 | 143:2,18 | 254:5 |
| 3:8 64:20 | 101:6,20 | 48:25 49:2 | 144:25 | 256:17,22 |
| 70:21 86:3 | 105:10 | 54:10 | 145:2 | 257:5 |
| 87:14 | 115:12 | 57:10 60:1 | 149:22,25 | 260:2 |
| 89:12 | 117:24 | 60:4 67:2 | 150:7 | 261:1 |
| 115:22 | 131:6 | 67:5,11,13 | 152:14,18 | 267:1,20 |
| 124:2 | 132:21 | 76:24 78:5 | 152:23 | 267:21,25 |
| 127:10 | 134:22 | 78:19 79:3 | 153:3 | 268:4,8,19 |
| 128:8 | 176:1 | 80:18 81:6 | 155:8 | 269:6 |
| 131:5 | **vaguely** | 82:24 | 158:7,24 | **verbal** 9:17 |
| 137:3,6 | 154:12 | 84:18,22 | 159:16 | **verifiable** |
| 139:14,17 | **vagueness** | 84:23 85:4 | 161:18 | 237:20 |
| 144:20 | 176:15 | 85:7 86:1 | 162:9,19 | 238:4 |
| 158:4,12 | **valid** 237:17 | 86:7 90:1 | 163:3,14 | **version** |
| 163:25 | **variant** | 91:2,8,11 | 164:18 | 227:23 |
| 164:13,23 | 190:25 | 93:4,6,23 | 165:8,18 | **versus** 8:5 |
| 167:5 | 191:1 | 94:3,8,13 | 165:21,24 | 217:3 |
| 168:1,4,11 | **variants** | 94:16,18 | 166:3 | **video** 21:18 |
| 169:1,15 | 190:21 | 94:21 95:2 | 168:16 | 54:3 |
| 169:21 | 191:17,20 | 95:6,12 | 171:16,21 | 227:12,23 |
| 170:15 | **varied** | 96:5,9 | 172:1 | 227:24 |
| 183:16 | 130:14 | 97:25 98:5 | 173:18,21 | 268:10,12 |
| 201:14 | **variety** 88:8 | 99:5 | 176:2 | 268:16 |
| 203:20,22 | **various** | 100:12,17 | 178:7,8 | 269:10 |
| 204:1,18 | 54:24 | 100:18 | 179:7,10 | **video-re...** |
| 231:5,10 | 55:11 | 101:4,7,22 | 179:20 | 8:3 |
| 253:11 | 122:2 | 102:1,8,21 | 187:7,10 | **videogra...** |
| 256:1,3 | 155:16 | 102:23 | 189:1 | 7:14 8:1,9 |
| **vaccines...** | 227:19 | 105:11 | 193:15,25 | 9:3,9 |

**CAROL CRAWFORD  11/15/2022**

30:24 31:2
31:17 98:1
98:3 102:9
102:11
150:2,4
205:9,11
256:25
257:2
268:9,14
268:18
269:2,11
269:13,15
269:17
**VIDEOTAPED**
1:13
**view** 29:8
146:7
164:23
209:19,22
**viewpoint**
71:12,24
**viewpoints**
71:9,19,24
**violate**
157:9
**violates**
157:6
**virus** 190:16
**visit** 218:17
**visual** 11:19
**visualize**
262:14
**voice** 223:19
**volume** 53:9
89:20
151:2
**voluntar...**
138:4
**vote** 253:12
**vs** 1:6

_____
**W**
_____
**W** 6:3
**Wait** 10:10
**Walensky**
120:23,25
125:20
**walkthrough**
234:22

**want** 23:6
27:11 29:1
33:17,18
34:9 36:24
46:18 47:4
55:25
68:18
70:12
76:19
77:16,24
78:24 79:9
80:7 85:22
126:20
131:12
175:1
176:9
178:18,19
186:19
191:23,25
192:14,19
200:10
205:16,23
205:24
206:4
215:10,13
217:10
226:24
234:16
240:1
245:18
262:23
267:3
268:7,12
268:14
269:2
**wanted** 18:13
31:6,19,20
48:22
51:25
66:12
68:16
77:23
82:16
87:10
98:23
123:11
144:9
147:8
156:23

160:4
166:23,25
183:18
186:22
188:11
190:13
191:22
199:20
204:25
207:21
209:20,23
215:16
217:2
224:5,6,22
228:20
230:22,22
242:14
251:23
259:16
260:7
267:5
**wanting**
106:10
171:8
**wants** 66:21
187:4
**warning** 4:7
42:8,19
**Washington**
6:12,21
7:3 271:6
**wasn't** 37:21
81:7 96:15
110:1
128:2
131:11
152:2
180:1
188:19
190:12
194:5
215:10,14
215:17,22
250:16
260:15
**watching**
143:10
196:6
**wave** 46:1

**way** 22:18
42:1 71:12
99:10
110:14
119:22
134:3
140:4
147:7,10
147:20,24
148:12
155:22
162:23
181:5
194:22
197:19
199:20
209:24
211:22
216:8
224:14
240:16
252:23
264:25
270:13
**ways** 2:13,16
39:9 43:21
44:10
81:13
87:16 88:8
**we'll** 21:3
48:2 55:21
84:20
95:10
100:14,15
107:5
116:12
121:19
133:17
185:1
187:23
188:6
235:12
256:23
**we're** 21:24
21:24 36:7
39:16
45:23
49:15
54:19

76:15
121:13
148:18
165:22,25
166:1
169:7
172:23
173:12,16
182:3
192:7
200:10
203:9
205:6
208:8,8
256:6
268:20
269:4
**we've** 31:7
33:14 47:4
60:13
66:14,19
78:11
102:14
114:12
133:10
141:1
145:13
148:4
157:11
167:1
179:3
180:12
189:19
207:6
208:4
209:15
220:1
222:10
226:17
229:17
234:15
239:25
240:5
242:2,22
247:2
257:19
268:20
**weaken**
163:25

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| **wear** 29:6 | 195:23 | **WhatsApp** | 9:24  22:6 | **words** 52:14 |
| **web** 11:15 | 196:8 | 70:17,19 | 31:19  33:1 | 55:4  64:21 |
| 12:6  15:6 | 197:12 | 70:25 | 66:20 | 133:15 |
| 15:21,21 | 226:25 | 137:9 | 80:21 | 145:8 |
| 15:23 | 229:21 | **White** 230:13 | 93:22 | 149:12 |
| 87:21 | 253:11,18 | 230:24,25 | 102:4,5,7 | 227:21 |
| 109:9 | 257:23 | 231:12,19 | 118:13,14 | 251:21 |
| 127:22 | 260:18,18 | 232:1,4,7 | 149:23 | **work** 11:5,21 |
| 128:14,16 | **week's** 2:23 | 232:22 | 150:1 | 11:22  12:2 |
| 128:21 | 5:6  68:6 | 233:2,8,11 | 179:17 | 14:1  19:25 |
| 129:1 | 76:5 | 233:18,19 | 205:13 | 25:12 |
| 134:11,14 | 226:10,16 | 233:21 | 236:1,3 | 33:19 |
| 134:15,16 | **weekend** | 234:4,5,14 | 269:1 | 34:20,23 |
| 134:17 | 126:20 | 259:10,22 | 270:7,10 | 35:22  36:8 |
| 135:16 | 186:8 | 260:9,17 | 270:15 | 40:12  73:7 |
| 192:8 | **weekly** 5:4 | 261:8,19 | 271:13 | 100:4 |
| **website** | 68:9  69:2 | 263:4 | 272:1,25 | 109:24 |
| 15:15,23 | 221:8 | **whitelist** | **witnesses** | 156:24 |
| 45:10 | 223:21 | 217:22 | 49:23 | 159:19 |
| 47:20,22 | 226:19,21 | **whitelisted** | **women** 46:4 | 160:5,9,16 |
| 59:13 | 239:21 | 217:11,11 | **wondered** | 160:22 |
| 106:13 | 260:11,13 | 217:15,17 | 176:15 | 164:13 |
| 108:4,16 | 262:5 | **whitelis...** | 248:12 | 166:24 |
| 109:4 | **weeks** 27:18 | 217:20 | **wonderful** | 167:18,19 |
| 113:15,22 | 51:23 | **wide** 55:24 | 55:20 | 175:6,7 |
| 114:16,17 | 56:21  84:8 | 56:7,11 | **wondering** | 177:21 |
| 114:20 | 132:8 | 58:21 | 75:15  81:2 | 181:12 |
| 115:22 | 151:13 | 59:15 | 140:6 | 200:7 |
| 130:23 | 169:20 | **widely** | 200:9 | 209:24 |
| 183:17 | 228:13 | 150:22 | 204:23 | 213:18 |
| 187:3 | **weeks'** | 153:25 | 258:6 | 214:1 |
| 194:20 | 131:25 | 154:23 | 263:7 | 224:11 |
| **websites** | **weigh** 230:7 | **widespread** | **Woods** 66:15 | 235:12 |
| 233:17 | **Weir** 223:2 | 29:1 | 141:17,19 | 237:19 |
| **Wednesday** | **went** 12:3 | **Wilhelm** | 141:21 | 258:21 |
| 247:15 | 63:8  70:11 | 263:1,5 | 144:1,13 | 262:3 |
| **week** 3:5 | 187:2 | **willing** | 145:15,18 | **worked** 24:15 |
| 46:2  48:2 | 219:4 | 35:10 | 146:22 | 40:25 |
| 65:14  68:8 | 236:6,11 | 173:1 | **word** 15:20 | 75:23 |
| 103:4 | 265:18 | 228:22 | 19:2  74:15 | 186:17 |
| 118:24 | **weren't** 81:8 | 263:2 | 85:3  195:2 | 192:18 |
| 119:21 | 115:3 | **withdraw** | 201:18 | 214:20 |
| 126:16 | 185:5 | 74:22 | 225:20 | **Worker-c...** |
| 156:18,20 | 212:15 | 100:24 | 241:12 | 55:5 |
| 157:1 | 240:10 | 127:16 | **worded** 260:4 | **workers** |
| 161:6 | 248:19 | 139:22 | **wording** | 53:17  58:6 |
| 177:3 | 267:12 | **withdrawn** | 42:14,15 | 66:5 |
| 180:20 | **Western** 1:1 | 247:25 | 110:25 | **working** 12:5 |
| 185:20 | 8:6 | **witness** 9:4 | 149:12 | 27:9,14 |

**CAROL CRAWFORD  11/15/2022**

28:19
56:17
58:19
70:17
77:21 80:8
84:4 87:5
89:22
101:10
111:9
114:23
135:13,15
174:18
175:3
177:5
189:20
195:15
232:4,8
234:15
236:9
262:15
**works** 22:18
24:15
44:20
216:6,8
**World** 51:7
**worldwide**
164:23
**worried**
34:24
214:1
258:9
263:9
**worth** 88:16
89:20
258:18
**wouldn't**
53:7
101:24
106:21
110:23
113:1
116:23
131:3,12
144:24
146:5
149:3,13
180:9
218:10
244:12

258:10
**Wright** 50:17
**write** 23:23
39:18 43:7
55:18
115:21
131:21
230:19
237:10,11
**writes** 36:23
74:25 84:4
126:18
145:18
156:14
166:14
195:12
197:2
211:5
226:24
252:5,7
**writing** 93:5
**written** 7:22
163:7
**wrong** 41:1
96:16
124:19
194:18,20
203:10
216:1
245:9
**wrote** 26:13
34:6 87:11
122:8
174:14,15
231:18
247:16
**WY** 5:7
**Wyoming**
237:7,12
237:18
239:3

___

**X**

**xlsx** 200:20

___

**Y**

**Y** 22:24 34:6
**y'all** 99:15
**yeah** 12:22

22:15
25:22
28:12
44:18 55:9
67:2 74:8
75:9 78:8
85:16
86:19 90:5
92:12 94:2
94:16
95:21
124:20,21
128:10
136:16
149:15
158:10
159:2
165:12
173:19
179:5
186:23
187:15
199:17
206:7,9
212:19
214:23
222:18
223:9
225:9
230:6
245:5
249:19
250:19
252:21
254:6
269:9,16
**year** 4:3,6
174:22
175:15
214:21
**years** 12:3
169:16,22
**yellow** 70:7
**yesterday**
100:3
109:15,16
**Young** 11:3
**youth** 45:24

**YouTube**
175:16
185:13
227:25
244:18,20
244:21,22
244:24
245:2,18
245:21,22
245:23
255:2
■ 97:7

___

**Z**

■ 35:6
**ZIP** 70:20
231:9
**Zoom** 7:7,11
31:8,11,13
102:14,18
102:19,19
240:25
241:6
**Zuckerberg**
33:22

___

■

35:7
**@CDC.gov**
35:8

___

**1**

**1** 2:7 5:21
21:12,14
40:15 55:3
55:4
252:24
270:8
**1.5** 235:12
**1/26/21** 2:17
**1:22** 156:15
**1:50** 207:3
**1:57** 119:7
124:12,17
**10** 3:2 91:1
91:7,8,10
100:19
102:2
207:3

211:6
212:23
241:22
**10(B)** 7:19
**10/28/2021**
249:20
**10/28/21**
5:14
**10:09** 31:1,3
**10:38** 189:12
**100** 46:13
69:25
128:19
**102** 3:4
**10th** 63:17
213:3
214:8
242:3
257:15
259:7
261:13
**11** 3:4 102:2
102:22,25
108:19
112:19
114:22
115:8
118:5
**11-year**
163:19
**11-year-...**
156:3
**11/2** 160:14
**11/2/21** 4:2
**11/8/21** 4:5
**11:27** 100:1
**11:51** 98:1
**11:53** 98:4
**11:59** 102:9
102:10
**1100** 6:20
271:5
**112** 3:6,7
**113** 3:9
**118** 3:11
**11th** 271:18
**12** 3:6 100:3
112:3,5
112:15

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 115:9 | 271:3 | 150:6,9 | 207:3 | 237:10 |
| 208:10 | **171** 4:10 | 266:12 | 211:6 | **24** 4:7 5:22 |
| **12/21/21** | **173** 4:11 | 273:15 | 216:4 | 28:9 63:17 |
| 4:17 | **179** 4:13 | **200** 4:20 7:3 | 218:13 | 119:7 |
| **12:51** 102:10 | **17th** 61:18 | **20036** 6:12 | 219:25 | 124:12 |
| 102:12 | 100:3 | **2019** 16:20 | 221:10 | 164:17,19 |
| **1225** 6:10 | 146:21,25 | **202** 6:14 | 237:8 | **241** 5:10 |
| **126** 3:13 | **18** 3:16 12:2 | **202-353-...** | 239:22 | **2440** 146:12 |
| **133** 3:7 112:5 | 141:6,7,9 | 6:22 | 241:22 | **247** 5:12 |
| 112:17 | 144:13 | **2020** 16:21 | 242:3 | **249** 5:14 |
| **138** 3:14 | 174:4,14 | 16:22 | 247:15 | **24th** 119:19 |
| **14** 3:9 112:4 | **187** 4:15 | 17:11 18:6 | 250:8 | 124:17 |
| 113:3,5,6 | **188** 4:17 | 20:2 22:15 | 252:22 | 216:4,14 |
| 115:9 | **18th** 99:23 | 34:5 38:8 | 257:15 | **25** 166:1 |
| 119:4 | 270:16 | 43:24 | **2022** 1:14 | 269:7 |
| 270:25 | **19** 3:19 | 77:13 | 8:2 13:3,4 | **254** 5:15 |
| **141** 3:16 | 21:25 | 147:14 | 13:14 15:2 | **257** 5:17 |
| **145** 3:19 | 145:1,4 | 175:19 | 16:2 166:8 | **25th** 49:21 |
| **15** 1:14 3:11 | 148:19 | 210:7 | 166:15 | 50:14 |
| 8:2 64:23 | **196** 4:18 | **20201** 7:3 | 171:23 | 65:24 |
| 65:14 | **19th** 6:10 | **2021** 3:6,7 | 270:16 | **26** 4:8 5:22 |
| 118:7,9,20 | 105:22 | 49:16,19 | 271:3,11 | 49:18 |
| 118:22 | 131:18 | 60:9 61:18 | 272:4 | 139:3 |
| 125:8 | **1st** 63:2,14 | 68:13 | **2024** 270:25 | 165:25 |
| 131:13 | 126:18 | 73:16 82:1 | **205** 5:1 | 166:2,6 |
| 133:1,1,5 | 152:25 | 85:13 | **20th** 103:5 | 172:9 |
| 133:8 | _____ | 91:10 | 119:20 | **269** 270:8 |
| 221:10 | **2** | 100:1 | 146:11 | **26th** 55:18 |
| 271:11 | **2** 2:8 22:5,8 | 117:8 | **212** 2:7 4:1 | **27** 4:10 |
| 272:4 | 32:1,3 | 118:24 | 21:24 60:9 | 171:15,21 |
| **150** 3:22 | 40:15 55:4 | 124:17 | 103:5 | 173:9 |
| **152** 4:1 | 169:15 | 126:18,24 | 152:16,22 | **27th** 44:25 |
| **155** 4:2 | **2/3/22** 4:8 | 131:21 | 152:23 | 47:1 |
| **16** 3:13 | **2/4/22** 4:10 | 134:21 | 189:7,12 | 218:12 |
| 61:18 | **2/7/20** 2:8 | 135:1 | 195:23 | **28** 4:11 |
| 126:8,12 | **2:06** 150:2,3 | 139:3 | **219** 5:2 | 173:20,23 |
| 126:14 | **2:07** 76:3 | 142:9,15 | **21st** 195:11 | 252:22 |
| 131:20 | 82:1,4 | 146:11,25 | **22** 2:8 4:2 | **28th** 230:4 |
| 133:1 | **2:18** 84:3 | 150:15 | 155:7,9,22 | 238:7 |
| 135:1,8 | **2:19** 150:3,5 | 156:1 | **221** 5:4 6:3 | 253:4 |
| 136:6,11 | **2:28** 216:4 | 163:20 | **226** 5:5 | **29** 4:13 |
| **1600** 1:17 | **2:30** 218:13 | 174:4 | **22nd** 144:2 | 179:9,11 |
| **163** 4:5 | **2:32** 230:3 | 176:6 | **23** 4:5 | 179:23 |
| **164** 4:7 | **2:42** 68:13 | 179:5 | 163:13,15 | 187:18 |
| **166** 4:8 | **2:54:26** | 185:17 | 163:23 | 234:10 |
| **1684** 169:13 | 160:15 | 187:15 | 165:18 | **29530** 6:21 |
| **17** 3:14 | **2:57** 131:21 | 189:8,12 | **237** 5:7 | 271:6 |
| 135:4 | **20** 3:22 | 190:5 | **239** 5:8 | **29th** 182:16 |
| 138:23,24 | 149:22,23 | 196:21,25 | **23rd** 176:6 | **2nd** 118:24 |

**CAROL CRAWFORD  11/15/2022**

126:24
156:1,14
185:17
219:25
253:13

**3**

**3** 2:10  32:1
33:2,4
55:3,4,6
128:23
**3/10/2021**
257:11
**3/10/21** 5:17
**3/23/2021**
173:25
**3/23/21** 4:11
**3/30/20** 2:15
**3/31/20** 2:12
**3/31/21** 2:22
**3/5/20** 2:10
**3:01** 47:1
**3:08** 70:4
**3:10** 263:15
**3:16** 73:4
74:12
**3:22-cv-** ...
1:5
**3:30** 70:6
177:21
**3:30-4:30**
44:9
**3:35** 27:5
**3:37** 205:9
205:10
**3:51** 205:10
205:11
**30** 4:15  47:7
187:9,11
216:16
271:17
**30th** 43:23
68:13  73:3
73:16
74:24
79:14  80:3
237:8
250:8
**31** 4:17

112:2
188:25
189:2,4
**31st** 40:4
44:1  76:3
76:13
81:25  82:3
82:4  84:3
**32** 4:18
196:15,17
196:18
**33** 2:10  4:20
200:15,17
200:19
**34** 5:1  12:3
205:18,19
206:14
211:6
**35** 5:2
219:19,21
219:21
**36** 5:4  221:3
221:5,6
**37** 5:5  226:4
226:6,7
**38** 2:12  5:7
237:2,4
**39** 5:8
239:13,16
239:18
**3rd** 46:2
126:16
131:20
134:21
135:1,9
145:17,18
166:8,15
172:10
253:14

**4**

**4** 2:12  38:18
38:20  44:1
49:4
128:23
169:22
187:15
**4-13-21**
200:20

**4/12/21** 4:15
187:15
**4/14/2021**
200:21
**4/14/21** 4:20
**4/15/21** 5:4
**4/29/2021**
226:11
**4/29/21** 5:5
**4/30/21** 5:7
**4/5/2021**
179:16
**4/5/21** 4:13
**4/9/21** 4:18
**4:00** 180:4,7
**4:19** 105:22
**4:23** 247:16
**4:36** 166:15
**4:43** 144:2
**40** 5:10
241:14,17
241:19
**40-49** 185:25
**41** 5:12
247:7,9
**42** 5:14  67:5
249:7,9
**43** 2:15  5:15
249:11
254:4,7,8
**44** 5:17,22
256:21
257:4,7
**450** 6:11
**49** 2:17
**496** 206:1
**497** 206:1
**498** 206:1
**499** 206:1
**4pm** 179:24
**4th** 171:23

**5**

**5** 2:15  4:10
34:5  43:10
156:2
163:19
**5-11** 4:3,6
**5/10/21** 3:2

5:10
**5/20/21** 3:4
**5/26/21** 2:19
**5/6/21** 3:1
5:8
**5:07** 256:25
257:1
**5:11** 253:4
**5:19** 257:1,3
**5:21** 172:10
**5:26** 66:14
**5:33** 1:15
269:18,19
**5:47** 63:14
**@CDC.gov**
24:14
**500** 206:2
**533** 136:9,12
**539** 124:18
**5th** 186:7

**6**

**6** 2:17  49:1
49:4,5
85:13
128:23
169:22
239:22
240:24
**6/10/2021**
247:13
**6/10/21** 5:12
**6/2/21** 3:11
**6/29/2022**
254:11
**6/29/22** 5:15
**6/3/21** 3:13
**6/30/2021**
205:21
206:17
**6/30/21** 5:1
**6:16** 145:19
**6:19** 64:24
**6:23** 234:10
**6:37** 238:7
**6:58** 126:25
**60** 2:19
228:14,16
**63101** 271:18

**65** 42:24
**65101** 6:4
**67** 2:22
**682** 241:25
**696-6775** 6:5

**7**

**7** 2:19  60:3
100:1
136:25
**7(a)** 137:4
**7/20/21** 3:16
141:11
**7/26/2021**
139:2
**7/26/21** 3:14
**7:38** 73:16
80:3
**7:46** 74:24
79:14
**711** 271:17

**8**

**8** 2:22  67:12
67:14  85:4
85:5
**8.15_AH_** ...
3:23
**8/18/21** 3:19
145:6
**8/19** 150:15
**8/19/21** 3:22
**8:13** 142:15
**8:39** 60:9
**8:49** 126:19
**8:51** 214:9
**8:55** 34:5
**80** 228:14,16
**800-number**
11:17
15:18
**85** 3:1
**869-5210**
6:14
**877** 6:5
**899** 6:4
**8th** 142:15
163:20
196:25

**CAROL CRAWFORD  11/15/2022**

| 9 |
|---|
| **9** 2:4  3:1 |
| 85:6  167:8 |
| 196:21 |
| 247:15 |
| **9/1/21** 4:1 |
| **9/3/21** 5:2 |
| **9:00** 61:19 |
| **9:24** 1:15 |
| 8:3  259:7 |
| **9:30** 261:13 |
| **9:32** 261:16 |
| **9:36** 262:11 |
| **9:43:56** |
| 262:22 |
| **9:52** 179:23 |
| **9:54** 263:15 |
| **9:57** 30:25 |
| 31:1 |
| **91** 3:2 |
| **99.96** 111:20 |
| **9th** 142:9 |

# EXHIBIT E

**Pages 1 - 53**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge Presiding

ROBERT F. KENNEDY, JR.,           )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )      **NO. C 23-03880 TLT**
                                  )
GOOGLE LLC, a Delaware            )
corporation, and YOUTUBE, LLC,)
a Delaware corporation,           )
                                  )
          Defendants.             )
_____)

San Francisco, California
Monday, August 21, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        JW HOWARD/ATTORNEYS
                        201 South Lake Avenue, Suite 303
                        Pasadena, California  91101
               **BY:  SCOTT J. STREET**
                     **ATTORNEY AT LAW**

For Defendant:
                        MUNGER, TOLLES & OLSON LLP
                        560 Mission Street - 27th Floor
                        San Francisco, California  94105
               **BY:  JONATHAN H. BLAVIN**
                     **JULIANA MARIKO YEE**
                     **ATTORNEYS AT LAW**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

<u>**Monday - August 21, 2023**</u>                              **9:56 a.m.**

**P R O C E E D I N G S**

**---000---**

    **THE CLERK:**  Now calling Case Number 23-cv-03880,
Kennedy, Jr. versus Google, LLC, et al.

    Counsel, will you please come forward to the podium and
state your appearances, beginning with the plaintiff.

    **ATTORNEY STREET:**  Good morning, Your Honor.  Scott
Street for the plaintiff, Mr. Kennedy.

    **THE COURT:**  Good morning.

    **ATTORNEY BLAVIN:**  Good morning, Your Honor.  Jonathan
Blavin for defendants Google and YouTube.

    **ATTORNEY YEE:**  Good morning, Your Honor.  Juliana Yee
on behalf of Google and YouTube.

    **THE COURT:**  Good morning.  And pleasure to meet you
all.  And I'm glad that there were safe travels coming from
Burbank as well as the streets of San Francisco.  So pleasure
to see everyone.

    All right.  This matter is before the Court for an
application of a temporary restraining order.  Plaintiff has
filed an application for a prospective temporary restraining
order to enjoin Google and YouTube from using its
misinformation policies during the 2024 presidential campaign.

    Counsel, if you'll please approach, I'm going to have some
general rules.  Those of you who are going to be presenting to

1   the Court should approach the podium so that you can be heard

2   by the Court as well as our court reporter.  Thank you.

3        For those who may be unfamiliar with this Court, I will

4   generally give a recitation of what I believe the facts to be

5   and allow you to provide correction during your presentation.

6        I will also have a list of questions and some I will

7   intermittently pose to you.  Please understand if I'm asking

8   these questions, these are questions that are relevant to my

9   ultimate decision.

10        I've read all of the briefing as well as the cases that

11   you've recited in your briefing, and I'm very clear in terms of

12   the standard of a temporary restraining order.

13        So, counsel, I'll note that the Court will have as one of

14   its first questions is why is this an emergency given the lapse

15   of time?  So please take that into consideration.

16        Now, on January 23rd, 2021, Twitter, not YouTube, removed

17   a tweet from Mr. Kennedy's Twitter account.  The takedown was

18   precipitated by an e-mail sent before from Clarke Humphrey of

19   the White House office flagging the tweet and asked if we can

20   get moving on the process for having it removed.  This is based

21   on the motion and declaration filed by Mr. Street.

22        This is a fact that I believe supports documentation of

23   *Missouri v. Biden*, but I want to note that Mr. Kennedy had

24   filed a motion to intervene and I believe that motion was

25   denied on January 10th, 2023, by the District Court Western

1    Division of Louisiana, Monroe Division.

2         Now the facts that are relevant to this case are as

3    follows and those of which the Court is asked to consider.

4    Mr. Kennedy announced his candidacy on April 19th, 2023.  He

5    spoke earlier, a month prior, at Saint Amselm College in

6    New Hampshire Institute of Politics on March -- in March of

7    2023.  I do -- I would like to know the actual date.

8         The speech centered around Mr. Kennedy's concern about the

9    merger of corporate and state power as it related to vaccines

10   that children are asked to take.

11        He spoke about the environmental and legal work fighting

12   corporate polluters.  And this is based on the motion pages 9

13   through 10, and counsel, Mr. Street's declaration paragraph 4.

14        Manchester Public Television posted a video of the speech,

15   and YouTube removed it.  This is according to the declaration

16   filed by Mr. Street.

17        Once again, Mr. Kennedy announced his candidacy a month

18   later on April 19th, 2023.  And he's seeking the Democratic

19   Party's nomination for President.  He has filed the necessary

20   paperwork within the Federal Election Commission and is taking

21   steps to qualify for the ballot in early primary states

22   including New Hampshire.

23        Now then YouTube removed a video of an interview with

24   podcast host Jordan Peterson and comedian Joe Rogan after he

25   announced his candidacy.  On June 17th, YouTube removed the

1  video titled "RFK on Joe Rogan, Pfizer COVID Vaccine Trial,"

2  and this is based upon the declaration in Exhibit A, Amaryllis

3  Kennedy.

4      Kennedy does not identify what video interview with Jordan

5  Peterson was taken down, the topics of the interview, what date

6  it was posted, or what date it was taken down.

7      On the 4th of July, 2023, the decision in *Missouri v.*

8  *Biden* was filed.  The appeal was filed on July 6th, 2023.

9  Defendant's motion to stay during appeal was denied on

10  July 10th.  Oral arguments for the appeal were held on

11  August 10th, 2023.

12      Plaintiff filed his complaint on August 8th, 2023, and his

13  TRO application on August 9th, 2023.

14      Now then, counsel, I invite you to share any additional

15  facts that you believe are relevant to the Court in making this

16  final decision and whether to grant a TRO.

17      There are standards of which the Court would like to know

18  which do you feel are the appropriate standards to apply,

19  keeping in mind that *Missouri v. Biden* at best is persuasive.

20  *O'Handley v. Weber* found at 62 F.4th 1143, decided in 2023 by

21  our Ninth Circuit, is the case that the Court will follow.  And

22  the Court would like to know which of the tests in that case

23  you feel is appropriate.

24      What date in March of 2023 did Mr. Kennedy give his

25  speech?  What date did Manchester Public Television post

1  Mr. Kennedy's speech?  On what date was Mr. Kennedy's speech

2  taken down by YouTube?  How many other videos of Mr. Kennedy

3  have been taken down by YouTube, if any?  And please precisely

4  indicate the date and the content.

5      Twitter, who is not a party to this case, allegedly

6  removed a video of Mr. Kennedy on January 23rd, '21.  Was this

7  video also posted to YouTube, and did YouTube remove it?

8      Now, I do have other questions.  And we'd like to start

9  with under which test for determining a state actor does

10  plaintiff suggest in controlling this case and why in terms of

11  the decision that I will be making today?

12      So, counsel, I have a number of other questions, but those

13  are kind of the broad stroke.  Please correct me on any facts

14  that I may have stated in error.  Speak as slowly as possible

15  for our court reporter.  And, please, I ask that neither party

16  speak over one another so we have a clear record.

17      **ATTORNEY STREET:**  Okay.  Thank you, Your Honor.  And

18  thank you for obviously putting a lot of time into this.

19      I know it was done on short notice, and thank you for

20  indulging my efforts to get here in person so -- which

21  fortunately were successful.

22      **THE COURT:**  You're welcome.  And as you can tell from

23  your binder behind you, every page has been read.

24      **ATTORNEY STREET:**  I appreciate that, by you and by me.

25  Thank you, Your Honor.

1    There were a lot of questions that the Court posed.  So
2 I'm going to start with the question that Your Honor -- the
3 last question that you asked, which is which test applies here.

4    And I want to emphasize that under -- that both the Ninth
5 Circuit and the Supreme Court have said that the tests are
6 really guides to use in determining whether private action --
7 otherwise private action is, quote, fairly attributable to the
8 state.  That's the standard that the Supreme Court laid out in
9 the *Brentwood* -- in the *Brentwood* case in 2002.  And the Ninth
10 Circuit has mentioned that several times including in *O'Handley*
11 and in the *Rawson v. Recovery* case that we cited in our brief.

12    Of the tests that are used, I think here the joint action
13 and the nexus tests are the most on point because of the
14 significant parent coordination between Google, YouTube, and
15 the government in developing particularly the vaccine
16 misinformation policy, which is the one that has been cited
17 when removing my speech -- my client's speech from YouTube.

18    That policy was drafted and the evidence that was
19 developed in *Missouri v. Biden* case showed that that policy was
20 developed by Google in 2020 -- I believe 2021 in response to
21 the government's demands for it.

22    **THE COURT:**  If I could interrupt, and I apologize
23 because I want to make sure our record is clear.  You indicated
24 that the joint action test along with the nexus test which has
25 two separate tests under nexus, under the nexus test.

1          **ATTORNEY STREET:**  Yes.

2          **THE COURT:**  And please identify which one.

3      With regards to the user agreement, and you misspoke and

4  said your speech as opposed to Mr. Kennedy's speech.  Did

5  Mr. Kennedy sign the user agreement when he became a consumer

6  on the free YouTube platform?  Did he sign the user agreement

7  or agreed to it electronically?

8          **ATTORNEY STREET:**  Well, as a -- as a user, yes, he

9  signed it.  But the issue in this case, Your Honor, is not

10  YouTube taking down videos posted by Mr. Kennedy, but

11  YouTube -- YouTube taking down videos of Mr. Kennedy's speech

12  posted by third parties, including Manchester Public

13  Television, including the individual whose name was redacted

14  but we included the e-mail with our filing.

15      And so what that has done is, irrespective of

16  Mr. Kennedy's post to YouTube themselves, Google's actions have

17  created this chill effect where they have said essentially to

18  third parties, including independent media, if you post videos

19  of this man, this political candidate talking about these

20  issues, your video is liable to be removed and you could be

21  punished, given a strike, for violating our policy.

22      And so that's -- and I want to pull back for a second,

23  Your Honor, to emphasize that what we're here for today is not

24  just to protect my client, Mr. Kennedy's, rights but to protect

25  the political process itself.

1          **THE COURT:**  I understand.  But you've now mentioned

2     third parties, and does Mr. Kennedy have standing to represent

3     those unknown third parties?

4          **ATTORNEY STREET:**  Yes.  In this context, Your Honor,

5     in the political process, the Supreme Court's made very clear

6     that where First Amendment rights are concerned and what the

7     plaintiff is alleging is a chilling effect on speech, a

8     plaintiff like Mr. Kennedy, who has clearly a concrete interest

9     in this relief, has standing to pursue such relief.

10         We cited those cases in our brief, and I think they're

11    especially appropriate in this context of the presidential

12    campaign.

13         **THE COURT:**  I don't know if you answered my earlier

14    question with regards to the joint action and nexus test.  I

15    indicated that there are two versions of the nexus test.  And

16    do you plan to address both or just one?

17         **ATTORNEY STREET:**  I do plan to address both,

18    Your Honor.  I just want to make sure that I have them -- I

19    have them both so I don't -- I don't discuss them in a

20    contrary -- contrary fashion.

21         So that the nexus test, the first one is the pervasive

22    entwinement between public officials and the government, which

23    I think is shown here by the evidence that's been developed in

24    the *Missouri v. Biden* case, the interaction between Google and

25    government officials in drafting the policy that it's been

1    using to remove my client's speech.

2         But the other one I think is even more appropriate, which

3    is the government encouragement that's discussed in the

4    *O'Handley* case at page 1158.  And this really gets into -- and

5    I think that second aspect of the nexus test overlaps with the

6    joint action test.  You can see that in *O'Handley*.  It

7    discusses the facts -- factors under each interchangeably.

8         And this is where, in *O'Handley*, the Ninth Circuit was

9    very, very clear, Your Honor, that a constitutional problem

10   would arise if Twitter had agreed to serve as an arm of the

11   government thereby fulfilling the state's censorship goals.

12        Now that wasn't satisfied in *O'Handley*, Your Honor,

13   because the only allegation in *O'Handley* was that a government

14   agency was flagging tweets that the government believed

15   violated a preexisting policy developed by Twitter to try to

16   protect the sanctity of its platform in the civic process.

17        Here you don't have information -- you don't have flagging

18   the one-way channel of communication that the Ninth Circuit

19   discussed in *O'Handley*.  Here you have actually evidence that

20   Google developed this policy in response to government demands

21   for it in apparent collaboration with government officials in

22   writing it -- in writing it, at least that's what the evidence

23   from the *Missouri v. Biden* case suggests.

24        And the policy itself is based entirely on what the

25   government says.  The policy says you cannot disagree with what

1    the government says about these issues.

2         And so that's why I think this case goes far beyond what

3    the Ninth Circuit was dealing with in *O'Handley* and satisfies

4    really both the nexus and the joint action test.

5         And more importantly, Your Honor, really shows that this

6    policy that Google developed, it's not its own policy.  It may

7    not have been compelled by the government to adopt it, but it's

8    a policy that looks entirely to the government to decide which

9    information to remove.  And I think under the Supreme --

10        **THE COURT:**  So you agree that they were not compelled,

11   that Google was not compelled by the government.  Do you agree

12   with that?

13        **ATTORNEY STREET:**  Well, I haven't seen evidence yet to

14   say that they were compelled.  I know that that was shown in

15   the *Missouri v. Biden* case.

16        **THE COURT:**  And again, *Missouri v. Biden* is persuasive

17   authority, not controlling, and *O'Handley* is the case that we

18   are concerned about.

19        **ATTORNEY STREET:**  That is true, Your Honor, and I will

20   note, though, that the *Missouri v. Biden* case had an

21   evidentiary record that did not exist in the *O'Handley* case or

22   any of the other what I'll call censorship cases that were

23   litigated in this court.

24        In fact, I think it's interesting that the allegations

25   that were deemed implausible in *O'Handley* and similar cases,

1   the court developed -- the parties developed actually an

2   evidentiary record in the *Missouri v. Biden* case which showed

3   exactly what the Ninth Circuit said was implausible in these

4   prior technology companies.

5       And I think that's very important because that's -- it was

6   the record in that case that convinced the judge,

7   Judge Doughty, and I think what convinced the Fifth Circuit

8   that there was coercion.

9       We may develop that here, I don't know yet, and I don't

10  want to argue coercion without having a good faith basis to do

11  that.  I think on the record we've established already, though,

12  Your Honor, we have satisfied the joint action and nexus tests.

13  We have shown that Google's policy is fairly attributable to

14  the government.  And we have shown that in the political

15  process where the Supreme Court has always said more speech is

16  better than less speech, that we have satisfied the burden.

17      And that brings me back to the first question that the

18  Court asked about what is the emergency here?  Now --

19          **THE COURT:**  No, my first question was actually -- I'm

20  going to go back to my questions because I need these answered.

21      What date in March of 2023 did Mr. Kennedy give his

22  speech?

23          **ATTORNEY STREET:**  So the date -- I should know this

24  since I was there.  If I remember correctly the date, it was

25  March 3rd of 2023.

1    **THE COURT:**  All right.  And on what date did

2    Manchester Public Television post his speech?

3    **ATTORNEY STREET:**  The same day.

4    **THE COURT:**  The same day.

5    And on what date was the video taken down?

6    **ATTORNEY STREET:**  As I recall, the same date or one

7    day later.  Not simultaneously but within a day or two.

8    **THE COURT:**  How many other videos by Mr. Kennedy have

9    been taken down by YouTube, if you know?

10   **ATTORNEY STREET:**  I know of at least half a dozen.

11   **THE COURT:**  And can you identify that half dozen?

12   **ATTORNEY STREET:**  Three of them were identified in

13   our -- in our moving papers.  There was an interview with

14   Jordan Peterson that was posted and removed.  There was -- and

15   it was reported on publicly.  There was a podcast that

16   Mr. Kennedy did with Joe Rogan that was taken down.

17   And then I have since -- which is referred to in our

18   moving papers -- and then I have since heard, received numerous

19   e-mails, communications from other people who said -- who told

20   me they have had similar content removed --

21   **THE COURT:**  Well, no.

22   (Simultaneous colloquy.)

23   **THE COURT:**  -- I want to know the actual.  So far I

24   know of two.  And one was with comedian Joe Rogan.  And the

25   date of that of which it was removed was what?

1    **ATTORNEY STREET:**  I don't have the date offhand,

2    Your Honor.  I can look for that.

3    **THE COURT:**  All right.

4    **ATTORNEY STREET:**  I believe it was in early July.

5    **THE COURT:**  And then with regards to podcast host

6    Jordan Peterson, what day was this one taken down?

7    **ATTORNEY STREET:**  Let me --

8    **THE COURT:**  What was the date of the interview and

9    what day was it taken down?  The date of the interview with

10   comedian Joe Rogan, and what date was that taken down?

11   **ATTORNEY STREET:**  That is not something I don't have

12   at the top of my head, Your Honor.  So I have to look through

13   my files to see if I have that.

14   **THE COURT:**  All right.  And then going back to my

15   earlier question, because it's in your declaration, Twitter was

16   not a party to this case, allegedly removed a video of

17   Mr. Kennedy on January 23rd, 2021.  Was this video also posted

18   to YouTube, and did YouTube remove it?

19   **ATTORNEY STREET:**  That question I don't have an answer

20   to, Your Honor, but I would be happy to look and find out.

21   **THE COURT:**  And then is the video of Mr. Kennedy at

22   the college in New Hampshire still available to view online

23   outside of YouTube?

24   **ATTORNEY STREET:**  I have not looked so I do not know

25   the answer to that.  I know it is not available through

1    Manchester Public Television.

2         **THE COURT:**  All right.  Then that brings us to the

3    topic that you want to address now, which is what grounds do

4    you allege which makes this an urgent request?  And was there

5    any correlation between this request and its urgency driven by

6    in any way the appeal taken in *Missouri v. Biden*?

7         **ATTORNEY STREET:**  Well, the urgency, Your Honor, is

8    twofold.  First off, the Ninth Circuit and Supreme Court have

9    always -- always recognized that First Amendment harms are

10   different than other harms.  And so as a general matter, they

11   have applied these doctrines flexibly, recognizing that ongoing

12   harms are actionable and that any chilling of speech is

13   irreparable and --

14        **THE COURT:**  But we waited from March to August.  So

15   I'm just trying to understand.

16        **ATTORNEY STREET:**  Sure.  Sure.  And I understand.  I'm

17   going to tell you as a practical matter what -- what the reason

18   for the delay, if there was a delay, was Mr. Kennedy believed

19   strongly that during his political campaign, the technology

20   companies would stop censoring him, recognizing the settled --

21   settled principles that more speech, not enforced silence,

22   rules in the political process.

23        Twitter and Facebook, in fact, changed the way they deal

24   with him and have stopped censoring him during his presidential

25   campaign.  Google has not, despite repeated requests.

1    We believed after -- and going back to the *Missouri v.*
2    *Biden* case, Your Honor noted that Mr. Kennedy moved to
3    intervene in that case.  That motion was denied, but he
4    subsequently filed a lawsuit against the federal officials who
5    were also named in that case.  And he filed that case in
6    Louisiana this spring.

7    And the judge, Judge Doughty in Louisiana, enforced --
8    issued an order essentially saying that the same injunction
9    that was issued in the State Attorney General case would apply
10    to protect Mr. Kennedy, given the overlapping issues.

11    So --

12    **THE COURT:**  Okay.  Well, I'm just trying to get some
13    clarity for areas that were a little foggy for me.  And I have
14    no ego invested in this so I want to make sure I get this right
15    and I'm clear.

16    The speech was early March of 2023.  Mr. Kennedy announced
17    his candidacy in April.  But the urgency, as you're describing
18    it, and the delay and his treatment by others have some nexus
19    to this case, and I'm just trying to allow you to tease that
20    out.

21    And then I may turn to Google after we get through a
22    couple of other questions that I have and give you an
23    opportunity to see if you can locate the dates I asked about
24    earlier.  But go ahead.

25    **ATTORNEY STREET:**  Sure.  Well, the truth is,

1   Your Honor, I don't know why Google removes some of my client's

2   speeches and not others.

3       **THE COURT:**  Well, I'm just looking at the timeline and

4   the urgency question.

5       **ATTORNEY STREET:**  I understand.  I understand.

6       So but that plays into my answer because it is my client

7   and his campaign have repeatedly reached out to Google to

8   prevent this from happening.

9       It doesn't -- he doesn't get censored completely, but

10  certain high-profile speeches and interviews do get censored.

11      And so we realized really in late July or early August

12  that Google was not changing its policies.  And in fact in the

13  last three days, Google has actually amended its misinformation

14  policies.  It really blended the vaccine misinformation and the

15  medical misinformation policies to prohibit all kinds of speech

16  on medical matters, including vaccines, abortion, cancer

17  screenings, and the like.

18      So it's become clear to us in the last month that Google

19  is, unlike Facebook and Twitter which have pulled back from the

20  censorship of people on their platforms, Google was actually

21  doing more censoring.  And that will likely continue during

22  Mr. Kennedy's presidential campaign.

23      And the damage that would be done to the political

24  process, if that's allowed to continue, would be irreparable.

25      **THE COURT:**  All right.  Let me ask three very precise

1   questions.  Then I'm going to turn to counsel on behalf of

2   Google to see if some of these dates and information or

3   questions I've asked can be resolved.

4       What authority does plaintiff have for the proposition

5   that defendants may not rely on local health authorities

6   informing their own medical misinformation policy?

7       Second question, and, again, going back to my earlier one:

8   Under which tests for determining a state actor does plaintiff

9   suggest is controlling and why?

10      And what irreparable harm will plaintiff suffer if the TRO

11  is not granted since we're talking about a video that was

12  uploaded prior to his announcement of his candidacy and then

13  one with a podcast host and the other with a comedian?

14      Please respond.

15      **ATTORNEY STREET:**  Well, with respect to the first

16  question, Your Honor, there is no evidence on this record that

17  Google has anybody making independent decisions about how to

18  apply its misin-- at least its medical misinformation policies.

19  The policies themselves depend entirely on government sources.

20      And so I guess in a hypothetical world, could they do

21  that?  Sure.  But in this situation, the record we have before

22  us, we have no record of independent decision-making.  Instead

23  we have a policy that was drafted in response to government

24  demands for it and collaboration with government -- government

25  sources, and a policy that looks on its face entirely to the

1    government to decide what is -- what is false, what is

2    misleading, what is damaging.  And that is exactly what I think

3    the state action doctrine was designed to prevent.

4        And I actually want to go -- I want to mention a case that

5    we cited in our reply brief, Your Honor, called *Brown v.*

6    *Hartlage* which 41 years ago dealt with a similar situation.

7    The government of Kentucky addressing alleged false

8    information -- false and misleading information by a political

9    candidate in an election.  And the Supreme Court said it's not

10    up to the government to decide what is true and what is false,

11    what is misleading in a political campaign.

12        Obviously this situation is different because there's a

13    private party involved, but you have a private party relying

14    entirely on government sources.  And so what that means is that

15    triggers constitutional scrutiny.  And that's what's

16    significant here.

17        Now to the Court's -- to the Court's other two questions.

18    I think -- again I think that in this case, at least on the

19    record we have right now, the joint action and nexus tests are

20    the most appropriate, but I would also say that we need to

21    remember that in Supreme Court's view stated in the *Brentwood*

22    case, what we're always looking for is whether seemingly

23    private action is, quote, fairly attributable to the

24    government.

25        And so regardless of whether we're using one test or

1    another applying aspects of different tests, I think that has

2    been -- that has been satisfied here.

3         And the danger to the political process, not just to my

4    client's presidential campaign, but the danger to the political

5    process of allowing Google to even selectively remove speech on

6    matters of public concern during a presidential campaign is

7    significant and would grossly affect the campaign itself.

8         **THE COURT:**  All right.  Does YouTube, as a private

9    company offering both free and paid services, have a right to

10   decide what's published or not published on their website?  Do

11   they have that right?

12        **ATTORNEY STREET:**  Well, if they were a publisher,

13   Your Honor, they would have that right, but they're not a

14   publisher.  And we went through this several pages in our -- in

15   our reply brief talking about the differences between

16   technology companies, Internet companies of today, and

17   publishers like the *New York Times* or private parties that are,

18   you know, putting in a newsletter, in the *PG&E* case, in their

19   billing statements.

20        And in fact, there's -- and the most fundamental reason

21   that Google/YouTube is not a publisher is, unlike publishers,

22   they take no responsibility for the content that's posted on

23   their platform.  And as a matter of law, they cannot be held

24   liable for that.

25        So that's an important -- that's an important distinction,

1    Your Honor, and one that distinguishes this case from the *Miami*

2    *Herald* case, *PG&E* case, and the *Hurley* cases that we discussed

3    in our brief.

4            **THE COURT:**  And, again, Mr. Kennedy did agree to

5    YouTube's terms and services when creating his account.  And

6    this issue from your perspective is going beyond his particular

7    account?

8            **ATTORNEY STREET:**  This does go beyond his particular

9    account.  And I would also say, Your Honor, that an agreement

10   cannot be used to circumvent the Constitution.

11       I think that would need to look at -- address each

12   question in the appropriate constitutional framework, and here

13   that weighs strongly in his favor.

14           **THE COURT:**  And so he agreed to the user agreement

15   which included misinformation language and other third parties

16   that they were all on notice and they could either accept or

17   decline that service.  Would that be fair?

18           **ATTORNEY STREET:**  I don't know if it's fair or not,

19   but what I know is that it can't be -- whether you agree to

20   boilerplate terms of service in a user agreement or not, I

21   don't think that even a private party can use those policies to

22   violate individuals' constitutional rights and to create a

23   chilling effect on speech in the political process.

24           **THE COURT:**  Thank you.

25       All right.  Counsel, the same questions are posed to you.

1   I will probably have a couple of additional questions with

2   regards to YouTube's user policy.  And if you can recite the

3   relevant portions.  And could YouTube be found liable by

4   private parties for not addressing information, therefore is

5   there any coercive nature that can be imposed by anyone?

6       If you know how many people died of COVID-19 by the end of

7   January 2021, and whether there's any dispute about the number

8   of citizens that were impacted by COVID-19.

9       And how does YouTube make decisions on what videos

10  violates its misinformation policies?

11      How are YouTube's misinformation policies enforced?

12      And if Mr. Kennedy plans on posting videos that violates

13  the terms and services or policies, how would that be addressed

14  in the future given the lifeline of COVID-19 as it stands now?

15      And if you need me to repeat any of the previous questions

16  posed to counsel, let me know and I'll go back and recite those

17  questions as well with regards to how many videos of

18  Mr. Kennedy were taken down and if you happen to know the

19  chronology of events.

20      **ATTORNEY BLAVIN:**  Thank you, Your Honor.

21      I'll start with Your Honor's questions relating to the

22  videos taken down and the timing with respect to them.

23      I think the record is unclear precisely when the video of

24  the Saint Amselm speech was taken down.  I don't have any

25  reason to dispute that it was within a short period of time of

1   the speech given on March 3rd, but there's nothing in the

2   record in this case at least in terms of the declarations that

3   have been submitted which identify the specific date.

4           **THE COURT:**  But it's definitely before he announced

5   his campaign?

6           **ATTORNEY BLAVIN:**  Yes, I know that's for sure.  I

7   think it was attempted to be reposted I believe on March 6th.

8   It was at that point not permitted.  So it was certainly within

9   a very close time frame of when it was posted to the site.

10          As to the Seth Rogan -- I'm sorry, the video with the

11  comedian Mr. Rogan, not Seth Rogan, not somebody else, and

12  Mr. Kennedy, I believe the record demonstrates that -- and this

13  is attached as an exhibit I believe to the A Kennedy

14  declaration, the takedown communications with Mr. Kennedy, I

15  believe it's identified as June 17th, 2023, in an e-mail from

16  YouTube to the recipients:  We've reviewed your content.  We

17  think it violates our medical misinformation policies and it's

18  been removed.

19          So I think we have a June 17th date for that.

20          With respect to the Peterson video, as Your Honor noted,

21  they don't identify the specific video at issue.  So I just

22  don't think it's clear from the record what that video was or

23  when it was removed.

24          **THE COURT:**  Thank you.

25          **ATTORNEY BLAVIN:**  Unless Your Honor has any more

1  questions about those specific issues, I'm happy to go to

2  Your Honor's questions relating to the applicable test and how

3  it applies here in the Ninth Circuit decision in *O'Handley*.

4      **THE COURT:**  All right.  And with regards to the

5  comedian Joe Rogan's video, you believe that that may be a

6  family member of the Kennedy family, or at least the same last

7  name, sharing the same last name as Mr. Kennedy?

8      **ATTORNEY BLAVIN:**  Are you referencing, Your Honor --

9      **THE COURT:**  The June 17th, 2023.

10      **ATTORNEY BLAVIN:**  Oh, yes, I believe that was sent

11  to -- it's redacted, I believe the "To" line, but from my

12  understanding of the declaration it was sent to Mr. Kennedy's

13  relative.

14      **THE COURT:**  Thank you.

15      And then if you'll proceed under which test for

16  determining a state actor, do you believe, is controlling and

17  why?

18      **ATTORNEY BLAVIN:**  So the Ninth Circuit's decision in

19  *O'Handley*, as Your Honor correctly identified, is controlling

20  here.

21      Plaintiffs, in their motion papers, didn't identify

22  specifically which test would apply.  As we indicated in our

23  opposition, we think if there's going to be any test which

24  would apply, it would be either the nexus test or the joint

25  action test.

1    Plaintiff's counsel today said that they are in fact in

2    agreement on that, that those would be the two applicable

3    tests.  And those tests are very demanding as the Ninth Circuit

4    made absolutely clear in *O'Handley*.

5    With respect to the nexus test, just to flesh it out,

6    Your Honor, the Ninth Circuit said, as Your Honor indicated,

7    there's two subparts to that test which could apply, the first

8    one being the State cannot, quote, threaten adverse action to

9    coerce a private party into performing a particular act.

10    And just to pause on that for a second, because I think

11    counsel conceded today that there's absolutely no evidence at

12    all that the federal government coerced Google in this instance

13    to either adopt a medical misinformation policy, much less to

14    apply that policy specifically to Mr. Kennedy's content.

15    In fact, there's absolutely nothing in the record

16    regarding any communications or even knowledge of the federal

17    government with respect to Mr. Kennedy's particular posts that

18    are at issue in this case or a request to take them down.

19    And that's very different from *O'Handley* where you had the

20    plaintiff's specific content, a request from the government to

21    remove that content, and the Ninth Circuit nonetheless said

22    that that did not constitute a state action under the nexus

23    test.

24    The second element of the nexus test is whether the state

25    uses positive incentives such that they, quote, overwhelm the

1   private party and essentially compel the party to act in a

2   certain way.

3       And just to pause on that, Your Honor, I don't think

4   there's anything in the record indicating any positive

5   incentives from the state to Google, much less one that would

6   essentially compel Google to act in a particular way.

7       With respect to the joint action test, the Ninth Circuit

8   said that the party -- the government, that is, has to so far

9   insinuate itself into a position of interdependence with the

10  private party that it must be recognized as a joint participant

11  in the challenged activity or significantly involve itself in

12  the private party's actions and decision-making in a complex

13  and deeply intertwined process.

14      And, again, in the Ninth Circuit decision in *O'Handley*,

15  based on the allegations of the complaint, the court found that

16  neither of those tests were satisfied.

17      And just to quickly summarize what those allegations were,

18  because I think they demonstrate, if anything, substantially

19  more government involvement than what we have in this case.

20  There Twitter allegedly established an expedited review process

21  for posts that were specifically flagged by state officials.

22  It removed 98 percent of the 300 posts that were flagged by the

23  state, including one specifically involving the plaintiff's

24  content.  And third, Twitter allegedly worked -- or the

25  government worked in partnership with social media companies to

1   develop more efficient reporting procedures for potential

2   misinformation.

3       Nonetheless the Ninth Circuit held that Twitter exercised

4   its own independent judgment in adopting its policies and

5   enforcing them, and the mere fact that you have information

6   sharing in cooperation between the government and the private

7   party does not establish state action.

8       And the Ninth Circuit specifically noted, because I know

9   plaintiffs have indicated this during today's argument,

10  plaintiff's counsel and also in their reply brief, that, well,

11  if there's a shared mission or objective between the private

12  party and the government, that could somehow satisfy the joint

13  action test.

14      Actually the Ninth Circuit specifically rejected that in

15  *O'Handley*.  The Ninth Circuit said that, quote, private and

16  state actors were generally aligned in a mission to limit the

17  spread of misleading election information...does not transform

18  private conduct into state action.

19      Moreover, Your Honor, courts in this district, both before

20  and after *O'Handley*, have rejected near identical claims.

21      And I want to direct Your Honor's attention to the *Hart v.*

22  *Facebook* decisions from Judge Breyer which plaintiff's counsel

23  did not address during today's argument or in their reply

24  brief.

25      There, similar to here, there was a motion to dismiss

which was granted by Judge Breyer.  Then the plaintiffs took
all of the discovery they could find from the *Missouri v. Biden*
proceeding and filed a motion for leave to amend their
complaint, and said, look, we have enough now based upon this
discovery to state a claim and to establish state action under
either of *O'Handley*'s test.

And Judge Breyer considered all of that evidence,
including Carol Crawford's CDC deposition testimony, which has
been submitted to Your Honor.  We provided the entire
transcript including e-mails from Mr. Flaherty of the
White House to Facebook and Twitter.  And if anything, and
Your Honor can see this in the declaration I submitted, those
communications were even more aggressive from the state than
anything that we have here.

And nonetheless Judge Breyer said under *O'Handley*, even
taking all of this evidence into account from the *Missouri v. Biden* proceeding, that it does not satisfy the *O'Handley* test.
And I think that's exactly right, Your Honor, and I think that
analysis squarely applies here.

Other decisions such as the *Federal Agency of News* case we
cite from Judge Koh involving Facebook, she held that the mere
fact that there was allegedly a partnership between government
and law enforcement agencies and Facebook to deal with Russian
misinformation on the platform did not satisfy either of these
state actions.

1       So there's a host of authority on this which plaintiff's

2  counsel has not addressed.

3       And I'll pause there to see if Your Honor has any

4  questions on the test.  But I would like to go through the

5  specific evidence that plaintiff's counsel has put forward

6  because they make assertions regarding that evidence, but the

7  actual evidence itself does not bear out what they're saying.

8       **THE COURT:**  All right.  That would be helpful since

9  the plaintiff is indicating they will suffer irreparable harm

10  if this TRO is not granted and it will have a chilling effect

11  on speech.

12       **ATTORNEY BLAVIN:**  Yes, Your Honor.

13       So if you look at the actual documents and materials that

14  plaintiff's counsel has put forward to establish state action

15  here, they formed the three buckets:  One, 2021 meetings with

16  the Surgeon General's office.  Second, an April 22nd, 2021,

17  e-mail from Rob Flaherty of the White House to Google.  And

18  three, meetings between the CDC and major online platforms in

19  2021, at which vaccine misinformation was occasionally

20  addressed.

21       Now if you actually look at the record here, two things

22  are absolutely clear.  First, none of these communications

23  offer any evidence of coercion which I think plaintiff has

24  conceded now, nor do they establish any sort of overwhelming

25  positive incentives to establish the nexus test.

1          But, two, with respect to the joint action test, what

2     these documents show and testimony shows is that Google was

3     already and independently crafting and developing its own

4     policies at the time it was talking with the government.

5     There's no evidence at all to state that Google somehow only

6     did this as a result of its discussions with the government.

7          So, for example, if you look at the communications with

8     the office of the Surgeon General, Eric Waldo testified in his

9     deposition that the government perceived Google to have

10    independently decided to limit vaccine-related misinformation

11    without any prompting by the government.

12         He describes his meetings with Google as saying what

13    Google was already doing to address these issues, and that's at

14    pages 119 through 121 of his deposition, which is attached as

15    Street Declaration Exhibit H, and he says the same thing at

16    page 129.

17         With respect to the White House communications, the

18    communications from Rob Flaherty, this is again the April 22nd,

19    2021 e-mail, Flaherty, in that e-mail, never directs Google to

20    take any particular action with respect to a medical

21    misinformation policy, whether with a carrot or a stick.  Just

22    the opposite, Flaherty acknowledges, and this is quoting from

23    his e-mail, that, quote, removing content that is unfavorable

24    to the cause of increasing vaccine adoption is not a realistic

25    or even a good solution.

1    So basically he's saying we're not saying to do this,

2    we're not even recommending to do that, it may not be the right

3    thing.  And that's exactly what he's accusing Google of doing

4    in this case.

5    With respect to the communications as to the CDC, we

6    provided Your Honor with a complete copy of Carol Crawford's

7    deposition testimony, and again this is the testimony that

8    Judge Breyer also considered in the *Hart v. Facebook* case.

9    And in that deposition testimony, which Mr. Kennedy only

10   provides excerpts for, we provided Your Honor with the entire

11   transcript, at pages -- page 105 of the deposition to 106, she

12   states in that deposition that no one at the CDC had crafted

13   the content policy of any social media company or even gave

14   input on what such a policy should look like.

15   So I think, Your Honor, collectively when you look at all

16   of this evidence, it doesn't even establish, you know, what

17   plaintiff's counsel has stated here today that somehow Google

18   just adopted this policy in response to the communications with

19   the government.

20   If anything, it shows that Google was independently

21   exercising its own judgment that these were important policies

22   to adopt, the government shared that objective, and that's

23   exactly what the Ninth Circuit in *O'Handley* rejected as

24   sufficient to satisfy the joint action test.

25   Now, if I could respond to an additional argument which

1    plaintiff's counsel made today regarding the fact that, well,

2    the fact that Google and YouTube made reference government

3    policies, you know, with respect to vaccine -- you know,

4    information, with respect to COVID-19, et cetera, that that

5    somehow would convert Google into a state actor.

6        And of course relying on the expertise of particular

7    agencies and individuals if they're in the government or

8    outside the government would not be sufficient to satisfy

9    either of *O'Handley*'s joint -- either of *O'Handley*'s state

10   action tests.

11       And I think in *O'Handley* itself, again, you had the

12   government that was specifically flagging for Twitter a post

13   that it thought constituted election misinformation.  And

14   Twitter was relying upon that expertise in terms of looking at

15   those posts itself and making its own independent judgment.  So

16   that can't be enough.

17       But beyond that, if you actually look at Exhibit D to the

18   Street declaration, and this is I believe the vaccine

19   misinformation policy, it specifically says that Google looks

20   to WHO and -- the World Health Organization, WHO, and local

21   health agencies in terms of identifying, you know, proper

22   information related to these policies.

23       So it's not even the federal government that Google was

24   looking to, and that's a big disconnect in that argument.  It's

25   looking to other regulatory agencies.

1    And then finally, Your Honor, on this point, you know,

2    even if, you know, there was allegedly some sort of government

3    pressure, which I think plaintiff's has counsel conceded there

4    wasn't even, the fact is he doesn't identify -- the plaintiff

5    doesn't identify any particular state action as to his content.

6    And the Supreme Court in the *Blum v. Yaretsky* case made

7    clear that the government must compel, quote, the specific

8    conduct of which the plaintiff complains.

9    And both in the *Hart* decision from Judge Breyer, his first

10   decision, and in the *Federal Agency of News* case from

11   Judge Koh, they both independently dismiss the claims at issue

12   because even though there may have been generalized discussions

13   relating to Russian misinformation, or in *Hart*, again, medical

14   misinformation between the government and the private party,

15   there was nothing to show that there was a specific

16   communication or pressure relating to any particular piece of

17   content of the plaintiff.

18   And I think as Your Honor correctly identified here, all

19   that they have with respect to Mr. Kennedy's own content is an

20   e-mail that a White House official sent more than two years ago

21   to a different company, Twitter.

22   And even if there was that type of evidence here, under

23   *O'Handley* it makes clear that even if the government tells you,

24   hey, we think this information should be removed, and then the

25   company exercises its own independent judgment and decides to

1    remove that, that cannot satisfy the state action doctrine.

2       And then finally on these legal issues, Your Honor, we've

3    heard frequently today that Mr. Kennedy is a political

4    candidate during the 2024 presidential election and that that

5    somehow should change the analysis.  But it doesn't.  The fact

6    that you're running for office doesn't excuse you from

7    satisfying the demanding requirements of the state action

8    doctrine.  And there's nothing, there's no authority at all

9    that somehow a looser standard were to apply when you have a

10    political candidate at issue.

11    **THE COURT:**  And just for clarity and closure, please

12    address the plaintiff's position on standing.  And then also

13    the, just for clarity, because I know you've woven it into your

14    argument, how YouTube's misinformation policies are enforced

15    and how does YouTube make decisions on what videos violate its

16    medical misinformation policies?

17    **ATTORNEY BLAVIN:**  Yes, Your Honor.  I'm sorry.  Could

18    you repeat that first question again?  I just want to make sure

19    I have that right.

20    **THE COURT:**  The first one was standing.

21    **ATTORNEY BLAVIN:**  Yes.

22    **THE COURT:**  Address plaintiff's argument on standing.

23    And then the next is how are YouTube's misinformation policies

24    enforced and how does YouTube make decisions on what videos

25    violates its medical information policies.

1    On standing, we're looking at causation and

2    redressability.

3         **ATTORNEY BLAVIN:**  Yes.  So with respect to the

4    standing arguments, I think -- and these were, I think,

5    interjected a little bit in the reply brief.  There were

6    various cases citing with respect to, you know, you can have

7    standing if there's a general chilling effect, et cetera,

8    et cetera.

9         All of those cases, Your Honor, address the particular

10   issue of where the government is taking direct action on the

11   plaintiff.  And I think the briefs were speaking a little bit

12   past each other because Google has not made a standing argument

13   here with respect to this content.  So there's no state action

14   to begin with.  So there's nothing to analyze under the First

15   Amendment in terms of whether or not there's standing.

16        In the *Brown* case, which plaintiff's counsel referenced,

17   again that involved a state actor taking action with respect to

18   a particular political candidate's content, not a private

19   party.

20        So the mere fact that Mr. Kennedy feels that he's

21   suffering a chilling effect on future content or that other

22   third parties may feel that they don't want to upload his

23   content, none of that is relevant for purposes of First

24   Amendment standing because there's no state action to begin

25   with.  And that really ends the inquiry.  There's not a

question of standing.  There's just a question of state action.
And without a state action, there's no potential violation of
Mr. Kennedy's First Amendment rights.

With respect to the application and development of
YouTube's own policies and their applications to Mr. Kennedy, I
want to pause here because I think Your Honor raised this
question in the context of your discussion with plaintiff's
counsel on Google's own rights here.  And I think that's
important to emphasize.

Google has its own First Amendment rights in terms of
deciding what content is appropriate to appear on its platform
or not.  So plaintiff's counsel actually have it backwards.  If
the Court were to issue an injunction here, that wouldn't
preserve plaintiff's rights.  It would actually violate
Google's First Amendment rights.  And that's exactly what
Judge Breyer held in the District Court in the *O'Handley*
decision.

He made clear that:

An online platform, quote, has important First
Amendment rights that would be jeopardized by a court
order telling it what content moderation policies to adopt
and how to enforce those policies.  The Court will issue
no such order.

And Judge Breyer's decision, as he noted, was consistent
with Supreme Court and Ninth Circuit precedent.  The Supreme

1    Court going back to the *Miami Herald v. Tornillo* case made

2    absolutely clear.  And again this case, just to be clear, it

3    involved political candidates.  The issue was whether or not

4    the government could force a newspaper to carry the content of

5    a political candidate to respond.  And the Supreme Court said

6    no, the treatment of public issues and public officials,

7    whether fair or unfair, constitute the exercise of editorial

8    control and judgment which is protected by the First Amendment.

9        The Eleventh Circuit, in the *NetChoice* case, this was

10   versus the Attorney General of Florida, similarly held that

11   online platforms have this First Amendment right.  The Eleventh

12   Circuit specifically said, quote, when a platform selectively

13   removes what it perceives to be incendiary political rhetoric,

14   pornographic content, or public health misinformation, it

15   conveys a message and thereby engages in speech within the

16   meaning of the First Amendment.

17       And the statute there also dealt with political candidate

18   speech.  The Florida statute limited the ability of platforms

19   to remove content of political candidates.  The Eleventh

20   Circuit confirmed the District Court's decision that that would

21   violate the platform's First Amendment rights.

22       So if anything, the injunction here that's being proposed

23   would violate Google's First Amendment rights, not plaintiff's

24   First Amendment rights, which demonstrates that the irreparable

25   harm would be suffered by Google and the balance of equities

sharply tip in Google's favor.

With respect to the policies themselves and their enforcement, I think the record is clear here that the policies were developed independently by Google, just looking at the communications with the government, and Google exercised its own independent judgment of what those policies would be, as we went over the evidence before.

And as to the application of those policies, it's not in the record, Your Honor, specifically how those policies are applied, but I think if you look at the communications such as Exhibit D to the A. Kennedy declaration, it says, "Our team has reviewed your content, and unfortunately we think it violates our medical misinformation policy."

So there's a team at Google that uses their own independent judgment in reviewing content and determining whether it violates the policies and to remove that content if it does.

And, again, that's Google's First Amendment right to do that, as Judge Breyer held, as the Eleventh Circuit held, and several other decisions have held as well, referenced in our papers.

I can address Your Honor's additional questions, and I apologize if I miss anything.  So please interject at any point in time.

I think you asked with respect to the harm that COVID had

been causing during the pandemic, you know, how many people may have died back in 2021 as a result of COVID when these policies were being adopted and how many people, you know, have died at this point.

I know at least the latter, I think it's very well publicly settled though I'm not sure if it's in the docket, although we did noted this in our brief.  At this point over a million people have died in the United States from COVID-19 back in 2021.

I don't have the specific figures, Your Honor, and I'm happy to supplement the record if that would be helpful.  But I think we knew that, you know, at that point close to half a million back in 2021 may have passed away from COVID.

And again this isn't in the record, and I'm just relying upon my colleague, Ms. Yee, looking for some of this information from public sources.  We're happy to supplement.

But I think what this will demonstrate is that this was a serious public health emergency.  I think it remains a serious public health issue.  There's discussion all the time of new variants coming up or even happening in San Francisco right now, a mini-surge of COVID.  So these are incredibly important issues that remain important public health issues.

And if you look at, you know, the question of would an injunction be in the public interest, I think the answer is absolutely not.  Besides the fact that such an injunction would

violate Google's First Amendment rights so it would causes

irreparable harm to Google, and if the First Amendment

demonstrates what's in the public interest, an injunction would

do exactly the opposite.  But forcing Google to carry medical

vaccine misinformation on YouTube is absolutely against the

public interest.

As the Surgeon General letter that is attached to the

Street declaration, Exhibit K, states, "The proliferation of

health misinformation during the pandemic has been both

extensive and dangerous and poses a growing threat to the

nation's health."

The Ninth Circuit in the *Doe v. San Diego Unified School

District* case, which we cited in our papers with respect to the

public interest, that involved the question of an injunction to

enjoin the San Diego School District's vaccine mandate.  And

what the Ninth Circuit said is the public interest weighs

strongly in favor of denying the injunction.

And the court noted that the record indicates that

vaccines are safe and effective at preventing the spread of

COVID-19 and that a mandate is therefore likely to promote the

health and safety of school students and staff as well as the

broader community.

So if anything, the Surgeon General itself has recognized

forcing Google to carry this type of medical misinformation,

vaccine-related misinformation would be directly contrary to

1  the public interest in this matter.

2        **THE COURT:**  All right.  Thank you.

3     Now then, plaintiff, based on the fact that the defendants

4  indicate that they did not rely on local health authorities

5  informing their medical information policy but were guided by

6  the expertise of those in the community, regulatory agencies,

7  and local health authorities, your response?

8        **ATTORNEY STREET:**  Well, that's still -- those are

9  still government actors, Your Honor.  And I think that it's

10  what's helpful from the record, that entry record that was

11  developed in the *Missouri v. Biden* case is that the evidence of

12  communications between these technology companies like Google,

13  Facebook, and Twitter, and government authorities while writing

14  these policies shows that there is something more than --

15  there's something more than Google having, say, a team of

16  doctors who are writing a policy.

17        **THE COURT:**  Do you have information to support that

18  assertion?

19        **ATTORNEY STREET:**  I'm sorry?

20        **THE COURT:**  Do you have information to support that

21  assertion that it's beyond their independent evaluation?

22        **ATTORNEY STREET:**  Well, there's no evidence in the

23  record that there's been an independent evaluation.  And I

24  think -- and this is my point as to the evidence that was

25  developed in *Missouri v. Biden*.

1          In the previous cases that Google's counsel cited that

2     were decided in this district, those cases were dismissed

3     because the judges in those cases decided that, well, it's

4     implausible to believe that Google or Facebook or Twitter are

5     working with the government or communicating with the

6     government and writing these policies.

7          And the relevance of the record, the evidence that was

8     gathered in *Missouri v. Biden* case is that in fact that is what

9     was happening.

10          Now this case may -- you know, we're still at an early

11     stage, and so I don't think that is the only issue that matters

12     here.  In fact, I think what's far more important in this case,

13     Your Honor, is the content of the policies, the misinformation

14     policies themselves.  They prohibit speech that contradict

15     government sources.  They change -- by their terms, they change

16     not when Google changes its mind, but when the government

17     changes its mind about these subjects.

18          And I'm glad that my colleague mentioned, you know, the

19     interest in -- Google's interest in promoting public -- you

20     know, what it calls public health, which is fine.  But

21     promoting public health, that's something that the government

22     does, and that's an inherently governmental action.

23          And if you're a publisher, say, you're the *New York Times*

24     or whoever else, and you want to write articles, write

25     editorials as a publisher that also promote public health, that

1    say, you know, the government is right, we think this is

2    important, we think people like Kennedy are quacks and aren't

3    to be listened to, aren't to be trusted, that's fine.  But a

4    publisher takes responsibility for what it publishes.  Under

5    the law, it has an obligation to do that.

6        Google does not.  Google disclaims responsibility for

7    anything.  It is not -- it is not a publisher.  And so I think

8    as to the balance of harms, there is no harm to Google in

9    issuing this injunction.  Which I would note, Your Honor, we've

10   actually narrowed substantially to only apply to speech from my

11   client, Mr. Kennedy, on issues related to his presidential

12   campaign.

13       And that's important because what's happening here is when

14   Google takes down a speech or a video content of Mr. Kennedy

15   speaking, it's not just removing what it claims to be or what

16   the government claims to be misinformation about medical

17   information, it's also removing political speech.  That's the

18   importance of that speech in New Hampshire that was taken down

19   back in March.

20       I was at that speech.  At least half of it had nothing to

21   do with medical information whatsoever.  It was Mr. Kennedy,

22   you know, talking about his environmental record, his

23   childhood.

24       So that's -- that's the issue here.  When you're removing

25   political speech, there is a chilling effect, and that does

1    damage the political process.

2         THE COURT:  So that brings me to a question.  Are you

3    indicating that the only objectionable portion was any

4    reference to the vaccines, that he didn't say anything else in

5    any of these speeches that may violate other policies, just the

6    medical policy standing alone, just the medical policy?

7         ATTORNEY STREET:  That is the only policy that

8    YouTube -- and if you look at the exhibit to my declaration

9    that attached a news article with YouTube's explanation, that's

10   the policy that they --

11        THE COURT:  No.  My question to you is, is it your

12   position there's nothing else in those speeches that could be

13   found as objectionable or violating any service agreement?

14        ATTORNEY STREET:  Well, correct, because I don't

15   think -- I don't think the discussion of Mr. Kennedy's

16   environmental record, like say with the Hudson River CAPERs,

17   is -- I wouldn't even claim -- I don't think they would even

18   claim that that's -- that that's misinformation.

19        THE COURT:  Well, the March one is not as relevant as

20   the April -- anything post-April since that is kind of the

21   linchpin of where you begin in your arguments.  And so I'm just

22   trying to have some clarity about what encompasses this TRO and

23   what does not.

24        ATTORNEY STREET:  Well, I'd say what encompasses this

25   TRO, Your Honor, is that -- and I think we spelled this out in

1   the order -- it's just that we're asking for the Court to order

2   Google to not remove speech of Mr. Kennedy's on matters of

3   public concern during his campaign.

4       Now if he ceases to be a presidential candidate, then

5   maybe that's a different situation.  But I think that given --

6   given the importance of my client's criticism of the government

7   on certain issues, including public health policy, it's

8   impossible to carve one out.  It's impossible to say, well, you

9   know, this certain information violates our policies, we'll

10  take this down.

11      And I think that's actually why we've seen, Your Honor,

12  that Google is not removing all of the content that's posted

13  regarding Mr. Kennedy.  It just happens to be certain -- you

14  know, certain -- certain content.

15      But that doesn't -- that doesn't change the analysis

16  because it still creates the chilling effect.  And some of the

17  videos they have taken down again have been some of the most

18  widely viewed videos, including the New Hampshire speech, the

19  Rogan interview, and the Peterson interview.  Which I checked

20  my notes and I don't -- I don't have the date.  I know that it

21  was in either June or July, but I apologize, I don't have the

22  specific date.

23          **THE COURT:**  All right.  Thank you.

24      Anything further?

25          **ATTORNEY BLAVIN:**  Yeah, Your Honor.  If you wouldn't

mind, I'll briefly go through just a last set of points here.

First with respect to the issue of whether only a portion of the speech was removed and other parts of the speech may not have been offending Google's policies, it's not Google's obligation to edit the video.  If the video violates its medical misinformation policies, its vaccine-related misinformation policies, it can remove that video.

Now if plaintiffs want to or anyone else wants to edit the video to take out the part of the video that's violating its policies, of course they are free to do so.

And, again, as Your Honor recognized, Mr. Kennedy, as he acknowledges, has his videos up on Twitter, or X as it's now called, has his videos up on Facebook.  There's several other videos of him up on YouTube.  He just acknowledge, yeah, if the videos don't violate those policies, generally they stayed up. So that's just a fact that I wanted to make sure that was clear in the record.

With respect to the reliance on government experts, I mean it can't be the fact that you rely on a government agency for their expertise would automatically convert you into a state actor when you're exercising your own independent judgment in adopting a policy and enforcing it.  And plaintiff cites no authority to support that.

And more so, as noted before, the specific government agencies that are referenced in the policies are not even the

1   federal government.  It's WHO and local health authorities.  So

2   there's a disconnect there.

3        With regards to plaintiff's counsel's argument that, well,

4   none of these other courts that have dismissed these cases,

5   again on the pleadings without any discovery whatsoever,

6   considered *Missouri v. Biden*.

7        Well, as I noted, Your Honor, that's just wrong.

8   Judge Breyer considered substantial evidence from *Missouri v.*

9   *Biden* including a significant amount of evidence that's in

10  front of your court and held that there was no state action

11  whatsoever.

12       And then briefly, Your Honor, with respect to, you know,

13  the alleged harm Mr. Kennedy would suffer from these handful of

14  videos being removed, Google also has, besides its First

15  Amendment rights, as we noted in our papers, Google has a

16  strong interest in its own content moderation policies

17  maintaining users' trusts and expectations in the platforms.

18       We've submitted to Your Honor several of those policies,

19  and they emphasized that the safety of our creators, viewers,

20  and partners is our highest priority.

21       So an injunction that would force Google to carry this

22  content would not only violate the First Amendment, but it

23  would harm its own efforts to make sure that it has a safe

24  platform in which potentially dangerous medical and vaccine

25  misinformation does not exist on it.

1    And then briefly, Your Honor, just on the issue of, you

2    know, plaintiffs have suggested that, you know, there could be

3    more out there that they just don't have.

4    Again, Your Honor, all of these cases have been dismissed

5    on the pleadings, including the *O'Handley* case which had

6    significant evidence in it, the *Hart* case*, Federal Agency of*

7    *News* case.

8    Courts do not allow discovery to determine if you have a

9    claim.  And plaintiff here has already had access to

10   substantial discovery from the *Missouri v. Biden* case,

11   including communications between government officials and

12   Google employees, deposition transcripts, government discovery

13   responses.  All that would happen with enabling any discovery

14   where there's absolutely no basis to issue a TRO would be a

15   fishing expedition from Google to see if the plaintiff has a

16   claim.

17   And Google's motion to dismiss is due on August 30th.  We

18   plan to file that motion on or before that date.  And we think

19   Your Honor should rule on that motion which we think is clear

20   based upon the record submitted here and the allegations of the

21   complaint that the complaint here is facially deficient, does

22   not come close to stating a claim.  We believe the Court should

23   dismiss that complaint on its face without permitting any

24   potential discovery from Google in the interim.

25   **THE COURT:**  Anything further?

1        **ATTORNEY STREET:**  The only thing I would add,

2   Your Honor, is that the Supreme Court and the Ninth Circuit,

3   indeed all federal courts in this country, have a very proud

4   history of protecting dissenting viewpoints, protecting

5   government dissent, especially in the political process, and

6   that's what this case comes down to.

7        Now, obviously we're dealing with it in a modern context

8   of you have huge companies that control what the Supreme Court

9   has called the, you know, modern public square, and that's a

10  new development.

11       But I would urge the Court to read the court's -- Supreme

12  Court's state action cases very, very closely.  And I'd also

13  ask the Court to think about the Ninth Circuit's reasoning in

14  the *O'Handley* case.  And in the context of the Supreme Court's

15  admonition, what we're really looking at is whether seemingly

16  private behavior is fairly attributable to the state.

17       And I think that the Ninth Circuit -- if the Ninth Circuit

18  had believed these cases never had merit, can't possibly be

19  brought, they would have said so.  It actually said to the

20  contrary, that there is a situation we can envision in which

21  private action could be deemed state action, and I think this

22  is that case.

23       And I think that the importance of protecting the

24  political process while minimizing any harm to Google who is

25  not a publisher, cannot be held liable for what my client says

1    on YouTube, weighs in favor of granting the relief.

2         **THE COURT:**  All right.  Thank you.

3         And I'm glad that you brought the Court back to *O'Handley*,

4    and I'm going to recite for the record the items that I'm going

5    to take under submission and based on what I've heard whether

6    the evidence and arguments fall short of state action.

7         And then taking a look at the guidelines in *O'Handley*,

8    whether a private entity's conduct amounts to state action,

9    namely, was the alleged constitutional violation caused by an

10   exercise of some right or privilege created by the state or by

11   a rule of conduct imposed by the state or by a person for whom

12   the state is responsible.

13        When I look at nexus test one, whether there is pervasive

14   entwinement of public institutions and public officials in the

15   private actor's composition and workings, that's the first

16   question that I would be looking at when I analyze this issue

17   in reflection based upon all of the arguments of counsel.

18        Number two seems to have been conceded with regards to the

19   nexus test, whether government officials have exercised

20   coercive power or provided such significant encouragement,

21   either overt or covert, that the choice must in law be deemed

22   to be that of the state; whether the government officials

23   threaten adverse action to coerce the private party into

24   performing a particular act or encouraged by using positive

25   incentives that overwhelm the private party and essentially

1    compel them to act.  Counsel has conceded that that does not

2    apply.

3        The joint action test, a plaintiff can show joint action

4    either by proving the existence of a conspiracy or by showing

5    that the private party was a willful participant in joint

6    action with the state or its agents.

7        Counsel is arguing that relying upon WHO and local

8    authorities and regulatory agencies and any public health

9    officials, that that somehow entwines and becomes a joint

10   action.

11       With regards to the remaining issues, the Court finds that

12   there's nothing to show that there's any coercion or

13   retaliation, and the evidence falls short of dates and nexus to

14   the actions that were taken by Google.

15       So I'm going to be focused on two questions in reflection.

16   It does not appear that, based upon what I've heard thus far,

17   would warrant discovery at this stage.

18       We do have a further case management conference scheduled

19   for September 12th, 2024.  And I can give you anticipated dates

20   that you may be assigned based on my calendar so that you can

21   begin your planning.  And when you have your joint conference

22   with regards to your case management conference, you can at

23   least determine whether these dates are suitable to your

24   calendar.

25       The first available trial date is March 17th, 2025.  So I

1    want you to know that.  Final pretrial conference would thereby

2    take place on February 13th, 2025.  And joint pretrial

3    statements would be due January 30th, 2025.

4        Now then we are going to reserve the date of November 7,

5    2023, at 2:00 p.m., that's an in-person hearing for motion for

6    preliminary injunction and motion to dismiss.

7        I believe the briefing schedule has already been uploaded

8    for you.  We will provide you with additional dates such as

9    close of discovery.  Fact discovery would be August 30th, 2024.

10   Expert disclosure September 30th, 2024.  Rebuttal expert

11   disclosure October 21st, 2024.  And close of expert discovery

12   November 11th, '24.  Last day to file dispositive motions would

13   be December 10th, '24.

14       This is a tentative schedule.  And the Court will place

15   the tentative schedule on ECF so that you can review it.  It

16   will be a standalone document that will indicate tentative

17   trial schedule.

18       Of course, these dates will fall off if the Court denies

19   the motion for preliminary injunction and/or the TRO.  And also

20   if the Court grants the motion to dismiss, any later dates that

21   come after November 7th would fall off the Court's calendar.

22       All right.  So we will post the tentative schedule so that

23   when you meet and confer, you will have the dates that are

24   convenient to the Court's calendar.

25       Thank you both for being so amazingly prepared and making

```
1   it through some inclement weather.  And it was a pleasure
2   meeting each of you.  Thank you.
3             ATTORNEY STREET:  Thank you, Your Honor.
4             ATTORNEY BLAVIN:  Thank you, Your Honor.
5             THE COURT:  This matter is concluded.
6                  (Proceedings adjourned at 11:13 a.m.)
7                          ---oOo---
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Thursday, August 24, 2023

8

9

10

11     _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F

TYLER BURSCH, LLP
Robert Tyler (STATE BAR NO. 179572)
rtyler@tylerbursch.com
Nada Higuera (STATE BAR NO. 299819)
nhiguera@tylerbursch.com
25026 Las Brisas Rd.
Murrieta, California 92562
Telephone: 951-600-2733
Facsimile: 951-600-4996

LIBERTY JUSTICE CENTER
Daniel Suhr, pro hac vice admitted
dsuhr@libertyjusticecenter.org
M.E. Buck Dougherty III, pro hac vice admitted
bdougherty@libertyjusticecenter.org
James McQuaid, pro hac vice admitted
jmcquaid@libertyjusticecenter.org
440 N. Wells Street, Ste. 200
Chicago, Illinois 60654
Telephone: 312-637-2280
Facsimile: 312-263-7702
*Attorneys for Plaintiff Justin Hart*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JUSTIN HART,<br><br>     Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., Inc.; TWITTER, INC.; VIVEK MURTHY in his official capacity as U.S. Surgeon General; JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; ROB FLAHERTY, in his official capacity as Deputy Assistant to the President and White House Director of Digital Strategy; and CAROL Y. CRAWFORD, in her official capacity as Chief of Digital Media within the Centers for Disease Control and Prevention,<br><br>     Defendants. | Case No. 3:22-cv-00737-CRB<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# INTRODUCTION

1. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The [United States Supreme] Court has sought to protect the right to speak in this spatial context." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

2. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace — the 'vast democratic forums of the Internet' in general, *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 868 (1997), and social media in particular." *Packingham*, 137 S. Ct. at 1735.

3. The Internet is a "dynamic, multifaceted category of communication" that "includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue." *Reno*, 521 U. S. at 870.

4. Congress determined that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). And Congress further found that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(4).

5. It is the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

6. Here, the Defendants conspired to remove from the Internet—a public forum devoted to the marketplace of ideas—valid public health messages and social media posts by Plaintiff, Justin Hart, and others, because they disagreed with the viewpoint and message expressed in such posts on the Internet, which contradicted the federal government's COVID-19 public health message and views expressed.

7.   The Federal Government Defendants (President Biden, Surgeon General Murthy, Flaherty, and Crawford) publicly criticized, exerted pressure, and threatened the Social Media Defendants (Meta Platforms, Inc. and Twitter, Inc.) and other social media platforms for allowing views opposed to the federal government's COVID-19 public health message to be posted on their platforms that access the Internet.

8. Such coercive, bullying, and intimidating threats and tactics by government officials designed to censor speech through private social media companies have been referred to as illegal jawboning.[1] "The term 'jawboning' was first used [during World War II] to describe official speech intended to control the behavior of businessmen and financial markets."[2]

9. The Ninth Circuit has long recognized the inherent problems associated with illegal jawboning techniques where government officials desired effect is censoring lawful free speech rights under the First Amendment. *See, e.g., Writers Guild of America, West, Inc. v. American Broadcasting Co., Inc.*, 609 F. 2d 355, 365 (9th Cir.1979) ("Regulation through 'raised eyebrow' techniques or through forceful jawboning is commonplace in the administrative context, and in some instances may fairly be characterized . . . as official action by the agency.") (footnotes omitted), *cert. denied*, 449 U.S. 824 (1980); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 52, 64 (1963) (holding government threats that amount to a censorship scheme violate free speech rights under the First Amendment.); *see also Backpage.com, LLC v. Dart*, 807 F. 3d 229, 231 (7th Cir. 2015) (Posner, J.) ("The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is

---

[1] *See* Will Duffield, *Jawboning against Speech*: *How Government Bullying Shapes the Rules of Social Media*, Policy Analysis no. 934, Cato Institute, Washington D.C. (Sep. 12, 2022), *available at* https://www.cato.org/policy-analysis/jawboning-against-speech.

[2] *Id* at p.2.

compliance with his demands.").

10. And in private communications, the Federal Government Defendants held regular "be-on-the-lookout" warning meetings with the Social Media Defendants and overtly instructed them on the specific types of so called COVID-19 "disinformation" or "misinformation" that should be excluded from their platforms and the Internet, regardless of whether such public posts violated the Social Media Defendants' terms, conditions, and policies on "disinformation" or "misinformation." The Social Media Defendants even adjusted their policies and algorithms on valid public health messages and acceptable viewpoints on the Internet to align with the Federal Government Defendants' pre-approved COVID-19 public health message and viewpoint.

11. The Social Media Defendants removing from the Internet COVID-19 related posts that opposed or contradicted the Federal Government Defendants' COVID-19 message— such as Hart's posts—violated the Social Media Defendants' terms, conditions, and policies on "disinformation" or "misinformation," because they acquiesced under duress to coercive pressure from the Federal Government Defendants.

12. Some of the Social Media Defendants further acquiesced under duress by giving the Federal Government Defendants millions of dollars in free advertising on their private platforms so the government's COVID-19 public health message would not be challenged on the Internet, despite the private Social Media Defendants substantially earning their revenue from third party advertising on their social media platforms.

13. The Federal Government Defendants knowingly received a benefit from the Social Media Defendants excluding from the Internet opposing views to the government's COVID-19 public health message such as Hart's public posts, because the government's views were unchallenged and without public scrutiny on the "vibrant and competitive free market that presently exists for the Internet" in violation of United States policy. 47 U.S.C. § 230(b)(2).

14. The Federal Government Defendants also knowingly received a financial benefit from some of the Social Media Defendants' financial gifts of millions of dollars in free

advertising to promote the government's COVID-19 public health message, because the Federal Government Defendants did not have to pay for a service—advertising its COVID-19 public health message on the Internet—that others who sought and paid for message advertising on the Internet, such as Hart, were required to pay to the Social Media Defendants.

15. First, Hart brings this action to defend the freedom of speech under the First Amendment from viewpoint-based, discriminatory collusion between private social media companies and the federal government, because they jointly removed his COVID-19 social media posts from the Internet since Hart's posts contradicted the federal government's COVID-19 public health message and views.

16. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Under the Free Speech Clause of the First Amendment, "discrimination against speech because of its message is presumed to be unconstitutional." *Id.*

17. A conspiracy between private and governmental actors satisfies the joint action test when they have had a "meeting of the minds" to "violate constitutional rights." *Fonda v. Gray*, 707 F. 2d 435, 438 (9th Cir. 1983). When a government actor has "so far insinuated itself into a position of interdependence" with private actors it is recognized as a joint participant in the challenged constitutional deprivation. *See Gorenc v. Salt River Project Agr. Imp. & Power Dist.*, 869 F. 2d 503, 507 (9th Cir. 1989) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)). Such joint action between government and private parties transforms private actors into state actors. *See Pasadena Republican Club v. W. Justice Ctr.*, 985 F. 3d 1161, 1167 (9th Cir. 2021).

18. When the federal government admits to conspiring with social media companies to censor messages on the Internet with which it disagrees, as it has in this case, both the government and the private companies are guilty of unconstitutional viewpoint discrimination: "Joint action exists where the government . . . encourages . . .

unconstitutional conduct through its involvement with a private party . . . ." *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013) (cleaned up). Joint action further occurs when there is "substantial cooperation" between the private and state actors, or their actions were "inextricably intertwined." *Brunette v. Humane Society of Ventura Cnty.*, 294 F. 3d 1205, 1211 (9th Cir. 2002).

19. This Court should declare the actions of Defendants Meta Platforms, Inc., f/k/a Facebook, Inc., Twitter, Inc., President Biden, Surgeon General Murthy, Flaherty, and Crawford unconstitutional and permanently enjoin them from monitoring, flagging, censoring, and deleting social media posts on the Internet based on the viewpoints the posts espouse that contradict the federal government's pre-approved viewpoint. The Court should further enjoin the Social Media Defendants from adjusting their policies on misinformation to align with the Federal Government Defendants' misinformation policies.

20. Second, Defendants Meta Platforms, Inc., f/k/a Facebook, Inc., and Twitter, Inc. are liable under the doctrine of promissory estoppel for promising Hart the use of their social media platforms to access the Internet so he could further his business interests and then rescinding this promise after he relied on them to his detriment.

21. Third, Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., is liable to Hart for intentional interference with a contract for knowingly denying him the ability to fulfill his contractual duty to administer the Facebook account of Donorbureau, LLC.

22. Fourth, Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., is liable to Hart for negligent interference with a prospective economic advantage for knowingly disrupting the contractual relationship between Donorbureau, LLC and him by preventing him from administering the Facebook account of Donorbureau.

23. For these reasons, Hart brings this lawsuit and seeks declaratory, injunctive, and monetary relief for the constitutional deprivation, injuries, and injustices he has suffered at the hands of the Defendants.

**PARTIES**

24. Plaintiff, Justin Hart, is a natural person domiciled in San Diego County, California.

25. Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., ("Facebook") is a publicly traded corporation incorporated in Delaware with a principal place of business at 1601 Willow Road, Menlo Park, California in San Mateo County.

26. Defendant Twitter, Inc. ("Twitter") is a publicly traded corporation incorporated in Delaware with a principal place of business at 1355 Market Street, Suite 900, San Francisco, California in the City and County of San Francisco.

27. Defendant Vivek Murthy is sued in his official capacity as the Surgeon General of the United States. In that role, he directs the office of the Surgeon General, a part of the Department of Health and Human Services ("HHS") agency within the Executive Branch of the federal government.

28. Defendant Joseph R. Biden, Jr. is sued in his official capacity as the President of the United States. In that role, he directs the Executive Branch of the federal government, including the Office of Management and Budget ("OMB"), White House staff, and HHS.

29. Defendant Rob Flaherty is sued in his official capacity as the Deputy Assistant to the President of the United States and Director of Digital Strategy at the White House.

30. Defendant Carol Y. Crawford is sued in her official capacity as Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention ("CDC"). The CDC is an agency within HHS and the Executive Branch of the federal government.

**JURISDICTION AND VENUE**

31. This case raises federal claims under the First Amendment of the United States Constitution; therefore, the Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

32. This Court has jurisdiction to issue injunctive relief to protect constitutional rights. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

33. The Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. § 2201 and to order further necessary or proper relief based on a declaratory judgment or decree pursuant to 28 U.S.C. § 2202.

34. The Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

35. The Court has personal jurisdiction over Defendants Murthy, Biden, Flaherty, and Crawford because they are officers of, or oversee agencies of, the United States.

36. The Court has personal jurisdiction over Defendants Facebook and Twitter because they maintain their principal places of business in California.

37. Venue is appropriate in this district because Facebook and Twitter maintain their principal places of business here and a substantial part of the events giving rising to the claims occurred in this district.

## FACTUAL ALLEGATIONS

*Facebook offered the government $15 million dollars in free COVID-19 advertising*

38. On February 21, 2021, Payton Iheme, a Facebook employee in charge of U.S. Public Policy at the social media platform, sent an email to Carol Crawford, an employee of the CDC. The CDC is a public health agency within HHS and its employees work with Surgeon General Murthy on public health issues such as COVID-19. A true and correct copy of this email string between Facebook's Iheme and the CDC's Crawford is attached as ***Exhibit 1***.

39. In the email, Facebook employee Iheme offered CDC and the federal government a $15 million-dollar in-kind donation to allow the government to advertise for free its COVID-19 public health message on Facebook's private platform and the Internet. *Id*.

40. CDC employee Crawford responded to Facebook's offer on the same day, stating, "Thank you for this amazing offer. We'll work with our policy staff on next steps." *Id*.

*The government placed a condition on the $15 million gift and Facebook accepted*

41. On April 5, 2021, Dia Taylor, CDC's Acting Chief Operating Officer, sent an email to Facebook's Iheme and copied Crawford and other CDC employees. The email contained an attached letter, and true copies of the email and letter are attached hereto as ***Exhibit 2***.

42. In the letter from the CDC to Facebook, the federal government placed a "Publicity and Endorsements" conditional clause on Facebook's $15 million gift of free COVID-19 advertising. This clause required Facebook to not use the name of HHS, CDC, or any related federal agencies regarding the federal government's COVID-19 public health messages to be posted on Facebook and the Internet. *Id.*

43. The "Publicity and Endorsements" clause further required Facebook to "clear all publicity materials for this gift with HHS and CDC to ensure compliance with this paragraph." *Id.*

44. Facebook acknowledged there was a meeting of the minds by accepting the federal government's "Publicity and Endorsements" conditional clause, evidenced by Iheme's signature to the letter. Iheme then emailed a copy of the signed acceptance letter to the CDC on April 8, 2022. *Id.*

### The government held "Be-on-the-lookout" meetings with social media companies

45. Beginning in May of 2021, the CDC scheduled regular "be-on-the-lookout" or BOLO meetings with social media platforms, including Facebook and Twitter, and provided detailed and specific instructions on what the government deemed to be COVID-19 disinformation or misinformation and what information the private social media companies should or should not allow on their platforms and on the Internet.

46. On May 6, 2021, the CDC sent an email to Facebook with examples of what COVID-19 messages were inappropriate for the public on private social media platforms and the Internet. Attached as *Exhibit 3* is a true and correct copy of this email.

47. On May 14, 2021, the CDC's Crawford sent an email inviting social media companies including Facebook and Twitter to participate in a BOLO meeting and included a slide presentation related to COVID-19 "Misinformation." Attached as *Exhibit 4* is a true and correct copy of this email along with the COVID-19 slide presentation.

48. On May 28, 2021, the CDC sent an email invitation for a second BOLO meeting with social media platforms including Facebook and Twitter, on COVID-19

"Misinformation." Attached as ***Exhibit 5*** is a true and correct copy of this email along with the COVID-19 slide presentation.

49. On June 18, 2021, the CDC sent another email invitation for a third BOLO meeting with social media platforms including Facebook and Twitter, on COVID-19 "Misinformation." Attached as ***Exhibit 6*** is a true and correct copy of this email along with the COVID-19 slide presentation.

50. These BOLO meetings held in May and June, between the federal government and private social media platforms, including Facebook and Twitter, followed a trend that began in December of 2020, with the CDC's Crawford initially emailing Facebook about COVID-19 "Misinformation." Attached as ***Exhibit 7*** is a true and correct copy of this December 2020 email, along with a COVID-19 slide presentation.

### *Deplatforming Justin Hart and removing his posts from the Internet*

51. In early July of 2021, in preparation for the upcoming school year, the CDC updated its guidelines and recommended that young children should continue to wear masks at school but vaccinated older students and teachers did not need to wear masks.[3]

52. Following Facebook's $15 million-dollar gift to the federal government, regular government BOLO instructional meetings with Facebook and Twitter, and the CDC's updated masking guidelines for children, on or around July 13, 2021, Hart posted to his personal Facebook page and on the Internet a graphic entitled, "Masking Children is Impractical and Not Backed by Research or Real World Data."

---

[3] https://www.chalkbeat.org/2021/7/9/22570068/new-cdc-guidance-schools-masks (last visited Oct. 10, 2022)

53. Below is a photo of the graphic in Hart's post:



54. The graphic Hart posted is science-based, contains footnotes to scientific evidence supporting its claims, and is a valid public health message.

55. Facebook flagged the above post on or around July 13, 2021, with the following notice:

> **You can't post or comment for 3 days.**
>
> This is because you previously posted something that didn't follow our Community Standards.
>
> This post goes against our standards on misinformation that could cause physical harm, so only you can see it.
>
> **Learn more about updates to our standards.**

56. On or around July 18, 2021, Hart posted to his personal Twitter page and on the Internet a tweet that read:

> So the CDC just reported that 70% of those who came down with
> #COvId19 symptoms had been wearing a mask. We know that
> masks don't protect you... but at some point you have to wonder
> if they are PART of the problem.

57. Although Hart's post stated a valid public health message, Twitter locked Hart's account on or around July 18, 2021, after his post, with the following notice sent to his email:

> **Hi Justin Hart,**
>
> **Your Account, @justin_hart has been locked for violating the Twitter Rules.**
>
> Specifically for: Violating the policy on spreading misleading and potentially harmful information related to COVID-19.

### *President Biden, the White House, and Surgeon General Murthy*

58. Within days of these two removals of Hart's posts from the Internet, Defendant Biden's administration revealed publicly that it was directing social media companies to remove posts that bucked their party line on COVID-19.

59. On July 15, 2021, at a White House Press Conference, Defendant Surgeon General Murthy stated, "We're asking [our technology companies] to consistently take action against misinformation super-spreaders on their platforms."[4]

60. The White House revealed that a team of government employees was actively researching and tracking social media posts with which it disagreed and relaying those posts to social media companies with instructions to take them down from the Internet.

61. Former White House Press Secretary Jen Psaki admitted, "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation."[5]

62. Psaki also revealed that the White House effort to suppress free speech on the

---

[4] Vivek H. Murthy, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

[5] Jen Psaki, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

Internet that contradicted the government's COVID-19 public health message reaches all the way to the level of senior staff for Defendant Biden's administration.

63. Psaki gave a glimpse of how the scheme works: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team . . . ."[6]

64. Emails confirm Psaki's public comments. For example, in February and March of 2021, Facebook conducted a survey, shared its survey data with the CDC, and held meetings with government employees to discuss COVID-19 vaccine hesitancy on Facebook's platform and the Internet. Attached as ***Exhibit 8*** are true and correct copies of emails regarding this communication between Facebook and the CDC.

65. Psaki further revealed in public comments that the far-reaching government effort targeted multiple posts on multiple social media sites and the Internet exclaiming, "You shouldn't be banned from one platform and not others."[7]

66. Against United States policy as set forth by Congress "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation" 47 U.S.C. § 230(b)(2), Defendants Biden and Murthy directed four key changes for social media platforms and the Internet.

67. First, Biden and Murthy directed that private companies "measure and publicly share the impact of misinformation on their platform."[8]

68. Second, Biden and Murthy directed social media companies to "create a robust enforcement strategy that bridges their properties and provides transparency about the rules."[9]

---

[6] *Id.*

[7] Jen Psaki, White House Press Briefing (July 16, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/ (last visited Aug. 18, 2021).

[8] Psaki, *supra* n. 3.

[9] *Id.*

69. Third, Biden and Murthy stressed that "it's important to take faster action against harmful posts" because "information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts[.]"[10]

70. Fourth, Biden and Murthy directed Facebook to "promote quality information in their feed algorithm."[11] No definition was provided by Biden and Murthy publicly as to the government's definition of "quality information."

71. At the direction of Biden, Murthy created and published a 22-page Advisory with instructions on how social media companies should remove posts with which Murthy and Biden disagree.[12]

72. Biden further threatened social media companies who do not comply with his directives by publicly shaming and humiliating them, stating, "They're killing people."[13]

73. Emails between Facebook and the government confirm that Facebook had used its proprietary tool "CrowdTangle" to monitor and report on social media posts that contradicted the federal government's COVID-19 message and shared such information with the government. Attached as ***Exhibit 9*** are true and correct copies of emails regarding this communication between Facebook and the CDC regarding CrowdTangle reports.

74. At the direction of the Federal Government Defendants Biden and Murthy, Facebook used CrowdTangle, along with social media algorithms designed to cast a wide net, to remove posts from the Internet that contradicted the government line on COVID-19,

---

[10] *Id.*

[11] *Id.*

[12] Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (2021), *available at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf (last visited Aug. 18, 2021).

[13] Lauren Egan, *"They're killing people": Biden blames Facebook, other social media for allowing Covid misinformation*, NBC News (July 16, 2021, 4:10 PM), *available at* https://www.nbcnews.com/politics/white-house/they-re-killing-people-biden-blames-facebook-other-social-media-n1274232 (last visited Aug. 18, 2021).

regardless of whether such posts violated Facebook's terms of service.

75. For example, in April of 2021, the CDC's Crawford and Facebook's Iheme communicated via email that the Wyoming Public Health Department notified the federal government that Facebook's and other platforms' algorithms, intended to screen out COVID-19 "misinformation," were also screening out "valid" public health messaging, including social media posts on the Internet by the Wyoming Public Health Department. Attached as ***Exhibit 10*** is a true and correct copy of this email communication.

76. Like the Wyoming Public Health Department's valid public health message that was wrongfully removed from the Internet because of social media platforms' adjusted algorithms, Hart's public Facebook and Twitter posts in July of 2021 were valid public health messages wrongfully removed from the Internet by algorithms designed jointly by the Federal Government Defendants and the Social Media Defendants.

77. Defendants Biden and Murthy directed Defendants Facebook and Twitter to design specific algorithms to identify and remove social media posts from the Internet that contradicted the federal government's COVID-19 public health message and viewpoint. The Social Media Defendants substantially cooperated with the Federal Government Defendants' request by designing algorithms that would target viewpoint messages and posts that contradicted the federal government's COVID-19 public health viewpoint, resulting in Hart's social media posts being removed from the Internet.

78. On July 23, 2021, ten days after Facebook removed Hart's valid public health message from Facebook's platform and the Internet, Facebook employee Nick Clegg emailed Defendant Surgeon General Murthy. In the email, Clegg advised Murthy that Facebook had recently taken steps "to adjust policies on what we are removing for misinformation." Attached as ***Exhibit 11*** is a true and correct copy of this email communication.

79. Clegg's tone in his email to Surgeon General Murthy was defensive, and he stated, "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id*.

80. Clegg continued with his defensive and submissive posture in his email to Defendant Murthy, and he said, "We will reach out directly to DJ to schedule the deeper dive on how to best measure Covid related content and how to proceed with the question around data." *Id.*

81. On information and belief, "DJ" is not employed by Facebook, does not have authority and control over Facebook's misinformation policies and terms of service, and "DJ" operates under the authority and control of Murthy, the Executive Branch, and the federal government.

82. Clegg further stated to Murthy, "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress." *Id.* Clegg also noted to Surgeon General Murthy, "You have identified 4 specific recommendations for improvement, and we want to make sure to keep you informed of our work on each." *Id.*

83. On information and belief, these "4 specific recommendations for improvement" Clegg referred to in his email to Surgeon General Murthy are the same 4 Executive Branch policy recommendations Psaki stated in her July 16, 2021, press briefing. *See supra*, Psaki transcript, n.5.

84. The following month, on August 20, 2021, Clegg sent Murthy a lengthy email because Surgeon General Murthy requested an update. Attached as ***Exhibit 12*** is a true and correct copy of this email communication.

85. In that email, Clegg stated to Defendant Murthy, "You asked for an update on existing and new steps Facebook is taking." Clegg noted to date that Facebook had removed over 20 million pieces of content for COVID-related misinformation. *Id.*

86. Clegg further stated to Murthy, "In light of our conversation we have been reviewing our efforts to combat COVID-19 and are eager to continue working toward our shared goal of helping more people get vaccinated and limiting the spread of harmful misinformation." *Id.*

### *Facebook*

87. Defendant Facebook is one of the most popular social media sites in the world. It

boasts "more than 2.8 billion monthly users worldwide," who use it for both business and pleasure.[14] Almost 70% of Americans use Facebook in some capacity.[15] Of these users, 70% visit Facebook daily.[16]

88. Facebook's services involve creating a sort of personal website for its users who can post pictures of themselves and others, create posts on their wall where they can "debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 137 S. Ct. at 1735. These posts are published on the Internet and can also include links to news articles and videos. Other users can post comments on a user's posts and thereby have a dialogue with one another. Users may also send each other direct messages through Facebook's Messenger feature.

89. Given this tremendous opportunity to network and speak with other people throughout the United States and even the world on the Internet, users frequently use Facebook to promote their business. "There are over 60 million active business [p]ages" on Facebook.[17] Millions of businesses pay to be active advertisers.[18]

90. Facebook's hosting of advertisements is very lucrative for it. In 2018, it generated a total of $55.8 billion in revenue, 99% of which came from ads on Facebook and other platforms that it owns, such as Instagram.[19]

91. On December 31, 2021, the same fiscal year when Facebook made its $15 million

---

[14] John Gramlich, *10 facts about Americans and Facebook*, Pew Research Center (June 1, 2021), *available at* https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/) (last visited Aug. 18, 2021).

[15] *Id.*

[16] *Id.*

[17] Kit Smith, *53 Incredible Facebook Statistics and Facts*, Brandwatch (June 1, 2019), *available at* https://www.brandwatch.com/blog/facebook-statistics/ (last visited Aug. 18, 2021).

[18] *Id.*

[19] Erin Black, *How Facebook makes money by targeting ads directly to you*, CNBC (Apr. 2, 2019), *available at* https://www.cnbc.com/2019/04/02/how-facebook-instagram-whatsapp-and-messenger-make-money.html?__source=facebook%7Cmain&fbclid=IwAR05sCPLjY61T3UOfYNvQQZwOiMY64mJsnMQ0Lu4UNYqXkaXa1FUPpn1Huo (last visited Aug. 18, 2021).

1
2
free advertising donation to the Federal Government Defendants, Facebook filed its Form 10K Annual Report with the Securities and Exchange Commission ("SEC").[20]

3
4
5
92. In its 2021 filed Annual Report with the SEC, Facebook noted: "Substantially all of our revenue is currently generated from third parties advertising on Facebook and Instagram."[21]

6
7
8
93. Facebook's terms of service invite businesses to use its services to "connect with [other people], build communities, and grow businesses."[22] Facebook describes its services as "[e]mpower[ing] you to express yourself and communicate about what matters to you."[23]

9
10
11
12
13
14
94. The terms of service require users to follow Facebook's "Community Standards."[24] Those standards state that Facebook is "a service for more than two billion people to freely express themselves across countries and cultures and in dozens of languages."[25] They go on to state, "To ensure that everyone's voice is valued, we take great care to craft policies that are inclusive of different views and beliefs, in particular those of people and communities that might otherwise be overlooked or marginalized."[26]

15
16
17
18
19
20
95. The limits on this pro-free-speech stance include abstract categories such as "Violence and Criminal Behavior," "Safety" (which includes "Suicide and Self-Injury," "Child Sexual Exploitation, Abuse, and Nudity," "Sexual Exploitation of Adults," "Bullying and Harassment," "Human Exploitation," and "Privacy Violations and Image Privacy Rights"), "Objectionable Content" (which includes "Hate Speech," "Violent and Graphic Content," "Adult Nudity and Sexual Activity," and "Sexual Solicitation"), "Integrity and

21
22
23
[20] https://www.sec.gov/Archives/edgar/data/1326801/000132680122000018/fb-20211231.htm (last visited Oct. 10, 2022).

24
25
[21] *Id.* at p. 15.
[22] Terms of Service, Facebook, *available at https://www.facebook.com/terms.php* (last revised Oct. 22, 2020) (last visited July 19, 2021).

26
[23] *Id.*
[24] *Id.*

27
28
[25] Community Standards, Facebook, *available at* https://www.facebook.com/communitystandards/ (last visited July 19, 2021).
[26] *Id.*

Case No. 3:22-cv-00737-CRB     18
FIRST AMENDED COMPLAINT

Authenticity," (which includes "Account Integrity and Authentic Identity," "Spam," "Cybersecurity," "Inauthentic Behavior," "False News," "Manipulated Media," and "Memorialization"), and "Respecting Intellectual Property." For the "False News" sub-category, Facebook states that "we do not remove false news from Facebook but we significantly reduce its distribution by showing it lower in News Feed."[27]

96. At no point in the terms of service or Community Standards does Facebook prohibit valid public health messages and viewpoints that oppose making children wear masks, such as Hart's posts.

97. Further, at no point in the terms of service or Community Standards does Facebook mention that it would adjust its policies at or about the same time Hart posted on Facebook in July of 2021, and substantially cooperate with, and follow, Defendants Biden and Murthy's "4 specific recommendations for improvement" Clegg referred to in his email to Surgeon General Murthy that Psaki mentioned in her July 16, 2021, press briefing.

98. Facebook voluntarily commits itself to be governed by an Oversight Board, which is an independent non-Article III quasi-judicial board that interprets Facebook's content policies by reviewing content moderation decisions.

99. For example, in March of 2021, shortly before Facebook removed Hart's valid public health message, the Oversight Board "upheld Facebook's decision to leave up a post by a state-level medical council in Brazil which claimed that lockdowns are ineffective and had been condemned by the World Health Organization (WHO)."[28]

100. Hart is an executive consultant with over 25 years' experience creating data-driven solutions for Fortune 500 companies and presidential campaigns alike. He is the Chief Data Analyst and founder of RationalGround.com, which helps companies, public policy officials, and parents gauge the impact of COVID-19 across the country.

101. He has used Facebook's services since 2007. He has roughly 1,700 Facebook users who follow his account, and roughly 3,000 Facebook friends.

[27] *Id.*

[28] https://www.oversightboard.com/decision/FB-B6NGYREK/ (last visited October 20, 2022).

102. He uses his Facebook account as a feeder for his other social media accounts, as a networking tool for his consulting business, and as a promotion for his online website, RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

103. Given Hart's use of Facebook for his business, he has purchased advertising on Facebook to promote his consulting business. Over the years, Hart has spent thousands of dollars on Facebook advertisements and has never been gifted free advertisement from Facebook as it gifted the Federal Government Defendants.

104. Hart has also purchased advertising for his consulting clients over the years, spending tens of thousands of dollars.

105. On his website RationalGround.com Hart offers some of his articles exclusively to subscribers. His subscriptions generate thousands of dollars per month.

106. On April 23, 2021, Facebook restricted Hart's ability to post or comment for 24 hours because it claimed the following three posts violated its Community Standards:

    a.    On or around April 14, 2021, Hart created a post on Facebook stating, "If you ever want to know where your BLM donation is going – the co-founder 'trained Marxist' Patrisee Cullars – just bought this amazing home in LA" and it included a link to a picture of the house.

    b.    That same day, a second post of his was removed from Facebook.

    c.    On April 23, 2021, he created a post stating: "This is the truth: Covid is almost gone in America. Hospitals are literally empty. Every willing senior has already been vaccinated. In a few weeks every willing adult can be…

107. Losing the ability to connect with people on the Internet through his Facebook account has harmed Hart's online business and work to help educate and provide information to others. He is also suffering injury because he serves as the administrator of at least one of his client's Facebook pages. While Hart's personal account is suspended, he cannot service this account.

108. Facebook's policies and standards for censorship on its platform and the Internet are constantly shifting and adjusting in accordance with Defendants Biden and Murthy's

FIRST AMENDED COMPLAINT

direction on COVID-19 "misinformation" and the federal government's pre-approved public health message and views allowed on the Internet.

109. For example, since early 2020, there has been widespread debate over whether COVID-19 was made by humans in a lab in Wuhan, China, and escaped from the lab or whether it started naturally through animal-to-human transmission.

110. Despite this public health debate, in February 2020, Facebook announced it would remove posts that suggested the virus was man-made, stating that the theory had been debunked by public health officials.[29]

111. But in May 2021, after Defendant Biden acknowledged the possibility of the theory, Facebook adjusted and reversed its policy to align with Biden's view and announced that it would no longer remove posts expressing that viewpoint.[30] Therefore, Facebook is stifling the free debate of scientific theories and valide public health messages on the Internet such as Hart's by taking its directions from the Federal Government Defendants.

### Twitter

112. Defendant Twitter is also a popular social media site; more than one in five adult Americans use the platform.[31] Of these users, 46% visit Twitter daily.[32]

113. Twitter's services involve creating a personal profile from which its users can "tweet"—meaning post messages, photos, and weblinks to their feed for other users to see. Users can "like", repost, or reply to other users' tweets.

---

[29] Peter Suciu, *Social Media About Face: Facebook Won't Remove Claims Covid Was Man-Made*, Forbes (May 28, 2021, 3:39 PM), *available at* https://www.forbes.com/sites/petersuciu/2021/05/28/social-media-about-face-facebook-wont-remove-claims-covid-was-man-made/?sh=d21e05c6aa1a (last visited Aug. 18, 2021).

[30] Donie O'Sullivan & Jordan Valinsky, *Facebook will no longer remove claims that Covid-19 was man-made*, CNN Business (May 27, 2021, 12:16 PM), *available at* https://www.cnn.com/2021/05/27/tech/facebook-covid-19-origin-claims-removal/index.html (last visited Aug.18, 2021).

[31] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Research Center (Apr. 7, 2021), *available at* https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021/ (last visited July 19, 2021).

[32] *Id.*

114. Twitter allows users to have a dialogue on a variety of issues, including topics of national importance. 42% of U.S. adults on Twitter say they use the site to discuss politics.[33] Twitter is known for being "one of the social media sites with the most news-focused users."[34] 71% of adult Twitter users in the U.S. use the site to get news.[35]

115. "The Twitter Rules" proclaim that "Twitter's purpose is to serve the public conversation."[36]

116. The limitations on that "public conversation" include tweets that threaten or glorify violence or terrorism, sexually exploit children, abuse or harass other people, promote self-harm or suicide, show excessively gory media or adult content within live videos or profile photos, or serve any unlawful purpose.[37]

117. At no point in the terms of service or Twitter Rules does Twitter prohibit valid public health messages and viewpoints that oppose wearing masks. Nor do the terms of service or Twitter Rules state that Twitter would have regular BOLO meetings with the Federal Government Defendants to get instruction and direction on COVID-19 "misinformation."

118. Hart has used Twitter's services since 2007.

119. He uses his Twitter account as a feeder for his other social media accounts, as a networking tool for his consulting business, and to promote his website RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

---

[33] Adam Hughes & Stefan Wojcik, *10 facts about Americans and Twitter*, Pew Research Center (Aug. 2, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/ (last visited July 19, 2021).

[34] *Id.*

[35] *Id.*

[36] The Twitter Rules, Twitter, *available at* https://help.twitter.com/en/rules-and-policies/twitter-rules (last visited Aug. 19, 2021).

[37] *Id.*

120. Hart has purchased ads on Twitter to promote his consulting business. Over the years, he has spent thousands of dollars on Twitter ads. Hart planned to increase his use of Twitter advertising, but Twitter has denied him the ability to do so.

121. Losing the ability to communicate with people through his Twitter account has harmed his online business.

### *Missouri v. Biden*

122. There is a similar pending case to this case, *State of Missouri v. Biden,* Case No. 3:22-cv-01213-TAD-KDM, in the United States District Court for the Western District of Louisiana, Monroe Division.

123. On October 21, 2022, that court issued a 28-page Memorandum Order Regarding Witness Depositions ("Order"). A copy of the Order is attached as ***Exhibit 13.***

124. In the Order, District Judge Terry A. Doughty explained that plaintiffs' claims involve allegations of collusion between the federal government and private social media companies to suppress disfavored views and content on social media platforms by labeling such content "dis-information," "mis-information," and "mal-information."

125. The court further determined that expedited discovery and depositions were appropriate for 10 witnesses. Three of the witnesses to be deposed as set forth in the Order are either parties in this case or play a prominent role in the allegations of this case.

126. The three individuals and witnesses relevant to this case with Judge Doughty's analysis as to why they should submit to depositions and expedited discovery in *State of Missouri v. Biden* are as follows:

- **Jennifer Psaki – Former White House Press Secretary**

127. The *Missouri* court noted that Psaki had made a series of public statements at press conferences in her former role as Press Secretary.

128. Judge Doughty found that Psaki had publicly spoken of pressuring social media companies to censor disfavored views related to COVID-19 misinformation.

129. In ordering her to submit to a deposition, the Court found that "Psaki has made a number of statements that are relevant to the Government's involvement in a number of

social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19."

- **Dr. Vivek Murthy – Surgeon General**

130. The court found that Dr. Murthy, a named defendant in this case, had publicly criticized "tech companies" by asserting that they are responsible for COVID-19 deaths due to their failure to censor "misinformation."

131. And that Murthy also engaged in communications with high-level Facebook executives about the "demand" for greater censorship of COVID-19 "misinformation."

132. Judge Doughty determined that Murthy's actions went beyond the scope of his rank as Surgeon General. In ordering his deposition, the court found that "Dr. Murthy made public statements about how the [social] media companies' failure to censor its users resulted in COVID-19 deaths."

- **Carol Y. Crawford – CDC's Chief of the Digital Media Branch**

133. The court addressed Crawford's organization of the BOLO meetings referenced above, which were essentially meetings that attempted to "quell the spread of misinformation" related to COVID-19.

134. In ordering her deposition, the court found that "Crawford organized meetings and engaged in a number of communications with social-media officials, and the contents of those meetings and communications are highly important for the issues presented by this case."

135. On November 15, 2022, Crawford submitted to a video deposition. A copy of the Crawford deposition transcript is attached as ***Exhibit 14***.

136. In her deposition, Crawford testified that the federal government had insinuated itself into a position of interdependence with the Social Media Defendants by holding regular BOLO meetings to assist them with implementing their misinformation policies on their private platforms and the Internet.

137. For example, Crawford explained this interdependence between the federal government and Social Media Defendants in her deposition as follows:

Q; What's BOLO?

A: Be on the lookout.

Q. Why were you concerned about this?

A. Similar to all the other BOLOs, we still thought it was good to point out if we had facts around something that was widely circulating as a cause of misinformation to the platforms to assist them in whatever they were going to do with their policy or not do. And this was one that was kind of growing, and we had a lot of facts about it, and the team was concerned about this, this misunderstanding.

Crawford Depo., *Exhibit 14*, p. 153-54, Lines 20-26.

138. In addition to the three individuals above named in the Order in *Missouri v. Biden*, emails were produced in discovery in that case from federal government employee Rob Flaherty to anonoymous Facebook officials. Attached hereto as *Exhibit 15* are the Flaherty emails in and around March of 2021.

139. The Flaherty emails were not produced by the federal government to Hart in this case pursuant to his FOIA claim.

140. The Flaherty emails' subject line is, "You are hiding the ball." The Flaherty emails may be summarized as Flaherty dressing down and admonishing a Facebook official for the private social media company's lack of transparency to the federal government regarding vaccine hesitancy and borderline content misinformation allowed to be posted on Facebook's platform.

141. For example, on March 15, 2021, Flaherty writes to this Facebook official and says, "I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you are trying, we want to know how we can help, and we want to know that you are not playing a shell game with us when we ask you what is going on."

142. And the anononymous Facebook official responds on behalf of the private social media company by groveling and asking Flaherty to hold Facebook "accountable."

143. For example, on March 15, 2021, the anonymous Facebook official responds to Flaherty and says, "We obviously have work to do to gain your trust. You mention that you are not trying to play "gotcha" with us – I appreciate the approach you are taking to continued discussions. We are also working to get you useful information that's on the

level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."

### *The Federal Defendants Engaged in Illegal Jawboning*

144. It was not essential for him to perform his duties and make decisions as President of the United States for Biden to direct the Social Media Defendants to employ his 4 recommendations for improvement; design algorithms to target opposing views of the government's COVID-19 message on the Internet; declare publicly they were "killing people;" and to adjust their misinformation policies related to COVID-19.

145. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

146. It was not essential for him to perform his duties and make decisions as Surgeon General for Murthy to engage in communications with high-level Facebook executives and demand greater censorship of COVID-19 "misinformation;" direct the Social Media Defendants to employ the 4 recommendations for improvement; design algorithms to target opposing views of the government's COVID-19 message on the Internet; and to adjust their misinformation policies related to COVID-19.

147. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

148. It was not essential for her to perform her duties and make decisions on behalf of the CDC for Crawford to conduct regular BOLO meetings with the Social Media Defendants to assist them with their misinformation policies related to COVID-19; and to negotiate with Facebook for the federal government to receive a $15 million advertising credit to promote its COVID-19 message on Facebook's platform that accesses the Internet.

149. Rather, the desired effect of her actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

150. It was not essential for him to perform his duties and make decisions on behalf of the White House for Flaherty to admonish an anonymous Facebook official and demand greater transparency from Facebook and to hold it accountable for COVID-19 "borderline content information" as he defined it that in his view was being posted to Facebook's private platform and on the Internet.

151. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate Facebook so it would censor its users' speech that was in opposition to the federal government's message on COVID-19.

### *Elon Musk's public release of the Twitter Files*

152. After purchasing and taking control of Twitter in late Fall of 2022 and firing most of its upper level management and many employees, Elon Musk released a number of internal Twitter documents to various journalists. Referred to as the "Twitter Files," they were then released to the public and were summarized into 15 Parts.[38]

153. In Part 10 of the summary of the Twitter Files, it was revealed that the United States government pressured Twitter and other social media platforms to elevate certain content and suppress other content about COVID-19.

154. The Twitter Files revealed three serious problems with Twitter's process related to moderating COVID-19 "misinformation:"[39]

- o First, much of the content moderation was conducted by bots, trained on machine learning and AI—impressive in their engineering, yet still too crude for such nuanced work.
- o Second, contractors, in places like the Philippines, also moderated content. They were given decision trees to aid in the process, but tasking non experts to adjudicate tweets on complex topics like myocarditis and mask efficacy data was destined for a significant error rate.
- o Third, most importantly, the buck stopped with higher level employees at Twitter who chose the inputs for the bots and decision trees, and

---

[38] *See The Twitter Files Parts 1-15: A Comprehensive Summary, Analysis, and Discussion of Ramifications for American Institutions (updated 1.19.23) – Stopping Socialism*, available at https://stoppingsocialism.com/2023/01/the-twitter-files-comprehensive-summary-analysis-and-discussion-of-ramifications-for-american-institutions/

[39] *See id* at Part 10.

subjectively decided escalated cases and suspensions. As it is with all people and institutions, there was individual and collective bias. With Covid, this bias bent heavily toward establishment dogmas.

155. And the Twitter Files revealed that on September 3, 2021, former FDA commissioner and Pfizer board member Dr. Scott Gottlieb, contacted Todd O'Boyle, a top lobbyist in Twitter's Washington office and the White House's Twitter point of contact. Gottlieb complained to O'Boyle about a tweet from Justin Hart, known to be a "lockdown and Covid vaccine skeptic with more than 100,000 Twitter followers."[40]

### COUNT I – Free Speech

**Murthy, Biden, Crawford, Flaherty, Facebook, and Twitter violated the Free Speech clause of the First Amendment when they acted jointly to remove Hart's social media posts from the Internet and block him from using his accounts.**

156. The allegations in the preceding paragraphs are incorporated herein by reference.

157. "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger*, 515 U.S. at 819.

158. Murthy, Biden, Crawford, and Flaherty knowingly engaged in viewpoint discrimination when they directed Facebook and Twitter to remove from the Internet social media posts and valid public health messages like those of Hart's that contained a viewpoint on COVID-19 that did not fit with their own political public health narrative.

159. Murthy, Biden, Crawford, and Flaherty further knowingly engaged in viewpoint discrimination against Hart when they and Executive Branch officials (1) directed Facebook and Twitter representatives to employ the federal government's "4 specific recommendations for improvement;" (2) held BOLO meetings with Facebook and Twitter representatives to target opposing public health messages on the Internet; (3) directed the Social Media Defendants to design algorithms to specifically target valid public health messages on the Internet opposing the government's COVID-19 views resulting in 20

---

[40] *See id*. at Part 13.

million pieces of content being removed from platforms and the Internet, including Hart's valid public health messages; (4) directed Facebook to adjust its policies regarding COVID-19 "misinformation" on the Internet at or about the time of Hart's valid public health message; and (5) negotiated and received a $15 million advertising credit from Facebook to advertise the government's unchallenged COVID-19 public health message on the Internet shortly before Hart's valid public messages were removed.

160.  Murthy, Biden, Crawford, and Flaherty's unconstitutional viewpoint discrimination acts that deprived Hart of his First Amendment rights were further contrary to the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

161. Private companies engage in state action when they jointly work with government officials to deprive individuals of their constitutional rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

162. "The Supreme Court has articulated four tests for determining whether a non-governmental person's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Ohno,* 723 F.3d at 995.

163. "Joint action exists where the government affirms, authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a private party." *Id.* at 996.

164. The Ninth Circuit finds joint action when "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (cleaned up). "This requirement can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Id.*

165. And threats from government officials that amount to a censorship scheme violate the First Amendment. *See Bantam Books,* 372 U.S. at 64; *Writers Guild of America*, 609 F. 2d at 365.

166. "Particularly relevant here is the maxim that if the state knowingly accepts the benefits derived from unconstitutional behavior, then the conduct can be treated as state action." *Tsao,* 698 F.3d at 1140.

167. Facebook and Twitter engaged in state action when they removed valid public health messages and posts like Hart's from their platforms and the Internet at the request of Murthy, Biden, Crawford, and Flaherty based on the viewpoint of those posts on COVID-19 that differed from the public health message of the federal government.

168. Facebook and Twitter worked in concert, substantially cooperated with, and/or conspired with Murthy, Biden, Crawford, and Flaherty to deprive Hart of his First Amendment right to free speech to post valid public health messages on the Internet.

169. Murthy, Biden, Crawford, and Flaherty affirmed, authorized, encouraged, and/or facilitated Facebook and Twitter's unconstitutional conduct of censorship of Hart's posts and valid public health messages on the Internet.

170. Facebook and Twitter either were willful participants when they removed Hart's posts from the Internet based on his viewpoint at the direction of Murthy, Biden, Crawford, and Flaherty or were subject to government compulsion, either of which makes the removal of the posts state action and transforms Facebook and Twitter into state actors.

171. Murthy, Biden, Crawford, and Flaherty knowingly accepted the benefits of censored speech derived from the unconstitutional behavior of Facebook and Twitter in removing posts from the Internet based on a valid COVID-19 public health viewpoint with which Murthy, Biden, Crawford, and Flaherty disagreed.

172. Further, Murthy, Biden, Crawford, Flaherty, and Executive Branch officials knowingly accepted the benefits of $15 million in advertising credit from Facebook to promote the federal government's unchallenged public health COVID-19 viewpoint and

message on the Internet, a public forum Congress intended to be a marketplace of ideas free from government regulation.

173. Although Hart remains active on Facebook and Twitter in an attempt to rebuild his brand and continue to post valid public health messages, Facebook and Twitter now require that Hart and other users in the future express a government-approved viewpoint to use their platforms that reach the Internet and that are subject to the COVID-19 public health policies and control of the federal government, and such posts that reach the Internet are no longer subject to the Social Media Defendants' policies.

174. Further, Facebook adjusts and deviates from its voluntary submission to its independent Oversight Board on COVID-19 public health misinformation and instead follows the direction of Murthy, Biden, Crawford, and Flaherty's recommendations.

175. Hart is entitled to declaratory and injunctive relief against Murthy, Biden, Crawford, and Flaherty for violating his right to free speech on the Internet under the First Amendment and to stop them from directing Facebook and Twitter to utilize the federal government's policies on what constitutes COVID-19 "misinformation" on their platforms and Internet.

176. Hart is entitled to declaratory and injunctive relief as well as compensatory and nominal damages from Facebook and Twitter for violating his right to free speech on the Internet under the First Amendment and to stop them from adjusting their algorithms and policies to align with the federal government's COVID-19 "misinformation" policies.

### COUNT II - Promissory Estoppel

**Facebook and Twitter committed promissory estoppel by not fulfilling their promise to Hart to use their social media platforms to reach an audience on the Internet in furtherance of his business.**

177. The allegations in the preceding paragraphs are incorporated herein by reference.

178. Facebook and Twitter made "a clear and unambiguous promise" to Hart that he could use their services to communicate and network with other Facebook and Twitter

users on the Internet. *Bushell v. JPMorgan Chase Bank, N.A.*, 163 Cal. Rptr. 3d 539, 550 (Cal. Ct. App. 2013).

179.  In making this promise, Facebook and Twitter did not include a provision that they would censor speech on the Internet opposing masks at the direction of the federal government.

180.  Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's and Twitter's promise when he started using their services to speak with and network with other Facebook and Twitter users on the Internet to promote his business. *Bushell*, 163 Cal. Rptr. 3d at 550.

181. Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's promise when he invested substantial sums of money to advertise on Facebook and Twitter and their platforms that reach an audience on the Internet. *Id.*

182.  Facebook's and Twitter's removal from the Internet and flagging of Hart's posts and suspension of his account for engaging in speech caused his reliance on their promises to be to the detriment of his business, finances, and reputation.

183. As the result of this detrimental reliance, Hart suffered monetary and non-monetary damages.

184. Hart is entitled to monetary relief from Facebook and Twitter for committing the tort of promissory estoppel.

## COUNT III - Intentional Interference with a Contract

**Facebook committed intentional interference with a contract by interfering with Hart's contract with Donorbureau, LLC.**

185. The allegations in the preceding paragraphs are incorporated herein by reference.

186. To establish a claim of intentional interference with a contractual relationship, the claimant must show (1) a valid contract between claimant and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual

relationship; and (5) resulting damage. *Davis v. Nadrich*, 94 Cal. Rptr. 3d 414, 421 (Cal. Ct. App. 2009).

187.  California law does not require that the defendant act with the specific intent to interfere. *See id.* at 422; *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513 (1998). The tort is applicable if the defendant knows that the interference is substantially certain or certain to happen as a result of defendant's actions. *Nadrich*, 94 Cal. Rptr. 3d at 422.

188.  Hart maintains a valid employment contract with Donorbureau, LLC ("Donorbureau"), a Virginia-based limited liability company.

189.  As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

190. Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

191. Facebook intentionally suspended Hart's use of his personal Facebook account and removed his posts from the Internet, and Facebook knew and intended that such action would prevent Hart from doing his work as an Administrator on the Donorbureau account.

192. Therefore, Facebook intentionally interfered with Hart's contract with Donorbureau.

193. Not being able to service Donorbureau's Facebook page placed Hart in breach of his contract with Donorbureau.

194. Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

195. Hart is entitled to monetary relief from Facebook for intentionally interfering with his contract with Donorbureau.

**COUNT IV - Negligent Interference with a Prospective Economic Advantage**

**Facebook committed negligent interference with a prospective economic advantage by interfering with Hart's contract with Donorbureau, LLC.**

196. The allegations in the preceding paragraphs are incorporated herein by reference.

197. To establish a claim of negligent interference with a prospective economic advantage, a claimant must show (1) the existence of a valid contractual relationship between the plaintiff and a third party containing the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge, actual or construed, of the relationship; (3) the defendant's knowledge, actual or construed, that the relationship would be disrupted if the defendant failed to act with reasonable care; (4) the defendant's failure to act with reasonable care; (5) actual disruption of the relationship; and (6) resulting economic harm. *Nelson v. Tucker Ellis, LLP*, 262 Cal. Rptr. 3d 250, 264 n.5 (Cal. App. Ct. 2020).

198. Hart maintains a valid employment contract with Donorbureau, LLC, a Virginia-based limited liability company.

199. As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

200. Hart has a probability of future economic benefit by fulfilling the terms of his employment contract with Donorbureau.

201. Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

202. When Facebook suspended Hart's use of his personal Facebook account and removed his posts from the Internet, it knew or should have known that Hart's work as an Administrator on the Donorbureau account and his relationship with Donorbureau would be disrupted as a result of its negligent actions.

203. In not providing Hart any avenue to access the Donorbureau account, Facebook failed to act with reasonable care.

204. Facebook's act of suspension caused an actual disruption in the relationship between Hart and Donorbureau because he could not post content to the site or on the Internet or make other changes in his work to increase Donorbureau's revenue.

205. Therefore, Facebook negligently interfered with Hart's prospective economic advantage from his contractual relationship with Donorbureau.

206. Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

207. Hart is entitled to monetary relief from Facebook for negligently interfering with the prospective economic advantage resulting from his contract with Donorbureau.

## PRAYER FOR RELIEF

Plaintiff Justin Hart respectfully requests that this Court enter judgment in his favor on every claim set forth above and award him the following relief:

A. Declare that the actions of Murthy, Biden, Crawford, Flaherty, Facebook, and Twitter constitute a violation of the Free Speech Clause of the First Amendment by denying Hart the ability to speak on the Internet through the private social media platforms of Facebook and Twitter;

B. Enjoin Murthy, Biden, Crawford, and Flaherty from directing in the future social media companies such as the Social Media Defendants to censor information and speech on platforms and the Internet with which Murthy, Biden, Crawford, and Flaherty disagree;

C. Enjoin Facebook and Twitter from removing in the future Hart's posts from the Internet or suspending his posts at the direction of Murthy, Biden, Crawford, and Flaherty or based on the federal government's "misinformation" policies;

D. Enjoin Murthy, Biden, Crawford, and Flaherty from directing social media companies such as the Social Media Defendants from censoring speech in the future;

E. Award Hart compensatory damages in the amount of his past, present, and future lost income resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

F. Award Hart compensatory damages in the amount of a return of the money he spent on Facebook and Twitter advertisements because of Facebook's and Twitter's actions of

promissory estoppel and Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

G. Award Hart compensatory damages in an amount to fully compensate him for the time he spent building a following on the Internet through Facebook and Twitter that has now been wasted by Facebook's and Twitter's actions of promissory estoppel and Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

H. Award Hart compensatory damages in the amount of the harm to his reputation on the Internet resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage; and

I. Award any further relief to which Hart may be entitled, including reasonable attorneys' fees and costs.

Dated: February 15, 2023      Respectfully submitted,

s/ Daniel Suhr
Daniel Suhr, pro hac vice admitted
dsuhr@libertyjusticecenter.org
M.E. Buck Dougherty III, pro hac vice admitted
bdougherty@libertyjusticecenter.org
James McQuaid, pro hac vice admitted
jmcquaid@libertyjusticecenter.org
LIBERTY JUSTICE CENTER
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Telephone: 312-637-2280
Facsimile: 312-263-7702

Robert Tyler (STATE BAR NO. 179572)
rtyler@tylerbursch.com
Nada Higuera (STATE BAR NO. 299819)
nhiguera@tylerbursch.com
TYLER BURSCH, LLP
25026 Las Brisas Road
Murrieta, California 92562

Telephone: 951-600-2733
Facsimile: 951-600-4996

*Attorneys for Plaintiff Justin Hart*

# EXHIBIT G

No. 23A-_____

_____
_____


IN THE SUPREME COURT OF THE UNITED STATES

_____


VIVEK H. MURTHY, U.S. SURGEON GENERAL, ET AL.,
APPLICANTS

v.

MISSOURI, ET AL.

_____


APPLICATION FOR A STAY OF THE INJUNCTION ISSUED BY
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

_____


ELIZABETH B. PRELOGAR
  Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____
_____

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Surgeon General Vivek H. Murthy and Chief Engagement Officer for the Surgeon General, Katharine Dealy, along with their directors, administrators and employees; White House Press Secretary, Karine Jean-Pierre; Counsel to the President, Edward N. Siskel; White House Partnerships Manager, Aisha Shah; Special Assistant to the President, Sarah Beran; Administrator of the United States Digital Service within the Office of Management and Budget, Mina Hsiang; White House National Climate Advisor, Ali Zaidi; White House Senior COVID-19 Advisor, formerly Andrew Slavitt; Deputy Assistant to the President and Director of Digital Strategy, formerly Rob Flaherty; White House COVID-19 Director of Strategic Communications and Engagement, Dori Salcido; White House Digital Director for the COVID-19 Response Team, formerly Clarke Humphrey; Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team, formerly Benjamin Wakana; Deputy Director for Strategic Communications and External Engagement for the White House COVID-19 Response Team, formerly Subhan Cheema; White House COVID-19 Supply Coordinator, formerly Timothy W. Manning; and the Chief Medical Advisor to the President, formerly Dr. Anthony S. Fauci, along with their directors, administrators and employees; the Centers for Disease Control and Prevention (CDC), and specifically the following employees: Carol Y. Crawford, Chief of the

ii

Digital Media Branch of the CDC Division of Public Affairs; Jay
Dempsey, Social-Media Team Leader, Digital Media Branch, CDC Di-
vision of Public Affairs; and Kate Galatas, CDC Deputy Communica-
tions Director; and the Federal Bureau of Investigation (FBI), and
specifically the following employees:  Section Chief, FBI Foreign
Influence Task Force, formerly Laura Dehmlow; and Elvis M. Chan,
Supervisory Special Agent of Squad CY-1 in the FBI San Francisco
Division.*

---

    *   All individual defendants were sued in their official
capacities and their successors, if any, have automatically been
substituted in their respective places.  See Sup. Ct. R. 35.3;
Fed. R. App. P. 43(c)(2); Fed. R. Civ. P. 25(d).
    The following defendants are not applicants here because the
court of appeals reversed the entry of injunctive relief against
them:  the Department of Health and Human Services (HHS); the
National Institute of Allergy and Infectious Diseases (NIAID);
Xavier Becerra, Secretary of HHS; Dr. Hugh Auchincloss, Director
of NIAID; Yolanda Byrd, HHS Digital Engagement Team; Christy Choi,
HHS Office of Communications; Ashley Morse, HHS Director of Digital
Engagement; Joshua Peck, HHS Deputy Assistant Secretary, Deputy
Digital Director of HHS (formerly Janell Muhammed); along with
their secretaries, directors, administrators, and employees;
United States Census Bureau, Jennifer Shopkorn, Census Bureau Sen-
ior Advisor for Communications, Division Chief for the Communica-
tions Directorate, and Deputy Director of the Census Bureau Office
of Faith Based and Neighborhood Partnerships, along with their
secretaries, directors, administrators and employees; the United
States Department of Justice, along with its secretary, director,
administrators, and employees; the Cybersecurity and Infrastruc-
ture Security Agency (CISA); Jen Easterly, Director of CISA; Kim
Wyman, Senior Cybersecurity Advisor and Senior Election Security
Leader; Lauren Protentis; Geoffrey Hale; Allison Snell; Brian
Scully, officials of CISA; the United States Department of Homeland
Security (DHS); Alejandro Mayorkas, Secretary of Homeland Secu-
rity; Robert Silvers, Under-Secretary of the Office of Strategy,
Policy and Plans; Samantha Vinograd, Senior Counselor for National
Security in the Office of the Secretary for DHS, along with their
secretary, directors, administrators, and employees; the United
States Department of State (State Department); Leah Bray, Acting

iii

Respondents (plaintiffs-appellees below) are the State of Missouri; the State of Louisiana; Dr. Aaron Kheriaty; Dr. Martin Kulldorff; Jim Hoft; Dr. Jayanta Bhattacharya; and Jill Hines.

## RELATED PROCEEDINGS

United States District Court (W.D. La.):

    <u>Missouri</u> v. <u>Biden</u>, No. 22-cv-1213 (July 4, 2023)

United States Court of Appeals (5th Cir.):

    <u>Missouri</u> v. <u>Biden</u>, No. 22-30531 (Nov. 15, 2022)

    <u>In re Vivek H. Murthy</u>, No. 22-30697 (Feb. 24, 2023)

    <u>Missouri</u> v. <u>Biden</u>, No. 23-30445 (Sept. 8, 2023)

---

Coordinator of the State Department's Global Engagement Center (GEC); Alexis Frisbie, State Department Senior Technical Advisor and Member of the Technology Engagement Team at the GEC; Daniel Kimmage, Acting Coordinator of the GEC, along with their secretary, directors, administrators, and employees.

    The following defendants are not applicants here because the district court did not enter injunctive relief against them:  Joseph R. Biden, Jr., President of the United States; the Food and Drug Administration; the Department of the Treasury; the Department of Commerce; Erica Jefferson; Michael Murray; Wally Adeyamo; Steven Frid; Brad Kimberly; Kristen Muthig; the Disinformation Governance Board; and Nina Jankowicz.

IN THE SUPREME COURT OF THE UNITED STATES
_____

No. 23A-_____

VIVEK H. MURTHY, U.S. SURGEON GENERAL, ET AL.,
APPLICANTS

v.

MISSOURI, ET AL.
_____

APPLICATION FOR A STAY OF THE INJUNCTION ISSUED BY
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
_____

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants Vivek H. Murthy, U.S. Surgeon General, et al., respectfully applies for a stay of a preliminary injunction issued on July 4, 2023, by the United States District Court for the Western District of Louisiana (App., _infra_, 1a-162a, 176a), as modified by the Fifth Circuit (_id._ at 178a-252a), pending the filing and disposition of the government's forthcoming petition for a writ of certiorari and any further proceedings in this Court.  The government also respectfully requests an administrative stay while the Court considers this application.

This application concerns an unprecedented injunction installing the United States District Court for the Western District of Louisiana as the superintendent of the Executive Branch's communications with and about social-media platforms -- including

senior White House officials' speech addressing some of the most salient public issues of the day. The lower courts held that federal officials had transformed the private platforms' content-moderation decisions into state action and violated the First Amendment by urging platforms to remove COVID-19 misinformation, highlighting the risk of disinformation from foreign actors, and responding to the platforms' inquiries about matters of public health. The courts then entered a sweeping preliminary injunction governing thousands of federal officials' and employees' speech concerning any content posted on any social-media platform by anyone. That injunction flouts bedrock principles of Article III, the First Amendment, and equity.

First, respondents lack Article III standing. Respondents are five individual social-media users and two States. The Fifth Circuit held that they have standing because their posts have been moderated by social-media platforms. But respondents failed to show that those actions were fairly traceable to the government or redressable by injunctive relief. To the contrary, respondents' asserted instances of moderation largely occurred <u>before</u> the allegedly unlawful government actions. The Fifth Circuit also held that the state respondents have standing because they have a "right to listen" to their citizens on social media. App., <u>infra</u>, 204a. But the court cited no precedent for that boundless theory, which would allow any state or local government to challenge any alleged violation of any constituent's right to speak.

Second, the Fifth Circuit's decision contradicts fundamental First Amendment principles.  It is axiomatic that the government is entitled to provide the public with information and to "advocate and defend its own policies."  Board of Regents v. Southworth, 529 U.S. 217, 229 (2000).  A central dimension of presidential power is the use of the Office's bully pulpit to seek to persuade Americans -- and American companies -- to act in ways that the President believes would advance the public interest.  President Kennedy famously persuaded steel companies to rescind a price increase by accusing them of "ruthless[ly] disregard[ing]" their "public responsibilities."  John F. Kennedy Presidential Library & Museum, News Conference 30 (Apr. 11, 1962), perma.cc/M7DL-LZ7N.  President Bush decried "irresponsible" subprime lenders that shirked their "responsibility to help" distressed homeowners.  The White House, President Bush Discusses Homeownership Financing (Aug. 31, 2007), perma.cc/DQ8B-JWN4.  And every President has engaged with the press to promote his policies and shape coverage of his Administration.  See, e.g., Graham J. White, FDR and the Press (1979).

Of course, the government cannot punish people for expressing different views.  Nor can it threaten to punish the media or other intermediaries for disseminating disfavored speech.  But there is a fundamental distinction between persuasion and coercion.  And courts must take care to maintain that distinction because of the drastic consequences resulting from a finding of coercion:  If the

4

government coerces a private party to act, that party is a state actor subject "to the constraints of the First Amendment." Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1933 (2019). And this Court has warned against expansive theories of state action that would "eviscerate" private entities' "rights to exercise editorial control over speech and speakers on their properties or platforms." Id. at 1932.

The Fifth Circuit ignored those principles. It held that officials from the White House, the Surgeon General's office, and the FBI coerced social-media platforms to remove content despite the absence of even a single instance in which an official paired a request to remove content with a threat of adverse action -- and despite the fact that the platforms declined the officials' requests routinely and without consequence. Indeed, the Fifth Circuit suggested that any request from the FBI is inherently coercive merely because the FBI is a powerful law enforcement agency. And the court held that the White House, the FBI, and the CDC "significantly encouraged" the platforms' content-moderation decisions -- and thus transformed those decisions into state action -- on the theory that officials were "entangled" in the platforms' decisions. App., infra, 235a. The court did not define that novel standard, but found it satisfied primarily because platforms requested and relied upon CDC's guidance on matters of public health.

The implications of the Fifth Circuit's holdings are startling. The court imposed unprecedented limits on the ability of

the President's closest aides to use the bully pulpit to address matters of public concern, on the FBI's ability to address threats to the Nation's security, and on the CDC's ability to relay public-health information at platforms' request.  And the Fifth Circuit's holding that platforms' content-moderation decisions are state action would subject those private actions to First Amendment constraints -- a radical extension of the state-action doctrine.

Third, the lower courts' injunction violates traditional equitable principles.  An injunction must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Califano v. Yamasaki, 442 U.S. 682, 702 (1979). Here, however, the injunction sweeps far beyond what is necessary to address any cognizable harm to respondents:  Although the district court declined to certify a class, the injunction covers the government's communications with all social-media platforms (not just those used by respondents) regarding all posts by any person (not just respondents) on all topics.  And it forces thousands of government officials and employees to choose between curtailing their interactions with (and public statements about) social-media platforms or risking contempt should the district court conclude that they ran afoul of the Fifth Circuit's novel and ill-defined concepts of coercion and significant encouragement.

The district court's injunction has been stayed during the Fifth Circuit proceedings, and the Fifth Circuit extended an administrative stay through Monday, September 18, to allow the gov-

ernment to seek relief from this Court.  If allowed to take effect, the injunction would impose grave and irreparable harms on the government and the public.  In contrast, a continued stay pending further proceedings in this Court would impose no cognizable harm on respondents.  The Court should therefore stay the injunction in full pending the filing and disposition of the government's forth-coming petition for a writ of certiorari.  At a minimum, the Court should stay the injunction insofar as it applies beyond any content posted by the individual respondents themselves.

To expedite further proceedings, the government intends to file a petition for a writ of certiorari by October 13, 2023.  If the Court wishes to expedite matters further, it could construe this application as a petition for a writ of certiorari and grant the petition without further briefing.  See, e.g., Harrington v. Purdue Pharma, L.P., No. 23A87 (Aug. 10, 2023).

## STATEMENT

1.   Social-media platforms allow billions of people to share content instantaneously around the globe.  Cf. Twitter, Inc. v. Taamneh, 143 S. Ct. 1206, 1216 (2023).  The unprecedented scope and speed of social-media communications has obvious benefits. But it also carries significant hazards, including the use of social media platforms to recruit terrorists, harm children, and spread misinformation and disinformation.[1]

---

[1]  See, e.g., Radicalization:  Social Media and The Rise of Terrorism:  Hearing Before the Subcomm. on Nat'l Sec. of the H.

7

Social-media platforms have long sought to address those hazards -- and thereby preserve the value of their products -- by adopting and enforcing content-moderation policies.  C.A. ROA 21,943-21,961.  In March 2020, for example, Twitter amended its content-moderation policies in response to the COVID-19 pandemic "to address content that goes directly against guidance from authoritative sources of global and local public health information."  Id. at 22,539.

The federal government also has sought to mitigate those hazards, including by calling attention to potentially harmful content so platforms can apply their content-moderation policies. For example, the FBI routinely shares information with platforms about accounts that appear to be used by covert foreign malign actors to influence the American public or by foreign terrorist organizations to recruit supporters.  C.A. ROA 23,859-23,860, 23,866.  And during the acute phase of the pandemic, the CDC alerted platforms to "COVID-19 misinformation narratives that CDC has identified" as "prevalent" online.  Id. at 23,097.

Senior government officials likewise have spoken publicly about the harms that can arise from the rapid spread of falsehoods through social media.  In May 2021, for example, the White House

---

Comm. on Oversight & Gov't Reform, 114th Cong., 1st Sess. (2015); Protecting Our Children Online:  Hearing Before the S. Comm. on the Judiciary, 118th Cong., 1st Sess. (2023); Disinformation Nation: Social Media's Role in Promoting Extremism & Misinformation:  Virtual Joint Hearing Before the Subcomm. on Consumer Prot. & Commerce of the H. Comm. on Energy & Commerce, 117th Cong., 1st Sess. (2021).

Press Secretary expressed the President's view that social-media platforms have a "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections." The White House, Press Briefing (May 5, 2021), https://perma.cc/4ZGE-N9QL. But she also emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address * * * disinformation" and "misinformation." Ibid.

2. Respondents' operative complaint names 67 federal entities and officials and characterizes their communications with and about social-media platforms as a "sprawling federal 'Censorship Enterprise.'" C.A. ROA 25,119. After allowing extensive discovery, the district court granted respondents' motion for a preliminary injunction. App., infra, 1a-155a.

The district court concluded that seven groups of government defendants "coerced" or "significantly encouraged" social-media platforms to moderate speech on the companies' platforms, in violation of the First Amendment. App., infra, 95a-116a. The court enjoined those defendants, as well as hundreds of thousands of unnamed employees of the defendant agencies, from engaging in ten types of communications regarding content moderation, such as "communication of any kind with social-media companies urging, encouraging, pressuring, or inducing" the "removal, deletion, suppression, or reduction of content"; "urging" those companies "to

change their guidelines for removing" content; and "flagging con-
tent or posts" for potential removal.  Id. at 159a-160a.  The
injunction also contained a series of carveouts that purported to
permit the government to inform social-media companies of postings
involving "criminal activity," "national security threats," and
certain other categories of content.  Id. at 160a-161a.

3.  The government appealed and sought a stay pending ap-
peal.  The Fifth Circuit granted an administrative stay and expe-
dited the appeal.  App., infra, 177a-178a.  After briefing and
argument, the court vacated the preliminary injunction in part and
modified the terms of what it left in place.  Id. at 179a-252a.

a.  The Fifth Circuit found that individual respondents have
Article III standing on the theory that the platforms' past mod-
eration of their posts and accounts caused respondents "ongoing
harm" because they now "self-censor" their social-media activity.
App., infra, 196a-197a.  The court also found "a substantial risk"
that the individual respondents' injuries "will reoccur" because
platforms "continue[] to enforce a robust general misinformation
policy" and the government "continue[s] to be in regular contact
with" the platforms.  Id. at 197a-198a.  The court found that
respondent States have standing, reasoning that the past removal
of content posted by a state legislator, a state agency, and a
county implicated the States' "'right' to speak," id. at 203a
(citation omitted), and that the States have a right "to listen to
their citizens" on social media, id. at 204a.

10

b.   On the merits, the Fifth Circuit held that the private platforms' decisions to moderate content constituted "state action" subject to the First Amendment.  App., <u>infra</u>, 206a-240a. The court explained that state action exists "when a private party is coerced or significantly encouraged by the government to such a degree that its 'choice'  * * *  'must in law be deemed to be that of the'" government.  <u>Id.</u> at 206a (citation omitted).

The Fifth Circuit stated that "coercion" means "the government compelled the decision by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply."  App., <u>infra</u>, 218a.  But the court held that even absent a threat of punishment, coercion may be found by an unspecified weighting of four factors:  "(1) word choice and tone"; "(2) the recipient's perception"; "(3) the presence of authority"; and "(4) whether the speaker refers to adverse consequences."  <u>Id.</u> at 218a-219a.  The court also stated that "significant encouragement" means the government "exercise[d] active, meaningful control over the private party's decision."  <u>Id.</u> at 218a.  But the court then held that such "control" could be established by mere "entanglement in a party's independent decision-making."  <u>Ibid.</u>[2]

Applying those standards, the Fifth Circuit found that officials from the White House and the Office of the Surgeon General

---

[2]  The Fifth Circuit also stated that "significant encouragement" could be established by "direct involvement in carrying out the decision," App., <u>infra</u>, 209a, but made no finding of such involvement on the facts here.

11

engaged in both coercion and significant encouragement.  App.,
infra, 220a-232a.  The court asserted that White House officials
made threats to social-media companies, though it did not cite any
communication threatening any specific action.  See id. at 221a-
222a.  The court also found that its four-factor test weighed in
favor of finding coercion, especially in light of officials' "tone"
and "demeanor."  Id. at 222a.  And the court found significant
encouragement because officials "entangled themselves in the plat-
forms' decision-making processes" by engaging in frequent commu-
nications and requests for information.  Id. at 230a.

The Fifth Circuit found the FBI's communications both coer-
cive and significantly encouraging even though it acknowledged
that the FBI did not "reference adverse consequences" in allegedly
"urg[ing] the platforms to take down content."  App., infra, 232a-
233a.  The court reasoned that the FBI has "inherent authority" as
a law-enforcement agency and that platforms must have "perceived
the FBI's messages as threats" because they sometimes removed the
relevant content.  Id. at 233a-234a.

As for the CDC, the Fifth Circuit acknowledged that its "re-
quests for removal were not coercive."  App., infra, 235a.  But
the court nonetheless found that CDC officials engaged in signif-
icant encouragement because they provided advice on COVID-related
misinformation, which the court characterized as making the
platforms "dependen[t]" on the CDC in applying their content-

12

moderation policies.  Id. at 236a.[3]

c.  On the equities, the Fifth Circuit found that respondents likely will suffer irreparable harm because federal officials continue to communicate with social-media companies. App., infra, 241a-242a.  The court acknowledged that an injunction could impair the government's legitimate interest "in engaging with social-media companies, including on issues such as misinformation and election interference," as well as "the Executive Branch's ability to 'persuade' the American public."  Id. at 242a.  But the court believed it could "address[]" those "legitimate concerns" by "modifying the scope of the injunction."  Id. at 243a.  The court did not otherwise address or weigh harms to the public interest.

d.  The court of appeals acknowledged that the district court's original injunction was both vague and overbroad, and accordingly vacated nine of the ten prohibitions and rewrote the remaining prohibition to read:

> Defendants, and their employees and agents, shall take no actions, formal or informal, directly or indirectly, to coerce or significantly encourage social-media companies to remove, delete, suppress, or reduce, including through altering their algorithms, posted social-media content containing protected free speech.  That includes, but is not limited to, compelling the platforms to act, such as by intimating that some form of punishment will follow a failure to comply with any request, or supervising, directing, or otherwise meaningfully controlling the social-media companies' decision-making processes.

---

[3]  The Fifth Circuit found that the remaining enjoined defendants did not engage in coercion or significant encouragement, and thus reversed the injunction as to them.  App., infra, 237a-238a, 252a.

13

App., infra, 249a; see id. at 243a-247a.  The court rejected the government's request to limit any relief to conduct seeking the removal or suppression of the respondents' own content, holding that broader relief was appropriate because "[t]he harms that radiate from [the challenged] conduct extend far beyond just [respondents]; it impacts every social-media user."  Id. at 250a.

4.   The court of appeals "extended the administrative stay for ten days following the date [of its decision] pending an application to" this Court.  App., infra, 252a.  Accordingly, the administrative stay will last through September 18, 2023.

**ARGUMENT**

The government respectfully requests that this Court stay the preliminary injunction, as modified by the court of appeals, pending the filing and disposition of the government's forthcoming petition for a writ of certiorari.  Such a stay is warranted if there is "(1) 'a reasonable probability' that this Court will grant certiorari, (2) 'a fair prospect' that the Court will then reverse the decision below, and (3) 'a likelihood that irreparable harm will result from the denial of a stay.'"  Maryland v. King, 567 U.S. 1301, 1302 (2012) (Roberts, C.J., in chambers) (brackets and citation omitted).  All of those requirements are met here.

**I.   THIS COURT WILL LIKELY GRANT CERTIORARI**

This Court will likely grant certiorari because the Fifth Circuit's decision adopts a novel and disruptive conception of the state-action doctrine, affirms an unprecedented injunction that

14

trenches on the separation of powers, and conflicts with the de-
cisions of other courts of appeals.

First, the Fifth Circuit held that federal officials' inter-
actions with private social-media platforms transformed a broad
swath of the platforms' content-moderation decisions into state
action subject to the First Amendment.  That holding has signifi-
cant implications for officials at all levels of government, many
of whom routinely engage with or speak about social-media plat-
forms.  It also has grave implications for the platforms them-
selves, which on the Fifth Circuit's logic are state actors subject
to suits for violating the First Amendment.  This Court has re-
cently granted certiorari or emergency relief to address other
important questions about the application of the First Amendment
and the state-action doctrine to social-media platforms.  See
Lindke v. Freed, 143 S. Ct. 1780 (No. 22-611); O'Connor-Ratcliff
v. Garnier, 143 S. Ct. 1779 (No. 22-324); NetChoice, LLC v. Paxton,
142 S. Ct. 1715 (2022) (No. 21A720).  The same result is warranted
here.

Second, the Fifth Circuit relied on its novel view of the
state-action doctrine to affirm an injunction that raises serious
separation-of-powers concerns by installing a single district
judge as the overseer of the Executive Branch's communications
with and about social-media companies.  Under the injunction, the
Surgeon General, the White House Press Secretary, and many other
senior presidential aides risk contempt if their public statements

on matters of policy cross the ill-defined lines drawn by the Fifth Circuit.  CDC officials run the same risk if they accurately answer platforms' questions about public health.  And FBI agents risk being haled into court if they flag content posted by terrorists or disinformation disseminated by covert malign foreign actors. That unprecedented injunction should not be permitted to take effect without this Court's review.

Third, the Fifth Circuit's decision conflicts with the decisions of other courts of appeals.  At times, the Fifth Circuit purported to align itself with its sister circuits.  See, e.g., App., infra, 214a-217a.  And at a high level of generality, it is uncontroversial that a nominally private decision is state action if the government "has exercised coercive power or has provided such significant encouragement  * * *  that the choice must in law be deemed to be that of the State."  Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).  But the Fifth Circuit cited no prior decision finding state action, or a violation of the First Amendment, on remotely comparable facts.  And its novel interpretations of coercion and significant encouragement squarely conflict with decisions of other courts of appeals.

For example, the Fifth Circuit acknowledged (App., infra, 228a) that this case is "strikingly similar" to O'Handley v. Weber, 62 F.4th 1145 (9th Cir. 2023), petition for cert. filed, No. 22-1199 (June 8, 2023).  There, as here, the relevant government agency regularly collaborated with the platforms, had access to a

16

"partner support portal" whereby state officials could readily bring specific content to the platforms' attention, and frequently suggested removal of false or misleading content.  Id. at 1153-1154.  Yet O'Handley found no state action, reasoning that the fact that platforms "allegedly removed 98 percent of the posts flagged by the [State] does not suggest that the companies ceded control over their content-moderation decisions to the State and thereby became the government's private enforcers."  Id. at 1156.  Instead, the court explained, "[i]t merely shows that these private and state actors were generally aligned in their missions to limit the spread of misleading election information."  Id. at 1156-1157.

That reasoning is irreconcilable with the holding below.  O'Handley held that "coercion" requires "threat[s] to prosecute," "threat[s] [of] adverse action," or "equivalent threat[s]," 62 F.4th at 1157, whereas the Fifth Circuit held that "tone" and authority can be sufficient, App., infra, 229a.  O'Handley further held that "significant encouragement" transforms private action into state action only when the government uses "positive incentives [to] overwhelm the private party and essentially compel the party to act in a certain way."  62 F.4th at 1158.  Here, in contrast, the Fifth Circuit held that mere "entanglement" is sufficient.  App., infra, 235a.

The Fifth Circuit's approach also cannot be squared with other appellate decisions.  The D.C. Circuit, for example, held that the Attorney General and a Department of Justice commission did not

violate the First Amendment when they sent a letter to media distributors stating that they had "received testimony alleging that your company is involved in the sale or distribution of pornography" and offering an opportunity to respond before the commission drafted "its final report section on identified distributors." Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011, 1013 (1991) (Silberman, J.), cert. denied, 503 U.S. 950 (1992). The D.C. Circuit explained that government officials may "vigorously criticize a publication" and that "the government's criticism or effort to embarrass the distributor" does not implicate the First Amendment so long as "the government threatens no sanction." Id. at 1015-1016. The Second and Tenth Circuits have reached similar holdings. See, e.g., National Rifle Ass'n of Am. v. Vullo, 49 F.4th 700, 717 (2d Cir. 2022), petition for cert. filed, No. 22-842 (Feb. 7, 2023); VDARE Found. v. Colorado Springs, 11 F.4th 1151, 1157 (10th. Cir. 2021), cert. denied, 142 S. Ct. 1208 (2022); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 68-72 (2d Cir. 1999).

## II.  THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

If this Court grants certiorari, it will likely vacate the injunction because respondents lack Article III standing, their First Amendment claims lack merit, and the injunction is overbroad.

### A.  Respondents Lack Article III Standing

Federal courts are limited to resolving only "Cases" or "Controversies." U.S. Const. Art. III, § 2. "The doctrine of standing implements this requirement by insisting that a litigant 'prove

that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'"  Carney v. Adams, 141 S. Ct. 493, 498 (2020) (citation omitted).  Respondents cannot satisfy those requirements.

1.  As the Fifth Circuit recognized (App., infra, 194a-195a), the individual respondents largely assert injury based on platforms' past moderation of respondents' social-media activity. Those incidents cannot support standing for at least two reasons.

First, most of those incidents are not traceable to the government because they occurred in 2020 or early 2021, before much of the challenged conduct occurred.  For example, respondents have focused on the "Great Barrington Declaration," App., infra, 195a, which was published in October 2020 and subject to content moderation beginning that same month.  C.A. ROA 1191.  The Fifth Circuit acknowledged that chronological problem, noting that the platforms adopted COVID-related "content-moderation policies in early 2020" without government involvement.  App., infra, 199a.  The court nonetheless held that respondents had shown that subsequent moderation decisions can be "traced to government-coerced enforcement of those policies."  Id. at 200a.  But the court relied solely on the district court's finding that the government's challenged actions affected the platforms' content-moderation activities as a general matter; the Fifth Circuit did not even purport to find that the government caused any platform to take action with respect

19

to any content posted by respondents that the platform would not otherwise have taken.

Second, even if respondents' past injuries were traceable to the government's actions, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief"; a plaintiff must instead show a "real and immediate threat of repeated injury." O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974); see Los Angeles v. Lyons, 461 U.S. 95, 101-108 (1983). Respondents were thus required to show that they face an immediate threat of content-moderation actions that the platforms would not take but for the government's challenged conduct.

The Fifth Circuit sought to avoid that requirement by holding that "prior censorship  * * *  has caused [respondents] to self-censor" today. App., infra, 196a-197a. But "respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013). The Fifth Circuit also stated that respondents' injuries "will reoccur," but that conclusion was based solely on the court's findings that (1) the platforms "continue[] to enforce a robust general misinformation policy," and (2) the government "continue[s] to be in regular contact with social-media platforms." App., infra, 197a-198a. As the court recognized, the platforms' policies are not attributable to the government. Id. at 199a. And neither the Fifth Circuit nor respondents even attempted to

20

connect the government's "regular contact" with any content that respondents have posted or wish to post.  Respondents thus failed to establish any "real and immediate threat of repeated injury" that is fairly traceable to governmental action.  O'Shea, 414 U.S. at 496.  Or, viewed another way, an injunction against the government will not redress any future injuries to respondents resulting from the platforms' content moderation.

2.  As for the state respondents, the Fifth Circuit relied on a handful of past incidents involving the moderation of content posted by state officials or entities, as well as on an injury to the States' purported right "to listen to their citizens" on social media.  App., infra, 204a.  Neither theory has merit.

The first suffers from the same flaw as the individual respondents' theory:  A handful of years-old injuries cannot confer standing to seek sweeping forward-looking relief, given that the States have not identified any "real and immediate threat of repeated injury."  O'Shea, 414 U.S. at 496.  Moreover, the Fifth Circuit did not identify any evidence tying those past episodes to any federal action or otherwise establishing that any injury was fairly traceable to the federal government.

The second theory -- based on the States' "right to listen" to its residents on social media -- is equally meritless.  This Court has sometimes "referred to a First Amendment right to 'receive information and ideas.'"  Kleindienst v. Mandel, 408 U.S. 753, 762 (1972) (citation omitted).  But it has relied on that

right to authorize suits only by intended recipients with some connection to the speaker. See, e.g., Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-757 (1976) (prohibition on advertising the price of prescription drugs challenged by consumers); Mandel, 408 U.S. at 762 (plaintiff professors planned to "hear, speak, and debate with [the invited speaker] in person" at a university conference). Respondents have established no such relationship here, and the Fifth Circuit's theory, if accepted, would confer standing on any government official who expresses a desire to receive a constituent's speech. That is exactly the sort of "boundless theory of standing" that this Court has consistently rejected. Already, LLC v. Nike, Inc., 568 U.S. 85, 99 (2013).

## B.   Respondents' First Amendment Claims Lack Merit

It is undisputed that the content-moderation decisions at issue in this case were made by private social-media companies, such as Facebook and YouTube. It likewise is undisputed that the First Amendment "can be violated only by conduct that may be fairly characterized as 'state action.'" Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982); see Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928 (2019). The critical premise of the Fifth Circuit's decision was thus that the government coerced or significantly encouraged the platforms' content-moderation decisions and thereby transformed those decisions into state action subject to the First Amendment. App., infra, 207a-219a, 239a.

22

The implications of that holding are startling.  If the platforms were state actors when they moderated respondents' content, respondents could have secured, on First Amendment grounds, injunctions compelling the platforms to restore content that they had chosen to delete.  Cf. Adickes v. S.H. Kress & Co., 398 U.S. 144, 171 (1970) (allowing claims against private party under 42 U.S.C. 1983 where the State "compelled" and "commanded" the private action).  This Court recently warned against state-action theories that would "eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms" by subjecting those choices "to the constraints of the First Amendment."  Halleck, 139 S. Ct. at 1932-1933.  And the Court has emphasized that "[c]areful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power."  Lugar, 457 U.S. at 936.  The Fifth Circuit's decision exceeds those limits by applying federal constitutional constraints to the decisions of private social-media companies regarding the content appearing on their own platforms.

As explained below, under a proper application of this Court's precedents, the content-moderation decisions at issue here are not state action.  The actions of a private party may "be fairly attributable to the [government]," Lugar, 457 U.S. at 937, when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert," over the pri-

23

vate decision "that the choice must in law be deemed to be that of the [government]," Blum, 457 U.S. at 1004.  But neither coercion nor significant encouragement is present here.  And respondents' First Amendment claims suffer from additional defects, including that the state respondents do not have First Amendment rights.

### 1.   The Fifth Circuit erred in finding state action based on coercion

a.   This Court has explained that unconstitutional coercion with respect to speech requires, at a minimum, an actual "threat of invoking legal sanctions [or] other means of coercion, persuasion, and intimidation." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963).  "Mere approval of or acquiescence in the initiatives of a private party is not sufficient."  Blum, 457 U.S. at 1004.  Generalized pressure likewise is insufficient; the government must compel "the specific conduct of which the plaintiff complains."  Ibid. (emphasis added).

In Bantam Books, for example, the Court found coercion when a state agency identified certain publications as "objectionable" in notices to distributors; asked for their "'cooperation in removing the listed and other objectionable publications'"; emphasized the agency's "duty to recommend to the Attorney General prosecution of purveyors of obscenity"; assured distributors that "'[c]ooperative action will eliminate the necessity of our recommending prosecution'"; and followed up by having a police officer visit to assess compliance.  372 U.S. at 62-63 & n.5 (citation

omitted).

In Blum, by contrast, the Court found no state action when private nursing homes transferred certain Medicaid patients to facilities offering lower levels of care, even though the "nursing homes in [the State were] extensively regulated," 457 U.S. at 1004; those regulations placed pressure (backed by "a range of penalties") on nursing homes to discharge or transfer patients, see id. at 1009; and the State was obliged to review and "approve or disapprove continued payment of Medicaid benefits" following a transfer, id. at 1010. Notwithstanding those general pressures, the Court explained that the nursing homes' specific "decision[s] to discharge or transfer particular patients" were not state action because they "ultimately turn[ed] on medical judgments made by private parties," id. at 1008.

b. As applied here, the lessons of this Court's state-action precedents are clear: In order for a platform's content-moderation decision to be deemed state action, the government must have compelled that "specific conduct," Blum, 457 U.S. at 1004 -- not simply sought to influence the platform's content-moderation activities in general. And even when "government officials" specifically "request that a private intermediary not carry a third party's speech," they do not violate the First Amendment "so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." O'Handley, 62 F.4th at 1158.

The Fifth Circuit entirely failed to heed the first of those

25

lessons:  It conducted a wide-ranging audit of federal officials'
dealings with social-media platforms, but did not even purport to
conclude that those officials had coerced any of the specific
content-moderation decisions (including the adoption of any spe-
cific moderation policy) that injured respondents.  And the court
compounded that error by adopting a novel and unjustified inter-
pretation of the type of "coercion" that can justify a finding of
state action.  The court at times appeared to recognize that co-
ercion requires the government to at least "intimat[e] that some
form of punishment will follow a failure to comply."  App., <u>infra</u>,
218a.  Yet the court went on to adopt and apply a far looser
understanding that could be met even absent such threats.

The Fifth Circuit's treatment of the FBI makes that error
especially plain.  The court stated that the FBI "regularly met
with the platforms," "frequently alerted the social media compa-
nies to misinformation," and "urged the platforms to take down
content."  App., <u>infra</u>, 232a.  The court acknowledged that the
FBI's communications were not "threatening in tone or manner" and
did not "reference adverse consequences."  <u>Id.</u> at 232a-233a.  But
the court nonetheless held that the FBI engaged in impermissible
coercion -- converting the platforms' independent decisions into
state action -- simply because the FBI is a law-enforcement agency
with some unspecified "authority over the platforms" and because
the platforms sometimes complied with its requests.  <u>Id.</u> at 233a.
That reasoning would mean that the FBI -- and any other law-

enforcement agency -- could never ask <u>anyone</u> for <u>anything</u> without transforming the recipient of the request into a state actor.

The Fifth Circuit's conclusion that the White House's actions were coercive was equally flawed.  The court cited White House "requests" to "remove posts 'ASAP' and accounts 'immediately,' and to 'slow down' or 'demote' content" in what the court viewed as a "persistent and angry" tone.  App., <u>infra</u>, 221a (brackets omitted). Missing is any intimation that any sanction would follow a failure to act on those requests.  The same is true of every one of the quoted follow-up communications.  See <u>ibid.</u>

The Fifth Circuit believed that White House "[o]fficials threw out the prospect of legal reforms and enforcement actions" and made "promises of legal regime changes, enforcement actions, and other unspoken threats."  App., <u>infra</u>, 221a-222a.  The only statement cited in support of that assertion contains no such threats.  See <u>id.</u> at 221a (referencing "low-bar things you guys can do to make people like me  * * *  think you're taking action") (brackets omitted).  The court instead appeared to be referencing an April 25, 2022, press conference at which the Press Secretary, asked to comment on the sale of Twitter, responded that "[n]o matter who owns or runs Twitter, the President has long been con-cerned about the power of large social media platforms," "has long argued that tech platforms must be held accountable for the harms they cause," and "has been a strong supporter of fundamental re-forms to achieve that goal, including reforms to Section 230,

enacting antitrust reforms, requiring more transparency, and more." C.A. ROA 784-785; see App., _infra_, 188a-189a. Those statements cannot plausibly be characterized as a threat of adverse action tied to specific acts of content moderation. And the fact that those off-the-cuff, general statements were the Fifth Circuit's _strongest_ evidence of coercive threats only underscores that this case is nothing like _Bantam Books_.

What is more, the record shows that platforms routinely declined to remove content flagged by federal officials, yet neither respondents nor the Fifth Circuit suggested that any federal official imposed any sanction in retaliation for platforms' refusal to act as the government requested. See, _e.g._, C.A. ROA 23,234-23,235, 23,240-23,243, 23,245-23,256 (emails declining to remove flagged content). Indeed, the district court cited testimony that the platforms rejected _half_ of the FBI's suggestions. _Id._ at 26,561; see App., _infra_, 107a, 191a. And Twitter entirely ceased enforcement of its COVID-19 misinformation policy in November 2022, yet suffered no retaliation. C.A. ROA 22,536.

Rather than any pattern of coercive threats backed by sanctions, the record reflects a back-and-forth in which the government and platforms often shared goals and worked together, sometimes disagreed, and occasionally became frustrated with one another, as all parties articulated and pursued their own goals and interests during an unprecedented pandemic. Senior government officials -- including the President, the White House Press Secretary, and the

Surgeon General -- believed that the platforms were enabling the spread of misinformation that was causing preventable deaths. App., _infra_, 186a-187a.   They said so publicly, and in strong terms.   _Ibid._   And government officials sought to understand the platforms' efforts to fight misinformation and flag content that violated the platforms' own policies.   _Id._ at 182a-184a.   The platforms, in turn, sought to address officials' concerns and may well have been motivated by a desire to avoid public criticism. _Id._ at 184a-185a.   But that sort of successful use of the bully pulpit has never been regarded as violating the First Amendment or transforming private action into state action.   As Judge Silberman observed, "[w]e know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content."   _Penthouse_, 939 F.2d at 1016 (brackets and citation omitted).

c.   Lacking evidence of any threatened adverse action, the Fifth Circuit found coercion by applying a four-factor test developed by other circuits.   App., _infra_, 222a.   Whatever the value of those factors as a tool for identifying coercive threats, the Fifth Circuit badly erred by loosely applying those factors to find state action where no such threats occurred.

The Fifth Circuit first relied on the "tone" or "demeanor" of some of the White House statements.   App., _infra_, 222a.   But the strong language used to criticize the platforms and request action does not make those statements coercive.   The government is enti-

29

tled to forcefully "advocate and defend its own policies." Board
of Regents v. Southworth, 529 U.S. 217, 229 (2000).  And government
officials are entitled to express their views -- including their
view that certain speech is false or harmful -- in strong terms.
See Penthouse, 939 F.2d at 1015; see also, e.g., Presidential
Proclamation No. 7725, Protection From Pornography Week, 2003, 68
Fed. Reg. 61,603, 61,603 (Oct. 28, 2003) ("Pornography can have
debilitating effects on communities, marriages, families, and
children.").

The Fifth Circuit next relied on the platforms' "perception"
of the relevant government statements.  App., infra, 222a.  But as
the court elsewhere acknowledged, the coercion inquiry is an ob-
jective one that depends on whether a "reasonable person" would
construe the government's conduct as a threat.  Id. at 249a.  And
even considering the platforms' perceptions, the court erred in
finding coercion merely because "the platforms were influenced by
the officials' demands."  Id. at 224a.  Influence is also the
natural result of successful persuasion, so the fact that the
platforms often "complied with" the government's "removal re-
quests" is "immaterial."  O'Handley, 62 F.4th at 1159.  And the
fact that the platforms frequently rebuffed the government, see p.
27, supra, further undermines any suggestion that the government
was engaged in coercion rather than persuasion.

The Fifth Circuit's third factor was "the presence of author-
ity."  App., infra, 222a.  Such authority may be relevant when

there is an actual threat; if the speaker lacks authority to impose any adverse consequences, the threat cannot be coercive. But "[a]gencies are permitted to communicate in a non-threatening manner with the entities they oversee without creating a constitutional violation." O'Handley, 62 F.4th at 1163.

Finally, the Fifth Circuit's fourth factor -- "whether the speaker refers to adverse consequences," App., infra, 222a -- is at best a watered-down version of the correct inquiry: whether the speaker actually threatened adverse consequences for noncompliance, either implicitly or explicitly. And here the Fifth Circuit failed to identify any instance of such a threat.

### 2. The Fifth Circuit erred in finding state action based on significant encouragement

The Fifth Circuit correctly recited (App., infra, 206a) this Court's statement in Blum that state action may exist when the government "has provided such significant encouragement" for a private decision "that the choice must in law be deemed to be that of the [government]," 457 U.S. at 1004. But this Court did not make "significant encouragement" a lesser, far-easier-to-satisfy alternative to coercion. Instead, it merely recognized that offers of positive incentives ("significant encouragement"), like threats of negative consequences ("coercive power"), may overwhelm a private party's independent judgment. Ibid.; see O'Handley, 62 F.4th at 1157-1158. As the Ninth Circuit recognized, therefore, "significant encouragement" does not exist merely because the govern-

ment urges a private party to act in a particular way -- even repeatedly or in strong terms.  Instead, the sort of "significant encouragement" sufficient to transform private conduct into state action occurs only through "the State's use of positive incentives to overwhelm the private party and essentially compel the party to act in a certain way."  O'Handley, 62 F.4th at 1158.

The Fifth Circuit did not find that anything like that occurred here.  Instead, the court adopted a far broader definition of state action, holding that "significant encouragement" can be established merely by a government official's "entanglement in a party's independent decision-making."  App., infra, 209a.  That was error.

As a threshold matter, the Fifth Circuit explained that its conception of "entanglement" requires a much lower "level of integration" than required by this Court's "joint action test" for state action.  App., infra, 209a n.11; cf. Lugar, 457 U.S. at 941. At the same time, the Fifth Circuit did not identify any other elements required to satisfy its conception of the "significant encouragement" test.  If accepted, therefore, the court's formulation would render the joint-action test entirely superfluous because the watered-down "significant encouragement" test would always be satisfied first.

The Fifth Circuit's novel "entanglement" standard is also vastly overbroad.  This case illustrates the point.  The court found significant encouragement by the FBI based solely on the

32

court's view that the platforms accepted an FBI recommendation to change their terms of service "to capture 'hack-and-leak' content." App., <u>infra</u>, 234a; see <u>id.</u> at 191a. The Fifth Circuit's opinion thus threatens to transform any private entity that accepts a government recommendation into a state actor.

Similarly, the Fifth Circuit held that "the CDC was entangled in the platforms' decision-making processes" because "the platforms asked CDC officials to decide whether certain claims were misinformation," which led to a closer working relationship in which "the platforms came to <u>heavily rely</u> on the CDC" to provide public health information that informed the platforms' content-moderation decisions. App., <u>infra</u>, 235a-236a (brackets omitted). The Fifth Circuit cited no precedent for its conclusion that if private companies <u>choose</u> to follow advice from the government (including advice they solicited), the companies thereby become state actors. To the contrary, this Court has emphasized that "[a]ction taken by private entities with the mere approval or acquiescence of the [government] is not state action." <u>American Mfrs. Mut. Ins. Co.</u> v. <u>Sullivan</u>, 526 U.S. 40, 52 (1999).

Finally, the Fifth Circuit's finding of state action was misplaced even under its watered-down "entanglement" standard because the court did not find that the government had any involvement in "the <u>specific</u> conduct of which the plaintiff complains." <u>Blum</u>, 457 U.S. at 1004 (emphasis added). The court concluded that the relevant officials were entangled in the platforms' content-

33

moderation decisions in general, but it cited no evidence that the government had any role in any specific decision to moderate content posted by respondents.  Cf. App., _infra_, 230a-232a (White House and Surgeon General's office); _id._ at 234a (FBI); _id._ at 235a-236a (CDC).

> **3.  Respondents' First Amendment claims fail for additional reasons**

From its erroneous premise that the private platforms' content-moderation decisions were "state actions," the Fifth Circuit concluded that the government "likely violated the First Amendment."  App., _infra_, 239a.  But a finding of state action means only that the action is subject to constitutional scrutiny -- not that there automatically was a constitutional violation. Even if the platforms' content-moderation activities were deemed state action, therefore, respondents would also have to establish the elements of a substantive First Amendment claim.

Of course, if the government had actually coerced the platforms to suppress speech, that coercion would plainly violate _the platforms_' First Amendment rights. Cf. _Miami Herald Publ'g Co._ v. _Tornillo_, 418 U.S. 241, 258 (1974).  But a conclusion that the platforms were state actors would not necessarily mean that the platforms' content-moderation decisions violated _respondents_' First Amendment rights; instead, that is a substantive question of First Amendment law and the answer could depend on the nature of the platform and the details of the particular decision.  Cf.

34

<u>Minnesota Voters Alliance</u> v. <u>Mansky</u>, 138 S. Ct. 1876, 1885-1886
(2018) (describing state actors' authority to limit speech depend-
ing on the type of forum).  The Fifth Circuit failed to analyze
that question because it incorrectly assumed that a finding of
state action alone established a First Amendment violation.

Finally, whatever the merits of the individual respondents'
underlying First Amendment claims, the state respondents' claims
fail for an additional, independent reason:  The States lack First
Amendment rights.  "The Free Speech Clause of the First Amendment
constrains governmental actors and protects private actors."  <u>Hal-</u>
<u>leck</u>, 139 S. Ct. at 1926.  The States thus have no basis for
asserting a First Amendment claim.  Cf. <u>United States</u> v. <u>American</u>
<u>Library Ass'n</u>, 539 U.S. 194, 210-211 (2003) (plurality opinion)
(noting this issue without resolving it).

### C.   The Injunction Is Overbroad

Even if respondents had standing and some likelihood of suc-
cess on the merits, the injunction entered by the lower courts is
vastly overbroad.  Because a federal court's "constitutionally
prescribed role is to vindicate the individual rights of the people
appearing before it," "[a] plaintiff's remedy must be tailored to
redress the plaintiff's particular injury."  <u>Gill</u> v. <u>Whitford</u>, 138
S. Ct. 1916, 1933-1934 (2018).  Principles of equity reinforce
that constitutional limit:  Injunctive relief may "be no more
burdensome to the defendant than necessary to provide complete
relief to the plaintiffs."  <u>Califano</u> v. <u>Yamasaki</u>, 442 U.S. 682,

35

702 (1979); see United States v. Texas, 143 S. Ct. 1964, 1985-1986 (2023) (Gorsuch, J., concurring in the judgment).  Here, that means that any injunctive relief must be limited to government actions targeting respondents' social-media accounts and posts.

The injunction here flouts those principles.  It covers thousands of federal officers and employees, and it applies to communications with and about all social-media platforms (not just those used by respondents, see App., infra, 158a n.2) regarding content moderation with respect to all posts by any person (not just respondents) on all topics (including national security and criminal matters, which even the district court recognized were improper to include, see id. at 160a-161a).

The Fifth Circuit attempted to justify that sweeping relief on the ground that an injunction may incidentally benefit non-parties "if such breadth is necessary to give prevailing parties the relief to which they are entitled."  App., infra, 249a-250a (citation omitted).  But the court did not find -- and could not plausibly have found -- that the breadth of its injunction was needed to provide full relief to respondents.  Instead, the court reasoned that "[t]he harms that radiate from [the government's alleged] conduct extend far beyond just [respondents]" and affect "every social-media user."  Id. at 250a.  That is a non sequitur.  Whether a defendant's conduct also might have harmed other non-parties has no bearing on whether party-specific relief will fully redress the plaintiffs' injuries.

At a minimum, therefore, this Court should stay the injunction to the extent it extends beyond government action specifically targeting content posted by the individual respondents.  An injunction so limited would largely or entirely eliminate any harm that respondents might face without burdening a vast universe of government actions lacking any connection to respondents.

## III.  THE EQUITIES OVERWHELMINGLY FAVOR A STAY

The government and public would suffer irreparable harm if the preliminary injunction took effect.  Respondents, in contrast, would suffer no cognizable injury -- much less irreparable harm -- if the current stay were extended.

### A.   The Injunction Would Irreparably Harm The Government And Undermine The Public Interest

If not stayed, the injunction would impose grave harms on the government and the public.  See Nken v. Holder, 556 U.S. 418, 435 (2009) (harms to government and public "merge").  One of the central duties and prerogatives of the President and the senior officials who serve as his proxies is to speak to the public on matters of public concern, and they must have the latitude to do so forcefully at times.  But the injunction subjects many such communications to a risk of contempt.

Consider, for example, a statement from the White House podium that the President urges platforms not to disseminate misinformation about a recent natural disaster circulating online -- and the platforms comply.  Cf. App., infra, 187a, 222a, 227a.  Or

suppose the Press Secretary says that the President condemns the role that social media has played in harming teenagers' mental health, calls on platforms to exercise greater responsibility, and mentions the possibility of legislative reforms.  Cf. id. at 188a-189a.  Those statements might be viewed as coercion or significant encouragement under the Fifth Circuit's novel understanding of those concepts.  Even the potential for the injunction to be construed to limit the communication of the Administration's views on issues of public consequence could chill such communications.  That "intrusion by a federal court into the workings of a coordinate branch of government" irreparably harms the Executive Branch and raises serious separation-of-powers concerns.  INS v. Legalization Assistance Project, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

The injunction's effects on the other affected entities are likewise profoundly damaging.  The Fifth Circuit's reasoning suggests that the CDC would risk contempt if it answered platforms' inquiries about scientific matters to allow the platforms to make informed content-moderation decisions.  Cf. App., infra, 235a-236a.  And given the court's suggestion that any request from a law-enforcement agency is inherently coercive, see id. at 232a-233a, the FBI would likewise need to tread carefully in its interactions with social-media companies, potentially eschewing communications that protect national security, public safety, or the security of federal elections.  For example, particularly in the

early stages of an investigation, law-enforcement officials may be uncertain whether a social-media post involves unprotected criminal activity (such as a true threat).  But the injunction leaves them guessing what quantum of certainty they must possess before they can inform social-media companies about the post, potentially leading to disastrous delays.  This Court has observed that even the "fear of being sued" can "'dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties.'"  Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) (brackets and citation omitted).  The fear of being held in contempt is no less damaging.

All of those harms are aggravated by the injunction's broad, general terms.  Cf. Fed. R. Civ. P. 65(d).  The injunction relies on contestable and indeterminate legal terminology to describe its prohibitions:  The government may not "coerce or significantly encourage" platforms with respect to "protected free speech." App., infra, 248a.  The legal meaning of "coercion" and "significant encouragement" in this context is at the very heart of the parties' dispute; and what constitutes "protected free speech" has been hotly disputed since the Founding.  Yet the Fifth Circuit's decision compels government officials -- including senior White House officials and FBI agents -- to parse those concepts and tailor their speech accordingly, on pain of contempt.

**B.    The Injunction Is Unnecessary To Prevent Irreparable Injury To Respondents**

Although First Amendment injuries may be irreparable when they occur, Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion), a plaintiff seeking a preliminary injunction still must make "a clear showing," Winter, 555 U.S. at 22, that such injuries are "imminent," Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 74 (2020) (per curiam) (Kavanaugh, J., concurring). Neither the district court nor the Fifth Circuit substantiated any finding that respondents face ongoing or imminent irreparable injury.  The Fifth Circuit found that respondents "are likely to suffer an irreparable injury" because they "sufficiently demonstrated that their First Amendment interests are either threatened or impaired."  App., infra, 241a.  But that is circular, and the court did not cite anything in the record to support the conclusion that an injunction is necessary to prevent any imminent First Amendment injury to respondents.  The court stated (id. at 242a) that "the officials' challenged conduct has not stopped," but that is not a finding that these respondents are likely to suffer imminent harm.

That is particularly true given the relatively brief duration of a further stay, if granted.  To facilitate this Court's prompt resolution of this case, the government will file a petition for a writ of certiorari by October 13, 2023 -- nearly two months early, and in time to allow the Court to hear the case this Term

40

in the ordinary course.  And to the extent the Court wishes to further expedite matters, it could construe this application as a petition for a writ of certiorari, grant the petition and a stay, and set the case for argument.  See, e.g., Harrington v. Purdue Pharma, L.P., No. 23A87 (Aug. 10, 2023) (No. 23-124).  If the court takes that course, the government respectfully suggests the following questions presented:  (1) Whether respondents have Article III standing; (2) Whether the government's challenged conduct transformed private social-media companies' content-moderation decisions into state action and violated respondents' First Amendment rights; and (3) Whether the terms and breadth of the preliminary injunction are proper.

**CONCLUSION**

This Court should stay the preliminary injunction pending the disposition of the government's petition for a writ of certiorari. At a minimum, the Court should stay the injunction to the extent it extends beyond actions specifically targeting content posted by individual respondents.

Respectfully submitted.

ELIZABETH B. PRELOGAR
Solicitor General

SEPTEMBER 2023

## APPENDIX

District court opinion granting preliminary injunction
        (July 4, 2023) ......................................... 1a

District court judgment entering preliminary injunction
        (July 4, 2023) ....................................... 156a

District court opinion denying stay
        (July 10, 2023) ...................................... 163a

District court judgment denying stay
        (July 10, 2023) ...................................... 176a

Court of appeals order granting administrative stay
        (July 14, 2023) ...................................... 177a

Court of appeals opinion affirming in part, reversing
        in part, vacating in part, and modifying preliminary
        injunction (September 8, 2023) ....................... 179a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

**STATE OF MISSOURI, ET AL.**　　　　　**CASE NO.  3:22-CV-01213**

**VERSUS**　　　　　　　　　　　　　　　**JUDGE TERRY A. DOUGHTY**

**JOSEPH R. BIDEN JR., ET AL.**　　　　**MAG. JUDGE KAYLA D. MCCLUSKY**

## <u>MEMORANDUM RULING ON REQUEST</u><br><u>FOR PRELIMINARY INJUNCTION</u>

At issue before the Court is a Motion for Preliminary Injunction [Doc. No. 10] filed by Plaintiffs.[1] The Defendants[2] oppose the Motion [Doc. No. 266]. Plaintiffs have filed a reply to the opposition [Doc. No. 276]. The Court heard oral arguments on this Motion on May 26, 2023 [Doc. No. 288]. Amicus Curiae briefs have been filed in this proceeding on behalf of Alliance Defending Freedom,[3] the Buckeye Institute,[4] and Children's Health Defense.[5]

---

[1] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty ("Kheriaty"), Dr. Martin Kulldorff ("Kulldorff"), Jim Hoft ("Hoft"), Dr. Jayanta Bhattacharya ("Bhattacharya"), and Jill Hines ("Hines").

[2] Defendants consist of  President Joseph R Biden ("President Biden"), Jr, Karine Jean-Pierre ("Jean-Pierre"), Vivek H Murthy ("Murthy"), Xavier Becerra ("Becerra"), Dept of Health & Human Services ("HHS"), Dr. Hugh Auchincloss ("Auchincloss"),  National Institute of Allergy & Infectious Diseases ("NIAID"), Centers for Disease Control & Prevention ("CDC"),  Alejandro Mayorkas ("Mayorkas"), Dept of Homeland Security ("DHS"),  Jen Easterly ("Easterly"), Cybersecurity & Infrastructure Security Agency ("CISA"), Carol Crawford ("Crawford"), United States Census Bureau ("Census Bureau"), U. S. Dept of Commerce ("Commerce"), Robert Silvers ("Silvers"), Samantha Vinograd ("Vinograd"), Ali Zaidi ("Zaidi"), Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Stuart F. Delery ("Delery"),  Aisha Shah ("Shah"),  Sarah Beran ("Beran"),  Mina Hsiang ("Hsiang"), U. S. Dept of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Laura Dehmlow ("Dehmlow"), Elvis M. Chan ("Chan"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), Katharine Dealy ("Dealy"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), Joshua Peck ("Peck"), Kym Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), Jennifer Shopkorn ("Shopkorn"), U. S. Food & Drug Administration ("FDA"), Erica Jefferson ("Jefferson"), Michael Murray ("Murray"), Brad Kimberly ("Kimberly"), U. S. Dept of State ("State"), Leah Bray ("Bray"), Alexis Frisbie ("Frisbie"), Daniel Kimmage ("Kimmage"), U. S. Dept of Treasury ("Treasury"), Wally Adeyemo ("Adeyemo"), U. S. Election Assistance Commission ("EAC"),  Steven Frid ("Frid"), and Kristen Muthig ("Muthig").

[3] [Doc. No. 252]

[4] [Doc. No. 256]

[5] [Doc. No. 262]

## I.      INTRODUCTION

>   I may disapprove of what you say, but I would defend to the death
>   your right to say it.
>                    Evelyn Beatrice Hill, 1906, *The Friends of Voltaire*

This case is about the Free Speech Clause in the First Amendment to the United States Constitution. The explosion of social-media platforms has resulted in unique free speech issues— this is especially true in light of the COVID-19 pandemic. If the allegations made by Plaintiffs are true, the present case arguably involves the most massive attack against free speech in United States' history. In their attempts to suppress alleged disinformation, the Federal Government, and particularly the Defendants named here, are alleged to have blatantly ignored the First Amendment's right to free speech.

Although the censorship alleged in this case almost exclusively targeted conservative speech, the issues raised herein go beyond party lines. The right to free speech is not a member of any political party and does not hold any political ideology. It is the purpose of the Free Speech Clause of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of the market, whether it be by government itself or private licensee. *Red Lion Broadcasting Co., v. F.C.C.*, 89 S. Ct. 1794, 1806 (1969).

Plaintiffs allege that Defendants, through public pressure campaigns, private meetings, and other forms of direct communication, regarding what Defendants described as "disinformation," "misinformation," and "malinformation," have colluded with and/or coerced social-media platforms to suppress disfavored speakers, viewpoints, and content on social-media platforms. Plaintiffs also allege that the suppression constitutes government action, and that it is a violation

of Plaintiffs' freedom of speech under the First Amendment to the United States Constitution. The

First Amendment states:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof: **or abridging the freedom of speech**, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. (emphasis added).

First Amendment, U.S. Const. amend. I.

The principal function of free speech under the United States' system of government is to invite dispute; it may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. *Texas v. Johnson*, 109 S. Ct. 2533, 2542–43 (1989). Freedom of speech and press is the indispensable condition of nearly every other form of freedom. *Curtis Pub. Co. v. Butts*, 87 S. Ct. 1975, 1986 (1967).

The following quotes reveal the Founding Fathers' thoughts on freedom of speech:

> For if men are to be precluded from offering their sentiments on a matter, which may involve the most serious and alarming consequences, that can invite the consideration of mankind, reason is of no use to us; the freedom of speech may be taken away, and dumb and silent we may be led, like sheep, to the slaughter.

George Washington, March 15, 1783.

> Whoever would overthrow the liberty of a nation must begin by subduing the free acts of speech.

Benjamin Franklin, *Letters of Silence Dogwood*.

> Reason and free inquiry are the only effectual agents against error.

Thomas Jefferson.

The question does not concern whether speech is conservative, moderate, liberal, progressive, or somewhere in between. What matters is that Americans, despite their views, will not be censored or suppressed by the Government. Other than well-known exceptions

to the Free Speech Clause, all political views and content are protected free speech.

The issues presented to this Court are important and deeply intertwined in the daily lives of the citizens of this country.

## II.  FACTUAL BACKGROUND

In this case, Plaintiffs allege that Defendants suppressed conservative-leaning free speech, such as: (1) suppressing the Hunter Biden laptop story prior to the 2020 Presidential election; (2) suppressing speech about the lab-leak theory of COVID-19's origin; (3) suppressing speech about the efficiency of masks and COVID-19 lockdowns; (4) suppressing speech about the efficiency of COVID-19 vaccines; (5) suppressing speech about election integrity in the 2020 presidential election; (6) suppressing speech about the security of voting by mail; (7) suppressing parody content about Defendants; (8) suppressing negative posts about the economy; and (9) suppressing negative posts about President Biden.

Plaintiffs Bhattacharya and Kulldorff are infectious disease epidemiologists and co-authors of The Great Barrington Declaration ("GBD"). The GBD was published on October 4, 2020.  The GBD criticized lockdown policies and expressed concern about the damaging physical and mental health impacts of lockdowns. They allege that shortly after being published, the GBD was censored on social media by Google, Facebook, Twitter, and others. Bhattacharya and Kulldorff further allege on October 8, 2020 (four days after publishing the GBD), Dr. Frances Collins, Dr. Fauci, and Cliff Lane proposed together a "take down" of the GBD and followed up with an organized campaign to discredit it.[6]

Dr. Kulldorff additionally alleges he was censored by Twitter on several occasions because of his tweets with content such as "thinking everyone must be vaccinated is scientifically flawed,"

---

[6] [Doc. No. 10-3 and 10-4]

that masks would not protect people from COVID-19, and other "anti-mask" tweets.[7] Dr. Kulldorff (and Dr. Bhattacharya[8]) further alleges that YouTube removed a March 18, 2021 roundtable discussion in Florida where he and others questioned the appropriateness of requiring young children to wear facemasks.[9] Dr. Kulldorff also alleges that LinkedIn censored him when he reposted a post of a colleague from Iceland on vaccines, for stating that vaccine mandates were dangerous, for posting that natural immunity is stronger than vaccine immunity, and for posting that health care facilities should hire, not fire, nurses.[10]

Plaintiff Jill Hines is Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization. Hines alleges she was censored by Defendants because she advocated against the use of masks mandates on young children. She launched an effort called "Reopen Louisiana" on April 16, 2020, to expand Health Freedom Louisiana's reach on social media. Hines alleges Health Freedom Louisiana's social-media page began receiving warnings from Facebook. Hines was suspended on Facebook in January 2022 for sharing a display board that contained Pfizer's preclinical trial data.[11] Additionally, posts about the safety of masking and adverse events from vaccinations, including VAERS data and posts encouraging people to contact their legislature to end the Government's mask mandate, were censored on Facebook and other social-media platforms. Hines alleges that because of the censorship, the reach of Health Freedom Louisiana was reduced from 1.4 million engagements per month to approximately 98,000. Hines also alleges that her personal Facebook page has been censored and restricted for posting content

---

[7] [Doc. No. 10-4]
[8] [Doc. No. 10-3]
[9] [Id.]
[10] [Id.]
[11] [Doc. No. 10-12]

that is protected free speech. Additionally, Hines alleges that two of their Facebook groups, HFL Group and North Shore HFL, were de-platformed for posting content protected as free speech.[12]

Plaintiff Dr. Kheriaty is a psychiatrist who has taught at several universities and written numerous articles. He had approximately 158,000 Twitter followers in December 2021 and approximately 1,333 LinkedIn connections. Dr. Kheriaty alleges he began experiencing censorship on Twitter and LinkedIn after posting content opposing COVID-19 lockdowns and vaccine mandates. Dr. Kheriaty also alleges that his posts were "shadow banned," meaning that his tweets did not appear in his follower's Twitter feeds. Additionally, a video of an interview of Dr. Kheriaty on the ethics of vaccine mandates was removed from YouTube.[13]

Plaintiff Jim Hoft is the owner and operator of The Gateway Pundit ("GP"), a news website located in St. Louis, Missouri. In connection with the GP, Hoft operates the GP's social-media accounts with Twitter, Facebook, YouTube, and Instagram. The GP's Twitter account previously had over 400,000 followers, the Facebook account had over 650,000 followers, the Instagram account had over 200,000 followers, and the YouTube account had over 98,000 followers.

The GP's Twitter account was suspended on January 2, 2021, again on January 29, 2021, and permanently suspended from Twitter on February 6, 2021. The first suspension was in response to a negative post Hoft made about Dr. Fauci's statement that the COVID-19 vaccine will only block symptoms and not block the infection. The second suspension was because of a post Hoft made about changes to election law in Virginia that allowed late mail-in ballots without postmarks to be counted. Finally, Twitter issued the permanent ban after the GP Twitter account posted video footage from security cameras in Detroit, Michigan from election night 2020, which showed two delivery vans driving to a building at 3:30 a.m. with boxes, which were alleged to

---

[12] [Id.]
[13] [Doc. No. 10-7]

contain election ballots. Hoft also alleges repeated instances of censorship by Facebook, including warning labels and other restrictions for posts involving COVID-19 and/or election integrity issues during 2020 and 2021.

Hoft further alleges that YouTube censored the GP's videos. YouTube removed a May 14, 2022 video that discussed voter integrity issues in the 2020 election. Hoft has attached as exhibits copies of numerous GP posts censored and/or fact checked. All of the attached examples involve posts relating to COVID-19 or the 2020 election.

In addition to the allegations of the Individual Plaintiffs, the States of Missouri and Louisiana allege extensive censorship by Defendants. The States allege that they have a sovereign and proprietary interest in receiving the free flow of information in public discourse on social-media platforms and in using social-media to inform their citizens of public policy decisions. The States also claim that they have a sovereign interest in protecting their own constitutions, ensuring their citizen's fundamental rights are not subverted by the federal government, and that they have a quasi-sovereign interest in protecting the free-speech rights of their citizens. The States allege that the Defendants have caused harm to the states of Missouri and Louisiana by suppressing and/or censoring the free speech of Missouri, Louisiana, and their citizens.

The Complaint,[14] Amended Complaint,[15] Second Amended Complaint,[16] and Third Amended Complaint[17] allege a total of five counts. They are:

> Count One – Violation of the First Amendment against all Defendants.
>
> Count Two – Action in Excess of Statutory Authority against all Defendants.

---

[14] [Doc. No. 1]
[15] [Doc. No. 45]
[16] [Doc. No. 84]
[17] [Doc. No. 268]

Count Three – Violation of the Administrative Procedure Act against HHS, NIAID, CDC, FDA, Peck, Becerra, Murthy, Crawford, Fauci, Galatas, Waldo, Byrd, Choi, Lambert, Dempsey, Muhammed, Jefferson, Murry, and Kimberly.

Count Four – Violation of the Administrative Procedure Act against DHS, CISA, Mayorkas, Easterly, Silvers, Vinograd, Jankowicz, Masterson, Protentis, Hale, Snell, Wyman, and Scully.

Count Five – Violation of the Administrative Procedure Act against the Department of Commerce, Census Bureau, Shopkorn, Schwartz, Molina-Irizarry, and Galemore.

Plaintiffs also ask for this case to be certified as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). For the reasons discussed herein, it is only necessary to address Count One and the Plaintiffs' request for class action certification in this ruling.

The following facts are pertinent to the analysis of whether or not Plaintiffs are entitled to the granting of an injunction.[18]

Plaintiffs assert that since 2018, federal officials, including Defendants, have made public statements and demands to social-media platforms in an effort to induce them to censor disfavored speech and speakers. Beyond that, Plaintiffs argue that Defendants have threatened adverse consequences to social-media companies, such as reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny/enforcement, increased regulations, and other measures, if those companies refuse to increase censorship. Section 230 of the Communications Decency Act shields social-media companies from liability for actions taken on their websites, and Plaintiffs argue that the threat of repealing Section 230 motivates the social-media companies to comply with Defendants' censorship requests. Plaintiffs also note that Mark Zuckerberg

---

[18] The Factual Background is this Court's interpretation of the evidence. The Defendants filed a 723-page Response to Findings of Fact [Doc. No. 266-8] which contested the Plaintiffs' interpretation or characterizations of the evidence. At oral argument, the Defendants conceded that they did not dispute the validity or authenticity of the evidence presented.

("Zuckerberg"), the owner of Facebook, has publicly stated that the threat of antitrust enforcement is "an existential threat" to his platform.[19]

### A. White House Defendants[20]

Plaintiffs assert that by using emails, public and private messages, public and private meetings, and other means, the White House Defendants have "significantly encouraged" and "coerced" social-media platforms to suppress protected free speech posted on social-media platforms.

(1)     On January 23, 2021, three days after President Biden took office, Clarke Humphrey ("Humphrey"), who at the time was the Digital Director for the COVID-19 Response Team, emailed Twitter and requested the removal of an anti-COVID-19 vaccine tweet by Robert F. Kennedy, Jr.[21] Humphrey sent a copy of the email to Rob Flaherty ("Flaherty"), former Deputy Assistant to the President and Director of Digital Strategy, on the email and asked if "we can keep an eye out for tweets that fall in this same genre." The email read, "Hey folks-Wanted to flag the below tweet and am wondering if we can get moving on the process of having it removed ASAP."[22]

(2)     On February 6, 2021, Flaherty requested Twitter to remove a parody account linked to Finnegan Biden, Hunter Biden's daughter and President Biden's granddaughter. The request stated, "Cannot stress the degree to which this needs to be resolved immediately," and "Please remove this account immediately."[23] Twitter suspended the parody account within forty-five minutes of Flaherty's request.

---

[19] [Doc. No. 212-3, citing Doc. No. 10-1, at 202]
[20] White House Defendants consists of President Joseph R. Biden ("President Biden"), White House Press Secretary Karine Jean-Pierre ("Jean-Pierre"), Ashley Morse ("Morse"), Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Stuart F. Delery ("Delery"), Mina Hsiang ("Hsiang"), and Dr. Hugh Auchincloss (Dr. Auchincloss")
[21] [Doc. No. 174-1, Exh. A. at 1]
[22] [Id. at 2]
[23] [Doc. No. 174-1, Exh. A. at 4]

(3)     On February 7, 2021, Twitter sent Flaherty a "Twitter's Partner Support Portal" for expedited review of flagging content for censorship. Twitter recommended that Flaherty designate a list of authorized White House staff to enroll in Twitter's Partner Support Portal and explained that when authorized reporters submit a "ticket" using the portal, the requests are "prioritized" automatically. Twitter also stated that it had been "recently bombarded" with censorship requests from the White House and would prefer to have a streamlined process. Twitter noted that "[i]n a given day last week for example, we had more than four different people within the White House reaching out for issues."[24]

(4)     On February 8, 2021, Facebook emailed Flaherty, and Humphrey to explain how it had recently expanded its COVID-19 censorship policy to promote authoritative COVID-19 vaccine information and expanded its efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines, and vaccines in general. Flaherty responded within nineteen minutes questioning how many times someone can share false COVID-19 claims before being removed, how many accounts are being flagged versus removed, and how Facebook handles "dubious," but not "provably false," claims.[25] Flaherty demanded more information from Facebook on the new policy that allows Facebook to remove posts that repeatedly share these debunked claims.

(5)     On February 9, 2021, Flaherty followed up with Facebook in regard to its COVID-19 policy, accusing Facebook of causing "political violence" spurred by Facebook groups by failing to censor false COVID-19 claims, and suggested having an oral meeting to discuss their policies.[26] Facebook responded the same day and stated that "vaccine-skeptical" content does not

---

[24] [Doc. No. 174-1 at 3]
[25] [Id. at 5–8]
[26] [Id. at 6–8]

violate Facebook's policies.[27] However, Facebook stated that it will have the content's "distribution reduced" and strong warning labels added, "so fewer people will see the post."[28] In other words, even though "vaccine-skeptical" content did not violate Facebook's policy, the content's distribution was still being reduced by Facebook.

Facebook also informed Flaherty that it was working to censor content that does not violate Facebook's policy in other ways by "preventing posts discouraging vaccines from going viral on our platform" and by using information labels and preventing recommendations for Groups, Pages, and Instagram accounts pushing content discouraging vaccines. Facebook also informed Flaherty that it was relying on the advice of "public health authorities" to determine its COVID-19 censorship policies.[29] Claims that have been "debunked" by public health authorities would be removed from Facebook. Facebook further promised Flaherty it would aggressively enforce the new censorship policies and requested a meeting with Flaherty to speak to Facebook's misinformation team representatives about the latest censorship policies.[30] Facebook also referenced "previous meetings" between the White House and Facebook representatives during the "transition period" (likely referencing the Biden Administration transition).[31]

(6)     On February 24, 2021, Facebook emailed Flaherty about "Misinfo Themes" to follow up on his request for COVID and vaccine misinformation themes on Facebook. Some of the misinformation themes Facebook reported seeing were claims of vaccine toxicity, claims about the side effects of vaccines, claims comparing the COVID vaccine to the flu vaccine, and claims downplaying the severity of COVID-19. Flaherty responded by asking for details about

---

[27] [Id.]
[28] [Id.]
[29] [Id.]
[30] [Id. at 6]
[31] [Id. at 5]

Facebook's actual enforcement practices and for a report on misinformation that was not censored. Specifically, his email read, "Can you give us a sense of volume on these, and some metrics around the scale of removal for each? Can you also give us a sense of misinformation that might be falling outside your removal policies?"[32] Facebook responded that at their upcoming meeting, they "can definitely go into detail on content that doesn't violate like below, but could 'contribute to vaccine hesitancy.'"[33]

(7)     On March 1, 2021, Flaherty and Humphrey (along with Joshua Peck ("Peck"), the Health and Human Services' ("HHS") Deputy Assistant Secretary) participated in a meeting with Twitter about misinformation. After the meeting, Twitter emailed those officials to assure the White House that Twitter would increase censorship of "misleading information" on Twitter, stating "[t]hanks again for meeting with us today. As we discussed, we are building on 'our' continued efforts to remove the most harmful COVID-19 'misleading information' from the service."[34]

(8)     From May 28, 2021, to July 10, 2021, a senior Meta executive reportedly copied Andrew Slavitt ("Slavitt"), former White House Senior COVID-19 Advisor, on his emails to Surgeon General Murthy ("Murthy"), alerting them that Meta was engaging in censorship of COVID-19 misinformation according to the White House's "requests" and indicating "expanded penalties" for individual Facebook accounts that share misinformation.[35] Meta also stated, "We think there is considerably more we can do in '*partnership*' with you and your team to drive behavior."[36]

---

[32] [Doc. No. 214-9 at 2–3]
[33] [Id.]
[34] [Doc. No. 214-10 at 2, Jones Declaration, #10, Exh. H] SEALED DOCUMENT
[35] [Doc. No. 71-4 at 6–11]
[36] [Id. at 10] (emphasis added)

(9)    On March 12, 2021, Facebook emailed Flaherty stating, "Hopefully, this format works for the various teams and audiences within the White House/HHS that may find this data valuable."[37] This email also provided a detailed report and summary regarding survey data on vaccine uptake from January 10 to February 27, 2021.[38]

(10)    On March 15, 2021, Flaherty acknowledged receiving Facebook's detailed report and demanded a report from Facebook on a recent Washington Post article that accused Facebook of allowing the spread of information leading to vaccine hesitancy. Flaherty emailed the Washington Post article to Facebook the day before, with the subject line: "You are hiding the ball," and stated "I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content as you define it – is playing a role."[39]

After Facebook denied "hiding the ball," Flaherty followed up by making clear that the White House was seeking more aggressive action on "borderline content."[40] Flaherty referred to a series of meetings with Facebook that were held in response to concerns over "borderline content" and accused Facebook of deceiving the White House about Facebook's "borderline policies."[41] Flaherty also accused Facebook of being the "top driver of vaccine hesitancy."[42] Specifically, his email stated:

> I am not trying to play 'gotcha' with you.  We are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on.

---

[37] [Doc. No. 174-1 at 9]
[38] [Id.]
[39] [Id. at 11]
[40] [Id. at 11–12]
[41] [Id.]
[42] [Id. at 11]

14a

This would all be a lot easier if you would just be straight with us.[43]

In response to Flaherty's email, Facebook responded, stating: "We obviously have work to do to gain your trust…We are also working to get you useful information that's on the level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."[44]

Slavitt, who was copied on Facebook's email, responded, accusing Facebook of not being straightforward, and added more pressure by stating, "internally, we have been considering our options on what to do about it."[45]

(11)  On March 19, 2021, Facebook had an in-person meeting with White House officials, including Flaherty and Slavitt.[46] Facebook followed up on Sunday, March 21, 2021, noting that the White House had demanded a consistent point of contact with Facebook, additional data from Facebook, "Levers for Tackling Vaccine Hesitancy Content," and censorship policies for Meta's platform WhatsApp.[47] Facebook noted that in response to White House demands, it was censoring, removing, and reducing the virality of content discouraging vaccines "that does not contain actionable misinformation."[48] Facebook also provided a report for the White House on the requested information on WhatsApp policies:

> You asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include the additional changes that were approved last week and that we will be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines that do not contain actionable misinformation.[49]

---

[43] [Id. at 11]
[44] [Id. at 11]
[45] [Id. at 10]
[46] [Id. at 15]
[47] [Id.]
[48] [Id. at 15]
[49] [Id. at 15]

On March 22, 2021, Flaherty responded to this email, demanding more detailed information and a plan from Facebook to censor the spread of "vaccine hesitancy" on Facebook.[50] Flaherty also requested more information about and demanded greater censorship by Facebook of "sensational," "vaccine skeptical" content.[51] He also requested more information about WhatsApp regarding vaccine hesitancy.[52] Further, Flaherty seemingly spoke on behalf of the White House and stated that the White House was hoping they (presumably the White House and Facebook) could be "partners here, even if it hasn't worked so far."[53] A meeting was scheduled the following Wednesday between Facebook and White House officials to discuss these issues.

On April 9, 2021, Facebook responded to a long series of detailed questions from Flaherty about how WhatsApp was censoring COVID-19 misinformation. Facebook stated it was "reducing viral activity on our platform" through message-forward limits and other speech-blocking techniques.[54] Facebook also noted it bans accounts that engage in those that seek to exploit COVID-19 misinformation.[55]

Flaherty responded, "I care mostly about what actions and changes you are making to ensure you're not making our country's vaccine hesitancy problem worse," accusing Facebook of being responsible for the Capitol riot on January 6, 2021, and indicating that Facebook would be similarly responsible for COVID-related deaths if it did not censor more information.[56] "You only

---

[50] [Id.]
[51] [Id.]
[52] [Id.]
[53] [Id. at 14]
[54] [Id. at 17]
[55] [Id. at 17]
[56] [Id. at 17–21]

did this, however, after an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform."[57]

(12)   On April 14, 2021, Flaherty demanded the censorship of Fox News hosts Tucker Carlson and Tomi Lahren because the top post about vaccines that day was "Tucker Carlson saying vaccines don't work and Tomi Lahren stating she won't take a vaccine."[58] Flaherty stated, "This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with Tucker Carlson saying it does not work'… then…I'm not sure it's reduction!"[59]

Facebook promised the White House a report by the end of the week.[60]

(13)   On April 13, 2021, after the temporary halt of the Johnson & Johnson vaccine, the White House was seemingly concerned about the effect this would have on vaccine hesitancy. Flaherty sent to Facebook a series of detailed requests about how Facebook could "amplify" various messages that would help reduce any effects this may have on vaccine hesitancy.[61]

Flaherty also requested that Facebook monitor "misinformation" relating to the Johnson & Johnson pause and demanded from Facebook a detailed report within twenty-four hours. Facebook provided the detailed report the same day.[62] Facebook responded, "Re the J & J news, we're keen to amplify any messaging you want us to project about what this means for people."[63]

(14)   Facebook responded to a telephone call from Rowe about how it was censoring information with a six-page report on censorship with explanations and screen shots of sample posts of content that it does and does not censor. The report noted that vaccine hesitancy content

---

[57] [Id. at 17]
[58] [Id. at 22]
[59] [Id. at 22]
[60] [Id. at 23]
[61] [Id. at 30–31]
[62] [Id. at 31]
[63] [Id. at 31–32]

does not violate Facebook's content-moderation policies, but indicated that Facebook still censors this content by suppressing it in news feeds and algorithms.[64] Other content that Facebook admitted did not violate its policy but may contribute to vaccine hesitancy are: a) sensational or alarmist vaccine misrepresentation; b) disparaging others based on the choice to or not to vaccinate; c) true but shocking claims or personal anecdotes; d) discussing the choice to vaccinate in terms of personal or civil liberties; and e) concerns related to mistrust in institutions or individuals.[65] Facebook noted it censors such content through a "spectrum of levers" that includes concealing the content from other users, "de-boosting" the content, and preventing sharing through "friction."[66] Facebook also mentioned looking forward to tomorrow's meeting "and how we can hopefully partner together."[67]

Other examples of posts that did not violate Facebook's policies but would nonetheless be suppressed included content that originated from the Children's Health Defense, a nonprofit activist group headed by Robert F. Kennedy, Jr. (labeled by Defendants as one of the "Disinformation Dozen").[68]

(15)    On April 14, 2021, Slavitt emailed Facebook executive Nick Clegg ("Clegg") with a message expressing displeasure with Facebook's failure to censor Tucker Carlson. Slavitt stated, "Not for nothing but the last time we did this dance, it ended in an insurrection."[69] The subject line was "Tucker Carlson anti-vax message."[70] Clegg responded the same day with a detailed report about the Tucker Carlson post, stating that the post did not qualify for removal under Facebook

---

[64] [Id. at 24–25]
[65] [Id.]
[66] [Id. at 24–25]
[67] [Id. at 24]
[68] [Id. at 25–27]
[69] [Id. at 34]
[70] Id. at 33]

policy but that the video was being labeled with a pointer to authoritative COVID-19 information, not being recommended to people, and that the video was being "*demoted*."[71]

After Brian Rice ("Rice") of Facebook forwarded the same report on the Tucker Carlson post to Flaherty on April 14, 2021, Flaherty responded to Rice wanting a more detailed explanation of why Facebook had not removed the Tucker Carlson video and questioning how the video had been "demoted" since there were 40,000 shares.[72] Flaherty followed up six minutes later alleging Facebook provided incorrect information through Crowd Tangle.[73]

Two days later, on April 16, 2021, Flaherty demanded immediate answers from Facebook regarding the Tucker Carlson video.[74] Facebook promised to get something to him that night. Facebook followed up on April 21, 2021, with an additional response in regard to an apparent call from Flaherty ("thanks for catching up earlier").[75] Facebook reported the Tucker Carlson content had not violated Facebook's policy, but Facebook gave the video a 50% demotion for seven days and stated that it would continue to demote the video.[76]

(16)     On April 21, 2021, Flaherty, Slavitt, and other HHS officials, met with Twitter officials about "Twitter Vaccine Misinfo Briefing." The invite stated the White House would be briefed by Twitter on vaccine information, trends seen generally about vaccine information, the tangible effects seen from recent policy changes, what interventions were being implemented, previous policy changes, and ways the White House could "partner" in product work.[77]

---

[71] [Id. at 36]
[72] [Id. at 33–34]
[73] [Id.]
[74] [Id. at 33]
[75] [Id.]
[76] [Id. at 33, 36]
[77] [Doc. No. 71-7 at 86].

Twitter discovery responses indicated that during the meeting, White House officials wanted to know why Alex Berenson ("Berenson") had not been "kicked off" Twitter.[78] Slavitt suggested Berenson was "the epicenter of disinfo that radiated outwards to the persuadable public."[79] Berenson was suspended thereafter on July 16, 2021, and was permanently de-platformed on August 28, 2021.[80]

(17)     Also on April 21, 2021, Flaherty, Slavitt, and Fitzpatrick had a meeting with several YouTube officials. The invitation stated the purpose of this meeting was for the White House to be briefed by YouTube on general trends seen around vaccine misinformation, the effects of YouTube's efforts to combat misinformation, interventions YouTube was trying, and ways the White House can "partner" in product work.[81]

In an April 22, 2021, email, Flaherty provided a recap of the meeting and stated his concern that misinformation on YouTube was "shared at the highest (and I mean the highest) levels of the White House."[82] Flaherty indicated that the White House remains concerned that YouTube is "funneling people into hesitancy and intensifying people's vaccine hesitancy."[83] Flaherty further shared that "we" want to make sure YouTube has a handle on vaccine hesitancy and is working toward making the problem better.[84] Flaherty again noted vaccine hesitancy was a concern that is shared by the highest ("and I mean the highest") levels of the White House.[85]

Flaherty further indicated that the White House was coordinating with the Stanford Internet Observatory (which was operating the Virality Project): "Stanford" has mentioned that it's recently

---

[78] [Doc. No. 212-14 at 2–5]
[79] [Id.]
[80] [Doc. No. 212-14, Exh. J, at 2–5]
[81] [Doc. No. 212-15, Exh. K, at 1–4] SEALED DOCUMENT
[82] [Doc. No. 174-1 at 39-40]
[83] [Id.]
[84] [Id.]
[85] [Doc. No. 174-1 at 39–40]

Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing."[86] Flaherty praised YouTube for reducing distribution of content: "I believe you said you reduced watch time by 70% on borderline content, which is impressive."[87] However, Flaherty followed up with additional demands for more information from YouTube. Flaherty emphasized that the White House wanted to make sure YouTube's work extends to the broader problem of people viewing "vaccine-hesitant content."[88] Flaherty also suggested regular meetings with YouTube ("Perhaps bi-weekly") as they have done with other "platform partners."[89]

(18)   On April 23, 2021, Flaherty sent Facebook an email including a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" ("the Brief"), which indicated that Facebook plays a major role in the spread of COVID vaccine misinformation and found that Facebook's policy and enforcement gaps enable misinformation to spread.[90] The Brief recommended much more aggressive censorship of Facebook's enforcement policies and called for progressively severe penalties. The Brief further recommended Facebook stop distributing anti-vaccine content in News Feed or in group recommendations. The Brief also called for "warning screens" before linking to domains known to promote vaccine misinformation.[91] Flaherty noted sending this Brief was not a White House endorsement of it, but "this is circulating around the building and informing thinking."[92]

On May 1, 2021, Facebook's Clegg sent an email to Slavitt indicating Facebook and the White House met recently to "share research work."[93] Clegg apologized for not catching and

---

[86] [Id. at 39]
[87] [Id.]
[88] [Doc. No. 214-1 at 39–40]
[89] [Id. at 39–40]
[90] [Doc. No. 214-14 at 2–3]
[91] [Id.]
[92] [Doc. No. 214-14 at 2–3, Jones Declaration]
[93] [Doc. No. 214-1]

censoring three pieces of vaccine content that went viral and promised to censor such content more aggressively in the future:

> I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral, and this has exposed gaps in our operational and technical process.

Notably, these three pieces of information did not violate Facebook's policies. Clegg told Slavitt that Facebook teams had spent the past twenty-four hours analyzing gaps in Facebook and were making several changes next week.[94]

Clegg listed—in bold—demands that the White House had made in a recent meeting and provided a response to each. The demands were: a) address Non-English mis/disinformation circulating without moderation; b) do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation; c) monitor events that host anti-vaccine and COVID disinformation; and d) address twelve accounts that were responsible for 73% of vaccine misinformation.[95] Facebook noted that it was scrutinizing these accounts and censoring them whenever it could, but that most of the content did not violate Facebook's policies.[96] Facebook referred to its new policy as their "Dedicated Vaccine Discouraging Entities."[97] Facebook even suggested that too much censorship might be counterproductive and drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more

---

[94] [Doc. No. 214-1 at ¶ 116].
[95] [Doc. No. 174-1 at 41–42]
[96] [Doc. No. 174-1 at 41–42].
[97] [Id.]

counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a 'cover-up.'"[98]

(19)    On May 5, 2021, then-White House Press Secretary Jen Psaki ("Psaki") publicly began pushing Facebook and other social-media platforms to censor COVID-19 misinformation. At a White House Press Conference, Psaki publicly reminded Facebook and other social-media platforms of the threat of "legal consequences" if they do not censor misinformation more aggressively. Psaki further stated: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19 vaccinations and elections."[99] Psaki linked the threat of a "robust anti-trust program" with the White House's censorship demand. "He also supports better privacy protections and a robust anti-trust program. So, his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometime life-threatening information, is not going out to the American public."[100]

The next day, Flaherty followed up with another email to Facebook and chastised Facebook for not catching various COVID-19 misinformation. Flaherty demanded more information about Facebook's efforts to demote borderline content, stating, "Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quicky?"[101] Flaherty also criticized Facebook's efforts to censor the "Disinformation Dozen":

---

[98] [Id. at 42]
[99] [Doc. No. 266-6 at 374]
[100] [Id.]
[101] [Doc. No. 174-1 at 41]

23a

"Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo-dozen – they're being deemed as not dedicated – so it feels like that problem likely coming over to groups."[102]

Things apparently became tense between the White House and Facebook after that, culminating in Flaherty's July 15, 2021 email to Facebook, in which Flaherty stated: "Are you guys fucking serious? I want an answer on what happened here and I want it today."[103]

(20)     On July 15, 2021, things became even more tense between the White House, Facebook, and other social-media platforms. At a joint press conference between Psaki and Surgeon General Murthy to announce the Surgeon General's "Health Advisory on Misinformation,"[104] Psaki announced that Surgeon General Murthy had published an advisory on health misinformation as an urgent public health crisis.[105] Murthy announced: "Fourth, we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms."[106]Psaki further stated, "We are in regular touch with these social-media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team," and "We're flagging problematic posts for Facebook that spread disinformation."[107]

Psaki followed up by stating that the White House's "asks" include four key steps by which social-media companies should: 1) measure and publicly share the impact of misinformation on

---

[102] [Id.]
[103] [Id. at 55]
[104] [Doc. No. 210-1 at 16 (Waldo Depo, Exh. 10)]
[105] [Id. at 162]
[106] [Doc. No. 10-1 at 370]
[107] [Id. at 376–77]

their platforms; 2) create a robust enforcement strategy; 3) take faster action against harmful posts; and 4) promote quality information sources in their feed algorithms.[108]

The next day, on July 16, 2021, President Biden, after being asked what his message was to social-media platforms when it came to COVID-19, stated, "[T]hey're killing people."[109] Specifically, he stated "Look, the only pandemic we have is among the unvaccinated, and that they're killing people."[110] Psaki stated the actions of censorship Facebook had already conducted were "clearly not sufficient."[111]

Four days later, on July 20, 2021, at a White House Press Conference, White House Communications Director Kate Bedingfield ("Bedingfield") stated that the White House would be announcing whether social-media platforms are legally liable for misinformation spread on their platforms and examining how misinformation fits into the liability protection granted by Section 230 of the Communications Decency Act (which shields social-media platforms from being responsible for posts by third parties on their sites).[112] Bedingfield further stated the administration was reviewing policies that could include amending the Communication Decency Act and that the social-media platforms "should be held accountable."[113]

(21)   The public and private pressure from the White House apparently had its intended effect. All twelve members of the "Disinformation Dozen" were censored, and pages, groups, and accounts linked to the Disinformation Dozen were removed.[114]

---

[108] [Id. at 377–78]
[109] [Doc. No. 10-1 at 370]
[110] [Id. at 436–37]
[111] [Doc. No. 10-1 at 446]
[112] [Doc. No. 10-1 at 477–78]
[113] [Id.]
[114] [Doc. No. 10-1 at 483–85]

Twitter suspended Berenson's account within a few hours of President Biden's July 16, 2021 comments.[115] On July 17, 2021, a Facebook official sent an email to Anita B. Dunn ("Dunn"), Senior Advisor to the President, asking for ways to "get back into the White House's good graces" and stated Facebook and the White House were "100% on the same team here in fighting this."[116]

(22)    On November 30, 2021, the White House's Christian Tom ("Tom") emailed Twitter requesting that Twitter watch a video of First Lady Jill Biden that had been edited to make it sound as if the First Lady were profanely heckling children while reading to them.[117] Twitter responded within six minutes, agreeing to "escalate with the team for further review."[118] Twitter advised users that the video had been edited for comedic effect. Tom then requested Twitter apply a "Manipulated Media" disclaimer to the video.[119] After Twitter told Tom the video was not subject to labeling under its policy, Tom disputed Twitter's interpretation of its own policy and added Michael LaRosa ("LaRosa"), the First Lady's Press Secretary, into the conversation.[120] Further efforts by Tom and LaRosa to censor the video on December 9, 13, and 17 finally resulted in the video's removal in December 2021.[121]

(23)    In January 2022, Facebook reported to Rowe, Murthy, Flaherty, and Slavitt that it had "labeled and demoted" vaccine humor posts whose content could discourage vaccination.[122] Facebook also reported to the White House that it "labeled and 'demoted' posts suggesting natural immunity to a COVID-19 infection is superior to vaccine immunity."[123] In January 2022, Jesse

---

[115] [Doc. No. 214-12 at 2–5]
[116] [Doc. No. 174-1 at 49]
[117] [Doc. No. 174-1 at 59–67]
[118] [Id.]
[119] [Id.]
[120] [Id.]
[121] [Id. at 59–67]
[122] [Doc. No. 71-3 at 10–11]
[123] [Doc. No. 71-3 at 10–11]

Lee ("Lee") of the White House sent an email accusing Twitter of calling the President a liar in regard to a Presidential tweet.[124]

At a February 1, 2022, White House press conference, Psaki stated that the White House wanted every social-media platform to do more to call out misinformation and disinformation, and to uplift accurate information.[125]

At an April 25, 2022, White House press conference, after being asked to respond to news that Elon Musk may buy Twitter, Psaki again mentioned the threat to social-media companies to amend Section 230 of the Communications Decency Act, linking these threats to social-media platforms' failure to censor misinformation and disinformation.[126]

On June 13, 2022, Flaherty demanded Meta continue to produce periodic COVID-19 insight reports to track COVID-19 misinformation, and he expressed a concern about misinformation regarding the upcoming authorization of COVID-19 vaccines for children under five years of age. Meta agreed to do so on June 22, 2022.[127]

(24)    In addition to misinformation regarding COVID-19, the White House also asked social-media companies to censor misinformation regarding climate change, gender discussions, abortion, and economic policy. At an Axios event entitled "A Conversation on Battling Misinformation," held on June 14, 2022, the White House National Climate Advisor Gina McCarthy ("McCarthy") blamed social-media companies for allowing misinformation and disinformation about climate change to spread and explicitly tied these censorship demands with threats of adverse legislation regarding the Communications Decency Act.[128]

---

[124] [Doc. No. 174-1 at 69]
[125] [Doc. No. 10-1 at 501–2]
[126] [Id. at 62–63, ¶¶ 193–197]
[127] [Doc. No. 71-3 at 5–6]
[128] [Doc. No. 214-15]

On June 16, 2022, the White House announced a new task force to target "general misinformation" and disinformation campaigns targeted at women and LBGTQI individuals who are public and political figures, government and civic leaders, activists, and journalists.[129] The June 16, 2022, Memorandum discussed the creation of a task force to reel in "online harassment and abuse" and to develop programs targeting such disinformation campaigns.[130] The Memorandum also called for the Task Force to confer with technology experts and again threatened social-media platforms with adverse legal consequences if the platforms did not censor aggressively enough.[131]

On July 8, 2022, President Biden signed an Executive Order on protecting access to abortion. Section 4(b)(iv) of the order required the Attorney General, the Secretary of HHS, and the Chair of the Federal Trade Commission to address deceptive or fraudulent practices relating to reproductive healthcare services, including those online, and to protect access to accurate information.[132]

On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter to one of President Biden's tweets about gas prices.[133]

(25)    On August 23, 2021, Flaherty emailed Facebook requesting a report on how Facebook intended to promote the FDA approval of the Pfizer vaccine. He also stated that the White House would appreciate a "push" and provided suggested language.[134]

---

[129] [Doc. No. 214-15[
[130] [Id.]
[131] [Doc. No. 214-16]
[132] [Doc. No. 214-18]
[133] [Doc. No. 174-1 at 68]
[134] [Id.]

## B. Surgeon General Defendants[135]

Surgeon General Murthy is the Surgeon General of the United States. Eric Waldo ("Waldo") is the Senior Advisor to the Surgeon General and was formerly Chief Engagement Officer for the Surgeon General's office. Waldo's Deposition was taken as part of the allowed Preliminary Injunction-related discovery in this matter.[136]

(1)     Waldo was responsible for maintaining the contacts and relationships with representatives of social-media platforms. Waldo did pre-rollout calls with Twitter, Facebook, and Google/YouTube before the Surgeon General's health advisory on misinformation was published on July 15, 2021.[137] Waldo admitted that Murthy used his office to directly advocate for social-media platforms to take stronger actions against health "misinformation" and that those actions involved putting pressure on social-media platforms to reduce the dissemination of health misinformation.[138] Surgeon General Murthy's message was given to social-media platforms both publicly and privately.[139]

(2)     At a July 15, 2021 joint press conference between Psaki and Murthy, the two made the comments mentioned previously in II A(19), which publicly called for social-media platforms "to do more" to take action against misinformation super-spreaders.[140] Murthy was directly involved in editing and approving the final work product for the July 15, 2021 health advisory on misinformation.[141] Waldo also admitted that Murthy used his "bully pulpit" to talk about health misinformation and to put public pressure on social-media platforms.[142]

---

[135] Surgeon General Defendants consists of Dr. Vivek H. Murthy ("Murthy") and Katharine Dealy ("Dealy").
[136] [Doc. No. 210]
[137] [Doc. No. 210 at 11, 20]
[138] [Id. at 25, 28]
[139] [Id. at 11, 20, 25, 28]
[140] [Id. at 33–35]
[141] [Waldo depo at 14–17]
[142] [Id. at 29]

(3)    Waldo's initial rollout with Facebook was negatively affected because of the public attacks by the White House and Office of the Surgeon General towards Facebook for allowing misinformation to spread.[143] Clegg of Facebook reached out to attempt to request "de-escalation" and "working together" instead of the public pressure.[144] In the call between Clegg and Murthy, Murthy told Clegg he wanted Facebook to do more to censor misinformation on its platforms. Murthy also requested Facebook share data with external researchers about the scope and reach of misinformation on Facebook's platforms to better understand how to have external researchers validate the spread of misinformation.[145] "Data about misinformation" was the topic of conversation in this call; DJ Patil, chief data scientist in the Obama Administration, Murthy, Waldo, and Clegg all participated on the call. The purpose of the call was to demand more information from Facebook about monitoring the spread of misinformation.[146]

(4)    One of the "external researchers" that the Office of Surgeon General likely had in mind was Renee DiResta ("DiResta") from the Stanford Internet Observatory, a leading organization of the Virality Project.[147] The Virality Project hosted a "rollout event" for Murthy's July 15, 2021 press conference.[148]

There was coordination between the Office of the Surgeon General and the Virality Project on the launch of Murthy's health advisory.[149] Kyla Fullenwider ("Fullenwider") is the Office of the Surgeon General's key subject-matter expert who worked on the health advisory on misinformation. Fullenwider works for a non-profit contractor, United States' Digital Response.[150]

---

[143] [Id. at 91–94]
[144] [Doc. No. 210 at 95–98]
[145] [Id.]
[146] [Doc. No. 210 at 95–98]
[147] The Virality Project will be discussed later in greater detail.
[148] [Id. at 36–38]
[149] [Id. at 38]
[150] [Id. at 39, 59, 85]

Waldo, Fullenwider, and DiResta were involved in a conference call after the July 15, 2021 press conference where they discussed misinformation.[151] The Office of the Surgeon General anticipated that social-media platforms would feel pressured by the Surgeon General's health advisory.[152]

(5)     Waldo and the Office of the Surgeon General received a briefing from the Center for Countering Digital Hate ("CCDH") about the "Disinformation Dozen." CCDH gave a presentation about the Disinformation Dozen and how CCDH measured and determined that the Disinformation Dozen were primarily responsible for a significant amount of online misinformation.[153]

(6)     In his deposition, Waldo discussed various phone calls and communications between Defendants and Facebook. In August of 2021, Waldo joined a call with Flaherty and Brian Rice of Facebook.[154] The call was an update by Facebook about the internal action it was taking regarding censorship.[155] Waldo was aware of at least one call between Murthy and Facebook in the period between President Biden's election and assuming office, and he testified that the call was about misinformation.[156] Waldo was also aware of other emails and at least one phone call where Flaherty communicated with Facebook.[157]

(7)     The first meeting between the Office of the Surgeon General and social-media platforms occurred on May 25, 2021, between Clegg, Murthy, and Slavitt. The purpose of this call was to introduce Murthy to Clegg. Clegg emailed Murthy with a report of misinformation on Facebook on May 28, 2021.[158]

---

[151] [Id.]
[152] [Id. at 39, 59, 85]
[153] [Id. at 43, 47]
[154] [Id. at 66, 124–25]
[155] [Id. at 66, 124–25]
[156] [Id. at 55–56]
[157] [Id. at 64–65]
[158] [Doc. No. 210-4]

31a

Policy updates about increasing censorship were announced by Facebook on May 27, 2021.[159] The Office of the Surgeon General had a pre-rollout (i.e., before the rollout of the Surgeon General's health advisory on misinformation) call with Twitter and YouTube on July 12 and July 14, 2021.[160] The Office of the Surgeon General had a rollout call with Facebook on July 16, 2021. The July 16 call with Facebook was right after President Biden had made his "[T]hey're killing people" comment (II A (19), above), and it was an "awkward call" according to Waldo.[161]

Another call took place on July 23, 2021, between Murthy, Waldo, DJ Patil, Clegg, and Rice. Clegg shared more about the spread of information and disinformation on Facebook after the meeting. At the meeting, Murthy raised the issue of wanting to have a better understanding of the reach of misinformation and disinformation as it relates to health on Facebook; Murthy often referred to health misinformation in these meetings as "poison."[162] The Surgeon General's health advisory explicitly called for social-media platforms to do more to control the reach of misinformation.[163]

On July 30, 2021, Waldo had a meeting with Google and YouTube representatives. At the meeting, Google and YouTube reported to the Office of the Surgeon General what actions they were taking following the Surgeon General's health advisory on misinformation.[164]

On August 10, 2021, Waldo and Flaherty had a call with Rice calling for Facebook to report to federal officials as to Facebook's actions to remove "disinformation" and to provide details regarding a vaccine misinformation operation Facebook had uncovered.[165]

---

[159] [Id. at 78, Exh. 3]
[160] [Id. at 85]
[161] [Id.]
[162] [Id. at 95–98, 101, 105]
[163] [Id. at 107–08]
[164] [Doc. No. 210-4 at 33]
[165] [Id.]

Another meeting took place between Google/YouTube, Waldo, and Flaherty on September 14, 2021, to discuss a new policy YouTube was working on and to provide the federal officials with an update on YouTube's efforts to combat harmful COVID-19 misinformation on its platform.[166]

(8)     After the meetings with social-media platforms, the platforms seemingly fell in line with the Office of Surgeon General's and White House's requests. Facebook announced policy updates about censoring misinformation on May 27, 2021, two days after the meeting.[167] As promised, Clegg provided an update on misinformation to the Office of Surgeon General on May 28, 2021, three days after the meeting[168] and began sending bi-weekly COVID content reports on June 14, 2021.[169]

On July 6, 2021, Waldo emailed Twitter to set up the rollout call for the Office of the Surgeon General's health advisory on misinformation and told Twitter that Murthy had been thinking about how to stop the spread of health misinformation; that he knew Twitter's teams were working hard and thinking deeply about the issue; and that he would like to chat over Zoom to discuss.[170] Twitter ultimately publicly endorsed the Office of the Surgeon General's call for greater censorship of health misinformation.[171]

Waldo sent an email to YouTube on July 6, 2021, to set up the rollout call and to state that the Office of the Surgeon General's purpose was to stop the spread of misinformation on social-media platforms.[172] YouTube eventually adopted a new policy on combatting COVID-19

---

[166] [Id. at 129]
[167] [Doc. No. 210-1 at 138]
[168] [Doc. No. 210-5 at 1–2]
[169] [Doc. No. 210-6]
[170] [Doc. No. 210-7 at 145–46]
[171] [Id.]
[172] [Doc. No. 210-8]

misinformation and began providing federal officials with updates on YouTube's efforts to combat the misinformation.[173]

(9)     At the July 15, 2021 press conference, Murthy described health misinformation as one of the biggest obstacles to ending the pandemic; insisted that his advisory was on an urgent public health threat; and stated that misinformation poses an imminent threat to the nation's health and takes away the freedom to make informed decisions.[174] Murthy further stated that health disinformation is false, inaccurate, or misleading, based upon the best evidence at the time.[175]

Murthy also stated that people who question mask mandates and decline vaccinations are following misinformation, which results in illnesses and death.[176] Murthy placed specific blame on social-media platforms for allowing "poison" to spread and further called for an "all-of-society approach" to fight health misinformation.[177] Murthy called upon social-media platforms to operate with greater transparency and accountability, to monitor information more clearly, and to "consistently take action against misinformation super-spreaders on their platforms."[178] Notably, Waldo agreed in his deposition that the word "accountable" carries with it the threat of consequences.[179] Murthy further demanded social-media platforms do "much, much, more" and take "aggressive action" against misinformation because the failure to do so is "costing people their lives."[180]

(10)     Murthy's July 15, 2021 health advisory on misinformation blamed social-media platforms for the spread of misinformation at an unprecedented speed, and it blamed social-media

---

[173] [Doc. No. 210-8].
[174] [Doc. No. 210-11]
[175] [Doc. No. 210-11]
[176] [Doc. No. 210-11]
[177] [Id.]
[178] [Id.]
[179] [Id.]
[180] [Id.]

features and algorithms for furthering the spread.[181] The health advisory further called for social-media platforms to enact policy changes to reduce the spread of misinformation, including appropriate legal and regulatory measures.[182]

Under a heading entitled "What Technology Platforms Can Do," the health advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of misinformation, including product changes, changing algorithms to avoid amplifying misinformation, building in "frictions" to reduce the sharing of misinformation, and practicing the early detection of misinformation super-spreaders, along with other measures.[183] The consequences for misinformation would include flagging problematic posts, suppressing the spread of the information, suspension, and permanent de-platforming.[184]

(11)    The Office of the Surgeon General collaborated and partnered with the Stanford University Internet Observatory and the Virality Project. Murthy participated in a January 15, 2021 launch of the Virality Project. In his comments, Murthy told the group, "We're asking technology companies to operate with great transparency and accountability so that misinformation does not continue to poison our sharing platforms and we knew the government can play an important role, too."[185]

Murthy expressly mentioned his coordination with DiResta at the Virality Project and expressed his intention to maintain that collaboration. He claimed that he had learned a lot from the Virality Project's work and thanked the Virality Project for being such a great "partner."[186]

---

[181] [Doc. No. 210-11]
[182] [Id.]
[183] [Id.]
[184] [Id.]
[185] [Doc. No. 210-13, Doc. No. 210, at 206–07].
[186] [Doc. No. 210-1 at 213]

Murthy also stated that the Office of the Surgeon General had been "partnered with" the Stanford Internet Observatory for many months.[187]

(12)    After President Biden's "[T]hey're killing people" comment on July 16, 2021, Facebook representatives had "sad faces" according to Waldo. On July 21, 2021, Facebook emailed Waldo and Fullenwider with CrowdTangle data and with "interventions" that created "frictions" with regard to COVID misinformation. The interventions also included limiting forwarding of WhatsApp messages, placing warning labels on fact-checked content, and creating "friction" when someone tries to share these posts on Facebook. Facebook also reported other censorship policy and actions, including censoring content that contributes to the risk of imminent physical harm, permanently banning pages, groups, and accounts that repeatedly broke Facebook's COVID-19 misinformation rules, and reducing the reach of posts, pages, groups, and accounts that share other false claims "that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines."[188]

On July 16, 2021, Clegg emailed Murthy and stated, "I know our teams met today to better understand the scope of what the White House expects of us on misinformation going forward."[189] On July 18, 2021, Clegg messaged Murthy stating "I imagine you and your team are feeling a little aggrieved—as is the [Facebook] team, it's not great to be accused of killing people—but as I said by email, I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits."[190] As a result of this communication, a meeting was scheduled for July 23, 2021.[191]

---

[187] [Doc. No. 210-1 at 213]
[188] [Doc. No. 210-15]
[189] [Doc. No. 210-16]
[190] [Doc. No. 210-17]
[191] [Doc. No. 210-18]

At the July 23, 2021 meeting, the Office of the Surgeon General officials were concerned about understanding the reach of Facebook's data.[192] Clegg even sent a follow-up email after the meeting to make sure Murthy saw the steps Facebook had been taking to adjust policies with respect to misinformation and to further address the "disinfo-dozen."[193] Clegg also reported that Facebook had "expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."[194] Further, Facebook also agreed to "do more" to censor COVID misinformation, to make its internal data on misinformation available to federal officials, to report back to the Office of the Surgeon General, and to "strive to do all we can to meet our 'shared' goals."[195]

Evidently, the promised information had not been sent to the Office of the Surgeon General by August 6, 2021, so the Office requested the information in a report "within two weeks."[196] The information entitled "How We're Taking Action Against Vaccine Misinformation Superspreaders" was later sent to the Office of the Surgeon General. It detailed a list of censorship actions taken against the "Disinformation Dozen."[197] Clegg followed up with an August 20, 2021 email with a section entitled "Limiting Potentially Harmful Misinformation," which detailed more efforts to censor COVID-19 Misinformation.[198] Facebook continued to report back to Waldo and Flaherty with updates on September 19 and 29 of 2021.[199]

(13)    Waldo asked for similar updates from Twitter, Instagram, and Google/YouTube.[200]

---

[192] [Id.]
[193] [Id. at 4–5]
[194] [Id.]
[195] [Id.]
[196] [Doc. No. 210-22 at 1–3]
[197] [Doc. No. 210-21]
[198] [Doc. No. 210-22 at 2]
[199] [Doc. No. 210, Waldo depo. Exh 30, 31]
[200] [Doc. No. 210, Waldo depo. at 257–58]

(14)     The Office of the Surgeon General also collaborated with the Democratic National Committee. Flaherty emailed Murthy on July 19, 2021, to put Murthy in touch with Jiore Craig ("Craig") from the Democratic National Committee who worked on misinformation and disinformation issues.[201] Craig and Murthy set up a Zoom meeting for July 22, 2021.

(15)     After an October 28, 2021 Washington Post article stated that Facebook researchers had deep knowledge about how COVID-19 and vaccine misinformation ran through Facebook's apps, Murthy issued a series of tweets from his official Twitter account indicating he was "deeply disappointed" to read this story, that health misinformation had harmed people's health and cost lives, and that "we must demand Facebook and the rest of the social-media ecosystems take responsibility for stopping health misinformation on their platforms."[202] Murthy further tweeted that "we need transparency and accountability now."[203]

(16)     On October 29, 2021, Facebook asked federal officials to provide a "federal health contract" to dictate "what content would be censored on Facebook's platforms."[204] Federal officials informed Facebook that the federal health authority that could dictate what content could be censored as misinformation was the CDC.[205]

(17)     Murthy continued to publicly chastise social-media platforms for allowing health misinformation to be spread on their platforms. Murthy made statements on the following platforms: a December 21, 2021 podcast threatening to hold social-media platforms accountable for not censoring misinformation;[206] a January 3, 2022 podcast with Alyssa Milano stating that "platformers need to step up to be accountable for making their spaces safer";[207] and a February

---

[201] [Doc. No. 210, Exh. 22]
[202] [Doc. No. 210, Exh. 31]
[203] [Id.]
[204] [Doc. No. 210, Exh. 33]
[205] [Id.]
[206] [Doc. No. 210, Exh. 38, Audio Transcript, at 7]
[207] [Doc. No. 210–33]

14, 2022 panel discussion hosted by the Rockefeller Foundation, wherein they discussed that technology platforms enabled the speed, scale, and sophistication with which this misinformation was spreading.[208]

On March 3, 2022, the Office of the Surgeon General issued a formal Request for Information ("RFI"), published in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation.[209] The RFI indicated that the Office of the Surgeon General was expanding attempts to control the spread of misinformation on social media and other technology platforms.[210] The RFI also sought information about censorship policies, how they were enforced, and information about disfavored speakers.[211] The RFI was sent to Facebook, Google/YouTube, LinkedIn, Twitter, and Microsoft[212] by Max Lesko ("Lesko"), Murthy's Chief of Staff, requesting responses from these social-media platforms.[213] Murthy again restated social-media platforms' responsibility to reduce the spread of misinformation in an interview with GQ Magazine.[214] Murthy also specifically called upon Spotify to censor health information.[215]

### C. CDC Defendants[216]

(1)     Crawford is the Director for The Division of Digital Media within the CDC Office of the Associate Director for Communications. Her deposition was taken pursuant to preliminary-

---

[208] [Doc. No. 210–34]
[209] [Doc. No. 32. Ex. 42, 87 Fed. Reg. 12712]
[210] [Id.]
[211] [Id.]
[212] [Id. Exh. 46, 47, 48, 49, 50, 51]
[213] [Id.]
[214] [Id. Exh. 51]
[215] [Exh. 52]
[216] The CDC Defendants consist of the Centers for Disease Control & Prevention, Carol Crawford ("Crawford"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), United States Census Bureau ("Census Bureau"), Jennifer Shopkorn ("Shopkorn"), the Department of Health and Human Services ("HHS"), Xavier Becerra ("Becerra"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), and Joshua Peck ("Peck").

injunction related discovery here.[217] The CDC is a component of the Department of Health and Human Services ("HHS"); Xavier Becerra ("Becerra") is the Secretary of HHS.[218] Crawford's division provides leadership for CDC's web presence, and Crawford, as director, determines strategy and objectives and oversees its general work.[219] Crawford was the main point of contact for communications between the CDC and social-media platforms.[220]

Prior to the COVID-19 pandemic, Crawford only had limited contact with social-media platforms, but she began having regular contact post-pandemic, beginning in February and March of 2020.[221] Crawford communicated with these platforms via email, phone, and meetings.[222]

(2)     Facebook emailed State Department officials on February 6, 2020, that it had taken proactive and reactive steps to control information and misinformation related to COVID-19. The email was forwarded to Crawford, who reforwarded to her contacts on Facebook.[223] Facebook proposed to Crawford that it would create a Coronavirus page that would give information from trusted sources including the CDC. Crawford accepted Facebook's proposal on February 7, 2020, and suggested the CDC may want to address "widespread myths" on the platform.[224]

Facebook began sending Crawford CrowdTangle reports on January 25, 2021. CrowdTangle is a social-media listening tool for Meta, which shows themes of discussion on social-media channels. These reported on "top engaged COVID and vaccine-related content overall across Pages and Groups."[225] This CrowdTangle report was sent by Facebook to Crawford

---

[217] [Doc. No. 205-1]
[218] [Doc. No. 266-5 at 57–61]
[219] [Doc. No. 205-1 at 11]
[220] [Id. at 249]
[221] [Id. at 16–18]
[222] [Id. at 20]
[223] [Doc. 205-3 at 3]
[224] [Id. at 1–2]
[225] [Id. at 49–52]

in response to a prior conversation with Crawford.[226] The CDC had privileged access to CrowdTangle since early 2020.[227]

Facebook emailed Crawford on March 3, 2020, that it intended to support the Government in its response to the Coronavirus, including a goal to remove certain information.[228] Crawford and Facebook began having discussions about misinformation with Facebook in the Fall of 2020, including discussions of how to combat misinformation.[229]

The CDC used CrowdTangle, along with Meltwater reports (used for all platforms), to monitor social media's themes of discussion across platforms.[230] Crawford recalls generally discussing misinformation with Facebook.[231] Crawford added Census Bureau officials to the distribution list for CrowdTangle reports because the Census Bureau was going to begin working with the CDC on misinformation issues.[232]

(3)    On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook weekly sync with CDC."[233] A number of Facebook and CDC officials were included in the invite, and the CDC could invite other agencies as needed.[234] The CDC had weekly meetings with Facebook.[235]

(4)    On March 10, 2021, Crawford sent Facebook an email seeking information about "Themes that have been removed for misinfo."[236] The CDC questioned if Facebook had info on the types of posts that were removed. Crawford was aware that the White House and the HHS

---

[226] [Doc. No. 205-1, Exh. 6 at 2]
[227] [Id. at 49–52, 146–47]
[228] [Doc. No. 205-4 at 1–2]
[229] [Doc. No. 205-7 at 1–2]
[230] [Doc. No. 205-1 at 154–55]
[231] [Id. at 58]
[232] [Id.]
[233] [Doc. No. 205-1 at 226]
[234] [Doc. No. 205-36]
[235] Doc. No. 205-1 at 226]
[236] [Doc. No. 205-44 at 2–3]

were also receiving similar information from Facebook.[237] The HHS was present at meetings with social-media companies on March 1, 2021,[238] and on April 21, 2021.[239]

(5)    On March 25, 2021, Crawford and other CDC officials met with Facebook. In an email by Facebook prior to that meeting, Facebook stated it would present on COVID-19 misinformation and have various persons present, including a Misinformation Manager and a Content-Manager official (Liz Lagone).[240] Crawford responded, attaching a PowerPoint slide deck, stating "This is a deck Census would like to discuss and we'd also like to fit in a discussion of topic types removed from Facebook."[241] Crawford also indicated two Census Bureau officials, Schwartz and Shopkorn, would be present, as well as two Census Bureau contractors, Sam Huxley and Christopher Lewitzke.[242]

The "deck" the Census Bureau wanted to discuss contained an overview of "Misinformation Topics" and included "concerns about infertility, misinformation about side effects, and claims about vaccines leading to deaths."[243] For each topic, the deck included sample slides and a statement from the CDC debunking the allegedly erroneous claim.[244]

(6)    Crawford admits she began engaging in weekly meetings with Facebook,[245] and emails verify that the CDC and Facebook were repeatedly discussing misinformation back and forth.[246] The weekly meetings involved Facebook's content-mediation teams. Crawford mainly inquired about how Facebook was censoring COVID-19 misinformation in these meetings.[247]

---

[237] [Doc. No. 205-1 at 258–61]
[238] Twitter with White House
[239] Twitter with White House
[240] [Doc. No. 205-1 at 103]
[241] [Id.]
[242] [Doc. No. 205-34 at 3]
[243] [Id. at 4]
[244] [Id. at 6–14]
[245] [Doc. No. 205-1 at 68–69]
[246] [Doc. No. 205-9 at 1–4]
[247] [Doc. No. 205-1 at 68–69]

42a

(7)     The CDC entered into an Intra-Agency Agreement ("IAA") with the Census Bureau to help advise on misinformation. The IAA required that the Census Bureau provide reports to the CDC on misinformation that the Census Bureau tracked on social media.[248] To aid in this endeavor, Crawford asked Facebook to allow the Census Bureau to be added to CrowdTangle.[249]

(8)     After the March 2021 weekly meetings between Facebook, the CDC, and Census Bureau began, Crawford began to press Facebook on removing and/or suppressing misinformation. In particular, she stated, "The CDC would like to have more info… about what is being done on the amplification-side," and the CDC "is still interested in more info on how you view or analyze the data on removals, etc."[250] Further, Crawford noted, "It looks like the posts from last week's deck about infertility and side effects have all been removed. Were these evaluated by the moderation team or taken down for another reason?"[251] Crawford also questioned Facebook about the CrowdTangle report showing local news coverage of deaths after receiving the vaccine and questioned what Facebook's approach is for "adding labels" to those stories.[252]

On April 13, 2021, Facebook emailed Crawford to propose enrolling CDC and Census Bureau officials in a special misinformation reporting channel; this would include five CDC officials and four Census Bureau officials. The portal was only provided to federal officials.[253]

On April 23, 2021, and again on April 28, 2021, Crawford emailed Facebook about a Wyoming Department of Health report noting that the algorithms that Facebook and other social-media networks are using to "screen out postings of sources of vaccine misinformation" were also screening out valid public health messages.[254]

---

[248] [Doc. No. 205-1 at 71–72, 110]
[249] [Doc. No. 205-9 at 1]
[250] [Doc. No. 205-9 at 2]
[251] [Id.]
[252] [Doc. No. 205-9 at 1]
[253] [Doc. No. 205-11 at 2]
[254] [Doc. No. 205-38 at 2]

On May 6, 2021, Crawford emailed Facebook a table containing a list of sixteen specific postings on Facebook and Instagram that contained misinformation.[255] Crawford stated in her deposition that she knew when she "flagged" content for Facebook, they would evaluate and possibly censor the content.[256] Crawford stated CDC's goal in flagging information for Facebook was "to be sure that people have credible health information so that they can make the correct health decisions."[257] Crawford continued to "flag" and send misinformation posts to Facebook, and on May 19, 2021,[258] Crawford provided Facebook with twelve specific claims.

(9)    Facebook began to rely on Crawford and the CDC to determine whether claims were true or false. Crawford began providing the CDC with "scientific information" for Facebook to use to determine whether to "remove or reduce and inform."[259] Facebook was relying on the CDC's "scientific information" to determine whether statements made on its platform were true or false.[260] The CDC would respond to "debunk" claims if it had an answer.[261] These included issues like whether COVID-19 had a 99.96% survival rate, whether COVID-19 vaccines cause bells' palsy, and whether people who are receiving COVID-19 vaccines are subject to medical experiments.[262]

Facebook content-mediation officials would contact Crawford to determine whether statements made on Facebook were true or false.[263] Because Facebook's content-moderation policy called for Facebook to remove claims that are false and can lead to harm, Facebook would

---

[255] [Doc. No. 205-10 at 1–3]
[256] [Doc. No. 205-1 at 88]
[257] [Id.]
[258] [Doc. No. 205-12 at 1]
[259] [Id. at 2]
[260] [Doc. No. 205-1 at 106]
[261] [Id.]
[262] [Doc. No. 205-12 at 1–2]
[263] [Doc. No. 205-12 at 2]

remove and/or censor claims the CDC itself said were false.[264] Questions by Facebook to the CDC related to this content-moderation included whether spike proteins in COVID-19 vaccines are dangerous and whether Guillain-Barre Syndrome or heart inflammation is a possible side effect of the COVID-19 vaccine.[265] Crawford normally referred Facebook to CDC subject-matter experts or responded with the CDC's view on these scientific questions.[266]

(10)    Facebook continued to send the CDC biweekly CrowdTangle content insight reports, which included trending topics such as Door-to-Door Vaccines, Vaccine Side Effects, Vaccine Refusal, Vaccination Lawsuits, Proof of Vaccination Requirement, COVID-19 and Unvaccinated Individuals, COVID-19 Mandates, Vaccinating Children, and Allowing People to Return to Religious Services.[267]

(11)    On August 19, 2021, Facebook asked Crawford for a Vaccine Adverse Event Reporting System ("VAERS") meeting for the CDC to give Facebook guidance on how to address VAERS-related "misinformation."[268] The CDC was concerned about VAERS-related misinformation because users were citing VAERS data and reports to raise concerns about the safety of vaccines in ways the CDC found to be "misleading."[269] Crawford and the CDC followed up by providing written materials for Facebook to use.[270] The CDC eventually had a meeting with Facebook about VAERS-related misinformation and provided two experts for this issue.[271]

(12)    On November 2, 2021, a Facebook content-moderation official reached out to the CDC to obtain clarity on whether the COVID-19 vaccine was harmful to children. This was

---

[264] [Doc. No. 205-26 at 1–4]
[265] [Doc. No. 205-18]
[266] [Doc. No. 205-1 at 140]
[267] [Doc. No. 205-20 at 205–20]
[268] [Doc. No. 205-21]
[269] [Doc. No. 205-22]
[270] [Doc. No. 205-21]
[271] [Doc. No. 205-1 at 151–52]

following the FDA's emergency use authorization ("EUA") related to the COVID-19 vaccine.[272] In addition to the EUA issue for children, Facebook identified other claims it sought clarity on regarding childhood vaccines and vaccine refusals.[273]

The following Monday, November 8, 2021, Crawford followed up with a response from the CDC, which addressed seven of the ten claims Facebook had asked the CDC to evaluate. The CDC rated six of the claims "False" and stated that any of these false claims could cause vaccine refusal.[274]

The questions the CDC rated as "false" were:

1) COVID-19 vaccines weaken the immune system;
2) COVID-19 vaccines cause auto-immune diseases;
3) Antibody-dependent enhancement ("ADE") is a side effect of COVID-19 vaccines;
4) COVID-19 vaccines cause acquired immunodeficiency syndrome (AIDS);
5) Breast milk from a vaccinated parent is harmful to babies/children; and
6) COVID-19 vaccines cause multi-system inflammatory syndrome in children (MIS-C).

(13)     On February 3, 2022, Facebook again asked the CDC for clarification on whether a list of claims were "false" and whether the claims, if believed, could contribute to vaccine refusals.[275] The list included whether COVID-19 vaccines cause ulcers or neurodegenerative diseases such as Huntington's and Parkinson's disease; the FDA's possible future issuance of an EUA to children six months to four years of age; and questions about whether the COVID-19 vaccine causes death, heart attacks, autism, birth defects, and many others.[276]

(14)     In addition to its communications with Facebook, the CDC and Census Bureau also had involvement with Google/YouTube. On March 18, 2021, Crawford emailed Google, with the

---

[272] [Doc. 205-23 at 1–2]
[273] [Id.]
[274] [Doc. No. 205–24]
[275] [Doc. No. 205-26 at 1]
[276] [Id. at 1–4]

subject line "COVID Misinfo Project." Crawford informed Google that the CDC was now working with the Census Bureau (who had been meeting with Google regularly) and wanted to set up a time to talk and discuss the "COVID Misinfo Project."[277] According to Crawford, the previous Census project referred to the Census' work on combatting 2020 Census misinformation.[278]

On March 23, 2021, Crawford sent a calendar invite for a March 24, 2021 meeting, which included Crawford and five other CDC employees, four Census Bureau employees, and six Google/YouTube officials.[279] At the March 24, 2021 meeting, Crawford presented a slide deck similar to the one prepared for the Facebook meeting. The slide deck was entitled "COVID Vaccine Misinformation: Issue Overview" and included issues like infertility, side effects, and deaths. The CDC and the Census Bureau denied that COVID-19 vaccines resulted in infertility, caused serious side effects, or resulted in deaths.[280]

(15)   On March 29, 2021, Crawford followed up with Google about using their "regular 4 p.m. meetings" to go over things with the Census.[281] Crawford recalled that the Census was asking for regular meetings with platforms, specifically focused on misinformation.[282] Crawford also noted that the reference to the "4 p.m. meeting" refers to regular biweekly meetings with Google, which "continues to the present day."[283] Crawford also testified she had similar regular meetings with Meta and Twitter, and previously had regular meetings with Pinterest. Crawford stated these meetings were mostly about things other than misinformation, but misinformation was discussed at the meetings.[284]

---

[277] [Doc. No. 205-28]
[278] [Doc. No. 205-1 at 175]
[279] [Doc. No. 214-22 Jones Dec. Exh. T] SEALED DOCUMENT
[280] [Id.] SEALED DOCUMENT
[281] [Doc. No. 205-1 at 179–82]
[282] [Doc. No. 205-1 at 184–85]
[283] [Doc. No. 205-1 at 180]
[284] [Id. at 181]

(16)    On May 10, 2021, Crawford emailed Facebook to establish "COVID BOLO" ("Be on The Lookout") meetings. Google and YouTube were included.[285] Crawford ran the BOLO meetings, and the Census Bureau official arranged the meetings and prepared the slide deck for each meeting.[286]

The first BOLO meeting was held on May 14, 2021; the slide deck for the meeting was entitled "COVID Vaccine Misinformation: Hot Topics" and included five "hot topics" with a BOLO note for each topic. The five topics were: the vaccines caused "shedding"; a report made on VAERS that a two-year old child died from the vaccine; other alleged misleading information on VAERS reports; statements that vaccines were bioweapons, part of a depopulation scheme, or contain microchips; and misinformation about the eligibility of twelve to fifteen year old children for the vaccine.[287] All were labeled as "false" by the CDC, and the potential impact on the public was a reduction of vaccine acceptance.

The second BOLO meeting was held on May 28, 2021. The second meeting also contained a slide deck with a list of three "hot topics" to BOLO: that the Moderna vaccine was unsafe; that vaccine ingredients can cause people to become magnetic; and that the vaccines cause infertility or fertility-related issues in men. All were labeled as false by the CDC, and possibly impacted reduced vaccine acceptance.[288]

A third BOLO meeting scheduled for June 18, 2021, was cancelled due to the new Juneteenth holiday. However, Crawford sent the slide deck for the meeting.  The hot topics for this meeting were: that vaccine particles accumulate in ovaries causing fertility; that vaccines contain

---

[285] [Doc. No. 205-40]
[286] [Doc. No. 205-1 at 246, 265–66]
[287] [Doc. No. 214-23 at 4–5] SEALED DOCUMENT
[288] [Doc. No. 214-24 at 3–7] SEALED DOCUMENT

microchips; and because of the risk of blood clots to vaccinated persons, airlines were discussing a ban. All were labeled as false.[289]

The goal of the BOLO meetings was to be sure credible information was out there and to flag information the CDC thought was not credible for potential removal.[290]

On September 2, 2021, Crawford emailed Facebook and informed them of a BOLO for a small but growing area of misinformation: one of the CDC's lab alerts was misinterpreted and shared via social media.[291]

(17)    The CDC Defendants also had meetings and/or communications with Twitter. On April 8, 2021, Crawford sent an email stating she was "looking forward to setting up regular chats" and asked for examples of misinformation. Twitter responded.[292]

On April 14, 2021, Crawford sent an email to Twitter giving examples of misinformation topics, including that vaccines were not FDA approved, fraudulent cures, VAERS data taken out of context, and infertility. The list was put together by the Census Bureau team.[293]

On May 10, 2021, Crawford emailed Twitter to print out two areas of misinformation, which included copies of twelve tweets.[294] Crawford informed Twitter about the May 14, 2021 BOLO meeting and invited Twitter to participate. The examples of misinformation given at the meeting included: vaccine shedding; that vaccines would reduce the population; abnormal bleeding; miscarriages for women; and that the Government was lying about vaccines. In a

---

[289] [Doc. No. 214-25 at 2–7] SEALED DOCUMENT
[290] [Doc. No. 205-1 at 266]
[291] [Doc. No. 205-22]
[292] [Doc. No. 205-1 at 197, 205–33]
[293] [Doc. No. 205-33]
[294] [Doc. No. 205-34]

49a

response, Twitter stated that at least some of the examples had been "reviewed and actioned."[295] Crawford understood that she was flagging posts for Twitter for possible censorship.[296]

Twitter additionally offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship.[297] Crawford asked for instructions of how to enroll in the Partnership Support Portal and provided her personal Twitter account to enroll. Crawford was fully enrolled on May 27, 2021.[298] Census Bureau contractor Christopher Lewitzke ("Lewitzke") also requested to enroll in the Partner Support Portal.[299]

Crawford also sent Twitter a BOLO for the alleged misinterpretation of a CDC lab report.[300]

(18)    Crawford testified in her deposition that the CDC has a strong interest in tracking what its constituents are saying on social media.[301] Crawford also expressed concern that if content were censored and removed from social-media platforms, government communicators would not know what the citizen's "true concerns" were.[302]

**D. NIAID Defendants[303]**

The NIAID is a federal agency under HHS. Dr. Fauci was previously the Director of NIAID. Dr. Fauci's deposition was taken as a part of the limited preliminary injunction discovery in this matter.[304]

---

[295] [Id.]
[296] [Doc. No. 205-1 at 211]
[297] [Id. at 211–12]
[298] [Id. at 211–18]
[299] [Doc. No. 201-34 at 2]
[300] [Doc. No. 201-35]
[301] [Doc. No. 201-1 at 57–58]
[302] [Id. at 75]
[303] The NIAD Defendants consist of the National Institute of Allergy and Infectious Disease and Dr. Hugh Auchincloss ("Dr. Auchincloss").
[304] [Doc. No. 206]

1)      Dr. Fauci had been the director of the NIAID for over thirty-eight years and became Chief Medical Advisor to the President in early 2021.[305] Dr. Fauci retired December 31, 2022.

## 1.  **Lab-Leak Theory**

Plaintiffs set forth arguments that because NIAID had funded "gain-of-function"[306] research at Dr. Fauci's direction at the Wuhan Institute of Virology ("Wuhan lab") in Wuhan, China, Dr. Fauci sought to suppress theories that the SARS-CoV2 virus leaked from the Wuhan lab.[307]

(1)      Plaintiffs allege that Dr. Fauci's motive for suppressing the lab-leak theory was a fear that Dr. Fauci and NIAID could be blamed for funding gain-of-function research that created the COVID-19 pandemic. Plaintiffs allege Dr. Fauci participated in a secret call with other scientists on February 1, 2020, and convinced the scientists (who were proponents of the lab-leak theory) to change their minds and advocate for the theory that the COVID-19 virus originated naturally.[308] A few days after the February 1, 2020 call, a paper entitled "The Proximal Origin of COVID-19" was published by Nature Medicine on March 17, 2020. The article concludes that SARS-CoV2 was not created in a lab but rather was naturally occurring.

On February 2, 2020, Dr. Fauci told the other scientists that "given the concerns of so many people and the threat of further distortions on social media it is essential that we move quickly. Hopefully, we can get the WHO to convene."[309] Dr. Fauci emailed Dr. Tedros of the WHO and two senior WHO officials, urging WHO to quickly establish a working group to address the lab-leak theory. Dr. Fauci stated they should "appreciate the urgency and importance of this issue

---

[305] [Doc. No. 206-1 at 10 (Deposition of Dr. Anthony S. Fauci)]
[306] "Gain-of-function" research involves creating a potentially dangerous virus in a laboratory.
[307] [Doc. No. 212-3 at 151–85]
[308] [Id. at 165]
[309] [Doc. No. 206-9 at 2]

given the gathering internet evident in the science literature and in mainstream and social media

to the question of the origin of this virus." Dr. Fauci also stated WHO needed to "get ahead of

…the narrative of this and not reacting to reports which could be very damaging."[310] Numerous

drafts of "The Proximal Origin of COVID-19" were sent to Dr. Fauci to review prior to the article

being published in Nature Medicine.[311]

(2)     On February 9, 2020, in a joint podcast with Dr. Peter Daszak of the Eco Health

Alliance,[312] both Drs. Fauci and Daszak discredited the lab-leak theory, calling it a "conspiracy

theory."[313]

(3)     Three authors of "The Proximal Origins of SARS-CoV2," Robert Garry, Kristian

Anderson, and Ian Lipkin, received grants from NIH in recent years.[314]

(4)     After "The Proximal Origins of SARS-CoV2" was completed and published in

Nature Medicine, Dr. Fauci began discrediting the lab-leak theory. "This study leaves little room

to refute a natural original for COVID-19." "It's a shining object (lab-leak theory) that will go

away in times."[315]

At an April 17, 2020 press conference, when asked about the possibility of a lab-leak, Dr.

Fauci stated, "There was a study recently that we can make available to you, where a group of

highly qualified evolutionary virologists looked at the sequences there and the sequences in bats

as they evolve. And the mutations that it took to get to the point where it is now is totally consistent

---

[310] [Doc. No. 206-9 at 1]
[311] [Doc. No. 206-13 at 1, 7-8; 206-11 at 2–3; and 206–20]
[312] [Doc. No. 206-16 at 1]
[313] [Doc. No. 206-16 at 1; 206-17 at 1]
[314] [Doc. No. 214-30]
[315] [Doc. No. 206-27 at 3–4]

with jump of a species from animal to a human."[316] "The Proximal Origin of SARS-CoV2" has since become one of the most widely read papers in the history of science.[317]

(5)     Twitter and Facebook censored the lab-leak theory of COVID-19.[318] However, Dr. Fauci claims he is not aware of any suppression of speech about the lab-leak theory on social media, and he claims he does not have a Twitter or Facebook account.[319]

(6)     On March 15, 2020, Zuckerberg sent Dr. Fauci an email asking for coordination between Dr. Fauci and Facebook on COVID-19 messaging. Zuckerberg asked Dr. Fauci to create a video to be used on Facebook's Coronavirus Information Hub, with Dr. Fauci answering COVID-19 health questions, and for Dr. Fauci to recommend a "point person" for the United States Government "to get its message out over the platform."[320]

Dr. Fauci responded the next day to Zuckerberg saying, "Mark your idea and proposal sounds terrific," "would be happy to do a video for your hub," and "your idea about PSAs is very exciting." Dr. Fauci did three live stream Facebook Q&A's about COVID-19 with Zuckerberg.[321]

## 2.  Hydroxychloroquine

Plaintiffs further allege the NIAID and Dept. of HHS Defendants suppressed speech on hydroxychloroquine. On May 22, 2020, The Lancet published an online article entitled "Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a multi-national registry analysis."[322] The article purported to analyze 96,032 patients to compare persons who did and did not receive this treatment. The study concluded that hydroxychloroquine

---

[316] (Video of April 17, 2020, White House Coronavirus Task Force Briefing, at https://www.youtube.com/watch?v=brbArPX8=6I)
[317] [Doc. No. 214-30]
[318] [Doc. No. 206-32 at 1–2; Doc. No. 206-33 at 3]
[319] [Doc. No. 206-1 at 210]
[320] [Doc. No. 206-24 at 3]
[321] [Doc. No. 201-1 at 177]
[322] [Doc. No. 206-36 at 1]

and chloroquine were associated with decreased in-hospital survival and an increased frequency of ventricular arrhythmias when used for treatment of COVID-19.[323]

Dr. Fauci publicly cited this study to claim that "hydroxychloroquine is not effective against coronavirus."[324] He then publicly began to discredit COVID-19 treatment with hydroxychloroquine and stated whether the treatment of COVID-19 by hydroxychloroquine was effective could only be judged by rigorous, randomized, double-blind, placebo-based studies. He testified the same on July 31, 2020, before the House Select Subcommittee on Coronavirus Crisis.[325]

(2)      When America's Frontline Doctors held a press conference criticizing the Government's response to the COVID-19 pandemic and spouting the benefits of hydroxychloroquine in treating the coronavirus,[326] Dr. Fauci made statements on Good Morning America[327] and on Andrea Mitchell Reports[328] that hydroxychloroquine is not effective in treating the coronavirus. Social-media platforms censored the America's Frontline Doctors videos. Facebook, Twitter, and YouTube removed the video.[329] Dr. Fauci does not deny that he or his staff at NIAID may have communicated with social-media platforms, but he does not specifically recall it.[330]

### 3.  The Great Barrington Declaration

(1)      The GBD was published online on October 4, 2020. The GBD was published by Plaintiffs Dr. Bhattacharja of Stanford and Dr. Kulldorff of Harvard, along with Dr. Gupta of

---

[323] [Id.]
[324] [Doc. No. 206-35 at 1]
[325] https://www.youtube.com/watch?v=RUNCSOQD2UE
[326] [Doc. No. 207-2 at 5]
[327] [Doc. No. 207-1 at 2]
[328] [Doc. No. 207-1 at 2–3]
[329] [Doc. No. 207-2 at 6]
[330] [Doc. No. 206-1 at 238]

Oxford. The GBD is a one-page treatise opposing reliance on lockdowns and advocating for an approach to COVID-19 called "focused protection."[331] It criticized the social distancing and lockdown approaches endorsed by government experts. The authors expressed grave concerns about physical and mental health impacts of current government COVID-19 lockdown policies and called for an end to lockdowns.[332]

(2)     On October 8, 2020, Dr. Francis Collins emailed Dr. Fauci (and Cliff Lane) stating:

> Hi Tony and Cliff, See https://gbdeclaration.org/. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that online yet- is it underway? Francis.[333]

The same day, Dr. Fauci wrote back to Dr. Collins stating, "Francis: I am pasting in below a piece from Wired that debunks this theory. Best, Tony."[334]

Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the GBD. In a Washington Post story run on October 14, 2020, Dr. Collins described the GBD and its authors as "fringe" and "dangerous."[335] Dr. Fauci consulted with Dr. Collins before he talked to the Washington Post.[336] Dr. Fauci also endorsed these comments in an email to Dr. Collins, stating "what you said was entirely correct."[337]

On October 15, 2020, Dr. Fauci called the GBD "nonsense" and "dangerous."[338] Dr. Fauci specifically stated, "Quite frankly that is nonsense, and anybody who knows anything about

---

[331] [Doc. No. 207-5 at 3]
[332] [Id.]
[333] [Doc. No. 207-6]
[334] [Doc. No. 207-7]
[335] [Doc. No. 207-9]
[336] [Doc. No. 206-1 at 272]
[337] [Doc. No. 207-10]
[338] [Doc. No. 207-11 at 1]

epidemiology will tell you that is nonsense and very dangerous."[339] Dr. Fauci testified "it's possible that" he coordinated with Dr. Collins on his public statements attacking the GBD.[340]

(3)     Social-media platforms began censoring the GBD shortly thereafter. In October 2020, Google de-boosted the search results for the GBD so that when Google users googled "Great Barrington Declaration," they would be diverted to articles critical of the GBD, and not to the GBD itself.[341] Reddit removed links to the GBD.[342] YouTube updated its terms of service regarding medical "misinformation," to prohibit content about vaccines that contradicted consensus from health authorities.[343] Because the GBD went against a consensus from health authorities, its content was removed from YouTube. Facebook adopted the same policies on misinformation based upon public health authority recommendations.[344] Dr. Fauci testified that he could not recall anything about his involvement in seeking to squelch the GBD.[345]

(4)     NIAID and NIH staff sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci. When a Twitter employee reached out to CDC officials asking if a particular account associated with Dr. Fauci was "real or not,"[346] Scott Prince of NIH responded, "Fake/Imposter handle.  PLEASE REMOVE!!!"[347] An HHS official then asked Twitter if it could "block" similar parody accounts: "Is there anything else you can also do to block other variations of his (Dr. Fauci's) name from impersonation so we don't have this

---

[339] [Id. at 3]
[340] [Doc. No. 206-1 at 279]
[341] [Doc. No. 207-12 at 4]
[342] [Id. at 4–5]
[343] [Doc. No. 207-13 at 4–5]
[344] [Doc. No. 207-15]
[345] [Doc. No. 206-1 at 251–52, 255–58]
[346] [Doc. No. 207-17 at 2]
[347] [Id.]

occur again?"[348] Twitter replied, "We'll freeze this @handle and some other variations so no one can hop on them."[349]

On April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh ("Routh"), and stated, "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you I have reported them from NIAID and my personal FB account."[350] Both Lavelle and Routh are members of Dr. Fauci's communications staff.[351] Six of the eight accounts listed were removed by Facebook on the same day.[352]

(5)  On October 30, 2020, a NIAID staffer wrote an email connecting Google/YouTube with Routh, "so that NIAID and the 'Google team' could connect on vaccine communications-specifically misinformation.'"[353] Courtney Billet ("Billet"), director of the Office of Communications and Government Relations of NIAID, was added by Routh, along with two other NIAID officials, to a communications chain with YouTube.[354] Twitter disclosed that Dina Perry ("Perry"), a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship.[355]

(6)  Dr. Fauci testified that he has never contacted a social-media company and asked them to remove misinformation from one of their platforms.[356]

### 4. Ivermectin

(8)  On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask whether the claim that "Ivermectin is effective in treating COVID is false, and if believed, could

---

[348] [Id. at 1]
[349] [Id.]
[350] [Doc. No. 207-19 at 3]
[351] [Doc. No. 206-1 at 308]
[352] [Doc. No. 207-19 at 3]
[353] [Doc. No. 207-20 at 1]
[354] [Id.]
[355] [Doc. No. 214-8 at 1]
[356] [Doc. No. 206-1 at 151]

contribute to people refusing the vaccine or self-medicating."[357] The CDC responded the next day and advised Facebook that the claim that Ivermectin is effective in treating COVID is "NOT ACCURATE."[358] The CDC cited the NIH's treatment guidelines for authority that the claims were not accurate.[359]

### 5. Mask Mandates

(9)      Plaintiffs maintain that Dr. Fauci initially did not believe masks worked, but he changed his stance. A February 4, 2020 email, in which Dr. Fauci responded to an email from Sylvia Burwell, stated, "the typical mask you buy in a drugstore is not really effective in keeping out the virus, which is small enough to pass through mankind."[360] Dr. Fauci stated that, at that time, there were "no studies" on the efficacy of masking to stop the spread.[361] On March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective.[362]

Plaintiffs allege that Dr. Fauci's position on masking changed dramatically on April 3, 2020, when he became an advocate for universal mask mandates.[363] Dr. Fauci testified his position changed in part because "evidence began accumulating that masks actually work in preventing acquisition and transmission,"[364] although Dr. Fauci could not identify those studies.[365]

---

[357] [Doc. No. 207-22 at 2]
[358] [Id. at 1]
[359] [Id.]
[360] [Doc. No. 206-1 at 314]
[361] [Id. at 316]
[362] [Id. at 318]
[363] [Id. at 317]
[364] [Id.]
[365] [Id. at 318]

58a

### 6. Alex Berenson

Alex Berenson ("Berenson") was a former New York Times Science reporter and critic of government messaging about COVID-19 vaccines. He was de-platformed from Twitter on August 28, 2021.[366]

Dr. Fauci had previously sought to discredit Berenson publicly during an interview with CNN.[367] Dr. Fauci does not deny that he may have discussed Berenson with White House or federal officials, but does not recall specifically whether he did so.[368]

### E. FBI Defendants[369]

(1) The deposition of Elvis Chan ("Chan") was taken on November 29, 2021.[370] Chan is the Assistant Special Agent in charge of the Cyber Branch for the San Francisco Division of the FBI.[371] In this role, Chan was one of the primary people communicating with social-media platforms about disinformation on behalf of the FBI. There are also other agents on different cyber squads, along with the FBI's private sector engagement squad, who relay information to social-media platforms.[372]

Chan graduated from the Naval Postgraduate School in 2020 with a M.A. in Homeland Security Studies.[373] His thesis was entitled, "Fighting Bears and Trolls. An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections."[374] His thesis focuses on information sharing between the FBI, Facebook,

---

[366] [Doc. No. 207-23 at 4]
[367] [Doc. No. 207-24 at 1–2]
[368] [Doc. No. 206-1 at 341–43]
[369] FBI Defendants include Elvis Chan ("Chan"), the Federal Bureau of Investigation ("FBI"), Lauren Dehmlow ("Dehmlow"), and the U.S. Department of Justice ("DOJ").
[370] [Doc. No. 204-1]
[371] [Id. at 8]
[372] [Id. at 105]
[373] [Id. at 10]
[374] [Doc. No. 204-2 at 1]

58

59a

Google, and Twitter.[375] Chan relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika,[376] and DiResta of the Stanford Internet Observatory. Chan communicated directly with DiResta about Russian disinformation.[377]

Chan also knows Alex Stamos ("Stamos"), the head of the Stanford Internet Observatory, from when Stamos worked for Facebook.[378] Chan and Stamos worked together on "malign-foreign-influence activities, on Facebook."[379]

(2)    Chan stated that the FBI engages in "information sharing" with social-media companies about content posted on their platforms, which includes both "strategic-level information" and "tactical information."[380]

(3)    The FBI, along with Facebook, Twitter, Google/YouTube, Microsoft, Yahoo!, Wikimedia Foundation, and Reddit, participate in a Cybersecurity and Infrastructure Security Agency ("CISA") "industry working group."[381] Representatives of CISA, the Department of Homeland Security's Intelligence & Analysis Division ("I&A"), the Office of Director of National Intelligence ("ODNI"), the FBI's FITF, the Dept. of Justice National Security Division, and Chan participate in these industry working groups.[382]

Chan participates in the meetings because most social-media platforms are headquartered in San Francisco, and the FBI field offices are responsible for maintaining day-to-day relationships with the companies headquartered in its area of responsibility.[383]

---

[375] [Id. at 18]
[376] [Doc. No. 204-1 at 145]
[377] [Doc. No. 204-1 at 51–52, 85]
[378] [Id. at 54]
[379] [Id at 55]
[380] [Id. at 16–19]
[381] [Id. at 18, 23–24]
[382] [Id. at 24, 171]
[383] [Id. at 24]

60a

Matt Masterson ("Masterson") was the primary facilitator in the meetings for the 2022 election cycle, and Brian Scully ("Scully") was the primary facilitator ahead of the 2022 election.[384] At the USG-Industry ("the Industry") meetings, social-media companies shared disinformation content, providing a strategic overview of the type of disinformation they were seeing. The FBI would then provide strategic, unclassified overviews of things they were seeing from Russian actors.[385]

The Industry meetings were "continuing" at the time Chan's deposition was taken on November 23, 2022, and Chan assumes the meetings will continue through the 2024 election cycle.[386]

(4)     Chan also hosted bilateral meetings between FBI and Facebook, Twitter, Google/YouTube, Yahoo!/Verizon, Microsoft/LinkedIn, Wikimedia Foundation and Reddit,[387] and the Foreign Influence Task Force.[388] In the Industry meetings, the FBI raised concerns about the possibility of "hack and dump" operations during the 2020 election cycle.[389] The bilateral meetings are continuing, occurring quarterly, but will increase to monthly and weekly nearer the elections.[390]

In the Industry meetings, FBI officials meet with senior social-media platforms in the "trust and safety or site integrity role." These are the persons in charge of enforcing terms of service and content-moderation policies.[391] These meetings began as early as 2017.[392] At the Industry

---

[384] [Id. at 25–26]
[385] [Id. at 156–57]
[386] [Id. at 285–86]
[387] [Id. at 23–24]
[388] [Id. at 39]
[389] [Id.]
[390] [Id. at 40]
[391] [Id. at 43–44]
[392] [Id. at 87–89]

60

meetings, in addition to Chan and Laura Dehmlow ("Dehmlow"), head of the FITF, between three and ten FITF officials and as high as a dozen FBI agents are present.[393]

(5)     On September 4, 2019, Facebook, Google, Microsoft, and Twitter along with the FITF, ODNI, and CISA held a meeting to discuss election issues. Chan attended, along with Director Krebs, Masterson, and Scully. Social media's trust and safety on content-moderation teams were also present. The focus of the meeting was to discuss with the social-media companies the spread of "disinformation."[394]

(6)     Discovery obtained from LinkedIn contained 121 pages of emails between Chan, other FBI officials, and LinkedIn officials.[395] Chan testified he has a similar set of communications with other social-media platforms.[396]

(7)     The FBI communicated with social-media platforms using two alternative, encrypted channels, Signal and Teleporter.[397]

(8)     For each election cycle, during the days immediately preceding and through election days, the FBI maintains a command center around the clock to receive and forward reports of "disinformation" and "misinformation." The FBI requests that social-media platforms have people available to receive and process the reports at all times.[398]

(9)     Before the Hunter Biden Laptop story breaking prior to the 2020 election on October 14, 2020, the FBI and other federal officials repeatedly warned industry participants to be alert for "hack and dump" or "hack and leak" operations.[399]

---

[393] [Id. at 109–10]
[394] [Id. at 151]
[395] [Doc. No. 204-3]
[396] Doc. No. 204-1 at 288]
[397] [Id. at 295–296]
[398] [Id. at 301]
[399] [Doc. No. 204-1 at 172, 232–34]

Dehmlow also mentioned the possibility of "hack and dump" operations.[400] Additionally, the prospect of "hack and dump" operations was repeatedly raised at the FBI-led meetings with FITF and the social-media companies, in addition to the Industry meetings.[401]

Social-media platforms updated their policies in 2020 to provide that posting "hacked materials" would violate their policies. According to Chan, the impetus for these changes was the repeated concern about a 2016-style "hack-and-leak" operation.[402] Although Chan denies that the FBI urged the social-media platforms to change their policies on hacked material, Chan did admit that the FBI repeatedly asked the social-media companies whether they had changed their policies with regard to hacked materials[403] because the FBI wanted to know what the companies would do if they received such materials.[404]

(10) Yoel Roth ("Roth"), the then-Head of Site Integrity at Twitter, provided a formal declaration on December 17, 2020, to the Federal Election Commission containing a contemporaneous account of the "hack-leak-operations" at the meetings between the FBI, other natural-security agencies, and social-media platforms.[405] Roth's declaration stated:

> Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security. During these weekly meetings, the federal law enforcement agencies communicated that they expected "hack-and-leak" operations by state actors might occur during the period shortly before the 2020 presidential election, likely in October. I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social-media platforms, including Twitter. These expectations of hack-and-leak operations

---

[400] [Id. at 175]
[401] [Id. at 177–78]
[402] [Id. at 205]
[403] [Id. at 206]
[404] [Id. at 249]
[405] [Doc. No. 204-5, ¶¶ 10-11, at 2–3]

were discussed through 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden.*[406]

Chan testified that, in his recollection, Hunter Biden was not referred to in any of the CISA Industry meetings.[407] The mention of "hack-and-leak" operations involving Hunter Biden is significant because the FBI previously received Hunter Biden's laptop on December 9, 2019, and knew that the later-released story about Hunter Biden's laptop was not Russian disinformation.[408]

In Scully's deposition,[409] he did not dispute Roth's version of events.[410]

Zuckerberg testified before Congress on October 28, 2020, stating that the FBI conveyed a strong risk or expectation of a foreign "hack-and-leak" operation shortly before the 2020 election and that the social-media companies should be on high alert. The FBI also indicated that if a trove of documents appeared, they should be viewed with suspicion.[411]

(11)    After the Hunter Biden laptop story broke on October 14, 2020, Dehmlow refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry from Facebook, although the FBI had the laptop in its possession since December 2019.[412]

The Hunter Biden laptop story was censored on social media, including Facebook and Twitter.[413] Twitter blocked users from sharing links to the New York Post story and prevented users who had previously sent tweets sharing the story from sending new tweets until they deleted

---

[406] (emphasis added)
[407] [Doc. No. 204-1 at 213, 227–28].
[408] [Doc. No. 106-3 at 5–11]
[409] [Doc. No. 209]
[410] [Id. at 247]
[411] [Doc. 204-6 at 56]
[412] [Doc. No. 204-1 at 215]
[413] [Doc. No. Doc 204-5 at ¶ 17]

the previous tweet.[414] Further, Facebook began reducing the story's distribution on the platform pending a third-party fact-check.[415]

(12)    Chan further testified that during the 2020 election cycle, the United States Government and social-media companies effectively limited foreign influence companies through information sharing and account takedowns.[416] Chan's thesis also recommended standardized information sharing and the establishment of a national coordination center.

According to Chan, the FBI shares this information with social-media platforms as it relates to information the FBI believes should be censored.[417] Chan testified that the purpose and predictable effect of the tactical information sharing was that social-media platforms would take action against the content in accordance with their policies.[418] Additionally, Chan admits that during the 2020 election cycle, the United States Government engaged in information sharing with social-media companies.[419] The FBI also shared "indicators" with state and local government officials.[420]

Chan's thesis includes examples of alleged Russian disinformation, which had a number of reactions and comments from Facebook users, including an anti-Hillary Clinton post, a secure-border post, a Black Lives Matter post, and a pro-Second Amendment post.[421]

Chan also identified Russian-aligned websites on which articles were written by freelance journalists. A website called NADB, alleged to be Russian-generated, was also identified by the FBI, and suppressed by social-media platforms, despite such content being drafted and written by

---

[414] [Id.]
[415] [Doc. No. 204-6 at 2]
[416] [Doc. No. 204-2 at 3]
[417] [Id.]
[418] [Id. at 32–33]
[419] [Id. at 19]
[420] [Id. at 50]
[421] [Id.]

American users on that site.[422] The FBI identified this site to the social-media companies that took action to suppress it.[423]

(13)  "Domestic disinformation" was also flagged by the FBI for social-media platforms. Just before the 2020 election, information would be passed from other field offices to the FBI 2020 election command post in San Francisco. The information sent would then be relayed to the social-media platforms where the accounts were detected.[424] The FBI made no attempt to distinguish whether those reports of election disinformation were American or foreign.[425]

Chan testified the FBI had about a 50% success rate in having alleged election disinformation taken down or censored by social-media platforms.[426] Chan further testified that although the FBI did not tell the social-media companies to modify their terms of service, the FBI would "probe" the platforms to ask for details about the algorithms they were using[427] and what their terms of service were.[428]

(14)  Chan further testified the FBI identifies specific social-media accounts and URLs to be evaluated "one to five times a month"[429] and at quarterly meetings.[430] The FBI would notify the social-media platforms by sending an email with a secure transfer application within the FBI called a "Teleporter." The Teleporter email contains a link for them to securely download the files from the FBI.[431] The emails would contain "different types of indicators," including specific

---

[422] [Id. at 144–46]
[423] [Doc. No. 204-1 at 141-43]
[424] [Id. at 162]
[425] [Id. at 163]
[426] [Id. at 167]
[427] [Id. at 88]
[428] [Id. at 92]
[429] [Id. at 96]
[430] [Id. at 98]
[431] [Id.]

social-media accounts, websites, URLs, email accounts, and the like, that the FBI wanted the platforms to evaluate under their content-moderation policies.[432]

Most of the time, the emails flagging the misinformation would go to seven social-media platforms. During 2020, Chan estimated he sent out these emails from one to six times per month and in 2022, one to four times per month. Each email would flag a number that ranged from one to dozens of indicators.[433] When the FBI sent these emails, it would request that the social-media platforms report back on the specific actions taken as to these indicators and would also follow up at the quarterly meetings.[434]

(15)    At least eight FBI agents at the San Francisco office, including Chan, are involved in reporting disinformation to social-media platforms.[435] In addition to FBI agents, a significant number of FBI officials from the FBI's Foreign Influence Task Force also participate in regular meetings with social-media platforms about disinformation.[436]

Chan testified that the FBI uses its criminal-investigation authority, national-security authority, the Foreign Intelligence Surveillance Act, the PATRIOT Act, and Executive Order 12333 to gather national security intelligence to investigate content on social media.[437]

Chan believes with a high degree of confidence that the FBI's identification of "tactical information" was accurate and did not misidentify accounts operated by American citizens.[438] However, Plaintiffs identified tweets and trends on Twitter, such as #ReleasetheMemo in 2019, and indicated that 929,000 tweets were political speech by American citizens.[439]

---

[432] [Id. at 99]
[433] [Id. at 100–01]
[434] [Id. at 102–03]
[435] [Id. at 105–08]
[436] [Id. at 108]
[437] [Id. at 111–12]
[438] [Id. at 112]
[439] [Doc. No. 204-2 at 71]

(16)    Chan testified that he believed social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles.[440] Chan further thinks that pressure from Congress, specifically the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence, resulted in more aggressive censorship policies.[441] Chan also stated that congressional hearings placed pressure on the social-media platforms.[442]

Chan further testified that Congressional staffers have had meetings with Facebook, Google/YouTube, and Twitter and have discussed potential legislation.[443] Chan spoke directly with Roth of Twitter, Steven Slagle of Facebook, and Richard Salgado of Google, all of whom participated in such meetings.[444]

(17)    Chan testified that 3,613 Twitter accounts and 825 Facebook accounts were taken down in 2018. Chan testified Twitter took down 422 accounts involving 929,000 tweets in 2019.[445]

(18)    Chan testified that the FBI is continuing its efforts to report disinformation to social-media companies to evaluate for suppression and/or censorship.[446] "Post-2020, we've never stopped…as soon as November 3 happened in 2020, we just pretty much rolled into preparing for 2022."[447]

---

[440] [Id. at 115–16]
[441] [Id. at 116]
[442] [Id. at 117–18]
[443] [Id. at 118]
[444] [Id. at 123–26]
[445] [Id. at 133–34, 149–50]
[446] [Doc. No. 204-8 at 2–3]
[447] [Doc. No. 204-8 at 2]

### E. CISA Defendants[448]

The deposition of Brian Scully was taken on January 12, 2023, as part of the injunction-related discovery in this matter.

(1)    The CISA regularly meets with social-media platforms in several types of standing meetings. Scully is the chief of CISA's Mis, Dis and Malinformation Team ("MDM Team"). Prior to President Biden taking office, the MDM Team was known as the "Countering Foreign Influence Task Force ("CFITF").[449] Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of outreach and engagement to key stakeholders, interagency partners, and private sector partners, which includes social-media platforms. Scully performed Protentis's duties while she was on maternity leave.[450] Both Scully and Protentis have done extended detail at the National Security Council, where they work on misinformation and disinformation issues.[451]

(2)    Scully testified that during 2020, the MDM Team did "switchboard work" on behalf of election officials. "Switchboarding" is a disinformation-reporting system provided by CISA that allows state and local election officials to identify something on social media they deem to be disinformation aimed at their jurisdiction. The officials would then forward the information to CISA, which would in turn share the information with the social-media companies.[452]

The main idea, according to Scully, is that the information would be forwarded to social-media platforms, which would make decisions on the content based on their policies.[453] Scully further testified he decided in late April or early May 2022 not to perform switchboarding in 2022.

---

[448] CISA Defendants consist of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"), Kim Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").
[449] [Doc. No. 209-1 at 12]
[450] [Id. at 18–20]
[451] [Id. at 19]
[452] [Id. at 16–17]
[453] [Id. at 17]

69a

However, the CISA website states the MDM Team serves as a "switchboard for routing disinformation concerns to social-media platforms."[454] The switchboarding activities began in 2018.[455]

(3)　The MDM Team continues to communicate regularly with social-media platforms in two different ways. The first way is called "Industry" meetings. The Industry meetings are regular sync meetings between government and industry, including social-media platforms.[456] The second type of communication involves the MDM Team reviewing regular reports from social-media platforms about changes to their censorship policies or to their enforcement actions on censorship.[457]

(4)　The Industry meetings began in 2018 and continue to this day. These meetings increase in frequency as each election nears. In 2022, the Industry meetings were monthly but increased to biweekly in October 2022.[458]

Government participants in the USG-Industry meetings are CISA, the Department of Justice ("DOJ"), ODNI, and the Department of Homeland Security ("DHS"). CISA is typically represented by Scully and Hale. Scully's role is to oversee and facilitate the meetings.[459] Wyman, Snell, and Protentis also participate in the meetings on behalf of CISA.[460] On behalf of the FBI, FITF Chief Dehmlow, Chan, and others from different parts of the FBI participate.[461]

In addition to the Industry meetings, CISA hosts at least two "planning meetings:" one between CISA and Facebook and an interagency meeting between CISA and other participating

---

[454] [Doc. No. 209-19 at 3]
[455] [Id.]
[456] [Doc. No. 209-1 at 21]
[457] [Id.]
[458] [Id. at 24]
[459] [Id. at 25]
[460] [Id. at 28]
[461] [Id. at 29]

69

federal agencies.[462] The social-media platforms attending the industry meetings include Facebook, Twitter, Microsoft, Google/YouTube, Reddit, LinkedIn, and sometimes the Wikipedia Foundation.[463] At the Industry meetings, participants discuss concerns about misinformation and disinformation. The federal officials report their concerns over the spread of disinformation. The social-media platforms in turn report to federal officials about disinformation trends, share high-level trend information, and repot the actions they are taking.[464] Scully testified that the specific discussion of foreign-originating information is ultimately targeted at preventing domestic actors from engaging in this information.[465]

(5)    CISA has established relationships with researchers at Stanford University, the University of Washington, and Graphika.[466] All three are involved in the Election Integrity Partnership ("EIP").[467]

When the EIP was starting up, CISA interns came up with the idea of having some communications with the EIP. CISA began having communications with the EIP, and CISA connected the EIP with the Center for Internet Security ("CIS"). The CIS is a CISA-funded, non-profit that channels reports of disinformation from state and local government officials to social-media platforms. The CISA interns who originated the idea of working with the EIP also worked for the Stanford Internet Observatory, another part of the EIP. CISA had meetings with Stanford Internet Observatory officials, and eventually both sides decided to work together.[468] The "gap"

---

[462] [Id. at 36–37]
[463] [Id. at 39]
[464] [Id. at 39–41]
[465] [Id. at 41]
[466] [Id. at 46, 48]
[467] [Id. at 48]
[468] [Id. at 49–52]

that the EIP was designed to fill concerned state and local officials' lack of resources to monitor and report on disinformation that affects their jurisdictions.[469]

(6)      The EIP continued to operate during the 2022 election cycle. At the beginning of the election cycle, the EIP gave Scully and Hale, on behalf of CISA, a briefing in May or June of 2022.[470] In the briefing, DiResta walked through what the plans were for 2022 and some lessons learned from 2020. The EIP was going to support state and local election officials in 2022.

(7)      The CIS is a non-profit that oversees the Multi-State Information Sharing and Analysis Center ("MS-ISAC") and the Election Infrastructure Information Sharing and Analysis Center ("EI-ISAC"). Both MS-ISAC and EI-ISAC are organizations of state and/or local government officials created for the purpose of information sharing.[471]

CISA funds the CIS through a series of grants. CISA also directs state and local officials to the CIS as an alternative route to "switchboarding."[472] CISA connected the CIS with the EIP because the EIP was working on the same mission,[473] and it wanted to make sure they were all connected. Therefore, CISA originated and set up collaborations between local government officials and CIS and between the EIP and CIS.

(8)      CIS worked closely with CISA in reporting misinformation to social-media platforms. CIS would receive the reports directly from election officials and would forward this information to CISA. CISA would then forward the information to the applicable social-media platforms. CIS later began to report the misinformation directly to social-media platforms.[474]

---

[469] [Id. at 57]
[470] [Id. at 53–54]
[471] [Id. at 59–61]
[472] [Id. at 61–62]
[473] [Id. at 62–63]
[474] [Id. at 63–64]

The EIP also reported misinformation to social-media platforms. CISA served as a mediating role between CIS and EIP to coordinate their efforts in reporting misinformation to the platforms. There were also direct email communications between the EIP and CISA about reporting misinformation.[475] When CISA reported misinformation to social-media platforms, CISA would generally copy the CIS, who, as stated above, was coordinating with the EIP.[476]

(9)  Stamos and DiResta of the Stanford Internet Observatory briefed Scully about the EIP report, "The Long Fuse,"[477] in late Spring or early Summer of 2021. Scully also reviewed copies of that report. Stamos and DiResta also have roles in CISA: DiResta serves as "Subject Matter Expert" for CISA's Cybersecurity Advisory Committee, MDM Subcommittee, and Stamos serves on the CISA Cybersecurity Advisory Committee, as does Kate Starbird ("Starbird") of the University of Washington.[478] Stamos identified the EIP's "partners in government" as CISA, DHS, and state and local officials.[479] Also, according to Stamos, the EIP targeted "large following political partisans who were spreading misinformation intentionally."[480]

(10)  CISA's Masterson was also involved in communicating with the EIP.[481] Masterson and Scully questioned EIP about their statements on election-related information. Sanderson left CISA in January 2021, was a fellow at the Stanford Internet Observatory, and began working for Microsoft in early 2022.[482]

---

[475] [Id. at 63–66]
[476] [Id. at 67–68]
[477] [Doc. 209-2]
[478] [Doc. No. 209-1, at 72, 361; Doc. No. 212-36 at 4 (Jones Deposition-SEALED DOCUMENT)]
[479] [Doc. No. 209-4 at 4]
[480] [Scully depo. Exh. at l7]
[481] [Doc. No. 209-1 at 76]
[482] [Id. at 88–89]

(11)     CISA received misinformation principally from two sources: the CIS directly from state and local election officials; and information sent directly to a CISA employee.[483] CISA shared information with the EIP and the CIS.[484]

(12)     CISA did not do an analysis to determine what percentage of misinformation was "foreign derived." Therefore, CISA forwards reports of information to social-media platforms without determining whether they originated from foreign or domestic sources.[485]

(13)     The Virality Project was created by the Stanford Internet Observatory to mimic the EIP for COVID.[486] As previously stated, Stamos and DiResta of the Stanford Internet Observatory were involved in the Virality Project. Stamos gave Scully an overview of what they planned to do with the Virality Project, similar to what they did with the EIP.[487] Scully also had conversations with DiResta about the Virality Project.[488] DiResta noted the Virality Project was established on the heels of the EIP, following its success in order to support government health officials' efforts to combat misinformation targeting COVID-19 vaccines.[489]

(14)     According to DiResta, the EIP was designed to "get around unclear legal authorities, including very real First Amendment questions" that would arise if CISA or other government agencies were to monitor and flag information for censorship on social media.[490]

(15)     The CIS coordinated with the EIP regarding online misinformation and reported it to CISA. The EIP was using a "ticketing system" to track misinformation.[491] Scully asked the social-media platforms to report back on how they were handling reports of misinformation and

---

[483] [Id. at 119–20]
[484] [Id. at 120–21]
[485] [Id. at 122–23]
[486] [Id. at 134]
[487] [Id. at 134–36]
[488] [Id. at 139]
[489] [Doc. No. 209-5 at 7]
[490] [Id. at 4]
[491] [Doc. No. 209-1 at 159]

disinformation received from CISA.[492] CISA maintained a "tracking spreadsheet" of its misinformation reports to social-media platforms during the 2020 election cycle.[493]

(16)    At least six members of the MDM team, including Scully, "took shifts" in the "switchboarding" operation reporting disinformation to social-media platforms; the others were Chad Josiah ("Josiah"), Rob Schaul ("Schaul"), Alex Zaheer ("Zaheer"), John Stafford ("Stafford"), and Pierce Lowary ("Lowary"). Lowary and Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was the operating the EIP.[494] Therefore, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of both CISA and the EIP.[495] Zaheer and Lowary were also two of the four Stanford interns who came up with the idea for the EIP.[496]

(17)    The CISA switchboarding operation ramped up as the election drew near. Those working on the switchboarding operation worked tirelessly on election night.[497] They would also "monitor their phones" for disinformation reports even during off hours so that they could forward disinformation to the social-media platforms.[498]

(18)    As an example, Zaheer, when switchboarding for CISA, forwarded supposed misinformation to CISA's reporting system because the user had claimed "mail-in voting is insecure" and that "conspiracy theories about election fraud are hard to discount."[499]

CISA's tracking spreadsheet contains at least eleven entries of switchboarding reports of misinformation that CISA received "directly from EIP" and forwarded to social-media platforms

---

[492] [Doc. No. 209-6 at 11]
[493] [Doc. No. 209-1 at 165–66]
[494] [Id. at 166–68, 183]
[495] [Id.]
[496] [Id. at 171, 184–85]
[497] [Id. at 174–75]
[498] [Id. at 75]
[499] [Doc. No. 209-6 at 61–62]

to review under their policies.[500] One of these reports was reported to Twitter for censorship because EIP "saw an article on the Gateway Pundit" run by Plaintiff Jim Hoft.[501]

(19)    Scully admitted that CISA engaged in "informal fact checking" to determine whether a claim was true or not.[502] CISA would do its own research and relay statements from public officials to help debunk postings for social-media platforms. In debunking information, CISA apparently always assumed the government official was a reliable source; CISA would not do further research to determine whether the private citizen posting the information was correct or not.[503]

(20)    CISA's switchboarding activities reported private and public postings.[504] Social-media platforms responded swiftly to CISA's reports of misinformation.[505]

(21)    CISA, in its interrogatory responses, disclosed five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of speech on social media.[506] CISA also had bilateral meetings between CISA and the social-media companies.[507]

(22)    Scully does not recall whether "hack and leak" or "hack and dump" operations were raised at the Industry meetings, but does not deny it either.[508] However, several emails confirm that "hack and leak" operations were on the agenda for the Industry meeting on September 15, 2020,[509] and July 15, 2020.[510]

---

[500] [Doc. No. 214-35 at 5–6, Column C]
[501] [Id. at 4–5, Column F, Line 94]
[502] CISA also became the "ministry of truth."
[503] [Doc. No. 209-1 at 220–22]
[504] [Doc. No. 209-7 at 45–46]
[505] [Doc. No. 209-1 at 291–94; 209–49]
[506] [Doc. No. 209-9 at 38–40]
[507] [Doc. No. 209-1 at 241]
[508] [Id. at 236–37]
[509] [Doc. No. 209-13 at 1]
[510] [Doc. No. 209-14 at 16]

(23)    In the spring and summer of 2022, CISA's Protentis requested that social-media

platforms prepare a "one-page" document that sets forth their content-moderation rules[511] that

could then be shared with election officials—and which also included "steps for flagging or

escalating MDM content" and how to report misinformation.[512] Protentis referred to the working

group (which included Facebook and CISA's Hale) as "Team CISA."[513]

(24)    The Center for Internet Security continued to report misinformation to social-media

platforms during the 2022 election cycle.[514]

(25)    CISA has teamed up directly with the State Department's Global Engagement

Center ("GEC") to seek review of social-media content.[515] CISA also flagged for review parody

and joke accounts.[516] Social-media platforms report to CISA when they update their content-

moderation policies to make them more restrictive.[517] CISA publicly stated that it is expanding its

efforts to fight disinformation-hacking in the 2024 election cycle.[518]

(26)    A draft copy of the DHS's "Quadrennial Homeland Security Review," which

outlines the department's strategy and priorities in upcoming years, states that the department plans

to target "inaccurate information" on a wide range of topics, including the origins of the COVID-

19 pandemic, the efficacy of COVID-19 vaccines, racial justice, the United States' withdrawal

from Afghanistan, and the nature of the United States' support of Ukraine.[519]

---

[511] [Doc. No. 209-14]
[512] [Doc. No. 209-15 at 41, 44–45]
[513] [Doc. No. 209-15 at 39]
[514] [Doc. No. 209-1 at 266]
[515] [Doc. No. 209-15 at 1–2]
[516] [Id. at 11–12]
[517] [Id. at 9]
[518] [Doc. No. 209-20 at 1–2]
[519] [Doc. No. 209-23 at 1–4]

(27)     Scully also testified that CISA engages with the CDC and DHS to help them in their efforts to stop the spread of disinformation. The examples given were about the origins of the COVID-19 pandemic and Russia's invasion of Ukraine.[520]

(28)     On November 21, 2021, CISA Director Easterly reported that CISA is "beefing up its misinformation and disinformation team in wake of a diverse presidential election a proliferation of misleading information online."[521] Easterly stated she was going to "grow and strengthen" CISA's misinformation and disinformation team. She further stated, "We live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts."[522]

Easterly also views the word "infrastructure" very expansively, stating, "[W]e're in the business of protecting critical infrastructure, and the most critical is our 'cognitive infrastructure.'"[523] Scully agrees with the assessment that CISA has an expansive mandate to address all kinds of misinformation that may affect control and that could indirectly cause national security concerns.[524]

On June 22, 2022, CISA's cybersecurity Advisory Committee issued a Draft Report to the Director, which broadened "infrastructure" to include "the spread of false and misleading information because it poses a significant risk to critical function, like elections, public health, financial services and emergency responses."[525]

---

[520] [Doc. No. 209-1 at 323–25]
[521] [Doc. No. 209-1 at 335–36]
[522] [Doc. No. 209-18 at 1–2]
[523] [Id.]
[524] [Doc. No. 209-1 at 341]
[525] [Doc. No. 209-25 at 1]

(29)    In September 2022, the CIS was working on a "portal" for government officials to report election-related misinformation to social-media platforms.[526] That work continues today.[527]

## F.  State Department Defendants[528]

### 1.  The GEC

(1)    Daniel Kimmage is the Principal Deputy Coordinator of the State Department's Global Engagement Center ("GEC").[529] The GEC's front office and senior leadership meets with social-media platforms every few months, sometimes quarterly.[530] The meetings focus on the "tools and techniques" of stopping the spread of disinformation on social media, but they rarely discuss specific content that is posted.[531] Additionally, GEC has a "Technology Engagement Team" ("TET") that also meets with social-media companies. The TET meets more frequently than the GEC.[532]

(2)    Kimmage recalls two meetings with Twitter. At these meetings, the GEC would bring between five and ten people including Kimmage, one or more deputy coordinators, and team chiefs from the GEC and working-level staff with relevant subject-matter expertise.[533] The GEC staff would meet with Twitter's content-mediation teams, and the GEC would provide an overview of what it was seeing in terms of foreign propaganda and information. Twitter would then discuss similar topics.[534]

---

[526] [Doc. No. 210-22]
[527] [Id.]
[528] The State Department Defendants consist of the United States Department of State, Leah Bray ("Bray"), Daniel Kimmage ("Kimmage'), and Alex Frisbie ("Frisbie").
[529] Kimmage's deposition was taken and filed as [Doc. No. 208-1].
[530] [Doc. No. 208-1 at 29, 32]
[531] [Id. at 30]
[532] [Id. at 37]
[533] [Id. at 130–31]
[534] [Id. at 133–36]

(3)     The GEC's senior leadership also had similar meetings with Facebook and Google. Similar numbers of people were brought to these meetings by GEC, and similar topics were discussed. Facebook and Google also brought their content-moderator teams.[535]

(4)     Samaruddin Stewart ("Stewart") was the GEC's Senior Advisor who was a permanent liaison in Silicon Valley for the purpose of meeting with social-media platforms about disinformation. Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to explore shared interests and alignment of mutual goals regarding the challenge.[536]

(5)     The GEC also coordinated with CISA and the EIP. Kimmage testified that the GEC had a "general engagement" with the EIP.[537]

(6)     On October 17, 2022, at an event at Stanford University, Secretary of State Anthony Blinken mentioned the GEC and stated that the State Department was "engaging in collaboration and building partnerships" with institutions like Stanford to combat the spread of propaganda.[538] Specifically, he stated, "We have something called the Global Engagement Center that's working on this every single day."[539]

(7)     Like CISA, the GEC works through the CISA-funded EI-ISAC and works closely with the Stanford Internet Observatory and the Virality Project.

---

[535] [Id. at 141–43]
[536] [Id. at 159–60]
[537] [Id. at 214–215]. The details surrounding the EIP are described in II 6(5)(6)(7)(8)(9)(10)(15) and (16). Scully Ex. 1 details EIPS work carried out during the 2020 election.
[538] [Doc. No. 208-17 at 5]
[539] [Id.]

## 2. The EIP

(8)    The EIP is partially-funded by the United States National Science Foundation through grants.[540] Like its work with CISA, the EIP, according to DiResta, was designed to "get around unclear legal authorities, including very real First Amendment questions" that would arise if CISA or other government agencies were to monitor and flag information for censorship on social media.[541]

The EIP's focus was on understanding misinformation and disinformation in the social-media landscape, and it successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020.[542]

The government agencies that work with and submit alleged disinformation to the EIP are CISA, the State Department Global Engagement Center, and the Elections Infrastructure Information Sharing and Analysis Center.[543]

(9)    The EIP report further states that the EIP used a tiered model based on "tickets" collected internally and from stakeholders. The tickets also related to domestic speech by American citizens,[544] including accounts belonging to media outlets, social-media influencers, and political figures.[545] The EIP further emphasized that it wanted greater access to social-media platform's internal data and recommended that the platforms increase their enforcement of censorship policies.[546]

---

[540] [Id. at 17]
[541] [Doc. No. 209-5 at 4]
[542] [Doc. No. 209-5, Exh. 1; Ex. 4 at 7, Audio Tr. 4]
[543] [Doc. No. 209-2 at 30]
[544] [Id. at 11]
[545] [Id. at 12]
[546] [Id. at 14]

The EIP was formed on July 26, 2020, 100 days before the November 2020 election.[547] On July 9, 2020, the Stanford Internet Observatory presented the EIP concept to CISA. The EIP team was led by Research Manager DiResta, Director Stamos and the University of Washington's Starbird.[548]

(10)　EIP's managers both report misinformation to platforms and communicate with government partners about their misinformation reports.[549] EIP team members were divided into tiers of on-call shifts. Each shift was four hours long and led by one on-call manager. The shifts ranged from five to twenty people. Normal scheduled shifts ran from 8:00 a.m. to 8:00 p.m., ramping up to sixteen to twenty hours a day during the week of the election.[550]

(11)　Social-media platforms that participated in the EIP were Facebook, Instagram, Google/YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest.[551]

(12)　In the 2020 election cycle, the EIP processed 639 "tickets," 72% of which were related to delegitimizing the election results.[552] Overall, social-media platforms took action on 35% of the URLs reported to them.[553] One "ticket" could include an entire idea or narrative and was not always just one post.[554] Less than 1% of the tickets related to "foreign interference."[555]

(13)　The EIP found that the Gateway Pundit was one of the top misinformation websites, allegedly involving the "exaggeration" of the input of an issue in the election process. The EIP did

---

[547] [Id. at 20]
[548] [Id.]
[549] [Id. at 27–28]
[550] [Id. at 28]
[551] [Id. at 35]
[552] [Id. at 45]
[553] [Id. at 58]
[554] [Id. at 27]
[555] [Id. at 53]

not say that the information was false.[556] The EIP Report cites The Gateway Pundit forty-seven times.[557]

(14)    The GEC was engaging with the EIP and submitted "tickets."[558]

(15)    The tickets and URLs encompassed millions of social-media posts, with almost twenty-two million posts on Twitter alone.[559] The EIP sometimes treats as "misinformation" truthful reports that the EIP believes "lack broader context."[560]

(16)    The EIP stated "influential accounts on the political right…were responsible for the most widely spread of false or misleading information in our data set."[561] Further, the EIP stated the twenty-one most prominent report spreaders on Twitter include political figures and organizations, partisan media outlets, and social-media stars. Specifically, the EIP stated, "All 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump."[562] The Gateway Pundit was listed as the second-ranked "Repeat Spreader of Election Misinformation" on Twitter. During the 2020 election cycle, the EIP flagged The Gateway Pundit in twenty-five incidents with over 200,000 retweets.[563] The Gateway Pundit ranked above Donald Trump, Eric Trump, Breitbart News, and Sean Hannity.[564]

The Gateway Pundit's website was listed as the domain cited in the most "incidents"; its website content was tweeted by others in 29,209 original tweets and 840,740 retweets.[565] The Gateway Pundit ranked above Fox News, the New York Post, the New York Times, and the

---

[556] [Id. at 51]
[557] [Id. at 51, 74, 76, 101, 103, 110, 112, 145, 150–51, 153, 155–56, 172, 175, 183, 194–95, 206–09, 211–12, 214–16, and 226]
[558] [Id. at 60]
[559] [Id. at 201]
[560] [Id. at 202]
[561] [Id. at 204–05]
[562] [Id. at 204–05]
[563] [Id.]
[564] [Id. at 246]
[565] [Id. at 207]

Washington Post.[566] The EIP report also notes that Twitter suspended The Gateway Pundit's account on February 6, 2021, and it was later de-platformed entirely.[567]

(17)    The EIP notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies—policies that attempted to slow the spread of specific narratives and tactics that could 'potentially mislead or deceive the public.'"[568] The EIP was not targeting foreign disinformation, but rather "domestic speakers."[569] The EIP also indicated it would continue its work in future elections.[570]

(18)    The EIP also called for expansive censorship of social-media speech into other areas such as "public health."[571]

(19)    The EIP stated that it "united government, academic, civil society, and industry, analyzing across platforms to address misinformation in real time."[572]

(20)    When asked whether the targeted information was domestic, Stamos answered, "It is all domestic, and the second point on the domestic, a huge part of the problem is well-known influences… you… have a relatively small number of people with very large followings who have the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these narratives."[573]

Stamos further stated:

> We have set up this thing called the Election Integrity Partnership, so we went and hired a bunch of students. We're working with the University of Washington, Graphika, and DFR Lab and the vast, vast majority we see we believe is domestic. And so, I think a much bigger issue for the platforms is elite disinformation. The staff that

---

[566] [Id.]
[567] [Id. at 224]
[568] [Id. at 229]
[569] [Id. at 243–44]
[570] [Id. at 243–44]
[571] [Id. at 251]
[572] [Id. at 259]
[573] [Doc. No. 276-1 at 12]

is being driven by people who are verified that are Americans who are using their real identities.[574]

(21)     Starbird of the University of Washington, who is on a CISA subcommittee and an

EIP participant, also verified the EIP was targeting domestic speakers, stating:

> Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States… Most of the accounts perpetrating this…. they're authentic accounts.  They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election.[575]

### 3.  The Virality Project

(22)     The Virality Project targeted domestic speakers' alleged disinformation relating to

the COVID-19 vaccines.[576] The Virality Project's final report, dated April 26, 2022, lists DiResta

as principal Executive Director and lists Starbird and Masterson as contributors.[577]

According to the Virality Project, "vaccine mis-and disinformation was largely driven by

a cast of recuring [sic] actors including long-standing anti-vaccine influencers and activists,

wellness and lifestyle influence, pseudo medical influencers, conspiracy theory influencers, right-

leaning political influencers, and medical freedom influencers."[578]

The Virality Project admits the speech it targets is primarily domestic, stating "Foreign …

actor's reach appeared to be far less than that of domestic actors."[579] The Virality Project also calls

for more aggressive censorship of COVID-19 misinformation, calls for more federal agencies to

---

[574] [Id.]
[575] [Doc. No. 276-1 at 42]
[576] [Doc. No. 209-3]; Memes, Magnets, Microchips, Narrative Dynamics Around COVID-19 Vaccines.
[577] [Doc. No. 209-3 at 4]
[578] [Id. at 9]
[579] [Id.]

be involved through "cross-agency collaboration,"[580] and calls for a "whole-of-society response."[581] Just like the EIP, the Virality Project states that it is "multistakeholder collaboration" that includes "government entities" among its key stakeholders.[582] The Virality Project targets tactics that are not necessarily false, including hard-to-verify content, alleged authorization sources, organized outrage, and sensationalized/misleading headlines.[583]

(23) Plaintiff Hines of the Health Freedom Louisiana was flagged by the Virality Project to be a "medical freedom influencer" who engages in the "tactic" of "organized outrage" because she created events or in-person gatherings to oppose mask and vaccine mandates in Louisiana.[584]

(24) The Virality Project also acknowledges that government "stakeholders," such as "federal health agencies" and "state and local public health officials," were among those that "provided tips" and "requests to access specific incidents and narratives."[585]

(25) The Virality Project also targeted the alleged COVID-19 misinformation for censorship before it could go viral. "Tickets also enabled analysts to qualify tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that those partners could determine whether something might merit a rapid public or on-platform response."[586]

(26) The Virality Project flagged the following persons and/or organizations as spreaders of misinformation:

    i.    Jill Hines and Health Freedom of Louisiana;[587]
    ii.   One America News;[588]

---

[580] [Id. at 12]
[581] [Id.]
[582] [Id. at 17]
[583] [Id. at 19]
[584] [Id. at 9, 19]
[585] [Id. at 24]
[586] [Id. at 37]
[587] [Id. at 59]
[588] [Id. at 60]

iii. Breitbart News;[589]
iv. Alex Berenson;[590]
v. Tucker Carlson;[591]
vi. Fox News;[592]
vii. Candace Owens;[593]
viii. The Daily Wire;[594]
ix. Robert F. Kennedy, Jr.;[595]
x. Dr. Simone Gold and America's Frontline Doctors; and[596]
xi. Dr. Joyce Mercula.[597]

(27) The Virality Project recommends that the federal government implement a Misinformation and Disinformation Center of Excellence, housed within the federal government, which would centralize expertise on mis/disinformation within the federal government at CISA.[598]

## III. LAW AND ANALYSIS

### A. Preliminary Injunction Standard

An injunction is an extraordinary remedy never awarded of right. *Benisek v. Lamone*, 138 U.S. 1942, 1943 (2018). In each case, the courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U. S. 7, 24, 129 S. Ct. 365 (2008).

The standard for an injunction requires a movant to show: (1) the substantial likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of an injunction; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Benisek*, 138 U.S. at 1944. The party seeking relief must satisfy a cumulative burden of proving

---

[589] [Id.]
[590] [Id. at 54, 57, 49, 50]
[591] [Id. at 57]
[592] [Id. at 91]
[593] [Id. at 86, 92]
[594] [Id.]
[595] [Id.]
[596] [Id. at 87–88]
[597] [Id. at 87]
[598] [Id. at 150]

each of the four elements enumerated before an injunction can be granted. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). None of the four prerequisites has a quantitative value. *State of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

### B. Analysis

As noted above, Plaintiffs move for a preliminary injunction against Defendants' alleged violations of the Free Speech Clause of the First Amendment. Plaintiffs assert that they are likely to succeed on the merits of their First Amendment claims because Defendants have significantly encouraged and/or coerced social-media companies into removing protected speech from social-media platforms. Plaintiffs also argue that failure to grant a preliminary injunction will result in irreparable harm because the alleged First Amendment violations are continuing and/or there is a substantial risk that future harm is likely to occur. Further, Plaintiffs maintain that the equitable factors and public interest weigh in favor of protecting their First Amendment rights to freedom of speech. Finally, Plaintiffs move for class certification under Federal Rule of Civil Procedure 23.

In response, Defendants maintain that Plaintiffs are unlikely to succeed on the merits for a myriad of reasons. Defendants also maintain that Plaintiffs lack Article III standing to bring the claims levied herein, that Plaintiffs have failed to show irreparable harm because the risk of future injury is low, and that the equitable factors and public interests weigh in favor of allowing Defendants to continue enjoying permissible government speech.

Each argument will be addressed in turn below.

### 1. Plaintiffs' Likelihood of Success on the Merits

For the reasons explained herein, the Plaintiffs are likely to succeed on the merits of their First Amendment claim against the White House Defendants, Surgeon General Defendants, CDC Defendants, FBI Defendants, NIAID Defendants, CISA Defendants, and State Department

Defendants. In ruling on a motion for Preliminary Injunction, it is not necessary that the applicant demonstrate an absolute right to relief. It need only establish a probable right. *West Virginia Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232 (4th Cir. 1971). The Court finds that Plaintiffs here have done so.

### a. Plaintiffs' First Amendment Claims

The Free Speech Clause prohibits only governmental abridgment of speech. It does not prohibit private abridgment of speech. *Manhattan Community Access Corporation v. Halleck*, 139 S. Ct. 1921, 1928 (2019). The First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. *Id.* Government action, aimed at the suppression of particular views on a subject that discriminates on the basis of viewpoint, is presumptively unconstitutional. The First Amendment guards against government action "targeted at specific subject matter," a form of speech suppression known as "content-based discrimination." *National Rifle Association of America v. Cuomo*, 350 F. Supp. 3d 94, 112 (N.D. N.Y. 2018). The private party, social-media platforms are not defendants in the instant suit, so the issue here is not whether the social-media platforms are government actors,[599] but whether the government can be held responsible for the private platforms' decisions.

Viewpoint discrimination is an especially egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the perspective of the speaker is the rationale for the restriction. *Rosenberger v. Rectors and Visitors*

---

[599] This is a standard that requires the private action to be "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

*of University of Virginia*, 515 U.S. 819, 829 (1995). Strict scrutiny is applied to viewpoint discrimination. *Simon & Schuster, Inc. v. Members of the New York State Crime Victim's Board*, 505 U.S. 105 (1991). The government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. *Police Department of Chicago v. Moseley*, 408 U.S. 92, 96 (1972).

If there is a bedrock principal underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377 (1996). The benefit of any doubt must go to protecting rather than stifling speech. *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 891 (2010).

### i. Significant Encouragement and Coercion

To determine whether Plaintiffs are substantially likely to succeed on the merits of their First Amendment free speech claim, Plaintiffs must prove that the Federal Defendants either exercised coercive power or exercised such significant encouragement that the private parties' choice must be deemed to be that of the government. Additionally, Plaintiffs must prove the speech suppressed was "protected speech." The Court, after examining the facts, has determined that some of the Defendants either exercised coercive power or provided significant encouragement, which resulted in the possible suppression of Plaintiffs' speech.

The State (i.e., the Government) can be held responsible for a private decision only when it has exercised coercive power or has provided such "significant encouragement," either overt or covert, that the choice must be deemed to be that of the State. Mere approval or acquiescence in the actions of a private party is not sufficient to hold the state responsible for those actions. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Rendell-Baker v. Kohn*, 457 U.S. 830, 1004–05 (1982);

90a

*National Broadcasting Co. Inc v. Communications Workers of America*, *Afl-Cio*, 860 F.2d 1022 (11th Cir. 1988); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1213 (11th Cir. 2003); *Brown v. Millard County*, 47 Fed. Appx. 882 (10th Cir. 2002).

In evaluating "significant encouragement," a state may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish. *Norwood v. Harrison*, 413 U.S. at 465. Additionally, when the government has so involved itself in the private party's conduct, it cannot claim the conduct occurred as a result of private choice, even if the private party would have acted independently. *Peterson v. City of Greenville*, 373 U.S. at 247–48. Further, oral, or written statements made by public officials could give rise to a valid First Amendment claim where the comments of a governmental official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request. *National Rifle Association of America*, 350 F. Supp. 3d at 114. Additionally, a public official's threat to stifle protected speech is actionable under the First Amendment and can be enjoined, even if the threat turns out to be empty. *Backpage.com, LLC v. Dart*, 807 F. 3d at 230–31.

The Defendants argue that the "significant encouragement" test for government action has been interpreted to require a higher standard since the Supreme Court's ruling in *Blum v. Yaretsky*, 457 U.S. 991 (1982). Defendants also argue that Plaintiffs are unable to meet the test to show Defendants "significantly encouraged" social-media platforms to suppress free speech. Defendants further maintain Plaintiffs have failed to show "coercion" by Defendants to force social-media companies suppress protected free speech. Defendants also argue they made no threats but rather sought to "persuade" the social-media companies. Finally, Defendants maintain the private social-media companies made independent decisions to suppress certain postings.

90

In *Blum*, the Supreme Court held the Government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the state." *Blum*, 457 U.S. at 1004. Defendants argue that the bar for "significant encouragement" to convert private conduct into state action is high. Defendants maintain that *Blum*'s language does not mean that the Government is responsible for private conduct whenever the Government does more than adopt a passive position toward it. *Skinner v. Ry. Labor Execs. Ass'n.*, 489 U.S. 602, 615 (1989).

Defendants point out this is a question of degree: whether a private party should be deemed an agent or instrument of the Government necessarily turns on the "degree" of the Government's participation in the private party's activities. 489 U.S. at 614. The dispositive question is "whether the State has exercised coercive power or has provided such significant encouragement that the choice must in law be deemed to be that of the State." *VDARE Fund v. City of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021).

The Supreme Court found there was not enough "significant encouragement" by the Government in *American Manufacturers Mutual Ins. Co. v. Sullivan*, 526 U.S. 40 (1999). This case involved the constitutionality of a Pennsylvania worker's compensation statute that authorized, but did not require, insurers to withhold payments for the treatment of work-related injuries pending a "utilization" review of whether the treatment was reasonable and necessary. The plaintiffs' argument was that by amending the statute to grant the utilization review (an option they previously did not have), the State purposely encouraged insurers to withhold payments for disputed medical treatment. The Supreme Court found this type of encouragement was not enough for state action.

The United States Court of Appeal for the Fifth Circuit has also addressed the issue of government coercion or encouragement. For example, in *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317 (5th Cir. 2020), the Sons of Confederate Veterans applied to march in a city parade that was coordinated by a private business association. The Mayor sent a letter asking the private business to prohibit the display of the Confederate battle flag. After the plaintiff's request to march in the parade was denied, the plaintiff filed suit and argued the Mayor's letter was "significant encouragement" to warrant state action. The Fifth Circuit found the letter was not "significant encouragement."

In determining whether the Government's words or actions could reasonably be interpreted as an implied threat, courts examine a number of factors, including: (1) the Defendant's regulatory or other decision-making authority over the targeted entities; (2) whether the government actors actually exercised regulatory authority over the targeted entities; (3) whether the language of the alleged threatening statements could reasonably be perceived as a threat; and (4) whether any of the targeted entities reacted in a manner evincing the perception of implicit threat. *Id.* at 114. As noted above, a public official's threat to stifle protected speech is actionable under the First Amendment and can be enjoined, even if the threat turns out to be empty. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339, 340-41 (2d. Cir. 2003).

The closest factual case to the present situation is *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). In *O'Handley*, the plaintiff maintained that a California agency was responsible for the moderation of his posted content. The plaintiff pointed to the agency's mission to prioritize working closely with social-media companies to be "proactive" about misinformation and the flagging of one of his Twitter posts as "disinformation." The Ninth Circuit rejected the argument

that the agency had provided "significant encouragement" to Twitter to suppress speech. In rejecting this argument, the Ninth Circuit stated the "critical question" in evaluating the "significant encouragement" theory is "whether the government's encouragement is so significant that we should attribute the private party's choice to the State…" *Id.* at 1158.

Defendants cited many cases in support of their argument that Plaintiffs have not shown significant coercion or encouragement. *See VDARE Found v. City of Colo. Springs*, 11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022) (city's decision not to provide "support or resources" to plaintiff's event was not "such significant encouragement" to transform a private venue's decision to cancel the event into state action); *S.H.A.R.K. v. Metro Park Serving Summit Cnty.*, 499 F.3d 553 (6th Cir. 2007) (government officials' requests were "not the type of significant encouragement" that would render agreeing to those requests to be state action); *Campbell v. PMI Food Equip, Grp., Inc.*, 509 F.3d 776 (6th Cir. 2007) (no state action where government entities did nothing more than authorize and approve a contract that provided tax benefits or incentives conditioned on the company opening a local plant); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) (payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity). Ultimately, Defendants contend that Plaintiffs have not shown that the choice to suppress free speech must in law be deemed to be that of the Government. This Court disagrees.

The Plaintiffs are likely to succeed on the merits on their claim that the United States Government, through the White House and numerous federal agencies, pressured and encouraged social-media companies to suppress free speech. Defendants used meetings and communications with social-media companies to pressure those companies to take down, reduce, and suppress the

free speech of American citizens. They flagged posts and provided information on the type of posts they wanted suppressed. They also followed up with directives to the social-media companies to provide them with information as to action the company had taken with regard to the flagged post. This seemingly unrelenting pressure by Defendants had the intended result of suppressing millions of protected free speech postings by American citizens. In response to Defendants' arguments, the Court points out that this case has much more government involvement than any of the cases cited by Defendants, as clearly indicated by the extensive facts detailed above. If there were ever a case where the "significant encouragement" theory should apply, this is it.

What is really telling is that virtually all of the free speech suppressed was "conservative" free speech. Using the 2016 election and the COVID-19 pandemic, the Government apparently engaged in a massive effort to suppress disfavored conservative speech. The targeting of conservative speech indicates that Defendants may have engaged in "viewpoint discrimination," to which strict scrutiny applies. *See Simon & Schuster, Inc.*, 505 U.S. 105 (1991).

In addition to the "significant encouragement" theory, the Government may also be held responsible for private conduct if the Government exercises coercive power over the private party in question. *Blum*, 457 U.S. at 1004. Here, Defendants argue that not only must there be coercion, but the coercion must be targeted at specific actions that harmed Plaintiffs. *Bantam Books v. Sullivan*, 372 U.S. 58 (1963) (where a state agency threatened prosecution if a distributor did not remove certain designated books or magazines it distributed that the state agency had declared objectionable); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (where a sheriff's letter demanded that two credit card issuers prohibit the use of their credit cards to purchase any ads on a particular website containing advertisements for adult services); *Okwedy v.*

*Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curium) (where a municipal official allegedly pressured a billboard company to take down a particular series of signs he found offensive).

The Defendants further argue they only made requests to the social-media companies, and that the decision to modify or suppress content was each social-media company's independent decision. However, when a state has so involved itself in the private party's conduct, it cannot claim the conduct occurred as a result of private choice, even if the private party would have acted independently. *Peterson v. City of Greenville*, 373 U.S. 244, 247–248 (1963).

Therefore, the question is not what decision the social-media company would have made, but whether the Government "so involved itself in the private party's conduct" that the decision is essentially that of the Government. As exhaustedly listed above, Defendants "significantly encouraged" the social-media companies to such extent that the decision should be deemed to be the decisions of the Government. The White House Defendants and the Surgeon General Defendants additionally engaged in coercion of social-media companies to such extent that the decisions of the social-media companies should be deemed that of the Government. It simply makes no difference what decision the social-media companies would have made independently of government involvement, where the evidence demonstrates the wide-scale involvement seen here.

### (1) White House Defendants

The Plaintiffs allege that by use of emails, public and private messages, public and private meetings, and other means, White House Defendants have "significantly encouraged" and "coerced" social-media platforms to suppress protected free speech on their platforms.

The White House Defendants acknowledged at oral arguments that they did not dispute the authenticity or the content of the emails Plaintiffs submitted in support of their claims.[600] However, they allege that the emails do not show that the White House Defendants either coerced or significantly encouraged social-media platforms to suppress content of social-media postings. White House Defendants argue instead that they were speaking with social-media companies about promoting more accurate COVID-19 information and to better understand what action the companies were taking to curb the spread of COVID-19 misinformation.

White House Defendants further argue they never demanded the social-media companies to suppress postings or to change policies, and the changes were due to the social-media companies' own independent decisions. They assert that they did not make specific demands via the White House's public statements and four "asks"[601] of social-media companies.[602] Defendants contend the four "asks" were "recommendations," not demands. Additionally, Defendants argue President Biden's July 16, 2021 "they're killing people" comment was clarified on July 19, 2021, to reflect that President Biden was talking about the "Disinformation Dozen," not the social-media companies.

Although admitting White House employee Flaherty expressed frustration at times with social-media companies, White House Defendants contend Flaherty sought to better understand the companies' policies with respect to addressing the spread of misinformation and hoped to find out what the Government could do to help. Defendants contend Flaherty felt such frustration

---

[600] [Doc. No. 288 at 164–65]

[601] The White House four "asks" are: (1) measure and publicly share the impact of misinformation on their platform; (2) create a robust enforcement strategy; (3) take faster action against harmful posts; and (4) promote quality information sources in their feed algorithm.

[602] [Doc. No. 10-1 at 377–78]

because some of the things the social-media-companies told him were inconsistent with what others told him, compounded with the urgency of the COVID-19 pandemic.

Explicit threats are an obvious form of coercion, but not all coercion need be explicit. The following illustrative specific actions by Defendants are examples of coercion exercised by the White House Defendants:

(a)    "Cannot stress the degree to which this needs to be resolved immediately.  Please remove this account immediately."[603]

(b)    Accused Facebook of causing "political violence" by failing to censor false COVID-19 claims.[604]

(c)    "You are hiding the ball."[605]

(d)    "Internally we have been considering our options on what to do about it."[606]

(e)    "I care mostly about what actions and changes you are making to ensure you're not making our country's vaccine hesitancy problem worse."[607]

(f)    "This is exactly why I want to know what "Reduction" actually looks like – if "reduction" means pumping our most vaccine hesitance audience with Tucker Carlson saying it does not work… then… I'm not sure it's reduction."[608]

(g)    Questioning how the Tucker Carlson video had been "demoted" since there were 40,000 shares.[609]

(h)    Wanting to know why Alex Berenson had not been kicked off Twitter because Berenson was the epicenter of disinformation that radiated outward to the persuadable public.[610] "We want to make sure YouTube has a handle on vaccine hesitancy and is working toward making the problem better. Noted that vaccine hesitancy was a concern. That is shared by the highest ('and I mean the highest') levels of the White House."'[611]

---

[603] [II. A.]
[604] [Id. A. (5)]
[605] [Id. A. (10)]
[606] [Id.]
[607] [Id. A. (11)]
[608] [Id. A. (12)]
[609] [Id. A. (15)]
[610] [Id. A. (16)]
[611] [Id. A. (17)]

(i)      After sending to Facebook a document entitled "Facebook COVID-19 Vaccine Misinformation Brief, which recommends much more aggressive censorship by Facebook. Flaherty told Facebook sending the Brief was not a White House endorsement of it, but "this is circulating around the building and informing thinking."[612]

(j)      Flaherty stated: "Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach and how quickly?"[613]

(k)      Flaherty told Facebook: "Are you guys fucking serious" I want an answer on what happened here and I want it today."[614]

(l)      Surgeon General Murthy stated: "We expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor information more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms."[615]

(m)      White House Press Secretary Psaki stated: "we are in regular touch with these social-media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team. We're flagging problematic posts for Facebook that spread disinformation. Psaki also stated one of the White House's "asks" of social-media companies was to "create a robust enforcement strategy."[616]

(n)      When asked about what his message was to social-media platforms when it came to COVID-19, President Biden stated: "they're killing people. Look, the only pandemic we have is among the unvaccinated and that – they're killing people."[617]

(o)      Psaki stated at the February 1, 2022, White House Press Conference that the White House wanted every social-media platform to do more to call out misinformation and disinformation and to uplift accurate information.[618]

(p)      "Hey folks, wanted to flag the below tweet and am wondering if we can get moving on the process of having it removed. ASAP"[619]

(q)      "How many times can someone show false COVID-19 claims before being removed?"

---

[612] [Id.]
[613] [Id at A. (19)]
[614] [Id.]
[615] [Id.]
[616] [Id.]
[617] [Id.]
[618] [Id. at A. (24)]
[619] [Doc. No. 174-1 at 1]

(r)     "I've been asking you guys pretty directly over a series of conversations if the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content- as you define it, is playing a role."[620]

(s)     "I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy-period."[621]

(t)     "You only did this, however after an election that you helped increase skepticism in and an insurrection which was plotted, in large part, on your platform."[622]

(u)     "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen." [623]

(v)     White House Communications Director, Kate Bedingfield's announcement that "the White House is assessing whether social-media platforms are legally liable for misinformation spread on their platforms, and examining how misinformation fits into the liability protection process by Section 230 of The Communication Decency Act."[624]

These actions are just a few examples of the unrelenting pressure the Defendants exerted against social-media companies. This Court finds the above examples demonstrate that Plaintiffs can likely prove that White House Defendants engaged in coercion to induce social-media companies to suppress free speech.

With respect to 47 U.S.C. § 230, Defendants argue that there can be no coercion for threatening to revoke and/or amend Section 230 because the call to amend it has been bipartisan. However, Defendants combined their threats to amend Section 230 with the power to do so by holding a majority in both the House of Representatives and the Senate, and in holding the Presidency. They also combined their threats to amend Section 230 with emails, meetings, press conferences, and intense pressure by the White House, as well as the Surgeon General Defendants. Regardless, the fact that the threats to amend Section 230 were bipartisan makes it even more

---

[620] [Id. at 11]
[621] [Id.]
[622] [Doc. No. 174-1 at 17–20]
[623] [Id. at 41]
[624] [Doc. No. 10-1 at 477–78]

likely that Defendants had the power to amend Section 230. All that is required is that the government's words or actions "could reasonably be interpreted as an implied threat." *Cuomo*, 350 F. Supp. 3d at 114. With the Supreme Court recently making clear that Section 230 shields social-media platforms from legal responsibility for what their users post, *Gonzalez v. Google*, 143 S. Ct. 1191 (2023), Section 230 is even more valuable to these social-media platforms. These actions could reasonably be interpreted as an implied threat by the Defendants, amounting to coercion.

Specifically, the White House Defendants also allegedly exercised significant encouragement such that the actions of the social-media companies should be deemed to be that of the government. The White House Defendants used emails, private portals, meetings, and other means to involve itself as "partners" with social-media platforms. Many emails between the White House and social-media companies referred to themselves as "partners." Twitter even sent the White House a "Partner Support Portal" for expedited review of the White House's requests. Both the White House and the social-media companies referred to themselves as "partners" and "on the same team" in their efforts to censor disinformation, such as their efforts to censor "vaccine hesitancy" spread. The White House and the social-media companies also demonstrated that they were "partners" by suppressing information that did not even violate the social-media companies' own policies.

Further, White House Defendants constantly "flagged" for Facebook and other social-media platforms posts the White House Defendants considered misinformation. The White House demanded updates and reports of the results of their efforts to suppress alleged disinformation, and the social-media companies complied with these demands. The White House scheduled numerous Zoom and in-person meetings with social-media officials to keep each other informed about the companies' efforts to suppress disinformation.

The White House Defendants made it very clear to social-media companies what they wanted suppressed and what they wanted amplified. Faced with unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied. The Court finds that this amounts to coercion or encouragement sufficient to attribute the White House's actions to the social-media companies, such that Plaintiffs are likely to succeed on the merits against the White House Defendants.

### (2) Surgeon General Defendants

Plaintiffs allege that Surgeon General Murthy and his office engaged in a pressure campaign parallel to, and often overlapping with, the White House Defendants' campaign directed at social-media platforms. Plaintiffs further allege the Surgeon General Defendants engaged in numerous meetings and communications with social-media companies to have those companies suppress alleged disinformation and misinformation posted on their platforms.

The Surgeon General Defendants argue that the Surgeon General's role is primarily to draw attention to public health matters affecting the nation. The SG took two official actions in 2021 and in 2022. In July 2021, the Surgeon General issued a "Surgeon General's Advisory." In March 2022, the Surgeon General issued a Request For Information ("RFI"). Surgeon General Defendants argue that the Surgeon General's Advisory did not require social-media companies to censor information or make changes in their policies. Surgeon General Defendants further assert that the RFI was voluntary and did not require the social-media companies to answer.

Additionally, the Surgeon General Defendants contend they only held courtesy meetings with social-media companies, did not flag posts for censorship, and never worked with social-media companies to moderate their policies. Surgeon General Defendants also deny that they were involved with the Virality Project.

102a

As with the White House Defendants, this Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment free speech claim against the Surgeon General Defendants. Through public statements, internal emails, and meetings, the Surgeon General Defendants exercised coercion and significant encouragement such that the decisions of the social-media platforms and their actions suppressing health disinformation should be deemed to be the decisions of the government. Importantly, the suppression of this information was also likely prohibited content and/or viewpoint discrimination, entitling Plaintiffs to strict scrutiny.

The Surgeon General Defendants did pre-rollout calls with numerous social-media companies prior to publication of the Health Advisory on Misinformation. The Advisory publicly called on social-media companies "to do more" against COVID misinformation Superspreaders. Numerous calls and meetings took place between Surgeon General Defendants and private social-media companies. The "misinformation" to be suppressed was whatever the government deemed misinformation.

The problem with labeling certain discussions about COVID-19 treatment as "health misinformation" was that the Surgeon General Defendants suppressed alternative views to those promoted by the government. One of the purposes of free speech is to allow discussion about various topics so the public may make informed decisions. Health information was suppressed, and the government's view of the proper treatment for COVID-19 became labeled as "the truth." Differing views about whether COVID-19 vaccines worked, whether taking the COVID-19 vaccine was safe, whether mask mandates were necessary, whether schools and businesses should have been closed, whether vaccine mandates were necessary, and a host of other topics were suppressed. Without a free debate about these issues, each person is unable to decide for himself or herself the proper decision regarding their health. Each United States citizen has the right to

decide for himself or herself what is true and what is false. The Government and/or the OSG does not have the right to determine the truth.

The Surgeon General Defendants also engaged in a pressure campaign with the White House Defendants to pressure social-media companies to suppress health information contrary to the Surgeon General Defendants' views. After the Surgeon General's press conference on July 15, 2021, the Surgeon General Defendants kept the pressure on social-media platforms via emails, private meetings, and by requiring social-media platforms to report on actions taken against health disinformation.

The RFI by the Surgeon General Defendants also put additional pressure on social-media companies to comply with the requests to suppress free speech. The RFI sought information from private social-media companies to provide information about the spread of misinformation. The RFI stated that the office of the Surgeon General was expanding attempts to control the spread of misinformation on social-media platforms. The RFI also sought information about social-media censorship policies, how they were enforced, and information about disfavored speakers.

Taking all of this evidence together, this Court finds the Surgeon General Defendants likely engaged in both coercion and significant encouragement to such an extent that the decisions of private social-media companies should be deemed that of the Surgeon General Defendants. The Surgeon General Defendants did much more than engage in Government speech: they kept pressure on social-media companies with pre-rollout meetings, follow-up meetings, and RFI. Thus, Plaintiffs are likely to succeed on the merits of their First Amendment claim against these Defendants.

### (3) CDC Defendants

Plaintiffs allege that the CDC Defendants have engaged in a censorship campaign, together with the White House and other federal agencies, to have free speech suppressed on social-media platforms. Plaintiffs allege that working closely with the Census Bureau, the CDC flagged supposed "misinformation" for censorship on the platforms. Plaintiffs further allege that by using the acronym "BOLO," the CDC Defendants told social-media platforms what health claims should be censored as misinformation.

In opposition, Defendants assert that the CDC's mission is to protect the public's health. Although the CDC Defendants admit to meeting with and sending emails to social-media companies, the CDC Defendants argue they were responding to requests by the companies for science-based public health information, proactively alerting the social-media companies about disinformation, or advising the companies where to find accurate information. The Census Bureau argues the Interagency Agreement, entered into with the CDC in regard to COVID-19 misinformation, has expired, and that it is no longer participating with the CDC on COVID-19 misinformation issues. The CDC Defendants further deny that they directed any social-media companies to remove posts or to change their policies.

Like the White House Defendants and Surgeon General Defendants, the Plaintiffs are likely to succeed on the merits of Plaintiffs' First Amendment free speech claim against the CDC Defendants. The CDC Defendants through emails, meetings, and other communications, seemingly exercised pressure and gave significant encouragement such that the decisions of the social-media platforms to suppress information should be deemed to be the decisions of the Government. The CDC Defendants coordinated meetings with social-media companies, provided examples of alleged disinformation to be suppressed, questioned the social-media companies about

how it was censoring misinformation, required reports from social-media companies about disinformation, told the social-media companies whether content was true or false, provided BOLO information, and used a Partner Support Portal to report disinformation. Much like the other Defendants, described above, the CDC Defendants became "partners" with social-media platforms, flagging and reporting statements on social media Defendants deemed false. Although the CDC Defendants did not exercise coercion to the same extent as the White House and Surgeon General Defendants, their actions still likely resulted in "significant encouragement" by the government to suppress free speech about COVID-19 vaccines and other related issues.

Various social-media platforms changed their content-moderation policies to require suppression of content that was deemed false by CDC and led to vaccine hesitancy. The CDC became the "determiner of truth" for social-media platforms, deciding whether COVID-19 statements made on social media were true or false. And the CDC was aware it had become the "determiner of truth" for social-media platforms. If the CDC said a statement on social media was false, it was suppressed, in spite of alternative views. By telling social-media companies that posted content was false, the CDC Defendants knew the social-media company was going to suppress the posted content. The CDC Defendants thus likely "significantly encouraged" social-media companies to suppress free speech.

Based on the foregoing examples of significant encouragement and coercion by the CDC Defendants, the Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CDC Defendants.

### (4) NIAID Defendants

Plaintiffs allege that NIAID Defendants engaged in a series of campaigns to discredit and procure the censorship of disfavored viewpoints on social media. Plaintiffs allege that Dr. Fauci

engaged in a series of campaigns to suppress speech regarding the Lab-Leak theory of COVID-19's origin, treatment using hydroxychloroquine, the GBD, the treatment of COVID-19 with Ivermectin, the effectiveness of mask mandates, and the speech of Alex Berenson.

In opposition, Defendants assert that the NIAID Defendants simply supports research to better understand, treat, and prevent infectious, immunologic, and allergic diseases and is responsible for responding to emergency public health threats. The NIAID Defendants argue that they had limited involvement with social-media platforms and did not meet with or contact the platforms to change their content or policies. The NIAID Defendants further argue that the videos, press conferences, and public statements by Dr. Fauci and other employees of NIAID was government speech.

This Court agrees that much of what the NIAID Defendants did was government speech. However, various emails show Plaintiffs are likely to succeed on the merits through evidence that the motivation of the NIAID Defendants was a "take down" of protected free speech. Dr. Francis Collins, in an email to Dr. Fauci[625] told Fauci there needed to be a "quick and devastating take down" of the GBD—the result was exactly that. Other email discussions show the motivations of the NIAID were to have social-media companies suppress these alternative medical theories. Taken together, the evidence shows that Plaintiffs are likely to succeed on the merits against the NIAID Defendants as well.

### (5) FBI Defendants

Plaintiffs allege that the FBI Defendants also suppressed free speech on social-media platforms, with the FBI and FBI's FITF playing a key role in these censorship efforts.

---

[625] [Doc. No. 207-6]

107a

In opposition, Defendants assert that the FBI Defendants' specific job duties relate to foreign influence operations, including attempts by foreign governments to influence U.S. elections. Based on the alleged foreign interference in the 2016 U.S. Presidential election, the FBI Defendants argue that, through their meetings and emails with social-media companies, they were attempting to prevent foreign influence in the 2020 Presidential election. The FBI Defendants deny any attempt to suppress and/or change the social-media companies' policies with regard to domestic speech. They further deny that they mentioned Hunter Biden or a "hack and leak" foreign operation involving Hunter Biden.

According to the Plaintiffs' allegations detailed above, the FBI had a 50% success rate regarding social media's suppression of alleged misinformation, and it did no investigation to determine whether the alleged disinformation was foreign or by U.S. citizens. The FBI's failure to alert social-media companies that the Hunter Biden laptop story was real, and not mere Russian disinformation, is particularly troubling. The FBI had the laptop in their possession since December 2019 and had warned social-media companies to look out for a "hack and dump" operation by the Russians prior to the 2020 election. Even after Facebook specifically asked whether the Hunter Biden laptop story was Russian disinformation, Dehmlow of the FBI refused to comment, resulting in the social-media companies' suppression of the story. As a result, millions of U.S. citizens did not hear the story prior to the November 3, 2020 election. Additionally, the FBI was included in Industry meetings and bilateral meetings, received and forwarded alleged misinformation to social-media companies, and actually mislead social-media companies in regard to the Hunter Biden laptop story. The Court finds this evidence demonstrative of significant encouragement by the FBI Defendants.

108a

Defendants also argue that Plaintiffs are attempting to create a "deception" theory of government involvement with regards to the FBI Defendants. Plaintiffs allege the FBI told the social-media companies to watch out for Russian disinformation prior to the 2020 Presidential election and then failed to tell the companies that the Hunter Biden laptop was not Russian disinformation. The Plaintiffs further allege Dr. Fauci colluded with others to cover up the Government's involvement in "gain of function" research at the Wuhan lab in China, which may have resulted in the creation of the COVID-19 pandemic.

Although this Court agrees there is no specified "deception" test for government action, a state may not induce private persons to accomplish what it is constitutionally forbidden to accomplish. *Norwood*, 413 U.S. at 455. It follows, then, that the government may not deceive a private party either—it is just another form of coercion. The Court has evaluated Defendants' conduct under the "coercion" and/or "significant encouragement" theories of government action, and finds that the FBI Defendants likely exercised "significant encouragement" over social-media companies.

Through meetings, emails, and in-person contacts, the FBI intrinsically involved itself in requesting social-media companies to take action regarding content the FBI considered to be misinformation. The FBI additionally likely misled social-media companies into believing the Hunter Biden laptop story was Russian disinformation, which resulted in suppression of the story a few weeks prior to the 2020 Presidential election. Thus, Plaintiffs are likely to succeed in their claims that the FBI exercised "significant encouragement" over social-media platforms such that the choices of the companies must be deemed to be that of the Government.

### (5) CISA Defendants

Plaintiffs allege the CISA Defendants served as a "nerve center" for federal censorship efforts by meeting routinely with social-media platforms to increase censorship of speech disfavored by federal officials, and by acting as a "switchboard" to route disinformation concerns to social-media platforms.

In response, the CISA Defendants maintain that CISA has a mandate to coordinate with federal and non-federal entities to carry out cybersecurity and critical infrastructure activities. CISA previously designated election infrastructure as a critical infrastructure subsector. CISA also collaborates with state and local election officials; as part of its duties, CISA coordinates with the EIS-GCC, which is comprised of state, local, and federal governmental departments and agencies. The EI-SSC is comprised of owners or operators with significant business or operations in U.S. election infrastructure systems or services. After the 2020 election, the EI-SCC and EIS-GCC launched a Joint Managing Mis/Disinformation Group to coordinate election infrastructure security efforts. The CISA Defendants argue CISA supports the Joint Managing Mis-Disinformation Group but does not coordinate with the EIP or the CIS. Despite DHS providing financial assistance to the CIS through a series of cooperative agreement awards managed by CISA, the CISA Defendants assert that the work scope funded by DHS has not involved the CIS performing disinformation-related tasks.

Although the CISA Defendants admit to being involved in "switchboarding" work during the 2020 election cycle, CISA maintains it simply referred the alleged disinformation to the social-media companies, who made their own decisions to suppress content. CISA maintains it included a notice with each referral to the companies, which stated that CISA was not demanding censorship. CISA further maintains it discontinued its switchboarding work after the 2020 election

110a

cycle and has no intention to engage in switchboarding for the next election.[626] CISA further argues that even though it was involved with USG-Industry meetings with other federal agencies and social-media companies, they did not attempt to "push" social-media companies to suppress content or to change policies.

The Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CISA Defendants. The CISA Defendants have likely exercised "significant encouragement" with social-media platforms such that the choices of the social-media companies must be deemed to be that of the government. Like many of the other Defendants, the evidence shows that the CISA Defendants met with social-media companies to both inform and pressure them to censor content protected by the First Amendment. They also apparently encouraged and pressured social-media companies to change their content-moderation policies and flag disfavored content.

But the CISA Defendants went even further. CISA expanded the word "infrastructure" in its terminology to include "cognitive" infrastructure, so as to create authority to monitor and suppress protected free speech posted on social media. The word "cognitive" is an adjective that means "relating to cognition." "Cognition" means the mental action or process of acquiring knowledge and understanding through thought, experiences, and the senses.[627] The Plaintiffs are likely to succeed on the merits on its claim that the CISA Defendants believe they had a mandate to control the process of acquiring knowledge. The CISA Defendants engaged with Stanford University and the University of Washington to form the EIP, whose purpose was to allow state and local officials to report alleged election misinformation so it could be forwarded to the social-

---

[626] However, at oral argument, CISA attorneys were unable to verify whether or not CISA would be involved in switchboarding during the 2024 election. [Doc. No. 288 at 122]

[627] Google English Dictionary

media platforms to review. CISA used a CISA-funded non-profit organization, the CIS, to perform the same actions. CISA used interns who worked for the Stanford Internal Observatory, which is part of the EIP, to address alleged election disinformation. All of these worked together to forward alleged election misinformation to social-media companies to view for censorship. They also worked together to ensure the social-media platforms reported back to them on what actions the platforms had taken. And in this process, no investigation was made to determine whether the censored information was foreign or produced by U.S. citizens.

According to DiResta, head of EIP, the EIP was designed "to get around unclear legal authorities, including very real First Amendment questions that would arise if CISA or the other government agencies were to monitor and flag information for censorship on social media."[628] Therefore, the CISA Defendants aligned themselves with and partnered with an organization that was designed to avoid Government involvement with free speech in monitoring and flagging content for censorship on social-media platforms.

At oral arguments on May 26, 2023, Defendants argued that the EIP operated independently of any government agency. The evidence shows otherwise: the EIP was started when CISA interns came up with the idea; CISA connected the EIP with the CIS, which is a CISA-funded non-profit that channeled reports of misinformation from state and local government officials to social-media companies; CISA had meetings with Stanford Internet Observatory officials (a part of the EIP), and both agreed to "work together"; the EIP gave briefings to CISA; and  the CIS (which CISA funds) oversaw the Multi-State Information Sharing and Analysis Center ("MS-ISAC") and the Election Infrastructure Information Sharing and Analysis Center

---

[628] [Doc. No. 209-5 at 4]

112a

("EI-ISAC"), both of which are organizations of state and local governments that report alleged election misinformation.

CISA directs state and local officials to CIS and connected the CIS with the EIP because they were working on the same mission and wanted to be sure they were all connected. CISA served as a mediating role between CIS and EIP to coordinate their efforts in reporting misinformation to social-media platforms, and there were direct email communications about reporting misinformation between EIP and CISA. Stamos and DiResta of the EIP also have roles in CISA on CISA advisory committees. EIP identifies CISA as a "partner in government." The CIS coordinated with EIP regarding online misinformation. The EIP publication, "The Long Fuse,"[629] states the EIP has a focus on election misinformation originating from "domestic" sources across the United States.[630] EIP further stated that the primary repeat spreaders of false and misleading narratives were "verified blue-checked accounts belonging to partisan media outlets, social-media influencers, and political figures, including President Trump and his family."[631] The EIP further disclosed it held its first meeting with CISA to present the EIP concept on July 9, 2020, and EIP was officially formed on July 26, 2020, "in consultation with CISA."[632] The Government was listed as one of EIP's Four Major Stakeholder Groups, which included CISA, the GEC, and ISAC.[633]

As explained, the CISA Defendants set up a "switchboarding" operation, primarily consisting of college students, to allow immediate reporting to social-media platforms of alleged election disinformation. The "partners" were so successful with suppressing election

---

[629] [Doc. No. 209-2]
[630] [Id. at 9]
[631] [Id. at 12]
[632] [Id. at 20–21]
[633] [Id. at 30]

113a

disinformation, they later formed the Virality Project, to do the same thing with COVID-19 misinformation that the EIP was doing for election disinformation. CISA and the EIP were completely intertwined. Several emails from the switchboarding operation sent by intern Pierce Lowary shows Lowary directly flagging posted content and sending it to social-media companies. Lowary identified himself as "working for CISA" on the emails.[634]

On November 21, 2021, CISA Director Easterly stated: "We live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts." The Free Speech Clause was enacted to prohibit just what Director Easterly is wanting to do: allow the government to pick what is true and what is false. The Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CISA Defendants for "significantly encouraging" social-media companies to suppress protected free speech.

### (5) State Department Defendants

Plaintiffs allege the State Department Defendants, through the State Department's GEC, were also involved in suppressing protected speech on social-media platforms.

In response, the State Department Defendants argue that they, along with the GEC, play a critical role in coordinating the U.S. government efforts to respond to foreign influence. The State Department Defendants argue that they did not flag specific content for social-media companies and did not give the company any directives. The State Department Defendants also argue that they do not coordinate with or work with the EIP or the CIS.

The Court finds that Plaintiffs are also likely to succeed on the merits regarding their First Amendment Free Speech Clause against the State Department Defendants. For many of the same reasons the Court reached its conclusion as to the CISA Defendants, the State Department

---

[634] [Doc. No. 227-2 at 15, 23, 42, 65 & 78]

Defendants have exercised "significant encouragement" with social-media platforms, such that the choices of the social-media companies should be deemed to be that of the government. As discussed previously, both CISA and the GEC were intertwined with the VP, EIP, and Stanford Internet Observatory.

The VP, EIP, and Stanford Internet Observatory are not defendants in this proceeding. However, their actions are relevant because government agencies have chosen to associate, collaborate, and partner with these organizations, whose goals are to suppress protected free speech of American citizens. The State Department Defendants and CISA Defendants both partnered with organizations whose goals were to "get around" First Amendment issues.[635] In partnership with these non-governmental organizations, the State Department Defendants flagged and reported postings of protected free speech to the social-media companies for suppression. The flagged content was almost entirely from political figures, political organizations, alleged partisan media outlets, and social-media all-stars associated with right-wing or conservative political views, demonstrating likely "viewpoint discrimination." Since only conservative viewpoints were allegedly suppressed, this leads naturally to the conclusion that Defendants intended to suppress only political views they did not believe in. Based on this evidentiary showing, Plaintiffs are likely to succeed on the merits of their First Amendment claims against the State Department Defendants.

### (6) Other Defendants

Other Defendants in this proceeding are the U.S. Food and Drug Administration, U. S. Department of Treasury, U.S. Election Assistance Commission, U. S. Department of Commerce, and employees Erica Jefferson, Michael Murray, Wally Adeyemo, Steven Frid, Brad Kimberly, and Kristen Muthig. Plaintiffs confirmed at oral argument that they are not seeking a preliminary

---

[635] [Doc. No. 209-5 at 4]

injunction against these Defendants. Additionally, Plaintiffs assert claims against the Disinformation Governance Board ("DGB") and its Director Nina Jankowicz. Defendants have provided evidence that the DGB has been disbanded, so any claims against these Defendants are moot. Thus, this Court will not address the issuance of an injunction against any of these Defendants.

### ii. Joint Participation

The Plaintiffs contend that the Defendants are not only accountable for private conduct that they coerced or significantly encouraged, but also for private conduct in which they actively participated as "joint participants." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961). Although most often "joint participation" occurs through a conspiracy or collusive behavior, *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992), even without a conspiracy, when a plaintiff establishes the government is responsible for private action arising out of "pervasive entwinement of public institutions and public officials in the private entity's composition and workings." *Brentwood Academy. v. Tennessee Secondary Sch. Athletic Ass'n.*, 531 U. S. 288, 298 (2001).

Under the "joint action" test, the Government must have played an indispensable role in the mechanism leading to the disputed action. *Frazier v. Bd. Of Trs. Of N.W. Miss. Reg.'l Med. Ctr.*, 765 F.2d 1278, 1287-88 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985). When a plaintiff establishes "the existence of a conspiracy involving state action," the government becomes responsible for all constitutional violations committed in furtherance of the conspiracy by a party to the conspiracy. *Armstrong v. Ashley*, 60 F.4th 262, (5th Cir. 2023). Conspiracy can be charged as the legal mechanism through which to impose liability on each and all of the defendants without

116a

regard to the person doing the particular act that deprives the plaintiff of federal rights. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990).

Much like conspiracy and collusion, joint activity occurs whenever the government has "so far insinuated itself" into private affairs as to blur the line between public and private action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). To become "pervasively entwined" in a private entity's workings, the government need only "significantly involve itself in the private entity's actions and decision-making"; it is not necessary to establish that "state actors … literally 'overrode' the private entity's independent judgment." R*awson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751, 753 (9th Cir. 2020). "Pervasive intertwinement" exists even if the private party is exercising independent judgment. *West v. Atkins*, 487 U.S. 42, 52, n.10 (1988); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (holding that a "substantial degree of cooperative action" can constitute joint action).

For the same reasons as this Court has found Plaintiffs met their burden to show "significant encouragement" by the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the FBI Defendants, the NIAID Defendants, the CISA Defendants, and the State Department Defendants, this Court finds the Plaintiffs are likely to succeed on the merits that these Defendants "jointly participated" in the actions of the private social-media companies as well, by insinuating themselves into the social-media companies' private affairs and blurring the line between public and private action.[636]

However, this Court finds Plaintiffs are not likely to succeed on the merits that the "joint participation" occurred as a result of a conspiracy with the social-media companies. The evidence

---

[636] It is not necessary to repeat the details discussed in the "significant encouragement" analysis in order to find Plaintiffs have met their initial burden.

thus far shows that the social-media companies cooperated due to coercion, not because of a conspiracy.

This Court finds the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the NIAID Defendants, the FBI Defendants, the CISA Defendants, and the State Department Defendants likely "jointly participated" with the social-media companies to such an extent that said Defendants have become "pervasively entwined" in the private companies' workings to such an extent as to blur the line between public and private action. Therefore, Plaintiffs are likely to succeed on the merits that the government Defendants are responsible for the private social-media companies' decisions to censor protected content on social-media platforms.

### iii. Other Arguments

While not admitting any fault in the suppression of free speech, Defendants blame the Russians, COVID-19, and capitalism for any suppression of free speech by social-media companies. Defendants argue the Russian social-media postings prior to the 2016 Presidential election caused social-media companies to change their rules with regard to alleged misinformation. The Defendants argue the Federal Government promoted necessary and responsible actions to protect public health, safety, and security when confronted by a deadly pandemic and hostile foreign assaults on critical election infrastructure. They further contend that the COVID-19 pandemic resulted in social-media companies changing their rules in order to fight related disinformation. Finally, Defendants argue the social-media companies' desire to make money from advertisers resulted in change to their efforts to combat disinformation. In other words, Defendants maintain they had nothing to do with Plaintiffs' censored speech and blamed any suppression of free speech on the Russians, COVID-19, and the companies' desire to make

money. The social-media platforms and the Russians are of course not defendants in this proceeding, and neither are they bound by the First Amendment. The only focus here is on the actions of the Defendants themselves.

Although the COVID-19 pandemic was a terrible tragedy, Plaintiffs assert that it is still not a reason to lessen civil liberties guaranteed by our Constitution. "If human nature and history teaches anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Does 1-3 v. Mills*, 142 S. Ct. 17, 20–21 (2021) (Gorsuch, J., dissenting). The "grave risk" here is arguably the most massive attack against free speech in United States history.

Another argument of Defendants is that the previous Administration took the same actions as Defendants. Although the "switchboarding" by CISA started in 2018, there is no indication or evidence yet produced in this litigation that the Trump Administration had anything to do with it. Additionally, whether the previous Administration suppressed free speech on social media is not an issue before this Court and would not be a defense to Defendants even if it were true.

Defendants also argue that a preliminary injunction would restrict the Defendants' right to government speech and would transform government speech into government action whenever the Government comments on public policy matters. The Court finds, however, that a preliminary injunction here would not prohibit government speech. The traditional test used to differentiate government speech from private speech discusses three relevant factors: (1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 465–80 (2009). A government entity has the right to speak for itself and is entitled to say what it wishes and express the views it wishes to express. The Free Speech Clause restricts government

119a

regulation of private speech; it does not regulate government speech. *Pleasant Grove City, Utah*, 555 U.S. at 468.

The Defendants argue that by making public statements, this is nothing but government speech. However, it was not the public statements that were the problem. It was the alleged use of government agencies and employees to coerce and/or significantly encourage social-media platforms to suppress free speech on those platforms. Plaintiffs point specifically to the various meetings, emails, follow-up contacts, and the threat of amending Section 230 of the Communication Decency Act. Plaintiffs have produced evidence that Defendants did not just use public statements to coerce and/or encourage social-media platforms to suppress free speech, but rather used meetings, emails, phone calls, follow-up meetings, and the power of the government to pressure social-media platforms to change their policies and to suppress free speech. Content was seemingly suppressed even if it did not violate social-media policies. It is the alleged coercion and/or significant encouragement that likely violates the Free Speech Clause, not government speech, and thus, the Court is not persuaded by Defendants' arguments here.

### b. Standing

The United States Constitution, via Article III, limits federal courts' jurisdiction to "cases" and "controversies." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (*citing* U.S. Const. art. III, § 2). The "law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017) (citation omitted). Thus, "the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99

(1975) (citation and internal quotation marks omitted). The Article III standing requirements apply to claims for injunctive and declaratory relief. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018); *Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997).

Article III standing is comprised of three essential elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citation omitted). "The plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (internal citations omitted). Furthermore, "[a] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y.*, 581 U.S. at 439 (citations omitted). However, the presence of one party with standing "is sufficient to satisfy Article III's case-or-controversy requirement." *Texas*, 809 F.3d 134 (*citing Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

In the context of a preliminary injunction, it has been established that "the 'merits' required for the plaintiff to demonstrate a likelihood of success include not only substantive theories but also the establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). In order to establish standing, the plaintiff must demonstrate that they have encountered or suffered an injury attributable to the defendant's challenged conduct and that such injury is likely to be resolved through a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). Further, during the preliminary injunction stage, the movant is only required to demonstrate a likelihood of proving standing. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). Defendants raise challenges to each essential element of standing for both the Private Plaintiffs and the States. Each argument will be addressed in turn below. For the reasons stated

herein, the Court finds that the Plaintiffs have demonstrated a likelihood of satisfying Article III's standing requirements.

### i.  Injury-in-fact

Plaintiffs seeking to establish injury-in-fact must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citations and internal quotation marks omitted). For an injury to be "particularized," it must "affect the plaintiff in a personal and individual way." *Id.* (citations and internal quotation marks omitted).

Plaintiffs argue that that they have asserted violations of their First Amendment right to speak and listen freely without government interference.[637] In response, Defendants contend that Plaintiffs' allegations rest on dated declarations that focus on long-past conduct, making Plaintiffs' fears of imminent injury entirely speculative.[638] The Court will first address whether the Plaintiff States are likely to prove an injury-in-fact. Then the court will examine whether the Individual Plaintiffs are likely to prove an injury-in-fact. For the reasons explained below, both the Plaintiff States and Individual Plaintiffs are likely to prove an injury-in-fact.

### (1) Plaintiff States

In denying Defendants' Motion to Dismiss,[639] this Court previously found that the Plaintiff States had sufficiently alleged injury-in-fact to satisfy Article III standing under either a direct injury or *parens patriae* theory of standing and that the States were entitled to special solicitude in the standing analysis.[640] At the preliminary injunction stage, the issue becomes whether the Plaintiffs are likely to prove standing. *See Speech First, Inc.*, 979 F.3d, at 330. The evidence

---

[637] *See* [Doc. No. 214, at 66]
[638] *See* [Doc. No. 266, at 151]
[639] [Doc. No. 128]
[640] [Doc. No. 224, at 20–33]

produced thus far through discovery shows that the Plaintiff States are likely to establish an injury-in-fact through either a *parens patriae* or direct injury theory of standing.

*Parens patriae*, which translates to "parent of the country," traditionally refers to the state's role as a sovereign and guardian for individuals with legal disabilities. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 n.8 (1982) (*quoting* Black's Law Dictionary 1003 (5th ed. 1979)). The term "*parens patriae* lawsuit" has two meanings: it can denote a lawsuit brought by the state on behalf of individuals unable to represent themselves, or a lawsuit initiated by the state to protect its "quasi-sovereign" interests. *Id.* at 600; *see also Kentucky v. Biden*, 23 F.4th 585, 596–98 (6th Cir. 2022); *Chapman v. Tristar Prod., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019). A lawsuit based on the former meaning is known as a "third-party" *parens patriae* lawsuit, and it is clearly established law that states cannot bring such lawsuits against the federal government. *Kentucky*, 23 F.4th at 596. Thus, to have *parens patriae* standing, the Plaintiff States must show a likelihood of establishing an injury to one or more of their quasi-sovereign interests.

In *Snapp*, the United States Supreme Court determined that Puerto Rico had *parens patriae* standing to sue the federal government to safeguard its quasi-sovereign interests. *Snapp*, 458 U.S. at 608. The Court identified two types of injuries to a state's quasi-sovereign interests: one is an injury to a significant portion of the state's population, and the other is the exclusion of the state and its residents from benefiting from participation in the federal system. *Id.* at 607–608. The Court did not establish definitive limits on the proportion of the population that must be affected but suggested that an indication could be whether the injury is something the state would address through its sovereign lawmaking powers. *Id.* at 607. Based on the injuries alleged by Puerto Rico, the Court found that the state had sufficiently demonstrated harm to its quasi-sovereign interests and had *parens patriae* standing to sue the federal government. *Id.* at 609–10.

123a

In *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), the United States Supreme Court further clarified the distinction between third-party and quasi-sovereign *parens patriae* lawsuits. There, the Court concluded that Massachusetts had standing to sue the EPA to protect its quasi-sovereign interests. The Court emphasized the distinction between allowing a state to protect its citizens from federal statutes (which is prohibited) and permitting a state to assert its rights under federal law (which it has standing to do). *Massachusetts*, 549 U.S. at 520 n.17. Because Massachusetts sought to assert its rights under a federal statute rather than challenge its application to its citizens, the Court determined that the state had *parens patriae* standing to sue the EPA.

Here, the Plaintiff States alleged and have provided ample evidence to support injury to two quasi-sovereign interests: the interest in safeguarding the free-speech rights of a significant portion of their respective populations and the interest in ensuring that they receive the benefits from participating in the federal system. Defendants argue that this theory of injury is too attenuated and that Plaintiffs are unlikely to prove any direct harm to the States' sovereign or quasi-sovereign interests, but the Court does not find this argument persuasive.

Plaintiffs have put forth ample evidence regarding extensive federal censorship that restricts the free flow of information on social-media platforms used by millions of Missourians and Louisianians, and very substantial segments of the populations of Missouri, Louisiana, and every other State.[641] The Complaint provides detailed accounts of how this alleged censorship harms "enormous segments of [the States'] populations." Additionally, the fact that such extensive examples of suppression have been uncovered through limited discovery suggests that the

---

[641] *See supra*, pp. 8–94 (detailing the extent and magnitude of Defendants' pressure and coercion tactics with social-media companies); *See also* [Doc. No. 214-1, at ¶¶ 1348 (noting that Berenson had nationwide audiences and over 200,000 followers when he was de-platformed on Twitter), 1387 (noting that the Gateway Pundit had more than 1.3 million followers across its social-media accounts before it was suspended), 1397–1409 (noting that Hines has approximately 13,000 followers each on her Health Freedom Louisiana and Reopen Louisiana Facebook pages, approximately 2,000 followers on two other Health Freedom Group Louisiana pages, and that the former Facebook pages have faced increasing censorship penalties and that the latter pages were de-platformed completely), etc.]

censorship explained above could merely be a representative sample of more extensive suppressions inflicted by Defendants on countless similarly situated speakers and audiences, including audiences in Missouri and Louisiana. The examples of censorship produced thus far cut against Defendants' characterization of Plaintiffs' fear of imminent future harm as "entirely speculative" and their description of the Plaintiff States' injuries as "overly broad and generalized grievance[s]."[642] The Plaintiffs have outlined a federal regime of mass censorship, presented specific examples of how such censorship has harmed the States' quasi-sovereign interests in protecting their residents' freedom of expression, and demonstrated numerous injuries to significant segments of the Plaintiff States' populations.

Moreover, the materials produced thus far suggest that the Plaintiff States, along with a substantial segment of their populations, are likely to show that they are being excluded from the benefits intended to arise from participation in the federal system. The U.S. Constitution, like the Missouri and Louisiana Constitutions, guarantees the right of freedom of expression, encompassing both the right to speak and the right to listen. U.S. Const. amend. I; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). The United States Supreme Court has acknowledged the freedom of expression as one of the most significant benefits conferred by the federal Constitution. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."). Plaintiffs have demonstrated that they are likely to prove that federal agencies, actors, and officials in their official capacity are excluding the Plaintiff States

---

[642] [Doc. No. 266, at 151]

and their residents from this crucial benefit that is meant to flow from participation in the federal system. *See Snapp*, 458 U.S. at 608.

Accordingly, the Court finds that the States have alleged injuries under a *parens patriae* theory of standing because they are likely to prove injuries to the States' quasi-sovereign interests in protecting the constitutionally bestowed rights of their citizens.

Further, Plaintiffs have demonstrated direct censorship injuries that satisfy the requirements of Article III as injuries in fact.[643] Specifically, the Plaintiffs contend that Louisiana's Department of Justice, which encompasses the office of its Attorney General, faced direct censorship on YouTube for sharing video footage wherein Louisianans criticized mask mandates and COVID-19 lockdown measures on August 18, 2021, immediately following the federal Defendants' strong advocacy for COVID-related "misinformation" censorship.[644] Moreover, a Louisiana state legislator experienced censorship on Facebook when he posted content addressing the vaccination of children against COVID-19.[645] Similarly, during public meetings concerning proposed county-wide mask mandates held by St. Louis County, a political subdivision of Missouri, certain citizens openly expressed their opposition to mask mandates. However, YouTube censored the entire videos of four public meetings, removing the content because some citizens expressed the view that masks are ineffective.[646] Therefore, this Court finds that the Plaintiff States have also demonstrated a likelihood of establishing an injury-in-fact under a theory of direct injury sufficient to satisfy Article III.

---

[643] [Doc. No. 214-1, at ¶¶1428–1430]
[644] [Id. at ¶1428]
[645] [Id. at ¶1429]
[646] [Id. at ¶ 1430]

126a

Accordingly, for the reasons stated above and explained in this Court's ruling on the Motion to Dismiss,[647] the Plaintiff States are likely to succeed on establishing an injury-in-fact under Article III.

### (2) Individual Plaintiffs

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"), the Supreme Court held that an allegation of future injury may satisfy the Article III injury-in-fact requirement if there is a "substantial risk" of harm occurring. (*quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). In *SBA List*, the petitioner challenged a statute that prohibited making false statements during political campaigns. *Id.* at 151–52. The Court considered the justiciability of the pre-enforcement challenge and whether it alleged a sufficiently imminent injury under Article III. It noted that pre-enforcement review is warranted when the threatened enforcement is "sufficiently imminent." *Id.* at 159. The Court further emphasized that past enforcement is indicative that the threat of enforcement is not "chimerical." *Id.* at 164 (*quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Likewise, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the Supreme Court found that the plaintiffs satisfied Article III's injury-in-fact requirement because the fear of future injury was not "imaginary or wholly speculative." There, the Court considered a pre-enforcement challenge to a statute that deemed it an unfair labor practice to encourage consumer boycotts through deceptive publicity. *Id.* at 301. Because the plaintiffs had engaged in past consumer publicity campaigns and intended to continue those campaigns in the future, the Court found their challenge to the consumer publicity provision satisfied Article III. *Id.* at 302. Similar pre-enforcement review was recognized in *Virginia v. Am. Booksellers Ass'n, Inc.*, 484

---

[647] [Doc. No. 214, at 20–33]

U.S. 383, 386 (1988), where the Supreme Court held that booksellers could seek review of a law criminalizing the knowing display of "harmful to juveniles" material for commercial purposes, as defined by the statute. *Virginia*, 484 U.S. at 386 (*certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168 (1988)).

Here, each of the Individual Plaintiffs are likely to demonstrate an injury-in-fact through a combination of past and ongoing censorship. Bhattacharya, for instance, is the apparent victim of an ongoing "campaign" of social-media censorship, which indicates that he is likely to experience future acts of censorship.[648] Similarly, Kulldorff attests to a coordinated federal censorship campaign against the Great Barrington Declaration, which implies future censorship.[649] Kulldorff's ongoing censorship experiences on his personal social-media accounts provide evidence of ongoing harm and support the expectation of imminent future harm.[650] Kheriaty also affirms ongoing and anticipated future injuries, noting that the issue of "shadow banning" his social-media posts has intensified since 2022.[651]

Hoft and Hines present similar accounts of past, ongoing, and anticipated future censorship injuries. Defendants even appear to be currently involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website.[652] Hines, too, recounts past and ongoing censorship injuries, stating that her personal Facebook page, as well as the pages

---

[648] *See* [Doc. No. 214-1, ¶787 (an email from Dr. Francis Collins to Dr. Fauci and Cliff Lane which read: "Hi [Dr. Fauci] and Cliff, See https://gbdeclaration.org. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that online yet – is it underway?"), ¶¶1368–1372 (describing the covert and ongoing censorship campaign against him)]
[649] *See* [Id. at ¶¶1373–1380 (where Kulldorff explains an ongoing campaign of censorship against his personal social-media accounts, including censored tweets, censored posts criticizing mask mandates, removal of LinkedIn posts, and the ongoing permanent suspension of his LinkedIn account)]
[650] [Id.]
[651] [Id. at ¶¶1383–1386]
[652] *See* [Id. at ¶¶1387–1396 (describing the past and ongoing campaign against his website, the Gateway Pundit, which resulted in censorship on Facebook, Twitter, Instagram, and YouTube)]

of Health Freedom Louisiana and Reopen Louisiana, are constantly at risk of being completely de-platformed.[653] At the time of her declaration, Hines' personal Facebook account was under an ongoing ninety-day restriction. She further asserts, and the evidence supplied in support of the preliminary injunction strongly implies, that these restrictions can be directly traced back to federal officials.

Each of the Private Plaintiffs alleges a combination of past, ongoing, and anticipated future censorship injuries. Their allegations go beyond mere complaints about past grievances. Moreover, they easily satisfy the substantial risk standard. The threat of future censorship is significant, and the history of past censorship provides strong evidence that the threat of further censorship is not illusory or speculative. Plaintiffs' request for an injunction is not solely aimed at addressing the initial imposition of the censorship penalties but rather at preventing any continued maintenance and enforcement of such penalties. Therefore, the Court concludes that the Private Plaintiffs have fulfilled the injury-in-fact requirement of Article III.

Based on the reasons outlined above, the Court determines that both the States and Private Plaintiffs have satisfied the injury-in-fact requirement of Article III.

## ii.    Traceability

To establish traceability, or "causation" in this context, a plaintiff must demonstrate a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Therefore, courts examining this element of standing must assess the remoteness, if any, between the plaintiff's injury and the defendant's actions. As explained in *Ass'n of Am. Physicians & Surgeons v. Schiff*, the plaintiff must establish that it is "'substantially probable that the challenged acts of the defendant, not of some absent third party'

---

[653] *See* [Id. at ¶¶1397–1411]

caused or will cause the injury alleged." 518 F. Supp. 3d 505, 513 (D.D.C. 2021), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*") (quoting Fla. Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)).

Plaintiffs argue that they are likely to prove that their injuries are fairly traceable to Defendants' actions of inducing and jointly participating in the social-media companies' viewpoint-based censorship under a theory of "but-for" causation, conspiracy, or aiding and abetting.[654] In support, they cite the above-mentioned examples of switchboarding and other pressure tactics employed by Defendants.[655] In response, Defendants assert that there is no basis upon which this Court can conclude that the social-media platforms made the disputed content-moderation decisions because of government pressure.[656] For the reasons explained below, the Court finds that Plaintiffs are likely to prove that their injuries are fairly traceable to the conduct of the Defendants.

In *Duke Power Co. v. Carolina Envt. Study Grp.*, the United States Supreme Court found that a plaintiff's injury was fairly traceable to a statute under a theory of "but-for" causation. 438 U.S. 59 (1978). The plaintiffs, who were comprised in part of individuals living near the proposed sites for nuclear plants, challenged a statute that limited the aggregate liability for a single nuclear accident under the theory that, but for the passing of the statute, the nuclear plants would not have been constructed. *Id.* at 64–65. The Supreme Court agreed with the district court's finding that

---

[654] [Doc. No. 204, at 67–68]

[655] [Id. at 69–71 (*citing* Doc. No. 214-1, ¶¶57, 64 "(promising the White House that Facebook would censor "often-true" but "sensationalized" content); ¶ 73 "(imposing forward limits on non-violative speech on WhatsApp)"; ¶¶ 89-92 "(assuring the White House that Facebook will use a "spectrum of levers" to censor content that "do[es] not violate our Misinformation and Harm policy, including "true but shocking claims or personal anecdotes, or discussing the choice to vaccinate in terms of personal and civil liberties")"; ¶¶ 93-100 "(agreeing to censor Tucker Carlson's content at the White House's behest, even though it did not violate platform policies)"; ¶¶ 103-104 "(Twitter deplatforming Alex Berenson at White House pressure)"; ¶ 171 "(Facebook deplatformed the Disinformation Dozen immediately after these comments). Facebook officials scrambled to get back into the White House's good graces. Id. ¶¶ 172, 224 (pleading for "de-escalation" and "working together").")]

[656] [Doc. No. 266, at 131–136]

there was a "substantial likelihood" that the nuclear plants would have been neither completed nor operated absent the passage of the nuclear-friendly statute. *Id.* at 75.

In *Duke Power Co.*, the defendants essentially argued that the statute was not the "but-for" cause of the injuries claimed by the plaintiffs because if Congress had not passed the statute, the Government would have developed nuclear power independently, and the plaintiffs would have likely suffered the same injuries from government-operated plants as they would have from privately operated ones. *Id.* In rejecting that argument, the Supreme Court stated:

> Whatever the ultimate accuracy of this speculation, it is not responsive to the simple proposition that private power companies now do in fact operate the nuclear-powered generating plants injuring [the plaintiffs], and that their participation would not have occurred but for the enactment and implementation of the Price-Anderson Act. Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief.

*Id.* at 77–78. The Supreme Court's reluctancy to follow the defendants down a rabbit-hole of speculation and "what-ifs" is highly instructive.

Here, Defendants heavily rely upon the premise that social-media companies would have censored Plaintiffs and/or modified their content moderation policies even without any alleged encouragement and coercion from Defendants or other Government officials. This argument is wholly unpersuasive. Unlike previous cases that left ample room to question whether public officials' calls for censorship were fairly traceable to the Government; the instant case paints a full picture.[657] A drastic increase in censorship, deboosting, shadow-banning, and account suspensions directly coincided with Defendants' public calls for censorship and private demands for

---

[657] *See* [Doc. No. 204, at 41-44 (where this Court distinguished this case from cases that "left gaps" in the pleadings)]

censorship.[658] Specific instances of censorship substantially likely to be the direct result of Government involvement are too numerous to fully detail, but a birds-eye view shows a clear connection between Defendants' actions and Plaintiffs injuries.

The Plaintiffs' theory of but-for causation is easy to follow and demonstrates a high likelihood of success as to establishing Article III traceability. Government officials began publicly threatening social-media companies with adverse legislation as early as 2018.[659] In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct.[660] Around this same time, Defendants began having extensive contact with social-media companies via emails, phone calls, and in-person meetings.[661] This contact, paired with the public threats and tense relations between the Biden administration and social-media companies, seemingly resulted in an efficient report-and-censor relationship between Defendants and social-media companies.[662] Against this backdrop, it is insincere to describe the likelihood of proving a causal connection between Defendants' actions and Plaintiffs' injuries as too attenuated or purely hypothetical.

The evidence presented thus goes far beyond mere generalizations or conjecture: Plaintiffs have demonstrated that they are likely to prevail and establish a causal and temporal link between

---

[658] *See, e.g.*, [Doc. No. 241-1, ¶¶1, 7, 17, 164 (examples of Government officials threatening adverse legislation against social-media companies if they do not increase censorship efforts); ¶¶ 51, 119, 133, 366, 424, 519 (examples of social-media companies, typically following up after an in-person meeting or phone call, ensuring Defendants that they would increase censorship efforts)]

[659] [Doc. No. 214-1, ¶1]

[660] *See, e.g.*, [Id. at ¶ 156 (Psaki reinforcing President Biden's "They're killing people" comment); ¶166 (media outlets reporting tense relations between the Biden administration and social-media companies)]

[661] *See, e.g.*, [Doc. No. 174-1, at 3 (Twitter employees setting up a more streamlined process for censorship requests because the company had been "recently bombarded" with censorship requests from the White House)]

[662] *See, e.g.*, [Doc. Nos. 174-1, at 3 (Twitter employees setting up a more streamlined process for censorship requests because the company had been "recently bombarded" with censorship requests from the White House); at 4 (Twitter suspending a Jill Biden parody account within 45 minutes of a White House official requesting twitter to "remove this account immediately"); 214-1, at ¶799 (Drs. Bhattacharya and Kuldorff began experienced extensive censorship on social media shortly after Dr. Collins emailed Dr. Fauci seeking a "quick and devastating take down" of the GBD.); ¶1081 (Twitter removing tweets within two minutes of Scully reporting them for censorship.); ¶¶1266-1365 (Explaining how the Virality Project targeted Hines and health-freedom groups.); 214-9, at 2-3 (Twitter ensuring the White House that it would increase censorship of "misleading information" following a meeting between White House officials and Twitter employees.); etc.]

Defendants' actions and the social-media companies' censorship decisions. Accordingly, this Court finds that there is a substantial likelihood that Plaintiffs would not have been the victims of viewpoint discrimination but for the coercion and significant encouragement of Defendants towards social-media companies to increase their online censorship efforts.[663]

For the reasons stated above, as well as those set forth in this Court's previous ruling on the Motion to Dismiss,[664] the Court finds that Plaintiffs are likely to succeed in establishing the traceability element of Article III standing.

### iii.      Redressability

The redressability element of the standing analysis requires that the alleged injury is "likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 S. Ct. 2104, 2115, 210 L. Ed. 2d 230 (2021) (*quoting Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Additionally, courts typically find that where an injury is traceable to a defendant's conduct, it is usually redressable as well. *See, e.g.*, *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016) ("[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement."); *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("Redressability . . . is closely related to traceability, and the two prongs often overlap."); *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019).

---

[663] Because this Court finds that Plaintiffs have successfully shown a likelihood of success under a "but for" theory of causation, it will not address Plaintiffs arguments as to other theories of causation. However, the Court does note that caselaw from outside of the Fifth Circuit supports a more lenient theory of causation for purposes of establishing traceability. *See, e.g.*, *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015).
[664] [Doc. No. 204, at 67–71]

Plaintiffs argue that they are likely to prove that a favorable decision would redress their injuries because they have provided ample evidence that their injuries are imminent and ongoing.[665] In response, Defendants contend that any threat of future injury is merely speculative because Plaintiffs rely on dated declarations and focus on long-past conduct of Defendants and social-media companies.[666] For the reasons explained below, the Court finds that Plaintiffs are likely to prove that their injuries would be redressed by a favorable decision.

As this Court previously noted,[667] a plaintiff's standing is evaluated at the time of filing of the initial complaint in which they joined. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); *Davis v. F.E.C.*, 554 F.3d 724, 734 (2008); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). The State Plaintiffs filed suit on May 5, 2022,[668] and the individual Plaintiffs joined on August 2, 2022.[669] Both groups are likely to prove that threat of future injury is more than merely speculative.

Plaintiff States have produced sufficient evidence to demonstrate a likelihood of proving ongoing injuries as of the time the Complaint was filed. For instance, on June 13, 2023, Flaherty still wanted to "get a sense of what [Facebook was] planning" and denied the company's request for permission to stop submitting its biweekly "Covid Insights Report" to the White House.[670] Specifically, Flaherty wanted to monitor Facebook's suppression of COVID-19 misinformation "as we start to ramp up [vaccines for children under the age of five]."[671] The CDC also remained in collaboration with Facebook in June of 2022 and even delayed implementing policy changes

---

[665] [Doc. No. 214, at 71–74]
[666] [Doc. No. 266, at 152–157]
[667] [Doc. No. 204, at 62–65]
[668] [Doc. No. 1]
[669] [Doc. No. 45]
[670] [Doc. No. 214-1, at ¶425]
[671] [Id.]

"until [it got] the final word from [the CDC]."[672] After coordinating with the CDC and White House, Facebook informed the White House of its new and government-approved policy, stating: "As of today, [June 22, 2022], all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older."[673]

Likewise, the individual Plaintiffs are likely to demonstrate that their injuries were imminent and ongoing as of August 2, 2022. Evidence obtained thus far indicates that Defendants have plans to continue the alleged censorship activities. For example, preliminary discovery revealed CISA's expanding efforts in combating misinformation, with a focus on the 2022 elections.[674] As of August 12, 2022, Easterly was directing the "mission of Rumor Control" for the 2022 midterm elections,[675] and CISA candidly reported to be "bee[fing] up [its] efforts to fight falsehoods[]" in preparation for the 2024 election cycle.[676] Chan of the FBI also testified at his deposition that online disinformation continues to be discussed between the federal agencies and social-media companies at the USG Industry meetings, and Chan assumes that this will continue through the 2024 election cycle.[677] All of this suggests that Plaintiffs are likely to prove that risk of future censorship injuries is more than merely speculative. Additionally, past decisions to suppress speech result in ongoing injury as long as the speech remains suppressed, and the past censorship experienced by individual Plaintiffs continues to inhibit their speech in the present. These injuries are also affecting the rights of the Plaintiffs' audience members, including those in Plaintiff States, who have the First Amendment right to receive information free from Government interference.

---

[672] [Doc. Nos. 71-7, at 6; 214-1, ¶424]
[673] [Doc. Nos. 71-7, at 6; 71-3, at 5; 214-1, ¶¶424–425]
[674] [Doc. No. 71-8, at 2; Doc. 86-7, at 14]
[675] [Doc. No. 86-7, at 14]
[676] [Doc. No. 214-1, at ¶1106 (*see also* [Doc. No. 71-8, at 2 (CISA "wants to ensure that it is set up to extract lessons learned from 2022 and apply them to the agency's work in 2024.")]
[677] [Id. at ¶ 866]

Accordingly, and for the reasons stated above, the Court finds that Plaintiffs are likely to prove that a favorable decision would redress their injuries because those injuries are ongoing and substantially likely to reoccur.

### iv.    Recent United States Supreme Court cases of *Texas* and *Haaland*

Defendants cite to two recent cases from the Supreme Court of the United States which they claim undermine this Court's previous ruling about the Plaintiff States' likelihood of proving Article III standing.

First, Defendants argue that *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023), undermines the States' Article III standing. In *Texas*, Texas and Louisiana sued the Department of Homeland Security (the "Department"), as well as other federal agencies, claiming that the recently promulgated "Guidelines for the Enforcement of Civil Immigration Law" contravened two federal statutes. *Id.* at *2. The Supreme Court held that the states lacked Article III standing because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." The Court further noted that the case was "categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* at *2, *8 (citations omitted).

Here, the Plaintiff States are not asserting a theory that the Defendants *failed* to act in conformity with the Constitution. To the contrary, the Plaintiff States assert that Defendants have affirmatively violated their First Amendment right to free speech. The Plaintiff States allege and (as extensively detailed above) are likely to prove that the Defendants caused direct injury to the Plaintiff States by significantly encouraging and/or coercing social-media companies to censor

136a

posts made on social-media. Further, as noted in this Court's previous ruling, the Plaintiff States are likely to have Article III standing because a significant portion of the Plaintiff States' population has been prevented from engaging with the posts censored by the Defendants. The Supreme Court noted that "when the Executive Branch elects not to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts are often called upon to protect." *Id.* at *5. Here, federal officials allegedly did exercise coercive power, and the Plaintiffs are likely to prevail on their claim that the Defendants violated the First Amendment rights of the Plaintiff States, their citizens, and the Individual Plaintiffs.

Defendants contend that the Supreme Court in *Texas* narrowed the application of special solicitude afforded to states because the Supreme Court noted that the standing analysis in *Massachusetts* "d[id] not control" because "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than the exercise of enforcement discretion. *Id.* at *8 n.6. This Court disagrees with Defendants on that point. As noted by Plaintiffs, the majority opinion in *Texas* does not mention special solicitude. Further, this Court noted in its previous analysis of standing that the Plaintiff States could satisfy Article III's standing requirements without special solicitude. Therefore, even to the extent this Court "leaves that idea on the shelf," as suggested in Justice Gorsuch's concurrence, the Court nonetheless finds that the Plaintiff States are likely to prove Article III standing.

Defendants also argue that the Supreme Court's recent ruling in *Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023), undermines the Plaintiff States' Article III standing. In *Haaland*, the Supreme Court ruled that Texas did not possess standing to challenge the placement provisions of the Indian Child Welfare Act, which prioritizes Indian families in

custody disputes involving Indian children. *Id.* at *19. The Supreme Court reasoned that the states in *Texas* could not "assert equal protection claims on behalf of its citizens because '[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* (*quoting Snapp*, 458 U.S. at 610 n.16)). The Defendants argue that this statement precludes *parens patriae* standing in the present case.[678] However, in its brief discussion regarding *parens patriae* standing, the *Haaland* Court quoted footnote 16 from *Snapp*, which, in turn, reiterated the "Mellon bar." *Haaland*, 2023 WL 4002951, at *19; *Snapp*, 458 U.S. at 610 n.16 (*quoting Massachusetts v.* 262 U.S. at 485–86.

Plaintiffs correctly note that, although both cases employ broad language, neither *Haaland* nor *Snapp* elaborate on the extent of the "Mellon bar." Moreover, the Supreme Court has clarified in other instances that *parens patriae* suits are permitted against the federal government outside the scope of the Mellon bar. *See Massachusetts v. EPA*, 549 U.S. at 520 n.17, (explaining the "critical difference" between barred *parens patriae* suits by Mellon and allowed *parens patriae* suits against the federal government).

Consistent with *Massachusetts v. EPA*, this Court has previously determined that the Mellon bar applies to "third-party *parens patriae* suits," but not to "quasi-sovereign-interest suits."[679] In *Haaland*, Texas presented a "third-party parens patriae suit," as opposed to a "quasi-sovereign-interest suit," as it asserted the equal protection rights of only a small minority of its population (i.e., non-Indian foster or adoptive parents seeking to foster or adopt Indian children against the objections of relevant Indian tribes), which clearly did not qualify as a quasi-sovereign interest. *See Haaland*, 2023 WL 4002951, at *19 & n.11). Here, however, Louisiana and Missouri advocate for the rights of a significant portion of their populations, specifically the hundreds of

---

[678] [Doc. 289, at 2].
[679] [Doc. 224, at 215–26], *quoting Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).

138a

thousands or millions of citizens who are potential audience members affected by federal social-media speech suppression.

Furthermore, when the *Haaland* Court determined that Texas lacked third-party standing, it stressed that Texas did not have either a "'concrete injury' to the State" or any hindrance to the third party's ability to protect its own interests. *Id.* at \*19 n.11 (*quoting Georgia v. McCollum*, 505 U.S. 42, 55–56 (1992)). Here, by contrast, the Plaintiff States have demonstrated a likelihood of succeeding on their claims that they have suffered, and likely will continue to suffer, numerous concrete injuries resulting from federal social-media censorship.[680] Additionally, the ability of the third parties in this case to protect their own interests is hindered because the diffuse First Amendment injury experienced by each individual audience member in Louisiana and Missouri lacks sufficient economic impact to encourage litigation through numerous individual lawsuits. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).

Defendants further contend that *Haaland* rejected Texas's argument regarding the ICWA's placement provisions requiring Texas to compromise its commitment to being impartial in child-custody proceedings.[681] However, the Supreme Court rejected this argument for a specific reason: "Were it otherwise, a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law." *Haaland*, 2023 WL 4002951, at \*19. By contrast, Missouri and Louisiana do not assert that the federal government mandates their complicity in enforcing federal-social-media-censorship regimes. The Plaintiff States instead assert that they, along with a substantial portion of their populations, have been injured by Defendants' actions.

Neither *Texas* nor *Haaland* undermine this Court's previous ruling that the Plaintiff States have Article III standing to sue Defendants in the instant case. Further, the evidence produced thus

---

[680] *See, e.g.*, [Doc. 214-1, ¶¶ 1427–1442]
[681] [Doc. 289, at 3] *quoting Haaland*, 2023 WL 4002951, at \*19.

far through limited discovery demonstrates that Plaintiffs are likely to succeed on their First Amendment claims. Accordingly, the Court finds that Plaintiffs are likely to prove all elements of Article III standing, and therefore, are likely to establish that this Court has jurisdiction.

### 2. Irreparable Harm

The second requirement for a Preliminary Injunction is a showing of irreparable injury: plaintiffs must demonstrate "a substantial threat of irreparable injury" if the injunction is not issued. *Texas*, 809 F.3d at 150. For injury to be "irreparable," plaintiffs need only show it cannot be undone through monetary remedies. *Burgess v. Fed. Deposit Inc., Corp.*, 871 F.3d 297, 304 (5th Cir. 2017). Deprivation of a procedural right to protect a party's concrete interests is irreparable injury. *Texas*, 933 F.3d at 447. Additionally, violation of a First Amendment constitutional right, even for a short period of time, is always irreparable injury. *Elrod*, 427 U.S. at 373.

Plaintiffs argue in their memorandum that the First Amendment violations are continuing and/or that there is a substantial risk that future harm is likely to occur. In contrast, Defendants argue that Plaintiffs are unable to show imminent irreparable harm because the alleged conduct occurred in the past, is not presently occurring, and is unlikely to occur in the future. Defendants argue Plaintiffs rely upon actions that occurred approximately one year ago and that it cannot be remedied by any prospective injunctive relief. Further, Defendants argue that there is no "imminent harm" because the COVID-19 pandemic is over and because the elections where the alleged conduct occurred are also over.

The Court finds that Plaintiffs have demonstrated a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc., v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986). To demonstrate irreparable

harm at the preliminary injunction stage, Plaintiffs must adduce evidence showing that the irreparable injury is likely to occur during the pendency of the litigation. *Justin Indus. Inc.*, v. *Choctaw Secs., L.P.*, 920 F.2d 262, 268 n. 7 (5th Cir. 1990). This Plaintiffs have done.

Defendants argue that the alleged suppression of social-media content occurred in response to the COVID-19 pandemic and attacks on election infrastructure, and therefore, the alleged conduct is no longer occurring. Defendants point out that the alleged conduct occurred between one to three years ago. However, the information submitted by Plaintiffs was at least partially based on preliminary injunction-related discovery[682] and third-party subpoena requests that were submitted to five social-media platforms on or about July 19, 2022.[683] The original Complaint[684] was filed on May 5, 2022, and most of the responses to preliminary injunction-related discovery provided answers to discovery requests that occurred before the Complaint was filed. Since completion of preliminary-injunction related discovery took over six months, most, if not all, of the information obtained would be at least one year old.

Further, the Defendants' decision to stop some of the alleged conduct does not make it any less relevant. A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the alleged wrongful behavior could not reasonably be expected to recur. *Already, LLC v. Nike*, 568 U.S. 85, 91 (2013). Defendants have not yet met this burden here.

Defendants also argue that, due to the delay in the Plaintiffs seeking relief,[685] the Plaintiffs have not shown "due diligence" in seeking relief. However, this Court finds that Plaintiffs have exercised due diligence. This is a complicated case that required a great deal of discovery in order

---

[682] [Doc. No. 34]
[683] [Doc. No. 37]
[684] [Doc. No. 1]
[685] Plaintiffs allege actions occurring as far back as 2020.

to obtain the necessary evidence to pursue this case. Although it has taken several months to obtain this evidence, it certainly was not the fault of the Plaintiffs. Most of the information Plaintiffs needed was unobtainable except through discovery.

Defendants further argue the risk that Plaintiffs will sustain injuries in the future is speculative and depends upon the action of the social-media platforms. Defendants allege the Plaintiffs have therefore not shown imminent harm by any of the Defendants.

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"), the Supreme Court held that, for purposes of an Article III injury-in-fact, an allegation of future injury may suffice if there is "a 'substantial risk' that the harm will occur." (*quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, (2013)). In *SBA List*, a petitioner challenged a statute that prohibited making certain false statements during the course of a political campaign. *Id.* at 151–52. In deciding whether the pre-enforcement challenge was justiciable—and in particular, whether it alleged a sufficiently imminent injury for purposes of Article III—the Court noted that pre-enforcement review is warranted under circumstances that render the threatened enforcement "sufficiently imminent." *Id.* at 159. Specifically, the Court noted that past enforcement is "good evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (*quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Similarly, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the Supreme Court held that a complaint alleges an Article III injury-in-fact where fear of future injury is not "imaginary or wholly speculative." In *Babbitt*, the Supreme Court considered a pre-enforcement challenge to a statute that made it an unfair labor practice to encourage consumers to boycott using "dishonest, untruthful, and deceptive publicity." *Id.* at 301. Because the plaintiffs had engaged in consumer publicity campaigns in the past and alleged an intention to continue those

campaigns in the future, the Court held that their challenge to the consumer publicity provision presented an Article III case or controversy. *Id.* at 302; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386 (1988) (where the Supreme Court held that booksellers could seek pre-enforcement review of a law making it a crime to "knowingly display for commercial purpose" material that is "harmful to juveniles," as defined by the statute).

Therefore, the question is whether Plaintiffs have alleged a "substantial risk" that harm may occur, which is not "imaginary or wholly speculative." This Court finds that the alleged past actions of Defendants show a substantial risk of harm that is not imaginary or speculative. *SBA List*, 573 U. S. at 164. Defendants apparently continue to have meetings with social-media companies and other contacts.[686]

Although the COVID-19 pandemic is no longer an emergency, it is not imaginary or speculative to believe that in the event of any other real or perceived emergency event, the Defendants would once again use their power over social-media companies to suppress alternative views. And it is certainly not imaginary or speculative to predict that Defendants could use their power over millions of people to suppress alternative views or moderate content they do not agree with in the upcoming 2024 national election. At oral arguments Defendants were not able to state that the "switchboarding" and other election activities of the CISA Defendants and the State Department Defendants would not resume prior to the upcoming 2024 election;[687] in fact, Chan testified post 2020, "we've never stopped."[688] Notably, a draft copy of the DHS's "Quadrennial Homeland Security Review," which outlines the department's strategy and priorities in upcoming years, states that the department plans to target "inaccurate information" on a wide range of topics,

---

[686] [Doc. No. 204-1 at 40]
[687] [Doc. No. 208 at 122]
[688] [Chan depo. at 8–9]

including the origins of the COVID-19 pandemic, the efficacy of COVID-19 vaccines, racial justice, the U.S. withdrawal from Afghanistan, and the return of U.S. Support of Ukraine.[689]

The Plaintiffs are likely to succeed on the merits in their claims that there is a substantial risk that harm will occur, that is not imaginary or speculative. Plaintiffs have shown that not only have the Defendants shown willingness to coerce and/or to give significant encouragement to social-media platforms to suppress free speech with regard to the COVID-19 pandemic and national elections, they have also shown a willingness to do it with regard to other issues, such as gas prices,[690] parody speech,[691] calling the President a liar,[692] climate change,[693] gender,[694] and abortion.[695] On June 14, 2022, White House National Climate Advisor Gina McCarthy, at an Axios event entitled, "A Conversation on Battling Disinformation," was quoted as saying, "We have to get together; we have to get better at communicating, and frankly, the tech companies have to stop allowing specific individuals over and over to spread disinformation."[696]

The Complaint (and its amendments) shows numerous allegations of apparent future harm. Plaintiff Bhattacharya alleges ongoing social-media censorship.[697] Plaintiff Kulldorff alleges an ongoing campaign of censorship against the GBD and his personal social-media accounts.[698] Plaintiff Kheriaty also alleges ongoing and expected future censorship,[699] noting "shadow-banning" his social-media account is increasing and has intensified since 2022.[700] Plaintiffs Hoft

---

[689] [Doc. No. 209-23 at 4]
[690] [Doc. No. 212-3 at 65–66, ¶ 211]
[691] [Id. at 58-60, ¶¶ 180–188]
[692] [Id. at 61, ¶ 190]
[693] [Id. at 63-64, ¶¶ 200–203]
[694] [Id. at 64-64, ¶¶ 204–208]
[695] [Id. at 65, ¶¶ 209–210]
[696] [Doc. No. 214-15]
[697] [Doc. No. 45-3, ¶¶ 15–33]
[698] [Doc. No. 45-4, ¶¶ 14–16]
[699] [Doc. No. 45-7, ¶¶ 12–18]
[700] [Id. at ¶¶ 15]

and Hines also allege ongoing and expected future censorship injuries.[701] It is not imaginary or speculative that the Defendants will continue to use this power. It is likely.

The Court finds that Plaintiffs are likely to succeed on their claim that they have shown irreparable injury sufficient to satisfy the standard for the issuance of a preliminary injunction.

### 3. Equitable Factors and Public Interest

Thus far, Plaintiffs have satisfied the first two elements to obtain a preliminary injunction. The final two elements they must satisfy are that the threatened harm outweighs any harm that may result to the Federal Defendants and that the injunction will not undermine the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). These two factors overlap considerably. *Texas*, 809 F.3d at 187. In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The public interest factor requires the court to consider what public interests may be served by granting or denying a preliminary injunction. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

Defendants maintain their interest in being able to report misinformation and warn social-media companies of foreign actors' misinformation campaigns outweighs the Plaintiffs' interest in the right of free speech. This Court disagrees and finds the balance of equities and the public interest strongly favors the issuance of a preliminary injunction. The public interest is served by maintaining the constitutional structure and the First Amendment free speech rights of the Plaintiffs. The right of free speech is a fundamental constitutional right that is vital to the freedom of our nation, and Plaintiffs have produced evidence of a massive effort by Defendants, from the

---

[701] [Doc. No. 45-7 at ¶¶ 12–18]; [Doc. No. 84 at ¶¶ 401–420]; [Doc. No. 45-12 at ¶ 4, 12]

145a

White House to federal agencies, to suppress speech based on its content. Defendants' alleged suppression has potentially resulted in millions of free speech violations. Plaintiffs' free speech rights thus far outweighs the rights of Defendants, and thus, Plaintiffs satisfy the final elements needed to show entitlement to a preliminary injunction.

### 4. Injunction Specificity

Lastly, Defendants argue that Plaintiff's proposed preliminary injunction lacks the specificity required by Federal Rule of Civil Procedure 65 and is impermissibly overbroad. Rule 65(d)(1) requires an injunction to "state its terms specifically" and to "describe in reasonable detail the acts or acts restrained or required." The specificity provisions of Rule 65(d) are designed to prevent uncertainty and confusion on the part of those faced with injunction orders and to avoid possible contempt based upon a decree too vague to be understood. *Atiyeh v. Capps*, 449 U.S. 1312, 1316–17 (1981). An injunction must be narrowly tailored to remedy the specific action that gives rise to the injunction. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).

This Court believes that an injunction can be narrowly tailored to only affect prohibited activities, while not prohibiting government speech or agency functions. Just because the injunction may be difficult to tailor is not an excuse to allow potential First Amendment violations to continue. Thus, the Court is not persuaded by Defendants arguments here.

Because Plaintiffs have met all the elements necessary to show entitlement to a preliminary injunction, this Court shall issue such injunction against the Defendants described above.

### IV. CLASS CERTIFICATION

In their Third Amended Complaint, the Individual Plaintiffs purport to bring a class action "on behalf of themselves and two classes of other persons similarly situated to them."[702] Plaintiffs

---

[702] [Doc. No. 268 at ¶489].

go on to describe the two proposed classes, as well as state generally that each requirement for class certification is met.[703] Defendants opposed Plaintiffs' request for class certification in their Response to Plaintiffs' Motion for Class Certification and for Leave to File Third Amended Complaint.[704]

The Court is obligated to analyze whether this litigation should proceed as a class action. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) ("A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class."). Pursuant to this obligation, the Court questioned counsel at the hearing on the preliminary injunction as to the basis for class certification. As explained in further detail below, the Court finds that Plaintiffs failed to meet their burden of proof, and class certification is improper here.

**A. Class Certification Standard under FRCP 23**

"The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Id.* at 740. "The party seeking certification bears the burden of proof." *Id.*

Federal Rule of Civil Procedure 23(a) lays out the four key prerequisites for a class action. It states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

---

[703] [Id. at ¶¶490–501].
[704] [Doc. No. 244].

In addition to the enumerated requirements above, Plaintiffs must propose a class that has an objective and precise definition. "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, Plaintiffs specifically bring this class action under Rule 23(b)(2), which allows for maintenance of a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b0) (2). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions. *Amchem Prod., Inc.*, 521 U.S. at 614.

Notably, the Fifth Circuit recently held that a standing analysis is necessary before engaging in the class certification analysis. *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 733 (5th Cir. 2023). However, because this Court has already completed multiple standing analyses in this matter, and because the Court ultimately finds that the class should not be certified, the Court will not address which standing test should be applied to this specific issue.

## B. Analysis

In order to certify this matter as a class action, the Court must find that Plaintiffs have established each element of Rule 23(a). *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 414–15 (5th Cir. 2004) ("All classes must satisfy the four baseline requirements of rule 23(a):

numerosity, commonality, typicality, and adequacy of representation."). The Court finds that Plaintiffs failed to meet their burden, and therefore, the Court will not certify the class action.

### 1. Class Definition

Plaintiffs propose two classes to proceed with their litigation as a class action. First, Plaintiffs define Class 1 as follows:

> The class of social-media users who have engaged or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the platform after Defendants and/or those acting in concert with them flag or flagged the speech to the platform(s) for suppression.[705]

Next, Plaintiffs define Class 2 as follows:

> The class of social-media users who have engaged in or will engage in, or who follow, subscribe to, are friends with, or are otherwise connected to the accounts of users who have engaged in or will engage in, speech on any social-media company's platform(s) that has been or will be removed; labelled; used as a basis for suspending, deplatforming, issuing strike(s) against, demonetizing, or taking other adverse action against the speaker; downranked; deboosted; concealed; or otherwise suppressed by the company pursuant to any change to the company's policies or enforcement practices that Defendants and/or those acting in concert with them have induced or will induce the company to make.[706]

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970). The Court finds that the class definitions provided by Plaintiffs are neither "adequately defined" nor "clearly ascertainable." Simply put, there is no way to tell just how many

---

[705] [Doc. No. 268 at ¶490]
[706] [Id. at ¶491]

people or what type of person would fit into these proposed classes. The proposed class definitions are so broad that almost every person in America, and perhaps in many other countries as well, could fit into the classes. The Court agrees with Defendants that the language used is simply too vague to maintain a class action using these definitions.[707] Where a class definition is, as here, "too broad and ill-defined" to be practicable, the class should not be certified. *See Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, No. 22-10145, 2023 WL 4073826, at *14 (5th Cir. June 20, 2023).

Further, no evidence was produced at the hearing on the motion for preliminary injunction that "would have assisted the district court in more accurately delineating membership in a workable class." *DeBremaecker*, 433 F.2d at 734. The Court questioned Plaintiffs' counsel about the issues with the proposed class definitions, but counsel was unable to provide a solution that would make class certification feasible here. Counsel for Plaintiffs stated that "the class definition is sufficiently precise," but the Court fails to see how that is so, and counsel did not explain any further.[708] Counsel for Plaintiffs focused on the fact that the proposed class action falls under Rule 23(b)(2), providing for broad injunctive relief, and therefore, counsel argued that the Court would not need to "figure out every human being in the United States of American [sic] who was actually adversely affected."[709] Even if the Court does not need to identify every potential class member individually, the Court still needs to be able to state the practical bounds of the class definition—something it cannot do with the loose wording given by Plaintiffs.

---

[707] [Doc. No. 244 at 7]
[708] Hearing Transcript at 181, line 15.
[709] [Id. at lines 16–18]

Without a feasible class definition, the Court cannot certify Plaintiffs' proposed class action. Out of an abundance of caution, however, the Court will address the other enumerated prerequisites of Rule 23(a) below.

## 2. Numerosity

The numerosity requirement mandates that a class be "so large that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Although the number of members in a proposed class is not determinative of whether joinder is impracticable," classes with a significantly high number of potential members easily satisfy this requirement. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding class of 100 to 150 members satisfied the numerosity requirement). Other factors, such as "the geographical dispersion of the class" and "the nature of the action," may also support a finding that the numerosity element has been met. *Id.* at 624–25.

Here, Plaintiffs state that both Class 1 and Class 2 are "sufficiently numerous that joinder of all members is impracticable."[710] Plaintiffs reference the "content of hundreds of users with, collectively, hundreds of thousands or millions of followers" who were affected by Defendants' alleged censorship.[711] Thus, based on a surface-level look at potential class members, it appears that the numerosity requirement would be satisfied because the class members' numbers reach at least into the thousands, if not the millions.

However, the numerosity requirement merely serves to highlight the same issue described above: the potential class is simply too broad to even begin to fathom who would fit into the class. Joinder of all the potential class members is more than impractical—it is impossible. Thus, while the sheer number of potential class members may tend towards class certification, the Court is only

---

[710] [Doc. No. 268 at ¶¶492–93]
[711] [Id. at ¶¶492]

further convinced by Plaintiffs' inability to estimate the vast number of class members that certification is improper here.

### 3. Commonality

The commonality requirement ensures that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Mullen*, 186 F.3d at 625 (*quoting Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).

Here, Plaintiffs state that both classes share common questions of law or fact, including "the question whether the government is responsible for a social-media company's suppression of content that the government flags to the company for suppression" for Class 1 and "the question whether the government is responsible for a social-media company's suppression of content pursuant to a policy or enforcement practice that the government induced the company to adopt or enforce" for Class 2.[712] These questions of law are broadly worded and may not properly characterize the specific issues being argued in this case.

At the hearing for the preliminary injunction, Plaintiffs' counsel clarified that the alleged campaign of censorship "involve[es] a whole host of common questions whose resolution are going to determine whether or not there's a First Amendment violation."[713] The Court agrees that there is certainly a common question of First Amendment law that impacts each member of the proposed classes, but notes Defendants' well-reasoned argument that Plaintiffs may be attempting to aggregate too many questions into one class action.[714] The difficulty of providing "a single,

---

[712] [Id. at ¶¶494–95]
[713] Hearing Transcript, at 183, lines 19–21.
[714] [Doc. No. 244 at 10]

class-wide answer," as highlighted by Defendants, further proves to this Court that class certification is likely not the best way to proceed with this litigation.[715] Although commonality is a fairly low bar, the Court is not convinced Plaintiffs have met their burden on this element of Rule 23(a).

### 4. Typicality

The typicality requirement mandates that named parties' claims or defenses "are typical…of the class." Fed. R. Civ. P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *Mullen*, 186 F.3d at 625. It "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Lightbourn*, 118 F.3d at 426.

Here, Plaintiffs assert that the Individual Plaintiffs' claims are typical of both Class 1 and Class 2 members' claims because they "all arise from the same course of conduct by Defendants…namely, the theory that such conduct violates the First Amendment."[716] Further, Plaintiffs state that the Individual Plaintiffs "are not subject to any affirmative defenses that are inapplicable to the rest of the class and likely to become a major focus of the case."[717]

While the general claims of each potential class member would arise from the Defendants' alleged First Amendment violations, the Individual Plaintiffs have not explained how their claims are typical of each proposed class specifically. For example, Class 2 includes those social-media users who "follow, subscribe to, are friends with, or are otherwise connected to the accounts of users" subject to censorship.[718] While the Individual Plaintiffs detail at length their own censorship, they do not clarify how they have been harmed by the censorship of other users. Again,

---

[715] [Id. at 13]
[716] [Doc. No. 268 at ¶496–97]
[717] [Id.]
[718] [Id. at ¶491]

this confusion highlights the myriad issues with this proposed class action as a result of the ill-defined and over-broad class definitions. The Court cannot make a finding that the Individual Plaintiffs' claims are typical of all class members' claims, simply because the Court cannot identify who would fit in the proposed class. Merely stating that the Rule 23(a) requirements have been met is not enough to persuade this Court that the class should be certified as stated.

### 5. Adequate Representation

The final element of a class certification analysis requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Differences between named plaintiffs and class members render the named plaintiffs' inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 626.

On this element, Plaintiffs state that they "are willing and able to take an active role in the case, control the course of litigation, and protect the interest of absentees in both classes."[719] Plaintiff also state that "[n]o conflicts of interest currently exist or are likely to develop" between themselves and the absentees.[720] This element is likely met, without evidence to the contrary.

However, without a working class definition, and with the issues concerning the other Rule 23(a) elements discussed above, the Court finds class certification inappropriate here, regardless of the adequacy of the Individual Plaintiffs' representation. Thus, for the foregoing reasons, the Court declines to certify this matter as a class action.

### V.   CONCLUSION

> Once a government is committed to the principle of silencing the
> voice of opposition, it has only one place to go, and that is down the
> path of increasingly repressive measures, until it becomes a source

---

[719] [Id. at ¶498]
[720] [Id.]

of terror to all its citizens and creates a country where everyone lives in fear.

Harry S. Truman

The Plaintiffs are likely to succeed on the merits in establishing that the Government has used its power to silence the opposition. Opposition to COVID-19 vaccines; opposition to COVID-19 masking and lockdowns; opposition to the lab-leak theory of COVID-19; opposition to the validity of the 2020 election; opposition to President Biden's policies; statements that the Hunter Biden laptop story was true; and opposition to policies of the government officials in power. All were suppressed. It is quite telling that each example or category of suppressed speech was conservative in nature. This targeted suppression of conservative ideas is a perfect example of viewpoint discrimination of political speech. American citizens have the right to engage in free debate about the significant issues affecting the country.

Although this case is still relatively young, and at this stage the Court is only examining it in terms of Plaintiffs' likelihood of success on the merits, the evidence produced thus far depicts an almost dystopian scenario. During the COVID-19 pandemic, a period perhaps best characterized by widespread doubt and uncertainty, the United States Government seems to have assumed a role similar to an Orwellian "Ministry of Truth."[721]

The Plaintiffs have presented substantial evidence in support of their claims that they were the victims of a far-reaching and widespread censorship campaign. This court finds that they are likely to succeed on the merits of their First Amendment free speech claim against the Defendants. Therefore, a preliminary injunction should issue immediately against the Defendants as set out

---

[721] An "Orwellian 'Ministry of Truth'" refers to the concept presented in George Orwell's dystopian novel, '1984.' In the novel, the Ministry of Truth is a governmental institution responsible for altering historical records and disseminating propaganda to manipulate and control public perception.

herein. The Plaintiffs Motion for Preliminary Injunction [Doc. No. 10] is **GRANTED IN PART and DENIED IN PART**.

The Plaintiffs' request to certify this matter as a class action pursuant to Fed. R. Civ. P. Article 23(b)(2) is **DENIED.**

MONROE, LOUISIANA this 4th day of July 2023.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

156a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

STATE OF MISSOURI, ET AL.   CASE NO. 3:22-CV-01213

VERSUS        JUDGE TERRY A. DOUGHTY

JOSEPH R BIDEN JR., ET AL.  MAG. JUDGE KAYLA D. MCCLUSKY

<u>**JUDGMENT**</u>

  For the reasons set forth in the Memorandum Ruling on the Request for Preliminary Injunction,

  **IT IS ORDERED, ADJUDGED, AND DECREED** that Plaintiffs' Motion for Preliminary Injunction [Doc. No. 10] is **GRANTED in part and DENIED in part**.

  **IT IS FURTHER ORDERED** that: the **DEPARTMENT OF HEALTH AND HUMAN SERVICES** ("HHS") and **THE NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES** ("NIAID"), and specifically the following employees of the HHS and NIAID: **XAVIER BECERRA,**[1] Secretary of HHS; **DR. HUGH AUCHINCLOSS**, Director of NIAID; **YOLANDA BYRD**, HHS Digital Engagement Team; **CHRISTY CHOI**, HHS Office of Communications; **ASHLEY MORSE**, HHS Director of Digital Engagement; **JOSHUA PECK**, HHS Deputy Assistant Secretary, Deputy Digital Director of HHS successor (formerly **JANELL MUHAMMED**); along with their secretaries, directors, administrators and employees; **SURGEON GENERAL VIVEK H. MURTHY**, **KATHARINE DEALY**, Chief Engagement Officer for the Surgeon General, along with her secretaries, directors, administrators, and employees; the **CENTERS FOR DISEASE CONTROL AND PREVENTION** ("CDC"), and specifically the following employees: **CAROL Y. CRAWFORD**, Chief of the Digital Media

---

[1] All individuals named in this Judgment are being sued in their official capacities.

1

Branch of the CDC Division of Public Affairs; **JAY DEMPSEY**, Social-media Team Leader, Digital Media Branch, CDC Division of Public Affairs; **KATE GALATAS**, CDC Deputy Communications Director; **UNITED STATES CENSUS BUREAU** ("Census Bureau"), and specifically the following employees: **JENNIFER SHOPKORN**, Census Bureau Senior Advisor for Communications, Division Chief for the Communications Directorate, and Deputy Director of the Census Bureau Office of Faith Based and Neighborhood Partnerships**,** along with their secretaries, directors, administrators and employees; the **FEDERAL BUREAU OF INVESTIGATION** ("FBI"), and specifically the following employees: **LAURA DEHMLOW**, Section Chief, FBI Foreign Influence Task Force; **ELVIS M. CHAN**, Supervisory Special Agent of Squad CY-1 in the FBI San Francisco Division; **THE UNITED STATES DEPARTMENT OF JUSTICE**, along with their secretary, director, administrators, and employees; the following members of the Executive Office of the President of the United States: White House Press Secretary **KARINE JEAN-PIERRE**, Counsel to the President; **STUART F. DELERY**, White House Partnerships Manager; **AISHA SHAH**, Special Assistant to the President; **SARAH BERAN**, **MINA HSIANG**, Administrator of the United States Digital Service within the Office of Management and Budget; **ALI ZAIDI**, White House National Climate Advisor; White House Senior COVID-19 Advisor successor (formerly **ANDREW SLAVITT**); Deputy Assistant to the President and Director of Digital Strategy successor (formerly **ROB FLAHERTY**); **DORI SALCIDO**, White House COVID-19 Director of Strategic Communications and Engagement; White House Digital Director for the COVID-19 Response Team successor (formerly **CLARKE HUMPHREY**); Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team successor (formerly **BENJAMIN WAKANA**); Deputy Director for Strategic Communications and External Engagement for the White House COVID-

19 Response Team successor (formerly **SUBHAN CHEEMA**); White House COVID-19 Supply Coordinator successor (formerly **TIMOTHY W. MANNING**); Chief Medical Advisor to the President, **DR. HUGH AUCHINCLOSS**, along with their directors, administrators and employees; the **CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY** ("**CISA**"), and specifically the following employees: **JEN EASTERLY**, Director of CISA; **KIM WYMAN**, Senior Cybersecurity Advisor and Senior Election Security Leader; **LAUREN PROTENTIS**; **GEOFFREY HALE**; **ALLISON SNELL**; **BRIAN SCULLY**, Officials of CISA; the **UNITED STATES DEPARTMENT OF HOMELAND SECURITY** ("DHS"), and specifically the following employees: **ALEJANDRO MAYORKAS**, Secretary of DHS; **ROBERT SILVERS**, Under-Secretary of the Office of Strategy, Policy and Plans; **SAMANTHA VINOGRAD**, Senior Counselor for National Security in the Official of the Secretary for DHS, along with their secretary, directors, administrators, and employees; the **UNITED STATES DEPARTMENT OF STATE** ("State Department"), and specifically the following employees: **LEAH BRAY**, Acting Coordinator of the State Department's Global Engagement Center ("GEC"); **ALEX FRISBIE**, State Department Senior Technical Advisor and member of the Technology Engagement Team at the GEC; **DANIEL KIMMAGE**, Acting Coordinator of the GEC, along with their secretary, directors, administrators, and employees **ARE HEREBY ENJOINED AND RESTRAINED** from taking the following actions as to social-media companies:[2]

---

[2] "Social-media companies" include Facebook/Meta, Twitter, YouTube/Google, WhatsApp, Instagram, WeChat, TikTok, Sina Weibo, QQ, Telegram, Snapchat, Kuaishou, Qzone, Pinterest, Reddit, LinkedIn, Quora, Discord, Twitch, Tumblr, Mastodon, and like companies.

(1)     meeting with social-media companies for the purpose of urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms;[3]

(2)     specifically flagging content or posts on social-media platforms and/or forwarding such to social-media companies urging, encouraging, pressuring, or inducing in any manner for removal, deletion, suppression, or reduction of content containing protected free speech;

(3)     urging, encouraging, pressuring, or inducing in any manner social-media companies to change their guidelines for removing, deleting, suppressing, or reducing content containing protected free speech;

(4)     emailing, calling, sending letters, texting, or engaging in any communication of any kind with social-media companies urging, encouraging, pressuring, or inducing in any manner for removal, deletion, suppression, or reduction of content containing protected free speech;

(5)     collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, the Stanford Internet Observatory, or any like project or group for the purpose of urging, encouraging, pressuring, or inducing in any manner removal, deletion, suppression, or reduction of content posted with social-media companies containing protected free speech;

(6)     threatening, pressuring, or coercing social-media companies in any manner to remove, delete, suppress, or reduce posted content of postings containing protected free speech;

---

[3] "Protected free speech" means speech that is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with jurisprudence of the United States Supreme Court, Courts of Appeal and District Courts.

4

(7)      taking any action such as urging, encouraging, pressuring, or inducing in any manner social-media companies to remove, delete, suppress, or reduce posted content protected by the Free Speech Clause of the First Amendment to the United States Constitution;

(8)      following up with social-media companies to determine whether the social-media companies removed, deleted, suppressed, or reduced previous social-media postings containing protected free speech;

(9)      requesting content reports from social-media companies detailing actions taken to remove, delete, suppress, or reduce content containing protected free speech; and

(10)     notifying social-media companies to Be on The Lookout ("BOLO") for postings containing protected free speech.

This Preliminary Injunction precludes said named Defendants, their agents, officers, employees, contractors, and all acting in concert with them from the aforementioned conduct. This Preliminary Injunction also precludes said named Defendants, their agents, officers, employees, and contractors from acting in concert with others who are engaged in said conduct.

**IT IS FURTHER ORDERED** that the following actions are **NOT** prohibited by this Preliminary Injunction:

(1)      informing social-media companies of postings involving criminal activity or criminal conspiracies;

(2)      contacting and/or notifying social-media companies of national security threats, extortion, or other threats posted on its platform;

(3)      contacting and/or notifying social-media companies about criminal efforts to suppress voting, to provide illegal campaign contributions, of cyber-attacks against election infrastructure, or foreign attempts to influence elections;

(4)    informing social-media companies of threats that threaten the public safety or security of the United States;

(5)    exercising permissible public government speech promoting government policies or views on matters of public concern;

(6)    informing social-media companies of postings intending to mislead voters about voting requirements and procedures;

(7)    informing or communicating with social-media companies in an effort to detect, prevent, or mitigate malicious cyber activity;

(8)    communicating with social-media companies about deleting, removing, suppressing, or reducing posts on social-media platforms that are not protected free speech by the Free Speech Clause in the First Amendment to the United States Constitution.

**IT IS FURTHER ORDERED** that no security is required to be posted by Plaintiffs under Federal Rule of Civil Procedure 65.

**IT IS FURTHER ORDERED** that this Preliminary Injunction Order shall remain in effect pending the final resolution of this case or until further orders issue from this Court, the United States Court of Appeals for the Fifth Circuit, or the Supreme Court of the United States.

**IT IS FURTHER ORDERD** that the Motion for Preliminary Injunction [Doc. No. 10] is **DENIED** as to the following Defendants: U.S. Food and Drug Administration; U. S. Department of Treasury; U.S. Election Assistance Commission; U. S. Department of Commerce and employees Erica Jefferson, Michael Murray, Wally Adeyemo, Steven Frid, Brad Kimberly, and Kristen Muthig; and Disinformation Governance Board ("DGB") and its Director Nina Jankowicz.

**IT IS FURTHER ORDERED** that no evidentiary hearing is required at this time.

162a

    **IT IS FURTHER ORDERED** that Plaintiffs' request for certification of this proceeding as a class action pursuant to Fed. R. Civ. P. Article 23 (b)(2) is **DENIED.**

    **THUS, DONE AND SIGNED IN MONROE, LOUISIANA,** this 4th day of July 2023**.**

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

STATE OF MISSOURI ET AL        CIVIL ACTION NO. 3:22-cv-1213

VERSUS        JUDGE TERRY A. DOUGHTY

JOSEPH R BIDEN JR ET AL        MAG. JUDGE KAYLA D. MCCLUSKY

## MEMORANDUM RULING ON MOTION TO STAY

Before the Court is a Motion to Stay Preliminary Injunction Pending Appeal and Alternatively, for Administrate Stay [Doc. No. 297] ("Motion to Stay") filed by Defendants.[1] An Opposition [Doc. No. 299] was filed by Plaintiffs.[2]

For the reasons set forth herein, Defendants' Motion to Stay is **DENIED**.

## I.    BACKGROUND

On July 4, 2023, this Court issued a Preliminary Injunction against the Defendants,[3] which prohibited the Defendants from contacting social-media companies and taking specific actions for the purpose of urging, encouraging, pressuring, or inducing in any manner, the removal, deletion,

---

[1] Defendants consist of President Joseph R Biden ("President Biden"), Jr, Karine Jean-Pierre ("Jean-Pierre"), Vivek H Murthy ("Murthy"), Xavier Becerra ("Becerra"), Dept of Health & Human Services ("HHS"), Dr. Hugh Auchincloss ("Auchincloss"), National Institute of Allergy & Infectious Diseases ("NIAID"), Centers for Disease Control & Prevention ("CDC"), Alejandro Mayorkas ("Mayorkas"), Dept of Homeland Security ("DHS"), Jen Easterly ("Easterly"), Cybersecurity & Infrastructure Security Agency ("CISA"), Carol Crawford ("Crawford"), United States Census Bureau ("Census Bureau"), U. S. Dept of Commerce ("Commerce"), Robert Silvers ("Silvers"), Samantha Vinograd ("Vinograd"), Ali Zaidi ("Zaidi"), Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Stuart F. Delery ("Delery"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Mina Hsiang ("Hsiang"), U. S. Dept of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Laura Dehmlow ("Dehmlow"), Elvis M. Chan ("Chan"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), Katharine Dealy ("Dealy"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), Joshua Peck ("Peck"), Kym Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), Jennifer Shopkorn ("Shopkorn"), U. S. Food & Drug Administration ("FDA"), Erica Jefferson ("Jefferson"), Michael Murray ("Murray"), Brad Kimberly ("Kimberly"), U. S. Dept of State ("State"), Leah Bray ("Bray"), Alexis Frisbie ("Frisbie"), Daniel Kimmage ("Kimmage"), U. S. Dept of Treasury ("Treasury"), Wally Adeyemo ("Adeyemo"), U. S. Election Assistance Commission ("EAC"), Steven Frid ("Frid"), and Kristen Muthig ("Muthig").

[2] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty ("Kheriaty"), Dr. Martin Kulldorff ("Kulldorff"), Jim Hoft ("Hoft"), Dr. Jayanta Bhattacharya ("Bhattacharya"), and Jill Hines ("Hines").

[3] [Doc. No. 294]

164a

suppression, or reduction of content containing protected free speech posted on social-media platforms.[4] The Judgment defined "protected free speech" as "speech that is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with the jurisprudence of the United States Supreme Court, Courts of Appeal and District Courts."[5]

Defendants filed a Notice of Appeal[6] on July 5, 2023. On July 6, 2023, Defendants filed the instant Motion to Stay.[7] In the Motion to Stay, Defendants seek to have the Court Stay the Preliminary Injunction pending appeal, or alternatively to administratively stay the preliminary injunction for seven days.

The Defendants allege that they face irreparable harm with each day the injunction remains in effect, because the injunction's broad scope and ambiguous terms may be read to prevent the Defendants from engaging in a vast range of lawful and responsible conduct, including speaking on matters of public concern, and working with social-media companies on initiatives to prevent grave harm to the American people and the Country's various democratic processes.

## II.   LAW AND ANALYSIS

In determining whether to grant a stay pending appeal, a court is to consider: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent  a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009). In evaluating these factors, courts have refused to apply them in a rigid or mechanical fashion. *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983).

---

[4] [Id.]
[5] [Id. at 4, n. 3]
[6] [Doc. No. 296]
[7] [Doc. No. 297]

165a

### A.    Success on the Merits

For all the reasons set forth in the Memorandum Ruling,[8] this Court finds the Plaintiffs have shown a likelihood of success on the merits and, therefore, that Defendants have failed to show a likelihood of success on the merits. As discussed in detail in the Memorandum Ruling, all of the Defendants likely "significantly encouraged" and/or "jointly participated" with the social-media companies to engage in viewpoint-based suppression of protected free speech. Additionally, the White House Defendants[9] and the Surgeon General Defendants[10] were found to have likely engaged in coercion of social-media companies.

The following are a few examples of actions taken by Defendants that demonstrate they are unlikely to succeed on the merits.

### 1.    White House Defendants

(a)    On January 23, 2021, White House Digital Director for COVID-19 Response Team Clarke Humphrey emailed Twitter and requested the removal of an anti-COVID-19 vaccine tweet by Robert F. Kennedy, Jr.[11]

(b)    On April 14, 2021, White House Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty") demanded censorship by Facebook of a video of Fox News hosts Tucker Carlson and Tomi Lahren where Tucker Carlson was saying COVID-19 vaccines don't work and Tomi Lahren was saying she won't take a COVID-19 vaccine.[12] Flaherty demanded immediate answers from Facebook on April 16, 2021, in relation to the video, and on

---

[8] [Doc. No. 294]
[9] White House Defendants consist of President Joseph R. Biden ("President Biden"), White House Press Secretary Karine Jean-Pierre ("Jean-Pierre"), Ashley Morse ("Morse"), Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Stuart F. Delery ("Delery"), Mina Hsiang ("Hsiang"), and Dr. Hugh Auchincloss (Dr. Auchincloss")
[10] Surgeon General Defendants consists of Dr. Vivek H. Murthy ("Murthy") and Katharine Dealy ("Dealy").
[11] [Doc. No. 293 at 9]
[12] [Doc. No. 293 at 16]

April 21, 2021, despite not violating Facebook's policies, Facebook gave the video a 50% reduction for seven days and stated it would continue to demote the video.[13]

### 2. Surgeon General Defendants

(a)     Senior Advisor to the Surgeon General Eric Waldo ("Waldo") testified that Surgeon General Dr. Vivek H. Murthy ("Murthy") used his office to advocate for social-media platforms to take stronger actions against "health misinformation," which involved putting pressure on social-media platforms to reduce the dissemination of health misinformation. That message was given to social-media platforms both publicly and privately.[14]

(b)     In addition to public statements, Murthy had meetings with social-media companies, called health misinformation "poison," and called for social-media companies to do more to control the reach of health disinformation. When Murthy was calling posts "health disinformation," he was referring to anti-vaccine posts.[15]

### 3. CDC Defendants[16]

(a)     The CDC Defendants consistently had regular contact with social-media platforms via email, phone, and in-person meetings. The CDC Defendants received CrowdTangle reports from Facebook as to the "top engaged COVID and vaccine related content.[17]

(b)     The CDC Defendants provided PowerPoint slide decks to Facebook, which provided examples of misinformation topics and made recommendations to Facebook as to whether claims were true or false. Some of the items designated as false by the CDC Defendants

---

[13] [Doc. No. 297 at 17-18]
[14] [Doc. No. 293 at 28]
[15] [Doc. No. 293 at 31-33]
[16] The CDC Defendants consist of the Centers for Disease Control & Prevention, Carol Crawford ("Crawford"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), United States Census Bureau ("Census Bureau"), Jennifer Shopkorn ("Shopkorn"), the Department of Health and Human Services ("HHS"), Xavier Becerra ("Becerra"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), and Joshua Peck ("Peck").
[17] [Doc. No. 293 at 39]

167a

included medically debatable topics such as whether COVID-19 had a 99.96% survival rate, whether COVID-19 vaccines weaken the immune system, and the safety of COVID-19 vaccines.[18]

### 4. NIAID Defendants[19]

(a)     Dr. Francis Collins sent an email to Dr. Anthony Fauci on October 8, 2020, which stated that the Great Barrington Declaration[20] needed to have a "quick and devastating take-down."[21]

(b)     Dr. Fauci sent back information to "debunk" The Great Barrington Declaration and both Dr. Collins and Dr. Fauci followed up with a series of public media statements attacking the Great Barrington Declaration. Thereafter the Great Barrington Declaration was censored by social-media platforms.[22]

### 5. FBI Defendants[23]

(a)     The FBI Defendants, along with numerous social-media platforms, CISA, and the Department of Homeland Security, met consistently at Industry Meetings. The Industry Meetings were used by the FBI Defendants and others to discuss election disinformation.[24]

(b)     Prior to the 2020 Presidential election, the FBI repeatedly warned social-media companies to be alert for "hack and dump" or "hack and leak" operations. The Hunter Biden laptop story was published by the Washington Post on October 14, 2020. After being asked by Facebook whether the Hunter Biden laptop story was Russian disinformation, the FBI's Laura Dehmlow

---

[18] [Doc. No. 293 at 41-44]
[19] The NIAD Defendants consist of the National Institute of Allergy and Infectious Disease and Dr. Hugh Auchincloss ("Dr. Auchincloss").
[20] [Doc. No. 293 at 55]
[21] The Great Barrington Declaration is a one-page treatise opposing the reliance of lockdowns, criticized social distancing, and expressed concerns about physical and mental health impacts of lockdowns.
[22] [Doc. No. 293 at 54]
[23] FBI Defendants include Elvis Chan ("Chan"), the Federal Bureau of Investigation ("FBI"), Lauren Dehmlow ("Dehmlow"), and the U.S. Department of Justice ("DOJ").
[24] [Doc. No. 293 at 54]

168a

refused to comment, leading Facebook to suppress the story. The FBI had had the laptop since December of 2019, and knew that the story was not Russian disinformation.[25]

### 6.   CISA Defendants[26]

(a)     The CISA Defendants regularly met with social-media platforms at several types of meetings. At those meetings, disinformation was discussed as well as reports about social-media companies' changes to censorship policies.[27] CISA had five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of protected free speech on social media.[28]

(b)     The CISA Defendants collaborated with the Election Integrity Partnership, working with them in a "switchboarding" operation which reported alleged election misinformation to social-media companies. The alleged election misinformation included claims that "mail-in voting is insecure" and "theories about election fraud are hard to discount."[29]

(c)     CISA Director Jen Easterly views the word "infrastructure" expressively to include our "cognitive infrastructure," which deals with the way people acquire knowledge and understanding.[30]

### 7.   State Department Defendants[31]

(a)     The State Department Defendants worked closely and collaborated with the Election Integrity Partnership and the Virality Project, who forwarded alleged election

---

[25] [Doc. No. 293 at 61-63]

[26] CISA Defendants consist of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"), Kim Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").

[27] [Doc. No. 293 at 68-69]

[28] [Doc. No. 293 at 75]

[29] [Doc. No. 293 at 70-74]

[30] [Doc. No. 293 at 77]

[31] The State Department Defendants consist of the United States Department of State, Leah Bray ("Bray"), Daniel Kimmage ("Kimmage'), and Alex Frisbie ("Frisbie").

misinformation and COVID-19 misinformation to social-media companies.[32] The alleged misinformation related to content by American citizens. The alleged disinformation primarily involved social media posts which delegitimized election results,[33] and posts which involved anti-vaccine content by such personalities as Alex Berenson, Candace Owens, Tucker Carlson, and John F. Kennedy, Jr.[34]

(b)     The Election Integrity Partnership was designed "to get around unclear legal authorities, including very real First Amendment questions" that would arise if government agencies were to monitor and flag information for censorship on social media.[35]

## B.     Standing

Defendants further argue that they will prevail as to establishing that Plaintiffs lack Article III standing. For the reasons set forth previously in the Memorandum Ruling[36] this Court found all of the Plaintiffs are likely to establish all elements of Article III standing. Defendants argue the States of Missouri and Louisiana do not have *parens patriae* standing to bring a claim against the Federal Government. This Court disagrees. In *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), the United States Supreme Court concluded that *Massachusetts* had standing to sue the E.P.A. to protect its *quasi-sovereign* interests. The court clarified that because *Massachusetts* sought to assert its rights under federal law, rather than challenge the federal law's application for its citizens, the *State of Massachusetts* had standing. Like *Massachusetts*, the States of Missouri and Louisiana are asserting their rights under the First Amendment to the United States Constitution, and also asserting rights under each Plaintiff States' own constitution. The Plaintiff States are likely to

---

[32] [Doc. No. 293 at 79-81]
[33] [Doc. No. 293 at 81]
[34] [Doc. No. 293 at 86]
[35] [Doc. No. 293 at 73].
[36] [Doc. No. 293 at 119-139] (see also [Doc. No. 214] (Memorandum Ruling Denying Defendants' Motion to Dismiss))

prevail on their standing argument because they have adequately alleged (and provided evidence supporting) injuries to their *quasi-sovereign* interest as well as direct censorship injuries on social-media.

There are also individual Plaintiffs in this case. Only one Plaintiff with standing is required to be able to maintain this suit. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Defendants argue that the individual Plaintiffs' standing have not shown "irreparable harm." The individual Plaintiffs' standing analysis is set forth in the Memorandum Ruling.[37] The "irreparable harm" element was also specifically discussed in the Memorandum Ruling.[38] Violation of a First Amendment Constitutional right, even for a short period of time, is always irreparable injury. *Elrod v. Burns*., 427 U.S. 347 (1976). Accordingly, for the reasons set forth previously, the Plaintiffs have shown there is a substantial risk that future harm is likely to occur and that they are likely to satisfy the requirements of Article III standing.

### C.    Public Interest and Harm

Defendants further maintain they will be irreparably injured absent a stay, and that the balance of the equities weighs heavily in the Defendants' favor of granting a stay. Again, this Court disagrees. As discussed in the Memorandum Ruling,[39] the First Amendment free speech rights of Plaintiffs by far outweighs the Defendants' interests.

Defendants argue that the injunction may be read to prevent the Defendants from engaging in a vast range of lawful conduct—including speaking on matters of public concern and working with social-media companies on initiatives to prevent grave harm to the American people and our democratic processes. However, the Preliminary Injunction only prohibits what the Defendants

---

[37] [Id. at 126-135]
[38] [Id. at 139-140]
[39] [Id. at 144-45]

have no right to do—urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech on social-media platforms. The Defendants provide no argument that they are legally allowed to take such action. The Defendants are asking the Court to grant them relief to a Preliminary Injunction that only bars illegal conduct. In other words, the only effect of staying the Preliminary Injunction would be to free Defendants to urge, encourage, pressure, or induce the removal, deletion, suppression, or reduction of content containing protected free speech on social-media platforms.

The Preliminary Injunction also has several exceptions which list things that are **NOT** prohibited. The Preliminary Injunction allows Defendants to exercise permissible public government speech promoting government policies or views on matters of public concern, to inform social-media companies of postings involving criminal activity, criminal conspiracies, national security threats, extortion, other threats, criminal efforts to suppress voting, providing illegal campaign contributions, cyber-attacks against election infrastructure, foreign attempts to influence elections, threats against the public safety or security of the United States, postings intending to mislead voters about voting requirements, procedures, preventing or mitigating malicious cyber activity, and to inform social-media companies about speech not protected by the First Amendment.

Defendants cite no specific action that would be prohibited by this Preliminary Injunction that would provide grave harm to the American people or over democratic processes. In fact, in opposition to the Motion for Preliminary Injunction, Defendants submitted five Declarations[40] that addressed Defendants' concerns. Every one of these concerns was addressed in the Preliminary

---

[40] Leah Bray [Doc. No. 226-6 at 198-296] (foreign propaganda); Larissa Knapp [Doc. No. 266-6 at 448-47] (crimes, threats, national security threats); Brandon Wales [Doc. No. 266-6 at 553-572] (malicious cyber activity); Max Lesko [Doc. No. 266-4 at 130-178] (commission of public health issues); and Carol Crawford [Doc. No. 266-5 at 67-77] (public health information)

Injunction exceptions. An enjoined party must identify a specific concern that the injunction will prohibit. *Regal Knitwear Co. v. N.L.R.B.*, 65 S. Ct. 478, 482 (1945). Defendants have failed to do so. Therefore, the Defendants would not be irreparably harmed, and the balance of equities and harm weighs in favor of Plaintiffs, not Defendants.

### D.    Specificity of Preliminary Injunction

Additionally, Defendants argue that the Preliminary Injunction is sweeping in scope and vague in its terms.[41] A Preliminary Injunction must describe in reasonable detail the act or acts restrained or required. FED. R. CIV. P. 65.  An ordinary person reading the Court's order must be able to ascertain from the document itself exactly what conduct is proscribed or prohibited. *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). Defendants argue that both the prohibited conduct and the conduct that is not prohibited is vague.

Defendants first argue the definition of "protected free speech" is vague because it refers to jurisprudence of the United States Supreme Court, The United States Courts of Appeal, and United States District Courts. Defendants question whether an agency official would be required to research the laws of every federal court to determine what is "protected free speech."

In order to clarify the definition of "protected free speech" in the Preliminary Injunction, this Court will modify the definition of "protected free speech" in n. 3 to read as follows:

> "Protected free speech" means speech which is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with the jurisprudence of the United States Supreme Court.

Although general "obey the law" injunctions are normally too vague to form the basis of an injunction, language in an injunction to prohibit future violations of a statute will be upheld when it relates to the type of acts the Defendants are alleged to have committed. *NLRB. V. Express*

---

[41] [Doc. No. 297-1 at 3]

*Pub. Co.*, 61 S. Ct. 693, 699 (1941); *Interstate Commerce Commission v. Keeshin Motor Exp. Co.*, 134 F.2d 228, 231, (7th Cir. 1943) cert. den. 64 S. Ct. 38 ( 1943).

The Preliminary Injunction at issue prohibits the Defendants from taking the described actions with social-media companies as to "protected free speech," which is defined by jurisprudence of the United States Supreme Court. The actions prohibited are the type of actions the Defendants are alleged to have committed. Therefore, the reference to United States Supreme Court jurisprudence is not vague. Defendant officials can be and should be trained to recognize what speech is protected and what speech is not prior to working with social-media companies to suppress or delete postings. Additionally, the exceptions to the Free Speech Clause of the First Amendment are "well-defined and narrowly limited classes of speech." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010).

Defendants further argue that the exemption in the Preliminary Injunction, which allows the Government to exercise permissible government speech promoting government policies or views on matters of public concern, is vague in light of references in the Memorandum Ruling to government speech by the White House Defendants and the Surgeon General Defendants.[42] It is clear that the Preliminary Injunction does not prohibit government speech. The portion of the Memorandum Ruling addressing Defendants' government speech argument[43] clearly notes that the government speech was not a First Amendment violation. Rather, it was the use of government agencies and employees to coerce and/or significantly encourage social-media platforms to suppress free speech on their platforms. Therefore, the government speech exception in the Preliminary Injunction is not ambiguous or vague.

---

[42] [Doc. No. 294 at 6]
[43] [Doc. No. 293 at 118-119].

Defendants further allege that the injunction is not clear what entities or individuals are covered because the Preliminary Injunction names entire agencies which are composed of many sub-components. Defendants noted that the Preliminary Injunction did not enjoin the Food and Drug Administration ("FDA") but enjoined the Department of Health and Human Services, of whom the FDA is a part.

The Motion for Preliminary Injunction is clearly denied as to the FDA, along with the other entities specifically noted. FED. R. CIV. P. Rule 65 not only prohibits the party Defendants, but also those identified with them in interest, in priority with them, represented by them, or subject to their control. *Regal Knitwear Co. v. N.L.R.B.*, 65 S. Ct. 478, 481 (1945). An injunctive order also binds the party's officers, agents, servants, employees, attorneys, and those persons in active concert with them who receive actual notice of the order. *U.S. v. Hall*, 472 F.2d 261, 267, (5th Cir. 1972). FED R. CIV. P. Rule 65(d) specifically allows an agency's officers, agents, servants, employees, and attorneys to be bound. Therefore, the Preliminary Injunction is not vague or ambiguous as to the entities or individuals who are covered. If Defendants' interpretation was accepted, an agency could simply instruct a sub-agency to perform the prohibited acts and avoid the consequences of an injunction.

## III. CONCLUSION

Plaintiffs are likely to prove that all of the enjoined Defendants coerced, significantly encouraged, and/or jointly participated social-media companies to suppress social-media posts by American citizens that expressed opinions that were anti-COVID-19 vaccines, anti-COVID-19 lockdowns, posts that delegitimized or questioned the results of the 2020 election, and other content not subject to any exception to the First Amendment. These items are protected free speech

and were seemingly censored because of the viewpoints they expressed. Viewpoint discrimination is subject to strict scrutiny.

Although this Preliminary Injunction involves numerous agencies, it is not as broad as it appears. It only prohibits something the Defendants have no legal right to do—contacting social-media companies for the purpose of urging, encouraging, pressuring, or inducing in any manner, the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms. It also contains numerous exceptions.

Therefore, for the reasons set forth herein,

The Defendants' Motion to Stay [Doc. No. 297] is **DENIED**.

**MONROE, LOUISIANA**, this 10th day of July 2023.

_____
**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

176a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**STATE OF MISSOURI ET AL**                    **CIVIL ACTION NO. 3:22-cv-1213**

**VERSUS**                                     **JUDGE TERRY A. DOUGHTY**

**JOSEPH R BIDEN JR ET AL**                    **MAG. JUDGE KAYLA D. MCCLUSKY**

## JUDGMENT ON MOTION TO STAY

For the reasons set forth in the Memorandum Ruling on Motion to Stay,

**IT IS ORDERED, ADJUDGED, AND DECREED** that the definition of "protected free speech" in the Memorandum Ruling [Doc. No. 294, at p.4, n.3] shall be amended to read as follows:

> "Protected free speech" means speech which is protected by the Free Speech Clause of the First Amendment of the United States Constitution in accordance with the jurisprudence of the United States Supreme Court.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Stay Preliminary Injunction Pending Appeal, and Alternatively, for Administrative Stay [Doc. No. 297] is **DENIED.**

**MONROE, LOUISIANA**, this 10th day of July 2023.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

# United States Court of Appeals for the Fifth Circuit

---

No. 23-30445

---

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

*Plaintiffs—Appellees,*

*versus*

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI; ET AL.,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:22-CV-1213

---

## UNPUBLISHED ORDER

Before STEWART, GRAVES, and OLDHAM, *Circuit Judges.*

PER CURIAM:

IT IS ORDERED that this appeal is EXPEDITED to the next available Oral Argument Calendar.

IT IS FURTHER ORDERED that a temporary administrative stay is GRANTED until further orders of the court.

IT IS FURTHER ORDERED that Appellants' opposed motion for stay pending appeal is deferred to the oral argument merits panel which receives this case.

179a

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 8, 2023

Lyle W. Cayce
Clerk

No. 23-30445

————————

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

*Plaintiffs—Appellees*,

*versus*

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI; ET AL.,

*Defendants—Appellants*.

————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:22-CV-1213

————————————————

Before CLEMENT, ELROD, and WILLETT, *Circuit Judges*.

PER CURIAM:

A group of social-media users and two states allege that numerous federal officials coerced social-media platforms into censoring certain social-media content, in violation of the First Amendment. We agree, but only as to some of those officials. So, we AFFIRM in part, REVERSE in part, VACATE the injunction in part, and MODIFY the injunction in part.

180a

No. 23-30445

# I.

For the last few years—at least since the 2020 presidential transition—a group of federal officials has been in regular contact with nearly every major American social-media company about the spread of "misinformation" on their platforms. In their concern, those officials—hailing from the White House, the CDC, the FBI, and a few other agencies—urged the platforms to remove disfavored content and accounts from their sites. And, the platforms seemingly complied. They gave the officials access to an expedited reporting system, downgraded or removed flagged posts, and deplatformed users. The platforms also changed their internal policies to capture more flagged content and sent steady reports on their moderation activities to the officials. That went on through the COVID-19 pandemic, the 2022 congressional election, and continues to this day.

Enter this lawsuit. The Plaintiffs—three doctors, a news website, a healthcare activist, and two states[1]—had posts and stories removed or downgraded by the platforms. Their content touched on a host of divisive topics like the COVID-19 lab-leak theory, pandemic lockdowns, vaccine side-effects, election fraud, and the Hunter Biden laptop story. The Plaintiffs maintain that although the platforms stifled their speech, the government officials were the ones pulling the strings—they "coerced, threatened, and pressured [the] social-media platforms to censor [them]" through private

---

[1] Specifically, the Plaintiffs are (1) Jayanta Bhattacharya and Martin Kulldorff, two epidemiologists who co-wrote the Great Barrington Declaration, an article criticizing COVID-19 lockdowns; (2) Jill Hines, an activist who spearheaded "Reopen Louisiana"; (3) Aaron Kheriaty, a psychiatrist who opposed lockdowns and vaccine mandates; (4) Jim Hoft, the owner of the Gateway Pundit, a once-deplatformed news site; and (5) Missouri and Louisiana, who assert their sovereign and quasi-sovereign interests in protecting their citizens and the free flow of information. Bhattacharya, Kulldorff, Hines, Kheriaty, and Hoft, collectively, are referred to herein as the "Individual Plaintiffs." Missouri and Louisiana, together, are referred to as the "State Plaintiffs."

181a

No. 23-30445

communications and legal threats. So, they sued the officials[2] for First Amendment violations and asked the district court to enjoin the officials' conduct. In response, the officials argued that they only "sought to mitigate the hazards of online misinformation" by "calling attention to content" that violated the "platforms' policies," a form of permissible government speech.

The district court agreed with the Plaintiffs and granted preliminary injunctive relief. In reaching that decision, it reviewed the conduct of several federal offices, but only enjoined the White House, the Surgeon General, the CDC, the FBI, the National Institute of Allergy and Infectious Diseases (NIAID), the Cybersecurity and Infrastructure Security Agency (CISA), and the Department of State. We briefly review—per the district court's order and the record—those officials' conduct.

### A.

Considering their close cooperation and the ministerial ecosystem, we take the White House and the Surgeon General's office together. Officials from both offices began communicating with social media companies—

---

[2] The defendant-officials include (1) the President; (2) his Press Secretary; (3) the Surgeon General; (4) the Department of Health and Human Services; (5) the HHS's Director; (6) Anthony Fauci in his capacity as the Director of the National Institute of Allergy and Infectious Diseases; (7) the NIAID; (8) the Centers for Disease Control; (9) the CDC's Digital Media Chief; (10) the Census Bureau; (11) the Senior Advisor for Communications at the Census Bureau; (12) the Department of Commerce; (13) the Secretary of the Department of Homeland Security; (14) the Senior Counselor to the Secretary of the DHS; (15) the DHS; (16) the Cybersecurity and Infrastructure Security Agency; (17) the Director of CISA; (18) the Department of Justice; (19) the Federal Bureau of Investigation; (20) a special agent of the FBI; (21) a section chief of the FBI; (22) the Food and Drug Administration; (23) the Director of Social Media at the FDA; (24) the Department of State; (25) the Department of Treasury; (26) the Department of Commerce; and (27) the Election Assistance Commission. The Plaintiffs also sued a host of various advisors, officials, and deputies in the White House, the FDA, the CDC, the Census Bureau, the HHS, and CISA. Note that some of these officials were not enjoined and, therefore, are not mentioned again in this opinion.

including Facebook, Twitter (now known as "X"), YouTube, and Google—in early 2021. From the outset, that came with requests to take down flagged content. In one email, a White House official told a platform to take a post down "ASAP," and instructed it to "keep an eye out for tweets that fall in this same [] genre" so that they could be removed, too. In another, an official told a platform to "remove [an] account immediately"—he could not "stress the degree to which this needs to be resolved immediately." Often, those requests for removal were met.

But, the White House officials did not only flag content. Later that year, they started monitoring the platforms' moderation activities, too. In that vein, the officials asked for—and received—frequent updates from the platforms. Those updates revealed, however, that the platforms' policies were not clear-cut and did not always lead to content being demoted. So, the White House pressed the platforms. For example, one White House official demanded more details and data on Facebook's internal policies at least twelve times, including to ask what was being done to curtail "dubious" or "sensational" content, what "interventions" were being taken, what "measurable impact" the platforms' moderation policies had, "how much content [was] being demoted," and what "misinformation" was not being downgraded. In one instance, that official lamented that flagging did not "historically mean[] that [a post] was removed." In another, the same official told a platform that they had "been asking [] pretty directly, over a series of conversations" for "what actions [the platform has] been taking to mitigate" vaccine hesitancy, to end the platform's "shell game," and that they were "gravely concerned" the platform was "one of the top drivers of vaccine hesitancy." Another time, an official asked why a flagged post was "still up" as it had "gotten pretty far." The official queried "how does something like that happen," and maintained that "I don't think our position is that you should remove vaccine hesitant stuff," but "slowing it down seems

Case: 23-30445   Document: 238-1   Page: 5   Date Filed: 09/08/2023
Case: 23-30445   Document: 161-1   Page: 510   Date Filed: 07/08/2023

183a

No. 23-30445

reasonable." Always, the officials asked for more data and stronger "intervention[s]."

From the beginning, the platforms cooperated with the White House. One company made an employee "available on a regular basis," and another gave the officials access to special tools like a "Partner Support Portal" which "ensure[d]" that their requests were "prioritized automatically." They all attended regular meetings. But, once White House officials began to demand more from the platforms, they seemingly stepped-up their efforts to appease the officials. When there was confusion, the platforms would call to "clear up" any "misunderstanding[s]" and provide data detailing their moderation activities. When there was doubt, they met with the officials, tried to "partner" with them, and assured them that they were actively trying to "remove the most harmful COVID-19 misleading information." At times, their responses bordered on capitulation. One platform employee, when pressed about not "level[ing]" with the White House, told an official that he would "continue to do it to the best of [his] ability, and [he will] expect [the official] to hold [him] accountable." Similarly, that platform told the Surgeon General that "[w]e're [] committed to addressing the [] misinformation that you've called on us to address." The platforms were apparently eager to stay in the officials' good graces. For example, in an effort to get ahead of a negative news story, Facebook preemptively reached out to the White House officials to tell them that the story "doesn't accurately represent the problem or the solutions we have put in place."

The officials were often unsatisfied. They continued to press the platforms on the topic of misinformation throughout 2021, especially when they seemingly veered from the officials' preferred course. When Facebook did not take a prominent pundit's "popular post[]" down, a White House official asked "what good is" the reporting system, and signed off with "last time we did this dance, it ended in an insurrection." In another message, an

No. 23-30445

official sent Facebook a Washington Post article detailing the platform's alleged failures to limit misinformation with the statement "[y]ou are hiding the ball." A day later, a second official replied that they felt Facebook was not "trying to solve the problem" and the White House was "[i]nternally . . . considering our options on what to do about it." In another instance, an official—demanding "assurances" that a platform was taking action—likened the platform's alleged inaction to the 2020 election, which it "helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform."

To ensure that problematic content was being taken down, the officials—via meetings and emails—pressed the platforms to change their moderation policies. For example, one official emailed Facebook a document recommending changes to the platform's internal policies, including to its deplatforming and downgrading systems, with the note that "this is circulating around the building and informing thinking." In another instance, the Surgeon General asked the platforms to take part in an "all-of-society" approach to COVID by implementing stronger misinformation "monitoring" programs, redesigning their algorithms to "avoid amplifying misinformation," targeting "repeat offenders," "[a]mplify[ing] communications from trusted . . . experts," and "[e]valuat[ing] the effectiveness of internal policies."

The platforms apparently yielded. They not only continued to take down content the officials flagged, and provided requested data to the White House, but they also changed their moderation policies expressly in accordance with the officials' wishes. For example, one platform said it knew its "position on [misinformation] continues to be a particular concern" for the White House, and said it was "making a number of changes" to capture and downgrade a "broader set" of flagged content. The platform noted that, in line with the officials' requests, it would "make sure that these additional

[changes] show results—the stronger demotions in particular should deliver real impact." Another time, a platform represented that it was going to change its moderation policies and activities to fit with express guidance from the CDC and other federal officials. Similarly, one platform noted that it was taking down flagged content which seemingly was not barred under previous iterations of its moderation policy.

Relatedly, the platforms enacted several changes that coincided with the officials' aims shortly after meeting with them. For example, one platform sent out a post-meeting list of "commitments" including a policy "change[]" "focused on reducing the virality" of anti-vaccine content even when it "does not contain actionable misinformation." On another occasion, one platform listed "policy updates . . . regarding repeat misinformation" after meeting with the Surgeon General's office and signed off that "[w]e think there's considerably more we can do in partnership with you and your teams to drive behavior."

Even when the platforms did not expressly adopt changes, though, they removed flagged content that did not run afoul of their policies. For example, one email from Facebook stated that although a group of posts did not "violate our community standards," it "should have demoted them before they went viral." In another instance, Facebook recognized that a popular video did not qualify for removal under its policies but promised that it was being "labeled" and "demoted" anyway after the officials flagged it.

At the same time, the platforms often boosted the officials' activities at their request. For example, for a vaccine "roll out," the officials shared "what [t]he admin's plans are" and "what we're seeing as the biggest headwinds" that the platforms could help with. The platforms "welcome[d] the opportunity" to lend a hand. Similarly, when a COVID vaccine was halted, the White House asked a platform to—through

"hard . . . intervention[s]" and "algorithmic amplification"—"make sure that a favorable review reaches as many people" as possible to stem the spread of alleged misinformation. The officials also asked for labeling of posts and a 24-hour "report-back" period to monitor the public's response. Again, the platforms obliged—they were "keen to amplify any messaging you want us to project," *i.e.*, "the right messages." Another time, a platform told the White House it was "eager" to help with vaccine efforts, including by "amplify[ing]" content. Similarly, a few months later, after the White House shared some of the "administration's plans" for vaccines in an industry meeting, Facebook reiterated that it was "committed to the effort of amplifying the rollout of [those] vaccines."

Still, White House officials felt the platforms were not doing enough. One told a platform that it "remain[ed] concerned" that the platform was encouraging vaccine hesitancy, which was a "concern that is shared at the highest (and I mean highest) levels of the [White House]." So, the official asked for the platform's "road map to improvement" and said it would be "good to have from you all . . . a deeper dive on [misinformation] reduction." Another time, the official responded to a moderation report by flagging a user's account and saying it is "[h]ard to take any of this seriously when you're actively promoting anti-vaccine pages." The platform subsequently "removed" the account "entirely" from its site, detailed new changes to the company's moderation policies, and told the official that "[w]e clearly still have work to do." The official responded that "removing bad information" is "one of the easy, low-bar things you guys [can] do to make people like me think you're taking action." The official emphasized that other platforms had "done pretty well" at demoting non-sanctioned information, and said "I don't know why you guys can't figure this out."

The officials' frustrations reached a boiling point in July of 2021. That month, in a joint press conference with the Surgeon General's office, the

White House Press Secretary said that the White House "expect[s] more" from the platforms, including that they "consistently take action against misinformation" and "operate with greater transparency and accountability." Specifically, the White House called on platforms to adopt "proposed changes," including limiting the reach of "misinformation," creating a "robust enforcement strategy," taking "faster action" because they were taking "too long," and amplifying "quality information." The Press Secretary said that the White House "engag[es] with [the platforms] regularly and they certainly understand what our asks are." She also expressly noted that several accounts, despite being flagged by the White House, "remain active" on a few platforms.

The Surgeon General also spoke at the press conference. He said the platforms were "one of the biggest obstacles" to controlling the COVID pandemic because they had "enabled misinformation to poison" public discourse and "have extraordinary reach." He labeled social-media-based misinformation an "urgent public health threat[]" that was "literally costing . . . lives." He asked social-media companies to "operate with greater transparency and accountability," "monitor misinformation more closely," and "consistently take action against misinformation super-spreaders on their platforms." The Surgeon General contemporaneously issued a public advisory "calling out social media platforms" and saying they "have a role to play to improve [] health outcomes." The next day, President Biden said that the platforms were "killing people" by not acting on misinformation. Then, a few days later, a White House official said they were "reviewing" the legal liability of platforms—noting "the president speak[s] very aggressively about" that—because "they should be held accountable."

The platforms responded with total compliance. Their answer was four-fold. First, they capitulated to the officials' allegations. The day after the President spoke, Facebook asked what it could do to "get back to a good

place" with the White House. It sought to "better understand . . . what the White House expects from us on misinformation going forward." Second, the platforms changed their internal policies. Facebook reached out to see "how we can be more transparent," comply with the officials' requests, and "deescalate" any tension. Others fell in line, too—YouTube and Google told an official that they were "working on [it]" and relayed the "steps they are currently taking" to do better. A few days later, Facebook told the Surgeon General that "[w]e hear your call for us to do more," and wanted to "make sure [he] saw the steps [it took]" to "adjust policies on what we are removing with respect to misinformation," including "expand[ing] the group of false claims" that it removes. That included the officials' "specific recommendations for improvement," and the platform "want[ed] to make sure to keep [the Surgeon General] informed of [its] work on each."

Third, the platforms began taking down content and deplatforming users they had not previously targeted. For example, Facebook started removing information posted by the "disinfo dozen"—a group of influencers identified as problematic by the White House—despite earlier representations that those users were not in violation of their policies. In general, the platforms had pushed back against deplatforming users in the past, but that changed. Facebook also made other pages that "had not yet met their removal thresholds[] more difficult to find on our platform," and promised to send updates and take more action. A month later, members of the disinfo dozen were deplatformed across several sites. Fourth, the platforms continued to amplify or assist the officials' activities, such as a vaccine "booster" campaign.

Still, the White House kept the pressure up. Officials continuously expressed that they would keep pushing the platforms to act. And, in the following year, the White House Press Secretary stressed that, in regard to problematic users on the platforms, the "President has long been concerned

No. 23-30445

about the power of large" social media companies and that they "must be held accountable for the harms they cause." She continued that the President "has been a strong supporter of fundamental reforms to achieve that goal, including reforms to [S]ection 230, enacting antitrust reforms, requiring more transparency, and more." Per the officials, their back-and-forth with the platforms continues to this day.

**B.**

Next, we turn to the CDC. Much like the White House officials, the CDC tried to "engage on a [] regular basis" with the platforms. They also received reports on the platforms' moderation activities and policy updates. And, like the other officials, the CDC also flagged content for removal that was subsequently taken down. In one email, an official mentioned sixteen posts and stated, "[W]e are seeing a great deal of misinfo [] that we wanted to flag for you all." In another email, CDC officials noted that flagged content had been removed. And, the CDC actively sought to promote its officials' views over others. For example, they asked "what [was] being done on the amplification-side" of things.

Unlike the other officials, though, the CDC officials also provided direct guidance to the platforms on the application of the platforms' internal policies and moderation activities. They did so in three ways. First, CDC officials authoritatively told the platforms what was (and was not) misinformation. For example, in meetings—styled as "Be On the Lookout" alerts—officials educated the platforms on "misinformation[] hot topics." Second, CDC officials asked for, or at least encouraged, harmonious changes to the platforms' moderation policies. One platform noted that "[a]s soon as the CDC updates [us]," it would change information on its website to comply with the officials' views. In that same email, the platform said it was expanding its "misinfo policies" and it was "able to make this change based

on the conversation we had last week with the CDC." In another email, a platform noted "several updates to our COVID-19 Misinformation and Harm policy based on your inputs." Third, through its guidance, the CDC outright directed the platforms to take certain actions. In one post-meeting email, an official said that "as mentioned on the call, any contextual information that can be added to posts" on some alleged "disinformation" "could be very effective."

Ultimately, the CDC's guidance informed, if not directly affected, the platforms' moderation decisions. The platforms sought answers from the officials as to whether certain controversial claims were "true or false" and whether related posts should be taken down as misleading. The CDC officials obliged, directing the platforms as to what was or was not misinformation. Such designations directly controlled the platforms' decision-making process for the removal of content. One platform noted that "[t]here are several claims that we will be able to remove as soon as the CDC debunks them; until then, we are unable to remove them."

## C.

Next, we consider the conduct of the FBI officials. The agency's officials regularly met with the platforms at least since the 2020 election. In these meetings, the FBI shared "strategic information with [] social-media companies" to alert them to misinformation trends in the lead-up to federal elections. For example, right before the 2022 congressional election, the FBI tipped the platforms off to "hack and dump" operations from "state-sponsored actors" that would spread misinformation through their sites. In another instance, they alerted the platforms to the activities and locations of "Russian troll farms." The FBI apparently acquired this information from ongoing investigations.

Per their operations, the FBI monitored the platforms' moderation policies, and asked for detailed assessments during their regular meetings. The platforms apparently changed their moderation policies in response to the FBI's debriefs. For example, some platforms changed their "terms of service" to be able to tackle content that was tied to hacking operations.

But, the FBI's activities were not limited to purely foreign threats. In the build up to federal elections, the FBI set up "command" posts that would flag concerning content and relay developments to the platforms. In those operations, the officials also targeted domestically sourced "disinformation" like posts that stated incorrect poll hours or mail-in voting procedures. Apparently, the FBI's flagging operations across-the-board led to posts being taken down 50% of the time.

## D.

Finally, we briefly discuss the remaining offices, namely the NIAID, CISA, and the State Department. Generally speaking, the NIAID did not have regular contact with the platforms or flag content. Instead, NIAID officials were—as evidenced by internal emails—concerned with "tak[ing] down" (*i.e.*, discrediting) opposing scientific or policy views. On that front, Director Anthony Fauci publicly spoke in favor of certain ideas (*e.g.*, COVID lockdowns) and against others (*e.g.*, the lab-leak theory). In doing so, NIAID officials appeared on podcasts and livestreams on some of the platforms. Apparently, the platforms subsequently demoted posts that echoed or supported the discredited views.

CISA and the State Department, on the other hand, both communicated directly with the platforms. The State Department hosted meetings that were meant to "facilitate []] communication" with the platforms. In those meetings, they educated the platforms on the "tools and techniques" that "malign" or "foreign propaganda actors" (*e.g.*, terrorist

No. 23-30445

groups, China) were using to spread misinformation. Generally, the State Department officials did not flag content, suggest policy changes, or reciprocally receive data during those meetings.

CISA, however, did flag content. Beyond holding regular industry meetings with the platforms, CISA officials engaged in "switchboarding" operations, meaning they acted as an intermediary for a third-party group by forwarding flagged content from them to the platforms. For example, during a federal election, CISA officials would receive "something on social media that [local election officials] deemed to be disinformation aimed at their jurisdiction" and, in turn, CISA would "share [that] with the appropriate social media compan[y]." In switchboarding, CISA officials worked alongside the Center for Internet Security and the Election Integrity Project, two private organizations. The officials' actions apparently led to content being removed or demoted by the recipient platforms.

\* \* \*

Relying on the above record, the district court concluded that the officials, via both private and public channels, asked the platforms to remove content, pressed them to change their moderation policies, and threatened them—directly and indirectly—with legal consequences if they did not comply. And, it worked—that "unrelenting pressure" forced the platforms to act and take down users' content. Notably, though, those actions were not limited to private actors. Accounts run by state officials were often subject to censorship, too. For example, one platform removed a post by the Louisiana Department of Justice—which depicted citizens testifying against public policies regarding COVID—for violating its "medical misinformation policy" by "spread[ing] medical misinformation." In another instance, a platform took down a Louisiana state legislator's post discussing COVID vaccines. Similarly, one platform removed several videos, namely

No. 23-30445

testimonials regarding COVID, posted by St. Louis County. So, the district court reasoned, the Plaintiffs were "likely to succeed" on their claim because when the platforms moderated content, they were acting under the coercion (or significant encouragement) of government officials, in violation of the First Amendment, at the expense of both private and governmental actors.

In addition, the court found that considerations of equity weighed in favor of an injunction because of the clear need to safeguard the Plaintiffs' First Amendment rights. Finally, the court ruled that the Plaintiffs had standing to bring suit under several different theories, including direct First Amendment censorship and, for the State Plaintiffs, quasi-sovereign interests as well. Consequently, the district court entered an injunction against the officials barring them from an assortment of activities, including "meeting with," "communicat[ing]" with, or "flagging content" for social-media companies "for the purpose of urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech." The officials appeal.

## II.

We review the district court's standing determination *de novo*. *Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 507 (5th Cir. 2019). "We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*. Whether an injunction fulfills the mandates of Fed. R. Civ. P. 65(d) is a question of law we review *de novo*." *Louisiana v. Biden*, 45 F.4th 841, 845 (5th Cir. 2022) (internal quotation marks and citation omitted).

## III.

We begin with standing. To establish Article III standing, the Plaintiffs bear the burden to show "[1] an injury in fact [2] that is fairly traceable to the challenged action of the defendant and [3] likely to be redressed by [their]

requested relief." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Because the Plaintiffs seek injunctive relief, the injury-in-fact and redressability requirements "intersect[]" and therefore the Plaintiffs must "demonstrat[e] a continuing injury or threatened future injury," not a past one. *Id.* "At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citations omitted). The presence of any *one* plaintiff with standing to pursue injunctive relief as to the Plaintiffs' First-Amendment claim satisfies Article III's case-or-controversy requirement. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

## A.

An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). "For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (quoting *Stringer*, 942 F.3d at 721). Past harm can constitute an injury-in-fact for purposes of pursuing injunctive relief if it causes "continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Otherwise, "'[p]ast wrongs are evidence' of the likelihood of a future injury but 'do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy.'" *Crawford*, 1 F.4th at 375 (quoting *Lyons*, 461 U.S. at 102–03) (alteration adopted).

Each of the Individual Plaintiffs has shown *past* injury-in-fact. Bhattacharya's and Kulldorff's sworn declarations allege that their article,

the Great Barrington Declaration, which was critical of the government's COVID-related policies such as lockdowns, was "deboosted" in Google search results and removed from Facebook and Reddit, and that their roundtable discussion with Florida Governor Ron DeSantis concerning mask requirements in schools was removed from YouTube. Kulldorff also claimed censorship of his personal Twitter and LinkedIn accounts due to his opinions concerning vaccine and mask mandates; both accounts were suspended (although ultimately restored). Kheriaty, in his sworn declaration, attested to the fact that his Twitter following was "artificially suppressed" and his posts "shadow bann[ed]" so that they did not appear in his followers' feeds due to his views on vaccine mandates and lockdowns, and that a video of one of his interviews concerning vaccine mandates was removed from YouTube (but ultimately re-posted). Hoft—founder, owner, and operator of news website The Gateway Pundit—submitted a sworn declaration averring that The Gateway Pundit's Twitter account was suspended and then banned for its tweets about vaccine mandates and election fraud, its Facebook posts concerning COVID-19 and election security were either banned or flagged as false or misinformation, and a YouTube video concerning voter fraud was removed. Hoft's declaration included photographic proof of the Twitter and Facebook censorship he had suffered. And Hines's declaration swears that her personal Facebook account was suspended and the Facebook posts of her organization, Health Freedom Louisiana, were censored and removed for their views on vaccine and mask mandates.

The officials do not contest that these past injuries occurred. Instead, they argue that the Individual Plaintiffs have failed to demonstrate that the harm from these past injuries is ongoing or that similar injury is likely to reoccur in the future, as required for standing to pursue injunctive relief. We disagree with both assertions.

196a

No. 23-30445

All five Individual Plaintiffs have stated in sworn declarations that their prior censorship has caused them to self-censor and carefully word social-media posts moving forward in hopes of avoiding suspensions, bans, and censorship in the future. Kulldorff, for example, explained that he now "restrict[s] what [he] say[s] on social-media platforms to avoid suspension and other penalties." Kheriaty described how he now must be "extremely careful when posting any information on Twitter related to the vaccines, to avoid getting banned" and that he intentionally "limit[s] what [he] say[s] publicly," even "on topics where [he] ha[s] specific scientific and ethical expertise and professional experience." And Hoft notes that, "[t]o avoid suspension and other forms of censorship, [his website] frequently avoid[s] posting content that [it] would otherwise post on social-media platforms, and [] frequently alter[s] content to make it less likely to trigger censorship policies." These lingering effects of past censorship must be factored into the standing calculus. *See Lyons*, 461 U.S. at 102.

As the Supreme Court has recognized, this chilling of the Individual Plaintiffs' exercise of their First Amendment rights is, itself, a constitutionally sufficient injury. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). True, "to confer standing, allegations of chilled speech or self-censorship must arise from a fear of [future harm] that is not imaginary or wholly speculative." *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir. 2018) (internal quotation marks and citation omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm"). But the fears motivating the Individual Plaintiffs' self-censorship, here, are far from hypothetical. Rather, they are grounded in the very real censorship injuries they have previously suffered to their speech on social media, which are "evidence of the likelihood of a future injury." *Crawford*, 1 F.4th at 375 (internal quotation marks and citation

197a

No. 23-30445

omitted). Supported by this evidence, the Individual Plaintiffs' self-censorship is a cognizable, ongoing harm resulting from their past censorship injuries, and therefore constitutes injury-in-fact upon which those Plaintiffs may pursue injunctive relief. *Lyons*, 461 U.S. at 102.

Separate from their ongoing harms, the Individual Plaintiffs have shown a substantial risk that the injuries they suffered in the past will reoccur. The officials suggest that there is no threat of future injury because "Twitter has stopped enforcing its COVID-related misinformation policy." But this does nothing to mitigate the risk of future harm to the Individual Plaintiffs. Twitter continues to enforce a robust general misinformation policy, and the Individual Plaintiffs seek to express views—and have been censored for their views—on topics well beyond COVID-19, including allegations of election fraud and the Hunter Biden laptop story.[3] Plaintiffs use social-media platforms other than Twitter—such as Facebook and YouTube—which still enforce COVID- or health-specific misinformation policies.[4] And most fundamentally, the Individual Plaintiffs are not seeking to enjoin Twitter's content moderation policies (or those of any other social-media platform, for that matter). Rather, as Plaintiffs' counsel made clear at oral argument, what the Individual Plaintiffs are challenging is the government's *interference with*

---

[3] Notably, Twitter maintains a separate "crisis misinformation policy" which applies to "public health emergencies." *Crisis misinformation policy*, TWITTER (August 2022), https://help.twitter.com/en/rules-and-policies/crisis-misinformation. This policy would presumably apply to COVID-related misinformation if COVID-19 were again classified as a Public Health Emergency, as it was until May 11, 2023. *See End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 5, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html.

[4] *Facebook Community Standards: Misinformation*, META, https://transparency.fb.com/policies/community-standards/misinformation/ (last visited August 11, 2023); *Misinformation policies*, YOUTUBE, https://support.google.com/youtube/topic/10833358 (last visited August 11, 2023).

those social-media companies' independent application of their policies. And there is no evidence to suggest that the government's meddling has ceased. To the contrary, the officials' attorney conceded at oral argument that they continue to be in regular contact with social-media platforms concerning content-moderation issues today.

The officials also contend that future harm is unlikely because "all three plaintiffs who suggested that their social-media accounts had been permanently suspended in the past now appear to have active accounts." But as the Ninth Circuit recently recognized, this fact weighs in *Plaintiffs'* favor. In *O'Handley v. Weber*, considering this issue in the context of redressability,[5] the Ninth Circuit explained:

> Until recently, it was doubtful whether [injunctive] relief would remedy [the plaintiff]'s alleged injuries because Twitter had permanently suspended his account, and the requested injunction [against government-imposed social-media censorship] would not change that fact. Those doubts disappeared in December 2022 when Twitter restored his account.

62 F.4th 1145, 1162 (9th Cir. 2023). The same logic applies here. If the Individual Plaintiffs did not currently have active social-media accounts, then there would be no risk of future government-coerced censorship of their speech on those accounts. But since the Individual Plaintiffs continue to be active speakers on social media, they continue to face the very real and imminent threat of government-coerced social-media censorship.

---

[5] When plaintiffs seek injunctive relief, the injury-in-fact and redressability requirements intersect. *Stringer*, 942 F.3d at 720. So, it makes no difference that the Ninth Circuit addressed the issue of reinstated social-media accounts in its redressability analysis while we address it as part of injury-in-fact. The ultimate question is whether there was a sufficient threat of future injury to warrant injunctive relief.

No. 23-30445

Because the Individual Plaintiffs have demonstrated ongoing harm from their past censorship as well as a substantial risk of future harm, they have established an injury-in-fact sufficient to support their request for injunctive relief.

## B.

Turning to the second element of Article III standing, the Individual Plaintiffs were also required to show that their injuries were "fairly traceable" to the challenged conduct of the officials. *Stringer*, 942 F.3d at 720. When, as is alleged here, the "causal relation between [the claimed] injury and [the] challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (internal quotation marks and citation omitted). "To satisfy that burden, the plaintiff[s] must show at the least 'that third parties will likely react in predictable ways.'" *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)).

The officials contend that traceability is lacking because the Individual Plaintiffs' censorship was a result of "independent decisions of social-media companies." This conclusion, they say, is a matter of timing: social-media platforms implemented content-moderation policies in early 2020 and therefore the Biden Administration—which took office in January 2021— "could not be responsible for [any resulting] content moderation." But as we just explained, the Individual Plaintiffs do not challenge the social-media platforms' content-moderation policies. So, the fact that the Individual Plaintiffs' censorship can be traced back, at least in part, to third-party policies that pre-date the current presidential administration is irrelevant. The dispositive question is whether the Individual Plaintiffs' censorship can

No. 23-30445

also be traced to government-coerced *enforcement* of those policies. We agree with the district court that it can be.

On this issue, *Department of Commerce* is instructive. There, a group of plaintiffs brought a constitutional challenge against the federal government's decision to reinstate a citizenship question on the 2020 census. 139 S. Ct. at 2561. Their theory of harm was that, as a result of this added question, noncitizen households would respond to the census at lower rates than citizen households due to fear of immigration-related consequences, which would, in turn, lead to undercounting of population in certain states and a concomitant diminishment in political representation and loss of federal funds. *Id.* at 2565–66. In response, the government presented many of the same causation arguments raised here, contending that any harm to the plaintiffs was "not fairly traceable to the [government]'s decision" but rather "depend[ed] on the independent action of third parties" (*there*, noncitizens refusing to respond to the census; *here*, social-media companies censoring posts) which "would be motivated by unfounded fears that the Federal Government will itself break the law" (*there*, "using noncitizens' answers against them for law enforcement purposes"; *here*, retaliatory enforcement actions or regulatory reform). *Id.* But a unanimous Supreme Court disagreed. As the Court explained, the plaintiffs had "met their burden of showing that third parties will likely react in predictable ways to the citizenship question" because evidence "established that noncitizen households have historically responded to the census at lower rates than other groups" and the district court had "not clearly err[ed] in crediting the . . . theory that the discrepancy [was] likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." *Id.* at 2566.

That logic is directly applicable here. The Individual Plaintiffs adduced extensive evidence that social-media platforms have engaged in censorship of certain viewpoints on key issues and that the government has

No. 23-30445

engaged in a years-long pressure campaign designed to ensure that the censorship aligned with the government's preferred viewpoints. The district court did not clearly err in crediting the Individual Plaintiffs' theory that the social-media platforms' censorship decisions were likely attributable at least in part to the platforms' reluctance to risk the adverse legal or regulatory consequences that could result from a refusal to adhere to the government's directives. The Individual Plaintiffs therefore met their burden of showing that the social-media platforms will likely react in a predictable way—*i.e.*, censoring speech—in response to the government's actions.

To be sure, there were instances where the social-media platforms *declined* to remove content that the officials had identified for censorship. But predictability does not require certainty, only likelihood. *See Dep't of Com.*, 139 S. Ct. at 2566 (requiring that third parties "will *likely* react in predictable ways"). Here, the Individual Plaintiffs presented extensive evidence of escalating threats—both public and private—by government officials aimed at social-media companies concerning their content-moderation decisions. The district court thus had a sound basis upon which to find a *likelihood* that, faced with unrelenting pressure from the most powerful office in the world, social-media platforms did, and would continue to, bend to the government's will. This determination was not, as the officials contend, based on "unadorned speculation." Rather, it was a logical conclusion based directly on the evidence adduced during preliminary discovery.

## C.

The final element of Article III standing—redressability—required the Individual Plaintiffs to demonstrate that it was "likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted). The redressability analysis focuses on "the relationship between

No. 23-30445

the judicial relief requested and the injury" alleged. *California*, 141 S. Ct. at 2115 (internal quotation marks and citation omitted).

Beginning first with the injury alleged, we have noted multiple times now an important distinction between censorship as a result of social-media platforms' *independent* application of their content-moderation policies, on the one hand, and censorship as a result of social-media platforms' *government-coerced* application of those policies, on the other. As Plaintiffs' counsel made clear at oral argument, the Individual Plaintiffs seek to redress the latter injury, not the former.

The Individual Plaintiffs have not sought to invalidate social-media companies' censorship policies. Rather, they asked the district court to restrain the officials from unlawfully interfering with the social-media companies' independent application of their content-moderation policies. As the Ninth Circuit has also recognized, there is a direct relationship between this requested relief and the injury alleged such that redressability is satisfied. *See O'Handley*, 62 F.4th at 1162.

### D.

We also conclude that the State Plaintiffs are likely to establish direct standing.[6] First, state officials have suffered, and will likely continue to suffer, direct censorship on social media. For example, the Louisiana Department of Justice posted a video showing Louisiana citizens testifying at the State Capitol and questioning the efficacy of COVID-19 vaccines and mask mandates. But one platform removed the video for spreading alleged "medical misinformation" and warned that any subsequent violations would

---

[6] The State Plaintiffs also contend that they have *parens patriae* standing. We do not consider this alternative argument.

203a

No. 23-30445

result in suspension of the state's account. The state thereafter modified its practices for posting on social media for fear of future censorship injury.

Similarly, another platform took down a Louisiana state legislator's post discussing COVID vaccines. And several videos posted by St. Louis County showing residents discussing COVID policies were removed, too. Acts of this nature continue to this day. In fact, at oral argument, counsel for the State of Louisiana explained that YouTube recently removed a video of counsel, speaking in his official capacity, criticizing the federal government's alleged unconstitutional censorship in this case.[7]

These acts of censorship confer standing for substantially the same reasons as those discussed for the Individual Plaintiffs. That is, they constitute an ongoing injury, and demonstrate a likelihood of future injury, traceable to the conduct of the federal officials and redressable by an injunction against them.

The federal officials admit that these instances of censorship occurred but deny that the State Plaintiffs have standing based on the assertion that "the First Amendment does not confer rights on States." But the Supreme Court has made clear that the government (state and otherwise) has a "right" to speak on its own behalf. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08 (2015). Perhaps that right derives from a state's sovereign nature, rather than from the First Amendment itself. But regardless of the source of the right, the State

---

[7] These actions are not limited to the State Plaintiffs. On the contrary, other states' officials have offered evidence of numerous other instances where their posts were removed, restricted, or otherwise censored.

204a

No. 23-30445

Plaintiffs sustain a direct injury when the social-media accounts of state officials are censored due to federal coercion.

Federally coerced censorship harms the State Plaintiffs' ability to listen to their citizens as well. This right to listen is "reciprocal" to the State Plaintiffs' right to speak and constitutes an independent basis for the State Plaintiffs' standing here. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 (1976).

Officials from the States of Missouri and Louisiana testified that they regularly use social media to monitor their citizens' concerns. As explained by one Louisiana official:

> [M]ask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year. It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them.

And a Missouri official testified to several examples of critical speech on an important topic that he was not able to review because it was censored:

> [O]ne parent who posted on nextdoor.com (a neighborhood networking site operated by Facebook) an online petition to encourage his school to remain mask-optional found that his posts were quietly removed without notifying him, and his online friends never saw them. Another parent in the same school district who objected to mask mandates for schoolchildren responded to Dr. Fauci on Twitter, and promptly received a warning from Twitter that his account would be banned if he did not delete the tweets criticizing Dr. Fauci's approach to mask mandates. These examples are just the sort of online speech by Missourians that it is important for me and the Missouri Attorney General's Office to be aware of.

205a

No. 23-30445

The Government does not dispute that the State Plaintiffs have a crucial interest in listening to their citizens. Indeed, the CDC's own witness explained that if content were censored and removed from social-media platforms, government communicators would not "have the full picture" of what their citizens' true concerns are. So, when the federal government coerces or substantially encourages third parties to censor certain viewpoints, it hampers the states' right to hear their constituents and, in turn, reduces their ability to respond to the concerns of their constituents. This injury, too, means the states likely have standing. *See Va. State Bd. of Pharm.*, 425 U.S. at 757.

\* \* \*

The Plaintiffs have standing because they have demonstrated ongoing harm from past social-media censorship and a likelihood of future censorship, both of which are injuries traceable to government-coerced enforcement of social-media platforms' content-moderation policies and redressable by an injunction against the government officials. We therefore proceed to the merits of Plaintiffs' claim for injunctive relief.[8]

## IV.

A party seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) there is a "substantial threat" they will suffer an "irreparable injury" otherwise, (3) the potential injury "outweighs any harm that will result" to the other side, and (4) an injunction will not "disserve the public interest." *Atchafalaya Basinkeeper* v. *U.S. Army*

---

[8] The Individual Plaintiffs' standing and the State Plaintiffs' standing provide independent bases upon which the Plaintiffs' injunctive-relief claim may proceed since there need be only one plaintiff with standing to satisfy the requirements of Article III. *Rumsfeld*, 547 U.S. at 52 n.2.

No. 23-30445

*Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citing *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010)). Of course, a "preliminary injunction is an extraordinary remedy," meaning it should not be entered lightly. *Id.*

We start with likelihood of success. The Plaintiffs allege that federal officials ran afoul of the First Amendment by coercing and significantly encouraging "social-media platforms to censor disfavored [speech]," including by "threats of adverse government action" like antitrust enforcement and legal reforms. We agree.

## A.

The government cannot abridge free speech. U.S. Const. amend. I. A private party, on the other hand, bears no such burden—it is "not ordinarily constrained by the First Amendment." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). That changes, though, when a private party is coerced or significantly encouraged by the government to such a degree that its "choice"—which if made by the government would be unconstitutional, *Norwood v. Harrison*, 413 U.S. 455, 465 (1973)—"must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Barnes v. Lehman*, 861 F.2d 1383, 1385–36 (5th Cir. 1988).[9] This is known as the close nexus test.[10]

─────────────────────

[9] That makes sense: First Amendment rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).

[10] Note that, at times, we have called this test by a few other names. *See, e.g.*, *Frazier v. Bd. of Trustees of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1284 (5th Cir. 1985) ("the fair attribution test"); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999) ("The state compulsion (or coercion) test"). We settle that dispute now—it is the close nexus test. *Am. Mfrs.*, 526 U.S. at 52 (a "close nexus" is required). In addition, some of our past decisions

No. 23-30445

Under that test, we "begin[] by identifying 'the specific conduct of which the plaintiff complains.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (quoting *Blum*, 457 U.S. at 1004 ("Faithful adherence to the 'state action' requirement . . . requires careful attention to the gravamen of the plaintiff's complaint.")). Then, we ask whether the government sufficiently induced that act. Not just any coaxing will do, though. After all, "the government can speak for itself," which includes the right to "advocate and defend its own policies." *Southworth*, 529 U.S. at 229; *see also Walker*, 576 U.S. at 207. But, on one hand there is persuasion, and on the other there is coercion and significant encouragement—two distinct means of satisfying the close nexus test. *See Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (per curiam) ("Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses . . ."). Where we draw that line, though, is the question before us today.

**1.**

We start with encouragement. To constitute "significant encouragement," there must be such a "close nexus" between the parties that the government is practically "*responsible*" for the challenged decision. *Blum*, 457 U.S. at 1004 (emphasis in original). What, then, is a close nexus? We know that "the mere fact that a business is subject to state regulation" is not sufficient. *Id.* (alteration adopted) (citation omitted); *Halleck*, 139 S. Ct. at 1932 ("Put simply, being regulated by the State does not make one a state actor."). And, it is well established that the government's "[m]ere approval of or acquiescence in" a private party's actions is not enough either. *Blum*,

---

have confused this test with the joint action test, *see Bass*, 180 F.3d at 242, but the two are separate tests with separate considerations.

208a

No. 23-30445

457 U.S. at 1004–05. Instead, for encouragement, we find that the government must exercise some active, meaningful control over the private party's decision.

Take *Blum v. Yaretsky*. There, the Supreme Court found there was no state action because a decision to discharge a patient—even if it followed from the "requir[ed] completion of a form" under New York law—was made by private physicians, not the government. *Id.* at 1006–08. The plaintiff argued that, by regulating and overseeing the facility, the government had "affirmatively command[ed]" the decision. *Id.* at 1005. The Court was not convinced—it emphasized that "physicians, [] not the forms, make the decision" and they do so under "professional standards that are not established by the State." *Id.* Similarly, in *Rendell-Baker v. Kohn* the Court found that a private school—which the government funded and placed students at—was not engaged in state action because the conduct at issue, namely the decision to fire someone, "[was] not . . . influenced by any state regulation." 457 U.S. 830, 841 (1982).

Compare that, though, to *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984). There, we held that a horseracing club's action was attributable to the state because the Louisiana government—through legal and informal supervision—was overly involved in the decision to deny a racer a stall. *Id.* at 224. "Something more [was] present [] than simply extensive regulation of an industry, or passive approval by a state regulatory entity of a decision by a regulated business." *Id.* at 228. Instead, the stalling decision was made partly by the "racing secretary," a legislatively created position accompanied by expansive supervision from on-site state officials who had the "power to override decisions" made by the club's management. *Id.* So, even though the secretary was plainly a "private employee" paid by the club, the state's extensive oversight—coupled with *some* level of authority on the part of the state—meant that the club's choice was not fully independent or

30

No. 23-30445

made wholly subject to its own policies. *Id.* at 227–28. So, this case is on the opposite end of the state-involvement spectrum to *Blum*.

Per *Blum* and *Roberts*, then, significant encouragement requires "[s]omething more" than uninvolved oversight from the government. *Id.* at 228. After all, there must be a "close nexus" that renders the government practically "*responsible*" for the decision. *Blum*, 457 U.S. at 1004. Taking that in context, we find that the clear throughline for encouragement in our caselaw is that there must be *some* exercise of *active* (not passive), *meaningful* (impactful enough to render them responsible) *control* on the part of the government over the private party's challenged decision. Whether that is (1) entanglement in a party's independent decision-making or (2) direct involvement in carrying out the decision itself, the government must encourage the decision to such a degree that we can fairly say it was the state's choice, not the private actor's. *See id.*; *Roberts*, 742 F.2d at 224; *Rendell-Baker*, 457 U.S. at 841 (close nexus test is met if action is "compelled or [] *influenced*" by the state (emphasis added)); *Frazier*, 765 F.2d at 1286 (significant encouragement is met when "the state has had some affirmative role, albeit one of encouragement short of compulsion," in the decision).[11]

---

[11] This differs from the "joint action" test that we have considered in other cases. Under that doctrine, a private party may be considered a state actor when it "operates as a 'willful participant in joint activity with the State or its agents.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 941 (1982)). The difference between the two lies primarily in the degree of the state's involvement.

Under the joint action test, the level of integration is *very high*—there must be "pervasive entwinement" between the parties. *Id.* at 298. That is integration to such a degree that "will support a conclusion that an ostensibly private organization ought to be charged with a *public character.*" *Id.* at 302 (emphasis added) (finding state action by athletic association when public officials served on the association's board, public institutions provided most of the association's funding, and the association's employees received public benefits); *see also Rendell-Baker*, 457 U.S. at 842 (requiring a "symbiotic

No. 23-30445

Take *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544 (5th Cir. 1988). There, a group of onion growers—by way of state picketing laws and local officials—shut down a workers' strike. *Id.* at 548–49. We concluded that the growers' "activity"—axing the strike—"while not compelled by the state, was so *significantly encouraged*, both overtly and covertly, that the choice must in law be deemed to be that of the state." *Id.* at 555 (alterations adopted) (citation and quotation marks omitted)

---

relationship"); *Frazier*, 765 F.2d at 1288 & n.22 (explaining that although the joint action test involves the government playing a "meaningful role" in the private actor's decision, that role must be part of a "functionally symbiotic" relationship that is so extensive that "*any act* of the private entity will be fairly attributable to the state even if it cannot be shown that the government played a direct role in the *particular* action challenged." (emphases added)).

Under the close nexus test, however, the government is not deeply intertwined with the private actor as a whole. Instead, the state is involved in only one facet of the private actor's operations—its decision-making process regarding the *challenged* conduct. *Roberts*, 742 F.2d at 224; *Howard Gault*, 848 F.2d at 555. That is a much narrower level of integration. *See Roberts*, 742 F.2d at 228 ("We do not today hold that the state and Louisiana Downs are in such a relationship that all acts of the track constitute state action, nor that all acts of the racing secretary constitute state action," but instead that "[i]n the area of stalling, . . . state regulation and involvement is so specific and so pervasive that [such] decisions may be considered to bear the imprimatur of the state."). Consequently, the showings required by a plaintiff differ. Under the joint action test, the plaintiff must prove substantial integration between the two entities *in toto*. For the close nexus test, the plaintiff instead must only show significant involvement from the state in the *particular* challenged action.

Still, there is admittedly *some* overlap between the tests. *See Brentwood*, 531 U.S. at 303 ("'Coercion' and 'encouragement' are like 'entwinement' in referring to kinds of facts that can justify characterizing an ostensibly private action as public instead. Facts that address any of these criterion are significant, but no one criterion must necessarily be applied. When, therefore, the relevant facts show pervasive entwinement to the point of largely overlapping identity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test."). But, that is to be expected—these tests are not "mechanical[ly]" applied. *Roberts*, 742 F.2d at 224.

(emphasis added).[12] Specifically, "[i]t was the heavy participation of state and state officials," including local prosecutors and police officers, "that [brought] [the conduct] under color of state law." *Id.* In other words, the officials were directly involved in carrying out the challenged decision. That satisfied the requirement that, to encourage a decision, the government must exert some meaningful, active control over the private party's decision.

Our reading of what encouragement means under the close nexus test tracks with other federal courts, too. For example, the Ninth Circuit reads the close nexus test to be satisfied when, through encouragement, the government "overwhelm[s] the private party['s]" choice in the matter, forcing it to "act in a certain way." *O'Handley*, 62 F.4th at 1158; *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751 (9th Cir. 2020) ("A finding that individual state actors or other state requirements literally 'overrode' a nominally private defendant's independent judgment might very well provide relevant information."). That analysis, much like meaningful control, asks whether a decision "was the result of [a party's] own independent judgment." *O'Handley*, 62 F.4th at 1159.

### 2.

Next, we take coercion—a separate and distinct means of satisfying the close nexus test. Generally speaking, if the government compels the

---

[12] We note that although state-action caselaw seems to deal most often with § 1983 (*i.e.*, the under-color-of-law prong) and the Fourteenth Amendment, there is no clear directive from the Supreme Court that any variation in the law or government at issue changes the state-action analysis. *See Blum*, 457 U.S. at 1004. In fact, we have expressly rejected such ideas. *See Miller v. Hartwood Apartments, Ltd.*, 689 F.2d 1239, 1243 (5th Cir. 1982) ("Although the *Blum* decision turned on § 1983, we find the determination of federal action to rest on the same general principles as determinations of state action."); *Barnes*, 861 F.2d at 1385 ("The analysis of state action under the Fourteenth Amendment and the analysis of action under color of state law may coincide for purposes of § 1983.").

private party's decision, the result will be considered a state action. *Blum*, 457 U.S. at 1004. So, what is coercion? We know that simply "being regulated by the State does not make one a state actor." *Halleck*, 139 S. Ct. at 1932. Coercion, too, must be something more. But, distinguishing coercion from persuasion is a more nuanced task than doing the same for encouragement. Encouragement is evidenced by an exercise of active, meaningful control, whether by entanglement in the party's decision-making process or direct involvement in carrying out the decision itself. Therefore, it may be more noticeable and, consequently, more distinguishable from persuasion. Coercion, on the other hand, may be more subtle. After all, the state may advocate—even forcefully—on behalf of its positions. *Southworth*, 529 U.S. at 229.

Consider a Second Circuit case, *National Rifle Ass'n v. Vullo*, 49 F.4th 700 (2d Cir. 2022). There, a New York state official "urged" insurers and banks via strongly worded letters to drop the NRA as a client. *Id.* at 706. In those letters, the official alluded to reputational harms that the companies would suffer if they continued to support a group that has allegedly caused or encouraged "devastation" and "tragedies" across the country. *Id.* at 709. Also, the official personally told a few of the companies in a closed-door meeting that she "was less interested in pursuing the [insurers' regulatory] infractions . . . so long as [they] ceased" working with the NRA. *Id.* at 718. Ultimately, the Second Circuit found that both the letters and the statement did not amount to coercion, but instead "permissible government speech." *Id.* at 717, 719. In reaching that decision, the court emphasized that "[a]lthough she did have regulatory authority over the target audience," the official's letters were written in a "nonthreatening tone" and used persuasive, non-intimidating language. *Id.* at 717. Relatedly, while she referenced "adverse consequences" if the companies did not comply, they were only "reputational risks"—there was no intimation that "punishment

or adverse regulatory action would follow the failure to accede to the request." *Id.* (alterations adopted). As for the "so long as" statement, the Second Circuit found that—when viewed in "context"—the official was merely "negotiating[] and resolving [legal] violations," a legitimate power of her office.[13] *Id.* at 718–19. Because she was only "carrying out her regulatory responsibilities" and "engaging in legitimate enforcement action," the official's references to infractions were not coercive. *Id.* Thus, the Second Circuit found that *seemingly* threatening language was actually permissible government advocacy.

That is not to say that coercion is *always* difficult to identify. Sometimes, coercion is obvious. Take *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). There, the Rhode Island Commission to Encourage Morality—a state-created entity—sought to stop the distribution of obscene books to kids. *Id.* at 59. So, it sent a letter to a book distributor with a list of verboten books and requested that they be taken off the shelves. *Id.* at 61–64. That request conveniently noted that compliance would "eliminate the necessity of our recommending prosecution to the Attorney General's department." *Id.* at 62 n.5. Per the Commission's request, police officers followed up to make sure the books were removed. *Id.* at 68. The Court concluded that this "system of informal censorship," which was "clearly [meant] to intimidate" the recipients through "threat of [] legal sanctions and other means of coercion" rendered the distributors' decision to remove the books a state action. *Id.* at 64, 67, 71–72. Given *Bantam Books*, not-so

---

[13] Apparently, the companies had previously issued "illegal insurance policies—programs created and endorsed by the NRA"—that covered litigation defense costs resulting from any firearm-related injury or death, in violation of New York law. *Vullo*, 49 F.4th at 718. The court reasoned that the official had the power to bring those issues to a close.

subtle asks accompanied by a "system" of pressure (*e.g.*, threats and follow-ups) are clearly coercive.

Still, it is rare that coercion is so black and white. More often, the facts are complex and sprawling as was the case in *Vullo*. That means it can be quite difficult to parse out coercion from persuasion. We, of course, are not the first to recognize this. In that vein, the Second Circuit has crafted a four-factor test that distills the considerations of *Bantam Books* into a workable standard. We, lacking such a device, adopt the Second Circuit's approach as a helpful, non-exclusive tool for completing the task before us, namely identifying when the state's messages cross into impermissible coercion.

The Second Circuit starts with the premise that a government message is coercive—as opposed to persuasive—if it "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Vullo*, 49 F.4th at 715 (quotation marks and citation omitted). To distinguish such "attempts to coerce" from "attempts to convince," courts look to four factors, namely (1) the speaker's "word choice and tone"; (2) "whether the speech was perceived as a threat"; (3) "the existence of regulatory authority"; and, "perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* (citations omitted). Still, "[n]o one factor is dispositive." *Id.* (citing *Bantam Books*, 372 U.S. at 67). For example, the Second Circuit found in *Vullo* that the state officials' communications were not coercive because, in part, they were not phrased in an intimidating manner and only referenced reputational harms—an otherwise acceptable consequence for a governmental actor to threaten. *Id.* at 717, 719.

The Ninth Circuit has also adopted the four-factor approach and, in doing so, has cogently spelled out the nuances of each factor. Consider *Kennedy v. Warren*, 66 F.4th 1199 (9th Cir. 2023). There, Senator Elizabeth

Warren penned a letter to Amazon asking it to stop selling a "false or misleading" book on COVID. *Id.* at 1204. The senator stressed that, by selling the book, Amazon was "providing consumers with false and misleading information" and, in doing so, was pursuing what she described as "an unethical, unacceptable, and potentially unlawful course of action." *Id.* So, she asked it to do better, including by providing a "public report" on the effects of its related sales algorithms and a "plan to modify these algorithms so that they no longer" push products peddling "COVID-19 misinformation." *Id.* at 1205. The authors sued, but the Ninth Circuit found no state action.

The court, lamenting that it can "be difficult to distinguish" between persuasion and coercion, turned to the Second Circuit's "useful non-exclusive" four-factor test. *Id.* at 1207. First, the court reasoned that the senator's letter, although made up of "strong rhetoric," was framed merely as a "request rather than a command." *Id.* at 1208. Considering both the text and the "tenor" of the parties' relationship, the court concluded that the letter was not unrelenting, nor did it "suggest[] that compliance was the only realistic option." *Id.* at 1208–09.

Second, and relatedly, even if she had said as much, the senator lacked regulatory authority—she "ha[d] no unilateral power to penalize Amazon." *Id.* at 1210. Still, the sum of the second prong is more than just power. Given that the overarching purpose of the four-factor test is to ask if the speaker's message can "reasonably be construed" as a "threat of adverse consequences," the lack of power is "certainly relevant." *Id.* at 1209–10. After all, the "absence of authority influences how a reasonable person would read" an official's message. *Id.* at 1210; *see also Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) (finding no government coercion where city official lacked "the power to impose sanctions on merchants who did not respond to [his] requests") (citing *Bantam Books*, 372 U.S. at 71). For

No. 23-30445

example, in *Warren*, it would have been "unreasonable" to believe, given Senator Warren's position "as a single Senator" who was "removed from the relevant levers of power," that she could exercise any authority over Amazon. 66 F.4th at 1210.

Still, the "lack of direct authority" is not entirely dispositive. *Id.* Because—per the Second and Ninth Circuits—the key question is whether a message can "reasonably be construed as coercive," *id.* at 1209,[14] a speaker's power over the recipient need not be clearly defined or readily apparent, so long as it can be reasonably said that there is *some* tangible power lurking in the background. *See Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (finding a private party "could reasonably have believed" it would face retaliation if it ignored a borough president's request because "[e]ven though [he] lacked direct regulatory control," there was an "implicit threat" that he would "use whatever authority he does have . . . to interfere" with the party's cashflow). That, of course, was not present in *Warren*. So, the second prong was easily resolved against state action.

Third, the senator's letter "contain[ed] no explicit reference" to "adverse consequences."[15] 66 F.4th at 1211. And, beyond that, no "threat

---

[14] According to the Ninth Circuit, that tracks with its precedent. "[I]n *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987), [they] held that a deputy county attorney violated the First Amendment by threatening to prosecute a telephone company if it continued to carry a salacious dial-a-message service." *Warren*, 66 F.4th at 1207. But, "in *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002), [they] held that San Francisco officials did not violate the First Amendment when they criticized religious groups' anti-gay advertisements and urged television stations not to broadcast the ads." *Id.* The rub, per the court, was that "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction." *Id.*

[15] The Ninth Circuit emphasized that officials may advocate for positions, including by "[g]enerating public pressure to motivate others to change their behavior."

38

No. 23-30445

[was] clear from the context." *Id.* To be sure, an "official does not need to say 'or else,'" but there must be some message—even if "unspoken"—that can be reasonably construed as intimating a threat. *Id.* at 1211–12. There, when read "holistically," the senator only implied that Amazon was "morally complicit" in bad behavior, nothing more. *Id.* at 1212.

Fourth, there was no indication that Amazon perceived the message as a threat. There was "no evidence" it "changed its algorithms"—"let alone that it felt compelled to do so"—as a result of the senator's urgings. *Id.* at 1211. Admittedly, it is not required that the recipient "bow[] to government pressure," but courts are more likely to find coercion if there is "some indication" that the message was "understood" as a threat, such as evidence of actual change. *Id.* at 1210–11. In *Warren*, it was apparent (and there was no sense to the contrary) that the minor policy change the company did make stemmed from reputational concerns, not "fears of liability in a court of law." *Id.* at 1211. Considering the above, the court found that the senator's message amounted to an attempt at persuasion, not coercion.

### 3.

To sum up, under the close nexus test, a private party's conduct may be state action if the government coerced *or* significantly encouraged it. *Blum*, 457 U.S. at 1004. Although this test is not mechanical, *see Roberts*, 742 F.2d at 224 (noting that state action is "essentially [a] factual determination" made by "sifting facts and weighing circumstances case by case to determine if there is a sufficient nexus between the state and the particular aspect of the

---

*Warren*, 66 F.4th at 1208. In that vein, it dismissed any references to "potential legal liability" because those statements do not necessarily "morph an effort to persuade into an attempt to coerce." *Id.* at 1209 (citing *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1165 (10th Cir. 2021)). Instead, there must be "clear allegation[s] of legal violations or threat[s] of specific enforcement actions." *Id.*

218a

No. 23-30445

private individual's conduct which is complained of" (citation and quotation marks omitted)), there are clear, although not exclusive, ways to satisfy either prong.

For encouragement, we read the law to require that a governmental actor exercise active, meaningful control over the private party's decision in order to constitute a state action. That reveals itself in (1) entanglement in a party's independent decision-making or (2) direct involvement in carrying out the decision itself. *Compare Roberts*, 742 F.2d at 224 (state had such "continuous and intimate involvement" and supervision over horseracing decision that, when coupled with its authority over the actor, it was considered a state action) *and Howard Gault*, 848 F.2d at 555 (state eagerly, and effectively, assisted a private party in shutting down a protest), *with Blum*, 457 U.S. at 1008 (state did not sufficiently influence the decision as it was made subject to independent standards). In any of those scenarios, the state has such a "close nexus" with the private party that the government actor is practically "*responsible*" for the decision, *Blum*, 457 U.S. at 1004, because it has necessarily encouraged the private party to act and, in turn, commandeered its independent judgment, *O'Handley*, 62 F.4th at 1158–59.

For coercion, we ask if the government compelled the decision by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply. *Vullo*, 49 F.4th at 715. Sometimes, that is obvious from the facts. *See, e.g.*, *Bantam Books*, 372 U.S. at 62–63 (a mafiosi-style threat of referral to the Attorney General accompanied with persistent pressure and follow-ups). But, more often, it is not. So, to help distinguish permissible persuasion from impermissible coercion, we turn to the Second (and Ninth) Circuit's four-factor test. Again, honing in on whether the government "intimat[ed] that some form of punishment" will follow a "failure to accede," we parse the speaker's messages to assess the (1) word choice and tone, including the overall "tenor" of the parties' relationship;

40

No. 23-30445

(2) the recipient's perception; (3) the presence of authority, which includes whether it is reasonable to fear retaliation; and (4) whether the speaker refers to adverse consequences. *Vullo*, 49 F.4th at 715; *see also Warren*, 66 F.4th at 1207.

Each factor, though, has important considerations to keep in mind. For word choice and tone, "[a]n interaction will tend to be more threatening if the official refuses to take 'no' for an answer and pesters the recipient until it succumbs." *Warren*, 66 F.4th at 1209 (citing *Bantam Books*, 372 U.S. at 62–63). That is so because we consider the overall "tenor" of the parties' relationship. *Id.* For authority, there is coercion even if the speaker lacks present ability to act so long as it can "reasonably be construed" as a threat worth heeding. *Compare id.* at 1210 (single senator had no worthwhile power over recipient, practical or otherwise), *with Okwedy*, 333 F.3d at 344 (although local official lacked direct power over the recipient, company "could reasonably have believed" from the letter that there was "an implicit threat" and that he "would use whatever authority he does have" against it).

As for perception, it is not necessary that the recipient "admit that it bowed to government pressure," nor is it even "necessary for the recipient to have complied with the official's request" — "a credible threat may violate the First Amendment even if 'the victim ignores it, and the threatener folds his tent.'" *Warren*, 66 F.4th at 1210 (quoting *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015)). Still, a message is more likely to be coercive if there is *some* indication that the party's decision resulted from the threat. *Id.* at 1210–11. Finally, as for adverse consequences, the government need not speak its threat aloud if, given the circumstances, it is fair to say that the message intimates *some* form of punishment. *Id.* at 1209. If these factors weigh in favor of finding the government's message coercive, the coercion test is met, and the private party's resulting decision is a state action.

No. 23-30445

## B.

With that in mind, we turn to the case at hand. We start with "the specific conduct of which the plaintiff complains." *Am. Mfrs.*, 526 U.S. at 51. Here, that is "censor[ing] disfavored speakers and viewpoints" on social media. The Plaintiffs allege that the "Defendants [] coerced, threatened, and pressured social-media platforms"—via "threats of adverse government action" like increased regulation, antitrust enforcement, and changes to Section 230—to make those censorship decisions. That campaign, per the Plaintiffs, was multi-faceted—the officials "publicly threaten[ed] [the] companies" while they privately piled on "unrelenting pressure" via "demands for greater censorship." And they succeeded—the platforms censored disfavored content.

The officials do not deny that they worked alongside the platforms. Instead, they argue that their conduct—asking or trying to persuade the platforms to act—was permissible government speech. So, we are left with the task of sifting out any coercion and significant encouragement from their attempts at persuasion. Here, there were multiple speakers and messages. Taking that in context, we apply the law to one set of officials at a time, starting with the White House and Office of the Surgeon General.

## 1.

We find that the White House, acting in concert with the Surgeon General's office, likely (1) coerced the platforms to make their moderation decisions by way of intimidating messages and threats of adverse consequences, and (2) significantly encouraged the platforms' decisions by commandeering their decision-making processes, both in violation of the First Amendment.

Generally speaking, officials from the White House and the Surgeon General's office had extensive, organized communications with platforms.

They met regularly, traded information and reports, and worked together on a wide range of efforts. That working relationship was, at times, sweeping. Still, those facts alone likely are not problematic from a First-Amendment perspective. But, the relationship between the officials and the platforms went beyond that. In their communications with the platforms, the officials went beyond advocating for policies, *Southworth,* 529 U.S. at 229, or making no-strings-attached requests to moderate content, *Warren,* 66 F.4th at 1209. Their interaction was "something more." *Roberts*, 742 F.2d at 228.

We start with coercion. On multiple occasions, the officials coerced the platforms into direct action via urgent, uncompromising demands to moderate content. Privately, the officials were not shy in their requests— they asked the platforms to remove posts "ASAP" and accounts "immediately," and to "slow[] down" or "demote[]" content. In doing so, the officials were persistent and angry. *Cf. Bantam Books*, 372 U.S. at 62–63. When the platforms did not comply, officials followed up by asking why posts were "still up," stating (1) "how does something like [this] happen," (2) "what good is" flagging if it did not result in content moderation, (3) "I don't know why you guys can't figure this out," and (4) "you are hiding the ball," while demanding "assurances" that posts were being taken down. And, more importantly, the officials threatened—both expressly and implicitly—to retaliate against inaction. Officials threw out the prospect of legal reforms and enforcement actions while subtly insinuating it would be in the platforms' best interests to comply. As one official put it, "removing bad information" is "one of the easy, low-bar things you guys [can] do to make people like me"—that is, White House officials—"think you're taking action."

That alone may be enough for us to find coercion. Like in *Bantam Books*, the officials here set about to force the platforms to remove metaphorical books from their shelves. It is uncontested that, between the White House and the Surgeon General's office, government officials asked

the platforms to remove undesirable posts and users from their platforms, sent follow-up messages of condemnation when they did not, and publicly called on the platforms to act. When the officials' demands were not met, the platforms received promises of legal regime changes, enforcement actions, and other unspoken threats. That was likely coercive. *See Warren*, 66 F.4th at 1211–12.

That being said, even though coercion may have been readily apparent here, we find it fitting to consult the Second Circuit's four-factor test for distinguishing coercion from persuasion. In asking whether the officials' messages can "reasonably be construed" as threats of adverse consequences, we look to (1) the officials' word choice and tone; (2) the recipient's perception; (3) the presence of authority; and (4) whether the speaker refers to adverse consequences. *Vullo*, 49 F.4th at 715; *see also Warren*, 66 F.4th at 1207.

First, the officials' demeanor. We find, like the district court, that the officials' communications—reading them in "context, not in isolation"— were on-the-whole intimidating. *Warren*, 66 F.4th at 1208. In private messages, the officials demanded "assurances" from the platforms that they were moderating content in compliance with the officials' requests, and used foreboding, inflammatory, and hyper-critical phraseology when they seemingly did not, like "you are hiding the ball," you are not "trying to solve the problem," and we are "gravely concerned" that you are "one of the top drivers of vaccine hesitancy." In public, they said that the platforms were irresponsible, let "misinformation [] poison" America, were "literally costing . . . lives," and were "killing people." While officials are entitled to "express their views and rally support for their positions," the "word choice and tone" applied here reveals something more than mere requests. *Id.* at 1207–08.

No. 23-30445

Like *Bantam Books*—and unlike the requests in *Warren*—many of the officials' asks were "phrased virtually as orders," 372 U.S. at 68, like requests to remove content "ASAP" or "immediately." The threatening "tone" of the officials' commands, as well as of their "overall interaction" with the platforms, is made all the more evident when we consider the persistent nature of their messages. Generally speaking, "[a]n interaction will tend to be more threatening if the official refuses to take 'no' for an answer and pesters the recipient until it succumbs." *Warren*, 66 F.4th at 1209 (citing *Bantam Books*, 372 U.S. at 62–63). Urgency can have the same effect. *See Backpage.com*, 807 F.3d at 237 (finding the "urgency" of a sheriff's letter, including a follow-up, "imposed another layer of coercion due to its strong suggestion that the companies could not simply ignore" the sheriff), *cert. denied*, 137 S. Ct. 46 (2016). Here, the officials' correspondences were both persistent and urgent. They sent repeated follow-up emails, whether to ask why a post or account was "still up" despite being flagged or to probe deeper into the platforms' internal policies. On the latter point, for example, one official asked at least *twelve* times for detailed information on Facebook's moderation practices and activities. Admittedly, many of the officials' communications are not by themselves coercive. But, we do not take a speaker's communications "in isolation." *Warren*, 66 F.4th at 1208. Instead, we look to the "tenor" of the parties' relationship and the conduct of the government in context. *Id.* at 1209. Given their treatment of the platforms as a whole, we find the officials' tone and demeanor was coercive, not merely persuasive.

Second, we ask how the platforms perceived the communications. Notably, "a credible threat may violate the First Amendment even if 'the victim ignores it, and the threatener folds his tent.'" *Id.* at 1210 (quoting *Backpage.com*, 807 F.3d at 231). Still, it is more likely to be coercive if there is some evidence that the recipient's subsequent conduct is *linked* to the

No. 23-30445

official's message. For example, in *Warren*, the Ninth Circuit court concluded that Amazon's decision to stop advertising a specific book was "more likely . . . a response to widespread concerns about the spread of COVID-19," as there was "no evidence that the company changed [course] in response to Senator Warren's letter." *Id.* at 1211. Here, there is plenty of evidence—both direct and circumstantial, considering the platforms' contemporaneous actions—that the platforms were influenced by the officials' demands. When officials asked for content to be removed, the platforms took it down. And, when they asked for the platforms to be more aggressive, "interven[e]" more often, take quicker actions, and modify their "internal policies," the platforms did—and they sent emails and assurances confirming as much. For example, as was common after public critiques, one platform assured the officials they were "committed to addressing the [] misinformation that you've called on us to address" after the White House issued a public statement. Another time, one company promised to make an employee "available on a regular basis" so that the platform could "automatically prioritize" the officials' requests after criticism of the platform's response time. Yet another time, a platform said it was going to "adjust [its] policies" to include "specific recommendations for improvement" from the officials, and emailed as much because they "want[ed] to make sure to keep you informed of our work on each" change. Those are just a few of many examples of the platforms changing—and acknowledging as much—their course as a direct result of the officials' messages.

Third, we turn to whether the speaker has "authority over the recipient." 66 F.4th at 1210. Here, that is clearly the case. As an initial matter, the White House wields significant power in this Nation's constitutional landscape. It enforces the laws of our country, U.S. CONST. art. II, and—as the head of the executive branch—directs an army of federal

agencies that create, modify, and enforce federal regulations. We can hardly say that, like the senator in *Warren*, the White House is "removed from the relevant levers of power." 66 F.4th at 1210. At the very least, as agents of the executive branch, the officials' powers track somewhere closer to those of the commission in *Bantam Books*—they were legislatively given the power to "investigate violations[] and recommend prosecutions." *Id.* (citing *Bantam Books*, 372 U.S. at 66).

But, authority over the recipient does not have to be a clearly-defined ability to act under the close nexus test. Instead, a generalized, non-descript means to punish the recipient may suffice depending on the circumstances. As the Ninth Circuit explained in *Warren*, a message may be "*inherently coercive*" if, for example, it was conveyed by a "law enforcement officer" or "penned by an executive official with unilateral power." *Id.* (emphasis added). In other words, a speaker's power may stem from an inherent authority over the recipient. *See, e.g.*, *Backpage.com*, 807 F.3d 229. That reasoning is likely applicable here, too, given the officials' executive status.

It is not even necessary that an official have direct power over the recipient. Even if the officials "lack[ed] direct authority" over the platforms, the cloak of authority may still satisfy the authority prong. *See Warren*, 66 F.4th at 1210. After all, we ask whether a "reasonable person" would be threatened by an official's statements. *Id.* Take, for example, *Okwedy*. There, a borough president penned a letter to a company—which, per the official, owned a "number of billboards on Staten Island and derive[d] substantial economic benefits from them"—and "call[ed] on [them] as a responsible member of the business community to please contact" his "legal counsel." 333 F.3d at 342. The Second Circuit found that, even though the official "lacked direct regulatory authority" or control over the company, an "implicit threat" flowed from his letter because he had *some* innate authority to affect the company. *Id.* at 344. The Second Circuit noted that "[a]lthough

No. 23-30445

the existence of regulatory or other direct decisionmaking authority is certainly relevant to the question of whether a government official's comments were unconstitutionally threatening or coercive, a defendant without such direct regulatory or decisionmaking authority can also exert an impermissible type or degree of pressure." *Id.* at 343.

Consider another example, *Backpage.com*. There, a sheriff sent a cease-and-desist letter to credit card companies—which he admittedly "had no authority to take any official action" against—to stop doing business with a website. 807 F.3d at 230, 236. "[E]ven if the companies understood the jurisdictional constraints on [the sheriff]'s ability to proceed against them directly," the sheriff's letter was still coercive because, among other reasons, it "invok[ed] the legal obligations of [the recipients] to cooperate with law enforcement," and the sheriff could easily "refer the credit card companies to the appropriate authority to investigate" their dealings,[16] much like a White House official could contact the Department of Justice. *Id.* at 236–37.

True, the government can "appeal[]" to a private party's "interest in avoiding liability" so long as that reference is not meant to intimidate or compel. *Id.* at 237; *see also Vullo*, 49 F.4th at 717–19 (statements were non-coercive because they referenced legitimate use of powers in a

---

[16] This was true even though the financial institutions were large, sophisticated, and presumably understood the federal authorities were unlikely to prosecute the companies. *Backpage.com*, 807 F.3d at 234. As the Seventh Circuit explained, it was still in the credit card companies' financial interests to comply. Backpage's measly $135 million in annual revenue was a drop in the bucket of the financial service companies' combined net revenue of $22 billion. *Id.* at 236. Unlike credit card processors that at least made money servicing Backpage, social-media platforms typically depend on advertisers, not their users, for revenue. *Cf. Wash. Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019) (holding campaign finance regulations on online ads unconstitutional where they "ma[de] it financially irrational, generally speaking, for platforms to carry political speech when other, more profitable options are available").

227a

No. 23-30445

nonthreatening manner). But here, the officials' demands that the platforms remove content and change their practices were backed by the officials' unilateral power to act or, at the very least, their ability to inflict "*some form of punishment*" against the platforms.[17] *Okwedy*, 333 F.3d at 342 (citation omitted) (emphasis added). Therefore, the authority factor weighs in favor of finding the officials' messages coercive.

Finally, and "perhaps most important[ly]," we ask whether the speaker "refers to adverse consequences that will follow if the recipient does not accede to the request." *Warren*, 66 F.4th at 1211 (citing *Vullo*, 49 F.4th at 715). Explicit and subtle threats both work— "an official does not need to say 'or else' if a threat is clear from the context." *Id.* (citing *Backpage.com*, 807 F.3d at 234). Again, this factor is met.

Here, the officials made express threats and, at the very least, leaned into the inherent authority of the President's office. The officials made inflammatory accusations, such as saying that the platforms were "poison[ing]" the public, and "killing people." The platforms were told they needed to take greater responsibility and action. Then, they followed their statements with threats of "fundamental reforms" like regulatory changes and increased enforcement actions that would ensure the platforms were "held accountable." But, beyond express threats, there was *always* an "unspoken 'or else.'" *Warren*, 66 F.4th at 1212. After all, as the executive of the Nation, the President wields awesome power. The officials were not shy to allude to that understanding native to every American—when the platforms faltered, the officials warned them that they were

---

[17] Or, as the Ninth Circuit put it, "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or *threatened* imposition of *government power or sanction*." *Warren*, 66 F.4th at 1207 (citation omitted) (emphasis added).

"[i]nternally . . . considering our options on what to do," their "concern[s] [were] shared at the highest (and I mean highest) levels of the [White House]," and the "President has long been concerned about the power of large social media platforms." Unlike the letter in *Warren*, the language deployed in the officials' campaign reveals clear "plan[s] to punish" the platforms if they did not surrender. *Warren*, 66 F.4th at 1209. *Compare id.*, *with Backpage.com*, 807 F.3d at 237. Consequently, the four-factor test weighs heavily in favor of finding the officials' messages were coercive, not persuasive.

Notably, the Ninth Circuit recently reviewed a case that is strikingly similar to ours. In *O'Handley*, officials from the California Secretary of State's office allegedly "act[ed] in concert" with Twitter to censor speech on the platform. 62 F.4th at 1153. Specifically, the parties had a "collaborative relationship" where officials flagged tweets and Twitter "almost invariably" took them down. *Id.* Therefore, the plaintiff contended, when his election-fraud-based post was removed, California "abridged his freedom of speech" because it had "pressured Twitter to remove disfavored content." *Id.* at 1163. But, the Ninth Circuit disagreed, finding the close nexus test was not satisfied. The court reasoned that there was no clear indication that Twitter "would suffer adverse consequences if it refused" to comply with California's request. *Id.* at 1158. Instead, it was a "purely optional," "no strings attached" request. *Id.* Consequently, "Twitter complied with the request under the terms of its own content-moderation policy and using its own independent judgment." *Id.*[18] To the Ninth Circuit,

---

[18] The Ninth Circuit insightfully noted the difficult task of applying the coercion test in the First Amendment context:

[W]e have drawn a sharp distinction between attempts to convince and attempts to coerce. Particularly relevant here, we have held that government officials do not violate the First Amendment when they

No. 23-30445

there was no indication—whether via tone, content, or otherwise—that the state would retaliate against inaction given the insubstantial relationship. Ultimately, the officials conduct was "far from the type of coercion" seen in cases like *Bantam Books*. *Id*. In contrast, here, the officials made clear that the platforms *would* suffer adverse consequences if they failed to comply, through express or implied threats, and thus the requests were not optional.

Given all of the above, we are left only with the conclusion that the officials' statements were coercive. That conclusion tracks with the decisions of other courts. After reviewing the four-factor test, it is apparent that the officials' messages could "reasonably be construed" as threats. *Warren*, 66 F.4th at 1208; *Vullo*, 49 F.4th at 716. Here, unlike in *Warren*, the officials' "call[s] to action"—given the context and officials' tone, the presence of *some* authority, the platforms' yielding responses, and the officials' express and implied references to adverse consequences—"directly suggest[ed] that compliance was the only realistic option to avoid government sanction." 66 F.4th at 1208. And, unlike *O'Handley*, the officials were not simply flagging posts with "no strings attached," 62 F.4th at 1158—they did much, much more.

---

request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply. This distinction tracks core First Amendment principles. A private party can find the government's stated reasons for making a request persuasive, just as it can be moved by any other speaker's message. The First Amendment does not interfere with this communication so long as the intermediary is free to disagree with the government and to make its own independent judgment about whether to comply with the government's request.

*O'Handley*, 62 F.4th at 1158. After all, consistent with their constitutional and statutory authority, state "[a]gencies are permitted to communicate in a non-threatening manner with the entities they oversee without creating a constitutional violation." *Id*. at 1163 (citing *Vullo*, 49 F.4th at 714–19).

No. 23-30445

Now, we turn to encouragement. We find that the officials also significantly encouraged the platforms to moderate content by exercising active, meaningful control over those decisions. Specifically, the officials entangled themselves in the platforms' decision-making processes, namely their moderation policies. *See Blum*, 457 U.S. at 1008. That active, meaningful control is evidenced plainly by a view of the record. The officials had consistent and consequential interaction with the platforms and constantly monitored their moderation activities. In doing so, they repeatedly communicated their concerns, thoughts, and desires to the platforms. The platforms responded with cooperation—they invited the officials to meetings, roundups, and policy discussions. And, more importantly, they complied with the officials' requests, including making changes to their policies.

The officials began with simple enough asks of the platforms—"can you share more about your framework here" or "do you have data on the actual number" of removed posts? But, the tenor later changed. When the platforms' policies were not performing to the officials' liking, they pressed for more, persistently asking what "interventions" were being taken, "how much content [was] being demoted," and why certain posts were not being removed. Eventually, the officials pressed for outright change to the platforms' moderation policies. They did so privately and publicly. One official emailed a list of proposed changes and said, "this is circulating around the building and informing thinking." The White House Press Secretary called on the platforms to adopt "proposed changes" that would create a more "robust enforcement strategy." And the Surgeon General published an advisory calling on the platforms to "[e]valuate the effectiveness of [their] internal policies" and implement changes. Beyond that, they relentlessly asked the platforms to remove content, even giving reasons as to why such

content should be taken down. They also followed up to ensure compliance and, when met with a response, asked how the internal decision was made.

And, the officials' campaign succeeded. The platforms, in capitulation to state-sponsored pressure, changed their moderation policies. The platforms explicitly recognized that. For example, one platform told the White House it was "making a number of changes"—which aligned with the officials' demands—as it knew its "position on [misinformation] continues to be a particular concern" for the White House. The platform noted that, in line with the officials' requests, it would "make sure that these additional [changes] show results—the stronger demotions in particular should deliver real impact." Similarly, one platform emailed a list of "commitments" after a meeting with the White House which included policy "changes" "focused on reducing the virality" of anti-vaccine content even when it "does not contain actionable misinformation." Relatedly, one platform told the Surgeon General that it was "committed to addressing the [] misinformation that you've called on us to address," including by implementing a set of jointly proposed policy changes from the White House and the Surgeon General.

Consequently, it is apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions. By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards. *See id.*; *see also Am. Mfrs.*, 526 U.S. at 52 ("The decision to withhold payment, like the decision to transfer Medicaid patients to a lower level of care in *Blum*, is made by concededly private parties, and 'turns on . . . judgments made by private

parties' without 'standards . . . established by the State.'") Instead, they were encouraged by the officials' imposed standards.

In sum, we find that the White House officials, in conjunction with the Surgeon General's office, coerced and significantly encouraged the platforms to moderate content. As a result, the platforms' actions "must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004.

## 2.

Next, we consider the FBI. We find that the FBI, too, likely (1) coerced the platforms into moderating content, and (2) encouraged them to do so by effecting changes to their moderation policies, both in violation of the First Amendment.

We start with coercion. Similar to the White House, Surgeon General, and CDC officials, the FBI regularly met with the platforms, shared "strategic information," frequently alerted the social media companies to misinformation spreading on their platforms, and monitored their content moderation policies. But, the FBI went beyond that—they urged the platforms to take down content. Turning to the Second Circuit's four-factor test, we find that those requests were coercive. *Vullo*, 49 F.4th at 715.

First, given the record before us, we cannot say that the FBI's messages were plainly threatening in tone or manner. *Id.* But, second, we do find the FBI's requests came with the backing of clear authority over the platforms. After all, content moderation requests "might be inherently coercive if sent by . . . [a] law enforcement officer." *Warren*, 66 F.4th at 1210 (citations omitted); *see also Zieper v. Metzinger*, 392 F. Supp. 2d 516, 531 (S.D.N.Y. 2005) (holding that a reasonable jury could find an FBI agent's request coercive when he asked an internet service provider to take down a controversial video that could be "inciting a riot" because he was "an FBI agent charged with investigating the video"); *Backpage*, 807 F.3d at 234

("[C]redit card companies don't like being threatened by a law-enforcement official that he will sic the feds on them, even if the threat may be empty."). This is especially true of the lead law enforcement, investigatory, and domestic security agency for the executive branch. Consequently, because the FBI wielded *some* authority over the platforms, *see Okwedy*, 333 F.3d at 344, the FBI's takedown requests can "reasonably be construed" as coercive in nature, *Warren*, 66 F.4th at 1210.

Third, although the FBI's communications did not plainly reference adverse consequences, an actor need not express a threat aloud so long as, given the circumstances, the message *intimates* that some form of punishment will follow noncompliance. *Id.* at 1209. Here, beyond its inherent authority, the FBI—unlike most federal actors—also has tools at its disposal to force a platform to take down content. For instance, in *Zieper*, an FBI agent asked a web-hosting platform to take down a video portraying an imaginary documentary showing preparations for a military takeover of Times Square on the eve of the new millennium. 392 F. Supp. 2d at 520–21. In appealing to the platform, the FBI agent said that he was concerned that the video could be "inciting a riot" and testified that he was trying to appeal to the platform's "'good citizenship' by pointing out a public safety concern." *Id.* at 531. And these appeals to the platform's "good citizenship" worked—the platform took down the video. *Id.* at 519. The Southern District of New York concluded that a reasonable jury could find that statement coercive, "particularly when said by an FBI agent charged with investigating the video." *Id.* at 531. Indeed, the question is whether a message intimates that *some* form of punishment that may be used against the recipient, an analysis that includes means of retaliation that are not readily apparent. *See Warren*, 66 F.4th at 1210.

Fourth, the platforms clearly perceived the FBI's messages as threats. For example, right before the 2022 congressional election, the FBI warned

No. 23-30445

the platforms of "hack and dump" operations from "state-sponsored actors" that would spread misinformation through their sites. In doing so, the FBI officials leaned into their inherent authority. So, the platforms reacted as expected—by taking down content, including posts and accounts that originated from the United States, in direct compliance with the request. Considering the above, we conclude that the FBI coerced the platforms into moderating content. But, the FBI's endeavors did not stop there.

We also find that the FBI likely significantly encouraged the platforms to moderate content by entangling themselves in the platforms' decision-making processes. *Blum*, 457 U.S. at 1008. Beyond taking down posts, the platforms also changed their terms of service in concert with recommendations from the FBI. For example, several platforms "adjusted" their moderation policies to capture "hack-and-leak" content after the FBI asked them to do so (and followed up on that request). Consequently, when the platforms subsequently moderated content that violated their newly modified terms of service (*e.g.*, the results of hack-and-leaks), they did not do so via independent standards. *See Blum*, 457 U.S. at 1008. Instead, those decisions were made subject to commandeered moderation policies.

In short, when the platforms acted, they did so in response to the FBI's inherent authority *and* based on internal policies influenced by FBI officials. Taking those facts together, we find the platforms' decisions were significantly encouraged and coerced by the FBI.[19]

---

[19] Plaintiffs and several *amici* assert that the FBI and other federal actors coerced or significantly encouraged the social-media companies into disseminating information that was favorable to the administration—information the federal officials knew was false or misleading. We express no opinion on those assertions because they are not necessary to our holding here.

No. 23-30445

**3.**

Next, we turn to the CDC. We find that, although not plainly coercive, the CDC officials likely significantly encouraged the platforms' moderation decisions, meaning they violated the First Amendment.

We start with coercion. Here, like the other officials, the CDC regularly met with the platforms and frequently flagged content for removal. But, unlike the others, the CDC's requests for removal were not coercive—they did not ask the platforms in an intimidating or threatening manner, do not possess any clear authority over the platforms, and did not allude to any adverse consequences. Consequently, we cannot say the platforms' moderation decisions were coerced by CDC officials.

The same, however, cannot be said for significant encouragement. Ultimately, the CDC was entangled in the platforms' decision-making processes, *Blum*, 457 U.S. at 1008.

The CDC's relationship with the platforms began by defining—in "Be On the Lookout" meetings—what was (and was not) "misinformation" for the platforms. Specifically, CDC officials issued "advisories" to the platforms warning them about misinformation "hot topics" to be wary of. From there, CDC officials instructed the platforms to label disfavored posts with "contextual information," and asked for "amplification" of approved content. That led to CDC officials becoming intimately involved in the various platforms' day-to-day moderation decisions. For example, they communicated about how a platform's "moderation team" reached a certain decision, how it was "approach[ing] adding labels" to particular content, and how it was deploying manpower. Consequently, the CDC garnered an extensive relationship with the platforms.

From that relationship, the CDC, through authoritative guidance, directed changes to the platforms' moderation policies. At first, the

platforms asked CDC officials to decide whether certain claims were misinformation. In response, CDC officials told the platforms whether such claims were true or false, and whether information was "misleading" or needed to be addressed via CDC-backed labels. That back-and-forth then led to "[s]omething more." *Roberts*, 742 F.2d at 228.

Specifically, CDC officials directly impacted the platforms' moderation policies. For example, in meetings with the CDC, the platforms actively sought to "get into [] policy stuff" and run their moderation policies by the CDC to determine whether the platforms' standards were "in the right place." Ultimately, the platforms came to *heavily rely* on the CDC. They adopted rule changes meant to implement the CDC's guidance. As one platform said, they "were able to make [changes to the 'misinfo policies'] based on the conversation [they] had last week with the CDC," and they "immediately updated [their] policies globally" following another meeting. And, those adoptions led the platforms to make moderation decisions based entirely on the CDC's say-so—"[t]here are several claims that we will be able to remove as soon as the CDC debunks them; until then, we are unable to remove them." That dependence, at times, was total. For example, one platform asked the CDC how it should approach certain content and even asked the CDC to double check and proofread its proposed labels.

Viewing these facts, we are left with no choice but to conclude that the CDC significantly encouraged the platforms' moderation decisions. Unlike in *Blum*, the platforms' decisions were not made by independent standards, 457 U.S. at 1008, but instead were marred by modification from CDC officials. Thus, the resulting content moderation, "while not compelled by the state, was so significantly encouraged, both overtly and covertly" by CDC officials that those decisions "must in law be deemed to be that of the state." *Howard Gault*, 848 F.2d at 555 (alterations adopted) (internal quotation marks and citation omitted).

No. 23-30445

**4.**

Finally, we address the remaining officials—the NIAID, the State Department, and CISA. Having reviewed the record, we find the district court erred in enjoining these other officials. Put simply, there was not, at this stage, sufficient evidence to find that it was likely these groups coerced or significantly encouragement the platforms.

For the NIAID officials, it is not apparent that they ever communicated with the social-media platforms. Instead, the record shows, at most, that public statements by Director Anthony Fauci and other NIAID officials promoted the government's scientific and policy views and attempted to discredit opposing ones—quintessential examples of government speech that do not run afoul of the First Amendment. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) ("[The government] is entitled to say what it wishes, and to select the views that it wants to express." (quotation marks and citations omitted)); *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view . . . ."). Consequently, with only insignificant (if any) communication (direct or indirect) with the platforms, we cannot say that the NIAID officials likely coerced or encouraged the platforms to act.

As for the State Department, while it did communicate directly with the platforms, so far there is no evidence these communications went beyond educating the platforms on "tools and techniques" used by foreign actors. There is no indication that State Department officials flagged specific content for censorship, suggested policy changes to the platforms, or engaged in any similar actions that would reasonably bring their conduct within the scope of the First Amendment's prohibitions. After all, their messages do not appear coercive in tone, did not refer to adverse consequences, and were not

No. 23-30445

backed by any apparent authority. And, per this record, those officials were not involved to any meaningful extent with the platforms' moderation decisions or standards.

Finally, although CISA flagged content for social-media platforms as part of its switchboarding operations, based on this record, its conduct falls on the "attempts to convince," not "attempts to coerce," side of the line. *See Okwedy*, 333 F.3d at 344; *O'Handley*, 62 F.4th at 1158. There is not sufficient evidence that CISA made threats of adverse consequences—explicit or implicit—to the platforms for refusing to act on the content it flagged. *See Warren*, 66 F.4th at 1208–11 (finding that senator's communication was a "request rather than a command" where it did not "suggest[] that compliance was the only realistic option" or reference potential "adverse consequences"). Nor is there any indication CISA had power over the platforms in any capacity, or that their requests were threatening in tone or manner. Similarly, on this record, their requests—although certainly amounting to a non-trivial level of involvement—do not equate to meaningful control. There is no plain evidence that content was actually moderated per CISA's requests or that any such moderation was done subject to non-independent standards.

\* \* \*

Ultimately, we find the district court did not err in determining that several officials—namely the White House, the Surgeon General, the CDC, and the FBI—likely coerced or significantly encouraged social-media

No. 23-30445

platforms to moderate content, rendering those decisions state actions.[20] In doing so, the officials likely violated the First Amendment.[21]

But, we emphasize the limited reach of our decision today. We do not uphold the injunction against all the officials named in the complaint. Indeed, many of those officials were permissibly exercising government speech, "carrying out [their] responsibilities," or merely "engaging in [a] legitimate [] action." *Vullo*, 49 F.4th at 718–19. That distinction is important because the state-action doctrine is vitally important to our Nation's operation—by distinguishing between the state and the People, it promotes "a robust sphere of individual liberty." *Halleck*, 139 S. Ct. at 1928. That is why the Supreme Court has been reluctant to expand the scope of the doctrine. *See Matal v. Tan*, 582 U.S. 218, 235 (2017) ("[W]e must exercise great caution before extending our government-speech precedents."). If just any relationship with the government "sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities." *Halleck*, 139 S. Ct. at 1932. So, we do not take our decision today lightly. But, the Supreme Court has rarely been faced with a coordinated campaign of this magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life. Therefore, the district court was correct in its assessment—"unrelenting pressure" from certain government

---

[20] Here, in holding that some of the officials likely coerced or sufficiently encouraged the platforms to censor content, we pass no judgment on any joint actor or conspiracy-based state action theory.

[21] "With very limited exceptions, none applicable to this case, censorship—'an effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive,' as distinct from punishing such dissemination (if it falls into one of the categories of punishable speech, such as defamation or threats) after it has occurred—is prohibited by the First Amendment as it has been understood by the courts." *Backpage.com*, 807 F.3d at 235 (citation omitted).

240a

No. 23-30445

officials likely "had the intended result of suppressing millions of protected free speech postings by American citizens." We see no error or abuse of discretion in that finding.[22]

## V.

Next, we address the equities. Plaintiffs seeking a preliminary injunction must show that irreparable injury is "likely" absent an injunction, the balance of the equities weighs in their favor, and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (collecting cases).

While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)), "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury," *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016).

Here, the district court found that the Plaintiffs submitted enough evidence to show that irreparable injury is likely to occur during the pendency of the litigation. In so doing, the district court rejected the officials' arguments that the challenged conduct had ceased and that future harm was speculative, drawing on mootness and standing doctrines. Applying the standard for mootness, the district court concluded that a defendant must

---

[22] Our holding today, as is appropriate under the state-action doctrine, is limited. Like in *Roberts*, we narrowly construe today's finding of state action to apply only to the challenged decisions. *See* 742 F.2d at 228 ("We do not doubt that many of the actions of the racetrack and its employees are no more than private business decisions," but "[i]n the area of stalling, [] state regulation and involvement is so specific and so pervasive that [such] decisions may be considered to bear the imprimatur of the state.").

Case 23-30445   Document 238-1   Page 631   Date Filed 09/08/2023
Case 23-30445   Document 238-1   Page 610   Date Filed 09/08/2023
Case 23-30445   Document 238-1   Page 610   Date Filed 09/08/2023

241a

No. 23-30445

show that "it is absolutely clear the alleged wrongful behavior could not reasonably be expected to recur" and that the officials had failed to make such showing here. In assessing whether Plaintiffs' claims of future harm were speculative and dependent on the actions of social-media companies, the district court applied a quasi-standing analysis and found that the Plaintiffs had alleged a "substantial risk" of future harm that is not "imaginary or wholly speculative," pointing to the officials' ongoing coordination with social-media companies and willingness to suppress free speech on a myriad of hot-button issues.

We agree that the Plaintiffs have shown that they are likely to suffer an irreparable injury. Deprivation of First Amendment rights, even for a short period, is sufficient to establish irreparable injury. *Elrod*, 427 U.S. at 373; *Cuomo*, 141 S. Ct. at 67; *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012).

The district court was right to be skeptical of the officials' claims that they had stopped all challenged conduct. *Cf. Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice, even in cases in which injunctive relief is sought."). But, the district court's use of a "not imaginary or speculative" standard in the irreparable harm context is inconsistent with binding case law. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on *a possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (citation omitted) (emphasis added)). The correct standard is whether a future injury is "likely." *Id.* But, because the Plaintiffs sufficiently demonstrated that their First Amendment interests are either threatened or impaired, they have met this standard. *See Opulent Life Church*, 697 F.3d at 295 (citing 11A Charles

242a

No. 23-30445

Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")). Indeed, the record shows, and counsel confirmed at oral argument, that the officials' challenged conduct has not stopped.

Next, we turn to whether the balance of the equities warrants an injunction and whether such relief is in the public interest. Where the government is the opposing party, harm to the opposing party and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The district court concluded that the equities weighed in favor of granting the injunction because the injunction maintains the "constitutional structure" and Plaintiffs' free speech rights. The officials argue that the district court gave short shrift to their assertions that the injunction could limit the Executive Branch's ability to "persuade" the American public, which raises separation-of-powers issues.

Although both Plaintiffs and the officials assert that their ability to speak is affected by the injunction, the government is not permitted to use the government-speech doctrine to "silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 235.

It is true that the officials have an interest in engaging with social-media companies, including on issues such as misinformation and election interference. But the government is not permitted to advance these interests to the extent that it engages in viewpoint suppression. Because "[i]njunctions protecting First Amendment freedoms are always in the public interest," the equities weigh in Plaintiffs' favor. *Opulent Life Church*, 697 F.3d at 298 (quotation marks and citations omitted).

243a

No. 23-30445

While the officials raise legitimate concerns that the injunction could sweep in lawful speech, we have addressed those concerns by modifying the scope of the injunction.

## VI.

Finally, we turn to the language of the injunction itself. An injunction "is overbroad if it is not 'narrowly tailored to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (alterations adopted) (quoting *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). This requirement that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" is in recognition of a federal court's "constitutionally prescribed role . . . to vindicate the individual rights of the people appearing before it," not "generalized partisan preferences." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018).

In addition, injunctions cannot be vague. "Every order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1). The Supreme Court has explained:

> [T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

244a

No. 23-30445

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citations omitted).

To be sure, "[t]he specificity requirement is not unwieldy," *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 373 (5th Cir. 1981), and "elaborate detail is unnecessary," *Islander E. Rental Program v. Barfield*, No. 96-41275, 1998 WL 307564, at *4 (5th Cir. Mar. 24, 1998). But still, "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Louisiana v. Biden*, 45 F.4th at 846 (citation omitted).

The preliminary injunction here is both vague and broader than necessary to remedy the Plaintiffs' injuries, as shown at this preliminary juncture. As an initial matter, it is axiomatic that an injunction is overbroad if it enjoins a defendant from engaging in legal conduct. Nine of the preliminary injunction's ten prohibitions risk doing just that. Moreover, many of the provisions are duplicative of each other and thus unnecessary.

Prohibitions one, two, three, four, five, and seven prohibit the officials from engaging in, essentially, any action "for the purpose of urging, encouraging, pressuring, or inducing" content moderation. But "urging, encouraging, pressuring" or even "inducing" action does not violate the Constitution unless and until such conduct crosses the line into coercion or *significant* encouragement. *Compare Walker*, 576 U.S. at 208 ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position."), *Finley*, 524 U.S. at 598 (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view . . . ."), *and Vullo*, 49 F.4th at 717 (holding statements "encouraging" companies to evaluate risk of doing business with the plaintiff did not violate the Constitution where the statements did not "intimate that some form of punishment or adverse regulatory action would follow the failure to accede to the request"), *with Blum*, 457 U.S. at 1004, *and*

*O'Handley*, 62 F.4th at 1158 ("In deciding whether the government may urge a private party to remove (or refrain from engaging in) protected speech, we have drawn a sharp distinction between attempts to convince and attempts to coerce."). These provisions also tend to overlap with each other, barring various actions that may cross the line into coercion. There is no need to try to spell out every activity that the government could possibly engage in that may run afoul of the Plaintiffs' First Amendment rights as long the unlawful conduct is prohibited.

The eighth, ninth, and tenth provisions likewise may be unnecessary to ensure Plaintiffs' relief. A government actor generally does not violate the First Amendment by simply "following up with social-media companies" about content-moderation, "requesting content reports from social-media companies" concerning their content-moderation, or asking social media companies to "Be on The Lookout" for certain posts.[23] Plaintiffs have not carried their burden to show that these activities must be enjoined to afford Plaintiffs full relief.

These provisions are vague as well. There would be no way for a federal official to know exactly when his or her actions cross the line from permissibly communicating with a social-media company to impermissibly "urging, encouraging, pressuring, or inducing" them "*in any way.*" *See Scott*, 826 F.3d at 209, 213 ("[a]n injunction should not contain broad generalities"); *Islander East*, 1998 WL 307564, at *4 (finding injunction against "interfering in any way" too vague). Nor does the injunction define

---

[23] While these activities, standing alone, are not violative of the First Amendment and therefore must be removed from the preliminary injunction, we note that these activities *may* violate the First Amendment when they are part of a larger scheme of government coercion or significant encouragement, and neither our opinion nor the modified injunction should be read to hold otherwise.

"Be on The Lookout" or "BOLO." That, too, renders it vague. *See Louisiana v. Biden*, 45 F.4th at 846 (holding injunction prohibiting the federal government from "implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in [the challenged Executive Order]" was vague because the injunction did not define the term "Pause" and the parties had each proffered different yet reasonable interpretations of the Pause's breadth).

While helpful to some extent, the injunction's carveouts do not solve its clarity and scope problems. Although they seem to greenlight legal speech, the carveouts, too, include vague terms and appear to authorize activities that the injunction otherwise prohibits on its face. For instance, it is not clear whether the Surgeon General could publicly urge social media companies to ensure that cigarette ads do not target children. While such a statement could meet the injunction's exception for "exercising permissible public government speech promoting government policy or views on matters of public concern," it also "urg[es] . . . in any manner[] social-media companies to change their guidelines for removing, deleting, suppressing, or reducing content containing protected speech." This example illustrates both the injunction's overbreadth, as such public statements constitute lawful speech, *see Walker*, 576 U.S. at 208, and vagueness, because the government-speech exception is ill-defined, *see Scott*, 826 F.3d at 209, 213 (vacating injunction requiring the Louisiana Secretary of State to maintain in force his "policies, procedures, and directives" related to the enforcement of the National Voter Registration Act, where "policies, procedures, and directives" were not defined). At the same time, given the legal framework at play, these carveouts are likely duplicative and, as a result, unnecessary.

Finally, the fifth prohibition—which bars the officials from "collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, the

No. 23-30445

Stanford Internet Observatory, or any like project or group" to engage in the same activities the officials are proscribed from doing on their own— may implicate private, third-party actors that are not parties in this case and that may be entitled to their own First Amendment protections. Because the provision fails to identify the specific parties that are subject to the prohibitions, *see Scott*, 826 F.3d at 209, 213, and "exceeds the scope of the parties' presentation," *OCA-Greater Houston v. Texas*, 867 F.3d 604, 616 (5th Cir. 2017), Plaintiffs have not shown that the inclusion of these third parties is necessary to remedy their injury. So, this provision cannot stand at this juncture. *See also Alexander v. United States*, 509 U.S. 544, 550 (1993) ("[C]ourt orders that actually [] forbid speech activities are classic examples of prior restraints."). For the same reasons, the injunction's application to "all acting in concert with [the officials]" is overbroad.

We therefore VACATE prohibitions one, two, three, four, five, seven, eight, nine, and ten of the injunction.

That leaves provision six, which bars the officials from "threatening, pressuring, or coercing social-media companies in any manner to remove, delete, suppress, or reduce posted content of postings containing protected free speech." But, those terms could also capture otherwise legal speech. So, the injunction's language must be further tailored to exclusively target illegal conduct and provide the officials with additional guidance or instruction on what behavior is prohibited. To be sure, our standard practice is to remand to the district court to tailor such a provision in the first instance. *See Scott*, 826 F.3d at 214. But this is far from a standard case. In light of the expedited nature of this appeal, we modify the injunction's remaining provision ourselves.

In doing so, we look to the Seventh Circuit's approach in *Backpage.com*, 807 F.3d at 239. There, the Seventh Circuit held that a county

No. 23-30445

sheriff violated Backpage's First Amendment rights by demanding that financial service companies cut ties with Backpage in an effort to "crush" the platform (an online forum for "adult" classified ads). *Id.* at 230. To remedy the constitutional violation, the court issued the following injunction:

> Sheriff Dart, his office, and all employees, agents, or others who are acting or have acted for or on behalf of him, shall take no actions, formal or informal, to coerce or threaten credit card companies, processors, financial institutions, or other third parties with sanctions intended to ban credit card or other financial services from being provided to Backpage.com.

*Id.* at 239.

Like the Seventh Circuit's preliminary injunction in *Backpage.com*, we endeavor to modify the preliminary injunction here to target the coercive government behavior with sufficient clarity to provide the officials notice of what activities are proscribed. Specifically, prohibition six of the injunction is MODIFIED to state:

> Defendants, and their employees and agents, shall take no actions, formal or informal, directly or indirectly, to coerce or significantly encourage social-media companies to remove, delete, suppress, or reduce, including through altering their algorithms, posted social-media content containing protected free speech. That includes, but is not limited to, compelling the platforms to act, such as by intimating that some form of punishment will follow a failure to comply with any request, or supervising, directing, or otherwise meaningfully controlling the social-media companies' decision-making processes.

249a

No. 23-30445

Under the modified injunction, the enjoined Defendants cannot coerce or significantly encourage a platform's content-moderation decisions. Such conduct includes threats of adverse consequences—even if those threats are not verbalized and never materialize—so long as a reasonable person would construe a government's message as alluding to some form of punishment. That, of course, is informed by context (*e.g.*, persistent pressure, perceived or actual ability to make good on a threat). The government cannot subject the platforms to legal, regulatory, or economic consequences (beyond reputational harms) if they do not comply with a given request. *See Bantam Books*, 372 U.S. at 68; *Okwedy*, 333 F.3d at 344. The enjoined Defendants also cannot supervise a platform's content moderation decisions or directly involve themselves in the decision itself. Social-media platforms' content-moderation decisions must be theirs and theirs alone. *See Blum*, 457 U.S. at 1008. This approach captures illicit conduct, regardless of its form.

Because the modified injunction does not proscribe Defendants from activities that could include legal conduct, no carveouts are needed. There are two guiding inquiries for Defendants. First, is whether their action could be reasonably interpreted as a threat to take, or cause to be taken, an official action against the social-media companies if the companies decline Defendants' request to remove, delete, suppress, or reduce protected free speech on their platforms. Second, is whether Defendants have exercised active, meaningful control over the platforms' content-moderation decisions to such a degree that it inhibits the platforms' independent decision-making.

To be sure, this modified injunction still "restricts government communications not specifically targeted to particular content *posted by plaintiffs themselves*," as the officials protest. But that does not mean it is still overbroad. To the contrary, an injunction "is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in

the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Pro. Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 274 (5th Cir. 1984) (citations omitted); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987). Such breadth is plainly necessary, if not inevitable, here. The officials have engaged in a broad pressure campaign designed to coerce social-media companies into suppressing speakers, viewpoints, and content disfavored by the government. The harms that radiate from such conduct extend far beyond just the Plaintiffs; it impacts every social-media user. Naturally, then, an injunction against such conduct will afford protections that extend beyond just Plaintiffs, too. *Cf. Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) ("[A]n injunction [can] benefit non-parties as long as that benefit [is] merely incidental." (internal quotation marks and citation omitted)).

As explained in Part IV above, the district court erred in finding that the NIAID Officials, CISA Officials, and State Department Officials likely violated Plaintiffs' First Amendment rights. So, we exclude those parties from the injunction. Accordingly, the term "Defendants" as used in this modified provision is defined to mean only the following entities and officials included in the original injunction:

> The following members of the Executive Office of the President of the United States: White House Press Secretary, Karine Jean-Pierre; Counsel to the President, Stuart F. Delery; White House Partnerships Manager, Aisha Shah; Special Assistant to the President, Sarah Beran; Administrator of the United States Digital Service within the Office of Management and Budget, Mina Hsiang; White House National Climate Advisor, Ali Zaidi; White House Senior COVID-19 Advisor, formerly Andrew Slavitt; Deputy Assistant to the President

and Director of Digital Strategy, formerly Rob Flaherty; White House COVID-19 Director of Strategic Communications and Engagement, Dori Salcido; White House Digital Director for the COVID-19 Response Team, formerly Clarke Humphrey; Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team, formerly Benjamin Wakana; Deputy Director for Strategic Communications and External Engagement for the White House COVID-19 Response Team, formerly Subhan Cheema; White House COVID-19 Supply Coordinator, formerly Timothy W. Manning; and Chief Medical Advisor to the President, Dr. Hugh Auchincloss, along with their directors, administrators and employees. Surgeon General Vivek H. Murthy; and Chief Engagement Officer for the Surgeon General, Katharine Dealy, along with their directors, administrators and employees. The Centers for Disease Control and Prevention ("CDC"), and specifically the following employees: Carol Y. Crawford, Chief of the Digital Media Branch of the CDC Division of Public Affairs; Jay Dempsey, Social-media Team Leader, Digital Media Branch, CDC Division of Public Affairs; and Kate Galatas, CDC Deputy Communications Director. And the Federal Bureau of Investigation ("FBI"), and specifically the following employees: Laura Dehmlow, Section Chief, FBI Foreign Influence Task Force; and Elvis M. Chan, Supervisory Special Agent of Squad CY-1 in the FBI San Francisco Division.

Case 3:23-30445 Document 288-151 Page 740 Date Filed 09/08/2023
Case 3:23-cv-00880 Document 238-151 Page 74 of 103 Filed 09/08/2023

252a

No. 23-30445

## VII.

The district court's judgment is AFFIRMED with respect to the White House, the Surgeon General, the CDC, and the FBI, and REVERSED as to all other officials. The preliminary injunction is VACATED except for prohibition number six, which is MODIFIED as set forth herein. The Appellants' motion for a stay pending appeal is DENIED as moot. The Appellants' request to extend the administrative stay for ten days following the date hereof pending an application to the Supreme Court of the United States is GRANTED, and the matter is STAYED.

# EXHIBIT H

# YouTube's Community Guidelines

When you use YouTube, you join a community of people from all over the world. The guidelines below help keep YouTube fun and enjoyable for everyone.

If you see content that you think violates these guidelines, report it.

Sometimes, content that would otherwise violate our Community Guidelines may stay on YouTube when it has Educational, Documentary, Scientific, or Artistic (EDSA) context. In these cases, the content gets an EDSA exception.

These policies apply to all types of content on our platform, including, for example, unlisted and private content, comments, links, Community posts, and thumbnails. This list isn't complete.



## Spam & deceptive practices



The YouTube Community is one that's built on trust. Content that intends to scam, mislead, spam, or defraud other users isn't allowed on YouTube.

- Spam, deceptive practices, & scams policies
- Impersonation policy
- External links policy
- Fake engagement policy
- Playlists policy
- Additional policies

## Sensitive content

We hope to protect viewers, creators, and especially minors. That's why we've got rules around keeping children safe, sex & nudity, and self harm. Learn what's allowed on YouTube and what to do if you see content that doesn't follow these policies.

- Nudity & sexual content policies
- Thumbnails policy
- Child safety policy
- Suicide, self-harm, and eating disorders policy
- Vulgar language policy



# Violent or dangerous content

Hate speech, predatory behavior, graphic violence, malicious attacks, and content that promotes harmful or dangerous behavior isn't allowed on YouTube.

- Harmful or dangerous content policies
- Violent or graphic content policies
- Violent criminal organizations policy
- Hate speech policy
- Harassment & cyberbullying policies



# Regulated goods

Certain goods can't be sold on YouTube. Find out what's allowed—and what isn't.

- Sale of illegal or regulated goods or services policies
- Firearms policy

# Misinformation



Certain types of misleading or deceptive content with serious risk of egregious harm are not allowed on YouTube. This includes certain types of misinformation that can cause real-world harm, like promoting harmful remedies or treatments, certain types of technically manipulated content, or content interfering with democratic processes.

- Misinformation policies
- Elections misinformation policies
- Medical misinformation policies

# Educational, Documentary, Scientific, and Artistic (EDSA) content

Our Community Guidelines aim to make YouTube a safer community. Sometimes, content that would otherwise violate our Community Guidelines may stay on YouTube when it has Educational, Documentary, Scientific, or Artistic (EDSA) context. In these cases, the content gets an EDSA exception.

- How YouTube evaluates Educational, Documentary, Scientific, and Artistic (EDSA) content

💡 Get creator tips for YouTube policies and guidelines.

**Please take these rules seriously**. *If a YouTube creator's on- and/or off-platform behavior harms our users, community, employees or ecosystem, we may respond based on a number of factors including, but not limited to, the egregiousness of their actions and whether a pattern of harmful behavior exists. Our response will range from suspending a creator's privileges to account termination.*

 Give feedback about this article

**Was this helpful?**  Yes   No

## Need more help?

Try these next steps:



**Post to the help community**
Get answers from community members

**Contact us**
Tell us more and we'll help you get there

oogle - Privacy Policy - YouTube Terms of Service

English

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**STATE OF MISSOURI ET AL**                    **CASE NO.  3:22-CV-01213**

**VERSUS**                    **JUDGE TERRY A. DOUGHTY**

**JOSEPH R BIDEN JR ET AL**                    **MAG. JUDGE KAYLA D. MCCLUSKY**

## MEMORANDUM RULING AND ORDER

Before this Court is a Motion for Expedited Preliminary Injunction-Related Discovery [Doc. No. 17] filed by the States of Missouri and Louisiana ("Plaintiff States").  An Opposition [Doc. No. 26] was filed by Government Defendants[1] on July 1, 2022.  A Reply [Doc. No. 30] was filed by Plaintiff States on July 7, 2022.

For the reasons set forth herein, Plaintiff States' Motion for Expedited Preliminary Injunction-Related Discovery is GRANTED in accordance with the schedule set out herein.

## I.    BACKGROUND

On May 5, 2022, Plaintiff States filed a Complaint [Doc. No. 1] against Government Defendants.  In the Complaint, Plaintiff States allege that Government Defendants have colluded with and/or coerced social media companies to suppress disfavored speakers, viewpoints, and content on social media platforms by labeling the content "disinformation," "misinformation," and "malinformation."  Plaintiff States allege the suppression of disfavored speakers, viewpoints, and contents constitutes government action and therefore violates Plaintiff States' freedom of speech in violation of the First Amendment to the United States Constitution.

---

[1] Government Defendants consist of Joseph R. Biden, Jr., Jennifer Rene Psaki, Vivek H. Murthy, Xavier Becerra, Department of Health and Human Services, Anthony Fauci, National Institute of Allergy and Infectious Diseases, Centers for Disease Control and Prevention, Alejandro Mayorkas, Department of Homeland Security, Jen Easterly, Cybersecurity and Infrastructure Security Agency, and Nina Jankowicz.

The Complaint further alleged Plaintiff States have created a "Disinformation Governance Board" ("DGB") within the Department of Homeland Security, which is intended to be used and will be used to induce, label, and pressure the censorship of disfavored content, viewpoints, and speakers on social-media platforms.

In the Complaint, Plaintiff States set forth examples of suppression of free speech, which include:

1. The Hunter Biden laptop story prior to the 2020 Presidential election;

2. Speech about the lab-leak theory of COVID-19's origin;

3. Speech about the efficiency of masks and COVID-19 lockdowns; and

4. Speech about election integrity and the security of voting by mail.

Additionally, the Complaint sets forth actions by specific Government Defendants that have been taken to suppress free speech. Plaintiff States allege that free speech is the bedrock of American liberty, and Government Defendants are in violation of the First Amendment to the U.S. Constitution in attempting to suppress free speech by labeling the speech as "misinformation."

Plaintiff States bring this action to enforce Plaintiff States' own laws and constitutions on behalf of themselves and on behalf of their citizens ("*parens patriae*").

The Complaint alleges:

Count One – Violation of the First Amendment against all Government Defendants;

Count Two – Action in Excess of Statutory Authority against all Government Defendants;

Count Three – Violation of the Administrative Procedures Act against the HHS Defendants; and

Count Four - Violation of the Administrative Procedures Act against the DHS Defendants.

On June 14, 2022, Plaintiff States filed a Motion for Preliminary Injunction [Doc. No. 10] asking to prohibit Government Defendants from taking steps to demand, urge, encourage, pressure, or otherwise induce any social-media company or platform to censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content, or viewpoint expressed on social media. On June 17, 2022, Plaintiff States filed the Motion for Expedited Preliminary Injunction-Related Discovery [Doc. No. 17]. Any response to the Motion for Preliminary Injunction has been stayed pending disposition of the request for discovery.[2]

## II.    LAW AND ANALYSIS

### A.    Standing

The first issue that must be addressed is standing. Government Defendants argue this Court does not have jurisdiction because Plaintiff States have no standing. Courts are instructed to examine their jurisdiction at every stage of the litigation.[3] At the pleading stage, the plaintiff's burden is to allege a plausible set of facts establishing jurisdiction.[4] Government Defendants additionally maintain discovery should be stayed pending the filing and ruling of the Government Defendants' expected motion to dismiss.

Government Defendants argue Plaintiff States do not have the authority to bring a *parens patriae* suit against the Federal Government. Government Defendants also argue that Plaintiff States do not meet the standing requirements of injury in fact, traceability, and redressability. Plaintiff States maintain in addition to a *parens patriae* suit on behalf of its citizens, it is also bringing a suit to enforce its own laws and constitution.

---

[2] [Doc. No. 19].
[3] *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 161 (5th Cir. 2011).
[4] *Haverkamp v. Linthicum*, 6 F.4th 662, 668 (5th Cir. 2021).

This Court must determine whether it has judicial power to hear this case. The United States Constitution limits exercise of judicial power to certain "cases" and "controversies."[5]

Under the doctrine of "standing," a federal court can exercise judicial power only where a plaintiff has demonstrated that it (1) suffered an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable decision. *Lujan v. Defenders. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.* at 561.

The Plaintiffs in this case are two states. States are not normal litigants for purposes of invoking federal jurisdiction. *Massachusetts v. E.P.A.,* 549 U.S. 497, 518, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007). Rather, a state is afforded "special solicitude" in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever its claims and injury meet certain criteria. *Id.* at 520; *Texas v. United States*, 809 F.3d 134, 151–55 (5th Cir. 2015), *as revised* (Nov. 25, 2015). Specifically, a state seeking special solicitude standing must allege that a defendant violated a congressionally accorded procedural right that affected the state's "*quasi-sovereign*" interests in, for instance, its physical territory or lawmaking function. *Massachusetts*, 549 U.S. at 520–21; *Texas*, 809 F.3d at 151–55.

### 1.    Injury in Fact

A plaintiff seeking to establish injury in fact must show that it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635

---

[5] U.S. Constitution Art. III Section 2.

4

(2016), *as revised* (May 24, 2016). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id*. at 1548. A "concrete" injury must be "de facto," that is, it must "actually exist." "Concrete" is not however, necessarily synonymous with "tangible." Intangible injuries can nevertheless be "concrete." *Id.,* at 1548-49.

Plaintiff States have alleged both individual and *quasi-sovereign parens patriae* interests.

This Court finds the Plaintiff States' alleged injuries are both particularized and concrete. Plaintiff States have a "*parens patriae*" standing and/or a *quasi-sovereign* interest in protecting their citizens from having rights of free speech suppressed.

Additionally, the Plaintiff States have standing to regulate enforcement of their laws and constitution, which guarantees residents of Missouri and Louisiana free speech. The alleged injuries are "imminent" and allegedly "on-going," due to allegations of social media suspensions, removals of disfavored viewpoints, and censorship.

### 2. Traceability

Plaintiff States must show a "fairly traceable" link between their alleged injuries and Government Defendants alleged actions. As a general matter, the causation required for standing purposes can be established with "no more than de facto causality." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2556, 204 L. Ed. 2d 978 (2019). The plaintiff need not demonstrate that the defendant's actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169–70, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997).

Plaintiff States easily meet this requirement based on allegations of suppression of disfavored speakers, viewpoints, and content of its citizens, and based upon alleged violations of Plaintiffs States' laws and constitutions.

### 3. Redressability

The redressability element of standing to sue requires a plaintiff to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020), *cert. denied sub nom. El Paso Cty., Texas v. Biden*, 141 S. Ct. 2885, 210 L. Ed. 2d 991 (2021), *reh'g denied*, 142 S. Ct. 51, 210 L. Ed. 2d 1019 (2021).

Plaintiff States meet this requirement. Stopping of the alleged suppression of supposed disfavored speakers, viewpoints, and content would address Plaintiff States' alleged injuries.

### 4. Special Solicitude

Although this Court has found that Plaintiff States have proven standing through the normal inquiry, they also can establish standing as a result of special solicitude. Plaintiff States assert a constitutionally bestowed right (free speech), and the government action at issue affects the Plaintiff States' *quasi-sovereign* interests (of protecting its citizens from suppression of free speech).

Additionally addressed herein is Government Defendants' contention that the Plaintiff States do not have the authority to bring a *parens patriae* suit against the Federal Government,[6] arguing the Federal Government is the ultimate *parens patriae* of every citizen. The States of Missouri and Louisiana have the authority to bring suits on behalf of their citizens. In *Massachusetts v. EPA*, 549 U.S. 497, 520 and n.17 (2007), the U.S. Supreme Court upheld the State of Massachusetts' ability to bring a *parens patriae* suit against the federal government where the states seek to assert its rights under federal law. In footnote 17, in addressing Chief Justice Roberts' argument that there was significant doubt on a States standing to assert a *quasi-*

---

[6] [Doc. No. 26, pp 15-16]

*sovereign* interest against the Federal Government, a majority of the Court specifically held that a State has standing to assert their rights under federal law, even if it applies to its citizens. The First Amendment obviously applies to the citizens of Missouri and Louisiana, so Missouri and Louisiana have the authority to assert those rights.

This Court further discusses the cases cited by Government Defendants that dismissed similar suits for lack of standing.[7]  The Plaintiff in *Hart* was a suit by an individual against Facebook, Twitter, President Joe Biden, Surgeon General Vivek Murthy, the Department of Health and Human Services, and the Office of Management and Budget. *Hart* alleged Facebook and Twitter flagged his posts as misinformation about COVID-19 and suspended and locked his accounts in violation of the First Amendment under the U.S. Constitution and the Free Speech Clause of the California Constitution.

In addition to the claim against Facebook and Twitter, *Hart* alleged the Government Defendants directed social media platforms to make changes resulting in his posts being flagged as "misinformation" and ultimate suspension.  The Motion to Dismiss filed by the government defendants was granted because *Hart* was unable to set forth facts plausibly alleging the government was a joint participant in the activity and that the government coerced Facebook and Twitter to take these actions.  Therefore, the Court lacked standing because *Hart's* claims were neither "fairly traceable" nor "redressable" by *Hart's* suit.

In *Association of American Physicians and Surgeons, the Association of American Physicians and Surgeons* ("AAPS") an individual, Katrina Verreli ("Verreli") alleged Congressman Adam Schiff ("Schiff") violated her First Amendment rights by coercing

---

[7] *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 510 (D.D.C. 2021), aff'd 23 F.4th 1028 (D.C. Cir. 2022); *Hart v. Facebook, Inc.*  2022 WL 1427507 (N.D. Cal. May 5, 2022); and *Changizi v. Dept. of Health & Hum. Servs.* 2022 WL 1423176 (S.D. Ohio, May 5, 2022).

technology companies to discriminate against AAPS. Verreli alleged Schiff's actions limited her First Amendment right to access information about vaccines.

The Court dismissed the plaintiff's claims against Schiff based upon standing.[8] In finding lack of standing, the Court found the plaintiff had not alleged an injury in fact which was sensually related to defendant's conduct.

The court also noted that standing was "ordinarily substantially more difficult to establish" when an individual plaintiff asserts injuries arising from the regulation of someone else.[9]

In *Changizi,* three individual Twitter users were suspended by Twitter for false or misleading COVID-19 information. The plaintiffs sued the United States Department of Health and Human Services ("DHHS") and the Surgeon General and Secretary of DHH, alleging defendants "instrumentalized" or "commandeered" Twitter to censor and chill online criticism of the government's response to COVID-19.

Like *Hart* and *Association of American Physicians and Surgeons*, the plaintiffs were unable to plausibly allege they sustained an injury-in-fact which was causably related to defendants' conduct.

Each of the above cases were factually intensive. Based upon the specific facts of each case, the court found the plaintiffs had not plausibly alleged injury-in-fact and causation. In the present case, this Court finds Missouri and Louisiana have plausibly alleged injury-in-fact, causation, and redressability. The Plaintiff States' eighty-four-page Complaint sets forth much more detailed allegations and evidence against federal agencies and officials than the cases cited by Government Defendants.

---

[8] Suit was also dismissed on the basis of the Speech and Debts clause of the U.S. Constitution.
[9] 518 F. Supp. 3d at 513

If Missouri and Louisiana do not have standing under the facts alleged, when would anyone ever have standing to address these claims? In conclusion, the Court finds that the Plaintiff States have standing and that this Court has the judicial power to hear this case.

### B. Expedited Discovery

Federal Rule of Civil Procedure 26 Article(d) states:

Duty to Disclose, General Provisions Governing Discovery

(d) Timing and Sequence of Discovery.

1) Timing. A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by Court order.

Plaintiff States seek a court order allowing expedited discovery. Although the Fifth Circuit has not explicitly adopted a standard to determine whether a party is entitled to expedited discovery, several districts within the Fifth Circuit have expressly utilized the "good cause" standard when addressing this issue. The "good cause" analysis takes into consideration such factors as the breadth of discovery requests, the purpose for requesting expedited discovery, the burden on the defendants to comply with the requests, and how far in advance of the typical discovery process the request was made.[10] Courts utilizing the "good cause" standard examine the discovery request on the entirety of the record to date, and the reasonableness of the request in light of all the surrounding circumstances.[11]

Expedited discovery is not the norm. Courts only allow it in limited circumstances. Courts have allowed expedited discovery when there is some showing of irreparable harm, or

---

[10] *GHX Industrial, LLC v. Servco Hose and Supply, LLC*, 2020 WL 1492920; *Elargo Holdings, LLC v. Doe*, 318 F.R.D. 58, 61 (M.D. La. 2016); *Wilson v. Samson Contour Energy E&P, LLC*, 2014 WL 2949457, at 2 (W.D. Louisiana 2014).
[11] *Wilson*, 2014 WL 2949457 at 2.

when there is a risk that evidence would be lost or destroyed.[12]  The factors used by good cause typically exists where the need for expedited discovery outweighs the prejudice to the responding party.[13]

When a party seeks expedited discovery for the purpose of an injunction hearing, factors commonly considered in determining the reasonableness of expedited discovery request include: (1) whether the preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose of requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.[14]

In the Motion for Expedited Preliminary Injunction-Related Discovery, Plaintiff States ask for the following expedited discovery:

(1)    Targeted interrogatories and document requests to Government Defendants requesting the identities of federal officials who have or are communicating with social-media platforms about disinformation, misinformation, malinformation, or any form of censorship or suppression of online speech;

(2)    Targeted interrogatories and document requests to Government Defendants requesting the nature and content of such federal officials' communications with such social-media platforms, including both currently known and unknown federal officials;

(3)    Serve third-party subpoenas on a limited number of major social-media platforms seeking similar information about the identity of federal officials who communicate with them, and the nature and content of those communications;

---

[12] *Id at 3.*
[13] *Soileau v. GPS Maine, LLC*, 2020 WL 9078308 at 2 (E.D. Louisiana 2020).
[14] *Amos v. Taylor*, 2020 WL 5809972 at 5 (N.D. Miss. 2020); *Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015).

(4)     Allowing objections and responses to the discovery requests, conferring in good faith about discovery disputes and submit a joint statement to the Court detailing the nature of any remaining disputes;

(5)     The Court rule on all objections;

(6)     After any objections are resolved by the Court, Plaintiff States are to notify Government Defendants, based upon discovery responses received, whether Plaintiff States seeks to take any depositions;

(7)     The parties will again confer in good faith and submit a joint statement to the Court of any remaining disputes;

(8)     The Court will rule on all objections.

### 1.     Good Cause

This Court will address whether Plaintiff States have shown "good cause" for expedited discovery.  First, the Court will address Government Defendants' contention that no discovery should be permitted except as to the administrative record before each federal agency.  Although generally discovery is not allowed beyond the Administrative Record ("AR"), a Court may receive and consider evidence outside the AR relating to a request for a preliminary injunction, and in circumstances where the moving party demonstrates unusual circumstances.[15]

Currently, there is no AR in this case, and the Court is not sure there will ever be one for this claim.  In any event, the need for a Preliminary Injunction would likely be thwarted if the Court were to wait for all of the Government Defendants to provide an AR before determining whether discovery is necessary.  This Court believes that determination needs to be made now, not after waiting for an AR to be produced.

---

[15] *Pegasus Equine Guardian Assoc. v. United States Army*, 2018 WL 2760339 (W.D. La. March 9, 2018); *Medina Co. Envt'l Action Ass'n. v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010).

### (i)     Whether a preliminary injunction is pending

The first factor for "good cause" is satisfied as Plaintiff States filed a Motion for

Preliminary Injunction [Doc. No. 10] on June 14, 2022.

### (ii)     Breadth of Discovery Requests

At this point, Plaintiff States seek to issue interrogatories and document requests to

Government Defendants; and to serve third party subpoenas on a limited number of social media

platforms.  Whether depositions will be taken will be addressed later.  Plaintiff States seek

identity of federal officials communicating with these social media platforms including the

nature and content of those communications.  Plaintiff States seek similar information from the

social media platforms.

This is a complicated case.  The proposed discovery requests are targeted to the specific

allegations of Plaintiff States' Complaint.  The requests are reasonable.

### (iii)     Purpose of Requesting the Expedited Discovery

The purpose of the proposed expedited discovery is to gain additional evidence to prove

the allegations of Missouri and Louisiana for purposes of the pending Motion for Preliminary

Injunction.  The proposed discovery is tailored to the allegations Plaintiff States seek to prove

and is not a "fishing expedition."

### (iv)     Burden on Government Defendants

Certainly, it would be time-consuming to produce the information requested.  However,

this issue involves the alleged violation of a constitutional right – the right of free speech.

Therefore, this Court feels the need for this information outweighs the burden to Government

Defendants.

### (v) Discovery Process

The last factor involves the question of how far in advance of the typical discovery process the request was made. The Complaint was filed on May 5, 2022. The Motion for Preliminary Injunction was filed on June 14, 2022. The Motion for Expedited Preliminary Injunction-Related Discovery was filed on June 17, 2022.

The request was made far in advance of the typical discovery process and is important to the resolution of the Motion for Preliminary Injunction.

Therefore, this Court believes that Missouri and Louisiana have shown good cause for expedited preliminary injunction discovery.

### C. Scope of Expedited Discovery

Although there is certainly a "need for speed" for discovery related to a preliminary injunction, the Plaintiff States' proposed schedule is too fast. Therefore, this Court adopts the following schedule for expedited preliminary injunction–related discovery and/or motion for preliminary injunction.

(1) Within five business days after this ruling, Plaintiff States may serve interrogatories and document requests upon Government Defendants and third party-subpoenas on up to five major social-media platforms seeking the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications.

(2) Within thirty days of Plaintiff States' discovery requests, responses and/or objections shall be provided by Government Defendants and/or the major social-media platforms.

13

(3)      Within ten days following receipt of the objections and/or responses, the parties shall meet and confer in good faith about discovery disputes.  A joint statement to the Court shall be submitted detailing the nature of the remaining disputes.

(4)      Within seven days from the filing of said joint statement, the Court shall rule on any remaining objections.

(5)      Withing ten days after the production of any objected-to responses, Plaintiff States shall notify Government Defendants of any depositions the Plaintiff States wish to take.

(6)      Within seven days thereafter, the parties shall meet and confer regarding any deposition requests.  If the parties do not agree on the deposition(s), the parties shall file a joint statement as to their positions as to the depositions.

(7)      Within seven days from date of filing of said joint statement, the Court shall rule on the deposition requests.

(8)      Plaintiff States will have thirty days after the Court's ruling to take any authorized depositions.

(9)      Within twenty days after all authorized depositions are taken, Plaintiff States will be allowed to supplement their previous memorandum regarding the need for a preliminary injunction.

(10)      Within twenty days after Plaintiff States files their supplemental memorandum, Government Defendants may file a supplemental memorandum addressing the requests for preliminary injunction.

(11)      Within ten days after Government Defendants' supplemental memorandum, the Plaintiff States may file a reply.

(12)     In due course, this Court will rule on Plaintiff States' Motion for Preliminary Injunction.

## III.     CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that in accordance with the terms and conditions set forth herein, Plaintiff States' Motion for Expedited Preliminary Injunction-Related Discovery [Doc. No. 17] is **GRANTED.**

**MONROE, LOUISIANA,** this 12th day of July 2022.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI ex rel. ERIC S. SCHMITT, Attorney General,<br><br>STATE OF LOUISIANA ex rel. JEFFREY M. LANDRY, Attorney General, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Case No. 3:22-cv-01213 |

## THE PARTIES' JOINT STATEMENT ON DISCOVERY DISPUTES

Pursuant to the Court's Order, Doc. 34, at 14, the parties respectfully submit this Joint Statement regarding discovery disputes.

## PLAINTIFFS' POSITION

On July 19, 2022, pursuant to the Court's Order, the Plaintiffs served interrogatories and document requests upon the Government Defendants seeking the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications. Doc. 34, at 13. Plaintiffs also served third-party subpoenas on five major social-media platforms – Twitter, Facebook and Instagram (both owned by Meta), YouTube, and LinkedIn. *See* Doc. 34, at 13. On August 17, 2022, the Government Defendants provided objections and responses to the Plaintiff States' discovery requests, and began a rolling production of documents that was completed on August 26, 2022.

The parties met and conferred on multiple occasions in attempt to resolve their disputes. These efforts resulted in a significant narrowing of the disputes, but disputes remain unresolved as to the following issues:

1. Whether the White House Defendants – the White House Press Secretary and Dr. Fauci in his capacity as Chief Medical Advisor to the President – should be compelled to respond to Plaintiffs' interrogatories and document requests.

2. Whether Defendants should be required, in response to Plaintiffs' interrogatories, to identify federal officials and agencies whom they know of *outside their own agencies* who have or are engaged in communications with social-media platforms about misinformation, disinformation, malinformation, and/or censorship or suppression of speech on social-media, and produce any such communications in their possession.

3. Whether Defendant Health and Human Services (HHS) and Dr. Fauci in his capacity as NIAID Director should be required to provide complete responses to Plaintiffs' interrogatories and document requests.[1]

4. Whether Plaintiffs should be allowed leave of Court to file a Second Amended Complaint adding as Defendants newly identified federal officials and agencies, whose identities have been revealed during the discovery process, and obtain similar expedited discovery against them.

5. Whether Defendants should be permitted to seek reciprocal discovery against Plaintiffs.

The Parties have set forth their respective positions on these disputes below. Plaintiffs' position is presented first, then Defendants' position.

---

[1] The parties are still engaged in active discussions of issues 2 and 3 listed here in effort to reach agreement. If they do reach agreement on these issues, they will promptly notify the Court that those issues are resolved.

Under the First Amendment, the federal Government should have no role in policing private speech or picking winners and losers in the marketplace of ideas. But that is what federal officials are doing, on a massive scale – a scale whose full scope and impact is yet to be determined.

Secretary Mayorkas of DHS commented that the federal Government's efforts to police private speech on social media are occurring "across the federal enterprise." Doc. 45, ¶ 233. It turns out that this statement is true, on a scale beyond what Plaintiffs could ever have anticipated. The limited discovery produced so far provides a tantalizing snapshot into a massive, sprawling federal "Censorship Enterprise," which includes dozens of federal officials across at least eleven federal agencies and components identified so far, who communicate with social-media platforms about misinformation, disinformation, and the suppression of private speech on social media—all with the intent and effect of pressuring social-media platforms to censor and suppress private speech that federal officials disfavor. The discovery provided so far demonstrates that this Censorship Enterprise is extremely broad, including officials in the White House, HHS, DHS, CISA, the CDC, NIAID, and the Office of the Surgeon General; and evidently other agencies as well, such as the Census Bureau, the FDA, the FBI, the State Department, the Treasury Department, and the U.S. Election Assistance Commission. And it rises to the highest levels of the U.S. Government, including numerous White House officials. More discovery is needed to uncover the full scope of this "Censorship Enterprise," and thus allow Plaintiffs the opportunity to achieve fully effective injunctive relief. Defendants have objected to producing some of the most relevant and probative information in their possession—*i.e.*, the identities, and nature and content of communications, of White House officials and officials at other federal agencies who are not yet Defendants in this case because they were unknown when Plaintiffs served their discovery six weeks ago. Defendants have objected to producing discovery that would reveal both the height

and the breadth of the federal "Censorship Enterprise." The Court should overrule these objections and order Defendants to provide this highly relevant, responsive, and probative information.

## I.     Status of Discovery To Date.

This Court's order granting expedited preliminary-injunction-related discovery authorized Plaintiffs to "serve interrogatories and document requests upon Government Defendants and third party-subpoenas on up to five major social-media platforms seeking the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications." Doc. 34, at 13. Pursuant to this Order, on July 18, 2022, Plaintiffs served ten sets of Interrogatories and eight sets of Requests for Production on the Government Defendants, including all Defendants except President Biden. These discovery requests sought the identities of federal officials who are or have engaged in communications with social-media platforms about the topics identified in the Court's Order, as well as the nature and content of those communications. At the same time, Plaintiffs served third-party subpoenas on Twitter, Facebook, Instagram,[2] YouTube, and LinkedIn, seeking similar information. *See id.*

Defendants served their objections and responses on August 17, 2022, and they began a rolling production of documents that lasted until August 26, 2022. During the same time, Plaintiffs and Defendants engaged in extensive discussions in attempt to resolve disputed issues, which resulted in the production (or anticipated production) of additional information. Plaintiffs also engaged in extensive discussions with the social-media platforms that received third-party

---

[2] Facebook and Instagram are both owned by Meta, so those two were treated as a combined subpoena.

subpoenas, and Plaintiffs obtained responses of relevant information from those social-media platforms. The discovery provided so far includes significant information that provides a snapshot into the extent of the federal Defendants' social-media censorship activities, and that support and reinforce the allegations in the First Amended Complaint. It also illustrates the nature and importance of the parties' remaining disputes.

First, the breadth and extent of the federal Defendants' censorship activities is massive. In their initial response to interrogatories, Defendants initially identified *forty-five* federal officials at DHS, CISA, the CDC, NIAID, and the Office of the Surgeon General (all within only two federal agencies, DHS and HHS), who communicate with social-media platforms about misinformation and censorship. Ex. 1 (Defendants' Redacted Interrogatory Responses), at 15-18. But in those responses, Defendants did not provide information about any federal officials at *other* federal agencies of whom they are aware who engage in such communications with social-media platforms about misinformation and censorship, though Plaintiffs had specifically asked for this highly relevant information. *See id.* Defendants' document production, however, reveals that such officials at other federal agencies exist—for example, their emails include extensive copying of officials at the Census Bureau, and they also include communications involving the Departments of Treasury and State. *See* Ex. 2. The third-party social-media platforms, moreover, have revealed that more federal agencies are involved. Meta, for example, has disclosed that at least 32 federal officials—including senior officials at the FDA, the U.S. Election Assistance Commission, and the White House—have communicated with Meta about content moderation on its platforms, many of whom were not disclosed in response to Plaintiffs' interrogatories to Defendants. YouTube disclosed eleven federal officials engaged in such communications, including officials at the Census Bureau and the White House, many of whom were also not disclosed by Defendants.

Twitter disclosed nine federal officials, including senior officials at the State Department who were not previously disclosed by Defendants.

Second, these federal censorship activities include very senior officials within the U.S. Government, *i.e.*, "members of our senior staff," in Jen Psaki's words. Doc. 42, ¶ 174. Defendants have steadfastly refused to respond to any interrogatories or document requests directed to the White House officials, such as White House Press Secretary Karine Jean-Pierre and Dr. Fauci in his capacity as Chief Medical Advisor to the President. But their own document production provides a glimpse into the involvement of several senior White House officials in communications with social-media platforms about censorship – including White House Senior Covid-19 Advisor Andrew Slavitt, Deputy Assistant to the President Rob Flaherty, White House Covid-19 Director of Strategic Communications and Engagement Courtney Rowe, White House Digital Director for the Covid-19 Response Team Clarke Humphrey, among others. *See* Ex. 3. Further, the social-media platforms have independently disclosed the identities of senior White House officials involved in such communications. For example, Meta has disclosed the involvement of additional White House officials as White House Counsel Dana Remus and White House Partnerships Manager Aisha Shah, as well as Deputy Assistant to the President Rob Flaherty. YouTube has disclosed the involvement of White House officials such as Rob Flaherty and Benjamin Wakana, the Director of Strategic Communications and Engagement at the White House COVID-19 Response Team. Twitter has disclosed the involvement of Andrew Slavitt.

The limited communications produced so far from these high-level officials are particularly relevant and probative, because they provide revealing glimpses into the intensive oversight and pressure to censor that senior federal officials placed on social-media platforms. For example, after President Biden publicly stated (about Facebook) on July 16, 2021, that "They're killing

people," a very senior executive at Meta (Facebook and Instagram) reached out to Surgeon General Murthy to engage in damage control and appease the President's wrath.  Ex. 4, at 1.  Soon thereafter, the same Meta executive sent a text message to Surgeon General Murthy, noting that "it's not great to be accused of killing people," and expressing that he was "keen to find a way to deescalate and work together collaboratively."  Ex. 5, at 1.  Such "deescalation" and "working together collaboratively," naturally, involved increasing censorship on Meta's platforms.  One week after President Biden's public accusation, on July 23, 2021, that senior Meta executive sent an email to Surgeon General Murthy stating, "I wanted to make sure you saw the steps we took *just this past week* to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen...."  Ex. 3, at 2.  Again, on August 20, 2021, the same Meta executive emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform.  These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine-related content," and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation."  Ex. 4, at 3.  In addition, that senior Meta executive sent a "Facebook bi-weekly covid content report" to Surgeon General Murthy to White House official Andrew Slavitt, evidently to reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their preferences.  Ex. 4, at 6-19.

In another, similar exchange, on October 31, 2021, Deputy Assistant to the President Robert Flaherty emailed a contact at Meta with a link to a Washington Post article that complaining about the spread of COVID "misinformation" on Facebook.  The email contained only the link to

that story with the subject line, "not even sure what to say at this point." Ex. 3, at 19. The Facebook employee defended Facebook's practices, and assured Mr. Flaherty that Facebook's internal studies were intended to "improve our defenses against harmful vaccine misinformation," and that Facebook had, in fact, "improved our policies," *i.e.*, increased censorship of online speech. *Id.* Likewise, Alex Berenson disclosed internal Twitter communications—which Plaintiffs are expecting from Twitter in response to their subpoena—revealing that senior "WH" officials including Andrew Slavitt specifically pressured Twitter to deplatform Berenson, an influential vaccine critic—which Twitter did. Doc. 45, ¶¶ 187, 309. This pressure to deplatform Berenson appears to have occurred on April 21, 2021, when four Twitter employees participated in a Zoom meeting with at least three White House officials and one HHS official intended to allow the White House to "partner" with Twitter in censoring COVID-related "misinfo." Ex. 7, at 86. The meeting invite stated: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can *partner* in product work." *Id.* (emphasis added). The next day, April 22, Twitter employees noted in internal communications that the White House officials had posed "tough" questions during this meeting, including "one really tough question about why Alex Berenson hasn't been kicked off the platform." *See* https://alexberenson.substack.com/p/the-white-house-privately-demanded.

Such communications from the White House impose maximal pressure on social-media companies, and they clearly get results when it comes to censorship. And federal officials are fully aware that such pressure is necessary to induce social-media platforms to increase censorship. CISA Director Jen Easterly, for example, texted with another CISA official about "trying to get us

in a place where Fed can work with platforms to better understand the mis/dis trends *so relevant agencies can try to prebunk/debunk as useful*," and complained about the Government's need to overcome the social-media platforms' "hesitation" to working with the government: "Platforms have got to get more comfortable with gov't. It's really interesting how hesitant they remain." Ex. 5, at 4 (emphasis added).

In fact, such pressures from government officials on social-media companies, along with the many public statements alleged in the Complaint, have succeeded on a grand scale. Discovery received so far indicates that a veritable army of federal bureaucrats are involved in censorship activities "across the federal enterprise." They include the 45 key custodians identified in Plaintiffs' interrogatory responses so far, 32 federal officials identified by Facebook so far, eleven officials identified by YouTube, and nine identified by Twitter (many of which do not overlap, either with each other or Defendants' disclosures). And Defendants have not yet received interrogatory responses reflecting Defendants' knowledge of federal officials at *other agencies* who communicate with social-media platforms about censorship – but apparently there are many. So many, in fact, that CISA Director Easterly and another CISA official apparently complained, in an internal text messages, that "chaos" would result if all federal officials were "independently" contacting social-media platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out to platforms which could cause a lot of chaos." Ex. 5, at 4.

These federal bureaucrats are deeply embedded in a joint enterprise with social-media companies to procure the censorship of social-media speech. Officials at HHS routinely flag content for censorship, for example, by organizing weekly "Be On The Lookout" meetings to flag disfavored content, Ex. 6; sending lengthy lists of examples of disfavored posts to be censored,

Ex. 6, at 21-22; serving as privileged "fact checkers" whom social-media platforms consult about censoring private speech, Ex. 7; and receiving detailed reports from social-media companies about so-called "misinformation" and "disinformation" activities online, Ex. 4; among others. CISA, likewise, has aggressively embraced its "evolved mission" of screening complaints of social-media disinformation and then "routing disinformation concerns" to social-media platforms, Doc. 45, ¶¶ 250-251. CISA routinely receives reports of perceived "disinformation" and forwards them to social-media companies, placing the considerable weight of its authority as a federal national-security agency behind other parties' demands for suppression of private speech. Ex. 8.

Moreover, many of these substantive communications from federal officials flagging specific posts and content for censorship seem to occur through alternative channels of communication that Plaintiffs have not yet obtained (as the third-party social-media platforms contend they are shielded from discovery by the Stored Communications Act). For example, Facebook trained CDC and Census Bureau officials on how to use a "Facebook misinfo reporting channel." Ex. 9. Twitter offered federal officials a privileged channel for flagging misinformation through a "Partner Support Portal." Ex. 9, at 69. YouTube has disclosed that it granted "trusted flagger" status to Census Bureau officials, which allows privileged and expedited consideration of their claims that content should be censored.

In the face of these and many other disclosures, Defendants are refusing to provide some of the most relevant and most probative evidence of the most egregious First Amendment violations. These issues are addressed below.

## II.     Status of Issues That Remain in Dispute.

### A.     Discovery Responses from the White House Press Secretary and Dr. Fauci as Chief Medical Officer to the President.

As authorized by the Court's order, Plaintiffs served interrogatories and document requests on the White House Press Secretary Karine Jean-Pierre (substituted for Jen Psaki in her official capacity), and Dr. Fauci in his capacity as Chief Medical Officer to the President. Ex. 1 (Collective Interrogatory Responses); Ex. 10 (Karine Jean-Pierre responses to RFPs); Ex. 11 (Fauci RFP responses). Defendants have categorically refused to produce any discovery from White House officials, and they have provided no interrogatory responses or responsive documents from them. *See, e.g.,* Ex. 1, at 6-7, 9-10, 20-21, etc. The parties have met and conferred on this point and failed to reach agreement.

### 1. Discovery from the White House officials is maximally relevant.

For all the reasons stated above, this discovery from White House officials is maximally relevant. *See supra* Part I. Among other things, this discovery will demonstrate the scope, the impact, the coercive pressure, and the powerful impact of the federal Censorship Enterprise. Needless to say, an email from a senior White House official demanding greater censorship of private speech raises by far the greatest First Amendment concerns. It is impossible to overstate the relevance and probative value of such communications, of which Defendants have provided several examples above.

### 2. Defendants' objections to this discovery lack merit.

In their Objections and Responses, Defendants have asserted a series of objections to this discovery from and relating to White House officials. All lack merit.

*First*, Defendants' categorical refusal to provide discovery responses from the White House Press Secretary and Dr. Fauci in his capacity as Chief Medical Advisor is inconsistent with this Court's order. Both the White House Press Secretary and Dr. Fauci were named as Defendants in their official capacities when Plaintiffs moved for expedited preliminary-injunction-related

11

discovery. The Court authorized Plaintiffs to "serve interrogatories and document requests upon Government Defendants," Doc. 34, at 13, and the Court's order did not exclude Ms. Jean-Pierre or Dr. Fauci, who were and are "Government Defendants." *Id.* The Court's order, therefore, expressly contemplated that Ms. Jean-Pierre and Dr. Fauci will participate in discovery.

*Second*, Defendants object that producing discovery from White House officials will be "unduly burdensome and disproportional to the needs of the case." *See, e.g.,* Ex. 1, at 9. The Court has already considered and rejected this argument. As the Court noted in its Order, "[c]ertainly, it would be time-consuming to produce the information requested. However, this issue involves the alleged violation of a constitutional right – the right to free speech. Therefore, this Court feels the need for this information outweighs the burden to Government Defendants." Doc. 34, at 12. This balancing of interests is still true today. In fact, given the sweeping nature of the Government's censorship activities, and the maximally probative nature of the discovery sought – relating to pressure placed on private companies to censor private speech by some of the most powerful federal officials in the Nation – the value of the discovery decisively outweighs any burden on Defendants, and it is plainly "proportional to the needs of the case." The fact that *White House* officials are engaged in communications with social-media companies encouraging and pressuring them to censor private speech on social-media places maximal pressure on such companies to comply, and thus raises the greatest of First Amendment concerns. Thus, the fact that these are extremely senior (and powerful) federal officials makes their communications with social-media platforms all the more probative of the coercion and pressure that has resulted in widespread First Amendment violations.

*Third*, Defendants make a blanket assertion of executive privilege and "presidential communications privilege" as to any and all discovery from the White House. Ex. 1, at 9-10. This

blanket assertion of privilege is detached from any specific document or communication, because Defendants refused to identify or produce any, so Defendants will be hard-pressed to justify it. In fact, Defendants do not even clearly assert that this privilege applies to any particular document or communication—they contend only that discovery "*may* have the effect of seeking information protected by the presidential communications privilege." *Id.* at 9 (emphasis added). Needless to say, the fact that discovery "may" raise privilege concerns, unmoored from any actual document, is an attenuated objection, at best.

In any event, it is clear that the assertion of privilege is meritless, because Plaintiffs have made very clear in meet-and-confer with Defendants that they are not seeking any *internal* White House communications at all. Instead, Plaintiffs are requesting only the identification and production of *external* communications between White House officials and *third-party social-media platforms* – which is just what the Court authorized in its discovery order. Doc. 34, at 13 (authorizing discovery of "the identities of federal officials" who communicate with social-media platforms about censorship, "including the nature and content of those communications"). There is no plausible claim of privilege in communications between White House officials and *outside third-parties* like social-media platforms. *See, e.g., In re Sealed Case*, 121 F.3d 729, 741–42 (D.C. Cir. 1997) (holding that "the White House has waived its claims of privilege in regard to the specific documents that it *voluntarily revealed to third parties outside the White House*") (emphasis added); *Center for Effective Government v. U.S. Department of State*, 7 F. Supp. 3d 16, 25, 27 (D.D.C. 2013) (holding that executive privilege applies to "protect the confidentiality of communications as between the President and his advisers," and thus "documents distributed from the Office of the President for non-advisory purposes do not implicate the goals of candor, opinion-gathering, and effective decision-making that confidentiality under the privilege is meant to

protect"); *see also, e.g., UnitedHealthcare Ins. Co. v. Azar*, 316 F. Supp. 3d 339, 349 (D.D.C. 2018) ("[A] document that was privileged as part of the deliberative process can lose its privilege when revealed outside the agency."); *O'Keefe v. Boeing Co.*, 38 F.R.D. 329, 335 (S.D.N.Y. 1965) (rejecting a claim of executive privilege over documents "not in the possession of the Air Force but in the possession of the defendant in this action, the Air Force having voluntarily turned them over to defendant").

The cases that Defendants cite are all distinguishable on this very ground. In *United States v. Nixon*, "[t]he subpoena directed the President to produce certain tape recordings and documents relating to his conversations *with aides and advisers*," 418 U.S. 683, 686 (1974) (emphasis added)—*i.e.*, *internal*, confidential executive-branch communications between the President and his confidants, not *external* communications with outside third-parties, which are not privileged. *Id.* The next case the Government cites, *In re Sealed Case*, 121 F.3d 729, 743-44 (D.C. Cir. 1997), involved a subpoena to the White House Counsel for documents resulting from the President's direction "to investigate" the Secretary of Agriculture "in order to advise the President on whether he should take executive action" against him based on allegations of improper gift-taking. *Id.* at 735. Again, the documents sought were *internal* documents relating to the advice given by the President by the White House Counsel – not *external* communications with social-media platforms. The same is true of *Judicial Watch, Inc. v. Dep't of Justice*, in which the D.C. Circuit addressed whether "the presidential communications privilege extends into the Justice Department to *internal* pardon documents in the Office of the Pardon Attorney and the Office of the Deputy Attorney General that were not solicited and received by the President or the Office of the President." *Judicial Watch, Inc. v. Dep't of Justice,* 365 F.3d 1108, 1109 (D.C. Cir. 2004) (emphasis added) (quotation marks omitted). *American Historical Association v. NARA*, likewise,

involved a situation where "Plaintiffs seek access to documents from President Reagan's tenure over which President Bush *has asserted constitutional executive privilege*." *Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin.*, 402 F. Supp. 2d 171, 180 (D.D.C. 2005) (emphasis added). In short, all the cases submitted by Defendants in support of this objection are plainly distinguishable because they involved plausible claims of privilege. There are no such claims here.

Further, even if there were any privilege to assert—which there is not—it would be waived in this case. Defendants have already disclosed numerous communications between White House officials and social-media platforms about misinformation, disinformation, and censorship of social-media speech—including communications involving White House officials like Andrew Slavitt, Courtney Rowe, and Clarke Humphrey, among others. *See* Ex. 3. Defendants, evidently, did not believe their own assertion of privilege in communications between White House officials and social-media platforms, because they have already disclosed many such communications, and they should not allowed to assert that privilege selectively to pick-and-choose which White House communications with social-media platforms to disclose.

*Fourth*, Defendants object that Plaintiffs must seek discovery from other sources before imposing any burdens on officials of the White House or the Executive Office of the President. *See, e.g.,* Ex. 1, at 9. In particular, they object that discovery from the White House should not be granted because "Plaintiffs have not first exhausted all available opportunities to seek related information from other sources." *Id.* This argument is both factually and legally meritless. First, it lacks a factual basis because Plaintiffs *have* pursued "*available* opportunities to seek related information from other sources." *Id.* (emphasis added). Because this case is in an expedited preliminary-injunction posture, Plaintiffs simultaneously served third-party subpoenas on five major social-media platforms at the same time as pursuing discovery from Defendants, as this

15

Court authorized.  Doc. 34, at 13.  Plaintiffs then engaged in exhaustive negotiations with those social-media platforms to obtain "related information" from those "other sources," just as Defendants contend we should.  Ex. 1, at 9.  And, despite the compressed time schedule, Plaintiffs obtained lists of federal officials—including several White House officials—who have or are engaged in communications with Twitter, Facebook, Instagram, and YouTube about misinformation and censorship of social-media content.  Facebook and Instagram identified 32 federal officials, including eight current and former White House officials.  YouTube identified 11 federal officials, including five current and former White House officials.  Twitter identified nine federal officials, including at least one White House official.  Plaintiffs promptly forwarded all this information to Defendants as soon as they received it and requested responsive communications from these officials be identified and produced.  Defendants flatly refused.  Thus, Plaintiffs *have* "exhausted all available opportunities to seek related information from other sources." *Id.*

In any event, this objection is legally meritless, because Defendants have invented their "every other source first" rule out of whole cloth.  To the extent that it exists, that rule does not apply to general discovery requests; rather, it applies only to discovery requests that would *force the Executive Branch to assert presidential privileges*.  But, as discussed above, there can be no plausible assertion of privilege in federal officials' communications about censorship with private third-parties outside the White House, such as social-media platforms.  *See, e.g., In re Sealed Case*, 121 F.3d at 741–42 (holding that "the White House has waived its claims of privilege in regard to the specific documents that it voluntarily revealed to third parties outside the White House").  Plaintiffs' discovery requests for communications with *outside third parties* do not implicate any privileges, and thus there is no "every other source first" rule.

16

Defendants' own case law confirms this conclusion. In their discovery objections, Defendants cite only three cases to support their supposed "every other source first" rule. First, Defendants rely heavily on *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), which is cited 39 times in their interrogatory responses alone. *See* Ex. 1. *Cheney* addressed a discovery order that would have required the Vice President "assert executive privilege to protect sensitive materials from disclosure." *Id.* at 375. This burden does not exist in this case. In *Cheney*, the Court of Appeals had held that, "to guard against intrusion of the President's prerogatives," the Executive "must first assert privilege … with particularity." *Id.* at 376. But the Supreme Court held that forcing the Executive Branch to assert presidential privileges with specificity, without adequate cause, would raise separation-of-powers concerns. *Id.* at 382. The Supreme Court rejected the lower court's holding that the Government could not pursue mandamus because "the Executive Branch can invoke executive privilege to maintain the separation of powers." *Id.* at 383. As the Supreme Court emphasized, the discovery sought potentially privileged material, as "[t]he discovery requests are directed to the Vice President and other senior Government officials who … g[a]ve advice and make recommendations to the President." *Id.* at 385. Again, these were *internal* Executive Branch communications. Here, by contrast, Plaintiffs' discovery requests simply do not require any assertion of Executive privilege, because no such privilege applies to Executive communications with *outside* social-media platforms.

In fact, *Cheney* directly supports the appropriateness of discovery here. First, the Supreme Court in *Cheney* held that, in contrast to criminal cases, "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions.'" *Id.* at 384. But here, where the White House communications at issue *perpetrate ongoing violations of the First Amendment*, the discovery sought plainly does have "constitutional dimensions." *Id.* For the same

reasons, in this case, "a court's ability to fulfill its constitutional responsibility to resolve cases and controversies within its jurisdiction hinges on the availability of certain indispensable information." *Id.* at 385. *Cheney* expressed concern that "production of confidential information would … disrupt the functioning of the Executive Branch," *id.* at 386, but here the information is not "confidential." And finally, Plaintiffs here, in compliance with the Court's order, have issued narrow, targeted discovery requests seeking only the identities of federal officials and that nature and content of their communications about misinformation and censorship with social-media platforms. *See* Doc. 34, at 13. This contrasts sharply with "the overly broad discovery requests" at issue in *Cheney*, which asked for "everything under the sky." *Id.* at 386-87.

In addition, Defendants cite *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2009). This case is distinguishable on exactly the same ground. *Karnoski* vacated a discovery order and directed the trial court to reconsider it "because the district court did not fulfill its obligation 'to explore other avenues, *short of forcing the Executive to invoke privilege.*'" *Id.* at 1207 (quoting Cheney, 542 U.S. at 390) (emphasis added). Here, by contrast, Plaintiffs' discovery orders will not "forc[e] the Executive to invoke privilege," *id.*, because there is no plausible claim of privilege in the White House's communications with social-media companies outside the White House. Finally, Defendants cite an unpublished docket-text order of the District of Massachusetts that appears on PACER only as a docket entry with no document attached to it. Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019). Defendants' citation of an unpublished docket entry with no opinion attached to it attests to the paucity of authority supporting their position. In any event, the order[3] provides no support for Defendants' position, because it specifically states that

---

[3] Reproduced from PACER, the docket entry states in full: "Judge Denise J. Casper: ELECTRONIC ORDER entered re 74 MOTION to Compel Responses to White House Discovery Requests. In light of Plaintiffs' motion to compel, D. 74, Defendants' opposition, D. 77, and

"the Court does not necessarily agree with Defendants' analysis and application of *Cheney v. U.S. District Court for the District of Columbia*," and merely allowed the parties to "supplement the record as to the pending motion to compel discovery" as an "interim step."

In short, the Court should order Defendants to provide complete interrogatory responses and responsive documents from Defendants White House Press Secretary Karine Jean-Pierre and Dr. Fauci in his capacity of Chief Medical Advisor to the President.

### B. Defendants Must Identify and Provide Communications of Federal Agencies and Officials of Whom They Are Aware, *Outside* Their Own Agencies, Who Have Engaged in Responsive Communications With Social-Media Platforms.

Plaintiffs served Interrogatory No. 1 on all Defendants except the President (which, after the parties' negotiations, Defendants call "Common Interrogatory No. 1."). *See* Ex. 1, at 13. Interrogatory No. 1 asks Plaintiffs to "[i]dentify every officer, official, employee, staff member, personnel, contractor, or agent of [eah Defendant] *or any other federal official or agency* who has communicated or is communicating with any Social-Media Platform regarding Content Modulation and/or Misinformation." *Id.* (emphasis added). Thus, Interrogatory No. 1 asks each Government Defendant to identify, not just federal officials *within their own agency*, but also

---

Plaintiffs' reply, D. 79-1, and having heard oral argument on the motion, D. 85, the Court ORDERS as follows. Responses to requests for written discovery shall continue and be completed, including as to those sought from the United States Department of Homeland Security ("DHS"). After the completion of such discovery responses and the completion of the deposition of DHS (which the Court understands, at the request of the parties, D. 80, is currently stayed, D. 81), Plaintiffs may supplement the record as to the pending motion to compel discovery from the White House, particularly as to issue of any continuing need for discovery sought from the White House after full discovery is received from DHS. Although the Court does not necessarily agree with Defendants' analysis and application of Cheney v. U.S. District Court for the District of Columbia, 542 U.S. 367 (2004), the Court concludes that this Order is an appropriate interim step in this case at this juncture. Accordingly, within two weeks after the completion of the DHS deposition, Plaintiffs may file a supplemental memorandum in support of their pending motion to compel. Defendants may then respond to such supplemental filing two weeks after the filing of the same. In light of this Order, the Court, at the moment, otherwise reserves any ruling on Plaintiffs' motion, D. 74. (Hourihan, Lisa) (Entered: 05/15/2019)."

federal officials of which they are aware at *other federal agencies* (including White House officials, if they know) who communicate with social-media platforms about misinformation and censorship. *Id.* In responding to these interrogatories, Defendants simply ignored the phrase "any other federal official or agency," and provided responses that identified only federal officials in *their own* agencies. *See id.* at 15-18. Thus, in response to this interrogatory, Defendants identified 45 federal officials, but *only* federal officials at CDC, NIAID, CISA, DHS, and the Office of the Surgeon General, and none at any other federal agency. *Id.* Plaintiffs have repeatedly requested that Defendants supplement their interrogatory responses to provide this critical information about federal officials at other federal agencies, but Defendants have refused to do so, without any clear legal basis.

It is clear that Defendants are withholding significant, highly relevant information on this point. Through the information received in response to third-party subpoenas, the documentary discovery received so far, and recent explosive public disclosures (such as Mark Zuckerberg's recent revelation about the FBI's "disinformation" activities on Joe Rogan's podcast), there has come an avalanche of revelations that many federal officials at *other* federal agencies are engaged in responsive communications about disinformation, misinformation, and censorship of private speech. For example, Defendants' interrogatory responses identify no White House officials. But Defendants' own document production includes several White House officials involved in such communication—such as Rob Flaherty, Andrew Slavitt, Clarke Humphrey, Courtney Rowe, and others—while Meta, Twitter, and YouTube have identified still more White House officials. Defendants' interrogatory responses did not identify any officials at the FDA, the U.S. Election Assistance Commission, or the State Department, but Meta's response to the third-party subpoena so far have identified senior FDA officials and U.S. Election Assistance Commission officials, and

Twitter's response so far has identified senior State Department Officials. Defendants did not identify any Census Bureau officials, but YouTube disclosed several Census Bureau officials, and the emails Defendants produced reflect extensive involvement of CDC officials. Defendants did not identify any FBI officials, but six days ago (while Plaintiffs were negotiating with Meta about producing this very kind of information), Mark Zuckerberg revealed on Joe Rogan's podcast that Facebook's censorship of the Hunter Biden laptop story was the result of an FBI "disinformation" advisory—and the FBI responded by stating publicly that it "***routinely***" issues such "disinformation" related communications to social-media platforms. Ex. 12, at 2-3. In short, Defendants are plainly withholding highly relevant, responsive information by artificially narrowing their interrogatory responses on this point.

Further, the information sought (and withheld so far) is of critical and central relevance to Plaintiffs' request for expedited preliminary-injunction-related discovery. As Plaintiffs emphasized in their motion for expedited discovery, discovering the identities of federal officials who are communication with social-media platforms about disinformation and censorship is essential to Plaintiffs' ability to receive meaningful injunctive relief. *See, e.g.,* Doc. 18, at 1-3. As stated in that Motion, which the Court granted, "[t]he current lack of specific details about which federal officials are directly coordinating with social-media companies to censor Americans' speech, and about the content and nature of communications between such federal officials (both known and unknown) and social-media platforms, threatens to frustrate the Court's ability to grant effective preliminary injunctive relief…." *Id.* at 3. "A fully effective preliminary injunction … will enjoin the specific actors most directly engaged in such unlawful activity, and their specific unlawful conduct. Some of these actors' identities are known, but many are not, and few of their secret, direct communications with social-media platforms have been revealed." *Id.* Even if

Plaintiffs obtain an injunction to prevent the currently named Defendants from urging and pressuring social-media companies to engage in censorship of private speech, such an injunction would have little practical effect if senior White House officials, FBI officials, FDA officials, State Department officials, EAC officials, and many others, are all allowed to continue imposing similar pressure.

Finally, responding to Interrogatory No. 1 involves no plausible claim of privilege (it requests the identities of federal officials who are communicating with *third-party* social-media platforms), and it is in no way unduly burdensome. The Defendant agencies and officials evidently know this information, and they must disclose it.

### C. Defendants Should Provide Complete Interrogatory Responses from HHS and from Dr. Fauci in his Capacity as NIAID Director, and Produce Responsive Communications as Applicable.

Defendants also artificially limited the scope of their responses to Interrogatory responses from HHS and from Dr. Fauci in his capacity as NIAID director. (They refused to provide any discovery at all relating to Dr. Fauci's capacity as Chief Medical Advisor to the President, *see supra*, Part II.A) These artificial limitations, which lack any legal basis, appear likely to deprive Plaintiffs of highly relevant information. Plaintiffs have met and conferred with Defendants about this issue, but it remains unresolved.

*First*, as to HHS's responses: Plaintiffs named as Defendants, and served discovery requests on, *both* HHS itself *and* three of its components: CDC, NIAID, and the Surgeon General. *See* Ex. 1, at 3 ("As the least burdensome sources of information consistent with Rules 26 and 33 that is potentially responsive to the Interrogatories, HHS has identified the Office of the Surgeon General (OSG), NIAID, and CDC…"). In other words, HHS did not provide any information from *its own* senior officials in responses to interrogatories—instead, it solely provided information

from its components in the Surgeon General's Office, NIAID, and CDC, all of whom were already subject to the same interrogatories. HHS, thus, effectively exempted itself from the discovery responses through this "identification." But on August 28, 2022, in response to Plaintiffs' third-party subpoena, Meta disclosed several HHS officials as likely engaged in responsive communications with Meta about modulation of content on Facebook and Instagram—including very senior HHS officials *outside* NIAID, the CDC, and the Office of the Surgeon General. Meta's identifications include, for example, HHS's Deputy Assistant Secretary for Public Engagement, the head of HHS's Digital Engagement Team, the Deputy Director of the Office of Communications in HRSA, and HHS's Deputy Digital Director, among others—none of whom was disclosed in HHS's responses to Plaintiffs' interrogatories. Thus, HHS's decision to "identify" NIAID, CDC, and OSG as its components "likely" to have discoverable information appears crafted to avoid disclosing the identities and communications of *the most senior HHS officials* involved in such communications with social-media platforms. HHS should be required to provide complete responses, in addition to the responses of CDC, NIAID, and OSG, in response to all Plaintiffs' discovery requests (to include both Interrogatories and the accompanying Requests for Production, *see* Ex. 13, which seek production of the relevant communications).

*Second*, as to Dr. Fauci's responses: In responding to discovery requests directed to Dr. Fauci in his capacity as NIAID director, the *only* step Defendants took to identify responsive information was to engage in keyword searches of Dr. Fauci's NIAID government email account. *See, e.g.,* Ex. 1, at 46, 48. Further, in response to Interrogatories 1 to 5, Defendants did not provide separate responses from Dr. Fauci at all, but merely responded on behalf of NIAID—again, by searching Dr. Fauci's government email account and the email accounts of other NIAID custodians for key words and taking no other action to locate responsive information. *See id.* at 48. Based

on these responses and Plaintiffs' meet-and-confer with Defendants, it has become clear that Defendants' counsel never actually *inquired of Dr. Fauci* about what he knows of his relevant communications with social-media platforms, and thus that critical input is not reflected in the responses. Thus, for example, in responding to Plaintiffs' interrogatories to identify and produce all relevant communications with social-media platforms, Defendants' responses include no information about Dr. Fauci's oral communications with social-media companies, or communications through any medium other than Dr. Fauci's NIAID email account.

Again, this artificially narrowed approach appears tailored to avoid the production of highly relevant information. The First Amended Complaint includes extensive allegations about Dr. Fauci and his communications with social-media companies like Meta. And the discovery produced so far raises the concern that there may be responsive information. For example, in March 2020, Mark Zuckerberg provided Dr. Fauci with his personal cell phone number, demonstrating the opportunity for follow-up phone conversations. And on August 28, 2022, Meta disclosed Dr. Fauci in its list of 32 federal officials who may have communicated with Meta about content modulation on Facebook and Instagram. In his interrogatory responses, Dr. Fauci is required to identify and describe the "nature and content" of any such communications, and in response to requests for production, he is obligated to produce any such written communications not already produced. After meeting and conferring, Defendants have agreed to supplement Dr. Fauci's responses to Interrogatories 8 and 9 directed to Dr. Fauci, but they have not agreed to supplement Dr. Fauci's responses to Interrogatories 1 to 5 directed to Dr. Fauci, and they have not agreed to produce any responsive communications identified in those responses. Dr. Fauci should be ordered to provide complete responses to all seven interrogatories served on Dr. Fauci, and to produce relevant documents identified in those responses.

**D. The Court Should Permit Plaintiffs to File a Second Amended Complaint and Serve Expedited Discovery Requests on Newly Identified Federal Officials Who Are Pressuring Social-Media Platforms to Engage in Censorship.**

As noted above, even the limited discovery provided so far has produced an avalanche of revelations about new federal officials, not previously publicly disclosed, who are or have engaged in communications with social-media platforms about misinformation, disinformation, and censorship of private speech. These include senior White House officials and officials at the State Department, the FDA, the Census Bureau, the U.S. Election Assistance Commission, and the Treasury Department, among others. Moreover, six days ago, Mark Zuckerberg disclosed the involvement of the FBI in communications about "disinformation" with social-media platforms, and the FBI confirmed that it "routinely" send such communications. With each of these new revelations, Plaintiffs have approached Defendants and requested that they supplement their discovery responses to include responsive communications from the newly disclosed federal officials. Defendants have refused to do so, on the grounds that none of these newly discovered officials have been sued or served with discovery as yet, and that it would be unduly burdensome to identify and produce their communications. Plaintiffs have replied that these officials have not yet been sued or served because their identities and involvement were concealed from the public until now, and that receiving discovery from these officials is essential to Plaintiffs' ability to receive effective injunctive relief. *See* Doc. 18, at 1-3. Again, an injunction against officials at DHS and HHS will have limited effect if senior officials at the White House, the FBI, the FDA, the State Department, the Census Bureau, the EAC, and other federal agencies may continue to pressure social-media companies to censor private speech.

To address Defendants' objection that these officials and agencies have not been sued or served with discovery, Plaintiffs propose the following procedure: Within two business days of

this Court's ruling on these disputed discovery issues, if not before, Plaintiffs will file a Second Amended Complaint with leave of the Court that names as Defendants additional federal officials and agencies that Plaintiffs have identified so far whom current information indicates are or have engaged in communications with social-media platforms about misinformation, disinformation, malinformation, and any censorship and suppression of speech on social media. In addition, within two business days of this Court's ruling on these disputed discovery issues, Plaintiffs will serve interrogatories and document requests on the newly named Defendants, seeking the same discovery this Court has already authorized—*i.e.*, "the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation, malinformation, and/or any censorship or suppression of speech on social media, including the nature and content of those communications." Doc. 34, at 13. The Court should order the new Defendants to respond in 14 days to those discovery requests, as the Government has already been on notice of Plaintiffs' request for this information for several days. This approach will accommodate Defendants' objections while avoiding interjecting undue delays into the ongoing discovery schedule already adopted by the Court. *See* Doc. 34, at 13-15.

### E.     The Court Should Not Authorize Defendants' Last-Minute, Retaliatory Request for "Reciprocal Discovery."

Yesterday, the day before this Joint Statement is due, Defendants notified Plaintiffs that they would request "reciprocal discovery" against the Plaintiffs in this Joint Statement, if the Court ordered any further discovery from Defendants. Defendants declined to specify the precise nature of the discovery they would seek, and they declined to provide copies of any potential discovery requests. Plaintiffs' only specific information about this request, therefore, comes from one previous email chain from August 27, 2022, in which Defendants' counsel stated "we want to note that if Plaintiffs are going to seek additional discovery, we may also seek discovery from

Plaintiffs," and stated that Defendants might seek discovery of communications between State officials and social-media platforms. *See* Ex. 12, at 2. To the extent Defendants make this request, the Court should reject it, for several reasons.

*First*, the request is untimely. Plaintiffs moved for expedited preliminary-injunction-related discovery on June 17, 2022—ten weeks ago. Docs. 17, 19. The Court granted this motion on July 12, 2022—six weeks ago. Doc. 34. The Court adopted a specific, detailed discovery plan for such discovery, under which the parties have been operating for six weeks. During all this time, Defendants never suggested that they would request reciprocal discovery until August 27, 2022. Ex. 12, at 2. This suggestion came very late in the process, and just as Plaintiffs were requesting highly relevant disclosures that the Government seems particularly eager to avoid making—*i.e.*, the communications between the FBI and Meta that led to the censorship of the Hunter Biden laptop story on Facebook and Instagram. *See* Ex. 12, at 2-3. Under the circumstances, the request is plainly untimely and would serve no useful purpose but to delay the adjudication of Plaintiffs' motion for preliminary injunction, which has been pending since June 14, 2022.

*Second*, the discovery is evidently sought for an ulterior, improper purpose—*i.e.*, to retaliate against Plaintiffs and attempt to deter Plaintiffs from seeking particularly relevant and probative disclosures from the Government. In particular, Defendants raised this issue of seeking "reciprocal discovery" for the very first time only in response to Plaintiffs' demand for the FBI's communications with Meta that led to the censorship of the Hunter Biden laptop story, which Mark Zuckerberg disclosed in an explosive revelation on Joe Rogan's podcast last Thursday. Ex. 12, at 2-3. Moreover, the FBI's public response to this disclosure stated that it "***routinely***" engages in such disinformation-related communications with social-media platforms. *Id.* at 3. Naturally, the

Government is eager to avoid making such disclosures. *See id.* at 1-2. Furthermore, the Government's threat to seek such discovery explicitly *admitted that the Government does not think such discovery would be probative* on any disputed issues. *Id.* The Government's attorney explicitly stated, of the discovery DOJ plans to seek: "*Of course, we do not suggest that we necessarily find those communications to be problematic.*" *Id.* at 2 (emphasis added). In other words, DOJ admits that it would not be seeking such discovery for its probative value. Thus, the context demonstrates that the Government seeks such discovery only for an improper, ulterior purpose—namely, to retaliate against Plaintiffs for their own discovery requests and to seek to deter Plaintiffs from pursuing particularly relevant, probative information.

*Third*, the retaliatory discovery the Government belatedly seeks would have little or no probative value—as the Government itself admits. *See id.* The Government threatened that it will seek communications between State officials and social-media companies about censorship. *See id.* But the Government does not contend that such State officials have engaged in a long campaign of threats and coercive pressure against social-media companies to pressure them to comply with such requests, as Plaintiffs allege the *federal* officials have done in great detail. *See* Doc. 45. Further, unlike the federal Government, neither Missouri nor Louisiana has a unitary executive branch; their Attorneys General are separately elected by the people, and authorized under State law with full authority to represent the State's interests in court. Statements by other state officials who report to separately elected officials thus are not attributable to Missouri and Louisiana's Attorneys General, and thus they would be discoverable only through third-party subpoenas, not discovery requests directed to Missouri's and Louisiana's Attorneys General. Even more, the First Amended Complaint includes several *private* Plaintiffs, for whom such communications would have no plausible relevance to their claims. In addition, the First Amendment does not contain an

"unclean hands" exception, and even if State officials unlawfully pressured social-media platforms to censor speech, that would have no relevance to the Government's violations of the First Amendment.

Finally, in yesterday's meet-and-confer, the Government stated for the first time that it might seek "reciprocal discovery" related to Plaintiffs' standing. But this Court has already addressed this issue in detail and determined that Plaintiffs have standing, Doc. 34, at 3-9, and Defendants provide no plausible reason to revisit that conclusion. Therefore, such discovery would serve no useful purpose. Moreover, discovery regarding Plaintiffs' standing, if appropriate at all, would be the proper subject of a "factual attack" on the Court's jurisdiction brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Defendants were served with the Complaint on May 10, 2022, and thus they have had almost four months to file such a motion, but they have never done so. If they wish to seek jurisdictional discovery regarding Plaintiffs' standing, they should file a Rule 12(b)(1) motion and a motion for jurisdictional discovery, to which Plaintiffs could respond and the Court could rule in due course. They should not be allowed to belatedly interject this issue to retaliate and delay Plaintiffs' motion for preliminary-injunction-related discovery that was filed 10 weeks ago and granted six weeks ago.

\* \* \*

WHEREFORE, for the reasons stated, Plaintiffs respectfully request that this Court:

1. Order Defendants White House Press Secretary Karine Jean-Pierre and Dr. Fauci in his capacity as Chief Medical Advisor to the President to provide complete responses to Plaintiffs' interrogatories and document requests.

2. Order all Defendants who were served with Interrogatories to identify federal officials and agencies *outside their own agencies* who have or are engaged in communications with social-

media platforms about misinformation, disinformation, malinformation, and/or censorship or suppression of speech on social-media, and produce any such communications in their possession.

3. Order Defendant Health and Human Services (HHS) and Dr. Fauci in his capacity as NIAID Director to provide complete responses to Plaintiffs' interrogatories and document requests as discussed herein.

4. Grant Plaintiffs leave to file a Second Amended Complaint suing newly identified federal officials and agencies, whose identities have been revealed during the discovery process, and to serve similar expedited discovery requests on them, within two business days of the Court's ruling on these disputed issues, and order those new Defendants to respond within 14 days.

5. Deny Defendants' belated and retaliatory request to seek reciprocal discovery against Plaintiffs.

## DEFENDANTS' POSITION

Plaintiffs moved for "leave to conduct specific, targeted, narrow discovery in support of their Motion for Preliminary Injunction." Pls.' Mem. in Support of their Mot. for Expedited Prelim. Inj.-Related Disc. at 3, ECF No. 18 ("Mot."). This Court granted their request in part, noting that "[e]xpedited discovery is not the norm" and should be "reasonable[] . . . in light of all the surrounding circumstances," Mem. Ruling and Order at 9, ECF No. 34 ("Order"), and authorizing discovery "targeted to the specific allegations of Plaintiff States' Complaint" "for purposes of the pending Motion for Preliminary Injunction," *id.* at 12.

The discovery that Plaintiffs ultimately sought was anything but reasonably tailored. Nevertheless, in the thirty days provided by this Court, Defendants provided written responses and objections to requests for production, while also producing substantive interrogatory responses and roughly 15,000 pages of documents. Given this breadth of produced information, Plaintiffs cannot suggest that they are lacking in the facts that they deemed necessary at the outset of this case to litigate their pending preliminary injunction motion. Nonetheless, Plaintiffs ask this Court to resolve a series of unjustified disputes that would only prolong Plaintiffs' purportedly time-sensitive motion. Plaintiffs, in short, seek to treat the extraordinary discovery process authorized by this Court as if it were the full discovery process provided by the Federal Rules of Civil Procedure, faulting Defendants for objecting to requests that are grossly disproportionate to this stage of the proceedings while they themselves seek to expand their already-too-broad requests after the prescribed deadline.

In an effort to resolve outstanding discovery disputes, Defendants have proposed to respond to certain additional targeted requests that may be completed expeditiously and thereby aid the swift resolution of the preliminary injunction motion, as Plaintiffs originally sought. The

Court should decline to order the expansive additional discovery sought by Plaintiffs and instead should, at most, order the targeted, supplemental interrogatory responses that Defendants have offered in the parties' meet and confer. *Infra* Section II. Such a process would allow the parties to resolve promptly any issues relating to depositions and then to complete briefing on the preliminary injunction motion and Defendants' forthcoming motion to dismiss Plaintiffs' Amended Complaint.

If the Court were inclined to order the more expansive discovery Plaintiffs demand, it should do so only after resolving the pending motion for preliminary injunction and forthcoming motion to dismiss and addressing the significant jurisdictional issues at the heart of this case. Defendants' motion to dismiss the original Complaint raised serious arguments that Plaintiffs lack Article III standing—arguments not before the Court when it reached a preliminary decision on standing in its discovery order, including under Supreme Court precedent foreclosing *parens patriae* actions by states against the federal government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)). This Court's preliminary conclusion otherwise for the limited purposes of granting expedited discovery targeted to the Complaint, predated the full briefing on this issue. And while the States have now added individual plaintiffs to the action in an attempt to shore up their standing, Defendants' forthcoming motion to dismiss the Amended Complaint will demonstrate why the individual plaintiffs' claims suffer from the same fundamental jurisdictional defects identified in Defendants' original motion. In particular, like the States, the individual plaintiffs cannot show causation and redressability for purposes of Article III standing, as the alleged injuries hinge on the "unfettered choices made by independent" social media companies "not before the court and whose exercise of broad and legitimate discretion the [C]ourt[] cannot presume to either

control or predict." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). For that reason, among others, courts across the country have dismissed claims by individual users of social media materially similar to the individual plaintiffs' claims here.[4] Authorizing the extensive discovery that Plaintiffs demand—essentially, on the whole of the federal government—before the Court resolves the forthcoming motion to dismiss addressing whether this Court has jurisdiction to hear the case at all, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), would impose needless and additional extensive burdens on the parties and the Court.

Furthermore, even if the Court were to continue to conclude that it has subject matter jurisdiction over the case, the Court should resolve Plaintiffs' pending preliminary injunction motion before allowing Plaintiffs to conduct any further written discovery, including by serving new requests on non-Defendant federal agencies and officials. Plaintiffs seek further discovery to, among other things, determine whether other federal actors beyond like HHS and DHS have communicated with social media companies about the harms of misinformation—communications which, as Defendants will argue, are routine and do not amount to a First Amendment violation. The Court should thus first assess, through a decision on the preliminary injunction motion, whether communications of that nature do indeed run afoul of the First Amendment. If it agrees with Defendants that those communications—which occurred even in the last Administration—are not problematic, then the additional discovery Plaintiffs seek would not support a viable First

---

[4] *Changizi v. Dep't of Health & Hum. Servs.*, --- F. Supp. 3d ---, 2022 WL 1423176 (S.D. Ohio May 5, 2022), *appeal filed,* No. 22-3573 (6th Cir. June 30, 2022); *Hart v. Facebook Inc.*, Case No. 22-cv-00737-CRB, 2022 WL 1427507 (N.D. Cal. May 5, 2022); *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505 (D.D.C. 2021) ("*AAPS I*"), *aff'd* 23 F.4th 1028 (D.C. Cir. 2022).

Amendment claim and would thus be unnecessary. Alternatively, the Court's clarification of the issues in dispute on the merits would provide a helpful guide to the scope of future discovery (if any) to resolve those claims.

At the very least, if the Court is inclined to authorize extensive additional discovery prior to ruling on these motions, it should stay the discovery for a period of thirty days to allow the Solicitor General to consider whether or not to seek immediate appellate review.

## I. Background to the Current Dispute

Plaintiffs moved for expedited discovery in June 2022 and, in their supporting memorandum, stated repeatedly that they sought "leave to conduct specific, targeted, narrow discovery in support of their Motion for Preliminary Injunction." Mot. at 3; *id.* at 1 (Plaintiffs seek "expedited preliminary-injunction-related discovery on a limited basis"); *id.* at 12 (noting that Plaintiffs seek "narrow, carefully targeted discovery—such as responding to targeted interrogatories and document requests"). Plaintiffs also asked the Court to set a compressed discovery schedule and acknowledged that their "requested discovery" would have to "be reasonably tailored to [those] time constraints[.]" *Id.* at 10 (*citing Amos v. Taylor*, No. 4:20-CV-7-DMB-JMV, 2020 WL 5809972, at *6 (N.D. Miss. Aug. 26, 2020)) The Court ultimately authorized expedited discovery, and set a compressed schedule, under which Defendants had "thirty days following receipt of Plaintiff States' discovery requests" to provide "responses and/or objections" to those requests. The Court emphasized, however, that "[e]xpedited discovery is not the norm" and that it must be "reasonable[] . . . in light of all the surrounding circumstances." Order at 9.

34

Despite the States' repeated representations that they sought only "narrow" and "carefully targeted discovery," Mot. at 12, they ultimately served ten sets of interrogatories[5] and eight sets of requests for the production of documents—totaling well over one hundred discovery requests—on a slew of federal agencies and officers. On an expedited timeframe, Defendants identified relevant custodians, pulled relevant documents, loaded those documents into a review platform, reviewed and processed them, and ultimately produced roughly 15,000 pages of documents along with interrogatory responses.

The parties then engaged in a meet and confer process in which Defendants made additional efforts to address objections raised by Plaintiffs, and to do so as expeditiously as possible. As a consequence of the parties' initially productive meet and confer process, several disputes were resolved. For instance, at Plaintiffs' request: Defendants agreed to produce organizational charts from Defendant agencies that technically fell outside the bounds of authorized discovery; Defendants agreed to produce additional email communications between Dr. Fauci and Mark Zuckerberg that fell outside the scope of discovery; Defendants agreed to provide Plaintiffs with an "overlay" file to allow them to extract certain metadata from the documents that the time constraints of expedited discovery did not practically permit Defendants to produce along with the 15,000 pages of documents; Defendants agreed to provide additional responses to specific interrogatories; and the parties reached several other agreements. On Friday, August 27, the parties

---

[5] Plaintiffs initially served 110 interrogatories. Prior to the 30-day deadline for service of objections and responses, Defendants objected to the interrogatories because they exceeded the 25-interrogatory limit in the Federal Rules. During subsequent discussions, Plaintiffs agreed to select the first five interrogatories served on CDC to apply to all Defendants on whom interrogatories had been served (the "Common Interrogatories") and to select twenty additional interrogatories directed at particular Defendants as specified by Plaintiffs ("Additional Interrogatories").

jointly sought a modest extension to the deadline for filing this Joint Statement because of the progress they were making during their meet-and-confer discussions.

Nonetheless, Plaintiffs contend that they are entitled to even more discovery. Just over the past several days, Plaintiffs have raised new disputes and demanded additional discovery from officials not named in the Complaint or the preliminary injunction motion. Plaintiffs do not suggest, however, that additional discovery is necessary to resolve their pending preliminary-injunction motion, as they must in the context of expedited discovery. *BKGTH Prods., LLC v. Does 1-20*, CIV.A. No. 13-5310, 2013 WL 5507297, at *5 (E.D. La. Sept. 30, 2013) ("A party seeking expedited discovery must narrowly tailor their requests in scope to the *necessary* information they seek." (emphasis added)); *Amos v. Taylor*, No. 4:20-CV-7-DMB-JMV, 2020 WL 7049848, at *5 (N.D. Miss. Dec. 1, 2020) (the "party seek[ing] to compel *expedited discovery*" must show "that the requested discovery falls within the scope of permitted expedited discovery— in other words, that it is narrowly tailored to obtain information relevant to a preliminary injunction determination" (emphasis in original)). Instead, they argue only that they requested additional information, and that such information may be relevant to their claims, as one would in the process of ordinary civil discovery. Although Plaintiffs initially sought a quick resolution of their preliminary injunction motion, *see* Mot. at 3 n.1 (claiming that the issues in this litigation "are particularly time-sensitive and urgent"), they now effectively ask the Court to extend and expand the discovery process originally authorized by this Court.

Although Plaintiffs have described for Defendants, in general terms, the discovery-related relief they planned to seek, Plaintiffs failed to provide a copy of their section of this Joint Statement in advance of filing to ensure that Defendants could address all of the disputes raised, or any questionable and unproven characterizations included, in Plaintiffs' section. Nevertheless, based

on Plaintiffs' oral and written communications, Defendants understand that the disputes Plaintiffs

plan to raise herein will fall within two categories: (1) disputes over discovery requests served on

July 18; and (2) disputes over new discovery requests proposed for the first time in the parties'

meet and confer discussions, which requests have not been served on any Defendant. As

Defendants contend below, none of Plaintiffs' demands has merit. Defendants' expedited

discovery responses and productions to date have been reasonable, and Plaintiffs do not contest

that are able to litigate their preliminary injunction motion with the materials they have received.

**II.    Defendants responded adequately to Plaintiffs' discovery requests served on July 18 and have offered reasonable compromises to address Plaintiffs' demands exceeding the expedited discovery that the July 12 Order allowed.**

Plaintiffs raise several objections to the adequacy of Defendants' searches for information

responsive to the interrogatory and document requests served on July 18. For the items for which

Defendants have proposed compromises, as specified below, the parties were still conferring up to

the time of filing and continue to confer in hopes of reaching a resolution on their own. To the

extent no agreement is reached, Plaintiffs' requests for broad discovery must be denied and

Defendants' proposed reasonable compromises should otherwise be adopted. First, Plaintiffs

request that Defendant agencies respond to interrogatories and document requests by identifying

officials across the federal government who have communicated with social media companies.

Although this request is facially unreasonable in the context of expedited discovery, Defendants

offer below a reasonable compromise. The Court should not grant Plaintiffs' unreasonable request

for responses that go beyond the scope of authorized expedited discovery. Second, Plaintiffs seek

broad supplemental discovery responses from Dr. Fauci, beyond Defendants' agreement to

provide, over the next three weeks in a manner consistent with the demands of expedited discovery,

responses to specific and targeted discovery requests directed to Dr. Fauci. Third, Plaintiffs assert

that Defendants' search for HHS custodians was unreasonable and demand that they conduct a

new search through every HHS component, despite HHS's prior due diligence to identify custodians most likely to have responsive information and to focus their searches for information and documents, using Plaintiffs' search terms, on those custodians. The Court should deny this request because Plaintiffs do not show that additional searches of officials in agency components that were not the focus of Plaintiffs' allegations is necessary to resolve the preliminary injunction motion or proportional to the needs of the case. And their conclusory assertion that the agency has actively concealed information is unsupported and contradicted by its already voluminous production of documents in response to Plaintiffs' requests. Fourth, Plaintiffs' request that Defendants respond to interrogatories on behalf of DHS by conducting additional ESI searches would impose disproportional and undue burdens on Defendants. Fifth, Plaintiffs' request for intrusive discovery from the White House, before exhausting alternative avenues (and before the Court resolves the forthcoming motion to dismiss), goes beyond the scope of Plaintiffs' initial requests, is unnecessary to resolve the preliminary injunction motion, and raises significant separation of powers concerns. This request, likewise, must be denied.

A. *Plaintiffs are not entitled to additional searches pertaining to agencies not named in the Complaint.*

Plaintiffs first demand that, in response to interrogatories, Defendants identify officials outside their own agencies, and across the entire federal government, who have communicated with social media companies—even if conduct of those officials is not even mentioned, let alone alleged to be illegal, in the original Complaint. The dispute centers on Common Interrogatory 1, in conjunction with requests seeking production of all documents relied on in responding to that request. As originally served, Common Interrogatory 1 reads: "Identify every officer, official, employee, staff member, personnel, contractor, or agent of" recipient Defendant "or any other

38

federal official or agency who has communicated or is communicating with any Social-Media Platform regarding Content Modulation and/or Misinformation."

Especially in the context of expedited discovery, it would be unduly burdensome and disproportional to the needs of this case to require Defendants to sift through thousands of communications and identify officials from outside agencies who have communicated with social media companies, in response to Plaintiffs' interrogatories. Complying with this request would not only be impossible within the expedited period provided for current discovery, it would be unnecessary in light of the thousands of external communications Defendants have already produced. Through those productions, much of this information is *already available* to Plaintiffs. It would be far less burdensome for Plaintiffs to consult these documents. Fed. R. Civ. P. 26(b)(2)(C)(i) (a district court must limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive). As written, Plaintiffs' requests that Defendants identify government actors who were not even alleged through bare legal conclusions, let alone facially plausible allegations in the Complaint, to have engaged in the conduct alleged in the Complaint or related preliminary injunction motion for which expedited discovery was authorized, are not "targeted" or "reasonable," Order at 12.

Nonetheless, recognizing that the Court's July 12 Order authorizes expedited discovery targeted to the original Complaint so that Plaintiffs can attempt to build a record to support their preliminary injunction application, Defendants offered reasonable compromises to address Plaintiffs' requests. In particular, during the meet-and-confer, Defendants offered in good faith to focus the inquiry underlying Common Interrogatory 1 by drawing on what is *known* to those agency Defendant custodians who currently are employed by the agency Defendants—*i.e.*, asking

those currently-employed custodians to identify other agencies known to have communicated, or to be in communication with, platforms concerning misinformation.[6] Because responding to the interrogatory as so reformulated entails significant additional efforts to interview the custodians beyond the efforts Defendants diligently undertook within the initial 30 days the Court set for responding to Plaintiffs' expedited discovery requests and interrogatories, Defendants proposed to provide their response to the reformulated interrogatory three weeks from the filing of this Joint Statement. Any other response would be unduly burdensome and disproportional to the needs of the case, especially in the context of expedited discovery.

Defendants' proposed compromise would not entail conducting any additional searches for information or documents from non-Defendant agencies that are not within their custody or control. Nor should it require Defendants to undertake any new searches. Doing so would be immensely more burdensome and would effectively require a re-opening of document discovery for which Defendants have already provided voluminous responses. Thus, Defendants' proposal is the only reasonable construction of Common Interrogatory 1 that accounts for the practical limitations inherent in expedited preliminary injunction discovery as authorized by this Court.

*Requested Relief:* Accordingly, should the Court find any remaining dispute, it should adopt Defendants' reasonable compromise proposal, setting the due date for the response to new Common Interrogatory 6 at three weeks from today, *i.e.*, September 21, 2022, and ordering that the response be *without* any new searches for ESI. Further, although Defendants maintain their objections to discovery on the White House as outlined below, under this proposal, an agency

---

[6] Common Interrogatory No. 6 as Defendants proposed it on August 29 would read: "Identify non-Defendant federal agencies or officials who are known to have communicated or to be communicating with any Social-Media Platform regarding Content Modulation or Misinformation, excluding communications produced by Defendants to date in this action or described in their interrogatory responses of August 17, 2022."

Defendant will identify White House officials but only subject to personal knowledge and when the agency and the White House participated in the communication(s) at issue. (Defendants have accepted Plaintiffs' request that the response to Common Interrogatory 6 cover the same period as Plaintiffs' other requests, *i.e.*, from January 1, 2020.)

B.  *The Court should reject Plaintiffs' expansive requests for supplemental responses from Dr. Fauci.*

To narrow the disputed issues, Defendants offered to supplement their responses to two interrogatories as to Dr. Fauci: Additional Interrogatory No. 5 (Dr. Fauci No. 8), and Additional Interrogatory No. 6 (Dr. Fauci No. 9). Plaintiffs signaled approval of that offer but insisted that any further response be based on additional searches of electronically stored information—a condition to which Defendants could not agree. Defendants' proposed compromise was reasonable in light of the severe time constraints resulting from the expedited discovery timetable. At any rate, Plaintiffs quickly pivoted to making new demands that Defendants supplement their answers to other interrogatories (Common Interrogatory Nos. 1-5) addressed to Dr. Fauci—demands not previously aired in the initial two meet-and-confer sessions. The Court should reject the contention that Defendants should be required to provide responses to any more of the interrogatories directed at Dr. Fauci than Defendants have agreed to provide, as Defendants have offered reasonable responses within the time constraints of expedited discovery.

Additional Interrogatory No. 5, concerning communications with Mark Zuckerberg of Facebook, reads: "Identify all Communications with Mark Zuckerberg from January 1, 2020 to the present, including but not limited to those referenced in Paragraphs 142-145 of the Complaint." Additional Interrogatory No. 6, concerning communications with social media platforms related to COVID-19, reads: "Identify all Communications with any Social-Media Platform that relate to the Great Barrington Declaration, the authors of the Great Barrington Declaration, the original

signers of the Great Barrington Declaration," other various individuals, "the Wuhan Institute of Virology, EcoHealth Alliance, and/or any member of the so-called 'Disinformation Dozen.'"

As to each of these interrogatories, Defendants reasonably identified the communications from Dr. Fauci they produced in response to Plaintiffs' parallel RFPs, stating that those responses provided a more expeditious and significantly less burdensome method for Plaintiffs to obtain the information sought, considering the expedited nature of the discovery here and the broad scope of the Interrogatories. Fed. R. Civ. P. 26(b)(2)(C)(i); *see also* Fed. R. Civ. P. 33(d).

Plaintiffs objected, contending that Defendants were required to undertake "separate effort to inquire of Dr. Fauci whether he is aware of any other (non-email) communications, whether oral or written" and seeking from Dr. Fauci "good-faith and comprehensive efforts," including as to "communications via channels other than his government email." Although Defendants had reasonably confined their document production and related interrogatory responses to email communications in an effort to provide meaningful discovery within the 30-day timetable the Court's July 12 Order imposed, Defendants nevertheless proposed to provide additional substantive responses to the two interrogatories,[7] and Plaintiffs initially indicated acceptance of that offer, while stressing their untenable demand that any further response be based on new searches of ESI.

Plaintiffs, however, came back with another demand. They asserted that Defendants must supplement their responses to various Interrogatories served on Dr. Fauci (Common Interrogatory Nos. 1-5), purportedly based on Facebook's designation of Dr. Fauci as one official who communicated with the platform. But the fact that Dr. Fauci communicated with Facebook is not

---

[7] In the same agreement, Plaintiffs' accepted Defendants' offer to supplement two interrogatories as to DHS, discussed below.

new (indeed, it is prominently alleged in the Complaint), and cannot warrant supplementation of existing interrogatory responses, let alone sustain a demand for any additional interrogatories. Defendants have already produced email communications between Dr. Fauci and social media companies. Indeed, at Plaintiffs' request during meet-and-confer sessions, Defendants also agreed to produce—and did produce on Friday, August 26—additional emails between Dr. Fauci and Mark Zuckerberg that were in their custody and control but that were not responsive to Plaintiffs' discovery requests. Facebook's confirmation that it communicated with Dr. Fauci simply repeats a fact already known to Plaintiffs before they filed this action, and cannot support requiring supplemental or additional interrogatory responses here.

*Requested Relief:* At any rate, should the Court find any remaining dispute, it should adopt Defendants' reasonable compromise proposal, under which Defendants would provide, by three weeks from today, as to Dr. Fauci, supplemental responses on Additional Interrogatory Nos. 5 and 6, and on Common Interrogatories Nos. 2, 3, and 4. That task omits Common Interrogatory Nos. 1 and 5: Defendants are responding to Common 6 in lieu of Common No. 1 as explained above, and Common No. 5 seeks the results of searches of documents also produced so no supplementation is proper. Again, the Court should clarify that the further response as to Dr. Fauci is permitted to be made on the existing documents Defendants produced, not on new ESI.

C. *The Court should reject Plaintiffs' expansive requests for supplemental responses from DHS.*

Subject to the meet-and-confer, Defendants have also offered to supplement responses to two interrogatories as to DHS: Additional Interrogatory No. 11 (DHS No. 9), and Additional Interrogatory No. 12 (DHS No. 13). Additional Interrogatory No. 11, concerning DHS's alleged contacts with unspecified "tech companies," reads: "Identify all 'the tech companies' with which DHS is 'working together' to 'prevent harm from occurring,' as Secretary Mayorkas stated on

August 2, 2021, as discussed in Paragraph 207-208 of the Complaint, including the nature of the work and all Communication(s) relating to such work." DHS objected on the grounds, among others, that Plaintiffs had not specified the "tech companies" about which they inquired, and provided a narrative response explaining that the nature of the work that the agency performs includes "respond[ing] to Misinformation that poses a threat to the homeland."

Additional Interrogatory No. 12, concerning communications with platforms about misinformation not only by the whole of DHS, but by the whole of the Federal Government, reads: "Identify every federal agency, group, sub-group, department, component, division, sub-division, officer, official, employee, agent, or other person or entity within the federal government, both within and without DHS, that communicates or has communicated with any Social-Media Platform regarding Misinformation and/or Content Modulation, including but not limited to any person or entity whose activity is or was to be subject to oversight by the Disinformation Governance Board, including the nature of their coordination with the Social-Media Platform(s)." DHS objected on the grounds, among others, that the interrogatory called on DHS to obtain information not reasonably available to it within the compressed expedited discovery period, about agencies whose alleged conduct is not challenged in either of Plaintiffs' pleadings and which is not within DHS's custody and control.

After Plaintiffs contended that the initial responses to those two interrogatories were not "meaningful," DHS nevertheless offered to provide a further response after the filing of this Joint Statement, but in signaling their approval of that offer, Plaintiffs stressed their demand that any further responses be based on new ESI searches—a condition Defendants cannot meet given the severe time constraints of the expedited discovery process, and because it would be disproportional to the needs of Plaintiffs' preliminary injunction application. Again, Defendants are willing to

supplement their responses to these interrogatories within three weeks of the filing of this Joint Statement, so long as it is not subject to the requirement to do new burdensome ESI searches.

**Requested Relief:** Accordingly, the Court should resolve the dispute on this point, should one remain, by adopting Defendants' reasonable compromise proposal, under which, without searching for any new ESI, Defendants will supplement Additional 11 and Additional 12 for DHS by three weeks from today's joint statement filing.

D. *Requiring HHS to conduct a search for responsive material through the entire agency would exceed the scope of the allegations of the Complaint and preliminary injunction motion and would cause disproportionate burden.*

Plaintiffs also challenge the adequacy of HHS's identification of custodians likely to have relevant information, and they request that Defendants immediately conduct a search of all of HHS—an agency of 80,000 employees—for communications with social media platforms. This request remains untenable. It proceeds from the faulty premise that Plaintiffs are entitled to discovery from every HHS employee—regardless of whether the discovery sought would be "necessary" to resolve their preliminary injunction motion, *BKGTH Prods., LLC*, 2013 WL 5507297, at *5, let alone whether it is "proportional to the needs of the case," or would impose undue "burden or expense" on Defendants, *see* Rule 26(b)(1). Plaintiffs' request would be unreasonable in an ordinary discovery context. *See Coleman v. Am. Red Cross*, 23 F.3d 1091, 1098 (6th Cir. 1994) (upholding district court order denying motion to compel request to search every file in Red Cross National Headquarters "for any documents that might be of any relevance to the matter in the case" because the request was "overly burdensome," particularly when thousands of pages of documents productions, interrogatory responses, and depositions provided other ways of obtaining relevant information). It is all the more unreasonable in the expedited discovery context presented here.

HHS's search for relevant custodians was reasonable and tailored to the discovery authorized by the Court. The Court ordered expedited discovery "targeted to the specific allegations of Plaintiff States' Complaint." Order at 12. In searching for responsive information, the agencies identified custodians in the relevant components based on their understanding of each individual's role at the agency and their involvement in the types of communications alleged in the Complaint and sought through Plaintiffs' discovery requests. *See* Rule 33(b)(1)(A) (stating that interrogatories must be answered "by the party to whom they are directed"); Rule 34(2)(A) (providing that "[t]he party to whom the request is directed must respond" or object); *see also In re Epipen Mktg., Sales Pracs. & Antitrust Litig.*, MDL No. 2785, 2018 WL 1440923, at *2 (D. Kan. Mar. 15, 2018) ("[T]he party responding to discovery requests is typically in the best position to know and identify those individuals within its organization likely to have information relevant to the case."). After all, the Complaint is what "give[s] the defendant fair notice of what ... the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

The agency's efforts, moreover, must be understood in the context of the expedited discovery process here. To respond to Plaintiffs' requests within the time allotted, the agencies were required to identify custodians within a matter of *days*. The agencies thus reasonably focused their efforts on identifying the custodians who were most likely to have responsive information. *See June Med. Servs., LLC v. Gee*, No. CV 16-444-BAJ-RLB, 2018 WL 5269813, at *2 (M.D. La. Oct. 23, 2018) (finding that a search of 23 custodians after an inquiry into those who were most likely to have discoverable information was reasonable). And because Plaintiffs specifically identified and served discovery on three HHS components—the Centers for Disease Control

(CDC), the National Institute of Allergy and Infectious Diseases (NIAID), the Office of the Surgeon General (OSG)—it is unsurprising that the officials identified as most likely to have responsive information would be employed by those components.

Moreover, in order to respond to Plaintiffs' discovery requests within the condensed time period allotted, after identifying custodians most likely to have responsive documents, HHS immediately began collecting, searching, and producing their responsive documents—using all of the expansive search terms Plaintiffs provided—within the month-long period authorized by the Court. HHS ultimately produced thousands of email communications in the identified custodians' custody and control. And in response to Plaintiffs' interrogatories, HHS identified the designated custodians by name and title, nothing that they had been identified after "a reasonable inquiry under the circumstances of abbreviated, expedited discovery."

Given these extensive efforts, Plaintiffs err in contending that HHS's search for custodians most likely to have responsive documents was inadequate because the very components named in the Complaint and discovery requests were the components HHS identified as having responsive information. First, Plaintiffs' demand that HHS search the ESI of officials from ever HHS component would collapse the distinction between various components and operating divisions that comprise the agency. HHS includes eleven operating components—including the Substance Abuse and Mental Health Services Administration, the Agency for Toxic Substances and Disease Registry, and the Food and Drug Administration—and employs approximately 80,000 individuals around the world. https://www.hhs.gov/careers/working-hhs/agencies (last accessed Aug. 30, 2022).[8] Plaintiffs apparently would have HHS conduct extensive searches of each of these

---

[8] DHS likewise includes numerous components and employs approximately 240,000 individuals. *See About DHS*, https://www.dhs.gov/about-dhs (last accessed Aug. 30, 2022).

components for potentially responsive records, even if the component's activities are nowhere mentioned in the Complaint underlying the preliminary injunction application. But under Rule 26(b)(1), it would be disproportional and unduly burdensome for HHS, in identifying the "information available to" the agency for purposes of answering an interrogatory, *see* Rule 33(b)(1)(B), or producing documents, *see* Rule 34, to be compelled to answer as to the activities of officials from every corner of the agency, even when their conduct is not alleged to be at issue in the Complaint. Even if Plaintiffs' request that Defendants search the entirety of HHS were compatible with Rules 26, 33, and 34—and it is not, for the reasons specified in Defendants' objections and responses—Defendants could not feasibly respond to such a request without conducting an inquiry into agency activities that could not be completed within the highly compressed timetable for expedited discovery as the Court authorized it.

Indeed, Plaintiffs do not dispute that the additional searches they demand would impose significant burdens on HHS that would be incompatible with the expedited discovery permitted by the Court. Instead, in the parties' meet and confer sessions, they baselessly accused HHS of intentionally concealing relevant and responsive information based on what Plaintiffs describe as a "list" of individuals from Meta of federal officials who have communicated with the company "about content modulation on a specified list of topics."[9] According to Plaintiffs, that "list" identifies additional individuals at HHS who have communicated with social media companies, who were not identified as custodians in HHS's interrogatory responses. But Plaintiffs offer no details about the nature or frequency of the communications those officials are said to have had with the platform. The platform apparently did not indicate whether those individuals

---

[9] Defendants have not seen Plaintiffs' request to Meta for this list or Meta's description of the types of communications the named officials are said to have had with the company and are only going by Plaintiffs' characterization of the list in email communications.

communicated with its officials about misinformation, or even whether they communicated with the platform on more than one occasion. Plaintiffs' bald assertion that Defendants have failed to conduct adequate searches, based solely on this list of names apparently devoid of any specificity, lacks any factual basis. Moreover, Plaintiffs' accusation that Defendants have actively *concealed* responsive information is not only lacking any factual support, is contradicted by the responses Defendants have already provided: Defendants' document productions—again, of roughly 15,000 pages of email communications—contain some of the very names Plaintiffs wrongly assert Defendants have attempted to hide. Nor would the agency, or any Defendant, have any incentive to conceal information: the communications Plaintiffs challenge here are not unlawful or remarkable.

  ***Requested Relief:*** Notwithstanding the foregoing, the Court should resolve the dispute about HHS, should one remain, by adopting Defendants' reasonable compromise proposal, under which, without searching for any new ESI, Defendants will supplement, by three weeks from today, the responses to Common Interrogatories Nos. 2 through 4, for HHS (where HHS would also respond to Common Interrogatory 6, as outlined above), based on a reasonable inquiry to HHS's Immediate Office of the Secretary ("IOS"). In that regard, because Common Interrogatory 5 seeks the results of searches of documents also produced, no supplementation is proper from HHS as to Common Interrogatory 5.

  *E. Plaintiffs are not entitled to discovery from the White House.*

  Plaintiffs have served wide-ranging discovery requests on two advisors to the President: (1) Karine Jean-Pierre in her official capacity as White House Press Secretary; and (2) Dr. Anthony Fauci in his official capacity as Chief Medical Advisor to the President. The discovery served on these White House officials is broad in scope, ranging from asking White House officials to answer

questions on behalf of the entire federal government to seeking records of internal communications that implicate serious separation of powers concerns. *See, e.g.*, Common Interrogatory No. 2;[10] Request for Production to Ms. Jean-Pierre No. 9.[11]

Plaintiffs have done so without first exhausting other avenues for related information. Indeed, the agency Defendants have produced thousands of documents, including documents revealing the very communications Plaintiffs also seek directly from the White House. And Plaintiffs have sought, and in some instances already obtained, information from third-party social media companies that Plaintiffs assert were communicating with the federal government, including the White House, about misinformation. Rather than exhausting other avenues first, Plaintiffs sought discovery from these White House officials in the first instance. Such an approach unnecessarily embroils this Court in a separation of powers dispute that may otherwise be avoided.

That conclusion is underscored by the fact that Plaintiffs seek such information immediately at the outset of this case, rather than in the normal course of civil discovery. The current procedural posture only heightens the concerns identified by the Supreme Court, as discussed below. Here, Plaintiffs seek White House records not only before they have evaluated information received from other parties, but before this Court has even decided a motion to dismiss. This Court should reject Plaintiffs' efforts to seek discovery from the White House at this stage of the litigation, in which Plaintiffs argued they needed limited and targeted discovery to

---

[10] Plaintiffs asked all Defendants, including Ms. Jean-Pierre and Dr. Fauci, to "'[i]dentify every officer, official, employee, staff member, personnel, contractor, or agent of' recipient Defendant '*or any other federal official or agency* who has communicated or is communicating with any Social-Media Platform regarding Content Modulation and/or Misinformation.'" (emphasis added).

[11] Plaintiffs requested the White House Office of the Press Secretary through Ms. Jean-Pierre to "[p]roduce all Documents and Communications *relating to any* 'government experts' who have 'partnered with' Facebook or any Social-Media Platform to address Misinformation and/or Content Modulation." (emphasis added).

inform the resolution of their motion for a preliminary injunction, and instead proceed to consideration of that motion as informed by the thousands of documents the various Defendants have already produced.

Because seeking such wide-ranging discovery from the White House implicates serious separation of powers concerns, courts are extremely cautious before allowing such discovery, especially when other avenues for related information have been not yet been exhausted. *See generally Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004); *see also* Order, *Centro Presente v. Biden*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (Dkt. No. 89) (requiring plaintiff to exhaust all discovery on other defendants before considering whether there was "continuing need for discovery sought from the White House"); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (vacating "district court's discovery orders because the district court did not fulfill its obligation 'to explore other avenues, short of forcing the Executive to invoke privilege'" (quoting *Cheney*, 542 U.S. at 390)). The burden imposed on the White House by discovery orders is an "important factor" to be considered by courts, due to the special deference and "the high respect that is owed to the office of the Chief Executive[.]" *Cheney*, 542 U.S. at 385 (citation omitted).

Courts have routinely recognized the weighty separation-of-powers concerns triggered by discovery directed to the White House. That is why "courts must narrow overly broad and intrusive discovery requests directed at the highest levels of the Executive Branch, lest 'vexatious litigation . . . distract [the Executive Branch] from the energetic performance of its constitutional duties.'" *Vidal v. Duke*, No. 16-CV-4756, 2017 WL 8773110, at *4 (E.D.N.Y. Oct. 17, 2017) (alterations in original) (citing *Cheney*, 542 U.S. at 382) (finding that a magistrate's order "requiring the White House to identify and assert privilege with respect to specific documents or risk waiving privilege over those documents . . . potentially raises constitutional concerns akin to those at issue in

*Cheney*"); Order at 4, *In re Kirstjen M. Nielsen, Secretary of Homeland Security*, No. 17-3345 (2d. Cir. Dec. 27, 2017) (Dkt. No. 171) (explaining that a discovery order covering White House documents would "creat[e] possible separation of powers issues"). Plaintiffs must demonstrate that the requests are limited to essential information that cannot otherwise be obtained. *See Karnoski*, 926 F.3d at 1205; *Lardner v. U.S. Dep't of Just.*, No. 03-0180, 2005 WL 758267, at *9 (D.D.C. Mar. 31, 2005) (citing *Cheney* for the proposition that "a court must screen a request for presidential documents to ensure that the discovery is essential to the proceedings").

In measuring the burden imposed, the Court must consider the extensive discovery—including roughly 15,000 pages of documents—already produced by the agency Defendants. Against that background, there is no warrant for steering this case into conflict with the separation of powers by allowing Plaintiffs to pursue expedited discovery from the White House. At most, discovery implicating these weighty constitutional concerns should be deferred to a later stage of this litigation and allowed then only if it is necessary to resolution of the case. This Court should therefore deny Plaintiffs' request to compel expedited discovery on the White House.

1. *Discovery requests on the White House Office of the Press Secretary.*

Plaintiffs' discovery requests on the White House Office of the Press Secretary[12] are facially unreasonable. Contrary to the principles discussed above, Plaintiffs have not exhausted other avenues before seeking these communications from the White House Office of the Press Secretary. Again, the burden imposed on the White House by discovery orders is an "important factor" to be considered by courts, due to the special deference and "the high respect that is owed

---

[12] The Office of the Press Secretary is separate from the White House Communications Office. Plaintiffs have not served any discovery on the Communications Office, and the Director of the Communications Office is not named as a defendant in the original Complaint on which the Court-authorized discovery is based.

to the office of the Chief Executive[.]" *Cheney*, 542 U.S. at 385 (citation omitted). Further, Rule 26(b) of the Federal Rules of Civil Procedure directs a district court to limit the scope of discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2)(C)(i). Although there is often a presumption in favor of disclosure of non-privileged material, "[i]n some circumstances, . . . the requesting party should be required to assume a heavy burden of persuasion before any discovery is allowed." *See Cheney*, 542 U.S. at 392 (Stevens, concurring); *see also* Order at 9 (noting that "[e]xpedited discovery is not the norm" and that it must be "reasonable[] . . . in light of all the surrounding circumstances").

Plaintiffs cannot meet this burden. Again, they have not exhausted other avenues for such information. Plaintiffs did not even evaluate the material that they obtained from other Defendants prior to serving discovery on the White House. Those Defendants produced thousands of records, including records of communications that involved White House personnel. But Plaintiffs do not identify any personnel in the White House Office of the Press Secretary as participants in or recipients of those communications, again suggesting that such discovery is altogether unwarranted.

To the extent Plaintiffs are seeking external communications with social media companies, it is Defendants' understanding that Plaintiffs served subpoenas on social media companies seeking the very same material. Although it possible that the social media companies may object, in full or in part, to the subpoenas, it is Defendants' understanding that at least some social media companies have responded by identifying the individuals they communicated with across the government, including at the White House. Notably, based on Plaintiffs' own representations during the meet-and-confer about the companies' responses, it does not appear that the social

media companies have identified anyone from the White House Office of the Press Secretary, where this discovery was served. Regardless, the scope of those responses by the third-party social media companies should first be resolved before burdens are imposed on the White House.

A party should not be allowed to engage in a fishing expedition for communications of a senior advisor to the White House, such as the White House Press Secretary, based on such a scarce record. The reference involving the Office of the Press Secretary to which Plaintiffs point to suggest the involvement of the Press Secretary or her Office in the conduct alleged in the Complaint are statements made by the former Press Secretary, Jennifer Psaki. But those statements do not suggest that anyone from the Office of the Press Secretary communicated with social media companies; they suggest that *others* did. And Defendants have produced thousands of records of such communications by officials throughout the government; there is no need for Plaintiffs to rummage through the email and other traffic from the Office of the Press Secretary. The information provided by the other Defendants in response to both document productions and interrogatories substantially similar to those served on the White House Press Secretary should be more than sufficient for the current stage of the litigation; *i.e.*, limited discovery in anticipation of a motion for preliminary injunction.

Moreover, Plaintiffs' requests on the White House are not cabined or narrow; to the contrary, they also seek communications internal within the government. As an initial matter, Defendants have objected to all of Plaintiffs' discovery requests that seek internal governmental communications as not proportional to the needs of the case, because they would have required an extensive search of internal records that was not possible within the expedited period provided for current discovery and would be unnecessary in light of the thousands of external communications

Defendants have agreed to produce from various Defendants. Thus, on this basis alone the Court should reject any effort by Plaintiffs to compel the White House Office of the Press Secretary.

The burdens on the White House are further magnified for discovery seeking internal White House communications. *See Cheney*, 542 U.S. at 390 (rejecting the requirement that such privileges must be initially logged given the burdens inherent in doing so in such a situation). Unlike other Government officials, the President maintains unique "constitutional responsibilities and status . . . ." *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982). Rather than put the White House to the substantial and constitutionally intrusive burden of searching for responsive documents and invoking privilege over each document to which a privilege might apply, under *Cheney*, the district court must hold the plaintiff to a heightened standard of relevance and need. As the Supreme Court explained, "precedents provide no support for the . . . requirement that the Executive Branch bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections. Indeed, those precedents suggest just the opposite." *Cheney*, 542 U.S. at 371.

In the end, Plaintiffs are not entitled to such far-ranging discovery on the White House Office of the Press Secretary, particularly at this stage at this litigation. *See Karnoski*, 926 F.3d at 1205 (finding that plaintiffs must meet a "heightened standard" where they "must make a preliminary showing of need demonstrating 'that the evidence sought [is] directly relevant to issues that are expected to be central to the trial' and 'is not available with due diligence elsewhere.'") (quoting *In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997)). As explained above, even interrogatories and document production requests that seek external communications from the White House Office of the Press Secretary impose improper burdens—burdens that are heightened to the extent the Plaintiffs seek to expand their requests beyond that Office (the only one that they actually served). And in no event should this Court permit Plaintiffs' even more burdensome

requests for internal documents that implicate concerns about privilege and the constitutional separation of powers. *See, e.g.*, *Cheney*, 542 U.S. at 390. Again, Plaintiffs have not exhausted all available alternative sources and demonstrated that the material they seek from the White House Office of the Press Secretary is essential and not substantially available through other avenues.

   2. *Discovery served on Dr. Fauci in his capacity as Chief Medical Advisor to the President.*

Defendants have already averred to Plaintiffs that "they are unaware of any separate White House e-mail account belonging to Dr. Fauci" and "that, to their understanding, Dr. Fauci's direct reports and staff are affiliated with the National Institute of Allergy and Infectious Diseases." Further, Defendants have searched and provided responsive documents from Dr. Fauci and the NIAID. Likewise, Defendants have provided information in response to interrogatories directed at Dr. Fauci and the NIAID. Accordingly, the dispute concerning Dr. Fauci is whether anything more is required beyond what Defendants have already done. But to the extent Dr. Fauci has any other information in his capacity advising the President, the production of such information would implicate core constitutional concerns outlined above, recognized by *Cheney* and its progeny. Again, the current phase of discovery is limited to development of a record necessary to support Plaintiffs' preliminary injunction motion. Given the breadth of information of Defendants have already produced concerning Dr. Fauci and the weighty separation of powers concerns that would be implicated if he were required to respond to discovery requests in his capacity as Chief Medical Advisor to the President, this Court should not allow Plaintiffs to obtain discovery from him in that role, at least at this stage. That is especially true when Plaintiffs, again, did not explore all other avenues before seeking such discovery.

Accordingly, Defendants ask this Court to consider their responses for Dr. Fauci in his capacity as Director of NIAID sufficient for the present purposes and reject Plaintiffs' invitation to intrude into the constitutional issues delineated by *Cheney* and its progeny.

3. *This Court should stay any order compelling discovery against the White House.*

Finally, to the extent that this Court agrees with Plaintiffs and orders discovery on the White House, in any form, Defendants respectfully request that this Court stay its order for 30 days to give the Solicitor General sufficient time to consider the government's appellate options prior to complying with the discovery requests. Such a stay was contemplated by the Supreme Court in *Cheney*, which explained that a dispute over White House discovery is distinct "from the category of ordinary discovery orders where interlocutory appellate review is unavailable, through mandamus or otherwise." *See Cheney*, 542 U.S. at 381-82. And should Defendants seek further review, Defendants respectfully ask that this Court continue its stay of its order pending completion of such appellate proceedings. *See* Order, *In re Donald J. Trump*, No. 18-72159 (9th Cir. Sept. 17, 2018) (Dkt. No. 36) (staying district court discovery order pending Ninth Circuit's consideration of the Government's petition for a writ of mandamus concerning White House discovery); *see also Karnoski*, 926 F.3d at 1204-06 (vacating that discovery order). This Court should protect the White House from responding to such discovery until Defendants can fully consider their appellate options and, if the Solicitor General determines in favor of seeking appellate review, until that review is complete.

**III.    The Court should reject Plaintiffs' attempts to re-open preliminary-injunction-related discovery by making new discovery requests for the first time during the parties' meet and confer discussions.**

Plaintiffs ask the Court to compel Defendants to respond to a number of new discovery requests directed to agencies and officials that were not defendants when the Court authorized

expedited discovery (and many of which are not even defendants now). Those discovery requests are improper.

First, the Court did not authorize Plaintiffs' new discovery requests. In the Court's expedited discovery order, it allowed the "Plaintiff States [to] serve interrogatories and document requests upon *Government Defendants*," which the Court defined as those who were Defendants *at the time of the Court's order*. Order at 1 n.1, 13 (emphasis added).[13] Additionally, the Court ordered Plaintiffs to serve their discovery requests "[w]ithin five business days after" the Court's July 12, 2022 expedited discovery order (*i.e.*, by July 19, 2022). *Id.* at 13. Here, Plaintiffs' new discovery requests are directed to agencies and officials who were not "Government Defendants" when the Court authorized discovery, and Plaintiffs did not serve their requests by July 19, 2022. Thus, the Court did not authorize Plaintiffs' new discovery requests, and their requests therefore seek impermissible expedited discovery under Federal Rule of Civil Procedure 26.

To be clear, this argument applies to Plaintiffs' new discovery requests on White House officials outside of the Office of the Press Secretary. Plaintiffs initially served discovery only on the White House *Press Secretary*. They did not serve discovery on the White House as a whole. Thus, their new discovery requests on White House officials outside of the Office of the Press Secretary were not served by the July 19, 2022, deadline set by the Court. And as explained above, Defendants object to White House discovery, particularly at this stage of the litigation, but, regardless, these particular requests were not properly served.

---

[13] "Government Defendants consist of Joseph R. Biden, Jr., Jennifer Rene Psaki, Vivek H. Murthy, Xavier Becerra, Department of Health and Human Services, Anthony Fauci, National Institute of Allergy and Infectious Diseases, Centers for Disease Control and Prevention, Alejandro Mayorkas, Department of Homeland Security, Jen Easterly, Cybersecurity and Infrastructure Security Agency, and Nina Jankowicz." Order at 1 n.1.

Second, Plaintiffs' new discovery requests are unjustified because they have failed to establish that they have standing to sue, and seek relief against, any of the new agencies and officials from whom they seek discovery. As explained in Defendants' opposition to Plaintiffs' expedited discovery motion, a court must first assess whether Plaintiffs have standing to sue prior to allowing the litigation against the parties in question to move forward. *See Haverkamp v. Linthicum*, 6 F.4th 662, 668 (5th Cir. 2021); *Steel Co.*, 523 U.S. at 94–95; Defs.' Disc. Resp., ECF No. 26, at 8-12. Here, Plaintiffs make no attempt to show that any have suffered any injury as a result of any comments made by the agencies and officials from whom they now seek new discovery. Thus, the Court can deny these belated expedited discovery requests for this reason alone.

Third, Plaintiffs' new discovery requests are incompatible with the compressed discovery schedule Plaintiffs demanded and the Court set. Plaintiffs argued that they needed expedited discovery because they needed a quick decision on the preliminary injunction motion. *See* Mot. at 3 n.1 (the "issues" raised in the preliminary injunction motion are allegedly "time-sensitive and urgent"). The Court thus ordered an expedited discovery schedule that gave Defendants only a few weeks to provide discovery responses. *See* Order at 13. This schedule did not contemplate a process whereby Plaintiffs could serve new and additional discovery requests on a rolling basis. *See id.* (allowing Plaintiffs to serve discovery "[w]ithin five business days after" the Court's order). Plaintiffs' new discovery requests, if allowed, would require a drastic change to the nature and schedule of this discovery process. The Court would have to institute a new schedule whereby Plaintiffs could serve their new discovery requests,[14] and Defendants would be given a meaningful

---

[14] Plaintiffs thus far have not properly served Defendants with the new discovery requests consistent with Federal Rule of Civil Procedure 34. Plaintiffs simply described their new discovery request in informal emails. Further, Plaintiffs' demand for discovery responses encompasses

amount of time—at a minimum, another 30 days—to respond to those discovery requests. Plaintiffs, however, have objected to any material extension in the discovery process.

Fourth, Plaintiffs' new discovery requests are unnecessary for them to litigate their preliminary injunction motion. That motion seeks relief against those who were Defendants when the motion was filed, and Plaintiffs do not even argue that they need any additional information or evidence to litigate the motion against those parties. Thus, Plaintiffs are not entitled to any further expedited discovery. *See BKGTH Prods., LLC*, 2013 WL 5507297, at *5 ("A party seeking expedited discovery must narrowly tailor their requests in scope to the *necessary* information they seek." (emphasis added)). If Plaintiffs believe they can litigate their motion now, and if they believe they need a prompt resolution of that motion, then the Court need not, and should not, authorize any further, time-consuming discovery.

Fifth, the discovery process Plaintiffs now request—where they submit new discovery requests seriatim as they learn new information—would be inefficient. Plaintiffs simply note that various other federal government agencies and officials may have been communicating with social media companies about misinformation, and thus they want discovery over whether those communications were occurring. But Plaintiffs are assuming those communications would be improper. Rather than allow Plaintiffs to conduct a multi-stage investigation into several components of the federal government, the parties should be directed to first litigate the pending preliminary injunction motion and secure a decision over whether the communications at issue amount to a First Amendment violation. A legal determination on that issue could illuminate whether further discovery into other federal agencies and officials relating to those types of

_____

federal agencies and officials who are not parties and thus Plaintiffs would have to comply with any requirement to seek information from non-parties. *See generally U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

communications would even be useful. If the Court agrees with Defendants that those communications are unproblematic, then Plaintiffs' new, requested discovery would be unnecessary. And even if the Court disagrees with Defendants, the parties can then secure a final determination on that question by litigating it through the appellate process—all before the federal government absorbs enormous discovery-related burdens as a result of Plaintiffs' new, sprawling discovery requests.

Plaintiffs rely on a number of arguments to justify their new requests. None has merit. First, Plaintiffs assert that they need discovery over the officials purportedly engaging in the communications at issue so that they can properly frame their request for relief. But Plaintiffs' preliminary injunction motion seeks relief against the agencies and officials who were defendants when that motion was filed, and it is unclear how Plaintiffs are unable to frame their request for relief against *those* defendants unless they obtain discovery into *other* agencies and officials. Regardless, if the Court finds that injunctive relief is proper, the Court can simply issue relief against the agency at issue. An injunction need not identify—and thus Plaintiffs do not need discovery over—each and every person who has engaged in allegedly improper communications.

Plaintiffs also argue that they could not serve their new discovery requests earlier because new information purportedly came to light only recently. As an initial matter, Plaintiffs fail to demonstrate that they could not have uncovered this information earlier. For example, Plaintiffs seek new discovery from the FBI based on certain recent comments by Mark Zuckerberg concerning communications Facebook had with the FBI. But Mark Zuckerberg made virtually identical comments nearly two years ago, at an October 28, 2020 Senate hearing. There, he stated: "[W]e've been able to build partnerships across the industry," including "with law enforcement and the intelligence community, to be able to share signals" and "one of the threats that the FBI

has alerted our companies and the public to, was the possibility of a hack and leak operation in the days or weeks leading up to this election." https://www.rev.com/blog/transcripts/tech-ceos-senate-testimony-transcript-october-28 (last accessed Aug. 30, 2022). Thus, this information has been in the public domain for years, as Plaintiffs' own Complaint acknowledges. *See also* Compl. ¶ 182 (relying on NBC News article to assert that platforms stated they met with, among other agencies, "the FBI's foreign influence task force").

In any event, even if Plaintiffs could not have uncovered the information at issue earlier, their new requests are nonetheless still incompatible with the discovery schedule currently in place. *See supra*. Thus, again, if Plaintiffs want the Court to expand the scope of authorized discovery, they cannot object to a commensurate extension of the discovery schedule.

Plaintiffs have also indicated that they intend to move for leave to amend their Complaint and add as Defendants the new agencies and officials from whom they now seek discovery. As an initial matter, Defendants expect to oppose Plaintiffs' motion for leave to amend their Complaint, including on futility grounds. Regardless, amending their Complaint to incorporate new parties would not address all of the deficiencies in their new discovery requests. Plaintiffs would still have to move for expedited discovery against those parties, and Defendants would oppose that. Further, as explained above, any new discovery would be inconsistent with Plaintiffs' representation that they need a prompt decision on the preliminary injunction motion.

Accordingly, the Court should not compel Defendants to respond to Plaintiffs' belated, unjustified discovery requests. Should the Court authorize these new discovery requests, Defendants reiterate their request that the Court provide sufficient time for the Solicitor General to consider options for appellate review.

IV. **If the Court is inclined to authorize any additional discovery, and extend the discovery period, the Court should permit Defendants to take discovery from the Plaintiffs.**

Defendants have thus far expended significant resources and produced thousands of pages of documents in what was billed as a narrow, targeted discovery process. If Defendants are required to provide additional discovery, and expend additional resources, Plaintiffs should not be spared from those burdens, especially since they too may have documents that are highly relevant to this litigation. In any order authorizing additional discovery, the Court should thus allow Defendants to take discovery from Plaintiffs on a number of issues. First, Defendants should be permitted to take discovery from Plaintiffs on any communications they may have had with social media companies about misinformation. Public reports suggest that at least one official in Missouri may have engaged in these communications. *See* https://www.news-leader.com/story/news/politics/2021/09/14/missouris-health-director-plans-state-covid-response-fight-misinformation-masks-vaccination/8332397002/ (last accessed Aug. 30, 2022) (the Director of the Missouri Department of Health and Senior Services claimed he wanted to "improve [ ] messaging . . . for social media," and "battl[e] misinformation"). If the Plaintiff States have alerted social media companies of misinformation on their platforms, that would further confirm that those types of communications are routine and lawful. Additionally, Defendants should also be permitted to serve document requests and/or interrogatories relating to Plaintiffs' standing theories. Responses to those discovery requests would be relevant to Plaintiffs' allegations concerning actions that social media companies may have taken directly against them or against their residents. This discovery would shed light on when those actions occurred, how often they occurred, and the context in which they occurred—information that would be relevant to whether those actions could be attributed to any Defendant. The Court should subject these discovery

requests to the same schedule that would be applied to any new discovery requests authorized against Defendants.

● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

---

The State of Missouri and the State of
Louisiana,

      *Plaintiffs*,

          v.

President Joseph R. Biden, Jr., in his official
capacity as President of the United States of
America,
          *et. al.,*

      *Defendants*.

Civil Action No. 22-cv-1213

---

## [DEFENDANTS' PROPOSED] ORDER

Having considered the Parties' Joint Statement concerning the expedited discovery

requests authorized by the Court, ECF No. 34, **IT IS ORDERED** that:

1. Other than the supplemental interrogatory responses Defendants have agreed to provide

   Plaintiffs by September 21, 2022, all further relief Plaintiffs seek in the Parties' Joint

   Statement is hereby **DENIED**.

2. The Parties shall otherwise follow the schedule set out in this Court's Order, ECF No. 34.


      MONROE, LOUISIANA, this _____ day of September 2022.


                    _____
                    Terry A. Doughty
                    United States District Judge

Dated: August 31, 2022                                  Respectfully submitted,

**ERIC S. SCHMITT**                                     **JEFFREY M. LANDRY**
**Attorney General of Missouri**                        **Attorney General of Louisiana**

*/s/ D. John Sauer*                                     */s/ Elizabeth B. Murrill*
D. John Sauer, Mo. Bar No. 58721*                       Elizabeth B. Murrill (La #20685)
  *Solicitor General*                                     *Solicitor General*
Justin D. Smith, Mo. Bar No. 63253                      Louisiana Department of Justice
  *First Assistant Attorney General*                    1885 N. Third Street
Todd Scott, Mo. Bar No. 56614*                          Baton Rouge, Louisiana 70804
  *Senior Counsel*                                      Tel: (225) 326-6766
Michael E. Talent, Mo. Bar No. 73339*                   murrille@ag.louisiana.gov
  *Deputy Solicitor General*                            *Counsel for State of Louisiana*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
John.Sauer@ago.mo.gov
*Counsel for State of Missouri*


*  admitted *pro hac vice*


*/s/ Jenin Younes*
Jenin Younes **
John J. Vecchione **
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*
** admitted *pro hac vice*

*/s/ John C. Burns*
John C. Burns ***
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

66

\*\*\* application for admission forthcoming


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC WOMACK
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*
ADAM KIRSCHNER
KYLA SNOW
INDRANEEL SUR
KUNTAL CHOLERA
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kyla.Snow@usdoj.gov
Indraneel.Sur@usdoj.gov
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*



## CERTIFICATE OF SERVICE

I hereby certify that, on August 31, 2022, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

# EXHIBIT K

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

The State of Missouri and the State of Louisiana,

      *Plaintiffs*,

      v.

President Joseph R. Biden, Jr., in his official capacity as President of the United States of America, *et. al.*,

      *Defendants*.

Civil Action No. 22-cv-1213

### DEFENDANTS U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES' AND SECRETARY XAVIER BECERRA'S OBJECTIONS TO PLAINTIFFS' REQUESTS FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendants U.S. Department of Health and Human Services ("HHS") and Xavier Becerra, in his official capacity as Secretary of the Department of Health and Human Services (collectively, "Defendants"), by and through their undersigned counsel, hereby submit the following objections to Plaintiffs' Requests for the Production of Documents ("RFPs").

### Objections to Definitions and Instructions

1.      Defendants object to the definitions of "Content Modulation," and the related term "Misinformation," including to the extent that Plaintiffs' definition of "Content Modulation" covers actions by Social Media Companies beyond those taken against content containing Misinformation and against users posting content containing Misinformation (such as actions taken as to any post on "efficacy of COVID-19 restrictions" or on "security of voting by mail"). For purposes of these Responses and Objections, Defendants generally define "Misinformation" in a manner consistent with Plaintiffs' definition of that term: "any form of speech . . . considered to be potentially or actually incorrect, mistaken, false, misleading, lacking proper context, disfavored, having the

1

tendency to deceive or mislead . . . including but not limited to any content or speech considered by any federal official or employee or Social-Media Platform to be 'misinformation,' 'disinformation,' 'malinformation,' 'MDM,' 'misinfo,' 'disinfo,' or 'malinfo.'" *See* RFP, Definition O. A broader definition of "Content Modulation," or "Misinformation," would cover subject-matter that goes beyond the scope of, and would thus not be relevant to, Plaintiffs' claims.

2.      Defendants object to the definitions of CDC, CISA, DHS, HHS, NIAID, and White House Communications Team to the extent those definitions include "any . . . agent," "contractors," "divisions, agencies, boards, employees, contractors, and any subordinate agency or entity" of those agencies on the ground that those definitions are overbroad and may include persons and entities that are not under the supervision or control of any Defendant. Furthermore, the Complaint contains no allegations concerning any component or officer of HHS separate and apart from the HHS components that have received their own requests for production: the Centers for Disease Control and Prevention, Dr. Anthony Fauci, in his official capacity as Director of the National Institute of Allergy and Infectious Diseases, the National Institute of Allergy and Infectious Diseases, and Surgeon General Vivek H. Murthy. Defendants interpret the Requests targeted at Defendants to apply only to the aforementioned components and officers of HHS.

3.      Defendants object to the definition of "document" to the extent it includes "documents retained on personal devices and/or in personal email accounts or other personal accounts." Documents found on personal devices or within electronic personal accounts would not be in the custody or control of any Defendant.

4.      Defendants object to the definition of "Social-Media Platform" as overbroad, because it includes "*any* organization that provides a service for public users to disseminate . . . content . . . to other users or the public, along with any "contractors, or any other person . . . acting on behalf of the Social-Media Platform . . . as well [as] subcontractors or entities used to conduct fact-checking

or any other activities relating to Content Modulation." The Complaint contains no nonconclusory allegation that Defendants communicated with each and every organization that allows users to "disseminate . . . content" to other users, along with any persons or entities affiliated with those organizations. Defendants will construe "Social-Media Platform" to encompass Facebook, Instagram, Twitter, LinkedIn, and YouTube.

5.      Defendants object to the definition of "You" an "Your" as overbroad as it includes "any officers, officials, employees, agents, staff members, contractors, and other(s)" acting at the direction, or on behalf, of HHS and Secretary Becerra. Such a definition is not proportional to the needs of the case, especially given the expedited, abbreviated discovery process where Defendants have only a limited amount of time to conduct a document search and produce responsive documents. Furthermore, the Complaint contains no allegations concerning any component or officer of HHS separate and apart from the HHS components that have received their own requests for production: the Centers for Disease Control and Prevention, Dr. Anthony Fauci, in his official capacity as Director of the National Institute of Allergy and Infectious Diseases, the National Institute of Allergy and Infectious Diseases, and Surgeon General Vivek H. Murthy. Defendants interpret the Requests targeted at Defendants to apply only to the aforementioned components and officers of HHS.

6.      Defendants object to Instruction 1. Plaintiffs cite to no authority requiring a recipient of discovery requests to "describe the efforts [it has] made to locate . . . document[s]" that are not in its custody and control "and identify who has control of the document and its location."

7.      Defendants object to Instruction 2 to the extent it exceeds the requirements of F.R.C.P. 26(b)(6).

8.      Defendants object to Instruction 3. Plaintiffs cite to no authority indicating that, if Defendants object to a request on burden grounds, Defendants must "stat[e] the approximate number of documents to be produced, the approximate number of person-hours to be incurred in the

identification, and the estimated cost of responding to the request." Further, it is unclear how Defendants could provide that type of information without conducting certain burdensome document searches and reviews that Defendants sought to avoid through their objections. As required by the Federal Rules of Civil Procedure, Defendants will "state with specificity the grounds for objecting to the request [at issue], including the reasons" for the objection. F.R.C.P. 34(b)(2)(B).

9. Defendants object to Instruction 5 as unduly burdensome to the extent it requires Defendants to produce electronic documents "with all metadata and delivered in their original format." Plaintiffs may identify the precise categories of metadata they believe they require to adequately litigate their claims, and the parties may then meet-and-confer over the issue.

10. Defendants object to Instruction 6 to the extent that it requires Defendants to produce documents in a format other than the format in which they are "kept in the usual course of business." F.R.C.P. 34 (b)(2)(E). Defendants object to Instruction 6 to the extent that it requests the production of all e-mail "forwards" for e-mails produced to Plaintiffs. That request may call for the production of documents that are not found in the e-mail files of the relevant custodians used by Defendants.

11. Defendants object to the Instruction in the introductory paragraph calling on Defendants to produce documents responsive to Plaintiffs' Requests by August 17, 2022. Defendants will make rolling productions, consisting of the documents Defendants have agreed to produce herein, starting on August 17, 2022 and will endeavor to complete those productions on or before August 25, 2022.

### **Objections Applicable to All Requests**

1. The general objections set forth below apply to each and every discovery request discussed below. In asserting Defendants' objections to specific discovery requests, Defendants may assert an objection that is the same as, or substantially similar to, one or more of these objections. Defendants may do so because the language of the discovery request itself may signal particular and

4

specific concerns that the discovery request at issue may be objectionable based on the grounds stated. The fact that Defendants may specifically reference some of the objections described immediately below in their objections to Plaintiffs' individual requests, but not others from the same list, does not indicate that Defendants has waived any of these objections as to any of Plaintiffs' requests.

2.     Defendants respectfully maintain that discovery is inappropriate in a matter such as this one challenging federal agency action. *See generally Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Challenges to administrative agency action are ordinarily not subject to discovery. *See id.*

3.     Defendants object to Plaintiffs' discovery requests to the extent that they seek (a) attorney work product; (b) communications protected by the attorney-client privilege; (c) information protected by the deliberative process privilege or law enforcement privilege; (d) material the disclosure of which would violate legitimate privacy interests and expectations of persons not party to this litigation; (e) information protected by any form of executive privilege; or (f) information covered by any other applicable privilege or protection.

4.     Defendants object to each Request to the extent it seeks documents that are not in the custody or control of any Defendant.

5.     Defendants object to each Request to the extent it seeks all communications and documents from each Defendant relating to the substantive topic identified in the Request. The parties are currently involved in an expedited, abbreviated discovery process where Defendants have only a limited amount of time to conduct a document search and produce responsive documents. Defendants will only produce non-privileged, responsive documents that it expressly agrees to produce herein, so long as those documents are found in the files collected from a reasonable set of custodians and contain one or more reasonable search terms.

6.      Defendants specifically reserve the right to make further objections as necessary to the extent additional issues arise regarding the meaning of and/or information sought by Plaintiffs' discovery requests.

### Objections to Specific Requests for the Production of Documents

**Request 1:**  Produce all Documents identified, referred to, or relied on in answering Plaintiffs' Interrogatories to You, including but not limited to all Communications identified in response to those Interrogatories.

**Response:**  In addition to the foregoing general objections, Defendants object to this Request as vague because it is unclear what it means to "rel[y]" on a document, as compared to "referr[ing]" to a document, in answering an Interrogatory. Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to this objection, Defendants will produce non-privileged documents expressly identified in Defendants' answers to the Interrogatories.

**Request 2:**  Produce all Communications with any Social-Media Platform relating to Misinformation and/or Content Modulation.

**Response:** In addition to the foregoing general objections, Defendants object to this Request as overbroad, unduly burdensome, and not proportional to the needs of this case. This Request calls for *any and all* communications from any Defendant or any employee or subordinate of any Defendant, to *any and all* Social-Media Platforms, even if those platforms are not at issue in the Complaint. Defendants cannot conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule. Defendants also understand this request to seek only communications between Defendants and third parties outside the government. Further, to the extent this Request seeks any purely internal documents or records,

Defendants object to the Request as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be unnecessary in light of the external documents Defendants have agreed to produce. Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to the foregoing objections, Defendants will produce non-privileged e-mail communications between Defendants and employees of Facebook, Twitter, LinkedIn, Instagram, and YouTube (the "Social-Media Platforms") concerning Misinformation located within a review population consisting of e-mail files that (i) are collected from custodians who, having been identified through Defendants' internal inquiry, are believed to have communicated with employees of the Social-Media Platforms (the "Custodial Social Media E-mails"),[1] and (ii) contain one or more of Plaintiffs' Search Terms.

**Request 3:**  Produce all Communications with any Social-Media Platform that contain any of the Search Terms.

**Response:**  In addition to the foregoing general objections, Defendants object to this Request as unduly burdensome, overbroad, and not proportional to the needs of this case. This Request calls for *any and all* specified documents from any Defendant or any employee or subordinate of any Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Furthermore, this Request

---

[1] Defendants collected, from those custodians, e-mail correspondence with Social-Media Platform employees who had e-mail addresses with the domain names of @meta.com, @fb.com, @facebook.com, @twitter.com, @instagram.com, @linkedin.com, @youtube.com, @microsoft.com, and @google.com.

covers documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request, however, would require the production of any document that contains any of Plaintiffs' Search Terms, regardless of whether that document pertains to Misinformation. Plaintiffs' Search Terms include many broad terms that could be found in e-mails that have nothing to do with misinformation, such as "election," "antitrust," and "Kennedy." Defendants also understand this Request to seek only communications between Defendants and third parties outside the government. Further, to the extent this Request seeks any purely internal documents or records, Defendants object to the Request as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be unnecessary in light of the external documents Defendants have agreed to produce. Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to the foregoing objection, Defendants will produce non-privileged e-mail communications between Defendants and employees of the Social-Media Platforms concerning Misinformation that can be located within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms.

**Request 4:** Produce organizational charts of any office or group, including HHS leadership, NIAID leadership, CDC leadership, any communications teams, advisory board, working groups, task forces, "analytic exchange," or other group that has communicated or is communicating with any Social-Media Platform relating to Misinformation and/or Content Modulation.

**Response:**  In addition to the foregoing general objections, Defendants object to this Request as vague because it does not define what constitutes a "communications team," an "advisory board," a "working group," "task force," or a "group." Defendants also object to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. The organizational charts identified in this Request would do far more than identify persons who have been "communicating with social-media platforms" about misinformation; *e.g.*, by identifying other persons who simply fall within the same organizational structure.

**Request 5:**  Produce organizational charts of any Social-Media Platform that identify any person(s) You communicate with or have communicated with relating to Misinformation and/or Content Modulation.

**Response:**  In addition to the foregoing general objections, Defendants object to this Request because Defendants do not, in their ordinary course of business, maintain any organizational charts for third party Social-Media Platforms.  Accordingly, this Request would not be proportional to the needs of the case, particularly in light of the Court's order permitting Plaintiffs to seek such information directly from the third parties themselves. Defendants also object to this Request because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. The organizational charts identified in this Request would not

identify any "federal officials" who have been "communicating with social-media platforms" about misinformation, nor would it describe the contents of those communications.

**Request 6:** Produce all Documents and Communications relating to any coordination between Social-Media Platform and any "member of our senior staff" and/or "member of our COVID-19 team," who are "in regular touch with … social media platforms," as Jennifer Psaki stated at a White House press briefing on or around July 15, 2021.

  **Response:** In addition to the foregoing general objections, Defendants object to this Request as vague because it relies on a characterization of a statement made by an individual other than an employee of HHS or Secretary Becerra, and the statement does not specify the individuals at issue or the specific communications referenced. Defendants further object to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from any Defendant or any employee or subordinate of any Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendants also object to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for communications with Social-Media Platforms regardless of whether they pertain to Misinformation. Further, to the extent this Request seeks any purely internal documents or records, Defendants object to the Request as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be

unnecessary in light of the external documents Defendants have agreed to produce. Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to the foregoing objection, Defendants will produce non-privileged e-mail communications between Defendants and employees of the Social-Media Platforms concerning Misinformation that can be located within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms.

**Request 7:** Produce all Communications with any Social-Media Platform that relating to the "12 people who are producing 65 percent of the anti-vaccine misinformation on social-media platforms," as Jennifer Psaki stated at a White House press briefing on or around July 15, 2021.

**Response:** In addition to the foregoing general objections, Defendants object to this Request as vague because it relies on a characterization of a statement made by an individual other than an employee of HHS or Secretary Becerra, and the statement does not specify the individuals at issue or the specific communications referenced. Defendants further object to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from any Defendant or any employee or subordinate of any Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendants also understand this Request to seek only communications between Defendants and third parties outside the government. Further, to the extent this Request seeks any purely internal documents or records, Defendants object to the Request as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be

unnecessary in light of the external documents Defendants have agreed to produce. Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to the foregoing objection, Defendants will produce non-privileged e-mail communications between Defendants and employees of the Social-Media Platforms concerning Misinformation that can be located within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms.

**Request 8:**  Produce all Documents and Communications with any Social-Media Platforms that You "engage with … regularly" relating to "what [Y]our asks are" to such Social-Media Platform(s), as Jennifer Psaki stated at the White House press briefing on or around July 15, 2021.

**Response:**  In addition to the foregoing general objections, Defendants object to this Request as vague because it relies on a characterization of a statement made by an individual other than an employee of HHS or Secretary Becerra, and the statement does not specify the individuals at issue or the specific communications referenced. Defendants further object to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from any Defendant or any employee or subordinate of any Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendants also object to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and

12

content of those communications." ECF No. 34 at 13. This Request appears to call for communications with Social-Media Platforms regardless of whether they pertain to Misinformation. Further, to the extent this Request seeks any purely internal documents or records, Defendants object to the Request as not proportional to the needs of the case, as it would require an extensive search of internal records that would not be possible to complete in the expedited period provided for current discovery and would be unnecessary in light of the external documents Defendants have agreed to produce. Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to the foregoing objection, Defendants will produce non-privileged e-mail communications between Defendants and employees of the Social-Media Platforms concerning Misinformation that can be located within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms.

**Request 9:** Produce all Documents and Communications relating to any "government experts" who have "partnered with" Facebook or any Social-Media Platform to address Misinformation and/or Content Modulation.

**Response:** In addition to the foregoing general objections, Defendants object to this Request as vague because it relies on a characterization of statement made by a third-party outside of government, and the statement does not specify the individuals at issue or the specific communications referenced. Defendants further object to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from any Defendant or any employee or subordinate of any Defendant. To conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the

case. Defendants also object to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for more than direct communications with Social-Media Platforms concerning Misinformation. It appears to also call for purely internal documents that relate to unspecified "government experts." Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to the foregoing objection, Defendants will produce non-privileged e-mail communications between Defendants and employees of the Social-Media Platforms concerning Misinformation that can be located within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms.

**Request 10:** Produce all Documents and Communications relating to the statement that federal officials "engage[s] regularly with all social media platforms about steps that can be taken" to address Misinformation on social media, which engagement "has continued, and … will continue," as Jennifer Psaki stated at the April 25, 2022 White House press briefing.

**Response:** In addition to the foregoing general objections, Defendants object to this Request as vague because it relies on a characterization of a statement made by an individual other than an employee of HHS or Secretary Becerra, and the statement does not specify the individuals at issue or the specific communications referenced. Defendants further object to this Request as unduly burdensome and not proportional to the needs of the case. This Request calls for *any and all* specified documents from any Defendant or any employee or subordinate of any Defendant that relate to the specified statement. To

conduct an exhaustive search to uncover all documents responsive to this Request, and process those documents for production, under the current, abbreviated expedited discovery schedule would be impractical, unduly burdensome, and disproportionate to the needs of the case. Defendants also object to this Request as overbroad because it calls for documents that are not relevant to Plaintiffs' claims and that do not fall within scope of discovery authorized by the Court. The Court authorized the service of discovery requests concerning "the identity of federal officials who have been and are communicating with social-media platforms about [misinformation and] any censorship or suppression of speech on social media, including the nature and content of those communications." ECF No. 34 at 13. This Request appears to call for more than direct communications with Social-Media Platforms concerning Misinformation. It appears to also call for purely internal documents that simply "relate" to a statement concerning communications with social media platforms. Defendants also object to this Request to the extent it seeks documents protected by the deliberative process privilege, attorney-client privilege, law enforcement privilege, a statutory national security privilege, or any other applicable privilege.

Subject to the foregoing objection, Defendants will produce non-privileged e-mail communications between Defendants and employees of the Social-Media Platforms concerning Misinformation that can be located within a review population consisting of Custodial Social Media E-mails that contain one or more of Plaintiffs' Search Terms.

Dated:  August 17, 2022           Respectfully submitted,

                                  BRIAN M. BOYNTON
                                  Principal Deputy Assistant Attorney General

                                  ERIC WOMACK
                                  Assistant Director, Federal Programs Branch

                                  */s/ Kuntal Cholera*
                                  KYLA SNOW
                                  INDRANEEL SUR
                                  KUNTAL CHOLERA
                                  Trial Attorneys
                                  U.S. Department of Justice
                                  Civil Division, Federal Programs Branch
                                  1100 L. Street, NW

Washington D.C. 20005
Kyla.Snow@usdoj.gov
Indraneel.Sur@usdoj.gov
Kuntal.Cholera@usdoj.gov

*Attorneys for Defendants*