Scott J. Street (SBN 258962)
**JW HOWARD/ATTORNEYS, LTD.**
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
**JW HOWARD/ATTORNEYS, LTD.**
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 3:23-cv-03880-TT |
| Plaintiff, | [Assigned to the Hon. Trina Thompson] |
| vs. | **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS** |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | [Filed concurrently with Opposition to Request for Judicial Notice] |
| Defendants. | Date:   January 16, 2024<br>Time:   2:00 p.m.<br>Crtrm:  9 |

///

///

///

///

///

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

**TABLE OF CONTENTS**

I.      INTRODUCTION…………………………………………………………7

II.     ALLEGATIONS IN THE FAC AND PROCEDURAL HISTORY…………8

III.    LEGAL STANDARD…………………………..…………………………13

IV.     ARGUMENT……………………………………………………...…14

        A. The State Action Doctrine Can Apply When Google Looks to the
           Government to Decide What Information to Censor on YouTube……..14

        B. Kennedy Has Alleged a Colorable First Amendment-Based State Action
           Claim Under *Biden*, *O'Handley* and *Lee*, Among Other Cases………..18

        C. Kennedy Has Alleged the Self-Censorship and Associational Injuries
           Necessary to State a First Amendment Claim…………………………23

        D. Google Is Not a Publisher, So It Does Not Have a First Amendment
           Right to Censor Speech Based on Its Viewpoint…………………....23

        E. The FAC Also States a Claim Under the California Constitution……...26

V.      CONCLUSION…………………………………………………………31

PL'S OPPOSITION TO MOTION TO DISMISS                                    CASE NO. 5:23-cv-03880-TT

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ariz. Right to Life Pol. Action Comm. v. Bayless*,
   320 F.3d 1002 (9th Cir. 2003)……………………………………………23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)………………………………………………..…..13

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009)…………………………………...26-27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)………………………………………………...…14

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)……………………………………………15, 19

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001)………………………………………………...…15

*Carafono v. Metrosplash.com*,
   339 F.3d 1119 (9th Cir. 2003)……………………………………28

*Chaker v. Mateo*,
   209 Cal. App. 4th 1138 (2012)…………………………………20, 21

*Children's Health Defense v. Facebook, Inc.*,
   546 F. Supp. 3d 909 (N.D. Cal. 2021)……………………………22

*Daniels v. Alphabet, Inc.*,
   No. 20-cv-04687-VKD, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021)..…21, 22

*Denver Area Ed. Telecomms. Consortium, Inc.*,
   518 U.S. 727 (1996)…………………………………………………...22

*e360Insight, LLC v. Comcast Corp.*,
   546 F. Supp. 2d 605 (N.D. Ill. 2008)……………………………..…27

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd.*,

    42 Cal.4th 850 (2007)……………………………………………………….29

*Hart v. Facebook, Inc.*,

    2023 WL 3362592 (N.D. Cal. May 9, 2023)…………………………………..22

*Hassell v. Bird*,

    5 Cal.5th 522 (2018)…………………………………………………....27

*hiQ Labs, Inc. v. LinkedIn Corporation*,

    273 F. Supp. 3d 1099 (N.D. Cal. 2017)…………………………………29, 30

*Howerton v. Gabica*,

    708 F.2d 380 (9th Cir. 1983)……………………………………………….14

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,

    515 U.S. 557 (1995)………………………………………………....25

*Informed Consent Action Network v. YouTube LLC*,

    582 F. Supp. 3d 712 (N.D. Cal. 2022)………………………………………22

*Kirtley v. Rainey*,

    326 F.3d 1088 (9th Cir. 2003)……………………………………………14

*Knievel v. ESPN*,

    393 F.3d 1068 (9th Cir. 2005)……………………………………...13-14

*L.A. Alliance for Survival v. City of Los Angeles*,

    22 Cal.4th 352 (2000)…………………………………………………….29

*Lee v. Katz*,

    276 F.3d 550 (9th Cir. 2002)………………………………………15, 18, 20, 31

*Lugar v. Edmondson Oil Company*,

    457 U.S. 922 (1982)……………………………………………….…..20

*Manhattan Cmty. Access Corp. v. Halleck*,

    139 S. Ct. 1921 (2019)………………………………………….…..14

PL'S OPPOSITION TO MOTION TO DISMISS        CASE NO. 5:23-cv-03880-TT

*Mathis v. Pacific Gas & Electric Company*,

    891 F.2d 1429 (9th Cir. 1989) ………………………………………....…31

*Mendiondo v. Centinela Hosp. Med. Ctr.*,

    521 F.3d 1097 (9th Cir. 2008) …………….…………………………………13

*Miami Herald Publishing Company v. Tornillo*,

    418 U.S. 241 (1974) ...................................................................................24

*Missouri v. Biden*,

    2023 WL 4335270 (W.D. La. July 4, 2023)....................................................17

*Munns v. Kerry*,

    782 F.3d 402 (9th Cir. 2015) ...........................................................................23

*NetChoice, L.L.C. v. Paxton*,

    49 F.4th 439 (5th Cir. 2022) ...................................................................24, 27

*O'Handley v. Weber*,

    62 F.4th 1145 (9th Cir. 2023)....................................................................*passim*

*Pacific Gas & Electric Company v. Public Utilities Commission of Calif.*

    475 U.S. 1 (1986) …………… .......................................................................25, 26

*Packingham v. North Carolina*,

    137 S. Ct. 1730 (2017) ...........................................................................24, 30

*Prager University v. Google LLC*,

    951 F.3d 991 (9th Cir. 2020). ........................................................................20

*Pruneyard Shopping Center v. Robins*,

    447 U.S. 74 (1980) ....................................................................................29-30

*Rawson v. Recovery Innovations, Inc.*,

    975 F.3d 742 (9th Cir. 2020) ............................................................15, 19, 31

*Rosenberger v. Rector & Visitors of Univ. of Va.*,

    515 U.S. 819 (1995) ........................................................................................14

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

PL'S OPPOSITION TO MOTION TO DISMISS          CASE NO. 5:23-cv-03880-TT

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,

    547 U.S. 47 (2006) ...................................................................25

*Skinner v. Railway Labor Executives' Association*,

    489 U.S. 602 (1989) .................................................................28

*State v. Biden*,

    2023 WL 6425697 (5th Cir. Oct. 3, 2023) (per curiam) ........................7, 13, 17

*Stratton Oakmont, Inc. v. Prodigy Services Company*,

    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .............................................24

