# EXHIBIT 1

Cite as: 601 U. S. ____ (2023) 1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES
_____

No. 23A243 (23–411)
_____

VIVEK H. MURTHY, SURGEON GENERAL, ET AL. *v.* MISSOURI, ET AL.

ON APPLICATION FOR STAY

[October 20, 2023]

 The application for stay presented to JUSTICE ALITO and by him referred to the Court is granted. The preliminary injunction issued on July 4, 2023, by the United States District Court for the Western District of Louisiana, case No. 3:22–cv–01213, as modified by the United States Court of Appeals for the Fifth Circuit on October 3, 2023, case No. 23–30445, is stayed. The application for stay is also treated as a petition for a writ of certiorari, and the petition is granted on the questions presented in the application. The stay shall terminate upon the sending down of the judgment of this Court.

 JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting from grant of application for stay.

 This case concerns what two lower courts found to be a "coordinated campaign" by high-level federal officials to suppress the expression of disfavored views on important public issues. *Missouri* v. *Biden*, ___ F. 4th ___, ___, 2023 WL 6425697, *27 (CA5, Oct. 3, 2023). To prevent the continuation of this campaign, these officials were enjoined from either "coerc[ing]" social media companies to engage in such censorship or "active[ly] control[ling]" those companies' decisions about the content posted on their platforms. *Id.*, at *7, *15. Today, however, a majority of the Court, without undertaking a full review of the record and without

any explanation, suspends the effect of that injunction until the Court completes its review of this case, an event that may not occur until late in the spring of next year. Government censorship of private speech is antithetical to our democratic form of government, and therefore today's decision is highly disturbing.

This case began when two States, Missouri and Louisiana, and various private parties filed suit alleging that popular social media companies had either blocked their use of the companies' platforms or had downgraded their posts on a host of controversial subjects, including "the COVID–19 lab leak theory, pandemic lockdowns, vaccine side effects, election fraud, and the Hunter Biden laptop story." *Id.*, at \*1. According to the plaintiffs, Federal Government officials "were the ones pulling the strings," that is, these officials "'coerced, threatened, and pressured [the] social-media platforms to censor [them].'" *Ibid.* (alteration in original). Based on extensive findings of fact that spanned 82 pages, the District Court held that the plaintiffs were likely to be able to prove their claims and were threatened with irreparable harm, and it therefore issued a preliminary injunction against a number of Executive Branch agencies and officials. *Missouri* v. *Biden*, ___ F. Supp. 3d ___, 2023 WL 4335270 (WD La., July 4, 2023).

On appeal, the Court of Appeals agreed with the District Court's assessment of the evidence, which, in its words, showed the existence of "a coordinated campaign" of unprecedented "magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life." *Missouri* v. *Biden*, 2023 WL 6425697, \*27. The Court of Appeals found that "the district court was correct in its assessment—'unrelenting pressure' from certain government officials likely 'had the intended result of suppressing millions of protected free speech postings by American citizens.'" *Ibid.*

To stop this "campaign," the injunction, as it now stands,

prohibits the covered officials from doing two things. First, they may not "coerce" social media platforms to make "content-moderation decisions." *Id.*, at *32. Second, they may not "meaningfully contro[l]" social media platforms' "content-moderation" efforts. *Ibid.* Displeased with these restrictions, the Government filed an emergency application asking us to stay the effect of this injunction pending certiorari.

  Under a straightforward application of the test we use in deciding whether to grant a stay, the Government's application should be denied. To obtain a stay pending the disposition of a petition for a writ of certiorari, an applicant must show, among other things, "a likelihood that irreparable harm will result from the denial of a stay." *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*). A stay is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 22 (2008) (discussing the similar standard for an injunction). Thus, the Government in this case must make a "clear showing" of irreparable harm. And to do that, it is not enough to "simply sho[w] some 'possibility of irreparable injury.'" *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). A mere "'possibility' standard is too lenient." *Id.*, at 435 (quoting *Winter*, 555 U. S., at 22). Instead, the Government must prove that irreparable harm is "likel[y]." *Hollingsworth*, 558 U. S., at 190. Here, the Government's attempts to demonstrate irreparable harm do not come close to clearing this high bar.

  Instead of providing any concrete proof that "harm is imminent," *White* v. *Florida*, 458 U. S. 1301, 1302 (1982) (Powell, J., in chambers), the Government offers a series of hypothetical statements that a covered official *might* want to make in the future and that, it thinks, *might* be chilled. Application 36–38. But hypotheticals are just that—speculation that the Government "*may* suffer irreparable harm

at some point in the future," not concrete proof. *White*, 458 U. S., at 1302 (emphasis added). And such speculation does not establish irreparable harm. *Nken*, 556 U. S., at 434; see also *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 414, n. 5 (2013) (rejecting similar speculation as insufficient to establish an Article III standing injury).

Moreover, it does not appear that any of the Government's hypothetical communications would actually be prohibited by the injunction. Nor is any such example provided by the Court's unreasoned order. The Government claims that the injunction might prevent "the President and the senior officials who serve as his proxies" from "speak[ing] to the public on matters of public concern." Application 36; accord, *id.*, at 3 (suggesting that the Fifth Circuit's decision implicates "the use of the Office's bully pulpit to seek to persuade Americans"). The President himself is not subject to the injunction, see *Missouri* v. *Biden*, 2023 WL 6425697, *33, and in any event, the injunction does not prevent any Government official from speaking on any matter or from urging any entity or person to act in accordance with the Government's view of responsible conduct. The injunction applies only when the Government crosses the line and begins to coerce or control others' exercise of their free-speech rights. Does the Government think that the First Amendment allows Executive Branch officials to engage in such conduct? Does it have plans for this to occur between now and the time when this case is decided?

Despite the Government's conspicuous failure to establish a threat of irreparable harm, the majority stays the injunction and thus allows the defendants to persist in committing the type of First Amendment violations that the lower courts identified. The majority takes this action in the face of the lower courts' detailed findings of fact. But "[w]here an intermediate court reviews, and affirms, a trial court's factual findings, this Court will not 'lightly overturn' the concurrent findings of the two lower courts." *Easley* v.

*Cromartie*, 532 U. S. 234 (2001); see also *Glossip* v. *Gross*, 576 U. S. 863, 882 (2015); *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.*, 336 U. S. 271, 275 (1949). And the majority suspends the relief afforded below without a word of explanation.

Applying our settled test for granting a stay, I would deny the Government's application, but I would specify in the order that in the unlikely event that a concrete occurrence presents a risk of irreparable harm, the Government can apply for relief at that time, including, if necessary, by filing an emergency application here. Such an order would fully protect the ability of Executive Branch officials to speak out on matters of public concern.

At this time in the history of our country, what the Court has done, I fear, will be seen by some as giving the Government a green light to use heavy-handed tactics to skew the presentation of views on the medium that increasingly dominates the dissemination of news. That is most unfortunate.