*Summit Bank v. Rogers*,

    206 Cal. App. 4th 669 (2012) .........................................................21

*Villegas v. Gilroy Garlic Festival*,

    541 F.3d 950 (9th Cir. 2008) ........................................................15

## Statutes

FRCP Rule 12……………………………………………………………….13

47 U.S.C. § 230 ……………………………………..……………….………..…*passim*

## Other

Eva Surovell, *RFK Jr. Officially Announces Independent Bid for Presidency*, The Messenger (Oct. 9, 2023), https://themessenger.com/politics/rfk-jr-officially-announces-independent-bid-for-presidency....................................................................8

PL'S OPPOSITION TO MOTION TO DISMISS                    CASE NO. 5:23-cv-03880-TT

1   Plaintiff Robert F. Kennedy, Jr., respectfully opposes the motion to dismiss
2   filed by Defendants Google LLC and YouTube, LLC.

3   **I.      <u>INTRODUCTION</u>**

4        This case challenges the conventional wisdom that private parties cannot violate
5   the First Amendment. They can when they coordinate with the government to violate
6   Americans' constitutional rights. The test used to determine whether state action exists
7   does not matter. What matters is deciding whether the private party's action is fairly
8   attributable to the government.

9        Mr. Kennedy's First Amended Complaint ("FAC") alleges that. It alleges facts
10  that, accepted as true and liberally construed in his favor, show that Google developed
11  its medical misinformation policies in response to the federal government's demands
12  for them. They show that Google consulted with government officials when drafting
13  the policies. And, most importantly, the FAC shows that the speech that is subject to
14  removal from YouTube is only speech that public health officials—*i.e.*, the
15  government—deem false, misleading, or dangerous. After all, the policies are
16  supposed to block "medical misinformation." But what is medical misinformation? It
17  is not speech that some Google or YouTube employee has determined to be false,
18  dangerous (whatever that means) or misleading. Rather, it is speech that *government*
19  *officials* say is false, dangerous, or misleading.

20       Those allegations, which are based on evidence obtained from other cases and
21  which the Fifth Circuit Court of Appeals found to violate the First Amendment in
22  *State v. Biden*, -- F.4th --, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) (per curiam),
23  distinguish this case from others that have been decided in this district and in the
24  Ninth Circuit. Indeed, these allegations show exactly the type of coordinated,
25  public/private censorship campaign that other courts said was implausible and which
26  the Ninth Circuit said would raise a constitutional problem in *O'Handley v. Weber*, 62
27  F.4th 1145, 1159 (9th Cir. 2023).

28

JW HOWARD/ ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, California 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Google disagrees, of course. But the arguments it raised involve factual issues. They require the development of evidence and a merits hearing. They are not proper at the pleading stage.

Indeed, without discovery, nobody will ever know the full extent of the public/private censorship campaign that Google has carried out—and is still carrying out—with public health officials. Until recently, courts deemed such allegations implausible. Discovery in *Biden* showed otherwise. That is why discovery matters. The Court may eventually find the evidence insufficient to constitute state action and rule for Google. It may find otherwise and rule for Kennedy. But, having pleaded facts that, liberally construed in his favor, state a plausible claim to relief under the state action doctrine, Kennedy's case should proceed.

The motion should be denied.

## II.     ALLEGATIONS IN THE FAC AND PROCEDURAL HISTORY

Mr. Kennedy is a lawyer, a son of former Attorney General Robert F. Kennedy and a nephew of former President John F. Kennedy. Until recently, he was seeking the Democratic Party's nomination for president, having declared his candidacy on April 19, 2023. First Am. Complaint ("FAC") ¶¶ 15-16. Now he is running for president in the 2024 general election as an independent candidate. Eva Surovell, *RFK Jr. Officially Announces Independent Bid for Presidency*, The Messenger (Oct. 9, 2023), https://themessenger.com/politics/rfk-jr-officially-announces-independent-bid-for-presidency.

Kennedy has long been a thorn in the side of public health officials and their political enablers. His criticism increased during the COVID-19 pandemic and especially after Joe Biden took office in 2021. FAC ¶ 3. Biden's White House responded in kind. First it instructed Twitter executives to censor Mr. Kennedy's speech. FAC ¶ 27, Exh. D. Then it turned to Google.

In April 2021, a White House staffer named Rob Flaherty reached out to

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Google executives, telling them that "we" (that is, President Biden and his White House staff) "remain concerned that YouTube is 'funneling' people into hesitance and intensifying people's hesitancy [to take the COVID-19 shots]." FAC ¶ 28, Exh. E. Flaherty said that concern was "shared at the highest (and I mean highest) levels of the White House." *Id.* Flaherty told the Google executives that there was "more work to be done here." *Id.* He asked them to explain "what your road map to empowerment is." *Id.* And he said the White House was "excited to continuing [*sic.*] partnering with you on this work … but we want to make sure that the work extends to the broader problem. Needless to say, in a couple of weeks when we're having trouble getting people to get vaccinated, we're going to be in the barrel together." *Id.*

As of April 22, 2021, Google did not have a vaccine misinformation policy for YouTube. FAC ¶ 29.[1] It began developing the vaccine misinformation policy, the policy it used to censor Kennedy, in response to the White House's demands for it. *Id.*

Google seems to have embraced its role. Between May and September 2021, Google executives met numerous times with government officials from the Centers for Disease Control and the Office of the Surgeon General to discuss the executive branch's demand for more vaccine-related censorship. FAC ¶ 30, Exhs. F-J.

But the executive branch was getting impatient. After all, President Biden had campaigned on a promise to eliminate COVID-19. FAC ¶ 31. By July 2021, a new variant was spreading. The president needed somebody to blame. Thus, on July 16, 2021, President Biden said: "Look, the only pandemic we have is among the unvaccinated." *Id.* Soon government officials were referring to COVID-19 as a "pandemic of the unvaccinated." *Id.* In the same July 16 speech, Biden said

---

[1] Google contends that the first version of its COVID-19 misinformation policy—which it says was adopted in May 2020—prohibited alleged vaccine misinformation. But the FAC alleges that Google did not start censoring Kennedy until 2021 and beyond and that it relied on its new vaccine misinformation policy (issued in September 2021) to do so. FAC ¶ 29.

technology companies like Google were "killing people" by not removing vaccine-critical speech from their platforms. *Id.* Around the same time, the Surgeon General issued an advisory calling on tech companies to aggressively remove criticism of the government's pro-vaccine message from their platforms. *Id.*

When making these comments, the president targeted not just the tech companies but a group of commentators—called the "disinformation dozen"—that an activist group has targeted for censorship. FAC ¶ 32. Biden explained: "Facebook isn't killing people – these 12 people are out there giving misinformation. Anyone listening to it is getting hurt by it. It's killing people. It's bad information." *Id.* Kennedy is part of that group. FAC ¶ 33.

These comments, delivered by the Commander in Chief, revealed a plan to punish tech companies like Google if they did not go along with the Biden Administration's censorship goals. FAC ¶ 34. They were corroborated by other threatening statements made by executive branch officials about the tech companies' responsibility to censor dissenting public health viewpoints, and the consequences if they did not do so—namely that the White House would push to eliminate the companies' section 230 immunity and bring more enforcement actions against them. *Id.* Indeed, within days of President Biden's July 16 "misinformation" speech, CNN reported that "[t]he White House is reviewing whether social media platforms should be held legally accountable for publishing misinformation via Section 230, a law that protects companies' ability to moderate content …." *Id.*, Exh. I.

The tech companies, especially Google, got the message. Google executives met with officials from the Surgeon General's office at least twice during the two weeks after President Biden's speech. FAC ¶ 35. They also met on September 14, 2021, to discuss "a new policy that [Google was] working on as well as [to] provide an update on our overall efforts to combat harmful COVID-19 misinformation on [YouTube]." *Id.* That "new policy" was the vaccine misinformation policy that

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Google has used to censor Mr. Kennedy's speech about public health matters, and which it announced on or around September 29, 2021. *Id.*, Exh. J.

Google was inconsistent in applying its vaccine misinformation policy on YouTube during 2021 and 2022, although the threat of censorship (and the related strike that could get offenders suspended or banned from YouTube) caused Mr. Kennedy to often self-censor his comments. FAC ¶¶ 18, 24-26. But the censorship took a new turn in 2023, when Kennedy launched his presidential campaign.

Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. FAC ¶ 17. He accepted an invitation to speak about that and other issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March. *Id.* His speech, which was viewed as a political speech and attended by several prominent New Hampshire Democrats, including the chairman of New Hampshire's Democratic Party, lasted nearly two hours. *Id.* It centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, a danger he has fought for years and which, in recent years, caused him to question the increasing number of vaccines American children are required to take. *Id.*

Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. FAC ¶ 20. Google removed it. *Id.* The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." *Id.*

Despite Kennedy's complaints, Google refused to change its position. FAC ¶ 21. Since then, it has removed other videos of Kennedy's speech, including interviews he did with Jordan Peterson and Joe Rogan. FAC ¶ 24. Again, although Google cited its vaccine misinformation policy to justify these decisions, it removed the entire video. *Id.* And it continues to claim that it can censor Kennedy's speech, even during

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

his political campaign. FAC ¶ 25.

That led to this case. After it was filed, Google merged its COVID-19 and vaccine misinformation policies into a single "medical misinformation" policy. FAC ¶ 22, Exh. C. The new policy is extraordinary. It added a host of topics that are subject to removal from YouTube, including:

• "Content that recommends the use of specific methods for the treatment of cancer when those have not been approved by local health authorities or the World Health Organization as safe or effective …."

• "Content that promotes use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19."

• "Claims that alternative treatments are safer or more effective than approved treatments for cancer."

• "Content that promotes diet and exercise instead of seeking approved treatment for cancer."

• "Discouraging people from consulting a medical professional or seeking medical advice if they're sick with COVID-19."

• "Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment for COVID-19 such as consulting a doctor or going to the hospital."

• "Content that contradicts local health authorities' or the World Health Organization's guidance on the safety of chemical and surgical abortion."

• "Promotion of alternative abortion methods in place of chemical or surgical methods deemed safe by health authorities."

*Id.* These are just a few examples—the new policy spans multiple pages—and Google says it "isn't a complete list." *Id.*

Like the earlier policies, the new policy looks entirely to government sources to determine what information gets removed from YouTube. It prohibits people from

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

saying anything "that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances." *Id.* And it gets changed only "in response to changes to guidance from health authorities or WHO." *Id.*

Google's use of its medical misinformation policy to censor videos of his speech on YouTube is just one of the many obstacles that Mr. Kennedy has had to deal with during the campaign. But it has a huge impact because YouTube has become an important platform for political campaigns, especially when it comes to raw content like candidate interviews and speeches. FAC ¶¶ 12-15.

Cases like this one are being litigated in other courts, most notably in the Fifth Circuit Court of Appeals. *State v. Biden*, -- F.4th --, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) (per curiam). *Biden* was the first case to order discovery into the public/private campaign to remove alleged "misinformation" from technology platforms like YouTube. It is now pending review in the United States Supreme Court (*Murthy v. Missouri*, Case No. 23A243).

### III.   **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

This is a low standard. "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). The Court does not weigh the evidence but must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

PL'S OPPOSITION TO MOTION TO DISMISS                                CASE NO. 5:23-cv-03880-TT

2005).  The goal is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

This is especially important in civil rights cases. A district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* at 563.

## IV.   <u>ARGUMENT</u>

The Court should deny the motion to dismiss because, accepting its allegations as true and liberally construing those allegations in Kennedy's favor, the FAC states a plausible claim to relief under the state action doctrine and the California Constitution.

### A. The State Action Doctrine Can Apply When Google Looks to the Government to Decide What Information to Censor on YouTube.

There is no doubt that the medical misinformation policy at issue in this case would violate the First Amendment if the government issued it. After all, it makes distinctions about which speech is allowed on YouTube based on the speech's content. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, Google's primary argument is that, unlike the government, it can decide which speech to allow, or not allow, on YouTube based on its content. It is wrong.

A "private entity is not ordinarily constrained by the First Amendment …." *Manhattan Cmty. Access Corp. v. Halleck*, -- U.S. --, 139 S. Ct. 1921, 1930 (2019). But it may be sued for violating a person's constitutional rights under certain circumstances. This Court recognizes "at least four different criteria, or tests, used to identify [such] state action: (1) public function; (2) joint action; (3) government compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (cleaned up). But it has also emphasized that "there is no specific formula for defining state action." *Howerton v. Gabica*, 708 F.2d 380, 383

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

(9th Cir. 1983) (quotations omitted). Moreover, the tests discussed above are guideposts and "the criteria lack rigid simplicity." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). The goal is to decide whether "seemingly private behavior may be fairly treated as that of the State itself." *Id.* (quotations omitted).

*Brentwood* represented a sea change in the Supreme Court's state action jurisprudence. It stopped the narrowing of the doctrine that had developed since the 1980s and moved the doctrine back to the functional and factual analysis that Justice Brennan had urged in cases like *Blum v. Yaretsky*, 457 U.S. 991, 1013 (1982) (Brennan and Marshall, JJ., dissenting). The Ninth Circuit did the same thing. For example, in *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002), the court reversed a district court's decision that found no state action in a case brought by preachers against a private party (the "OAC") who leased land (the "Commons") from the City of Portland. The OAC had occasionally excluded the preachers from preaching on the land, a plaza near Portland's basketball arena. The City played no role in excluding the preachers from the property: the OAC, a private entity, made that decision for its own reasons. *Id.* at 552-53. But the court "conclude[d] that, in regulating speech within the Commons, the OAC performs an exclusively and traditionally public function within a public forum." *Id.* at 557. That satisfied the state action doctrine.

Similarly, in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 754 (9th Cir. 2020), the Ninth Circuit reversed a grant of summary judgment for the defendant, a private entity that operated a private hospital, which the plaintiff sued after he was involuntarily committed at the hospital. 975 F.3d at 754. Other examples abound. Indeed, until 2021, on the rare occasion that the Ninth Circuit applied the state action doctrine narrowly, it did so over the objection of its most liberal judges, who emphasized that, in state action cases, the Supreme Court has always taken "a flexible approach" by "applying a variety of tests to the facts of each case." *Villegas v. Gilroy*

15

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*Garlic Festival*, 541 F.3d 950, 960 (9th Cir. 2008) (en banc) (Thomas, Wardlaw, Fisher, Paez and Gould, JJ., dissenting) (cleaned up).

Google's actions in removing Kennedy's speeches and interviews from YouTube satisfy several aspects of the state action tests and show that, at root, it is the government—not Google, acting independently—that is responsible for removing Kennedy's speech from YouTube. After all, the misinformation policy that Google has used to remove Kennedy's speech from YouTube relies *entirely* on the government to decide what speech is false, misleading, or dangerous (and thus subject to removal). FAC ¶ 22, Exh. C. The policy changes only when the government sources change their guidance about certain issues. *Id.*

In fact, according to the misinformation policy, if public health authorities said that birds can talk but can't fly, a person would be prohibited from posting a video that says otherwise on YouTube—at least until the government decides otherwise.

Moreover, evidence developed in *Biden* shows that Google developed the vaccine part of its medical misinformation policy in response to the federal government's demand for it and that Google consulted with government officials when writing it. FAC ¶¶ 27-35. That partnership intensified after the president accused the tech platforms of killing people by not censoring the content the government wanted removed, while simultaneously suggesting that tech companies should lose their section 230 immunity if they did not cooperate. *Id.*

This environment was coercive but, if anything, the fact that Google says it cooperated with executive branch officials to develop the vaccine misinformation policy strengthens the state action analysis. Many of the previous social media related state action cases that Google cited were based on comments made by Democratic Party legislators. Unlike legislators, executive branch officials have direct regulatory authority over companies like Google. That is why the record developed in *Biden* led Judge Doughty to describe the pressure that executive branch officials put on

PL'S OPPOSITION TO MOTION TO DISMISS                                    CASE NO. 5:23-cv-03880-TT

technology companies to censor dissenting viewpoints as "unrelenting pressure" which "had the intended result of suppressing millions of protected free speech postings by American citizens." *Missouri v. Biden*, -- F. Supp. 3d --, 2023 WL 4335270, at \*44 (W.D. La. July 4, 2023).

Judge Doughty discussed that record at length. *Id.* at \*9-28. He had no problem finding that it violated the First Amendment. Indeed, Judge Doughty concluded that federal government officials "aligned themselves with and partnered with" third parties like Google "to avoid Government involvement with free speech" that would clearly violate the First Amendment. *Id.* at \*52.

The Fifth Circuit largely affirmed Judge Doughty's decision, most notably with respect to officials from the White House and Surgeon General's office. It focused on "coercion and significant encouragement—two distinct means of satisfying the close nexus test." *Biden*, 2023 WL 6425697, at \*13. As to the latter, it found "that the clear throughline for encouragement in our caselaw is that there must be *some* exercise of *active* (not passive), *meaningful* (impactful enough to render them responsible) *control* on the part of the government over the private party's challenged decision." *Id.* at \*14 (original emphasis). That can be demonstrated either by "entanglement in a party's independent decision-making" or by "direct involvement in carrying out the decision itself …." *Id.*

The court concluded that the executive branch officials' actions satisfied both the coercion and significant encouragement tests. *Id.* at \*19. As to encouragement, it noted that "the officials entangled themselves in the platforms' decision-making processes, namely their moderation policies." *Id.* at \*23. They "had consistent and consequential interaction with the platforms and constantly monitored their moderation activities." *Id.* They did so not informally or indirectly but by "repeatedly communicat[ing] their concerns, thoughts, and desires to the platforms." *Id.* Critically, the court noted that "[t]he platforms responded with cooperation—they invited the

officials to meetings, roundups, and policy discussions. And, more importantly, they complied with the officials' requests, including making changes to their policies." *Id.*

These were not isolated actions. The court summarized its analysis as follows:

> Consequently, it is apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions. By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards. Instead, they were encouraged by the officials' imposed standards.

*Id.* at *24 (cleaned up).

**B. Kennedy Has Alleged a Colorable First Amendment-Based State Action Claim Under *Biden*, *O'Handley* and *Lee*, Among Other Cases.**

As in *Biden*, the FAC alleges facts that, accepted as true and liberally construed in Kennedy's favor, state a plausible claim to relief under the First Amendment and the state action doctrine.

Google knows that. Thus, instead of applying the proper standard, it disputed the FAC's allegations and construed the allegations in the light most favorable to it. That cannot be done at this stage. Similarly, Google chided Kennedy for not presenting more evidence of communications between Google and executive branch officials—including communications between Google/YouTube and the federal government about Kennedy himself—but no discovery has been done yet. In fact, the only reason Kennedy has any of this evidence is because Judge Doughty denied a motion to dismiss and allowed discovery in *Biden*.

This Court should do the same. The state action doctrine involves a fact intensive inquiry. "In an era of active government intervention to remedy social ills,

18

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

the true character of the State's involvement in, and coercive influence over, the activities of private parties, often through complex and opaque regulatory frameworks, may not always be apparent. But if the task that the Fourteenth Amendment assigns to the courts is thus rendered more burdensome, the courts' obligation to perform that task faithfully, and consistently with the constitutional purpose, is rendered more, not less, important." *Blum*, 457 U.S. at 1012 (Brennan and Marshall, JJ., dissenting). Thus, discovery is critical in a case like this.

That result is consistent with the Ninth Circuit's decision in *O'Handley*. Mr. O'Handley had evidence that Twitter suspended his account at least once after a California government agency called the Office of Elections Cybersecurity (OEC) notified Twitter of his post. O'Handley alleged that this government notification process constituted state action. 62 F.4th at 1153-55. The Ninth Circuit struggled with those allegations. It avoided finding state action by saying the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.* at 1158. Of course, the court explained that "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government," but it concluded that "we do not see the high degree of entwinement needed for state action in this case." *Id.* at 1158 n.2 (citing *Rawson*).

That high degree of entwinement exists here. Indeed, as *Biden* explained, it is unprecedented. Moreover, *O'Handley* said "[a] constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *Id.* at 1159. That is exactly what Google is doing to public health critics like Kennedy. It is removing speech that public health authorities (the government) deem false, misleading, or dangerous. That cooperation, combined with the shared goals, distinguishes this case from *O'Handley*.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

This does not mean that Google had to cloak itself in the power of the state or exercise a state-created right or privilege, the first step of the two-step framework the Supreme Court discussed in *Lugar v. Edmondson Oil Company*, 457 U.S. 922, 937 (1982). Indeed, the Ninth Circuit has "refused to apply the two-step framework [from *Lugar*] rigidly, and [it has] suggested that the first step may be unnecessary in certain contexts." *O'Handley*, 62 F.4th at 1157. That is the case here.

There is also no merit to Google's argument that, as a matter of law, YouTube does not provide a public function such that censorship on YouTube could violate the First Amendment via the state action doctrine. The Ninth Circuit suggested otherwise in *Lee,* in which the Ninth Circuit "conclude[d] that, in regulating speech within" a public space (an outdoor space near a basketball arena), "the OAC [a private entity] performs an exclusively and traditionally public function within a public forum." 276 F.3d at 557. The Ninth Circuit said little about *Lee* when it rejected a "public function" argument made at the pleading stage in *Prager University v. Google LLC*, 951 F.3d 991, 997-99 (9th Cir. 2020). That was unfortunate, as the plaintiff in *Prager* accurately predicted what it would be like "living under the tyranny of big-tech, possessing the power to censor any speech it does not like." *Id.* at 999. Mr. Kennedy finds himself in that situation now, as he heads into an election that Google and its public health partners want him to lose.

Moreover, *Prager* did not allege, much less have evidence of, the deep entwinement between Google and government officials that this case does. That is critical. Mr. Kennedy is not seeking to have YouTube declared a public forum for all purposes. He is simply alleging that, in disseminating political speech to millions of Americans during an election, YouTube is performing a public function that warrants stricter scrutiny of its actions.[2]

---

[2] It is also worth noting that California courts view the Internet "as a classic public forum" in cases involving the state's anti-SLAPP statute. *Chaker v. Mateo*, 209 Cal.

PL'S OPPOSITION TO MOTION TO DISMISS                    CASE NO. 5:23-cv-03880-TT

That distinction is significant. "As of 2023, [YouTube] boasts 2.68 billion active users, as well as 80 million YouTube Premium subscribers. It's also established itself as the second-largest search engine in the world, next to its parent Google." ECF 49-1 at 47. According to *Forbes*, more than half of internet users visit YouTube at least once per month. Those "staggering numbers aren't just statistics, either. They highlight the expansive influence and potential of social media platforms." *Id.* And they continue to grow.

Historically, this has been the type of situation in which the courts paid closer attention to the inherent nexus between the government and the private entity. The Supreme Court did not deviate from those principles in *Halleck*. There the plaintiffs argued that a private entity "exercises a traditional, exclusive public function when it operates the public access [television] channels on Time Warner's cable system in Manhattan." 139 S. Ct. at 1928. The majority disagreed and reversed the Second Circuit's decision, but four justices dissented in an opinion that echoed the state action doctrine's liberal roots, and which noted that "[t]he right to convey expressive content using someone else's physical infrastructure is not new." *Id.* at 1938 (Sotomayor, Ginsburg, Breyer and Kagan, JJ., dissenting). That reasoning should have special force with respect to YouTube, a publicly accessible website designed as a place for the global population to participate in the free exchange of ideas.

Google's reliance on other state action cases from this district is misplaced. For example, in *Daniels v. Alphabet, Inc.*, No. 20-cv-04687-VKD, 2021 WL 1222166, at *7 (N.D. Cal. Mar. 31, 2021), the court found that the plaintiff (Daniels) did not allege sufficient facts to success under a "nexus" theory because he did "not plead any facts suggesting that Speaker Pelosi or Rep. Schiff were personally involved in or directed

App. 4th 1138, 1146 (2012); *see also Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 693 (2012) (citing cases and explaining why). It is hard to reconcile the technology industry's argument that web sites are public forums for some purposes but not for others.

PL'S OPPOSITION TO MOTION TO DISMISS                    CASE NO. 5:23-cv-03880-TT

the removal of Mr. Daniels's' videos [from YouTube]." The FAC *does* allege such facts. FAC ¶¶ 27-35. Similarly, in *Children's Health Defense v. Facebook, Inc.*, 546 F. Supp. 3d 909, 930 (N.D. Cal. 2021), the court emphasized that the plaintiff (CHD) had not "alleged that the government was actually involved in the decisions to label CHD's posts as 'false' or 'misleading,' the decision to put the warning label on CHD's Facebook page, or the decisions to 'demonetize' or 'shadow-ban.'" The FAC *does* allege such facts.

And while the courts rejected more specific allegations of a public/private censorship project in *Informed Consent Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 720-21 (N.D. Cal. 2022), and *Hart v. Facebook, Inc.*, No. 22-cv-737-CRB, 2023 WL 3362592, at *3 (N.D. Cal. May 9, 2023), those cases lacked the detailed evidence that the FAC is based on. They also lacked the guidance from the Fifth Circuit's decision in *Biden*. And they did not involve speech by a political candidate during a political campaign, a situation in which courts have been the most active in upholding free speech principles. *See, e.g., Denver Area Ed. Telecomms. Consortium, Inc.*, 518 U.S. 727, 782-83 (1996) (O'Connor, J., concurring in part and dissenting in part) (explaining why).

Google's attempt to portray *O'Handley* as a case that involved a greater degree of entwinement and coordination than this one also fails. *O'Handley* was a one-way, information sharing case. The plaintiff "allege[d] no facts plausibly suggesting either that the [State] interjected itself into the company's internal decisions to limit access to his tweets and suspend his account or that the State played any role in drafting Twitter's Civic Integrity Policy." 62 F.4th at 1160. The FAC does allege such facts. FAC ¶¶ 27-35.

That is why White House official Rob Flaherty's April 2021 email, and the partnership it led to between Google and the executive branch officials regarding vaccine-related dissent, is so significant. It shows exactly the type of situation that the

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Ninth Circuit said *could* violate the First Amendment, via the state action doctrine, in *O'Handley* and what the Fifth Circuit said *did* violate the First Amendment in *Biden*.

Finally, Google's argument that Kennedy cannot seek relief under a coercion theory because of a comment his counsel made at the TRO hearing lacks merit. Kennedy's counsel merely stated that the evidence of coercion obtained in *Biden* focused on Facebook and Twitter, not Google. In fact, Kennedy's counsel said that "[w]e may develop that [evidence of coercion] here," but that the TRO focused on other aspects of the state action doctrine. ECF 39 at 12. Thus, discovery regarding the coercive environment that the executive branch officials created during 2021 is appropriate before the Court issues a final decision.

### C. Kennedy Has Alleged the Self-Censorship and Associational Injuries Necessary to State a First Amendment Claim.

The Court should reject Google's argument that Kennedy cannot state a claim because Google has not "engaged in any state action with respect to videos of him." ECF 50 at 17:18-19. The FAC alleges specifically that Google used its government-dependent misinformation policies to remove videos of Kennedy's political speech, including his New Hampshire pre-announcement speech and several political interviews. FAC ¶¶ 20-24.  The FAC also alleges that Google's use of the government-dependent misinformation policy chills speech surrounding Kennedy's campaign. FAC ¶¶ 25-26. That chilling effect provides a sufficient basis to state a First Amendment claim. *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015); *see also Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006-07 (9th Cir. 2003) (describing special standing rules courts apply in political speech cases).

### D. Google Is Not a Publisher, So It Does Not Have a First Amendment Right to Censor Speech Based on Its Viewpoint.

Google's argument that Kennedy cannot plead a First Amendment claim because it has its own constitutional rights to censor people on YouTube also fails.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*First*, Google is not a publisher. Under section 230 of the Communications Decency Act, it cannot be held liable for the content its users publish. 47 U.S.C. § 230(c)(1). In fact, Congress enacted section 230 in response to a decision, *Stratton Oakmont, Inc. v. Prodigy Services Company*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), that deemed an internet platform, over its objection, to be akin to a newspaper because its content removal process "constitute[d] editorial control" over the platform. See H.R. REP. No. 104-458, at 194 (1996) ("One of the specific purposes of [section 230] is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers….").

Google cannot have it both ways, claiming that it cannot be held liable for content posted on YouTube because it is not a publisher while asserting the rights that genuine publishers do have.

*Second*, Google does not engage in expressive activity when people post videos on YouTube. "Unlike newspapers," internet platforms like YouTube "exercise virtually no editorial control or judgment." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 460 (5th Cir. 2022). They use "algorithms to screen out certain obscene and spam-related content. And then virtually everything else is just posted to the Platform with zero editorial control or judgment." *Id.* That is why the Supreme Court has called the internet the "modern public square." *Packingham v. North Carolina*, -- U.S. --, 137 S. Ct. 1730, 1737 (2017).

That distinguishes this case from *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241 (1974). *Tornillo* involved a newspaper's challenge to a law that required the paper to give free space to political candidates its editorial board criticized. The Supreme Court declared the law unconstitutional. In doing so, it noted that "[a] newspaper is more than a passive receptacle or conduit for news, comment and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public

issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment." *Id.* at 258. The First Amendment protects that process.

Similarly, in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), the Supreme Court decided that the California government could not force PG&E, a private company, to give an opponent space in a newsletter that PG&E included in its billing statements. The Court emphasized that "because access is awarded only to those who disagree with appellant's views and who are hostile to appellant's interests, appellant must contend with the fact that whenever it speaks out on a given issue, it may be forced … to help disseminate hostile views." *Id.* at 14. The Court had no problem finding that regulation to violate the First Amendment. *Id.* And in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995), the Supreme Court held that a state law could not require a parade to include a group whose message the parade organizer did not want to promote.

Google describes these cases as enshrining a broad constitutional right to exclude disfavored messages. Not so. They were compelled speech cases and "[t]he compelled speech violation in each … resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006) ("*FAIR*"). For example, in *Hurley*, the law that dictated including a particular group in the parade "alter[ed] the expressive content of the parade." *Id.* (cleaned up). In *Tornillo*, the "right-of-reply statute infringed the newspaper editors' freedom of speech by altering the message the paper wished to express" about a particular candidate. *Id.* at 64. And the regulation in *PG&E* "interfered with the utility's ability to communicate its own message in its newsletter." *Id.*

Moreover, in each of these cases, the Supreme Court emphasized that the challenged action would chill speech. *See Tornillo*, 418 U.S. at 257 (noting that, due

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

to penalties imposed by statute, "editors might well conclude that the safe course is to avoid controversy"); *PG&E*, 475 U.S. at 14 (same). No such concern exists here. To the contrary, it is Google's actions that will chill speech—and not just any speech, but speech by a presidential candidate on matters of public concern during one of the most important elections in American history.

Justice Marshall drew an important distinction between the limited nature of the forum involved in *PG&E* (billing statements) and the way the company used it. He explained that if PG&E were "to use its billing envelopes as a sort of community billboard, regularly carrying the messages of third parties, its desire to exclude a particular speaker would be deserving of lesser solicitude." 475 U.S. at 23 (Marshall, J., concurring). That is exactly what Google did with YouTube and why its desire to remove Mr. Kennedy's political speech after the fact does not deserve the protection the Supreme Court showed in the *Tornillo* line of cases.

### E. The FAC Also States a Claim Under the California Constitution.

Finally, the Court should reject Google's argument that Kennedy cannot plead a claim to relief under the California Constitution, which the Supreme Court has interpreted to provide broader protection than the First Amendment in this context.

***Immunity.*** Google contends that section 230 bars all state law claims. It is wrong. Courts have construed section 230 to contain two immunity provisions. The first, section 230(c)(1), "protect[s] from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009) (cleaned up). Although some courts have reflexively applied this section to bar all sorts of claims brought against Internet companies, the most astute courts have recognized that it was designed "to shield Internet intermediaries from the burdens associated with defending against state-law claims that treat them as the publisher or

speaker of third party content, and from compelled compliance with demands for relief that, when viewed in the context of a plaintiff's allegations, similarly assign them the legal role and responsibilities of a publisher *qua* publisher." *Hassell v. Bird*, 5 Cal.5th 522, 544 (2018); *cf. Barnes*, 570 F.3d at 1102 (holding that section 230(c)(1) immunity only applies if "the duty that the plaintiff alleges the defendant violated derives from the defendant's status as or conduct as a 'publisher or speaker'").

Here, of course, Mr. Kennedy does not seek to hold Google liable as a publisher or speaker. In fact, Kennedy contends that Google does *not* act as a publisher or speaker in operating YouTube. The Fifth Circuit recently reached the same conclusion in a case that will be argued in the Supreme Court next year. *NetChoice,* 49 F.4th at 460.

The other immunity provision, section 230(c)(2), protects Internet companies from "civil liability" for "any action taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected …." 47 U.S.C. § 230(c)(2)(A). That section does not apply for several reasons.

*First*, the FAC alleges that Google did not act in good faith but as part of a government-sponsored censorship project to prevent Americans from hearing from government critics like Kennedy. FAC ¶¶ 25-37. *Second*, Kennedy is not seeking damages from Google, so there is no risk of imposing "civil liability" on Google. *Third*, Google has not argued that any of the speech from Kennedy that it censored is "obscene, lewd, lascivious, filthy, excessively violent, [or] harassing" as set forth in section 230(c)(2)(A). And while Google may argue that it found Kennedy's speech to be "otherwise objectionable," that part of section 230 "imposes a subjective element into the determination of whether a provider or user is immune from liability." *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 608 (N.D. Ill. 2008). No

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1   such evidence appears in the record yet.

2   *Fourth*, section 230(c)(2)(A) protects Internet companies' efforts to "restrict

3   access" to certain conduct. That is a term of art. Congress viewed the Internet as a

4   "forum for true diversity of … myriad avenues of intellectual activity" which "had

5   flourished … with a minimum of government regulation." 47 U.S.C. § 230(a)(3)-(4).

6   It enacted section 230 to preserve that "vibrant and competitive free market" while

7   encouraging companies to develop "blocking and filtering technologies that empower

8   parents to restrict their children's access to objectionable or inappropriate online

9   material." *Id.* § 230(b)(1)-(2), (4)-(5). Thus, the Ninth Circuit has construed section

10  230 as being designed "to promote the free exchange of information and ideas over

11  the Internet and to encourage voluntary monitoring [that is, monitoring by users] for

12  offensive or obscene material." *Carafono v. Metrosplash.com*, 339 F.3d 1119, 1122

13  (9th Cir. 2003).

14      It is impossible to reconcile Google's interpretation of section 230 with the

15  construction given to it when Congress passed the law. Indeed, the idea that a statute

16  designed to *promote* the free exchange of ideas on the Internet gives companies the

17  power to *prevent* the free exchange of ideas among Americans would have been

18  ridiculed when Congress passed the Communications Decency Act in 1996. It should

19  be ridiculed now, too.

20      In fact, if Google has a federally created right to immunity when it engages in

21  viewpoint discrimination on YouTube, that fact strengthens the state action analysis.

22  The Supreme Court found similar legal protections, combined with the government's

23  direct encouragement of private action, to satisfy the state action in *Skinner v. Railway

24  Labor Executives' Association,* 489 U.S. 602, 615-16 (1989).

25      **Preemption.** Nor is there any merit to Google's argument that section 230

26  preempts a declaratory relief claim under the California Constitution. In fact, section

27  230(e) states that "[n]othing in this section shall be construed to prevent any State

28

from enforcing any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). Kennedy's state law claim is consistent with section 230 because it does not treat Google as a publisher of information and it does not seek to impose civil liability on Google for restricting access to information.

Furthermore, while the California Constitution may provide Kennedy and other speakers with greater rights than the federal Constitution to use private property when speaking, states have the power to do that. *See L.A. Alliance for Survival v. City of Los Angeles*, 22 Cal.4th 352, 366-67 (2000) (discussing broader protections provided by California's liberty of speech clause). And while a valid federal law might be able to preempt such rights, that is not a concern here because section 230 does not expressly (or even impliedly) prohibit such laws. Indeed, interpreting the California Constitution to provide greater speech rights for people on the Internet is consistent with Congress' intent in passing section 230.[3]

**Sufficiency of the pleading.** The second claim seeks relief under the California Constitution's liberty of speech clause, a provision that "is broader and more protective than the free speech clause of the First Amendment." *Id.* For example, "the California Constitution protects the right to free speech in a [privately owned] shopping mall, even though the federal Constitution does not." *Fashion Valley Mall, LLC v. Nat'l Labor Relations Bd.*, 42 Cal.4th 850, 862 (2007). This doctrine stems from the California Supreme Court's landmark decision in *Robins v. Pruneyard Shopping Center*, 23 Cal. 3d 899 (1979), which the United States Supreme Court upheld in *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980).

Google makes much of the fact that no court has extended *Pruneyard* to the internet. That may be true, although several courts have discussed the possibility. For example, in *hiQ Labs, Inc. v. LinkedIn Corporation*, 273 F. Supp. 3d 1099, 1103

---

[3] This is one of the issues that the Supreme Court will consider in the *NetChoice* cases this term.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1    (N.D. Cal. 2017), a data collection company (hiQ) sued LinkedIn after LinkedIn

2    "attempted to terminate hiQ's ability to access otherwise publicly available

3    information on profiles of LinkedIn users." Among other things, hiQ alleged that

4    LinkedIn's actions violated its rights under the California Constitution. The court

5    expressed "doubts about whether *Pruneyard* may be extended wholesale into the

6    digital realm of the Internet." *Id.* at 1116. But it noted that, in other contexts (notably

7    the anti-SLAPP context), California courts had found an interactive web site to be a

8    public forum for speech. *Id.* The court ultimately declined to issue a preliminary

9    injunction under the California Constitution "[i]n light of the potentially sweeping

10   implications … and the lack of any more direct authority" about the matter. *Id.* at

11   1117.

12        This case may be the one to extend *Pruneyard* to the digital realm. After all, it

13   concerns pure political speech, in the context of a political campaign, in a forum that

14   is freely accessible to the public and which the Supreme Court has called the "modern

15   public square." *Packingham*, 137 S. Ct. at 1737. And while Google may complain

16   about that, the same objections were raised and rejected in *Pruneyard*. Indeed, the

17   U.S. Supreme Court specifically noted that the property owners in *Pruneyard* "can

18   expressly disavow any connection with the message [discussed on their property] by

19   simply posting signs in the area where the speakers or handbillers stand. Such signs,

20   for example, could disclaim any sponsorship of the message and could explain that the

21   persons are communicating their own messages by virtue of state law." 447 U.S. at 87.

22        So here. There is even less of a compelled speech problem here than in

23   *Pruneyard*, as no reasonable person expects Google to endorse the speech that occurs

24   on YouTube. Moreover, the California Constitution does not prohibit all restrictions

25   on speech. "The level of scrutiny … depends upon whether [the restriction] is a

26   content-neutral regulation of the time, place, or manner of speech or restricts speech

27   based upon its content." *Fashion Valley*, 42 Cal. 4th at 865. The latter are flatly

28

PL'S OPPOSITION TO MOTION TO DISMISS                          CASE NO. 5:23-cv-03880-TT

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

prohibited, even when the rules are imposed by private property owners. *Id.* at 865-66.

Finally, Google makes much of the fact that other courts have decided state action cases on the pleadings. But not always. *Rawson* was decided on summary judgment. *Lee* was decided after a bench trial. And in *Mathis v. Pacific Gas & Electric Company*, 891 F.2d 1429, 1433-34 (9th Cir. 1989), the Ninth Circuit rejected the district court's "conclusion that Mathis' allegations of governmental coercion or encouragement are frivolous or wholly without merit." Thus, the Court reversed the trial court's dismissal of the claim. *Id.* at 1434. The same should be done here.

In fact, the evidence Google submitted with its request for judicial notice (although improper) raises more questions than it answers. It suggests that Google decided *not* to censor Kennedy's speech before 2021, despite having policies in place that it could have cited to justify that decision. It suggests that Google only decided to censor Kennedy after being pressured by the Biden Administration (Kennedy's political opponent) to do so and when it could rely entirely on the government to decide which speech constitutes "misinformation."

## V.    **CONCLUSION**

For all those reasons, the Court should deny the motion to dismiss.

DATED:  October 12, 2023          JW HOWARD/ATTORNEYS, LTD.




By:  */s Scott J. Street*
        John W. Howard
        Scott J. Street
        Attorneys for Plaintiff
        ROBERT F. KENNEDY, JR.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

**CERTIFICATE OF SERVICE**

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On October 12, 2023, I caused the **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS** to be filed and served via the Court's Electronic Service upon the parties listed on the Court's service list for this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on October 12, 2023 at San Diego, California.

*/s/ Dayna Dang*
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com

PL'S OPPOSITION TO MOTION TO DISMISS                    CASE NO. 5:23-cv-03880-TT